IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


ANDREW H. WARREN,

                Plaintiff,                            Civil Action No.

v.

RON DESANTIS, individually and in his official
capacity as Governor of the State of Florida,

                Defendant.

_____

## MEMORANDUM IN SUPPORT OF MOTION
## FOR PRELIMINARY INJUNCTION

For the reasons set forth in this Memorandum, the Court, pursuant to Rule 65 of the Federal Rules of Civil Procedure, should grant Plaintiff Andrew Warren's motion for a preliminary injunction. Specifically, Warren respectfully asks that the Court order Defendant Governor Ron DeSantis to rescind his unconstitutional, unlawful executive order suspending Warren from his duly elected office as State Attorney for the 13th Judicial Circuit, order DeSantis to reinstate Warren to this office, and enjoin DeSantis from issuing any further order or taking any other action against Warren in retaliation for Warren's constitutionally protected speech or in excess of the powers granted DeSantis under the Florida Constitution.

As set forth below, DeSantis's suspension of Warren violated his right to free speech and exceeded the limited authority that the Florida Constitution grants DeSantis to suspend Warren from office in extraordinary circumstances.

Without immediate relief from this Court, Warren will remain unable to perform the duties of the office to which voters have elected him, twice. Instead, barring judicial intervention, the powers of the constitutional office to which Warren was duly elected will continue to be exercised by a hand-picked ally of DeSantis who has never received a single vote of a single voter to hold a single office.

## Facts

Plaintiff Andrew Warren is a native Floridian, husband, father, and career prosecutor. After growing up in Gainesville, Warren studied law at Columbia Law School and was admitted to the Florida Bar in 2003. For eight years, Warren was a prosecutor for the U.S. Department of Justice where he prosecuted matters including street and violent crimes in Washington, D.C., as well as complex fraud cases across

the country. During his tenure with the Justice Department, Warren earned multiple accolades and awards, including the 2013 Attorney General Award for Trial Litigation. Warren also served as an instructor at the Justice Department's national training center.

In 2016 and again in 2020, Warren was elected State Attorney for Florida's 13th Judicial Circuit. The Florida Constitution provides that the State Attorney is "the prosecuting officer of all trial courts in [his or her] circuit and shall perform other duties prescribed by general law." Fla. Const. art. V, § 17.

Warren was elected and re-elected after making and keeping numerous promises to voters about how he would perform his duties. Among other things, Warren set forth a vision for his office that began with criminal justice reform, including focusing on long-term safety by balancing punishment, prevention, treatment, and rehabilitation. Both as a candidate and as State Attorney, Warren also stressed, spoke out about, and relentlessly pursued the use of smart, innovative strategies to hold low-level offenders accountable while steering them away from the criminal justice system's historical downward spiral toward prison.

The Florida Supreme Court has spoken repeatedly and clearly on the legal and ethical obligations of state attorneys. The State Attorney serves a "unique role" "both as quasi-judicial and quasi-executive." *Valdes v. State*, 728 So. 2d 736, 739 (Fla. 1999). His or her discretion "in deciding whether and how to prosecute" is "absolute." *McGinley v. Fla. Dep't of Highway Safety & Motor Vehicles*, 438 F. App'x 754, 757 (11th Cir. 2011) (per curiam) (quoting *State v. Cain*, 381 So. 2d 1361, 1367 (Fla. 1980), *superseded by statute on other grounds as stated in Banks*

*v. State*, 520 So. 2d 43, 46 (Fla. 1st DCA 1987)). And, among other obligations, as a member of the Bar and a prosecutor, a State Attorney must "reflect a scrupulous adherence to the highest standards of professional conduct," including "the responsibility of a minister of justice and not simply that of an advocate." *The Fla. Bar v. Cox*, 794 So. 2d 1278, 1285, 1286 (Fla. 2001) (citations omitted). The State Attorney is also "required to exercise sound discretion and independent judgment in the performance of the prosecution function." ABA Criminal Justice Standards for the Prosecution Function 3-1.2(a); Fla. Bar R. 4-3.8, cmt. (noting Florida's adoption of the American Bar Association Standards of Criminal Justice Relating to Prosecution Function after "careful deliberation by lawyers experienced in criminal prosecution and defense").

In carrying out his constitutionally and ethically required duties, Warren has maintained numerous policies providing guidance and executive direction to the approximately 130 Assistant State Attorneys ("ASAs") under his command. Among other things, some such policies speak generally to the importance of exercising discretion in every case and every stage of every case. For instance, in a memorandum disseminated to his Assistant State Attorneys in 2021 Warren reiterated that "ASAs must exercise discretion based on the facts of [each individual] case—the nature and circumstances of the offense, the defendant's criminal history (or lack thereof), victim input, and other factors. ASAs must exercise that discretion at every stage . . . ." [Compl. Ex. 2 at 2; Declaration of Andrew Warren ¶ 5]

Other policies are more specific, providing principles to guide prosecutorial discretion in particular types of cases. Two such policies (the "Presumptive Non-

- 3 -

Prosecution Policies") guide the discretion of ASAs by establishing a "presumption of non-prosecution" "for certain criminal violations including trespassing at a business location" and "disorderly conduct" and in cases "where the initial encounter between law enforcement and the defendant results from a non-criminal violation in connection with riding a bicycle or a pedestrian violation." [*See* State of Florida, Office of the Governor, *Executive Order Number 22-176 (Executive Order of Suspension)* (Aug. 4, 2022), attached to Declaration of David Singer ("Singer Decl.") as Ex. 1 (the "Order" or "EO")]

The Presumptive Non-Prosecution Policies speak for themselves and are not absolute. By their terms, both policies state presumptions, only. But in all cases covered by these policies (indeed in all cases within the State Attorney's Office), ASAs are bound by ethics and by policy to apply their judgment and discretion to the individual case before them. [*See* Compl. Exs. 3 & 4; Declaration of Andrew Warren ("Warren Decl.") ¶¶ 6–7]

Warren believes strongly that his innovative ideas and opinions are critical to fulfilling his constitutional and ethical duties. Warren also believes that part of his job is to state his positions and opinions on matters of public importance impacting the criminal justice system. And he has done that repeatedly.

