## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

ANDREW H. WARREN,

    *Plaintiff*,

    v.                               Case No. 4:22-cv-302-RH-MAF

RON DESANTIS, individually and in his
official capacity as Governor of the State
of Florida,

    *Defendant*.

_____/

## DEFENDANT'S CONSOLIDATED MOTION TO DISMISS AND MEMORANDUM OF LAW, AND RESPONSE IN OPPOSITION TO <u>MOTION FOR PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

INTRODUCTION ................................................................................1

BACKGROUND ................................................................................1

    A.    The Governor's suspension authority .........................................1

    B.    Governor DeSantis suspends Mr. Warren because of
        Mr. Warren's blanket non-prosecution policies .........................3

LEGAL STANDARD ........................................................................6

ARGUMENT ....................................................................................6

    I.    Mr. Warren fails to state a claim and is unlikely to succeed on the
        merits ..........................................................................................6

        A.    Mr. Warren cannot establish a claim for First Amendment
            retaliation ...........................................................................7

            1.    Mr. Warren's First Amendment claim is barred by
                *Garcetti* and *Pickering*.......................................................7

            2.    Mr. Warren was not suspended for the views he
                expressed but for the conduct he announced.................13

            3.    Mr. Warren has not established the causation element
                of a First Amendment retaliation claim.........................15

        B.    Mr. Warren's state-law claim fails ..........................................16

            1.    Sovereign immunity bars Mr. Warren's state-law
                claim................................................................................16

            2.    Mr. Warren's state-law claim is meritless under
                Florida law ....................................................................18

        C.    The Court may not and should not grant the requested
            injunctive relief .......................................................................26

    II.    Nor has Mr. Warren made the equitable showings necessary for a
        preliminary injunction ........................................................................31

CONCLUSION ................................................................................33

# INTRODUCTION

The former state attorney for the Thirteenth Judicial Circuit of Florida, Andrew Warren, has sued Governor Ron DeSantis seeking reinstatement to his previous position. He argues that the Governor, in exercising his authority to suspend state officials guilty of neglect of duty and incompetence, violated both the First Amendment and the Florida Constitution. But Mr. Warren ignores that his speech as a government official was unprotected, and that in any event he was suspended solely for his conduct; mistakenly relies on the Court's pendent jurisdiction to bring state-law claims that are equal parts barred by sovereign immunity and baseless under the state constitution; and discounts that important federalism and equitable considerations foreclose his requested relief.

At bottom, this case does not warrant federal-court intervention in a quintessentially state matter: the Governor's constitutional duty to take care that the laws be faithfully executed, and the State's constitutional process for removing wayward officials who refuse to faithfully execute those laws. The Governor therefore moves to dismiss the complaint and opposes Mr. Warren's bid for a preliminary injunction.

# BACKGROUND

## A. The Governor's suspension authority.

As Florida's chief executive officer, the Governor has broad authority to oversee the State's executive branch. *See* Fla. Const. art. IV, § 1 (vesting the "supreme

executive power" in the Governor). That authority includes "tak[ing] care that the laws be faithfully executed," "commission[ing]" state officers, and "transact[ing] all necessary business with the officers of government." *Id.* § 1(a).

This power would be incomplete without the authority to suspend state officials who falter in their duties. To that end, the Governor—"[b]y executive order stating the grounds"—"may suspend from office any state officer not subject to impeachment." *Id.* § 7(a). The permissible bases for suspension are "malfeasance, misfeasance, neglect of duty, drunkenness, incompetence, permanent inability to perform official duties, or commission of a felony." *Id.* The Governor may appoint a replacement during the suspension. *Id.*

Once the Governor has suspended a state official, the matter goes to the Florida Senate, which "may, in proceedings prescribed by law, remove from office or reinstate the suspended official." *Id.* § 7(b).

Throughout this process, Florida courts play only a "limited role." *Israel v. DeSantis*, 269 So. 3d 491, 495 (Fla. 2019). That role entails "determining whether the executive order, on its face, sets forth allegations of fact relating to one of the constitutionally enumerated grounds of suspension." *Id.* In that inquiry, a court will ask only whether the executive order alleges facts that "bear some reasonable relation" to the charge levied against the officer. *Id.* at 497. If so, the correctness of the Governor's action is left to the Florida Senate. *Id.* at 495–96.

### B. Governor DeSantis suspends Mr. Warren because of Mr. Warren's blanket non-prosecution policies.

On August 4, 2022, the Governor issued an executive order suspending Andrew Warren from his position as State Attorney for the Thirteenth Judicial Circuit. DE1-1:1–11.[1] The Governor issued that order after it became clear that Mr. Warren would refuse to prosecute four broad categories of crimes.

As explained in the executive order, a state attorney's "blanket refusal" to enforce a criminal law is, under Florida law, "not an exercise of prosecutorial discretion." *Id.* at 3 (quoting *Ayala v. Scott*, 224 So. 3d 755, 758–59 (Fla. 2017)). Refusing outright to enforce a criminal law instead is "tantamount to a 'functional veto.'" *Id.* (same). Thus, when a state attorney refuses to make "'case-specific' and 'individualized' determinations as to whether the facts warrant prosecution," the state attorney either commits "neglect of duty" or demonstrates "incompetence." *Id.* at 2–4 (same).

The four categories of crimes for which Mr. Warren decreed blanket non-enforcement policies are as follows.

