IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

ANDREW H. WARREN,

                  Plaintiff,              Case No. 4:22-cv-302-RH-MAF

v.

RON DESANTIS, individually and in
his official capacity as Governor of the
State of Florida,

                  Defendant.

_____

**PLAINTIFF'S CONSOLIDATED REPLY IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION, AND RESPONSE IN OPPOSITION TO
MOTION TO DISMISS**

Plaintiff Andrew Warren's Verified Complaint and his Motion for Preliminary Injunction ("Motion") demonstrate that Defendant Ron DeSantis ousted Warren from his elected office for "speak[ing] freely on questions of government policy," *Houston Community College System v. Wilson*, 142 S.Ct. 1253, 1261 (2022), and exercising prosecutorial discretion differently than DeSantis would like. In suspending Warren, DeSantis violated the First Amendment and the Florida Constitution, and Warren is entitled to an injunction to remedy these violations.

In his brief, DeSantis fails to establish otherwise. Instead, he demonstrates that he misunderstands not only the office to which he was elected, but also the office to which Warren was twice elected. DeSantis cannot justify retaliating against Warren for Warren's speech because Warren is not his employee and because courts, not the governor, define the standards for suspension under the Florida Constitution. Nor can DeSantis avoid answering in court for his illegal actions by hiding beneath the cloak of sovereign immunity because Florida—not DeSantis—is the sovereign.

## Argument

DeSantis seeks two things: denial of a preliminary injunction under Rule 65 and dismissal of the Complaint under Rule 12(b)(6). In evaluating Warren's Motion, the Court must review the parties' evidentiary submissions and determine if Warren satisfies the preliminary-injunction factors. *See Swain v. Junior*, 961 F.3d 1276, 1284–85 (11th Cir. 2020). Under Rule 12(b)(6), the Court must "accept as true the facts set out" in Warren's Complaint and exhibits, construe them in Warren's favor, and determine if Warren states facially plausible claims. *Daniels v. Select Portfolio Servicing, Inc.*, 34 F.4th 1260, 1263, 1266 (11th Cir. 2022). Here, Warren not only

states plausible claims, but also establishes he will likely succeed on them. Finally, Warren establishes he is entitled to injunctive relief.

## I.     Warren adequately states two claims, on which he is likely to succeed.

### A.     Warren adequately pleads a First Amendment claim, on which he is likely to succeed.

Warren is likely to succeed on his claim that DeSantis retaliated against him for exercising his First Amendment right to speak because (1) he engaged in "speech" that was "constitutionally protected"; (2) he suffered an adverse action; and (3) "there is a causal connection between the retaliatory actions and the adverse effect on speech." *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005). In his response, DeSantis does not dispute the second prong. He instead focuses on the first and third prongs, arguing: (1) Warren's speech was unprotected under a line of Supreme Court cases that applies to public employees rather than elected officials, and (2) Warren was not suspended for his speech. DeSantis's arguments fail.

#### 1.     Warren engaged in protected speech.

Warren adequately alleges and is likely to succeed in showing that his speech was constitutionally protected. To establish the first element of a retaliation claim, an elected official need only demonstrate he engaged in speech that "express[ed] [his] views on issues of policy." *Bond v. Floyd*, 385 U.S. 116, 136 (1966). Such speech is protected because of the "role that elected officials play in our society," which "makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance." *Wood v. Georgia*, 370 U.S. 375, 394–95 (1962).

Here, the first prong is "readily met" because Warren is an "elected official[]" who "express[ed] [his] views and opinions" on controversial issues of public debate. *Boquist v. Courtney*, 32 F.4th 764, 775 (9th Cir. 2022). He signed two statements, one on gender-affirming care and one on abortion ("Joint Statements"). [DE1 ¶¶ 33–34]¹ The Joint Statements, opining on significant public-policy issues, are "at the core of activity protected by the First Amendment" and are protected speech. *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1564 (11th Cir. 1995).

That such speech by elected officials is protected has been established at least since the Supreme Court decided *Wood*, 370 U.S. 375, and *Bond*, 385 U.S. 116. Indeed, just this year, the Supreme Court reiterated that "[t]he First Amendment surely promises an elected representative . . . the right to speak freely on questions of government policy." *Wilson*, 142 S.Ct. at 1261.²

DeSantis argues (at 12–15) that this Court should nonetheless disregard *Bond* and *Wood* (and presumably *Wilson*), and instead apply a modified First Amendment framework applicable to cases in which the government—in its role as employer— discharges or disciplines its employees based on their speech. *See Garcetti v. Ceballos*, 547 U.S. 410, 414–15 (2006) (public employee sued his supervisors for

---

¹ Docket entry ("DE") page citations refers to ECF-assigned pagination.

² DeSantis argues (at 10) that the reasoning of *Bond* and *Wood* (and presumably *Wilson*) does not apply to First Amendment claims arising from speech that an elected official, like Warren, made in his official capacity. But whatever the line between an elected official's personal and official speech, the First Amendment protection in these cases does not turn on the capacity in which the official spoke. Indeed, in *Bond* and *Wilson* the Court never mentioned this supposed distinction. Only in *Wood* did the Court note that the speaker spoke "as a private citizen," but the Court confirmed it did "not rely on th[is] point exclusively." 370 U.S. at 393.

"retaliatory employment actions"); *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 564 (1968) (teacher sued school board after the board dismissed him from employment).

Under those cases, an employee must demonstrate that he "spoke as a citizen on a matter of public concern," *Garcetti*, 547 U.S. at 418, and his interests in speaking outweigh "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees," *Pickering*, 391 U.S. at 568. This makes sense: "Government employers, like private employers, need a significant degree of control over their employees' words and actions" to ensure "the efficient provision of public services," and an employee's speech might "contravene" his employer's policies "or impair the proper performance of governmental functions." *Garcetti*, 547 U.S. at 418–19.

