## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

ANDREW H. WARREN,

      Plaintiff,

v.                                CASE NO. 4:22cv302-RH-MAF

RON DESANTIS,

      Defendant.

_____/


## ORDER DISMISSING THE STATE-LAW CLAIM,
## DENYING THE MOTION TO DISMISS THE FEDERAL
## CLAIM, AND DENYING A PRELIMINARY INJUNCTION


This case arises from the Florida Governor's suspension of an elected State

Attorney ostensibly for announcing he would not prosecute cases of certain kinds.

The State Attorney asserts two claims against the Governor: first, that the

suspension violated the First Amendment, and second, that the suspension

exceeded the Governor's authority under the Florida Constitution. The Governor

has not identified a single case the State Attorney failed to prosecute.

The State Attorney has moved for a preliminary injunction. The Governor

has responded and has moved to dismiss. The Governor asserts the First

Amendment claim fails on the merits—that is, that the complaint fails to state a First Amendment claim on which relief can be granted. The Governor asserts the Eleventh Amendment bars the state-law claim and alternatively that this claim, too, fails on the merits.

This order denies the motion to dismiss the First Amendment claim but dismisses the state-law claim based on the Eleventh Amendment. The order denies a preliminary injunction without reaching the merits. When the facts are known, the case could come out either way.

## I. Background

The plaintiff is Andrew H. Warren. He was elected as the State Attorney for the Florida Thirteenth Judicial Circuit in 2016. He was reelected in 2020. The defendant is Ron DeSantis, who was elected as the Governor of Florida in 2018. He is standing for reelection on November 8, 2022. The complaint names him as a defendant in his official and individual capacities and seeks declaratory and injunctive relief, together with costs and attorney's fees, not an award of damages.

Under Florida's system of government, a state attorney is an elected, constitutional officer. Although serving in the executive branch, a state attorney is not an employee of, or supervised by, the governor. A governor may, however, suspend certain officials, including state attorneys, for "malfeasance, misfeasance,

neglect of duty, drunkenness, incompetence, permanent inability to perform

official duties, or commission of a felony." Fla. Const. art. IV, § 7(a).

On August 4, 2022, Governor DeSantis issued an executive order

suspending State Attorney Warren. *See* Executive Order No. 22-176, ECF No. 1-1.

The executive order listed four writings as a basis for the suspension. The order

concluded the writings constituted a "blanket refusal" to enforce certain laws. *Id.* at

3. The order acknowledged a state attorney's "complete discretion" in deciding

whether to prosecute any given case, but the order said a blanket refusal to

prosecute cases of a given kind is not a permissible exercise of that discretion. *Id.*

The order concluded, instead, that such a blanket refusal demonstrates both neglect

of duty and incompetence.

With the possible exception of one sentence, nothing in any of the four

writings explicitly announced a blanket refusal to prosecute cases of any kind.

The first cited writing was a statement joined by 74 prosecutors and law

enforcement officers from around the country pledging not to "promote the

criminalization of gender-affirming healthcare and transgender people." *Id.* at 4 &

13–20. The signers were listed alphabetically, so Mr. Warren was third from last.

He was identified as the "State Attorney, 13th Judicial Circuit (Tampa), Florida."

*Id.* at 20.  Florida has no laws criminalizing trans people or gender-affirming

healthcare, and the writing did not include any pledge not to enforce any such laws

that might then be in effect in other states or that might later be adopted in Florida or elsewhere. A copy of the writing was attached to the executive order.

The second and third writings were policies that Mr. Warren adopted for the State Attorney's office—that is, policies to guide the performance of the office's roughly 130 assistant state attorneys. The writings announced a presumption against criminal prosecution of some kinds of cases, but the writings made clear that cases of those kinds could sometimes be prosecuted; neither writing announced a blanket refusal to pursue cases of any given kind. *See* ECF Nos. 1-3 & 1-4. And a different written policy instructed assistant state attorneys to "exercise discretion based on the facts" in "every case." ECF No. 1-2 at 3.

