# Exhibit 8

```
 1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF FLORIDA
 2                      TALLAHASSEE DIVISION

 3                              CASE NO. 4:22-cv-302-RH-MAF

 4   ANDREW H. WARREN,

 5        Plaintiff,

 6   vs.

 7   RON DESANTIS, individually
     and in his official capacity
 8   as Governor of the State
     of Florida,

 9
          Defendant.
10   _____/

11                      VIDEO DEPOSITION OF
                          LAWRENCE KEEFE
12
                    Taken on Behalf of PLAINTIFF
13
                DATE:         October 19, 2022
14              TIME:         10:00 a.m. - 2:26 p.m.
                PLACE:        Messer Caparello PA
15                            2618 Centennial Place
                              Tallahassee, Florida 32308
16
                Examination of the witness taken before:
17
                        JEFFREY R. BABCOCK
18                        Court Reporter
                        Tallahassee, Florida
19

20

21

22

23

24

25
```

1  ago, and at the beginning of the call said that he had

2  been noticed in some way to be deposed, and had I, and I

3  said I had.

4      And I -- and he said, well, what -- you know, "What's

5  this going to be about," or "What do you anticipate will

6  occur?"  And I said that we should let -- I asked whether

7  he had a lawyer, and he said he did.  And I said, "Well,

8  then your lawyer should confer with my lawyers, and they

9  should be the ones that have dialogue, not us."  And the

10  call ended.

11      Q.  And so he took your direction or your suggestion

12  at that, and you didn't -- am I correct that you didn't

13  discuss this further?

14      A.  No.  He took my direction at that, meaning, he

15  didn't persist, and we did not discuss it further.

16      Q.  Okay.  Other than Sheriff Chronister, is there

17  any other person with whom you've discussed your testimony

18  here today?

19      A.  With counsel.

20      Q.  Okay.  And other than that?

21      A.  Not in any manner of substance, just the fact

22  that I was going to be deposed and have a deposition in

23  this, but not in any kind of substantive discussion.

24      Q.  Okay.  Okay.  Mr. Keefe, prior to Mr. Warren's

25  suspension from office an August 4th, was there, at the

1  Governor's request, an investigation or review of state

2  attorney's offices across Florida?

3      A.   My -- my recollection of that was not that the

4  Governor requested anything.  What happened was, sometime,

5  I estimate in December of -- last December, I was in a

6  meeting with the Governor with Ryan Newman and with James

7  Uthmeier on subjects wholly unrelated to state attorneys.

8  And at some point in that meeting, the Governor asked me

9  whether any of the state attorneys in Florida were not

10 enforcing the law, and I responded that I did not know but

11 that I would be glad to look into it.  The Governor said

12 nothing further on that, and we went back to the

13 discussion that we were having on other subjects.  And I

14 would estimate that that exchange between the Governor and

15 me on that topic took less than 30 seconds to occur.

16     And then based on that, the overall subject of whether

17 state attorneys in Florida, any of them, were not

18 enforcing Florida law became a project, but not a high

19 priority project, not anything with urgency.  And so it

20 wasn't so much that I was tasked as much as I took on the

21 project based on the Governor's question to me.  So there

22 was never a tasking with any specific form.  It became a

23 matter that I said -- that I said I would look into.

24     Q.   Okay.  What was the purpose for which that

25 meeting was convened?

1          MR. LEVESQUE:  I'm going to object and assert

2     executive privilege and deliberative process privilege

3     to the extent that it doesn't deal with any matters

4     related to the Executive Order.  If it deals with the

5     Executive Order, you can answer.  But if it doesn't,

6     I'm going to instruct the witness not to answer.

7          THE WITNESS:  It had absolutely nothing

8     whatsoever -- that meeting had absolutely nothing

9     whatsoever to do with U.S. attorneys, state attorneys,

10     any attorneys.  It was wholly unrelated subjects.

11  BY MR. CABOU:

12     Q.  So how did it come up?

13     A.  I do not know.  I do not know what the -- I do

14  not know.  It was -- I do not not know whatever the thing

15  was that caused the Governor to ask me that question.  I

16  don't know.  I don't recollect.

17     Q.  Okay.  He -- there was nothing else that he said

18  that, in your mind, caused this subject to bubble up in

19  the otherwise unrelated meeting?

20     A.  Not that I recall.

21     Q.  Okay.  Who would know why this came up in that

22  meeting?

23     A.  Well, the human beings that were present at the

24  meeting were the Governor, Ryan Newman, James Uthmeier,

25  and me.  I've told you what I know.  I can't speak to and

 1    don't know whatever else was happening in their minds.

 2         Q.   Okay.  Just so I'm clear, who was it that

 3    broached the subject of whether state attorneys in Florida

 4    were enforcing the law?

 5         A.   The Governor, and totally out of context of what

 6    we were discussing.  And there may have been some

 7    tangential thing, there may have been some -- some topic

 8    or thing, one aspect of which had to do with enforcement

 9    of law, but I'm speculating now.

