# Exhibit 9

```
1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF FLORIDA
2                       TALLAHASSEE DIVISION

3                           CASE NO. 4:22-cv-302-RH-MAF

4    ANDREW H. WARREN,

5         Plaintiff,

6    vs.

7    RON DESANTIS, individually
     and in his official capacity
8    as Governor of the State
     of Florida,
9
          Defendant.
10   _____/

11                       VIDEO DEPOSITION OF
                           CHRISTINA PUSHAW
12                         VOLUME I OF II

13                  Taken on Behalf of PLAINTIFF

14         DATE:           October 18, 2022
           TIME:           10:00 a.m. - 4:38 p.m.
15         PLACE:          Messer Caparello PA
                           2618 Centennial Place
16                         Tallahassee, Florida 32308

17         Examination of the witness taken before:

18                       JEFFREY R. BABCOCK
                           Court Reporter
19                       Tallahassee, Florida

20

21

22

23

24

25
```

```
 1  APPEARANCES OF COUNSEL:

 2  On behalf of the PLAINTIFF:

 3  JEAN-JAQUES CABOU, ESQUIRE
    MARGO CASSELMAN, ESQUIRE
 4  Perkins Coie LLP
    2901 North Central Avenue, Suite 2000
 5  Phoenix, Arizona 85012-2740
    Direct: 602-351-8003
 6  Office/Firm: 602-351-8000

 7  SAMANTHA SINGH, ESQUIRE
    ALEXANDRA SWAIN, ESQUIRE
 8  Debevoise and Plimpton
    919 Third Avenue
 9  New York, New York 10022
    Tel: +1 212 909 6000
10
    On behalf of the DEFENDANT:
11
    GEORGE T. LEVESQUE, ESQUIRE
12  JEFF AARON, ESQUIRE
    Gray Robinson, P.A.
13  301 South Bronough Street, Suite 600
    Tallahassee, Florida 32301-1724
14  Office: 850-577-9090
    Cell: 850-577-9090
15  Email:  george.levesque@gray-robinson.com

16  VIDEOGRAPHER:

17  JASON TAYLOR

18

19

20

21

22

23

24

25
```

1  and that I sent.

2       Q.  Have you completed your answer?

3       A.  Yes.

4       Q.  Okay.  Other than text messages, was there any

5  other type of document that you collected?

6                 MR. LEVESQUE:  Object to form.

7                 THE WITNESS:  Not to my recollection.

8  BY MR. CABOU:

9       Q.  Okay.  Why was Andrew Warren suspended from

10  office?

11                MR. LEVESQUE:  Object to form.

12                THE WITNESS:  I did not make that decision,

13      so I cannot answer it.

14  BY MR. CABOU:

15      Q.  Okay.  Well, let's unpack that a little bit.  Who

16  made that decision?

17      A.  Governor DeSantis.

18      Q.  Okay.  What is your understanding of why Andrew

19  Warren was suspended from office?

20      A.  My understanding is that it was because he had

21  stated on the record that he would not uphold certain laws

22  that were passed by the Florida Legislature and signed

23  into law by the Governor.  And so according to Florida's

24  constitution -- again, I'm not a lawyer, but if a public

25  official cannot or refuses to do their job, then they are

1  Executive Order.

2       Q.   Go on.

3       A.   So the reasons for the suspension are in the

4  Governor's Executive Order, and the ones that I heard him

5  reference were the letters.

6       Q.   Okay.  So on page 234 of Exhibit B, which is the

7  Executive Order, it says -- why don't you read that out

8  loud for me, the first paragraph on page 234?

9       A.   "Whereas, Warren has also instituted a policy

10  during his current term against prosecuting crimes where

11  the initial encounter between law enforcement and the

12  defendant results from a non-criminal violation in

13  connection with riding a bicycle or a pedestrian

14  violation.  This presumption of non-prosecution applies

15  even to crimes of misdemeanor resisting arrest without

16  violence, for example, fleeing from a law enforcement

17  officer.  The only exception to the policy is where there

18  is a direct threat to public safety, such as where an

19  individual has suffered physical harm, or where a firearm

20  is involved."

21       Q.   Thank you.  So that paragraph that you just read

22  in the Executive Order refers to the policy in Exhibit E;

23  correct?

24       A.   Yes.

25       Q.   So it was part of the Governor's decision to

1  suspend him; correct?

2           MR. LEVESQUE:  Object to form.

3           THE WITNESS:  Again, I don't know what -- how

4      the Governor made the decision to suspend him.  I know

5      this is referenced in the Executive Order of

6      Suspension.

7  BY MR. CABOU:

8      Q.   Okay.  And the policy that's in Exhibit E says

9  right in there that it doesn't apply in all cases; right?

