# Exhibit 1
## (Ryan Newman Depo. Excerpts)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CASE NO. 4:22-cv-302-RH-MAF

ANDREW H. WARREN,

   Plaintiff,

vs.

RON DESANTIS, individually
and in his official capacity
as Governor of the State
of Florida,

   Defendant.

                                                            /

REMOTE VIDEO-RECORDED DEPOSITION OF
RYAN NEWMAN
{Pages 1 - 194}

Monday, November 7, 2022
8:30 a.m. - 3:36 p.m.
U.S. Legal Support, Inc.

(Held Remotely)

Stenographically Reported By:
Deanne M. Moore, RMR, CRR, FPR, FPR-C

|   |   |
|---|---|
| 1 | APPEARANCES |

On Behalf of the Plaintiff:

```
   DEBEVOISE AND PLIMPTON
   919 Third Avenue
   New York, New York 10022
   (212) 909 6000
   daoneil@debevoise.com
   sbsingh@debevoise.com
   apswain@debevoise.com
   BY:  DAVID O'NEIL, Esquire            (Via Zoom)
        SAMANTHA SINGH, Esquire
        ALEXANDRA SWAIN, Esquire
```

On behalf of the Defendant:

```
   GRAY ROBINSON, P.A.
   301 South Bronough Street
   Suite 600
   Tallahassee, Florida 32301-1724
   (850) 577-9090
   george.levesque@gray-robinson.com
   jeff.aaron@gray-robinson.com
   BY:  GEORGE T. LEVESQUE, ESQUIRE       (Via Zoom)
        JEFF AARON, Esquire
```

ALSO PRESENT:

Michael Hollander, Videographer, U.S. Legal Support, Inc.

Charlie McKenna, Debevoise and Plimpton

Andrew Warren

1                    INDEX OF PROCEEDINGS

2                                                          PAGE
   Deposition of RYAN NEWMAN
3
   Direct Examination by Mr. O'Neil                           7
4  Certificate of Oath                                      191
   Certificate of Reporter                                  192
5  Witness Notification Letter                              193
   Errata Sheet                                             194
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1       Exhibit 1.
 2            (Exhibit 1 was marked for identification.)
 3   BY MR. O'NEIL:
 4       Q    Mr. Newman, you see here on page 5 and then it
 5   continues on page 6 a list of meetings in which Governor
 6   DeSantis personally participated relating to the
 7   suspension.  Do you see that?
 8       A    Yes, sir.
 9       Q    Okay.  You don't know what was discussed at the
10   meeting in December of 2021; is that correct?
11       A    That's correct.
12       Q    Did either Mr. Uthmeier or Mr. Keefe tell you
13   what occurred at that meeting?
14       A    The only thing that comes to mind is Larry
15   might have mentioned to me that he believed that's when
16   he was given some direction to conduct a review, but I
17   wasn't there.
18       Q    Do you know whether or not --
19       A    Or I don't recall being -- at least I don't
20   recall being there.
21       Q    Do you know whether or not Mr. Warren's name
22   arose at that meeting?
23       A    No -- no, sir, I -- I don't.
24       Q    What happened at the meeting between
25   Mr. Uthmeier, you and Mr. Keefe on July 26th?
```

1    A    That was the -- that was the meeting in which
2  we broached with the Governor -- or at least we informed
3  the Governor of Mr. Warren's pledge and the joint
4  statement not to prosecute abortion crimes.
5    Q    What -- what specifically did you say to the
6  Governor?
7    A    Well, we -- we informed him of the joint
8  statement and of -- of the declaration, you know, the --
9  the pledge or commitment not to enforce or prosecute
10 abortion crimes in the state.
11   Q    Is that how you described it to him?
12   A    What's that?
13   Q    Is that how it was described?
14   A    Well, as best as I -- as best as I can recall.
15 I can't -- I can't say with exact detail what precisely
16 I said, but I do know that that's the first time I made
17 the Governor aware of Mr. Warren's pledge not to
18 prosecute abortion crimes in the state.
19         And the purpose of the -- of the meeting was to
20 gauge or determine whether or not the Governor -- the
21 Governor thought -- or would be willing to or thought
22 there would be grounds for suspension based on that
23 pledge.
24   Q    How long did the meeting go?
25   A    Meetings like this tend to be fairly short and

1  certainly wouldn't have exceeded 30 minutes, but
2  honestly, it was probably even less than that.
3      Q    What, if any, documents did you bring to that
4  meeting?
5      A    I would have brought -- although I honestly
6  cannot recall precisely what I carried to the meeting.
7  I would be surprised if I did not bring the joint
8  statement, so I suspect that I did, but I --  I honestly
9  can't remember with great detail.
10     Q    Based on the Governor's reaction, do you
11 believe that he was familiar with the joint statement
12 before you briefed him on it?
13     A    No.
14     Q    Did he read the joint statement during that
15 meeting?
16     A    I don't recall that he did.  I probably -- as
17 is common in meetings like this, I probably read the
18 language from the joint statement that made clear that
19 Mr. Warren was pledging not to prosecute abortion
20 crimes.
21     Q    Do you recall which particular sentences you
22 read?
23     A    Well, the -- the -- without having it in front
24 of me, the line where he committed to not use his
25 office's resources and pledged to refrain from

