# Exhibit 2
## (Ray Treadwell Depo. Excerpts)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


ANDREW H. WARREN,

      Plaintiff,

                         Case No.:  4:22-cv-302-RH-MAF

v.

RON DESANTIS, individually
and in his official
capacity as Governor
of the State of Florida,

      Defendant.
-----------------------------------------------------/




VIDEOTAPED
DEPOSITION OF:   RAYMOND TREADWELL, ESQUIRE
               Appearing Remotely

DATE TAKEN:      October 31 2022

TIME:            8:58 a.m.

REPORTED BY:     Michele Coburn, FPR
               Appearing Remotely from
               Hillsborough County, Florida

Raymond Treadwell, Esquire
October 31, 2022

```
 1   REMOTE APPEARANCES:

 2

 3   DAVID O'NEIL, ESQUIRE
          Debevoise & Plimpton, LLP
          801 Pennsylvania Avenue NW, Suite 500
 4        Washington, D.C.  20004
          202-383-8000
 5        daoneil@debevoise.com

 6   ALEXANDRA P. SWAIN, ESQUIRE
          Debevoise & Plimpton, LLP
 7        650 California Street
          San Francisco, California  94108
 8        apswain@debevoise.com
          415-738-5700
 9        apswain@debevoise.com

10   SAMANTHA B. SINGH, ESQUIRE
          Debevoise & Plimpton, LLP
11        919 Third Avenue
          New York, New York  10022
12        212-909-6836
          sbsingh@debevoise.com
13
                 APPEARING ON BEHALF OF THE PLAINTIFF
14

15

16   GEORGE T. LEVESQUE, ESQUIRE
     JEFF AARON, ESQUIRE
17        GrayRobinson, PA
          301 South Bronough Street, Suite 600
18        Tallahassee, Florida  32302
          850-577-9090
19        george.levesque@gray-robinson.com
          jeff.aaron@gray-robinson.com

20             APPEARING ON BEHALF OF THE DEFENDANT
               AND WITNESS
21

22   ALSO PRESENT:

23
          ANDREW H. WARREN
24        MICHAEL HOLLANDER, VIDEOGRAPHER
          CHARLIE McKENNA
25
```

Raymond Treadwell, Esquire
October 31, 2022

1                          INDEX

2                                              PAGE

3    Direct Examination by Mr. O'Neil              8

4    Continued Direct Examination by Ms. Swain    189

5    Continued Direct Examination by Mr. O'Neil   225

6    Certificate of Oath                          261

7    Certificate of Reporter                      262

8    Witness Notification Letter                  263

9    Errata Sheet                                 264

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Raymond Treadwell, Esquire
October 31, 2022

1   suspension order, the executive order suspending

2   Mr. Warren?

3        MR. LEVESQUE:   Object to form.

4   A    In general, my role was assessing the merits of

5   recommendation of suspension of Andrew Warren and then

6   drafting most of what became the final executive order.

7   BY MR. O'NEIL:

8   Q    And when did you begin that process?

9   A    So for me I learned that the office was

10  considering a suspension of Andrew Warren on, I want to

11  say, Monday, July 18th.

12  Q    Okay.  And at that -- how did you first learn

13  of it?

14  A    The general counsel Ryan Newman introduced the

15  topic at our legal office weekly meeting, which takes

16  place on Monday mornings.

17  Q    Okay.  That was the first you'd ever heard of

18  the potential suspension of Mr. Warren?

19  A    It's the first I've heard of potential

20  suspension.

21       There was an email that went around some of us

22  lawyers at the end of June mentioning his abortion

23  statements, the Fair and Just Prosecution of abortion

24  statement.  But the first I can recall that being

25  connected to the idea of suspending Mr. Warren was on

Raymond Treadwell, Esquire
October 31, 2022

1   July 18th.

2       Q   When did you first learn that this purported

3   investigation had been done by Mr. Warren?

4       A   So again, it was either on or right before

5   August 4th, because the way it came to me in the legal

6   office was, "Here is Andrew Warren's abortion statement.

7   Is this -- is this potentially worthy of a

8   constitutional suspension?"  And --

9       Q   So -- so from your perspective, the results of

10  this investigation were not part of the reason for the

11  suspension?

12          MR. LEVESQUE:  Object to form.

13      A   I wouldn't say there's no connection there.

14          I mean, my understanding, again, after the fact

15  is that Larry Keefe conducted this investigation and

16  gathered information on Andrew Warren, and part of the

17  information he had gathered was this abortion statement.

18  BY MR. O'NEIL:

19      Q   Okay.  I'm asking about the investigation that

20  the governor referenced or this looking around the state

21  that the governor referenced in his August 4th press

22  conference.

23          You first became of aware of that when the

24  governor spoke about it or sometime after that?

25          MR. LEVESQUE:  Object to form.

Raymond Treadwell, Esquire
October 31, 2022

1        A    I knew that Larry Keefe had been kind of

2    gathering documents, some on Andrew Warren.   And I

3    didn't know, though, that it was a full statewide review

4    until the governor mentioned that.   And then again,

5    after the fact I learned that Larry Keefe had been

6    working on this for essentially months.

