# Exhibit 3
## (Lawrence Keefe Depo. Excerpts)

```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF FLORIDA
 2                    TALLAHASSEE DIVISION

 3                          CASE NO. 4:22-cv-302-RH-MAF

 4  ANDREW H. WARREN,

 5       Plaintiff,

 6  vs.

 7  RON DESANTIS, individually
    and in his official capacity
 8  as Governor of the State
    of Florida,

 9
         Defendant.
10  _____/

11                  VIDEO DEPOSITION OF
                      LAWRENCE KEEFE
12
                Taken on Behalf of PLAINTIFF
13
            DATE:          October 19, 2022
14          TIME:          10:00 a.m. - 2:26 p.m.
            PLACE:         Messer Caparello PA
15                         2618 Centennial Place
                           Tallahassee, Florida 32308
16
            Examination of the witness taken before:
17
                     JEFFREY R. BABCOCK
18                     Court Reporter
                    Tallahassee, Florida
19

20

21

22

23

24

25
```

```
 1   APPEARANCES OF COUNSEL:

 2   On behalf of the PLAINTIFF:

 3   JEAN-JAQUES CABOU, ESQUIRE
     MARGO CASSELMAN, ESQUIRE
 4   Perkins Coie LLP
     2901 North Central Avenue, Suite 2000
 5   Phoenix, Arizona 85012-2740
     Direct: 602-351-8003
 6   Office/Firm: 602-351-8000

 7   SAMANTHA SINGH, ESQUIRE
     ALEXANDRA SWAIN, ESQUIRE
 8   Debevoise and Plimpton
     919 Third Avenue
 9   New York, New York 10022
     Tel: +1 212 909 6000
10
     On behalf of the DEFENDANT:
11
     GEORGE T. LEVESQUE, ESQUIRE
12   JEFF AARON, ESQUIRE
     Gray Robinson, P.A.
13   301 South Bronough Street, Suite 600
     Tallahassee, Florida 32301-1724
14   Office: 850-577-9090
     Cell: 850-577-9090
15   Email:  george.levesque@gray-robinson.com

16   VIDEOGRAPHER:

17   CASSIE MINNICH

18

19

20

21

22

23

24

25
```

```
1                    INDEX TO WITNESS

2   LAWRENCE KEEFE                                    PAGE

3          Examination by MR. CABOU                     7

4                        *  *  *

5                   E X H I B I T S

6   NUMBER                   DESCRIPTION              PAGE

7   For the Plaintiff:

8     1       Memorandum                               37
      2       Composite                                51
9                        *  *  *
10
    Certificate of Oath                               119
11  Certificate of Reporter                           120
    Errata Sheet                                      121
12  Read and Sign Letter                              122

13                       *  *  *

14

15

16

17

18

19

20

21

22

23

24

25
```

1   ago, and at the beginning of the call said that he had

2   been noticed in some way to be deposed, and had I, and I

3   said I had.

4       And I -- and he said, well, what -- you know, "What's

5   this going to be about," or "What do you anticipate will

6   occur?"  And I said that we should let -- I asked whether

7   he had a lawyer, and he said he did.  And I said, "Well,

8   then your lawyer should confer with my lawyers, and they

9   should be the ones that have dialogue, not us."  And the

10  call ended.

11      Q.  And so he took your direction or your suggestion

12  at that, and you didn't -- am I correct that you didn't

13  discuss this further?

14      A.  No.  He took my direction at that, meaning, he

15  didn't persist, and we did not discuss it further.

16      Q.  Okay.  Other than Sheriff Chronister, is there

17  any other person with whom you've discussed your testimony

18  here today?

19      A.  With counsel.

20      Q.  Okay.  And other than that?

21      A.  Not in any manner of substance, just the fact

22  that I was going to be deposed and have a deposition in

23  this, but not in any kind of substantive discussion.

24      Q.  Okay.  Okay.  Mr. Keefe, prior to Mr. Warren's

25  suspension from office an August 4th, was there, at the

1   Governor's request, an investigation or review of state

2   attorney's offices across Florida?

