# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

ANDREW H. WARREN,

                Plaintiff,               Civil Action No.

v.

RON DESANTIS, individually and in his official
capacity as Governor of the State of Florida,

                Defendant.

---

## COMPLAINT

Plaintiff Andrew Warren ("Plaintiff" or "Warren") files this Complaint for Injunctive and Declaratory Relief against Defendant Ron DeSantis, individually and in his official capacity as the Governor of Florida ("Defendant" or "DeSantis"). Plaintiff alleges the following:

### NATURE OF THE CASE

1.     The First Amendment to the United States Constitution requires that elected officials "be given the widest latitude to express their views on issues of policy." *Bond v. Floyd*, 385 U.S. 116, 135–36 (1966).

2.     Reaffirming that truth, the U.S. Supreme Court recently explained that the First Amendment "prohibits government officials from subjecting individuals to 'retaliatory actions' after the fact for having engaged in protected speech." *Houston*

4:22-cv-302-RH-MAF

**JOINT EX**

**1**

*Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1259, 212 L. Ed. 2d 303 (2022) (quoting *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722, 204 L. Ed. 2d 1 (2019)).

3. The Florida Constitution creates the office of State Attorney to which Warren has been twice elected and from which Warren has been recently suspended by DeSantis.

4. The State Attorney, with limited exceptions, "shall be the prosecuting officer of all trial courts in [his or her circuit]." Fla. Const. art. V, § 17.

5. The Florida Supreme Court has made clear that the State Attorney is a constitutional officer who, as an elected official, "is responsible to the electorate of [the] circuit, this being the traditional method in a democracy by which the citizenry may be assured that vast power will not be abused." *Austin v. State ex rel. Christian*, 310 So. 2d 289, 293 (Fla. 1975).

6. And while the Florida Constitution sets forth limited, enumerated circumstances under which the Governor may suspend from office certain state officers including elected State Attorneys, "this removal power applies only in extraordinary circumstances." *Abusaid v. Hillsborough Cnty. Bd. of Cnty. Comm'rs*, 405 F.3d 1298, 1307 (11th Cir. 2005).

7. Those "extraordinary circumstances" are spelled out in the Florida Constitution, and "it is the exclusive province of the judiciary to interpret terms in a constitution and to define those terms." *In re Senate Joint Resol. of Legis. Apportionment 1176*, 83 So. 3d 597, 631–32 (Fla. 2012); *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

JEX 1.002

8.      Warren brings this lawsuit to confirm that the First Amendment still applies even though DeSantis is the Governor of Florida and that the Constitution of the State of Florida means what the courts say it means, not whatever DeSantis needs it to mean to silence his critics, promote his loyalists, and subvert the will of the voters.

## JURISDICTION AND VENUE

9.      Plaintiff brings Claim I below under 42 U.S.C. §§ 1983 and 1988, and *Ex parte Young*, 209 U.S. 123 (1908), to redress the deprivation under the color of state law of rights secured by the U.S. Constitution.

10.     This Court has jurisdiction to hear Claim I pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1357.

11.     Plaintiff also brings Claim II below under Florida law for a writ of quo warranto.

12.     This Court has jurisdiction to hear Plaintiff's state-law claim pursuant to 28 U.S.C. § 1367(a) because it arises out of the same occurrence and common nucleus of operative facts as Plaintiff's claim under federal law and will involve the same or similar evidence.

13.     This Court has jurisdiction over Defendant, as he is sued individually and in his official capacity as an elected official in Florida. Further, Defendant works or resides in the State of Florida.

14.     Venue in this district is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

- 3 -

15.     This Court has the authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202. Further, this Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure.

## PARTIES

16.     Plaintiff Andrew Warren is the elected State Attorney for the 13th Judicial Circuit of the State of Florida. State Attorneys are "the prosecuting officer[s] of all trial courts in th[eir] circuit and shall perform other duties prescribed by general law." Fla. Const. art. V, § 17. Warren is not subject to impeachment. *Id.* art. III, § 17.

17.     Defendant Ron DeSantis is the Governor of Florida and is sued individually and in his official capacity. Article IV of the Florida Constitution provides that the "supreme executive power shall be vested in a governor." *Id.* art. IV, § 1(a). Further, the Florida Constitution provides that "[b]y executive order stating the grounds and filed with the custodian of state records, the governor may suspend from office any state officer not subject to impeachment . . . for malfeasance, misfeasance, neglect of duty, drunkenness, incompetence, permanent inability to perform official duties, or commission of a felony, and may fill the office by appointment for the period of suspension." *Id.* § 7(a). The Florida Constitution further provides that "[t]he suspended officer may at any time before removal be reinstated by the governor." *Id.*

18.     By Executive Order signed on August 4, 2022, DeSantis suspended Warren from office. *See* State of Florida, Office of the Governor, *Executive Order*

JEX 1.004

*Number 22-176 (Executive Order of Suspension)* (Aug. 4, 2022), attached as Ex. 1 (the "Order" or "EO").

19.    Warren has not been removed from office. *See* Fla. Const. art. IV, § 7(b).

## STATEMENT OF FACTS

### Warren is an Elected Constitutional Officer Who Is Obligated by Law to Exercise Independence and Discretion

20.    Warren is a native Floridian, husband, father, and career prosecutor. After growing up in Gainesville, Warren studied law at Columbia Law School and was admitted to the Florida Bar in 2003.

21.    For eight years Warren was a prosecutor for the U.S. Department of Justice. As a federal prosecutor he prosecuted matters including street and violent crimes in Washington, D.C., as well as complex fraud cases across the country. During his tenure with the Justice Department, Warren earned multiple accolades and awards, including the 2013 Attorney General Award for Trial Litigation. Warren also served as an instructor at the Justice Department's national training center.

22.    In November 2016, Warren was elected State Attorney for Florida's 13th Judicial Circuit. He took his oath of office and began service as State Attorney on January 3, 2017.

23.    In 2020, Warren was reelected to his office, with 369,129 people choosing him to continue to lead the office of approximately 300 prosecutors, investigators, and other professional staff.

**JEX 1.005**

24.     Warren was elected and re-elected after making and keeping numerous promises to voters about how he would perform the duties of the office he sought and to which he was twice elected.

25.     For example, Warren has consistently promised to focus on targeting violent criminals, serious fraudsters, and serial recidivists, while utilizing smart and innovative reforms, including mental health courts and civil citations for low-level offenders, to hold others accountable and save taxpayer resources.

26.     Warren has also been clear with voters that he will not blindly prosecute to obtain convictions wherever possible and instead exercises his discretion and pursues common-sense solutions that further the ultimate goal and job of every prosecutor: seeking justice.

27.     The State Attorney serves a "unique role" "both as quasi-judicial and quasi-executive." *Valdes v. State*, 728 So. 2d 736, 739 (Fla. 1999). His or her discretion "in deciding whether and how to prosecute" is "absolute." *McGinley v. Fla. Dep't of Highway Safety & Motor Vehicles*, 438 F. App'x 754, 757 (11th Cir. 2011) (per curiam) (quoting *State v. Cain*, 381 So. 2d 1361, 1367 (Fla. 1980), *superseded by statute on other grounds as stated in Banks v. State*, 520 So. 2d 43, 46 (Fla. 1st DCA 1987)).

28.     The Florida Constitution requires, among other things, that the State Attorney "shall be and have been a member of the bar of Florida for the preceding five years." Fla. Const. art. V, § 17.

29.     Among other obligations, as a member of the Bar and a prosecutor, the State Attorney must "reflect a scrupulous adherence to the highest standards of

JEX 1.006

professional conduct," including "the responsibility of a minister of justice and not simply that of an advocate." *The Fla. Bar v. Cox*, 794 So. 2d 1278, 1285, 1286 (Fla. 2001) (citations omitted).

30.     The State Attorney is also "required to exercise sound discretion and independent judgment in the performance of the prosecution function." ABA Criminal Justice Standards for the Prosecution Function 3-1.2(a); Fla. Bar R. 4-3.8, cmt. (noting Florida's adoption of the American Bar Association Standards of Criminal Justice Relating to Prosecution Function after "careful deliberation by lawyers experienced in criminal prosecution and defense").

31.     Warren has fulfilled these and all the obligations of his office at all times.

### While In Office Warren Has Spoken Out on Controversial Issues Affecting His Office and the Criminal Justice System

32.     While State Attorney, Warren has also stated his positions and values on matters of public importance impacting the criminal justice system.

33.     In June 2021, for example, Warren co-signed a Joint Statement with other elected prosecutors that, in part, called "on policymakers to . . . leave healthcare decisions to patients, families, and medical providers." [*See* Fair and Just Prosecution, *Joint Statement from Elected Prosecutors and Law Enforcement Leaders Condemning the Criminalization of Transgender People and Gender-Affirming Healthcare* (June 2021), attached to EO as "Exhibit A" (hereafter, "Gender Statement")] In this Joint Statement, the signatories went on to "pledge to

- 7 -

use [their] discretion and not promote the criminalization of gender-affirming healthcare or transgender people." [*Id.*]

34.     More recently, in the wake of the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), Warren co-signed a similar Joint Statement stating the signatories' opinion that, among other things, "[c]riminalizing and prosecuting individuals who . . . provide abortion care makes a mockery of justice; prosecutors should not be part of that." [*See* Fair and Just Prosecution, *Joint Statement from Elected Prosecutors* (June 2022) (updated July 25, 2022), attached to EO as "Exhibit B" (hereafter, "Abortion Statement") (together with the Gender Statement, the "Joint Statements")]

35.     This Abortion Statement also stated that signatories would "exercise [their] well-settled discretion and refrain from prosecuting those who seek, provide or support abortions." [*Id.*] And it stated that "legislatures may decide to criminalize personal healthcare decisions, but *we* remain obligated to prosecute only those cases that serve the interests of justice and the people." [*Id.*]

### While In Office Warren Has Specifically Guided the Exercise of Discretion by His Assistant State Attorneys Through Certain Policies

36.     In carrying out his constitutionally and ethically required duties, Warren has maintained numerous policies providing guidance and executive direction to the approximately 130 Assistant State Attorneys ("ASAs") under his command.

37.     Among other things, some such policies speak generally to the importance of exercising discretion in every case and every stage of every case. [*See*

JEX 1.008

Memorandum from Andrew H. Warren, State Attorney 13th Judicial Circuit, to Assistant State Attorneys, regarding *Prosecutorial Discretion and the Mission of Criminal Justice*, at 2 (Dec. 14, 2021) ("In every case, ASAs must exercise discretion based on the facts of that case—the nature and circumstances of the offense, the defendant's criminal history (or lack thereof), victim input, and other factors. ASAs must exercise that discretion at every stage . . . ."), attached as Ex. 2]

38.    Other policies are more specific, providing principles to guide prosecutorial discretion in particular kinds of cases.

39.    Two such policies guide the discretion of ASAs by establishing a "[p]resumption of [n]on-[p]rosecution" "for certain criminal violations, including trespassing at a business location" and "disorderly conduct" (the "March 2021 Policy") and in cases "where the initial encounter between law enforcement and the defendant results from a non-criminal violation in connection with riding a bicycle or a pedestrian violation" (the "Bike Stop Policy") (collectively, the "Presumptive Non-Prosecution Policies"). [*See* EO at 3–4]

40.    The Presumptive Non-Prosecution Policies speak for themselves and are not absolute. By their terms, both policies state presumptions, but in all cases covered by these policies (indeed in all cases within the State Attorney's Office) ASAs are bound by ethics and by policy to apply their judgment and discretion to the individual case before them. [Presumption of Non-Prosecution Policy (Mar. 9, 2021) ("March 2021 Policy"), attached as Ex. 3; Policy Regarding Prosecution of Cases Based on Pedestrian and Bicycle Violations ("Bike Stop Policy"), attached as Ex. 4]

JEX 1.009

41.    The Bike Stop Policy explains, among other things, that it followed meetings with community members "to discuss specific prosecutorial issues, analyze criminal justice data, and examine actual cases, resulting in a series of policy proposals for consideration." [Ex. 4 at 1] The Bike Stop Policy explains that for "any case referred to our office arising out of a stop exclusively for a bicycle or pedestrian violation, there is a presumption that our office will not file charges against the defendant." [*Id.* at 2]

42.    The Bike Stop Policy also is explicit that the presumption is just that— a presumption. It is not a universal or "blanket" policy.

43.    Specifically, it instructs ASAs that if "based on the facts and circumstances of the case, the public safety needs of the community outweigh the presumption to not file the case, the charge may be filed with the approval of a supervisor." [*Id.*]

44.    The March 2021 Policy is functionally identical. It lists certain offenses including "Expired drivers license," "Violation of nonresident restriction," "Trespass at [a] business location," and "Disorderly intoxication" as "carry[ing] a presumption of no file." [Ex. 3 at 1]

45.    It also says that the "no file" "presumption may be overcome by significant public safety concerns, such as pending felony charges." [*Id.*]

46.    Nowhere in either of the Presumptive Non-Prosecution Policies is there a blanket, no discretion rule. Both explicitly acknowledge that exceptions to the presumptions exist.

JEX 1.010

## Warren is a Critic and Political Rival of DeSantis

47.    DeSantis has spoken out frequently opposing Warren and Warren's views, including specifically on the subjects of criminal justice administration, abortion, and the rights of transgender people.

