IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

ANDREW H. WARREN,

                 Plaintiff,               Case No. 4:22-cv-302-RH-MAF

v.

RON DESANTIS, individually and in
his official capacity as Governor of the
State of Florida,

                 Defendant.

_____

**PLAINTIFF'S RESPONSE TO MOTION TO BAR TESTIMONY**

## INTRODUCTION

Ron DeSantis has never been short on things to say about his suspension of Andrew Warren.  Defendant DeSantis announced Mr. Warren's suspension in a made-for-TV rally at the Hillsborough County Sheriff's Office on August 4, 2022. Later that day he went on Fox News for a one-on-one segment with Tucker Carlson about the suspension, speaking for several minutes in response to the question "Why did you do it?"  [Tucker Carlson Tonight, *Gov DeSantis Suspends Soros-Backed Progressive Prosecutor Andrew Warren*, FoxNews, at 00:09 (Aug. 4, 2022), https://www.youtube.com/watch?v=9C0aJK63vGQ]    Among other things, the Governor told Mr. Carlson that he suspended Mr. Warren because he "actually signed letters saying he wouldn't enforce laws against transgender surgeries for minors, laws protecting the right to life, and then he has all these policies in his agency that are called presumptive non-prosecution policies."  [*Id*. at 00:50]  As set forth in prior filings, in the three months since suspending Mr. Warren, the Governor has spoken over and over about the suspension.  *E.g.*, [Doc. 94 at 12 ("Defendant has consistently taken credit for the decision to suspend Mr. Warren. *See, e.g.*, Ex. 6, August 23, 2022 Statements in Hialeah, Fla. ("I removed him from office.").  At the Florida gubernatorial debate, Defendant declared: "I acted appropriately [in suspending Mr. Warren], and I would do it again." Ex. 7 October 24, 2022 Florida Gubernatorial Debate, at 53:10–17.") (alterations in original).][1]  But now, with no apparent sense of irony, Defendant has again filed 20+ pages of motion papers imploring the Court to protect him and his most senior advisor not only from having

---

[1]      Record page cites are to the ECF-stamped header pagination.

1

to speak under oath about a subject on which he has previously been delighted to hold forth but also from the legal consequences of his choice to be absent from a case about which he has unique knowledge.

As Mr. Warren has said before, his "focus is on continuing efficiently on the path toward trial on November 29 and on minimizing the harm to himself and the public that accrues with each day he remains unlawfully suspended." [Doc. 94 at 3] Defendant's Motion distracts from that task and is without merit. First, Defendant's Motion is premature because it asks the Court to consider and rule now on the issue of the Governor's testimony—an issue that is not even certain to arise after Mr. Warren has made his *prima facie* case and after Defendant has tried to rebut it.[2] Second, the Motion is premature because it asks the Court to decide *before* trial what, if any inference, the Court might draw from the evidence presented (or not presented) *at* trial. In all events, none of the precedents relied on by the Governor's lawyers in the Motion stand for the proposition that an elected official who speaks over and again in the press about his suspension of a fellow constitutional officer is shielded from having to speak about that same topic in court. And none of those precedents supports this Court resolving, in advance of trial, the question of what inference should be drawn from the state of the evidence at the close of trial.

---

[2]     Mr. Warren has previously noted, and this Court has previously confirmed, that the Governor's choice to run away from testifying in this proceeding means that "Defendant will not have benefit of his own or Mr. Uthmeier's trial testimony to satisfy the *Mt. Healthy* same-decision defense on which he carries the burden." [Doc. 94 at 5 (citing Doc. 69 at 2)]

The Motion should be denied as premature or, in the alternative, denied on the merits.

I.    **The Motion's Request As To Testimony Is Premature And Will Remain So Until Defendant Tries To Carry The Burden That He Will Soon Bear. The Request is Also Wrong.**

A.    **Mr. Warren Does Not Need, And Does Not Seek, The Governor's Testimony to Establish His *Prima Facie* Case.**

Mr. Warren may very well decide not to call the Governor to the stand. And at least at this moment, the Court need not and should not rule on the Motion.

