# Exhibit 2

```
             IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF FLORIDA
                   TALLAHASSEE DIVISION




ANDREW H. WARREN,

       Plaintiff,
                            Case No.:  4:22-cv-302-RH-MAF
v.

RON DESANTIS, individually
and in his official
capacity as Governor
of the State of Florida,

       Defendant.
---------------------------------------------------------/




VIDEOTAPED
DEPOSITION OF:   RAYMOND TREADWELL, ESQUIRE
                 Appearing Remotely

DATE TAKEN:      October 31 2022

TIME:            8:58 a.m.

REPORTED BY:     Michele Coburn, FPR
                 Appearing Remotely from
                 Hillsborough County, Florida
```

1   Mr. Warren has gone out and made this egregious abortion
2   statement and Larry happened to have some more
3   information on Andrew Warren.  So we started, you know,
4   our own legal office review of the file.
5       Q   Okay.  Do you know if Mr. Keefe reported his
6   results directly to the governor?
7       A   I don't know.
8       Q   Do you know whether -- so you don't know how
9   the governor reacted to the results?
10      A   I am --
11          MR. LEVESQUE:  Object to form.
12      A   I am confident that once Larry brought the
13  legal office the materials that he had discovered on
14  Mr. Warren that Larry didn't have a conversation with
15  the governor except with the general counsel Ryan Newman
16  being there because this was driven by the legal office
17  once the materials came to the legal office.
18  BY MR. O'NEIL:
19      Q   What was Mr. DeSantis's -- Mr. DeSantis's
20  reaction to the results of the review?
21          MR. LEVESQUE:  Object to form.
22      A   I was not in any meeting with Governor DeSantis
23  about this matter.  I do not know his reaction.
24  BY MR. O'NEIL:
25      Q   Do you know his state of mind at the time that

```
 1   he was briefed on the results of the review?
 2           MR. LEVESQUE:  Object to form.
 3       A   Again, I was not in any of these meetings, so I
 4   don't know what the governor said.  But I -- I have to
 5   conclude that his state of mind aligned with what he
 6   signed in the executive order suspending Mr. Warren.
 7   BY MR. O'NEIL:
 8       Q   And that's an assumption.  Right?
 9           MR. LEVESQUE:  Object to form.
10       A   No.  It's not an assumption.
11           The governor has a constitutional duty to state
12   the grounds, state the reasons, tell the public what his
13   mindset is behind suspending a public official and to
14   defend those reasons before the Florida Senate.
15           So if you're -- if you're asking me did the
16   governor just make those things up, I'm going to
17   absolutely disagree with you.
18   BY MR. O'NEIL:
19       Q   Well, that's not what I asked.
20           I asked what -- if you know, all of the
21   subjective reasons in the governor's mind at the time
22   that he held his pen and signed the executive order.
23           MR. LEVESQUE:  Object to form.
24       A   The subjective reasons?
25   BY MR. O'NEIL:
```

```
 1       A    I know the official reasons that were in the
 2   executive order that the governor signed his name for,
 3   and some of those I'm sure are subjective.
 4   BY MR. O'NEIL:
 5       Q    Okay.  But you don't know all of the subjective
 6   reasons?
 7       A    What other subjective reasons are there?
 8       Q    Did you speak to the governor right before he
 9   signed the executive order?
10            MR. LEVESQUE:  Object to form.
11       A    Again, I have not spoken to the governor on
12   this matter and I did not speak to the governor on this
13   matter.
14   BY MR. O'NEIL:
15       Q    Okay.  So what you know is that the governor
16   signed an executive order stating official reasons?
17       A    Correct.
18       Q    Okay.  And that's the extent of your knowledge
19   of his subjective reasons for the order?
20            MR. LEVESQUE:  Object to form.
21       A    I'm also aware of the edits that the governor
22   made to the draft.
23   BY MR. O'NEIL:
24       Q    Okay.  Well, tell us about those.
25       A    Okay.
```

