Exhibit 3

Ryan Newman
November 07, 2022

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CASE NO. 4:22-cv-302-RH-MAF

ANDREW H. WARREN,

    Plaintiff,

vs.

RON DESANTIS, individually
and in his official capacity
as Governor of the State
of Florida,

    Defendant.

                             /


REMOTE VIDEO-RECORDED DEPOSITION OF
RYAN NEWMAN
{Pages 1 - 194}

Monday, November 7, 2022
8:30 a.m. - 3:36 p.m.
U.S. Legal Support, Inc.


(Held Remotely)


Stenographically Reported By:
Deanne M. Moore, RMR, CRR, FPR, FPR-C

Ryan Newman
November 07, 2022

1  that he would take a look at and make any other

2  arrangements.

3      Q    What other sorts of arrangements?

4      A    Well, I mean, we would have to give thought --

5  if we were going to have to suspend the state attorney,

6  we would obviously have to give thought to who his

7  replacement would be, you know, and so that required

8  some work and some effort.

9           That -- that being said, you know, it was

10 always a possibility that the Governor could, you know,

11 change his mind and elect not to do this, but we were

12 given, you know, the tentative approval to do the work.

13     Q    Was there any discussion in that meeting about

14 the political implications of taking that step?

15     A    Are you talking about the meeting on the 26th?

16     Q    On the 26th.

17     A    No, the meeting was focused on whether or not

18 this was neglect of duty.

19     Q    Do you remember anything else that was said at

20 that meeting that you haven't described?

21     A    The only other thing I recall, and I can't

22 recall whether it was at this meeting or a later

23 meeting, but the Governor did express, you know, a

24 desire to, you know, have the support of law

25 enforcement.  You know, he didn't want to make his

1  decision without some confidence that -- that law

2  enforcement would support him in -- in making it.

3       Q    Why was that important to the Governor?

4       A    I -- I don't know.  That's just what I remember

5  him asking.

6       Q    What was the response?

7       A    I don't remember the response.

8       Q    What, if anything --

9       A    I mean --

10      Q    Please go ahead.  I'm sorry.

11      A    Yeah, I don't recall the response, but my -- my

12  general impression was that everybody understood that

13  there was the satisfaction about Mr. Warren from law

14  enforcement circles in Hillsborough.  Nobody was

15  really -- nobody was really concerned that law

16  enforcement would not -- in the area would not support

17  this decision.

18      Q    What work have you done to prepare for the

19  meeting with Mr. DeSantis on the 26th?

20      A    I don't really recall other than just studying

21  the -- the joint statement, perhaps refreshing my -- my

22  understanding of Florida Supreme Court's precedent on

23  prosecutorial discretion.

24      Q    Did you have -- in connection with preparing

25  for this meeting, did you have discussions with

Ryan Newman
November 07, 2022

1      Q     Other than him providing you with his comments

2   on that, did anything else -- was anything else

3   discussed?

4      A     The only other thing that probably was

5   discussed was to confirm with the Governor that Suzy

6   Lopez had agreed to be the replacement.

7      Q     By this time had the Governor definitively made

8   the decision to suspend Mr. Warren?

9      A     Yeah.  I think it's fair to say that by this

10  point, he was not going to reverse course.

11     Q     Do you know when in the process that you've

12  been describing -- in the sequence of events you've been

13  describing that the Governor went in his mind from

14  tentative to definitive?

15     A     Not precisely.  It was just apparent from --

16  you know, from the beginning of the week when we came

17  back after the weekend on August 1st that -- that he was

18  going to be fine with this course of action.

19     Q     Did you speak with the Governor about what he

20  would decide to do -- what -- what he would have decided

21  if he had the same -- same documents that we've

22  discussed, but -- but no office policies of -- of

23  Mr. Warren, so no bike policy no presumptive

24  non-prosecution policy.

25          Did you ask the Governor about what he would

Ryan Newman
November 07, 2022

1  decide if those policies were not part of the picture?

2          MR. LEVESQUE:  Object to form.

3      A     Not a specific discussion about that.

4      Q     Did you have a discussion with the Governor

5  about what he would decide to do if the only fact

6  supporting the suspension were the -- the abortion

7  statement?

8      A     If the only fact were the abortion statement,

9  the entire joint abortion statement?

10     Q     Yeah, did you have -- if -- did you have a

11  discussion with the Governor, what would you do if -- if

12  the only fact were the abortion statement?

13          MR. LEVESQUE:  Object to form.

14     A     No.  I mean, we didn't discuss those kind of

15  hypotheticals.

