IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

ANDREW H. WARREN,

                Plaintiff,                Case No. 4:22-cv-302-RH-MAF

v.

RON DESANTIS, individually and in
his official capacity as Governor of the
State of Florida,

                Defendant.

_____

**PLAINTIFF'S TRIAL BRIEF**

"Under our system of government, counterargument and education are the weapons available to expose [perceived errors in an elected official's speech], not abridgment of the rights of free speech and assembly." *Wood v. Georgia*, 370 U.S. 375, 389 (1962). By suspending Andrew Warren from his duly elected office because of disagreement with the content and viewpoints of Mr. Warren's protected speech, Defendant Ron DeSantis trampled on this fundamental principle and violated Mr. Warren's rights under the First Amendment. Mr. Warren will prove at trial that he is entitled to reinstatement to the office voters twice elected him to hold.

The key issue for trial is "why the governor suspended Mr. Warren." [11/10/2022 Hr'g Tr. at 19:3] While Defendant will neither appear at trial during Mr. Warren's case-in-chief nor voluntarily testify in support of his own affirmative defense, Defendant has already amply established that his reasons were impermissible. For example:

- In the Executive Order suspending Mr. Warren, Defendant explained that he suspended Mr. Warren because "he signed a 'Joint Statement' . . . in support of gender-transition treatments . . ." (the "Gender Statement") and because "Warren signed a 'Joint Statement'" opposing the criminalization of certain abortions (the "Abortion Statement") (collectively, the "Joint Statements"). [Joint Trial Exhibit ("JEX") 3 at 3 & 6]

- The Executive Order quotes extensively from the Joint Statements and attaches copies of them.

- In his rally-like press conference announcing the suspension to a curated room of supporters on August 4, 2022, the Governor reiterated that he suspended Mr. Warren because "he signed [these] letter[s]." [JEX 8]

- In an interview with Fox News the same day, Defendant again stated he suspended Mr. Warren because "he actually signed letters saying he wouldn't enforce laws against transgender surgeries for minors" and "laws protecting the right to life." [JEX 10]

In fact, Defendant's lawyers have already *conceded* in this Court that Mr. Warren's protected speech—the Joint Statements—was a critical motivating factor in Defendant's decision to suspend. In his Motion for a Protective Order, Defendant said that he should not be deposed because his "motives [for the suspension] are fully expressed within the four corners of the suspension order." [Doc. 91 at 14] Those motives include the protected speech contained in the Joint Statements. [*See, e.g. also* Ex. 1 (10/31/2022 Dep. Tr. of Raymond Treadwell ("Treadwell Dep.") at 167:21-23) ("Q: And one of the reasons was the -- Mr. Warren's signature on the gender-affirming statement letter? A: That's right."); *id.* at 233:18-19 ("[T]he abortion statement was central to the reasoning of our recommendation [to suspend Mr. Warren].")] Accordingly, Mr. Warren will carry his *prima facie* burden at trial.

Defendant cannot counter that straightforward conclusion through a "same-decision" affirmative defense. [Doc 73, ¶ 135; *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) (explaining that the defendant has the burden to show that he "would have reached the same decision … even in the

absence of the protected conduct")] The evidence will not support Defendant's insistence that he cared only about Mr. Warren's "conduct," not the speech in the Joint Statements. Of course, the one witness who could speak directly to that issue, Defendant himself, has refused to testify about it. And the remaining evidence will support a conclusion that the viewpoints Mr. Warren expressed were inseparable from Defendant's decision to suspend him. That evidence will point in the same direction as common sense: Defendant never would have seized on the "law-unto-himself" rationale to suspend an elected official who made similar statements that aligned with Defendant and supported his defining political positions. *See United States v. Stanchich*, 550 F. 2d 1294, 1300 (2nd Cir. 1977) (Friendly, J.) (explaining that the court is "not required to exhibit a naiveté from which ordinary citizens are free").[1]

The evidence at trial will show what Mr. Warren explained at the preliminary injunction hearing: Mr. Warren—just like Professor Julian Bond—has been "excluded from his elected seat … [b]ecause of what he said" and because what he said is "different from what [another elected official] believes and approves of." [9/19/2022 Preliminary Injunction Hr'g Tr. at 4:2-11] The evidence at trial will further show that even the lawyers in the Governor's Office charged

