# Exhibit 1

Raymond Treadwell, Esquire
October 31, 2022

```
              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF FLORIDA
                     TALLAHASSEE DIVISION




ANDREW H. WARREN,

         Plaintiff,
                              Case No.:   4:22-cv-302-RH-MAF
v.

RON DESANTIS, individually
and in his official
capacity as Governor
of the State of Florida,

         Defendant.
----------------------------------------------------------/




VIDEOTAPED
DEPOSITION OF:    RAYMOND TREADWELL, ESQUIRE
                  Appearing Remotely

DATE TAKEN:       October 31 2022

TIME:             8:58 a.m.

REPORTED BY:      Michele Coburn, FPR
                  Appearing Remotely from
                  Hillsborough County, Florida
```

```
 1       A    I know the official reasons that were in the
 2   executive order that the governor signed his name for,
 3   and some of those I'm sure are subjective.
 4   BY MR. O'NEIL:
 5       Q    Okay.  But you don't know all of the subjective
 6   reasons?
 7       A    What other subjective reasons are there?
 8       Q    Did you speak to the governor right before he
 9   signed the executive order?
10            MR. LEVESQUE:  Object to form.
11       A    Again, I have not spoken to the governor on
12   this matter and I did not speak to the governor on this
13   matter.
14   BY MR. O'NEIL:
15       Q    Okay.  So what you know is that the governor
16   signed an executive order stating official reasons?
17       A    Correct.
18       Q    Okay.  And that's the extent of your knowledge
19   of his subjective reasons for the order?
20            MR. LEVESQUE:  Object to form.
21       A    I'm also aware of the edits that the governor
22   made to the draft.
23   BY MR. O'NEIL:
24       Q    Okay.  Well, tell us about those.
25       A    Okay.
```

Raymond Treadwell, Esquire
October 31, 2022

```
 1   BY MR. O'NEIL:
 2       Q   The reasons that were in his mind when he took
 3   the action.
 4       A   I don't know what was in the governor's mind
 5   other than the fact he signed the executive order.
 6       Q   Okay.  Do you know anything else about this
 7   investigation?
 8           MR. O'NEIL:  Actually -- I'm sorry.  Could we
 9       take a five to ten-minute break?  Be very short.
10       Thank you.
11           MR. LEVESQUE:  Yes, we can.
12           THE VIDEOGRAPHER:  Going off the record.  The
13       time is 10:01 a.m. Eastern time.
14           (Recess from 10:01 a.m. to 10:08 a.m.)
15           THE VIDEOGRAPHER:  We are back on the video
16       record.  The time is 10:08 a.m. Eastern time.
17   BY MR. O'NEIL:
18       Q   All right.  Mr. Treadwell, I want to focus on
19   when you first learned of Mr. Warren.
20           When -- to the best of your recollection, when
21   did you first become familiar with the name Andrew
22   Warren?
23       A   So I would say Monday, July 18th.  Even though
24   I was emailed the story about the abortion statement at
25   the end of June, I don't -- I don't even know if I read
```

1           Yeah.  Keep going.  Thanks.
2           This is -- can we zoom out a little bit so that
3      the witness can see more of the document?  Thank
4      you.
5    BY MR. O'NEIL:
6       Q   Mr. Treadwell, are you familiar with this
7    document?
8       A   I believe I read it at some point.  Yes.
9       Q   Okay.  What is it, in your view?
10      A   If it's what I'm thinking of, this is the memo
11   from Mr. Warren to his office outlining what
12   prosecutorial discretion is.
13      Q   Okay.  Is this -- in your view, is this
14   official guidance to the office?
15      A   I think that's fair.
16      Q   Okay.  And Mr. Warren's ASAs under his
17   responsibility -- they would be expected to follow this,
18   from your perspective?
19      A   From my perspective, yes.
20          MR. O'NEIL:  Okay.  Can we mark this as
21      Exhibit 3, please.
22          (Exhibit 3 identified.)
23          THE COURT REPORTER:  Yes.
24   BY MR. O'NEIL:
25      Q   Can you read the first line of this memorandum?

1    what a state attorney can and cannot do.
2            So, yeah.  Even though there was no Florida
3    Statute prohibiting transgender treatments, it still --
4    that joint statement still reflected his incompetence.
5            THE COURT REPORTER:  I'm sorry.  I didn't get
6        the end of your answer.
7        A    Because he thinks he can nullify Florida law.
8    BY MR. O'NEIL:
9        Q    Is it incompetence for a prosecutor to say that
10   he will not prosecute an unconstitutional law?
11           MR. LEVESQUE:  Object to form.
12       A    If a law has been invalidated because it's
13   unconstitutional, then no.  I don't think it's
14   incompetence.
15   BY MR. O'NEIL:
16       Q    Is it incompetence for a prosecutor to say that
17   he will not prosecute a law that might be passed because
18   he believes it would be unconstitutional?
19       A    I mean, you know, there are tons of different
20   opinions on whether a given law, you know, may be
21   constitutional or unconstitutional.
22           I do not think a state attorney should
23   single-handedly be making that decision.
24       Q    Is it the role of a state attorney to express
25   his views on the constitutionality of potential

1    Q   Going back for a moment to the -- the gender --
2    we'll call it the gender statement, the transgender --
3    transgender statement.
4           You read the sentences that you highlighted and
5    that are read in the executive order -- that are quoted
6    in the executive order as -- as grounds for suspension.
7    Is that right?
8        A   That's right.
9        Q   Okay.  So those would warrant suspension?
10       A   In my opinion, they do.
11       Q   Would they warrant suspension without --
12   without anything else?
13       A   Maybe.  But I will say emphatically that it was
14   the abortion statement that drove our recommendation
15   across the goal line.
16       Q   So there were a number of reasons -- there were
17   a number of reasons -- were there a number of reasons
18   for the suspension?
19       A   Yes.  We did.  We include a number of reasons
20   and --
21       Q   And one of the reasons was the -- Mr. Warren's
22   signature on the gender-affirming statement letter?
23       A   That's right.
24           MR. O'NEIL:  Okay.  Okay.  Let's look at the
25       abortion statement.

