# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CASE NO. 4:22-cv-302-RH-MAF

ANDREW H. WARREN,

   Plaintiff,

vs.

RON DESANTIS, individually
and in his official capacity
as Governor of the State
of Florida,

   Defendant.
                                             /

REMOTE VIDEO-RECORDED DEPOSITION OF
RYAN NEWMAN
{Pages 1 - 194}

Monday, November 7, 2022
8:30 a.m. - 3:36 p.m.
U.S. Legal Support, Inc.

(Held Remotely)

Stenographically Reported By:
Deanne M. Moore, RMR, CRR, FPR, FPR-C

```
 1  Mr. Treadwell?
 2      A    I don't -- I don't recall.
 3      Q    Did you ask Mr. Treadwell to conduct any
 4  research?
 5      A    Before this meeting?
 6      Q    Yes.
 7      A    Before the 26th?
 8      Q    Yes.
 9      A    I don't recall directing him to do that, in
10  part because I needed want to invest -- part of the
11  point of the meeting was to see if -- to gauge whether
12  we needed, you know, a lot of staff effort and work
13  in -- in -- in doing this.
14      Q    Going into the meeting on the 26th, you didn't
15  know how the Governor would react to this proposal?
16      A    No.
17      Q    Did you have a prediction of how he'd react?
18      A    No.
19      Q    Why not?
20      A    What's that?
21      Q    Why not?  Why -- why were you not able to
22  predict how he would react?
23           MR. LEVESQUE:  Object to form.
24      A    I -- why wasn't I able to predict?  I don't
25  know.  I just didn't know.  I didn't know how he -- I
```

1  didn't know how he'd react because I did understand
2  ourselves to be taking aggressive -- an aggressive
3  posture, and so I didn't -- I didn't know how he'd react
4  to it.
5     Q   At that meeting did you discuss with him the
6  litigation risks of taking this action?
7     A   Yeah.  I mean, he -- he caught on very quickly
8  to the litigation risk because he -- you know, he
9  certainly perceived right off the bat that -- you know,
10 that someone could argue that, you know, neglect of duty
11 hadn't occurred, you know, until a prosecutor is
12 actually presented with a case and declines to prosecute
13 it.
14          So I think he understood that, you know, basing
15 a decision on a pledge was -- you know, that there was
16 legal -- that there was legal risk there, but as I
17 explained earlier, I -- I -- I brought him around I
18 think to the view I think, and that's because I came
19 around to the view.
20          I know, at the end of the day, it's even worse.
21 It's even worse to publicly pledge, and -- as -- as the
22 state attorney to not prosecute a certain class of
23 crimes.  I mean, it's even worse because you're inviting
24 it.  The state attorney is inviting the law breaking,
25 and -- and I just think he was convinced of that.

1  Q    Other than him providing you with his comments
2  on that, did anything else -- was anything else
3  discussed?
4  A    The only other thing that probably was
5  discussed was to confirm with the Governor that Suzy
6  Lopez had agreed to be the replacement.
7  Q    By this time had the Governor definitively made
8  the decision to suspend Mr. Warren?
9  A    Yeah.  I think it's fair to say that by this
10 point, he was not going to reverse course.
11 Q    Do you know when in the process that you've
12 been describing -- in the sequence of events you've been
13 describing that the Governor went in his mind from
14 tentative to definitive?
15 A    Not precisely.  It was just apparent from --
16 you know, from the beginning of the week when we came
17 back after the weekend on August 1st that -- that he was
18 going to be fine with this course of action.
19 Q    Did you speak with the Governor about what he
20 would decide to do -- what -- what he would have decided
21 if he had the same -- same documents that we've
22 discussed, but -- but no office policies of -- of
23 Mr. Warren, so no bike policy no presumptive
24 non-prosecution policy.
25      Did you ask the Governor about what he would

1  decide if those policies were not part of the picture?
2          MR. LEVESQUE:  Object to form.
3      A    Not a specific discussion about that.
4      Q    Did you have a discussion with the Governor
5  about what he would decide to do if the only fact
6  supporting the suspension were the -- the abortion
7  statement?
8      A    If the only fact were the abortion statement,
9  the entire joint abortion statement?
10     Q    Yeah, did you have -- if -- did you have a
11 discussion with the Governor, what would you do if -- if
12 the only fact were the abortion statement?
13         MR. LEVESQUE:  Object to form.
14     A    No.  I mean, we didn't discuss those kind of
15 hypotheticals.
16     Q    Okay.  So did you have a discussion with the
17 Governor about what he would do if there were no
18 abortion statement but all the other policies were
19 there?
20     A    Not that specific discussion.
21     Q    Okay.  Did you speak with the Governor about
22 what he would do -- what he would decide if there were
23 only the gender affirming care statement?
24     A    No, not -- not specifically.  But just to point
25 out that we were presenting the Governor with this

