# Exhibit 3

```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF FLORIDA
 2                     TALLAHASSEE DIVISION

 3                          CASE NO. 4:22-cv-302-RH-MAF

 4  ANDREW H. WARREN,

 5       Plaintiff,

 6  vs.

 7  RON DESANTIS, individually
    and in his official capacity
 8  as Governor of the State
    of Florida,
 9
         Defendant.
10  _____/

11                 VIDEO DEPOSITION OF
                      LAWRENCE KEEFE
12
                Taken on Behalf of PLAINTIFF
13
           DATE:          October 19, 2022
14         TIME:          10:00 a.m. - 2:26 p.m.
           PLACE:         Messer Caparello PA
15                        2618 Centennial Place
                          Tallahassee, Florida 32308
16
           Examination of the witness taken before:
17
                    JEFFREY R. BABCOCK
18                    Court Reporter
                   Tallahassee, Florida
19
```

1  prosecutors that are not enforcing the law?"
2      It was an ongoing, hour-by-hour, day-to-day thing in
3  terms of looking into this subject.  It was not a -- a
4  systematic, methodical investigation.  It was
5  incorporating into my routine, my travels, my
6  participations in events and meetings, phone conferences,
7  when I was working with either -- or communicating with
8  one other member of the law enforcement community in
9  Florida, or a group of them, I would bring the subject up
10 and listen to what they said.
11     And once again, no one was guiding or directing or
12 telling me what to do.  There was no time line.  There was
13 no sense of urgency.  It was information I was collecting
14 on an ad hoc basis in the general course of doing my work.
15     Q.  Okay.  Do you recall any particular conversations
16 with any specific members of the law enforcement community
17 that influenced your conclusions in this review?
18     A.  I do.  And I did my best to sort things out in --
19 in assisting counsel and responding to interrogatories in
20 this case; which is, largely a number of the state
21 attorneys in the State of Florida, a number of the
22 sheriffs in the State of Florida -- and when I say
23 "sheriffs," I don't mean just the sheriff.  They all have
24 command staffs who I've come to know -- people involved
25 with police agencies in the State of Florida, people in

```
 1  progressive prosecutor community.  I have seen and heard
 2  the terms, you know, about that.  And that was -- once all
 3  the roads had led to Mr. Warren, I was basically doing
 4  online searches of, who is this Andrew Warren and what is
 5  it that is happening in his world?
 6      And that expanded beyond the State of Florida into
 7  these national -- or this -- these national organizations,
 8  I should say, and that was my observation of it; that it
 9  was left-leaning, liberal, Democrat, progressive, or
10  whatever sets of terms one would want to use to describe
11  the community that holds those beliefs that are manifested
12  in things of the sort, these joint statements and things
13  that I rapidly found from the -- the Just and Fair
14  Prosecution organization; that that was what I found and
15  observed.
16      Q.   Okay.  And fair to say that it is those beliefs
17  as expressed in the joint statements that were the cause
18  of Mr. Warren being suspended?
19      A.   Well, there were other -- there were other
20  things.  You know, there were a number of, you know,
21  prosecution policies, presumptions of non-prosecution and
22  so forth.  But truly what caught my attention in this --
23  and it was not an investigation.  I was looking into a
24  matter.  I was operating on my own.  But what stood out to
25  me was the -- were the joint statements that -- to which
```

```
 1  responses.  I spoke with -- do you want me to go through
 2  all the ones I spoke with or --
 3       Q.   If you can remember the names of elected state
 4  attorneys with whom you spoke about this review --
 5  state-wide review that you conducted, then please.  If
 6  it's difficult for you to review, I'll happily accept your
 7  representation that this is all that you can think of as
 8  you sit here today.
 9       A.   No.  No, I will go through.  But again, I --
10  there are probably some in the interrogatories that I
11  don't recollect now, because I had to go through kind of a
12  process to help answer the interrogatories on this.
13       But here's some names of some state attorneys -- and
14  then there are state attorneys that I spoke to that they,
15  themselves, then spoke to other state attorneys, and then
16  you know, got back to me.
17       Q.   Did you speak to every state attorney?
18       A.   I did not speak to every state attorney.
19       Q.   Did you speak to Mr. Warren?
20       A.   I did not speak to Mr. Warren.
21       Q.   Why not?
22       A.   I --- I did not know or have an existing
23  relationship with Mr. Warren.
24       Q.   Why was that -- why did that matter?  Did you
25  think he wouldn't take your call?
```

```
 1  a document.
 2       Q.   Okay.
 3       A.   I remember that document.  I haven't seen it yet,
 4  but I remember that document.
 5       Q.   Okay.  You don't think the PostIt note was on the
 6  document here that's on page 2188?
 7       A.   It may have been.
 8       Q.   Okay.  So this document that begins on page
 9  12188, it's a memorandum.  It's on official Office of the
10  State Attorney stationery from Andrew H. Warren to
11  Assistant State Attorneys.  The subject is partially
12  occluded by the PostIt note, but it begins "Prosecutorial
13  discretion and the;" right?  This is a document you've
14  seen before; right?
15       A.   I'm sorry, are you making a distinction between
16  the PostIt note and the document, or the document itself
17  or -- I'm not -- you're confusing me.
18       Q.   I'm sorry.  The memorandum itself, you've seen
19  this before?
20       A.   I believe so.
21       Q.   And the PostIt note, you've seen that before?
22       A.   I have.
23       Q.   Okay.  And you recall that the PostIt note was in
24  the box you got from Sheriff Chronister.  You're just not
25  sure if it was stuck to this document that it's now
```

