**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

ANDREW H. WARREN,

       Plaintiff,

                              Case No. 4:22-cv-302-RH-MAF

v.

RON DESANTIS, individually and in his
official capacity as Governor of the State
of Florida,

       Defendant.

_____/

**THE GOVERNOR'S TRIAL BRIEF**

# TABLE OF CONTENTS

Introduction ................................................................................................1

Facts and Procedural History ......................................................................3

Legal Argument ..........................................................................................9

    I.     Mr. Warren will fail to show that his suspension was substantially motivated by the expressive content of his speech. ............................10

    II.    Mr. Warren's claim will fail because he cannot show that the Governor lacked probable cause to suspend him. ...............................16

           A.    Mr. Warren must make a threshold showing that the Governor lacked probable cause to suspend him for neglect of duty and incompetence. ...........................................................................17

           B.    Mr. Warren will fail to show that the Governor lacked probable cause to suspend Mr. Warren. ....................................................30

    III.    Mr. Warren cannot establish that the relevant speech was protected under the First Amendment. ..................................................35

           A.    Mr. Warren's statements were unprotected government speech. ...............................................................................36

           B.    Mr. Warren's speech was unprotected because it fails the *Pickering* balancing test. ..........................................................50

           C.    Mr. Warren's statements were not protected because the suspension standard in the Florida Constitution represents a conduct regulation that only incidentally burdened Mr. Warren's speech. ......................................................................52

    IV.    The Governor will establish that retaliatory animus was not the but-for cause of Mr. Warren's suspension because the Governor would have suspended Mr. Warren even absent any retaliatory motive. ...............55

Conclusion ................................................................................................56

# TABLE OF AUTHORITIES

**Cases**

*Alves v. Bd. of Regents of Univ. Sys.*,
    804 F.3d 1149 (11th Cir. 2015) ..........................................................................37

*Ayala v. Scott*,
    224 So. 3d 755 (Fla. 2017).......................................................................... passim

*Bd. of Cnty. Comm'rs v. Umbehr*,
    518 U.S. 668 (1996).............................................................................................55

*Belcher v. City of McAlester*,
    324 F.3d 1203 (10th Cir. 2003) .................................................................... 51, 52

*Berry v. Bailey*,
    726 F.2d 670 (11th Cir. 1984) ............................................................................52

*Boquist v. Courtney*,
    32 F.4th 764 (9th Cir. 2022) ...............................................................................55

*Bostock v. Clayton Cnty.*,
    140 S. Ct. 1731 (2020)........................................................................................55

*Burton v. City of Belle Glade*,
    178 F.3d 1175 (11th Cir. 1999) ..........................................................................14

*Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n*,
    942 F.3d 1215 (11th Cir. 2019) ................................................................... passim

*Castle v. Appalachian Tech. Coll.*,
    631 F.3d 1194 (11th Cir. 2011) ..........................................................................10

*Choose Life Ill., Inc. v. White*,
    547 F.3d 853 (7th Cir. 2008) ..............................................................................38

*Connick v. Myers*,
    461 U.S. 138 (1983).............................................................................................52

*Crawford-El v. Britton*,
    523 U.S. 574 (1998)..................................................................................... 20, 55

*Culter v. Stephen F. Austin State Univ.*,
    767 F.3d 462 (5th Cir. 2014) ...............................................................37

*Davison v. Randall*,
    912 F.3d 666 (4th Cir. 2019) .............................................. 38, 47, 49

*Del Castillo v. Sec'y, Fla. Dep't of Health*,
    26 F.4th 1214 (11th Cir. 2022) .........................................................53

*DeMartini v. Town of Gulf Stream*,
    942 F.3d 1277 (11th Cir. 2019) ................................................ passim

*Fikes v. City of Daphne*,
    79 F.3d 1079 (11th Cir. 1996) ..........................................................12

*Florida v. United States*,
    886 F. Supp. 2d 1301 (N.D. Fla. 2012) ...................................... 21, 27

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006).................................................................2, 35

*Giboney v. Empire Storage & Ice Co.*,
    336 U.S. 490 (1949).......................................... 1, 16, 53, 54

*Gogel v. Kia Motors Mfg. of Ga., Inc.*,
    967 F.3d 1121 (11th Cir. 2020) ........................................................15

*Goldstein v. Galvin*,
    719 F.3d 16 (1st Cir. 2013)...............................................................38

*Gregoire v. Biddle*,
    177 F.2d 579 (2d Cir. 1949)..............................................................21

*Gundy v. City of Jacksonville*,
    50 F.4th 60 (11th Cir. 2022) ...................................................... passim

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982)......................................................... 21, 27

*Hartman v. Moore*,
    547 U.S. 250 (2006)...................................................................... passim

iv

*Heffernan v. City of Paterson,*
    578 U.S. 266 (2016) ................................................................................10

*Holder v. Humanitarian L. Project,*
    561 U.S. 1 (2010) ...................................................................................53

*In re U.S.,*
    985 F.2d 510 (11th Cir. 1993) ................................................................27

*Ingram v. Johnson,*
    187 F.3d 877 (8th Cir. 1999) ..................................................................54

*Israel v. DeSantis,*
    269 So. 3d 491 (Fla. 2019) ................................................... 2, 10, 24, 31

*Keeton v. Anderson-Wiley,*
    664 F.3d 865 (11th Cir. 2011) ....................................................... 15, 16

*Kennedy v. Bremerton Sch. Dist.,*
    142 S. Ct. 2407 (2022) ...........................................................................36

*Knight First Amend. Inst. at Columbia Univ. v. Trump,*
    928 F.3d 226 (2d Cir. 2019) ...................................................................38

*Knight v. Baptist Hosp. of Mia., Inc.,*
    330 F.3d 1313 (11th Cir. 2003) ..............................................................15

*Lane v. Franks,*
    573 U.S. 228 (2014) ................................................................................37

*Latif v. Obama,*
    666 F.3d 746 (D.C. Cir. 2011) ...............................................................19

*Leake v. Drinkard,*
    14 F.4th 1242 (11th Cir. 2021) ...................................................... 39, 44

*Lewis v. City of Union City,*
    918 F.3d 1213 (11th Cir. 2019) ..............................................................15

*Marshall v. City of Cape Coral,*
    797 F.2d 1555 (11th Cir. 1986) .........................................................3, 55

*Matal v. Tam*,
  137 S. Ct. 1744 (2017) .......................................................................................38

*McBeth v. Himes*,
  598 F.3d 708 (10th Cir. 2010) ...........................................................................24

*McCabe v. Sharrett*,
  12 F.3d 1558 (11th Cir. 1994) ...........................................................................51

*Mech v. Sch. Bd. of Palm Beach Cnty.*,
  806 F.3d 1070 (11th Cir. 2015) ................................................................. 36, 46

*Moss v. City of Pembroke Pines*,
  782 F.3d 613 (11th Cir. 2015) ..............................................................................9

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
  429 U.S. 274 (1977)......................................................................................3, 55

*Newton v. LePage*,
  700 F.3d 595 (1st Cir. 2012)...............................................................................39

*Nieves v. Bartlett*,
  139 S. Ct. 1715 (2019) ............................................................................. passim

*Nix v. WLCY Radio/Rahall Commc'ns*,
  738 F.2d 1181 (11th Cir. 1984) .........................................................................15

*Norwegian Cruise Line Holdings LTD v. State Surgeon Gen.*,
  50 F.4th 1126 (11th Cir. 2022) ............................................................ 52, 53, 54

*Otto v. City of Boca Raton*,
  981 F.3d 854 (11th Cir. 2020) ...........................................................................52

*Pennhurst State Sch. & Hosp. v. Halderman*,
  465 U.S. 89 (1984).......................................................................................8, 54

*Pickering v. Bd. of Educ.*,
  391 U.S. 563 (1968)........................................................................... 3, 35, 51, 52

*Pleasant Grove City v. Summum*,
  555 U.S. 460 (2009)......................................................................... 36, 38, 46, 48

vi

*Prof'l Real Est. Inv'rs, Inc. v. Columbia Pictures Indus., Inc.,*
    508 U.S. 49 (1993) ...............................................................................30

*Reichle v. Howards,*
    566 U.S. 658 (2012) ................................................................ 18, 19, 26

*Rosenberger v. Rector & Visitors of the Univ. of Va.,*
    515 U.S. 819 (1995) ...............................................................................36

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.,*
    547 U.S. 47 (2006) ............................................................................1, 16

*Shahar v. Bowers,*
    114 F.3d 1097 (11th Cir. 1997) ............................................................51

*Shurtleff v. City of Boston,*
    142 S. Ct. 1583 (2022) .................................................................. 41, 47

*Small Bus. in Trans. Coal. v. Bowser,*
    No. 20-2645, 2022 WL 2315544 (D.D.C. June 28, 2022) ..................39

*Smith v. Mosley,*
    532 F.3d 1270 (11th Cir. 2008) ............................................................10

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552 (2011) ...................................................................... 53, 54

*Stanley v. City of Dalton,*
    219 F.3d 1280 (11th Cir. 2000) ............................................................12

*State ex rel. Hardee v. Allen,*
    172 So. 222 (Fla. 1937)..........................................................................2

*State ex rel. Hardie v. Coleman,*
    155 So. 129 (Fla. 1934)................................................................. 25, 31

*State v. Bloom,*
    497 So. 2d 2 (Fla. 1986).......................................................................48

*Sussman v. U.S. Marshals Serv.,*
    494 F.3d 1106 (D.C. Cir. 2007) ...........................................................20

*Turner v. City Council of Fredericksburg,*
    534 F.3d 352 (4th Cir. 2008) ................................................................. 38, 46, 47

*United States v. Armstrong,*
    517 U.S. 456 (1996) .......................................................................................25

*United States v. Chem. Found.,*
    272 U.S. 1 (1926) .................................................................................. 19, 25

*United States v. Scroggins,*
    880 F.2d 1204 (11th Cir. 1989) .......................................................................20

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.,*
    576 U.S. 200 (2015) ............................................................................. 38, 46, 47

*Waters v. Churchill,*
    511 U.S. 661 (1994) .......................................................................................10

**Statutes**

Conn. Charter of 1662 ..........................................................................................29

Fla. Const. art. IV, § 1 ................................................................................. 25, 27

Fla. Const. art. IV, § 7 ........................................................................... passim

Fla. Const. art. V, § 17 ................................................................................ 45, 49

Fla. Const. of 1885, art. IV, § 15 .........................................................................30

Fla. Const. of 1885, art. IV, § 20 .........................................................................30

Fla. Stat. § 112.41 ...............................................................................................28

Fla. Stat. § 112.43 ......................................................................................... 25, 28

Mass. Bay Charter of 1629 ..................................................................................29

Mich. Const. of 1850, art. XII, § 8 ......................................................................30

N.Y. Const. of 1821, art. IV, § 8 .........................................................................30

Pa. Const. 1776, § 22 ..........................................................................................30

R.I. & Providence Plantations Charter of 1663 ...................................................29

U.S. Const. amend. I ...................................................................................36

Vt. Const. of 1777, ch. II, § XX ................................................................30

Wis. Const. of 1848, art. VI, § 4 ...............................................................30

