

Andrew H. Warren
Office of the
13th Judici

VERY SIMILAR TO NEW YORK DISTRICT ATTORNEY MEMORANDUM [ATTACHED]

MEMORANDUM

TO:        Assistant State Attorneys

FROM:      Andrew H. Warren
           State Attorney

SUBJECT:   **Prosecutorial Discretion and the M**

This memorandum provides guidance for how Assi
discretion, and how the appropriate exercise of prc
the mission of the State Attorney's Office and the criminal justice system.

#### Our Mission

In 2017, we drafted a mission statement to succinctly define our office's collective purpose:

> *Our mission is to build a safer community while promoting justice and fairness for*
> *everyone in Hillsborough County. Our office is committed to making our county a safer*
> *place to live, work, and raise a family. It is our privilege and honor to serve this*
> *community.*

The goals of the criminal justice system can be categorized and summarized as (1) punishing and holding offenders accountable; (2) preventing crime; (3) rehabilitating offenders; and (4) seeking justice for crime victims.[1] The efficient and successful operation of our system requires balancing these objectives. Achieving that balance is extremely difficult, especially when these goals are not perfectly aligned. Filing charges, securing convictions, and imposing appropriate sanctions constitute the traditional method of achieving accountability and punishment, but diversion programs, specialty courts, and restorative justice models have shown that traditional prosecution is not the only method. Specific and general deterrence resulting from traditional prosecution prevents crime, but crime reduction strategies outside of the criminal justice system such as community-based intervention and mentorship programs are generally more effective and less expensive. Also, contact with the criminal justice system, including incarceration, often increases the likelihood of recidivism—a nuance that can undermine the specific deterrence sought through traditional prosecution. Additionally, embracing victims' importance in the process requires valuing their input and balancing that input along with the other goals while also promoting consistency in the handling of similar cases.

4:22-cv-302-RH-MAF
**JOINT EX**
**47**

---

[1] These goals are sometimes abbreviated as the four "Rs": retribution, recidivism, rehabilitation, and restitution.



**EXHIBIT**
Chronister
6
11-2-22

PENGAD 800-631-6989

DEF 002188

Arguably, over the past generation the system became too focused on punishing offenders, to the detriment of the other goals. This punishment-centered approach is often short-sighted. Overlooking strategies to prevent crime, reduce recidivism, and rehabilitate offenders has perpetuated the revolving door nature of our system, which undermines long-term public safety. These long-term goals often require solutions at a macro, systemic level that go beyond a prosecutor's decision in any individual case. Nevertheless, in handling individual cases, prosecutors must focus on both the short-term and long-term goals—addressing any immediate public safety risk that a defendant poses while also evaluating how best to minimize the likelihood of that defendant reoffending.

Former Supreme Court Justice and United States Attorney General Robert H. Jackson said, "The prosecutor has more control over life, liberty, and reputation than any other person in America. His discretion is tremendous." Prosecutors wield tremendous influence within the system through charging decisions, plea negotiations, and sentencing recommendations. Conventional wisdom incorrectly views prosecutors and defense attorneys as having opposing roles in the system with judges as neutral arbiters of the law. However, a prosecutor's duties go beyond merely prosecuting. As our ethical rules dictate, "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate."[2] As ministers of justice, prosecutors must exercise their discretion to further all the goals of the system. And as representatives of this office and public servants, Assistant State Attorneys must exercise their discretion to further the mission of this office while efficiently using limited public resources and taxpayer dollars.

## General Principles of Prosecutorial Discretion

### Exercise Discretion at Every Stage

There is no simple formula that yields the right prosecutorial outcome. Case-specific review is a hallmark of our criminal justice system. In every case, ASAs must exercise discretion based on the facts of that case—the nature and circumstances of the offense, the defendant's criminal history (or lack thereof), victim input, and other factors. ASAs must exercise that discretion at every stage—from charging through plea negotiation, trial, and sentencing. Additionally, ASAs must continually exercise discretion throughout the pendency of a case beyond those key decision-points. The facts and circumstances may change and consequently warrant re-evaluating a decision that has already been made.

As in any prosecutor's office, there are common practices for handling cases, which ASAs consider to be unwritten "policy." These practices are based on generally applicable approaches but are not absolutes; they are not policy and should not be treated as such. Instead, ASAs should consider the reasons underlying the practice and exercise discretion as to whether the practice should be followed in each individual case.

Supervisors play a pivotal role in guiding ASAs' exercise of discretion. The assigned ASA best knows the facts of each case and should be candid with his/her assessment for decision

---

[2] American Bar Association Model Rule of Professional Conduct 3.8; Florida Rule of Professional Conduct 4-3.8.

DEF 002189

**JEX 47.002**

involving that case. However, supervisors can provide additional insight and promote consistency with similarly situated cases. Accordingly, the assigned ASA should consult with the appropriate supervisor(s) on all critical decisions. Disagreement between an ASA's recommendation and a supervisor's decision is inevitable, and in the small subset of those disagreements where appropriate, ASAs are encouraged to consult with the Chief Assistant for the Bureau for further evaluation of a particular case and to promote consistency across similarly situated cases.

### Solve the Problem

In every case, ASAs should exercise their discretion to further the four goals of accountability & punishment, prevention, rehabilitation, and justice for victims. ASAs should view each case as a problem to be solved rather than simply a person to be prosecuted. For certain types of offenses and offenders, especially violent crime and major fraud, the solution is usually straightforward: traditional prosecution resulting in incarceration neutralizes the offender to ensure that s/he does not harm additional innocent victims. For a defendant who is addicted to drugs or suffering from mental illness, treatment may be the best solution. Often the solution is neither readily apparent nor simple; it requires critical evaluation of all the relevant circumstances and a combination of punitive and rehabilitative sanctions.

### Triage

Different crimes and different criminals represent different threats to public safety. ASAs should view a crime not simply as the violation of a written law but in terms of the harm to the victim and the threat of future harm. This perspective reinforces the aforementioned problem-solving approach. Cases in which the defendant poses a greater threat to public safety are more likely to justify traditional prosecution and more prosecutorial resources. On the other hand, cases in which the defendant poses a minimal threat to public safety are more likely to justify alternative methods of prosecution and fewer prosecutorial resources.

### Charging Requires Discretion

Charging a person with a crime is a serious and consequential decision. Although our system professes innocent until proven guilty, being charged (without being convicted) can have negative and far-reaching impact on a person's family, employment, and finances. For suspects who have not been arrested for the crime, the charge may result in an arrest, which carries its own consequences. Even for suspects who have already been arrested, the formal filing of charges is consequential. ASAs' expectation in filing a charge is that it will result in a conviction or diversion.

ASAs must exercise discretion in filing charges. Charging is not an academic question of which statutes have been violated but rather a judgment decision based on the law, facts, evidence, and expected outcome that appropriately considers the severity of the offense and the suspect's criminal history. The idea that prosecutors should always charge every offense committed and later determine the "appropriate" outcome through sentencing or sanctions is misguided. This approach can undermine the goals of the system; it ignores the use of pre-file

3

diversion programs and civil enforcement that are commonly used as an alternative to criminal charges; it assumes that all laws on the books are equally enforced[3]; and it disregards the existence of overlapping and duplicative statutes. Laws as written do not—and cannot— contemplate every scenario involving countless combinations of defendants, fact patterns, victims, and likely outcomes. By enacting criminal statutes, the legislature gives prosecutors the tools to serve the public interest of justice, but prosecutors must decide how to wield those tools to advance the goals of the system.

ASAs must follow their ethical obligations in making filing decisions. In addition to considering the factors above, prosecutors should only file criminal charges if: (1) the prosecutor reasonably believes the charges are supported by probable cause; (2) admissible evidence is sufficient to support a conviction beyond a reasonable doubt; and (3) charging is in the interest of justice.[4] This is the minimum requirement for filing *and maintaining* criminal charges. Additionally, the governing ethical rules expressly provide that a prosecutor "is not obliged to file or maintain all criminal charges which the evidence may support" and should consider, among other factors, the extent of harm, the potential for punishment disproportionate to the offense, victim input, efficient use of limited prosecutorial resources, and the adequacy of civil remedies.[5]

### *Embracing Diversion and Alternatives to Prosecution*

ASAs must consider and utilize diversion and other alternatives to traditional prosecution. Our office offers a wide variety of diversion programs, including misdemeanor and felony intervention, substance-abuse rehabilitation, and specialty courts such as mental health, drug, and veterans treatment. ASAs need to be familiar with the purposes and eligibility requirements of these programs to be able to identify and refer appropriate cases.

Additionally, ASAs are encouraged to think outside the box in terms of finding innovative ways to further criminal justice goals in a particular case. For example, in cases where the victims have expressed a desire for reconciliation with the defendant, ASAs should consider a restorative justice approach— an approach that emphasizes repairing the harm caused by the criminal behavior more than punishing the offender. This type of approach seeks direct accountability by having the offender accept responsibility and fix the damage caused, while giving the victim a more active role in the process. ASAs should not feel bound by doing what has "always" been done, nor should they be reluctant to explore atypical case resolutions, so long as the resolution furthers the criminal justice goals. Consultation with a supervisor is especially important in a situation where an ASA is seeking an atypical resolution.

### *Sentencing Requires Discretion*

Discretion is imperative with respect to sentencing. Prosecutors do not impose sentences but wield significant influence through how they advocate for sentences. ASAs should seek

---

[3] For example, adultery remains a second-degree misdemeanor in Florida but is rarely, if ever, enforced.

[4] American Bar Association Rule 3-4.3.

[5] American Bar Association Rule 3-4.4.

4

DEF 002191

JEX 47.004

sentences that further the criminal justice goals while factoring in the nature and circumstances of the offense, the defendant's criminal history (or lack thereof), victim input, and other factors. There is a wide range of available sanctions, including incarceration, probation, treatment, and restitution to accomplish the goals of accountability, punishment, deterrence, and rehabilitation. Also, ASAs should advocate for sentences that are consistent with similarly situated defendants.

Determining the appropriate sentence is not simply a math problem dictated by the Criminal Punishment Code. The Code expressly contemplates a range of aggravating and mitigating factors that warrant departures, but the sentencing calculation alone does not quantify the mitigation. Statutory mitigators include the extent of the defendant's participation, the need for specialized mental health treatment, whether the crime was an isolated incident, and the defendant's remorse.[6] ASAs must evaluate all mitigating and aggravating factors, as well as the strengths and weaknesses of each case, in advocating for a sentence. Additionally, ASAs are responsible for obtaining mitigation that they know or should reasonably know to exist. ASAs should not use prosecutorial or investigative resources to obtain mitigation and therefore usually have to rely on defense counsel to provide it. However, when the presence of mitigation is readily apparent, e.g., it is documented in the police report, ASAs should seek it out rather than waiting for defense counsel to raise the issue and provide the mitigation.

Incarceration should generally be reserved for when the defendant is a danger to the community. Whether the defendant poses a danger is evaluated based on the circumstances of the crime and the criminal history. Generally, for violent crimes, especially for offenders with a criminal history, incarceration is warranted. However, a defendant with minimal or no criminal history engaged in an isolated incident of violence may not warrant prison. The defendant's intent also factors into the danger posed. For example, a defendant who intended to seriously injure the victim but did not (e.g., repeated blows to the face that resulted in bruising) likely poses a greater danger than a defendant who did not intend to seriously injury the victim but did (e.g., pushing a victim who falls and breaks a bone).

Using a problem-solving approach requires considering the defendant's motivation in committing the crime. Defendants who are intent on harming innocent members of the community warrant different sentences than defendants who have committed a crime because of addiction or mental illness, or an otherwise law-abiding citizen whose crime was isolated and out of character.

Probation can be an effective intermediate sanction between incarceration and freedom. Probation, however, is not a universal solution, and when overused it can undermine long-term public safety at a significant monetary cost to society. Therefore, it is important that ASAs utilize probation—whether following or in place of incarceration—specifically to further the goals of accountability, punishment, or deterrence, rather than automatically seeking probation

---

[6] F.S. 921.0026(2).

5

DEF 002192

in every case. In every case, ASAs should consider both whether probation is appropriate and, if so, the appropriate length of probation.

ASAs must exercise discretion in utilizing sentencing enhancements—including minimum mandatories such as HFO, HVO, PRR, and VCC. ASAs have discretion to file enhancements when (1) the legal requirements are met and (2) the heightened sentence *may be* warranted. ASAs, however, are not bound to seek enhancements at sentencing (or through negotiated guilty pleas) simply because the enhancement had been filed earlier in the case.

ASAs should consider the consequences of the sanctions we seek to impose. Incarceration as well as lesser sanctions can impact a defendant's job, future employment opportunities, or immigration status. Incarcerating parents has a hidden impact on children, often destabilizing a home environment and potentially increasing the likelihood of criminal activity by the child. Additionally, as mentioned above, sanctions that are warranted from a punishment and accountability perspective may undermine rehabilitation and therefore increase recidivism. Prosecutors are not responsible for navigating all the collateral consequences of conviction and sentences—nor can they be—but ASAs should be aware of these consequences and consider them in advocating for appropriate sentences.

ASAs should be mindful of the monetary cost of sanctions. For example, the cost in Florida for incarceration is approximately $24,265 per year for an adult and as high as $90,000 per year for a juvenile[7]. Although prosecutors are not tasked with saving taxpayer dollars when it comes to sentencing, ASAs should not close their eyes to the cost of the sanctions sought in relation to how effective they believe the sanctions will be in achieving the criminal justice goals in a particular case.

### Negotiate Reasonably & Fairly

Plea negotiations involve advocating for a specific sentence, and therefore prosecutors should follow a similar approach for plea negotiations as they do for sentencing. In conducting plea negotiations, prosecutors must evaluate all mitigating and aggravating factors, as well as the strength and weaknesses of each case. As with sentencing, a prosecutor's role in making plea offers is not simply a question of arithmetic; making offers requires more than calculating the bottom of the sentencing guidelines of the Criminal Punishment Code. Pleas should be made in good faith towards resolving cases through the defendant's acceptance of responsibility, and the plea offer should aim to further the criminal justice goals while promoting consistency with similarly situated defendants. In addition to the statutory mitigators referenced above, the first mitigator listed in the statute is that the case resolved from a plea.[8] Accordingly, in all guilty pleas a mitigator is present that may justify a departure from the bottom of the guideline sentence.

---

[7] Adult cost is based on OPPAGA cost of $66.48 per day for Fiscal Year 2019-20. Juvenile cost is based on Justice Policy Institute's July 2020 report, "Sticker Shock 2020: The Cost of Youth Incarceration."

[8] F.S. 921.0026(2)(a).

6

DEF 002193

JEX 47.006

In making plea offers, ASAs should consider the sentence that the ASA would seek if the defendant were to be convicted at trial. Generally, the plea offer should be below such a sentence to account for the defendant's acceptance of responsibility, the certainty and finality a plea provides to the victim, and the elimination of trial and appellate risk accomplished through the plea. Generally, stronger cases involve less of a reduction from the appropriate post-trial sentence, whereas weaker cases unfortunately necessitate a greater reduction because of greater trial risk. Furthermore, although it is impossible to predict with accuracy what sentence a judge would impose, it is permissible for ASAs to adjust the plea offer to reflect the expected sentence.

There is a tendency among prosecutors and defense attorneys to want the other side to initiate plea discussions. Whereas a defense attorney's goal may be to minimize the sentence, prosecutors should seek the appropriate sentence, not simply the maximum that they can negotiate. Accordingly, ASAs should not avoid initiating plea discussions. ASAs should make reasonable plea offers and be open to negotiating an appropriate resolution. In most cases, ASAs should make an offer by arraignment[9] and be open to further negotiations based on the relevant factors as they learn more about the case. In certain situations, especially those involving more serious crimes where there is a more active dialogue with defense counsel farther in advance of trial, it is appropriate for ASAs to discuss a general range of likely plea offers rather than making a specific, binding offer. This process will help determine the likelihood of a resolution. For example, in situations where a resolution is highly unlikely because the two sides are too far apart, or because the appropriate sentence is so high that the defendant will choose to go to trial, plea negotiations may be unproductive and therefore unnecessary.

A prosecutor's role as a minister of justice applies to plea negotiations as it applies to all other aspects of prosecution. Accordingly, prosecutors must conduct plea negotiations fairly. Although prosecutors can condition plea offers on waiving sentencing enhancements that are appropriate—including capital punishment, mandatory minimums, or the adult prosecution of juveniles—they must not make empty threats regarding enhancements to coerce a plea. It is acceptable for prosecutors to set reasonable deadlines before trial or hearings for acceptance of offers but should not condition pleas on defendants waiving credible allegations of constitutional violations. Appropriate situations for conditional revocation of an offer may include involvement of a vulnerable witness/victim, confidential informants, or other cases where there is a specific justification for withdrawing a plea offer prior to a particular pre-trial event occurring.

## Constitutional Violations

As ministers of justice, prosecutors are obligated to identify Constitutional violations as well as any other police or prosecutorial misconduct. In addition to always complying with discovery and disclosure obligations, ASAs should exercise discretion in terms of prosecuting a case when faced with Constitutional problems or misconduct. Whereas defense attorneys are obligated to

---

[9] Administrative Order 2021-44, ¶ 15.

7

DEF 002194

JEX 47.007

litigate any tenable violation, prosecutors are not merely advocates on behalf of the government. Accordingly, if an ASA believes that a violation occurred that warrants dismissal, s/he should not proceed with the case. Similarly, if an ASA believes that a law enforcement officer has provided misleading testimony or information—even if it falls short of a Constitutional violation warranting dismissal—the ASA should, immediately notify the Chief Assistant pursuant to our office's Law Enforcement Disclosure Policy.

### Examples

Case-specific decisions must be made according to the unique facts and circumstances of the case. Therefore, it is impossible to provide examples that dictate the appropriate decision in every situation across a category of cases. The examples below are intended to provide guidance for certain issues in terms of evaluating charging decisions but are not mandatory charging policies that must be followed in every situation.

- Homeless defendants who are sleeping in a business's parking lot generally should not be charged with trespass because the prosecution is not going to solve the underlying problem in terms of the trespass or the homelessness. The arrest itself addresses the short-term issue of the trespass, but the subsequent prosecution does not further any goal.

- ASAs generally should dismiss a case against a defendant charged with driving on a suspended license who is subsequently able to get his/her license reinstated, as the underlying problem has often been solved, thereby furthering the goal of traffic safety.

- Where a person has committed a public order offense such as making a false 911 call or disorderly conduct, and the police report indicates that the person was suffering from mental health issues or was Baker Acted at the scene, it may be appropriate to no-file the charges if the person is receiving treatment, especially if the prosecution risks undermining the success of the treatment.

- Where a defendant committed petit theft but paid restitution to the victim's satisfaction, the defendant's criminal history is instructive. In these situations, defendants with a limited criminal record may not warrant prosecution if the expected outcome is court costs, whereas defendants with a more significant criminal history may warrant prosecution if sanctions beyond courts costs are appropriate and expected.

- For bringing a firearm into an airport or a courthouse, the decision to charge should depend largely on the suspect's intent. There is a significant difference in the threat to public safety between a person who tries to sneak a firearm into a secure location for ostensibly nefarious purposes, versus an otherwise law-abiding gun owner who merely forgets to remove the firearm from his/her luggage.

- The armed burglary statute applies to situations where the offender is armed prior to the burglary and where the offender becomes armed during the burglary. However, a defendant who arms himself either before or during a burglary to confront the victim of the burglary, e.g., carrying a gun when breaking into a person's home, poses a different

8

DEF 002195

JEX 47.008

public safety threat than a defendant who steals a weapon as the object of the burglary, e.g., opening an empty, unlocked car and stealing a gun. In general, the former should be charged as armed burglary whereas the latter should not.

- The burglary with assault or battery statute applies to (1) situations where the offender breaks into a person's home in the middle of the night and physically attacks the homeowner and (2) to situations in which the offender reaches across the threshold of a rolled-down car window and threatens the driver. There is a significant difference between these two crimes in terms of the threat to public safety and the harm caused to the victim. In general, the former should be charged as burglary with assault or battery whereas the latter is should be charged as a misdemeanor assault, with the possibility of adding the charge of burglary of a conveyance.

- In deciding whether to charge drug trafficking, ASAs must look at factors other than the amount of drugs sold. There is a significant difference in the threat to public safety and the degree of culpability between the kingpin and the mule, even though both may be caught selling the same amount of drugs. Similarly, there is a significant different between a person selling prescription drugs as an organized criminal business versus someone selling his/her own prescribed drugs to afford the medication that s/he needs for legitimate medical use.

- For certain crimes, individual acts that are part of the overall crime may constitute a separate charge, e.g., wire fraud, identity theft, possession of child pornography, unlicensed practice of law, et al. Often in these situations, it is possible to charge dozens or hundreds of counts. For these crimes, ASAs should not file every possible count but rather should strategically charge a number of representative counts to achieve the appropriate sanctions while simplifying the burden of proof at trial.

9

DEF 002196

JEX 47.009



# New Leader to Continue Successful Conviction Review Unit

**This should be part of every prosecutor's office —
any wrongful conviction undermines our justice system
and threatens public safety.**

Without a doubt, our strongest asset at the State Attorney's Office is our team. We strive to hire, develop, and promote talent throughout our office. Top talent is even more critical for specialty positions, and our Conviction Review Unit (CRU) demands a supervisor with legal acumen, trial experience, and steadfast objectivity. So, we're thrilled about our new CRU supervisor, Theresa Jean-Pierre Coy.

We founded the CRU in 2018 to identify, remedy, and prevent wrongful convictions. Attorneys, inmates, and the public can submit a petition[1] to the CRU. If it contains a plausible claim of innocence, we thoroughly investigate the case from beginning to end. An Independent Review Panel of retired judges then provides additional evalu-



Theresa Jean-Pierre Coy

ation. If the CRU identifies a wrongful conviction, our office will take the necessary steps to remedy that conviction.

Ms. Jean-Pierre Coy brings superb perspective to this position. She's a longtime leader in Tampa Bay's legal community with experience as a civil attorney, private criminal defense attorney, Assistant Public Defender, and adjunct professor at both her *alma mater* Stetson University College of Law and WMU Cooley Law School.

In the community, Ms. Jean-Pierre Coy has served as president of the George Edgecomb Bar Association, a member of the Mayor's African-American Advisory Council and many professional organizations, and as both a hearing officer and Civil Service Board attorney for the City of Tampa.

Continued on page 13

# NEED CLE CREDITS?

*You can now order a selection of more than 60 previous CLEs
in mp3 downloadable format from the HCBA!*

**Download the file and listen at your convenience in the comfort of your office or home.
CLEs on CD also are still available for order if you prefer that format.**

## FOR MORE INFORMATION, VISIT WWW.HILLSBAR.COM.

DEF 002197

JEX 47.010

Continued from page 12

She stepped away from her private practice in early 2020 as she battled metastatic breast cancer. With her cancer now under control, she has emerged ready to step up to this new challenge.

Ms. Jean-Pierre Coy understands that a prosecutor's job is to seek justice and that commitment never ends — even if it means acknowledging we got something wrong in the past. "We all know that the justice system has had its flaws," she said. "So the ability to be able to get into this and try to correct some of those errors — whether they were intentional or unintentional — is really a dream job for me and a great culmination of my life's work so far."

Hillsborough's State Attorney's Office is one of the first in Florida with a CRU. It has reviewed more than 400 convictions. In nearly every case, the review confirmed the conviction was correct and justice was served. However, CRU reviews have prompted us to seek reversals of wrongful convictions in three cases, including Robert DuBoise,[2] who spent nearly 37 years behind bars for a murder he did not commit.

Ms. Jean-Pierre Coy is taking the reins from Assistant State Attorney Teresa Hall. Ms. Hall was our CRU's initial supervising attorney, who over the past three years developed the fledging unit into a national leader. Ms. Hall has returned to full-time prosecution within our office.

This position should be part of every prosecutor's office — any wrongful conviction undermines our entire justice system and threatens public safety. If an innocent person is behind bars, that means the guilty person is still out there.

If you know of a case that our CRU should review, fill out a petition today on our website at sao13th.com. ∎

[1] https://www.sao13th.com/conviction-review-unit-cru/
[2] https://www.sao13th.com/2020/08/state-attorney-office-identifies-man-wrongfully-convicted/



**SAVE** *the* **DATE**    **hcba events**

**April 2, 2022**
HCBA Night at Tampa Bay Lightning Game
Amalie Arena

**May 12, 2022**
Law & Liberty Dinner
Hilton Tampa Downtown

**May 16, 2022**
Law Day Membership Luncheon
JW Marriott Tampa Water Street

**May 20, 2022**
Diversity Fair/CLE, Ferguson Law Center

**June 3, 2022**
YLD State Court Trial Seminar
George Edgecomb Courthouse

**June 10, 2022**
HCBA/ABOTA Professionalism Seminar
Stetson Tampa Campus/Ferguson Law Center

Learn more about HCBA events at www.hillsbar.com.
STAY CONNECTED.

DEF 002198

JEX 47.011



# Ending the Mystery Around the Use of Deadly Force

**Every time a law enforcement officer or civilian claims justifiable use of deadly force, the Hillsborough State Attorney's Office follows a deliberate process to determine the facts and share its findings with the public.**

An armed suspect takes off down a dark side road. An officer runs after him. There, on that empty street, the officer opens fire. The suspect falls to the ground and doesn't survive. What happened?

Every time a law enforcement officer or civilian claims justifiable use of deadly force, the Hillsborough State Attorney's Office follows a deliberate process to determine the facts and share its findings with the public.

First, a senior prosecutor responds to the scene and remains available as detectives gather evidence, question witnesses, and piece together the puzzle.

Detectives then present their findings to our Homicide Committee — around two dozen of our most seasoned prosecutors. They hear the evidence and go to work picking it apart, often with uncomfortable questions. Did you follow this lead? Did you ask that question? Does this add up?

After the detectives depart, the committee digs into the applicable law. Does this meet the standards in the statute? In the case law? How does it match up with our high burden of proof — beyond a reasonable doubt?

The law lays out our potential outcomes. We may determine that the use of force was justified or that we cannot refute a person's claims that they were lawfully acting in self-defense. In those situations, no criminal charges are filed. Or the facts may show that the act was potentially neither justified nor lawful self-defense, and we file charges to prosecute and bring that question to a jury.

The committee makes a recommendation, and as State Attorney, I make the ultimate filing decision.



Footage from police officer body-worn camera.

Our office has further expanded its commitment to transparency, posting every review's outcome online.[1] Since implementing this process following George Floyd's murder, our reports now cover over thirty civilian and law enforcement cases.

We also include related materials — typically photos, video, and other evidence that helps readers better understand the situation and our decision — and links to request additional detailed public records.

We believe this level of transparency will help grow the public's confidence in the system at a time when relationships are strained between law enforce - ment and the communities they serve.

The case I described at the start is a real incident. Body-worn camera video and other evidence clearly showed that the suspect stopped running, turned and walked toward the officer with his gun in his hand, and then — just a few steps away — raised his gun and pointed it directly at the officer. That image is printed above. We found the officer's use of deadly force to be justified and no charges were filed.

I hope this look behind the scenes shows you how much analysis goes into getting these decisions right. This process may have been shrouded in mystery in the past. But today, any community member can see the evidence for themselves, read about the facts and the law, and learn exactly why we took the action we did on behalf of the people of the State of Florida. ∎

[1] Available at sao13th.com/useofdeadlyforcereviews.

JEX 47.012



# Clearing the Case Backlog and Getting Back to Business

**Enhanced safety measures have allowed us to conduct more than 200 jury trials since the courthouse reopened.**

Though the pandemic *tried* to press pause on the work we do each day, the State Attorney's Office and our court partners found creative solutions to remain open for business. From virtual dockets to enhanced cleaning and safety measures in the courthouse, we have kept cases moving and conducted more than 200 trials — including several large-scale, high-profile cases — since the courts reopened.

Our prosecutors worked diligently to negotiate appropriate conclusions to many cases while trials were halted, which helped reduce the growing case backlog and keep people from being unnecessarily held in custody.

As we prepared to resume in-person court activities in October 2020, we worked with the Public Defender's Office, the Chief Judge, and the Court Administrator to ensure a safe environment. This included mandatory temperature checks and mask-wearing, social distancing by jurors, limiting the number of people in courtrooms, and providing plexiglass shields at lecterns. These enhanced safety measures have allowed us to conduct more than 200 jury trials since the courthouse reopened — tackling the case backlog, and prioritizing the homicides and violent crime cases that pose the biggest threat to public safety.

Once trials resumed, several prominent cases were finally brought before a jury, including those of defendants Erin Robinson, Ronnie Oneal III, and Dontae Johnson.

Robinson made headlines as one of the first defendants to stand trial in a homicide case since the



pandemic shut down courts across the country. Robinson viciously beat Raul Ortiz to death in a fit of jealousy. He was found guilty of first-degree murder and sentenced to life in prison.

In March 2018, Ronnie Oneal III brutally attacked and murdered his daughter and the mother of his children and then stabbed and set fire to his young son. His son managed to escape the house of horrors but was critically injured. In June 2021, after several days of emotional testimony, the jury found Oneal guilty on seven separate counts. He will serve the rest of his life in prison.

Weeks later, following 90 minutes of deliberation, a jury found Dontae Johnson guilty of first-degree murder and robbery with a firearm in the death of James Beck. Johnson and his co-defendant, Ramontrae Williams, responded to a Craigslist ad placed by Beck, offering a dirt bike for sale. Johnson and Williams gave Beck the cash for the bike, but it was far less than the $1,200 sale price. When Beck questioned the cash, Johnson pulled out a gun and shot Beck several times in front of his 15-year-old son. Williams jumped on the bike and took off, while Johnson ran from the crime scene. Beck did not survive, and his son was forever traumatized by what he witnessed. A judge ultimately sentenced Johnson to 40 years in prison.

The COVID-19 pandemic created countless obstacles to the pursuit of justice. I am proud that even through challenges, uncertainty, and ever-changing working conditions, our office's commitment to seek justice, prioritize public safety, and protect victims never wavered. ∎

DEF 002200



JEX 47.013



# One Year Free: Overturning Robert DuBoise's Conviction

**No matter how carefully we all work to ensure the right outcome, we know there are rare cases where we simply get it wrong.**

It's stunning to think of spending nearly 37 years behind bars for a murder you didn't commit, as Tampa's Robert DuBoise did. But it's also stunning to realize that in many places across Florida and America, he would still be locked up right now — sleeping in a cell, missing his family, and ticking away the hopeless days until he dies.

August 27, 2021, marks one year since Robert walked out of the Hardee Correctional Institution and into the bright summer sunlight, a free man.

Locked up at just 18 years old, he was convicted of raping and murdering Barbara Grams in 1983. With no evidence



Robert DuBoise and his mother outside prison.

linking Robert to the scene and no witnesses from the night of the murder, the case was limited — but the sentence was extreme. Originally sentenced to die, an appeals court lowered the punishment to life in prison.

The Innocence Project explored Robert's case and in late 2019, they sent a petition to the Conviction Review Unit (CRU) at the Hillsborough County State Attorney's Office. I created the CRU in 2018 to identify, remedy, and even prevent wrongful convictions. The CRU looks at plausible claims of innocence and retraces the investigation, prosecution, and trial to study all the elements that led up to the conviction.

A prosecutor's job is to seek justice, and our obligation to seek justice never ends. Here's the bottom line: no matter how carefully we all work to ensure the right outcome, we know there are rare cases where we simply get it wrong. When the wrong person is convicted, the actual perpetrator goes free. On the flip side, when a CRU affirms that we got a conviction right (which is the case in nearly all of our CRU's 200+ reviews so far), it strengthens our justice system.

Despite this, conviction review units (also called conviction integrity units) are exceptionally rare. Of the 20 State Attorney's Offices in Florida, only six have a CRU. Even worse, there are only approximately 60 conviction review units nationally out of America's 2,300 local prosecutor's offices.