In June 2021, for example, Warren co-signed a Joint Statement with other elected prosecutors that, in part, called "on policymakers to . . . leave healthcare decisions to patients, families, and medical providers." In the Joint Statement, the signatories went on to "pledge to use [their] discretion and not promote the

criminalization of gender-affirming healthcare or transgender people." [EO Ex. A ("Gender Statement")]

More recently, in the wake of the U.S. Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), Warren co-signed a similar Joint Statement stating the signatories' opinion that, among other things, "[c]riminalizing and prosecuting individuals who . . . provide abortion care makes a mockery of justice; prosecutors should not be part of that." [EO Ex. B ("Abortion Statement")] This Joint Statement also stated that signatories would "exercise [their] well-settled discretion and refrain from prosecuting those who seek, provide or support abortions." And it stated that "legislatures may decide to criminalize personal healthcare decisions, but we remain obligated to prosecute only those cases that serve the interests of justice and the people." [*Id.*]

At no time while in office, though, has Warren had any policy, written or otherwise, of his office that applied specifically to cases involving abortion or transgender rights. [Warren Decl. ¶¶ 17–18]

Warren's opinions and strategies have drawn the ire of, and stand in marked contrast to, the beliefs and opinions of DeSantis. For example, on the rights of transgender Floridians and specifically the right to access gender-affirming care, DeSantis has made numerous statements and characterizations in support of his goal to criminalize such care. On August 3, 2022, for instance DeSantis falsely characterized such care as "giving very young girls double mastectomies" and as "castrat[ing] these young boys." [*See* Singer Decl. Ex. 2, at 00:43-01:12] On August 4, 2022, in a press event at which he announced he was suspending Warren from

office, DeSantis falsely said that gender-affirming care includes "literally chopping off the private parts of young kids." [*See id.* Ex. 3, at 44:49-45:05]

As to abortion, for example, Warren characterized the Supreme Court's decision in *Dobbs* as disappointing, scary, and "open[ing] the door to boundless attacks on our freedoms." [*See id.* Ex. 4] For his part, DeSantis praised *Dobbs* as having "answered the prayers of millions upon millions of Americans." [*See id.* Ex. 5]

And on the subject of criminal justice reform, DeSantis has said that "Florida is a law and order state[,]" and he has insisted that criminal justice reform policies espoused by Warren amount to being "soft[]on[]crime." [*See id.* Ex. 6]

Of course, Warren and DeSantis are not only free, but also encouraged, to air their policy disagreements publicly. As the Supreme Court has said, elected officials "have an obligation to take positions on controversial political questions so that their constituents can be fully informed by them, and be better able to assess their qualifications for office." *Bond v. Floyd*, 385 U.S. 116, 136–37 (1966). But neither can use the powers of his office to retaliate against the other for holding opposing views to his own.

In setting forth the Governor's powers, the Florida Constitution provides, in part, that "[b]y executive order stating the grounds and filed with the custodian of state records, the governor may suspend from office any state officer not subject to impeachment . . . for malfeasance, misfeasance, neglect of duty, drunkenness, incompetence, permanent inability to perform official duties, or commission of a felony, and may fill the office by appointment for the period of suspension." Fla.

Const. art. IV, § 7(a). The Florida Constitution further provides that "[t]he suspended officer may at any time before removal be reinstated by the governor." *Id.*

On August 4, 2022, at a media event at which he appeared surrounded by cheering supporters including armed, uniformed law enforcement officers, DeSantis suspended Warren from office. [*See* Singer Decl. Ex. 3, at 04:15-04:40] Warren has not been removed from office. *See* Fla. Const. art. IV, § 7(b).

The evening before DeSantis announced Warren's suspension, DeSantis's official spokesperson touted that a "MAJOR announcement" was coming and bragged that it would cause the "liberal media" to "meltdown." [Singer Decl. Ex. 7]

Standing in the Hillsborough County Sheriff's Office to announce Warren's suspension, DeSantis made clear that he was suspending Warren because of the statements made in the 2021 Letter and in the letter signed by Warren "after *Dobbs*." [*See id.* Ex. 3, at 44:30] In the same media event at which he announced Warren's suspension, DeSantis appointed Susan Lopez to be the new State Attorney for the 13th Judicial District. Ms. Lopez has already begun making sweeping changes to the office for which she has never received a single vote. She "plans to roll back" the policies enacted by Warren and opposed by DeSantis. [*See id.* Ex. 8] And she has posted a self-promotional video on that website in which, among other things, she claims "the previous state attorney lost the confidence of law enforcement" and in which she says "thank you to the Governor" for her job. [*Id.* Ex. 9, at 1:46, 1:54]

## Argument

Plaintiff is entitled to a preliminary injunction because: (1) he is substantially "likely to succeed on the merits," (2) he is "likely to suffer irreparable harm in the

absence of preliminary relief," (3) "the balance of equities tips in" his "favor," and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Swain v. Junior*, 961 F.3d 1276, 1284–85 (11th Cir. 2020) (noting that to obtain preliminary injunctive relief a party must establish "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest") (citation omitted).