*First*, the executive order noted that Mr. Warren "instituted a policy . . . against prosecuting crimes where the initial encounter between law enforcement and the defendant results from a non-criminal violation in connection with riding a

---

[1] This memorandum refers to ECF pagination. Page numbers are listed after the colon.

bicycle or a pedestrian violation." *Id.* at 5. That presumption of non-prosecution applied even when the defendant resisted arrest without violence, and the "only exception" covered offenses involving "a direct threat to public safety, such as where an individual has suffered physical harm or where a firearm is involved." *Id.*

*Second*, the Governor observed that Mr. Warren had adopted a policy of "presumptive non-enforcement for certain criminal violations, including trespassing at a business location, disorderly conduct, disorderly intoxication, and prostitution." *Id.*

*Third*, based on Mr. Warren's public statements, the Governor found that Mr. Warren had pledged not to prosecute abortion-related crimes. *Id.* at 5–8. Indeed, though Florida law criminalizes various conduct pertaining to abortions—including partial-birth abortions, abortions during the third trimester or after the fetus achieves viability, and, as recently enacted, abortions performed after 15 weeks' gestation— Mr. Warren signed a "Joint Statement" in his official capacity as State Attorney with other prosecutors from around the country, dated June 24, 2022 and updated in July, that swore off prosecuting abortion providers. *Id.* at 6. That letter announced:

- "Criminalizing and prosecuting individuals who . . . provide abortion care makes a mockery of justice; prosecutors should not be part of that."

- "Enforcing abortion bans runs counter to the obligations and interests we are sworn to uphold."

- "As such, we [the undersigned prosecutors] decline to use our offices' resources to criminalize reproductive health decisions and commit to exercise our well-settled discretion and refrain from prosecuting those who . . . provide, or support abortions."

4

- "Our legislatures may decide to criminalize personal healthcare decisions, but *we* remain obligated to prosecute only those cases that serve the interests of justice and the people."

*Id.* at 7.

Those statements, the Governor concluded, demonstrate that Mr. Warren had "clearly, unequivocally, and publicly declared that his office will not prosecute violations of Florida criminal laws that prohibit providers from performing certain abortions to protect the life of the unborn child." *Id.* Mr. Warren was the lone Florida state attorney to sign that letter. *Id.*; *see id.* at 21–30.

*Fourth*, Mr. Warren had signed a similar letter in June 2021 refusing to prosecute laws governing gender-transition treatments for children and bathroom usage based on gender identity. *Id.* at 4. Among other things, Mr. Warren stated that laws "that criminalize safe and crucial medical treatments or the mere public existence of trans people do not promote public safety, community trust, or fiscal responsibility." *Id.* In his view, "[t]hey serve no legitimate purpose." *Id.* He thus "pledge[d] to use [his] discretion and not promote the criminalization of gender-affirming healthcare or transgender people." *Id.*

Though, as the executive order noted, Florida currently has no such criminal laws, the Governor interpreted these statements as still further evidence that Mr. Warren "thinks he has authority to defy the Florida Legislature and nullify in his jurisdiction criminal laws with which he disagrees." *Id.*

## LEGAL STANDARD

"To survive a motion to dismiss for failure to state a claim, a plaintiff must plead 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Ruben v. Cotton States Mut. Ins. Co.*, 2017 WL 628295, at *1 (N.D. Fla. Feb. 14, 2017) (citation omitted). "For purposes of a motion to dismiss, the complaint's factual allegations, though not its legal conclusions, must be accepted as true." *Id.* (same).

A preliminary injunction is an "extraordinary and drastic remedy." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). A plaintiff seeking such relief must establish that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

### I. MR. WARREN FAILS TO STATE A CLAIM AND IS UNLIKELY TO SUCCEED ON THE MERITS.

Mr. Warren claims that he was suspended "in retaliation for exercising his First Amendment rights," DE1 ¶ 104; that the Governor's suspension order violates Florida law, *id.* ¶ 131; and that the Court should order his reinstatement, *id.* at 26. But he fails to state a claim—let alone show a likelihood of success on the merits—so this Court should dismiss and deny the motion for a preliminary injunction.

**A. Mr. Warren cannot establish a claim for First Amendment retaliation.**

To prove that he was "suspended" for "exercising his constitutional right to speak," DE3-1:8, Mr. Warren must show that he engaged in constitutionally protected speech and that the Governor suspended him because of it. *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1289 (11th Cir. 2019).

He cannot meet that standard. For one thing, Mr. Warren did not engage in constitutionally protected speech. The statements on which he relies were made "pursuant to [his] official duties," and "the Constitution does not insulate [such] communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). Nor was Mr. Warren even suspended for his speech; he was suspended for preemptively deciding not to enforce Florida laws with which he disagrees—conduct that receives no First Amendment protection.

**1. Mr. Warren's First Amendment claim is barred by *Garcetti* and *Pickering*.**

Under *Garcetti*, "the Constitution does not insulate" "from employer discipline" speech by public employees made "pursuant to their official duties." 547 U.S. at 421; *see Vila v. Padrón*, 484 F.3d 1334, 1339 (11th Cir. 2007). That alone defeats Mr. Warren's First Amendment claim.

To show that he was suspended for allegedly protected speech, Mr. Warren cites two letters he signed, DE1 ¶ 99, both discussed in the Governor's suspension

order, *see* DE1-1:4, 7.[2] The first letter relates to "transgender and gender-affirming healthcare," *id.* at 13, while the second letter relates to "abortion," *id.* at 22. Both are framed as "joint statements from elected prosecutors," *id.* at 13, 22, and are signed in Mr. Warren's official capacity, bearing his signature in the following format:

> **Andrew Warren**
> State Attorney, 13th Judicial Circuit (Tampa), Florida

*Id.* at 20, 29. Those letters contain formal commitments regarding how Mr. Warren will exercise his government powers. *See id.* at 15 ("[W]e pledge to use our settled discretion and limited resources on enforcement" of certain laws.); *id.* at 22 (committing to use "well-settled discretion and refrain from prosecuting those who seek, provide, or support abortion"). The suspension order relies on those statements, *id.* at 4, 7, and faults Mr. Warren for his "public proclamations of non-enforcement," *id.* at 9.