But "[t]he rationale for allowing the government to restrict the speech of government employees and contractors is not applicable to elected officials. Such elected officials are not speaking as employees of the government." *Boquist*, 32 F.4th at 779. Their speech cannot "impair the proper" functioning of government. *Garcetti*, 547 U.S. at 418–19. To the contrary, an elected official's speech—even criticism—regarding government policy "is a vital component of his duties because '[elected officials] have an obligation to take positions on controversial political questions so that their constituents can be fully informed by them.'" *Boquist*, 32 F.4th at 780 (quoting *Bond*, 385 U.S. at 136–37); *see also Sheet Metal Workers' Int'l Ass'n v. Lynn*, 488 U.S. 347, 355 (1989) ("The consequences of the removal of an elected official are much different. . . . Not only is the fired official likely to be

chilled in the exercise of his own free speech rights, but so are the members who voted for him.").

Indeed, other courts confronted with this question have agreed that *Garcetti* and *Pickering* do not apply to elected officials like Warren.[3] *See, e.g.*, *Boquist*, 32 F.4th at 780 (holding that "an elected official's speech is protected regardless [of] whether the official is speaking 'as a citizen upon a matter of public concern'" and that "the *Pickering* balancing test [does not] apply to an elected official's claim of First Amendment retaliation by the official's elected peers") (citation omitted); *Phelan v. Laramie Cnty. Cmty. Coll. Bd. of Trs.*, 235 F.3d 1243, 1247 (10th Cir. 2000) ("The *Pickering* line of cases" does not apply because when the plaintiff is an elected official, "not a governmental employee or contractor," the "case [does] not involve the government's exercise of contractual power or its 'daily management functions,' factors which form the underlying factual basis for judicial deference and the application of the *Pickering* approach in the governmental employee and contractor contexts[.]"); *Rangra v. Brown*, 566 F.3d 515, 522–24 (5th Cir.) (same), *vacated on mootness grounds on reh'g en banc*, 584 F.3d 206 (5th Cir. 2009).[4]

---

[3] DeSantis argues (at 12) that "[i]t is unclear whether [*Bond* and *Wood*] survive *Garcetti*," a case about a public employee. But less than one year ago, in *Wilson*, the Supreme Court reviewed whether an elected official stated a First Amendment retaliation claim. 142 S.Ct. at 1257–59. Unsurprisingly, the Court cited *Bond* and *Wood* and discussed *Bond*. *Id.* at 1263–64. The Court did not suggest that either case was in jeopardy. And the Court nowhere mentioned the relaxed protections described in those cases for unelected public employees. Given DeSantis's failure to even cite *Wilson* (decided in 2022), DeSantis's suggestion that *Bond* and *Wood* did not "survive" *Garcetti* (decided in 2006) is meritless.

[4] Instead of grappling with these cases, DeSantis (at 13 n.3) refers to an Eighth Circuit case that assumed *Garcetti* applied in a footnote without analysis, *Parks v.*

Further, DeSantis mischaracterizes the facts to argue that Warren is his employee, requiring the modified framework for public employees. Wrong.

DeSantis claims (at 13–14)—without authority—that he is a "superior official tasked with ensuring [Warren] perform[s] [his] duties" and that Warren is merely a "public employee" under DeSantis's control and subject to his discipline. But both DeSantis and Warren are elected officials who serve and report to the voters who elected them, not to any government "employer" or "supervising officer." *Jenevein v. Willing*, 493 F.3d 551, 557 (5th Cir. 2007) (When it comes to elected officials, "the 'employer' is the public itself, at least in the practical sense, with the power to hire and fire."). Indeed, state attorneys are, intentionally, independent from such influence. *See Valdes v. State*, 728 So.2d 736, 739 (Fla. 1999) (noting that "state attorneys fulfill a unique role, which is both quasi-judicial and quasi-executive" and that "[t]his unique role is due to the tradition of their exclusive discretion in prosecution, combined with their status as officers of the court").

State attorneys do not act or speak on behalf of the governor. Nor does the governor decide to "employ" state attorneys; the voters do. *See* Fla. Const. art. V, § 17. Furthermore, whereas the governor's office is created by Article IV of the Florida Constitution (Executive), Warren's office is created by Article V (Judiciary).

---

*City of Horseshoe Bend*, 480 F.3d 837, 840 & n.4 (8th Cir. 2007), and two district-court cases, *Hartman v. Register*, No. 06-CV-33, 2007 WL 915193, at *6 (S.D. Ohio Mar. 26, 2007); *Hogan v. Twp. of Haddon*, No. 04–2036, 2006 WL 3490353, at *7 (D.N.J. Dec. 1, 2006). But none involved an adverse action that interfered with an elected official's ability to perform his elected duties, like here. Each case also predates *Wilson*, which emphasized that excluding an elected official from office implicates not only his interest in speaking but also "the franchise of his constituents." 142 S.Ct. at 1263.

That Florida law affords DeSantis the ability to suspend state attorneys under extreme circumstances does not transform DeSantis into Warren's employer. Florida law simply does not empower a governor to regulate the speech of state attorneys to maintain office relations or the smooth functioning of government.[5]

### 2. DeSantis does not dispute that suspending Warren was adverse action.

Next, Warren adequately pleads and is likely to establish the second element of his First Amendment claim, that DeSantis subjected him to adverse action. *Bennett*, 423 F.3d at 1250. The action of suspending Warren would "deter a person of ordinary firmness from the exercise of First Amendment rights." *Bailey v. Wheeler*, 843 F.3d 473, 481 (11th Cir. 2016) (citation omitted). DeSantis's Executive Order "prevent[s] [Warren] from doing his job" and "den[ies] him" *every* "privilege of office," *Wilson*, 142 S.Ct. at 1255, effectively nullifying a popular vote. In his response, DeSantis does not dispute that Warren's suspension is a qualifying adverse action. As a result, Warren will prevail on this element.