The fourth writing was a statement joined by 92 prosecutors from around the country addressing abortion. The signers were again listed alphabetically; this time Mr. Warren was sixth from last. The writing included statements of opinion, including, for example, that enforcing abortion bans will erode trust in the legal system and retraumatize victims of sexual violence. ECF No. 1-1 at 22. But the writing also said the signers "commit to exercise our well-settled discretion and refrain from prosecuting those who seek, provide, or support abortions." *Id*. A footnote listed narrow exceptions: "We will continue to consider the prosecution of individuals who violate the autonomy of a pregnant person by carrying out a forced

abortion, or who perform an abortion negligently or with the intent to cause harm to the pregnant person." *Id*. at 22 n.2.

Mr. Warren says the commitment to "refrain from prosecuting those who seek, provide, or support abortions" was a promise only to use discretion, not a blanket refusal to prosecute abortion offenses. But a fair reading, at least of this one sentence, is that the signers claimed—and intended to exercise—the discretion not to prosecute abortion offenses at all, subject to the narrow exceptions described in the footnote. If so read, this was a blanket refusal to prosecute certain kinds of cases.

The record includes at least two other potential sources of information about the Governor's motivation for the suspension.

First, on the day before the suspension, the Governor's press secretary tweeted that there would be a major announcement the next morning. The tweet said everyone should "get some rest tonight" and "[p]repare for the liberal media meltdown of the year." ECF No. 3-10 at 2.

Second, the Governor announced the suspension at an event at which he spoke at some length and at which he introduced other speakers. *See* ECF No. 3-6. The remarks were consistent with but far exceeded the explanation for the suspension set out in the executive order itself. A fair description is that the Governor and other speakers disagreed with Mr. Warren's policies in general—that

they favored a more strident "law and order" approach than Mr. Warren had put in place.

## II. The State-Law Claim and the Eleventh Amendment

With exceptions not applicable here, the Eleventh Amendment bars any claim in federal court for declaratory or injunctive relief based on state law against a state or state officer. This was the square holding of *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 121 (1984). This requires dismissal of Mr. Warren's state-law claim.

In asserting the contrary, Mr. Warren says *Pennhurst* applies only when the real party in interest is the state as a sovereign, and that here, the real party in interest is Mr. DeSantis himself, not the state. But that is just semantics. Mr. Warren was an employee of the State of Florida, not of Mr. DeSantis individually. Mr. Warren's suspension was an official action of the State of Florida. *Pennhurst* would be a dead letter, or nearly so, if it could be avoided simply by asserting that the state official who took the challenged state action was the real party in interest. Mr. Warren's state-law claim is the very paradigm of a claim that, under *Pennhurst*, cannot be adjudicated in federal court.

Mr. Warren cites *Florida Department of State v. Treasure Salvors, Inc.*, 458 U.S. 670 (1982), for the proposition that a state official who acts *ultra vires*—that is, without authority under state law—does not share the state's Eleventh

Amendment immunity from injunction claims based on state law. But in *Treasure Salvors*, the plaintiff was permitted to go forward on a claim that the plaintiff was entitled, as a matter of federal admiralty law, to possession of property the plaintiff salvaged from international waters; the claim did not arise under state law. Moreover, in *Pennhurst*, the Court said any *ultra vires* exception to Eleventh Amendment immunity applies only when a state official acts "without any authority whatsoever," not when the official's act is an erroneous use of authority that exists. *Pennhurst*, 465 U.S. at 101 n.11 (quoting *Treasure Salvors*, 458 U.S. at 697). A Florida governor has suspension authority, so Governor DeSantis's suspension of Mr. Warren, even if erroneous, would not qualify for any *Pennhurst* exception for *ultra vires* acts.

Mr. Warren also cites *Lewis v. Clarke*, 137 S. Ct. 1285 (2017), but the issue there was only whether a driver could be held individually liable for negligently crashing into another motorist, even if the individual was acting within the course and scope of his duties for an Indian tribe. The decision speaks not at all to a federal court's authority to enter an injunction requiring official state action, including, for example, reinstatement of a state employee.

In sum, Mr. Warren's state-law claim must be dismissed based on *Pennhurst*. The dismissal on this basis is not a ruling one way or the other on

whether the suspension violated state law. The dismissal does not affect one way or the other the question whether Mr. Warren can obtain relief in state court.