10         And I responded to the Governor that I did not know

11    whether there were state attorneys in Florida that were

12    not enforcing the law, and I said that I would be glad to

13    look into it.  And there was no follow-up.  There was no

14    further discussion.  We went on with whatever it was that

15    we were talking about that had absolutely nothing

16    whatsoever to do with state attorneys.

17         Q.   Okay.  Is it fair to say that your review of

18    Florida state attorneys began after that meeting?

19         A.   Yes.

20         Q.   And then, although you said it was a low-priority

21    project, the project was ongoing from that meeting

22    forward?

23         A.   Ongoing in a sense that there were times days and

24    weeks passed, I did nothing, and there were times where I

25    had a significant amount of oral communications with

1          A.   No.

2          Q.   Okay.  Had you ever seen this document before?

3          A.   I think so.

4          Q.   Okay.  So the document says, in that sentence you

5     just read six minutes ago, "In every case, ASAs must

6     exercise discretion based on the facts of that case."

7     This is a policy of Mr. Warren's office that the PostIt

8     note is covering, but I think there's a copy later, was

9     promulgated in December of 2021 and it codified other

10    policies, including preferable policies that had been in

11    place before.

12         Does seeing that Mr. Warren's office had a written

13    policy of discretion in every case change your view about

14    your conclusions that he had blanket policies as to

15    anything?

16         A.   No.

17                   MR. LEVESQUE:  Object to form.

18    BY MR. CABOU:

19         Q.   Why not?

20         A.   Because notwithstanding what it said in this

21    memo, it is not what I heard from law enforcement in the

22    Tampa area, and it's not what I saw in the joint

23    statement.

24         Q.   Okay.  Did you speak to line prosecutors in the

25    State Attorney's Office of the 13th District?

1      A.   No.

2      Q.   Did you speak to any attorneys in the State

3  Attoney's Office in the 13th District?

4      A.   Say that again.

5      Q.   Other than line prosecutors, did you speak to

6  anyone else in the state attorney's office prior to

7  Mr. Warren's suspension?

8      A.   No.

9      Q.   Why not?

10      A.   Because in terms of my analysis and what I looked

11  at and what I did, I had completed what I was tasked to

12  do.  And then it was largely a legal analysis by the

13  general counsel's office in terms of dissecting these

14  presumptions of non-prosecution, and -- these documents

15  and the things other than the joint statements were

16  analyzed and evaluated by the general counsel's office in

17  communication with Sheriff Chronister, and perhaps Chief

18  Dugan, I'm not certain.

19      But I -- my central role was not in the analysis of

20  these documents, comparing it to the case law, and the how

21  it went down in the field in real life with Sheriff

22  Chronister and his folks, and Sheriff Dugan.  That wasn't

23  my focus.  That wasn't what -- I wasn't key in that area

24  of the work.

25      Q.   So the analysis of these documents was done by --

1   not by you; correct?

2        A.   I read them, I looked at them, I did analyze

3   them, but the incorporation of them as factors in the

4   Executive Order was largely done by the general counsel's

5   office, in consultation with Sheriff Chronister and

6   information that he would gather from Chief Dugan as to

7   how this actually occurred in the real world, not in

8   the -- the -- in concept, as reflected in the document.

9        Q.   Okay.  Do you know who in the general counsel's

10  office actually did the analysis?

11       A.   I know that Ryan Newman was involved.  I know

12  that Ray Treadwell was involved.  I think others were

13  involved, but I couldn't be certain.

14       Q.   Mr. Treadwell's the Chief Deputy General Counsel;

15  correct?

16       A.   I believe that's his title.

17       Q.   Okay.  All right.  So on page 2192, there's

18  additional highlighting on the subject of incarceration.

19  Do I assume correctly that you did not highlight that?

20       A.   I must say that there's no highlighting on

21  the document --

22       Q.   Okay -- you can look at mine.

23       So page 2192 in the electronic copy shows

24  highlighting.  Was that highlighting placed there by you?

25       A.   No.

1  in the general counsel's office.

2      Q.  Did you not think it was antithetical to a

3  democratic society to remove from office an elected

4  prosecutor who was doing the exact things that he ran for

5  office to do?

6              MR. LEVESQUE:  Object to form.

7              THE WITNESS:  I believe that it was essential

8          to suspend, not remove -- that's left to the senate

9          and Judge Hinkle.  I believe it was absolutely

10         imperative for the Governor to exercise his authority

11         and to make certain that the laws are being faithfully

12         executed in the State of Florida.

13              And my job is to help the Governor implement

14         his vision.  And the Governor believed, when he made

15         the decision to move on this, that it was the right

16         thing to do.  I agree with the Governor, and I believe

17         that to continue to allow prosecutors of the sort of

18         Mr. Warren, who made the statements that he made in

19         the joint statements, to basically be God in their

20         particular circuits and decide what laws of the

21         legislature will be ignored and those that will be

22         enforced, is a threat to democracy, yes.

23  BY MR. CABOU:

24      Q.  Are you -- but not removing him from office,

25  that's not a threat to democracy?