10 It says based on the facts and circumstances of the case?

11     A.   Yes.

12     Q.   Okay.  Well, is that what the Governor told

13 Tucker Carlson?

14           MR. LEVESQUE:  Object to form.

15           THE WITNESS:  It's -- it's in the Executive

16      Order.

17 BY MR. CABOU:

18     Q.   That wasn't my question.

19     A.   When --

20           MR. LEVESQUE:  Is there a question pending?

21 BY MR. CABOU:

22     Q.   Is that what the Governor told Tucker Carlson, is

23 the question that was pending.

24           MR. LEVESQUE:  Well, no, you said -- she

25      answered it, and you said that wasn't my question and

1   when, for example, we would be on a plane together, or in

2   the car, that's when we would communicate.

3        Q.   So that's less formal than a meeting perhaps, but

4   it was still --

5        A.   Correct.

6        Q.   -- face-to-face encounter; is that what I'm

7   understanding?

8        A.   Yes.

9        Q.   Okay.  Okay.  So you never spoke to the Governor

10  on the phone?

11       A.   No.

12       Q.   Okay.  Did you ever text with the Governor?

13       A.   No.

14       Q.   Does anyone text with the governor, to your

15  knowledge?

16       A.   Not that I know of.

17       Q.   Do you know if the Governor has a phone?

18       A.   Yes.

19       Q.   Okay.  Do you know -- have you ever seen him text

20  anyone?

21       A.   No.

22       Q.   Okay.  Do you know if there's a policy that the

23  Governor doesn't text?

24       A.   That's what I've always heard.

25       Q.   Okay.  And you know of no individual that has

1    ever texted the Governor -- no individual in the Executive

2    Office of the Governor that's ever texted the Governor; is

3    that true?

4                    MR. LEVESQUE:  Object to form.

5                    THE WITNESS:  To my knowledge, I don't know

6         of anyone who was texting with the Governor when he

7         was Governor.

8    BY MR. CABOU:

9         Q.   Okay.  Yeah, I'm not asking if the Governor texts

10   with his family.  That's not what I'm asking, okay?  I'm

11   just asking if you have any reason to believe that the

12   Governor has ever texted, Signal messaged, WhatsApp

13   messaged, or sent any form of electronic message to any

14   member of the Executive Office of the Governor?

15        A.   Not that I've seen.

16        Q.   Okay.  Is there any -- I'm just asking about your

17   personal knowledge.

18        A.   No.  Not that I know of.

19        Q.   Okay.  Thank you.  What about -- I assume the

20   same is true for email?  Do you email with the Governor?

21        A.   No.

22        Q.   Do you know anybody that emails with the

23   Governor?

24        A.   No.

25        Q.   Is it your understanding that the only way people

1  communicate with the governor is in person or perhaps via

2  telephone?

3      A.   That is my understanding.

4      Q.   Let's say oral communication.  We'll include Zoom

5  or conference call or whatever.

6      A.   That is my understanding, yes.

7      Q.   Okay.  Okay.  I think you told us that you

8  resigned from the Governor's office on the 12th of August;

9  is that right?

10     A.   Was that the Friday?  That's my recollection.

11     Q.   I can find it.  Did you know you were planning to

12 resign during the -- on August -- the week prior on August

13 4th, the day that Mr. Warren was suspended?

14     A.   Yes.  And I can tell you it was either July 30th,

15 31st or August 1st, sometime around that time frame, those

16 few days, that I was asked to join the campaign.  And I

17 had sat down with James, the Chief of Staff, and Taryn, my

18 supervisor, to discuss it, and we had made the decision I

19 would officially resign in two weeks.  So basically it was

20 a two-weeks notice situation.

21     Q.   Okay.

22     A.   So yes, before August 4th.

23     Q.   Okay.  Thank you.  With whom did you discuss the

24 possibility of joining the campaign?

25     A.   With Taryn Fenske, James Uthmeier, and the

1 answered.

2    MR. LEVESQUE:  It was answered.

3 BY MR. CABOU:

4 Q.  Okay.  Let's try this again.  Do you think

5 Mr. Warren has a radical pro-crime ideology?

6 A.  That was a reference to prosecutors who refuse to

7 uphold or follow laws that they don't agree with.

8 Q.  Okay.  Adultery is still illegal in the State of

9 Florida; right?

10 A.  I don't know.

11 Q.  Well, let's assume that it is.  Do you know

12 anyone that's ever committed adultery?  I'm not asking for

13 names.

14 A.  Yes.

15 Q.  Do you think they should be prosecuted?

16 A.  Well, I don't know what the laws are in Florida

17 on --

18 Q.  If the law in Florida is that adultery is a

19 crime, do you think that somebody who committed adultery

20 should be prosecuted criminally?

21 A.  I don't know.  I guess I would have to hear the

22 details of that, like, what happened.  Like --

23 Q.  Okay.  Your letter refers to a Governor that,

24 quote, "Does not tolerate prosecutors who refuse to follow

25 the laws of our state.  Do you see that language on page