```
 1   prosecuting -- I can't remember the exact language, but
 2   he pledged to refrain from prosecuting those who provide
 3   abortions.
 4        Q    What did the Governor?
 5        A    That was -- that was a key -- that was the key
 6   language, so I suspect I probably read that to him,
 7   although --
 8        Q    I'm sorry, continue.
 9        A    Again, you know --
10        Q    What did the Governor --
11             (Crosstalk.)
12        A    I'm sorry.  How did he respond?
13        Q    What did the Governor -- yeah, what did he say
14   to you?
15        A    Well, his response was not particularly
16   enthusiastic.  He expressed concern that suspension
17   based on a pledge perhaps could be viewed as not a
18   neglect of duty under the law.
19             And he was concerned that with just a pledge,
20   you know, that could be easily walked back.  A pledge
21   before a crime was actually committed, he was concerned
22   about, and certainly in taking this in to him, I was
23   aware that those could be, you know, valid objections to
24   the Governor's suspension, although at the end of the
25   day -- and this was my response back to him.
```

1           My conclusion was that when a prosecutor, state
2    attorney, the head prosecutor in the jurisdiction,
3    pledges to -- pledges in his official capacity to not
4    enforce a particular law, the laws of the state, that
5    that was actually even worse than had he just remained
6    quiet and waited until after the offenses were committed
7    and then not prosecute them, because to declare the
8    pledge, to commit to the public that you're not going to
9    bring certain prosecutions is to invite law breaking, is
10   to invite violations of the law.
11          And so my view -- and this is -- this is what I
12   responded to him.  So I sort of pushed back on his
13   initial reluctance because I just thought -- honestly, I
14   just thought it was appalling to -- for the chief
15   prosecutor in a jurisdiction to go out and make that
16   kind of commitment, and thereby invite law breaking,
17   thereby inviting a crime to occur.
18          And I think -- my impression is that that
19   convinced the Governor because his response back to me
20   was, oh, yeah, well, I guess that's right.  What if --
21   what if somebody just declared that they're not going to
22   prosecute murder cases for certain classes of victim,
23   would the government just have -- have to stand by and
24   wait for the crimes to be committed?
25          And I think we both agreed that, no, that can't

1  possibly be right, that if they -- if a state attorney
2  makes pledge or commitment not to prosecute certain
3  classes of cases, that that alone -- that itself is
4  neglect of duty.  That would -- you know, that -- that
5  would be a basis for suspension.
6      Q   Would it be the same concern if there was a
7  pledge not to arrest people for certain types of
8  conduct?
9      A   Yes, perhaps, depending upon the -- you know,
10 the -- the -- the circumstances.
11     Q   Do you know what --
12     A   But, yes.
13     Q   Yeah.
14     A   Yeah, I'm just saying -- the general idea, I
15 mean, I think you understand is when you know, the chief
16 prosecutor of the jurisdiction announces he's not going
17 to -- not going to prosecute a certain class of crimes
18 that -- that that can be problematic.
19     Q   Were there any other documents discussed in
20 this meeting on the 26th?
21     A   I don't think any other documents were
22 discussed.
23     Q   What else was discussed?
24     A   So after we had that exchange, the Governor
25 next asked whether were any other grounds for

1  suspension, and my recollection was that Larry, who had
2  been conducting the review, had been interfacing with
3  various law enforcement officials, including Sheriff
4  Cronnister, indicated that there were other policies
5  that were problematic because they created in effect
6  categorical exemptions from the enforcement of certain
7  crimes.
8          And -- and -- and -- and I think we brought up
9  the -- the bike policy as an example.  Whether or not
10 we've brought up the other presumptive, non-prosecution
11 policy or not, I cannot -- I cannot recall sitting here
12 right now, but I do know that -- that Larry made the
13 point that there were other policies that were
14 problematic.
15    Q    And at that time had you read those other
16 policies?  Were you familiar with those other policies?
17    A    I think I had read the -- the bike policy.
18 Whether I was aware at that time of the other preemptive
19 non-prosecution policy, I honestly can't recall whether
20 I -- whether I became aware of that policy, you know,
21 before that meeting or shortly thereafter.  I -- I just