7    BY MR. O'NEIL:

8        Q    Okay.   From your perspective --

9        A    One month.

10        Q    From your perspective, was the investigation

11    that the governor referenced a motivating factor for the

12    suspension at the time you were preparing the suspension

13    documents?

14            MR. LEVESQUE:   Object to form.

15        A    I think the motivation for the suspension is

16    apparent on the face of the executive order.

17    BY MR. O'NEIL:

18        Q    So the results of this looking around the state

19    are not relevant to the -- are not a motivating factor

20    for the suspension?

21            MR. LEVESQUE:   Object to form.

22        A    I well, I hear you're -- I hear you're

23    referring to two different things.   One, you're saying

24    the investigation was the motivation, and now you're

25    saying the results of the investigation were the

Raymond Treadwell, Esquire
October 31, 2022

1      A   I don't know if the governor's office needs to

2   wrap up every investigation with a formal report.

3           THE COURT REPORTER:  I'm sorry.  I didn't get

4       the end of your answer.

5      A   And we certainly didn't have a formal report of

6   the statewide investigation in this -- in this instance.

7   BY MR. O'NEIL:

8      Q   How many state attorneys has the governor

9   suspended?

10          MR. LEVESQUE:  Object to form.

11     A   Governor DeSantis?  I believe only one.

12  BY MR. O'NEIL:

13     Q   Okay.  Wouldn't you say that that was a

14  major -- a major event in his -- in his tenure?

15     A   Certainly.

16     Q   Okay.  And you later learned that there was a

17  review conducted as part of that.  Right?

18     A   Yes.

19          MR. LEVESQUE:  Object to form.

20  BY MR. O'NEIL:

21     Q   Okay.  But your testimony is that there was no

22  written document summarizing the results of that review?

23     A   Whether there's a written document summarizing

24  the results of the review, I don't know.

25     Q   You've been, as you said at the outset, helping

Raymond Treadwell, Esquire
October 31, 2022

1  to prepare for this case for some time.  Right?

2      A   That's right.

3      Q   Do you think that if there were such a report

4  you'd be aware of it?

5      A   I would think so.  And if there is a written

6  assessment it should have been produced, but I'm not

7  aware that there is one.  So I think it's -- I'm

8  confident to say then it probably doesn't exist.

9      Q   How were the results of the review reported to

10 the governor?

11     A   I don't know.

12     Q   Do you know whether they were reported to the

13 governor?

14     A   I don't know.  I was not in any conversations

15 with the governor on -- on this -- on this matter.

16     Q   Okay.  Were the results of that review part of

17 the governor's subjective motivation for suspending

18 Mr. Warren?

19         MR. LEVESQUE:  Object to form.

20     A   If the results of the review brought the

21 materials on Andrew Warren to legal, then they were

22 absolutely made part of the executive order and part of

23 the reasons the governor suspended him.

24 BY MR. O'NEIL:

25     Q   Well, you said that you don't know whether the

Raymond Treadwell, Esquire
October 31, 2022

1    results were reported.  Right?

2              MR. LEVESQUE:  Object to form.

3        A    So -- so I did not say that.

4              You asked me if there was a written report or

5    any kind of written summary, and I said I don't think

6    there is one that exists.

7              But Larry Keefe certainly brought material to

8    the legal office for us to consider in assessing whether

9    there was sufficient grounds to suspend Andrew Warren.

10   So in that sense Larry Keefe did report the results of

11   his investigation to the legal office.

12   BY MR. O'NEIL:

13       Q    But you didn't know that this was an

14   investigation?

15       A    I didn't know this was a statewide

16   investigation.  And that's what the governor referenced

17   at his August 4th press conference.  I only learned that

18   after the fact.  All I got was the narrow -- the narrow

19   view of it, you know, in terms of what was discovered

20   about Mr. Warren.

21       Q    Was it your understanding that the material

22   that Mr. Keefe was bringing to your office was him

23   specifically investigating Mr. Warren as opposed to

24   conducting a statewide review?

25       A    At the time I think my mindset was, okay,

Raymond Treadwell, Esquire
October 31, 2022

1    Mr. Warren has gone out and made this egregious abortion

2    statement and Larry happened to have some more

3    information on Andrew Warren.  So we started, you know,

4    our own legal office review of the file.

5         Q    Okay.  Do you know if Mr. Keefe reported his

6    results directly to the governor?

7         A    I don't know.

8         Q    Do you know whether -- so you don't know how

9    the governor reacted to the results?

10        A    I am --

11             MR. LEVESQUE:  Object to form.

12        A    I am confident that once Larry brought the

13   legal office the materials that he had discovered on

14   Mr. Warren that Larry didn't have a conversation with

15   the governor except with the general counsel Ryan Newman

16   being there because this was driven by the legal office

17   once the materials came to the legal office.

18   BY MR. O'NEIL:

19        Q    What was Mr. DeSantis's -- Mr. DeSantis's

20   reaction to the results of the review?