3       A.   My -- my recollection of that was not that the

4   Governor requested anything.  What happened was, sometime,

5   I estimate in December of -- last December, I was in a

6   meeting with the Governor with Ryan Newman and with James

7   Uthmeier on subjects wholly unrelated to state attorneys.

8   And at some point in that meeting, the Governor asked me

9   whether any of the state attorneys in Florida were not

10  enforcing the law, and I responded that I did not know but

11  that I would be glad to look into it.  The Governor said

12  nothing further on that, and we went back to the

13  discussion that we were having on other subjects.  And I

14  would estimate that that exchange between the Governor and

15  me on that topic took less than 30 seconds to occur.

16      And then based on that, the overall subject of whether

17  state attorneys in Florida, any of them, were not

18  enforcing Florida law became a project, but not a high

19  priority project, not anything with urgency.  And so it

20  wasn't so much that I was tasked as much as I took on the

21  project based on the Governor's question to me.  So there

22  was never a tasking with any specific form.  It became a

23  matter that I said -- that I said I would look into.

24      Q.   Okay.  What was the purpose for which that

25  meeting was convened?

1        MR. LEVESQUE:  I'm going to object and assert

2     executive privilege and deliberative process privilege

3     to the extent that it doesn't deal with any matters

4     related to the Executive Order.  If it deals with the

5     Executive Order, you can answer.  But if it doesn't,

6     I'm going to instruct the witness not to answer.

7        THE WITNESS:  It had absolutely nothing

8     whatsoever -- that meeting had absolutely nothing

9     whatsoever to do with U.S. attorneys, state attorneys,

10    any attorneys.  It was wholly unrelated subjects.

11  BY MR. CABOU:

12    Q.   So how did it come up?

13    A.   I do not know.  I do not know what the -- I do

14  not know.  It was -- I do not not know whatever the thing

15  was that caused the Governor to ask me that question.  I

16  don't know.  I don't recollect.

17    Q.   Okay.  He -- there was nothing else that he said

18  that, in your mind, caused this subject to bubble up in

19  the otherwise unrelated meeting?

20    A.   Not that I recall.

21    Q.   Okay.  Who would know why this came up in that

22  meeting?

23    A.   Well, the human beings that were present at the

24  meeting were the Governor, Ryan Newman, James Uthmeier,

25  and me.  I've told you what I know.  I can't speak to and

1    don't know whatever else was happening in their minds.

2        Q.   Okay.   Just so I'm clear, who was it that

3    broached the subject of whether state attorneys in Florida

4    were enforcing the law?

5        A.   The Governor, and totally out of context of what

6    we were discussing.   And there may have been some

7    tangential thing, there may have been some -- some topic

8    or thing, one aspect of which had to do with enforcement

9    of law, but I'm speculating now.

10       And I responded to the Governor that I did not know

11   whether there were state attorneys in Florida that were

12   not enforcing the law, and I said that I would be glad to

13   look into it.   And there was no follow-up.   There was no

14   further discussion.   We went on with whatever it was that

15   we were talking about that had absolutely nothing

16   whatsoever to do with state attorneys.

17       Q.   Okay.   Is it fair to say that your review of

18   Florida state attorneys began after that meeting?

19       A.   Yes.

20       Q.   And then, although you said it was a low-priority

21   project, the project was ongoing from that meeting

22   forward?

23       A.   Ongoing in a sense that there were times days and

24   weeks passed, I did nothing, and there were times where I

25   had a significant amount of oral communications with

1  people in the law enforcement community throughout the
2  State of Florida on the subject of whether there were
3  state attorneys that were not enforcing the law.

4    Q.   Okay.  Have you been involved in any other

5  state-wide review like this one?

6    A.   You know, I -- I have, but the, you know, full

7  response, appropriate response to that is, my job -- or

8  one of the key facets of my job is to be a liaison between

9  the Governor's office and the federal, state, and local

10 law enforcement community in the State of Florida.

11     And -- and in the course of my work, not just for the

12 Governor, but for the chief of staff, for the general

13 counsel, for other deputy chiefs of staff, for my

14 colleagues in the executive branch of government, will ask

15 me about a topic, and I -- and I will often say "I don't

16 know, but I will look into it."  And then I will make

17 calls to sheriffs, to state attorneys, to members of

18 federal law enforcement, to any number of people who I

19 know throughout the state to get their impressions or

20 thoughts on whatever the subject is.