48.    For instance, in 2019 Florida voters passed Amendment 4, amending the Florida Constitution to restore voting rights to numerous ex-offenders. Warren openly and strongly supported Amendment 4 and the policy choices behind it.

49.    On the other hand, DeSantis vigorously opposed Amendment 4 and, even after it was passed, signed controversial laws limiting the reach of Amendment 4 despite it having garnered 64.5% of the vote.

50.    In 2020, Warren appeared with law enforcement supporting the arrest and prosecution of a church pastor who held packed services amidst the spreading pandemic.

51.    Shortly after the arrest, DeSantis intervened, criticizing Warren and signing an executive order retroactively authorizing the services.

52.    Warren called the DeSantis move undermining law enforcement "weak" and "spineless."

53.    More recently, in April 2021, DeSantis held a media ceremony trumpeting his signature of "HB 1," also known as the "anti-rioting" bill. DeSantis considered HB 1 a "top priority."

54.    Meanwhile, Warren was vocal in opposition to HB 1, criticizing it as, among other things, a solution in search of a problem and as "undermin[ing] 1st Am freedoms of speech and assembly." Andrew Warren (@AndrewWarrenFL), Twitter

JEX 1.011

(Mar.         10,         2021,         7:27         AM)
https://twitter.com/AndrewWarrenFL/status/1369656091131412482?s=20&t=G_E
hyRohc6vtUCFYSLIUNQ.

55.     More recently, Warren and DeSantis have clashed publicly over their
conflicting views on privacy and abortion.

56.     Warren is an outspoken supporter of women's privacy and right to
choose; DeSantis is opposed to abortion in almost all instances.

### DeSantis Suspends Warren from Office for Speaking Out on Issues and for Maintaining Policies that DeSantis Opposes

57.     Of course, DeSantis is free to express his views and his disagreements
with Warren as often as he likes. Indeed, the Federal Constitution ensures that he is.

58.     But on Thursday August 4, 2022, DeSantis went too far. Employing the
powers of his esteemed office as a weapon to suppress criticism and promote
cronyism, DeSantis promulgated Executive Order 22-176 suspending Warren from
his duly elected office.

59.     After being given an incomplete copy of the Order, Warren was
physically escorted from his office by an armed deputy.

60.     The Order claims that Warren is "incompetent" to hold his office and
has demonstrated "neglect of duty" while in office.

61.     Both in his Order and in the rally-like media event he conducted to
announce it, DeSantis said over and again that he was suspending Warren for what
he said in the Joint Statements that he co-signed.

- 12 -

62. The evening before DeSantis announced Warren's suspension, DeSantis's official spokesperson had touted that a "MAJOR announcement" was coming and bragged that it would cause the "liberal media" to "meltdown":



Christina Pushaw (@ChristinaPushaw), Twitter (Aug. 3, 2022, 6:32 PM) https://twitter.com/ChristinaPushaw/status/1555003744781230080?s=20&t=obr8H qKrqjAzd3aWng-W4A.

63. Standing in the Hillsborough County Sheriff's Office, flanked by a phalanx of armed, uniformed law enforcement officers, and to the cheers of a room of supporters, DeSantis made clear that he was suspending Warren because of the statements he made in the Gender Statement and in the Abortion Statement signed by Warren "after *Dobbs*." *See* YouTube, *Gov. DeSantis' Reasoning for suspending State Attorney Andrew Warren*, at 44:30 (Aug. 4, 2022), https://youtu.be/2oZ5Xy55OHw?t=27.

- 13 -

64.     In his media blitz, DeSantis also, for instance, told Fox News's Tucker Carlson that he was suspending Warren because "he actually signed letters saying he wouldn't enforce laws against transgender surgeries . . . laws protecting the right to life." *See* Ron DeSantis (@GovRonDeSantis), Twitter, at 0:54 (Aug. 5, 2022, 7:48 AM) https://twitter.com/GovRonDeSantis/status/1555566375661408256.

65.     Florida has no law regarding "transgender surgeries," whatever that means.

66.     And at no time while in office has Warren ever been referred a case involving a request to prosecute abortion-related crimes.

67.     As a result of Warren's decision to continue to speak out on issues his constituents elected him to pursue, DeSantis suspended Warren from his elected office and has deprived Warren of the ability to perform his duties, of his income, and of the benefits associated with the job.

68.     DeSantis's conduct—which has deprived Warren of his job, his income, and the prestigious title he was elected to hold—"would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005).

69.     DeSantis's Executive Order openly admits that he suspended Warren because Warren "signed" the Joint Statements. [*See* EO at 3, 6] Indeed, DeSantis even attaches copies of the Joint Statements to his Order and quotes specific opinions and views expressed in the Joint Statements with which DeSantis disagrees. [*See id.*]

### DeSantis Immediately Appointed a Long-time Ally to Warren's Elected Post

70.     In the same media event at which he announced Warren's suspension, DeSantis appointed Susan Lopez to be the new State Attorney for the 13th Judicial District.

71.     According to DeSantis's official spokesperson, Warren's "'suspension' . . . is not like paid administrative leave or whatever. Andrew Warren is no longer the Hillsborough state attorney. We have a new Hillsborough state attorney sworn in today to replace him: Susan Lopez."



Christina Pushaw (@ChristinaPushaw), Twitter (Aug. 4, 2022, 5:40 PM) https://twitter.com/ChristinaPushaw/status/1555353085207347203.

72.     Ms. Lopez has already begun making changes to the office that Warren has been elected to hold. She "plans to roll back" the policies enacted by Warren and opposed by DeSantis. *See* Gloria Gomez, *'Back to Basics': Newly-appointed*

- 15 -

JEX 1.015

*Hillsborough State Attorney Sets New Tone with Policy Rollbacks Coming Soon*, Fox News (Aug. 9, 2022, 4:58 PM), https://www.fox13news.com/news/back-to-basics-newly-appointed-hillsborough-state-attorney-sets-new-tone-with-policy-rollbacks-coming-soon.

73.    She has added her name as "The State Attorney" to the office's website without any mention of the supposedly temporary nature of her power. Office of the State Attorney 13th Judicial Circuit, https://www.sao13th.com/ (last visited Aug. 15, 2022).

74.    And she has posted a self-promotional video on that website in which she claims "the previous state attorney lost the confidence of law enforcement" and in which she says "thank you to the Governor" for her job. Office of the State Attorney 13th Judicial Circuit, *State Attorney Susan Lopez, 13th Judicial Circuit*, at 1:46, 1:54, YouTube (Aug. 5, 2022), https://youtu.be/s4lBNh13T5Q.

75.    She has also reversed a previous decision by Warren not to pursue the death penalty in a pending case, proclaiming in a media release that "Susan S. Lopez, State Attorney, for the 13th Judicial Circuit in and for Hillsborough County, filed notice that her office will seek the death penalty for Defendant Mathew Terry." Press Release, Office of the State Attorney 13th Judicial Circuit, *State Attorney Susan S. Lopez Seeking Death Penalty in Brutal Murder Case* (Aug. 8, 2022), https://www.sao13th.com/2022/08/state-attorney-susan-s-lopez-seeks-death-penalty-in-brutal-murder-case/.

76.    After Warren's suspension, the Chief Communications Officer of his office was "told she had to report to Fred Piccolo, a former Communications

JEX 1.016

Director for the governor," and then "given an ultimatum" to "either resign and get paid through the end of the month or . . . be fired on the spot." *See* Justin Schecker, *Chief Communications Officer for Hillsborough County State Attorney Terminated From Her Job*, News Channel 8 (Aug. 15, 2022), https://www.wfla.com/news/hillsborough-county/chief-communications-officer-for-hillsborough-county-state-attorney-terminated-from-her-job/. She refused and was terminated. *Id.*

## CLAIM I

### Violation of First Amendment

### U.S. Const. Amend. I

### 42 U.S.C. § 1983, *Ex parte Young*, 28 U.S.C. §§ 2201, 2202

77.     Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and the paragraphs in the claims below as though fully set forth herein.

78.     Under the First Amendment, "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

79.     The First Amendment applies to states through the Fourteenth Amendment. *Cooper v. Dillon*, 403 F.3d 1208, 1213 (11th Cir. 2005).

80.     The First Amendment generally "prohibits government officials from subjecting individuals to 'retaliatory actions' after the fact for having engaged in protected speech." *Houston Cmty. Coll.*, 142 S. Ct. at 1259, 212 L. Ed. 2d 303 (quoting *Nieves*, 139 S. Ct. at 1722, 204 L. Ed. 2d 1).

- 17 -

81. As the governor of the state of Florida, DeSantis is a governmental official constrained by the First Amendment.

82. Warren is an elected official.

83. As an elected official, Warren enjoys the "right to speak freely on questions of government policy," *id.* at 1261, 212 L. Ed. 2d 303, and "to enter the field of political controversy," *Wood v. Georgia*, 370 U.S. 375, 394 (1962); *see also Bond*, 385 U.S. at 135–36 ("The manifest function of the First Amendment in a representative government requires that [elected officials] be given the widest latitude to express their views on issues of policy.").

84. In June 2021, Warren co-signed a Joint Statement with 73 other American chief prosecutors opposing the criminalization of gender-affirming healthcare. A copy of the Gender Statement was attached to DeSantis's Order as "Exhibit A."

85. In June 2022, Warren co-signed another Joint Statement, again with many other American chief prosecutors, opposing the criminalization of abortion. A copy of this Abortion Statement was attached to DeSantis's Order as "Exhibit B."

86. Both Joint Statements express Warren's views and opinions on controversial issues that are currently the subject of extensive public debate.

87. For example, in the Joint Statements, Warren expressed the following views and opinions, among others:

    a. "Abortion bans will . . . disproportionately harm victims of sexual abuse, rape, incest, human trafficking, and domestic violence." [Abortion Statement]

- 18 -

b. "Enforcing abortion bans runs counter to the obligations and interests we are sworn to uphold [as prosecutors]." [*Id.*]

c. "We are horrified that some states have failed to carve out exceptions for victims of sexual violence and incest in their abortion restrictions; this is unconscionable." [*Id.*]

d. "Criminalizing and prosecuting individuals who seek or provide abortion care makes a mockery of justice; prosecutors should not be part of that." [*Id.*]

e. "Bills that criminalize safe and crucial medical treatments or the mere public existence of trans people do not promote public safety, community trust, or fiscal responsibility. They serve no legitimate purpose." [Gender Statement]

f. "[W]e do not support the use of scarce criminal justice and law enforcement resources on criminalization of doctors who offer medically necessary, safe gender-affirming care to trans youth, parents who safeguard their child's health and wellbeing by seeking out such treatments, or any individuals who use facilities aligned with their gender identity." [*Id.*]

g. "[W]e urge other policymakers to join us in standing up and standing together on this important issue." [*Id.*]

88. Neither Joint Statement mentions any specific Florida law.

JEX 1.019

89.     Neither Joint Statement mentions Warren (other than by including his name on the signature pages) or any specific case presented to or pending before Warren.

90.     Both Joint Statements explicitly affirm that the signatories will exercise the discretion inherent in the role of prosecutors in pursuing the policies and views expressed therein.

91.     On August 4, 2022, DeSantis issued the Order purporting to suspend Warren from the office he was elected to hold.

92.     DeSantis ordered, among other things, that "Andrew Warren is hereby prohibited from performing any official act, duty, or function of public office; from receiving any pay or allowance; from being entitled to any of the emoluments or privileges of public office during the period of this suspension, which period shall be from the effective date hereof, until a further executive order is issued, or as otherwise provided by law." [EO at 9]

93.     DeSantis also appointed Susan Lopez, effective immediately, "to fill the position of State Attorney for the 13th Judicial Circuit of Florida . . . for the duration of the suspension." [*Id.* at 9–10]

94.     DeSantis's Order explicitly states that DeSantis is suspending Warren because he "signed" the Joint Statements. [*See id.* at 3, 6]

95.     DeSantis's Order criticizes and opposes the viewpoints and opinions Warren expressed in the Joint Statements.

- 20 -

96.     DeSantis's Order does not identify any actual conduct by Warren related to his official duties involving alleged criminal activity for seeking gender-affirming healthcare or abortion.

97.     DeSantis's Order does not identify any other conduct by Warren or other reason sufficient to justify a suspension under Article IV, section 7(a) of the Florida Constitution.

98.     DeSantis has repeatedly and openly expressed his own views and opinions on transgender rights and abortion rights, which conflict with Warren's views on those issues, as expressed in the Joint Statements.

99.     By signing the Joint Statements, which expressed Warren's views and opinions on matters of public concern, Warren engaged in protected speech under the First Amendment. *See, e.g.*, *Bond*, 385 U.S. at 136–37.

100.    Among other obvious and important reasons why elected officials must be free to state their values on controversial questions like abortion or the rights of transgender Floridians, is that such officials "have an obligation to take positions on controversial political questions so that their constitu[]ents can be fully informed by them, and be better able to assess their qualifications for office." *Id.* at 136.

101.    DeSantis took adverse action against Warren when he issued an executive order that barred Warren from "performing any official act, duty, or function of public office; from receiving any pay or allowance; from being entitled to any of the emoluments or privileges of public office." [EO at 9]

102.    Such action "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Bennett*, 423 F.3d at 1254.

- 21 -

103.   DeSantis suspended Warren from his elected office because Warren signed the Joint Statements.

104.   DeSantis violated Warren's rights under the First and Fourteenth Amendments by issuing his August 4, 2022 Order suspending Warren in retaliation for exercising his First Amendment rights.