The issues for trial "include the Governor's actual motivation for the suspension and, if improperly motivated in substantial part, whether the Governor would have made the same decision anyway, without the improper motivation."[3] [Doc. 98 at 1] At the risk of oversimplifying, it is Mr. Warren's job at trial to prove that the Governor suspended him, at least in part, because of his protected speech. It will then be the Governor's task, if he can, to show that Mr. Warren would have been suspended even without that protected speech.

Mr. Warren does not need, and would not call, the Governor or Mr. Uthmeier, to prove his *prima facie* case.  As Mr. Warren has explained before, he will present strong evidence that ideological animus infected the suspension from start to finish

---

[3]    Whether the "part" played by Defendant's improper motivation must be "substantial" is subject to question.  *See, e.g.*, *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1564 (11th Cir. 1995) (describing the plaintiff's burden to establish a causal connection between protected speech and adverse action as "not a heavy one"); *see also Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (explaining that causal inquiry is whether "protected conduct played a part, substantial or otherwise," in the defendant's wrongdoing (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285 (1977)).

and (1) that he engaged in protected speech, (2) that he suffered an adverse action by being suspended, and (3) that this speech was causally connected to the adverse action. *See Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005); *see also* Doc. 68 at 17 ("The bottom line: the writings attached to the executive order included speech protected by the First Amendment."; "the record would support and indeed compel a finding, that this second element of a First Amendment retaliation claim has been met;" "Indeed, the executive order cited, discussed, and attached the writings.").

It is hard to see how Defendant could offer evidence to rebut Mr. Warren's *prima facie* case. Defendant has already confirmed that in order to avoid depositions in this matter, he "waives the right to call himself and his Chief of Staff, James Uthmeier, as witnesses at the trial." [Doc. 100 at 1] The Governor has absented himself from this case, say his lawyers, "rather than divert his attention from more pressing matters (like managing back-to-back hurricane effects)." [Doc. 107 at 9] And the Governor intends, they say, "to substitute his and his Chief of Staff's testimony with that of the high ranking officials primarily responsible for developing the suspension order…his General Counsel Ryan Newman; his Chief Deputy General Counsel Raymond Treadwell; and his Senior Advisor for Public Safety Larry Keefe." [*Id*. at 9–10 (cleaned up)] The Governor goes on to say that the testimony of these men is as good as his own because these "important executive officials cultivated the suspension order from start to finish." [*Id.* at 10]

Fine. It is up to the Governor to decide how to try his case. *E.g.*, *Fed. Deposit Ins. Corp. v. Hutchins*, No.11-CV-1622, 2013 WL 12109446, at *4 (N.D. Ga. Oct.

25, 2013) ("Each party is the master of his own case.").  As a threshold matter, though, it is wrong to suggest that by offering testimony from the various lawyers who "cultivated" the suspension order, the Governor is offering evidence of his "actual motivation for the suspension" or evidence of "whether the Governor would have made the same decision anyway, without the improper motivation." [*See* Doc. 98 at 1 (cleaned up)]  He is not.

The Motion, combined with these lawyers' deposition testimony makes this very clear.  The Motion waxes on about how these men, alone and together, "identified the bases for the order," "analyzed and refined the bases for the suspension," and are thus "the most knowledgeable officials about the suspension order." [Doc. 107 at 10 (cleaned up)]  Even taking such statements at face value, these things are evidence of what lawyers, whose job it was to paper the decision to suspend Mr. Warren, said and might say about "the suspension order"—the document by which Mr. Warren was deprived of his elected office.  None of these things is direct evidence of *why* the Governor suspended Mr. Warren, and none of these things is evidence of *what*, if anything, the Governor would have done to Mr. Warren in the absence of the Governor's improper motivations.

Furthermore, these lawyers (as well as other witnesses) have already admitted that they don't know what the Governor was thinking when he made the decision to suspend Mr. Warren.  As for Mr. Keefe, he has already said that he doesn't "know what thoughts lie in the Governor's mind relative to Mr. Warren." [Ex. 1 (11/4/2022 Dep. Tr. of Larry Keefe ("Keefe Dep.") at 118:23-25]  He doesn't even know the date on which the Governor made "the mental cognitive decision" to suspend Mr.