1    BY MR. O'NEIL:
2        Q   The reasons that were in his mind when he took
3    the action.
4        A   I don't know what was in the governor's mind
5    other than the fact he signed the executive order.
6        Q   Okay.  Do you know anything else about this
7    investigation?
8            MR. O'NEIL:  Actually -- I'm sorry.  Could we
9        take a five to ten-minute break?  Be very short.
10       Thank you.
11           MR. LEVESQUE:  Yes, we can.
12           THE VIDEOGRAPHER:  Going off the record.  The
13       time is 10:01 a.m. Eastern time.
14           (Recess from 10:01 a.m. to 10:08 a.m.)
15           THE VIDEOGRAPHER:  We are back on the video
16       record.  The time is 10:08 a.m. Eastern time.
17   BY MR. O'NEIL:
18       Q   All right.  Mr. Treadwell, I want to focus on
19   when you first learned of Mr. Warren.
20           When -- to the best of your recollection, when
21   did you first become familiar with the name Andrew
22   Warren?
23       A   So I would say Monday, July 18th.  Even though
24   I was emailed the story about the abortion statement at
25   the end of June, I don't -- I don't even know if I read

```
 1        Q   Do you advise Mr. Newman as to what types of
 2   cases could be, what litigation you envisioned as a
 3   result of this action?
 4        A   You know, I want to say he -- he probably
 5   brought up the potential due process challenge.
 6            We figured -- okay -- quo warranto would almost
 7   certainly be a challenge we'd get.  Neither of us at
 8   that time were thinking this was a First Amendment
 9   challenge.
10        Q   Do you know what Mr. Newman advised the
11   governor on those points?
12        A   I don't.  I do not precisely.
13        Q   Do you know how -- do you know how the legal
14   risk of proceeding factored into Mr. DeSantis's decision
15   to proceed?
16        A   I don't know how he calculated all of that.
17   But I know we felt pretty good that we would, you know,
18   withstand a quo warranto challenge and a due process
19   challenge because Mr. Warren's term is nowhere near --
20   was nowhere near close to ending.
21            MR. O'NEIL:  Okay.  Can we move forward in this
22       document.  All right.  Let's stop here.
23   BY MR. O'NEIL:
24        Q   What is this page?
25        A   This page looks like Mr. Madry's assessment of
```

1    BY MR. O'NEIL:
2       Q   -- what the basis for the decision was, whether
3    it was accurate?
4            MR. LEVESQUE:  Object to form.
5       A   Again, a lot of your questions go to the weight
6    of various evidence.  And we had this correspondence
7    here with Mr. Warren defending his blanket policy, and
8    we had Sheriff Chronister telling us that Mr. Warren had
9    a blanket policy.
10           Again, we thought this was all going to go
11   before the Senate and we were going to have to defend
12   our recommendation.
13           That being said, one of the things that I
14   considered in that first week were potential options
15   short of full-scale suspension.  I mean, one of the --
16   one of the potential courses of action here that I
17   had to wrestle with, well, you can -- you can give
18   Mr. Warren a warning and say, "Okay.  Unless you retract
19   this abortion statement you'll be suspended, or you can
20   suspend with a potential promise to reinstate if he
21   retracts the blanket policy and the abortion statement."
22           I mean, these were all things we had to
23   consider.
24   BY MR. O'NEIL:
25      Q   What was your advice as to whether to pursue

1    didn't have an obligation to put forward the exhibits
2    that supported the allegations we made in every regard,
3    and that we would have a trial in the Senate to look
4    over the evidence for and against the allegations.
5        Q   Did you believe that a court would be reviewing
6    the permissibility of the reasons that you had provided?
7        A   At the time I only thought that a court would
8    be reviewing it from the basis of a quo warranto
9    petition in terms of whether the governor has the
10   authority to suspend for these alleged reasons.
11           And so, to me, that was the only judicial
12   review that was likely to happen.
13       Q   Do you know -- I'm just asking do you know --
14       A   Yes.
15       Q   -- whether the governor would have made the
16   decision to suspend Mr. Warren based on the bike stop
17   policy and the presumption -- prosecution policy that we
18   described earlier?  Do you know whether the governor
19   would have made those -- made the same decisions based
20   solely on those documents?
21       A   So here I'm going to say probably not because
22   Ryan and I -- Mr. Newman and I probably would not have
23   recommended Mr. Warren's suspension based on those
24   documents standing by themselves.
25           It really was the abortion statement that drove