16     Q     Okay.  So did you have a discussion with the

17  Governor about what he would do if there were no

18  abortion statement but all the other policies were

19  there?

20     A     Not that specific discussion.

21     Q     Okay.  Did you speak with the Governor about

22  what he would do -- what he would decide if there were

23  only the gender affirming care statement?

24     A     No, not -- not specifically.  But just to point

25  out that we were presenting the Governor with this

Ryan Newman
November 07, 2022

1    option.  It's not as though, you know, he -- he was

2    reaching out to us for a particular outcome.

3            But presented it to him, and we provided the

4    grounds for it, and he ultimately agreed with what we

5    were recommending.

6        Q    Yeah.  My question is whether you had

7    discussions with him about, you know, what would happen

8    if there were some grounds but not others and various

9    hypotheticals that, you know, if certain grounds were

10   removed, what would happen.

11           MR. LEVESQUE:  Object to form.

12       A    No, because we didn't expect -- we didn't

13   expect that we would lose on --

14           THE COURT REPORTER:  I'm sorry, you would lose

15       on the what?

16           THE WITNESS:  ^ on a Quoranto (phonetic)

17       action.  That's normally the process for challenging

18       a Governor's suspension authority in the -- in the

19       State of Florida.

20   BY MR. O'NEIL:

21       Q    Did you have a discussion with the Governor

22   about what he would decide if Mr. Warren had made -- had

23   signed the abortion statement, but he were a political

24   ally of the Governor.  Did you have a discussion with

25   him about that?

Ryan Newman
November 07, 2022

```
 1            THE WITNESS:  I'm sorry.
 2            MR. O'NEIL:  I think what's going on is there's
 3      a bit of a delay.  I think because Mr. Newman is on
 4      Mr. Levesque's line, I think that's what's
 5      happening.  We'll try to -- we'll try to stop the
 6      crosstalk.
 7  BY MR. O'NEIL:
 8      Q    Mr. Newman, what did you do to determine
 9  whether the rationale for Mr. Warren allowing his name
10  to be added to the abortion statement was his views of
11  the constitutionality of laws limiting abortion?
12            MR. LEVESQUE:  Object to the form.
13      A    I -- I read his joint statement.
14      Q    Did you do anything else?
15      A    No.
16      Q    Did the Governor explain to you what the
17  purpose was of adding this language in the middle of the
18  page about the nature of the apportion procedure and its
19  effect on the fetus; did he explain why he wanted to add
20  that?
21            MR. LEVESQUE:  Object to the form.
22      A    No, he didn't -- he didn't explain.  He just
23  asked -- he just asked that I add it.
24      Q    You don't know what motivated him to add that?
25      A    No.
```

Ryan Newman
November 07, 2022

1     Q     He -- and what did -- did he separately explain
2  that edit, "put before abortion"?
3     A     No.  He was just explaining to me how he saw
4  the order -- you know, the progression of the executive
5  order.
6     Q     And did he explain the edits in the paragraph
7  above that?
8     A     No.  I mean, most of our discussion was him
9  just telling me what he wanted the edits to be, but then
10 I think when he realized I couldn't keep up, he just
11 handed this to me.  So he didn't necessarily give a
12 reason for every single edit that he made.
13    Q     And where he didn't give a reason, you don't
14 know why -- the reason for those edits?
15    A     No.
16          MR. O'NEIL:  Can we go to tab 46 and mark it as
17       exhibit whatever Sam tells me what number we're on.
18          MS. SINGH:  14.
19          MR. O'NEIL:  14?
20          MS. SINGH:  Correct.
21          MR. O'NEIL:  Thanks.
22          (Exhibit 14 was marked for identification.)
23 BY MR. O'NEIL:
24    Q     Let me go through this with Mr. Newman so he
25 knows what this document is.

Ryan Newman
November 07, 2022

```
 1                 CERTIFICATE OF REPORTER

 2    STATE OF FLORIDA

 3    COUNTY DUVAL

 4          I, Deanne M. Moore, RMR, CRR, FPR, FPR-C certify

 5    that I was authorized to and did stenographically report

 6    the deposition of RYAN NEWMAN, pages 1 through 190; that

 7    a review of the transcript was requested; and that the

 8    transcript is a true record of my stenographic notes.

 9          I further certify that I am not a relative,

10    employee, attorney, or counsel of any of the parties,

11    nor am I a relative or employee of any of the parties'

12    attorneys or counsel connected with the action, nor am I

13    financially interested in the action.

14          Dated this 8th day of November, 2022.

15

16

17

                  Deanne M. Moore, RMR, CRR, FPR, FPR-C
18

19

20

21

22

23

24

25
```