---

[1]  At best, the evidence may show that Defendant suspended Mr. Warren because Defendant disagreed not just with the specific viewpoints expressed in the Joint Statements, but also more broadly with Mr. Warren's political views and stances, which Defendant views as "liberal," "Democrat," and "woke." That is obviously not a reason that the U.S. Constitution (or Florida law) tolerates for excluding an elected official like Mr. Warren from his duly elected office. *See Velez v. Levy*, 401 F.3d 75, 95–98 (2d Cir. 2005).

with papering Mr. Warren's suspension never considered the (obvious) First Amendment problems with suspending Mr. Warren because of the Joint Statements. Naturally, then, none of these lawyers will be able to tell the Court that Defendant would have suspended Mr. Warren even if Mr. Warren *hadn't* signed the Joint Statements (or engaged in other protected speech). In fact, the evidence will establish the opposite: without the Joint Statements and the viewpoints they expressed, Mr. Warren never would have been suspended.

Based on conclusive evidence establishing his *prima facie* case and with little if any evidence to support the Governor's same-decision defense, Mr. Warren will ask the Court to enforce, by issuing a permanent injunction, "the limits of state power regarding freedom of speech and expression" and to protect an elected official who has been retaliated against on this basis. *Wood*, 370 U.S. at 386.

# I.    The Legal Standards Governing this Case are Familiar and Well-Established.

As this Court explained, the elements of Mr. Warren's First Amendment claim "are (1) speech or activity protected by the First Amendment, (2) an adverse action, and (3) a causal connection between the protected speech or activity and the adverse action." [Doc. 68 at 9–10 (collecting cases, including *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005))][2]

---

[2] Defendant may argue that the controlling legal framework is something new and different. While Defendant's exact proposed framework is not yet clear, it appears Defendant thinks Mr. Warren must make an additional "threshold showing" that the Governor lacked "probable cause" to suspend Mr. Warren from office. [Pretrial Stipulation at 7 (citing *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019)); *see also* Doc. 73, ¶ 134 ("Plaintiff also fails to state a valid claim for relief because Defendant's Executive Order is presumed correct and proper, and Defendant had good cause to

## II.    Mr. Warren Will Readily Prove his Case.

Mr. Warren will present evidence readily proving the *prima facie* elements of First Amendment retaliation, specifically that there was: "(1) speech or activity protected by the First Amendment, (2) an adverse action, and (3) a causal connection between the protected speech or activity and the adverse action." [Doc. 68 at 9–10 (collecting cases, including *Bennett*, 423 F.3d at 1250)][3]

### A.    The Joint Statements—which express opinions on hot-button political issues—are quintessential protected speech.

Mr. Warren will establish the first element because, as an elected official with the right and indeed the "obligation to take positions on controversial political questions," Mr. Warren spoke out on issues at the core of First Amendment protection. *Bond v. Floyd*, 385 U.S. 116, 136–37 (1966). The Supreme Court confirmed this bedrock principle as recently as this year, reaffirming that "[t]he

---

suspend Plaintiff. *See United States v. Chemical Foundation*, 272 U.S. 1, 14–15 (1926); and *Nieves v. Bartlett*, 139 S. Ct. 1715, 1728 (2019).")] Not so. This is not a retaliatory arrest or prosecution case and no such requirement exists. Indeed, in *Nieves* itself Chief Justice Roberts explicitly distinguished between cases like Mr. Warren's, where, under *Mt. Healthy*, "establishing the causal connection between a defendant's animus and a plaintiff's injury is straightforward" and "retaliatory [arrest and] prosecution claims, [where the Supreme Court] adopted the requirement that plaintiffs plead and prove the absence of probable cause for the underlying criminal charge." 139 S. Ct. at 1722, 1723.

[3]   The parties have also stipulated to the facts establishing Mr. Warren's standing to bring this case. This includes that Mr. Warren is the State Attorney, that Defendant, the Governor, suspended him through an executive order, and that Mr. Warren has thus been deprived of the benefits of his office. [*See* Pretrial Stipulation at 1–2 (Stipulated Facts 1–9)] And the parties have stipulated that Defendant was acting under color of state law. [*See id.* at 5 (Stipulated Legal Issue 7)]

First Amendment surely promises an elected representative like Mr. [Warren] the right to speak freely on questions of government policy." *Houston Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1261 (2022).