1    didn't have an obligation to put forward the exhibits

2    that supported the allegations we made in every regard,

3    and that we would have a trial in the Senate to look

4    over the evidence for and against the allegations.

5        Q   Did you believe that a court would be reviewing

6    the permissibility of the reasons that you had provided?

7        A   At the time I only thought that a court would

8    be reviewing it from the basis of a quo warranto

9    petition in terms of whether the governor has the

10   authority to suspend for these alleged reasons.

11           And so, to me, that was the only judicial

12   review that was likely to happen.

13       Q   Do you know -- I'm just asking do you know --

14       A   Yes.

15       Q   -- whether the governor would have made the

16   decision to suspend Mr. Warren based on the bike stop

17   policy and the presumption -- prosecution policy that we

18   described earlier?  Do you know whether the governor

19   would have made those -- made the same decisions based

20   solely on those documents?

21       A   So here I'm going to say probably not because

22   Ryan and I -- Mr. Newman and I probably would not have

23   recommended Mr. Warren's suspension based on those

24   documents standing by themselves.

25           It really was the abortion statement that drove

```
 1   Mr. Newman and I to the point of wholly recommending
 2   Mr. Warren's suspension.
 3        Q    Do you know --
 4        A    And we --
 5        Q    I'm sorry.
 6        A    Sorry.
 7        Q    Continue.  I'm sorry.
 8        A    That's all.
 9             It was the abortion statement that -- that
10   drove us to -- to recommend the suspension and the
11   other -- the other reasons that we used to show
12   Mr. Warren has sort of a pattern or practice of
13   non-prosecution policies.
14             I mean, I don't think those extra -- extra
15   documents would have been presented to the governor
16   without the abortion statement being with them.
17        Q    So you can speak to what you would -- what you
18   think you would have done in certain circumstances.
19   Right?
20        A    That's right.  That's right.
21        Q    I asked you, do you know what decision the
22   governor would have made?  So do you know:  yes or no?
23        A    If he was presented -- if he was presented with
24   that option, I don't know.
25        Q    Do you know what decision he made if the -- if
```

1    this were based solely on the gender statement?
2        A    I don't know what he would have decided on that
3    alone.
4        Q    Who would know the answer to that?
5        A    It's kind of a tough hypothetical because,
6    again, legal made the recommendation to the governor.
7    So this -- this idea that what would have happened if
8    legal would have made a different recommendation -- I
9    think only the governor would know that hypothetical.
10       Q    Okay.  Would Mr. Uthmeier know?
11       A    He might -- he might serve as sort of a barrier
12   as to whether that hypothetical recommendation got to
13   the governor.  But ultimately what the governor would do
14   in that hypothetical only the governor would know.
15       Q    Okay.  You mentioned -- you referenced the Fox
16   interview by Mr. Warren.
17       A    Right.
18       Q    Okay.  And you acknowledge that Mr. Warren said
19   that any -- any decision would have to be made on its
20   facts and circumstances.  Right?
21       A    Yeah.  I don't recall if Mr. Warren said that
22   or if the news anchor was relaying Mr. Warren's words to
23   that effect.
24       Q    Well, why -- why don't we take a look at that.
25            MR. O'NEIL:  Sam, do you know which -- pull

1       And I believe that -- that critical moment
2  happened when Mr. Newman met with the governor on
3  July 26th.  And I say that because Mr. Newman then came
4  to my office and told me, "Okay.  Prioritize this draft.
5  Get it done.  The event -- you know, if we're going to
6  do this, it could happen as early as -- as Monday of the
7  following week, which would have been, I think,
8  August 1st.
9       Q   And what was the operative draft at the time
10 that Mr. Newman came to your office to report that to
11 you?
12      A   I mean, I had already begun editing Larry's
13 draft.  So there wasn't any kind of operative, you know,
14 or official draft at that point.  It was definitely a
15 work in progress.
16      But -- and again, only Mr. Newman would know
17 what he shared with the governor.  At that point,
18 though, the abortion statement was central to the
19 reasoning of our recommendation.
20      Q   Okay.
21      A   From there we were building it.
22      Q   Am I right that just on the timing the decision
23 was made by -- by Mr. DeSantis in a meeting that you, I
24 gather, were not in on July 26th?  Do I have that right?
25      A   And when you say "decision," I don't think

1 | CERTIFICATE OF REPORTER
2
3 | STATE OF FLORIDA
4 | COUNTY OF HILLSBOROUGH
5 |     I, Michele Coburn, Florida Professional Reporter
6 | and Notary Public, do hereby certify:
7 |     That prior to being examined the witness in the
8 | foregoing proceedings was by me duly sworn to testify to
9 | the truth, the whole truth, and nothing but the truth;
10 |     That said proceedings were taken before me
11 | remotely at the time and places therein set forth and
12 | were taken down by me in shorthand and thereafter
13 | transcribed into typewriting under my direction and
14 | supervision.
15 |     I further certify that I am neither counsel for,
16 | nor related to, any party to said proceedings, not in
17 | anywise interested in the outcome thereof.
18
19 |     DATED this 3rd day of November, 2022.
20
21 | _____
22 |     Michele Coburn, FPR
     Florida Professional Reporter
23
24
25