1   Q   Have you read the memo?
2   A   I have read it.
3   Q   Did you read it before you recommended
4   suspension to the Governor?
5   A   I believe so.
6   Q   Was it part of the packet of materials that
7   Mr. Cronnister assembled for your office?
8   A   I don't recall that.  I don't recall whether I
9   got it through him or through some other means.
10  Q   What other means did you have for obtaining
11  policies from the state attorney's office outside of
12  Mr. Cronnister and Mr. Keefe?
13  A   I didn't know if maybe this was -- appeared
14  online.  All I'm saying is I don't have any idea how I
15  would have gotten the document.  It very well could have
16  come from -- from Sheriff Cronnister.
17  Q   Can we turn to -- go down a page, please.
18  Right.  Right there on that page, you see where it says,
19  "Exercise discretion at every stage"?
20       And then it reads, "There's no simple formula
21  that yields the right prosecutorial outcomes.  Case
22  specific review is a hallmark in our criminal justice
23  system.  In every case, ASAs must exercise discretion
24  based on the facts of this case, the nature and
25  circumstances of the offense," et cetera.

1       Do you believe that that is a blanket policy or
2  an appropriate exercise of -- appropriate statement of
3  prosecutorial discretion?
4      A    That strikes me as appropriate.  I didn't -- I
5  didn't have any objections to this particular document.
6      Q    Would you describe this document as a statement
7  of non-prosecution as to -- you know, that -- would you
8  describe this as a statement of non-prosecution that is
9  inappropriate for a prosecutor to issue?  I'm talking
10 about the -- the document as a whole.
11     A    The document -- I'd have to look through it
12 more thoroughly.  I mean, is there something specific
13 that -- that you --
14     Q    Well, the defendant identified this document in
15 discovery as -- as containing a statement of
16 non-prosecution, so I'm asking you to point me to where
17 it says -- where it contains that.
18     A    Wait.  I'm -- the defendant identified this as
19 a statement of non-prosecution?
20     Q    Correct.
21     A    I don't recall that.
22          MR. O'NEIL:  Sam, do we have that document?
23          MS. SINGH:  Yes, hold on.  It's tab 3, page 13.
24     This is Exhibit 9.
25          MR. O'NEIL:  Thanks.

1  answers to -- the sworn answers to the discovery

2  response -- to our discovery requests.  Do.

3          You see that it identifies in paragraph 6

4  prosecutorial discretion, mission of criminal justice,

5  Bates plaintiff's -- I'm sorry, defendant's Bates 52 to

6  60?

7      A    52 to 60.

8      Q    Yeah.

9      A    I mean, I see that.  It says it's referenced in

10 the executive order, but I think that might be in error

11 because I don't think that it was referenced in the

12 executive order.

13     Q    And --

14     A    That being -- that being --

15     Q    Go ahead.

16     A    That being said, it is -- it is -- if I recall

17 the memo correctly, it is -- it is evidence that

18 Mr. Warren does understand what case specific

19 individualized discretion is.

20          And so this memo, if I'm -- if I'm recalling

21 everything correctly kind of stands in stark contrast to

22 the presumption of non-prosecution policies that we

23 cited in -- in the -- in the executive order.

24     Q    Focusing on this document, you see that it

25 says, "state's attorney office cites this memo in

1          MS. SINGH:  Tab 20.
2          MR. O'NEIL:  Thanks.  If we go down one more.
3     That's great.
4  BY MR. O'NEIL:
5     Q    One of the reasons that the Governor
6  provided -- cited for the suspension of Mr. Warren was
7  this statement on gender -- we'll call it gender
8  affirming care statement.  Is that your understanding?
9     A    Yeah, it's a factual -- you know, factual
10 allegation in the executive order.
11    Q    Was this a reason for -- was this one of the
12 reasons for Mr. Warren's suspension?
13    A    Yeah, it was an allegation in support of the
14 suspension.  But -- but I don't want to overstate, you
15 know, the purpose of fighting this document --
16    Q    I'm just asking was it --
17    A    -- specific.
18         (Crosstalk.)
19    Q    Was it a reason provided for suspending
20 Mr. Warren?
21    A    It definitely -- yes, it was definitely a
22 reason provided.
23    Q    What Florida law was Mr. Warren stating a
24 position on in this statement, in this document?
25    A    Well, we -- we acknowledge that there isn't a