1       A.   No.

2       Q.   Okay.  Had you ever seen this document before?

3       A.   I think so.

4       Q.   Okay.  So the document says, in that sentence you
5  just read six minutes ago, "In every case, ASAs must
6  exercise discretion based on the facts of that case."
7  This is a policy of Mr. Warren's office that the PostIt
8  note is covering, but I think there's a copy later, was
9  promulgated in December of 2021 and it codified other
10 policies, including preferable policies that had been in
11 place before.

12      Does seeing that Mr. Warren's office had a written
13 policy of discretion in every case change your view about
14 your conclusions that he had blanket policies as to
15 anything?

16      A.   No.

17           MR. LEVESQUE:  Object to form.

18 BY MR. CABOU:

19      Q.   Why not?

20      A.   Because notwithstanding what it said in this
21 memo, it is not what I heard from law enforcement in the
22 Tampa area, and it's not what I saw in the joint
23 statement.

24      Q.   Okay.  Did you speak to line prosecutors in the
25 State Attorney's Office of the 13th District?

```
1        A.   No.
2        Q.   Did you speak to any attorneys in the State
3   Attoney's Office in the 13th District?
4        A.   Say that again.
5        Q.   Other than line prosecutors, did you speak to
6   anyone else in the state attorney's office prior to
7   Mr. Warren's suspension?
8        A.   No.
9        Q.   Why not?
10       A.   Because in terms of my analysis and what I looked
11  at and what I did, I had completed what I was tasked to
12  do.  And then it was largely a legal analysis by the
13  general counsel's office in terms of dissecting these
14  presumptions of non-prosecution, and -- these documents
15  and the things other than the joint statements were
16  analyzed and evaluated by the general counsel's office in
17  communication with Sheriff Chronister, and perhaps Chief
18  Dugan, I'm not certain.
19       But I -- my central role was not in the analysis of
20  these documents, comparing it to the case law, and the how
21  it went down in the field in real life with Sheriff
22  Chronister and his folks, and Sheriff Dugan.  That wasn't
23  my focus.  That wasn't what -- I wasn't key in that area
24  of the work.
25       Q.   So the analysis of these documents was done by --
```

```
 1        us in standing up and standing together on this
 2        important issue."  I don't know.  Is your question,
 3        does that vitiate the clear and unequivocal statement
 4        that he's not going to enforce transgender treatment
 5        laws?
 6  BY MR. CABOU:
 7        Q.   I think it's fair to say that you and I disagree
 8  on whether such a clear and unequivocal statement exists.
 9        A.   We do.
10        Q.   Yes.  But my question to you is whether language
11  I just read to you is part of what you believe to be a
12  clear and unequivocal statement?
13        A.   It is.  I spent lots of time looking at these two
14  joint statements and others, and I'm bringing the best I
15  have as a professional and as a human being to this, and
16  that is my view:  That there is significant consequences
17  to the order and structure of the State of Florida to have
18  a state attorney making these statements.
19        Q.   Okay.
20        A.   I do.
21        Q.   I -- you stated your view very sincerely.  I have
22  no reason doubt you, and you hold it quite firmly.
23             MR. CABOU:  Okay.  It's about 12:42, would
24        folks like to take a lunch break?
25             THE WITNESS:  I'm fine with whatever you all
```

Case 4:22-cv-00302-RH-MAF   Document 125-3   Filed 11/22/22   Page 10 of 10
120

```
 1                    CERTIFICATE OF REPORTER

 2

 3   STATE OF FLORIDA

 4   COUNTY OF LEON

 5

 6              I, JEFFREY BABCOCK, do hereby certify that I

 7      was authorized to and did stenographically report the

 8      deposition of LAWRENCE KEEFE; that a review of the

 9      transcript WAS requested; and that the foregoing

10      transcript, pages 1 through 118, is a true record of

11      my stenographic notes.

12              I FURTHER CERTIFY that I am not a relative,

13      employee, or attorney, or counsel of any of the

14      parties, nor am I a relative or employee of any of the

15      parties' attorney or counsel connected with the

16      action, nor am I financially interested in the action.

17

18              DATED this 22nd day of October, 2022 at

19      Tallahassee, Leon County, Florida.

20      _____

21              JEFFREY R. BABCOCK

22                 Court Reporter

23

24

25
```