**Other Authorities**

*Dozens of Elected Prosecutors Say They Will Refuse to Prosecute Abortion Care*,
  NBC News (June 24, 2022, 10:38 PM),
  https://www.nbcnews.com/politics/politics-news/dozens-elected-prosecutors-
  say-will-refuse-prosecute-abortion-care-rcna35305 ...........................................40

Fair and Just Prosecution, Facebook (June 21, 2022 8:56 AM),
  https://tinyurl.com/yd56x9da ...............................................................................41

I Blackstone, Commentaries on the Laws of England (Thomas M. Cooley ed.
  1884) ...........................................................................................................29

*Liberal Prosecutors in Red States Vow Not to Enforce Abortion Bans*, Stateline
  (June 24, 2022), https://www.pewtrusts.org/en/research-and-
  analysis/blogs/stateline/2022/06/24/liberal-prosecutors-in-red-states-vow-not-to-
  enforce-abortion-bans ............................................................................................40

*Prosecution Discretion Power at Its Zenith: The Power to Protect Liberty*, 97
  B.U.L. Rev. 489 (2017) ................................................................................ 44, 45

*Removal and Tenure in Office*,
  92 Va. L. Rev. 1779 (2006) ...............................................................................30

Restatement (First) of Torts § 674 (Am. L. Inst. 1938) .................................... 29, 30

*Some Big-City District Attorneys Vow not to Prosecute Abortion Cases, Setting Up
  Legal Clashes in R*ed States, CNN (June 30, 2022, 4:27 AM),
  https://www.cnn.com/2022/06/29/us/district-attorneys-abortion-prosecutions-
  invs ...........................................................................................................40

*The Origins of the Elected Prosecutor*,
  121 Yale L.J. 1528 (2012) .................................................................................45

*The Prosecutors Pledging Not to Enforce Abortion Bans*, Brennan Ctr. (May 16,
  2022), https://www.brennancenter.org/our-work/research-reports/prosecutors-
  pledging-not-enforce-abortion-bans ...................................................................41

*Why the Constitution was Written Down*,
71 Stan. L. Rev. 1397 (2019)................................................................................29

*With Roe Overturned, 83 Elected Prosecutors Commit to Not Prosecute Abortions*
(June 25, 2022), https://da.lacounty.gov/media/news/roe-overturned-83-elected-prosecutors-commit-not-prosecute-abortions ....................................................40

x

**INTRODUCTION**

This is a First Amendment retaliation case. Plaintiff Andrew Warren contends that Governor Ron DeSantis suspended him under Article IV, Section 7 of the Florida Constitution in retaliation for statements Mr. Warren made about refusing to enforce laws that restrict abortion and gender-affirming care. For four reasons, he will not prove that claim at trial.

At the threshold, Mr. Warren will fail to show that his suspension was substantially motivated by the expressive content of any speech. Instead, the evidence will show that the Governor suspended Mr. Warren for the conduct that the Governor reasonably took his speech to announce (blanket refusals to prosecute certain types of cases) and for the state of mind that the Governor reasonably believed it evinced (the view that a prosecutor can make such blanket refusals consistent with Florida law). Neither of those reasons constitutes retaliation for speech, even if the Governor learned of them by reading Mr. Warren's words. *See, e.g.*, *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949) (the government may criminalize antitrust conspiracies even though such conspiracies are often created and evidenced through words); *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 62 (2006) (*FAIR*) (same for discrimination).

Even if Mr. Warren can show that he was suspended in part because of the message expressed in his statements, retaliatory-suspension cases like this one

1

involve the same causal complexities and policy concerns that the Supreme Court identified in *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019) and its predecessors. Mr. Warren therefore must show that the Governor lacked probable cause to suspend him, *see id.* at 1725—a showing Mr. Warren will be unable to make. Again, the Governor reasonably construed Mr. Warren's statements to be either blanket refusals to enforce Florida law or evidence that Mr. Warren was grossly ignorant of his official responsibilities. Those circumstances amply justify suspension under the Florida Constitution. *See Ayala v. Scott*, 224 So. 3d 755, 758–59 (Fla. 2017); *Israel v. DeSantis*, 269 So. 3d 491, 495–96 (Fla. 2019); *see also State ex rel. Hardee v. Allen*, 172 So. 222, 224 (Fla. 1937) (holding prosecutor's refusal to enforce gambling laws was a neglect of duty that justified suspension by the governor).

If Mr. Warren shows a lack of probable cause, he still will be unable to establish the first element of his prima facie case—that his statements were protected speech. For one thing, his statements were unprotected government speech under both the Supreme Court's bright-line rule in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), and the general three-factor test for identifying when an individual is speaking as the government, *Gundy v. City of Jacksonville*, 50 F.4th 60 (11th Cir. 2022). But even if Mr. Warren spoke in a non-government capacity, his speech was still unprotected because it was subject to a conduct restriction that only incidentally burdens speech—the Florida Constitution's suspension power. And at the least, Mr.

Warren's statements that he could choose (and in fact had chosen) not to enforce particular Florida laws substantially interfered with his responsibilities as chief prosecutor for the Thirteenth Judicial Circuit, divesting his speech of First Amendment protection under *Pickering v. Board of Education*, 391 U.S. 563 (1968).

Finally, even if Mr. Warren establishes all that, the Governor will meet his burden to show that retaliatory motive was not a "but-for cause" of the suspension, because he would have suspended Mr. Warren even "without a retaliatory motive." *Hartman v. Moore*, 547 U.S. 250, 260–61 (2006) (discussing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)). Simply put, the Governor fairly concluded that Mr. Warren was neglectful or incompetent. "While the exercise of individual liberties must not be chilled, such rights are not a shield to protect one from one's own malfeasance." *Marshall v. City of Cape Coral*, 797 F.2d 1555, 1561 (11th Cir. 1986) (affirming summary judgment for employer under same-decision defense when employee failed to perform his job duties).

## FACTS AND PROCEDURAL HISTORY

The Governor incorporates the factual section in his Consolidated Motion to Dismiss and Response in Opposition to Motion for Preliminary Injunction, DE 30, and in his contemporaneously filed pretrial stipulation. He briefly recaps the facts and posture here for context, but does not profess to catalogue the universe of facts that he intends to establish at trial.

3

1. Andrew Warren was formerly State Attorney for the Thirteenth Judicial Circuit. During his tenure, he established several policies related to the non-prosecution of certain categories of cases. One policy instructed his office not to "prosecut[e] crimes where the initial encounter between law enforcement and the defendant results from a non-criminal violation in connection with riding a bicycle or a pedestrian violation" except when the offense involves "a direct threat to public safety, such as where an individual has suffered physical harm or where a firearm is involved." DE 1-1 at 5. He also instituted a policy of "presumptive non-enforcement for certain criminal violations, including trespassing at a business location, disorderly conduct, disorderly intoxication, and prostitution." *Id.* (collectively, the Presumptive Non-Prosecution Policies).

Along with these policies, Mr. Warren signed two joint statements relating to the enforcement of laws restricting abortion and gender-affirming care (the Abortion Statement and the Gender Statement). In the Abortion Statement, Mr. Warren pledged to "refrain from prosecuting those who [seek,] provide, or support abortions" and to "decline to use [his] offices' resources to criminalize reproductive health decisions." *Id.* at 7. And in the Gender Statement, he similarly "pledge[d] to use [his] discretion and not promote the criminalization of gender-affirming healthcare or transgender people," asserting that such laws serve "no legitimate purpose" and that those laws "do not promote public safety, community trust, or

fiscal responsibility." *Id.* at 4. Mr. Warren signed each of these statements using his official title: "State Attorney, 13th Judicial Circuit (Tampa), Florida." *Id.* at 20, 29. Dozens of prosecutors from across the country joined him in signing these statements, also brandishing their official designations. *See id.* at 15–20, 24–30.

2. The evidence will show that in December 2021, the Governor became concerned that some state attorneys in Florida may not be enforcing the law after learning that prosecutors were failing to do so in other states. He asked his Senior Advisor for Public Safety, Larry Keefe, to identify whether any state attorneys were failing to fulfill their obligations under the Florida Constitution. While talking with diverse law-enforcement officials—sheriffs, law-enforcement organizations, state attorneys, and others—from around the state, Mr. Keefe kept hearing one name: Mr. Warren. Further digging into Mr. Warren uncovered Mr. Warren's Presumptive Non-Prosecution Policies and the Gender Statement. Then, after Mr. Warren signed the Abortion Statement in June 2022, Mr. Keefe approached Governor DeSantis's General Counsel Ryan Newman and Chief Deputy General Counsel Ray Treadwell about suspending Mr. Warren.

Mr. Newman reviewed the Presumptive Non-Prosecution Policies, the Gender Statement, and the Abortion Statement. He became convinced, after speaking with his staff, that Mr. Warren was repeatedly attempting to nullify swathes of Florida laws and that he fundamentally misunderstood his role as a prosecutor. Mr. Newman

believed that Mr. Warren's pledge in the Abortion Statement was a sufficient ground to suspend him, and that the Presumptive Non-Prosecution Policies and Gender Statement provided further evidence supporting suspension. In July 2022, Mr. Newman thus approached the Governor with the recommendation that he suspend Mr. Warren for neglect of duty and incompetence under Article IV, Section 7 of the Florida Constitution.

The Governor was initially reluctant to suspend Mr. Warren because he was unsure if Mr. Warren, based on a pledge that could easily be walked back, had definitively refused to enforce Florida law or had evinced a belief to that effect. But the Governor eventually determined that the Presumptive Non-Prosecution Policies, the Gender Statement, and the Abortion Statement were categorical exemptions from the enforcement of certain crimes that exemplified an escalating and increasingly brazen pattern of disregard for the prosecutorial function. The Governor viewed these statements as contrary to the prosecutorial role, which requires a case-by-case analysis of all relevant facts on an individualized basis. He also believed such broad, blanket statements vowing not to enforce Florida law would invite lawlessness in Mr. Warren's jurisdiction. The Governor thus instructed Mr. Newman to draft a suspension order.

Mr. Keefe provided Mr. Treadwell with an initial draft, and Mr. Treadwell culled materials not relevant to suspension and refined the draft. Mr. Treadwell's

draft ultimately focused on Mr. Warren's blanket policies—the Abortion Statement, the Gender Statement, and the Presumptive Non-Prosecution Policies. A near-final draft was then shared with the Governor. As part of his edits, the Governor told Mr. Newman to cite Mr. Warren's policies in such an order as to highlight what the Governor was most concerned with: Mr. Warren's escalating pattern or practice of conduct and the progression of brazen defiance for Florida law that the policies revealed.

On August 4, 2022, the Governor signed the executive order drafted by his staff, suspending Mr. Warren for neglect of duty and incompetence. DE 1-1. Among other things, the order noted that Mr. Warren had "publicly proclaimed in writing that he will not prosecute individuals who provide abortions in violation of Florida's criminal laws." *Id.* at 7. That "avowed refusal to enforce certain criminal laws," explained the order, constituted "neglect of [Mr. Warren's] duty" to exercise his discretion case-by-case. *Id.* at 8. And the order expressed that Mr. Warren's "public proclamations of non-enforcement further demonstrate his incompetence and lack of judgment arising from his gross ignorance of his official duties to faithfully enforce the criminal law." *Id.* at 9. "[I]n light of [his] strident representations of non-enforcement and open defiance of the Florida Legislature," the order stated, "there is no reason to believe that [Mr.] Warren will faithfully enforce the abortion laws of

this State and properly exercise his prosecutorial discretion on a case-specific and individualized basis." *Id.* at 8 (quotations omitted).