In other places, the Innocence Project would have had nowhere to go with Robert's case. But in Hillsborough, CRU Chief Teresa Hall reviewed the facts and identified troubling flaws in the case. She then located DNA evidence that had been thought destroyed, which proved Robert's innocence. We're currently working with law enforcement on the ongoing investigation to identify Barbara Grams' actual killer.

What's Robert DuBoise up to now? I recently ran into him as I was out walking our dog. He's doing handyman work using skills he learned in a prison training program. He's not bitter about the time that was taken from him. He just wants to make the most of the time he has left - - time that's now his to control. And he wants to spread the word: if you're passionate about justice, fairness, and public safety, then you should support a conviction review unit in every community in America. ∎

DEF 002201

JEX 47.014



# Advocating for a Smarter Criminal Justice System

**As we seek long-term solutions ... we must remember to not follow the ghost of criminal justice past.**

The State Attorney's Office is responsible for prosecuting criminal violations of state law that occur throughout Hillsborough County. But the work we do extends well beyond the courthouse walls. We actively engage with our community, protect victims, and seek solutions that further our office's mission to build a safer community while promoting justice and fairness for everyone. One way we focus our efforts to improve our criminal justice system is through legislative advocacy. By working to change outdated laws that have disproportionately affected minorities,

Continued on page 13





*Ferman* **FERMAN CORPORATE PARTNERS PROGRAM**

AN
# Exceptional Perk
## FOR MEMBERS & EMPLOYEES

TO JOIN OR LEARN MORE, PLEASE CONTACT: FERMAN CORPORATE PARTNERS PROGRAM (813) 995-6993 or
| EMAIL CorpPartner@Ferman.com | **FermanCorporatePartner.com**

DEF 002202

JEX 47.015

**Continued from page 12**

led to mass incarceration, and have had no significant impact on public safety, we begin to rebuild trust with the citizens we serve.

My office continues to work alongside elected officials and community organizations that advocate for smart reforms that improve public safety. When Amendment 4 — the Voting Rights Restoration for Felons Initiative — was passed in 2018, we quickly worked to develop and implement a process for returning the right to vote to citizens who had completed the terms of their sentence but could not afford to pay their remaining fees. Allowing returning citizens to vote increases public safety because it reintegrates them back into society and reduces the likelihood of reoffending.

In addition to promoting the safety of our community, the State Attorney's Office is committed to supporting crime victims through every step of the criminal justice process. We staunchly supported Amendment 6, also known as Marsy's Law, which enshrined the rights of crime victims into the Florida Constitution. Once passed, my office revamped our policies to comply with the new law. We updated our victim notification procedures and resources; developed and trained assistant state attorneys, victim advocates, and staff on the changes in the law; and coordinated with our law enforcement partners on how the requirements of Marsy's Law would affect their operations. My office advocated for Amendment 6 to uphold our promise to protect victims and ensure their voices are heard from arrest to conviction.

As we seek long-term solutions to the issues that plague the justice system, we must remember to not follow the ghost of criminal justice past. We now see the cost of antiquated laws that disproportionately punish poor and minority communities. We see the "tough on crime" philosophy that has resulted in a ballooning penal system. Now, we must regroup and find evidence-based solutions that address crime at the root. My office will continue to listen to the communities we serve and work tirelessly with legislators to ensure that the criminal justice system is fair, promotes public safety, and listens to the voices of victims. ∎

 



**Printers Plus, Morgan Business Solutions serving Tampa Bay companies for 29 years**

**We offer the most updated Data Security available**

*Let us show your firm how to reduce paper usage and improve workflow while reducing costs by 23%+ monthly!*

- Electronic Data file storage and retrieval
- Total Document Solutions and Management
- Fleet services provides total system monitoring and remote systems services

  

2840 Scherer Dr. N. | Ste. 420 | St. Petersburg, FL 33716
727.317.5599 | PrintPlusLLC.com | LarryM23@gmail.com

DEF 002203

JEX 47.016



# State Attorney Convenes Racial Justice Work Group

**Our Office partnered with grassroots organizations and community leaders to create five new Action Steps for Fairness & Engagement.**



Prosecutors are responsible for more than simply prosecuting cases. We have a unique ability to actively build a more fair and equitable criminal justice system. Over the past several months, we have listened as our community has called out for progress, and we have re-evaluated our own role in delivering sensible reforms. We recognize that only in partnership with our community are we able to build a strong system of criminal justice that prioritizes public safety and fairness.

To that end, our Office partnered with grassroots organizations and community leaders to create five new Action Steps for Fairness & Engagement to address issues of racial injustice, as part of our mission of building a safer community while promoting justice and fairness for everyone.

Those Action Steps include providing more information regarding our review of use of deadly force incidents, increasing engagement with minority communities, and improving the recruitment and retention of minority prosecutors. The most ambitious initiative is the creation of a Racial Justice Work Group whose goal is to identify distinct problems of racial injustice and to develop and implement solutions to address those inequalities.

The 19-member Work Group includes members of the faith community, grass-roots organization leaders, mentors for at-risk youth, returning citizens, business owners, and prosecutors. Assistant State Attorney Jeria Wilds, Chief of Problem-Solving Courts, is leading our effort to organize and facilitate these important and often uncomfortable conversations.

Stanley Gray of the Urban League of Hillsborough County explained his interest in taking part, saying, "If you don't have a place where people can share their feelings, we're never going to get to a solution."

The Work Group's meetings began with frank conversations about challenges faced by Black men and women — both youth and adults — in the justice system. Those conversations led to identification of issues across different topics including police accountability, consistency in charging decisions and sentencing, effectiveness and access to diversion programs, mental health, and community engagement. The goal is to identify very specific issues within those topics, then create real solutions that can be implemented by the State Attorney's Office and our partners.

We have been working hard over the past four years to tackle racial disparities. Our Office has added new data-driven approaches to handling cases, increased transparency with the public, and reformed how we address low-risk first-time offenders in an effort to make their first encounter with the justice system their last. But this Work Group is built on the idea that the more input we have from the community, the more likely we are to find solutions to the problems that we know continue to exist. ∎

DEF 002204

JEX 47.017



# Real Justice: Uncovering the Truth After 37 Years

**We are not infallible, and we must continue to evaluate the work that we do — even long after the case has closed.**

What does justice look like? How do we define it?

Throughout my career, justice has taken on different meanings — a guilty verdict on a complex case, seeing the relief from a victim's family after the person who hurt their loved one was held accountable, or even watching a person serve their time and then go on to pay back their community in a positive way.

Recently, justice has taken on a new meaning.

I'm a firm believer that a



Robert DuBoise with his mother

prosecutor's job is to seek justice and our obligation to seek justice never ends. In November 2018, I created the Conviction Review Unit, or CRU, at the State Attorney's Office to identify, remedy, and even prevent wrongful convictions. Since then, the Unit has reviewed more than two hundred petitions requesting review of convictions.

Additionally, last year the CRU conducted an extensive review of hundreds of cases involving alleged misconduct by former law enforcement officers. Based on the CRU's findings, my office lost confidence in the integrity of eighteen convictions based entirely on the testimony of discredited officers and took the necessary steps to vacate those convictions. This was a major step in gaining the public's trust and building transparency with the community we serve. This was justice — but something bigger was looming.

In September 2019, the Conviction Review Unit received a petition from the Innocence Project on behalf of Robert DuBoise, an inmate convicted of the first-degree

murder and attempted sexual battery of Barbara Grams in Tampa in 1983. Teresa Hall, the CRU's supervising attorney, undertook a thorough review and re-investigation of the case. However, the review process came to a halt when Hall discovered that all trial evidence had been disposed of decades ago, which was allowed by law at the time.

A few months later, Hall, sparked by an idea from a former homicide detective, located rape kit samples that had not been used at trial, still intact at the Hillsborough Medical Examiner's Office. The samples were immediately sent for DNA testing and unequivocally proved Robert DuBoise was innocent of the crimes for which he was convicted nearly four decades ago. In addition to proving his innocence, the DNA samples have created leads in the investigation into who actually committed the crime.

The tenacity of Teresa Hall and the Conviction Review Unit — to find the truth behind this terrible crime — has proven that it is never too late for justice to be served. We will do everything in our power to hold the actual perpetrator accountable and deliver justice on behalf of the victim and her family.

It took 37 years to reveal the truth in this case. For Mr. DuBoise, this is a new beginning. For the victim's family, this is a step towards true closure. For the State Attorney's Office, this is a humble reminder that we are not infallible, and we must continue to evaluate the work that we do — even long after the case has closed.

And *that* is the meaning of justice. ∎

DEF 002205

JEX 47.018



# "We Are Open" Confronts Domestic Violence Amid Pandemic

**All our partners have worked together to make sure support for domestic violence survivors is continuing, nonstop, no matter what.**

We all know the COVID-19 pandemic has created significant public safety challenges. But one challenge — increased domestic violence incidents — is particularly worrying because it wasn't attracting much attention. That is why my office teamed up with local advocates in an effort to end a quiet crisis in Hillsborough County: domestic violence survivors who are not reaching out for help.

The Hillsborough State Attorney's Office and The Spring of Tampa Bay worked with partners to launch the "We Are Open" campaign, drawing attention to the issue and spreading the message that "Help for victims of domestic violence never closes."

In the first two months of the pandemic, domestic violence arrests referred to the Hillsborough State Attorney's Office by law enforcement were slightly down, and calls for help to The Spring of Tampa Bay, Hillsborough's main nonprofit supporting domestic

violence victims, did not increase. This trend has continued as the pandemic has persisted, with domestic

Continued on page 17



## SEXUAL HARASSMENT AND EMPLOYMENT RETALIATION LAW

Representing Victims of Sexual Harassment

*Contingency Fees Only*
*Free Consultations*
*Confidential Pre-Litigation Settlements*

*Ronald Fraley, an AV rated attorney,
has practiced Employment Law for almost 30 years.*

**The Fraley Law Firm, P.A.** | 813-229-8300 | Visit Our Website: www.FraleyLawFirm.com

DEF 002206

JEX 47.019

**Continued from page 16**

violence cases referred to our office down 10% year-over-year during the emergency.

Usually we would welcome these statistics. However, given what we know about the incidence of domestic violence increasing during periods of stress and isolation, we are concerned that the decrease in calls is not the result of less domestic violence but rather because victims are not reaching out for help — either because they're scared of the effects of the coronavirus pandemic, or they're not able to get to a safe place where they can call for support.

Through many media interviews, our office has worked to send a message of hope to survivors who may be afraid no one will be there, or that the justice system can't handle their case right now — assuring them that "We Are Open." All our partners have worked together to make sure support for domestic violence survivors is continuing, nonstop, no matter what.

"Our hotline and support services are all here for you. When we say we're here to help 24/7, we mean it. So if you or someone you know needs to talk, or needs help staying safe, remember that 'We Are Open,'" said Mindy Murphy, President & CEO of The Spring of Tampa Bay.

Anyone needing support should call The Spring's 24-hour crisis hotline at (813) 247-7233. Anyone in an emergency should always call 911.

The "We Are Open" campaign launched with social media graphics shared with more than one million followers through a network of partners, including the Hillsborough State Attorney's Office, The Spring of Tampa Bay, Hillsborough County Sheriff's Office, City of Tampa, Hillsborough County Fire Rescue, Tampa Fire Rescue, the Hillsborough County Clerk of Court, Thaddeus Bullard a/k/a WWE Superstar Titus O'Neil, and more.

Just as the State Attorney's Office will continue to prosecute domestic abusers and support victims, we hope that the "We Are Open" campaign gives hope to survivors that even during these strange and challenging times, they don't have to suffer in silence. ■

## YLD Virtual Trivia/Scavenger Hunt

**On July 30, the YLD had a great time supporting Big Brothers Big Sisters of Tampa Bay with a fun Virtual Trivia/Scavenger Hunt! Thank you to Tampa Bay Club Sport for hosting this event, and also to Bush Ross Law Firm, P.A. and Hill Ward Henderson for sponsoring and supporting a great cause!**



 
 
 
 

 

DEF 002207

JEX 47.020



# 2019 Year in Review: Criminal Justice Reform Continues in Hillsborough County

**Every milestone achieved reflects the hard work of our nearly 300 dedicated public servants and collaboration from our incredible criminal justice partners in Hillsborough County.**

We continued to reshape our criminal justice system in 2019. We remain focused on aggressively prosecuting criminals who threaten public safety while finding smarter approaches to steer low-level offenders away from the system. We have implemented strategic, problem-solving approaches that build a safer community while promoting justice and fairness for all. I am pleased to report on the following:



### Civil Citation Programs

Working with our criminal justice partner agencies, we have expanded the list of eligible offenses for the juvenile arrest diversion program to include family violence (e.g., sibling against sibling). We have also increased the use of our jurisdiction's adult arrest diversion program to nearly 1,200 citations a year, a significant increase since 2018. Both programs are useful methods to hold low-level offenders accountable while minimizing the taxpayer resources that would otherwise be necessary to prosecute these types of crimes.

### Victims' Rights

Our state constitution now includes rights for victims of crime — also known as Marsy's Law. We have updated our victim assistance program to include these recent changes in the law. From victim notification of court appearances to training our staff, to working with other stakeholders, our jurisdiction continues to lead the way in providing support for victims of crime and ensuring their voices are an important part of the criminal justice process. Over the past year, we provided nearly 400,000 victim notifications. Each notification allows a

**Continued on page 17**



# Trombley Hanes
PROFESSIONAL ASSOCIATION ATTORNEYS & COUNSELORS AT LAW

WHITE COLLAR CRIMES · GENERAL CRIMES AND OFFENSES
CIVIL LITIGATION · PERSONAL INJURY
AV Rated · Super Lawyers · Lawyers.com · Best Lawyers in America


Gary R. Trombley


Ronald P. Hanes


P. Matthew Luka


Wesley E. Trombley

707 N. Franklin Street
10th Floor Tampa Theatre Building
Tampa, FL 33602

(P) 813-229-7918
(F) 813-223-5204
www.trombleyhaneslaw.com

DEF 002208

**JEX 47.021**

**Continued from page 16**

victim to know the procedural steps being taken and how they may be heard during our prosecution of the case.

### Community Outreach

In honor of Veterans Day, our office hosted a specialized expungement clinic for the men and women who selflessly served this country. More than 200 citizens completed the fingerprinting, application, and notarization of the sealing and expunction process. Hillsborough County is the only judicial circuit in Florida that has offered these services at no cost. With support from our community partners, we have provided critical services valued at $700,000 to help our fellow citizens move beyond past mistakes.

We launched the SAO Business Academy, a first-of-its-kind program in this county to engage community business leaders with our Office's work — specifically, to develop an awareness of the challenges facing our criminal justice system.

### Transparency

We reached a critical milestone in the FIU/MacArthur research project with the completion of the second in a series of reports entitled, "Race, Ethnicity, and Prosecution in Hillsborough County." We presented this report during an insightful community conversation with key stakeholders and the media. The next and final stage of this project is the development of Prosecutorial Performance Indicators (PPIs) that will allow our team to redefine success and track the performance of this office beyond conviction and crime rates.

Every milestone achieved reflects the hard work of our nearly 300 dedicated public servants and collaboration from our incredible criminal justice partners in Hillsborough County. We are working tirelessly to advance our core mission of public safety by holding offenders accountable, protecting victims, ensuring transparency, and responsibly using taxpayer dollars. Thank you for your continued support of our work. ∎



# "OK BOOMER,
# YOU'RE **TOO OLD** FOR THIS JOB."

*We Fight Age Discrimination.*
*We're the aggressive representation your clients need.*

## Was your client treated unlawfully by their employer?
## We will help them obtain workplace justice.

- **Unpaid Overtime/Wages**
- **Retaliation**
- **Sexual Harassment**
- Wrongful Termination
- Hostile Work Environment
- Family and Medical Leave

*We pay co-counsel fees in accordance with*
*the Rules Regulating the Florida Bar.*

Best Lawyers
**BEST LAW FIRMS**
U.S.News
2019

**WENZEL** FENTON **CABASSA** P.A.
Employee Rights Attorneys
**www.wfclaw.com | 813-344-1172**

DEF 002209

JEX 47.022



# Administering Justice in Veterans Treatment Court

**Hillsborough's Veterans Treatment Court has become a national model for handling the distinct issues facing veterans in our criminal justice system.**

One of the many ways we employ a strategic problem-solving approach to criminal justice is through the Thirteenth Circuit's Veterans Treatment Court (VTC). Hillsborough County is home to nearly 100,000 military veterans. Responding to the unique needs of the brave men and women who served this country allows us to create a safer community by directly addressing issues affecting veterans who become involved in the criminal justice system.

The VTC is a problem-solving court that holds veterans accountable for crimes in a non-adversarial context, while addressing underlying issues like post-traumatic stress disorder and substance abuse, as well as associated problems of unemployment, homelessness, and transportation. The VTC incorporates therapeutic principles and key components of problem-solving courts, primarily treatment and rehabilitation. Veterans undergo a risk-need responsivity assessment, and their progress is tracked as a phase-based system of treatment in accordance with evidence-based best practices. This treatment court model requires routine court appearances, mandatory attendance at

Continued on page 13



Problem-Solving Courts Chief Jeria Wilds, State Attorney's Office



28 YEARS OF
TRUSTED EXPERIENCE
IN TAMPA

PERSONAL INJURY     WRONGFUL DEATH

OF COUNSEL TO THE YERRID LAW FIRM

*Our practice remains focused on personal injury, wrongful death, product liability, premises liability, and medical negligence. We look forward to future relationships regarding referrals or co-counsel opportunities. Thank you for your trust.*

RATED AV PREEMINENT
BY MARTINDALE-HUBBELL

JEFFREY D. MURPHY, P.A.
P: 813.443.5553

101 E KENNEDY BLVD, BOA PLAZA
STE 3910, TAMPA, FL 33602
WWW.JEFFMURPHYLAW.COM

JM@JEFFMURPHYLAW.COM
FAX: 813.436.5190

DEF 002210

JEX 47.023

**Continued from page 12**

treatment sessions, and frequent and random testing for drug and alcohol use.

Established in 2013, the VTC is the result of collaboration between the court system, the Public Defender's Office, the U.S. Department of Veterans Affairs, and the State Attorney's Office. The judges who have overseen the VTC — Judge Gregory Holder and currently Judge Michael Scionti — are essential to its success. Perhaps the most critical factor to success, however, is the partnership with mentors from Hillsborough County Veterans, a 501(c)(3) organization of current and retired veterans who volunteer to serve as "battle buddies" to the VTC defendants. Each veteran-defendant is partnered with a mentor who assumes the tremendous responsibility of supporting that person throughout the duration of case — and often after.

Seeking to build on the VTC's past success and that of other problem-solving courts, in 2017 our office created a supervisory attorney position to oversee our Mental Health, Veterans Treatment, and Drug Courts. This position allows for greater continuity between the problem-solving courts and simplifies bringing new innovations to each court. It is part of our commitment to focus on treatment rather than incarceration for community members suffering from substance abuse or mental illness.

Our problem-solving court chief, Jeria Wilds, is a 14-year assistant state attorney who served in the U.S. Army as an officer in the Judge Advocate General's Corps. In her oversight of the problem-solving courts, Wilds and her team focus on the root of problems that bring people into the system, rather than a punitive approach that perpetuates the revolving door of the system.

Hillsborough's VTC has become a national model for handling the distinct issues facing veterans in our criminal justice system. In just a few years, VTC has greatly expanded. With the court infrastructure firmly in place, more veterans are being identified as suitable VTC candidates, and the stakeholders continue to seek additional legislative and grant funding to grow this program to meet the needs of all servicemen and servicewomen in our community.

Veterans are a critical part of the Hillsborough County community. Our office, along with our criminal justice partners, is proud to be part of this amazing program — not only to support veterans who have made mistakes, but also because it furthers our core mission of improving public safety while promoting fairness and justice. ∎



## HCBA Participates in Two Judicial Investitures

HCBA was proud to participate in two recent investitures of new judges appointed to the bench at the Thirteenth Judicial Circuit. Judge Thomas Palermo was invested on August 22, and Judge Jessica Costello was invested on September 19.

As part of the ceremony, HCBA traditionally brings greetings and congratulations, while also presenting the new judges their first robe. In addition, the Young Lawyers Division also presents a bible for their swearing-in. Congratulations to Judges Palermo and Costello!



DEF 002211

JEX 47.024



# Establishing a Blueprint for Prosecutorial Success in the 21st Century

**In July, we reached another critical milestone in the FIU/MacArthur research project with the completion of a report entitled, *Race, Ethnicity and Prosecution in Hillsborough County.***

Our criminal justice system continues to evolve as more local prosecutors embrace their responsibility to tackle complex issues like recidivism, drug addiction, mental illness, crime prevention, and racial disparities. As we recognize different goals that increase public safety and promote effectiveness and fairness, we must concede that crime rates and conviction rates are imprecise measurements for our system's success.

It is time to redefine how we evaluate the work that we do.

To that end, our office is engaged in a groundbreaking national research project that will redefine the metrics of prosecutorial success. In March 2018, we were selected as one of only four prosecutor's offices in the nation to participate in a $1.7 million grant-funded project under the MacArthur Foundation's Safety and Justice Challenge to study and develop more effective prosecutorial practices.

The grant funds a two-year project conducted by researchers at Florida International University and Loyola University to examine

Continued on page 13



28 YEARS OF
TRUSTED EXPERIENCE
IN TAMPA

PERSONAL INJURY        WRONGFUL DEATH

OF COUNSEL TO THE YERRID LAW FIRM

*Our practice remains focused on personal injury, wrongful death, product liability, premises liability, and medical negligence. We look forward to future relationships regarding referrals or co-counsel opportunities. Thank you for your trust.*

RATED AV PREEMINENT
BY MARTINDALE-HUBBELL

JEFFREY D. MURPHY, P.A.
P: 813.443.5553

101 E KENNEDY BLVD, BOA PLAZA
STE 3910, TAMPA, FL 33602        WWW.JEFFMURPHYLAW.COM

JM@JEFFMURPHYLAW.COM
FAX: 813.436.5190

**Continued from page 12**

data and policies to increase effectiveness and fairness in four districts nationwide: Hillsborough, Chicago, Jacksonville, and Milwaukee. Last December, our research partners released the first of three project reports, which summarized prosecutorial attitudes about different aspects of the criminal justice system, including goals, effectiveness, racial disparities, and community engagement.

In July, we reached another critical milestone in the FIU/MacArthur research project with the completion of a report entitled *Race, Ethnicity and Prosecution in Hillsborough County*. We know racial disparities exist within the criminal justice system, and that they undermine fairness and effectiveness. That report addresses how much prosecutorial discretion within our office is leading to racially disparate outcomes. Researchers spent nearly two years gathering and analyzing data from approximately 87,000 cases to compare outcomes for black, white, and Hispanic defendants across multiple stages of case processing, including charging decisions, entry into diversion programs, and sentencing. Although the report reveals disparities, the disparities were not glaring. The report,

however, identifies several areas for further analysis regarding racial disparities and beyond, such as resource allocation and use of custodial sentences.

The next and final stage of this project is the development of Prosecutorial Performance Indicators (PPIs) that will rewrite the blueprint for how prosecutor's offices measure their success. PPIs will allow our team to identify and track the performance of this office, giving us valuable tools to improve public safety, minimize racial disparities, effectively allocate resources, and make better decisions regarding charging, diversion, and sentencing.

We are proud of the proactive steps we are taking to evaluate ourselves, the effectiveness of our work, and how we live up to our mission to promote fairness and justice for everyone and to keep our community safe. From day one, we have embraced data-driven and evidence-based policies to make that mission a reality. Our participation in the MacArthur project puts Hillsborough County at the forefront of innovation in our criminal justice system. Working with our local law enforcement and community partners, we are setting the standard for prosecutor's offices around the state and country to follow in being accountable and transparent to the communities they serve. ∎



## SEXUAL HARASSMENT AND EMPLOYMENT RETALIATION LAW

Representing Victims of Sexual Harassment

*Contingency Fees Only*
*Free Consultations*
*Confidential Pre-Litigation Settlements*

*Ronald Fraley, an AV rated attorney, has practiced Employment Law in Tampa for 30 years.*

**The Fraley Law Firm, P.A.** • 813-229-8300 • VISIT OUR WEBSITE: www.fraleylawfirm.com

DEF 002213

JEX 47.026



# Elevating Victims' Rights in Hillsborough County

**The implementation of the crime victims' rights amendment created an opportunity to revisit and re-energize our Victim Assistance Program.**

Victims of crime deserve respect and dignity from our criminal justice system. From the right to receive notification of hearings to having a voice in front of a judge who is considering the impact of a defendant's crime, legal protections for crime victims restore much-needed balance to our criminal justice system. Efforts to establish constitutional rights for crime victims began in 1982 when President Ronald Regan created the President's Task Force on Victims of Crime.

In a report issued that year, the Task Force concluded that the criminal justice system had lost an "essential balance." While in no way seeking to lessen the constitutional safeguards that protect the rights of the accused, the Task Force found that "the system has deprived the innocent, the honest, and the helpless of its protection." Nearly 36 years later, Florida sought to return balance to our judicial process and relieve burdens the criminal justice system has placed on crime victims.



During the November 2018 elections, constitutional rights for crime victims in Florida became law.

Imagine you or a loved one is the victim of a violent crime and just days afterwards is shocked to learn that

*Continued on page 13*



**The Go-To Law Firm for Termite Damage Litigation**

Referral fees paid per Florida Bar Rules upon the successful conclusion of each case.

Since 1994, Pete Cardillo has focused his practice on defending the rights of condominium associations, apartment complex owners, and homeowners who have suffered termite related damage or purchased unreported termite damaged property. Your client may be able to collect from the insurance company or exterminator even if the damage is discovered years later. Call us to discuss your client's case.

**Practice Focus:**
◆ Termite damage insurance claims
◆ Claims against sellers of termite damaged property
◆ Termite treatment liability
◆ Wood rot, decay, or collapse

**Contingency Fee – No recovery, No fee**

**Cardillo Law Firm**
TERMITE LAW
www.cardillolaw.com
info@cardillolaw.com

Peter M. Cardillo, Esq.

Cardillo Law Firm | 712 S. Oregon Ave., Suite 200, Tampa, FL 33606
Office (813) 801-9050 | www.cardillolaw.com

DEF 002214

JEX 47.027

*Continued from page 12*

the perpetrator is standing in the same aisle as you in the grocery store, having been released pending trial. Between the inevitable fear and anger, obvious questions such as "how could this happen," "why didn't anyone tell me," and "what about my safety," would race through your mind. That stark reality for Marsy Nicholas' family led to a recent nationwide movement known as "Marsy's law," which seeks to ensure that no family member suffers the indignity of not knowing an accused criminal has been released on bail. Hillsborough County has embraced this movement.

Since Marsy's Law — aka the Victims Rights Amend - ment — passed as part of Amendment 6, the State Attorney's Office has made several policy and procedural changes to improve our steadfast protection of victims' rights. Our office has developed notification systems, victim counseling, and advocacy services that ensure that we treat crime victims fairly and with respect.

The implementation of the crime victims' rights amend- ment created an opportunity to revisit and re-energize our Victim Assistance Program. Working with law enforcement agencies, the Clerk's Office, and our court administrators, we have refined our notification procedures to ensure that crime victims are aware of the defendant's initial court appearance and that they have a voice in bond decisions, including circumstances where pre-trial detention is appropriate. We have updated our informational resources so every crime victim will know his rights. We have trained our Assistant State Attorneys and legal staff on these new constitutional protections. We have met with all criminal justice agencies within our circuit to coordinate the development of systems and procedures that support these new rights. All our local criminal justice agency leaders have welcomed this effort.

In the coming months, the Legislature may address some definitional issues in the new law and funding challenges. In Hillsborough County, however, we are already implementing the will of the voters, who spoke clearly and loudly in support of constitutional protections for crime victims.



LORI A. HEIM, CAITLYN PARSLEY, AND MARJORIE S. HENSEL

# BUSH|ROSS
ATTORNEYS AT LAW

## LAWYERS FOR FLORIDA PROFESSIONALS
ATTORNEYS | ACCOUNTANTS | ARCHITECTS | ENGINEERS | REAL ESTATE

DEFENDING
PROFESSIONALS
IN CIVIL AND
ADMINISTRATIVE
PROCEEDINGS.



Best Lawyers
**BEST**
**LAW FIRMS**
**USNews**
2018

Ranked a Tier 1 Firm for Professional
Malpractice Law - Defendants for 2018
by U.S. News - Best Lawyers®

Marjorie S. Hensel, Professional Liability Practice Group Leader
1801 N. Highland Avenue, Tampa, Florida 33602
(813) 224-9255 | bushross.com

DEF 002215

JEX 47.028



# 2018 Year in Review

**Nearly 300 dedicated public servants work hard every day to make our criminal justice system better.**



We are making progress on the path of criminal justice reform in Hillsborough County. I am proud of our progress in 2018. We are advancing our core mission of public safety, fairness, and justice. We are embracing methods to lessen the impact of low-level, non-violent offenders on an already overburdened criminal justice system. We are dedicating our resources to prosecuting and convicting violent criminals who are a threat to public safety. As we close the second year of my administration, I am pleased to report to you on our efforts:

**Prosecutorial:**

• We implemented the Reduced Impaired Driving Program (RIDR) to address the plague of drunk/impaired driving in our county. This program aggressively targets and reduces impaired driving through enhanced sanctions like alcohol monitoring devices and an education program for first-time offenders who have not injured a person or property.

*Continued on page 11*



# EWE DEMAND, INC.

*Print Solutions by JoAnn Klay*

Print | Wide Format | Creative | Specialty Items

JKlay@EweDemand.com | 813-205-7653

Woman & Minority Business Certified

DEF 002216

JEX 47.029

*Continued from page 10*

Meaningful sanctions reduce the likelihood of future criminal violations and promote public safety.

- We expanded our civil citation program for adult, first-time offenders committing misdemeanors. Our goal is to hold offenders accountable without the arrest, prosecution, and conviction that will ultimately jeopardize their job or housing. Nine hundred people participated in 2018.
- We created the first-ever conviction review unit in our county to further protect the integrity of our system. This unit will review the rare circumstance where a person is wrongfully committed to ensure that the actual perpetrators are held accountable.
- We handled nearly 55,000 cases in 2018.

### Preventative Public Safety Steps:
- We convened our school system stakeholders to address school safety following the tragedy at Marjory Stoneman Douglas High School.
- We helped our criminal justice partners implement sensible steps to keep guns out of the hands of mentally unstable individuals who pose a threat to our community and themselves.

### Community Outreach:
- We hosted the first-ever Hillsborough County expungement clinic. This allowed people to have a criminal record sealed or expunged if they were arrested, but not prosecuted, for a criminal violation. We created a single location for nearly 200 citizens to complete the fingerprinting, application, and notarization, so they could help put past mistakes behind them and benefit our community.
- We created a community council that engages community members in candid discussion with our team about public safety and our policies. These leaders provide an honest assessment of programs, promote accountability, and increase understanding of our criminal justice system. We are proud to have these volunteers who represent the diversity of our great county.

### Transparency:
- We have partnered with the MacArthur Foundation to study better ways to measure prosecutorial success. The MacArthur Foundation is part of a nationwide effort to study the challenges and successes of prosecutors. This groundbreaking effort will make our office stronger and our community better.
- We continue to handle a huge volume of public records requests — nearly 800 in 2018. Making information available and providing insight into our work allows the community to better understand the role of the State Attorney's Office.

Over and above these specific policies, our nearly 300 dedicated public servants work hard every day to make our criminal justice system better. We are standing up for victims and holding offenders accountable, and building a safer, stronger community.



THE LAW OFFICE OF
ROBERT ECKARD
ASSOCIATES,P.A.