**A. Warren is likely to succeed on the merits.**

> **1. Warren is likely to succeed on his First Amendment claim.**

*First*, Warren will succeed on the merits of his First Amendment retaliation claim because Warren was suspended from the office that he was duly elected to hold for exercising his constitutional right to speak.

Under the First Amendment, "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. "The central commitment of the First Amendment . . . is that 'debate on public issues should be uninhibited, robust, and wide-open.'" *Bond*, 385 U.S. at 136 (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). "[I]t has been universally recognized that one of the primary purposes of the First Amendment is to 'protect the free discussion of governmental affairs' because the maintenance of a responsible democratic government depends upon it." *Cooper v. Dillon*, 403 F.3d 1208, 1214 (11th Cir. 2005) (quoting *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 838 (1978)). To that end, the First

Amendment generally "prohibits government officials from subjecting individuals to 'retaliatory actions' after the fact for having engaged in protected speech." *Houston Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1259, 212 L. Ed. 2d 303 (2022) (quoting *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722, 204 L. Ed. 2d 1 (2019)).

To state a claim for retaliation in violation of the First Amendment, "a plaintiff must establish first, that his speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech." *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005). Here, Warren will establish all three elements.

### a.   Warren engaged in protected speech.

Warren will prevail in establishing the first element because, as an elected official with the right and obligation to engage in public debate, he spoke out on issues at the core of First Amendment protection. "The manifest function of the First Amendment in a representative government requires that [elected officials] be given the widest latitude to express their views on issues of policy." *Bond*, 385 U.S. at 135–36; *see also Wood v. Georgia*, 370 U.S. 375, 394–95 (1962) ("The petitioner was an elected official and had the right to enter the field of political controversy . . . ."). Accordingly, "[t]he First Amendment surely promises an elected representative like Mr. [Warren] the right to speak freely on questions of government policy." *Houston Cmty. Coll.*, 142 S. Ct. at 1261, 212 L. Ed. 2d 303.

Indeed, "[t]he role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of

current public importance." *Republican Party of Minn. v. White*, 536 U.S. 765, 781–
82 (2002) (quoting *Wood*, 370 U.S. at 395). To that end, elected officials "have an
obligation to take positions on controversial political questions so that their
constitu[]ents can be fully informed by them, and be better able to assess their
qualifications for office; also so they may be represented in governmental debates
by the person they have elected to represent them." *Bond*, 385 U.S. at 136–37. Given
these bedrock principles, "[t]he first prong" of a First Amendment retaliation claim
"is readily met when elected officials express their views and opinions." *Boquist v.
Courtney*, 32 F.4th 764, 775 (9th Cir. 2022).

Warren, an elected official who spoke on controversial public policy issues,
readily satisfies this element. Specifically, in June 2021, Warren signed a "Joint
Statement from Elected Prosecutors and Law Enforcement Leaders Condemning the
Criminalization of Transgender People and Gender-Affirming Healthcare," which
was published by an organization known as Fair and Just Prosecution ("FJP") (the
Gender Statement). And in June 2022, Warren signed a "Joint Statement from
Elected Prosecutors" also published by FJP (the Abortion Statement).[1] Both Joint
Statements express views and opinions on issues that are currently the subject of
extensive public debate: the criminalization of transgender people and gender-
affirming healthcare and the criminalization of certain abortions.

For example, in the Abortion Statement, Warren expressed his views that
"[a]bortion bans will . . . disproportionately harm victims of sexual abuse, rape,

---

[1] As noted above, copies of these Joint Statements are attached to DeSantis's Order
as "Exhibit A" and "Exhibit B," respectively.

incest, human trafficking, and domestic violence" and that "[e]nforcing abortion bans runs counter to the obligations and interests we are sworn to uphold [as prosecutors]" and "makes a mockery of justice." In the Gender Statement, Warren expressed his opinions, among others, that "[b]ills that criminalize safe and crucial medical treatments or the mere public existence of trans people do not promote public safety, community trust, or fiscal responsibility" and that he "do[es] not support the use of scarce criminal justice and law enforcement resources on criminalization of doctors who offer medically necessary, safe gender-affirming care to trans youth, parents who safeguard their child's health and wellbeing by seeking out such treatments, or any individuals who use facilities aligned with their gender identity."

These Joint Statements, on their face, express Warren's views and opinions on matters of public concern. Such matters are "at the core of activity protected by the First Amendment." *Beckwith v. City of Daytona Beach Shores, Fla.*, 58 F.3d 1554, 1564 (11th Cir. 1995) (holding that fire chief had a "strong interest in informing the public about policies he believed were dangerous to the City's citizens"). Warren was elected by his constituents precisely to engage in this kind of public policy debate. Warren's statements are protected speech under the First Amendment. *See Bond*, 385 U.S. at 136–37.

### b.    DeSantis's conduct adversely affected Warren's speech.

As a result of speaking out on the issues his constituents elected him to pursue, Warren has suffered the ultimate adverse action. DeSantis suspended Warren from his elected office and has deprived Warren of the ability to perform his duties, his

income, and all benefits associated with the job. "A plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Bennett*, 423 F.3d at 1254.

In cases involving elected officials, the Supreme Court has explained that an official may be "materially deterred" from exercising his right to speak if he is subjected to action that "prevent[s] [him] from doing his job" or "den[ies] him any privilege of office," *Houston Cmty. Coll*, 142 S. Ct. at 1261, 212 L. Ed. 2d 303, including if the official is disqualified from assuming his office, *Bond*, 385 U.S. at 137. *See also, e.g.*, *Cook v. Gwinnett Cnty. Sch. Dist.*, 414 F.3d 1313, 1318 (11th Cir. 2005) (finding a sufficient adverse action for First Amendment retaliation claim where the plaintiff was "transfer[red]" to a new position where her hourly pay rate remained the same but she was no longer guaranteed 40 hours of work each week and she "lost the additional prestige and office responsibilities that came with" her old title).