These statements were made pursuant to Mr. Warren's official duties. A statement is made pursuant to an official's duties when it "relate[s] to" his position and is "under h[is] jurisdiction and authority." *Vila*, 484 F.3d at 1339. Similarly, a

---

[2] Mr. Warren does not contend that it violated the First Amendment for the Governor to suspend him because he instituted presumptive non-prosecution policies for certain enumerated crimes and for crimes arising from stops for non-criminal bicycle or pedestrian violations. *Supra* 3–4. That is for good reason: Those portions of the suspension order relate entirely to Mr. Warren's conduct—his decision not to prosecute certain cases—and contain no reference to any of Mr. Warren's statements. *Infra* 14–15.

statement is made pursuant to an official's duties when it is made "in his [official] capacity." *D'Angelo v. Sch. Bd. of Polk Cnty.*, 497 F.3d 1203, 1210 (11th Cir. 2007). The statements here meet either test. Mr. Warren signed both letters in his official capacity as "State Attorney [for the] 13th Judicial Circuit," DE1-1:20, 29, making commitments regarding how he would use (or not use) his governmental authority. It is hard to imagine a clearer case of speech pursuant to official duties. Even Mr. Warren's putative amici appear to concede as much. DE14-1:10 (discussing Mr. Warren's "public statements about public safety priorities," which are "part of the elected prosecutor's duty"); DE22-1:2 (claiming Mr. Warren's "statements concerning his and his office's prosecutorial priorities" were "consistent with" his "duties as an elected prosecutor").

As official speech, the letters fall squarely within *Garcetti*. Because "government employers" must enjoy "sufficient discretion to manage their operations"—and because when government employees speak, "they can express views that contravene governmental policies or impair the proper performance of governmental functions"—"[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Garcetti*, 547 U.S. at 419, 422–23. Such official-capacity speech is unprotected. *See id.* at 426.

Mr. Warren does not even cite this precedent. He instead relies on pre-*Garcetti* cases like *Bond v. Floyd*, 385 U.S. 116 (1966), and *Wood v. Georgia*, 370 U.S. 375 (1962), to claim that his statements were protected speech, DE1 ¶ 83. It is unclear whether those cases survive *Garcetti*. *See Werkheiser v. Pocono Twp.*, 780 F.3d 172, 179–80 (3d Cir. 2015) (discussing without resolving that question). Regardless, they do not apply here for two reasons.

For one, the statements in those cases were made in the plaintiffs' personal capacities. The Court in *Bond* found a First Amendment violation where a state legislature prevented the swearing in of a member-elect because it wished to condemn his comments on the Vietnam War. 385 U.S. at 118, 123. Those statements were made *before* the plaintiff was sworn into office. *Id.* at 123. Similarly, in *Wood*, the Court found a First Amendment violation where a state court held a sheriff in contempt for comments about an issue pending before a grand jury. 370 U.S. at 376. But it was "uncontroverted" that "the statements were distributed by [the sheriff] as a private citizen" and not "in his capacity as sheriff." *Id.* at 393.

*Garcetti* does not apply to such personal-capacity speech. *E.g.*, *Siefert v. Alexander*, 608 F.3d 974, 980 (7th Cir. 2010). But it does apply where, as here, the statements are made pursuant to official duties.

Yet even if *Bond* and *Wood* applied to official-capacity speech, they would not control when the plaintiff is terminated or disciplined by a more senior official

10

with supervisory power. The rationale behind *Garcetti* is that the government has the "right to control official communications," *Hubbard v. Clayton Cnty. Sch. Dist.*, 756 F.3d 1264, 1268 (11th Cir. 2014), because "[o]fficial communications have official consequences," *id.* (quoting *Garcetti*, 547 U.S. at 422). That rationale applies where, as here, the Governor is tasked under the Florida Constitution with ensuring that Mr. Warren discharges his duties properly and removing him if he does not. Fla. Const. art. IV, § 1(a) (obliging the Governor to "take care that the laws be faithfully executed"); *id.* § 7 (empowering the Governor to suspend an official for "malfeasance, misfeasance, neglect of duty, drunkenness, incompetence, permanent inability to perform official duties, or commission of a felony").

We acknowledge that some courts have applied *Bond*, not *Garcetti*, to the speech of elected legislators. *See Boquist v. Courtney*, 32 F.4th 764, 780 (9th Cir. 2022). But other courts have found no such carveout in *Garcetti*.[3] And even if those cases are correct, legislators and inferior executive officers are not the same. Legislators are supervised by the people, not by a superior official tasked with ensuring that they perform their duties. An inferior official subject to the latter constraints—as was Mr. Warren—is a "public employee" charged with carrying out "professional

---

[3] *See Parks v. City of Horseshoe Bend*, 480 F.3d 837, 840 (8th Cir. 2007) ("We note that under *Garcetti* [the elected official's] speech would not be protected under the First Amendment if it was made in the course of her official duties."); *Hartman v. Register*, 2007 WL 915193, at *6 (S.D. Ohio Mar. 26, 2007) (similar); *Hogan v. Twp. of Haddon*, 2006 WL 3490353, at *6 (D.N.J. Dec. 1, 2006) (similar).

responsibilities" entrusted to it by the State. *Garcetti*, 547 U.S. at 421. The Governor knows of no case holding otherwise.[4]

At any rate, even if this Court determines that Mr. Warren's speech was made in a personal capacity, his public refusals to enforce Florida law are still not protected. *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). When a government employee speaks on matters of "public concern," courts balance the employee's interest in making the statement against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* The "more closely the [suspension] serves the [State's] interest in the efficient and effective functioning of" government office, the "more heavily" the balance "weighs" against First Amendment protection. *McCabe v. Sharrett*, 12 F.3d 1558, 1570 (11th Cir. 1994). And here that balance weighs overwhelmingly for the State because Mr. Warren's public repudiation of his duty "impede[d] the performance of [his] duties" and "interfere[d] with the regular operation of" his office. *Belcher v. City of McAlester*, 324 F.3d 1203, 1208 (10th Cir. 2003).

Indeed, Mr. Warren is tasked with enforcing the criminal law and keeping his community safe. But by openly declining to enforce Florida law, Mr. Warren shirked

---

[4] Nor can Mr. Warren sidestep *Garcetti* on the theory that his official-capacity speech "implicated contentious political issues important to the public." *See Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 693 (5th Cir. 2007). The significance of speech is "irrelevant" to the *Garcetti* official-capacity analysis. *Id.*

his obligations, barred prosecutors in his office from fulfilling their own, and encouraged individuals to commit crimes within his community. His statements therefore represent the "simplest example of a statement by a public employee that would not be protected" by the First Amendment: "answering 'No' to a request that the employee perform a lawful task within the scope of his duties." *Connick v. Myers*, 461 U.S. 138, 163 n.3 (1983) (Brennan, J., dissenting); *see also Berry v. Bailey*, 726 F.2d 670, 676 (11th Cir. 1984) ("refusal to perform a duty" is unprotected); *Belcher*, 324 F.3d at 1208 (firefighter's speech on matter of public concern was unprotected when it disrupted his department).