### 3. DeSantis suspended Warren in retaliation for the Joint Statements, and DeSantis does not demonstrate otherwise.

Finally, Warren adequately pleads and will prevail on the third prong because the uncontradicted evidence establishes "there is a causal connection between the retaliatory actions and the adverse effect on speech." *Bennett*, 423 F.3d at 1250.

---

[5] DeSantis argues (at 14–15) that even if Warren was speaking in his personal capacity his speech was still unprotected under the First Amendment. This argument misses the point. Warren is not a public employee, and it does not matter in what capacity he made his speech.

Warren submitted declarations and other evidence, including a verified complaint, establishing that DeSantis issued the Order because Warren signed the Joint Statements, with which DeSantis disagreed. The Order itself attaches the Joint Statements and discloses that the primary reason for the suspension is that Warren allowed his name to be added to Joint Statements expressing views "in support of" gender-affirming healthcare and against criminalizing certain abortions. [*See* DE1-1 at 4 (describing Joint Statement on gender-affirming healthcare), 5–8 (discussing abortion and Joint Statement), 12–30 (the Joint Statements)] These are topics subject to intense political debate and on which DeSantis and Warren disagree. [DE1 ¶¶ 47–56 (political rivalry and clash between Warren and DeSantis on abortion); DE3-1 at 6–7 (clash on abortion, gender-affirming care, and more); DE3-7 & DE3-8 (same)]

DeSantis suspended Warren shortly after he signed the Abortion Statement in a manner intentionally aimed at humiliating him and garnering political favor with DeSantis's base. [*See* DE1 ¶¶ 58–64; DE3-5; DE3-6] DeSantis immediately appointed a political ally to perform Warren's elected duties during the suspension. [DE1-1 at 11; DE1 ¶¶ 70–76] And DeSantis took no action when other state officials, with whom he aligns, spoke out about exercising their discretion as Warren did here. [DE3-1 at 16; DE3-14; DE3-15; DE3-16]

Warren's burden to establish a prima facie case of retaliation "is not a heavy one," *Beckwith*, 58 F.3d at 1564, and the evidence here more than carries it. *See Boquist*, 32 F.4th at 776.

Warren having carried his burden, "the burden shifts to [DeSantis] to demonstrate that even without the impetus to retaliate he would have [suspended

Warren]." *Hartman v. Moore*, 547 U.S. 250, 260 (2006). Tellingly, DeSantis offers no evidence to even attempt to carry the burden he now bears. Instead, he merely asks this Court to accept his unsupported factual gloss for Warren's suspension.

Again, Warren's First Amendment claim is premised on the Joint Statements—written statements expressing political opinions and joined by dozens of prosecutors. [DE1 ¶¶ 61–64] Yet DeSantis insists (at 15–18) Warren's suspension was not based on the Joint Statements.[6] He claims (at 5, 18) that he suspended Warren "for the conduct that his words conveyed," citing four supposed "blanket non-enforcement policies."

The evidence is to the contrary; Warren has not refused to categorically enforce any law. The Joint Statements do not cite a single Florida law, do not announce any official policy, and do not categorically refuse to exercise discretion.[7] The Joint Statements speak in general terms about general principles in which Warren and his co-signers believe. They are not prosecutorial directives, nor are they "blanket decision[s] not to enforce certain Florida laws." [DE30 at 15]

Several actual policies and directives of Warren's Office are, though, in evidence. One makes clear that "ASAs must exercise discretion" in "every case" at "every stage" [DE1-2 at 3; DE3-2 ¶¶ 4–5], and a declaration confirms again that Warren always "exercise[s] [his] prosecutorial discretion on a case-by-case basis" and has not "categorically refuse[d] to prosecute any particular kind of case," [DE3-

---

[6] DeSantis does not even seem to dispute that the Joint Statements are speech.

[7] With no answer to the fact that the Joint Statements are speech, DeSantis insists that the Non-Prosecution Policies are conduct, *not* speech. But Warren's First Amendment claim is not based on the Non-Prosecution Policies.

2 ¶¶ 3, 16]. *See Bond*, 385 U.S. at 134 (holding there was no evidence of "any incitement to violation of law" based on elected official's statements opposing the war, where he clarified that "I do not advocate that people should break laws" and simply "admired the courage of someone who could act on his convictions").

Furthermore, the crux of DeSantis's argument (at 17) is that he "removed [Warren] because he *made* his decision." In support of this argument DeSantis cites several cases for the proposition that conduct (as opposed to speech) usually is unprotected by the First Amendment. But this argument, and the cases it relies on, do not apply here. No decision was ever made through the Joint Statements; the Verified Complaint and exhibits to the Motion confirm as much. [*E.g.*, DE3-2 ¶¶ 3–5, 14–18] DeSantis offers no evidence to the contrary (and indeed there is none).

### B.    Warren has adequately stated his quo warranto claim and is likely to succeed on it.

Like his first claim, Warren is likely to succeed on the merits of his second claim—that DeSantis unlawfully suspended Warren merely because he signed statements expressing his political views and issued charging guidelines for prosecutors in his office. DeSantis discourages this Court from considering this claim, for numerous reasons. None succeed.

### 1.    DeSantis unlawfully suspended Warren for expressing his political views and exercising prosecutorial discretion when issuing charging guidelines.

"Quo warranto is used 'to determine whether a state officer or agency has improperly *exercised* a power or right derived from the State.'" *Israel v. DeSantis*,

269 So.3d 491, 494 (Fla. 2019) (quoting *League of Women Voters of Fla. v. Scott*, 232 So.3d 264, 265 (Fla. 2017)).

The parties largely agree on the standards governing this claim. Under the Florida Constitution, a governor may suspend a state attorney only for certain enumerated grounds, including "incompetence" and "neglect of duty." Fla. Const. art. IV, § 7(a). DeSantis agrees (at 22–23) that "[i]ncompetenc[e]" refers to a "physical, moral, or intellectual quality, the lack of which *incapacitates* one to perform the duties of his office." *Israel*, 269 So.3d at 496 (emphasis added) (quoting *State ex rel. Hardie v. Coleman*, 155 So. 129, 133 (Fla. 1934)). By comparison, "neglect of duty" refers "to the neglect or failure on the part of a public officer to do and perform some duty or duties laid on him as such by virtue of his office or which is required of him by law." *Id.* (quoting *Hardie*, 155 So. at 132).