### III.  Standards on a Motion to Dismiss for Failure to State a Claim

To survive a motion to dismiss for failure to state a claim on which relief can be granted, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For purposes of a motion to dismiss, the complaint's factual allegations, though not its legal conclusions, must be accepted as true. *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Credibility choices play no part in the analysis; a motion to dismiss is not the vehicle by which the truth of a plaintiff's factual allegations can be judged.

### IV. Standards on a Preliminary-Injunction Motion

As a prerequisite to a preliminary injunction, a plaintiff must establish a substantial likelihood of success on the merits, that the plaintiff will suffer irreparable injury if the injunction does not issue, that the threatened injury outweighs whatever damage the proposed injunction may cause a defendant, and that the injunction will not be adverse to the public interest. *See*, *e.g.*, *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1354 (11th Cir. 2005); *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).

On a preliminary-injunction motion, unlike on a motion to dismiss for failure to state a claim, evidence is properly considered, and credibility choices can be made.

## V. First Amendment Retaliation

Removal of an elected official for expressing political views—or in circumstances that plausibly support a claim that that happened—has occurred only rarely in American history. Predictably, then, there is limited judicial authority on the subject. It is useful to begin with the framework that applies to First Amendment retaliation claims more generally, including those filed by rank-and-file, at-will public employees.

Because this order addresses both a motion to dismiss, on which the complaint, attachments, and limited additional documents govern, and a preliminary-injunction motion, on which all the record evidence may be considered, this order sometimes refers to the complaint and attachments, and sometimes to the other evidence, separating out the analysis only when it makes a difference.

### A. The Elements of a First Amendment Retaliation Claim

The elements of a First Amendment retaliation claim are (1) speech or activity protected by the First Amendment, (2) an adverse action, and (3) a causal connection between the protected speech or activity and the adverse action. *See*

*Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005) (adopting these elements of a First Amendment retaliation claim); *see also Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022) (reversing summary judgment for a school district that did not renew a football coach's contract because he prayed at midfield following a game); *Bond v. Floyd*, 385 U.S. 116 (1966) (holding a state legislator could not be excluded from office because of statements on matters of public interest).

The complaint includes allegations easily sufficient to meet these requirements. And there is evidence that would support, but in some respects not compel, findings in Mr. Warren's favor. This order addresses each of the three elements in turn.

### B. Protected Speech or Activity

The first and fourth writings cited in the executive order—the statements joined by prosecutors from around the country on transgender issues and abortion—are chock full of statements of opinion constituting core political speech. Thus, for example, the first writing said transgender people are "some of the most vulnerable Americans" and that attacks on them "will deeply harm public safety." ECF No. 1-1 at 13. The fourth writing said enforcing abortion bans will erode trust in the legal system and retraumatize victims of sexual violence. *Id.* at 22.

Transgender and abortion issues have been the subject of proposed legislation in Florida and elsewhere and likely will be again. These writings were plainly intended to influence public opinion and, in turn, any proposed legislation. If a member of the public at large or a typical rank-and-file state employee wrote a letter to a newspaper—or in today's world, issued a tweet—with comments like these, nobody would seriously contend the comments were not protected by the First Amendment. Nobody would seriously contend the employee could be suspended or fired for making the comments.

That Mr. Warren is an elected official, not a rank-and-file employee, does not change the result. If anything, the distinction cuts the other way. In *Bond*, a state argued that an elected official—there a legislator—had lesser First Amendment rights than the public at large. The Supreme Court unanimously rejected the assertion. *Bond*, 385 U.S. at 135–37. And just last term, the Supreme Court said, again unanimously, "The First Amendment surely promises an elected representative . . . the right to speak freely on questions of government policy." *Houston Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1261 (2022). The Court added that the role of elected officials "makes it all the more imperative that they be allowed to freely express themselves." *Id*. (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 781 (2002)).

The Governor suggests *Bond* has lost its force, but the unanimous decision in *Wilson*, decided just six months ago, cited and discussed *Bond* at length, with nary a hint that its precedential value had ebbed. *See Wilson*, 142 S. Ct. at 1263. The Governor also says *Bond* deals only with a legislator, not an official in the executive branch. But *Wilson* involved an elected official in the executive branch, a member of a college board of trustees, and *Wood v. Georgia*, 370 U.S. 375 (1962), involved a sheriff, also a member of the executive branch. *White* involved campaigns for judgeships, part of the judicial branch. The suggestion that an elected state attorney has no First Amendment right to comment on matters of public concern, including transgender and abortion issues, is wrong.