22 don't remember.
23    Q    What, if anything, was discussed about the
24 gender affirming care statement?
25    A    I don't recall having any conversations about

1    A    Yeah, I do remember being on a call where
2  Sheriff Cronnister was on the phone and Chief Dugan, and
3  James and Larry would have been there.  Whether it was
4  on this date or some other date in this sort of two-day
5  period.  I'm a little uncertain, but it could well have
6  been this one.
7    Q    What was discussed?
8    A    My only recollection was that James wanted
9  to -- that's Mr. Uthmeier -- wanted to confirm that
10 Sheriff Cronnister would ultimately support the
11 Governor's decision if that's -- to suspend Mr. Warren
12 if that's what -- if that's what was ultimately decided.
13   Q    And what was -- what was said on that topic?
14   A    That -- that he would.
15   Q    That -- and according to Exhibit 1, there was
16 an additional meeting on August 3rd, I believe.  Maybe
17 we can go back to that.  Yes.
18        So according to this -- while we're scrolling,
19 I'll just read it.  Paragraph F says -- paragraph E says
20 "meeting with James Uthmeier and Ryan Newman on
21 August 3rd."
22        So that's the next day.  What happened at that
23 meeting?
24   A    ==This is when the Governor gave me feedback on==
25 ==the draft of the executive order.==

1    Q    Other than him providing you with his comments
2  on that, did anything else -- was anything else
3  discussed?
4    A    The only other thing that probably was
5  discussed was to confirm with the Governor that Suzy
6  Lopez had agreed to be the replacement.
7    Q    By this time had the Governor definitively made
8  the decision to suspend Mr. Warren?
9    A    Yeah.  I think it's fair to say that by this
10 point, he was not going to reverse course.
11   Q    Do you know when in the process that you've
12 been describing -- in the sequence of events you've been
13 describing that the Governor went in his mind from
14 tentative to definitive?
15   A    Not precisely.  It was just apparent from --
16 you know, from the beginning of the week when we came
17 back after the weekend on August 1st that -- that he was
18 going to be fine with this course of action.
19   Q    Did you speak with the Governor about what he
20 would decide to do -- what -- what he would have decided
21 if he had the same -- same documents that we've
22 discussed, but -- but no office policies of -- of
23 Mr. Warren, so no bike policy no presumptive
24 non-prosecution policy.
25        Did you ask the Governor about what he would

1  Mr. Keefe ever identify the Seminole County sheriff as a
2  potential target of suspension?
3      A    No.
4      Q    And why not?
5           MR. LEVESQUE:  Object to the form.
6      A    I have no idea.  He never -- he never
7  identified him to me.
8           MR. O'NEIL:  Is this tab 45?
9           MS. SINGH:  This is 45.  Did you want 25 or 45?
10          MR. O'NEIL:  45.
11          MS. SINGH:  That was 45.
12          MR. O'NEIL:  This is 45?  Okay.
13 BY MR. O'NEIL:
14     Q    Mr. Newman, can you take a look at this?
15          MS. SINGH:  And Exhibit 13.  Exhibit 13.
16          MR. O'NEIL:  Thanks.  We'll label this
17     Exhibit 13.
18          (Exhibit 13 was marked for identification.)
19 BY MR. O'NEIL:
20     Q    Why don't we flip through this a minute so you
21 can see what this document is.
22          Okay.  Now that you see the writing, do you
23 know what this document is?
24     A    Yes, sir.
25     Q    What is it?

```
 1     A     These are the -- these are the Governor's edits
 2  to the executive order.
 3     Q     How do you know that they are the Governor's
 4  edits?
 5     A     Because he gave the -- these to me during that
 6  August 3rd meeting when I got his feedback.
 7     Q     Did he explain the edits to you when he gave
 8  them to you or did he just provide them to you?
 9     A     No, he -- he rattled off orally actually what
10  the edits were, and I had my own draft of the executive
11  order and tried to, you know, make my notes as quickly
12  as I could.  But he was going faster than I could --
13  than I could keep up, so I think at the end of the
14  meeting he just said here, take my -- take my hand
15  edits, and so that's what he -- that's what he gave to
16  me at the end of the meeting.
17     Q     So let's go back to page 4 of this -- 3 of this
18  document.  I think it's the first edit.
19           I believe that says "non-abortion infractions
20  first;" is that correct?
21     A     Yeah, that's -- that's how I read it.
22     Q     Why did the --
23           (Crosstalk.)
24     A     And, Mr. O'Neil, you -- you cut out I think.
25     Q     I just -- I didn't know if you were done with
```