21             MR. LEVESQUE:  Object to form.

22        A    I was not in any meeting with Governor DeSantis

23   about this matter.  I do not know his reaction.

24   BY MR. O'NEIL:

25        Q    Do you know his state of mind at the time that

Raymond Treadwell, Esquire
October 31, 2022

1    Q   Okay.  So you had no discussions with anyone

2    about this topic between -- sorry.

3        When did you go on vacation?

4    A   I went on -- I was on vacation from July 2nd to

5    the 16th.  My parents were celebrating their 50th

6    anniversary and they took the whole family on a cruise.

7    So I didn't even have, you know, network and phone

8    access for a good portion of that.

9    Q   You -- you do vacations better than I.

10   A   It was magical.  I mean, first vacation I've

11   had in many years.

12   Q   And so between the 30th and the 2nd what

13   occurred with respect to this issue?

14   A   I don't recall anything occurring on July 1st

15   or 2nd before I left.

16   Q   Who was taking the lead in the office on this

17   issue during your absence?

18       MR. LEVESQUE:  Object to form.

19   A   I don't know.

20   BY MR. O'NEIL:

21   Q   You mentioned that -- earlier in your testimony

22   that there was an email which someone sent around the

23   abortion statements.

24       Was -- was it this email that you were

25   referencing?

Raymond Treadwell, Esquire
October 31, 2022

1      A    That's correct.

2      Q    Okay.  And you said that you weren't sure that

3   you actually read the article at the time?

4      A    I'm -- I'm an early riser.  And so by 9 p.m.

5   I'm really not interested in working.

6          I looked at the text of the emails themselves

7   and decided I didn't really need to click the links at

8   this point.

9      Q    So when did you -- when did you first read the

10   statement?

11     A    I don't recall reading it before July 18th when

12   the idea of, you know, suspending Mr. Warren, in part

13   because of this statement, landed on my desk.

14     Q    So you returned from vacation on the 18th?

15     A    Correct.

16     Q    How was the idea of suspending Mr. Warren

17   introduced to you at that time?

18     A    Mr. Newman, the general counsel and my boss,

19   brought up the idea at the all-legal staff meeting that

20   Monday morning.

21     Q    What did he say about it?

22     A    From what I recall is that Larry Keefe had

23   suggested suspending Mr. Warren for this and that we

24   needed to take a look at it.

25     Q    Was there any discussion --

Raymond Treadwell, Esquire
October 31, 2022

1      A   And that's what --

2      Q   -- about the governor's views at that time?

3      A   No.  Not that I recall.

4      Q   Okay.

5          MR. O'NEIL:  All right.  Can we go to -- sorry.

6   BY MR. O'NEIL:

7      Q   And then what -- so Mr. Newman said that to the

8   all -- all-hands general counsel meeting.

9          What then took place?  What happened next?

10     A   Sure.

11         So from what I remember on that Monday, because

12  appointments, suspensions and removals is part of my

13  portfolio, that's when I took lead on this matter.  And

14  because this idea was -- was coming from Larry Keefe, I

15  must have connected with him at some point that day.

16         And I knew Larry has the skill set to really

17  put together a draft.  And, you know, given his deep

18  involvement in it, I figured okay.  I'm -- I'm busy over

19  the next few days, so maybe -- maybe Larry can attempt a

20  draft of this executive order.

21         And so I think I confirmed with him that he

22  would be -- he would be attempting the first draft.  And

23  so that, I think, is something that happened very early

24  in the week, probably that Monday.

25         The other thing that happened that Monday is

Raymond Treadwell, Esquire
October 31, 2022

1    one of our interns in the legal office, Andrew Madry,

2    came to me and said that he's from Tampa and wanted to

3    be involved in this -- in this issue.

4          And so I said, "Why don't you, you know, go and

5    write up a memo with the various options that we're

6    considering and, you know, lay out -- lay out the law

7    that we need to consider in suspending Mr. Warren if --

8    if we're going to make this recommendation potential."

9      Q   Okay.  And so Mr. Madry -- what is his role in

10   the office?

11     A   So he was -- he was only there for a handful of

12   weeks in the summer.  And he -- I'm pretty sure he was

13   an intern, but he would have been in a small office with

14   the other interns and law clerks for the summer.  And

15   their job was just to provide some additional legal

16   research and, you know, help -- help -- help out on

17   questions that would be appropriate for law students to

18   help out on.

19     Q   Okay.  Did he --

20         MR. O'NEIL:  Sorry.  Let's mark this exhibit as

21      7, please.

22         (Exhibit 7 identified.)