21     So it's certainly -- you know, there's, on -- on a

22 continuum or gradation of investigations, reviews, looking

23 into, however you would construct that continuum of I will

24 look into something.  That's the kind of thing that I do.

25 That's what I do in my job.

008

1    Q.   Okay.   Was this review led by yourself?

2    A.   Yes.

3    Q.   Okay.   Did anyone assist you within the Executive

4  Office of the Governor?

5    A.   No.   No one was -- well, no one was directing me

6  or guiding me.   I -- I mean, I would have assistance in

7  the extent to which, for example, I might, in the course

8  of a meeting with Ryan Newman, mention to him some of the

9  things I was learning or finding out, and I would have

10  collegial dialogue with him on that, which I considered to

11  be assistance.

12    At the later stages in this, his colleagues in the

13  general counsel's office that were focusing on the legal

14  aspects, the legal principles, the applicable legal

15  precedence, I would get their input and assistance.   I

16  guess that's a fair characterization of assistance.   So

17  yeah, that would be my response.

18    Q.   Okay.   I -- yesterday, with one of your

19  now-former colleagues in the Executive Office of the

20  Governor, Ms. Pushaw, we reviewed the org chart, and you

21  were on there reporting to Mr. Uthmeier; is that correct?

22    A.   It is.

23    Q.   Does anyone report to you?

24    A.   No.

25    Q.   Do you have a executive assistant or anything --

1     Q.   Okay.

2     A.   And I think Steve Casey spoke with the Police

3 Chiefs' Association.

4     Q.   Okay.

5     A.   But your question is for private organizations?

6     Q.   Right.  In other words, other than sworn, you

7 know, law enforcement officers and their subordinates, did

8 you speak with anyone in the private sector other than --

9     A.   I may have.  I just don't recall.

10     Q.   Okay.  You can't think of any as you sit here

11 today?

12     A.   I cannot.

13     Q.   Okay.  Did you speak to anyone from Fair and Just

14 Prosecution?

15     A.   I did not, other than reading material that they

16 published.

17     Q.   Um-hmm.  But you didn't call anyone or reach out

18 to them by email?

19     A.   I did not.

20     Q.   Okay.  Why not?

21     A.   My -- my -- my job, as I -- as I mentioned to

22 you, I wasn't given the job or the tasking.  The work that

23 I did, as I understood it, was to identify any state

24 attorneys in -- any state attorneys in Florida who were

25 not enforcing the law.  And I chose to talk to the law

1   enforcement community on the notion they might be in the

2   best position to know whether the law was being enforced

3   by state attorneys.  And that's where I focusd my work.

4       And then all roads led to Mr. Warren based on that

5   informal "look into" survey that I did, and that when I

6   did my own research online about Mr. Warren is where the

7   Fair and Just Prosecution memoranda came up, which to me

8   were not fraught with the need for digging into underlying

9   factual material like there was, for example, on the

10  presumptions of non-prosecution and anecdotal things

11  people heard via reputation.  That's largely where my

12  focus was.  It --

13      Q.  Sorry, just to be clear where -- what was largely

14  where you focus was?

15      A.  On answering the question of whether there were

16  state attorneys in Florida that did not enforce the law.

17      Q.  Okay.  And is it fair to say that you spoke

18  predominately, if not exclusively, with either current or

19  former members of police agencies to make that

20  determination?

21      A.  You know -- you know, whether I spoke with other

22  groups or organizations, I may well have, not -- but I

23  don't recollect as I sit here today.  I may well have.

24      This project began in December of last year.  My, sort

25  of, fact collection and fact gathering, you know, may have

1    gone through June or July.  But it largely became, pretty

2    much early on, more of a legal analysis based on the Fair

3    and Just Prosecution joint statements.  And I wasn't

4    deeply involved in the dissections of the presumption of

5    non-prosecution.  Those were communications with Sheriff

6    Chronister and Ryan Newman and the general counsel folks,

7    you know, dissecting exactly how that played out in the

8    field.

9         Q.  Did Sheriff Chronister tell you that he was a

10   historical opponent of both the bike stop policy and the

11   low-level offense policy?