## CLAIM II

### Quo Warranto under Florida State Law

### Fla. Const. art. IV, § 7(a)

### 28 U.S.C. §§ 2201, 2202

105.   Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and the paragraphs below as though fully set forth herein.

106.   "Quo warranto is used 'to determine whether a state officer or agency has improperly *exercised* a power or right derived from the State.'" *Israel v. DeSantis*, 269 So. 3d 491, 494 (Fla. 2019) (quoting *League of Women Voters of Fla. v. Scott*, 232 So. 3d 264, 265 (Fla. 2017)). And because "[t]he Governor is a state officer[,]" quo warranto may be used to confirm whether he exercised his powers unlawfully. *Id.* (citation omitted).

107.   This claim is related to the other claim in this Complaint; both claims arise out of a common nucleus of operative facts—namely the facts and circumstances of and relating to DeSantis's unlawful suspension of Warren.

108.   Article IV, section 7(a) of the Florida Constitution provides that the Governor "may suspend from office any state officer not subject to impeachment . . . for malfeasance, misfeasance, neglect of duty, drunkenness,

JEX 1.022

incompetence, permanent inability to perform official duties, or commission of a felony, and may fill the office by appointment for the period of suspension."

109.   The Governor also has the power to reinstate a suspended officer "at any time before removal." Fla. Const. art. IV, § 7(a).

110.   By his Order, the Governor has suspended Warren for alleged "incompetence" and "neglect of duty." *Id.*

111.   These terms have plain meanings that the courts have defined and that are not malleable at the whim of DeSantis.

112.   "Neglect of duty" is having "reference to the neglect or failure on the part of a public officer to do and perform some duty or duties laid on him as such by virtue of his office or which is required of him by law." *Israel*, 269 So. 3d at 496 (quoting *State ex rel. Hardie v. Coleman*, 155 So. 129, 132 (Fla. 1934)).

113.   "Incompetency" refers "to any physical, moral, or intellectual quality, the lack of which incapacitates one to perform the duties of his office." *Id.* (quoting *Hardie*, 155 So. at 133).

114.   "Incompetency" "'has reference to any physical, moral, or intellectual quality, the lack of which incapacitates one to perform the duties of his office' and 'may arise from gross ignorance of official duties or gross carelessness in the discharge of them . . . [or] from lack of judgment and discretion.'" *Id.* (quoting *Hardie*, 155 So. at 133) (alterations in original).

115.   A difference of opinion is not "incompetency" as defined by the Florida Constitution. Neither is the exercise of ethically and constitutionally required prosecutorial discretion.

- 23 -

**JEX 1.023**

116.    The Governor's Order claims that three separate policy statements by Warren demonstrate his "incompetence" and "neglect of duty."

117.    The Order, however, on its face does not set forth allegations of fact reasonably related to either constitutionally enumerated ground of suspension.

118.    As a first basis for suspension, the Order cites to Warren's signature of the Gender Statement, condemning the proposed criminalization of transgender people and gender-affirming healthcare. The Gender Statement nowhere contained a statement that Warren categorically planned not to enforce any specific law. Indeed, Florida has no such law.

119.    Warren's signature on the Gender Statement does not relate to "any physical, moral, or intellectual quality" that Warren is lacking that incapacitates him from performing the duties of his office. *Israel*, 269 So. 3d at 496 (quoting *Hardie*, 155 So. at 133).

120.    Similarly, his signature on this letter does not relate to neglect of duty, or the failure "to do and perform some duty or duties laid on him as such by virtue of his office or which is required of him by law," *id.* (quoting *Hardie*, 155 So. at 133), as none of the clauses in the Order set forth any allegation that Warren has refused to enforce any specific law.

121.    As a second basis for suspension, the Order cites Warren's two policies of presumptive non-prosecution for certain crimes. These Presumptive Non-Prosecution Policies are described in Paragraphs 39 through 46 above.

122.    As the Order concedes, State Attorneys have complete discretion in making the decision to prosecute a particular defendant.

- 24 -

123. As State Attorney, Warren rightfully exercised his prosecutorial discretion in setting guidelines for his office when charging cases. Those guidelines are presumptive only and require prosecutors to consider each case individually on a case-by-case basis.

124. Warren's exercise of discretion under the Presumptive Non-Prosecution Policies is consistent with his duties and categorically does not relate to incompetence, or "any physical, moral, or intellectual quality" that Warren is lacking. *Id.* (quoting *Hardie*, 155 So. at 133).

125. For the same reasons, Warren's exercise of discretion under the Presumptive Non-Prosecution Policies does not relate to a neglect of duty.

126. As a third and final basis for suspension, the Order sets forth facts relating to Warren's signature on the Abortion Statement, condemning the criminalization of abortion. [*See* EO at 5–7]

127. Warren's signature on the Abortion Statement also cannot relate to "incompetence," or "any physical, moral, or intellectual quality" that Warren is lacking that "incapacitates" him from performing the duties of his office. *Israel*, 269 So. 3d at 496 (quoting *Hardie*, 155 So. at 133).

128. No decision on any case ever considered by Warren while in office was impacted by these statements. Statements of opinion on matters of public debate do not relate to incompetence within the meaning of the Florida Constitution.

129. Further, as DeSantis must and does admit, "state attorneys have complete discretion in making . . . decision[s] to prosecute a particular defendant." [EO at 2] The Joint Statements are explicit in invoking the exercise of discretion as

their foundation. Warren's discretion-based statement condemning the criminalization of abortion is entirely consistent with the obligations of his office to exercise discretion about whether to prosecute a particular defendant and do not relate to any ignorance.

130.   The abortion-related allegations in the Order thus also do not relate to neglect of duty. In exercising his discretion in considering which cases to prosecute, Warren is doing what is constitutionally required.

131.   The Order's cited justifications for Warren's suspension are facially insufficient under Florida law.

### PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court enter judgment:

A.   Declaring that the Order is unconstitutional pursuant to the First and Fourteenth Amendments of the United States Constitution;

B.   Declaring that the Order was issued in excess of the powers granted to DeSantis under the Florida Constitution;

C.   Ordering DeSantis to rescind the Order on these grounds;

D.   Ordering DeSantis to reinstate Warren as State Attorney for Florida's 13th Judicial Circuit;

E.   Preliminarily and permanently enjoining DeSantis from retaliating against Warren for the statements and policies identified in the Order;

F.   Granting the writ of quo warranto;

G.   Awarding Plaintiff his costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and

- 26 -

H.    Granting such other and further relief as the Court deems just and proper.

Dated:  August 17, 2022

By:  */s/ David B. Singer*
     David B. Singer
     Florida Bar No. 72823
     Matthew T. Newton
     Florida Bar No. 111679
     101 E. Kennedy Blvd., Suite 2800
     Tampa, FL 33602
     dsinger@shumaker.com
     mnewton@shumaker.com

**AND PERKINS COIE LLP**

Jean-Jacques Cabou (AZ #022835)*
Alexis E. Danneman (AZ #030478)*
Matthew R. Koerner (AZ #035018)*
Margo R. Casselman (AZ #034963)*
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
JCabou@perkinscioe.com
ADanneman@perkinscoie.com
MKoerner@perkinscoie.com
MCasselman@perkinscoie.com
DocketPHX@perkinscoie.com
602.351.8000

**Pro Hac Vice* pending

**ATTORNEYS FOR PLAINTIFF**

JEX 1.027

## VERIFICATION UNDER 28 U.S.C. § 1746

I, Andrew H. Warren, state as follows:

1. I am the elected State Attorney for Florida's 13th Judicial Circuit and the Plaintiff in this case. Florida Governor Ron DeSantis recently issued an Executive Order suspending me from that office.

2. I have read the foregoing Complaint, and I am acquainted with and/or have personal knowledge of the facts stated therein.

3. To the best of my knowledge and recollection, the facts set forth in the foregoing Complaint are true and accurate.

I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 16th day of August 2022.

/s/ _____

Andrew H. Warren

157944172.6

JEX 1.028

# Exhibit 1

JEX 1.029

# STATE OF FLORIDA

## OFFICE OF THE GOVERNOR
## EXECUTIVE ORDER NUMBER 22-176
(Executive Order of Suspension)

**WHEREAS**, Article IV of the Florida Constitution vests the State's supreme executive power in the Governor and requires the Governor to take care that the laws of Florida are faithfully executed. *See* Art. IV, § 1(a), Fla. Const.; and

**WHEREAS**, in furtherance of the Governor's executive responsibility, the Governor may suspend from office any state officer not subject to impeachment for that officer's malfeasance, misfeasance, neglect of duty, drunkenness, incompetence, permanent inability to perform official duties, or commission of a felony. *See* Art. IV, § 7(a), Fla. Const.; and

**WHEREAS**, "neglect of duty" refers to "the neglect or failure on the part of a public officer to do and perform some duty or duties laid on him as such by virtue of his office or which is required of him by law." *Israel v. DeSantis*, 269 So. 3d 491, 496 (Fla. 2019) (quoting *State ex rel. Hardie v. Coleman*, 155 So. 129, 132 (Fla. 1934)). "It is not material whether the neglect be willful, through malice, ignorance, or oversight." *Id.*; and

**WHEREAS**, "incompetence" may arise from "gross ignorance of official duties or gross carelessness in the discharge of them," or from "lack of judgment and discretion." *Id.* (quoting *Coleman*, 155 So. at 133); and

**WHEREAS**, state attorneys are state officers constitutionally elected to serve as the prosecuting officers of all trial courts within each judicial circuit. *See* Art. V, § 17, Fla. Const.; and

1

JEX 1.030

**WHEREAS**, with respect to the prosecution of crimes in general, "the State acts exclusively through the offices of the state attorneys." *Cook v. State*, 921 So. 2d 631, 644 (Fla. 2d DCA 2005); and

**WHEREAS**, state attorneys are not subject to impeachment, *see* Art. III, § 17, Fla. Const., and thus are eligible for suspension by the Governor and removal by the Senate, *see* Art. IV, § 7(a), (b), Fla. Const.; and

**WHEREAS**, even though state attorneys have complete discretion in making the decision to prosecute a particular defendant, *Cleveland v. State*, 417 So. 2d 653, 654 (Fla. 1982), prosecutorial discretion requires a state attorney to make "case-specific" and "individualized" determinations as to whether the facts warrant prosecution. *Ayala v. Scott*, 224 So. 3d 755, 758-59 (Fla. 2017); and

**WHEREAS**, a state attorney's "blanket refusal" to enforce a criminal law is not an exercise of prosecutorial discretion but is "tantamount to a 'functional veto' of state law." *Id.* at 758 (discussing *Johnson v. Pataki*, 691 N.E.2d 1002, 1007 (N.Y. 1997)) (alteration omitted); and

**WHEREAS**, a state attorney's policy to "knowingly permit" criminal activity and "prefer no charges" constitutes "neglect of duty" under the Florida Constitution. *See State ex rel. Hardee v. Allen*, 172 So. 222, 223-24 (Fla. 1937) (concluding that the Governor's suspension of a Tampa prosecutor for "neglect of duty" was sufficiently based on the prosecutor's alleged unwillingness to prosecute gambling offenses); and

**WHEREAS**, a state attorney who contends that prosecutorial discretion may be used to disregard entire criminal laws demonstrates incompetence and gross ignorance of a state attorney's official duty to exercise discretion only on a "case-by-case" and "individualized" basis. *See Ayala*,

2

**JEX 1.031**

224 So. 3d at 759 (a state attorney's erroneous application of prosecutorial discretion "embodies, at best, a misunderstanding of Florida law"); and

**WHEREAS**, Andrew Warren is the State Attorney for the 13th Judicial Circuit of the State of Florida (hereafter, "Warren"); and

**WHEREAS**, Warren demonstrated his incompetence and willful defiance of his duties as a state attorney as early as June 2021, when he signed a "Joint Statement" with other elected prosecutors in support of gender-transition treatments for children and bathroom usage based on gender identity (attached hereto as Exhibit "A"). The statement read:

> "[W]e pledge to use our discretion and not promote the criminalization of gender-affirming healthcare or transgender people."

> and

> "Bills that criminalize safe and crucial medical treatments or the mere public existence of trans people do not promote public safety, community trust, or fiscal responsibility. They serve no legitimate purpose. As such, we pledge to use our settled discretion and limited resources on enforcement of laws that will not erode the safety and well-being of our community. And we do not support the use of scarce criminal justice and law enforcement resources on criminalization of doctors who offer medically necessary, safe, gender-affirming care to trans youth, parents who safeguard their child's health and wellbeing by seeking out such treatments, or any individuals who use facilities aligned with their gender identity."

> and

> "We are committed to ending this deeply disturbing and destructive criminalization of gender-affirming healthcare and transgender people."