Warren.  [*Id.* at 31:23-32:1]   Nor does he know "the moment that all of those synaps[e]s in the Governor's mind aligned where he formed a decision [to suspend Mr. Warren]."  [*Id.* at 32:25-33:2]

Mr. Treadwell is similarly ignorant as to the Governor's thoughts and motivations.  Though the Motion (at 10) says that Mr. Treadwell is among the "important executive officials" whose testimony and knowledge the Governor seeks to substitute for his own, Mr. Treadwell "was not in any of these meetings [with the Governor about Mr. Warren]," (Ex. 2 (10/31/2022 Dep. Tr. of Raymond Treadwell ("Treadwell Dep.") at 53:25-54:4)).  Moreover, Mr. Treadwell testified: "I have not spoken to the [G]overnor on this matter and I did not speak to the [G]overnor on this matter."  [*Id.* at 56:11-13]   Most conclusively, Mr. Treadwell has said, much like Mr. Keefe did, "I don't know what was in the governor's mind other than the fact he signed the executive order."  [*Id*. at 58:4-5]

Finally, Mr. Newman. Completely understandably, and just like his fellow lawyers in the Governor's office, he doesn't know "precisely" "when in the process…in the sequence of events…the Governor went in his mind from tentative to definitive [in his decision to suspend Mr. Warren]."  [Ex. 3 (11/7/2022 Dep. Tr. of Ryan Newman ("Newman Dep.") at 91:11-15)]   He doesn't know what "motivated" the Governor to personally add language to the suspension order "about the nature of the a[b]ortion procedure and its effect on the fetus."  [*Id.* at 151:16-25;

153:1-5] Mr. Newman doesn't even know "the reason for [many of the Governor's] edits [to the suspension order]."[4] [*Id.* at 151:6-15]

None of these men know what was in the Governor's mind, in other words what his "subjective motivation" was, when he decided to suspend Mr. Warren. The Governor's prior press secretary, Christina Pushaw, perhaps said it best when she said "I'm not going to be able to answer, like, questions, about what was going through [Defendant's] mind when he decided to issue the suspension." [Ex. 4 (10/18/2022 Dep. Tr. of Christina Pushaw at 143:7-11)]

The Governor's testimony is not needed, or sought, for Mr. Warren's *prima facie* case, and it may not be needed at all.

## B.   If The Governor Were to Carry His Burden Through the Testimony of his Lawyers and Others, Mr. Warren Would Then Be Entitled to Examine The Governor.

Only if the Governor, through his chosen witnesses, carries, or threatens to carry, his burden to show that he would have made the same decision to suspend Mr. Warren without the improper motivation, would Mr. Warren consider calling him or his chief of staff to the stand in rebuttal. Mr. Warren might make this strategic choice, for example, "to assert a defendant's purported [lawful] reasons for disciplinary action were pretextual." [Doc. 68 at 19 (citing *Tracy v. Fla. Atl. Univ. Bd. of Trs.*, 980 F.3d 799 (11th Cir. 2020), *cert. denied*, 142 S. Ct. 584 (2021), and

---

[4]   Mr. Newman does know, though, that the Governor "didn't want to make this decision without some confidence that law enforcement would support him in -- in making it." [Ex. 3 (Newman Dep. at 70:21-71:2)] For his part, Mr. Treadwell was focused on the "larger political narrative." [Ex. 5 (Treadwell Dep. Ex. 21)]

*Stanley v. City of Dalton*, 219 F.3d 1280, 1291 n.20 (11th Cir. 2000))]  But, should Mr. Warren seek this testimony, he should have it.

### 1.    This is an Extraordinary Case.

As Mr. Warren has previously explained, the Apex Doctrine on which Defendant's argument rests "has no force in this case, which presents exactly the kind of 'extraordinary circumstances' in which testimony by high-level officials is warranted and necessary."[5]  [Doc. 94 at 6 (quoting *In re United States (Kessler)*, 985 F.2d 510, 512 (11th Cir. 1993); *In re United States (Jackson)*, 624 F.3d 1368, 1372 (11th Cir. 2010))]  This is not an ordinary lawsuit in which the Governor's testimony is sought simply because of his title or role; it is a constitutional controversy between two high-level government officials over the free-speech rights of elected representatives, one of whom personally and to great fanfare suspended the other. *See Kimberly Regenesis, LLC v. Lee County*, No. 19-cv-538, 2021 WL 5285093, at *6 (M.D. Fla. Sept. 29, 2021) ("apex doctrine rarely, if ever, shields [an official] from discovery when the official is directly involved in the event at issue and has **personal knowledge** about it"), *modified*, No. 19-cv-538, 2021 WL 5028204 (M.D. Fla. Oct. 29, 2021); *cf. Florida v. United States*, No. 21-cv-1066, 2022 WL 4021934, at *4 (N.D. Fla. Sept. 2, 2022) (permitting a government officer who oversees the section of the agency responsible for the challenged policy to be deposed in a suit between the state of Florida and the United States).