Raymond Treadwell, Esquire
October 31, 2022

```
 1    Mr. Newman and I to the point of wholly recommending
 2    Mr. Warren's suspension.
 3         Q   Do you know --
 4         A   And we --
 5         Q   I'm sorry.
 6         A   Sorry.
 7         Q   Continue.  I'm sorry.
 8         A   That's all.
 9             It was the abortion statement that -- that
10    drove us to -- to recommend the suspension and the
11    other -- the other reasons that we used to show
12    Mr. Warren has sort of a pattern or practice of
13    non-prosecution policies.
14             I mean, I don't think those extra -- extra
15    documents would have been presented to the governor
16    without the abortion statement being with them.
17         Q   So you can speak to what you would -- what you
18    think you would have done in certain circumstances.
19    Right?
20         A   That's right.  That's right.
21         Q   I asked you, do you know what decision the
22    governor would have made?  So do you know:  yes or no?
23         A   If he was presented -- if he was presented with
24    that option, I don't know.
25         Q   Do you know what decision he made if the -- if
```

Raymond Treadwell, Esquire
October 31, 2022

```
 1   this were based solely on the gender statement?
 2       A   I don't know what he would have decided on that
 3   alone.
 4       Q   Who would know the answer to that?
 5       A   It's kind of a tough hypothetical because,
 6   again, legal made the recommendation to the governor.
 7   So this -- this idea that what would have happened if
 8   legal would have made a different recommendation -- I
 9   think only the governor would know that hypothetical.
10       Q   Okay.  Would Mr. Uthmeier know?
11       A   He might -- he might serve as sort of a barrier
12   as to whether that hypothetical recommendation got to
13   the governor.  But ultimately what the governor would do
14   in that hypothetical only the governor would know.
15       Q   Okay.  You mentioned -- you referenced the Fox
16   interview by Mr. Warren.
17       A   Right.
18       Q   Okay.  And you acknowledge that Mr. Warren said
19   that any -- any decision would have to be made on its
20   facts and circumstances.  Right?
21       A   Yeah.  I don't recall if Mr. Warren said that
22   or if the news anchor was relaying Mr. Warren's words to
23   that effect.
24       Q   Well, why -- why don't we take a look at that.
25           MR. O'NEIL:  Sam, do you know which -- pull
```

1  was it relevant what Mr. Chronister thought about the
2  policy but not what the Tampa Police Department thought
3  about the policy?
4      A   I don't know if I ever really sat down and --
5  and assessed whether we should be listening to the
6  county-wide sheriff or whether we should be listening to
7  the police departments in all the municipalities.  I
8  don't -- I don't think that even crossed my mind.
9          What I did know is, okay, we have a fair amount
10 of information from Mr. Chronister combined with what
11 we're seeing in writing, both internally at Mr. Warren's
12 office and in news publications.  I thought, okay, this
13 is something that we can send to trial in the Florida
14 Senate.
15     Q   Can you direct your attention to the document
16 on screen, which I will mark on the exhibit we are on
17 right now which I think is --
18         MS. SINGH:  22.
19         MR. O'NEIL:  Sorry.  22?  Thank you.
20 BY MR. O'NEIL:
21     Q   What is this exchange?
22     A   This looks like a request for information from
23 the Hillsborough County Sheriff's Office that I had sent
24 to them.
25     Q   Why had you asked for information?

1      CERTIFICATE OF REPORTER

2

3   STATE OF FLORIDA

4   COUNTY OF HILLSBOROUGH

5        I, Michele Coburn, Florida Professional Reporter

6   and Notary Public, do hereby certify:

7        That prior to being examined the witness in the

8   foregoing proceedings was by me duly sworn to testify to

9   the truth, the whole truth, and nothing but the truth;

10       That said proceedings were taken before me

11  remotely at the time and places therein set forth and

12  were taken down by me in shorthand and thereafter

13  transcribed into typewriting under my direction and

14  supervision.

15       I further certify that I am neither counsel for,

16  nor related to, any party to said proceedings, not in

17  anywise interested in the outcome thereof.

18

19            DATED this 3rd day of November, 2022.

20

21            *Michele Coburn*
              _____
22            Michele Coburn, FPR
              Florida Professional Reporter

23

24

25