In June 2021 and June 2022, Mr. Warren, along with dozens of other elected officials from across the nation, joined two "Joint Statements" authored by Fair and Just Prosecution. [*See* JEX 4, JEX 5] These Joint Statements "are chock full of statements of opinion constituting core political speech." [Doc. 68 at 10] Specifically, they express views and opinions on hot-button topics currently subject to public debate: abortion and gender-affirming healthcare. This speech is "at the core of activity protected by the First Amendment." *Beckwith v. City of Daytona Beach Shores, Fla.*, 58 F.3d 1554, 1564 (11th Cir. 1995).

Defendant apparently intends to relitigate this Court's conclusions about the inapplicability of *Garcetti v. Ceballos*, 547 U.S. 410 (2006), and its progeny. [*See* Doc. 73, ¶ 132] This argument is as wrong now as it was when the Court rejected it before: "*Garcetti* does not help the Governor for two reasons." [Doc. 68 at 13–16] First, *Garcetti* does not apply to elected officials. Second, the speech, the signing of the Joint Statements, was not part of Mr. Warren's "official duties." [*See id.* at 16]

### B.    Defendant took adverse action against Mr. Warren by excluding him entirely from the office Mr. Warren was twice elected to hold.

Defendant has never disputed that Mr. Warren satisfies the second element of an "adverse action." [*See* Pretrial Stipulation at 5 (Stipulated Legal Issue 9)] Mr. Warren has been forcibly excluded, indefinitely, from performing any function,

and receiving any benefit, of the office that he was elected by voters to hold. [JEX 3 at 9–10] It is hard to imagine a more significant adverse action in this context. *See Wilson*, 142 S. Ct. at 1263 (explaining that "exclu[ding]" an elected official "from office" "implicate[s] not only the speech of an elected official, [but] also . . . the franchise of his constituents").

### C.   There is a causal connection between Mr. Warren's protected speech and the suspension.

Mr. Warren will prove that "there is a causal connection between the retaliatory actions and the adverse effect on speech." *Bennett*, 423 F.3d at 1250. Specifically, the evidence, much of it undisputed, will establish Defendant suspended Mr. Warren in retaliation for his protected speech in the Joint Statements. This is plain from the face of the Executive Order. It quotes from the Joint Statements, it says that they provide grounds for suspension, and then it attaches them. [JEX 3 at 3 & 6]

The Executive Order, alone, establishes the causal connection. In addition to that, since signing the Executive Order, Defendant has confirmed over and again the causal connection between the Joint Statements and Mr. Warren's suspension. On the very morning of August 4th, in his press conference announcing the suspension, the Governor reiterated that he suspended Mr. Warren because "he signed [these] letter[s]." [JEX 8] Then, in an interview with Fox News the same day, Defendant told Tucker Carlson that he suspended Mr. Warren because "he actually signed letters saying he wouldn't enforce laws against transgender surgeries for minors" and "laws protecting the right to life." [JEX 10]

Still more, Defendant's senior advisors and staff lawyers will make clear through their testimony that the Joint Statements and the views they espouse motivated the suspension. Unless they recant their sworn deposition testimony, the three "high-ranking officials primarily responsible for developing the suspension order … his General Counsel Ryan Newman; his Chief Deputy General Counsel Raymond Treadwell; and his Senior Advisor for Public Safety Larry Keefe" (Doc. 107 at 9–10 (cleaned up)) will all testify that Mr. Warren's suspension was driven by the Joint Statements. Mr. Newman will testify, for example, that the Gender Statement "was definitely a reason provided" for Mr. Warren's suspension. [Ex. 2 (11/7/2022 Dep. Tr. of Ryan Newman ("Newman Dep.") at 116:5-22)] Mr. Treadwell will testify that "[e]ven though there was no Florida Statute prohibiting transgender treatments, it still -- that joint statement still reflected [Mr. Warren's] incompetence [and thus was grounds for suspension]." [Ex. 1 Treadwell Dep. at 126:2-4] And he will testify "emphatically that it was the abortion statement that drove our recommendation [to suspend Mr. Warren] across the goal line." [*Id*. at 167:13-15] Finally for now, Mr. Keefe will testify that he "spent lots of time looking at these two joint statements and others, and … there is significant consequences to the order and structure of the State of Florida to have a state attorney making these statements." [Ex. 3 (10/19/2022 Dep. Tr. of Larry Keefe ("Keefe Dep. Vol. 1") at 114:13-18)]

Here, as in "many cases, 'establishing the causal connection between a defendant's animus and a plaintiff's injury is straightforward,' and courts may take 'the evidence of the motive and the [defendant's wrongdoing] as sufficient for a

circumstantial demonstration that the one caused the other.'" *Boquist v. Courtney*, 32 F.4th 764, 777 (9th Cir. 2022) (alteration in original) (quoting *Nieves*, 139 S. Ct. at 1722); *see also Hartman v. Moore*, 547 U.S. 250, 260 (2006) (collecting free speech retaliation cases where courts "have simply taken the evidence of the motive and the discharge as sufficient for a circumstantial demonstration that the one caused the other" and discussing, among other cases, *Mt. Healthy*).