1  Are you aware of that or are you not aware of it?
2    A    For possession of certain firearms?  I've only
3  seen one tweet about a Seminole sheriff, but I don't
4  even recall the specifics of it.
5         I guess what I'm saying is I don't -- I don't
6  know the specifics of what you're talking about.
7    Q    Okay.  If a sheriff announced that they were
8  not going to make arrests for possession of certain
9  firearms because they disagreed with -- disagreed that
10 those firearms would be unlawful, would that be a social
11 justice approach to law enforcement?
12        MR. LEVESQUE:  Object to form.
13   A    I guess it would depend on the circumstances.
14   Q    If a prosecutor announced that they did not
15 agree with certain laws, would it depend on the
16 circumstances of whether that was appropriate or not
17 appropriate?
18        MR. LEVESQUE:  Object to form.
19   A    Yeah, I think it depends on the particulars of
20 the policy.
21   Q    Well --
22        MR. O'NEIL:  Can we go to the next page?
23 BY MR. O'NEIL:
24   Q    You see it reported here in 2020 Seminole
25 County Sheriff Lemma told gun activists he wouldn't

```
 1  enforce a proposed amendment to the state constitution.
 2  Lemma responded, to applause from the audience, "it's
 3  not only that I wouldn't, a majority of sheriffs across
 4  the state would not do it."  He added, "it's up to the
 5  sheriffs what we are willing to enforce."
 6          Was that -- first of all, is that an
 7  appropriate statement?
 8          MR. LEVESQUE:  Object to form.
 9      A   Is that an appropriate statement?
10      Q   Is that statement consistent -- is that
11  statement consistent with what your view of proper law
12  enforcement to be?
13          MR. LEVESQUE:  Object to form.
14      A   It would depend on the particulars of the case
15  and the rationale for the policy.
16      Q   I -- I am -- I am -- I'm showing you this
17  statement right here, the sheriff announced "it is up to
18  the sheriffs what they are willing to enforce."  Is that
19  a blanket policy or is that a case-by-case approach to
20  law enforcement?
21          MR. LEVESQUE:  Same objection.
22      A   That statement's definitely not consistent
23  with -- with my view of things.
24          But in terms of the underlying policy that he's
25  talking about, I think it would depend upon, you know,
```

1  viewpoints?
2         MR. Levesque:  Object to the form.
3     A    Against woke viewpoints.  Well, I -- I -- I --
4  I believe so.  I think so, yes.  I just don't want to
5  be -- I don't know if you're talking about something
6  specific.  It's hard to answer in the abstract.
7     Q    I'm not asking about the abstract.  I asked you
8  for a definition of woke.  You provided one, and I'm
9  asking whether the Governor advocates against the
10 viewpoints that you just defined as woke.
11    A    Advocates against the viewpoints.
12        MR. LEVESQUE:  Object to the form.
13    A    Yeah, I think it's -- I guess it's fair to say
14 that he probably does.
15    Q    Your testimony is that Governor DeSantis
16 probably advocates against what he regards as wokeness?
17    A    You --
18    Q    Is that correct?
19    A    Yeah, I guess, I -- I should -- I mean, you
20 know, we did pass legislation that's called Stop WOKE
21 Act.  So I guess it's fair to say that, yes, he
22 advocates against it.  And, you know, he advocates for
23 policies that -- you know, that are opposed to --
24    Q    I'm going to ask for a five-minute break and
25 then I hope that we can conclude relatively quickly.  So

1         CERTIFICATE OF REPORTER

2  STATE OF FLORIDA

3  COUNTY DUVAL

4         I, Deanne M. Moore, RMR, CRR, FPR, FPR-C certify

5  that I was authorized to and did stenographically report

6  the deposition of RYAN NEWMAN, pages 1 through 190; that

7  a review of the transcript was requested; and that the

8  transcript is a true record of my stenographic notes.

9         I further certify that I am not a relative,

10 employee, attorney, or counsel of any of the parties,

11 nor am I a relative or employee of any of the parties'

12 attorneys or counsel connected with the action, nor am I

13 financially interested in the action.

14        Dated this 8th day of November, 2022.

15

16

17

                                Deanne M. Moore, RMR, CRR, FPR, FPR-C
18

19

20

21

22

23

24

25