3. After his suspension, Mr. Warren sued the Governor, seeking declaratory and injunctive relief under federal and state law. DE 1. Count I alleged that the Governor retaliated against him in violation of the First Amendment based on alleged speech in the Gender and Abortion Statements, though it did not assert the Governor's reliance on the Presumptive Non-Prosecution Policies as a basis for the retaliation claim. *Id.* ¶¶ 77–104. Count II sought an equitable writ of quo warranto on grounds that the Governor lacked sufficient grounds to suspend him under Florida law. *Id.* ¶¶ 105–31. The same day, Mr. Warren also moved for a preliminary injunction, seeking reinstatement and the rescission of the Governor's executive order. DE 3. The Governor opposed the motion and moved to dismiss. DE 30.

On September 19, the Court orally denied the preliminary injunction and partially granted the motion to dismiss. DE 55. The Court dismissed Mr. Warren's state-law claim in Count II under *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984), but denied the motion as to the First Amendment retaliation claim in Count I. DE 68. It later set trial for November 29, 2022. DE 69.

8

## LEGAL ARGUMENT

To establish that the government retaliated against a plaintiff's speech by initiating a legal process, the plaintiff must make a "threshold showing" that the government lacked probable cause to invoke that process. *Nieves*, 139 S. Ct. at 1727. If he establishes a lack of probable cause, he must then show that (1) he engaged in protected speech, (2) an adverse action was taken against him, and (3) the protected speech was a "substantial motivating factor" for the action. *See Moss v. City of Pembroke Pines*, 782 F.3d 613, 617–18 (11th Cir. 2015). If he does so, the burden shifts to the defendant, who can rebut the prima facie case by showing that he would have taken the same adverse action even without a retaliatory animus for protected speech. *Hartman*, 547 U.S. at 260.

Mr. Warren will fail at every step in dispute. For starters, he cannot establish that the Governor was motivated by the expressive content of Mr. Warren's speech. Rather, the evidence will show that the Governor's sole motive was to protect the rule of law by suspending a prosecutor whom he reasonably believed had refused to enforce the law and had an incompetent understanding of his job duties. Mr. Warren will also be unable to prove that the Governor lacked probable cause to suspend him under Florida law, as he must given the causal complexities and significant policy concerns presented here. Nor will Mr. Warren show that he engaged in any protected speech. And even if he demonstrates all that, the Governor will show that he would

9

have suspended Mr. Warren for neglecting his duty and evincing incompetence regardless of any alleged animus for his statements.

## I.   Mr. Warren will fail to show that his suspension was substantially motivated by the expressive content of his speech.

At trial, Mr. Warren will be unable to show that any protected speech substantially motivated his suspension. *See Castle v. Appalachian Tech. Coll.*, 631 F.3d 1194, 1197 (11th Cir. 2011) (citing *Smith v. Mosley*, 532 F.3d 1270, 1278 (11th Cir. 2008)). Rather, the evidence will show that the Governor suspended Mr. Warren because, and only because, the Governor reasonably construed Mr. Warren's statements to be announcements of blanket non-prosecution policies, or at the least, indications that Mr. Warren believed he could impose such prosecutorial policies. *See Heffernan v. City of Paterson*, 578 U.S. 266, 272 (2016) ("The facts as the government reasonably understood them are what matter." (simplified)); *see also Waters v. Churchill*, 511 U.S. 661, 677 (1994) (plurality op.). In other words, the evidence will show that the suspension was not motivated by the expressive content of Mr. Warren's statements, but by the conduct and state of mind that the Governor fairly took those words to convey: neglect of his prosecutorial duty and an incompetent understanding of his job function. *See Israel*, 269 So. 3d at 496; *see also Ayala*, 224 So. 3d at 758 ("blanket refusal[s]" to enforce certain laws constitute neglect of duty and show incompetence).

1. The evidence will show that the Governor suspended Mr. Warren for his recalcitrance toward his prosecutorial duties and mistaken belief that such conduct was proper. The Governor stated as much in the suspension order. DE 1-1. He noted that Mr. Warren had "publicly proclaimed in writing that he will not prosecute individuals who provide abortions in violation of Florida's criminal laws." *Id.* at 7. That "avowed refusal to enforce certain criminal laws," explained the Governor, constituted "neglect of [Mr. Warren's] duty" to exercise his discretion case-by-case. *Id.* at 8. And the Governor expressed that Mr. Warren's "public proclamations of non-enforcement further demonstrate his incompetence and lack of judgment arising from his gross ignorance of his official duties to faithfully enforce the criminal law." *Id.* at 9. "[I]n light of [his] strident representations of non-enforcement and open defiance of the Florida Legislature," the Governor wrote, "there is no reason to believe that [Mr.] Warren will faithfully enforce the abortion laws of this State and properly exercise his prosecutorial discretion on a case-specific and individualized basis." *Id.* at 8 (quotations omitted). The Governor was clear—he suspended Mr. Warren for his evidenced neglect of duty and incompetent understanding of his prosecutorial responsibilities.

The Governor's staff has also confirmed his intent. His General Counsel Ryan Newman explained that the team that developed the suspension order was focused on Mr. Warren's clear misunderstanding of his role as a prosecutor and his

nullification of Florida law. Their discussions with local law-enforcement leaders in Hillsborough County revealed that Mr. Warren's Presumptive Non-Prosecution Policies in effect created categorical exemptions to the criminal law, leading to Mr. Newman's belief that the Gender and Abortion Statements were merely more unabashed forms of that practice. His Chief Deputy General Counsel Ray Treadwell echoed these concerns. As did the Governor's Senior Advisor for Public Safety Larry Keefe.

Nor will Mr. Warren be able to show that speech, rather than the reasons the Governor advanced in the suspension order, motivated his suspension. For one, the evidence at trial will show that the Governor and his staff have been remarkably consistent about why the Governor suspended Mr. Warren. *See Stanley v. City of Dalton*, 219 F.3d 1280, 1291 n.20 (11th Cir. 2000) (citing *Fikes v. City of Daphne*, 79 F.3d 1079, 1084 (11th Cir. 1996) (inconsistency "indicates that appellant was discharged for conduct other than" the proffered reasons)). From the start, the Governor made his goals clear: He wanted to ensure that state attorneys in Florida were enforcing the law. When he gave Mr. Keefe the green light to look for prosecutors not enforcing the law, the Governor did not refer to any specific prosecutor. Even when Mr. Warren was brought to his attention, the Governor was at first unsure if Mr. Warren, based on a pledge that could potentially be walked back, had definitively refused to enforce Florida law or indicated a belief to that

effect. But the Governor ultimately concluded that the Presumptive Non-Prosecution Policies, the Gender Statement, and the Abortion Statement were categorical exemptions from the enforcement of certain crimes that invited lawbreaking and exemplified an escalating and increasingly more concerning pattern of disregard for the prosecutorial function. The Governor therefore insisted that the suspension letter cite the policies in such an order to underscore Mr. Warren's escalating pattern or practice of conduct and the progression over time that the policies revealed, not the statements' subject matter. And the Governor went to great lengths to make his intent clear, disciplining Christina Pushaw—his then-communications director—for a tweet that could potentially give the impression that Mr. Warren's suspension was based on anything but his refusal to enforce Florida law and his belief that such refusals were appropriate. DE 1 ¶ 62 (Pushaw tweet); *see also* DE 94-4 at 2–3 (Chief of Staff James Uthmeier disciplining a staffer for publicly tweeting in a way that could give the impression that the suspension was anything but a "legal proceeding").

Finally, the Governor's statements at the press conference on August 4 are consistent with these motivations. The Governor highlighted that "over the last few years," prosecutors across the country have "take[n] it upon themselves to determine which laws they like and will enforce and which laws they don't like and then don't enforce." DE 3-6 at 0:40–1:00. Those refusals to enforce the law have palpable

consequences to communities and the "rule of law." *Id.* at 0:30–1:30. For example, the Governor continued, in some places individuals can enter a store "and steal a certain amount of merchandise" without risking criminal prosecution, undermining "public safety" and hurting working-class communities. *Id.* at 0:55–1:30. In response, the Governor asked his staff to ensure that this "was not going to happen here" by looking for state attorneys who were "nullify[ing]" Florida law. *Id.* at 1:15–1:45. That inquiry "all came back" to Mr. Warren, who "put himself publicly above the law." *Id.* at 1:30–2:30. By signing the Gender and Abortion Statements, Mr. Warren had effectively exercised a "veto" over the legislature's authority, and by his non-prosecution policies, he had refused to exercise "individualized and case-specific" discretion. *Id.* at 2:00–4:30. The other presenters at the press conference echoed the same sentiment—Mr. Warren had refused to enforce state laws, and his removal would protect the community and promote respect for the rule of law. *Id.* at 7:00–39:00 (statements of Hillsborough County Sheriff Chad Chronister, Polk County Sheriff Grady Judd, Pasco County Sheriff Chris Nocco, Attorney General Ashley Moody, former Tampa Police Chief Brian Dugan, and then-Circuit Judge Susan Lopez).

A lack of any discriminatory history or comparators will also counsel in the Governor's favor at trial. *See Burton v. City of Belle Glade*, 178 F.3d 1175, 1189 (11th Cir. 1999). Mr. Warren will be unable to establish that any other official has

been suspended by the Governor for the content of his speech, nor that other individuals made similar speech and were not punished. *See Lewis v. City of Union City*, 918 F.3d 1213, 1222–23 (11th Cir. 2019) (en banc). To be sure, Mr. Warren identified two individuals in his motion for a preliminary injunction who are allegedly comparators: Sheriff Dennis Lemma and Sheriff Chad Chronister. DE 3 at 16 & n.2. But the evidence at trial will show that those comparators are not "similarly situated in all relevant respects" to Mr. Warren, *Knight v. Baptist Hosp. of Mia., Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003), because they did not issue comparable non-enforcement policies. Moreover, Mr. Warren will be unable to establish that the Governor was even aware of Sheriff Lemma's or Sheriff Chronister's statements—a key requirement for establishing them as valid comparators. *See id.* at 1317 n.5; *see also Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1186 (11th Cir. 1984), *abrogated on other grounds*, *Lewis*, 918 F.3d at 1217–18 ("If an employer applies a rule differently to people it believes are differently situated, no discriminatory intent has been shown." (simplified)).

2. One final point: It does not matter that the Governor identified Mr. Warren's neglect of duty and incompetence primarily by reading Mr. Warren's written words. *See Keeton v. Anderson-Wiley*, 664 F.3d 865, 877–78 (11th Cir. 2011) (refusal to do job that becomes "apparent through [] writings and [other forms of speech] does not cloak [that refusal] in First Amendment protection"); *cf. Gogel v.*

15

*Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1148 (11th Cir. 2020) (en banc) (for Title VII discrimination and retaliation claims, "our precedent makes clear, when assessing whether [the government] has properly imposed an adverse action on an employee based on that employee's conduct, the question is not whether the employee actually engaged in the conduct, but instead whether [the government] *in good faith believed* that the employee had done so" (emphasis added)). The government may regulate conduct that incidentally involves speech without implicating the First Amendment. For instance, the State may pass an anti-discrimination law that prohibits an employer from posting a "White Applicants Only" sign because the law is regulating conduct (racial discrimination), even though that conduct was announced and accomplished using words. *See FAIR*, 547 U.S. at 62; *see also Keeton*, 664 F.3d at 877–78. Likewise, the State may use a defendant's own words as evidence against him in a criminal trial, without running afoul of the First Amendment. *See Giboney*, 336 U.S. at 502 (a regulation of conduct does not transform into a regulation of speech "merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed"). The same principle applies here.