**State & Federal Business Litigation/
Co-Counsel Arrangements Accepted**

### Robert D. Eckard
*Board Certified Business Litigation.*
*L.L.M. International Law & Business*

- DeceptiveTrade PracticesLitigation
- UnfairCompetition
- Non-CompeteAgreements
- SecuritiesLitigation
- TradeSecretLitigation
- CriminalDefense
- WhiteCollarCrime
- Immigration
- InternationalLaw
- Family Law

*Spanish
Speaking
Attorney
on Staff*

*Main Office Palm Harbor*



### (727) 772 - 1941
**www.RobertEckardLaw.com**

3110 Alternate US 19 North
Palm Harbor, FL 34683
*We pay referral fees consistent with rules and
regulations of the Florida Bar.*

Like us on Facebook &
Follow us on Twitter
 @PWRLitigator

DEF 002217

**JEX 47.030**



# A Public Health Approach to Mentally Ill Offenders

**The critical stage of dealing with mentally ill community members occurs before they end up in the courtroom.**



I magine being a patient with a history of cardiovascular disease. You suddenly experience chest pains and are rushed to the nearest hospital, admitted, and taken into the emergency room ... where you are greeted by a prosecutor, a defense attorney, and a judge. It is preposterous to consider this happening, but it approximates an everyday occurrence across the country — only the patients are defendants suffering not from heart disease, but rather from mental illness.

Mental illness is a disease — a diagnosable and treatable disease. Yet for far too long, we have been treating mental health as a criminal justice issue. Despite the best efforts of prosecutors, judges, and law enforcement, our current mental health system — which functions largely within the criminal justice system — is antiquated, ineffective, and does not reflect modern medicine.

The prevalence of mentally ill[1] defendants in the criminal justice system is staggering. An estimated 56 percent of state prison inmates and 64 percent of jail inmates are mentally ill. Approximately 20 percent of jail inmates and 25 percent of prison inmates suffer from *serious* mental illness.[2] Incarcerated individuals are three to six times more likely to have serious mental health disorders than the general population.[3] Not only do prisons and jails house many mentally ill inmates, they house *most* of the mentally ill. In Florida, a person with serious mental illness is nearly five times more likely to be incarcerated than hospitalized.[4]

Using the criminal justice system to treat mental illness yields worse outcomes at a significant cost.

*Continued on page 13*

IS YOUR MEMBER PROFILE UP-TO-DATE?
Log-in today at Hillsbar.com and make sure your contact information is correct with the HCBA!

DEF 002218

JEX 47.031

*Continued from page 12*

Defendants with a serious mental illness remain incarcerated longer than other defendants, yet they require more resources. The reality is that society spends so much money prosecuting and incarcerating the mentally ill that it is almost criminal.

The entire construct of treating mental illness primarily through the criminal justice system is fitting a square peg into a round hole. Still, within the system, the goals for handling many mentally ill defendants — most of whom are in the system for non-violent and lower-level offenses — should be: (1) minimize incarceration; (2) connect them with mental health providers; and (3) focus on the treatment needed to avoid recidivism.

Last year, our community established a mental health court, which was a tremendous and necessary first step for improving how we handle mentally ill defendants. But, the capacity of any mental health court is limited compared to the need. More importantly, the critical stage of dealing with mentally ill community members occurs *before* they end up in the courtroom.

Our local criminal justice stakeholders know that we cannot arrest and prosecute our way out of this problem. Instead, we are studying the successful interventions of cities like Miami that embrace a public health approach to mental illness, using the criminal justice system to facilitate access to treatment. No one wants an attorney providing medical treatment, but prosecutors can help connect mentally ill offenders to clinicians to receive treatment, which improves outcomes, reduces recidivism, and promotes public safety.

[1] Edward P. Mulvey & Carol A. Schubert, 2017. *"Mentally Ill Individuals in Jails and Prisons,"* 46 Crime & Justice 1, 231 (2017), *available at* https://www.journals.uchicago.edu/doi/10.1086/688461

[2] *Id.*

[3] *Id.*

[4] E. Torrey Fuller et al., *More Mentally Ill Persons Are In Jails and Prisons Than Hospitals: A Survey of the States.* Treatment Advocacy Center & National Sheriffs' Association, (2010), *available at* http://www.treatmentadvocac5center.org/storage/documents/final_jails_v_hospitals_study.pdf



# Wenzel Fenton Cabassa, P.A.
## YOUR TRUSTED EMPLOYEE RIGHTS PARTNER

*We hold employers accountable.*

*Let us put our experience to work for your clients.*

Our firm welcomes referrals of employees who have experienced wrongful termination, sexual harassment, denial of medical leave, discrimination, unlawful retaliation, a hostile work environment, or have not been paid their wages or overtime, and pays co-counsel fees in accordance with the Rules Regulating the Florida Bar.

*Se Habla Español*

Wenzel Fenton Cabassa, P.A. represents employees who are victims of illegal workplace violations in state and federal courts throughout Florida.

LUIS A. CABASSA
Board Certified in Labor and
Employment Law by The Florida Bar



WENZEL FENTON CABASSA, P.A.

www.wfclaw.com | 813-344-1172

DEF 002219

**JEX 47.032**



# Reducing DUIs in Hillsborough County Through Enhanced Sanctions

**RIDR imposes enhanced sanctions on first-time, non-aggravated DUI offenders in order to aggressively target and reduce impaired driving.**



Hillsborough County consistently ranks as the worst in the state for DUI arrests, crashes, injuries, and fatalities. Given the dangers of impaired driving, as well as the importance of reducing recidivism to promote long-term community safety, the State Attorney's Office has established a new prosecutorial initiative known as the Reducing Impaired Driving Recidivism program, or "RIDR." RIDR imposes enhanced sanctions on first-time, non-aggravated DUI offenders in order to aggressively target and reduce impaired driving.

Enhanced sanctions like alcohol monitoring devices and DUI education programs reduce recidivism of impaired driving for individuals with DUI convictions. Presently, our office pleads a significant percentage of

DUI cases to reckless driving based on the defendant's acceptance of responsibility, the strength of the evidence (including whether the defendant agreed to provide a breath sample), resource allocation, and other factors that do not concern the egregiousness of the offense. Capitalizing on the effectiveness of enhanced sanctions that are often reserved for DUI convictions, RIDR seeks to impose such sanctions on all DUI offenses, including those reduced to reckless driving. Although RIDR's primary purpose is to reduce the recidivism of impaired driving, it will also promote consistency in the prosecution of DUI cases and eliminate the perverse incentive to refuse a breath sample.[1]

*Continued on page 13*



# SHIFT YOUR CHANCES OF SUCCESS
## WITH SKODA MINOTTI'S BUSINESS VALUATION AND LITIGATION ADVISORY TEAM

We understand the demands you face in today's court of law. That's why our team offers unparalleled depth and expertise. We are uniquely qualified and credentialed to help you plan and prepare for your most complex financial cases.

ECONOMIC DAMAGES • VALUATIONS • BANKRUPTCY • FORENSIC ACCOUNTING • ABV, CFE, CFF, CIRA, CPA, CVA, JD, MBA

Delivering on the Promise.
888-201-4440 • skodaminotti.com
AKRON | CLEVELAND | TAMPA



**SKODA MINOTTI**
CPAs, BUSINESS & FINANCIAL ADVISORS

DEF 002220

JEX 47.033

*Continued from page 12*

All misdemeanor-level DUI cases that occur on or after March 1, 2018, will be screened for eligibility for the program. Eligibility is determined at the sole discretion of the State Attorney's Office. But offenders may be eligible if their current charge is a first-time DUI offense that does not involve a minor in the vehicle, a breath alcohol sample of .20 or higher, or a crash. There are additional disqualifying criteria based upon the offender's prior record.

Eligible offenders are offered the opportunity to complete enhanced sanctions directed at reducing recidivism and protecting community safety. These sanctions include the completion of DUI school, attendance at the MADD Victim Impact Panel, and the completion of community service hours. The offender will also be required to install an ignition interlock device, wear a continuous alcohol monitoring device, or wear a patch to monitor illegal drug use.

If an eligible offender satisfactorily completes a designated portion of these enhanced sanctions, a plea offer will be extended by the State to a reduced charge of reckless driving with a withhold of adjudication. The remaining enhanced sanctions would include a period of probation with standard conditions typically associated with a first-time DUI, in addition to the continued use of an alcohol- or drug-monitoring device, as well as the completion of treatment recommended by the DUI school assessment. Additional information about RIDR can be found at www.sao13th.com.

RIDR's use of enhanced sanctions better protects our community from the dangers of drunk driving, while also providing a way for first-time offenders to prevent a criminal conviction that could impair their livelihood and their ability to be a productive citizen.

[1] To avoid creating inculpatory evidence, DUI offenders often refuse to provide a breath sample, which weakens the State's case and increases the likelihood that the charges are reduced to reckless driving. By contrast, those who provide a sample as required by Florida's implied consent law, section 316.1932, Florida Statutes, often do not receive that reduction.

## Admission to the Bar of the Supreme Court of the United States

Ten HCBA members were presented for admission to the Bar of the Supreme Court of the United States by HCBA member Movant James Salvatore Giardina on March 20 in Washington, D.C.

On a rainy morning, attorneys Tiffany McElheran, Robert Walton, Christina Z. Pacheco, Joseline Hardrick, Kristin Serafin Ottinger, Rachael Reese, Ryan C. Reese, Heather Lang, Richard Peck, and Courtney Bueno (pictured from left to right with James Giardina in center) were admitted by a full Court of all nine sitting Justices.

Immediately following the swearing in, the Court heard oral arguments on the case of National Institute of Family and Life Advocates v. Becerra, where the new admittees had a front row seat to democracy at work.

Thank you to James Giardina for organizing this memorable event!



DEF 002221

JEX 47.034



# Embracing Data to Improve Criminal Justice

**We must examine the data and use it to drive policies that increase public safety, reduce recidivism, and promote fairness.**



We've all heard the dispiriting adage about "lies, damn lies, and statistics." That century-old quote sounds antiquated in today's era of big data, where number-crunching supercomputers process incomprehensible amounts of information to improve decision-making and outcomes in almost every arena and industry. Unfortunately, our criminal justice system has largely managed to avoid the data revolution ... until now. This past session, the Florida Legislature passed a data collection bill that aims to bring Florida's criminal justice system into the 21st century.

The sad reality is that there is a tremendous lack of criminal justice data at the national, state, and local levels. Federal and state governments have collected certain data for years, but they have largely been limited to crime rates and offense types. Starting July 1, 2018, Florida's data collection will be far more nuanced, making our state a national leader through this ambitious transparency endeavor. The new law requires criminal justice stakeholders — State Attorneys, Public Defenders, Clerks of Court, and the Department of Corrections — to collect specific data, report it to the Florida Department of Law Enforcement, and publish it online in a searchable format for any and all to see.

The data sought is comprehensive: approximately 100 pieces of information covering, among other things, the defendant, charges, bail, plea, and sentencing. The idea to collect this information is not revolutionary, but implementing the idea is.

The Legislature's recent embrace of data mirrors the data-driven solutions we have pursued since the beginning of my administration in the State Attorney's Office. Of course, data-driven solutions require data. Last year, we partnered with Measures for Justice, a national organization whose goal is to collect and publish prosecutorial data from across the United States, to make sure that Hillsborough County was represented in that research. (In designing its data collection bill, the Legislature also worked with Measures for Justice.)

We have also teamed up with the University of South Florida's Criminology Department to identify implicit bias and other blind spots in how we charge juveniles. Earlier this year, we were selected as one of only four prosecutor's offices in the nation to participate in a \$1.7 million data research project with the MacArthur Foundation and Florida International University to increase effectiveness and fairness in how we prosecute cases. These partnerships are critical in helping us discover, to quote Donald Rumsfeld, the "known unknowns" — the things we know we don't know — and the "unknown unknowns" — the things we don't even know we don't know.

Whereas many prosecutors' offices have historically been reluctant to open their kimono for fear of what others may see, we have taken the opposite approach. We are willing to bare all for inspection — revealing the good, the bad, and the ugly — not only to be completely transparent but also to improve the work we do every day.

It has been said, "Ninety-nine percent of statistics only tell 49 percent of the story." We agree, which is why the robust data collection and analysis that we are building is only half the battle. Ultimately, we must examine the data and use it to drive policies that increase public safety, reduce recidivism, and promote fairness, which will become the most important statistic of all.

DEF 002222

JEX 47.035



# Engaging the Community in our Criminal Justice System

**Robust community engagement builds trust and promotes transparency and accountability, which leads to more amicable interactions and cooperation.**



One of our goals at the State Attorney's Office is to develop a significant presence in the dynamic and multifaceted community that we serve. Doing so means interacting with residents so that they have a better understanding of who we are and what we do; partnering with attorneys, stakeholders, and organizations involved in the criminal justice system; and educating neighborhood associations about new programs.

Robust community engagement builds trust and promotes transparency and accountability, which leads to more amicable interactions and cooperation. It gives the community a voice about our criminal justice system, which in turn provides us with invaluable insight into how our prosecutorial decisions and policies impact community health, safety, and crime at a grassroots level. And it gives us a way to increase public knowledge about

*Continued on page 11*

## Morgan Stanley



*Morgan Stanley is proud to support*
# Hillsborough County Bar Association



**Tony Pastore  CFP®**
Financial Advisor
4890 West Kennedy Blvd
Tampa, FL 33609
+1 813 286-5628
Tony.Pastore@morganstanley.com

Certified Financial Planner Board of Standards Inc. owns the certification marks CFP®, CERTIFIED
FINANCIAL PLANNER™ and federally registered CFP (with flame design) in the U.S.
© 2017 Morgan Stanley Smith Barney LLC. Member SIPC.SUP001 CRC 1688173 01/17 CS 8653056 10/16

JEX 47.036

*Continued from page 10*

the extraordinary work that our prosecutors do every day. Here are a few of the steps that we are taking to increase our engagement with the community:

- **Quarterly Community Workshops.** We have established quarterly workshops, open to the public, at which my prosecutors and I talk about important issues facing our criminal justice system. The workshops rotate throughout the county, and the topics addressed change based on current news and events. Every Community Workshop begins with an introduction to the office and an update on new policies or initiatives, and it ends with a question-and-answer session where community members have the opportunity to directly ask me questions that are important to them. We also live-stream the workshops on our Facebook page. Between live attendance and streaming, we reached more than 2,000 Hillsborough County residents with our Community Workshops in 2017.
- **Internal Community Engagement Task Force.** We have established an internal State Attorney's Office Community Engagement Task Force (CETF) that consists of service-minded prosecutors and staff members. The purpose of the CETF is to increase our office's community service and outreach, and discover and organize ways in which we can better serve the public and our partners. Look for increased outreach to schools and kids through mock trial programs, criminal justice education awareness

initiatives, and partnerships with organizations that share our mission of a safer, stronger Hillsborough.

- **Increased Communications Tools.** Those that follow our office on Facebook, Twitter, or YouTube know that we have increased our social media presence and interaction to expand our office's reach. (Follow us at @sao13th!) We are also establishing a periodic newsletter to share information and news about the office, new initiatives, and selected matters of importance within our local, statewide, and national criminal justice system. Also, 2018 will see a new, user-friendly website to increase our information-sharing capabilities.
- **Policy Initiative Awareness Campaigns and Listening Tours.** In addition to our Community Workshops, we have increased regular meetings with community leaders, organizations, and residents to spread the word about new policy initiatives and programs at the State Attorney's Office; to better involve the community in policy development; and to expand our opportunities to receive feedback. In 2017, we embarked upon a Listening Tour with Hillsborough County criminal defense attorneys, community leaders, partner organizations like the Crisis Center, and law enforcement. We also engaged in awareness campaigns for the newly expanded juvenile civil citation program, as well as the new initiative to disarm domestic abusers.

We are committed to increased community engagement, and we value all the benefits it brings to Hillsborough County.



**SEXUAL HARASSMENT AND EMPLOYMENT RETALIATION LAW**

Representing Victims of Sexual Harassment

*Contingency Fees Only*
*Free Consultations*
*Confidential Pre-Litigation Settlements*

*Ronald Fraley, an AV rated attorney, has practiced Employment Law in Tampa for 30 years*

**The Fraley Law Firm, P.A.** ♦ 813-229-8300 ♦ VISIT OUR WEBSITE: www.fraleylawfirm.com

DEF 002224

JEX 47.037



# Florida Supreme Court Rules Death Penalty Statute Unconstitutional

**Our use of the death penalty must be fair, objective, and rare.**

Capital punishment is the most serious and sobering component of our criminal justice system. The most important thing is that we, as a society, get it right. Until recently, Florida had gotten it wrong.

A brief history: In the landmark case of *Furman v. Georgia* in 1972, the U.S. Supreme Court struck down the death penalty across the country because, in part, its application was arbitrary and capricious. After *Furman*, Florida (like many other states) codified the aggravating and mitigating factors that need to be considered for capital punishment. In 2002, the Supreme Court held, in *Ring v. Arizona,* that the Sixth Amendment requires a jury to make factual findings regarding those factors. Despite *Ring*, Florida's capital sentencing scheme provided that during the penalty phase — a second trial conducted after the initial guilt phase trial if the jury unanimously found the



defendant guilty of a capital crime — the jury would recommend whether the death penalty was appropriate. The jury's recommendation was just that — *a recommendation* — and the judge had great latitude in deciding whether to accept or disregard it. This was problem number one. Complicating matters further, the jury reached its recommendation based on a simple majority, even though the determination of guilt required unanimity. This was problem number two.

In January 2016, in *Hurst v. Florida*, the U.S. Supreme Court expressly applied *Ring* to Florida's sentencing scheme and invalidated the state's method of having juries make recommendations (as opposed to rendering a verdict) about whether capital punishment is warranted.

In response, the Florida legislature, in March 2016, amended the law to make the jury's decision binding and increased the standard from simple majority to requiring ten or more jurors to agree (out of twelve). Problem solved? Not quite. In October 2016, the Florida Supreme Court responded with a swift rebuke in *Perry v. State*, stating that only a death penalty statute that required unanimity would pass constitutional muster.

This past spring, our legislature and Governor Scott fixed the problem by requiring a unanimous verdict, bringing Florida's statutory framework in line with constitutional requirements and the rest of the country. From a procedural standpoint, we finally got it right.

So where does that leave us going forward? The U.S. and Florida Supreme Courts have made it clear that capital punishment must be limited to the most aggravated and least mitigated offenses. Following that guidance, our use of the death penalty must be fair, objective, and rare.

Fair means that not only should it be limited to the most egregious offenses, but that the threat of the death penalty should not be used as leverage to coerce a guilty plea; a person's life is not a bargaining chip. Objective means that each case is thoroughly evaluated based on its particular facts and circumstances, while ensuring that similarly situated defendants are treated consistently. And rare means, well, rare. Although all capital offenses are horrible and inhuman, the law reserves capital punishment for those rare crimes so heinous, atrocious, and undeserving of mercy as to be the worst of the worst in our society. Guided by these principles, we must get it right.

DEF 002225

JEX 47.038



# A Reflection on our First Months of Criminal Justice Reform

**Building a safer community while promoting justice and fairness has required new approaches and concrete changes.**

We have accomplished a lot at the State Attorney's Office during the first months of 2017, but we are just getting started. From enhancing public safety and improving juvenile justice to expanding diversion programs and increasing community engagement, we have set ambitious goals. I am pleased to share with you our progress, highlighting the changes we have made and the steps we have taken towards fulfilling our mission:

Building a safer community while promoting justice and fairness has required new approaches and concrete changes. To respond to the unique needs of our community, we must hear everyone's voice. So we embarked on a 60-day Listening Tour, meeting with the stakeholders in our criminal justice system to discuss necessary changes and how best to address the challenges ahead. We met with community leaders, law enforcement agencies, judges and court personnel, criminal defense attorneys, the Public Defender's Office, and



third-party agencies that work closely with the State Attorney's Office. The constructive conversations generated feedback on issues ranging from charging decisions and plea negotiations to diversion programs and operational efficiencies. You spoke, and we listened.

To build trust with our community, we regularly meet with the community through quarterly Community

Workshops, which are open to the public and streamed live on our Facebook page. These workshops engage our community with candid dialogue and transparency regarding the policies we implement and the decisions we make, while also giving residents a platform to raise issues and share ideas.

There is no substitute for enlisting others in a shared vision for the future. We restructured our office and hired key personnel to carry out the office's vision and mission. Our newly created Chief of Policy and Communication oversees policy initiatives, communication, and community outreach. Likewise, our new Chief of Staff oversees the complex administration of our office and handles legislative affairs to make sure that our community's needs are heard in Tallahassee. We realigned the office to incentivize hard work, critical thinking, and problem-solving, and we have elevated the status of our Problem Solving Courts: the Drug Court, Veterans Court, and the brand new Mental Health Court.

We are finding smart alternatives to prison for first-time, non-violent, and juvenile offenders to more efficiently use your tax dollars and reduce recidivism. For example, in my first few weeks in office, we declined to prosecute members of Food Not Bombs for feeding the homeless in a city park. Prosecuting

*Continued on page 11*

DEF 002226

JEX 47.039

*Continued from page 10*

people for charitable work does not further our mission and would have been an inefficient use of our resources.

We have also partnered with the Hillsborough County Sheriff's Office on several resource-intensive operations that resulted in numerous arrests, as well as the seizure of large quantities of firearms, drugs, and cash. We worked with local law enforcement agencies to review their Use of Deadly Force Policies, to ensure they promoted best practices such as prohibiting shooting at moving vehicles, rendering first aid, and proportional response. To improve juvenile justice, we have taken action to reduce the number of juveniles charged as adults, and we have worked to expand the pilot program for civil citations for misdemeanor marijuana possession, making it a permanent policy throughout the county.

Day by day, we are doing our part to form a more perfect union by striving to promote justice here in our community. I am excited about the progress that we have already made and even more excited for our journey ahead.



## NEW ADMITTEE SWEARING-IN CEREMONY

The HCBA hosted a swearing-in ceremony for new admittees to The Florida Bar on April 13 at the George Edgecomb Courthouse. HCBA president-elect Gordon Hill and YLD president Web Melton III spoke to the new lawyers about the benefits of joining the HCBA, and Judge Christopher Nash discussed the importance of professionalism as they embark on their new careers. Congratulations to all that were sworn in! The HCBA would like to thank the ceremony's sponsor:



STETSON LAW



DEF 002227

JEX 47.040



# Smart Justice: Using Mental Health Court to Reduce Crime

**Hillsborough County's MHC is a problem-solving court that seeks to bring mental health treatment into the courtroom.**

To accomplish its goal of promoting safety and justice, an effective criminal justice system must see beyond conviction and incarceration. It must also reduce recidivism, rehabilitate, and re-integrate offenders back into society. For too long, our criminal justice system has failed those in its confines who suffer from mental illness. Annually, an estimated two million people with mental illness are booked into jails in our country — many for non-violent offenses.[1]

Last year, the Hillsborough County Bar Association raised awareness of this issue in our legal community during the Law Day Membership Luncheon and CLE on "Ending the Criminalization of Mental Illness." And by enacting section 394.47892, Florida Statutes, the Florida Legislature has recognized the value of creating mental health courts at the local level.

This statute authorizes the creation of mental health court programs "under which a defendant in the justice system assessed with a mental illness shall be processed in such a manner as to appropriately address the severity of the identified mental illness through treatment services tailored to the individual needs of the participant."[2] Here in Hillsborough County, we have addressed this need by developing and implementing our own mental health court (MHC).

Hillsborough County's MHC is a problem-solving court that seeks to bring mental health treatment into



the courtroom. Spearheaded by Chief Judge Ronald Ficarrotta — and supported by our Public Defender, community partners, and treatment providers, as well as my office — the MHC allows individuals charged with certain crimes to participate in a diversion program that incorporates a treatment plan into the sanctions. Before entering the MHC, the individual is assessed by treatment providers, and a treatment plan is developed.

Compliance with that treatment plan is monitored by the court and can be altered to meet the needs of the individual. Those participating in the MHC are supervised by the Department of Corrections to ensure community safety. A large portion of the court proceedings are confidential due to the sensitive nature of the proceedings and the treatment plans being discussed. This intensive program provides the monitoring and treatment offenders need, while reducing the likelihood that they will re-offend.

Because its focus is on mental health and not solely on criminal charges, the MHC also is able to monitor court cases for persons with developmental disabilities who are receiving services under Chapter 393, Florida Statutes, and through the Agency for Persons with Disabilities. Although these cases are not criminal in nature, the relationship between treatment providers and the court can benefit the involved individuals.

*Continued on page 11*

DEF 002228

JEX 47.041

*Continued from page 10*

Too frequently, those suffering from mental illness find their way into the criminal justice system. We have implemented a way to handle those cases in a manner that serves our entire community — balancing safety and accountability with appropriate services to those in need. By allowing offenders to access treatment services while receiving the support needed to make positive decisions, we seek to change behavior and improve our community. I challenge my prosecutors to view each case they have, not as a person to be prosecuted, but as a problem to be solved. Our mental health court is a critical component of those solutions.

[1] National Alliance on Mental Illness, *Jailing People with Mental Illness*, http://www.nami.org/Learn-More/Public-Policy/Jailing-People-with-Mental-Illness (last checked 3/8/2017).

[2] § 394.47892(1), Fla. Stat. (2016).

# Have Clients with Tax Problems? Look No Further than the Team at Heinkel Tax Law Group!

The Team at Heinkel Tax Law Group includes a former IRS Appeals Officer; a CPA; EAs; a tax attorney and a criminal tax attorney. The Heinkel Tax Team has a combined average experience of over 30 years fighting the IRS and DOR. You can trust YOUR clients to the Heinkel Tax Team. Make the referral and make your clients happy you did.



We deeply appreciate all of our many referral relationships built over the years, and strive to establish trust and confidence in your clients, that we will try to resolve their tax dilemmas. You can trust in our skills, and having a rewarding referral relationship with us.

St. Pete - Clearwater - Tampa: **(727) 894-2099**



**TaxProblemSolver.com**
*"Get a Good Night's Sleep!"*



# GORDON HILL, HCBA PRESIDENT-ELECT
## GRACIOUSLY REQUESTS THE HONOR OF YOUR PRESENCE AT THE
## INSTALLATION OF OFFICERS AND DIRECTORS

THURSDAY, JUNE 8, 2017 | 5:00 P.M. TO 7:00 P.M.
CHESTER H. FERGUSON LAW CENTER

COMPLIMENTARY FOR MEMBERS
R.S.V.P. AT WWW.HILLSBAR.COM OR CALL (813) 221-7777

SPONSORED BY:



The Bank of Tampa
BANKING · INVESTMENTS · TRUST

DEF 002229

**JEX 47.042**



# The Future of Criminal Justice in Hillsborough County

**At its heart, criminal justice reform embodies the shift towards evaluating the long-term consequences of our system.**

On January 3, 2017, I was honored to be sworn in as State Attorney for the Thirteenth Judicial Circuit, along with the approximately 125 Assistant State Attorneys who serve in the Office. Chief Judge Ronald Ficarrotta and the Honorable E.J. Salcines presided over the swearing-in ceremony. The following is an excerpt from my remarks at the ceremony:

The future of criminal justice has already arrived in certain cities. My goal as State Attorney is to make Hillsborough the model of what a prosecutor's office should be, not just in Florida, not just throughout the Southeast, but across the entire country. This office has talent, and it has had success. But the difference between being good and being great is the difference between ability and achievement. It is time for us to start achieving at a higher level.

Across the country, there has been a lot of discussion about criminal justice reform, a broad term that encompasses many different policies and practices, some of which already exist here, and others which don't. At its heart, criminal justice reform embodies the shift towards evaluating the long-term consequences of our system. How do we best safeguard our neighborhoods? How do we reduce recidivism? What is the impact of incarceration on families? Reform is about appreciating what happens after we close the file. It's about viewing a case not as a person to be prosecuted, but as a problem to be solved.



Those are the principles that should guide our system. In practice, that means we must focus on the violent and economic crimes that threaten our community. We must endeavor to steer non-violent offenders, especially juveniles, away from the downward spiral of conviction and incarceration. We must proactively engage with those we serve so that our entire community views us not as the enemy, but as their partner.

That is my vision for this office. But our work together is not just about my vision. It's not about what I believe. It is about what we believe: our shared commitment to justice, fairness, and integrity; our dedication to public service.

Robert Jackson is the only person in our nation's history to have served as the U.S. Solicitor General, Attorney General, and as a Supreme Court Justice. He was also America's chief prosecutor at Nuremberg. As epitomized by his dissent in *Korematsu*, Justice Jackson was a staunch defender of due process.[1]

I mention him not because of his service or his jurisprudence, but because of his description of what it means to be a prosecutor. His characterization remains as astute today as when he first said it 75 years ago:

"The qualities of a good prosecutor are as elusive and as impossible to define as those which make a gentleman. And those who need to be told would not understand it anyway. A sensitiveness to fair play and

*Continued on page 11*

DEF 002230

JEX 47.043

*Continued from page 10*

sportsmanship is perhaps the best protection against the abuse of power, and the citizens' safety lies in the prosecutor who tempers zeal with human kindness, who seeks truth and not victims, who serves the law and not factional purposes, and who approaches his task with humility."[2]

To seek truth with humility — that is the essence of what it means to be a prosecutor. That is our fight song. That is how we will approach our jobs every day. That is how we will meet and exceed the lofty standards of professionalism and performance that I expect and that the public deserves.

[1] *See Korematsu v. United States*, 323 U.S. 214, 242 (1944) (Jackson, J., dissenting).

[2] Robert Jackson, *The Federal Prosecutor*, Second Annual Conference of United States Attorneys, Great Hall Department of Justice Building, Washington D.C., delivered April 1, 1940.

## Have Clients with Tax Problems? Look No Further than the Team at Heinkel Tax Law Group!

The Team at Heinkel Tax Law Group includes a former IRS Appeals Officer; a CPA; EAs; a tax attorney and a criminal tax attorney. The Heinkel Tax Team has a combined average experience of over 30 years fighting the IRS and DOR. You can trust YOUR clients to the Heinkel Tax Team. Make the referral and make your clients happy you did.



We deeply appreciate all of our many referral relationships built over the years, and strive to establish trust and confidence in your clients, that we will try to resolve their tax dilemmas. You can trust in our skills, and having a rewarding referral relationship with us.

St. Pete - Clearwater - Tampa: **(727) 894-2099**



TaxProblemSolver.com
*"Get a Good Night's Sleep!"*



## Plaintiff Hurt in DUI

### Dram Shop Co-Counsel

We hold alcohol vendors accountable.

Dram Shop is all we do - a one trick pony with a really good trick.

THE LIQUOR LAW CENTER
Dram Shop Attorneys

866.957.4878

DramLaw.com

DEF 002231

**JEX 47.044**



## State Attorney

**ANDREW H. WARREN**
Thirteenth Judicial Circuit
419 N. Pierce Street
Tampa, Florida 33602-4022
(813) 272-5400

*Policy Regarding Prosecution of Cases Based on Pedestrian and Bicycle Violations*

### Background

In October 2020, our office partnered with community representatives to form the Racial Justice Work Group. The Work Group was tasked with identifying areas where the implementation of new initiatives or processes could address issues of racial disparity as part of our agency's mission to improve public safety while ensuring justice and fairness for our citizens. Since October 2020, the Work Group has held regular meeting to discuss specific prosecutorial issues, analyze criminal justice data, and examine actual cases, resulting in a series of policy proposals for consideration by our office.

One such proposal is to evaluate racial disparities in cases of resisting a law enforcement without violence or the threat of violence, a misdemeanor. Our office asked researchers at Florida International University's Center for the Administration of Justice to review data regarding this category of crime. Using data from 2017-2019, FIU researchers found that Black defendants are overrepresented in resisting arrest without violence cases compared with all misdemeanors in general. During that period, Black defendants constitute approximately 33.6% of all misdemeanor defendants but 49.2% of all resisting without violence defendants.