DeSantis's conduct here was more than sufficient. DeSantis "suspended" Warren from the office that he was elected to hold, indefinitely, without pay. [*See* EO at 9 ("Andrew Warren is hereby prohibited from performing any official act, duty, or function of public office; from receiving any pay or allowance; from being entitled to any of the emoluments or privileges of public office during the period of this suspension, which period shall be from the effective date hereof, until a further executive order is issued, or as otherwise provided by law.")]

Warren has thus been "denied" *every* "privilege of office." *Houston Cmty. Coll.*, 142 S. Ct. at 1261, 212 L. Ed. 2d 303. In fact, DeSantis has appointed someone else to hold Warren's office and "do[] his job" entirely. *Id.*; *see* EO at 9–10 ("The Honorable Susan Lopez . . . is hereby appointed forthwith, effective August 4, 2022, to fill the position of State Attorney for the 13th Judicial Circuit of Florida . . . for the duration of the suspension.").

DeSantis's conduct—which has deprived Warren of his job, his income, and the prestigious title he was elected to hold—"would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Bennett*, 423 F.3d at 1254.

### c. Warren's protected speech was the motivating factor for DeSantis's conduct.

Warren will prevail in showing retaliatory motive because DeSantis admitted, even boasted, that he was suspending Warren *because of* the Joint Statements. "The causal connection inquiry asks whether the defendants were subjectively motivated to discipline because" of the plaintiff's protected speech. *Smith v. Mosley*, 532 F.3d 1270, 1278 (11th Cir. 2008). A plaintiff's burden in this regard "is not a heavy one." *Beckwith*, 58 F.3d at 1564.

In this case, there is "direct evidence of discriminatory motive," which is alone sufficient. *Id.* at 1565. Specifically, DeSantis's executive order openly admits that he is suspending Warren *because* Warren "signed" the Joint Statements. [*See* EO at 3, 6] Indeed, DeSantis even attaches copies of the Joint Statements to his order and quotes specific opinions and views expressed in the Joint Statements with which DeSantis disagrees. [*See id.*] For example, DeSantis criticizes the fact that Warren

expressed "support" for "gender-transition treatments for children and bathroom usage based on gender identity" and disagreement with the wisdom, lawfulness, and justice of abortion bans. [*Id.*] DeSantis even stresses that Warren is "the only state attorney in Florida" willing to openly disagree with DeSantis by expressing the viewpoints in the Abortion Statement. [*Id.* at 6]

DeSantis may argue, as his Order does, that Warren's statements on these topics somehow "demonstrate[] [Warren's] incompetence and willful defiance of his duties as a state attorney." [*Id.* at 3] But this mere pretext is belied by the Order and the Joint Statements themselves, which are facially insufficient to justify the suspension. DeSantis admits that "the Florida Legislature has not enacted" any "criminal law[]" regarding the topics discussed in the Gender Statement that could bear relation to Warren's "duties as a state attorney." [*Id.*] And neither Joint Statement refers to *any* Florida law, let alone any case presented to or pending before Warren or his office. Instead, the Joint Statements are general statements of opinions and viewpoints on broad topics of national public debate signed by dozens of elected officials from across the nation. Nothing in these statements could be reasonably read as relating to Warren's "incompetence" or "neglect" of duty. Stated differently, and as explained in more detail below with respect to Warren's second claim, the Order is facially insufficient to justify a suspension under Florida law.

DeSantis's unannounced, harsh actions in direct response to Warren's statements—without any record of actual misconduct to justify removing Warren from the office he was elected to hold and without sufficient grounds under state law—strongly "suggests a desire to punish [Warren] for protected speech" and "an

- 14 -

inference that [DeSantis] harbored retaliatory animus towards [Warren]." *Beckwith*, 58 F.3d at 1565.

That his suspension is in retaliation for espousing views contrary to those held by DeSantis is further clear when considering that other Florida elected law enforcement officials—officials whose views DeSantis agrees with—have spoken out about exercising their discretion and suffered no adverse action. To name one prominent example, Seminole County Sheriff Dennis Lemma made headlines in 2020 by declaring that even if there were a law requiring owners of assault rifles to register their weapons, "[i]t's not only that I wouldn't [enforce that law], the majority of sheriffs across the state would not do it." Lemma further said, "It's up to the sheriffs what they are willing to enforce[.]" [Singer Decl. Ex. 11; *see also id.* Ex. 12] Lemma endorsed DeSantis in his gubernatorial campaign. And Lemma suffered no adverse consequences for his very public declaration that he wouldn't enforce the law, even if passed.[2]

In sum, "[u]nder our system of government," elected officials like DeSantis and Warren have every right to disagree with each other's opinions, but "the weapons available to" DeSantis in responding to Warren's opinions were "counterargument and education," "not abridgment of [Warren's] rights of free

---

[2] Ironically, Hillsborough County Sheriff Chad Chronister, who hosted the media event announcing Warren's suspension, provides another example. In 2020, exercising discretion he claimed by virtue of his office, Sheriff Chronister announced that he was "suspending the execution of eviction notices through April 20 due to widespread effects of the coronavirus pandemic." [Singer Decl. Ex. 13]

speech and assembly." *Wood*, 370 U.S. at 389. Warren is likely to prevail on each element of his First Amendment retaliation claim.

**2.      Warren is likely to succeed on his quo warranto claim.**

Warren is similarly likely to succeed on his quo warranto claim under Florida State law.