Either because the statements relied on by the Governor were made pursuant to Mr. Warren's official duties, or because his open dereliction of those duties impeded his ability to fulfill them, Mr. Warren's First Amendment claim fails.[5]

### 2. Mr. Warren was not suspended for the views he expressed but for the conduct he announced.

Even setting *Garcetti* aside, Mr. Warren's claim fails for a more fundamental reason: He was suspended for his conduct, not his speech. Subject to a narrow (and

---

[5] A final note: Mr. Warren appears to suggest that his state-law arguments should color the First Amendment analysis. *See* DE3-1:15 (asserting that the order's alleged facial invalidity evinces a "desire to punish [Mr. Warren] for protected speech"). But the validity of the suspension order under state law does not make Mr. Warren's speech more or less protected under federal law. *See Snowden v. Hughes*, 321 U.S. 1, 11 (1944) ("[An action's] illegality under [a] state statute can neither add to nor subtract from its [federal] constitutional validity.").

inapplicable) exception for "inherently expressive" conduct, the First Amendment protects only speech. *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 62, 65–66 (2006) (*FAIR*). Yet the Governor's justifications for suspending Mr. Warren identified only *conduct*: his preemptive decision not to prosecute certain types of crime.

The suspension order made that focus quite clear. For instance, it flagged two presumptive non-enforcement policies, one aimed at "crimes where the initial encounter between law enforcement and the defendant results from a non-criminal violation in connection with riding a bicycle or a pedestrian violation," and the other geared toward "trespassing at a business location, disorderly conduct, disorderly intoxication, and prostitution." DE1-1:5. Nowhere in discussing these policies did the order mention speech; it simply explained that these policies evinced Mr. Warren's presumptive refusal to prosecute these kinds of cases. *See id.*

The order's other justifications also homed in on Mr. Warren's policy choices. Quoting his pledge that he would "decline to use [his] office['s] resources to criminalize reproductive health decisions," the order concluded that Mr. Warren had "clearly, unequivocally, and publicly declared that his office [would] not prosecute violations of Florida criminal laws that prohibit providers from performing certain abortions." *Id.* at 7. Similarly, quoting Mr. Warren's declaration that he would "not promote the criminalization of gender-affirming healthcare or transgender people"

14

because such laws supposedly "serve no legitimate purpose," the order reasoned that Mr. Warren's preliminary non-enforcement determination evinced his belief that "he has authority to defy the Florida Legislature and nullify in his jurisdiction criminal laws with which he disagrees." *Id.* at 4. In short, his blanket decision not to enforce certain Florida laws was the cause for his suspension.

It does not matter that Mr. Warren used *words*—even politically charged ones—to explain his decision. The Governor did not remove him because he explained his decision; the Governor removed him because he *made* his decision. The State may regulate conduct that incidentally involves speech without implicating the First Amendment. For example, the State may pass an anti-discrimination law that prohibits an employer from posting a "White Applicants Only" sign because the law is regulating conduct (racial discrimination), even though that conduct was announced and accomplished using words. *See FAIR*, 547 U.S. at 62; *see also Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949) (a regulation of conduct does not transform into a regulation of speech "merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed"). The same principle applies here.

### 3. Mr. Warren has not established the causation element of a First Amendment retaliation claim.

Alternatively, even if Mr. Warren engaged in some protected speech in announcing his decision not to enforce Florida law, he cannot establish that his words

were a "motivating factor" in the Governor's suspension decision. *Castle v. Appalachian Tech. Coll.*, 631 F.3d 1194, 1197 (11th Cir. 2011). Rather, as just explained, it is indisputable that the Governor suspended him for the conduct that his words conveyed—his refusal to enforce the criminal law.

### B. Mr. Warren's state-law claim fails.

Mr. Warren also urges the Court to order his reinstatement under Florida law, invoking the state judiciary's authority to issue writs of "quo warranto" to "determine whether a state officer or agency has improperly exercised a power or right derived from the State." DE3-1:17. The claim should be denied. The Governor's sovereign immunity precludes a federal court from compelling him to comply with state law. And in any case, the claim fails on the merits.

#### 1. Sovereign immunity bars Mr. Warren's state-law claim.

Eleventh Amendment sovereign immunity bars a federal court from ordering state officials to comply with state law. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984). That rule bars Mr. Warren's state-law claim.

Ordinarily, "[s]tate sovereign immunity limits federal court jurisdiction" in actions against a state or state officials. *S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198, 1204 (11th Cir. 2019); *see* U.S. Const. amend. XI. Under *Ex parte Young*, however, "[s]ome suits requesting injunctive or declaratory relief against state officials are not considered suits against the state," and therefore are not barred

16

by sovereign immunity. *Id.* (citing 209 U.S. 123, 159–60 (1908)). That is so because when a state official violates federal law, the state has no power to "authorize th[at] action"; and "stripped of his official or representative character," the official cannot invoke the state's sovereign immunity. *Pennhurst*, 465 U.S. at 102.