Here, none of the reasons cited in DeSantis's Order qualify—as a matter of law—as either "incompetence" or "neglect of duty."

> a) **DeSantis concedes that, as to the statement on gender issues, Warren "has not yet had occasion to neglect his duty."**

DeSantis unlawfully suspended Warren because "he signed a 'Joint Statement' with other elected prosecutors *in support of* gender-transition treatments for children and bathroom usage based on gender identity." [DE1-1 at 4 (emphasis added)] In signing this statement, Warren expressed his political views on the topic, only. No Florida law criminalizes any such conduct, in fact, as DeSantis admits. [*Id.*; DE30 at 26–27] Simply expressing these views is not a "physical, moral, or

intellectual quality, the lack of which incapacitates [Warren] to perform the duties of his office," to qualify as "incompetence." *Israel*, 269 So.3d at 496 (citation omitted). Nor, as a matter of law, can Warren expressing his views on a topic—not prohibited under Florida law—qualify as neglecting or failing "to do and perform some . . . duties laid on him as such by virtue of his office or which is required of him by law," to suffice for "neglect of duty." *Id.* (citation omitted).

DeSantis, in fact, concedes that "[Warren] has not yet had occasion to neglect his duty." [DE30 at 27] By DeSantis's own concession—and because Warren cannot neglect a duty to enforce a law that does not exist—neglect of duty cannot apply here as a matter of law.

On incompetence, DeSantis argues that Warren's political views "ma[k]e abundantly clear that [he] will not authorize his office to charge violations of any such criminal laws the Florida Legislature might adopt in the future" and that "his erroneous understanding of the relationship between the legislature and state attorneys proves incompetence." [*Id.* at 26, 27] As much as DeSantis would like, though, political views different than his own do not create a "physical, moral, or intellectual quality" that "incapacitates [a public official] to perform the duties of his office." *Israel*, 269 So.3d at 496 (citation omitted). Accepting DeSantis's argument, moreover, would allow the governor to suspend elected officials simply for expressing political views on hot-button topics. The First Amendment does not permit such governmental retaliation, as established above (at 3–11). To avoid this constitutional issue, "the Court [should] construe [the governor's suspension power]

to avoid such problems." *Burban v. City of Neptune Beach*, 920 F.3d 1274, 1282 (11th Cir. 2019) (citation omitted).

### b)    DeSantis cannot rewrite Warren's charging guidelines that require individualized, case-specific assessments.

In his Order, DeSantis also faulted Warren for issuing charging guidelines and priorities for the prosecutors in his office. A prosecutor's discretion "in deciding whether and how to prosecute" is "absolute." *McGinley v. Fla. Dep't of Highway Safety & Motor Vehicles*, 438 F. App'x 754, 757 (11th Cir. 2011) (per curiam) (quoting *State v. Cain*, 381 So.2d 1361, 1367 (Fla. 1980)), *superseded by statute on other grounds as stated in Banks v. State*, 520 So.2d 43, 46 (Fla. 1st DCA 1987). And "prosecutorial discretion requires a state attorney to make 'case-specific' and 'individualized' determinations as to whether the facts warrant prosecution," as DeSantis admits. [DE1-1 at 3 (quoting *Ayala v. Scott*, 224 So.3d 755, 758–59 (Fla. 2017))]

Both policies at issue satisfy those requirements. Under the policy for pedestrian and bicycle violations, for example, prosecutors may file charges when, "based on the facts and circumstances of the case, the public safety needs of the community outweigh the presumption to not file the case." [DE1-4 at 3] And the policy concerning certain misdemeanors includes a non-prosecution "presumption [that] may be overcome by significant public safety concerns, such as pending felony charges," among several other circumstances.[8] [DE1-3 at 2] Though guided by

---

[8] Based on this exclusion, and as Warren explains elsewhere [*see, e.g.*, DE1 ¶ 45], DeSantis is wrong that prosecutors may not "charge these misdemeanors in some instances" [DE30 at 24].

presumptions, both policies require "case-specific," "individualized" assessments. *Ayala*, 224 So.3d at 758–59. Stated otherwise, Warren advised his prosecutors to do precisely what Florida law requires: to exercise prosecutorial discretion in charging decisions. And because that is what the law requires, neither policy creates, as a matter of law, grounds for either "incompetence" or "neglect of duty."[9]

DeSantis concedes (at 16) that both these policies contain "presumpti[ons]" only. He further concedes (at 23) that at least one policy contains, as he frames it, a "*small exception*" for "crimes posing a 'direct threat to public safety, such as where an individual has suffered physical harm or where a firearm is involved.'" He nevertheless contends that these policies are categorical, blanket policies indistinguishable from *Ayala*. Not so. These presumptive policies are a far cry from the policy at issue in *Ayala*: "[a state attorney]'s blanket refusal to pursue the death penalty in any case." 224 So.3d at 758. Unlike *Ayala*, Warren's guidelines explicitly allow such charges and require prosecutors to apply those guidelines to determine whether to file charges. [*See* DE3-2 ¶¶ 9–10]

---

[9] DeSantis claims (at 23) that Warren deprioritized charges arising from non-criminal interactions between police and bicyclists because, supposedly, Warren found these interactions "unsavory." Not quite. Warren did not deem such charges unsavory; he determined—after "meeting[] with community members," "analyz[ing] criminal justice data, and examin[ing] actual cases" [DE1 ¶ 41]—that, in typical cases, these charges "have limited public safety benefits," "undermine trust within the communities," and "disproportionately burden Black citizens of Hillsborough County" [DE1-4 at 2]. By exercising his "absolute" discretion "in deciding whether and how to prosecute" these cases, *McGinley*, 438 F. App'x at 757 (quoting *Cain*, 381 So.2d at 1367), Warren acted no differently than if he had prioritized resources on capital murder cases over jaywalking tickets.