The Governor says, though, that the writings addressed prosecuting cases—or not prosecuting cases—and that this is conduct, not speech. The distinction between speech and other activity protected by the First Amendment, on the one hand, and conduct not protected by the First Amendment, on the other hand, is not always clear. *See Wollschlaeger v. Governor*, 848 F.3d 1293, 1307 (11th Cir. 2017). This order assumes that in this context, a state attorney's prosecutorial decisions are unprotected conduct. The Governor is correct that when conduct is not protected, talking about it does not change that status. But the Governor is incorrect when he suggests that the writings' mention of conduct removes the protection from the core political speech that is also included in the writings. The

protected comments quoted above—and the many other examples included in the writings—remain protected, despite any references to conduct also included in the writings.

The Governor also cites—and seemingly places his principal reliance on—*Garcetti v. Ceballos*, 547 U.S. 410 (2006). There the plaintiff, an assistant state attorney, allegedly suffered adverse action—a transfer and denial of a promotion—because of a memorandum he wrote, as part of his job, criticizing the handling of a search warrant. The plaintiff asserted a First Amendment claim. The Ninth Circuit evaluated the claim under *Pickering v. Board of Education*, 391 U.S. 563 (1968), which held that, when a public employee speaks as a citizen on a matter of public concern, the speech is protected by the First Amendment. On review, the Supreme Court held *Pickering* inapplicable: "We hold that when public employees make statements pursuant to their *official duties*, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from *employer discipline*." *Garcetti*, 547 U.S. at 421 (emphasis added). Instead, "government *employers*" must be afforded "sufficient discretion to *manage their operations*." *Id*. at 422 (emphasis added). The result: "the First Amendment does not prohibit *managerial discipline* based on an employee's expressions made pursuant to *official responsibilities*." *Id*. at 424 (emphasis added).

*Garcetti* does not help the Governor for two reasons.

First, *Garcetti* deals with government supervisors, their subordinates, and managerial discipline. The decision includes not a word about the First Amendment rights of elected officials—the issue decided in *Bond*—and the decision's rationale simply does not apply to them. Elected officials are beholden to their constituents, not to some other elected official, even if the other official ranks higher. Here, for example, the Governor was not Mr. Warren's boss and had no right to dictate how Mr. Warren did his job—whom he hired, what policies he adopted, or any of the myriad other policy matters a state attorney must address. As the Florida Supreme Court has put it, "the power to remove is not analogous to the power to control." *Whiley v. Scott*, 79 So. 3d 702, 715 (Fla. 2011).

The voters in the Thirteenth Judicial Circuit elected Mr. Warren, not Mr. DeSantis, to serve as their state attorney. As *Bond* recognizes, Mr. Warren could not be excluded from his elected position for exercising his First Amendment rights.

The better view thus is that *Bond*, not *Garcetti*, applies to elected officials. And the weight of circuit authority supports this analysis. In *Boquist v. Courtney*, 32 F.4th 764, 780 (9th Cir. 2022), the court squarely held *Garcetti* inapplicable to elected officials. In *Phelan v. Laramie County Community College Board of Trustees*, 235 F.3d 1243, 1247 (10th Cir. 2000), which came after *Pickering* but

predated *Garcetti*, the court held *Pickering* inapplicable to elected officials, based on analogous reasoning. In *Rangra v. Brown*, 566 F.3d 515, 522–27, *reh'g en banc granted*, 576 F.3d 531, *vacated as moot*, 584 F.3d 206 (5th Cir. 2009), a Fifth Circuit panel held *Garcetti* inapplicable to elected officials, but the decision was vacated as moot while en banc review was pending. In *Werkheiser v. Pocono Twp.*, 780 F.3d 172, 177–79 (3d Cir. 2015), the Third Circuit discussed the issue and recognized the difference between elected officials and unelected employees, but the court did not decide the issue because a ruling was not essential to the outcome.