23         THE COURT REPORTER:  Yes, sir.

24   BY MR. O'NEIL:

25     Q   What instruction did you give to Mr. Madry

Raymond Treadwell, Esquire
October 31, 2022

```
1          THE VIDEOGRAPHER:  We're back on the video
2      record.  The time is 2:36 p.m. Eastern time.
3                  CONTINUED DIRECT EXAMINATION
4   BY MS. SWAIN:
5      Q    Mr. Treadwell, I want to ask you some
6   questions.
7           You said you were involved in the process of
8   drafting the executive order.  Correct?
9      A    That's correct.
10      Q    And how were you involved in that process?
11      A    So after Larry Keefe took a stab at the first
12   draft, he delivered that to me right around July 25th.
13   And from there I kind of rewrote most of the draft and
14   took out a bunch of sections and, you know, added a
15   bunch of stuff for the -- for the next four days.  And
16   then Ryan and I kept switching the draft back between
17   us.
18      Q    And how did you get involved in that process?
19      A    So as part of my portfolio as deputy general
20   counsel, I have appointments, suspensions and removals.
21   And so given that we were considering suspending a
22   public official, that was naturally my work to do.
23      Q    Now, you said Mr. Keefe was involved.
24           Did Mr. Keefe write the first draft of the
25   executive order?
```

Raymond Treadwell, Esquire
October 31, 2022

1      A    He did write the first draft.

2      Q    And why did he write the first draft of the

3   executive order?

4      A    It was largely because this was his idea and he

5   was the one that had probably the most background

6   knowledge at this point.  And so I think I was busy on

7   other things and decided that we could move the ball

8   forward quicker by having, you know -- I wanted his -- I

9   wanted his attempt at a draft before I started looking

10  in-depth at it.

11     Q    And Mr. Keefe is not a member of the legal

12  department for the office of the governor, isn't he?

13     A    He's not a member of the legal office.  No.

14          And by the way, I'm having a little trouble

15  hearing you.

16     Q    Can you hear me now?

17     A    Yes.

18          MR. LEVESQUE:  Your audio got a little

19  garbled --

20          MS. SWAIN:  Okay.

21          MR. LEVESQUE:  -- on that last question.

22          MS. SWAIN:  Okay.  Well, let's keep going.  And

23  then if it still happens I might have to like log in

24  and log back -- log off and log back in.

25          MR. LEVESQUE:  The video is really jumpy.

Raymond Treadwell, Esquire
October 31, 2022

```
 1              MS. SWAIN:  What's that now?  My video is
 2        jumbled?
 3              Okay.  Give me a second.  I'm going to log off
 4        and log back in.
 5              Can we go off the record for like two minutes.
 6              THE VIDEOGRAPHER:  Sure.
 7              Going off the record 2:40 p.m. Eastern time.
 8              (Recess from 2:40 p.m. to 2:43 p.m.)
 9              THE VIDEOGRAPHER:  We're back on the record.
10        The time is 2:43 p.m.  We're back on the record.
11     BY MS. SWAIN:
12        Q    So, Mr. Treadwell, besides you and Mr. Keefe
13     were there any other individuals involved in the
14     drafting of the executive order?
15        A    Yes, there were.
16        Q    And who were those individuals?
17        A    Mr. Ryan Newman played a large role in the
18     drafting of it and then I think several other people in
19     the legal office took a look at it, including a couple
20     of the law interns and I want to say --
21        Q    Okay.
22        A    Go ahead.
23        Q    Who were the other people in the office?
24     Names?
25        A    I want to say a law intern by the name of --
```

Raymond Treadwell, Esquire
October 31, 2022

1    law interns by the name of Anthony Leonardi and Anthony

2    Licata helped us with many of the edits.

3         Q    Anyone else in the governor's office that

4    helped draft the --

5         A    I think -- I think Andrew King might have taken

6    a look at the draft and provided feedback.

7         Q    And that's it?  Anyone else?

8         A    That's -- that's as -- that's what I can recall

9    in terms of those of us lawyers in the legal office who

10   had an active role in the draft.

11        Q    And did the governor provide any feedback on

12   the executive order draft?

13        A    He did.

14        Q    And how did he provide that feedback?

15        A    My recollection is that Mr. Ryan Newman brought

16   the governor a draft on August 3rd and the governor

17   provided edits to that.

18        Q    How?

19        A    By hand.

20        Q    And have the governor's edits been produced in

21   this litigation?

22        A    Yes, they have.

23             MS. SWAIN:  Okay.  So I will -- I want to bring

24        up Tab 10, Charlie.

25             And we can mark this as Exhibit 15.

Raymond Treadwell, Esquire
October 31, 2022

1    a definitive answer.

2        Q    Sure.

3            MS. SWAIN:  Charlie, do you want to do that?

4            I can represent on the record that this was --

5        was included as a family member in the production.

6        So it appears to be the attachment.

7        A    And I'll confirm that it also appears to be the

8    version that he sent at that time.

9    BY MS. SWAIN:

10       Q    So this is a draft that Mr. Keefe wrote.

11   Correct?

12       A    That's correct.

13       Q    In his official capacity as an employee for the

14   governor?

15           MR. LEVESQUE:  Object to form.

16       A    I mean, I think he wrote it as part of his job

17   performance.  Yes.