12        A.  I had a lot of communication with Sheriff

13   Chronister.  Much was said about all sorts of particular

14   settings or contexts of problems that Sheriff Chronister,

15   and according to him, Sheriff Dugan, had encountered with

16   Mr. Warren.

17        Q.  Sorry, just to be clear Chief Dugan.

18   Former-Chief Dugan; right?

19        A.  Yes.

20        Q.  Okay.

21        A.  What did I say?

22        Q.  You said sheriff.  I think it's the same.  I just

23   want to make sure that we're --

24        A.  Sheriff Chronister and Chief Dugan.  They were

25   the -- the primary sources of what was really happening on

```
1        Q.   Did you ask?

2        A.   I don't -- I don't recollect if I did.

3        Q.   Why wouldn't you have asked?

4        A.   Same answer.

5        Q.   That you don't know?

6        A.   I don't recollect asking anyone about

7   Mr. Warren's office's efforts to prosecute or not prosecut

8   abortion.

9        Q.   I thought that was the focus of your

10  investigation was -- your part was the joint statements,

11  and the one we keep talking about is an abortion?

12                  MR. LEVESQUE:   Object to form.

13                  THE WITNESS:   Well, there's the transgender

14       statement, a proactive, preemptive statement that, if

15       and when there are laws, I will not enforce them;

16       that's also a factor.  But no, I had not -- I was not

17       aware of what Mr. Warren had done prior to his

18       statement where he said he would not.

19  BY MR. CABOU:

20       Q.   But you read this memo; right?  The memo that is

21  the --

22       A.   This -- this memo came from Sheriff Chronister,

23  then I did read it, but I don't have a recollection

24  specifically of having read it in the past.  We just read

25  it today.
```

1      Q.   Why not just ask Mr. Warren to clarify what the

2  policy of his office was if you had questions about it?

3      A.   There is no why or reasons for that.  It was not

4  what I did.

5      Q.   Okay.  Why not ask someone in his office about

6  the exercise of discretion on a case-by-case basis?

7      A.   It is not what I did.

8      Q.   Okay.  Is that because all roads led the Andrew

9  Warren based on your anecdotal conversations with law

10  enforcement across the state?

11      A.   No.  All -- the all roads lead to Andrew Warren

12  led me to the joint statements from the Fair and Just

13  Prosecution organization, one of which I think was

14  actually in June, I think, of 2022; that it was a recent,

15  direct, clear, unequivocal statement that drew my

16  attention.

17          Then I found the -- I think the summer of 2021 was the

18  transgender issue -- or the joint statement.  And that --

19  once again, I felt that based upon those, this was a

20  clear, open, notorious declaration that, "I, Andrew

21  Warren, have the power to nullify laws and will not

22  enforce them," and that that was his view and mindset, or

23  his understanding of his role.  That was the driver for

24  me.

25          All of these other things with regard to these other

1  presumptive non-prosecution policies were factors that the

2  general counsel's office addressed and engaged in in terms

3  of legal analysis.

4      Q.  Okay.  Let's take a look at the Executive Order

5  and these joint statements.

6      So if you'll permit me, that folder next to you is

7  prior deposition exhibits, and I'm happy to locate Exhibit

8  B for you.  Thank you.

9          MR. AARON:  Do you have additional copies for

10     us?  We didn't bring the exhibits from yesterday.

11          MS. CASSELMAN:  I do have this one.

12  BY MR. CABOU:

13     Q.  So I've handed you what's been marked as Exhibit

14  B, which is the Executive Order that suspended Mr. Warren,

15  including its attachments.  This is the document you're

16  quite familiar with; correct?

17     A.  Well, I only saw what -- what -- this, seven to

18  ten days before August 4th.  Just to give you some time

19  line or context, I believe in July I created some draft

20  Executive Orders, and at some point, those went to the

21  general counsel's office where I believe Ray Treadwell, of

22  course working with Ryan Newman, took it from there.  And

23  there was a significant change in what they ended up with

24  in terms of where I began.  And I really wasn't involved

25  in that process except toward the end when they were

0015

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CASE NO. 4:22-cv-302-RH-MAF


ANDREW H. WARREN,

    Plaintiff,

vs.

RON DESANTIS, individually
and in his official capacity
as Governor of the State
of Florida,

    Defendant.