**WHEREAS**, although the Florida Legislature has not enacted such criminal laws, these statements prove that Warren thinks he has authority to defy the Florida Legislature and nullify in his jurisdiction criminal laws with which he disagrees; and

**WHEREAS**, based on this fundamentally flawed and lawless understanding of his duties as a state attorney, Warren has acted as a law unto himself by instituting a policy during his current

JEX 1.032

term of presumptive non-enforcement for certain criminal violations, including trespassing at a business location, disorderly conduct, disorderly intoxication, and prostitution; and

**WHEREAS**, Warren has also instituted a policy during his current term against prosecuting crimes where the initial encounter between law enforcement and the defendant results from a non-criminal violation in connection with riding a bicycle or a pedestrian violation. This presumption of non-prosecution applies even to crimes of misdemeanor resisting arrest without violence—for example, fleeing from a law enforcement officer. The only exception to the policy is where there is a direct threat to public safety, such as where an individual has suffered physical harm or where a firearm is involved; and

**WHEREAS**, Warren's policies of presumptive non-enforcement are not a proper exercise of prosecutorial discretion because they do not require "case-specific" and "individualized" determinations as to whether the facts warrant prosecution but instead are based on categorical exclusions of otherwise criminal conduct that is tantamount to rewriting Florida criminal law; and

**WHEREAS**, such policies have the effect of usurping the province of the Florida Legislature to define criminal conduct as well as the duties of other law enforcement officials in Hillsborough County to faithfully enforce violations of Florida criminal law; and

**WHEREAS**, Warren's erroneous understanding of his duties recently culminated in his public declaration that he would not enforce criminal laws enacted by the Florida Legislature that prohibit providers from performing certain abortions to protect the lives of unborn children; and

**WHEREAS**, the majority of abortion procedures performed after 15 weeks' gestation are dilation and evacuation procedures that involve the use of surgical instruments to crush and tear apart the unborn child, who is capable of feeling pain at this stage, before removing the remains of the dead child from the womb; and

4

**WHEREAS**, Florida's criminal law prohibits partial-birth abortions, which are classified as second degree felonies and punishable by imprisonment of up to 15 years and monetary penalties. *See* §§ 782.34, 775.082(3)(d), and 775.083(1)(b), Fla. Stat. Partial-birth abortion is a late-term procedure where the unborn child is partially delivered, but the physician ends the child's life by piercing the child's head with scissors while the head is still in the mother's womb; and

**WHEREAS**, Florida criminal law has also generally prohibited physicians from performing an abortion during the third trimester or after a fetus achieves viability. *See* §§ 390.0111, 390.01112, Fla. Stat. (2021); and

**WHEREAS**, on March 3, 2022, the Florida Legislature passed House Bill 5 ("HB 5"), entitled "Reducing Fetal and Infant Mortality," which prohibits a physician from performing an abortion after a fetus reaches the gestational age of 15 weeks, with certain exceptions; and

**WHEREAS**, I signed HB 5 on April 14, 2022, it took effect on July 1, 2022, and it remains in full force and effect, *see State v. Planned Parenthood of Sw. & Cent. Fla.*, No. 1D22-2034, 2022 WL 2865900 (Fla. 1st DCA July 21, 2022) (declining to vacate automatic stay of preliminary injunction against HB 5); and

**WHEREAS**, a violation of Florida's criminal law against certain abortions is, at a minimum, a felony of the third degree, punishable by imprisonment of up to five years and monetary penalties. *See* §§ 390.0111(10)(a), 775.082(3)(e), and 775.083(1)(c), Fla. Stat.; and

**WHEREAS**, the purpose and effect of Florida's abortion laws are to protect women and their unborn children by punishing and deterring providers who perform unlawful abortions, rather than the women who may receive them; and

**WHEREAS**, on June 24, 2022, the Supreme Court of the United States overturned *Roe v. Wade*, 410 U.S. 113 (1973), and *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833

JEX 1.034

(1992), reaffirming that states may prohibit abortion through criminal laws passed by their elected representatives. *See Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022); and

**WHEREAS**, in the wake of the Supreme Court's decision in *Dobbs*, Warren publicly proclaimed in writing that he will not prosecute individuals who provide abortions in violation of Florida's criminal laws to protect the life of the unborn child. Specifically, Warren signed a "Joint Statement" dated June 24, 2022, and updated on July 25, 2022, with other elected prosecutors (attached hereto as Exhibit "B"), which stated:

> "Criminalizing and prosecuting individuals who … provide abortion care makes a mockery of justice; prosecutors should not be part of that."
>
> and
>
> "Enforcing abortion bans runs counter to the obligations and interests we are sworn to uphold."
>
> and
>
> "As such, we [the undersigned prosecutors] decline to use our offices' resources to criminalize reproductive health decisions and commit to exercise our well-settled discretion and refrain from prosecuting those who … provide, or support abortions."
>
> and
>
> "Our legislatures may decide to criminalize personal healthcare decisions, but *we* remain obligated to prosecute only those cases that serve the interests of justice and the people."

**WHEREAS**, Warren is the only state attorney in Florida who signed this statement, and he signed the statement in his official capacity as the "State Attorney, 13th Judicial Circuit (Tampa), Florida"; and

**WHEREAS**, Warren has thus clearly, unequivocally, and publicly declared that his office will not prosecute violations of Florida criminal laws that prohibit providers from performing certain abortions to protect the life of the unborn child; and

6

JEX 1.035

**WHEREAS**, the "Joint Statement" defines abortion as "a personal choice made by a pregnant person to terminate a pregnancy" and thus applies to any abortions, including late-term and partial-birth abortions; and

**WHEREAS**, Warren's declared intent in the "Joint Statement" not to prosecute abortion crimes to achieve their purpose of protecting the lives of unborn children encourages not only the abortions recently prohibited by HB 5, but also late-term and partial-birth abortions that have long been banned under Florida's criminal law; and

**WHEREAS**, Warren has effectively nullified these Florida criminal laws in the 13th Judicial Circuit, thereby eroding the rule of law, encouraging lawlessness, and usurping the exclusive role of the Florida Legislature to define criminal conduct. *See* Ex. B ("Our legislatures may decide to criminalize personal healthcare decisions, but *we* remain obligated to prosecute only those cases that serve the interests of justice and the people. Criminalizing and prosecuting individuals who seek or provide abortion care makes a mockery of justice; prosecutors should not be part of that."); and

**WHEREAS**, in light of the strident representations of non-enforcement and open defiance of the Florida Legislature evident in the "Joint Statement," there is no reason to believe that Warren will faithfully enforce the abortion laws of this State and properly exercise his prosecutorial discretion on a "case-specific" and "individualized" basis; and

**WHEREAS**, Warren's declared refusal to prosecute abortion cases is alone sufficient to justify his suspension and removal for neglect of duty and incompetence; and

**WHEREAS**, Warren's avowed refusal to enforce certain criminal laws on a non-individualized, category-wide basis of his choosing is a neglect of duty in violation of his oath of office to faithfully perform his duties as State Attorney for the 13th Judicial Circuit; and

7

**WHEREAS**, Warren's neglect of duty is willful and intended to be a "functional veto" on the policies of the Florida Legislature; and

**WHEREAS**, Warren's neglect of duty is not excused by prosecutorial discretion, because his blanket policies ensure that he will exercise no discretion at all in entire categories of criminal cases; and

**WHEREAS**, Warren's public proclamations of non-enforcement further demonstrate his incompetence and lack of judgment arising from his gross ignorance of his official duties to faithfully enforce the criminal law and to exercise discretion only on a case-by-case basis; and

**WHEREAS**, it is my duty as Governor to take care that the laws are faithfully executed by ensuring that all criminal violations remain eligible for prosecution throughout the State of Florida; and

**WHEREAS**, as a result of his open and notorious repudiation and nullification of Florida law, as well as his blatant defiance of the Florida Legislature, Warren can no longer be trusted to fulfill his oath of office and his duty to see that Florida law is faithfully executed; and

**WHEREAS**, it is in the best interests of the residents of the 13th Judicial Circuit that they immediately have a new state attorney who will faithfully execute Florida's criminal laws and exercise prosecutorial discretion to do justice on a case-by-case, fact-specific basis in accordance with Florida law; and

**NOW, THEREFORE, I, RON DESANTIS**, Governor of Florida, pursuant to the Constitution and the laws of the State of Florida, do hereby find, and for the purposes of Article IV, section 7 of the Florida Constitution, determine as follows:

A.) Andrew Warren is, and at all material times was, the State Attorney for the 13th Judicial Circuit of Florida.

JEX 1.037

B.)     The office of state attorney is within the purview of the suspension powers of the Governor, pursuant to Article IV, section 7 of the Florida Constitution.

C.)     The actions and omissions of Andrew Warren as referenced above constitute "neglect of duty" and "incompetence" for the purposes of Article IV, section 7 of the Florida Constitution.

D.)     If, after execution of this suspension, additional facts are discovered that illustrate further neglect of duty, incompetence, or other constitutional grounds for suspension of Andrew Warren, this Executive Order may be amended to allege those additional facts.

**BEING FULLY ADVISED** in the premises, and in accordance with the Constitution and the laws of the State of Florida, this Executive Order is issued, effective immediately:

Section 1.  Andrew Warren is hereby suspended from the public office that he now holds, to wit: State Attorney for the 13th Judicial Circuit of Florida.

Section 2.  Andrew Warren is hereby prohibited from performing any official act, duty, or function of public office; from receiving any pay or allowance; from being entitled to any of the emoluments or privileges of public office during the period of this suspension, which period shall be from the effective date hereof, until a further executive order is issued, or as otherwise provided by law.

Section 3.  As of the signing of this Executive Order, the Hillsborough County Sheriff's Office, assisted by other law enforcement agencies as necessary, is requested to: (i) assist in the immediate transition of Andrew Warren from the Office of the State Attorney for the 13th Judicial Circuit of Florida, with access only to retrieve his personal belongings; and (ii) ensure that no files, papers,

JEX 1.038

documents, notes, records, computers, or removable storage media are removed from the Office

of the State Attorney for the 13th Judicial Circuit of Florida by Andrew Warren or any of his staff.

Section 4. The Honorable Susan Lopez, County Court Judge of the 13th Judicial Circuit in

and for Hillsborough County, is hereby appointed forthwith, effective August 4, 2022, to fill the

position of State Attorney for the 13th Judicial Circuit of Florida in accordance with Article IV,

section 7, subsection (a) of the Florida Constitution for the duration of the suspension.



IN TESTIMONY WHEREOF, I have hereunto set my hand and caused the Great Seal of the State of Florida to be affixed at Tallahassee, this 4th day of August, 2022.

RON DESANTIS, GOVERNOR

ATTEST:

SECRETARY OF STATE



2022 AUG -4 AM 9: 19
DEPARTMENT OF STATE
TALLAHASSEE, FL
FILED

10

JEX 1.039

# EXHIBIT A



**JOINT STATEMENT FROM ELECTED PROSECUTORS AND LAW ENFORCEMENT
LEADERS CONDEMNING THE CRIMINALIZATION OF TRANSGENDER PEOPLE
AND GENDER-AFFIRMING HEALTHCARE**
June 2021

As elected prosecutors and law enforcement leaders, we condemn the ongoing efforts to criminalize transgender people and gender-affirming healthcare across the country. These blatantly unconstitutional attacks on some of the most vulnerable Americans will deeply harm public safety. We call on policymakers to cease this extraordinary overreach and leave healthcare decisions to patients, families, and medical providers, and we pledge to use our discretion and not promote the criminalization of gender-affirming healthcare or transgender people.

As criminal justice leaders, we are responsible for pursuing justice for *all* members of our communities. Unfortunately, the full and equal protection of the law has consistently been denied to transgender people living in this country. Transgender individuals endure unconscionably high rates of violent victimization.[1] However, rather than fighting for their protection the criminal legal system has painted their very existence as a threat, often criminalizing trans survivors of violence rather than protecting them. As a result, transgender people, while disproportionately likely to be victims of or witnesses to serious crime, too often receive inadequate assistance from police and prosecutors or face further victimization at their hands.[2] These failings are both a moral travesty and an obstacle in our collective efforts to prevent crime, build public trust, and promote community well-being.

Rather than working to remedy these harms, many state legislatures have instead intensified their efforts to isolate, discriminate against, and criminalize transgender people. In fact, in just the first half of this year, state legislators have introduced a record-breaking number of bills targeting the transgender community.[3] Since the beginning of 2021, at least 105 bills that discriminate against transgender people have been proposed in 34 states, and 10 have been signed into law[4] — a significant increase from the 2020 legislative session, during which 52 such proposals were introduced in legislatures around the country.[5]

---

[1] Andrew R. Flores et. al., Gender Identity Disparities in Criminal Victimization, UCLA School of Law Williams Institute, March 2021 *available at* https://williamsinstitute.law.ucla.edu/publications/ncvs-trans-victimization/.
[2] National Center for Transgender Equality, Failing to Protect and Serve: Police Department Policies Towards Transgender People, May 7, 2019, *available at* https://transequality.org/issues/resources/failing-to-protect-and-serve-police-department-policies-towards-transgender-people.
[3] Wyatt Ronan, Breaking: 2021 Becomes Record Year For Anti-Transgender Legislation, Human Rights Campaign, March 13, 2021, *available at* https://www.hrc.org/press-releases/breaking-2021-becomes-record-year-for-anti-transgender-legislation.
[4] American Civil Liberties Union, Legislation Affecting LGBT Rights Across the Country, 2021 *available at* https://www.aclu.org/legislation-affecting-lgbt-rights-across-country.
[5] American Civil Liberties Union, Past Legislation Affecting LGBT Rights Across the Country, 2020 *available at* https://www.aclu.org/past-legislation-affecting-lgbt-rights-across-country-2020.