---

[5]    Rather than wholly repeat the relevant arguments set forth in Mr. Warren's Response to Defendant's Motion for Protective Order (Doc. 94), Mr. Warren will summarize them here in particularly relevant part and otherwise respectfully incorporates them by this reference.

As this Court knows, the Eleventh Circuit has long ago said that the Governor's suspension power can be exercised "only in extraordinary circumstances." *Abusaid v. Hillsborough Cnty. Bd. of Cnty. Comm'rs*, 405 F.3d 1298, 1307 (11th Cir. 2005).  The Governor's attempts to cast this case as just another suit against the State, too small to merit the Governor's attention, are hard to credit.

> ## 2. The Governor's Testimony Would be Sought, If Needed, Because He Has Unique and Critical Knowledge.

The Apex Doctrine also would not apply to the potential trial testimony here because none of the "important executive officials" on whom the Governor intends to rely at trial, knows what was in the Governor's mind or whether he would have suspended Mr. Warren even in the absence of Mr. Warren's protected speech.  For his part, when asked at deposition what the Governor would have done "if the only fact supporting the suspension were the -- the abortion statement," Mr. Newman said "we didn't discuss those kind of hypotheticals."  [Ex. 3 (Newman Dep. at 92:4-15)] Mr. Newman similarly did not discuss with the Governor, and does not know, what the Governor "would decide if there were only the gender affirming care statement." [*Id.* at 92:21-24]  When asked, in summary "whether you had discussions with him about…what would happen if there were some grounds but not others?" Mr. Newman said they did not have any such discussion "because we didn't expect -- we didn't expect we would lose on…[quo warranto]."  [*Id.* at 93:6-19]

Mr. Treadwell, of course, didn't even discuss the suspension with the Governor himself.  But when asked, for example, whether the Governor would have

suspended Mr. Warren solely based on the Gender Statement he termed that question "kind of a tough hypothetical because, again, legal made the recommendation to the governor" and concluded: "I think only the governor would know that hypothetical."[6]  [Ex. 2 (Treadwell Dep. at 174:25-175:9)]

Mr. Keefe, finally, simply doesn't "know what thoughts lie in the Governor's mind relative to Mr. Warren."  [Ex. 1 (Keefe Dep. at 118:23-25)]

Especially in a case where his General Counsel and Deputy General Counsel were never "thinking this was a First Amendment challenge" (Ex. 2 (Treadwell Dep. at 103:6-9)) and were instead focused on a potential Senate trial (*e.g.*, Ex. 2 (Treadwell Dep. 121:10-12; 252:12-14)) or a state *quo warranto* challenge (*id.* at 103:8-9) it is unsurprising that no one knows if the Governor would have suspended Mr. Warren even in the absence of Mr. Warren's protected speech.  Therefore, if the Governor somehow succeeds, in his own absence, in establishing that defense, Mr. Warren must be allowed to call and press the Governor under oath on the veracity and weight of that otherwise circumstantial evidence.  *See, e.g.*, *United States v. Lamons*, 532 F.3d 1251, 1264 (11th Cir. 2008) (cross-examination under oath is

---

[6]    Notably, when asked the critical question of his opinion of "whether the governor would have made the decision to suspend Mr. Warren based on the bike stop policy and the [Low Level Offense] prosecution policy that we discussed earlier…solely on those documents" Mr. Treadwell said "here I'm going to say probably not because Ryan and I -- Mr. Newman and I probably would not have recommended Mr. Warren's suspension based on those documents standing by themselves."  [Ex. 2 (Treadwell Dep. at 173:15-24]  In addition to cutting deeply against any "same decision defense," this testimony makes the need for the Governor's testimony even less likely, but, should the need arise, even more acute. Again, Mr. Warren would only seek to call the Governor if other evidence suggested that he might be able to establish the "same decision defense."