The causal connection here is supported by evidence that Defendant has expressed strong opposition to the viewpoints expressed in the joint statements. For instance, Mr. Warren, a registered Democrat, will prove at trial that he and Defendant, a registered Republican, have both been outspoken on abortion rights and transgender rights. They have contrary views on both issues. [*Compare, e.g.*, JEX 45 (Warren statement on overturning *Roe v. Wade*) *with* JEX 46 (DeSantis statement), both attached as Ex. 4]

And they disagree on other controversial issues. To name one prominent example and as Mr. Warren's testimony, among other evidence, will establish, during the COVID-19 pandemic, Mr. Warren prosecuted a pastor who was arrested by Sheriff Chad Chronister for holding packed services in violation of a county public health order. [Doc. 1 ¶ 50] Shortly after that, Defendant intervened by signing an order retroactively authorizing the services (*see* Doc. 1 ¶ 50 & Doc. 73 ¶ 51), a move Mr. Warren called "weak" and "spineless" (*see id.* ¶ 52). Similarly, Mr. Warren was an outspoken critic of HB 1, criticizing it as, among other things, a solution in search of a problem and as "undermin[ing] 1st Am freedoms of

speech and assembly." [*Id.* ¶ 54] For his part, Defendant "signed HB1, considered it a priority, and held a press conference to announce the same." [Doc. 73, ¶ 53]

On the subject of criminal prosecution, the evidence will also show that Defendant and Mr. Warren were ideological opponents and Defendant disagreed with Mr. Warren's viewpoints on criminal justice. Mr. Warren ran for office, and then delivered while in office, on a platform of progressive prosecution policies, one of which was the Bike Stop Policy. As the policy says, and as Mr. Warren and others will confirm at trial, it was borne of efforts by the Racial Justice Work Group, formed in October 2020, to "address issues of racial disparity as part of [the State Attorney's Office] mission to improve public safety while ensuring justice and fairness for our citizens." [JEX 23 at 1] Using more than two years of data from researchers at Florida International University's Center for the Administration of Justice, the Group found "that bicycle and pedestrian stops disproportionately burden Black citizens of Hillsborough County." [*Id.*] Thus Mr. Warren instituted the Bike Stop Policy.

The evidence at trial will show that because of this policy and for other reasons including the Joint Statements, the Governor has described Mr. Warren as a "woke idealogue masquerading as a prosecutor." [JEX 44 at 3] In contrast, Defendant's staff will testify, and Defendant's own media statements confirm, that the Governor is "anti-woke." [*E.g.*, Ex. 5 (10/18/2022 Dep. Tr. of Christina Pushaw at 208:1-3); *see also* Ex. 2 (Newman Dep. at 180:3-6, 180:7-14) (confirming Governor advocates against woke viewpoints)] The Governor has

even termed Florida "the place woke goes to die." [Plaintiff's Trial Exhibit "PEX" 23]

Mr. Warren's burden to establish a *prima facie* case of retaliation "is not a heavy one," *Beckwith*, 58 F.3d at 1564, and the evidence presented at trial will more than carry it. *See Boquist*, 32 F.4th at 776.

### III. The Governor Cannot Establish He Would Have Suspended Mr. Warren Without the Protected Speech Nor Can He Otherwise Excuse His Retaliatory Conduct.

To overcome Mr. Warren's showing that the Joint Statements were not the cause of the suspension, Defendant must prove "that even without the impetus to retaliate he would have [suspended Mr. Warren]." *Hartman v. Moore*, 547 U.S. 250, 260 (2006). Defendant cannot carry that burden.

In support of this defense, Defendant argues only that he would have suspended Mr. Warren in the absence of his retaliatory motive arising from the Joint Statements because of Mr. Warren's "blanket refusal not to enforce certain Florida laws." [Doc. 30 at 17] That assertion will fail at trial for multiple reasons.