## II.   Mr. Warren's claim will fail because he cannot show that the Governor lacked probable cause to suspend him.

Even assuming Mr. Warren could show that the Governor based the suspension on the expressive content of Mr. Warren's speech, Mr. Warren's claim

faces still a threshold obstacle. First Amendment retaliation claims arising from suspension orders will often pose vexing causation issues and, in all cases, threaten to seriously impair the functioning of government. Thus, like in many other First Amendment retaliation contexts, Mr. Warren can prevail only if he makes a "threshold showing" that the Governor lacked probable cause to suspend him. *Nieves*, 139 S. Ct. at 1727. Because he cannot, his claim will fail.

### A.   Mr. Warren must make a threshold showing that the Governor lacked probable cause to suspend him for neglect of duty and incompetence.

For various types of First Amendment retaliation claims involving the institution of legal process, the Supreme Court and Eleventh Circuit have required plaintiffs to show that the government lacked probable cause to take the action. *E.g.*, *id.* That requirement applies here.

1. Several factors justify treating the lack of probable cause as an element of a claim alleging that the government retaliated by using legal process. At the start, that element ameliorates the otherwise thorny causation issues posed by such claims. Whereas sometimes—as in the ordinary "public employment context"— "establishing the causal connection between a defendant's animus and a plaintiff's injury is straightforward," *id.* at 1722, that inquiry is "not so straightforward" when the alleged retaliatory action is the government's institution of legal action, like a prosecution, an arrest, or a civil lawsuit, *id.* at 1723–24; *see also DeMartini v. Town*

17

*of Gulf Stream*, 942 F.3d 1277, 1304 (11th Cir. 2019). Indeed, many causes contribute to the difficulty of proving or disproving causation "in a claim that [legal process] was induced by an official bent on retaliation." *Hartman*, 547 U.S. at 265.

To start, a plaintiff's protected speech will often be a "wholly legitimate consideration" for the government "when deciding whether" legal process is necessary to protect the public. *Nieves*, 139 S. Ct. at 1723–24. The "content and manner of [the plaintiff's] speech may convey vital information" about whether the plaintiff has broken or intended to break the law. *Id.*; *see also id.* at 1720–21, 1724 (wholly legitimate for officers to identify a person "to be a threat based on . . . the content and tone of his speech" when he approached the officers drunkenly and yelled at them); *DeMartini*, 942 F.3d at 1305–06 (plaintiff's speech was a "wholly legitimate consideration" in determining whether probable cause existed to file a civil RICO action). Given that speech will often indicate wrongdoing, and can thus be a "proper basis" for adverse action, *DeMartini*, 924 F.3d at 1305, it is typically difficult to parse "whether the adverse government action was caused by the offic[ial's] malice" toward the speech or instead by an appropriate response to the "potentially [unlawful] conduct" that the speech evinced, *Nieves*, 139 S. Ct. at 1724; *see also Reichle v. Howards*, 566 U.S. 658, 668 (2012).

Compounding the difficulty of assessing causation in this context is that multiple government actors are typically involved in the decision to institute legal

process. *Reichle*, 566 U.S. at 667–68. Often, the actor with the allegedly retaliatory motive will not be the actor that instigated legal action, *see DeMartini*, 942 F.3d at 1304, creating "the factual difficulty of divining" whose (if anyone's) retaliatory motive "induced the [adverse] action," *Hartman*, 547 U.S. at 263. In *DeMartini*, for instance, a town was alleged to harbor a retaliatory motive for filing a civil lawsuit, but outside lawyers for the town were the ones that "conducted [the] investigations, evaluated the facts, and [ultimately and] independently recommended" that the town take the allegedly adverse action. 942 F.3d at 1304. Those degrees of separation "widen[ed] the causal gap between the defendant's animus and the plaintiff's injury," *Reichle*, 566 U.S. at 668, making the "chain of causation" substantially "more complex" than in a typical retaliation case, *DeMartini*, 942 F.3d at 1304; *see also Hartman*, 547 U.S. at 262–63 (retaliatory-prosecution claims often involve such a gap because they typically turn on the alleged "retaliatory animus" of an arresting or investigative officer, not the prosecutor who "presse[s] charges").

Relatedly, the official instituting a legal process is often entitled to a "presumption of regularity" that courts will "not lightly discard" given judicial respect for "executive discretion." *Hartman*, 547 U.S. at 263 (prosecutors); *see also United States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926) (explaining that "in the absence of clear evidence to the contrary, courts presume that [high-level executive officials] have properly discharged their official duties"); *Latif v. Obama*, 666 F.3d

19

746, 748 (D.C. Cir. 2011) ("The presumption of regularity supports the official acts of [executive] officers . . . ." (quoting *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007)). That "added legal obstacle" makes it harder to distinguish between a good-faith charging decision and one fueled by retaliatory animus. *Hartman*, 547 U.S. at 263; *cf. also DeMartini*, 942 F.3d at 1304 (imparting a presumption of regularity to lawyers who were "bound by the Florida Rules of Professional Conduct").

Alongside these causal difficulties, challenges to the government's institution of legal process implicate serious public policy concerns. Government enforcement actions serve important functions—they simultaneously protect the public in individual cases, *see DeMartini*, 924 F.3d at 1305 (in which the government filed a civil RICO lawsuit against an abusive public-records requester to "protect[] itself, its coffers, and its taxpaying citizens"); *Nieves*, 139 S. Ct. at 1725 (in which an officer arrested a disorderly citizen), while promoting the rule of law through "general deterrence," *see United States v. Scroggins*, 880 F.2d 1204, 1206 (11th Cir. 1989). But claims that animus motivated the government's use of legal action hinge on an official's purportedly improper "state of mind," which is notoriously "easy to allege and hard to disprove." *Nieves*, 139 S. Ct. at 1725 (quoting *Crawford-El v. Britton*, 523 U.S. 574, 585 (1998)). The result is that "any inartful turn of phrase or perceived slight during a legitimate use of legal process could land" an official "in

20

years of litigation" and open the door to "broad-ranging discovery" for which there "is no clear end" in sight. *Id.* (simplified).

When retaliation suits become too easy to plead and too hard to defend, they damage the public interest in many ways. First, the threat of "overwhelming litigation" is likely to "dampen the ardor of all but the most resolute" public officials in "the unflinching discharge of their duties," *id.* (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949) (Learned Hand, C.J.)), "chilling" the performance of critical functions entrusted to government officials by the public, *cf. Florida v. United States*, 886 F. Supp. 2d 1301, 1303 (N.D. Fla. 2012) (Hinkle, J.). "[P]olicing certain events like an unruly protest," for example, would simply be unworkable if officers were threatened by constant "litigation risk[]." *Nieves*, 139 S. Ct. at 1725. Second, that risk encourages officials to "minimize their communication [when taking official action] to avoid having their words scrutinized for hints of improper motive—a result that would leave everyone worse off." *Id.* Third, these suits generate "expens[ive] litigation" while "diver[ting] official energy from pressing public issues" and "deterr[ing] able citizens from acceptance of public office." *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982). And fourth, motive manhunts in challenges to government-instituted process inject arbitrariness into the legal system "by making the constitutionality of [an enforcement action] vary from place to place

21

and from time to time depending on the personal motives of individual officers." *Nieves*, 139 S. Ct. at 1725 (simplified).

To "address[] those familiar concerns," courts turn to a time-tested legal element for establishing the improper use of legal process: the requirement that the plaintiff "plead and prove the absence of probable cause" for the allegedly retaliatory action. *Id.* at 1724–25. That requirement simplifies the causation inquiry in many legal-process retaliation cases because the "absence" or "presence" of probable cause to institute a legal process is "high[ly] probative" evidence of the government's retaliatory animus or its lack thereof. *Hartman*, 547 U.S. at 265; *see also Nieves*, 139 S. Ct. at 1723 (probable cause is "highly valuable circumstantial evidence that is" typically "apt to prove or disprove whether retaliatory animus actually caused the injury" (simplified)). When probable cause is lacking, there is often enough evidence to overcome the inherent difficulties present in a legal-process retaliation case, ensuring that "the claim of retaliation will have some vitality." *Hartman*, 547 U.S. at 265; *see also id.* at 261 (a lack of probable cause "will tend to . . . show that retaliation was the but-for basis for instigating the [adverse action]"). But when probable cause exists, that too is "weighty evidence" that animus did not drive the government's enforcement decision. *Nieves*, 139 S. Ct. at 1724; *Hartman*, 547 U.S. at 265 (the presence of probable cause is "high[ly] probative" of an action's propriety). And because the "existence of probable cause

will be at issue in practically all" retaliation claims involving government-instituted legal process, the no-probable-cause element provides substantial evidentiary benefit "with little or no added cost," *Nieves*, 139 S. Ct. at 1723 (simplified).

The common law confirms the appropriateness of a no-probable-cause requirement in many cases involving allegedly retaliatory government process. *See id.* at 1726 (using the common law to confirm the Court's precedential analysis). "When defining the contours of a claim under § 1983, [courts] look to common-law principles that were well settled at the time of its enactment." *Id.* But there was no tort for First Amendment retaliation in 1871, so courts search for the "closest analogy" in defining the contours of a retaliation claim. *DeMartini*, 942 F.3d at 1308. And when the purported retaliation involves the government's allegedly improper use of process, the most analogous common-law torts are usually "false imprisonment" and "malicious prosecution," *Nieves*, 139 S. Ct. at 1726, or "wrongful civil proceedings," *DeMartini*, 942 F.3d at 1308—all of which required the plaintiff to prove probable cause "at common law," *id.* at 1308–09; *Nieves*, 139 S. Ct. at 1726.

2. Those considerations apply no less forcefully here. Mr. Warren claims that the Governor has instituted a legal process—suspension under Article IV, Section 7 of the Florida Constitution—in retaliation for protected speech. Though the Governor will establish at trial that he suspended Mr. Warren for his neglect of duty

and incompetence, not in retaliation for protected speech, many exercises of the suspension power may present a causal picture for proving retaliation that is just as cloudy as that in claims for retaliatory arrest (*Nieves*), retaliatory prosecution (*Hartman*), retaliatory civil process (*DeMartini*), or retaliatory administrative proceedings (*McBeth v. Himes*, 598 F.3d 708 (10th Cir. 2010)).

To begin with, speech is no doubt a "wholly legitimate consideration" for a governor weighing whether there are grounds to suspend a state official. *See Nieves*, 139 S. Ct. at 1724. Take a governor who suspends an official for commission of "a felony" or acts constituting "misfeasance" or "malfeasance," where the proof of the official's crime is a confession. Fla. Const. art. IV, § 7(a). If that confession itself contains otherwise protected speech, the official may seek to transform the governor's entirely lawful action into a First Amendment retaliation claim. The same is true where, as here, a suspension occurs for "incompetence," which includes "gross ignorance of official duties." *Israel*, 269 So. 3d at 496 (simplified). Speech— even speech on politically charged issues, such as the appropriateness of enforcing the death penalty, *see Ayala*, 224 So. 3d at 759—often will be the only way to determine whether an official has such a misunderstanding. Applying *Nieves*'s no-probable-cause requirement to that claim streamlines the causation inquiry and respects the Governor's suspension authority.