In reviewing this category of cases, an area of focus that has emerged involves a subset of cases involving bicycle and pedestrian stops where the only charge resulting from the stop is resisting arrest without violence. Of the resisting arrest without violence cases referred to our office in which a bicycle or pedestrian violation was the reason for the initial contact, 71% involved Black defendants.[1]

Bicycle and pedestrian stops can be a legal and legitimate law enforcement tool to promote community safety, particularly in high crime areas. In many instances, however, bicycle and pedestrian stops have limited public safety benefits, especially because arrests resulting from such stops are predominantly for non-violent, low-level offenses. Furthermore, actual or even perceived racial disparities in the use of bicycle and pedestrian stops undermine trust within the communities that law enforcement serves.

Our analysis reveals that bicycle and pedestrian stops disproportionately burden Black citizens of Hillsborough County. To address this disparity, as well as to address inconsistencies in how cases resulting from these stops are prosecuted, and to ensure that prosecutorial resources are focused on crimes that pose a demonstrable public safety threat, it is necessary to memorialize our

---

[1] This review was limited to the 2019 data, which was the most recent calendar year of data not skewed by the impact of the pandemic. The most common reason for a stop/contact was the execution of a warrant on the defendant, followed by a criminal or crash investigation, impeding the investigation or execution of a warrant of another, or a bicycle stop.

DEF 002232



# OFFICE OF THE SHERIFF

**Chad Chronister, Sheriff**
**Donna Lusczynski, Chief Deputy**
*Hillsborough County, Florida*

January 25, 2022

Mr. Andrew Warren
State Attorney
Thirteenth Judicial Circuit
419 North Pierce Street
Tampa, Florida 33602

Dear Mr. Warren:

As the Sheriff of Hillsborough County, I am charged with ensuring the safety and well-being of the citizens of our county who elected me to office. I want to express my concerns on some recent policy decisions which have come from your office regarding the prosecution, or rather lack of prosecution, on certain crimes. Although we may not agree on every facet within the criminal justice system, the Criminal Justice partners in this county have typically discussed any significant policy decisions or changes that impact the other partners and the overall safety of our community prior to implementation. It is particularly disturbing that two recent memorandums/policies issued by you, were not ever discussed or provided to our office when they were issued and placed into effect.

You have decided not to prosecute individuals arrested for resist without violence based upon a bicycle or pedestrian violation. The policy indicated this was based on a study you solicited from Florida International University's Center for the Administration of Justice from 2017-2019. However, in the footnote of that study, it stated it was "limited to 2019 data, which was the most recent calendar year of data set not skewed by the impact of the pandemic." This appears misleading as data from 2017 and 2018 is available and was not "skewed" by the pandemic. I am perplexed that you would not simply have asked us for the data in our county. Listed below is the data for the Hillsborough County Sheriff's Office during this time period.

| Year | BLACK | WHITE | Grand Total | Black Males |
|------|-------|-------|-------------|-------------|
| 2017 | 3 | 10 | 13 | 23.08% |
| 2018 | 7 | 8 | 15 | 46.67% |
| 2019 | 9 | 6 | 15 | 60.00% |
| Grand Total | 19 | 24 | 43 | 44.19% |

JEX 47.046



Andrew H. Warren
Office of the State Attorney
13th Judicial Circuit

February 3, 2022

Sheriff Chad Chronister
P.O. Box 3371
Tampa, FL 33601

Dear Sheriff Chronister,

I write in response to your letter of January 25, 2022 regarding my office's policy on the prosecution of cases arising from law enforcement stopping pedestrians and bicyclists for civil traffic infractions.

I am proud of the productive partnership my administration has had with the Sheriff's Office both prior to and since you became Sheriff. Open and honest communication has been critical to that partnership, and I appreciate your willingness to be candid on difficult issues or those where we may disagree, as I hope you have appreciated mine. In that spirit of candor, let me express that your letter comes from a fundamental misunderstanding of our pedestrian and bicycle stop policy.

First, you incorrectly suggest that my office failed to discuss the pedestrian/bike stop policy with your agency. As we have typically done throughout our professional relationship, you and I spoke over the phone in the fall of 2021 about my intention to create this policy. At that time, I summarized to you how the issue had arisen, the research we had conducted, and the policy we were preparing to implement. You raised no objection and accurately pointed out that the policy would have limited impact on cases arising from the Sheriff's Office because your agency makes few arrests from civil bicycle (and pedestrian) infractions. Additionally, I discussed this policy at length with the Tampa Police Department before implementation because they had recommendations, whereas you did not.

Second, your contention that this policy is a political statement creating a blanket approach to no longer prosecute certain types of cases is inaccurate. To the contrary, our policy articulates consistent criteria for handling charges that arise from civil pedestrian/bike stops, including clearly directing that we *will* file charges where there is "a direct threat to public safety, such as where an individual has suffered physical harm or where a firearm is involved." The policy is expressly limited to stops where the initial encounter resulted from only a civil traffic infraction; if an arrest is made for a crime unrelated to a pedestrian/bike stop, even if the arrest happens during such a stop, the policy does not apply.

Third, you conclude that our policy's presumption of not filing low-level, non-violent charges that often arise from civil pedestrian/bike stops means that we will not evaluate the facts of each individual case. That conclusion is mistaken; the policy expressly states that prosecutors should consider the "facts and circumstances of the case." Furthermore, the language is similar to that contained in the Juvenile Arrest Avoidance Program, which your agency helped draft, in that there is a presumption of not filing criminal charges with broad exceptions for public safety concerns.

Fourth, our policy has not taken any tools away from law enforcement. To the contrary, our policy expressly recognizes, "[b]icycle and pedestrian stops can be a legal and legitimate law

DEF 002234



**Andrew H. Warren**
**Office** of the **State Attorney**
**13th Judicial Circuit**

December 14, 2021

## MEMORANDUM

TO:     Assistant State Attorneys

FROM:   Andrew H. Warren
        State Attorney

SUBJECT:    **Prosecutorial Discretion and the Mission of Criminal Justice**

This memorandum provides guidance for how Assistant State Attorneys should exercise discretion, and how the appropriate exercise of prosecutorial discretion is critical to furthering the mission of the State Attorney's Office and the criminal justice system.

### Our Mission

In 2017, we drafted a mission statement to succinctly define our office's collective purpose:

*Our mission is to build a safer community while promoting justice and fairness for everyone in Hillsborough County. Our office is committed to making our county a safer place to live, work, and raise a family. It is our privilege and honor to serve this community.*

The goals of the criminal justice system can be categorized and summarized as (1) punishing and holding offenders accountable; (2) preventing crime; (3) rehabilitating offenders; and (4) seeking justice for crime victims.[1] The efficient and successful operation of our system requires balancing these objectives. Achieving that balance is extremely difficult, especially when these goals are not perfectly aligned. Filing charges, securing convictions, and imposing appropriate sanctions constitute the traditional method of achieving accountability and punishment, but diversion programs, specialty courts, and restorative justice models have shown that traditional prosecution is not the only method. Specific and general deterrence resulting from traditional prosecution prevents crime, but crime reduction strategies outside of the criminal justice system such as community-based intervention and mentorship programs are generally more effective and less expensive. Also, contact with the criminal justice system, including incarceration, often increases the likelihood of recidivism—a nuance that can undermine the specific deterrence sought through traditional prosecution. Additionally, embracing victims' importance in the process requires valuing their input and balancing that input along with the other goals while also promoting consistency in the handling of similar cases.

---

[1] These goals are sometimes abbreviated as the four "Rs": retribution, recidivism, rehabilitation, and restitution.

DEF 002235

involving that case. However, supervisors can provide additional insight and promote consistency with similarly situated cases. Accordingly, the assigned ASA should consult with the appropriate supervisor(s) on all critical decisions. Disagreement between an ASA's recommendation and a supervisor's decision is inevitable, and in the small subset of those disagreements where appropriate, ASAs are encouraged to consult with the Chief Assistant for the Bureau for further evaluation of a particular case and to promote consistency across similarly situated cases.

## Solve the Problem

In every case, ASAs should exercise their discretion to further the four goals of accountability & punishment, prevention, rehabilitation, and justice for victims. ASAs should view each case as a problem to be solved rather than simply a person to be prosecuted. For certain types of offenses and offenders, especially violent crime and major fraud, the solution is usually straightforward: traditional prosecution resulting in incarceration neutralizes the offender to ensure that s/he does not harm additional innocent victims. For a defendant who is addicted to drugs or suffering from mental illness, treatment may be the best solution. Often the solution is neither readily apparent nor simple; it requires critical evaluation of all the relevant circumstances and a combination of punitive and rehabilitative sanctions.

## Triage

Different crimes and different criminals represent different threats to public safety. ASAs should view a crime not simply as the violation of a written law but in terms of the harm to the victim and the threat of future harm. This perspective reinforces the aforementioned problem-solving approach. Cases in which the defendant poses a greater threat to public safety are more likely to justify traditional prosecution and more prosecutorial resources. On the other hand, cases in which the defendant poses a minimal threat to public safety are more likely to justify alternative methods of prosecution and fewer prosecutorial resources.

## Charging Requires Discretion

Charging a person with a crime is a serious and consequential decision. Although our system professes innocent until proven guilty, being charged (without being convicted) can have negative and far-reaching impact on a person's family, employment, and finances. For suspects who have not been arrested for the crime, the charge may result in an arrest, which carries its own consequences. Even for suspects who have already been arrested, the formal filing of charges is consequential. ASAs' expectation in filing a charge is that it will result in a conviction or diversion.

ASAs must exercise discretion in filing charges. Charging is not an academic question of which statutes have been violated but rather a judgment decision based on the law, facts, evidence, and expected outcome that appropriately considers the severity of the offense and the suspect's criminal history. The idea that prosecutors should always charge every offense committed and later determine the "appropriate" outcome through sentencing or sanctions is misguided. This approach can undermine the goals of the system; it ignores the use of pre-file

3

DEF 002236

JEX 47.049

sentences that further the criminal justice goals while factoring in the nature and circumstances of the offense, the defendant's criminal history (or lack thereof), victim input, and other factors. There is a wide range of available sanctions, including incarceration, probation, treatment, and restitution to accomplish the goals of accountability, punishment, deterrence, and rehabilitation. Also, ASAs should advocate for sentences that are consistent with similarly situated defendants.

Determining the appropriate sentence is not simply a math problem dictated by the Criminal Punishment Code. The Code expressly contemplates a range of aggravating and mitigating factors that warrant departures, but the sentencing calculation alone does not quantify the mitigation. Statutory mitigators include the extent of the defendant's participation, the need for specialized mental health treatment, whether the crime was an isolated incident, and the defendant's remorse.[6] ASAs must evaluate all mitigating and aggravating factors, as well as the strengths and weaknesses of each case, in advocating for a sentence. Additionally, ASAs are responsible for obtaining mitigation that they know or should reasonably know to exist. ASAs should not use prosecutorial or investigative resources to obtain mitigation and therefore usually have to rely on defense counsel to provide it. However, when the presence of mitigation is readily apparent, e.g., it is documented in the police report, ASAs should seek it out rather than waiting for defense counsel to raise the issue and provide the mitigation.

Incarceration should generally be reserved for when the defendant is a danger to the community. Whether the defendant poses a danger is evaluated based on the circumstances of the crime and the criminal history. Generally, for violent crimes, especially for offenders with a criminal history, incarceration is warranted. However, a defendant with minimal or no criminal history engaged in an isolated incident of violence may not warrant prison. The defendant's intent also factors into the danger posed. For example, a defendant who intended to seriously injure the victim but did not (e.g., repeated blows to the face that resulted in bruising) likely poses a greater danger than a defendant who did not intend to seriously injury the victim but did (e.g., pushing a victim who falls and breaks a bone).

Using a problem-solving approach requires considering the defendant's motivation in committing the crime. Defendants who are intent on harming innocent members of the community warrant different sentences than defendants who have committed a crime because of addiction or mental illness, or an otherwise law-abiding citizen whose crime was isolated and out of character.

Probation can be an effective intermediate sanction between incarceration and freedom. Probation, however, is not a universal solution, and when overused it can undermine long-term public safety at a significant monetary cost to society. Therefore, it is important that ASAs utilize probation—whether following or in place of incarceration—specifically to further the goals of accountability, punishment, or deterrence, rather than automatically seeking probation

---

[6] F.S. 921.0026(2).

DEF 002237

JEX 47.050

In making plea offers, ASAs should consider the sentence that the ASA would seek if the defendant were to be convicted at trial. Generally, the plea offer should be below such a sentence to account for the defendant's acceptance of responsibility, the certainty and finality a plea provides to the victim, and the elimination of trial and appellate risk accomplished through the plea. Generally, stronger cases involve less of a reduction from the appropriate post-trial sentence, whereas weaker cases unfortunately necessitate a greater reduction because of greater trial risk. Furthermore, although it is impossible to predict with accuracy what sentence a judge would impose, it is permissible for ASAs to adjust the plea offer to reflect the expected sentence.

There is a tendency among prosecutors and defense attorneys to want the other side to initiate plea discussions. Whereas a defense attorney's goal may be to minimize the sentence, prosecutors should seek the appropriate sentence, not simply the maximum that they can negotiate. Accordingly, ASAs should not avoid initiating plea discussions. ASAs should make reasonable plea offers and be open to negotiating an appropriate resolution. In most cases, ASAs should make an offer by arraignment[9] and be open to further negotiations based on the relevant factors as they learn more about the case. In certain situations, especially those involving more serious crimes where there is a more active dialogue with defense counsel farther in advance of trial, it is appropriate for ASAs to discuss a general range of likely plea offers rather than making a specific, binding offer. This process will help determine the likelihood of a resolution. For example, in situations where a resolution is highly unlikely because the two sides are too far apart, or because the appropriate sentence is so high that the defendant will choose to go to trial, plea negotiations may be unproductive and therefore unnecessary.

A prosecutor's role as a minister of justice applies to plea negotiations as it applies to all other aspects of prosecution. Accordingly, prosecutors must conduct plea negotiations fairly. Although prosecutors can condition plea offers on waiving sentencing enhancements that are appropriate—including capital punishment, mandatory minimums, or the adult prosecution of juveniles—they must not make empty threats regarding enhancements to coerce a plea. It is acceptable for prosecutors to set reasonable deadlines before trial or hearings for acceptance of offers but should not condition pleas on defendants waiving credible allegations of constitutional violations. Appropriate situations for conditional revocation of an offer may include involvement of a vulnerable witness/victim, confidential informants, or other cases where there is a specific justification for withdrawing a plea offer prior to a particular pre-trial event occurring.

### Constitutional Violations

As ministers of justice, prosecutors are obligated to identify Constitutional violations as well as any other police or prosecutorial misconduct. In addition to always complying with discovery and disclosure obligations, ASAs should exercise discretion in terms of prosecuting a case when faced with Constitutional problems or misconduct. Whereas defense attorneys are obligated to

---

[9] Administrative Order 2021-44, ¶ 15.

7

DEF 002238

JEX 47.051

public safety threat than a defendant who steals a weapon as the object of the burglary, e.g., opening an empty, unlocked car and stealing a gun. In general, the former should be charged as armed burglary whereas the latter should not.

- The burglary with assault or battery statute applies to (1) situations where the offender breaks into a person's home in the middle of the night and physically attacks the homeowner and (2) to situations in which the offender reaches across the threshold of a rolled-down car window and threatens the driver. There is a significant difference between these two crimes in terms of the threat to public safety and the harm caused to the victim. In general, the former should be charged as burglary with assault or battery whereas the latter is should be charged as a misdemeanor assault, with the possibility of adding the charge of burglary of a conveyance.

- In deciding whether to charge drug trafficking, ASAs must look at factors other than the amount of drugs sold. There is a significant difference in the threat to public safety and the degree of culpability between the kingpin and the mule, even though both may be caught selling the same amount of drugs. Similarly, there is a significant different between a person selling prescription drugs as an organized criminal business versus someone selling his/her own prescribed drugs to afford the medication that s/he needs for legitimate medical use.

- For certain crimes, individual acts that are part of the overall crime may constitute a separate charge, e.g., wire fraud, identity theft, possession of child pornography, unlicensed practice of law, et al. Often in these situations, it is possible to charge dozens or hundreds of counts. For these crimes, ASAs should not file every possible count but rather should strategically charge a number of representative counts to achieve the appropriate sanctions while simplifying the burden of proof at trial.

9

DEF 002239

JEX 47.052

community. The GVU is designed to help allocate limited resources to focus on the most dangerous offenders.

## GVU Structure

The GVU is being restructured to better respond to the increase in gun violence in our community and to provide support to firearm prosecutions at all levels of the office. We are expanding the number of prosecutors to four (Felony Division Chief, Felony Division Deputy Chief, and two Lead Trial Attorneys), increasing the level of attorney supervision for gun crime cases, and broadening our level of interaction with law enforcement on gun related crimes.

The GVU will be supervised by a designated Felony Division Chief and Felony Division Deputy Chief. These supervisors will:

1. Supervise the Lead Trial Attorneys assigned to the Gun Violence Unit;
2. Work with law enforcement agencies to identify those defendants of special concern who pose the biggest threat to our community. On these cases, these supervisors will communicate with the assigned attorneys and divisions to ensure that appropriate resources are allocated and consistent decisions are made regarding those cases;
3. For any cases identified by the Gun Violence Identification Case Tag, the GVU Chief must approve the waiver of any minimum mandatory sentence; and,
4. Coordinate and conduct annual firearm prosecution training for ASAs.

Two Lead Trial Attorneys will be assigned to the GVU, with each being assigned to four of the eight felony divisions. Within their assigned divisions, these GVU ASAs will be assigned violent 1st degree felony cases involving a firearm and which have been identified as individuals of special concern by law enforcement and non-fatal firearm cases resulting in great bodily harm (cases carrying the 25-year minimum mandatory penalties under Florida's 10-20-Life provisions in Florida Stat. §775.087) excluding domestic violence cases.

The GVU Chief may assign cases which meet these criteria to regular divisions as needed. A Gun Violence Identification Case Tag will be added to these cases in our Case Management System by the GVU Legal Assistant.

## Responsiveness to Law Enforcement

It is imperative that law enforcement and the SAO work collaboratively in investigating and prosecuting gun violence. Prosecutors often have only the information contained in criminal report affidavits and other case-specific information when making decisions about how to handle a case. By contrast, law enforcement agencies may have access to criminal information related to unsolved cases or ongoing investigations that may not be known to prosecutors. As a result, it is imperative that law enforcement officers and prosecutors work together not only on the cases sent for criminal prosecution but also communicate and cooperate on open investigations for defendants of special concern.

Law enforcement should identify individuals of special concern based upon their heightened threat to the community, significant prior record, or connection to additional dangerous crime. The GVU ASAs, along with other senior prosecutors, will meet regularly with law enforcement to discuss individuals or defendants who pose significant safety threats to the community. Notifications of these individuals can also be sent to the Gun Violence Unit distribution list.

2

DEF 002240

- o  Annual training focused on the prosecution of firearm charges prepared by GVU
- o  Availability of the members of the GVU to consult on individual gun cases
- o  Publication of a Legal Quick Guide to Illegal Possession of Firearms
- o  Implementation of written prosecutorial standards contained in this policy to promote a consistent and informed approach to prosecutions of gun cases

## Charging Decisions

When making filing decisions regarding gun charges, there will be a presumption that the charging document will include the "actual possession" language whenever the facts and evidence support such filing. There will also be a presumption that felon in possession charges will be filed in the same charging document as other charges arising out of the same case with the understanding that severance may be appropriate for trial.

Whether reviewing a case for intake, completing discovery, or preparing for trial, the assigned ASA should prepare the case thoroughly, including preparing for potential evidentiary challenges and identifying supplemental avenues of investigation. The assigned ASA should also be cognizant of factors which are indicative of an increased danger to the community whether based upon the prior actions of the defendant or based on facts which connect the charged offense to a pattern of dangerous criminal conduct within the community. This may include:

- •  Jail Phone Calls/Jail Visitation
- •  Witness Statements / Sworn Statements
- •  Fingerprint Analysis of Firearm (including related magazine and ammunition if possible)
- •  Social Media Investigations
- •  Information received from ShotSpotter
- •  ATF eTrace of Firearms Recovered
- •  NIBIN Associations: Related Reports
- •  Defendant's Prior Law Enforcement Contacts Related to Firearms

## Felon in Possession Cases, Fla. Stat. 790.23

When evaluating a felon in possession case, the assigned ASA and the Division Chief should consider any aggravating factors when extending an offer. **Where a minimum mandatory sentence is applicable[1], there is a presumption that the assigned ASA will seek enforcement of that minimum mandatory. Offers below the guideline minimum or waiving the three-year minimum mandatory should not be made absent substantial mitigation and must be clearly documented within the file.**

---

[1] Fla.Stat. 775.087(2)(a): "except that a person who is convicted for possession of a firearm by a felon or burglary of a conveyance shall be sentenced to a minimum term of imprisonment of 3 years if such person possessed a "firearm" or "destructive device" during the commission of the offense. However, if an offender who is convicted of the offense of possession of a firearm by a felon has a previous conviction of committing or attempting to commit a felony listed in s. 775.084(1)(b) 1. and actually possessed a firearm or destructive device during the commission of the prior felony, the offender shall be sentenced to a minimum term of imprisonment of 10 years."

4

DEF 002241

JEX 47.054

## Carrying a Concealed Firearm, Fla. Stat. 790.01

The charge of carrying a concealed firearm ("CCF") covers a broad spectrum of circumstances and dangers. Although in some cases this charge may be the only viable criminal charge on which our agency is able to proceed, the circumstances surrounding the crime are indicative of a course of conduct that poses a substantial risk of harm to the community or is part of an ongoing course of criminal conduct. Those cases may be identified by the investigative agency, or the aggravating factors referenced above may be identified which demonstrate substantial risk of danger to the community. When determining an offer to be made on these cases, there will be a presumption that our agency will seek an adjudication of guilt and seek incarceration in order to neutralize the defendant's ability to harm the community.

Some CCF cases involve defendants with no aggravating factors and no substantial risk to the community. These defendants may be merely irresponsible, negligent and/or uninformed regarding firearm laws. They may be amenable to education and rehabilitation given their demonstrated poor firearm training or a lack of responsible firearm education. These defendants may be appropriate candidates for diversion, which includes sanctions other than prison or jail. The ASA and Division Chief should evaluate the case and any mitigation factors that are present. A defendant is not required to meet all the mitigation criteria for a CCF diversion, and no defendant is automatically entitled to lesser sanctions merely because of the presence of mitigating factors.

As with all gun cases, the substantial risk to the community is the paramount factor in determining appropriate sanctions. Even if multiple criteria are present in a case, the prosecutor must still evaluate the specific facts of the case. If circumstances surrounding the case or related to the defendant indicate that diversion is not appropriate, then it should not be offered. In addition to an evaluation of the stated criteria, a defendant must meet all statutory eligibility requirements to participate in Pre-Trial Intervention. A CCF Mitigation Form must be completed and included as part of the case file for a referral to diversion on a CCF case. In addition to each of the standard conditions of PTI, the PTI contract will also contain the following special firearm related conditions:

1. No firearm possession (except defendant may possess a firearm while participating in an approved Firearms Safety Course).
2. Completion of a Firearms Safety Course pursuant to Florida Statute 790.06 or approved by the Florida Department of Agriculture.
3. No early termination until NIBIN results are confirmed.

### Supervision Sanctions

Except as otherwise indicated within this memo, there will be a presumption in any gun case where the defendant is being placed on supervision for any portion of their sentence, that **the assigned ASA will request as a special condition that the defendant cannot possess any firearms or replica firearms.** This includes juvenile cases.

The suggested language for this condition is:

> The defendant shall not possess any weapons, or the replicas of any weapons, during the term of probation. The defendant shall refrain from making any social media postings that depict, involve, or mention firearms or replica firearms or that depict the

6

JEX 47.055

For any firearm offense, the Petition should include a reference to Fla. Stat. §790.22 in addition to the substantive charge to provide the juvenile with notice regarding any potential secure detention sanctions.

Any juvenile convicted of a first offense for Minor in Possession of a Firearm, Fla. Stat. §790.22(3), *may* be ordered to serve up to three (3) days in secure detention (15 days for a second or subsequent violation). In addition. The juvenile *must* perform 100 community service hours and may have their driving license or privilege suspended or delayed issuance for up to one year.

Any juvenile convicted of a felony firearm offense and charged under Fla. Stat. §790.22(9) as well as the substantive offense *must* serve 15 days in secure detention and complete 100 community service hours unless committed to a residential commitment program.

DEF 002243

## Disposition

When a disposition is entered on a Gun Violence case, an email notification will be sent to the GVU Chief and the rest of GVU allowing them to stay abreast of cases as they resolve and facilitating timely follow up communication with law enforcement on the resolution of GVU cases.

| Highest Charge | Offender of special concern/identified for possible federal prosecution? | GV Case Tag | Assigned Prosecutor | Approval of any waiver of minimum mandatory sentence |
|---|---|---|---|---|
| Non-fatal firearm cases resulting in GBH excluding DV | Not applicable | Yes | GVU Prosecutor* | GVU Chief |
| Violent 1st degree felony firearm case | Yes | Yes | GVU Prosecutor* | GVU Chief |
| Violent 1st degree felony firearm case | No | Yes | Letter Division | GVU Chief |
| All other firearm charges | Yes | Yes | Letter Division | GVU Chief |
| All other firearm charges | No | No | Letter Division | Division Chief |

*Preference will be to assign these cases to the GVU Prosecutor. Based on staffing or case load needs, the case may be assigned an appropriate experienced prosecutor within the assigned letter division. The case will still be supervised by the GVU Chief.

10

DEF 002244

## Legal Quick Guide to Illegal Possession of Firearms

Weapons and Firearms, F.S. 790

- What is a firearm?
  - o Any weapon (including a starter gun) which will, is designed to, or may readily be converted to expel a projectile by the action of an explosive, the frame or receiver of any such weapon, any firearm muffler or firearm silencer, any destructive device, or any machine gun.
- What is not a firearm?
  - o A BB gun[5] or an antique firearm is not a firearm (unless used in the commission of a crime).
- What is possession?
  - o Possession = knowledge + ability to control.[6] Possession may be actual or constructive.
  - o When found in an area over which the defendant had exclusive possession, defendant's knowledge of the contraband and ability to maintain control over it may be presumed.[7]
- Prima facia case of constructive possession
  - o Defendant is the sole occupant and in exclusive possession of a vehicle, and the firearm is found in the backseat.[8]
  - o Defendant is the sole occupant and driver of car but not the owner.[9]
- Facts that do not support constructive possession
  - o A firearm is found between mattresses in the bedroom of the defendant's home occupied by another, and there is touch DNA of the defendant (charge: felon in possession).[10]
  - o A vehicle is jointly occupied, and there is only mere proximity of the defendant.[11]
  - o A defendant driver and two other occupants flee from a car; a firearm is found on driver seat, but the defendant's prints are not on it.[12]
  - o The defendant is the driver Jointly occupied vehicle, and a firearm wrapped in a handkerchief is in a car.[13]

---

[5] *J.M.P. v. State*, 43 So. 3d 189 (Fla. 4th DCA 2010); *Petz v. State*, 917 So. 2d 381 (Fla. 2d DCA 2005); *Wilson v. State*, 901 So. 2d 885 (Fla. 4th DCA 2005); *Mitchell v. State*, 698 So. 2d 555 (Fla. 2d DCA 1997), decision approved, 703 So. 2d 1062 (Fla. 1997).

[6] *Sinclair v. State*, 50 So. 3d 1223 (Fla. 4th DCA 2011); *Williams v. State*, 724 So. 2d 1214 (Fla. 4th DCA 1998).

[7] *Barlatier v. State*, 26 So. 3d 29 (Fla. 3d DCA 2009); *Hunter v. State*, 914 So. 2d 985 (Fla. 4th DCA 2005).
[8] *Sinclair v. State*, 50 So. 3d 1223 (Fla. 4th DCA 2011).

[9] *Henderson v. State*, 88 So. 3d 1060 (Fla. 1st DCA 2012), review denied, 163 So. 3d 509 (Fla. 2015).

[10] *Miller v. State*, 107 So. 3d 498 (Fla. 2d DCA 2013).
[11] *Watson v. State*, 961 So. 2d 1116 (Fla. 2d DCA 2007).
[12] *Williams v. State*, 724 So. 2d 1214 (Fla. 4th DCA 1998).

[13] *Daniels v. State*, 718 So. 2d 1274 (Fla. 2d DCA 1998).

12

JEX 47.058

loaded, a court must consider the location and accessibility of both the firearm and the ammunition in determining whether the firearm is readily accessible.[24]

*"Readily accessible"*

- Generally, includes the interior of an automobile and the vehicle's glove compartment.[25]
- Under the driver's seat, and ammunition and a fully loaded clip were under the passenger's seat.[26]

*Not "readily accessible"*

- At the time of the arrest, the firearm was under the driver's seat of the defendant's locked vehicle, and the defendant was in his carport trying to find a way to enter his locked home.[27]
- The defendant is involved in a shooting and after leaving the scene put a firearm underneath the passenger seat. The defendant was outside of car and admitted that the firearm was under the front seat of the car.[28]
- An unloaded firearm is under front passenger seat.[29]
- An unloaded firearm wedged between the front seats of defendant's vehicle where ammunition was inside a closed center console of the vehicle; and the defendant would have had to retrieve the firearm, open the center console, retrieve the ammunition magazine, and load the firearm before he could use it.[30]
- A firearm is located inside a locked, unattended vehicle.[31]

---

[24] *State v. Weyant*, 990 So. 2d 675 (Fla. 2d DCA 2008).

[25] *U.S. v. Archer*, 531 F.3d 1347 (11th Cir. 2008); *State v. Hinkle*, 970 So. 2d 433 (Fla. 4th DCA 2007); *Wallace v. State*, 964 So. 2d 722 (Fla. 2d DCA 2007); *Gehring v. State*, 937 So. 2d 169 (Fla. 2d DCA 2006).
[26] *Ridley v. State*, 621 So. 2d 409 (Fla. 1993).

[27] *Lamb v. State*, 668 So. 2d 666 (Fla. 2d DCA 1996).
[28] *Brunson v. State*, 211 So. 3d 96 (Fla. 4th DCA 2017).

[29] *Strikertaylor v. State*, 997 So. 2d 488 (Fla. 2d DCA 2008).
[30] *State v. Weyant*, 990 So. 2d 675 (Fla. 2d DCA 2008).
[31] *Wallace v. State*, 964 So. 2d 722 (Fla. 2d DCA 2007).

DEF 002246

JEX 47.059

- Lack of knowledge regarding felony conviction not a defense.[43]

*DNA and Felon in Possession Charges*

- Although DNA can be strong evidence to establish possession, courts have found that DNA by itself is often insufficient to rebut a reasonable hypothesis of innocence.
    - o "Evidence was not sufficient to support defendant's conviction for being felon in possession of a firearm or ammunition; although handgun was found in defendant's apartment and his DNA was on the handgun and magazine, State's witness could not determine when the DNA was put on the gun, and even more significantly, she testified that secondary DNA transfer was possible, and since there were additional inferences needed, that defendant's DNA was put on gun by him, and that it was put under the mattress by him, in order to believe that defendant possessed handgun, the DNA evidence was circumstantial, and defendant's theory was that it was the burglar, who put the handgun in his apartment, and state did not present any evidence inconsistent with this theory."[44]
    - o "Defendant's DNA found on firearm's magazine at the time it was seized by law enforcement did not show, by itself, whether defendant committed or participated in the crime of possession of a firearm by a felon, after officer conducted traffic stop, observed suspect running, and found firearm near the car, and thus circumstantial evidence standard of review applied to the ruling on defendant's post-trial renewed motion for judgment of acquittal; DNA evidence presented the possibility DNA was transferred to the firearm without defendant being in possession of it or touching it."[45]
    - o "Evidence was insufficient to support finding that defendant constructively possessed gun found between mattress and box spring in bedroom of defendant's home which was occupied by defendant's sister, as would support felon in possession of firearm charge, even though State presented DNA evidence establishing that defendant had touched gun at some undetermined point in past; there was no evidence whatsoever that defendant knew gun was located in that spot or that defendant had ability to exercise any control over gun at that time."[46]

---

[43] *Burkett v. State*, 518 So. 2d 1363 (Fla. 1st DCA 1988).