**a.      Quo warranto is proper to confirm that the Governor unlawfully exercised his powers in suspending Warren.**

Under Florida state law, the claim of "[q]uo warranto is used 'to determine whether a state officer or agency has improperly *exercised* a power or right derived from the State.'" *Israel v. Desantis*, 269 So. 3d 491, 494 (Fla. 2019) (quoting *League of Women Voters of Fla. v. Scott*, 232 So. 3d 264, 265 (Fla. 2017)).

The Governor has unlawfully suspended Warren in violation of the Florida Constitution. Article IV, section 7(a) of the Florida Constitution provides that the Governor "may suspend from office any state officer not subject to impeachment . . . for malfeasance, misfeasance, neglect of duty, drunkenness, incompetence, permanent inability to perform official duties, or commission of a felony, and may fill the office by appointment for the period of suspension." The Governor also has the power to reinstate a suspended officer "at any time before removal." Fla. Const. art. IV, § 7(a).

      **b.**      **The Governor can suspend a State Attorney only under the limited circumstances enumerated in Article IV, section 7(a) of the Constitution.**

Again, the Governor's Order claims that three separate policy statements by Warren are evidence of both "incompetence" and "neglect of duty." These words have meaning long ago confirmed by the Florida Supreme Court.

As the Supreme Court has explained, "incompetency" refers "to any physical, moral, or intellectual quality, the lack of which incapacitates one to perform the duties of his office.'" *Israel*, 269 So. 3d at 496 (quoting *State ex rel. Hardie v. Coleman*, 155 So. 129, 133 (Fla. 1934)). This is consistent with the plain text definition of the term. *See Incompetent*, Oxford English Dictionary (3d ed. 2016), https://www.oed.com ("Of inadequate ability or fitness; not having the requisite capacity or qualification; incapable."). And though "incompetency" "may arise from gross ignorance of official duties or gross carelessness in the discharge of them . . . [or] from lack of judgment and discretion," that gross ignorance or carelessness must be the product of the public officer's "physical, moral, or intellectual quality" that "incapacitates [the officer] to perform the duties of his office." *Israel*, 269 So. 3d at 496 (quoting *Hardie*, 155 So. at 133) (alterations in original).

The Court has defined neglect of duty as having "reference to the neglect or failure on the part of a public officer to do and perform some duty or duties laid on

him as such by virtue of his office or which is required of him by law." *Id.* (quoting *Hardie*, 155 So. at 132).[3]

### c. It is the job of the courts to determine whether the Governor has invoked his power lawfully.

Courts have a critical role in reviewing the Governor's exercise of the suspension power. The Florida Constitution requires the Governor's Executive Order to "stat[e] the grounds" of the officer's suspension. Fla. Const. Art. IV, § 7(a). As a result, suspended officers "may seek judicial review . . . to ensure that the order satisfies that constitutional requirement . . . ." *Israel*, 269 So. 3d at 495. Indeed, "it is the exclusive province of the judiciary to interpret terms in a constitution and to define those terms." *In re Senate Joint Resol. of Legislative Apportionment 1176*, 83 So. 3d 597, 631 (Fla. 2012); *see also Dade Cnty. Classroom Teachers Ass'n, Inc. v. Legislature*, 269 So. 2d 684, 686 (Fla. 1972) ("We are under a constitution, but the constitution is what the judges say it[] is, and the judiciary is the safeguard of our liberty and our property under the constitution." (citation omitted)).

In doing so, the judiciary's role is to "determin[e] whether the executive order, on its face, sets forth allegations of fact relating to one of the constitutionally

---

[3] Florida's constitutional provision concerning the suspension power was amended after *Hardie* but retained the same grounds for suspension, including "incompetency" and "neglect of duty." *Compare* Fla. Const. art. IV, § 15 (1934), *with* Fla. Const. art. IV, § 7. Those words therefore carried forward their prior meanings, including as interpreted in *Hardie*. *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 322 (2012) ("If a word or phrase has been authoritatively interpreted by the highest court in a jurisdiction, . . . a later version of that act perpetuating the wording is presumed to carry forward that interpretation.").

enumerated grounds of suspension." *Israel*, 269 So. 3d at 495; *see also Hardie*, 155 So. at 133 (because suspensions "affect[] the lawful rights of individuals, the jurisdictional facts, in other words, the matters and things on which the executive grounds his cause of removal, may be inquired into by the court"). Put differently, it is the job of the courts, if asked, to say whether the facial allegations in an Executive Order fall within the Florida Supreme Court's definitions of the enumerated categories of offenses for which the constitution permits suspension. If they are not, or the Executive Order is otherwise "arbitrary," *Hardie*, 155 So. at 133, the order is insufficient to withstand judicial review. Where, on the other hand "on the whole, [the executive order] contains allegations that bear some reasonable relation to the charge made against the officer, it will be adjudged as sufficient." *Israel*, 269 So. 3d at 496 (quoting *Hardie*, 155 So. at 133) (alterations in original).

### d.   The Governor has not invoked his power lawfully.

In this case, none of the Executive Order's allegations relate to, or fall within, the well-defined boundaries of "incompetence" or "neglect of duty." It would give the Governor limitless, dictatorial power to allow him—as he has done here—to suspend a State Attorney simply for opining on public issues and for performing his duty to exercise prosecutorial discretion when prioritizing the charging of certain criminal cases. The Governor's Order is facially insufficient under the Florida Constitution.

### (i)   The Gender Statement.

To support Warren's suspension, the Executive Order cites his signature of the Gender Statement, which again criticizes the *proposed* criminalization of

transgender people and gender-affirming healthcare. In doing so, the Executive Order does not allege conduct that would constitute "incompetence" or "neglect of duty" as defined by the Florida Supreme Court.