But the situation is different "when the claim of entitlement to relief is based on a violation of *state law*." *S&M Brands*, 925 F.3d at 1204 (emphasis added). In that instance, "sovereign immunity applies." *Id.*; *see also Dekalb Cnty. Sch. Dist. v. Schrenko*, 109 F.3d 680, 688 (11th Cir. 1997) ("[A] federal court may not entertain a cause of action against a state for alleged violations of state law, even if that state claim is pendent to a federal claim[.]"). Suits asking a federal court to enforce state law do not implicate *Ex parte Young*'s narrow exception to sovereign immunity, as they do not seek to "vindicate the supreme authority of federal law." *Pennhurst*, 465 U.S. at 106. And "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Id.*

Those principles apply here. Mr. Warren's claim for quo warranto turns entirely on state constitutional law. *See* DE3-1:17–27 (predicating Count 2 on "Florida State law," specifically the contention that "[t]he Governor has unlawfully suspended Warren in violation of the Florida Constitution"). He asks this Court, in other words, not to "vindicate the supreme authority of federal law" but to "instruct[] [a]

17

state official[] on how to conform their conduct to state law." *Pennhurst*, 465 U.S. at 106.[6] That claim must therefore be brought, if at all, in state court. *E.g.*, *Corn v. Miss. Dep't of Pub. Safety*, 954 F.3d 268, 274–75 (5th Cir. 2020) (claim for injunctive relief based on state-law violation barred by *Pennhurst*). And because this question is one for the state courts, the Court should decline to exercise supplemental jurisdiction even if it determines that sovereign immunity does not apply. *See* 28 U.S.C. § 1367(c).

## 2.  Mr. Warren's state-law claim is meritless under Florida law.

In any event, Mr. Warren's state-law claim fails on the merits. He does not dispute that the Governor has the power to suspend from office an official who exhibits "neglect of duty" or "incompetence." DE3-1:17–19. Nor does he dispute that the Florida Senate is the ultimate arbiter of whether a suspension was proper, and that courts play only a "limited role" in Florida's suspension and removal process. *Israel*, 269 So. 3d at 495. Mr. Warren nevertheless asks the Court to substitute its

---

[6] For reasons similar to those described above, *supra* 16–18, Mr. Warren cannot evade *Pennhurst* by suing the Governor in his individual capacity. "The Eleventh Amendment bars a suit against state officials when 'the state is the real, substantial party in interest.'" *Pennhurst*, 465 U.S. at 101. As a "general rule," "relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter." *Id.* That includes where the relief sought would "interfere with the public administration" or "compel [the government] to act." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277 n.3 (11th Cir. 1998). Reinstating a state officer to his previous position would "operate against" the sovereign in precisely those ways.

judgment for that of the Senate, asserting that the Governor lacked a lawful ground for the suspension. DE3-1:20. But under the highly deferential standard applicable to quo warranto petitions—indeed, under *any* standard—the Governor's order is lawful.

i. The Florida Constitution provides that the Governor "may suspend from office any state officer" for "neglect of duty" or "incompetence." Fla. Const. art. IV, § 7(a). Upon suspension, "[t]he senate may, in proceedings prescribed by law, remove from office or reinstate the suspended official." *Id.* § 7(b).

As that express delegation of authority to the Governor and Senate suggests, the judiciary has only a "limited role in reviewing the exercise of the suspension power." *Israel*, 269 So. 3d at 495 (quoting *Jackson v. DeSantis*, 268 So. 3d 662, 663 (Fla. 2019)). "Where an executive order of suspension 'names one or more of the grounds embraced in the Constitution and clothes or supports it with alleged facts sufficient to constitute the grounds or cause of suspension, it is sufficient.'" *Id.* (quoting *State ex rel. Hardie v. Coleman*, 155 So. 129, 133 (Fla. 1934)). "Similarly, the Senate's judgment of removal or reinstatement 'is final, and will not be reviewed by the courts,' as under the constitutional process for suspension and removal, the 'Senate is nothing less than a court provided to examine into and determine whether or not the Governor exercises the power of suspension in keeping with the constitutional mandate.'" *Id.*

This Court's task here, then, is simply to ask whether the Governor's suspension order satisfies "a low threshold": "if, on the whole, [the order] contains allegations that bear some reasonable relation to the charge made against the officer, it will be adjudged as sufficient." *Id.* at 496. That inquiry is "facial" in nature and focuses on "the factual allegations in an executive order of suspension." *Id.*

ii. The suspension order easily satisfies that standard. Florida law dictates that a prosecutor's charging discretion, though in many ways broad, is cabined by the requirement that it be exercised on a case-by-case basis. *See Ayala*, 224 So. 3d at 758. "[A]dopting a 'blanket policy' against" enforcing certain types of criminal laws is "in effect refusing to exercise discretion." *Id.* (quoting *Johnson v. Pataki*, 691 N.E.2d 1002, 1007 (N.Y. 1997)). In fact, refusing to prosecute certain categories of crimes is "tantamount to a 'functional[] veto' of state law." *Id.* (same). Florida law thus requires prosecutors to "mak[e] case-specific determinations" about whether to charge a crime. *Id.*

The failure or refusal to exercise case-by-case prosecutorial discretion is both "neglect of duty" and "incompetence." Neglect of duty refers to "the neglect or failure on the part of a public officer to do and perform some duty or duties laid on him as such by virtue of his office or which is required of him by law." *Israel*, 269 So. 3d at 496. "It is not material whether the neglect be willful, through malice, ignorance, or oversight." *Id.* "Incompetence," on the other hand, refers to "any physical, moral,

or intellectual quality, the lack of which incapacitates one to perform the duties of his office," and "may arise from gross ignorance of official duties or gross carelessness in the discharge of them." *Id.* That includes a "lack of judgment and discretion." *Id.*

Applying those considerations, four categories of facts described on the face of the suspension order "bear some reasonable relation" to the charge of neglect of duty and incompetence. *Israel*, 269 So. 3d at 497.

*Non-prosecution of pedestrians and bicyclists with small exception.* To start, the Governor's suspension order highlights that Mr. Warren had instructed his line prosecutors not to enforce crimes "where the initial encounter between law enforcement and the defendant results from a non-criminal violation in connection with riding a bicycle or a pedestrian violation." DE1-1:5. That policy applies "even to crimes" involving "resisting arrest without violence," and its "only exception" is for the prosecution of crimes posing a "direct threat to public safety, such as where an individual has suffered physical harm or where a firearm is involved." *Id.*

Mr. Warren apparently found police encounters with pedestrians or bicyclists to be unsavory. But as the Governor concluded, that hardly excuses turning a blind eye in his professional capacity to an array of misdemeanors and felonies discovered or occurring during such encounters—crimes that might include public displays of obscenity, theft, resisting arrest, and other offenses against the public good, such as

serious drug violations. By eroding respect for law enforcement and the legislature's enactments, the existence of the policy bears "some reasonable relation" to neglect of duty or incompetence. *Ayala*, 224 So. 3d at 758.