For the policy on pedestrian and bicycle violations (but not the other policy), DeSantis separately contends (at 24) that Warren's charging guidelines—indeed, it seems, any charging guidelines—establish incompetence or neglect of duty because "[prosecutors] lack the freedom to charge as appropriate," meaning without any restraint. But this contention contravenes Florida law: "Under Florida's constitution, the decision to charge and prosecute is an executive responsibility, and the state attorney has complete discretion in deciding whether and how to prosecute." *State v. Bloom*, 497 So.2d 2, 3 (Fla. 1986) (citing Fla. Const. art. II, § 3 (separation of powers)).[10]

### c)    DeSantis cannot pretend that Warren's political view on abortion is a blanket, categorical policy.

Under the last reason cited in the Order, DeSantis unlawfully suspended Warren for "a letter signed by a group of prosecutors after the *Dobbs* decision." [DE30 at 25] This signature does not qualify as either "incompetence" or "neglect of duty," as Warren's Motion (at 26–28) establishes.

In this statement, Warren simply expressed his political views. Critically, he and numerous other prosecutors opposed using their "offices' resources to criminalize reproductive health decisions" and vowed "to prosecute only those cases that serve the interests of justice and the people." [DE1-1 at 22, 24] Warren's uncontroverted declaration, in fact, confirms he never "instituted any policy that

---

[10] DeSantis also argues (at 24) that this policy establishes incompetence and neglect of duty because it "erod[es] respect for law enforcement and the legislature's enactments." This argument is meritless. Neither such "erosion" (even assuming it exists) qualifies as "incompetence" or "neglect of duty."

applied specifically to cases involving abortion," nor was he even "referred a criminal case arising from abortion in violation of" Florida law. [DE3-2 ¶¶ 17, 19] Because Warren simply expressed his views on the topic and vowed to use prosecutorial discretion in charging such cases, the Order fails to allege either "incompetence" or "neglect of duty." *Israel*, 269 So.3d at 496 (citation omitted).

DeSantis contends that "Warren cannot evade responsibility for that statement by clinging to its reference to 'discretion.'" [DE30 at 26] That contention fails for two reasons. First, as DeSantis seems to recognize through his own choice of words, the statement is just that—a statement. It is not an office policy dealing with specific abortion-related crimes in Florida. The statement was made on behalf of numerous prosecutors; it makes no reference to any Florida law. Second, the Abortion Statement does not even contain a blanket, categorical ban against all prosecution. It is, on its face, readily distinguishable from *Ayala*'s "blanket 'policy' of not seeking the death penalty in any eligible case." 224 So.3d at 756.

In short, DeSantis unlawfully suspended Warren simply for expressing his political views and exercising prosecutorial discretion as he was required to do.

### 2. Sovereign immunity does not bar this claim where DeSantis, not the State, is the real party in interest and where DeSantis acted *ultra vires* in suspending Warren.

Seeking to deflect this Court's scrutiny away from the merits of his state law claim, DeSantis (at 18) urges this Court not to reach it because of "[t]he Governor's sovereign immunity" under the Eleventh Amendment. But sovereign immunity governs claims against the sovereign: the State of Florida. It does not bar claims

against state officials where, as here, the sovereign is not the real party in interest. Nor does it bar claims where, as here, the official is acting beyond his legal authority. DeSantis himself, not the State of Florida, acted illegally against Warren; DeSantis cannot hide from his actions under the mantle of Florida's sovereign immunity.

As DeSantis fails to recognize, sovereign immunity protects the sovereignty of *States.* The Eleventh Amendment is interpreted "in light of its history and structure, to preserve the States' traditional immunity from private suits." *Franchise Tax Bd. of Cal. v. Hyatt*, 139 S.Ct. 1485, 1496 (2019) (citation omitted).

Under this "traditional immunity," "no suit or action can be brought against the king, even in civil matters, because no court can have jurisdiction over him." *Id.* at 1493 (quoting 1 W. Blackstone, Commentaries on the Laws of England 235 (1765)). But DeSantis is not a king. For purposes of sovereign immunity, the sovereign is the State of Florida; thus, as DeSantis himself even acknowledges (at 20 n.6), "[t]he Eleventh Amendment bars a suit against state officials when 'the state is the real, substantial party in interest.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984) (citation omitted). A suit "directed only at state officials and not at the State itself or any agency of the State," by comparison, "is not barred by the Eleventh Amendment as a direct action against the State." *Fla. Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 691–92 (1982) (plurality); *see also Lewis v. Clarke*, 137 S.Ct. 1285, 1288 (2017) (holding where the sovereign's agent "is the real party in interest," "sovereign immunity is not implicated").

So, "in the context of lawsuits against state . . . employees or entities, courts should look to whether the sovereign is the real party in interest." *Lewis*, 137 S.Ct.

at 1290. "[T]he general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter." *Pennhurst*, 465 U.S. at 101 (citation omitted); *accord Lewis*, 137 S.Ct. at 1292–93 ("The critical inquiry is who may be legally bound by the court's adverse judgment, not who will ultimately pick up the tab.").

Separately, though relatedly, "it is plain 'that the Eleventh Amendment does not bar an action against a state official that is based on a theory that the officer acted beyond the scope of his statutory authority or, if within that authority, that such authority is unconstitutional,'"—i.e., the officer acted *ultra vires*. *Word of Faith World Outreach Ctr. Church, Inc. v. Morales*, 986 F.2d 962, 966 (5th Cir. 1993) (quoting *Treasure Salvors*, 458 U.S. at 689). State officers may act *ultra vires*, for example, where they "acted without legitimate authority in withholding the property at issue," *Treasure Salvors*, 458 U.S. at 692, or "where the state official's actions are alleged to be *un*authorized by state law," *Word of Faith*, 986 F.2d at 966 n.5.