The only circuit decision cited by the Governor as authority for his contrary view is *Parks v. City of Horseshoe Bend*, 480 F.3d 837, 840 n.4 (8th Cir. 2007). There the Eighth Circuit said, in dictum in a footnote, that the plaintiff elected official's speech would not be protected if made pursuant to his official duties. For this the court cited *Garcetti*, did not mention *Bond*, and did not discuss or apparently even recognize the issue of whether *Garcetti* applies to elected officials. Dictum is "not binding on anyone for any purpose," *United States v. Garcia*, 405 F.3d 1260, 1274 (11th Cir. 2005) (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1315 (11th Cir.1998) (Carnes, J., concurring)). And this is especially true when the dictum does not analyze or even recognize an issue on which it is cited. *Parks* does not help the Governor.

Second, joining in writings with other prosecutors addressing issues of nationwide concern—writings like those attached to the executive order suspending Mr. Warren—was not part of his "official duties" as the Thirteenth Judicial Circuit State Attorney, at least as that term is used in *Garcetti*. *See Lane v. Franks*, 573 U.S. 228, 240 (2014) ("The critical question under *Garcetti* is whether the speech at issue is *itself* ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.") (emphasis added here and as later quoted in *Alves*); *Alves v. Bd. of Regents of Univ. Sys. of Ga.*, 804 F.3d 1149, 1159–62 (11th Cir. 2015) ("After *Lane*, the exception to First Amendment protection in *Garcetti* . . . must be read narrowly to encompass speech that an employee made in accordance with or in furtherance of the ordinary responsibilities of her employment, not merely speech that concerns the ordinary responsibilities of her employment.").

To be sure, the lists of signers at the end of the writings identified Mr. Warren as the Florida Thirteenth Judicial Circuit State Attorney, just as they identified the dozens of other signers by their positions. But Mr. Warren had no "duty," as state attorney, to join in writings of this kind, let alone to join in these specific writings. By signing the statements, Mr. Warren took no official action. Any more general duty, as an elected official, to take positions on matters of public concern was not an "official" duty within the meaning of *Garcetti*.

The bottom line: the writings attached to the executive order included speech protected by the First Amendment. The complaint meets the first of the three elements of a First Amendment retaliation claim, even without considering the broader First Amendment interests of Mr. Warren and his constituents in the elected position. *See, e.g.*, *Bond*, 385 U.S. at 135–36; *Velez v. Levy*, 401 F.3d 75, 95–98 (2d Cir. 2005). The evidence would support a finding that protected speech or activity was a motivating factor in the Governor's decision.

### C. Adverse Action

Suspending an officeholder, or indeed any employee, especially when accompanied by an interruption of pay, is an adverse action. *See Wilson*, 142 S. Ct. at 1260–61 (stating that removal from employment is an "easy to identify" adverse action). The Governor does not assert the contrary and could not reasonably do so. The complaint alleges, and the record would support and indeed compel a finding, that this second element of a First Amendment retaliation claim has been met.

### D. Causal Connection

The complaint adequately alleges, and the record would support a finding, that there was a causal connection between the suspension and the first and fourth writings. Indeed, the executive order cited, discussed, and attached the writings.

This does not necessarily mean, of course, that there was a causal connection between the suspension and any given *part* of the writings. But in addressing Mr.

Warren's burden at the initial stage of the analysis, it is enough to note that the complaint adequately alleges, and the limited record now before the court would support a finding, that there was a causal connection between the suspension and protected speech included in the first and fourth writings, regardless of whether other parts of the writings were unprotected. *See Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1564 (11th Cir. 1995) (describing the plaintiff's burden on this issue as "not a heavy one.").

### E. The Same-Decision Defense

When a plaintiff's First Amendment-protected speech or activity is a motivating factor in a defendant's decision to take adverse action against the plaintiff, the defendant may assert as an affirmative defense that the defendant would have taken the same adverse action anyway, even in the absence of the protected speech or activity. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977); *Beckwith*, 58 F.3d at 1563–64. The burden of proof on the same-decision defense is on the defendant. *See Mt. Healthy*, 429 U.S. at 287.

Here, the Governor has not (yet) asserted a same-decision defense. He has not cited *Mt. Healthy*. The only evidence in the record to this point that would support a same-decision defense is the assertion in the executive order that Mr. Warren's "declared refusal to prosecute abortion cases is alone sufficient to justify his suspension and removal for neglect of duty and incompetence." ECF No. 1-1 at

8. This is followed closely, though, by the statement that because of Mr. Warren's refusal to prosecute cases, he "can no longer be trusted to fulfill his oath of office." *Id.* at 9. This closely tracks the ground invoked in *Bond* for excluding a state legislator from his position—the ground the United States Supreme Court held unavailing.