18           MS. SWAIN:  Okay.  So I will -- we could turn

19       to -- let me pull up the Bates number -- Bates

20       Number 1045, Charlie.

21   BY MS. SWAIN:

22       Q    So, Mr. Keefe, I'll -- sorry.

23           Mr. Treadwell, I'll draw your attention to the

24   text that's on this page.  It says, "Whereas, in the

25   document entitled Statement from Elected Prosecutors

Raymond Treadwell, Esquire
October 31, 2022

1    Pledging to Work Towards the Elimination of the Death

2    Penalty," dated February 22nd, 2022, printed on the

3    letterhead of the Fair and Just Prosecution

4    organization.

5            Are you familiar with this document that's

6    referenced here?

7        A    I am.

8        Q    And did you review this document in editing the

9    executive order?

10       A    I did.

11       Q    Now, this document -- now, this text of the --

12   this text that's on this page here, Defendant's 1045, is

13   not included in the final executive order, is it?

14       A    It is not.

15       Q    And why is it not?

16       A    Because I decided to remove all references to

17   the death penalty statement.

18       Q    But this is a draft that was passed back and

19   forth between members of the governor's office.

20   Correct?

21           MR. LEVESQUE:   Object to form.

22       A    This -- this was part of the draft that Larry

23   Keefe sent to me.  But I did not think that this

24   particular death penalty statement was an appropriate

25   basis for suspension, and so I removed it from the draft

Raymond Treadwell, Esquire
October 31, 2022

1    that I then produced for Mr. Newman.

2    BY MS. SWAIN:

3        Q   But it is an official draft, meaning -- meaning

4    you are -- you and Mr. Keefe are both members of the

5    governor's office and you were exchanging it as part of

6    your job responsibilities?

7            MR. LEVESQUE:  Object to form.

8        A   I mean, this -- this language was one of the

9    drafts that was -- was part of that, you know,

10   three-week-long process.  So I don't know what you mean

11   by "official draft."  It was a draft.

12   BY MS. SWAIN:

13       Q   And why was the -- why was the language cut

14   from the final draft of the executive order?

15           MR. LEVESQUE:  Object to form.

16       A   Because, to me, it had no place in an executive

17   order where we had to state the grounds for suspension.

18           The language in this death penalty statement

19   was qualitatively different than the language in the

20   abortion statement and the transgender statement.  I

21   mean, at most this -- this would be the prosecutors who

22   are simply saying they're going to uphold Supreme Court

23   precedent, and I didn't think there was anything

24   troubling about that.

25   BY MS. SWAIN:

Raymond Treadwell, Esquire
October 31, 2022

1       Q    But Mr. Keefe did?

2       A    Mr. Keefe thought it might have fallen in that

3   same category of a blanket refusal to enforce the law,

4   but I just didn't read it the same way.

5       Q    And do you know if others in the governor's

6   office held the same belief as Mr. Keefe?

7       A    I don't know if anyone else reviewed this draft

8   or the death penalty state ment.  I mean, this was a

9   decision that I made to take it out.

10      Q    Did anyone else other than you and Mr. Keefe

11  see this draft of the executive order?

12      A    I don't think anyone else saw this version.

13  Maybe Mr. Newman did.

14          MS. SWAIN:  Okay.  I will move on to

15      Defendant's 1048.

16  BY MS. SWAIN:

17      Q    So I'll draw your attention to -- let me see.

18  Where is it? -- about the middle of the page where it

19  says, "Whereas, Warren has publicly acknowledged that

20  activist George Soros, (Soros) affiliated entities, have

21  funded Warren's political activities."

22          Who is George Soros?

23      A    I'm only going what I've gathered from sort of

24  public reports that he's a very wealthy individual who

25  supports progressive causes.

Raymond Treadwell, Esquire
October 31, 2022

1      Q   And do you know what Mr. Soros's political

2   affiliation is?

3      A   I do not.

4      Q   Do you know -- you -- you just said that

5   Mr. Soros is an individual who funds progressive causes.

6          Do you believe Mr. Soros to be a liberal?

7          MR. LEVESQUE:  Object to form.

8      A   I would -- I would guess that he is, but I

9   don't have any firsthand knowledge about his political

10  affiliation.

11  BY MS. SWAIN:

12     Q   Okay.  The next sentence says, "Soros has

13  supported Warren and other progressive prosecutors

14  through a series of shell organizations, affiliates and

15  pass-through entities, including the democratic party."

16         Are you aware of Mr. Warren's political

17  affiliation?

18     A   Same answer.  No.

19     Q   Are you aware of Mr. Soros's political

20  affiliation from looking at this document?

21     A   To me, Larry Keefe's write-up about Mr. Soros's

22  political activities does not give me knowledge about

23  his political affiliation.

24     Q   Well, what is a progressive prosecutor as

25  referenced here on this page?

Raymond Treadwell, Esquire
October 31, 2022

1     A   I didn't write that phrase, so only Mr. Keefe

2  would know what he meant by that.

3     Q   What do you believe the word -- the phrase to

4  mean?