                            /



VIDEO-RECORDED DEPOSITION OF
LARRY KEEFE
{Pages 1 - 207}

Friday, November 4, 2022
9:54 a.m. - 2:36 p.m.
GRAY ROBINSON, P.A.
301 South Bronough Street
Suite 600
Tallahassee, Florida 32301-1724










Stenographically Reported By:
Deanne M. Moore, RMR, CRR, FPR, FPR-C

Larry Keefe
November 04, 2022

```
 1                    APPEARANCES

 2  On Behalf of the Plaintiff:

 3      PERKINS COIE, LLP
        2901 North Central Avenue
 4      Suite 2000
        Phoenix, Arizona 85012-2740
 5      (602) 351-8000
        jcabou@perkinscoie.com
 6      dsinger@perkinscoie.com
        BY: JEAN-JACQUES CABOU, ESQUIRE
 7          DAVID SINGER, ESQUIRE

 8
    On behalf of the Defendant:
 9
        GRAY ROBINSON, P.A.
10      301 South Bronough Street
        Suite 600
11      Tallahassee, Florida 32301-1724
        (850) 577-9090
12      george.levesque@gray-robinson.com
        jeff.aaron@gray-robinson.com
13      BY:  GEORGE T. LEVESQUE, ESQUIRE       (Via Zoom)
             JEFF AARON, Esquire
14

15

16  ALSO PRESENT:

17  Ed Salazar, Videographer, U.S. Legal Support, Inc.

18

19

20

21

22

23

24

25
```

Larry Keefe
November 04, 2022

1                    INDEX OF PROCEEDINGS

2                                                      PAGE
  Deposition of LARRY KEEFE
3
  Direct Examination by Mr. Cabou                        6
4 Certificate of Oath                                  204
  Certificate of Reporter                              205
5 Witness Notification Letter                          206
  Errata Sheet                                         207
6


7


8
                         EXHIBITS
9
  Number              Description                     Page
10
  1                   April Kirsheman E-mail             9
11
  2                   Press Office Communication        26
12
  3                   Defendant's Responses and         38
13                    Objections to Plaintiff's
                      First Set of Interrogatories
14
  4                   Policy                            60
15
  5                   Low Level Offense Policy          61
16
  6                   DEF 1689                          63
17
  7                   Governor's Schedule for 8/22/22   67
18
  8                   Memorandum RE:  Suzy Lopez        78
19
  9                   DEF 1224 - DEF 1256              82
20
  10                  E-mail 7/25/22                   108
21                    Keefe to Treadwell

22 11                 Draft Executive Order            113

23 12                 E-mail 7/25/22                   116
                      Keefe to Treadwell
24
  13                  DEF 1309 - DEF 1320              120
25

Larry Keefe
November 04, 2022

1      Q     No problem.

2            After it became obvious to you that all roads

3      led to Mr. Warren, did you communicate that to the

4      Governor?

5      A     The only -- the only communications that I had

6      with the Governor as best I can recollect were -- was

7      the one in December which I'll call the initial.

8      Q     Yep.

9      A     And then the next time I had any communication

10     with the Governor was sometime I think in late July or

11     the week before the August 4 executive order and the

12     suspension.

13           So there was three as best I can recollect.

14     There was December of 2021.  There was late July, a week

15     before the suspension, and then there was very early --

16     Monday, Tuesday, very early on the week of the

17     suspension are the only times that I've been part of

18     communications with the Governor with anything to do

19     with Andrew Warren.

20     Q     Okay.  So fair to say that when all roads led

21     very quickly sometime in the winter of 2022, you didn't

22     tell the Governor that, right?

23           MR. LEVESQUE:  Object to form.

24     A     I did not tell the Governor that.

25     Q     Perfect.

Larry Keefe
November 04, 2022

1        A     I do.

2        Q     On there it notes a 2:00 p.m. meeting with

3   senior advisor for public safety, Larry Keefe.  That's

4   you, right?

5        A     It is.

6        Q     Do you recall the content of that meeting as

7   regards -- if it -- do you recall if any part of that

8   meeting related to Mr. Warren's suspension?

9        A     I believe so.

10       Q     What was discussed at that meeting

11  specifically?

12       A     What I remember about that meeting were

13  discussions about -- upon the suspension of Mr. Warren,

14  who would be deemed to be the successor state attorney.