Among these concerning restrictions are bills that aim to block trans youth from receiving life-saving gender-affirming healthcare. So far this year, 20 state legislatures have considered a total of 29 proposals that would prevent many trans youth from receiving this essential medical care. The ongoing discrimination and hostility that trans youth face has already had a grim impact: in 2020, a national survey found that *over half* of trans and non-binary youth seriously considered suicide.[6] Research has firmly established that access to gender-affirming healthcare not only reduces the risk of suicide in youth[7], it significantly reduces their lifetime risk of suicidal ideation.[8] Accordingly, a slate of medical organizations — including the American Medical Association, American Academy of Pediatrics, and Endocrine Society — all agree that access to gender-affirming care is crucial in maintaining the health of trans youth.[9] And yet, these dangerous bills will not only restrict the ability of healthcare providers to administer life-saving gender-affirming care, some will criminalize parents who allow their trans children to receive medically recommended treatments.

Additionally for several years, anti-trans legislators have worked to pass laws that prohibit trans people from using single-sex facilities — mainly restrooms — that align with their gender identity. Six such bills have been introduced in two states during the 2021 legislative session. Their goal is clear: to reinforce stigmatizing falsehoods that trans people pose a public safety threat and to prevent trans people from freely living, working, and traveling in these communities. These bills have no legitimate public safety justification and will only increase harassment and violence against trans people forced to use facilities that do not align with their gender identity.[10]

Prosecutors are trusted with immense discretion to decide how best to promote the interests of justice. We have been elected to run offices funded by taxpayers and to represent the people in court. And both chief prosecutors and law enforcement leaders have an obligation to ensure we

---

[6] The Trevor Project, National Survey on LGBTQ Youth Mental Health 2020, *available at* https://www.thetrevorproject.org/survey-2020/?section=Introduction.
[7] The Trevor Project, Research Brief: Gender-Affirming Care for Youth, Jan. 2020, *available at* https://www.thetrevorproject.org/2020/01/29/research-brief-gender-affirming-care-for-youth/.
[8] Tim Fitzsimmons, Puberty blockers linked to lower suicide risk for transgender people, NBC News, Jan. 2020, *available at* https://www.nbcnews.com/feature/nbc-out/puberty-blockers-linked-lower-suicide-risk-transgender-people-n112210.
[9] American Medical Association, AMA to states: Stop interfering in health care of transgender children, April 26, 2021, *available at* https://www.ama-assn.org/press-center/press-releases/ama-states-stop-interfering-health-care-transgender-children; American Academy of Pediatrics, Pediatricians say state bills would harm transgender youths, March 9, 2021, *available at* https://www.aappublications.org/news/2021/03/09/transgender-legislation-030921; Endocrine Society, Endocrine Society opposes legislative efforts to prevent access to medical care for transgender youth, April 15, 2021, *available at* https://www.endocrine.org/news-and-advocacy/news-room/2021/endocrine-society-condemns-efforts-to-block-access-to-medical-care-for-transgender-youth#:~:text=The%20Endocrine%20Society%20opposes%20legislative,accessing%20gender%2Daffirming%20medical%20care.&text=The%20proposals%20reflect%20widespread%20misinformation,of%20gender%2Daffirming%20medical%20care; Alexander Chen, Gender-Affirming Care Doesn't Just Help Trans Youth Survive. It Allows Them to Flourish., Slate, April 7, 2021, *available at* https://slate.com/human-interest/2021/04/anti-trans-bills-youth-gender-affirming-care-survive-flourish.html.
[10] Stevie Borrello, Sexual Assault and Domestic Violence Organizations Debunk 'Bathroom Predator Myth,' ABC News, April 22, 2016, *available at* https://abcnews.go.com/US/sexual-assault-domestic-violence-organizations-debunk-bathroom-predator/story?id=38604019.

2

are directing our offices' and departments' limited resources to pursuits that advance fairness and justice for *all* members of our communities. Bills that criminalize safe and crucial medical treatments or the mere public existence of trans people do not promote public safety, community trust, or fiscal responsibility. They serve no legitimate purpose. As such, we pledge to use our settled discretion and limited resources on enforcement of laws that will not erode the safety and well-being of our community. And we do not support the use of scarce criminal justice and law enforcement resources on criminalization of doctors who offer medically necessary, safe gender-affirming care to trans youth, parents who safeguard their child's health and wellbeing by seeking out such treatments, or any individuals who use facilities aligned with their gender identity.

We are committed to ending this deeply disturbing and destructive criminalization of gender-affirming healthcare and transgender people. And we urge other policymakers to join us in standing up and standing together on this important issue.


Respectfully,

**Diana Becton**
District Attorney, Contra Costa County, California

**Wesley Bell**
Prosecuting Attorney, St. Louis County, Missouri

**Buta Biberaj**
Commonwealth's Attorney, Loudoun County, Virginia

**Richard Biehl**
Chief, Dayton Police Department, Ohio

**Sherry Boston**
District Attorney, DeKalb County, Georgia

**Chesa Boudin**
District Attorney, City and County of San Francisco, California

**RaShall M. Brackney, Ph.D.**
Chief, Charlottesville Police Department, Virginia

**Aisha Braveboy**
State's Attorney, Prince George's County, Maryland

**John Choi**
County Attorney, Ramsey County, Minnesota

3

**Jerry L. Clayton**
Sheriff, Washtenaw County (Ann Arbor), Michigan

**Shameca Collins**
District Attorney, 6th Judicial District, Mississippi

**Scott Colom**
District Attorney, 16th Judicial District, Mississippi

**John Creuzot**
District Attorney, Dallas County, Texas

**Satana Deberry**
District Attorney, Durham County, North Carolina

**Parisa Dehghani-Tafti**
Commonwealth's Attorney, Arlington County and the City of Falls Church, Virginia

**Steve Descano**
Commonwealth's Attorney, Fairfax County, Virginia

**Thomas J. Donovan, Jr.**
Attorney General, Vermont

**Michael Dougherty**
District Attorney, 20th Judicial District (Boulder), Colorado

**Mark Dupree**
District Attorney, Wyandotte County (Kansas City), Kansas

**Matt Ellis**
District Attorney, Wasco County, Oregon

**Keith Ellison**
Attorney General, Minnesota

**Kim Foxx**
State's Attorney, Cook County (Chicago), Illinois

**Kimberly Gardner**
Circuit Attorney, City of St. Louis, Missouri

**José Garza**
District Attorney, Travis County (Austin), Texas

4

**George Gascón**
District Attorney, Los Angeles County, California
Former District Attorney, City and County of San Francisco, California
Former Chief, San Francisco Police Department, California
Former Chief, Mesa Police Department, Arizona

**Sarah F. George**
State's Attorney, Chittenden County, Vermont

**Sim Gill**
District Attorney, Salt Lake City, Utah

**Joe Gonzales**
District Attorney, Bexar County (San Antonio), Texas

**Deborah Gonzalez**
District Attorney, Western Judicial Circuit (Athens), Georgia

**Eric Gonzalez**
District Attorney, Kings County (Brooklyn), New York

**Mark Gonzalez**
District Attorney, Nueces County (Corpus Christi), Texas

**Andrea Harrington**
District Attorney, Berkshire County, Massachusetts

**Mark Herring**
Attorney General, Commonwealth of Virginia

**Jim Hingeley**
Commonwealth's Attorney, Albemarle County, Virginia

**John Hummel**
District Attorney, Deschutes County, Oregon

**Natasha Irving**
District Attorney, 6th Prosecutorial District, Maine

**Letitia James**
Attorney General, New York

**Kathy Jennings**
Attorney General, Delaware

5

JEX 1.045

**Zach Klein**
City Attorney, Columbus, Ohio

**Justin F. Kollar**
Prosecuting Attorney, County of Kaua'i, Hawaii

**Lawrence S. Krasner**
District Attorney, Philadelphia, Pennsylvania

**Brian S. Mason**
District Attorney, 17th Judicial District, Colorado

**Beth McCann**
District Attorney, 2nd Judicial District (Denver), Colorado

**Ryan Mears**
Prosecuting Attorney, Marion County (Indianapolis), Indiana

**Spencer Merriweather**
District Attorney, Mecklenburg County (Charlotte), North Carolina

**Marilyn Mosby**
State's Attorney, Baltimore City, Maryland

**Jody Owens**
District Attorney, Hinds County (Raymond and Jackson), Mississippi

**Alonzo Payne**
District Attorney, 12th Judicial District (San Luis), Colorado

**Joseph Platania**
Commonwealth's Attorney, City of Charlottesville, Virginia

**Bryan Porter**
Commonwealth's Attorney, City of Alexandria, Virginia

**Abdul Pridgen**
Chief, Seaside Police Department, California

**Karl A. Racine**
Attorney General, District of Columbia

**Kwame Raoul**
Attorney General, State of Illinois

6

**Rachael Rollins**
District Attorney, Suffolk County (Boston), Massachusetts

**Jeff Rosen**
District Attorney, Santa Clara County, California

**Ellen Rosenblum**
Attorney General, Oregon

**Marian Ryan**
District Attorney, Middlesex County, Massachusetts

**Tori Verber Salazar**
District Attorney, San Joaquin County (Stockton), California

**Dan Satterberg**
Prosecuting Attorney, King County (Seattle), Washington

**Eli Savit**
Prosecuting Attorney, Washtenaw County (Ann Arbor), Michigan

**Mike Schmidt**
District Attorney, Multnomah County (Portland), Oregon

**Daniella Shorter**
District Attorney, 22nd Judicial District, Mississippi

**Carol Siemon**
Prosecuting Attorney, Ingham County (Lansing), Michigan

**David Soares**
District Attorney, Albany County, New York

**David Sullivan**
District Attorney, Northwestern District, Massachusetts

**Shannon Taylor**
Commonwealth's Attorney, Henrico County, Virginia

**Raúl Torrez**
District Attorney, Bernalillo County (Albuquerque), New Mexico

**Gregory Underwood**
Commonwealth's Attorney, City of Norfolk, Virginia

JEX 1.047

**Suzanne Valdez**
District Attorney, Douglas County, Kansas

**Matthew Van Houten**
District Attorney, Tompkins County (Ithaca), New York

**Cyrus R. Vance**
District Attorney, New York County (Manhattan), New York

**Andrew Warren**
State Attorney, 13th Judicial Circuit (Tampa), Florida

**Todd Williams**
District Attorney, Buncombe County (Asheville), North Carolina

**Monique H. Worrell**
State Attorney, 9th Judicial Circuit, Florida

**<u>Organizations</u>**

**Law Enforcement Action Partnership**

**National Organization of Black Law Enforcement Executives**

8

# EXHIBIT B

*UPDATED 7/25/22*



## JOINT STATEMENT FROM ELECTED PROSECUTORS
### June 24, 2022

We are a group of elected prosecutors representing communities across every region of the country. Over the past few years, we have watched with increasing concern as the constitutional right to abortion has been threatened and eroded. Now, the Supreme Court's decision to end the federally protected constitutional right to abortion first established five decades ago in *Roe v. Wade* — a right that three generations of Americans have come of age relying upon — means that abortions will immediately or soon be banned, and potentially criminalized, in at least half of our nation's states.[1] As elected prosecutors, ministers of justice, and leaders in our communities, we cannot stand by and allow members of our community to live in fear of the ramifications of this deeply troubling decision.

Not all of us agree on a personal or moral level on the issue of abortion. But we stand together in our firm belief that prosecutors have a responsibility to refrain from using limited criminal legal system resources to criminalize personal medical decisions. As such, we decline to use our offices' resources to criminalize reproductive health decisions and commit to exercise our well-settled discretion and refrain from prosecuting those who seek, provide, or support abortions.[2]

Prosecutors are entrusted with immense discretion. With this discretion comes the obligation to seek justice. And at the heart of the pursuit of justice is the furtherance of policies and practices that protect the well-being and safety of *all* members of our community.

Prosecutors make decisions every day about how to allocate limited resources and which cases to prosecute. Indeed, our communities have entrusted us to use our best judgment in deciding how and if to leverage the criminal legal system to further the safety and well-being of all, and we are ethically bound to pursue those interests in every case.

Enforcing abortion bans runs counter to the obligations and interests we are sworn to uphold. It will erode trust in the legal system, hinder our ability to hold perpetrators accountable, take resources away from the enforcement of serious crime, and inevitably lead to the retraumatization and criminalization of victims of sexual violence.

Criminalizing abortion will not end abortion; it will simply end *safe* abortions, forcing the most vulnerable among us — as well as medical providers — to make impossible decisions. Abortion

---

[1] Guttmacher Institute, "26 States Are Certain or Likely to Ban Abortion Without Roe: Here's Which Ones and Why," October 28, 2021 guttmacher.org/article/2021/10/26-states-are-certain-or-likely-ban-abortion-without-roe-heres-which-ones-and-why.

[2] We use abortion to refer to a personal choice made by a pregnant person to terminate a pregnancy. We will continue to consider the prosecution of individuals who violate the autonomy of a pregnant person by carrying out a forced abortion, or who perform an abortion negligently or with the intent to cause harm to the pregnant person.

bans will isolate people from the law enforcement, medical, and social resources they need. When individuals know that they or someone they love could be investigated and prosecuted for having an abortion, they are far less likely to call for help in the event of an emergency. Prosecutors, police, and our medical partners cannot do our jobs when many victims and witnesses of crime or other emergencies are unwilling to work with us for fear that their private medical decisions will be criminalized.

Our criminal legal system is already overburdened. As elected prosecutors, we have a responsibility to ensure that these limited resources are focused on efforts to prevent and address serious crimes, rather than enforcing abortion bans that divide our community, create untenable choices for patients and healthcare providers, and erode trust in the justice system. Enforcing abortion bans would mean taking time, effort, and resources away from the prosecution of the most serious crimes — conduct that truly impacts public safety.