"greatest legal engine ever invented for the discovery of truth" (quoting *Lee v. Illinois*, 476 U.S. 530, 540 (1986)).

None of Defendant's cited authorities are to the contrary.  Many rely on the premise, flawed as explained above, that Defendant's three chosen lawyers are "most knowledgeable about the [challenged] government action."  [Doc. 107 at 13 (cleaned up)]  They may be knowledgeable about some things, but the only things on which Mr. Warren would seek the Governor's testimony, if necessary, are (1) the Governor's "subjective motivations" for suspending Mr. Warren and (2) what the Governor would have done in the absence of the Joint Statements.  By their own admission, these men can, at best, only speculate about these topics.  Again, these lawyers were tasked to paper the suspension; they know the legal reasons for which (in their own opinion) the Governor was supposed to be suspending Mr. Warren.  But none of them knows what the Governor was thinking when he suspended Mr. Warren and none of them knows what the Governor would have done if Mr. Warren had not engaged in protected speech, if the Governor agreed with the content and viewpoint of the purportedly offending speech, or if the circumstances involved an elected official whose speech made that person the Governor's political ally or supporter.[7]

---

[7]     For similar reasons, the Governor's repeated suggestion that Mr. Warren accept, as a substitute for the direct examination of the Governor, the examination of a representative of the Governor who would be prepared to say what the Governor and his staff say the Governor was thinking at critical moments or what the Governor would have done under facts other than those present at the time of the decision is no answer.  This attempt to insist that information obtained from the Governor *during and for the purposes of this litigation*, washed through a trusted representative, would be the same as the live testimony of the Governor strains

Others of Defendant's cited authorities wrongly attempt to lump this case into the compost heap of garden-variety civil rights cases brought against the Governor, saying that the Governor's examination in this case would open him to "constant distraction of testifying in lawsuits." [*Id.* at 4 (cleaned up)]  Not so.  This case is unlike any other in the history of Florida.  Never before has the Governor of Florida suspended an elected official for his protected speech, held a media event at which he gloated about it, appeared on Fox News to continue to gloat about it, campaigned around the country for like-minded candidates while gloating about it, and then run away from Court when asked to testify about it.  Hopefully no similar case ever arises again.  But if such a further case is necessary, the Governor should testify there, just like he should, if circumstances warrant, here.

## II. The Motion's Request For A Ruling On What Inference, If Any, Will Be Drawn At The Close Of Evidence Is Premature.  The Request is Also Wrong.

### A. Any Inference To Be Drawn From the Evidence Should Be Drawn Only At The Close of Evidence.

In his Motion, as in a prior motion, the Governor asks not only that the Court now bar Mr. Warren from calling him as a rebuttal witness but also that the Court now absolve him of the inference that may be warranted from his refusal to testify affirmatively.  This further attempt by the Governor to place himself above the law and rules that apply to everyone else is without merit.

---

credulity.  This logic would also permit, for instance, a criminal defendant to invoke the 5th Amendment privilege to remain silent and then at the same time allow a lawyer of his choosing to testify as his representative about his mental state.  That's not how the rules of evidence work nor is it how courts search for the truth.

Only the Governor knows what was in his mind and what he would have done in the absence of the Joint Statements. And if "a party successfully invokes a privilege or does not testify because of a privilege, this fact may suggest, at least in the context of ongoing litigation, that he is withholding information favorable to his opponent." § 5:12 General principles—Adverse comment or inference, 2 Federal Evidence § 5:12 (4th ed. 2022). This "adverse inference" rule "can be traced as far back as 1722 when it was applied in the famous case of the chimney sweep's jewel, it has been utilized in scores of modern cases as well." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. (UAW) v. NLRB*, 459 F.2d 1329, 1336 (D.C. Cir. 1972). "Simply stated, the rule provides that when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him." *Id.*

The Supreme Court and U.S. appellate courts have repeatedly confirmed this venerable rule that "[u]nquestionably the failure of a defendant in a civil case to testify or offer other evidence within his ability to produce and which would explain or rebut a case made by the other side, may, in a proper case, be considered as a circumstance against him and may raise a presumption that the evidence would not be favorable to his position." *United States v. Roberson*, 233 F.2d 517, 519 (5th Cir. 1956); *see, e.g. also Graves v. United States*, 150 U.S. 118, 121 (1893) ("[I]f a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable.").