### A. Defendant has Decided to Forego the Key Evidence For his Affirmative Defense.

As a threshold matter, Defendant has the burden to prove this affirmative defense. Defendant has waived his right to offer his own testimony in this case. [*See* Doc. 107] And only the Governor knows what was in his mind and what he would have done in the absence of Mr. Warren's protected speech, including that contained in the Joint Statements.

Defendant cannot carry this burden, as he has suggested, through testimony of his staff. Indeed, each of these witnesses has already admitted under oath that he does not know what was in Defendant's mind when he suspended Mr. Warren. [Ex. 6 (11/4/2022 Dep. Tr. of Larry Keefe ("Keefe Dep. Vol. 2") at 118:23-25); Ex. 1 (Treadwell Dep. at 58:4-5); Ex. 2 (Newman Dep. at 91:11-15)]

As the testimony at trial will confirm, none of the Governor's senior advisors knows, and without the Governor there will be no evidence of, what the Governor would have done in the absence of the Joint Statements. Consistent with their depositions, the Governor's senior advisors will have little if any knowledge about what the Governor would have done in the "hypothetical" situation where one or both Joint Statements didn't exist or expressed different viewpoints. Mr. Newman will testify that he and the Governor "didn't discuss those kind of hypotheticals." [Ex. 2 (Newman Dep. at 92:4-15)] When questioned about what the Governor would have done in the absence of the Joint Statements, Mr. Keefe is expected to confirm that he doesn't "know what thoughts lie in the Governor's mind relative to Mr. Warren." [Ex. 6 (Keefe Dep. Vol. 2 at 118:23-25)]

For his part, when asked what the Governor would have done in the absence of the Joint Statements, Mr. Treadwell is expected to testify, consistent with his deposition, that he "think[s] only the governor would know that hypothetical." [Ex. 1 (Treadwell Dep. at 174:25-175:9)] In fact, Mr. Treadwell "did not speak to the [G]overnor on this matter [of Mr. Warren's suspension]." [*Id.* at 56:11-13]

But, even though he never spoke to the Governor about Mr. Warren, Mr. Treadwell can and will confirm that without the Joint Statements, the suspension

would never have happened. Mr. Treadwell will explain that the Governor would not have made the same decision in the absence of the Joint Statements "because Ryan and I -- Mr. Newman and I probably would not have recommended Mr. Warren's suspension based on [the Bike Stop Policy and the Low-Level Offense Policy] standing by themselves." [*Id.* at 173:15-24] Even without the heap of other evidence preventing the Governor from establishing his same-decision defense, this commendably candid testimony alone is enough to bar Defendant from carrying the burden he bears under *Mt. Healthy.*

### B.     Defendant's Purported Rationale is False and Pretextual.

As even the most basic due diligence would have demonstrated, the purported "blanket refusal" rationale is false, and Defendant could not reasonably have believed otherwise. Mr. Warren had a policy, both in writing and in practice, of exercising prosecutorial discretion in every case and on every case's unique facts. And the evidence will establish that the vaunted "thorough" statewide "investigation" by which Defendant reached his decision was not even an investigation, much less a thorough one.

#### 1.     There Was No Blanket Policy Refusing to Prosecute Anything.

Mr. Warren and others will testify, and he has always made clear, that he looked at every case on its individual facts. The documentary record and the testimony of high-ranking, career prosecutors in his office will confirm this fact. In December 2021, Mr. Warren issued a memorandum regarding "Prosecutorial Discretion and the Mission of Criminal Justice" to all Assistant State Attorneys in

the office to codify his prior instructions regarding the appropriate exercise of prosecutorial discretion. [JEX 7] In it, Mr. Warren stated: "[c]ase-specific review is a hallmark of our criminal justice system" and "[i]n every case, ASAs must exercise discretion based on the facts of that case." [*Id.* at 2] That memorandum applied across all cases and all contexts.