24

The Governor's exercise of the suspension power is also entitled to the "presumption of regularity" that courts have long afforded to exercises of "executive discretion." *Hartman*, 547 U.S. at 263. As the State's highest-ranking "public officer," the Court must "presume that [the Governor has] properly discharged [his] official duties" absent "clear evidence to the contrary." *Chem. Found.*, 272 U.S. at 14–15; *see also United States v. Armstrong*, 517 U.S. 456, 464 (1996) (the President and "the President's delegates" that "help him . . . 'take Care that the Laws be faithfully enforced'" are entitled to a presumption of regularity); Fla. Const. art. IV, § 1 (vesting the State's "supreme executive power" in the Governor). And that presumption should be particularly strong in the context of suspension. After all, suspension is akin to a prosecutorial power, Fla. Stat. § 112.43 ("All suspensions . . . shall be prosecuted by the Governor, the Governor's legal staff, or an attorney designated by the Governor."); *State ex rel. Hardie v. Coleman*, 155 So. 129, 134 (Fla. 1934), and courts afford a "longstanding presumption of regularity" to "prosecutorial decisionmaking," *Hartman*, 547 U.S. at 263; *cf. DeMartini*, 942 F.3d at 1304 (adopting the no-probable-cause requirement for retaliatory civil process in part because the filing of a civil lawsuit is typically performed by a lawyer bound by ethical rules, to whom the presumption of regularity applies).

What is more, a suspension typically involves multiple government actors and a "causal gap" between the decisionmaker (Florida's governor) and the actors that

developed the suspension (his staff). *Reichle*, 566 U.S. at 668; *see also DeMartini*, 942 F.3d at 1304 (explaining that lawyers there "conducted investigations, evaluated the facts, and only then independently recommended the filing" of a civil lawsuit). This case proves the point. The Governor of course made the final call to suspend Mr. Warren. But as the evidence will show, his staff—General Counsel Ryan Newman, Chief Deputy General Counsel Raymond Treadwell, and Senior Advisor for Public Safety Larry Keefe—developed the suspension order from start to finish. Mr. Keefe identified Mr. Warren as a potentially neglectful and incompetent state attorney, created the initial bases for the suspension order, and completed an initial draft. Mr. Newman and Mr. Treadwell analyzed and refined the bases for the suspension. Mr. Newman then presented those bases to the Governor. And both Mr. Newman and Mr. Treadwell drafted the final order and incorporated the Governor's edits. Those officials' substantial involvement "widens the causal gap between the defendant's [alleged] animus and the plaintiff's injury," *Reichle*, 566 U.S. at 668, stretching the "chain of causation" to yet another level, *see DeMartini*, 942 F.3d at 1304. And while none of those officials, as the trial will show, harbored any retaliatory motive, the no-probable-cause requirement bypasses potentially complicated causation issues in cases that are not so clear cut.

Along with all that, the difficulties discussed above manifest here in spades. The suspension power is integral to Florida's governmental structure: It allows the

Governor to "take care that the [State's] laws be faithfully executed," Fla. Const. art. IV, § 1(a), by temporarily removing wayward officers from positions of power. But if exercising that power embroiled governors (and their staff) in onerous litigation, their "time would be monopolized by preparing and testifying in such cases," *cf. In re U.S.*, 985 F.2d 510, 512 (11th Cir. 1993), their energies would be "divert[ed] . . . from [more] pressing public issues," *Harlow*, 457 U.S. at 814, and "expens[ive] litigation" would siphon funds from the public fisc, *id.* Those risks combined would "dampen the ardor of all but the most resolute" governor in "the unflinching discharge of [his] duties." *Nieves*, 139 S. Ct. at 1725 (quotation omitted); *see also Florida*, 886 F. Supp. 2d at 1303 (discussing the "chilling effect" that the burdens of litigation have on the good-faith performance of official duties).

As in *Hartman*, *Nieves*, *DeMartini*, and *Himes*, a no-probable-cause requirement solves all those problems. On the one hand, a lack of probable cause to believe that justifications for suspension exist is "highly valuable circumstantial evidence that . . . retaliatory animus actually caused the [suspension]." *Nieves*, 139 S. Ct. at 1723. But on the other, the presence of probable cause is "highly probative" evidence of a governor's (and his staff's) good faith and "will suggest that [the adverse action] would have occurred even without a retaliatory motive." *See Hartman*, 547 U.S. at 261. In other words, the stronger the objective grounds for suspension, the less likely it is that the governor acted with a subjectively improper

27

motive and vice versa. *See Nieves*, 139 S. Ct. at 1724 ("[Probable cause's] absence will . . . generally provide weighty evidence that . . . animus caused the [adverse action], whereas the presence of probable cause will suggest the opposite.").

For just that reason, imposing a threshold no-probable-cause requirement "can be made mandatory with little or no added cost." *Hartman*, 547 U.S. at 265. Given its probative value, probable cause is "likely to be raised by some party at some point," whether in the plaintiff's prima facie case or in the governor's same-decision defense. *Cf. id*. Alongside the merits of the retaliation case, the suspended official will also evaluate whether reasonable grounds for suspension exist while preparing for the imminent Florida Senate proceeding, which will consider whether to remove the suspended official permanently on the grounds stated in the suspension order. *See* Fla. Senate Rs. 12.7, 12.9–15 (2020–2022); Fla. Stat. § 112.43. And the suspended official will usually have most (if not all) of the evidence he needs to assess whether the governor had probable cause, because the governor will have issued an "executive order stating the [legal] grounds" for the suspension, Fla. Const. art. IV, § 7(a), as well as "specify[ing] facts sufficient to advise both the officer and the Senate as to . . . [its] basis," Fla. Stat. § 112.41(1); s*ee also DeMartini*, 942 F.3d at 1304–05 (adopting no-probable-cause requirement in part because the plaintiff knew of the facts surrounding an allegedly retaliatory civil lawsuit brought against him).

28

Finally, the common law underscores that a no-probable-cause requirement is a proper fit for a retaliatory-suspension case brought under Section 1983. *See Nieves*, 139 S. Ct. at 1726; *DeMartini*, 942 F.3d at 1308. Again, there was no common-law tort for First Amendment retaliation in 1871, so courts search for the "closest analogy" in defining the contours of a retaliation claim. *DeMartini*, 942 F.3d at 1308. And just like in *DeMartini*, the closest analogue to a retaliation claim based on civil suspension proceedings is the tort of wrongful civil proceedings. *See id.*; *see also* Thomas M. Cooley, *Law of Torts* 187–89 (1879); Francis Hilliard, *The Law of Torts or Private Wrongs* 433–66 (4th ed. 1874); Restatement (First) of Torts § 674 (Am. L. Inst. 1938). Indeed, Mr. Warren challenges the Governor's "initiation of proceedings" through suspension, which "set the machinery of" Florida's legal removal process "in motion" against him. *See* Restatement (First) of Torts § 674 cmt. a. That is precisely the injury that the tort of wrongful civil proceedings was historically designed to remedy.[1] *See* Martin L. Newell, *A Treatise on the Law of*

---

[1] Legal procedures for executive-officer removal were settled features of the law at the time of Section 1983's adoption. In Blackstone's time, the "coroner" was an elected officer subject to "for cause" removal by the king. I Blackstone, Commentaries on the Laws of England, 346 (Thomas M. Cooley ed. 1884). Three corporate colonial charters provided for executive involvement in the removal of elected officers. Mass. Bay Charter of 1629; Conn. Charter of 1662; R.I. & Providence Plantations Charter of 1663; *see also* Nikolas Bowie, *Why the Constitution was Written Down*, 71 Stan. L. Rev. 1397, 1416–17 (2019). Several state constitutions from the Founding until the time around Section 1983's adoption featured similar systems in which governors could suspend or remove lower-level

*Malicious Prosecution, False Imprisonment, and the Abuse of Legal Process*, ch. 1 § 1 (1892) (defining the wrong in this tort as "institut[ing] proceedings maliciously which [a person] has no good reason to believe are justified by the facts and the law"). And like malicious prosecution and false imprisonment, *Nieves*, 139 S. Ct. at 1726, the tort of wrongful civil proceedings required the plaintiff to prove a lack of probable cause for the initiation of the challenged legal proceedings. *See* Restatement (First) of Torts §§ 674–75; *see also DeMartini*, 942 F.3d at 1309 (adopting a no-probable-cause threshold requirement in a retaliation claim when the adverse action was analogous to a civil proceeding).

### B.   Mr. Warren will fail to show that the Governor lacked probable cause to suspend Mr. Warren.

Mr. Warren will not meet the no-probable-cause element here. Probable cause "requires no more than a 'reasonabl[e] belie[f] that there is a chance that [a] claim may be held valid upon adjudication.'" *DeMartini*, 942 F.3d at 1300–01 (quoting *Prof'l Real Est. Inv'rs, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 62–63 (1993)). As applied here, Mr. Warren therefore bears the burden to prove that the Governor did *not* reasonably believe—"based on the facts and circumstances known

---

executive officials. *See* N.Y. Const. of 1821, art. IV, § 8; Wis. Const. of 1848, art. VI, § 4; Mich. Const. of 1850 (as amended 1862), art. XII, § 8; Fla. Const. of 1885, art. IV, § 15, art. IV, § 20; *see also* Pa. Const. 1776, § 22; Vt. Const. of 1777, ch. II, § XX; Saikrishna Prakash, *Removal and Tenure in Office*, 92 Va. L. Rev. 1779, 1822–23 (2006). So this type of legal procedure would have been familiar to the framers of Section 1983.

to him"—that Mr. Warren engaged in "neglect of duty" or "incompetence." *See id.* at 1301.

Under Florida law, "neglect of duty" means the "failure on the part of a public officer to do and perform some duty or duties laid on him as such by virtue of his office or which is required of him by law." *Israel*, 269 So. 3d at 496 (quoting *Hardie*, 155 So. at 132). Incompetence exists when a person has "gross ignorance of official duties or gross carelessness in the discharge of them." *Id.* (quoting *Hardie*, 155 So. at 133). Because prosecutors have a duty to enforce Florida law, a state attorney neglects his duties when he declares a "blanket policy" of non-prosecution. *Ayala*, 224 So. 3d at 758–59. And because it also shows "a misunderstanding of Florida law," a genuine belief that one can promulgate blanket non-prosecution policies or refuse to enforce laws based upon one's own sense of which laws serve the public interest similarly shows incompetence under the suspension standard. *See id.*

The evidence at trial will establish that, based on the facts known to him, the Governor reasonably believed he was authorized to suspend Mr. Warren. At the very least, Mr. Warren's own public statements gave the Governor a reasonable belief that Mr. Warren either (1) announced blanket, non-individualized non-prosecution policies or (2) genuinely believed that he could adopt such policies consistent with his duties under Florida law. *See DeMartini*, 942 F.3d at 1300–01.