[44] *Finley v. State*, 139 So.3d 940 (Fla. 4th DCA 2014).

[45] *State v. Sephes*, 262 So.3d 811 (Fla. 4th DCA 2019).

[46] *Miller v. State*, 107 So.3d 498(Fla. 2d DCA 2013).

16

DEF 002247

JEX 47.060

Firearm Mandatory Minimums

| Statute | Sentence |
| --- | --- |
| 775.087 (2)(a) 1—Actual possession of a firearm in enumerated felonies a-q[50] | 10 year m/m |
| 775.087 (2)(a) 1—Discharge a firearm in enumerated felonies a-q | 20 year m/m |
| 775.087 (2)(a) 1—Discharge a firearm in enumerated felonies a-q and cause great bodily harm or death | Minimum of 25 years and up to life |
| 775.087 (2)(a) 1—Felon in possession of a Firearm[51] | 3 year m/m |
| 775.087 (2)(a) 1-Felon in possession of a Firearm with a prior felony conviction for a specified felony[52] AND a firearm was used in that crime | 10 year m/m |
| 775.087 (3)(a) 1--Actual possession of a semiautomatic firearm and a high-capacity detachable box magazine or machine gun[53] | 15 year m/m |
| 775.087 (3)(a) 2—Discharge of a semiautomatic firearm and a high-capacity detachable box magazine or machine gun | 20 year m/m |
| 775.087 (3)(a) 3—Discharge of a semiautomatic firearm and a high-capacity detachable box magazine or machine gun and causes great bodily harm or death | Minimum of 25 years and up to life |
| 790.235 Actual possession of a firearm by a Violent Career Criminal (under 774.084(1)(d) | 15 year m/m |

---

[50] Murder, Sexual Battery, Robbery, Burglary, Arson, Aggravated Battery, Kidnapping, Escape, Aircraft Piracy, Aggravated Child Abuse, Aggravated Abuse of Elderly or Disabled Person, Unlawful throw/place/discharge destructive device or bomb, Carjacking, Home-Invasion Robbery, Aggravated Stalking, Trafficking in specified substances and Possession of a Firearm by a Convicted Felon.

[51] Proof of actual possession is required to impose minimum mandatory

[52] Arson, Sexual Battery, Robbery, Kidnapping, Aggravated Child Abuse, Aggravated Abuse of Elderly or Disabled Person, Aggravated Assault with a Deadly Weapon, Murder, Manslaughter, Aggravated Manslaughter of an Elderly or Disabled Person, Aggravated Manslaughter of a Child, Unlawful throw/place/discharge destructive device or bomb, Armed Burglary, Aggravated Battery, Aggravated Stalking,

[53] Same enumerated felonies in Footnote 1

18

DEF 002248

JEX 47.061

March 20, 2020

Categories: News, Press Release

The State Attorney's Office has been actively working with our criminal justice partners in response to the coronavirus (COVID-19) pandemic. Our goal is to ensure public safety while taking all necessary precautions to protect the health of our employees and those of our court system, their families, and our entire community.

Our courts are currently conducting only mission critical functions such as first appearance court, arraignments, detention hearings, emergency hearings, and mental health proceedings (many of which are occurring through phone and video conferencing). Non-emergency court proceedings such as trials, pleas, and regular court dockets, have been suspended until April 20. Although this suspension will cause a major disruption to court operations, it is the appropriate action to minimize the threat of the coronavirus to our legal community and beyond.

Our criminal justice stakeholders have taken several additional steps to limit courthouse traffic, decrease the number of new cases, and reduce the likelihood of the coronavirus spreading throughout our jails and courthouse, including:

- In consultation with the State Attorney's Office, local law enforcement agencies are minimizing arrests for non-violent misdemeanors that do not pose an immediate or material threat to public safety. Instead, law enforcement agencies are issuing notices to appear (paper arrests) where appropriate to reduce jail population and courthouse traffic.

- In consultation with the State Attorney's Office and Hillsborough County Sheriff's Office, Chief Judge Ronald Ficarrotta has implemented emergency procedures to permit the release of certain pretrial detainees to mitigate the threat of the coronavirus, and the Sheriff has already begun releasing inmates who don't pose an immediate or material threat to public safety. This includes defendants charged with local ordinance violations, misdemeanors, criminal traffic offenses, and third-degree felony offenses.

- To prioritize the prosecution of violent crimes and offenders who pose a direct threat to public safety, the State Attorney's Office has temporarily suspended filing charges for local ordinance violations (e.g., panhandling), non-violent misdemeanors (e.g., trespass and prostitution), and criminal traffic offenses (e.g., driving with a suspended license where the suspension is not based on DUI or a permanent revocation). Our office is continuing to prepare these cases for prosecution and intend to file charges where appropriate when normal court operations resume. Our office has not suspended filing charges for misdemeanor offenses that pose a direct threat to public safety (e.g., assault, battery, domestic violence, stalking, DUI, et al.).

- To mitigate against the forthcoming backlog of low-level cases that diverts resources from the prosecution of more serious offenses, and to ensure that low-level offenders do not receive excessive punishments as a result of the current reduction in court operations, the State Attorney's Office is dismissing certain non-violent misdemeanor and criminal traffic cases (e.g., driving with a suspended license, trespass, ordinance violations, prostitution, and disorderly conduct) where the defendant has a limited criminal history and where the time served exceeds the likely sentence following a conviction.

DEF 002249

**JEX 47.062**

The State Attorney's Office will continue to coordinate with the Administrative Office of the Courts, the Office of the Public Defender, and our law enforcement partners to make necessary changes to our criminal justice system that promote the safety and health of Hillsborough County while our community unites to fight the coronavirus pandemic.

DEF 002250

JEX 47.063

October 14, 2020

**Categories:** News, Press Release

In response to the senseless murder of George Floyd, the State Attorney's Office continues to reach out and listen to community members calling for change and reform. Prosecutors have unique responsibilities and can actively help build a more fair and equitable criminal justice system. We have listened as our community has called out for progress. We have analyzed our own role in delivering sensible reforms. We recognize that only in partnership with our community are we able to build a strong system of criminal justice that prioritizes public safety and fairness.

To that end, our Office is partnering with a wide range of grassroots organizations and community leaders to create new initiatives that address issues of racial injustice as part of our mission of building a safer community while promoting justice and fairness for everyone.

## Racial Justice Work Group

Our Office will convene a working group to study race and criminal prosecution in Hillsborough County. This group will be composed of a small group of Assistant State Attorneys and community members who represent the rich diversity of Hillsborough's Black community. Working with various community organizations, State Attorney Warren will identify leaders in our community who have shown a commitment to criminal justice issues and civic engagement, and a firm resolve to make positive change. The goal of the group will be to identify important community issues pertaining to racial injustice and develop consistent case-by-case decisions that address these inequities. The group will study criminal justice data, examine actual cases, and develop meaningful policy recommendations for turning ideas into action. Additionally, the group will expand upon our existing efforts to decriminalize poverty, address bail reform, and expand effective diversion programs that steer people away from the criminal justice system.

**If you would like to suggest a potential topic for the Racial Justice Work Group to address, please let us know using this form. Your suggestions, along with ideas from organizations across our community, will help guide the group's planning.**

## Use of Deadly Force Review

Our prosecutors review every law enforcement and civilian use of deadly force incident to determine whether the actions taken were permissible within the bounds of the law. This role provides an important check and balance in our criminal justice system that ensures no person is beyond the reach of the law, even those who enforce it. Our Office will continue to update the community regarding our review, analysis, and findings for use of deadly force incidents in response to inquiries from community groups and the media. Specifically, our Office will provide a detailed report of each review on the SAO website within approximately one week of our decision. This report will include an initial release of video, photos, and documents related to the case. Further, State Attorney Warren will hold quarterly meetings with the public to address questions regarding these cases and other important issues. Providing this information for review and discussion will help our community gain a better understanding of what takes place in such an incident, the legal limits of using deadly force, and promote a greater level of transparency.

DEF 002251

JEX 47.064

Additionally, our Office will present the findings of any incident involving the use of deadly force by law enforcement to the Racial Justice Work Group and keep the group informed during the pendency of any such investigation. State Attorney Warren will also update the Hillsborough NAACP President regarding these investigations during their monthly meetings.

## Community Engagement

The discretion that squarely rests with prosecutors must have at its center an understanding of the community we serve. Going forward, our Office will encourage prosecutors to participate in community groups and events on a continuous and ongoing basis. Community involvement will be evaluated as a regular part of a prosecutor's performance review and promotion eligibility. Whether it is neighborhood associations, the ACLU, the NAACP, Metropolitan Ministries, Realtor associations, Equality Florida, chambers of commerce, or any of the dedicated civic groups in our community, the goal of this participation is to better connect our team with our community.

Additionally, State Attorney Warren will continue to meet regularly with community leaders, including monthly meetings with the NAACP President and quarterly meetings with members of the clergy, leaders of grass-roots organizations, and the community at large.

## Recruitment of Minority Prosecutors

It is critical that our Office's prosecutors reflect the community in which we live and serve. To maximize the recruitment and retention of minority prosecutors, our Office is taking two additional steps beyond its current efforts to increase diversity among prosecutors:

- For two years, our Office has supported prosecutors who wish to participate in the National Black Prosecutors Association. This organization is the only professional membership organization dedicated to the advancement of Black prosecutors. We will formalize our Office's investment and participation on an annual basis to enhance the professional development of our prosecutors.
- Our Office will work to establish partnerships with historically Black law schools to connect talented new attorneys with careers in our Office.

## Better Sentencing Analysis

Criminal prosecution that ends in two people charged with the same crime and with similar criminal histories receiving vastly different plea offers or sentences destroys the equality and fairness central to an effective criminal justice system. To that end, our Office will increase existing efforts to study and analyze fairness in sentencing. We will examine the role sentencing guidelines have in prosecutorial discretion. We will dedicate resources to providing better tools for our prosecutors to ensure fairness in their evaluations of potential criminal sanctions.

George Floyd's murder and the national discussion that has ensued cast a spotlight on racial injustice and systemic issues within the criminal justice arena. As prosecutors, we believe this moment represents a chance for government institutions and our community to increase our recognition of systemic racism and develop meaningful partnerships. While there is no single proposal to instantly solve these challenges, we are committed to taking necessary steps to walk further down the path towards equality and a better, stronger community.

DEF 002252

JEX 47.065



# DISARMING DOMESTIC ABUSERS

## INFORMATION SHEET

Fatalities resulting from domestic violence continue to threaten the safety of Hillsborough County residents, take the lives of vulnerable victims, and affect the well-being of our children. The following policy proposal details steps that the State Attorney's Office is taking to disarm domestic abusers.

## STATISTICS

**The statistics on domestic violence fatalities caused by gunshot are disturbing:**

### Nationwide

➤ 56% of domestic violence homicides were caused by a firearm. (Violence Policy Center, September 2017; National Coalition Against Domestic Violence "NCADV")

➤ The presence of a gun in the home during a domestic violence incident increases the risk of homicide by **over 500%**. Domestic violence assaults involving a firearm are **12 times more likely to result in death** than those involving other weapons or bodily force. (NCADV; Law Center to Prevent Gun Violence)

➤ **54% of mass shootings** in the U.S. between 2009-2016 (84 out of 156) **were related to domestic or family violence. 34% involved a shooter who was legally prohibited from possessing a firearm.** (Every Town for Gun Safety, Mass Shootings in the United States, March 2017)

### Florida

➤ A Floridian is killed in a domestic violence incident **every other day**: 986 deaths from 2012-2016. (F.D.L.E. Uniform Crime Reports ["UCR"])

➤ **Guns were used in 45-50%** of domestic violence homicides in Florida between 2010 and 2016, by far the most common manner of homicide. (Florida Coalition Against Domestic Violence, 2016; Florida Attorney General "Faces of Fatality" 2017 Report)

➤ **62%** of perpetrators **were known by family or friends to carry or possess a weapon.** This risk factor **increased significantly** in the 2017 report (62%) vs. the 2016 report (35%). ("Faces of Fatality" 2017 Report)

➤ **55%** of perpetrators **had a known criminal history of domestic violence.** ("Faces of Fatality" 2017 Report)

### Hillsborough County

➤ In Hillsborough County, a DV offense occurs approximately every 79 minutes (6670/year). (UCR, 2012-2016)

➤ From 2012-2016, Hillsborough County suffered 61 domestic violence homicides. (UCR, 2012-2016)

## STAY ENGAGED

@SAO13th
WWW.SAO13TH.COM

### STATE LAW

Florida law prohibits a person convicted of any felony, including domestic violence, from purchasing or possessing any firearm or ammunition. A violation constitutes a second-degree felony punishable up to five years in prison. (F.S. § 790.233)

Florida law prohibits a person subject to a domestic violence final civil injunction from possessing or controlling any firearm or ammunition. A violation constitutes a first-degree misdemeanor punishable up to one year in prison. (F.S. §§ 790.233, 741.31(4)(b)(1))

The federal Violence Against Women Act prohibits any person convicted of misdemeanor domestic violence to possess any firearm or ammunition. A violation constitutes a felony punishable up to 10 years in prison. (18 U.S.C. §§ 922(g)(9), 924(a)(2))

### SUMMARY OF POLICY

The State Attorney's Office will aggressively seek the relinquishment of firearms from domestic violence defendants through bond conditions, plea agreements, terms of probation, and entry into diversion programs. This applies to:

   (1) any defendant who is prohibited by law from owning a firearm; and

 (2) any defendant who has been charged based on probable cause with having committed an act of domestic violence.

### SUMMARY OF PROCESS

1. Upon responding to a domestic violent incident, law enforcement conducts an initial risk assessment and inquiry of the victim and offender to determine whether the offender has possession or access to a firearm.

2. The State Attorney's Office receives information about the defendant's possession/access to a firearm from law enforcement and conducts a background check to determine whether the offender is legally prohibited from possessing a firearm.

3. At the time of the initial appearance and/or bond hearing, the State Attorney's Office seeks relinquishment of any firearms as a condition of pre-trial release. Additionally, State Attorney's Office will seek relinquishment of any firearms as part of any plea agreement, probation, or entry into a diversion program.

### POLICY BENEFITS

- Remove guns from convicts and domestic abusers.
- Remove guns from defendants charged with domestic violence after a probable cause determination has been made.
- Make victims feel safer and encourage the reporting of domestic violence incidents.
- Simplifies the prosecution of domestic abusers via additional charges or violation of bond/probation for illegal possession of a firearm, especially where the victim is reluctant to testify.
- Remove illegal guns from the community.
- Alert law enforcement to the possible presence of a firearm when responding to domestic violence incidents.

Office Hours: 8:30 am – 5:00 pm

**Tampa Office**
419 N. Pierce Street
Tampa, Florida 33602

**Plant City Office**
301 N. Michigan Ave. Rm #1022
Plant City, Florida 33563

DEF 002253



# Domestic Abusers and Guns: A Deadly Combination

**Ultimately, by removing guns from the hands of convicts and domestic abusers, we can protect law enforcement officers, safeguard and support victims, and possibly save lives.**

From Sutherland Springs to Rancho Tehama to right here in Hillsborough, the tragedies surround us. Before his murderous rampage at a Texas church on November 5 that killed more than 25 people, Devan Patrick Kelley had been convicted of domestic violence, which should have prevented him from possessing a firearm. Eight days later, Kevin Janson Neal killed his wife before going on a shooting spree that left four others dead. Neal had prior run-ins with the law, including having been the subject of a domestic violence incident the day before the shootings. The connection between mass shootings and domestic violence is well-documented. More than half of mass shootings in America from 2009 to 2016 were related to domestic violence. The deadly combination of guns and domestic violence, however, extends far beyond mass shootings. Every day in America, a woman is murdered by a domestic partner using a gun.

The statistics are alarming: 56 percent of domestic violence homicides are committed using a gun, and the presence of a gun during a domestic violence incident increases the risk of homicide by 500 percent. In Hillsborough County, a domestic violence offense occurs every 80 minutes. From 2012-2016, there were 61 domestic violence homicides in the county. But the numbers only tell part of the story. In the State Attorney's Office, there are multiple cases pending against men, with a history of domestic violence, charged with killing their spouses or girlfriends. Victims speak of the paralyzing fear caused by an abusive partner who owns a gun. Our law enforcement partners recognize the inherent danger when responding to a domestic violence call where one of the parties is armed. The case files, the victims, and the law enforcement officers — in addition to the statistics — all lead to an inescapable conclusion: we must do something.

The State Attorney's Office is working with law enforcement and domestic violence organizations to reduce gun violence and threats committed by domestic



abusers. Specifically, the Office is seeking to dispossess domestic abusers of their guns by aggressively enforcing existing laws that prohibit any person convicted of domestic violence or subject to a final injunction stemming from a domestic incident from having a firearm. In short, law enforcement officers conduct an initial risk assessment when responding to a domestic violence incident to determine the presence of a gun, and then the State Attorney's Office uses that information to require the offender to relinquish the gun where prohibited by law or as a condition of release, probation, or entry into a diversion program, where appropriate.

This multi-faceted approach will take guns away from those legally prohibited from owning them; make victims feel safer and encourage the reporting of domestic violence incidents; simplify the prosecution of domestic abusers; remove illegal guns from the community; and alert law enforcement regarding the possible presence of a firearm when responding to an incident. Ultimately, by removing guns from the hands of convicts and domestic abusers, we can protect law enforcement officers, safeguard and support victims, and possibly save lives.

DEF 002254

JEX 47.067



# A Smart Change for Juvenile Justice in Hillsborough County

**The program is an evidenced-based, smart alternative to arrest and detention of juveniles for first-time minor offenses, allowing for early intervention into delinquency.**

For too long, our juvenile justice system in Hillsborough County has been ineffective: It's been too focused on a reflexive system of arrest and detention — especially for minor, non-violent misdemeanors — and not enough on targeted treatment and rehabilitation, and reducing recidivism. It hasn't worked. Our system must take a more innovative approach — one that considers the long-term impact of how we prosecute our youth, one that breaks the cycle of juvenile recidivism, and one that is designed to keep our kids on the right path, all while keeping public safety as a number one priority.

On August 1, 2017, Hillsborough County took an important first step towards that goal. The State Attorney's Office was honored to lead the

*Continued on page 11*



# COMPUTER & CELL PHONE FORENSICS

## DATA SPECIALIST GROUP

Computer Forensics Experts    Mobile Forensics Experts
Expert Witness Testimony      Data Preservation
Certified Forensic Examiners  Data Recovery

888.747.6855 | DataSpecialistGroup.com

JEX 47.068

*Continued from page 10*

effort to expand and make permanent in Hillsborough County the Juvenile Arrest Avoidance Program, commonly referred to as the juvenile civil citation program. It is an evidenced-based, smart alternative to arrest and detention of juveniles for first-time minor offenses, allowing for early intervention into delinquency, and holding youth accountable with targeted and immediate sanctions. Studies have shown that a youth is up to 50 percent less likely to reoffend after completing a civil citation program, because it significantly reduces the likelihood of the youth escalating into the juvenile justice system.

There is another significant benefit of the juvenile civil citation program: It makes economic sense. The average cost to prosecute a juvenile is $5,000.[1] To incarcerate a juvenile costs approximately $55,000 annually.[2] By contrast, the average cost to enroll a juvenile in a civil citation program is less than $400.[3] It reduces costs to taxpayers, and allows our office to focus more resources on those violent and repeat crimes that pose the greatest threats to public safety.

Here's how the program works: Officers issue civil citations for first-time offending youth for any misdemeanors, other than thirteen enumerated more dangerous offenses, like DUI or a lewd and lascivious act, unless there is an immediate and material threat to public safety. The youth, along with a parent or guardian, will then meet with a caseworker to assess appropriate sanctions, including drug treatment, restitution, community service, specialized classes, supervision, or others. Once the juvenile successfully completes the sanctions, the citation is closed without referral to the State Attorney's Office. If the juvenile does not successfully complete the sanctions, the case is then referred to the State Attorney's Office for a charging decision. Ultimately, this program allows good kids who have made a mistake to be held accountable and receive appropriate sanctions without an arrest or conviction record following them for years to come, hindering their ability to go to college, join the military, or find a job.

Our office was pleased to work with our criminal justice partners in making this program a part of the permanent fabric of our community. But make no mistake, change takes time, sustained involvement, and community support and engagement. This first step has been critical, and we will monitor the success of the program for expansions or adjustments in the future. Interceding in delinquency early not only reduces crime over time, but it gives our youth a greater opportunity for a productive and positive future — a goal to which we are dedicated.

[1] American Bar Association, Criminal Justice Section, *State Policy Implementation Project, 2*, available at https://www.americanbar.org/content/dam/aba/administrative/criminal_justice/ spip_civilcitations.authcheckdam.pdf.

[2] Justice Policy Institute, *Calculating the Full Price for Youth Incarceration* (December 2014), available at www.justicepolicy.org.

[3] American Bar Association, State Policy Implementation Project, supra note 1, at 2.

# RECOVERY OF INVESTORS' LOSSES

*Representing individuals and entities that have suffered losses as a result of the negligence, fraud or other wrongdoing of their stockbroker, investment advisor, or other financial professional.*

## SCOTT C. ILGENFRITZ
*Board Certified Business Litigation Attorney*
SCOTTI@JPFIRM.COM
WWW.FLORIDASECURITIESFRAUDLAWYER.COM



## JOHNSON POPE
BOKOR RUPPEL & BURNS, LLP

COUNSELORS AT LAW
401 E. JACKSON ST., SUITE 3100 TAMPA, FL 33602 ■ (813) 225-2500
*Member of the Public Investors Arbitration Bar Association (PIABA) since 1997. Past President of PIABA. Elected member of PIABA's Board of Directors.*



DEF 002256

JEX 47.069



# Remodeling Juvenile Justice Reform in Hillsborough County

**We are building on our successes, using data-driven solutions to improve prosecutorial effectiveness, and finding new ways to redirect juvenile offenders into productive members of our community.**

Disrupting the dangerous cycle of juvenile recidivism in Hillsborough County remains a top priority for my office and our local criminal justice partners. A 2016 report by The Children's Campaign, a nonpartisan public policy think tank, sparked calls for reform by criticizing Hillsborough as an outlier in juvenile justice in Florida. Previous steps taken in Hillsborough did not go far enough to effectively disrupt juvenile delinquency and recidivism. We lagged behind comparable jurisdictions and neighboring counties in the underutilization of juvenile civil citations, and we outpaced all 66 other counties in Florida with the highest number of kids charged as adults (referred to as "direct files"). Not to mention, we were tone deaf to the crescendo of mental health-related cases careening through our courtrooms.

Faced with these legitimate criticisms, we got to work. In 2017, we significantly expanded and made permanent the patchwork of juvenile civil citation programs into the comprehensive Juvenile Arrest Avoidance Program (J.A.A.P.) — a pre-arrest



program that sanctions offenders without formal prosecution. Since it was implemented, J.A.A.P. has been effective. The utilization rate for our local program has exceeded 80 percent, with an average of 750 citations issued each year. Initial statistics

*Continued on page 17*



**Want to advertise your business to THOUSANDS OF ATTORNEYS in the Tampa Bay area?**

**Call (813) 221-7777 for information.**

DEF 002257

JEX 47.070

*Continued from page 16*

showing low recidivism are extremely encouraging. Earlier this year, we expanded the list of eligible offenses to include family violence (e.g., sibling against sibling), leaving only five offenses ineligible for a citation. Working with our law enforcement partners, the courts, the Public Defender, and the Clerk of the Court, we continue to evaluate ways to expand the program, including for subsequent offenses.

Over the past two years, we have drastically reduced juvenile direct files by 51 percent. This tremendous improvement brings Hillsborough in line with national standards and improves the long-term safety of our community by affording more juvenile offenders the chance of rehabilitation before effectively writing them off through the adult system.

In partnership with Big Brothers & Big Sisters of Tampa Bay, we recently launched a pilot mentorship program that pairs juvenile offenders with community leaders to steer those youths away from the criminal justice system. This program seeks to change the trajectory of young teenagers charged with intermediate-level offenses by providing much needed guidance, support, and stability to their lives.

Working with the other criminal justice stakeholders, we established a juvenile mental health court in January 2019. This problem-solving court, a-first-of-its-kind pilot program in Florida, will provide the necessary access to treatment, consistent and intensive supervision, and academic and family support for young offenders with mental health issues.

Holding juvenile offenders accountable while maximizing long-term public safety by steering them away from the downward spiral of our system remains a challenge — as it has been for decades. Our commitment to solving these complex problems, however, has not waned. We are building on our successes, using data-driven solutions to improve prosecutorial effectiveness, and finding new ways to redirect juvenile offenders into productive members of our community. Together, with the support of our criminal justice partners, we know that we are on the right path to become a model for juvenile justice reform across Florida and our entire country.



**Add Fun, Romance, & Excitement to Your Life!**

...Learn to

# DANCE!

**It's Easy. We'll Show You How!**

Blanche & Emilio Librero

## FUN BEGINNERS COURSE - $79

**Call (813) 253-0644**

**GIFT CERTIFICATES AVAILABLE**

New to Dancing?...Relax...We Make Learning Comfortable Every Step of the Way

**Libreros School & Dance Club**

*Since 1979 ...Your Place to Learn*

*...Your Place to Dance*

FL Reg. 007

Davis Islands, Tampa ✦ www.LiberosDanceStudio.com



Ronald E. Bush          Holly B. Platter

## CONFLICT RESOLUTION
### Mediation & Arbitration Services

**KNOWLEDGE ✦ EXPERIENCE ✦ COMMON SENSE**

We are committed to Alternative Dispute Resolution, which is the most efficient forum for resolution of litigated and non-litigated matters. Our extensive litigation experience allows us to assist litigants with a pragmatic valuation of their case based on past results in similar cases, the potential jury pool, and the appellate climate in which any verdict would be reviewed. Our active litigation practices keep us well apprised of the environment in which matters are currently litigated and the myriad of nuances that drive litigation risks.

To schedule a mediation or arbitration call 813.228.7000 or www.bgrplaw.com for online calendar.

BUSH GRAZIANO RICE & PLATTER, P.A.
TRIAL LAWYERS

DEF 002258

JEX 47.071

June 15, 2020

Categories: News, Press Release

Tampa, FL (June 15, 2020) – Hillsborough State Attorney Andrew Warren announced today that the State Attorney's Office will not be filing charges against the 67 protestors arrested for unlawful assembly on the night of June 2.

Our office is in the process of reviewing approximately 200 arrests involving protests that began the night of Saturday, May 30, including those 67.

In each of the 67 arrests from June 2, the evidence shows that the individuals arrested were peacefully protesting; there was no violence, no vandalism, and no attack on a police officer. Therefore, our office will not be filing charges against any of these 67 individuals.

Additionally, we will work with our law enforcement partners to expunge the arrest from each person's record. Our office intends to handle any future arrests with similar circumstances in a similar fashion.

"I've said many times that criminal justice reform involves looking at each case as a problem to solve, not just a person to be punished," State Attorney Warren said. "In these unlawful assembly cases, there is no value in filing charges. Prosecuting people for exercising their First Amendment rights creates problems rather than solving them. It can weaken the bonds between law enforcement and the community, while undermining faith in our system."

Under Florida law, an "unlawful assembly" is a gathering of three or more people with a "common unlawful purpose" that must have an "intent to do an unlawful act which threatens the peace." Also, they must assemble in a way that gives "rational, firm, and courageous persons in the neighborhood of the assembly a well-grounded fear of a breach of the peace." Based on our office's review, the 67 cases outlined above do not meet that standard.

As so many in our community unite to fight against racial inequality, our office will prosecute anyone who tries to take advantage of the protests to commit crimes for personal gain or to cause destruction.

"I want to make one thing clear: while we have no intention of prosecuting anyone who is peacefully protesting, we will not tolerate people looking to exploit this moment," State Attorney Warren said. "There is no place for violence or destruction that puts the safety of our citizens—including our law enforcement officers—at risk."

DEF 002259

# Tampa Bay Times

NEWS / **HILLSBOROUGH**

# Hillsborough declines to prosecute 67 arrested in protests

Andrew Warren is the second state attorney in Florida to decline criminal charges en masse related to recent marches over the death of George Floyd.

   



Hillsborough County State Attorney Andrew Warren talks with reporters after a verdict in September. On Monday, he announced his office will not bring charges against dozens of people arrested during recent protests in Tampa. [ Times (2019) ]

By **Dan Sullivan** *Times staff*

Published Jun. 15, 2020 | Updated Jun. 15, 2020

TAMPA — Hillsborough prosecutors will not bring formal charges against 67

JEX 47.073

# Tampa Bay Times

State Attorney Andrew Warren announced in a Monday news conference that his office would decline to prosecute those who were arrested on allegations of unlawful assembly. He said he would also work to expunge records of the arrests.

"In each of those 67 arrests, the evidence shows the person arrested was peacefully protesting," Warren said. "There was no violence. There was no vandalism. There was no attack on a law enforcement officer."

Warren did make a distinction, though, between those who were arrested for unlawful assembly and more than 100 others arrested since May 30 on a range of other charges. Those accused of battering police, vandalizing property, inciting riots, or other crimes still face prosecution.

Like most other places throughout the nation, the Tampa Bay area has seen daily protests in the last two weeks over the death of George Floyd, a black man who died at the hands of police in Minneapolis.

While most local protests have been peaceful, a few early demonstrations were marred by clashes between protesters and police.

On May 30, demonstrations devolved into violence in north Tampa, where vandals hurled objects at officers and set fire to businesses.

The days that followed saw protests in downtown and east Tampa, which were broken up by police using gas canisters and "less lethal" rounds, which have attracted criticism for causing serious injuries and, in some cases, death.

The 67 unlawful assembly arrests occurred in downtown Tampa the night of June 2 and into the early morning June 3. Police officers monitored the group for hours as they marched and chanted in the streets. The march ended abruptly when officers fired gas and began detaining people, including a *Tampa Bay Times* reporter who was later let go.

Those taken to jail faced a misdemeanor charge. Most were released the next day.

JEX 47.074

# Tampa Bay Times

"Prosecuting people for exercising their First Amendment rights doesn't solve problems," Warren said. "It creates them by weakening the bonds that exist between law enforcement and our community and undermining people's faith in our system."

Warren said he spoke with local law enforcement leaders and Tampa Mayor Jane Castor before making the announcement. He avoided criticizing the police, saying the decision not to prosecute the cases doesn't mean the arrests were bad.

"The fact that the arrests were made is a different decision than the one we make as prosecutors about whether to move forward," he said.

Tampa Police Chief Brian Dugan stood by the arrests.

"Although I understand the difficulty in prosecuting those arrested, they were given two warnings after blocking streets," Dugan said in a statement. "Although taking over intersections can be peaceful, it is still illegal. The Tampa Police Department will continue to work to bring our department and the community together. We remain in solidarity with those who are using their First Amendment right peacefully to speak on injustices."

JEX 47.075

# Tampa Bay Times

You'll get a remembrance of Tampa Bay residents we've lost, including heartwarming and
amusing details about their lives, every Tuesday.

**Loading...**

Standing with Warren were Rev. Larry Roundtree, Christopher Harris, and
Thomas Scott, all leaders of predominantly African American churches in Tampa.
They spoke of having continued discussions with Warren and other elected
leaders.

They planned a meeting with elected officials for Monday evening, but said it
would not be open to the public.

Roundtree, the pastor of New Mt. Zion Missionary Baptist Church, called it a
"launch pad to a long dialogue" on race issues.

Warren is at least the second state attorney in Florida to decline to press criminal
charges related to the protests en masse. Miami-Dade State Attorney Katherine
Fernandez Rundle recently said her office would not seek charges against people
arrested for curfew violations.