The Order first alleges that Warren "demonstrated his incompetence and willful defiance of his duties as a state attorney . . . when he signed a 'Joint Statement' with other elected prosecutors *in support of* gender-transition treatments for children and bathroom usage based on gender identify." [EO at 3 (emphasis added)] Among other things, and as alleged in the Order, the Gender Statement asserted that the numerous signatories pledged to use their "discretion and not promote the criminalization of gender-affirming healthcare or transgender people." [*Id.*] Further, the signatories pledged to use their "settled discretion and limited resources on enforcement of laws that will not erode the safety and well-being" of communities and that the signatories do not support "the use of scarce criminal justice and law enforcement resources on criminalization of doctors." [*Id.*] In the end, the Gender Statement affirmed that the signatories were "committed to ending this deeply disturbing and destructive criminalization of gender-affirming healthcare and transgender people." [*Id.*] In short, DeSantis has suspended Warren because he supports certain policies and opposes criminalizing certain conduct.

As alleged in the Order, the Joint Statement nowhere asserted that Warren categorically planned not to enforce *any* specific law. And, indeed, the Order concedes that the "Florida Legislature has not enacted such criminal laws." [*Id.*] Nonetheless, according to DeSantis, these statements evidence Warren's incompetence and neglect of duty because they "prove that [Mr.] Warren thinks he

has authority to defy the Florida Legislature and nullify . . . criminal laws with which he disagrees." [*Id.*] Wrong.

These allegations are facially insufficient to show "incompetence," or "any physical, moral, or intellectual quality" that Warren is lacking that incapacitates him from performing the duties of his office. *Israel*, 269 So. 3d at 496 (quoting *Hardie*, 155 So. at 133). Nor are there any allegations of "gross ignorance" that could give rise to, or provide evidence of, this incapacitation. *Id.* Indeed, there are no allegations that Warren lacks "knowledge or awareness" generally about his job duties "or about a particular thing." *Ignorance*, Oxford English Dictionary, *supra*. And because Florida has not even enacted any such criminal law, Warren cannot have neglected any duty that might stem from it as "the prosecuting officer of all trial courts in [Hillsborough County]." Fla. Const., art. V, § 17.

At most, under the most generous reading of the allegations (at 3), Warren has pledged to use "discretion and not promote the criminalization of gender-affirming healthcare or transgender people." Instead of showing extreme ignorance of his job duties—and, in fact, evidencing awareness of his precise powers as a prosecutor— this statement recognizes that it is his duty to "serve justice," *Frazier v. State*, 294 So. 2d 691, 692 (Fla. Dist. Ct. App. 1974), and to "exercise. . . prosecutorial discretion" over criminal cases, *Ayala v. Scott*, 224 So. 3d 755, 759 (Fla. 2017).

The statements in the Order also do not relate to "neglect of duty," or the failure "to do and perform some duty or duties laid on him as such by virtue of his office or which is required of him by law." *Israel*, 269 So. 3d at 496 (quoting *Hardie*, 155 So. at 133). Again, no clause in the Executive Order alleges that Warren has

refused to enforce any specific law. Indeed, the Executive Order concedes (at 3) that no specific Florida laws exist as to the subjects in the joint statement. Absent any such law, Warren cannot have neglected any duty as the "prosecuting officer of all trial courts" in Hillsborough County. Fla. Const. art. V, § 17.[4]

### (ii)    Presumption of non-prosecution for certain crimes.

Next, in relying on Warren's Presumptive Non-Prosecution Policies, the Executive Order does not allege conduct that would constitute "incompetence" or "neglect of duty."

Without explanation, the Executive Order (at 4) says the Presumptive Non-Prosecution Policies are "not a proper exercise of prosecutorial discretion because they do not require 'case-specific' and 'individualized' determinations as to whether the facts warrant prosecution" and "instead are based on categorical exclusions of otherwise criminal conduct that is tantamount to rewriting Florida criminal law."

DeSantis's allegations about the Presumptive Non-Prosecution Policies, however, are facially insufficient, as a matter of law, to establish incompetence or neglect of duty. As the Executive Order concedes, "state attorneys have complete discretion in making the decision to prosecute a particular defendant." [EO at 2 (citing *Cleveland v. State*, 417 So. 2d 653, 654 (Fla. 1982))] "[P]rosecutorial discretion requires a state attorney to make 'case-specific' and 'individualized'

---

[4] The Executive Order also says this conduct "prove[s] that [Mr.] Warren thinks he has authority to defy the Legislature and nullify . . . criminal laws with which he disagrees. But, again, "the Florida Legislature has not enacted such criminal laws," as the Executive Order concedes (at 3). Mr. Warren therefore cannot "defy" or "nullify" a law that does not exist.

determinations as to whether the facts warrant prosecution," as the Executive Order further concedes. [*Id.* (quoting *Ayala*, 224 So. 3d at 758–59)] And "exercising discretion demands an individualized determination 'exercised according to the exigency of the case, upon a consideration of the attending circumstances.'" *Ayala*, 224 So. 3d at 759 (quoting *Barber v. State*, 5 Fla. 199, 206 (Fla. 1853) (Thompson, J., concurring)).