It is beside the point that, as Mr. Warren argues, the public-safety exception "naturally would require an individualized, case-specific determination." DE3-1:24 n.5. Prosecutorial discretion means "individualized determination[s] 'exercised according to the exigency of the case, upon a consideration of the attending circumstances.'" *Ayala*, 224 So. 3d at 759 (citation omitted). But where prosecutors first must establish that their cases fit within narrowly defined windows not imposed by the legislature itself, they lack the freedom to charge as appropriate.

*Presumptive non-prosecution of various misdemeanors.* Next, the Governor noted Mr. Warren's policy of "presumptive non-enforcement for certain criminal violations, including trespassing at a business location, disorderly conduct, disorderly intoxication, and prostitution." DE1-1:4–5. The Governor reasonably could have concluded that this policy clashes with Florida law's requirement that prosecutorial discretion be exercised on an "individualized" basis, *Ayala*, 224 So. 3d at 759, rather than in some sort of "presumptive" manner favoring non-prosecution. Even now, Mr. Warren does not contend that this policy (unlike the pedestrian/bicyclist policy) "enumerates specific exemptions" that would allow prosecutors to charge these misdemeanors in some instances. DE3-1:24.

*Non-prosecution of abortion offenses.* The Governor also cited Mr. Warren's publicly announced policy of not prosecuting abortion providers for criminal infractions. DE1-1:7. In a letter signed by a group of prosecutors after the *Dobbs* decision, Mr. Warren proclaimed that "prosecutors should not be part of" enforcing abortion limitations, as doing so "runs counter to the obligations and interests we are sworn to uphold." *Id.* "As such," Mr. Warren wrote, he would "decline to use [his] office['s] resources to criminalize reproductive health decisions" and "commit[ted] to exercise [his] well-settled discretion and refrain from prosecuting those" who "provide, or support abortions." *Id.* He added that while a state legislature "may decide to criminalize personal healthcare decisions," he was "obligated to prosecute only those cases that serve the interests of justice and the people"—cases, in other words, not involving abortion crimes.[7]

Despite that bold stance, Mr. Warren now protests that the letter "does not contain a categorical statement that Warren would not prosecute any law." DE3-1:25. On his telling, it is no more than a "value statement." *Id.* Reasonable readers will conclude otherwise. Most notably, the letter "*commit*[s]" Mr. Warren's office to "*refrain*[*ing*] from prosecuting" those who "provide, or support abortions"—full stop. DE1-1:7 (emphasis added).

---

[7] As the Governor observed, this would seemingly include even longstanding bans on partial-birth and late-term abortions. DE1-1:6.

Mr. Warren cannot evade responsibility for that statement by clinging to its reference to "discretion." DE3-1:26. The letter does not vow to exercise individualized discretion in the abortion context, as Mr. Warren now would have it. Rather, it invokes a prosecutor's "well-settled discretion" as the very basis for its sweeping promise not to prosecute abortion providers. DE1-1:7. Under Florida law, nullifying a criminal enactment wholesale is not an exercise in individualized discretion. *Ayala*, 224 So. 3d at 758–59.

It is likewise no defense that the abortion letter reserves the right to prosecute those who "carry[] out a forced abortion" or who "perform an abortion negligently or with the intent to harm" the mother. DE3-1:27 n.7 (citing DE1-1:22 n.2). If anything, that vanishingly narrow exception underscores just how categorical Mr. Warren's promise not to prosecute abortion offenses truly is. And it reflects his misconception that he has the power to prosecute only those crimes reflecting policies he agrees with—here, laws protecting the mother, not those protecting unborn children.

*Non-prosecution of offenses related to "gender-affirming care."* Last, the Governor found further evidence of Mr. Warren's neglect of duty and incompetence in his public statement pledging not to prosecute offenses related to "gender-affirming" care. DE1-1:4. Like Mr. Warren's comments on abortion, that statement made abundantly clear that Mr. Warren will not authorize his office to charge violations of any such criminal laws the Florida Legislature might adopt in the future, as those

24

laws would not, in his view, "promote public safety, community trust, or fiscal responsibility," and would "serve no legitimate purpose." *Id.* On that basis, Mr. Warren "pledge[d] to use [his] discretion" to not "promote the criminalization of gender-affirming healthcare or transgender people." *Id.*

Mr. Warren says the Governor misread his remarks. The gender-affirming-care statement, he claims, "nowhere asserted that Warren categorically planned not to enforce any specific law." DE3-1:21. But the import was clear: Mr. Warren would decline to enforce laws he disagreed with. And even if he has not yet had occasion to neglect his duty, his erroneous understanding of the relationship between the legislature and state attorneys proves incompetence. *Cf. Ayala*, 224 So. 3d at 759 (refusal to prosecute classes of cases "does not reflect an exercise of prosecutorial discretion; it embodies, at best, a misunderstanding of Florida law"). At the very least, the statement confirms the Governor's interpretation of the other policies described in the order—on the whole, they bespeak a "blatant defiance of the Florida Legislature." DE1-1:9.

The facts in the suspension order therefore plainly "bear some reasonable relation" to the charge of neglect of duty and incompetence. *Israel*, 269 So. 3d at 496. The weight and significance of those facts are for the Senate to decide—not a court, let alone a federal court. Moreover, as Mr. Warren's case proceeds in the Senate, the Governor is free to present additional evidence supporting the pending charges or to

add new charges based on misconduct that may since have surfaced. *See* DE1-1:10

("If, after execution of this suspension, additional facts are discovered that illustrate

further neglect of duty, incompetence, or other constitutional grounds for suspension

of Andrew Warren, this Executive Order may be amended to allege those additional

facts.").