"In light of the principles set forth above, the proper resolution of the Eleventh Amendment issue raised in this case requires an answer to each of [two] specific questions[.]" *Treasure Salvors*, 458 U.S. at 690. First, "[i]s this action asserted against officials of the State or is it an action brought directly against the State of Florida itself?" *Id.* Second, "[d]oes the challenged conduct of state officials constitute an ultra vires or unconstitutional withholding of property or merely a tortious interference with property rights?" *Id.*

### a) Sovereign immunity does not bar this suit because Florida is not the real party in interest.

The only real, substantial defendant in interest is DeSantis, not the State of Florida. Because Warren seeks an order directing DeSantis to rescind his Order—as only he may do, *see* Fla. Const. art. IV, § 7(a)—DeSantis, only, would "be legally bound by the court's adverse judgment," *Lewis*, 137 S.Ct. at 1292–93. That is the nature of quo warranto; "[it] is used 'to determine whether a state officer or agency has improperly exercised a power or right derived from the State.'" *League of Women Voters of Fla.*, 232 So.3d at 265 (citation and emphasis omitted). The writ would not, and could not, run against the State itself. *See State ex rel. Landis v. Prevatt*, 148 So. 578, 579–80 (Fla. 1933) ("Under the common law the writ of quo warranto was directed against one who usurped or obtained any office, franchise, or liberty of the crown, and would also lay in cause of nonuser, or long neglect of a franchise or misuser or abuse of it."). Warren's claim therefore is unlike, for example, Eleventh Amendment-barred claims against state officers "seeking to impose a liability which must be paid from public funds in the state treasury." *Edelman v. Jordan*, 415 U.S. 651, 663 (1974).

Further demonstrating that this suit is not against the sovereign, Warren sues DeSantis in part in his *individual* capacity. [DE1 at 1] "The identity of the real party in interest dictates what immunities may be available." *Lewis*, 137 S.Ct. at 1291. In fact, "'officers sued in their personal capacity come to court as individuals,' and the real party in interest is the individual, not the sovereign." *Id.* (internal citation omitted). "But sovereign immunity 'does not erect a barrier against [such] suits

. . . [,]'" as courts have held repeatedly. *Id.* Because this suit is in part against DeSantis "in his individual capacity," "sovereign immunity is not implicated." *Id.* at 1288; *see Word of Faith*, 986 F.2d at 965 (holding that the Eleventh Amendment did not bar a suit challenging the Texas Attorney General's exercise of his powers in an investigation, where he "was acting in his individual capacity for purposes of Eleventh Amendment immunity").

For these reasons, "[i]t is clear that the process at issue [is] directed only at state officials and not at the State itself or any agency of the State." *Treasure Salvors*, 458 U.S. at 691. DeSantis serves the people of Florida, but he is not himself the State of Florida. He therefore is "the real, substantial party in interest." *Pennhurst*, 465 U.S. at 101 (citation omitted).

> **b)      Sovereign immunity does not bar this suit because DeSantis acted *ultra vires* in suspending Warren.**

A further, independent basis on which DeSantis's claim of immunity must fail is that he acted *ultra vires* in suspending Warren. As established above, *see supra* Part I.B.1, DeSantis exceeded his powers in suspending Warren for reasons that fail as a matter of law under Florida's Constitution. Neither signing the Joint Statements, nor issuing charging guidelines for prosecutors, can qualify as "incompetence" or "neglect of duty" under Florida law. Warren has and will exercise the very duty that Florida law requires: prosecutorial discretion. DeSantis's Order had "no 'colorable basis'" and therefore was *ultra vires*. *Pennhurst*, 465 U.S. at 101 n.11 (citation omitted); *see also Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 701–02 ("[T]he action of an officer of the sovereign (be it holding, taking or otherwise

legally affecting the plaintiff's property) can be regarded as so 'illegal' as to permit a suit for specific relief against the officer as an individual only if it is not within the officer's statutory powers or, if within those powers, only if the powers, or their exercise in the particular case, are constitutionally void.").

Accordingly, because "the real, substantial party in interest" for Warren's quo warranto claim is DeSantis rather than the State of Florida and because DeSantis's Order was *ultra vires*, sovereign immunity does not apply to this claim.[11]

## II.   DeSantis's other attempts to convince this Court not to hear this case are without merit.

DeSantis also urges this Court not to hear this case for several other reasons. None have merit.

### A.   No principle of comity or federalism excuses this Court from hearing the case.

DeSantis wrongly insists that "principles of federalism and comity" would be "flout[ed]" if this Court hears Warren's claims (at 28–32).

---

[11] In one sentence, DeSantis contends that the Court "should decline to exercise supplemental jurisdiction" over this quo warranto claim. [DE30 at 20] This Court has "supplemental jurisdiction over all state claims which arise out of a common nucleus of operative fact with a substantial federal claim." *Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 743 (11th Cir. 2006). Here, of course, the Court has subject-matter jurisdiction over Warren's First Amendment claim. *See* 28 U.S.C. § 1331. And both this claim concerning DeSantis retaliating against Warren and the quo warranto claim concerning DeSantis unlawfully suspending Warren "arise out of a common nucleus of operative fact." *Parker*, 468 F.3d at 743. DeSantis offers no other reason to decline jurisdiction, so this Court should not "hunt[]" for one. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

1. ***Younger* abstention is inappropriate because the senate suspension hearing is not "ongoing," not "judicial," and inadequate to raise the constitutional claim here.**

*Younger* abstention would be inappropriate here. "Federal courts have a virtually unflagging obligation to exercise their jurisdiction except in those extraordinary circumstances where the order to the parties to repair to the State court would clearly serve an important countervailing interest*." For Your Eyes Alone, Inc. v. City of Columbus*, 281 F.3d 1209, 1216 (11th Cir. 2002) (citation omitted). Attentive to the principles of equity, comity, and federalism, the Supreme Court in *Younger v. Harris* recognized an exception to this unflagging obligation. 401 U.S. 37, 43–44 (1971). The *Younger* Court held that federal courts should abstain from suits aimed at restraining pending state criminal prosecutions. *Id*. at 42. Since *Younger*, of course, the Supreme Court has clarified that abstention is proper not only in cases of pending criminal proceedings, but also in "noncriminal *judicial* proceedings when important state interests are involved." *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982) (emphasis added). But the "[c]ircumstances fitting within the *Younger* doctrine . . . are 'exceptional.'" *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 73 (2013) (citation omitted).