In any event, the law is settled, even for plaintiffs who are not elected officials, that a defendant's proffered reasons for taking action against a plaintiff are not necessarily controlling. It is commonplace for a plaintiff in an employment case to assert a defendant's purported reasons for disciplinary action were pretextual. *See, e.g.*, *Tracy v. Fla. Atl. Univ. Bd. of Trs.*, 980 F.3d 799 (11th Cir. 2020); *Stanley v. City of Dalton*, 219 F.3d 1280, 1291 n.20 (11th Cir. 2000). There is at least some evidence that might raise the issue here: the night before Mr. Warren's suspension was announced, the Governor's press secretary tweeted that everyone should prepare for the liberal media meltdown of the year. That might suggest a political motive for the suspension, or it might suggest only an awareness that the suspension would be perceived by others as politically motivated. Neither the Governor nor the press secretary has explained the tweet.

On the limited record now before the court, no finding can be made with confidence on whether the Governor would have suspended Mr. Warren based on

his blanket refusal to prosecute most types of abortion cases—if that is what it was—even without regard to Mr. Warren's other, protected speech.

### F. The Elrod-Branti Principle

The Supreme Court has made clear that a government employer ordinarily cannot terminate employees based on political patronage—that is, for supporting an opposing political party or based on other partisan considerations. *See Branti v. Finkel*, 445 U.S. 507 (1980); *Elrod v. Burns*, 427 U.S. 347 (1976).

There is an exception for employees whose party affiliation or political loyalty is an appropriate requirement for effective performance of the job. Thus, for example, an elected official is entitled to a chief of staff whose political views line up with the official's. The Eleventh Circuit applies the exception broadly. *See, e.g.*, *Cutcliffe v. Cochran*, 117 F.3d 1353 (11th Cir. 1997) (holding that a Florida sheriff could remove deputy sheriffs at all levels based on partisanship).

The Governor has not asserted he could lawfully suspend Mr. Warren based on their political differences. And this is understandable: in the Florida system, political loyalty to the Governor is not an appropriate requirement for effective performance of a state attorney's job. The Governor does not claim it is.

### G. Elected Officials

The analysis set out to this point started with the elements of a typical First Amendment retaliation case—the elements applicable even to a plaintiff who is not

an elected official. Two cases make clear that an elected official has at least as great a First Amendment right as a typical plaintiff.

First, in *Bond*, the Supreme Court held that an elected official was entitled to his position despite the state's invocation of a ground for exclusion—inability to follow his oath of office—that, if true, surely would have supported exclusion. The Court itself analyzed the record to determine whether the asserted ground was true; the Court did not give the same deference to the state's position as would occur in a typical case not involving an elected official. *See Bond*, 385 U.S. at 132–37. In a typical case, an "employer may fire an employee for a good reason, a bad reason, *a reason based on erroneous facts*, or for no reason at all, as long as its action is not for a [prohibited] reason." *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984) (Wisdom, J.) (emphasis added); *see also Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000); *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991).

Second, in *Velez v. Levy*, 401 F.3d 75 (2d Cir. 2005), an elected community school board member asserted a First Amendment claim based on her removal from office by the school district's elected chancellor. The chancellor had authority to remove school board members for specified categories of misconduct, and he based this removal on alleged misconduct that, if it had occurred, would have authorized the removal. The plaintiff claimed the misconduct did not occur—that

the asserted grounds for removal were pretextual and the real reason for the

removal was political disagreement. The Second Circuit held that the complaint

stated a First Amendment claim on which relief could be granted. This was a

holding that when an executive-branch elected official with authority to remove a

lower-ranking executive-branch elected official on limited grounds takes action

purportedly on those grounds, the lower-ranking official may prevail on a First

Amendment claim by showing that the real reason for the action was political

disagreement between the officials, not the cited grounds. This is a factual issue.