5         MR. LEVESQUE:  Object to form.

6     A   I don't know what Mr. Keefe had in mind when he

7  wrote that.  But, to me --

8  BY MS. SWAIN:

9     Q   I'm not asking you what -- go ahead.  Go ahead.

10  Yeah.

11     A   If I'm just sort of thinking about the term

12  "progressive prosecutor," it maybe means a prosecutor

13  who thinks he or she has the ability to nullify law

14  within their jurisdiction and not prosecute certain

15  types of cases.

16     Q   Like what types of cases?

17         MR. LEVESQUE:  Object to form.

18     A   Well, I mean, Mr. Warren nullified the law by

19  refusing to prosecute abortion cases and transgender

20  cases.

21  BY MS. SWAIN:

22     Q   So do you believe Mr. Warren is a progressive

23  prosecutor?

24     A   Based on the definition that I just gave you of

25  how I understand the phrase "progressive prosecutor,"

Raymond Treadwell, Esquire
October 31, 2022

1    then Mr. Warren, based on the evidence I reviewed, would

2    be one.  Yes.

3         Q   And that's one of the considerations the

4    governor's office considered in drafting the executive

5    order:  whether or not Mr. Warren is a progressive

6    prosecutor.  Correct?

7         A   I recommended removing this language.  I

8    recommended removing that phrase.  That phrase was

9    nowhere in the executive order, so we cannot say that

10   the governor's office considered that in suspending

11   Mr. Warren.

12        Q   That's not my question.

13            I asked if the governor's office considered

14   Mr. Warren as a progressive prosecutor in drafting the

15   executive order.  Is that correct?

16        A   Whose definition of "progressive prosecutor"

17   are you using now?  Mr. Keefe's?  Mine?  Somebody

18   else's?

19        Q   I'm not sure it matters to the question, but we

20   can go ahead and use yours.  You described Mr. Warren as

21   a progressive prosecutor.  It says here "progressive

22   prosecutor" on this draft page.

23            Was Mr. Warren being a progressive prosecutor a

24   factor considered in drafting the executive order?

25        A   His identity as a so-called progressive

Raymond Treadwell, Esquire
October 31, 2022

1    prosecutor was not a factor in the suspension.

2         We suspended him based on his actions to

3    nullify Florida law.  Now, if that then made him a

4    progressive prosecutor, then it's a chicken and an egg

5    problem.

6         Q   It's written here on the page.  I'm asking if

7    it was considered in drafting the language of the

8    executive order.

9         MR. LEVESQUE:  Object to form.

10        A   I removed this language from the executive

11   order because I thought it had no place as a basis for

12   the suspension of Mr. Warren.

13   BY MS. SWAIN:

14        Q   Mr. Keefe, an employee of the governor --

15   employee of the governor's office sent you a draft

16   executive order that says -- that references Mr. Warren

17   as a progressive prosecutor, did he not?

18        A   He did.

19        Q   As an employee of the governor.  Correct?

20        MR. LEVESQUE:  Object to form.

21   BY MS. SWAIN:

22        Q   Mr. -- I'll withdraw the question.

23        Mr. Keefe -- Mr. Keefe sent you this draft

24   executive order in his capacity as an employee of the

25   governor.  Correct?

Raymond Treadwell, Esquire
October 31, 2022

1       A    We're all employees of the governor.  So, yes,

2    that is correct.

3       Q    Yes.

4            And it references Mr. Warren as a progressive

5    prosecutor.  Correct?

6       A    Correct.

7       Q    So I'll ask my question again.

8            Was -- did members of the governor's office

9    consider in drafting the executive order whether or not

10   Mr. Warren was a progressive prosecutor?

11           MR. LEVESQUE:  Object to form.

12      A    Because I was the main drafter of the executive

13   order, and I took out this language because I thought it

14   had no basis as being grounds for the suspension of

15   Mr. Warren.

16           My answer is going to be no.  His identity as a

17   so-called progressive prosecutor, which we haven't even

18   properly identified, was not a consideration of the

19   office as a whole.

20   BY MS. SWAIN:

21      Q    It was a consideration of Mr. Keefe's.

22   Correct?

23      A    Only Mr. Keefe can speak for Mr. Keefe.  But if

24   the language came to me like this, then I assume he

25   thought it was relevant.  I did not.

Raymond Treadwell, Esquire
October 31, 2022

1       Q    Okay.

2            MS. SWAIN:  Okay.  So, Charlie, can you just

3       scroll back to the first page of this document, the

4       first page of the attachment.  So -- and let's go to

5       the second -- well, let's stick on the first page.

6    BY MS. SWAIN:

7       Q    So, Mr. Treadwell, I just want you to take a

8    look -- and Charlie will flip the pages of what's

9    included in this draft.  I just want you to get a sense

10   of -- because I know there were a lot of drafts going

11   back and forth, I just want you to get a sense of what's

12   in this one in particular.

13           MS. SWAIN:  So, Charlie, you want to flip the

14      pages.

15   BY MS. SWAIN:

16      Q    Okay.  So, Mr. Treadwell, did you get a chance

17   to look through so you know in broad strokes the general

18   topics referenced in this version of the executive

19   order?