15  There very well may have been other things discussed in

16  that meeting, but that is what I remember.

17       Q     Do you recall discussing with the Governor

18  during your 2:00 p.m. meeting on August 2nd the reasons

19  for which Mr. Warren was about to be suspended?

20       A     I believe in the preceding week, or -- I think

21  the preceding week, late July sometime, there was

22  another meeting that was not about successors to

23  Mr. Warren, but that was about the executive order, its

24  content.

25            I remember the Governor asking questions

Larry Keefe
November 04, 2022

1  particularly of Ryan Newman on legal points.  So that's

2  what's in my head.  There was the December of 2021

3  meeting that we've talked about at length, meaning --

4  not length of meeting, but you and I have -- have had

5  dialogue on at length.

6             There was a late July meeting which Ryan

7  Newman, James Uthmeier and the Governor and I attended

8  where the Governor had questions particularly of Ryan

9  with regard to the legal principles, the legal analysis.

10            And in this meeting, the week of the suspension

11  that -- my recollection was that was about successor for

12  Mr. Warren.

13      Q    Okay.  Thank you.  Let's take those in order.

14            So the late July meeting where you recall the

15  Governor had questions of Mr. Newman, please tell me

16  every question the Governor had of Mr. Newman.

17      A    I don't remember the particulars.  I -- it's my

18  experience with the Governor that he is very

19  knowledgeable about legal issues, the constitutional

20  issues.  The Governor delves very deeply into legal

21  analysis, Constitutional analysis.  Everyone knows that

22  he is a -- a -- a Harvard trained lawyer.

23            Ryan Newman, the general counsel, is a former

24  United States Supreme Court clerk, and they speak at a

25  level with regard to Constitutional principles and legal

Larry Keefe
November 04, 2022

1  principles that are kind of beyond my bandwidth as to

2  the particular things that they're discussing.

3          So they were having that type of, you know,

4  academic high level dialogue where the Governor, which

5  as usual -- who as usual is asking very probative

6  questions to which Ryan Newman was responding, and my

7  recollection is that James Uthmeier and I were largely

8  observing that dialogue.

9      Q    Yourself and Mr. Uthmeier were observing the

10  dialogue between the Governor and Mr. Newman; is that

11  correct?

12     A    Yes.

13     Q    Okay.  In your capacity as an observer of this

14  high level Constitutional dialogue, is there any

15  specific question that you recall being asked?

16     A    I mean, not as I sit here, not that I

17  particularly request or -- or recollect.  I just

18  remember it was largely a legal discussion about legal

19  issues.  That's what I recollect.

20     Q    Do you remember any of the legal issues in

21  particular?

22     A    I do not.

23     Q    Okay.  Do you remember any mention of abortion?

24     A    I do not.

25     Q    Do you remember any mention of transgender

Larry Keefe
November 04, 2022

```
 1      Q     Great.  That -- that is helpful.  Thank you.
 2            Were you directed by anyone to begin drafting
 3   the EO?
 4      A     No.  I am the one that said to Ryan Newman that
 5   I -- I would like to.  I feel that we need to get moving
 6   on this, we need to do this, and I want to get it
 7   moving, and so I'm going to create a draft.
 8            The people in the general counsel's office,
 9   very busy, lots of things going on, and the way to get
10   this project moving forward, I said to my colleague, you
11   know, Ryan -- I said, In order to get the ball rolling,
12   I'm going to make my humble effort at something that the
13   lawyers and the general counsel's office can then at
14   least have a beginning point.
15            So I was not tasked to do it.  I am the
16   initiator of it being done.
17      Q     Why did you think it was time to start
18   drafting?
19      A     You know, I don't know exactly what -- what in
20   particular was a trigger or precipitator of this.  I'm
21   not quite certain.  I don't know.  But in order to get
22   movement -- I know I was developing the view or the
23   feeling that this needed action.  There needed to be
24   something done on this.
25            And I've come to find in my time in the office
```

1  sometimes, you know, advising and counseling and then

2  waiting for others to initiate and make a project

3  happen, that this was the best way in my view to get

4  this project moving.