Abortion bans will also disproportionately harm victims of sexual abuse, rape, incest, human trafficking, and domestic violence.[3] Over the past several decades, law enforcement has rightly worked to adopt evidence-based, trauma-informed approaches that recognize that not all victims of such crimes are able or willing to immediately report, and that delays in reporting or a reticence to report are consistent with the experience of trauma.[4] As prosecutors, we also know that the process of reporting can be retraumatizing for many survivors.[5]

We are horrified that some states have failed to carve out exceptions for victims of sexual violence and incest in their abortion restrictions; this is unconscionable. And, even where such exceptions do exist, abortion bans still threaten the autonomy, dignity, and safety of survivors, forcing them to choose between reporting their abuse or being connected to their abuser for life. Laws that revictimize and retraumatize victims go against our obligation as prosecutors to protect and seek justice on behalf of all members of our community, including those who are often the most vulnerable and least empowered. Our obligation to exercise our discretion wisely requires us to focus prosecutorial resources on the child molester or rapist, not on prosecuting the victim or the healthcare professionals who provide that victim with needed care and treatment.

Keeping communities safe inherently requires promoting trust and faith in the integrity of the rule of law.[6] To best promote public safety, prosecutors must be perceived by their communities as trustworthy, legitimate, and fair — values that would be undermined by the enforcement of laws that criminalize deeply personal decisions, harm those most in need of our help, and force unnecessarily difficult and traumatizing decisions on many in our community.

---

[3] Starre Vartan, "The Lifelong Consequences of Rape," Pacific Standard, Jun. 14, 2017, *available at* https://psmag.com/social-justice/lifelong-consequences-rape-96056.

[4] Robert Muller, "Rape Victims' Reactions Misunderstood by Law Enforcement," Psychology Today, Jan. 11, 2019, *available at* https://www.psychologytoday.com/us/blog/talking-about-trauma/201801/rape-victims-reactions-misunderstood-law-enforcement.

[5] Office on Violence Against Women, "The Importance of Understanding Trauma-Informed Care and Self-Care for Victim Service Providers," U.S. Department of Justice, July 30, 2014, *available at* https://www.justice.gov/archives/ovw/blog/importance-understanding-trauma-informed-care-and-self-care-victim-service-providers.

[6] Yucel Ors, "6 Essential Tenets for Effective Community Policing," National League of Cities, March 21, 2016, *available at* https://nlcors.wordpress.com/2016/10/06/6-essential-tenets-for-effective-community-policing/.

*UPDATED 7/25/22*

As elected prosecutors, when we stand in court, we have the privilege and obligation to represent "the people." All members of our communities are our clients – they elected us to represent them and we are bound to fight for them as we carry out our obligation to pursue justice. Our legislatures may decide to criminalize personal healthcare decisions, but *we* remain obligated to prosecute only those cases that serve the interests of justice and the people.

Criminalizing and prosecuting individuals who seek or provide abortion care makes a mockery of justice; prosecutors should not be part of that.

Respectfully,

**Michael Atwell**
District Attorney, Alpine County, California

**Patsy Austin-Gatson**
District Attorney, Gwinnett Judicial Circuit, Georgia

**Diana Becton**
District Attorney, Contra Costa County, California

**Wesley Bell**
Prosecuting Attorney, St. Louis County, Missouri

**Buta Biberaj**
Commonwealth's Attorney, Loudoun County, Virginia

**Sherry Boston**
District Attorney, DeKalb County, Georgia

**Chesa Boudin**
District Attorney, City and County of San Francisco, California

**Alvin Bragg**
District Attorney, New York County (Manhattan), New York

**Aisha Braveboy**
State's Attorney, Prince George's County, Maryland

**Mary Carmack-Altwies**
District Attorney, 1st Judicial District, New Mexico

**Danny Carr**
District Attorney, Jefferson County, Alabama

**Christian Champagne**
District Attorney, 6th Judicial District, Colorado

*UPDATED 7/25/22*

**John T. Chisholm**
District Attorney, Milwaukee County, Wisconsin

**John Choi**
County Attorney, Ramsey County, Minnesota

**Dave Clegg**
District Attorney, Ulster County, New York

**Shameca Collins**
District Attorney, 6th Judicial District, Mississippi

**Shalena Cook Jones**
District Attorney, Chatham County (Savannah), Georgia

**David Cooke**
District Attorney, Macon Judicial Circuit, Georgia

**John Creuzot**
District Attorney, Dallas County, Texas

**Ann Davison**
City Attorney, Seattle, Washington

**Satana Deberry**
District Attorney, Durham County, North Carolina

**Parisa Dehghani-Tafti**
Commonwealth's Attorney, Arlington County and the City of Falls Church, Virginia

**Steve Descano**
Commonwealth's Attorney, Fairfax County, Virginia

**Joshua R. Diamond**
Acting Attorney General, Vermont

**Michael Dougherty**
District Attorney, 20th Judicial District (Boulder), Colorado

**Matt Ellis**
District Attorney, Wasco County, Oregon

**Keith Ellison**
Attorney General, Minnesota

*UPDATED 7/25/22*

**Ramin Fatehi**
Commonwealth's Attorney, City of Norfolk, Virginia

**Kimberly M. Foxx**
State's Attorney, Cook County (Chicago), Illinois

**Glenn Funk**
District Attorney, Nashville, Tennessee

**José Garza**
District Attorney, Travis County (Austin), Texas

**George Gascón**
District Attorney, Los Angeles County, California

**Sarah F. George**
State's Attorney, Chittenden County (Burlington), Vermont

**Joe Gonzales**
District Attorney, Bexar County (San Antonio), Texas

**Deborah Gonzalez**
District Attorney, Western Judicial Circuit (Athens), Georgia

**Eric Gonzalez**
District Attorney, Kings County (Brooklyn), New York

**Mark Gonzalez**
District Attorney, Nueces County (Corpus Christi), Texas

**Andrea Harrington**
District Attorney, Berkshire County, Massachusetts

**Maura Healey**
Attorney General, Massachusetts

**John Hummel**
District Attorney, Deschutes County, Oregon

**Natasha Irving**
District Attorney, 6th Prosecutorial District, Maine

**Kathleen Jennings**
Attorney General, Delaware

*UPDATED 7/25/22*

**Melinda Katz**
District Attorney, Queens County, New York

**Alexis King**
District Attorney, 1st Judicial District, Colorado

**Zach Klein**
City Attorney, Columbus, Ohio

**Lawrence S. Krasner**
District Attorney, Philadelphia, Pennsylvania

**David Leyton**
Prosecuting Attorney, Genesee County, Michigan

**Rebecca Like**
Prosecuting Attorney, County of Kaua'i, Hawaii

**Edward E. Manibusan**
Attorney General, Northern Mariana Islands

**Brian Mason**
District Attorney, 17th Judicial District, Colorado

**Beth McCann**
District Attorney, 2nd Judicial District (Denver), Colorado

**Karen McDonald**
Prosecuting Attorney, Oakland County, Michigan

**Colette McEachin**
Commonwealth's Attorney, Richmond, Virginia

**Gordon McLaughlin**
District Attorney, 8th Judicial District, Colorado

**Ryan Mears**
Prosecuting Attorney, Marion County (Indianapolis), Indiana

**Brian Middleton**
District Attorney, Fort Bend County, Texas

**Stephanie Morales**
Commonwealth's Attorney, Portsmouth, Virginia

*UPDATED 7/25/22*

**Michael W. Morrissey**
District Attorney, Norfolk County, Massachusetts

**Marilyn J. Mosby**
State's Attorney, Baltimore City, Maryland

**Jamie Mosser**
State's Attorney, Kane County, Illinois

**Dana Nessel**
Attorney General, Michigan

**Michael O'Malley**
County Prosecutor, Cuyahoga County (Cleveland), Ohio

**Nancy O'Malley**
District Attorney, Alameda County, California

**Jody Owens**
District Attorney, Hinds County, Mississippi

**Alonzo Payne**
District Attorney, 12th Judicial District (San Luis), Colorado

**Joseph Platania**
Commonwealth's Attorney, City of Charlottesville, Virginia

**Bryan Porter**
Commonwealth's Attorney, City of Alexandria, Virginia

**Dalia Racine**
District Attorney, Douglas County, Georgia

**Karl Racine**
Attorney General, District of Columbia

**Carrie Rasmussen**
District Attorney, Hood River County, Oregon

**Jill R. Ravitch**
District Attorney, Sonoma County, California

**Eric Rinehart**
State's Attorney, Lake County (Waukegan), Illinois

*UPDATED 7/25/22*

**Mimi Rocah**
District Attorney, Westchester County, New York

**Jeff Rosen**
District Attorney, Santa Clara County, California

**Marian Ryan**
District Attorney, Middlesex County, Massachusetts

**Dan Satterberg**
Prosecuting Attorney, King County (Seattle), Washington

**Eli Savit**
Prosecuting Attorney, Washtenaw County (Ann Arbor), Michigan

**Mike Schmidt**
District Attorney, Multnomah County (Portland), Oregon

**Carol Siemon**
Prosecuting Attorney, Ingham County (Lansing), Michigan

**Jack Stollsteimer**
District Attorney, Delaware County, Pennsylvania

**David Sullivan**
District Attorney, Northwestern District, Massachusetts

**Shannon Taylor**
Commonwealth's Attorney, Henrico County, Virginia

**Raúl Torrez**
District Attorney, Bernalillo County (Albuquerque), New Mexico

**Suzanne Valdez**
District Attorney, Douglas County (Lawrence), Kansas

**Matthew Van Houten**
District Attorney, Tompkins County (Ithaca), New York

**Dora A. Villarreal**
State's Attorney, Rock Island County, Illinois

**Andrew Warren**
State Attorney, 13th Judicial Circuit (Tampa), Florida

*UPDATED 7/25/22*

**Phil Weiser**
Attorney General, Colorado

**Matthew J. Wiese**
Prosecuting Attorney, Marquette County, Michigan

**Jared Williams**
District Attorney, Augusta Judicial Circuit, Georgia

**Jason Williams**
District Attorney, Orleans Parish, Louisiana

**Todd Williams**
District Attorney, Buncombe County (Asheville), North Carolina


 ***\*\*Additional elected prosecutors interested in joining the statement should contact FJP Executive Director Miriam Krinsky at [mkrinsky@fairandjustprosecution.org](mailto:mkrinsky@fairandjustprosecution.org) to be added.***

# Exhibit 2



**Andrew H. Warren**
**Office** of the **State Attorney**
**13th Judicial Circuit**

December 14, 2021

<u>MEMORANDUM</u>

TO:          Assistant State Attorneys

FROM:      Andrew H. Warren
             State Attorney

SUBJECT:   <u>**Prosecutorial Discretion and the Mission of Criminal Justice**</u>

This memorandum provides guidance for how Assistant State Attorneys should exercise discretion, and how the appropriate exercise of prosecutorial discretion is critical to furthering the mission of the State Attorney's Office and the criminal justice system.

<u>**Our Mission**</u>

In 2017, we drafted a mission statement to succinctly define our office's collective purpose:

> *Our mission is to build a safer community while promoting justice and fairness for everyone in Hillsborough County. Our office is committed to making our county a safer place to live, work, and raise a family. It is our privilege and honor to serve this community.*

The goals of the criminal justice system can be categorized and summarized as (1) punishing and holding offenders accountable; (2) preventing crime; (3) rehabilitating offenders; and (4) seeking justice for crime victims.[1] The efficient and successful operation of our system requires balancing these objectives. Achieving that balance is extremely difficult, especially when these goals are not perfectly aligned. Filing charges, securing convictions, and imposing appropriate sanctions constitute the traditional method of achieving accountability and punishment, but diversion programs, specialty courts, and restorative justice models have shown that traditional prosecution is not the only method. Specific and general deterrence resulting from traditional prosecution prevents crime, but crime reduction strategies outside of the criminal justice system such as community-based intervention and mentorship programs are generally more effective and less expensive. Also, contact with the criminal justice system, including incarceration, often increases the likelihood of recidivism—a nuance that can undermine the specific deterrence sought through traditional prosecution. Additionally, embracing victims' importance in the process requires valuing their input and balancing that input along with the other goals while also promoting consistency in the handling of similar cases.

---

[1] These goals are sometimes abbreviated as the four "Rs": retribution, recidivism, rehabilitation, and restitution.

**JEX 1.060**

Arguably, over the past generation the system became too focused on punishing offenders, to the detriment of the other goals. This punishment-centered approach is often short-sighted. Overlooking strategies to prevent crime, reduce recidivism, and rehabilitate offenders has perpetuated the revolving door nature of our system, which undermines long-term public safety. These long-term goals often require solutions at a macro, systemic level that go beyond a prosecutor's decision in any individual case. Nevertheless, in handling individual cases, prosecutors must focus on both the short-term and long-term goals—addressing any immediate public safety risk that a defendant poses while also evaluating how best to minimize the likelihood of that defendant reoffending.