In *UAW*, the D.C. Circuit traced the origins and purposes of the rule, including through decades of circuit precedent, before applying the rule to a case where a party refused to produce certain evidence within its control.   *Id.* at 1332.   That case involved a defense contractor's decision to "discharg[e] some 30 union members at the height of an organizing campaign."   *Id.*   In similar fashion to the Governor's actions here, there, in response to claims of unlawful retaliatory discharge (on account of the union campaign), the company defended itself by proffering a defense that it got rid of the union workers not for their First Amendment-protected organizing activity, but instead for another reason (cost-cutting).   *See id.* at 1333.

The company refused to produce certain evidence, even though there was, as Mr. Warren will adduce at trial here, "strong proof of discriminatory discharge[]" making out plaintiffs' *prima facie* case.   *Id.* at 1344-45.   And there, as here, once the *prima facie* case was made the defendant "was perfectly free to prove its [same decision/other reason defense] by secondary evidence, and whether it chose to do so or not has no effect on the applicability of the adverse inference principle."   *Id.* at 1345.   Rather, the D.C. Circuit held, "the adverse inference rule is based on the belief that a party will introduce all relevant evidence which is favorable to him *on his own initiative*.   If a piece of evidence appears clearly relevant but the party without explanation nonetheless fails to introduce it, it must be inferred that that evidence would be unfavorable to him."   *Id* (emphasis original).

But the court there, as have other courts, and as should the Court here, also recognized that any inference to be drawn is decided and drawn at the close of evidence.   The *UAW* court made clear that the adverse inference is a presumption to

be drawn, if at all, once the court can evaluate the absence of missing evidence against the evidence that is present. *Id*. ("Given the clearly relevant character of the rehiring records, we can see no reason why Gyrodyne would not have come forward with them of its own volition if they had supported its case."); *see also Roberson*, 233 F.2d at 519 (holding that an unfavorable inference is not appropriate until after the *prima facie* case is made, at least).

As Mr. Warren has explained in prior filings "[t]he missing-witness presumption, in particular, is a factfinding tool that applies at trial." [Doc. 94 at 21 (citing *Jones v. Otis Elevator Co.*, 861 F.2d 655, 658–60 (11th Cir. 1988)[8])] The Court should determine whether, if at all, to draw an inference against the Governor only in light of the evidence at trial; Defendant's request for a ruling now is premature. *See, e.g.*, *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("[A]s far as this record reveals, his silence was given no more evidentiary value than was warranted by the facts surrounding his case."); *Harrison v. Wille*, 132 F.3d 679, 683

---

[8] Defendant suggests in his Motion that *Jones* somehow undermined the continued vitality of the adverse inference rule. It did not. The Eleventh Circuit has, and other circuits have, continued to apply the rule without questioning its centuries-old vitality. *See, e.g.*, *Coquina Invs. v. TD Bank, N.A.*, 760 F.3d 1300, 1310 (11th Cir. 2014) ("[T]he Supreme Court has said that 'the Fifth Amendment does not forbid adverse inferences against parties ... when they refuse to testify in response to probative evidence offered against them.'" (citation omitted)); *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1304 (11th Cir. 2009) ("[I]n a civil suit such as this one, the court may draw adverse inferences against a party that invokes the Fifth Amendment."); *see, e.g. also Endeavor Partners Fund, LLC v. Comm'r of Internal Revenue*, 943 F.3d 464, 468 (D.C. Cir. 2019) ("a fact finder (typically, a jury) may but need not draw an adverse inference from the absence of a witness 'if a party has it [1] peculiarly within his power to produce witnesses whose testimony would [2] elucidate the transaction'" (citation omitted)).

(11th Cir. 1998) ("Considered along with other evidence, however, an adverse inference may be drawn from an employee's exercise of his Fifth Amendment right to silence."), *as amended* (Apr. 1, 1998), *reh'g and suggestion for reh'g en banc denied* (Apr. 1, 1998); *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000) ("an adverse inference can be drawn when silence is countered by *independent evidence* of the fact being questioned, but that same inference cannot be drawn when, for example, silence is the answer to an allegation contained in a complaint"); *Odom v. Roberts*, 337 F.R.D. 353, 359 (N.D. Fla. 2020) ("At trial, the trier of fact may draw adverse inferences from [defendant's] invocation of his Fifth-Amendment right.").