Chief Assistant State Attorney Jeria Wilds will corroborate this practice, testifying consistent with her deposition, that "the use of discretion on a case-by-case basis and at every stage of cases [is] the procedure of the state attorney's office under Mr. Warren." [Ex. 7 (10/24/2022 Dep. Tr. of Jeria Wilds ("Wilds Dep.") at 56:20-23)] She will also confirm that prosecutors under Mr. Warren understood that "we have to use our discretion in every case." [*Id*. at 71:18-19]

The Governor and his staff knew about this when the Governor signed the suspension order. [*E.g.*, Ex. 3 (Keefe Dep. Vol. 1 at 54:8-20, 61:2-11); Ex. 1 (Treadwell Dep. at 70:10-19); Ex. 2 (Newman Dep. at 97:1-5)] Mr. Newman, in fact, is expected to testify not only that he recalled reviewing the December 2021 Memorandum Regarding Prosecutorial Discretion, but also that he "didn't have any objections to this particular document" [Ex. 2 (Newman Dep. at 98:4-6)] and that "it is evidence that Mr. Warren does understand what case specific individualized discretion is." [*Id*. at 100:17-19]

Further, the actual policies of Mr. Warren's office that are referenced in the Executive Order—the Bike Stop and Low-Level Offense Policies—themselves evidence Mr. Warren's direction that charging decisions must be made on a case-by-case basis. Neither the Bike Stop Policy nor the Low-Level Offense Policy is a

"blanket" policy of non-prosecution. [JEX 23 (referencing "presumption"; JEX 24 (same)] And, the evidence will show that Mr. Warren's office did prosecute cases after these policies took effect. [Ex. 7 (Wilds Dep. at 36:12-14)]

In contrast to these official edicts, the Joint Statements were not policies of Mr. Warren's office; they were just what their titles confirm – joint statements. The evidence at trial will establish that the Joint Statements were not authored in any part by Mr. Warren, and neither statement references any Florida law. In fact, the Gender Statement was joined by 74 individuals from 27 states and Washington, D.C., as well as two organizations. [Pretrial Stipulation at 3 (Stipulated Fact 20)] And the Abortion Statement was joined by 92 individuals from 30 states, Washington D.C., and the Northern Mariana Islands. [*Id.* (Stipulated Fact 21)]

Senior prosecutors in the State Attorney's Office will confirm that the Joint Statements were not policies of the Office–indeed they were not even known to exist. For example, Chief Assistant State Attorney Wilds is expected to testify that she first "learn[ed] of the letter written by FJP on the subject of gender-affirming care" "[w]hen [Mr. Warren] was suspended." [Ex. 7 (Wilds Dep. at 53:4-11)] That letter was never discussed at the Office Executive Committee; it was never the subject of training within the Office; and it was never distributed by Mr. Warren (or anyone else) within the Office. [*Id.* at 53:15-54:9] Similarly for the Abortion Statement, Ms. Wilds did not even know it existed prior to her deposition in this matter. [*Id.* at 54:10-13] She will confirm that it was not distributed within the Office, was not a subject of any training within the Office, was not discussed at the Office Executive Committee, and was not "a policy of the state attorney's office."

[*Id*. 55:21-56:14] Indeed, Ms. Wilds will testify that prior to her deposition in this matter she, a Chief Assistant State Attorney, "ha[d] never seen either [of the Joint Statements before]." [*Id*. at 55:8-14]

In any event, the Joint Statements do not reflect any expressed "blanket decision not to enforce certain Florida laws," and even the Defendant's own staff knew that Mr. Warren had unequivocally stated he had no such blanket policy. [Doc. 30 at 17] As the Executive Order recognized, Florida does not have any criminal laws related to gender affirming healthcare. [JEX 3 at 3] And the Abortion Statement does not mention or cite a single Florida law. Furthermore, mere days after the Joint Statement was issued, Mr. Warren himself, in a June 28, 2022 interview known to Defendant's staff and *originally cited in a draft of the Executive Order*, made unequivocally clear "that prosecution of abortion crimes 'depends again on the facts and circumstances of every case.'" [JEX 26 (quoting June 28, 2022 FOX 13 Tampa interview with Andrew Warren)]

### 2.   The "Investigation" That Concluded Otherwise Was Pretextual and Unreasonable.

The evidence at trial will show that even though Defendant told Tucker Carlson, on the day of the suspension, that "we did a thorough review" [JEX 10] of prosecutors around the state, that was false. The evidence will show that the man in charge of it, Larry Keefe, didn't "call what [he] did to be an investigation of Andrew Warren. It was simply a process of looking into a situation[.]" [Ex. 6 (Keefe Dep. Vol. 2 at 39:19-21)] Mr. Keefe will similarly confirm that his work "was not … a systematic, methodical investigation …. [He] was collecting