31

Starting with the Abortion Statement, Mr. Warren publicly stated that he would "decline to use [his] offices' resources to criminalize reproductive health decisions" and "*commit* to exercise [his] well settled discretion and refrain from prosecuting those who seek, provide, or support abortions." DE 1-1 at 22 (emphasis added). He emphasized that "prosecutors should not be part of [prosecuting abortion cases]" even if democratically elected "legislatures . . . decide to criminalize [abortion]." *Id.* at 24.[2] And in the Gender Statement, Mr. Warren "pledge[d] to . . . not promote the criminalization of gender-affirming healthcare or transgender people," *id.* at 13, and "committed" to using his "settled discretion and limited

---

[2] In addition to these, the Abortion Statement also asserted that:

- "[W]e cannot stand by and allow members of our community to live in fear of the ramifications of this deeply troubling decision [i.e., Dobbs]."
- "[W]e stand together in our firm belief that prosecutors have a responsibility to refrain from using limited criminal legal system resources to criminalize personal medical decisions."
- "Enforcing abortion bans runs counter to the obligations and interests we are sworn to uphold."
- "As elected prosecutors, we have a responsibility to ensure that these limited resources are focused on efforts to prevent and address serious crimes, rather than enforcing abortion bans . . . ."
- "Criminalizing and prosecuting individuals who seek or provide abortion care makes a mockery of justice; prosecutors should not be part of that."
- "We will continue to consider the prosecution of individuals who violate the autonomy of a pregnant person by carrying out a forced abortion, or who perform an abortion negligently or with the intent to cause harm to the pregnant person."

*See* DE 1-1 at 22–24.

resources on enforcement of laws that [be believes] will not erode the safety and well-being of [the] community," *id.* at 15. In other words, Mr. Warren would not use any "criminal justice and law enforcement resources" on enforcing laws that he disagreed with, such as laws criminalizing gender-affirming care. *Id.* A reasonable person in the Governor's position could rightly conclude that Mr. Warren was thus refusing to exercise "individualized" prosecutorial discretion through blanket or near-blanket non-prosecution policies, *Ayala*, 224 So. 3d at 758, or at the very least signaling incompetence, *cf. id.* at 759.

Next, Mr. Warren's Presumptive Non-Prosecution Policies addressing bicyclists, pedestrians, and certain misdemeanors could reasonably be construed as negating particular legislative enactments. Mr. Warren instructed his prosecutors not to charge "where the initial encounter between law enforcement and the defendant results from a non-criminal violation in connection with riding a bicycle or a pedestrian violation," with the "only exception" being for crimes posing a "direct threat to public safety, such as where an individual has suffered physical harm or where a firearm is involved." DE 1-1 at 5. Likewise, the Governor was aware of Mr. Warren's policy of "presumptive non-enforcement for certain criminal violations, including trespassing at a business location, disorderly conduct, disorderly intoxication, and prostitution." DE 1-1 at 4–5. This presumption could only be overcome by "significant public safety concerns." DE 1-3 at 2. The Governor

33

reasonably concluded that these policies clashed with Florida law's requirement that prosecutorial discretion be exercised on an "individualized" basis, *Ayala*, 224 So. 3d at 759, rather than in some sort of "presumptive" manner disfavoring prosecution. The practical effect of these policies is that Mr. Warren rewrote Florida's criminal law to add a new, subjective element to these crimes—that there also be significant public safety concerns.

In addition to Mr. Warren's public statements, the other facts known by the Governor buttressed his determination of probable cause. The evidence adduced at trial will show that as early as January 2021, law-enforcement officers and other state attorneys in Florida began identifying Mr. Warren to the Governor's staff as a state attorney who would not enforce the law. From his conversations with law-enforcement officials, Senior Advisor for Public Safety Larry Keefe saw that all roads in this inquiry led to Mr. Warren. Those most likely to know the practical impact of Mr. Warren's prosecution policies, the local law-enforcement officials in Hillsborough County—including Sheriff Chad Chronister and former Tampa Police Chief Brian Dugan—told the Governor's office about their problems with Mr. Warren's lack of enforcement, including improperly declined criminal prosecutions. Sheriff Chronister told the Governor's staff that the Presumptive Non-Prosecution Policies created, in effect, categorical exemptions to certain crimes. As a result, the Governor's team concluded that Mr. Warren's office was not exercising

34

individualized discretion under the Presumptive Non-Prosecution Policies and that the later-adopted Abortion and Gender Statements were merely more brazen forms of this practice. These findings and concerns were relayed to the Governor at a July meeting with Mr. Keefe and General Counsel Ryan Newman, and through the draft of the executive order that the Governor reviewed.

In sum, the question under *Nieves* is not whether the Florida Senate could ultimately remove Mr. Warren. The only question is whether the Governor had probable cause to believe Mr. Warren's suspension was authorized under Florida law. He undoubtedly did.

## III.   Mr. Warren cannot establish that the relevant speech was protected under the First Amendment.

Even if Mr. Warren could show a lack of probable cause, his retaliation claim will still fail for another, independent reason: Mr. Warren cannot establish the first element of his prima facie case—that the Abortion and Gender Statements constitute protected speech under the First Amendment. That is because the statements are either unprotected government speech, *see Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Gundy v. City of Jacksonville*, 50 F.4th 60 (11th Cir. 2022), speech that substantially interferes with Mr. Warren's job duties, *Pickering v. Board of*

*Education*, 391 U.S. 563 (1968), or speech incidentally burdened by a valid conduct restriction.

### A.     Mr. Warren's statements were unprotected government speech.

If Mr. Warren spoke as the government when making the Abortion and Gender Statements, those statements were unprotected speech. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009) ("[G]overnment speech is not restricted by the Free Speech Clause."). The First Amendment protects the people's "freedom of speech," U.S. Const. amend. I, and thus "restricts *government regulation* of private speech; it does not regulate government speech," *Mech v. Sch. Bd. of Palm Beach Cnty.*, 806 F.3d 1070, 1074 (11th Cir. 2015) (emphasis added); *see also Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 841 (1995) (there is a "critical difference between *government* speech" limited only by the Establishment Clause "and *private* speech . . . , which the Free Speech and Free Exercise Clauses protect").

In joining the Gender and Abortion Statements, Mr. Warren was speaking for the government, under either the bright-line rule of *Garcetti* or the more general three-factor test in *Gundy*.

1. The Governor adopts his prior arguments that Mr. Warren's statements were unprotected government speech under *Garcetti*. *See* DE 30 at 7–13; DE 60 at 4–7; *see also Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2424 (2022)

(describing *Garcetti* as a government-speech case). But he raises one additional point. In denying the Governor's motion to dismiss, the Court reasoned that Mr. Warren did not act pursuant to his job duties by participating in the Abortion and Gender Statements because it was not his "duty, as state attorney, to join in writings of this kind, let alone to join in these specific writings." DE 68 at 16. That answers the wrong question. It is true that a state attorney has no duty to join public statements with other prosecutors denouncing certain laws, but a state attorney *does* have a duty to, and often does, institute and articulate prosecutorial policies for his jurisdiction. *Supra* Part II.B. And as explained above, *supra* Parts I–II.B, that is what the Governor reasonably took Mr. Warren to do in the Gender and Abortion Statements: He announced how he intended to exercise prosecutorial discretion in carrying out the duties of his office. *See Culter v. Stephen F. Austin State Univ.*, 767 F.3d 462, 469–70 (5th Cir. 2014) (courts must take a "deferential approach" when determining whether "speech [was] made pursuant to [official] duties or as a citizen on a matter of public concern"); *cf. Ayala*, 224 So. 3d at 756 (State Attorney Aramis Ayala announced at a press conference that she would not seek the death penalty). Because such announcements no doubt would have been made "in furtherance of" Mr. Warren's "ordinary responsibilities" as a state attorney, they plainly were made in his official capacity. *Alves v. Bd. of Regents of Univ. Sys.*, 804 F.3d 1149, 1159– 62 (11th Cir. 2015); *see also Lane v. Franks*, 573 U.S. 228, 239 (2014) ("The critical

question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties . . . .").

2. *Garcetti* aside, Mr. Warren's speech also qualifies as unprotected government speech under the standard three-part test for determining whether a message stems from the government or a private speaker. *See, e.g.*, *Gundy*, 50 F.4th at 71–80 (applying three-part government speech test to a legislative invocation and concluding that it was government speech); *Matal v. Tam*, 137 S. Ct. 1744, 1757–60 (2017) (trademarks were not government speech); *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015) (license plates were government speech); *Summum*, 555 U.S. at 481 (public park monuments were government speech). The *Gundy* test is distinct from *Garcetti* and unquestionably applies to the speech of elected officials.[3]

---

[3] *See, e.g.*, *Davison v. Randall*, 912 F.3d 666, 686 (4th Cir. 2019) (applying three-part government speech test to an elected official Facebook page and concluding that the official's posts were government speech but that the interactive portions of her Facebook page were not government speech); *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 239 (2d Cir. 2019), *cert. granted, judgment vacated for mootness sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021) (assuming that an elected official's tweets were government speech); *Goldstein v. Galvin*, 719 F.3d 16, 30 (1st Cir. 2013) (applying this test and concluding that an elected official's "use of the plaintiff's name in a website announcement" was government speech); *Choose Life Ill., Inc. v. White*, 547 F.3d 853, 855 (7th Cir. 2008) (applying this test and concluding, before *Walker*, that elected official's refusal to issue specialty license plate was not government speech); *Turner v. City Council of Fredericksburg*, 534 F.3d 352, 354–55 (4th Cir. 2008) (O'Connor, J., retired) (applying this test and concluding that

Under *Gundy*, courts first zero in on the "type of speech under scrutiny." 50 F.4th at 77. From there, they balance three factors—history, the public's perception of whether the government endorses the speech, and the government's control of the speech—to determine whether that type of speech is attributable to the government. *See id.* at 76. No factor is dispositive, "but 'a finding that all [three factors] evidence government speech will almost always result in a finding that the speech is that of the government.'" *Id.* at 77 (quoting *Leake v. Drinkard*, 14 F.4th 1242, 1248 (11th Cir. 2021)).

Mr. Warren's Gender and Abortion Statements are government speech. Those statements announced how Mr. Warren intended to deploy the resources of his office in prosecuting crimes. And history, endorsement, and control all demonstrate that such announcements were not made in his individual capacity, but as an arm of the government that he represents.

---

legislative invocations given by an elected official were government speech); *Small Bus. in Transp. Coal. v. Bowser*, No. 20-2645, 2022 WL 2315544, at *1–4 (D.D.C. June 28, 2022) (applying this test and concluding that a mural commissioned by the District of Columbia's elected mayor was government speech); *cf. also Newton v. LePage*, 700 F.3d 595, 602–04 (1st Cir. 2012) (noting that "the [then-nascent] government speech doctrine favors the result we reach" that removal of a mural on government property did not violate the First Amendment, because the government may "disassociate itself from an endorsement implicit" in the art that "interfer[ed] with the message of neutrality the administration wishes to portray").

39

       i.     *The Abortion and Gender Statements were announcements of prosecutorial policies.*

The "type of speech under scrutiny" here, *id.*, is the announcement of Mr. Warren's prosecutorial intentions. The characteristics of such announcements are straightforward: They generally are signed by a high-ranking prosecutorial official, communicate to the public how a prosecutorial office intends to carry out its duties, and explain the office's rationale for doing so. *Cf.* Dep't of Just., Justice Manual, §§ 9-27.001–.130 (2018).