Prosecutors in Pinellas and Pasco counties were evaluating individual arrests. So
far there have been about 40 misdemeanor arrests, plus nine felony cases, said
Chief Assistant State Attorney Bruce Bartlett.

The felonies are likely to still be prosecuted, Bartlett said. They include the case of
a man who is accused of hurling an object at St. Petersburg Police Chief Anthony
Holloway.

Brett Becker was one of the 67 people jailed June 3 in Tampa. He noticed the
protest downtown shortly after finishing work at a moving company. He soon
found himself near the front of the crowd, which he said was loud, but peaceful.

"There was no sense of violence or aggression by anyone," he said. "They claim
there were damages that were done. I didn't see anything like that."

JEX 47.076

# Tampa Bay Times

Late in the evening, police blocked the crowd from crossing the Brorein Street bridge, Becker said. A recorded announcement told the protesters to leave the area.

They doubled back, eventually marching to the area of N Morgan and E Madison streets. It was there that officers surrounded the crowd, shooting pepper spray and gas. Becker said his impression was that officers simply wanted to end the march.

"Nobody was doing anything wrong, but walking and chanting," he said.

He spent the night in jail and had to hire a lawyer. He said he thinks prosecutors would have run into problems trying to prove their cases.

He has family members who work in law enforcement, and said he has much respect for police. But after what happened, it's hard to trust them, he said. He is considering legal action.

"If they want respect, they're not getting it by doing this to people," Becker said. "They could've peacefully resolved it."

**UP NEXT:** Shooting leads to crash on I-4 in Tampa, injuring one, troopers say

**DAN SULLIVAN**
Courts Reporter

## MORE FOR YOU

**Pinellas and Pasco county judges: Times Editorial Board recommendation**

JEX 47.077



# Poverty Traps Undermine Public Safety, Perpetuate Vicious Cycle

**Approximately 45 percent of working families in Florida struggle to afford life's basic necessities.**

Approximately 45 percent of working families in Florida struggle to afford life's basic necessities: housing, food, health care, and transportation. Our working neighbors are treading water to keep their heads above poverty, just one unforeseen expense away from a crisis. Beyond their financial struggles, the working class are also vulnerable to ending up in the criminal justice system because of "poverty traps" that effectively criminalize economic hardship. From driver's license suspensions to the imposition of excessive fines and court fees, Florida is guilty of setting poverty traps that penalize otherwise law-abiding citizens simply for being poor.

Our office is implementing policies and programs that decriminalize poverty and reduce the financial burden on families in Hillsborough County. For example, a red light ticket in Florida costs approximately $158. That ticket bumps up to $262 if it is not paid after the first notification — a 66 percent increase from the cost



of the original ticket. One traffic violation can catapult someone into a downward spiral of exorbitant fees, criminal charges, and, in the most extreme cases,

*Continued on page 11*

**Want to advertise your business to THOUSANDS OF ATTORNEYS in the Tampa Bay area?**

**Call (813) 221-7777 for information.**

DEF 002265

JEX 47.078

*Continued from page 10*

incarceration. Having a suspended license makes it difficult to get to work to earn the money needed to pay those fines and fees. Prosecuting someone for driving with a license that is suspended for financial reasons only worsens the problem by threatening job security and undermining public safety.

As part of our office's efforts to stop this cycle, we adopted a human-centered approach to handling Driving with License Suspended (DWLS) cases. If the original suspension resulted from financial reasons rather than a public safety issue (such as a DUI), our office works with the drivers to get their licenses reinstated. When a driver successfully regains his or her license, our office dismisses the charges. We implemented this policy in 2017, and in 2018, we dismissed approximately 2,500 DWLS cases — 32 percent of the total number of DWLS cases — because the offender successfully had his or her license reinstated. We have made our roads safer and freed up precious criminal justice resources while showing compassion toward those struggling to make ends meet.

Our office's commitment to helping those in need extends beyond those who are currently involved in the criminal justice system. In 2018, we hosted the first-ever expungement clinic in Hillsborough County, which allowed approved applicants to have one criminal record sealed or expunged for an arrest or charge that did not result in adjudication. The estimated cost of expungement or sealing often exceeds $2,500 in application and legal fees. We were able to host the clinic at no cost to participants, because of money raised and services provided by our office and other community partners. This event helped people move beyond a single mistake in their past and pursue better employment and housing opportunities for themselves and their families.

We are committed to stopping the criminalization of poverty while prosecuting criminals and serious offenders who threaten public safety. Dismantling poverty traps means more than eliminating counterproductive and wasteful criminal justice policies. It also means giving struggling families the opportunity to achieve economic stability.



GRACE H. YANG, HCBA PRESIDENT-ELECT
GRACIOUSLY REQUESTS THE HONOR OF YOUR PRESENCE
AT THE
INSTALLATION OF OFFICERS AND DIRECTORS
THURSDAY, JUNE 6 | 5 TO 7 P.M. | CEREMONY AT 5:45 P.M.
CHESTER H. FERGUSON LAW CENTER

COMPLIMENTARY FOR MEMBERS
R.S.V.P. AT WWW.HILLSBAR.COM OR CALL (813) 221-7777

SPONSORED BY:


The Bank of Tampa

DEF 002266

JEX 47.079

# DECRIMINALIZING POVERTY – SUSPENDED LICENSE REFORM

**Capacity & Efficiency**          **Community Safety & Well-Being**

**Fairness & Justice**          **Dashboard Home**



JEX 47.080

For years, criminal charges for Driving While License Suspended (DWLS) have been one of the most challenging "poverty traps." The charges, for the low-level nonviolent DWLS offense, often lead to people losing their jobs, their housing, and community connections.

By delaying prosecuting appropriate DWLS cases to give the driver a chance to pay overdue fines and restore his or her license, prosecutors can hold the driver accountable, fix the underlying problem, and not set the driver into a downward spiral of poverty and incarceration.

Since 2017, we have prioritized traffic safety when prosecuting offenders for Driving with License Suspended cases. We will hold defendants accountable using DWLS charges in situations where the suspension was ordered for a traffic-related offense that jeopardizes safety, such as cases where someone is hurt or property is damaged, Driving Under the Influence, or violating commercial driver's license laws.

# Focusing on safety

But many license suspensions are not related to traffic safety at all—instead, they result from an inability to pay civil fines and fees. Because of this, many Floridians are trapped in a cycle of driving without a license so they can earn money to reinstate their license.

This is a vicious cycle. It puts otherwise law-abiding citizens into the criminal justice system because of financial hardship. That approach is counterproductive, wasteful, and undermines public safety. Prosecution worsens the problem by imposing additional fines and threatening their job security.

Starting when he took office in 2017, State Attorney Warren implemented this approach to DWLS charges, which increases traffic safety by ensuring drivers are properly licensed and insured. Drivers successfully regain their licenses, and then our office dismisses the charges, providing an added incentive for drivers to take the steps needed to get their license back while reducing the criminalization of poverty.

# What does the data story tell us?

Through our continued commitment to this approach, our office has dismissed more than 7,000 cases since 2017 because defendants met the requirements to regain their licenses.

Our data illustrates that this approach is having a significant impact on removing this "poverty trap" and decriminalizing poverty. In 2019, approximately 41% of DWLS cases were resolved because a driver became licensed again—in 2016, that figure was just 4%.

This tremendous increase has removed an unnecessary government-imposed hurdle from people's lives, achieved safer roads, saved taxpayers money, and delivered compassion for people who are struggling to make ends meet.

DEF 002268

JEX 47.081



# Shutting Down the Suspended License Poverty Trap

**This poverty trap fuels a vicious cycle, putting otherwise law-abiding citizens into the criminal system due to financial trouble.**



When I took office in 2017, I made it my mission to build a safer community while promoting justice and fairness for *everyone*. For too long, outdated criminal justice policies have steered people into the system for reasons unrelated to public safety — in ways that disproportionately impact minorities and the poor. One common example is cases of Driving While License Suspended, or DWLS, that do not result from a traffic violation or crime. The State Attorney's Office has worked to identify these poverty traps and make strides toward a more equitable justice system.

Each year, the State Attorney's Office handles thousands of criminal charges for DWLS, but many license suspensions have nothing to do with traffic safety and are often a consequence of a person's inability to pay civil fines and fees. This poverty trap fuels a vicious cycle, putting otherwise

**Continued on page 13**



**Florida Lawyers Mutual®**

INSURANCE COMPANY

LEGAL MALPRACTICE INSURANCE
RECOMMENDED BY THE BAR

407-326-2844
www.flmic.com
mailbox@flmic.com
541 East Mitchell Hammock Road
Oviedo, Florida 32765

**IT'S ABOUT A *RELATIONSHIP*.
IT'S ABOUT *TRUST*.**

**THE ONLY ONE RECOMMENDED BY...**

✓ The Florida Bar

✓ Florida Association for Women Lawyers

✓ Virgil Hawkins Florida Chapter National Bar Association

✓ Hillsborough County Bar Association Lawyer Referral Service

✓ Many of Florida's largest county-level voluntary bar associations

**CREATED FOR FLORIDA LAWYERS,
BY FLORIDA LAWYERS.**

DEF 002269

JEX 47.082

**Continued from page 12**

law-abiding citizens into the criminal justice system due to financial trouble. This is counterproductive and wasteful, and it undermines public safety. Prosecuting these individuals only worsens the problem for them and for society at large — imposing additional fines on them and threatening their job security because they can't drive to work to earn the money needed to pay off the fines to reinstate their licenses.

The State Attorney's Office has continued to prioritize traffic safety by actively prosecuting DWLS cases that stem from driving violations like DUI. But in 2017, we changed our approach to prosecuting defendants whose licenses were suspended only for financial issues. This new effort incentivizes them to go through all the proper steps to restore their licenses and become properly insured. Once the driver has successfully regained their license, our office promptly dismisses the criminal charge. Since that time, my office has dismissed more than 8,000 cases because the defendants regained their licenses, giving them the dignity of keeping their jobs and

feeding their families — without the government getting in the way. We recently expanded this policy to further minimize the waste of resources associated with prosecuting financial-based suspensions.

To further shut down this DWLS poverty trap, the State Attorney's Office works with the Clerk of Courts and Public Defender's Office to host Driver License Reinstatement events that reduce the burden of overdue fines and fees and help people get back on the road. Defendants who participate can have their cases dismissed once they are properly licensed. This collaboration with local stakeholders on *Operation Green Light* has achieved safer roads, taxpayer savings, and compassion toward our neighbors struggling to make ends meet.

My office continues to identify poverty traps in the system and will keep working to address them in a way that prioritizes public safety while helping people get back on a path to success. Criminalizing poverty takes our community in the wrong direction. It holds our neighbors down when what they need most is a path up and out. We are committed to breaking that cycle. ∎



**GARCIA**
**Mediation**
PATIENCE • PERSPECTIVE • PERSISTENCE



Now offering Family Mediation services
*Serving both attorney-represented and pro-se parties*

**Certified in Circuit Civil, County, Family & Federal**

Full virtual capability with HD equipment

www.GarciaMediation.com

Mediator Anthony J. Garcia, Esq.
*Elected 2021 HCBA Board of Directors*

DEF 002270

JEX 47.083

## STATE ATTORNEY'S OFFICE, 13TH JUDICIAL CIRCUIT

## DRUG EDUCATION & TREATMENT REDUCING RECIDIVISM ("DETRR")
### DRUG POSSESSION PROSECUTION POLICY

The State Attorney's Office mission is to create a safer community while promoting justice and fairness in our system. To fulfill our mission, we are committed to holding defendants accountable for criminal behavior, reducing recidivism, and achieving justice for victims, while effectively using limited government resources.

The State Attorney's Office policy for prosecuting drug possession offenses embraces the well-established principle that, for offenders who suffer from substance abuse, rehabilitation and treatment better advance our mission than punitive sanctions such as incarceration. Compared with incarceration, treatment and rehabilitation reduce recidivism and increase public safety. Additionally, treatment-based approaches are less expensive than prison and more cost effective in terms of reducing crime and addressing substance abuse. Lastly, treatment and rehabilitation for low-level drug offenders have societal benefits outside of the criminal justice arena such as helping offenders find gainful employment and improving their health, both which reduce the burden on government resources.

Our drug possession prosecution policy employs a strategic, problem-solving approach by holding offenders accountable while addressing the underlying substance-abuse that leads to criminal conduct. Specifically, the policy adheres to the evidence-based principle of tailoring sanctions based on the risk and needs of the offender, utilizing a combination of diversion for low-level offenders and drug court for defendants who are at higher risk to reoffend. This policy incorporates elements from the Florida Supreme Court Adult Drug Court Best Practice Standards. These best practices are based on more than 30 years of empirical research that have been scientifically shown to yield better outcomes in terms of public safety and recidivism. These practices include eligibility and exclusion criteria, risk and need assessments, use of validated risk and assessment tools, and clinical recommendations.

1

DEF 002271

JEX 47.084

## DETRR Level One – Marijuana/Cannabis Possession

### Eligibility:

- Level One is available to any defendant charged with **simple possession of 30 grams or less of Marijuana/Cannabis. This includes all oils, waxes, plant-based, or any other form of cannabis/THC but specifically** *excludes* **synthetic cannabis, also known as "spice."**
- This program does not apply to defendants who have pending charges (other than possession of drug paraphernalia), or other cases (by arrest or information), or to defendants who are currently on felony probation.
- This program does not apply to defendants where the facts of the case indicate the defendant is involved in the sale or distribution of the controlled substance.
- Defendants are not excluded from this program due to either a prior criminal record or a score of 44 or more points on the Criminal Punishment Scoresheet.
- Defendants are required to waive their right to a speedy trial in writing.
- Defendants will have one opportunity to participate in the Level One Drug Diversion Program. Any subsequent arrests or charges will result in the Level Two or higher Drug Diversion Program if otherwise eligible.

### Program Requirements:

- To successfully complete the Level One Drug Diversion Program, defendants are required to remain free from arrest for a period of six months from the time they enter the program.
- Defendants will be encouraged to participate in any substance abuse treatment programs available in the community.
- Defendants who remain arrest free for six months will have their charges dismissed.
- Defendants will be offered information regarding the expunction of their criminal record.

### Exceptions:

- Any ASA who believes that a case presents aggravating circumstances that do not warrant an offer of the Level One Drug Diversion Program must discuss the case with the Chief of their Felony Division. Ultimate approval to decline to make an offer of Level One Drug Diversion Program to an otherwise eligible defendant must be made by either the Felony Bureau Chief or the Chief of the Problem Solving Courts.

2

DEF 002272

## DETRR Level Two – First Time Offenders (Non-Marijuana/Cannabis)

### Eligibility:

- Level Two is for defendants charged with any felony possession of a controlled substance that is not included in the Level One Drug Diversion Program including possession of cannabis charges over 30 grams.
- Trafficking charges are specifically omitted from eligibility.
- Eligible defendants only include first time offenders with no prior felony convictions (withhold or adjudication).
- This program does not apply to defendants who have pending charges or cases (other than possession of drug paraphernalia or possession of a controlled substance).
- This program does not apply to defendants where the facts of the case indicate the defendant is involved in the sale or distribution of the controlled substance.
- Defendants are required to waive their right to a speedy trial in writing.
- Defendants will have one opportunity to participate in the Level Two Drug Diversion Program. Any subsequent arrests or charges will result in the Level Three or higher Drug Diversion Program if otherwise eligible.

### Program Requirements:

- Defendants will be required to be assessed for their suitability for either a drug treatment program or a drug education program.
- Defendants must participate in either a drug treatment program or a drug education program depending on their assessment.
- To successfully complete the Level Two Drug Diversion Program, defendants are required to remain free from arrest for a period of six months from the time that they enter the program.
- Defendants who remain arrest free for six months will have their charges dismissed. Charges will be dismissed even for those defendants who are still participating in a drug treatment program at the end of the six-month period.
- Defendants will be offered information regarding the expunction of their criminal record.

### Exceptions:

- Any ASA who believes that a case presents aggravating circumstances that do not warrant an offer of the Level Two Drug Diversion Program must discuss the case with the Chief of their Felony Division. Ultimate approval to decline to make an offer of Level Two Drug Diversion Program to an otherwise eligible defendant must be made by either the Felony Bureau Chief or the Chief of the Problem Solving Courts.

3

DEF 002273

## DETRR Level Three – Low Risk Offenders

### Eligibility:

- Level Three is for defendants who are either unsuccessful in the Level Two diversion program or who are not eligible because they are not a first-time offender.
- Defendants in Level Three are charged with any felony possession of a controlled substance that is not included in the Level One Drug Diversion Program including possession of cannabis charges over 30 grams.
- Trafficking charges are specifically omitted from eligibility.
- This program does not apply to defendants who have pending charges or cases (other than possession of drug paraphernalia or possession of a controlled substance) or to defendants who are currently on felony probation.
- This program does not apply to any defendant who is assessed as a high risk to reoffend.
- This program does not apply to defendants where the facts of the case indicate the defendant is involved in the sale or distribution of the controlled substance.
- Defendants are not excluded from this program due to either a prior criminal record or a score of 44 or more points on the Criminal Punishment Scoresheet.
- Defendants are required to waive their right to a speedy trial in writing.

### Program Requirements:

- Defendants will be required to undergo a risk-needs-responsivity assessment.
- If the defendant is determined to be low risk to reoffend, they must participate in any treatment or education interventions that are determined necessary by the RNR assessment and offered by a community-based program. Those interventions may include substance abuse treatment, mental health treatment, cognitive behavioral therapy or other social service program.
- To successfully complete the Level Three Drug Diversion Program, defendants are required to remain free from arrest for a period of six months from the time that they enter the program.
- Defendants who remain arrest free for six months will have their charges dismissed. Charges will be dismissed even for those defendants who are still participating in treatment interventions at the end of the six-month period.

4

DEF 002274

## Drug Court (not part of DETRR) – High Risk Offenders

### Eligibility:

- Drug Court is for defendants who are either unsuccessful in the Level Three diversion program or who have been assessed as a high risk to reoffend.
- Statutory criteria determine whether defendants will be offered the traditional drug court model in Division W (Drug Pretrial Intervention program) or Division Y (Drug Court).

### Program Requirements:

- Defendants will be required to participate in the program offered in traditional drug court.
- Defendants who successfully complete drug court in Division Y will be allowed to withdraw their guilty plea and the State will dismiss the charges. This only applies to defendants who are charged with possession of a controlled substance.

DEF 002275

**JEX 47.088**

## FREQUENTLY ASKED QUESTIONS

### 1. Why is the period of diversion 6 months for possession cases?

Research shows that many low risk diversion participants are harmed and that the risk of recidivism **_increases_** when the defendant is over-supervised.[1]  When a participant is required to comply with numerous conditions and requirements, it is more difficult for him or her to engage in prosocial activities such as obtaining employment, attending school, and maintaining familial connections, all of which are associated with a lower risk of criminal activity.[2]  These effects are particularly pronounced for individuals who have a low risk of recidivism initially.  For these persons, close supervision, like that typical of felony probation, "enhances, rather than reduces, the risk of recidivism."[3]

### 2. In Level 2, why doesn't the State require drug treatment even if the treatment provider assessment does not require it?

Providing substance abuse treatment for nonaddicted substance abusers can lead to higher rates of reoffending or substance abuse, or a greater likelihood of these individuals becoming addicted.[4]

---

[1] https://cepp.com/wp-content/uploads/2018/10/A-Framework-for-Evidence-Based-Decision-Making-in-State-and-Local-Criminal-Justice-Systems.pdf

[2] https://www.prisonlegalnews.org/media/publications/scott-hayward_the_failure_of_parole_rethinking_the_role_of_the_state_in_reentry.pdf

[3] Executive Session on Community Corrections, *Toward an Approach to Community Corrections for the 21st Century: Consensus Document of the Executive Session on Community Corrections*. Program in Criminal Justice Policy and Management, Harvard Kennedy School (2017) at 4.
https://www.hks.harvard.edu/sites/default/files/centers/wiener/programs/pcj/files/Consensus_Final2.pdf

[4] See Florida Adult Drug Court Best Practice Standards (June 2017) developed by the Florida Supreme Court Task Force on Substance Abuse and Mental Health Issues in the Courts. (Appendix A).
https://www.flcourts.org/content/download/216679/file/Florida_Adult_Drug_Court_Standards_Full_Document.pdf

6

DEF 002276

## 3. What is a Risk Needs Responsivity (RNR) Assessment and why is it necessary?[5]

The Supreme Court of Florida has mandated that drug courts use a validated risk assessment tool.[6] Treatment Courts do better when they target defendants who are a higher risk to reoffend and will not succeed on standard supervision.[7]

The RNR assessment tells us which defendants to target for drug court by assessing their risk level, identifying their criminogenic and non-criminogenic needs[8], and determining how a defendant will respond to treatment interventions. The assessment provides a road map to tailor individual treatment for each defendant in a problem-solving court. It is also a prudent use of limited resources in that only those who need treatment/services will receive them (high risk offenders versus low risk offenders).

## 4. What are problem-solving courts?

Problem Solving courts in the 13th Judicial Circuit include Drug Court (Divisions Y and W), Veteran's Treatment Court, Juvenile Mental Health Court, and Adult Mental Health Court. They are defined in F.S. 397.334 as courts that follow "therapeutic jurisprudence principles and adhere to the

---

[5] https://cepp.com/wp-content/uploads/2018/10/A-Framework-for-Evidence-Based-Decision-Making-in-State-and-Local-Criminal-Justice-Systems.pdf

[6] See Florida Adult Drug Court Best Practice Standards (June 2017) developed by the Florida Supreme Court Task Force on Substance Abuse and Mental Health Issues in the Courts. https://www.flcourts.org/content/download/216679/file/Florida_Adult_Drug_Court_Standards_Full_Document.pdf

[7] Drug courts that focus on high risk/high need offenders reduce crime approximately twice as much as those who serve less serious offenders and return 50% greater cost savings to their communities. (Appendix A, State of Florida Adult Drug Court Best Practice Standards).

[8] Criminogenic needs are risk factors that are associated with criminal conduct. The eight major criminogenic risk factors are antisocial values and beliefs, antisocial peers, substance abuse, family dysfunction, lack of education, employment instability, and lack of prosocial leisure and recreational activities. Addressing antisocial values and beliefs along with the issue of antisocial peers leads to the greatest reduction in recidivism. Non criminogenic needs are *not* associated with an increase in criminal behavior and include low self-esteem, mental health issues, and homelessness.

7

DEF 002277

JEX 47.090

ten key components" of the drug court model.[9]  Essentially, these courts use a nonadversarial approach that combines defendant accountability through court supervision, with substance abuse, mental health, and other necessary treatment programs.

## 5.  Why do we need Drug Court?

Research consistently shows that there is a strong connection between criminal activity and substance abuse.[10]  More than 80% of crime is drug or alcohol fueled and "53.4% of jail or prison inmates meet the [DSM IV] criteria for drug abuse or dependence."[11]

Research also shows that substance abuse treatment reduces recidivism for offenders who use drugs.[12]  Drug court participants have a lower recidivism rate than those individuals who are supervised through normal probation or who receive jail or prison sanctions.[13]

## 6.  What is the drug court model?

The drug court model is a structured, non-adversarial, phased system of treatment that incorporates a team approach through court staffings designed to address the needs of individual participants.  The drug court team consists of the judge, prosecutor, defense attorney, program coordinator, treatment representatives, case managers, probation officers, and law enforcement officers. (Hillsborough County's drug court does not

---

[9] See F.S. 397.334 (4) (a)-(j).  The 10 key components were recognized by the Drug Courts Program Office of the Office of Justice programs of the U.S. Department of Justice and adopted by the Florida Supreme Court through their Treatment Based Drug Court Steering Committee.  For more information see https://www.ncjrs.gov/pdffiles1/bja/205621.pdf

[10] https://store.samhsa.gov/sites/default/files/d7/priv/sma13-4056.pdf

[11] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3859122/

[12] https://store.samhsa.gov/sites/default/files/d7/priv/sma13-4056.pdf

[13] https://cepp.com/wp-content/uploads/2018/10/A-Framework-for-Evidence-Based-Decision-Making-in-State-and-Local-Criminal-Justice-Systems.pdf

8

DEF 002278

JEX 47.091

currently use a law enforcement officer.) In addition to substance abuse treatment, if services and resources are available, the defendant may receive assistance with transportation, securing permanent housing, employment, vocational training, or other needed services.

The defendant advances through five court phases, is required to attend and participate in all recommended treatment (substance abuse, mental health, criminal thinking interventions, etc.), is tested for the presence of drugs frequently and randomly, is subject to a graduated list of court sanctions for violations, is provided with court incentives for reaching milestones, and is required to attend frequent court case reviews.

DEF 002279

**JEX 47.092**

October 29, 2020

Categories: News, Press Release

*ATTORNEYS: More detailed information on DETRR and eligibility for the program is available at this link.*

**TAMPA, FL (October 29, 2020) – Prosecutors with the Hillsborough State Attorney's Office aim to make treatment—not jail—the first stop for drug addicts arrested for drug possession with the launch of the new DETRR program. Research shows more than 80% of all crimes are tied to drugs or alcohol. This bold step, using a clinical approach to address addiction, is designed to create an overall increase in our community's safety by dealing with the underlying issues that lead to much of our area's criminal behavior.**

DETRR, which stands for Drug Education & Treatment Reducing Recidivism, gives low-risk drug offenders who are accused of no other serious crimes an off-ramp out of the downward spiral of drug use, arrests, and incarceration. State Attorney Andrew Warren launched the program Thursday, corresponding with the county's re-start of jury trials and following a pilot program that began earlier this year. DETRR is limited to drug possession cases for low-risk, non-violent offenders; it is *not allowed* for drug dealers, violent offenders, or anyone deemed high-risk.

DETRR embraces the well-established medical principle that, for offenders who suffer from substance abuse, treatment and rehabilitation are more successful at reducing repeat offenses and increasing public safety compared to a punishment-only approach, such as incarceration. Treatment and rehabilitation are more effective and less expensive than jail or prison. Additionally, this approach benefits the community beyond the criminal justice system by improving health outcomes and employment opportunities, both of which reduce the burden on taxpayers.

Under DETRR, if offenders successfully follow the prescribed drug treatment or drug education program and stay arrest-free for six months, the drug possession charge will be dismissed.

Think of DETRR as a new "younger sibling" of Hillsborough County's highly effective Drug Court. Drug Court addresses an offender's addiction, mental health, housing, and even job training, to break the cycle of drug use and crime. Drug Court works—but it's most effective for people who are classified as "high-risk" to become repeat offenders. DETRR offers new paths for low-risk defendants to get help, correct their actions, and avoid the downward spiral of arrests and prison time.

DETRR is only an option for low-risk offenders who are not accused of any serious crime beyond using drugs. Participants who reoffend face escalating consequences, including the possibility of traditional prosecution and incarceration.

**DETRR's 3 Levels**

*This is a brief summary—more details on each level are available at this link*

**Level 1 – Marijuana / Cannabis Possession (30 grams or less)**

**JEX 47.093**

Defendants must remain arrest-free for six months and will be encouraged to take part in substance abuse treatment. Defendants get only one opportunity to take part in Level 1.

### Level 2 – First-Time Drug Possession (other than 30 g or less of marijuana)

Defendants must remain arrest-free for six months and *must* take part in substance abuse treatment or drug education. Defendants get only one opportunity to take part in Level 2.

### Level 3 – Low-Risk Repeat Offender

Defendants must be assessed as a low risk to reoffend. They can be sent to the full Drug Court program or must remain arrest-free for six months and *must* take part in a full range of treatment, which may include substance abuse and mental health treatment, cognitive behavioral therapy, and social services. Defendants get only one opportunity to take part in Level 3.

"Blindly locking up people who suffer from addiction undermines public safety—we can make our neighborhoods safer by attacking the root cause of the problem," Hillsborough State Attorney Andrew Warren said.

"Both research and common sense tell us there's a major link between drug abuse and crime. Taking a problem-solving approach to drug abuse prevents crime, saves money, and gives people suffering from addiction the help they need."

More than half the inmates in the U.S. meet the criteria for drug abuse or dependence. Research shows that treatment for substance abuse makes people less likely to reoffend. People who go through a Drug Court program are also less likely to reoffend than people who serve normal probation or jail time.

*DETRR is available now for non-violent, low-risk offenders in Hillsborough County who qualify; defense attorneys should ask the prosecutor assigned to a defendant's case about whether they are eligible for the program.*

JEX 47.094



# SAO Takes New Approach to DETRR Drug Possession Cases

**A problem-solving approach to drug abuse prevents crime, saves money, and gives people suffering from addiction the help they need.**

Research shows more than 80% of all crimes are tied to drugs or alcohol. With that in mind, we are taking a bold step at the Hillsborough State Attorney's Office. Our aim is to make treatment — not jail — the first stop for drug addicts arrested for drug possession through our new DETRR program.

We are using a clinical approach to address addiction, designed to create an overall increase in our community's safety by dealing with the underlying issues that lead to much of our area's criminal behavior.

DETRR, which stands for Drug Education & Treatment Reducing Recidivism, gives low-risk drug offenders who are accused of no other serious crimes an off-ramp out of the downward spiral of drug use, arrests, and incarceration. DETRR is limited to drug possession cases for low-risk, non-violent offenders; it is not allowed for drug dealers, violent offenders, or anyone deemed high-risk.



DETRR embraces the well-established medical principle that, for offenders who suffer from substance abuse, treatment and rehabilitation are more successful at reducing repeat offenses and increasing public safety compared to a punishment-centered approach.

Continued on page 15

# RECOVERY OF INVESTORS' LOSSES

*Representing individuals and entities that have suffered losses as a result of the negligence, fraud or other wrongdoing of their stockbroker, investment advisor, or other financial professional.*

## SCOTT C. ILGENFRITZ

*Board Certified Business Litigation Attorney*
SCOTTI@JPFIRM.COM
WWW.FLORIDASECURITIESFRAUDLAWYER.COM



## JOHNSON POPE
BOKOR RUPPEL & BURNS, LLP



COUNSELORS AT LAW
401 E. JACKSON ST., SUITE 3100 TAMPA, FL 33602 ▪ (813) 225-2500

*Member of the Public Investors Arbitration Bar Association (PIABA) since 1997. Past President of PIABA. Member of PIABA's Board of Directors 2008-2017.*

DEF 002282

JEX 47.095

**Continued from page 14**

Treatment and rehabilitation are more effective and less expensive than jail or prison. Additionally, this approach benefits the community beyond the criminal justice system by improving health outcomes and employment opportunities, both of which reduce the burden on taxpayers.

Under DETRR, if offenders successfully follow the prescribed drug treatment or drug education program and stay arrest-free for six months, the drug possession charge will be dismissed.

DETRR has three different levels: Level 1 is for marijuana possession; Level 2 is for first-time possession of other drugs; and Level 3 is for low-risk repeat offenders — essentially anyone who doesn't qualify for Levels 1 or 2. In each level, defendants must remain arrest-free for six months and participate in treatment based on their individual needs. Treatment ranges from drug education to substance abuse or mental health treatment, to cognitive behavioral therapy. The key is that clinicians — not lawyers — prescribe the treatment.

Blindly locking up people who suffer from addiction undermines public safety — we can make our neighborhoods safer by attacking the root cause of the problem.

More than half the inmates in the U.S. meet the criteria for drug abuse or dependence. Research shows that treatment for substance abuse makes people less likely to re-offend. People who go through a drug diversion program are also less likely to re-offend than people who serve normal probation or jail time.

Think of DETRR as a new "younger sibling" of Hillsborough County's highly effective Drug Court, which is most effective for people classified as "high-risk" to become repeat offenders. DETRR offers new paths for low-risk defendants, whereas Drug Court remains an option for the highest risk, highest needs offenders.