Warren's policies do precisely that. As State Attorney, Warren rightfully exercised his prosecutorial discretion in setting guidelines for his office when charging cases. Both policies are "presumptive" only, as DeSantis *admits*.[5] [EO at 2] One policy, in fact, enumerates specific exemptions that would trigger prosecution. Those policies require prosecutors to consider each case individually and on a case-by-case basis. And by making these "case-specific determinations," Warren's policies "reflect an exercise of prosecutorial discretion." *Ayala*, 224 So. 3d at 759 (citation omitted). Warren has in no way failed "to do and perform some duty or duties laid on him as such by virtue of his office or which is required of him

---

[5] Though simultaneously conceding that these policies are "presumptive" only, the Executive Order alleges that these policies "do not require 'case-specific' and 'individualized' determinations as to whether the facts warrant prosecution." But a "presumption" is only that and requires further case-specific consideration. *See* Presumption, Black's Law Dictionary (11th ed. 2019) ("A legal inference or assumption that a fact exists because of the known or proven existence of some other fact or group of facts . . . A presumption shifts the burden of production or persuasion to the opposing party, who can then attempt to overcome the presumption."). Otherwise it would be a requirement and not a presumption. Again, the Executive Order acknowledges that, for one policy, there is an exception "where there is a direct threat to public safety." That exception naturally would require an individualized, case-specific determination.

by law." *Israel*, 269 So. 3d at 496 (quoting *Hardie*, 155 So. at 132). Rather, he has performed the precise duties laid on him as the prosecutor for Hillsborough County.

The Florida Supreme Court's opinion in *Ayala* confirms that Warren did not neglect the duties of his office. In *Ayala*, then-Governor Rick Scott reassigned death penalty-eligible cases from a State Attorney who adopted "a blanket 'policy' of not seeking the death penalty in any eligible case," "even where an individual case 'absolutely deserve[s] [the] death penalty.'" 224 So. 3d at 756–57 (alterations in original). The Court upheld the Governor's actions "because by effectively banning the death penalty in the [county]—as opposed to making case-specific determinations as to whether the facts of each death-penalty eligible case justify seeking the death penalty—Ayala" adopted a policy that "is 'in effect refusing to exercise discretion' and tantamount to a 'functional[] veto' of state law authorizing prosecutors to pursue the death penalty in appropriate cases." *Ayala*, 224 So. 3d at 758 (alterations in original) (citation omitted).

The policy in *Ayala* is opposite of the policy here. In setting guidelines for charging decisions, Warren required case-specific determinations. That is the heart of prosecutorial discretion. *See Ayala*, 224 So. 3d at 758–59. Warren is doing exactly what the constitution requires. As a matter of law, the statements in the Executive Order therefore do not relate to "neglect of duty." *Israel*, 269 So. 3d at 496 (quoting *Hardie*, 155 So. at 132).

Moreover, none of these allegations relate to "incompetence," or "any physical, moral, or intellectual quality" that Warren lacks and that "incapacitates" him from performing the duties of his office. *Id.* (quoting *Hardie*, 155 So. at 133).

Further, because "state attorneys have complete discretion in making decisions to prosecute a particular defendant" [EO at 2], the Presumptive Non-Prosecution Policies cannot relate to any "gross ignorance" that could give rise to, or provide evidence of, this incapacitation, *Israel*, 269 So. 3d at 496 (quoting *Hardie*, 155 So. at 133).

### (iii)   The Abortion Statement.

Finally, the Executive Order alleges that Warren (along with many other prosecutors across the country) signed the Abortion Statement, condemning the criminalization of abortion and promising to use prosecutorial discretion when reviewing charges concerning abortion. This signature also does not fall within the well-defined contours of "incompetence" or "neglect of duty."

Specifically, the Executive Order (at 5) alleges that Warren made "a public declaration that he would not enforce criminal laws enacted by the Florida Legislature that prohibit providers from performing certain abortions to protect the lives of unborn children."[6] The Executive Order, however, then quotes from the Abortion Statement. None of the statements cited, or contained in the Abortion Statement, however, contain a categorical statement that Warren would not prosecute any law, let alone any Florida law.

Instead, the Abortion Statement, as quoted in the Executive Order, contains broad value statements, like "[e]nforcing abortion bans runs counter to the

---

[6] Among other things, the Executive Order cites (at 5) Florida's criminal ban on certain late-term abortions and Florida's recently enacted law "which prohibits a physician from performing an abortion after a fetus reaches the gestational age of 15 weeks, with certain exceptions."

obligations and interest we are sworn to uphold." At its most forceful, the Abortion Statement contains the assertion that the signatory prosecutors would "decline to use [their] offices' resources to criminalize reproductive health decisions" and would "commit to exercise [their] well-settled discretion and refrain from prosecuting" certain (but not all) people "who seek, provide, or support abortions."[7] [EO Ex. B] The Joint Statement concludes, however, by affirming that the undersigned prosecutors would exercise their discretion given their judgment. As the Executive Order recites (at 6), the signatory prosecutors affirm: "Our legislatures may decide to criminalize personal healthcare decisions, but we remain obligated to prosecute only those cases that serve the interests of justice and the people."