### C. The Court may not and should not grant the requested injunctive relief.

Merits aside, Mr. Warren asks this court to intervene, midstream, in the State's

constitutional process for removing an elected officer. *See* Fla. Const. art. V, § 17

(discussing state attorneys); *id.* art. IV, § 7(a)–(b) (granting the Governor and Senate

exclusive power to reinstate a suspended officer). That request flouts the principles

of federalism and comity that compel courts to abstain from interfering with what

amounts to a "noncriminal judicial proceeding[] when important state interests are

involved." *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423,

432 (1982); *see also Younger v. Harris*, 401 U.S. 37, 43–54 (1971). And it would

require this Court to award extraordinary relief well beyond the historical limits of

equity. *See Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S.

308, 318 (1999). Either reason justifies dismissal of the case and denial of a preliminary injunction.

1. Under *Younger*, "[w]here vital state interests are involved, a federal court

should abstain unless state law clearly bars the interposition of the constitutional

claims." *31 Foster Children v. Bush*, 329 F.3d 1255, 1274 (11th Cir. 2003). A three-part test governs the *Younger* inquiry: (1) "do [the proceedings] constitute an ongoing state judicial proceeding"; (2) "do the proceedings implicate important state interests"; and (3) "is there an adequate opportunity in the state proceedings to raise constitutional challenges." *Id.* Each prong is met here.

For starters, the pending Senate proceedings are judicial. The Florida Senate, after all, "is nothing less than a court provided to examine into and determine whether or not the Governor exercises the power of suspension in keeping with the constitutional mandate." *Hardie*, 155 So. at 130; *see also* Fla. Sen. R. 12 (allowing the filing of a bill of particulars and response—effectively a complaint and answer—presentation of physical evidence and testimony, issuance of subpoenas, and hearings).[8]

The Senate proceedings are also ongoing. Removal proceedings begin in the Senate "on receipt" of the suspension order "by the Senate." Fla. Sen. R. 12.7. The Senate received the Governor's order here on August 4, 2022, so the process has begun. *See* Memorandum from Senate President Wilton Simpson to All Senators re: Executive Order of Suspension 22-176 (Aug. 4, 2022).[9] And the proceedings remain

---

[8]     https://www.flsenate.gov/UserContent/Publications/SenateRules/2020-2022_Rules.pdf.

[9]     https://www.flsenate.gov/usercontent/session/executivesuspensions/Warren_Andrew/MemotoSenators20200804.pdf.

"ongoing" for *Younger* purposes even though the Senate has temporarily stayed its proceedings pending this litigation. *See* Letter from Senate Secretary Debbie Brown to Andrew Warren re: Executive Order of Suspension, Exec. Order No. 22-176 (Aug. 17, 2022).[10] "[T]he whole point of *Younger* abstention is to stop federal interference with state proceedings," so it would be "backwards to reject abstention because the state proceedings have been stayed to allow the federal case to proceed." *San Remo Hotel v. City & Cnty. of San Francisco*, 145 F.3d 1095, 1104 (9th Cir. 1998); *accord PDX N. Inc. v. Comm'r N.J. Dep't of Labor & Workforce Dev.*, 978 F.3d 871, 884–85 (3d Cir. 2020).

As for the important-interests prong, the removal of an executive official under state constitutional processes for his publicized neglect of duty and incompetence undoubtedly implicates sovereign interests of paramount importance to the State.

And Mr. Warren will have full opportunity to raise his federal claims in the Senate proceeding. He may present "all written defenses or matters in avoidance of the charges contained in the suspension order," Fla. Sen. R. 12.9(3), including a claim that the order was a response to his protected speech. And since Mr. Warren has not yet tried to "present his federal claims in [the] state-court proceedings"—

---

[10]       https://www.flsenate.gov/usercontent/session/executivesuspensions/Warren_Andrew/081722AndrewWarrenNoticeofAbeyance.pdf.

indeed, he has not even tried to invoke the State's mechanism for lifting a stay, *see id.* 12.9(2)—this Court "should assume that state procedures will afford an adequate remedy." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 15 (1987).

Finally, to the extent this Court questions whether Mr. Warren can adequately present his federal claim before the Senate, those questions are themselves reasons to abstain. *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941) (refraining from hearing case in which the resolution of a federal constitutional question might be rendered unnecessary by an unresolved question of state law); *see also Butler v. Ala. Jud. Inquiry Comm'n*, 245 F.3d 1257, 1265–66 (11th Cir. 2001) (certifying whether defendants can raise a constitutional challenge in an Alabama forum to the Alabama Supreme Court).

2. This Court also lacks the power to grant the injunctive relief Mr. Warren seeks. He asks the Court to order "DeSantis to rescind" the suspension order and "reinstate" him. DE1:26. But this Court may not grant equitable relief that extends beyond what equity permitted at the Founding. *See Grupo Mexicano*, 527 U.S. at 318. And back then, "federal equity power could not be exercised to enjoin a state proceeding to remove a public officer." *Baker v. Carr*, 369 U.S. 186, 231 (1962); *accord Fineran v. Bailey*, 2 F.2d 363, 363 (5th Cir. 1924) ("It is well settled by the decisions of the Supreme Court that a District Court of the United States has no

jurisdiction over the appointment and removal of public officers.").[11] That is pre-
cisely the relief Mr. Warren seeks here: He asks this Court to use its equitable powers
to upend a state removal proceeding. Equity never stretched so far, and Mr. Warren
cites nothing to suggest that Congress has expanded the equitable power of the fed-
eral courts to fashion such relief. *See Grupo Mexicano*, 527 U.S. at 333.

That rule also honors federalism principles. Federal courts seldom interfere
with how sovereign states choose to govern themselves and police their officials.
*See Ala. Pub. Serv. Comm'n v. S. Ry. Co.*, 341 U.S. 341, 349 (1951) (discussing "the
scrupulous regard for the rightful independence of state governments which should
at all times actuate the federal courts"). Such interference upsets our system's careful
"federal-state balance," *cf. Jones v. United States*, 529 U.S. 848, 858 (2000), and
raises difficult questions about how federal courts could even enforce reinstatement
remedies, *see Nixon v. United States*, 506 U.S. 224, 236 (1993) (questioning what
relief a federal court could grant a judge impeached and removed from office). For
that reason, any congressional statement expanding equity to permit federal-court
intrusion into state removal proceedings would need to be "exceedingly clear." *Cf.
Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489
(2021). No such clear statement exists here.