Though DeSantis's brief acknowledges the proper three-part test for *Younger* abstention (at 28–29), DeSantis fails to apply the test to the facts of this case. First, the Florida Senate proceeding is not "ongoing"; indeed it has not even started. The Senate's own rules make clear that the Senate "shall institute action by transmitting a notice of hearing" "[u]nless suspension proceedings are held in abeyance[.]" Fla. Senate R. 12.9(1). Here, proceedings are in abeyance and thus no such notice of

hearing was ever transmitted. *See* Fla. Senate, Session: Executive Suspensions (Sess. 2023), https://www.flsenate.gov/Session/ExecutiveSuspensions/2023; *see also* Letter from Debbie Brown, Florida Senate Secretary, to Andrew Warren (Aug. 17, 2022), https://www.flsenate.gov/usercontent/session/executivesuspensions/Warren _Andrew/081722AndrewWarrenNoticeofAbeyance.pdf. Action in the Senate has not been "institute[d]," and even if it had been "*Younger* abstention is inapplicable because the state proceedings were automatically stayed . . . [.]" *Villasmil v. CitiMortgage, Inc.*, No. 1:11-CV-2055, 2012 WL 13012570, at *3 (N.D. Ga. Mar. 6, 2012) (citing *Maseda v. Honda Motor Co*., 861 F.2d 1248, 1256 n.13 (11th Cir. 1988)).

Second, DeSantis himself acknowledges that the Senate proceeding is not "judicial" such that *Younger* abstention can apply. He states unequivocally (at 36) that "[t]he propriety of the Governor's suspension order . . . is a question for Florida's political branches." *See also, e.g.*, The Federalist No. 65, at 396 (Alexander Hamilton) (Clinton Rossiter ed., 1961), https://babel.hathitrust.org/ cgi/pt?id=uc1.32106001170155&view=1up&seq=346&skin=2021 (Trials in the senate concern "[o]ffenses which proceed from the misconduct of public men, or in other words from the abuse or violation of some public trust. They are of a nature which may with peculiar propriety be denominated POLITICAL, as they relate chiefly to injuries done immediately to the society itself.").

Third, even if Senate proceedings were ongoing and judicial, which they are not, they would still be substantively inadequate to vindicate Warren's constitutional rights. To say that a federal court must refuse to hear Warren's constitutional

challenge because a political body, which has no ongoing proceeding, which is vested with no part of the State's judicial power, and which is, among other things, permitted at its own choosing to conduct its proceedings in secret, might later consider his case, would turn the narrow exception of *Younger* on its head. *See* Fla. Senate R. 12.2 ("The Senate may resolve itself into executive session for the sole purpose of considering appointment, removal, or suspension. No one shall be in attendance except Senators, the Secretary, and staff as approved by the President, who shall be sworn not to disclose any executive business without consent of the Senate.").

### 2. DeSantis's other avoidance arguments fail.

DeSantis also argues (at 31–33) that other abstention or "federalism principles" bar this Court from hearing Warren's case. These arguments fare no better than his *Younger* claim. DeSantis contends that so-called *Pullman* abstention means this Court should decline to consider Warren's claims. But *Pullman* abstention applies, if at all, only "when there exists an unclear issue of state law whose resolution might moot the federal constitutional question or present it in a substantially different light." *Jones v. DeSantis*, 410 F.Supp.3d 1284, 1292 (N.D. Fla. 2019), *aff'd sub nom. Jones v. Governor of Fla.*, 950 F.3d 795 (11th Cir. 2020). Here, there is no "unclear issue of state law" much less one that "might moot the federal constitutional question." The First Amendment claim is independent of the quo warranto claim.

With his *Younger* and *Pullman* claims failing, DeSantis (at 31) also tries to convince this Court that it lacks the power to grant the relief Warren seeks. But in

the very case DeSantis relies on for this odd proposition, the Supreme Court made clear that where, as here, "challenges to state action . . . have rested on claims of constitutional deprivation which are amenable to judicial correction, this Court has acted upon its view of the merits of the claim." *Baker v. Carr*, 369 U.S. 186, 229 (1962) (footnote omitted). And while DeSantis is right that *Baker* cited examples in which federal courts have declined to enjoin state officer removal proceedings, Warren doesn't seek that remedy here. Warren seeks an injunction requiring DeSantis to rescind his unlawful Order. DeSantis points to no authority, and Warren knows of none, establishing that a federal court cannot order an official to rescind an unlawful order. Indeed, the authority is to the contrary. *See, e.g.*, *Reams v. Scott*, No. 18cv154, 2018 WL 5809967, at *5 (N.D. Fla. Nov. 6, 2018) (granting "injunction bind[ing] the Governor" and requiring him to remedy, including by vacating his order of suspension, the unconstitutional deprivation of due process in elected official's suspension).

## III.   Warren is otherwise entitled to injunctive relief.

### A.   Warren will suffer irreparable harm absent relief.

Absent an injunction, Warren will continue to suffer at least two irreparable harms: (1) removal from his public office and (2) loss of his First Amendment freedoms.