The event at which the Governor announced Mr. Warren's removal included

statements by the Governor and his supporters emphasizing their political

disagreements with Mr. Warren. The record does not make clear whether those

political disagreements were a reason for Mr. Warren's suspension or whether he

would have been suspended anyway, without regard to the political differences.

## VI.  Younger Abstention

The Supreme Court established an abstention doctrine in *Younger v. Harris*,

401 U.S. 37 (1971), holding that, with narrow exceptions, a federal court must not

interfere with an ongoing state criminal prosecution. In *Middlesex County Ethics

Commission v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982), the Court

extended *Younger* to "noncriminal judicial proceedings when important state

interests are involved." *Middlesex* involved a bar disciplinary proceeding conducted under the auspices of the state supreme court.

The Governor asserts *Younger* applies here because Florida Senate review of a suspension is a judicial proceeding.

*Middlesex* establishes three prerequisites to *Younger* abstention: "first, [is there] an ongoing state judicial proceeding; second, do the proceedings implicate important state interests; and third, is there an adequate opportunity in the state proceedings to raise constitutional challenges." *Id*. at 432. Here there is no ongoing state proceeding, judicial or otherwise. And a Senate proceeding, if one ever begins, will not provide an adequate opportunity to address the suspension decision itself, let alone the constitutional challenge to it.

On the first prerequisite—an ongoing state judicial proceeding—the Florida Senate's rules state that "action" on a governor's suspension decision is "institute[d]" when a notice of hearing is transmitted, "[u]nless suspension proceedings are held in abeyance." Fla. Sen. R. 12.9. At least as shown by this record, no notice of hearing has been transmitted, so no proceeding has begun. And the "held in abeyance" clause makes doubly clear that no proceeding is ongoing: the Senate has explicitly said there will be no Senate proceeding until this federal lawsuit is over. Letter from Fla. Senate Sec'y Brown to Warren (Aug. 17, 2022), https://www.flsenate.gov/usercontent/session/executivesuspensions/Warren_Andre

w/081722AndrewWarrenNoticeofAbeyance.pdf (cited at ECF No. 46 at 24). This

failure to meet the first *Middlesex* criterion is sufficient, standing alone, to render

*Younger* inapplicable.

This makes it unnecessary to decide whether a Senate proceeding, if one

begins, will be "judicial." What matters is the nature of the proceeding, not

whether the tribunal is a traditional court. *See New Orleans Pub. Serv., Inc. v.

Council of City of New Orleans*, 491 U.S. 350, 372 (1989). The Florida Supreme

Court has said that in reviewing a suspension, the Senate "is nothing less than a

court," *State ex rel. Hardie v. Coleman*, 155 So. 129, 134 (Fla. 1934), but whether

a proceeding is "judicial" for *Younger* purposes is a question of federal, not state

law. The Governor has cited no case applying *Younger* to political bodies or

proceedings remotely like those involved here. And in every proceeding held

"judicial" for *Younger* purposes, judicial review—review in a traditional court—

has been available at some stage of the proceeding.

This leads into the third *Middlesex* prerequisite—an adequate opportunity in

the state proceeding to raise constitutional challenges. Mr. Warren will have no

adequate opportunity to raise his constitutional challenges in a state proceeding,

even if one occurs, for two reasons.

First, this lawsuit involves the suspension, while any Senate proceeding will

involve removal, not necessarily on the same grounds. The Governor insists that

the Senate will be obligated to consider not just the alleged neglect of duty or incompetence cited by the Governor as grounds for Mr. Warren's suspension, but also—or perhaps instead—any different grounds asserted by the Governor between now and then. *See* Hr'g Tr., ECF No. 59 at 43-44. The issue in a Senate proceeding, if there ever is a Senate proceeding, will not be whether the evidence establishes the legal and factual basis for the suspension that occurred. Instead, the issue will be whether the evidence establishes a legal and factual basis for removal on any grounds that may be asserted by the Governor *at that time*.