20      A    Yeah.  I mean, about to two to three seconds

21   was spent on each page.  So I briefly scanned each page

22   and I have a general awareness of what's in this

23   particular version of the executive order from

24   Mr. Keefe.

25      Q    Okay.  So you see the references to the

Raymond Treadwell, Esquire
October 31, 2022

1    abortion statement:  HB5.  Correct?

2        A    Correct.

3        Q    And do you see the references to the Soros

4    language and language about Mr. Warren being a

5    progressive prosecutor that we just went through?

6    Correct?

7        A    Yes.  Correct.

8        Q    And now -- and you saw a reference to the

9    gender-affirming care statement letter as well.

10   Correct?

11       A    I believe so.  Yes.

12       Q    So what's -- are there parts of the final

13   executive order or information included in the final

14   executive order that's not included in this draft?

15           MR. LEVESQUE:  Object to form.

16       A    Quite a lot.

17   BY MS. SWAIN:

18       Q    Okay.  So what are the specific pieces?  I'll

19   break my question down.

20           Is the bike stop policy part of this draft?

21       A    I don't believe so.  No.

22       Q    Why not?

23           MR. LEVESQUE:  Object to form.

24       A    I didn't -- I didn't write this draft, so I

25   don't know what kind of judgment calls Mr. Keefe made in

Raymond Treadwell, Esquire
October 31, 2022

1    writing this one.

2    BY MS. SWAIN:

3        Q   Did you give Mr. Keefe any direction or did you

4    even know Mr. Keefe had any conversations before he

5    wrote this?

6        A   I did not give him any directions on the

7    substance of the order.  I think -- I mean, I asked -- I

8    confirmed that he was going to attempt the first draft.

9            I think either I or somebody else in the legal

10   office might have given him copies of some previous

11   suspension orders so he at least had an example to go

12   off.  But in terms of the substance, I gave Mr. Keefe no

13   direction on what should be included.

14       Q   And by this point in the process -- so this

15   is -- the email was dated July 25th.

16           Were you aware of Mr. Warren's bike stop

17   policy?

18       A   I might have been aware by July 25th of the

19   bike stop policy.

20       Q   What about the presumption non-prosecution

21   policy?

22       A   It was right around that day that I think I got

23   the folder of materials that Sheriff Chronister had

24   delivered to our office with that presumption

25   non-prosecution policy within it.  So it's highly likely

Raymond Treadwell, Esquire
October 31, 2022

1    that by sending Larry's rough language to her she could

2    put it in the proper format of an executive order from

3    which then I could make my edits.

4         MS. SWAIN:  Okay.  So we'll include in the

5         exhibit the attachment, Charlie.  That's just 11.1.

6         And I believe this to be the same copy that we

7         marked as -- the same copy of the executive order

8         that we marked as part of Exhibit 15.

9         Okay.  So let's move on to Tab 12, Charlie.

10        And I'll mark this as Exhibit 17.

11        (Exhibit 17 identified.)

12        MS. SWAIN:  So we'll move on to the attachment,

13        which we'll keep in the same --

14        Charlie, why don't you just click through it

15        slowly just to give Mr. Treadwell a general sense of

16        what's in this document.

17   A    I think we can save everybody time here.

18        I think the only difference between this

19   version that Larry sent me from the version he sent me

20   earlier is the inclusion of a fourth Fair and Just

21   Prosecution statement on election laws.

22        MS. SWAIN:  Okay.  So we'll go straight to that

23        then.  It's 1083.

24   BY MS. SWAIN:

25   Q    So who wrote this draft of the executive order?

Raymond Treadwell, Esquire
October 31, 2022

1     A    Once again, that was all Larry Keefe.

2     Q    And why did Mr. Keefe insert in this language

3    about a Fair and Just Prosecution letter regarding

4    election security laws?

5     A    I'm not sure why he included that.

6     Q    It notes that Warren condemned the election

7    security laws that the Florida Legislature had enacted

8    in 2021 and condemned the Florida Legislature's proposed

9    election security legislation for 2022.

10          Do elected officials have freedom of speech?

11          MR. LEVESQUE:  Object to form.

12     A    I think everybody has freedom of speech in this

13    country.

14    BY MS. SWAIN:

15     Q    So elected officials have freedom of speech?

16     A    I mean, depending on what context they're

17    speaking, yes.

18     Q    And they can express their opinions on issues

19    of public policy?

20     A    Certainly.

21     Q    And it's okay for elected officials to disagree

22    on issues of public policy.  Right?