5      Q    Okay.  So as it states in here in the couple of

6  weeks leading up to you starting to draft, HB-5 was

7  scheduled to take effect on July 1; is that correct?

8      A    I -- I -- I don't remember the specific dates,

9  but I know that there was a lot going on with HB-5.

10 Whether it was the litigation or the status of the

11 legislation itself, I don't know what the trigger or

12 precipitator was, but, I mean, that is what it is.

13 Whatever the -- the language that is in this that I put

14 in here was drawn on knowledge that I had at the time.

15     Q    Okay.  So -- so like the fifth whereas or sixth

16 whereas clause says "whereas I signed HB-5. . ., and it

17 took effect on July 1, 2022," you knew that at the time

18 you drafted this, right?

19     A    I believe so.

20     Q    Okay.  And you knew at the time you drafted

21 this that as it says on page 2, "State Attorney Warren

22 publicly announced in writing on June 29th, 2022 his

23 intent that he will not prosecute any individuals who

24 provide abortions in violation of Florida law."

25          You knew that at the time, right?

Larry Keefe
November 04, 2022

 1  do the best I can to express these technical points.  I

 2  learned somewhere that no matter how good your computer

 3  it at backing itself up, there's no substitute for

 4  sending a draft wherever you are to yourself in an

 5  e-mail so it lives -- it continues to live --

 6      Q    In the cloud?

 7      A    Somewhere it lives in an e-mail, not just

 8  inside the computer, not to sound like Derek Zoolander,

 9  or in the cloud.

10      Q    Understood, sir.

11      A    Okay?

12      Q    So later in the day, you do another draft, and

13  you send it to yourself pursuant to your sort of self

14  backup process?

15      A    Yes.

16      Q    Okay.

17      A    That is what -- to me that is the only

18  significance of that is this kind of redundant

19  preservation.

20      Q    Understood.  So this is draft number 2 that

21  we're about to look at?

22      A    I think so.

23      Q    The subject says "AW-2."

24      A    Okay.

25      Q    So --

1      A      Yeah.

2      Q      And it's the second one in the packet.  Do you

3  have any reason to believe it's not the second draft?

4      A      I don't.

5      Q      Okay.  All right.  Is -- do you know -- without

6  reviewing the entirety of this document, do you know

7  what's different about draft number 2 from draft

8  number 1?

9      A      Let me just take a quick scan.

10      Q      Of course.

11      A      I'm not going to read it.  I think that this

12  one seems to be based on the abortion joint statement.

13  I don't see where I address the transgender care

14  treatment joint statement or the capital punishment

15  joint statement or the presumptive prosecution issues.

16           I think what I did in this one was maybe edit

17  or add some of the legal standards from Ayala or Israel

18  or some of the other cases.

19      Q      Sure.  Okay.  But the only the only -- the only

20  fact to which this statement refers outside of the

21  Constitutional standards is the abortion joint

22  statement, correct?

23      A      It is, and if you'd like, I can tell you why

24  that's the case.

25      Q      Of course.

Larry Keefe
November 04, 2022

```
 1      A    The -- the policies of non-prosecution for

 2   certain criminal infractions and the policies with

 3   regard to resisting arrest -- resisting arrest without

 4   violence and such arising out of noncriminal

 5   infractions, that was an area that was increasingly by

 6   this time becoming a matter that the general counsel's

 7   office was addressing, you know, whatever its role or

 8   significance would play.

 9           For my own purposes knowing that the far

10   smarter, far -- far more well trained lawyers in the

11   general counsel's office were working on that issue, the

12   more straightforward and simple things that did not

13   involve those complexities were the joint statements.

14   They did not rely or need any sort of inquiry in order

15   to -- by my -- in my opinion or my view.  They didn't

16   require -- they were on their face actionable

17   statements.

18           So the -- the reason that the non-prosecution

19   policies that we've talked about are not in this were

20   that I contemplated that all being things that would be

21   covered by the general counsel's office.

22      Q    Okay.  One of the standards that you discuss on

23   Bates page 1233 in the top paragraph says, "Whereas, it

24   is in the best interest of the residents of the

25   Thirteenth Judicial Circuit they immediately have a new
```

Larry Keefe
November 04, 2022

1  the sole office.  There are people -- I tried to explain

2  to you a minute ago, there are people who live and

3  reside in Hillsborough County --

4      Q    I understand.

5      A    -- that did not vote for Mr. Warren.  There are

6  people in Hillsborough County who did not vote at all,

7  and there are people coming and going every day in

8  Hillsborough County that have the right to the

9  protections of Florida law, and the Governor is

10  accountable for protecting them.