Former Supreme Court Justice and United States Attorney General Robert H. Jackson said, "The prosecutor has more control over life, liberty, and reputation than any other person in America. His discretion is tremendous." Prosecutors wield tremendous influence within the system through charging decisions, plea negotiations, and sentencing recommendations. Conventional wisdom incorrectly views prosecutors and defense attorneys as having opposing roles in the system with judges as neutral arbiters of the law. However, a prosecutor's duties go beyond merely prosecuting. As our ethical rules dictate, "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate."[2] As ministers of justice, prosecutors must exercise their discretion to further all the goals of the system. And as representatives of this office and public servants, Assistant State Attorneys must exercise their discretion to further the mission of this office while efficiently using limited public resources and taxpayer dollars.

**General Principles of Prosecutorial Discretion**

*Exercise Discretion at Every Stage*

There is no simple formula that yields the right prosecutorial outcome. Case-specific review is a hallmark of our criminal justice system. In every case, ASAs must exercise discretion based on the facts of that case—the nature and circumstances of the offense, the defendant's criminal history (or lack thereof), victim input, and other factors. ASAs must exercise that discretion at every stage—from charging through plea negotiation, trial, and sentencing. Additionally, ASAs must continually exercise discretion throughout the pendency of a case beyond those key decision-points. The facts and circumstances may change and consequently warrant re-evaluating a decision that has already been made.

As in any prosecutor's office, there are common practices for handling cases, which ASAs consider to be unwritten "policy." These practices are based on generally applicable approaches but are not absolutes; they are not policy and should not be treated as such. Instead, ASAs should consider the reasons underlying the practice and exercise discretion as to whether the practice should be followed in each individual case.

Supervisors play a pivotal role in guiding ASAs' exercise of discretion. The assigned ASA best knows the facts of each case and should be candid with his/her assessment for decision

---

[2] American Bar Association Model Rule of Professional Conduct 3.8; Florida Rule of Professional Conduct 4-3.8.

2

involving that case. However, supervisors can provide additional insight and promote consistency with similarly situated cases. Accordingly, the assigned ASA should consult with the appropriate supervisor(s) on all critical decisions. Disagreement between an ASA's recommendation and a supervisor's decision is inevitable, and in the small subset of those disagreements where appropriate, ASAs are encouraged to consult with the Chief Assistant for the Bureau for further evaluation of a particular case and to promote consistency across similarly situated cases.

*Solve the Problem*

In every case, ASAs should exercise their discretion to further the four goals of accountability & punishment, prevention, rehabilitation, and justice for victims. ASAs should view each case as a problem to be solved rather than simply a person to be prosecuted. For certain types of offenses and offenders, especially violent crime and major fraud, the solution is usually straightforward: traditional prosecution resulting in incarceration neutralizes the offender to ensure that s/he does not harm additional innocent victims. For a defendant who is addicted to drugs or suffering from mental illness, treatment may be the best solution. Often the solution is neither readily apparent nor simple; it requires critical evaluation of all the relevant circumstances and a combination of punitive and rehabilitative sanctions.

*Triage*

Different crimes and different criminals represent different threats to public safety. ASAs should view a crime not simply as the violation of a written law but in terms of the harm to the victim and the threat of future harm. This perspective reinforces the aforementioned problem-solving approach. Cases in which the defendant poses a greater threat to public safety are more likely to justify traditional prosecution and more prosecutorial resources. On the other hand, cases in which the defendant poses a minimal threat to public safety are more likely to justify alternative methods of prosecution and fewer prosecutorial resources.

*Charging Requires Discretion*

Charging a person with a crime is a serious and consequential decision. Although our system professes innocent until proven guilty, being charged (without being convicted) can have negative and far-reaching impact on a person's family, employment, and finances. For suspects who have not been arrested for the crime, the charge may result in an arrest, which carries its own consequences. Even for suspects who have already been arrested, the formal filing of charges is consequential. ASAs' expectation in filing a charge is that it will result in a conviction or diversion.

ASAs must exercise discretion in filing charges. Charging is not an academic question of which statutes have been violated but rather a judgment decision based on the law, facts, evidence, and expected outcome that appropriately considers the severity of the offense and the suspect's criminal history. The idea that prosecutors should always charge every offense committed and later determine the "appropriate" outcome through sentencing or sanctions is misguided. This approach can undermine the goals of the system; it ignores the use of pre-file

3

JEX 1.062

diversion programs and civil enforcement that are commonly used as an alternative to criminal charges; it assumes that all laws on the books are equally enforced[3]; and it disregards the existence of overlapping and duplicative statutes. Laws as written do not—and cannot—contemplate every scenario involving countless combinations of defendants, fact patterns, victims, and likely outcomes. By enacting criminal statutes, the legislature gives prosecutors the tools to serve the public interest of justice, but prosecutors must decide how to wield those tools to advance the goals of the system.

ASAs must follow their ethical obligations in making filing decisions. In addition to considering the factors above, prosecutors should only file criminal charges if: (1) the prosecutor reasonably believes the charges are supported by probable cause; (2) admissible evidence is sufficient to support a conviction beyond a reasonable doubt; and (3) charging is in the interest of justice.[4] This is the minimum requirement for filing *and maintaining* criminal charges. Additionally, the governing ethical rules expressly provide that a prosecutor "is not obliged to file or maintain all criminal charges which the evidence may support" and should consider, among other factors, the extent of harm, the potential for punishment disproportionate to the offense, victim input, efficient use of limited prosecutorial resources, and the adequacy of civil remedies.[5]

### *Embracing Diversion and Alternatives to Prosecution*

ASAs must consider and utilize diversion and other alternatives to traditional prosecution. Our office offers a wide variety of diversion programs, including misdemeanor and felony intervention, substance-abuse rehabilitation, and specialty courts such as mental health, drug, and veterans treatment. ASAs need to be familiar with the purposes and eligibility requirements of these programs to be able to identify and refer appropriate cases.

Additionally, ASAs are encouraged to think outside the box in terms of finding innovative ways to further criminal justice goals in a particular case. For example, in cases where the victims have expressed a desire for reconciliation with the defendant, ASAs should consider a restorative justice approach— an approach that emphasizes repairing the harm caused by the criminal behavior more than punishing the offender. This type of approach seeks direct accountability by having the offender accept responsibility and fix the damage caused, while giving the victim a more active role in the process. ASAs should not feel bound by doing what has "always" been done, nor should they be reluctant to explore atypical case resolutions, so long as the resolution furthers the criminal justice goals. Consultation with a supervisor is especially important in a situation where an ASA is seeking an atypical resolution.

### *Sentencing Requires Discretion*

Discretion is imperative with respect to sentencing. Prosecutors do not impose sentences but wield significant influence through how they advocate for sentences. ASAs should seek

---

[3] For example, adultery remains a second-degree misdemeanor in Florida but is rarely, if ever, enforced.

[4] American Bar Association Rule 3-4.3.

[5] American Bar Association Rule 3-4.4.

4

JEX 1.063

sentences that further the criminal justice goals while factoring in the nature and circumstances of the offense, the defendant's criminal history (or lack thereof), victim input, and other factors. There is a wide range of available sanctions, including incarceration, probation, treatment, and restitution to accomplish the goals of accountability, punishment, deterrence, and rehabilitation. Also, ASAs should advocate for sentences that are consistent with similarly situated defendants.

Determining the appropriate sentence is not simply a math problem dictated by the Criminal Punishment Code. The Code expressly contemplates a range of aggravating and mitigating factors that warrant departures, but the sentencing calculation alone does not quantify the mitigation. Statutory mitigators include the extent of the defendant's participation, the need for specialized mental health treatment, whether the crime was an isolated incident, and the defendant's remorse.[6] ASAs must evaluate all mitigating and aggravating factors, as well as the strengths and weaknesses of each case, in advocating for a sentence. Additionally, ASAs are responsible for obtaining mitigation that they know or should reasonably know to exist. ASAs should not use prosecutorial or investigative resources to obtain mitigation and therefore usually have to rely on defense counsel to provide it. However, when the presence of mitigation is readily apparent, e.g., it is documented in the police report, ASAs should seek it out rather than waiting for defense counsel to raise the issue and provide the mitigation.

Incarceration should generally be reserved for when the defendant is a danger to the community. Whether the defendant poses a danger is evaluated based on the circumstances of the crime and the criminal history. Generally, for violent crimes, especially for offenders with a criminal history, incarceration is warranted. However, a defendant with minimal or no criminal history engaged in an isolated incident of violence may not warrant prison. The defendant's intent also factors into the danger posed. For example, a defendant who intended to seriously injure the victim but did not (e.g., repeated blows to the face that resulted in bruising) likely poses a greater danger than a defendant who did not intend to seriously injury the victim but did (e.g., pushing a victim who falls and breaks a bone).

Using a problem-solving approach requires considering the defendant's motivation in committing the crime. Defendants who are intent on harming innocent members of the community warrant different sentences than defendants who have committed a crime because of addiction or mental illness, or an otherwise law-abiding citizen whose crime was isolated and out of character.

Probation can be an effective intermediate sanction between incarceration and freedom. Probation, however, is not a universal solution, and when overused it can undermine long-term public safety at a significant monetary cost to society. Therefore, it is important that ASAs utilize probation—whether following or in place of incarceration—specifically to further the goals of accountability, punishment, or deterrence, rather than automatically seeking probation

---

[6] F.S. 921.0026(2).

5

JEX 1.064

in every case. In every case, ASAs should consider both whether probation is appropriate and, if so, the appropriate length of probation.

ASAs must exercise discretion in utilizing sentencing enhancements—including minimum mandatories such as HFO, HVO, PRR, and VCC. ASAs have discretion to file enhancements when (1) the legal requirements are met and (2) the heightened sentence *may be* warranted. ASAs, however, are not bound to seek enhancements at sentencing (or through negotiated guilty pleas) simply because the enhancement had been filed earlier in the case.

ASAs should consider the consequences of the sanctions we seek to impose. Incarceration as well as lesser sanctions can impact a defendant's job, future employment opportunities, or immigration status. Incarcerating parents has a hidden impact on children, often destabilizing a home environment and potentially increasing the likelihood of criminal activity by the child. Additionally, as mentioned above, sanctions that are warranted from a punishment and accountability perspective may undermine rehabilitation and therefore increase recidivism. Prosecutors are not responsible for navigating all the collateral consequences of conviction and sentences—nor can they be—but ASAs should be aware of these consequences and consider them in advocating for appropriate sentences.

ASAs should be mindful of the monetary cost of sanctions. For example, the cost in Florida for incarceration is approximately $24,265 per year for an adult and as high as $90,000 per year for a juvenile[7]. Although prosecutors are not tasked with saving taxpayer dollars when it comes to sentencing, ASAs should not close their eyes to the cost of the sanctions sought in relation to how effective they believe the sanctions will be in achieving the criminal justice goals in a particular case.

_Negotiate Reasonably & Fairly_

Plea negotiations involve advocating for a specific sentence, and therefore prosecutors should follow a similar approach for plea negotiations as they do for sentencing. In conducting plea negotiations, prosecutors must evaluate all mitigating and aggravating factors, as well as the strength and weaknesses of each case. As with sentencing, a prosecutor's role in making plea offers is not simply a question of arithmetic; making offers requires more than calculating the bottom of the sentencing guidelines of the Criminal Punishment Code. Pleas should be made in good faith towards resolving cases through the defendant's acceptance of responsibility, and the plea offer should aim to further the criminal justice goals while promoting consistency with similarly situated defendants. In addition to the statutory mitigators referenced above, the first mitigator listed in the statute is that the case resolved from a plea.[8] Accordingly, in all guilty pleas a mitigator is present that may justify a departure from the bottom of the guideline sentence.

---

[7] Adult cost is based on OPPAGA cost of $66.48 per day for Fiscal Year 2019-20. Juvenile cost is based on Justice Policy Institute's July 2020 report, "Sticker Shock 2020: The Cost of Youth Incarceration."

[8] F.S. 921.0026(2)(a).

JEX 1.065

In making plea offers, ASAs should consider the sentence that the ASA would seek if the defendant were to be convicted at trial. Generally, the plea offer should be below such a sentence to account for the defendant's acceptance of responsibility, the certainty and finality a plea provides to the victim, and the elimination of trial and appellate risk accomplished through the plea. Generally, stronger cases involve less of a reduction from the appropriate post-trial sentence, whereas weaker cases unfortunately necessitate a greater reduction because of greater trial risk. Furthermore, although it is impossible to predict with accuracy what sentence a judge would impose, it is permissible for ASAs to adjust the plea offer to reflect the expected sentence.

There is a tendency among prosecutors and defense attorneys to want the other side to initiate plea discussions. Whereas a defense attorney's goal may be to minimize the sentence, prosecutors should seek the appropriate sentence, not simply the maximum that they can negotiate. Accordingly, ASAs should not avoid initiating plea discussions. ASAs should make reasonable plea offers and be open to negotiating an appropriate resolution. In most cases, ASAs should make an offer by arraignment[9] and be open to further negotiations based on the relevant factors as they learn more about the case. In certain situations, especially those involving more serious crimes where there is a more active dialogue with defense counsel farther in advance of trial, it is appropriate for ASAs to discuss a general range of likely plea offers rather than making a specific, binding offer. This process will help determine the likelihood of a resolution. For example, in situations where a resolution is highly unlikely because the two sides are too far apart, or because the appropriate sentence is so high that the defendant will choose to go to trial, plea negotiations may be unproductive and therefore unnecessary.