### B.   If the Governor Attempts to Carry His "Same Decision" Burden Through Second-Hand Evidence Proffered Chiefly by the Lawyers Whose Advice It Was To Suspend Mr. Warren, The Court Should Draw an Adverse Inference From Their Absence.

That said, should the Court decide now, based on the *anticipated* evidence at trial, whether to draw an adverse inference from the Governor's failure to call himself and Mr. Uthmeier to the stand, it should draw such an inference. Indeed, if the evidence is as Mr. Warren expects it will be, this case would be a prime example of why the rule exists and when it should be applied.

As discussed above, the prevailing rule is that even "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Baxter*, 425 U.S. at 318. As the Eleventh Circuit has held in a case where a party, upon a *prima facie* showing by plaintiff, then bore a burden to rebut that evidence, a party who claims

a right not to testify "may not 'convert [that right] from the shield…which it was intended to be into a sword whereby [he] would be freed from adducing proof in support of a burden which would otherwise have been his.'" *Arango v. U.S. Dep't of the Treasury*, 115 F.3d 922, 926 (11th Cir. 1997) (second alteration in original) (citation omitted).

"[I]n a civil proceeding, 'the parties are on a somewhat equal footing, one party's assertion of his [privilege not to testify] should not obliterate another party's right to a fair proceeding.'" *Glanzer*, 232 F.3d at 1264 (citation omitted). Not allowing an adverse inference under circumstances, like those likely to be posed here, "poses substantial problems for an adverse party who is deprived of a source of information that might conceivably be determinative in a search for the truth." *SEC v. Graystone Nash, Inc*., 25 F.3d 187, 190 (3d Cir. 1994); *see also id*. at 191 (explaining that "a party's invocation of the privilege may be proper, but it does not take place in a vacuum; the rights of the other litigant are entitled to consideration as well").

If Mr. Warren carries his burden, this Court would be entitled to apply the centuries-old rule that "if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable." *Graves*, 150 U.S. at 121.

## Conclusion

This Motion should be denied as premature. Should the Court reach the merits, the Court should permit Mr. Warren to continue to preserve his right, under

appropriate circumstances, to call the Defendant or his Chief of Staff, and, once Mr. Warren establishes his *prima facie* case, the Court should draw an adverse inference from the refusal of the Defendant to offer his own testimony and that of his Chief of Staff.

Dated:  November 21, 2022

**PERKINS COIE LLP**

By:  */s/ Jean-Jacques Cabou*

Jean-Jacques Cabou (AZ #022835)*
Alexis E. Danneman (AZ #030478)*
Matthew R. Koerner (AZ #035018)*
Margo R. Casselman (AZ #034963)*
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
JCabou@perkinscoie.com
ADanneman@perkinscoie.com
MKoerner@perkinscoie.com
MCasselman@perkinscoie.com
602.351.8000

**AND**

David B. Singer (FBN 72823)
Matthew T. Newton (FBN 111679)
101 E. Kennedy Blvd., Suite 2800
Tampa, FL 33602
dsinger@shumaker.com
mnewton@shumaker.com

**DEBEVOISE & PLIMPTON LLP**

David O'Neil*
801 Pennsylvania Ave NW, Suite 500
Washington, D.C. 20004
(202) 383-8000
daoneil@debevoise.com

Alexandra P. Swain*
650 California Street
San Francisco, CA 94108
apswain@debevoise.com

Samantha B. Singh (FBN 1036051)
919 Third Avenue
New York, NY 10022
sbsingh@debevoise.com

* *Pro Hac Vice*

**ATTORNEYS FOR PLAINTIFF**

## LOCAL RULE 7.1(F) CERTIFICATE OF COMPLIANCE

I certify that this Response to Motion contains 4,432 words, with such word count incorporating all portions of this document subject to the word limitations imposed under Local Rule 7.1(F).

*/s/ Jean-Jacques Cabou*

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2022, a true and correct copy of the foregoing document was served upon all counsel of record via the Court's CM/ECF System for filing.

*/s/ Indy Fitzgerald*