[information from law enforcement] on an ad hoc basis in the general course of doing [his other] work." [Ex. 3 (Keefe Dep. Vol. 1 at 23:2-14)] The evidence will be unequivocal not only that Mr. Keefe's work "was not an investigation" [*Id*. at 28:23] but also that he "did not speak to Mr. Warren" during the course of his "ad hoc" collection of information, and that he did not "speak to any attorneys in the State Attorney's Office in the 13th [Circuit]." [*Id*. at 42:19-20; 62:2-8]

Had Defendant asked Mr. Warren, or anyone in Mr. Warren's office, about any of this, he of course would have quickly learned that Mr. Warren exercised discretion in every case, that the Joint Statements were unknown to most ASAs in his Office, that, as is obvious because few if any ASAs knew about them, the Joint Statements were not policies of the Office and that, therefore, there was no basis to suspend Mr. Warren. Of course, Defendant didn't make any such inquiries in his slipshod "look around the state" (Ex. 6 (Keefe Dep. Vol. 2 at 128:19-23)) to find a problem for which his staff had an "aggressive" (Ex. 2 (Newman Dep. at 72:21-73:4)) solution at the ready.

Thus, should Defendant try to argue through his lawyer-witnesses that he is excused from his constitutional tort because he *believed* (even if erroneously) Mr. Warren had a blanket policy, that argument too, must fail. The Supreme Court decades ago foreclosed the argument that an unconstitutional retaliation for protected speech can be excused by "an erroneous and unreasonable belief about what plaintiff said." *Waters v. Churchill*, 511 U.S. 661, 678 (1994) (J. Souter concurring). Where, as here, a plaintiff carries his *prima facie* burden to show retaliation for protected speech, any excuse about "belief" for that retaliation must

be based on an "objectively reasonable" investigation. *Id.* at 682; *see also id.* at 677 (holding that "it may be unreasonable for an employer to act based on extremely weak evidence when strong evidence is clearly available—if, for instance, an employee is accused of writing an improper letter to the editor, and instead of just reading the letter, the employer decides what it said based on unreliable hearsay").

Applying *Waters,* and as particularly relevant in light of Mr. Keefe's non-investigation, retaliatory conduct cannot be justified by even a mistaken belief "without at least asking [the speaker] what she said" because this basic failure to conduct even a minimally competent inquiry means that "the indispensable investigation into whether … speech was protected will not be reasonable." *Cutler v. Stephen F. Austin State Univ*., 767 F.3d 462, 475 (5th Cir. 2014) (applying and quoting *Waters,* 511 U.S. at 677, for, among other things, the proposition that "[i]t is necessary that the decisionmaker reach its conclusion about what was said in good faith, rather than as a pretext").

Here, Defendant and his office made no attempt to understand or identify Mr. Warren's actual policies or practices. Indeed, there is evidence that the Defendant's staff recognized they did not understand what Mr. Warren's policies were, considered asking Mr. Warren for clarification, and then decided not to because, they claim, it would have delayed their announcement of his suspension. [PEX 20 (draft letter to Mr. Warren)] Should Defendant argue that his retaliatory conduct against Mr. Warren is excused because, even if mistaken, he *believed* Mr. Warren had a blanket policy of non-prosecution, that defense must be rejected.

Even if Defendant could, in his own absence, establish what he believed and that he believed there was a blanket policy, the process by which that belief was formed was constitutionally unreasonable and pretextual. *See, e.g.*, *Waters*, 511 U.S. at 677.

### C.   The Viewpoints and Content of Mr. Warren's Speech Influenced Every Step of the Process Leading to Suspension.

To establish a same-decision defense, Defendant needs to show, among other things, that he would have suspended any elected official who made statements that sounded to him like a "blanket refusal" to enforce certain laws, even if that official were a political supporter and even if Defendant agreed with the official's viewpoint on the law at issue. That he cannot do.[4]

To the contrary, the evidence will show that at each step of the process that resulted in Mr. Warren's suspension, Defendant and his subordinates treated Mr. Warren differently precisely *because* of their disagreement with his viewpoints and his association with those whom they considered political and ideological foils. That viewpoint discrimination is why Defendant and his staff set their sights on Mr. Warren as a "Soros prosecutor[]." [*E.g.*, JEX 10 (Tucker Carlson asking Defendant: "Why did you do it?")] It is why Defendant and his staff, as described