Mr. Warren's statements have all that. Starting at the top, the Abortion and Gender Statements were signed by dozens of high-level prosecutors, each brandishing their official titles. DE 1-1 at 13–30. Mr. Warren was no exception—he signed the statements as "State Attorney, 13th Judicial Circuit (Tampa), Florida." *Id.* at 20, 29. Many observers[4] besides the Governor therefore fairly recognized that

---

[4] *See, e.g.*, Casey Tolan, *Some Big-City District Attorneys Vow not to Prosecute Abortion Cases, Setting Up Legal Clashes in Red States*, CNN (June 30, 2022, 4:27 AM), https://www.cnn.com/2022/06/29/us/district-attorneys-abortion-prosecutions-invs; Christine Vestal, *Liberal Prosecutors in Red States Vow Not to Enforce Abortion Bans*, Stateline (June 24, 2022), https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2022/06/24/liberal-prosecutors-in-red-states-vow-not-to-enforce-abortion-bans; Zoë Richards, *Dozens of Elected Prosecutors Say They Will Refuse to Prosecute Abortion Care*, NBC News (June 24, 2022, 10:38 PM), https://www.nbcnews.com/politics/politics-news/dozens-elected-prosecutors-say-will-refuse-prosecute-abortion-care-rcna35305; L.A. Cnty. Dist. Att'y's Office, *With Roe Overturned, 83 Elected Prosecutors Commit to Not Prosecute Abortions* (June 25, 2022), https://da.lacounty.gov/media/news/roe-overturned-83-elected-prosecutors-

the prosecutors signed these statements in their official capacities. *See Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1589 (2022) (the "public's likely perception as to who (the government or a private person) is speaking" is critical to the "holistic [government speech] inquiry"). The Executive Director of Fair and Just Prosecution—the group that drafted the statements—characterized the abortion statement as "[n]early 70 elected prosecutors . . . com[ing] together in a joint statement . . . to pledge not to criminalize abortion." Lauren-Brooke Eisen, *The Prosecutors Pledging Not to Enforce Abortion Bans*, Brennan Ctr. (May 16, 2022), https://www.brennancenter.org/our-work/research-reports/prosecutors-pledging-not-enforce-abortion-bans. And even Gary Weissman, Mr. Warren's chief of staff, relayed to the Governor's Public Safety Advisor Larry Keefe that he had warned Mr. Warren that the Abortion Statement was an official pronouncement that carried a risk of suspension under *Ayala*.

The statements also informed the public of how their signatories would exercise their prosecutorial authority: by committing to blanket non-enforcement policies. In the Abortion Statement, for example, signatories pledged to "decline to use [their] offices' resources to criminalize reproductive health decisions" to "refrain

---

commit-not-prosecute-abortions (viewing the joint statement on abortion as a commitment to "never prosecute a woman for making private, medical choices about her own body"); Fair and Just Prosecution, Facebook (June 21, 2022 8:56 AM), https://tinyurl.com/yd56x9da ("Over 75 criminal justice leaders . . . pledged to not use limited resources to criminalize gender-affirming healthcare.").

from prosecuting those who seek, provide, or support abortions," to "not be a part" of the criminal enforcement of abortion laws, regardless of what state "legislatures may decide." DE 1-1 at 22–24. The group that drafted the statement also called it a "pledge not to criminalize abortion," and a "commitment to not criminalize reproductive choice." Eisen, *supra*. And in the Gender Statement, signatories "pledge[d] to use their discretion and not promote the criminalization of gender-affirming healthcare or transgender people" and to use "limited resources on enforcement of laws that [they believe] will not erode the safety and well-being of [the] community," while also committing to not use "criminal justice and law enforcement resources on criminalization of doctors" who provide gender-affirming care. DE 1-1 at 13–15. Neither statement left the public in doubt—the signatories did not intend to prosecute crimes related to abortion and gender-affirming care.

Lastly, each statement explained the reasons driving its signatories' joint prosecutorial decision. In the Abortion Statement, signatories stated that "generations of Americans have come of age relying upon [the right to abortion]." *Id.* at 22. Abortion bans, in Mr. Warren's view, also "erode trust in the legal system, hinder [the] ability to hold perpetrators accountable, take resources away from the enforcement of serious crime, and inevitably lead to the retraumatization and criminalization of victims of sexual violence." *Id.* at 22. As a result, signatories stated that prosecutors, acting in "the pursuit of justice . . . , should not be part of

[prosecuting abortion cases]." *Id.* at 22–24. Similarly for the Gender Statement, signatories cited statistics on the victimization of and suicidal ideation by transgender individuals and noted their belief that gender-affirming care prohibitions, in whatever form, "intensif[y]" these harms by "isolat[ing], discriminat[ing] against, and criminaliz[ing] transgender people." *Id.* at 13.[5]

Because both statements possess all the hallmarks of announcements of prosecutorial policies, and stated Mr. Warren's intentions about how he would prosecute cases, the Court should treat them as such.

> ii.   *Announcements of prosecutorial policy like Mr. Warren's were attributable to the government under the* Gundy *factors.*

As applied to Mr. Warren's prosecutorial policy announcements, all the *Gundy* factors point in one direction: Mr. Warren carried a message for the government, not for himself. This Court should thus rule that his statements were unprotected government speech.

1.   *History.* Courts look first to "whether the type of speech under scrutiny has traditionally communicated messages on behalf of the government." *Gundy*, 50

---

[5] It is beside the point that no abortion or gender-affirming-care case was referred to Mr. Warren's office. Prosecutorial policies are prospective by design and are intended to guide prosecutors in future cases. *See* DE 1-4 (Mr. Warren's policy stating that, for referred bicycle or pedestrian violations in the future, "there is a presumption that our office *will* not file charges" (emphasis added)). Even if a policy will only later "spring" into effect by not prosecuting a case that is eventually referred to his office, it remains a policy—which is just an intention about how to exercise prosecutorial authority in the future—all the same.

F.4th at 77 (quoting *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n*, 942 F.3d 1215, 1232 (11th Cir. 2019)). If a type of speech boasts a "well-recognized history of communicating [government] messages," that favors a government-speech classification, although "a long historical pedigree is not a prerequisite." *Cambridge Christian*, 942 F.3d at 1232. At bottom, where "both . . . the medium used . . . and the message conveyed through it are . . . traditionally associated with governments," *Gundy*, 50 F.4th at 78 (quoting *Leake*, 14 F.4th at 1249), history "weighs in favor of a government speech finding," *id.*

Both the medium and message here were "traditionally associated with governments." *Id.* The medium—a public statement signed by government officials and intended to announce the adoption of uniform prosecutorial policies—was expressly associated with government. "Broad categorical prosecutorial discretion policies were implemented by a number of early presidents. Presidents Washington, Adams, Jefferson, Madison, Lincoln, and Johnson all granted amnesty from prosecution to a broad class of individuals." Peter L. Markowitz, *Prosecution Discretion Power at Its Zenith: The Power to Protect Liberty*, 97 B.U.L. Rev. 489, 498 & n.40, 499 n.45 (2017) (citing sources). The Department of Justice's Justice

Manual (previously called the United States Attorneys' Manual), which communicates to the public through a similar medium, was first issued in 1953.[6]

Mr. Warren's message—how a high-level government official planned to carry out his executive duties—was also traditionally associated with government. To start, it was governmental by nature because it informed the public about what the government is doing and how it is doing it. Famously, along with pardoning those prosecuted under the Sedition Act, President Thomas Jefferson "ordered his district attorneys to enter *nolle prosequis*" in all prosecutions under the Sedition Act. Markowitz, *supra* at 498–99 & n.45. Mr. Warren's message, like President Jefferson's, concerned how government prosecutors should proceed with criminal cases. And there are few more "traditional" officials to communicate these government messages than elected state attorneys, a common feature in American government for almost 200 years, *see* Michael J. Ellis, *The Origins of the Elected Prosecutor*, 121 Yale L.J. 1528, 1530 (2012), and in Florida's for 50 years, *see* Fla. Const. art. V, § 17 (adopted 1972). State attorneys uniquely have both the ability to sign an announcement of prosecutorial policy and the power to *mean* it. Accordingly, the history factor "weighs in favor of a government speech finding." *Gundy*, 50 F.4th at 78.

---

[6] *United States Attorneys' Manual & Resource Manual Archives*, Dep't of Just., https://www.justice.gov/archive/usao/usam/index.html.

2.    *Endorsement.* The endorsement factor focuses on "whether the kind of speech at issue is often closely identified in the public mind with the government." *Id.* (internal quotations omitted). Another formulation of this standard is "whether 'observers reasonably believe the government has endorsed the message.'" *Cambridge Christian*, 942 F.3d at 1232–33 (quoting *Mech*, 806 F.3d at 1076). For example, monuments in public parks are identified with the government's message because those "parks are often closely identified in the public mind with the government unit that owns the land, and because it certainly is not common for property owners to open up their property for the installation of permanent monuments that convey a message with which they do not wish to be associated." *Id.* (simplified) (quoting *Summum*, 555 U.S. at 471–72). Additionally, state-issued license plates are closely identified with the government because they bear the State's name and are required and regulated "for undeniably governmental purposes." *Id.* (citing *Walker*, 576 U.S. at 212). In sum, the endorsement inquiry is broader than any particular set of facts and turns on whether a speaker speaks "on behalf of the government," *Gundy*, 50 F.4th at 79 (quoting *Turner v. City Council of Fredricksburg*, 534 F.3d 352, 356 (4th Cir. 2008) (O'Connor, J., retired)), such that "a member of the public . . . would identify the [speech] with the [relevant government entity], given the occasion," *id.*

46

Here, "reasonable observers" no doubt would believe that Mr. Warren's statements flowed from the government. A chief prosecutor's announcement of prosecutorial policy is inherently "closely identified" with the government. *See Gundy*, 50 F.4th at 78. The public naturally associates his messages with the government because the "literal speaker" is a high-level government official, even if elected. *See Davison v. Randall*, 912 F.3d 666, 686 (4th Cir. 2019) (holding that an elected official's posts on her government Facebook page were government speech); *Turner*, 534 F.3d at 354–55. And Mr. Warren left no doubt of his high-level government status, as he signed the statements with his title as state attorney—a title and duties borne only because of Florida's governmental structure. Just as the word "TEXAS" being stamped on a license plate associates the plate's message with the government, *Walker*, 576 U.S. at 212, so too does Mr. Warren placing "State Attorney 13th Judicial Circuit (Tampa), Florida" on two "Joint Statement[s] from Elected Prosecutors," *see Cambridge Christian*, 942 F.3d at 1233. DE 1-1 at 13, 20, 22, 29.

Moreover, reasonable observers were likely to believe that a high-level government official, speaking about the duties traditionally assigned to that position, provides the position of the government on the exercise of those duties. *See Shurtleff*, 142 S. Ct. at 1589 (focusing on "the public's likely perception" in the endorsement factor). Just as observers of a public monument reasonably infer the property owner

47

to be the speaker of that monument's message because property owners do not usually permit monuments offensive to their views on their land, *Summum*, 555 U.S. at 471, observers would reasonably infer Mr. Warren's statements to represent the message of his governmental office because private persons do not typically pledge their prosecutorial discretion. Private speakers save their breath because they have no prosecutorial discretion. So reasonable observers would conclude that this message came from an entity that could pledge such power: the government. *See State v. Bloom*, 497 So. 2d 2, 3 (Fla. 1986) (describing the decision to prosecute as "an executive responsibility"). That assumption is confirmed by the public describing these statements as non-enforcement pledges[7] and, in the case of the Abortion Statement, by the drafter of the language itself. Eisen, *supra* (calling the statement a "pledge" and "commitment" not to enforce abortion restrictions).