Both research and common sense tell us there is a major link between drug abuse and crime. Taking a problem-solving approach to drug abuse prevents crime, saves money, and gives people suffering from addiction the help they need. ■

---

# "STEP INTO MY OFFICE, BABY!"

*We Fight Sexual Harassment.*
*We're the aggressive representation your clients need.*

## Was your client treated unlawfully by their employer? We will help them obtain workplace justice.

- Unpaid Overtime/Wages
- Retaliation
- Discrimination

- Wrongful Termination
- Hostile Work Environment
- Family and Medical Leave

*We pay 25% co-counsel fees in accordance with the Rules Regulating the Florida Bar.*



Best Lawyers
**BEST LAW FIRMS**
US News
2019

**WENZEL FENTON CABASSA..**
Employee Rights Attorneys
www.wfclaw.com | 813-534-6858

DEF 002283

JEX 47.096



## $\mathfrak{State}$ $\mathfrak{Attorney}$

**ANDREW H. WARREN**
Thirteenth Judicial Circuit
419 N. Pierce Street
Tampa, Florida 33602-4022
(813) 272-5400

MEMORANDUM

TO: All Assistant State Attorneys

Date: September 4, 2019

From: State Attorney Andrew Warren

Re: Prosecution of Marijuana Cases following the enactment of the Hemp law.

## Summary:

- **Effective immediately, our office will not file charges nor prosecute any cannabis case with an offense date on or after July 1, 2019 without a scientifically reliable, admissible test that proves beyond a reasonable doubt that the substance contains a THC level above the 0.3 % threshold that distinguishes illegal cannabis from legal hemp. Among cannabis-related offenses, our office will continue to prioritize felonies: trafficking, manufacturing, delivery, sale, possession with intent, and felony-amount possession cases, while continuing to deprioritize the prosecution of misdemeanor cannabis cases in favor of established diversion and civil citation programs. Also, we will continue to prioritize the prosecution of cannabis-related felonies in which other felonies are part of the same transaction or occurrence, such as felon in possession of a firearm or offenses involving other controlled substances.**

Florida's new hemp law took effect on July 1, 2019. Since that time, our office has been discussing the prosecutorial impact of the law with elected representatives, other State Attorney's Offices, and our law enforcement partners. Over the past two months, we have provided guidance consistent with this memorandum within our office while waiting to see what, if any, policy changes our law enforcement partners would make with respect to investigating and arresting cannabis offenses. This memorandum formalizes the guidance ASAs have already been given.

### New Law

Senate Bill 1020, known as the "Hemp Law," went into effect on July 1, 2019. This law legalizes the possession and use of hemp. The bill defines hemp as "the plant *Cannabis sativa L.* and any part of that plant, including the seeds thereof, and all derivatives, extracts, cannabinoids,

1

DEF 002284

JEX 47.097

isomers, acids, salts, and salts of isomers thereof, whether growing or not, that has a total delta-9 tetrahydrocannabinol concentration that does not exceed 0.3 percent on a dry-weight basis." See Florida Statute §581.217(3)(d). The new law changes the definition of cannabis such that the term excludes hemp as defined in section 581.217. Cannabis and hemp both come from the same plant, Cannabis sativa L. Cannabis and hemp look, feel and smell the same, and both can be smoked. The main difference between hemp and cannabis is that hemp has a total delta-9 tetrahydrocannabinol (THC) concentration that does not exceed 0.3%. If the THC concentration of the plant **is less than or equal to 0.3%,** then the plant is hemp, and is legal in Florida. If the THC concentration of the plant **exceeds 0.3%,** then the plant is cannabis and is illegal in Florida (subject to medicinal exceptions).

## Impact on Prosecution

The Hemp Law will impact prosecutors and law enforcement. Specifically, the new law affects our ability to prove beyond a reasonable doubt that a substance is illegal cannabis as opposed to legal hemp. Given the inability to distinguish between hemp and cannabis visually or through smell, the only current reliable method is quantitative testing. In order to prove beyond a reasonable doubt that a substance is cannabis, we need quantitative testing to establish that the THC level exceeds 0.3% on a dry weight basis.

Prosecutorial ethics preclude us from charging an offense without a good faith belief that we can prove the offense beyond a reasonable doubt. Accordingly, for any cannabis-related offense occurring on or after July 1, 2019, our office needs a reliable, admissible laboratory test result establishing the suspected substance is illegal cannabis rather than hemp **before filing** charges. Because, pursuant to Florida Rule of Criminal Procedure 3.191, the speedy trial period starts at the time of arrest, probable cause arrests for cannabis offenses made before law enforcement has obtained a reliable, admissible positive ($\geq$ 0.3% THC) lab test result may jeopardize the successful prosecution of such offenses, absent other circumstances.

Current field tests are insufficient to establish beyond a reasonable doubt that a substance exceeds the 0.3% THC concentration. Law enforcement agencies locally and statewide are working diligently to develop best practices and procedures to meet this challenge. In the meantime, law enforcement is working with private labs to provide reliable and admissible quantitative testing. A law enforcement agency must submit the suspected substance to a DEA-licensed facility for quantitative testing and ensure that proper chain of custody is preserved. To ensure that the results of any such testing are not excluded by the Court, the particular lab testing methodology utilized must be capable of meeting the Daubert standard. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). ACS Laboratory, located in Hillsborough County, is the largest cannabis and hemp testing laboratory in the southeastern United States. ACS Laboratory has advised that it can produce results that will give a quantitative amount of THC in 2-5 business days. More information about ACS Laboratory is available at www.acslabcannabis.com. ASAs should familiarize themselves with the information on the lab practices and procedures necessary to submit evidence of a cannabis offense.

2

DEF 002285

The Hemp Law does not affect our current prioritization of cannabis cases. Among cannabis-related offenses, our office will continue to prioritize felonies: trafficking, manufacturing, delivery, sale, possession with intent, and felony-amount possession cases. We will likewise continue to deprioritize the prosecution of misdemeanor cannabis cases in favor of established diversion and civil citation programs. Also, we will continue to prioritize the prosecution of cannabis-related felonies in which other felonies are part of the same transaction or occurrence, such as felon in possession of a firearm or offenses involving other controlled substances. Although we anticipate that law enforcement will direct file charges after obtaining a positive lab result in lieu of making an arrest, whether a defendant is arrested or direct filed will not affect the priority of the prosecution.

These changes will increase the cost of prosecuting cannabis related offenses. Law enforcement will pay the increased expenses for the necessary quantitative testing prior to our office filing charges. Our office will pay for expert witness testimony to prosecute cannabis cases, subject to the volume of cases and budgetary constraints.

## Impact on Probable Cause Investigations and Admissible Evidence

As in any prosecution, ASAs must evaluate cannabis cases to ensure the admissibility of evidence. Probable cause to search in cannabis investigations has often been based on odor or plain view from a vehicle or person. As noted above, however, hemp and illegal cannabis look and smell the same. As a result, the Hemp Law creates additional Fourth Amendment challenges related to cannabis-based searches.

We continue to work with law enforcement to establish best practices to protect people's Fourth Amendment rights while ensuring successful prosecutions based upon lawful searches and seizures. Under the new Hemp law, the visual observation of suspected cannabis or its odor alone is likely no longer sufficient to establish probable cause to believe a crime is being committed or that evidence of a crime is present. The probable cause standard requires merely a reasonable basis to believe that a crime was committed or that evidence of the crime exists. Accordingly, in most instances, an "odor plus" standard likely demonstrates probable cause to conduct a warrantless cannabis-based search. Many local and statewide law enforcement agencies are adopting this standard.

Below is a non-exhaustive list of "odor plus" factors. This list provides a starting point for ASAs working through these issues in cases involving warrantless cannabis-based searches.

1. Information or intelligence regarding illicit activity prior to the stop
2. Knowledge of the subject's prior recent criminal history for narcotics violations
3. Observation of a hand-to-hand transaction prior to the stop
4. Admission that the substance is illegal cannabis
5. Conflicting or implausible statements
6. Nervousness, such as:
   a. Sweating when it is not hot
   b. Shaking or trembling hands
   c. Avoiding eye contact

3

JEX 47.099

7. Furtive movements
8. Discarding, destroying, or trying to hide a substance
9. A large amount of currency
10. Currency in rubber-banded "quick count bundles"
11. Masking agents such as fabric softener, air fresheners, or coffee grinds
12. Firearms or other weapons
13. Drug paraphernalia, such as baggies, pipes, heat sealers, or scales (although legal hemp may be stored in a baggie and smoked in a pipe as well)
14. Signs of impairment on a driver (such as bloodshot, watery eyes or slurred speech)

ASAs must assess the documentation of these "odor plus" factors when making evaluations related to charging determinations and admissible evidence. ASAs must always keep in mind that probable cause is assessed under the totality of the circumstances standard, and thus looking for documentation and evidence of circumstances in addition to the sight or odor of cannabis is fundamental to our evaluation of a case.

Our office will continue to provide guidance as to the latest legal developments related to these Fourth Amendment issues.

## Conclusion

As these issues work through our court system, we will continue to monitor new court decisions and law enforcement procedures. We intend for this information to help guide your decision-making as you evaluate your cases rather than dictate specific prosecution decisions. Please consult with your supervisors should you have questions or additional thoughts. The recent legal changes make this an evolving area of law, and it is therefore imperative that we continue to communicate effectively to ensure the appropriate and consistent handling of cannabis offenses to advance our mission of public safety, fairness, and justice.

DEF 002287

JEX 47.100

Police Headquarters
411 North Franklin Street
Tampa, Florida 33602

SAO Violent Crime Cases

Ruben Delgado
Interim Chief of Police
The mission of the Tampa Police Department is to
reduce crime and improve the quality of life through
cooperative partnership with all citizens.



Aaron Campbell
5/21/2004

Campbell has a criminal history to include Shooting into a Vehicle, Robbery, Aggravated Assault, Burglary and Minor in possession of a Firearm. Campbell has been placed on Juvenile Detention with a curfew, however, continues to violate the court appointed sanctions.

Most notable SAO results:

- 9/3/2018 – Minor in Possession of a Firearm (18-451613)- SAO -Dismissed at Pre-Trial
- 11/10/2018 - Aggravated Battery with Deadly Weapon/GBH (18-575886) – SAO- No File- Lack of Evidence
- 11/10/2020- Battery (20-371482) – SAO No File -No contact (did not indicate with whom)
- 5/12/2021- Shot at a vehicle two time and arrested for Aggravated Assault W/Firearm (21-506566)  SAO No File - Lack of Evidence -6/10/21
- 9/28/2021 Arrested for murder (21-413883).  Shot and killed the victim



Quantarion
Darby
11/4/1996

Darby has a criminal history that includes Aggravated Battery, Carrying a Concealed Firearm and Felon in Possession of a Firearm. Darby has continued the revolving rotation between County Jail and Florida State Prison. After serving 1 year and 6 months for Aggravated Battery Dabry continued to engage in violent offenses with some of the charges being no filed.

Most Notable SAO results:

- 2016- Felon in Possession Adjudication and 270 days county jail- (16-88024)
- 2017- Florida State Prison Agg Battery 18months (17-642226)
- 2/13/2021 Battery (2nd Subsequent) Felony No File on 3/11/21 (HCSO-21-97635)
- 8/2/2021 Battery (2nd Subsequent) Felony No File on 8/24/21 (HCSO- 21-510250)
- 10/18/2021 Battery (2nd Subsequent) Felony No File 11/30/21 (HCSO 21-697419)
- 10/30/2021 POI in Homicide (21-459925).  Victim shot in chest



Ronald Yates
7/2/1998

Yates has a criminal history that includes Carrying a Concealed Firearm, Robbery, Kidnapping, shooting Throwing Deadly Weapon, Burglary, and has been listed as the suspect in two shooting investigation. After severing a 3-year prison sentence, Yates returned to his criminal enterprises.

Currently Yates is the Person of Interest in 2021 Homicide and 2022 Shooting into an Occupied Dwelling.

Most Notable SAO results

- 4/5/2015 – Shooting at within or into a Vehicle, Direct Discharge of a Firearm, Minor in Possession of Firearm (15-197360) SAO – No Filed -Generic
- 10/17/2016- Robbery with Firearm (>$300) Grand Theft- (HCSO – 16-668755) SAO- 36mths Florida State Prison
- 11/9/2020- Robbery with Firearm (>$100,000) Kidnapping, Dealing in Stolen Property, Felon in Possession of Firearm- {he was identified on video} (20-514184) SAO -No Filed -No Cooperation
- 12/8/21 – POI in Homicide (21-508923)
- 1/15/22 – Warrant Issued for Felon in Poss, Shooting into building, etc....
- 1/20/22 – Arrested with a 9MM UZI style firearm with a 26-round magazine

DEF 002288

JEX 47.101

Police Headquarters
411 North Franklin Street
Tampa, Florida 33602

SAO Violent Crime Cases

Ruben Delgado
Interim Chief of Police
The mission of the Tampa Police Department is to
reduce crime and improve the quality of life through
cooperative partnership with all citizens.



Calvin Williams
10/10/2002

Williams has a criminal history of Auto Burglary, Burglary, Carrying a Concealed Weapon, Aggravated Battery on Pregnant Minor, Fraudulent use of Credit Card and Aggravated Assault. Williams was placed into a Juvenile Diversion Program however; it did not deter him for his criminal activities. Williams has been served with a Risk Protection order where he is not allowed Firearms.

Williams is currently the Person of Interest in a Homicide Investigation.

Most Notable SAO results:

- 12/06/2019- Burglary, Fraud use of Credit Card (19-584765)- SAO No Filed - Juvenile Diversion Alternative Program
- 2/12/2020- Burglary, Grand theft Motor (20-68611) SAO No Filed -Juvenile Diversion Alternative Program
- 2/17/2021 – Aggravated Battery on Preg Female (21-74258) SAO No Filed
- 10/24/2021- Aggravated Assault with Firearm (21-451334) – punched, bit and pointed a firearm at his girlfriend and threatened to kill her. Out on low bond
- 1/3/2022 – POI in a Homicide. Drive by Shooting



Kenny
Kendrick
4/12/1993

Kendrick has a criminal history of Felon in possession of Firearm, Burglary, Delivery of a Controlled Substance, Auto Burglary (Theft from Vehicle), Auto Burglary, Aggravated Assault, Possession of Cocaine, Battery, and Aggravated Assault of Deadly Weapon. While Kendrick was a minor, he was placed on Juvenile Detention in which he violated twelve times. Kendrick is a certified member of the MPR Gang.

**Most Notable SAO results**

- 1/19/2018- Aggravated Assault with Deadly Weapon (2 counts) (21-576688)- SAO No File No Cooperation
- 8/17/2018-Felon in Possession of Firearm, Carrying a Concealed Firearm, Possession of Cannabis (18-394328) – SAO -Dismissed at Pre-Trial
- 2/12/2021- Armed Trafficking in Cocaine, Felon Possession (21-54585) SAO- No-File Lack of Evidence.
- He has been arrested 34 times in Hillsborough County since 2006



Zielinski
Walton
1/14/1997

Walton has a criminal history of Aggravated Assault with Firearm, Carrying a Concealed Firearm, Battery, Aggravated Battery Pregnant Minor, Possession of Marijuana <20grams, Aggravated Battery Great Bodily Harm and is the Person of Interest in a Felon in Possession of a Firearm investigation. Even though Walton has been arrested a total of 7 times he has spent two 2 days in County Jail.

**Most Notable SAO results**

- 10/16/2013- Aggravated Assault w/ Deadly Weapon (13-666883) – SAO No File No Cooperation
- 11/12/2015 – Aggravated assault with Deadly Weapon Firearm Discharge (15-63855) SAO No File Other
- 2/28/2020- Aggravated Battery Great Bodily Harm (20-102667) – SAO No File No Cooperation
- 2/23/2021- Aggravated Battery Great Bodily Harm (21-777122) - SAO No File No Contact

DEF 002289

Sgt. Jordan Russel 813-276.3575

Prepared by: Rosalind Fulks. Crime Analyst. 813-276-3682

JEX 47.102

Police Headquarters
411 North Franklin Street
Tampa, Florida 33602

SAO Violent Crime Cases

Ruben Delgado
Interim Chief of Police
The mission of the Tampa Police Department is to
reduce crime and improve the quality of life through
cooperative partnership with all citizens.



Terrance
Blalock
11/15/1990

Blalock has a criminal history of Aggravated Assault with Deadly Weapon, Aggravated Battery Pregnant Minor with Injury, Battery, and Battery with Strangulation. Walton has been arrested twelve times for violent acts against his partner.

### Most Notable SAO results

- 3/31/2019- Aggravated Battery Pregnant Female -(19-153529) – SAO -Time Served {3 months and 14 days}
- 12/2/2019- Battery 2nd or Subsequent Offense-(19-625525) SAO No File No Cooperation
- 2/3/2020- Battery 2rd or Subsequent Offense – (20-59460) SAO No File No Cooperation
- 3/17/2020- - Battery 2nd or Subsequent Offense-(20-137986) SAO - Time Served {3 days}
- 3/3/2021- Aggravated Battery with Deadly Weapon (21-94582) SAO No File No Contact
- 10/6/2021- Aggravated Battery with Deadly Weapon, Battery 2nd or Subsequent Offense (21-406671) SAO No File Generic



Dennis Bass
8/23/2000

Bass has a criminal history of Robbery, Robbery with Firearm, Robbery (Strong Arm), Battery, Grand Theft, Robbery by Snatching, Felon in Possession of a Firearm, Lewd and Lascivious Battery on Child. Bass has also been listed in an Aggravated Assault investigation, Information Shooting Investigation and Aggravated Assault with a Deadly Weapon.

### Most Notable SAO results

- 6/26/2015- Robbery with Firearm (15-341476) -SAO -Juvenile Probation
- 7/2/2015-Battery (15-376605) SAO No File Generic
- 12/30/2015- Carrying concealed Firearm, Robbery with Firearm (15-731495)- SAO Juvenile Probation
- 4/23/2021- Suspect -Aggravated Assault W/I Commit Felony (21-178207)



Givante Shaw
3/8/1988

Shaw has a criminal history of Burglary, Grand Theft Auto, Aggravated Fleeing, Possession of a Controlled Substance, Felon in Possession of a Firearm, Aggravated Assault with Deadly Weapon, Auto Burglary (Theft from Motor Vehicle). Shaw as been listed as the Person of Interest in a ShotSpotter investigation, and most recently listed as the suspect in an Aggravated Assault with a Deadly Weapon investigation.

### Most Notable SAO results

9/17/20- Battery, Domestic Violence, Grand Theft Motor Vehicle (TTPD-20-2734)- SAO No File -No Contact (did not indicate with whom)

2/4/2021- Aggravated Assault with Deadly Weapon No Intent to Kill (21-52033) SAO No File Generic

3/15/2021- Aggravated Assault with Deadly Weapon No Intent to Kill (21-117010) SAO No File Credibility

4/8/2021- Possession of Controlled Substance (5 counts) and Possession of Heroin (21-154674) SAO No File Constructive Possession

DEF 002290

Sgt. Jordan Russel 813-276.3575

Prepared by: Rosalind Fulks. Crime Analyst. 813-276-3682

JEX 47.103

## Keith D. Cobb 12/6/99

Bicycle Related Incidents

- 10/6/18 – Bike check – Warning given for riding against traffic (SC 2018-30153)
- 5/7/18 – Bike Check – Stopped for no lights at night and given warning. Large amount of synthetic cannabinoid was also found where subject was stopped but couldn't prove he discarded it. (18-239020)
- 4/7/19 – fled from officers on a bicycle and found to be in possession of cocaine (19-165197)
- 9/7/20 – arrived on and fled scene of crime on rented electric scooter after holding victim at gunpoint and battering her. Also, broke victim's phone when she attempted to call 911 (20-414970)

Arrest Timeline

- 1/3/17 – Charged with Felon in possession of a firearm (juvenile conviction), this was also part of an aggravated battery where a subject was shot. (17-6549) – No File (lack of evidence)
- 4/7/19 – Charged with sale and possession of cocaine – plead guilty (withheld adjudication) 300 days in jail Fled from officers on a bicycle and 19.7 grams of cocaine found in pouch attached to bicycle (19-165197)
- 4/14/19 – Charged with delivery of cocaine – undercover officers purchased cocaine from Cobb, and he fled on foot during apprehension. (19-177342)
- 5/20/19 – Charged with Burglary of Conveyance with assault or battery – No File (lack of cooperation) Cobb was a passenger in a hit and run vehicle. When victim tried to speak to them about the crash, he grabbed a bat from the house and struck the victim's window causing the window to break, the victim then fled in her vehicle and Cobb continued to chase her down the road with the bat (19-247242)

DEF 002291

- 6/1/19 – Charged with RAWOV, possession of cocaine and possession of paraphernalia – plead no contest and received time served (original arrest was for a warrant) (19-271462 and 19-271454)
- 3/21/20 – Charged with burglary of a dwelling with assault or battery – No file (no contact with victim)
- 9/7/20 – Charged with armed false imprisonment after holding the victim at gun point inside her apartment and battered her. (20-414970) – plead guilty, time served
- 9/15/20 – Charged with violation of pretrial release condition – This was for sending the victim in the armed false imprisonment case threatening text messages. (20-427670) Nolle Prossed
- 11/22/20 – Charged with felon in possession and attempted murder with great bodily harm – Cobb was in a vehicle in a trailer park when a visitor walked up. He shot the male four times with a .40 cal firearm and fled the scene. (20-534458) No file (lack of cooperation)
- 9/16/21 – Charged with Agg Assault with a deadly weapon after Cobb armed himself with a firearm and told the victim that he was going to kill her multiple times in front of her young children. Victim was also currently pregnant with Cobb's child. (21-395781) case currently open

DEF 002292

# Tyrell V. Kiffin

Bicycle Stops

- 01/22/20 – Warning issued for bicycle violations (SC 2020-3177)
- 07/22/19 – Warning issued for no bike light (SC 2019-22000)
- 09/09/18 – Warning issued for no bike light (SC 2018-26946)
- 09/06/18 – Warning issued for no bike light (SC 2018-26624)
- 08/26/18 – Warning issued for no bike light (SC 2018-25318)
- 06/12/18 – Warning issued for no bike light (SC 2018-17513)
- 11/29/17 – Consensual encounter – no bike light (SC 2017-37873)

Arrest Timeline

- 04/16/20 – Charged with CCF – No File
- 01/20/21 – Aggravated Assault Deadly Weapon (21-29976) - Two suspects opened fire on a group of 50-100 people attending a candlelight vigil for a deceased person. No victims were struck by gunfire. Kiffin and co-defendant Denson were identified by the victim, and warrants were later issued for Aggravated Assault Deadly Weapon.
- 06/24/21 – Arrested on warrant for Aggravated Assault (held on bond 70 days)
- 08/31/21 – Placed on 36 months of probation for Aggravated Assault W/WPN
- 01/03/22 – Arrested for Felon in Possession of a Firearm – Possibly involved in a homicide on January 01/2/22

DEF 002293

# Quavion Peoples 7/24/03

Bike Related Activity:

- 6/15/17 – Bicycle Stop after call of suspicious activity of looking into cars. Found operating bicycle with no lights and was warned and returned home. (SC 2017-19609)
- 7/30/17 – Peoples was stopped on a bicycle in the area of a burglary with several other subjects. The subjects fit the description of the suspects in the burglary but were not able to be positively identified by the witnesses. They were all released on scene. (17-398015)
- 8/8/17 – Arrested for loitering and prowling after being seen on a bicycle in the neighborhood. Upon sight of officers, he fled and discarded the bicycle. (17-413927)
- 8/11/17 – Bicycle stop after report of suspicious activity where three males had a male surrounded. (SC 2017-25907) Peoples was also arrested during this encounter as the bicycle that he in was in possession of was just stolen 30 minutes prior to this stop. (17-421537.)
- 8/25/17 – Bicycle stop after description was given of a male leaving the park with a firearm. Peoples matched the description and was located a short distance away. He was patted down but no firearm was located.
- 11/10/17 – Bicycle stop for riding a bike with no lights after sunset. Issued a warning and released. (SC 2017-35772)
- 2/14/18 – Stopped for a bicycle violation and found to be in violation of his probation since he was not at home prior to his curfew. (18-80185)
- 6/27/18 – Fled from officers on a bicycle when he was recognized as a subject with an active local pick up. Charged with resist arrest without violence (18-327821)
- 2/27/21 – Bicycle stop after observed riding a bicycle with no lights after dark. (SC 2021-6131)
- 3/7/21 – Bicycle stop after observed riding a bicycle with no lights after dark. (SC2021-7136)

Arrest

- 9/12/17 – Arrested after seen burglarizing vehicles. Positively Identified by a witness. (17-477538) Plead no contest and given probation. Violated multiple times until it was finally terminated 1/28/20
- 9/29/17 – Arrested for Battery on a LEO after an officer was attempting to arrest another subject for fighting. He grabbed the officer from behind and then took a defensive stance as if he was going to charge the officer when he was taken into custody

DEF 002294

with the assistance of a teacher. (17-506314) Plead no contest. Violated multiple times until finally terminated 1/28/20

- 4/30/18 – Arrested for Robbery after snatching the victim's necklace from around his neck. Fled the scene on a bicycle. (18-221491) Pretrial – dismissed
- 12/17/18 – Arrested for Aggravated assault with a deadly weapon after a firearm was pointed at a subject during an argument placing the victim in fear of his life. Peoples admitted to discarding the firearm (determined to be a BB gun) in this case. (18-639480) Originally referred to adult intake and then dismissed during pretrial.
- 9/12/20 – Arrested for CCF after a traffic stop where he was a passenger in the vehicle. He was also found to be in possession of <20 grams of marijuana. (20-423236) 10/14/20 No File
- 1/20/21 – Arrested for CCF after shots were heard in the area by officers. Peoples was pointed out as the shooter and found to be in possession of a firearm. Firearm was also found to be stolen. (21-30390) 2/18/21 No File

Other

- 9/1/20 – Stolen firearm observed posted on his Instagram account. (SC 2020-19558 and 20-402126)
- 12/22/20 – Firearms being posted for sale on his Instagram account. These guns consisted of long guns and handguns. (SC 2020-29771)

DEF 002295

## James E. Broom

### Bicycle Stops (non-arrest)

- 12/06/18 – Stopped at scene of shooting and issued warning for bike violation (SC 18-37083)
- 04/28/19 – Warning issued for no bike light (SC 2019-11823)
- 05/01/19 – Warning issued for bicycle violation (SC 2019-12292)

### Arrest Timeline

- 12/26/17 - Arrest – Robbery Firearm (Victim robbed of bicycle). Pre-trial diversion (Walker Plan)

- 11/25/19 – Bicycle Stop. Arrested for Carrying a Concealed Firearm and Possession of Marijuana (19-613654). Pled guilty to CCF on 02/04/21, receiving 2 years probation. Gun NIBIN's back to TPD 19-572195. Shots fired, no victims.
- 01/24/21 – Bicycle Stop. Arrested again for Carrying a Concealed Firearm (HCSO 21-52519) and VOP for CCF. Case remains open.
- 01/03/22 – Traffic stop. Arrested for Carrying Concealed Firearm, Felon in Possession, Possession of a Firearm During Commission of a Felony, and Possession of Cannabis with Intent to Sell (22-4613). Case remains open. Gun NIBIN's back to TPD 21-15715 (Homicide). NIBIN Link 2020-224.

DEF 002296

# Jamon Williams 09/01/00

Bicycle Stops (non-arrest)

- 01/04/17 – Stopped after matching description during a possible robbery investigation (SC 2017-368)
- 01/25/17 – Consensual encounter on bicycle (SC 2017-2711)
- 04/02/17 – Stopped for no bike light and after matching description of shooting earlier in the day. Warning issued for no bike light (SC 2017-10991)
- 07/18/17- Bicycle stop after observed riding with no lights-Warnings issued. (SC 2017-23003)
- 12/23/17-Bicycle stop after a traffic infraction-Warning issued (SC 2017-40301)
- 04/16/18-Bicycle stop for no bike lights-Warning issued (SC 2018-11470)
- 04/19/19-Bicycle stop for no bike lights-Warned, but arrested for providing false name to LEO and burglary tools (GO 2019-187783) (SC 2019-11467)

Arrest Timeline

- 09/30/19 – Bicycle stop and Williams fled. Was captured and gun found in path of travel (TPD 19-509691). NIBIN came back to shooting that occurred the day before the stop, for which Williams was the suspect. DNA later came back positive to Williams, and he was charged with Felon in Possession. Plead Guilty and sentenced to 220 days in county jail.
- 11/05/19 – Arrested for CCF and Felon in Possession of a Firearm (19-576039). Appears sentenced **to 220 days in county jail** for this case, and the one above on 09/30/19.
- 12/28/19 – Arrested for Armed Robbery (19-667394). Photo pack ID and stolen phone recovered from his house. Nolle Prossed for "insufficient evidence."
- 05/03/21 – Arrested for Felon in Possession (21-197561). This case is still open.
- 01/01/22 – Believed to be captured on pole camera entering the vehicle responsible for the homicide in Robles on this date. Investigation on going.

DEF 002297

## Julian M. Dezil 05/21/01

Bicycle Stops:

- 01/16/17 - 17-29653 Dezil and other subjects stole a bicycle from University Square Mall and then committed a burglary in New Tampa. Dezil was arrested along with the other subjects.
- 5/15/17 - Stopped on a bicycle after dark without the proper lights and issued warning (SC 2017-16126).
- 6/8/17 –Stopped on a bicycle for two subjects riding on the same bicycle; one on handlebars (SC 2017-18863). Issued warning.
- 1/18/18 - Arrested for an active warrant after being observed on a bicycle after dark with no lights (TPD 18-31606). During this same stop, he was identified as being involved in multiple auto burglaries that had occurred and was also arrested for that (18-29795).
- 3/3/18 –Bicycle stop for riding against oncoming traffic. Issued warning (SC 2018-6784).
- 7/20/18 – Bicycle stop for no lights after dark (SC 2018-21832). Issued warning.
- 8/21/18 - Stopped on a bicycle for running a stop sign and issued warning (SC 2018-24770).
- 9/4/18 –Bicycle stop for running a stop sign (SC 2018-26464). Issued warning.
- 10/26/18 –Dezil observed on a bicycle and was known that he had an active warrant. Officer attempted to arrest him upon sight, and he fled after a brief scuffle with the officer (TPD 18-548644). He was arrested for the warrant, and also, RAWOV.
- 5/8/19 – Fled from mall security after a theft (HCSO jurisdiction) and later observed on a bicycle still fleeing the scene (19-224298). He fled when officers attempted to stop him for riding in the center of the road and was ultimately apprehended and charged with RAWOV. He was also charged with the theft, HCSO case number 19-322152 and was also found to be on probation which was violated.

DEF 002298

Arrest Timeline:

- 7/10/19 – 19-348423 Dezil's mother found a firearm in his bedroom and called police to collect the firearm. Dezil was currently on probation and had fled the scene prior to police arrival. Dezil never faced charges for this firearm possession.

- 1/22/20 –Arrested for shooting into an occupied building or vehicle (TPD 20-37137). Gun used in offense in defendant's room. Pled guilty and was sentenced to 15 months FSP and 36 months probation. This was violated under the case 21-337898.

- 1/27/20 – Arrested for armed robbery. Search warrant revealed gun and cash in his room (20-46937). This firearm was linked to two separate shootings, 19-671106 and 20-36849 (no suspects). He was charged with the robbery but it was no filed do to lack of cooperation from the victim.

- 8/9/21 – Arrested for Felon in Possession of a Firearm (21-337898). During a probation check arranged by Tampa Police, a firearm was located in Dezil's room. A search warrant was obtained, and the firearm was recovered. This firearm was also linked back to a shooting that occurred 7/23/21. Dezil plead guilty and was sentenced to 364 days **Minimum Mandatory should have been 3 years. Had just been released from prison on 05/30/21 for a shooting. This case also violated his 36 month probation that he was on. Officer Maceo requested to be contacted prior to plea deal, but was never notified.**

DEF 002299

# Samuel E Ward Jr

Bicycle Stops

- 10/16/18 – Bicycle stop no headlights. Possessed fake handgun and three knives. Warning issued (SC 2018-31019).
- 07/01/19 – Bicycle waring issued for no headlights (SC 2019-19692)

Arrest Timeline

- 12/07/17 – Stopped in vehicle. Arrested for Felon in Possession of a Firearm and Conspiracy to Traffic in Methamphetamine. Appears to have received 60 days' time served in ORJ.
- 07/02/19 – Stopped for no bicycle light. Arrested for CCF, Felon in Possession, Armed Possession Controlled Substance, and Possession with intent. Currently serving 36 months prison for this offense.