Perhaps recognizing that that this Joint Statement amounts to little more than a value statement, the Executive Order (at 7 (emphasis added)) draws the ultimate conclusion that "*there is no reason to believe* that Warren will faithfully enforce the abortion laws of this State and properly exercise his prosecutorial discretion on a 'case-specific' and 'individualized' basis." It does not allege, because it cannot, that Warren himself asserted any intention to abdicate his duty of case-by-case discretion. Again, "State attorneys have complete discretion in making the decision to prosecute a particular defendant," as the Order concedes. [EO at 2 (citing *Cleveland*, 417 So. 2d at 654)]

---

[7] Even with this assertion, the Joint Statement caveats it with express belief that certain individuals should be prosecuted under abortion-related statutes. [EO Ex. B at n.2]

In the end, the Order's allegations concerning the Abortion Statement cannot relate to "incompetence," or "any physical, moral, or intellectual quality" that Warren is lacking that "incapacitates" him from performing the duties of his office. *Israel*, 269 So. 3d at 496 (quoting *Hardie*, 155 So. at 133). Again, because "state attorneys have complete discretion in making decisions to prosecute a particular defendant" [EO at 2], Warren's value statements condemning the criminalization of abortion cannot evidence any "gross ignorance" that could give rise to, or provide evidence of, this incapacitation, *Israel*, 269 So. 3d at 496 (quoting *Hardie*, 155 So. at 133). The Abortion Statements also not relate to "neglect of duty." *Israel*, 269 So. 3d at 496 (quoting *Hardie*, 155 So. at 132). In exercising his discretion in considering what cases to prosecute, Warren is doing what is constitutionally required.

DeSantis has suspended Warren simply for opining on public issues and for exercising prosecutorial discretion—as the constitutional requires—by setting guidelines for charging decisions. The Florida Constitution prohibits DeSantis's actions and thus Warren is likely to succeed on the merits of his quo warranto claim.

## B.    Warren will suffer irreparable injury absent an injunction.

Absent an injunction from this Court, Warren will continue to remain ousted from his elected office, with the chilling prospect of punishment for speaking out hanging over his head. As set forth above, not only did his removal violate state law, but also it has deprived—and continues to deprive—him of his right to freedom of speech under the First and Fourteenth Amendments to the U.S. Constitution. Irreparable injury is one that "cannot be undone through monetary remedies." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896

F.2d 1283, 1285 (11th Cir. 1990); *see ABC Charters, Inc. v. Bronson*, 591 F. Supp. 2d 1272, 1309 (S.D. Fla. 2008) ("Irreparable harm means any serious injury that cannot be quantified, i.e., the party suffering the injury cannot be made whole by the payment of monetary damages alone.").

First, DeSantis's suspension of Warren in violation of his First Amendment rights alone constitutes irreparable injury. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983), *certified question answered*, 450 So. 2d 224 (Fla. 1984) ("It is well settled that the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction.") (quoting *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B 1981))). Further, "direct penalization" for having exercised First Amendment freedoms, as occurred here, "constitutes irreparable injury." *Cate*, 707 F.2d at 1188; *see also Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000) (en banc) (citing with approval holding that "direct penalization" of speech is an irreparable injury).

Second, Warren will also suffer irreparable harm because of his unlawful and continued removal from office. "[R]emoval from office is not the type of injury which can be compensated monetarily." *Caudell v. City of Toccoa*, 153 F. Supp. 2d 1371, 1381 (N.D. Ga. 2001) (quoting *Hunt v. City of Longview*, 932 F. Supp. 828, 842 (E.D. Tex. 1995), *aff'd*, 95 F.3d 49 (5th Cir. 1996)). This is particularly true where, as here, the individual who has been appointed to replace Warren during his unlawful and indefinite suspension has already begun reversing policies that Warren

- 28 -

instituted and discretionary decisions that Warren made—as voters elected him to do. [*See*, *e.g.*, Singer Decl. Exs. 8 & 10] These policy reversals—which include, for example, the reversal of Warren's decision not to seek the death penalty in a case pending before his office [*id.* Ex. 10] and the termination of Warren's Chief Communications Officer [*id.* Ex. 14]—cannot be undone by monetary remedies.

## C.   The public interest will be vindicated, not disserved, by an injunction and the balance of equities tips in Warren's favor.

Finally, a court may grant a preliminary injunction only where, as here, the "injunction would not be adverse to the public interest." *Siegel*, 234 F.3d at 1176. As this court has previously held, "[t]he vindication of constitutional rights . . . serve[s] the public interest almost by definition." *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012). And "there is undoubtedly a public interest in having the will of [the] voters . . . carried out . . . ." *Guzzo v. Mead*, No. 14-CV-200-SWS, 2014 WL 5317797, at *6 (D. Wyo. Oct. 17, 2014).

The injuries and irreparable harm suffered by Warren far outweigh any damage that an injunction might cause to DeSantis's lawful interests. True, DeSantis would be denied his hand-picked choice of State Attorney for the 13th Judicial Circuit. But that choice was never his to make; the Florida Constitution commits that choice to the voters. And no matter how often or how loudly DeSantis claims to be acting in their "best interests" the people expressed their interests by electing Warren—twice.

**Conclusion**

The Motion for Preliminary Injunction should be granted.

Dated:  August 17, 2022

By: */s/ David B. Singer*
David B. Singer
Florida Bar No. 72823
Matthew T. Newton
Florida Bar No. 111679
101 E. Kennedy Blvd., Suite 2800
Tampa, FL 33602
dsinger@shumaker.com
mnewton@shumaker.com

**AND PERKINS COIE LLP**

Jean-Jacques Cabou (AZ #022835)*
Alexis E. Danneman (AZ #030478)*
Matthew R. Koerner (AZ #035018)*
Margo R. Casselman (AZ #034963)*
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
JCabou@perkinscioe.com
ADanneman@perkinscoie.com
MKoerner@perkinscoie.com
MCasselman@perkinscoie.com
602.351.8000

*\*Pro Hac Vice* pending

**ATTORNEYS FOR PLAINTIFF**

**LOCAL RULE 7.1(F) CERTIFICATE OF COMPLIANCE**

I hereby certify that this Memorandum in Support of Motion for Preliminary Injunction contains 7,938 words, with such word count incorporating all portions of this document subject to the word limitations imposed under Local Rule 7.1(F).

*/s/ David B. Singer*
David B. Singer

157914031.7

- 30 -