---

[11] Decisions of the former Fifth Circuit released before October 1, 1981 are
binding in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.
1981) (en banc).

Though this Court lacks any equitable power to upset the State's removal proceedings, at the very least the Court cannot order the reinstatement of Mr. Warren and instead must limit its remedy to vacatur of any unlawful state action. *See Reams v. Scott*, 2018 WL 5809967, at *5 (N.D. Fla. Nov. 6, 2018). That is especially so given that Mr. Warren does not challenge on First Amendment grounds two of the four stated grounds in the Governor's suspension order, *see supra* n.1, and given that the Governor may add grounds for suspending and removing Mr. Warren for the Senate's consideration, *supra* 26.

## II.   Nor has Mr. Warren made the equitable showings necessary for a preliminary injunction.

To obtain the extraordinary relief of a preliminary injunction, Mr. Warren must establish that he will suffer irreparable harm without an injunction and that the equities and the public interest favor injunctive relief. *See Winter*, 555 U.S. at 20. He has not made these showings.

1. To establish irreparable harm, Mr. Warren cites two harms. Neither is irreparable.

Mr. Warren first claims that the "direct penalization" he allegedly suffered for exercising his First Amendment right constitutes irreparable injury. DE3-1:29

(quoting *Cate v. Oldham*, 70 F.3d 1176, 1188 (11th Cir. 1983)).[12] Direct penaliza-tion, however, amounts to irreparable injury only when it "chill[s]" future speech by leading the plaintiff to believe that he will suffer future government retaliation if he engages in additional expression. *See Siegel*, 234 F.3d at 1178; *see also Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir. 1989).

That is not the case here. Mr. Warren has been suspended from office, and the Governor cannot retaliate against him further. Mr. Warren thus has no reason to fear future retaliation for his speech, nor does his conduct post-suspension suggest that he has let any such concern stop him from speaking. *See* Andrew Warren, *DeSantis sacked me for doing my job as a prosecutor. Who's next?*, The Washington Post (August 12, 2022).[13] His "direct penalization," then, has not triggered any irrepara-ble "chill" that this Court could remedy.

Mr. Warren next argues that his "[r]emoval from office" cannot be "compen-sated monetarily." DE3-1:28. That too is wrong. If Mr. Warren is reinstated after winning this lawsuit (or after prevailing in the Senate), he will be paid any "salary

---

[12] Mr. Warren also suggests in passing that the "loss of First Amendment free-doms" always "constitutes irreparable injury." DE3-1:29. That is incorrect. *See Siegel*, 234 F.3d at 1178 ("Plaintiffs also contend that a violation of constitutional rights always constitutes irreparable harm. Our case law has not gone that far[.]"); *Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir. 1989) ("Constitutional harm is not neces-sarily synonymous with [] irreparable harm[.]").

[13] https://www.washingtonpost.com/opinions/2022/08/12/florida-state-attor-ney-desantis-fired-me/.

or other compensation" withheld during his suspension. Fla. Stat. § 111.05. His removal therefore can be "compensated monetarily."

2. The equities and the public interest also do not favor reinstating Mr. Warren. Of most concern, Mr. Warren has publicly announced his decision not to prosecute certain crimes in the Thirteenth Judicial Circuit. Reinstating him would therefore undermine the deterrent effect that the threat of prosecution has on crime and embolden individuals to engage in criminal conduct within that jurisdiction.

What is more, the Thirteenth Judicial Circuit's State Attorney's Office has already undergone one leadership change and borne all the administrative burdens that come with it. Switching leadership yet again would only sow further confusion and uncertainty for the employees in that office and the citizens it serves. If this switch must be made, it should be made by the politically accountable members of the Florida Senate, not a federal court. As a result, this Court should decline to mandate the disruptive back-and-forth that Mr. Warren seeks and should instead allow the new State Attorney to maintain the stability of her office while Mr. Warren's case proceeds in the courts and, ultimately, in the Senate.

## CONCLUSION

Mr. Warren had no First Amendment right, as a public official, to declare that he would not perform his duties under Florida law. And "[o]nce the Governor suspends a public official, the Florida Senate has the exclusive role of determining

whether to remove or reinstate that suspended official." *Israel*, 269 So. 3d at 495. The propriety of the Governor's suspension order therefore is not a matter for this Court to decide, or any court for that matter. It is a question for Florida's political branches.

For the reasons above, the Court should deny Mr. Warren's motion for a preliminary injunction and should dismiss the complaint.

Dated: September 2, 2022

Respectfully submitted,

ASHLEY MOODY
  *Attorney General*

/s/ *Henry C. Whitaker*
HENRY C. WHITAKER (FBN 1031175)
  *Solicitor General*
JAMES H. PERCIVAL (FBN 1016188)     JEFFREY PAUL DESOUSA (FBN 110951)
  *Deputy Attorney General*             *Chief Deputy Solicitor General*
  *of Legal Policy*                  DAVID M. COSTELLO (FBN 1004952)
NATALIE CHRISTMAS (FBN 1019180)       *Deputy Solicitor General*
  *Assistant Attorney General*
  *of Legal Policy*                 Office of the Attorney General
                                    The Capitol, PL-01
                                    Tallahassee, Florida 32399
                                    (850) 414-3300
                                    *henry.whitaker@myfloridalegal.com*

                                    *Counsel for Governor DeSantis*

35

## CERTIFICATE OF COMPLIANCE

This motion complies with the requirements of Local Rule 7.1(F) because it contains 7,998 words.

/s/ *Henry C. Whitaker*
Solicitor General

## CERTIFICATE OF SERVICE

I hereby certify that on September 2, 2022, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties.

/s/ *Henry C. Whitaker*
Solicitor General