First, and most plainly "[r]emoval from office is not the type of injury which can be compensated monetarily." *Caudell v. City of Toccoa*, 153 F.Supp.2d 1371, 1381 (N.D. Ga. 2001) (alteration in original) (quoting *Hunt v. City of Longview*, 932 F.Supp. 828, 842 (E.D. Tex. 1995)). In response, DeSantis argues only (at 34–35)

26

that Warren's suspension can be compensated through money damages because he will be entitled to his withheld salary if he is reinstated.

But loss of salary is not the only injury resulting from Warren's suspension, and Warren has never claimed irreparable injury based on that. There are wide-ranging effects of removal from office—including, as has occurred in this case, the loss of entitlement to elected office, termination of staff, change in policies, and other changes in the shape of the office. [*See* DE3-1 at 28–29; *see also Sheet Metal Workers' Int'l Ass'n*, 488 U.S. at 355 ("[W]hen an elected official . . . is removed from his post, the [individuals they represent] are denied the representative of their choice . . . [The] removal deprived the membership of his leadership, knowledge, and advice at a critical time.")] DeSantis does not dispute Warren has suffered any of these effects because of the suspension, nor does he dispute that such effects cannot be compensated monetarily.

Second, this Circuit has expressly held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) (alteration in original) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Further, this case involves "direct penalization, as opposed to incidental inhibition, of First Amendment rights" and therefore suffices to constitute "irreparable injury" under controlling case law. *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983).

Contrary to this authority, DeSantis argues (at 34) that the First Amendment injury does not support irreparable injury because "[d]irect penalization" amounts to "irreparable injury only when it 'chill[s]' future speech" and in this case Warren's

27

speech cannot and has not been chilled. This argument is flawed both legally and factually.

This Circuit has expressly rejected the argument "that only if a plaintiff can prove actual, current chill can he prove irreparable injury." *Id.* at 1189. "On the contrary, direct retaliation by the state for having exercised First Amendment freedoms in the past[,]" as here, "is particularly proscribed by the First Amendment" and supports irreparable injury. *Id.*[12]

In all events, Warren's speech has been chilled. For instance, were Warren reinstated, he would fear further suspensions from DeSantis based on his speech. *See, e.g.*, *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1229 (11th Cir. 2017) (holding that plaintiff suffered irreparable injury where "[h]is right to speak at the . . . [school board] meeting was violated and his right to speak at future meetings was chilled and could be prevented altogether [through defendants' actions]").

### B.    The public interest and balance of equities favor an injunction.

Finally, the balance of equities and public interest favor an injunction. Indeed, "[t]he vindication of constitutional rights . . . serve[s] the public interest almost by definition." *League of Women Voters of Fla. v. Browning*, 863 F.Supp.2d 1155, 1167 (N.D. Fla. 2012). Further, the public interest is served by "having the will of [the]

---

[12] Indeed, the Eleventh Circuit has held that all direct infringements of First Amendment rights constitute irreparable injury, without qualification. *See, e.g.*, *KH Outdoor, LLC*, 458 F.3d at 1272. DeSantis challenges this authority (at 34 n.12), citing to cases holding that not *all* types of constitutional violations constitute irreparable injury. Warren does not dispute that, under Eleventh Circuit law, not all constitutional violations constitute irreparable injury. But the First Amendment differs.

voters . . . carried out." *Guzzo v. Mead*, No. 14-CV-200, 2014 WL 5317797, at *6 (D. Wyo. Oct. 17, 2014).

In response, DeSantis argues (at 35) that Warren has categorically decided not to prosecute crimes, citing nothing. Warren has not; the evidence is clear that he has long directed his office to exercise discretion in every case. [DE3-2 ¶¶ 4–5] Further, DeSantis argues (at 35) that it will be an administrative burden that will "sow further confusion." Any administrative burdens and uncertainty that come with switching leadership are DeSantis's own doing. And such burdens do not justify DeSantis unconstitutionally violating Warren's rights. *See Taylor v. Louisiana*, 419 U.S. 522, 535 (1975) ("administrative convenience" cannot justify practices that impinge upon fundamental rights); *Johnson v. Halifax County*, 594 F.Supp. 161, 171 (E.D.N.C. 1984) ("[A]dministrative and financial burdens on the defendant . . . are not . . . undue in view of the otherwise irreparable harm to be incurred by plaintiffs.").

## Conclusion

For these reasons, this Court should grant Warren's Motion for a Preliminary Injunction and should direct DeSantis to rescind his Executive Order, reinstate Warren as State Attorney, and enjoin DeSantis from any further unlawful action. Relatedly, the Court should deny DeSantis's Motion to Dismiss.

Dated:  September 9, 2022

**PERKINS COIE LLP**

By:  */s/ Jean-Jacques Cabou*

    Jean-Jacques Cabou (AZ #022835)*
    Alexis E. Danneman (AZ #030478)*
    Matthew R. Koerner (AZ #035018)*
    Margo R. Casselman (AZ #034963)*
    2901 N. Central Avenue, Suite 2000
    Phoenix, Arizona 85012-2788
    JCabou@perkinscoie.com
    ADanneman@perkinscoie.com
    MKoerner@perkinscoie.com
    MCasselman@perkinscoie.com
    602.351.8000

    *Pro Hac Vice*

**AND**

    David B. Singer
    Florida Bar No. 72823
    Matthew T. Newton
    Florida Bar No. 111679
    101 E. Kennedy Blvd., Suite 2800
    Tampa, FL 33602
    dsinger@shumaker.com
    mnewton@shumaker.com

**ATTORNEYS FOR PLAINTIFF**

**LOCAL RULE 7.1(F) CERTIFICATE OF COMPLIANCE**

I certify that this Consolidated Reply in Support of Motion for Preliminary Injunction and Response in Opposition to Motion to Dismiss contains 7,862 words, with such word count incorporating all portions of this document subject to the word limitations imposed under Local Rule 7.1(F).

*/s/ Jean-Jacques Cabou*

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2022, a true and correct copy of the foregoing document was served upon all counsel of record via the Court's CM/ECF System for filing.

*/s/ Stephanie Lawson*