Second, even if the Senate was required to consider only the grounds on which the suspension was based, Mr. Warren still would not have an adequate opportunity to raise his federal constitutional claims there. This is so because there would be no opportunity for meaningful judicial review—for review in a court at any level. The Florida Supreme Court has held that when a governor *alleges* a legitimate factual basis for a suspension decision, the role of the Florida courts is at an end—a Florida court cannot review the sufficiency of the evidence to prove the allegation. *See, e.g.*, *Israel v. DeSantis*, 269 So. 3d 491, 495 (Fla. 2019). Asked at oral argument in the case at bar for any authority applying *Younger* to a state proceeding affording no opportunity for review in a *court*, the Governor could cite none. Courts applying *Younger* have emphasized time and again the critical role of judicial review. *See Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.*, 477

U.S. 619, 629 (1986) (stating that the opportunity for "state-court judicial review" of administrative action that is judicial in nature is a sufficient opportunity to raise federal constitutional claims); *see also Pompey v. Broward Cnty.*, 95 F.3d 1543, 1551 (11th Cir. 1996) (stating that what matters under *Younger* is the plaintiff's ability to raise (not necessarily succeed on) "his constitutional claims in the state courts, from which a certiorari petition can be filed seeking review on the merits in the United States Supreme Court"); *Baffert v. Cal. Horse Racing Bd.*, 332 F.3d 613, 620–21 (9th Cir. 2003) (outlining the available, extensive state-court review as a basis for holding there was an adequate opportunity to present constitutional claims in a state proceeding).

In addition to the three *Middlesex* prerequisites, there is another limitation: *Younger* does not apply when there are "circumstances suggesting bad faith, harassment or *irreparable injury that is both serious and immediate*." *Gibson v. Berryhill*, 411 U.S. 564, 574 (1983) (emphasis added). Mr. Warren has alleged circumstances suggesting serious and immediate irreparable injury to Mr. Warren and, perhaps more importantly, his constituents, if not also bad faith. *See, e.g.*, *Wilson v. Thompson*, 593 F.2d 1375, 1383 (5th Cir. 1979). *Younger* has never been applied in circumstances quite like these.

In sum, *Younger* does not bar this action.

## VII.  Pullman Abstention

Under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941), a federal court may abstain from deciding a federal constitutional question when a state court's resolution of an unclear issue of state law might moot the federal constitutional question or present it in a substantially different light. The Governor says this requires abstention here, but the only purportedly unclear issue of state law he has identified has nothing to do with the merits. That issue is whether the Florida Senate, if it eventually decides to go forward and considers whether to remove Mr. Warren from office as advocated by the Governor, may consider Mr. Warren's assertion that doing so would violate the First Amendment.

There is no chance—none—that the substantive First Amendment issue that is the subject of this federal lawsuit will be rendered moot by a ruling on the Senate's authority to address that issue. So *Pullman* has nothing to do with it. The Governor has cited no case suggesting a procedural issue unrelated to the merits of a federal claim can be a basis for *Pullman* abstention. Instead, the Governor cites a case in which the Eleventh Circuit certified a similar question to a state supreme court. *See Butler v. Ala. Jud. Inquiry Comm'n*, 245 F.3d 1257, 1265–66 (11th Cir. 2001). But a circuit court's certification of a state-law question leaves any federal claim pending in the circuit court; certification is a far different process, permissible under far different standards, than abstention. *Butler* did not cite

*Pullman* or suggest that *Pullman* abstention was required or even permissible based on the procedural issue the court certified.

## VIII.  Applying the Preliminary-Injunction Standards

As set out above, four factors control a district court's decision whether to grant a preliminary injunction. The first factor, likelihood of success on the merits, is often the most important. Here, though, the existing record is insufficient to allow a *reliable* assessment at this time of which side is likely to prevail on the merits.

The decisive factor, instead, is the fourth: the public interest. Changes at the top of any enterprise can be disruptive. The Governor has replaced Mr. Warren with a new state attorney, and she has made substantial changes. If Mr. Warren is to be reinstated, it should happen once. Reinstating him now, when it cannot be predicted with confidence that he will ultimately prevail in the litigation, risks further disruption. The public interest calls for proceeding to trial as soon as possible, but the public interest does not support entry of a preliminary injunction.

## IX. Conclusion

For these reasons,

IT IS ORDERED:

1. The motion for a preliminary injunction, ECF No. 3, is denied.

2. The motion to dismiss, ECF No. 30, is granted in part and denied in part. The state-law claim is dismissed without prejudice based on the Eleventh Amendment. The federal claim is not dismissed.

SO ORDERED on September 29, 2022.

s/Robert L. Hinkle
United States District Judge