23     A    I think that's American.  Yes.

24     Q    So is it fair to say that Mr. Warren, in

25    signing this -- or in signing this letter, is expressing

Raymond Treadwell, Esquire
October 31, 2022

```
 1    opinion on a public policy?

 2         A    There were -- there were lots of opinions in

 3    that statement.  If you want to go through them sentence

 4    by sentence we can.

 5         Q    No.  I mean just in general.  We don't have to

 6    go sentence by sentence.  In general.

 7         A    Yeah.  In general I think it's mostly opinion.

 8         Q    And now, this language was removed from the --

 9    from the -- it was cut out of the executive order before

10    the executive order was signed and made final.  Correct?

11         A    That's right.  I took it out.

12         Q    Why did you take it out?

13         A    Because I didn't think that it provided any

14    basis for suspending Mr. Warren.

15              I mean, when I read this statement, at most I

16    saw prosecutors around the country urging policy makers

17    and others to, you know, stop these kinds of election

18    laws.  To me, that wasn't the kind of same qualitative

19    pledge or vow made that Mr. Warren made in the abortion

20    statement and the transgender statement.

21         Q    Okay.  And was this draft shared with anyone

22    other than you and Mr. Keefe?

23         A    I don't think so.

24         Q    But it's a -- it is a draft, an official draft

25    of the office of the governor, is it not?
```

Raymond Treadwell, Esquire
October 31, 2022

1            MR. LEVESQUE:  Object to form.

2       A    What do you mean by "official draft"?

3   BY MS. SWAIN:

4       Q    I mean, a member, an employee of the governor's

5   office sent it to another employee of the governor's

6   office.  Correct?

7       A    Yes.  This was an internal draft of the

8   executive order.

9       Q    So Mr. -- Mr. Warren's views on the Florida

10  Legislature's election security laws and proposed

11  election security laws was a factor considered in the

12  drafting of the executive order.  Correct?

13           MR. LEVESQUE:  Object to form.

14      A    I considered the statement and rejected it as a

15  potential basis to suspend Mr. Warren.

16  BY MS. SWAIN:

17      Q    Okay.  Did anyone else provide any comments on

18  this draft of the executive order?

19      A    Not to me.

20      Q    And not to Mr. Keefe?

21      A    I'm not aware of who -- who might have talked

22  to Mr. Keefe.

23      Q    But you're not aware of anyone giving feedback

24  to Mr. Keefe on this draft other than you?

25           MR. LEVESQUE:  Object to form.

Raymond Treadwell, Esquire
October 31, 2022

1      A    I mean, once this draft reached me I rewrote

2   almost all of it.  So this draft really didn't see the

3   light of day beyond my computer.

4           MS. SWAIN:  Okay.  So let's move to Tab 16 now,

5      Charlie.

6   BY MS. SWAIN:

7      Q    Mr. Treadwell, do you recognize this document?

8      A    Yes.  I believe this is my substantial rewrite

9   of Larry's draft.

10          MS. SWAIN:  Okay.  And can we, Charlie, go to

11     1315.

12  BY MS. SWAIN:

13     Q    So this is -- as you described, you were

14  removing the language about the letter on election

15  security policy.  Correct?

16     A    That's correct.

17          MS. SWAIN:  Can we go to the next page,

18     Charlie?

19          And sorry.  I'll mark this as Exhibit 18.

20          (Exhibit 18 identified.)

21  BY MS. SWAIN:

22     Q    Now, in this draft the statement on the death

23  penalty is still in this draft.

24          Why is that?

25     A    I think I hadn't deleted it yet.  I mean, this

Raymond Treadwell, Esquire
October 31, 2022

1     A    Yeah.  So I recommended not producing all of

2     those exhibits because, one, this was going to go to a

3     trial in front of the Senate and we didn't have any duty

4     to put forward all of our evidence as -- as an

5     attachment to this executive order.

6            The "whereas" clauses were sufficient legally

7     to put Mr. Warren on notice for why he was being

8     suspended.

9            MS. SWAIN:  Okay.  So we'll go to -- Charlie,

10           it's Defendant's 002315.  I don't think it's in

11           this.  I think it's a separate file, Charlie.

12           MR. McKENNA:  Could you repeat that number?

13           MS. SWAIN:  2315.

14           MS. SINGH:  And it's in your -- it's in the

15           folder not the binder.

16           MR. McKENNA:  Okay.

17           (Mr. O'Neill returned.)

18           MS. SWAIN:  Okay.  Let's -- can you scroll,

19           Charlie.  Okay.  Can you stop there.

20           So I'll mark this as Exhibit 19.

21           (Exhibit 19 identified.)

22    BY MS. SWAIN:

23     Q   So this is another draft of the executive

24    order.

25           Do you know who these edits are from -- these

Raymond Treadwell, Esquire
October 31, 2022

1    handwritten edits?

2         A    I am told that those handwritten edits are from

3    the governor.

4         Q    So you said you were told they're from the

5    governor.

6              You don't know firsthand?

7         A    I never met with the governor on this matter.

8    Only Mr. Newman did from our office.

9         Q    So these are the edits that the governor gave

10   to Mr. Newman?

11        A    That's my understanding.   Yes.

12        Q    And this first one says "non-abortion

13   infractions first."

14             Do you know why the governor would have made

15   that edit?

16        A    I do not.

17             MS. SWAIN:   Okay.   Let's go to the next one.

18   BY MS. SWAIN:

19        Q    And similarly, these edits, for the first one,

20   it looks like it says, "Florida law does not impose

21   penalties on pregnant women."

22             Do you know why the governor would have made

23   that edit?

24        A    I mean, I would guess that he didn't want this

25   in any way to be misconstrued to suggest that we're