11          This isn't just about the people, however many

12  there were in Hillsborough County that voted yes to

13  Mr. Andrew Warren, and who knows how many of those

14  people don't -- didn't know when they voted for him that

15  he was going to do what he did with regard to the joint

16  statement in June of 2022 --

17      Q    Okay.

18      A    -- and any endless number of sets of

19  hypotheticals.

20      Q    Let's move on.  The next draft in this packet

21  starts on page 1235.  Do you see that?  I'm sorry,

22  that's the e-mail, and there's a draft after it.  It's

23  draft -- the e-mail is dated July 19th, and the subject

24  is "AW/719," which I assume is 7/19 which I now

25  understand in your backup system is probably the version

Larry Keefe
November 04, 2022

1  you wrote on that day, correct?

2     A    I would think so.  I suppose so.

3     Q    Okay.  This draft, the third draft that we've

4  reviewed today, adds additional joint statements from

5  the group Fair Just Prosecution to the text and to the

6  reasons for which Mr. Warren would be suspended,

7  correct?

8     A    Yeah, let me just -- I think so, but let me --

9  this adds the death penalty.  And, yeah, this has all

10 three.

11    Q    Okay.  So I'd like to just review these

12 briefly.

13         So on page 1239 it has reference to a joint

14 statement by the group Fair and Just Prosecution on the

15 subject of the death penalty dated February 22nd, 2022,

16 right?

17    A    Yes.  Correct.

18    Q    Okay.  When was the first you learned of this

19 joint statement?

20    A    I -- I don't know.

21    Q    Okay.  Was it your idea to add reference to

22 this death penalty joint statement in this draft?

23    A    It was.

24    Q    Why did you do that?

25    A    I -- I was trying to put together a draft that

1  would be at least a beginning point for the general

2  counsel's office.  I collected this information and data

3  myself, and I was trying to present as many potential

4  things of concern or consideration to the general

5  counsel's office for them to make whatever decisions

6  they wanted to make in terms of the legal significance

7  of those things.

8      Q    Okay.  On the following page, it goes on to

9  reference the June 2021 joint statement written by Fair

10  and Just Prosecution on the subject of the

11  criminalization of transgender people and gender

12  affirming health care, right?

13     A    It does.

14     Q    You also decided to add that statement in your

15  draft?

16     A    I -- I did.

17     Q    For the same reasons I assume as you added the

18  death penalty statement?

19     A    Correct.

20     Q    Okay.  Ultimately that joint statement on

21  transgender care people and gender affirming health care

22  was attached to the final executive order removing --

23  suspending Mr. Warren from office, correct?

24     A    It was.

25     Q    Okay.  I'm -- on Bates page 1242, you say,

Larry Keefe
November 04, 2022

1      Q      Okay.  You were the one who brought Mr. Warren

2    to the Governor's attention; is that correct?

3      A      I brought Mr. Warren to the attention of

4    James Uthmeier and Ryan Newman.  When I -- in the first

5    meeting in December of 2021, nothing was said or

6    mentioned about Mr. Warren or any state attorney.

7             In the meeting of December 2021, the Governor

8    asked me if I knew of any state attorneys that were not

9    enforcing the law, and I said I did not, but I would be

10   glad to look into it.

11            The next -- the only time Mr. Warren -- when

12   Mr. Warren came up, we've used the expression "all roads

13   leading to Warren," I shared that with Ryan Newman, I

14   shared that with James Uthmeier.  I never had any more

15   communication with the Governor about this subject until

16   that late July meeting that we discussed earlier with

17   Ryan Newman, James Uthmeier and the Governor and me

18   where the Governor was asking Ryan Newman legal

19   questions.

20     Q      Okay.

21     A      And then there was a meeting on August the 2nd

22   that I think was predominantly about who the successor

23   state attorney would be.

24     Q      Understood.

25            MR. CABOU:  Okay.  Let's mark Exhibit 13.