A prosecutor's role as a minister of justice applies to plea negotiations as it applies to all other aspects of prosecution. Accordingly, prosecutors must conduct plea negotiations fairly. Although prosecutors can condition plea offers on waiving sentencing enhancements that are appropriate—including capital punishment, mandatory minimums, or the adult prosecution of juveniles—they must not make empty threats regarding enhancements to coerce a plea. It is acceptable for prosecutors to set reasonable deadlines before trial or hearings for acceptance of offers but should not condition pleas on defendants waiving credible allegations of constitutional violations. Appropriate situations for conditional revocation of an offer may include involvement of a vulnerable witness/victim, confidential informants, or other cases where there is a specific justification for withdrawing a plea offer prior to a particular pre-trial event occurring.

_Constitutional Violations_

As ministers of justice, prosecutors are obligated to identify Constitutional violations as well as any other police or prosecutorial misconduct. In addition to always complying with discovery and disclosure obligations, ASAs should exercise discretion in terms of prosecuting a case when faced with Constitutional problems or misconduct. Whereas defense attorneys are obligated to

---

[9] Administrative Order 2021-44, ¶ 15.

JEX 1.066

litigate any tenable violation, prosecutors are not merely advocates on behalf of the government. Accordingly, if an ASA believes that a violation occurred that warrants dismissal, s/he should not proceed with the case. Similarly, if an ASA believes that a law enforcement officer has provided misleading testimony or information—even if it falls short of a Constitutional violation warranting dismissal—the ASA should, immediately notify the Chief Assistant pursuant to our office's Law Enforcement Disclosure Policy.

## Examples

Case-specific decisions must be made according to the unique facts and circumstances of the case. Therefore, it is impossible to provide examples that dictate the appropriate decision in every situation across a category of cases. The examples below are intended to provide guidance for certain issues in terms of evaluating charging decisions but are not mandatory charging policies that must be followed in every situation.

- Homeless defendants who are sleeping in a business's parking lot generally should not be charged with trespass because the prosecution is not going to solve the underlying problem in terms of the trespass or the homelessness. The arrest itself addresses the short-term issue of the trespass, but the subsequent prosecution does not further any goal.

- ASAs generally should dismiss a case against a defendant charged with driving on a suspended license who is subsequently able to get his/her license reinstated, as the underlying problem has often been solved, thereby furthering the goal of traffic safety.

- Where a person has committed a public order offense such as making a false 911 call or disorderly conduct, and the police report indicates that the person was suffering from mental health issues or was Baker Acted at the scene, it may be appropriate to no-file the charges if the person is receiving treatment, especially if the prosecution risks undermining the success of the treatment.

- Where a defendant committed petit theft but paid restitution to the victim's satisfaction, the defendant's criminal history is instructive. In these situations, defendants with a limited criminal record may not warrant prosecution if the expected outcome is court costs, whereas defendants with a more significant criminal history may warrant prosecution if sanctions beyond courts costs are appropriate and expected.

- For bringing a firearm into an airport or a courthouse, the decision to charge should depend largely on the suspect's intent. There is a significant difference in the threat to public safety between a person who tries to sneak a firearm into a secure location for ostensibly nefarious purposes, versus an otherwise law-abiding gun owner who merely forgets to remove the firearm from his/her luggage.

- The armed burglary statute applies to situations where the offender is armed prior to the burglary and where the offender becomes armed during the burglary. However, a defendant who arms himself either before or during a burglary to confront the victim of the burglary, e.g., carrying a gun when breaking into a person's home, poses a different

8

public safety threat than a defendant who steals a weapon as the object of the burglary, e.g., opening an empty, unlocked car and stealing a gun. In general, the former should be charged as armed burglary whereas the latter should not.

- The burglary with assault or battery statute applies to (1) situations where the offender breaks into a person's home in the middle of the night and physically attacks the homeowner and (2) to situations in which the offender reaches across the threshold of a rolled-down car window and threatens the driver. There is a significant difference between these two crimes in terms of the threat to public safety and the harm caused to the victim. In general, the former should be charged as burglary with assault or battery whereas the latter is should be charged as a misdemeanor assault, with the possibility of adding the charge of burglary of a conveyance.

- In deciding whether to charge drug trafficking, ASAs must look at factors other than the amount of drugs sold. There is a significant difference in the threat to public safety and the degree of culpability between the kingpin and the mule, even though both may be caught selling the same amount of drugs. Similarly, there is a significant different between a person selling prescription drugs as an organized criminal business versus someone selling his/her own prescribed drugs to afford the medication that s/he needs for legitimate medical use.

- For certain crimes, individual acts that are part of the overall crime may constitute a separate charge, e.g., wire fraud, identity theft, possession of child pornography, unlicensed practice of law, et al. Often in these situations, it is possible to charge dozens or hundreds of counts. For these crimes, ASAs should not file every possible count but rather should strategically charge a number of representative counts to achieve the appropriate sanctions while simplifying the burden of proof at trial.

9

JEX 1.068

# Exhibit 3

JEX 1.069

*Approved 3/9/2021*

## Presumption of Non-Prosecution

Based on the appropriate allocation of resources and the impact that a lawful arrest can have on quelling or resolving an immediate situation, the following charges carry a presumption of no file (or nolle prosequi if sent as a notice to appear).

| | | |
|---|---|---|
| Unregistered motor vehicle | TRAF5015 | 320.02 |
| Unlawful use of temporary tag | TRAF5031 | 320.131 |
| Attaching tag not assigned | TRAF5040 | 320.261 |
| Violation of nonresident restriction | TRAF6006 | 322.03 |
| Expired drivers license | TRAF5100 | 322.03 |
| No vehicle registration | TRAF5015 | 320.02 |
| Violation on non-resident registration requirements | TRAF5061 | 320.38 |
| Permitting unauthorized person to drive | TRAF6060 | 322.36 |
| No motorcycle endorsement or no valid motorcycle endorsement | TRAF6200/ TRAF6004 | 322.57/ 322.03 |
| Failure to notify DMV of address change | TRAF5019 | 320.02 |
| Trespass at business location | | 810.02 |
| Disorderly conduct | MISC0124 | 877.03 |
| Disorderly intoxication | MISC0018 | 856.011 |
| Soliciting (panhandling) | HCOR0501 | 42-23 |
| Prostitution (where defendant is accused of giving or offering to give her/his body for sexual activity for hire) | PROS3101 | 796.07(2)(e) |

This presumption may be overcome by significant public safety concerns, such as pending felony charges, a VOP, or if the current charge is part of a charged course of contact that includes a charge not on this list.

## Driving with Suspended License (DWLS) Cases

If a defendant is charged with DWLS, the ASA must screen the case to determine the basis for the current suspension and the current license status of the defendant.   This will allow the ASA to determine whether or not the case is suited for being addressed through reinstatement.

*Prosecution-focused DWLS Cases*

A non-exhaustive list of DWLS charges demanding high-priority prosecution include for:

1. Underlying suspensions for DUIs, or other traffic-related convictions like Fleeing and/or Attempting to Elude or Vehicular Homicide;
2. Permanent revocations;
3. Active non-traffic criminal conviction suspensions;
4. DWLS that arises out of the same arrest as a DUI; or,
5. Habitual Traffic Offender (HTO) revocations (non-financial/prior forcible felony).

These suspensions are presumed to be <u>not</u> appropriate for handling through reinstatement.

*Reinstatement-focused DWLS Cases*

DWLS charges better handled with a focus on reinstatement include suspensions for:

1. Failure to pay (FTP) for civil infractions; [1]
2. Failure to appear (FTA) for civil infractions;
3. Expired medical clearance;
4. PIP coverage;
5. Outstanding judgments related to traffic accidents;
6. HTO (financial);
7. Out-of-state suspension;
8. Child support;
9. Inactive non-traffic convictions; or,
10. NVDL.

In the event that the defendant is able to obtain a valid drivers license, the ASA will announce a nolle prosequi. In many cases, a defendant may not be able to obtain a valid license within a short period of time or may be barred from doing so based upon the operation of federal law. If the defendant is unable to obtain a drivers license by their second disposition date (or prior to trial if set earlier), the State will review the case for a nolle prosequi. Supervisors will review DWLS cases older than 90 days to determine if prosecution will continue.

*ASA Review of DWLS Cases*
*If there are any attached civil infraction, our office does not handle those and takes no position on the outcome of those citation.*

1. In all cases, we must be able to prove that the license was suspended on the date of the offense, the identity of the defendant, and knowledge of the suspension (may use statutory presumptions).

If can't establish element of offense → nolle prosequi
If yes, go to #2.

2. Did this DWLS arise out of the same incident as a DUI?

If yes, → continue prosecution.
If no, go to #3.

3. What was the basis of the suspension?

Prosecution-focused DWLS: If underlying suspensions for DUIs, or other traffic-related convictions like Fleeing and/or Attempting to Elude or Vehicular Homicide, a permanent revocation, an active non-traffic criminal conviction, or Habitual Traffic Offender (HTO) revocations (non-financial/prior forcible felony) → continue prosecution

For all others, go to #4.

4. Has the license been reinstated prior to arraignment?

If yes ⟶ nolle prosequi.
If no, go to #5.

 5.  Has the license been reinstated prior to disposition or trial?

If yes ⟶ nolle prosequi.
If no, go to #6.

 6.  If case is set for second disposition hearing or trial, and defendant has been unable to obtain
      license, review for nolle prosequi.  Presumption is to enter a nolle prosequi.

[1] For the sake of consistency, FTP/FTA for civil infractions will be handled the same, although an FTP is
less likely to include evidence needed to prove knowledge.

# Exhibit 4

JEX 1.073



# State Attorney

**ANDREW H. WARREN**
Thirteenth Judicial Circuit
419 N. Pierce Street
Tampa, Florida 33602-4022
(813) 272-5400

*Policy Regarding Prosecution of Cases Based on Pedestrian and Bicycle Violations*

*Background*

In October 2020, our office partnered with community representatives to form the Racial Justice Work Group. The Work Group was tasked with identifying areas where the implementation of new initiatives or processes could address issues of racial disparity as part of our agency's mission to improve public safety while ensuring justice and fairness for our citizens. Since October 2020, the Work Group has held regular meeting to discuss specific prosecutorial issues, analyze criminal justice data, and examine actual cases, resulting in a series of policy proposals for consideration by our office.

One such proposal is to evaluate racial disparities in cases of resisting a law enforcement without violence or the threat of violence, a misdemeanor. Our office asked researchers at Florida International University's Center for the Administration of Justice to review data regarding this category of crime. Using data from 2017-2019, FIU researchers found that Black defendants are overrepresented in resisting arrest without violence cases compared with all misdemeanors in general. During that period, Black defendants constitute approximately 33.6% of all misdemeanor defendants but 49.2% of all resisting without violence defendants.

In reviewing this category of cases, an area of focus that has emerged involves a subset of cases involving bicycle and pedestrian stops where the only charge resulting from the stop is resisting arrest without violence. Of the resisting arrest without violence cases referred to our office in which a bicycle or pedestrian violation was the reason for the initial contact, 71% involved Black defendants.[1]

Bicycle and pedestrian stops can be a legal and legitimate law enforcement tool to promote community safety, particularly in high crime areas. In many instances, however, bicycle and pedestrian stops have limited public safety benefits, especially because arrests resulting from such stops are predominantly for non-violent, low-level offenses. Furthermore, actual or even perceived racial disparities in the use of bicycle and pedestrian stops undermine trust within the communities that law enforcement serves.

Our analysis reveals that bicycle and pedestrian stops disproportionately burden Black citizens of Hillsborough County. To address this disparity, as well as to address inconsistencies in how cases resulting from these stops are prosecuted, and to ensure that prosecutorial resources are focused on crimes that pose a demonstrable public safety threat, it is necessary to memorialize our

---

[1] This review was limited to the 2019 data, which was the most recent calendar year of data not skewed by the impact of the pandemic. The most common reason for a stop/contact was the execution of a warrant on the defendant, followed by a criminal or crash investigation, impeding the investigation or execution of a warrant of another, or a bicycle stop.

prosecution policy concerning charges arising out of stops based upon pedestrian or bicycle violations.

Filing Policy Regarding Cases Based Upon Bicycle or Pedestrian Violations

For any case referred to our office arising out of a stop exclusively for a bicycle or pedestrian violation, there is a presumption that our office will not file charges against the defendant. This policy is based on our determination that prosecuting offenses resulting from such stops has a limited impact on public safety (as most such offenses are low-level, non-violent) and has a disparate impact on Black bicyclists and pedestrians. It is not a finding or determination concerning the reasonable suspicion or probable cause necessary to conduct a bicycle or pedestrian stop, and we continue to recognize that bicycle and pedestrian violations are a valid law enforcement instrument under the appropriate circumstances. For purposes of data collection, decisions not to proceed with prosecution based on this policy should be documented with the appropriate no file code (no file code 93: Based on SAO Pedestrian/Bicycle Stop Policy).

If, based on the facts and circumstances of the case, the public safety needs of the community outweigh the presumption to not file the case, the charge may be filed with the approval of a supervisor. The reason for the exception and the supervisor's approval is to be documented in the file. This exception should be reserved for cases that pose a direct threat to public safety, such as where an individual has suffered physical harm or where a firearm is involved.

This policy applies only to arrests where the initial encounter between law enforcement and the defendant results from a non-criminal violation in connection with riding a bicycle or a pedestrian violation. This policy does not apply to arrests that arise out of a criminal violation independent from the bicycle or pedestrian stop, even if the defendant is ultimately apprehended while riding a bicycle or violating pedestrian laws.

**JEX 1.075**