---

[4]   Also among the things Defendant would have to show, and also among the things he cannot show, would be that the basis of any proffered same-decision defense would itself be constitutionally adequate for suspension. *See.* Fla. Const. art. IV, § 7(a); *see* also *Abusaid v. Hillsborough Cnty. Bd. of Cnty. Comm'rs,* 405 F.3d 1298, 1307 (11th Cir. 2005) (Governor's suspension power under Article IV "applies only in extraordinary circumstances"). After all the Governor legally *could not* make the same decision unless the reason for that decision, too, fell within his constitutional powers.

above, rushed to conclusions about Mr. Warren's policies without contacting anyone in his office or engaging in any genuine effort to find out what those policies actually were. And it is why Mr. Warren's words resulted in suspension while an elected conservative sheriff who supports Defendant drew no attention at all when he pledged not to enforce a firearms registration law. [*E.g.*, Ex. 2 (Newman Dep. at 133:2-134:15) (while familiar generally with the matter of Sheriff Lemma's statement that he would not enforce a proposed constitutional amendment restricting gun ownership, Mr. Newman did not "even recall the specifics" of the matter and testified that the propriety of such a statement and its potential basis for gubernatorial suspension "would depend on the circumstances" and "the particulars of the [Sheriff's] policy")]

Defendant cannot plausibly assert, and at trial will fail to prove, that he would have suspended Mr. Warren solely for purported "conduct" regardless of Defendant's views on the issues, the speaker, or the political context.

## IV.   Mr. Warren Will Establish His Entitlement to a Permanent Injunction.

As set forth above, Mr. Warren will establish that his First Amendment rights have been violated. He is entitled to an injunction to remedy that violation. Absent an injunction, Mr. Warren will continue to suffer at least two irreparable harms: (1) removal from his public office and (2) loss of his First Amendment freedoms. *See Caudell v. City of Toccoa*, 153 F.Supp.2d 1371, 1381 (N.D. Ga. 2001) (noting that "[r]emoval from office is not the type of injury which can be compensated monetarily") (alteration in original) (quoting *Hunt v. City of Longview*, 932 F.Supp. 828, 842 (E.D. Tex. 1995), *aff'd* 95 F.3d 49 (5th Cir.

1996))); *see also KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) (noting that loss of First Amendment rights is irreparable injury).

Further, the balance of equities and public interest favor this result. Indeed, "[t]he vindication of constitutional rights … serve[s] the public interest almost by definition." *League of Women Voters of Fla. v. Browning*, 863 F.Supp.2d 1155, 1167 (N.D. Fla. 2012). Further, the public interest is served by "having the will of [the] voters … carried out." *Guzzo v. Mead*, No. 14-CV-200, 2014 WL 5317797, at *6 (D. Wyo. Oct. 17, 2014).

## Conclusion

Defendant's Executive Order suspending Mr. Warren violates the First Amendment. Mr. Warren is entitled to injunctive relief requiring his reinstatement.

Dated:  November 22, 2022          **PERKINS COIE LLP**

By:  */s/ Jean-Jacques Cabou*

Jean-Jacques Cabou (AZ #022835)*
Alexis E. Danneman (AZ #030478)*
Matthew R. Koerner (AZ #035018)*
Margo R. Casselman (AZ #034963)*
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
JCabou@perkinscoie.com
ADanneman@perkinscoie.com
MKoerner@perkinscoie.com
MCasselman@perkinscoie.com
602.351.8000

**AND**

David B. Singer (FBN 72823)
Matthew T. Newton (FBN 111679)
101 E. Kennedy Blvd., Suite 2800
Tampa, FL 33602
dsinger@shumaker.com
mnewton@shumaker.com

**DEBEVOISE & PLIMPTON LLP**

David O'Neil*
801 Pennsylvania Ave NW, Suite 500
Washington, D.C. 20004
(202) 383-8000
daoneil@debevoise.com

Alexandra P. Swain*
650 California Street
San Francisco, CA 94108
apswain@debevoise.com

Samantha B. Singh (FBN 1036051)
919 Third Avenue
New York, NY 10022
sbsingh@debevoise.com

* *Pro Hac Vice*

**ATTORNEYS FOR PLAINTIFF**

**LOCAL RULE 7.1(F) CERTIFICATE OF COMPLIANCE**

I certify that this Response to Motion contains 5,700 words, with such word count incorporating all portions of this document subject to the word limitations imposed under Local Rule 7.1(F).

*/s/ Jean-Jacques Cabou*

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2022, a true and correct copy of the foregoing document was served upon all counsel of record via the Court's CM/ECF System for filing.

*/s/ Indy Fitzgerald*