Accordingly, the endorsement factor also weighs toward a finding that these statements were government speech.

3.   *Control.* Finally, the control factor focuses on whether the "relevant government unit maintains direct control over the messages conveyed through the speech in question." *Gundy*, 50 F.4th at 79 (quoting *Cambridge Christian*, 942 F.3d at 1234). The government, however, need not "control every word or aspect of speech in order for the control factor to lean toward government speech." *Id.*

---

[7] *See* sources cited *supra* note 4.

(simplified) (quoting *Cambridge Christian*, 942 F.3d at 1235–36). Instead, inviting a speaker "inherently exhibits governmental control over [speech] from the outset of the selection process," even when a private citizen is "the literal speaker." *Id.* at 79–80 (simplified). The government therefore need not have "initial editorial rights over the exact content" of speech for the control factor to cut toward a finding of government speech. *Id.* at 80.

Here, the government totally controlled Mr. Warren's speech because that message came "[s]traight from the horse's mouth." Aldous Huxley, *Brave New World* 3 (1932). Unlike in *Gundy*, here a government official, not a private person, was the "literal speaker." 50 F.4th at 79–80 (quotation omitted). Mr. Warren was the State Attorney for the 13th Judicial Circuit and was therefore "the prosecuting officer in all trial courts in that circuit." Fla. Const. art. V, § 17. Who could have more control over the announcement of a government office's policies and actions than the head of that office? Because Mr. Warren had "initial editorial rights" over his office's policies and how to announce them, he was the relevant government official with control. That explains, for example, why in *Page*, the Fourth Circuit determined that the elected Chair of the Loudon County Board of Supervisor's social-media messages were government speech because she "effectively controlled" those messages. *Davison*, 912 F.3d at 672–73, 687. The same was true here: as the elected head of the 13th Judicial Circuit State Attorney's office, Mr.

Warren had complete control over his office's prosecutorial policies and how to announce them. This amounts to "initial editorial rights," which weigh this factor in the Governor's favor. *See Gundy*, 50 F.4th at 80.

*       *       *

All said, each *Gundy* factor points to one conclusion: Mr. Warren's announcements of his prosecutorial policies were not his speech, but the government's speech. *See id.* at 77 (stating that "a finding that *all* [three factors] evidence government speech will almost always result in a finding that the speech is that of the government" (quotation omitted)). And because the government's speech was not protected by the First Amendment, *see id.* at 71, there was no protected speech present here, even counting Mr. Warren's elected status, *see supra* note 3 (collecting cases applying more general government-speech standards to elected officials).[8] As a consequence, Mr. Warren cannot meet the first element of his prima facie case.

### B.   Mr. Warren's speech was unprotected because it fails the *Pickering* balancing test.

Even if the government-speech doctrine does not apply, Mr. Warren's speech is still unprotected under the balancing test established in *Pickering*. When a

---

[8] Nor is it relevant that Mr. Warren may attempt to identify personal expressions in the Abortion and Gender Statements beyond an announcement of prosecutorial policy. In *Gundy*, the Eleventh Circuit noted that Pastor Reginald

government employee speaks on matters of "public concern" in a personal capacity, courts still balance the employee's interest in making the statement against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. The "more closely the [suspension] serves the [State's] interest in the efficient and effective functioning of" a government office, the "more heavily" the balance "weigh[s]" against First Amendment protection. *McCabe v. Sharrett*, 12 F.3d 1558, 1570 (11th Cir. 1994). And here that balance weighs overwhelmingly for the Governor because Mr. Warren's public repudiation of his duty "impede[d] the performance of [his] duties" and "interfere[d] with the regular operation of" his office. *Belcher v. City of McAlester*, 324 F.3d 1203, 1208 (10th Cir. 2003) (quotation omitted); *see also Shahar v. Bowers*, 114 F.3d 1097, 1107–08 (11th Cir. 1997) (crediting government's reasonable prediction that speech will impede job duties).

Mr. Warren is tasked with enforcing the criminal law and keeping his community safe. But by openly declining to enforce Florida law, Mr. Warren shirked his obligations, barred prosecutors in his office from fulfilling their own, and encouraged individuals to commit crimes within his community. His statements therefore represent the "simplest example of a statement by a public employee that

---

Gundy's legislative invocation contained political statements criticizing the city, and yet the entire statement was government speech. 50 F.4th at 65, 72–80. So too here.

would not be protected" by the First Amendment: "answering 'No' to a request that the employee perform a lawful task within the scope of his duties*." Connick v. Myers*, 461 U.S. 138, 163 n.3 (1983) (Brennan, J., dissenting); *see also Berry v. Bailey*, 726 F.2d 670, 676 (11th Cir. 1984) ("refusal to perform a duty" is unprotected); *Belcher*, 324 F.3d at 1208–09 (firefighter's speech on matter of public concern was unprotected when it disrupted his department).

Because Mr. Warren's statements strongly interfered with the regular operation of his office, the *Pickering* balance overwhelmingly weighs in favor of the Governor. *See Pickering*, 391 U.S. at 568; DE 30 at 12–13.

**C.    Mr. Warren's statements were not protected because the suspension standard in the Florida Constitution represents a conduct regulation that only incidentally burdened Mr. Warren's speech.**

The final reason that Mr. Warren's statements were unprotected is that any burden by suspension placed on his speech was merely incidental to a conduct regulation. Mr. Warren was suspended under a conduct restriction, the state suspension standard. So Mr. Warren cannot establish the first element of his prima facie case. *See Norwegian Cruise Line Holdings LTD v. State Surgeon Gen.*, 50 F.4th 1126, 1135 (11th Cir. 2022).

Foundational to the speech-incident-to-conduct doctrine is the notion that regulations on "non-expressive conduct do 'not implicate the First Amendment at all' even if they incidentally burden speech." *Id.* (citing *Otto v. City of Boca Raton*,

52

981 F.3d 854, 861, 865 (11th Cir. 2020)); *see also Holder v. Humanitarian L. Project*, 561 U.S. 1, 26–27 & n.5 (2010). This doctrine does not require that the government show that the application of its regulation primarily targets conduct in a specific case. *See Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1222–23, 1226 (11th Cir. 2022) (noting that a professional licensing standard primarily regulated conduct but "also involved some speech" in the abstract, and not considering any specific speech made by the plaintiff). Rather, the government only needs to establish that the relevant regulations are "directed at . . . conduct" and do not facially discriminate against the expressive components of speech by imposing a burden "based on the content of speech and the identity of the speaker." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). If that is true, then the speech swept into the regulation is incidental to the State's lawful regulation of conduct. *Norwegian Cruise Line Holdings*, 50 F.4th at 1135–36. It is immaterial that "the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney*, 336 U.S. at 502.

Here, the Florida suspension standard creates a type of conduct standard. Neglect of duty is an action that an official takes, just like the "commission of a felony," "drunkenness," and "malfeasance." Fla. Const., art. IV, § 7(a). And

"incompetence" is a state of being, not an expression of speech.[9] *See id.* So like the anti-discrimination law in *Norwegian Cruise Line Holdings*, Florida's suspension provision targets conduct—irrespective of speech used to prove the conduct. *See* 50 F.4th at 1135–37. And unlike the Vermont law in *Sorrell*, the suspension standard does not target the content of speech *ex ante* or focus on who the speaker is. 564 U.S. at 558–59, 563–64 (noting that the law in that case prohibited the sale, disclosure, and use of prescriber-identifying information, to protect doctors from being contacted by drug companies). The fact, then, that Mr. Warren's conduct was "initiated, evidenced, or carried out by means of language, either spoken, written, or printed" does not protect his conduct more than discrimination that takes the form of words. *See Giboney*, 336 U.S. at 502; *see also Ingram v. Johnson*, 187 F.3d 877, 879 (8th Cir. 1999) (holding in a retaliation case that speech-incidental-to-conduct doctrine authorizes "incidental limitations on First Amendment freedoms" (quotation omitted)). The only question is whether his speech evinced conduct that meets the state law standard—a question for the state's levers of government to decide. *See Pennhurst*, 465 U.S. at 106. Thus, Mr. Warren's claim fails.

---

[9] Incompetence is a characteristic of individuals that reflects how they conduct themselves, though is not itself conduct. Because incompetence is not protected speech, it should be treated similarly for purposes of the application of the speech-incident-to-conduct doctrine.

**IV.**   **The Governor will establish that retaliatory animus was not the but-for cause of Mr. Warren's suspension because the Governor would have suspended Mr. Warren even absent any retaliatory motive.**

Assuming Mr. Warren establishes that protected speech substantially motivated his suspension, that the Governor lacked probable cause for the suspension, that Mr. Warren engaged in protected speech at all, and that Mr. Warren's claim survives *Pickering* balancing, the Governor will still show that the suspension "would have been taken anyway." *Hartman*, 547 U.S. at 260 (citing *Crawford-El*, 523 U.S. at 593 and *Mt. Healthy*, 429 U.S. at 285–86); *see also Boquist v. Courtney*, 32 F.4th 764, 778 (9th Cir. 2022) (citing *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739 (2020)). As explained before, the evidence will show that the Governor reasonably believed that Mr. Warren pointedly declined to perform his job duties and that he believed such refusals were appropriate. *Supra* Parts I–II.B. And the evidence will show that "in light of [the Governor's] knowledge, perceptions, and policies at the time of" the suspension, he would have suspended Mr. Warren for such misconduct regardless of animus toward protected speech. *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 685 (1996) (citation omitted); *see also Marshall*, 797 F.2d at 1561 (affirming summary judgment based on same-decision defense where defendant would have fired the employee regardless of animus because the employee's failure to perform his job duties constituted a "compelling independent reason[] for not continuing employment" (quotation omitted)).

55

## CONCLUSION

For the reasons above, the Court should find for the Governor at trial.

Dated: November 22, 2022

Respectfully submitted,

ASHLEY MOODY
*Attorney General*

*/s/ Henry C. Whitaker*
HENRY C. WHITAKER (FBN 1031175)
  *Solicitor General*

JAMES H. PERCIVAL (FBN 1016188)
*Deputy Attorney General*
*of Legal Policy*
NATALIE CHRISTMAS (FBN 1019180)
*Assistant Attorney General*
*of Legal Policy*

JEFFREY PAUL DESOUSA (FBN 110951)
  *Chief Deputy Solicitor General*
DAVID M. COSTELLO (FBN 1004952)
  *Deputy Solicitor General*
ROBERT S. SCHENCK (NYBN 5948039)
ZACHARY GROUEV (FBN 1038629)
  *Solicitor General Fellows*

Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399
(850) 414-3300
*henry.whitaker@myfloridalegal.com*

GEORGE T. LEVESQUE (FBN 555541)
JEFF AARON (FBN 123473)

GrayRobinson, P.A.
301 South Bronough Street, Suite 600
Tallahassee, Florida 32302
(850) 577-9090
*george.levesque@gray-robinson.com*

*Counsel for Governor DeSantis*

57

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2022, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties.

/s/ *Henry C. Whitaker*
Solicitor General