DEF 002300

# Jevon M Hamilton

Bicycle Stops

- 12/17/18-Warning issued for bicycle violations (SC 2018-38179)

- 01/09/19- Warning issued for loitering and prowling (SC 2019-850)

- 01/13/19-Warning issued for no bike lights (SC 2019-1145)

- 12/30/20 – Warning issued for bicycle violations (SC 2020-30048)

- 04/15/21 – Warning issued for no bike light & out past curfew (SC 2021-10613)

Arrest Timeline

- 04/18/17-Possession of Weapon on School Property (Knife and BB gun) (GO 2017-203195)-Javon Hamilton had three knifes and a BB Gun on school property, found by the principal. Hamilton was charged and subsequently completed the JAAP.

- 09/09/18-Burglary Structure/Dwelling (GO 2018-462181)-Jevon Hamilton was captured on video burglarizing a business where he left blood evidence behind. Officers reviewed the surveillance video and stopped Hamilton in the immediate area riding a bicycle shortly after. FDLE confirmed blood on scene belonged to Hamilton. Charged with Burglary, Petit Theft and RAWOV-Global Offer from state where they Nolle Prossed all charges and placed him on probation with adjudication withheld.

- 12/30/20 – CCF & RAWOV (GO 2020-586823) stemmed from the Bicycle stop (SC 2020-30048)-Jevon Hamilton was observed riding the handlebars of a bicycle and dropping a firearm. Officers conducted a bicycle stop and recovered the firearm. Hamilton was charged with CCF and RAWOV. Global Offer from State where they Nolle Prossed count one (CCF) and plead as charged for count two (RAWOV).

- 02/24/2021-Felon in Possession of Firearm (GO 2021-84803)-Jevon Hamilton posted with a firearm on social media at approximately 1900 hrs. At 2036 hrs Hamilton was observed wearing the same clothing and a firearm was located within a car in the front yard of his residence. The firearm located was found to be the same as the one the Hamilton posted earlier in the day on social media. Charged with CCF and Minor in Possession of Firearm (2nd or subsequent). Global

offer from state where they Nolle Prossed count 2 (Minor in Possession), plead as charged for count one and 15 days secured detention.

DEF 002302

# Willie Tinsley

Bicycle Stops

- 06/26/17-Warning issued for no bike light (SC 2017-20563)
- 06/28/17- Warning issued for no bike light (Contact made after S44 call about possible S21) (SC 2019-20940)
- 03/01/2018-Warning issued for loitering, observed on bikes (SC 2018-6330)

Arrest Timeline

- 02/25/17-Auto Burglary (2017-107836)-Willie Tinsley was arrested for Burglary of an Unoccupied Conveyance and P/T after his fingerprints were found inside a school bus that was burglarized. State No file for Lack of Evidence.

- 05/28/17- Burglary of an Unoccupied Conveyance (GO 2017-276696)- Willie Tinsley was arrested by patrol officers for multiple S21 along with nine (9) other defendant's who were all on bicycles. Tinsley plead "No Contest" to a reduced charge of Trespass and was placed on juvenile probation.

- 08/08/17 – GTA, Auto Burglary & GT (GO 2017-407233)- Willie Tinsley was arrested by detectives after his fingerprints and co-defendant's statement placed him inside of a stolen vehicle. It was believed the suspect(s) arrived in and left their bicycle behind, however this was never proven. The case was dismissed after an Adjudicatory Hearing.

- 06/28/2018-GTA, Burglary of Unoccupied Conveyance, GT and NVDL-Willie Tinsley was arrested by patrol after being in a stolen vehicle. He plead guilty and was adjudicated for the GT charge, withheld adjudication on GTA and Nolle Prossed the Burglary and NVDL charge.

- 02/23/2021-Felon in Possession of Firearm/Ammo, Alteration of Firearm SN and Trespass-Willie Tinsley was arrested after patrol located him sleeping inside a vehicle during a Curfew Check for Jevon Hamilton. During the curfew check, patrol officers observed a firearm within the vehicle and within immediate reach of Tinsley's person (Tinsley was sole occupant of vehicle). State Nolle Prossed the case due to the victim of the trespass (vehicle Tinsley was located sleeping in) had contracting statement-not enough evidence.

DEF 002303

# HCSO / SAO Cases

### HCSO Case# 22-58115 / 2022-CF-918: Robbery/Shooting (01/24/2022)

### Jordan Ryan Gracia (W/M DOB: 07/11/2002) and Jaycob Ajay Riley (B/M DOB: 03/27/2002)

On January 24, 2022, an HCSO detective with the Special Investigations Division (SID) arranged a "Buy Walk" gun operation with, Jordan Gracia. The detective arranged the operation and agreed to purchase a Glock 19 and an AR-15 style rifle from Mr. Gracia in exchange for United States currency. The detective communicated with Mr. Gracia via telephone number 813-697-9877. The detective and Mr. Gracia agreed to conduct the transaction at the Brandon Mall, located at 459 Brandon Town Center Dr., Brandon, FL 33511. The detective arrived at the predetermined location and parked between Macy's and The Cheesecake Factory. At approximately 1541 hours, a gray in color Acura approached and parked on the passenger side of the detective's undercover vehicle. Mr. Gracia exited the front passenger seat of the Acura and another male, Jaycob Riley, exited the rear driver's side of the Acura. Mr. Riley had a black in color gym bag as he exited the vehicle. Mr. Riley passed the same gym bag to Mr. Gracia who entered the detective's front passenger seat. The detective observed a Glock pistol and an AR-15 style rifle within the gym bag. As the detective negotiated the transaction with Mr. Gracia, Mr. Riley leaned into the detective's vehicle. Mr. Riley pointed a black in color pistol at the detective and demanded United States currency. At this time, additional detectives/victims (four detectives) responded to the rescue signal given by the detective. The detectives activated their emergency lights and sirens and moved in to apprehend both Mr. Gracia and Mr. Riley. Mr. Riley looked back over his left shoulder in the direction of the emergency response vehicle and fired several rounds in the direction of the detective's vehicle and the emergency response vehicle (which was occupied by the four additional detectives).

Mr. Riley and Mr. Gracia fled on foot, and a witness at the mall heard something (Ruger 9MM gun) hit the ground as Mr. Riley and Mr. Gracia ran past him. A preliminary ballistic comparison of the casings recovered near the incident scene matched those from the recovered Ruger. The lead detective in the operation witnessed Mr. Riley touch the area above his front passenger door. The area was processed for latent prints and the print was identified as, Mr. Riley's. Mr. Gracia was located by detectives on scene and Mr. Gracia identified Mr. Riley as the shooter. The telephone number referenced earlier to arrange the transaction was registered to Mr. Riley. A close friend of Mr. Riley also identified Mr. Riley in still photographs from surveillance that captured the incident. Another citizen's vehicle was found to be struck by the firearm fired by Mr. Riley as the citizen was sitting inside her vehicle. The citizen/victim was sitting in the front seat of her vehicle and the projectile went through the lower outer rear driver door, exited the inner rear driver door, and re-entered into the kick plate area in the rear driver's side area. There were multiple 9MM shell casings located in the vicinity of the citizen's vehicle and were consistent with the area where the gunshots would have been fired that struck the citizen's vehicle.

Prior to this incident, Mr. Gracia was involved in seven (7) cases involving firearms which are on the USB drive attached to this report. The charges associated with those cases are: Carrying a Concealed Firearm, Felon in Possession of a Firearm (x3), Grand Theft Firearm, Tampering with

DEF 002304

Electronic Monitoring Device, Robbery with Firearm, and Minor in Possession of a Firearm. The incidents occurred from June 2019 to March 2021.

*-Mr. Gracia has a total of 31 felony charges, 14 misdemeanor charges, 0 felony convictions, 0 misdemeanor convictions, and 4 felonies not adjudicated*

*-Mr. Riley has a total of 19 felony charges, 0 misdemeanor charges, 3 felony convictions, 0 misdemeanor convictions, and 2 felonies not adjudicated*

### Deitrick Elite Baldwin (B/M DOB: 07/25/05) and Thomas Jerome Cook (B/M DOB: 08/10/02)

#### HCSO Case# 21-271554 / 2021-CJ-953, 2021-CF-5018, 2021-CF-5019 (04/26/2021)

On April 26, 2021, Deitrick Baldwin and Thomas Cook set up a marijuana deal but instead they committed an armed robbery. During the robbery, shots were fired and one of the victims was struck in the head (he survived). This incident was captured on video surveillance and during the investigation, the firearm used in the robbery was located in Mr. Cook's vehicle which was parked at Eastbay High School. There was a NIBIN match between the firearm located in Mr. Cook's vehicle and the shell casings from the scene. Mr. Cook and Mr. Baldwin were charged with Aggravated Battery with Deadly Weapon, Aggravated Assault with Deadly Weapon (x2), Robbery with Firearm, Discharge Firearm from an Occupied Vehicle, and Shooting at a Vehicle. All charges were no-filed for Mr. Baldwin on June 3, 2021, citing no contact with the victim. All charges except Possession of Weapon on School Property were no-filed for Mr. Cook citing no contact with the victim. The Possession of a Weapon on School Property is still pending.

#### HCSO Case# 21-306337 / 2021-CF-5692 (04/22/2021)

During the above mention robbery investigation, a search warrant was executed on Mr. Cook's cell phone. During the examination of the phone, detectives became aware of another robbery that occurred on April 22, 2021. Mr. Cook and two unknown suspects met up with the victim to conduct a marijuana deal. During the deal, the victim was struck in the head with an unknown object while being told to give up his property. The victim positively identified Mr. Cook as the suspect via a sequential photographic lineup. Mr. Cook was charged with Robbery. This case is pending.

#### HCSO Case# 21-372012 / 2021-CF-11792 (06/05/2021)

On June 05, 2021, the victim met up with Deitrick Baldwin to conduct a sale of a phone after making contact via the website, Offer-Up. When the victim arrived at the scene, Mr. Baldwin approached her, pulled out a firearm, and demanded the phone. The victim did not comply and fled the scene on foot. The victim was able to identify Mr. Baldwin via a sequential photographic lineup. Mr. Baldwin was charged with Robbery with a Firearm. This case is pending.

#### HCSO Case# 21-613538 / 2021-CF-11214 (09/13/2021)

DEF 002305

On September 13, 2021, at approximately 1505 hours, Deitrick Baldwin and multiple co-defendants fired multiple rounds into two occupied residences along with one unoccupied vehicle. M. Baldwin and the co-defendants were identified and arrested the following day. A search warrant was executed on Mr. Baldwin's residence and firearms were located that matched the caliber of the spent shell casings found at the incident scene. Mr. Baldwin was charged with Aggravated Assault with Intent to Commit a Felony with a Weapon (x4), Shooting into an Occupied Dwelling (x2), and Shooting into a Vehicle. This case is pending.

*-Deitrick Baldwin has a total of 21 felony charges, 1 misdemeanor charge, 0 felony convictions, 0 misdemeanor convictions, and 14 felonies not adjudicated*

*-Thomas Cook has a total of 9 felony charges, 0 misdemeanor charges, 0 felony convictions, 0 misdemeanor convictions, and 7 felonies not adjudicated*

### James Lee Raulerson (W/M DOB: 04/14/84), Prolific Priority Offender, Criminal Registrant

### HCSO Case# 21-650046 / 2021-CF-11809 (09/28/2021)

On September 28, 2021, James Raulerson was the passenger when a traffic stop was conducted after a traffic violation was observed. Once stopped, the driver was found to have a suspended license and was in possession of synthetic marijuana. Mr. Raulerson consented to the search as the passenger of the vehicle and his person. Illegal drugs were located under Mr. Raulerson's seat, at his feet, and the incident was captured on the deputy's Body Worn Camera (BWC). The firearm was observed in plain view under Mr. Raulerson's seat. Additionally, a trafficking amount of fentanyl was found in his pocket. Mr. Raulerson was arrested for Armed Trafficking in Fentanyl, Felon in Possession of a Firearm, Felon Carrying Concealed Weapon, and Armed Possession with Intent to Deliver a Controlled Substance within 1,000 feet of a Church (Amphetamine).

This case is currently active but is being pled to simple possession. There has been no decision on sentencing at this time. Mr. Raulerson has 147 charges in RMS including Felon in Possession, Armed Trafficking, and Aggravated Battery. He has been to prison four times for Possession of Control Substance/Other, Willful Flee/Elude LEO, Trafficking Amphetamine, Sale/Manufacture/Deliver Other Schedule I and II Drugs, Possession of Controlled Substance/Other, Cocaine Possession, Burglary of an Occupied Dwelling, Burglary of an Occupied Conveyance, and Simple Battery (x2).

### HCSO Case# 21-752447 / 2021-CF-13681 (11/09/2021)

On November 09, 2021, Mr. Raulerson was arrested for Armed Trafficking Fentanyl (28 grams), Armed Trafficking Methamphetamine (200 grams), Possession of Cocaine, Felon in Possession of a Firearm, and other charges. Mr. Raulerson was the passenger in the vehicle being stopped for a traffic violation, and Mr. Raulerson attempted to flee from the traffic stop after trying to throw a gun out of the window. The driver of the vehicle gave a sworn statement confirming Mr.

DEF 002306

Raulerson's actions. All of those charges have been no-filed (generic) and a letter of release was completed with reference to "constructive possession."

### HCSO Street Check# 22-196 (01/22/2022)

On January 22, 2022, at 2204 hours, a drive-by shooting occurred at 10833 E Old Hillsborough Avenue (an address Mr. Raulerson is known to frequent). The victim identified Mr. Raulerson as the person who committed the shooting. This victim was afraid of Mr. Raulerson and is afraid to press charges against him so no charges were issued for Mr. Raulerson.

### HCSO Case# 22-97517 / 2022-CF-1505 (02/08/2022)

On February 8, 2022, Mr. Raulerson was arrested for Trafficking in Cocaine, Trafficking in Illegal Drugs (Methamphetamine), and Possession of Drug Paraphernalia. The case is currently open.

*-Mr. Raulerson has a total of 54 felony charges, 29 misdemeanor charges, 13 felony convictions, 17 misdemeanor convictions, and 27 felonies not adjudicated*

## Russell Edward Hewitt III (W/M DOB: 08/17/88), Prolific Priority Offender, Criminal Registrant

**HCSO Case# 19-226955 / 2020-CF-7697 (04/02/2019)**
**HCSO Case# 19-350174 / 2019-CF-9869 (05/19/2019)**
**HCSO Case # 19-414970 / 2019-CF-9743 (06/12/2019)**
**HCSO Case# 19-431864 / 2019-CF-9745 (06/20/2019)**
**HCSO Case# 19-442059 / 2019-CF-10800 (06/24/2019)**

In 2019, Russell Hewitt accumulated charges in six separate criminal cases. The total charges included:
-Burglary of an Unoccupied Structure (x4)
-Grand Theft 3rd Degree (x4)
-Burglary of an Unoccupied Conveyance
-Grand Theft Motor Vehicle
-Criminal Mischief (x2)

Mr. Hewitt was charged in the above cases after he fled out of state to Alabama (in one of the stolen vehicles) and received additional charges including, Fleeing to Elude Law Enforcement. The above cases were combined in a global offer, and Mr. Hewitt ultimately plead to *only* 15 months in Florida State Prison. This was effectively a 'time served' sentence, and Mr. Hewitt was released without actually serving any time in prison. The only time Mr. Hewitt served was in county jail. Mr. Hewitt had an extensive history prior to these charges, with prior charges including Aggravated Assault w/ Deadly Weapon, Burglary, Grand Theft Motor Vehicle, and DV Battery, dating back to 2003.

Mr. Hewitt was released from jail in April 2021; one month after his sentencing for the above cases. By December 30, 2021, Mr. Hewitt had accumulated six more felony charges (Burglary

DEF 002307

of an Unoccupied Conveyance, Fleeing to Elude Law Enforcement (x2), Driving While License Revoked – Habitual (x2), and Felony Petit Theft).

### HCSO Case# 21-828423 / 2021-CF-15443 (12/11/2021)

On December 11, 2021, Mr. Hewitt burglarized a victim's unoccupied vehicle and removed property from the victim's toolbox within the vehicle. The incident was captured on video surveillance along with Mr. Hewitt driving a stolen vehicle while committing the burglary. Florida Highway Patrol (FHP) conducted a traffic stop on Mr. Hewitt driving the stolen vehicle later in the morning (on the same day as the burglary). Mr. Hewitt fled from FHP, and FHP learned the vehicle was reported stolen out of Pasco County. Mr. Hewitt was located on December 31, 2021, by HCSO and charged with Burglary of an Unoccupied Conveyance and Felony Petit Theft. This case was closed (Mr. Hewitt plead guilty, pre-trial).

### HCSO Case# 22-10388 / 2022-CF-0190 (12/30/2021)

On December 30, 2021, Mr. Hewitt was observed (by an undercover deputy) in the area, and the deputy knew Mr. Hewitt had several outstanding warrants. The deputy was conducting surveillance and positively identified Mr. Hewitt by his HCSO booking photograph. The deputy identified himself as a Deputy Sheriff and Mr. Hewitt fled on foot and got into his vehicle to flee from the deputy. The deputy learned Mr. Hewitt is listed as a Habitual Traffic Offender and issued a warrant for Mr. Hewitt for the following charges: Resisting Officer without Violence, Fleeing and Attempting to Elude a Police Officer, and Driving while License Revoked-Habitual Offender. This case was closed (The above cases were combined in a global offer, and Mr. Hewitt plead guilty, pre-trial, and was sentenced (approved) to global 364 Hillsborough County Jail on February 1, 2022, and was approved global of 300 Hillsborough County Jail on March 15, 2022, and court costs.

*-Mr. Hewitt has a total of 33 felony charges, 15 misdemeanor charges, 11 felony convictions, 8 misdemeanor convictions, and 6 felonies not adjudicated.*

## Christopher Glen Chattin (W/M DOB: 04/06/82), Prolific Priority Offender, Criminal Registrant

### HCSO Case# 21-34879 / 2021-CF-867 (01/15/2021)

On January 15, 2021, Christopher Chattin and Jessica Bronson were involved in a carjacking where they grabbed one victim on the back of the neck, pulled the victim from the rear passenger side of the vehicle, and pushed him down. Mr. Chattin placed his right arm around the second victim's neck and pulled him away from the driver's side of the vehicle. Mr. Chattin approached the third victim and struck him in the face with his hand, got in the vehicle with Ms. Bronson, and fled the area. A warrant was issued for Mr. Chattin for Carjacking and Battery (x2).

Mr. Chattin and Ms. Bronson were captured on surveillance video and the victims identified them as the individuals who carjacked them. Also, several detectives positively identified Mr. Chatting and Ms. Bronson in the same video based on previous contacts. The SAO refused to file charges on Mr. Chattin and Ms. Bronson because the victims were delayed in reporting the

DEF 002308

crime. It was later learned the victims were afraid of law enforcement due to being undocumented and two of the three victims did not speak English or Spanish; rather, they spoke a native Guatemalan dialect.

### HCSO Case# 21-279674 / 2021-CF-5113 (04/29/2021)

On April 29, 2021, Mr. Chattin stole a victim's vehicle from a parking lot and stole two kayaks and other property from the vehicle, and stored it at his mother's residence. Mr. Chattin was arrested on April 30, 2021, in reference to HCSO Case# 21-280242, and admitted to stealing the victim's vehicle and property within it. This case was closed (Mr. Chattin plead guilty, pre-trial, and was sentenced with community control and probation.

### HCSO Case# 21-280242 / 2021-CF-5101 (04/30/2021)

On April 30, 2021, two victims observed Mr. Chattin burglarize several vehicles in their driveway. Mr. Chattin then burglarized the victims' enclosed porch area of the residence and stole property from within. Mr. Chattin attempted to steal the victims' golf cart and when he was unsuccessful, he stole the keys to the golf cart and fled the area on foot. Mr. Chattin burglarized another vehicle in the area and was located by law enforcement with the stolen items (on his person) from the third vehicle burglary. Mr. Chattin was not compliant with law enforcement and was subsequently tased by deputies when he would not obey their lawful commands. Mr. Chattin was charged with Burglary of an Occupied Dwelling, Burglary of an Unoccupied Conveyance (x3), Resisting Officer without Violence (x2), Grand Theft Motor Vehicle, and Petit Theft. This case was closed (Mr. Chattin plead guilty, pre-trial, and was sentenced with community control and probation.

*-Mr. Chattin has a total of 39 felony charges, 14 misdemeanor charges, 15 felony convictions, 7 misdemeanor convictions, and 9 felonies not adjudicated.*

### Santavious Mykiron Arointae Wright (B/M DOB: 02/27/2003), Juvenile Offender

Mr. Wright currently has 42 felony charges with zero felony convictions from incidents ranging from 2015 to the present. Throughout that time, Mr. Wright was charged with the following offenses (this does not include everything on his criminal history):

-Grand Theft

-Grand Theft Firearm

-Grand Theft Motor Vehicle

-Burglary of an Occupied Dwelling

-Armed Burglary of a Dwelling

-Burglary of an Unoccupied Dwelling

-Armed Burglary of Conveyance

DEF 002309

-Burglary of an Unoccupied Conveyance (x20)

-Tampering with Physical Evidence

-Improper Exhibition of a Dangerous Weapon or Firearm

-Robbery by Sudden Snatching

-Aggravated Battery Great Bodily Harm or Deadly Weapon Firearm-Discharge

The other statistics on Mr. Wright include:

-15 misdemeanor charges with 0 misdemeanor convictions

-109 Re-arrests

-0 cases adjudicated delinquent

-19 withholds

-33 without a disposition

### HCSO Case# 19-682529 / 2019-CJ-2549 (09/22/2019)

On September 22, 2019, Mr. Wright coordinated a drug deal with a witness on Snapchat. During the deal, Mr. Wright displayed a silver handgun and got into a physical altercation with the witness. The victim tried to help the witness during the physical altercation and the witness and Mr. Wright fell to the ground. The victim was shot in the stomach by Mr. Wright and Mr. Wright fled the scene. The victim sustained a gunshot wound through his left lateral abdomen. Mr. Wright was charged with Aggravated Battery Great Bodily Harm or Deadly Weapon Firearm-Discharge and Minor in Possession of a Firearm. This case is closed. The case was no-filed, with "lack of evidence" listed in the remarks.

### HCSO Case# 19-869240 / 2019-CJ-3220 (12/15/2019)

On December 15, 2019, Mr. Wright burglarized seven vehicles and stole approximately $1800.00 in property to include credit cards and controlled substances. Mr. Wright was charged with seven counts of Burglary of an Unoccupied Conveyance, Possession of Burglary Tools, Possession of a Controlled Substance, Grand Theft, and Unlawful Possession of a Stolen Credit or Debit Card (x2). The case was closed and Mr. Wright received probation.

### HCSO Case# 20-43616 / 2020-CJ-239 (01/16/2020)

On January 16, 2020, Mr. Wright burglarized an unoccupied residence by breaking a glass window pane on the rear door of the residence. Mr. Wright rummaged through multiple rooms and removed over $1000.00 in property. Mr. Wright was observed on video surveillance with a witness pawning some of the property at a pawn store on January 23, 2020. Mr. Wright was charged with Burglary of an Unoccupied Dwelling and Grand Theft. The case was closed and Mr. Wright received probation.

### HCSO Case# 20-50386 / 2020-CJ-243 (01/20/2020)

DEF 002310

On January 20, 2020, Mr. Wright burglarized a vehicle and stole a black Glock firearm. The firearm was located in Mr. Wright's bedroom on January 23, 2020, when he was taken in custody for active warrants on two other vehicle burglary cases with HCSO (Case# 20-60306). Mr. Wright's mother gave signed consent to search her residence and deputies located the stolen firearm in Mr. Wright's bedroom. The case was closed and Mr. Wright received continued probation.

### HCSO Case# 20-805933 / 2020-CM-10760 (12/14/2020)

On December 14, 2020, Mr. Wright exhibited a black handgun in an angry and threatening manner toward five subjects standing near a vehicle. The subjects were in fear and hid behind the vehicle. Mr. Wright fled from deputies on foot and was apprehended. Mr. Wright was charged with Resisting Officer without Violence and Improper Exhibition of a Dangerous Weapon or Firearm. The case was closed and Mr. Wright received continued probation.

Mr. Wright's recent arrest was on November 22, 2021, for Possession of Cannabis and the case was no-filed (2021-CM-10388). Mr. Wright was the passenger in a vehicle during a traffic stop and had one live 9MM round of ammunition in his short's pocket. Mr. Wright was arrested with another male in the vehicle who was charged with Armed Possession of a Controlled Substance, Carrying Concealed Firearm, and Felon in Possession of a Firearm,

*-Mr. Wright has a total of 42 felony charges, 15 misdemeanor charges, 0 felony convictions, 0 misdemeanor convictions, and 7 felonies not adjudicated.*

### Robert Taylor Marcano (W/M DOB: 08/29/64)

### HCSO Case# 21-680670 / 2021-CF-12427 (10/11/2021)

On October 11, 2021, Robert Marcano was arrested for Possession of Heroin with Intent to Sell after a search warrant was conducted on his residence by deputies. The drugs were located in his bedroom. The case was no-filed-generic on October 28, 2021, which was 17 days after his arrest.

### HCSO Case# 21-758105 / 2021-CF-13794 (11/12/2021)

On November 12, 2021, a deputy conducted a traffic stop, in which Mr. Marcano was the sole occupant. During the stop, Mr. Marcano drove away while holding the deputy's arm. The deputy fell to the ground as the vehicle sped away. Other deputies in the area were able to locate Mr. Marcano a few miles away. During his arrest, Mr. Marcano was found to be in possession of multiple types of narcotics. He was subsequently charged with Aggravated Battery w/ Deadly Weapon on Law Enforcement Officer, Fleeing and Eluding, Resisting Arrest with Violence, Resisting Arrest without Violence, Possession of Heroin, Suboxone, Dilaudid, Morphine, Oxycodone, and Methamphetamine. Mr. Marcano was able to bond out after six days. This case is still pending.

### HCSO Case# 21-834833 / 2021-CF-15140 (12/14/2021)

On December 14, 2021, Mr. Marcano was the subject of another traffic stop. When he opened his glove box to obtain his registration, marijuana was seen. Mr. Marcano was ordered out of the

vehicle at which time he fled in his vehicle. Mr. Marcano was found a short distance away and arrested. A trafficking amount of Methamphetamine was located on his person. He was subsequently charged with Trafficking in Methamphetamine, Possession of a Controlled Substance, Fleeing to Elude, Tampering with Evidence. The case is still pending prosecution. Mr. Marcano is currently in jail.

*-Mr. Marcano has a total of 31 felony charges, 23 misdemeanor charges, 7 felony convictions, 8 misdemeanor convictions, and 9 felonies not adjudicated.*

### William Mason Kernodle (W/M DOB: 11/02/91), Criminal Registrant

#### HCSO Case# 20-724564 / 2020-CF-12927 (11/09/2020)

On November 9, 2020, William Kernodle and another defendant committed an armed robbery at 11018 E Highway 92. During the investigation, video surveillance of the incident was found which showed the robbery incident. The victim of this case was homeless. Mr. Kernodle was charged with Aggravated Assault with a Deadly Weapon and Robbery with a Deadly Weapon. The case was no-filed on these charges. A detective reached out to the SAO in reference to this case and it was explained to him since the victim was homeless, it would be too hard to prosecute the case.

#### HCSO Case# 21-9023 / 2021-CF-883 (01/05/2021)

On January 05, 2021, between 0000 hours and 0800 hours, the victim's vehicle was stolen. On January 7, 2021, detectives received information from Bill Grimm with the Florida Department of Transportation (FDOT) showing the stolen vehicle was scanned twice on the Polk Parkway. The first photograph, taken from the January 05, 2021 scan, showed what appeared to be a white male driving the vehicle with a large "B" on his left hand and characters on his left fingers. The photo from the second scan on January 06, 2021, showed the suspect to possibly be identified as Mr. Kernodle. A detective viewed recent photographs of Mr. Kernodle and noted the facial features, facial hair, and tattoos appeared to be identical to the suspect in the toll camera pictures. Specifically, the font style and placement of the "B" on Mr. Kernodle's left hand and characters on his left fingers. On January 22, 2021, the detective traveled to multiple addresses associated with Mr. Kernodle in an attempt to locate him and/or the victim's vehicle with negative results. The detective eventually met with a subject who was a cousin of Mr. Kernodle and has known him his entire life. The cousin viewed the January 05, 2021 toll camera picture and immediately recognized the driver as Mr. Kernodle. An arrest warrant was obtained and served on Mr. Kernodle. On February 10, 2021, the detective learned the SAO rescinded the arrest warrant for Mr. Kernodle and no-filed the case. The detective contacted an ASA on the case and learned it was the opinion of the SAO that the fact Mr. Kernodle was identified driving the victim's vehicle in Polk County the same day it was stolen, was insufficient evidence for a successful prosecution.

#### HCSO Case# 21-120484 / 2021-CF-2281 (02/22/2021)

DEF 002312

On February 22, 2021, William Kernodle broke into a business located at 11302 E US Highway 92. Once inside, Mr. Kernodle removed two sets of car keys to two vehicles there for repairs. Mr. Kernodle removed one vehicle and left it near the incident scene. Hours later, Mr. Kernodle was located by deputies within the vehicle. Additionally, his fingerprints were located within the business. The SAO no-filed this case. A detective reached out about this case and was not given a reason why it was no-filed.

### HCSO Case# 21-672425 / 2021-CF-12288 (10/07/2021)

On October 7, 2021, William Kernodle stole a vehicle from 11369 North Highway 301. Several hours later, Mr. Kernodle was found in possession of the vehicle near the incident scene. This case is still open.

*-Mr. Kernodle has a total of 14 felony charges, 3 misdemeanor charges, 8 felony convictions, 1 misdemeanor conviction, and 6 felonies not adjudicated.*

### Jose Virgilio Valerio Sanchez (W/M DOB: 06/08/96)

### HCSO Case# 21-381613 / 2021-CF-6943 (06/09/2021)

On June 9, 2021, Jose Valerio Sanchez took the victim's bike and when the victim made attempts to prevent this, Mr. Sanchez swung a hatchet at her. Mr. Sanchez then shoved the victim to the ground causing her to hit her head. Deputies located Mr. Sanchez nearby riding the victim's bike. There were four witnesses to the incident plus the victim. Mr. Sanchez was charged with Aggravated Assault with a Deadly Weapon, Robbery with a Deadly Weapon, and Battery. The case was no-filed on June 23, 2021, citing "lack of contact with the victim."

### HCSO Case# 22-9913 / 2022-CF-428 (01/11/2022)

On January 11, 2022, Mr. Sanchez was arrested for a series of burglaries that occurred at a storage unit facility. Multiple trailers and RVs were broken into and approximately $6700 worth of property was stolen. Mr. Sanchez placed multiple stolen items up for sale on Facebook Marketplace at which time detectives purchased these items. When detectives moved in to affect an arrest, Mr. Sanchez fled on foot but was caught at his residence. Mr. Sanchez was charged with Burglary of Unoccupied Conveyance (x6), Grand Theft ($5000-10,000), Dealing in Stolen Property, and Resist without Violence. The case is pending.

*-Mr. Sanchez has a total of 10 felony charges, 3 misdemeanor charges, 0 felony convictions, 0 misdemeanor convictions, and 0 felonies not adjudicated.*

DEF 002313