**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

ANDREW H. WARREN,          )
                            )
         Plaintiff,    ) Case No: 4:22cv302
                            )
        v.             ) Tallahassee, Florida
                            ) November 30, 2022
RON DESANTIS, individually and )
in his official capacity as   )
Governor of the State of     )
Florida,                 )
                            ) 9:00 AM
         Defendant.    ) VOLUME II
_____ )

**TRANSCRIPT OF BENCH TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE ROBERT L. HINKLE**
**UNITED STATES DISTRICT JUDGE**
**(Pages 274 through 523)**

Court Reporter:             MEGAN A. HAGUE, RPR, FCRR, CSR
                          111 North Adams Street
                          Tallahassee, Florida 32301
                          megan.a.hague@gmail.com

*Proceedings reported by stenotype reporter.*
*Transcript produced by Computer-Aided Transcription.*

```
1   APPEARANCES:

2   For the Plaintiff:        Perkins Coie LLP
                              By:  JEAN-JACQUES CABOU
3                                  MARGO R. CASSELMAN
                                   ALEXIS DANNEMAN
4                                  Attorneys at Law
                                   jcabou@perkinscoie.com
5                                  mcasselman@perkinscoie.com
                                   adanneman@perkinscoie.com
6                             2901 North Central Avenue
                              Suite 2000
7                             Phoenix, Arizona 85012

8                             Debevoise & Plimpton LLP
                              By:  ALEXANDRA P. SWAIN
9                                  SAMANTHA B. SINGH
                                   Attorneys at Law
10                                 apswain@debevoise.com
                                   sbsingh@debevoise.com
11                            919 Third Avenue
                              New York, New York 10022
12
                              Debevoise & Plimpton LLP
13                            By:  DAVID A. O'NEIL
                                   Attorney at Law
14                                 daoneil@debevoise.com
                              801 Pennsylvania Avenue NW
15                            Suite 500
                              Washington, DC 20004
16
                              Shumaker Loop Kendrick, LLP
17                            By:  MATTHEW T. NEWTON
                                   Attorney at Law
18                                 mnewton@shumaker.com
                              101 East Kennedy Boulevard
19                            Suite 2800
                              Tampa, Florida 33602
20

21
    For the Defendant:        GrayRobinson PA
22                            By:  GEORGE T. LEVESQUE
                                   Attorney at Law
23                                 george.levesque@gray-robinson.com
                              301 South Bronough Street
24                            Suite 600
                              Tallahassee, Florida 32301
25
```

1   <u>APPEARANCES (cont'd.):</u>

2

3   For the Defendant:      GrayRobinson PA
                      By:  JEFFREY M. AARON
                            Attorney at Law

4                            jeff.aaron@gray-robinson.com
                      301 East Pine Street

5                      Suite 1400
                      Orlando, Florida 32801

6

7                      Florida Attorney General's Office
                      Office of the Attorney General

8                      By:  HENRY C. WHITAKER
                            Attorney at Law

9                            henry.whitaker@myfloridalegal.com
                      P1-01

10                     The Capitol
                     Tallahassee, Florida 32399

11                     Florida Attorney General's Office
                     By:  DAVID M. COSTELLO

12                            Attorney at Law
                          david.costello@myfloridalegal.com

13                     3501 East Frontage Road
                     Suite 200

14                     Tampa, Florida 33606

15

16

17

18

19

20

21

22

23

24

25

1              **P R O C E E D I N G S**

2        (Call to Order of the Court at 9:00 AM on Wednesday,

3   November 30, 2022.)

4              THE COURT:  Good morning.  Please be seated.

5              Mr. Keefe, you are still under oath.

6              Mr. Cabou, you may proceed.

7              MR. CABOU:  Thank you, Your Honor.

8                    DIRECT EXAMINATION, Cont'd

9   BY MR. CABOU:

10  Q.   Good morning, Mr. Keefe.

11  A.   Good morning.

12  Q.   Sir, at the end of the day yesterday you reviewed a number

13  of policies from other State Attorney's Offices.  Do you recall

14  those?

15  A.   I do.

16  Q.   Those were about -- some of them were about marijuana and

17  some of them were about mandatory minimums.  Do you recall

18  those?

19  A.   I do.

20  Q.   And you told me, sir, if I understood your testimony

21  correctly, that none of those policies were problematic, or none

22  of those policies subjected the State Attorneys who authored

23  them to suspension because, in your view, they weren't a refusal

24  to enforce the law.  Is that a fair summary?

25  A.   It's a fair summary.

1    Q.   Okay.  And, in contrast, you said that the things that were

2    anti-Democratic, contributed to chaos and anarchy about

3    Mr. Warren's joint statements, for example, were a supposed

4    categorical refusal on his part through those statements to

5    enforce certain laws.  Do I have that right?

6    A.   Generally speaking, yes.

7    Q.   Okay.  Sir, are you familiar with Seminole County Sheriff

8    Dennis Lemma?

9    A.   I know who he is.

10   Q.   Okay.  Do you recall ever meeting him?

11   A.   I do.  I believe I have met him.

12   Q.   Now, are you aware that Mr. Lemma in about 2000, very

13   publicly, very clearly declared that he wouldn't enforce a

14   particular law if it were enacted?

15   A.   I did not know about Sheriff Lemma and what you speak of

16   until the deposition when you brought that up.  I was not aware

17   of it.  It was not during my time working for the State of

18   Florida.  I believe it was during the time that I was U.S.

19   Attorney that that statement was made by Sheriff Lemma, and I

20   know nothing more about it other than what came out -- or you

21   brought the issue up during my deposition.

22          THE COURT:  So that the record doesn't get messed up,

23   I think you said 2000.  You probably meant 2020.

24          MR. CABOU:  Thank you, Your Honor.  I apologize.

25

1   BY MR. CABOU:

2   Q.   Yes, that was 2020, not 22 years ago.

3        That statement by Mr. Lemma is in evidence.

4           MR. CABOU:   And let's take a look at

5   Plaintiff's Exhibit 38.

6           THE WITNESS:   38?

7        (Exhibit 38 played.)

8   BY MR. CABOU:

9   Q.   So that's a statement you hadn't seen before; right?

10  A.   I have not seen that video.   No, I have not.

11  Q.   Okay.   Sheriff Lemma said that not only would he not

12  enforce the proposed -- in the wake of the mass shooting here in

13  Florida, proposed registration of assault weapons law, not only

14  would he not enforce it, but, in his opinion, sheriffs across

15  the state wouldn't enforce it.

16       Did you hear about that refusal from the law enforcement

17  officers with whom you spoke in your look around the state that

18  we talked about yesterday?

19  A.   I did not.

20  Q.   Did you recommend suspending Mr. Lemma?

21  A.   I did not become aware of the statement by Mr. Lemma until

22  my deposition in this case back in October when you brought it

23  up, and -- is that your question?

24  Q.   Yeah.   Just -- you didn't -- you did not at any point

25  recommend suspending Mr. Lemma; correct?

Direct Examination - Mr. Keefe

1    A.   I have not.  If I am tasked or requested to look into the

2    situation with Sheriff Lemma, as I testified in my deposition,

3    that concerns me.  That statement would be of interest to me,

4    and it does concern me.  It occurred when I was the U.S.

5    Attorney.  It wasn't part of the scope of my work, but --

6    Q.   Okay.  Sir, you answered my question, which was yes or no.

7         Thank you.  I appreciate that.

8         Now, you do know Sheriff Chronister; right?

9    A.   I do.

10   Q.   Okay.  His deposition -- he's going to testify, or he has

11   testified in this matter, through his deposition.  And at his

12   deposition he confirmed that for many years he has had a program

13   in his county where anyone can turn in illegal narcotics to a

14   sheriff substation, with no questions asked, and instead of

15   being arrested, they will be taken to treatment.

16        Do you know that?

17   A.   I became aware of that.  I did, yes.

18   Q.   When did you become aware of that?

19   A.   Sometime in the early fall of this year.

20   Q.   Okay.  Let's take a look at Plaintiff's Exhibit 42.

21        This is a news article that we asked -- that is in evidence

22   as Exhibit 42.  We asked Mr. Chronister about it, and it

23   discusses this amnesty program that you and I just discussed.

24        Had you seen this news article as part of your look around

25   the state?

1  A.   I don't recall it.  I may have, but I don't recall it.

2  Q.   Okay.  And you said you first became aware of

3  Sheriff Chronister's program in early fall?

4  A.   I'm guessing.  It was later in the course of my work on

5  this project, but I don't recall exactly when that was.

6  Q.   Okay.  And just to be clear, did you recommend suspending

7  Mr. Chronister?

8  A.   No.

9  Q.   In fact, Mr. Chronister is the one who hosted the press

10  conference at which the Governor suspended Mr. Warren; is that

11  correct?

12  A.   It is.

13  Q.   Okay.  We talked yesterday about your look around the state

14  and you gave us a couple of names.  One of them I believe was

15  Preston Farrier; was that right?

16  A.   It was.

17  Q.   What specific law did Mr. Farrier say that Mr. Warren

18  refused to enforce?

19  A.   The conversation didn't get into the specifics of what

20  particular laws.

21  Q.   Okay.  Another person you spoke with was Rex Farrier; is

22  that right?

23  A.   Correct.

24  Q.   Did Mr. Rex Farrier give you any specific law that

25  Mr. Warren refused to enforce?

1    A.    Same answer.

2    Q.    The answer's no?

3    A.    That's correct.

4    Q.    Thank you.

5          You also spoke to Martin Garcia in your look around the

6    state; correct?

7    A.    Correct.

8    Q.    And did Mr. Garcia tell you any specific law that

9    Mr. Warren wouldn't enforce?

10   A.    No specific law, correct.

11   Q.    And Mr. Phil Dingle was the other name you gave us.  Did

12   Mr. Dingle tell you any specific law that Mr. Warren wouldn't

13   enforce?

14   A.    Same answer.

15   Q.    Which is no?

16   A.    Correct.

17   Q.    Now, sir, you told us that you spoke with former Tampa

18   police chief Brian Dugan in your look around the state; is that

19   right.

20   A.    That's true.

21   Q.    But you didn't speak to the current police chief?

22   A.    That's true.

23   Q.    Okay.  Did you speak to the chief before him, before

24   Mr. Dugan?

25   A.    I don't believe so.

```
 1   Q.   Okay.  That's Jane Castor.  Did you speak to her?

 2   A.   I don't believe so.

 3   Q.   So Mr. Dugan -- and was -- is it fair to say that Mr. Dugan

 4   expressed an opinion that -- I'm sorry.  Let me start again.

 5        Is it fair to say that Mr. Dugan was the source of your

 6   belief that you testified to yesterday that there was crime and

 7   violence in the city of Tampa?

 8   A.   He and Sheriff Chronister, correct.

 9   Q.   Okay.  The chief before Mr. Dugan was Ms. Castor.  Did you

10   speak to her?

11   A.   I did not.

12   Q.   Do you know what she's doing now?

13   A.   I believe she's the mayor.

14   Q.   Right.  After being police chief, they elected her mayor.

15        Do you think that suggests that the citizens of Tampa don't

16   think there's crime for which she should be blamed?

17   A.   I don't have an opinion.  I haven't followed Mayor Castor

18   or her policies or her views.  I don't know.

19   Q.   Okay.

20        Sir, when did the Governor make the decision to suspend

21   Mr. Warren?

22   A.   I don't know.

23   Q.   Who was present when he made that decision?

24   A.   I don't know.

25   Q.   Okay.  Let's move to something that I believe you do know.
```

Direct Examination - Mr. Keefe

1    Let's look at Joint Exhibit 30.

2         Sir, Joint Exhibit 30 is on the screen for you, and if

3    you'd prefer, there's a hard copy, and I'll be happy to give you

4    a minute.

5    A.    I got it.

6    Q.    Do you recognize Joint Exhibit 30?

7    A.    I do.

8    Q.    Okay.  These are emails from you that were produced in this

9    litigation; correct?

10   A.    They are.

11   Q.    If we scroll down a couple of pages, I believe this here,

12   page 2.

13        Sir, is page 2 the beginning of the first draft of the

14   Executive Order that you wrote?

15   A.    I believe so.

16   Q.    And you wrote that on or about July 13th; is that correct?

17   A.    That sounds about right.

18   Q.    In setting out the reasons for suspension in this first

19   draft, does it mention any FJP letter other than the abortion

20   statement?

21   A.    No.

22   Q.    Is it fair to say that the precipitating trigger for you

23   that got you to start drafting the -- this document, this first

24   draft, was the FJP abortion statement?

25   A.    No.  The reason that it was in this first draft is to me it

 1   was the most clear, specific, unambiguous in relation to an

 2   existing statute promulgated by the Florida Legislature.  It was

 3   the number one showcase example of the mindset that Mr. Warren

 4   had that was of concern to me.

 5   Q.   Okay.  Let's review what you said about that at your

 6   deposition, which is clip 46.

 7        (Clip 46 played.)

 8   BY MR. CABOU:

 9   Q.   So does that refresh your recollection about what you told

10   me at your deposition?

11   A.   To me they're completely reconciled; they're not

12   inconsistent.

13   Q.   Okay.  So you agree with the testimony you gave at your

14   deposition?

15   A.   I believe that my testimony here a moment ago and what I

16   said in the deposition are harmonious.

17   Q.   Okay.  Does this draft, this first draft that we're looking

18   at that starts on page 2 of Joint Exhibit 30 --

19           MR. CABOU:  And if we could get that back up, that

20   would be great.

21   BY MR. CABOU:

22   Q.   Does this first draft mention any -- does it mention the

23   bike stop policy?

24   A.   No.

25   Q.   Does it mention the low-level offense policy?

1  A.   No.

2  Q.   Does it mention the prosecutorial discretion policy?

3  A.   No.

4  Q.   Does it mention any document other than the abortion

5  statement?

6  A.   I don't believe so.

7  Q.   Okay.  The second draft is a few pages further down, I

8  believe.  Let's scroll to that, please.

9  A.   Is this Bates 30.013?

10 Q.   I believe that it is.

11 A.   Yep, it is.

12 Q.   Yes.  Thank you.

13      This is the second draft, the transmittal email -- and I'm

14 sorry.  Just so that folks here are clear on what you told us at

15 your depo, sir, was it your practice to email yourself the draft

16 to sort of preserve it?

17 A.   Pretty much, yeah.

18 Q.   And on page 30.012, this email was to you from you on

19 July 19th; correct?

20 A.   It is.

21 Q.   And the attachment to that email was this second draft that

22 we're about to review; is that right?

23 A.   I believe so.

24 Q.   This also relies exclusively on the abortion statement;

25 correct?

1   A.   I believe so.

2   Q.   Well, actually to be clear --

3   A.   No, hold on.  Sorry.

4   Q.   Sorry.

5   A.   No, I think this has the death penalty in it.

6   Q.   Yes.  Okay.  First of all, the subject of this draft that's

7   on page 30.012 is AW-719.  Is that Andrew Warren, July 19th?

8   A.   I think so.

9   Q.   Now, this draft adds additional references to additional

10  FJP statements; is that correct?

11  A.   I believe so.  I have to refresh myself real quick.  This

12  has the death penalty.  It has transgender and the abortion,

13  yep.

14  Q.   And just to confirm that we're both of that opinion -- you

15  can look on page 30.019.  It lists three exhibits -- A, B, and

16  C -- and they correspond with the policies you just listed; is

17  that correct?

18  A.   That's correct.

19  Q.   Now, in addition to these three statements from FJP, it

20  also includes on page 019 several other recitals relating to

21  George Soros.

22       Do you see that?

23  A.   I do.

24  Q.   So who's George Soros?

25  A.   I've come to know much more about him during the course of

1    this.  My present understanding is he is a donor/contributor to

2    various causes -- political causes and endeavors.

3    Q.   Okay.  You noted, for example, that -- in this draft of the

4    suspension order, you noted that Mr. Warren has publicly

5    acknowledged that Soros-affiliated entities have funded his

6    political activities.

7         Do you see that?

8    A.   I do.

9    Q.   And you noted that *Soros has supported Warren and other*

10   *"progressive prosecutors" through a series of shell*

11   *organizations,* among other things.

12        Do you see that?

13   A.   I do.

14   Q.   And you used the word -- phrase "progressive prosecutor,"

15   in quotes?

16   A.   I did.

17   Q.   What did you mean by those quotes?

18   A.   I believe that this was largely drawn from either a

19   *New York Times* article or a *Washington Post* article that had

20   done a deep dive into the relationship between Soros and

21   progressive prosecutors, and I believe in that article

22   Mr. Warren is quoted as saying that he received Soros money

23   through the Florida Democratic Party and that he believed that

24   Mr. Soros, thus, was a donor/contributor to Mr. Warren.

25   Q.   Okay.  But my question was about why you used quotation

1    marks around the phrase "progressive prosecutors."

2         Do you recall why you did that, sir?

3    A.   Because I believe it was a term of art used in the article

4    and various other places I was looking in the course of my

5    research.  That was a term or a descriptor or a phrase used for

6    prosecutors that implemented and internalized Mr. Soros's views

7    on criminal prosecution.

8    Q.   Why did you add these references to Mr. Soros in the

9    Executive Order?

10   A.   Because in study and the work that I had done with regard

11   to Mr. Warren and these FJP joint statements, I was doing

12   everything I can to try to find out and understand why, what

13   was -- what were the circumstances, what were the -- what was

14   happening.

15        And based on all the look and inquiry that I did, it

16   appeared to me that Mr. Warren -- and the word that I chose to

17   use -- had ceded his power and authority as the State Attorney

18   in Tampa to be an expresser or a conduit for Mr. Soros's world

19   views on criminal prosecution.

20   Q.   I think in your deposition you say you were trying to

21   figure out the cause of this alarming behavior.  Do you remember

22   telling me that?

23   A.   I -- that sounds like something that I would probably say,

24   but I don't know without looking back at what exactly I said.

25   But I embrace that, yes.  I feel that way.  That's true.

Direct Examination - Mr. Keefe

1   Q.   Just to be clear, though, sir, can you identify even one

2   case in which Mr. Warren's prosecutorial decision-making was

3   influenced by the abortion statement?

4   A.   My look did not get into that depth, no.

5   Q.   And with regard to the statement on transgender care, can

6   you identify any specific case in which Mr. Warren's

7   prosecutorial decision-making was influenced in any way by the

8   statement on transgender care?

9   A.   No.

10  Q.   And, sir, am I correct that the only outside document

11  referenced in every draft of the Executive Order, from your

12  first draft through the final draft that suspended Mr. Warren,

13  is the FJP abortion statement?

14  A.   That's true.

15  Q.   Okay.  Let's summarize.

16       You testified that you did not conduct an investigation;

17  correct?

18  A.   True.

19  Q.   You testified that you looked around the state; correct?

20  A.   True.

21  Q.   You did it in an ad hoc way; is that correct?

22  A.   By my definition of ad hoc, yes.

23  Q.   You chose who to talk to; correct?

24  A.   I did.

25  Q.   And who not to talk to?

Direct Examination – Mr. Keefe

1   A.   Well, I would talk to someone, and then someone would

2   suggest that I talk to someone else that I would not have talked

3   to but for the first person who suggested that I talk to them.

4   Q.   But you still made the choice to talk to every single

5   person; right?

6   A.   I did.

7   Q.   No one ordered you to talk to any particular person?

8   A.   That's true.

9   Q.   You didn't keep any written records?

10   A.   Nope.

11   Q.   You didn't speak to Mr. Warren?

12   A.   Nope.

13   Q.   You didn't speak to anyone in his office?

14   A.   True.

15   Q.   You didn't speak to the current police chief in Tampa?

16   A.   True.

17   Q.   You didn't speak to former chief, now mayor, Castor?

18   A.   True.

19   Q.   And the precipitating trigger, as you said in your

20   deposition, to the draft was the abortion statement?

21   A.   To begin drafting the proposed Executive Order, yes, it was

22   at or near the time of the abortion statement, but that was not

23   the only factor in my decision to begin drafting.

24   Q.   I understand.  But just to be clear, the precipitating

25   trigger, as you said in your deposition, was the abortion

Direct Examination - Mr. Keefe

1   statement?

2   A.   My testimony is just what I described.

3   Q.   Okay.

4            MR. CABOU:  Your Honor, we have no further questions

5   at this time for Mr. Keefe.

6            THE COURT:  Before I turn to cross, let me ask a

7   question I could save until later.

8            Who did you talk to who was not a Republican?

9            THE WITNESS:  I believe the sheriff in Orlando is not

10  a Republican.  I don't know that for certain, but I believe that

11  Sheriff Mina -- I think he is a Democrat, the sheriff in the

12  Orlando area.

13           THE COURT:  What did he tell you?

14           THE WITNESS:  He shared with me and discussed with me

15  the prosecutor in Orlando -- some concerns he had about the

16  prosecutor in Orlando, Monique Worrell.

17           THE COURT:  What did he tell you about Mr. Warren?

18           THE WITNESS:  That -- regarding Mr. Warren's

19  reputation as a prosecutor of the sort that I've described

20  during the course of my testimony.  His -- excuse me.  His --

21  Sheriff Mina's statements were consistent with those I heard

22  from around the state.

23           THE COURT:  I'm not asking about the prosecutor in

24  Orlando.  My question was what did the sheriff in Orlando tell

25  you about Mr. Warren?

Direct Examination - Mr. Keefe

1           THE WITNESS:  Yes, sir.  What the sheriff in Orlando

2    told me about Mr. Warren is that the sheriff in Orlando had

3    heard reputationally about Mr. Warren the same things that I've

4    expressed to the Court that had been said by other sheriffs and

5    other law enforcement people around the state, similar,

6    consistent things.

7           THE COURT:  Tell me your best recollection of what the

8    Orlando sheriff -- I guess that's Orange County --

9           THE WITNESS:  Yes, sir.

10          THE COURT:  -- sheriff said about Mr. Warren, not what

11   is consistent with, not everything you've said in your

12   testimony.  This is a specific question about a specific person.

13   I know you talked to a lot of people, so I'd be shocked if you

14   remembered exactly what everyone told you.  I just want to know

15   your best recollection specifically what that man said.

16          THE WITNESS:  I will do the best I can.

17          Can I add some things to help me remember while I'm

18   doing this or --

19          THE COURT:  I just want to know what he said.

20          THE WITNESS:  Yeah.  I called Sheriff Mina to ask him

21   the general question about State Attorneys that don't enforce

22   the law.  He had experience with -- and this is in the context

23   of he had -- the number one thing he said was presently right

24   now there was Mr. Warren in Tampa and Monique Worrell in his own

25   geographic area, that he had concerns that they were both what

Direct Examination - Mr. Keefe

1    he described as the Soros progressive prosecutors.

2              THE COURT:  He used that word, "Soros"?

3              THE WITNESS:  I believe he did.  I believe he did.

4    I'm doing the best I can to recollect one of many conversations.

5              And so whether we were talking specifically about

6    Mr. Warren or whether we were talking about Ms. Ayala, the

7    predecessor to Ms. Worrell, he was sharing with me the

8    difficulties he had in light of his position, his role in that

9    community with its demographic, if it's -- you know, its

10   culture, that to be a law enforcement sheriff is very difficult

11   in that environment, and that he was doing the best he could to

12   do his job and to enforce the law and be a sheriff in that

13   community.  But it was a very difficult situation that he had

14   been in and that he understood that Mr. Warren was of the same

15   mindset and had the same approach and reputationally had heard

16   the same things.  But Sheriff Mina was in a very difficult

17   political situation.

18             He went on to discuss some other things that, in your

19   judgment, may be tangential, not specific to Mr. Warren, that

20   I'm glad to share with you, but I don't want to exceed the scope

21   of what it is you seek from me.

22             THE COURT:  No, I just wanted to know what he said.

23   So he told you about the reputation and what he had heard.

24             He didn't tell you who he heard it from?

25             THE WITNESS:  Not that I recollect, sir.

Direct Examination - Mr. Keefe

1          THE COURT:  You listed four people who were not in law

2     enforcement, not prosecutors.  Any of those Democrats?

3          THE WITNESS:  I do not believe so.

4          THE COURT:  Any of those who have not been active in

5     Republican politics or contributing to Republican candidates?

6          THE WITNESS:  Those four, yes, are probably

7     contributors to Republican candidates, but, Your Honor, I spoke

8     with other people.  I just simply can't remember all those

9     people with whom I spoke.

10          THE COURT:  I'm just trying to find anybody who is not

11     a Republican -- who is not actively involved in Republican

12     politics or a Republican contributor that you talked to.

13          THE WITNESS:  I may well have.  My wife is a Democrat.

14     One of my four sons is a Democrat.  I interact and speak with

15     Democrats, and I may well have.

16          THE COURT:  You probably didn't ask them about

17     Mr. Warren.

18          THE WITNESS:  I did not.

19          THE COURT:  You can't give me the name of a single

20     Democrat, other than the sheriff of Orange County, that you

21     talked to about Mr. Warren?  Is that true or not true?

22          THE WITNESS:  That's true.

23          THE COURT:  You said you didn't do an investigation.

24     Your background, of course, was being the U.S. Attorney.  If you

25     were the U.S. Attorney setting up a criminal case, you would

 1   never do an investigation talking just to people on one side of

 2   the issue; is that true?

 3              THE WITNESS:  That's true.

 4              THE COURT:  And so you didn't try to do the kind of

 5   investigation that you would do in a criminal case to determine

 6   whether there was a basis to proceed; is that true?

 7              THE WITNESS:  That's true.

 8              THE COURT:  That's the questions I have.

 9              Cross-examine?

10              MR. LEVESQUE:  Certainly.

11                          CROSS-EXAMINATION

12   BY MR. LEVESQUE:

13   Q.   Good morning, Mr. Keefe.  You were asked some questions

14   about who you spoke with in the process.  If you could refer to

15   Plaintiff's Exhibit 3 and flip to page 6 of that exhibit.

16   A.   Okay.

17              MR. LEVESQUE:  If we could scroll in the exhibit as

18   well.

19   BY MR. LEVESQUE:

20   Q.   In these interrogatories -- these were interrogatories that

21   we had responded in terms of who people in the Governor's Office

22   had spoke to related to the suspension of Mr. Warren.

23              MR. LEVESQUE:  And if we could scroll down to page 6.

24              And stop right there.

25   BY MR. LEVESQUE:

 1  Q.   So in going through this list, did you speak with -- you

 2  did speak with Sheriff Chronister.

 3       Do we know what his political affiliation is?

 4  A.   I don't.

 5  Q.   When you were speaking to people about Mr. Warren, did you

 6  ask them about their political affiliation?

 7  A.   I did not.

 8  Q.   Did you speak with Mr. Dugan about Mr. Warren in your

 9  investigation?

10  A.   I did.

11  Q.   And did you speak with Sheriff Nocco in your investigation?

12  A.   I did.

13  Q.   Did you speak with Sheriff Grady Judd in your

14  investigation?

15  A.   I did.

16       MR. CABOU:   Objection, Your Honor.   There is no

17  testimony that there was an investigation.

18       MR. LEVESQUE:   I apologize, Your Honor.   I'll amend my

19  question.

20  BY MR. LEVESQUE:

21  Q.   In your review of State Attorneys, did you speak with State

22  Attorney General Ashley Moody?

23  A.   I did.

24  Q.   Did you speak with Mr. Guard in her office related to your

25  view of State Attorneys?

1   A.   Yes, I did.

2          MR. LEVESQUE:  Scroll down a little bit.

3   BY MR. LEVESQUE:

4   Q.   Did you speak with Mr. -- Representative Beltran?

5   A.   Not to my knowledge.

6   Q.   Okay.  Did you speak with State Attorney Lopez --

7   A.   I did --

8   Q.   -- in your --

9   A.   -- but not during the investigative --

10  Q.   Okay.  And my questions are only referring to the

11  investigative review.

12          THE COURT:  You are --

13          MR. LEVESQUE:  I'm sorry.  The statewide review.

14          I apologize, Your Honor.

15  BY MR. LEVESQUE:

16  Q.   In your review of State Attorneys, did you speak with Matt

17  Dunagan from the Florida Sheriffs Association?

18  A.   I did.

19  Q.   Did you speak with State Attorney Ginger Bowden Madden --

20  A.   I did.

21  Q.   -- in your review?

22  A.   I did.

23  Q.   In your review of State Attorneys, did you speak with David

24  Folsom?

25  A.   I did.

Cross-Examination – Mr. Keefe

1    Q.   Did you speak with Sheriff Chip Simmons --

2    A.   I did.

3    Q.   -- from Escambia County?

4         Did you speak with Sheriff Bob Johnson?

5    A.   I did.

6    Q.   Did you speak with Sheriff Eric Aden?

7    A.   I did.

8    Q.   Did you speak with Sheriff Tommy Ford?

9    A.   I did.

10   Q.   Did you speak with State Attorney Larry Basford?

11   A.   I did.

12   Q.   Did you speak with State Attorney Jack Campbell?

13   A.   I may have communicated with him via text.  I don't

14   remember a conversation with him.

15   Q.   Have you ever discussed Mr. Warren with Mr. Campbell?

16   A.   I don't recollect.

17   Q.   Did you speak with Mr. Mark Glass at Florida Department of

18   Law Enforcement in your investigation?

19   A.   I did.

20   Q.   Did you speak with Shane Desquin from the Florida

21   Department of Law Enforcement?

22   A.   I did.

23   Q.   Did you speak with State Attorney Melissa Nelson?

24   A.   I did.

25   Q.   Did you speak with L. E. Hutton, the chief of staff in her

1  office?

2  A.   I did.

3  Q.   At any point did you ask either of them their political

4  affiliation?

5  A.   I never asked any of them their political affiliation.

6  Q.   Did you ask Sheriff Smith in Franklin County?

7  A.   Did I ask him or did I speak to him?

8  Q.   Did you ask him about Andrew Warren?

9  A.   Oh, I did.

10  Q.   Did you ask him about other State Attorneys?

11  A.   Yes.  I'm sorry.  My conversations with sheriffs were

12  typically, Do you know of any State Attorneys in the state of

13  Florida, reputationally or otherwise, that are not enforcing the

14  law?

15      And then, as I've testified, all roads would lead to -- and

16  I cannot think of an exception -- Andrew Warren, and then there

17  would be discussion about Warren.  I had such a conversation

18  with Sheriff A.J. Smith.

19  Q.   Was he the only one that was identified in any of your

20  conversations with sheriffs across the state?

21  A.   I'm sorry?

22  Q.   Was he the only State Attorney that -- whose name ever came

23  up in conversations with sheriffs across the state?

24  A.   With this particular sheriff or --

25  Q.   With any of the sheriffs that you spoke with.  Was it only

Cross-Examination – Mr. Keefe

1   Mr. Warren, or were there any other names that would sometimes

2   come up?

3   A.   As I mentioned to the Judge during his inquiry, Sheriff

4   Mina in Orange County, whose political affiliation I do not

5   know, brought up Ms. Worrell, the prosecutor in -- I believe

6   that's the Ninth Circuit, Orlando area.

7   Q.   And so looking at the list there -- Sheriff Mina, Sheriff

8   Gualtieri, Sheriff Marceno, Sheriff Ramsey -- did you speak with

9   all of them related to State Attorneys in Florida and whether

10  they were prosecuting the law?

11  A.   I did.

12  Q.   Did you speak with Sheriff Ivey, Sheriff Williams, and

13  Sheriff Hunter about State Attorneys who may not be enforcing

14  the law?

15  A.   I did.

16  Q.   Did you speak with Sheriff McCallum, Sheriff Schultz about

17  State Attorneys who may not be enforcing the law?

18  A.   I did.

19  Q.   Did you speak with Ms. Lopez about U.S -- I'm sorry --

20  State Attorneys that may not be enforcing the law?

21  A.   I did.

22  Q.   Did you speak with Mr. Sukhia --

23  A.   I did.

24  Q.   -- about --

25  A.   I'm sorry.

Cross-Examination - Mr. Keefe

1   Q.   -- about State Attorneys who may not be enforcing the law?

2   A.   I did.

3   Q.   Did either of them provide names or identify Mr. Warren?

4   A.   Ms. Lopez knew of Mr. Warren.  She was the U.S. Attorney --

5   when I was a U.S. Attorney for the Northern District of Florida,

6   she was the U.S. Attorney for the Middle District of Florida.

7   She knew of Mr. Warren.

8        I'm sorry.  What was your --

9   Q.   Well, did you discuss Mr. Warren with Ms. Lopez?

10  A.   I did.

11  Q.   And what did she relay?

12  A.   That he had the -- her view was similar to that which I've

13  expressed a number of times.  I cannot specifically recollect

14  the actual words that she used.  She ultimately ended up signing

15  off as an amicus to the Florida Sheriffs Association brief.  We

16  had discussions, but she shared the views that I cannot

17  specifically recollect at this time.  There were so many of

18  these conversations.

19  Q.   Did you speak with Mr. Weisman, the chief of staff in the

20  State Attorney's Office, in your investigation -- in your review

21  phase?

22  A.   Not during the review phase.

23  Q.   Did you speak with Mr. Gladson in the review phase, the

24  State Attorney for the Fifth Judicial Circuit?

25  A.   I did.

Cross-Examination – Mr. Keefe

1   Q.   Did you speak with State Attorney Bruce Bartlett related to

2   other State Attorneys, including Mr. Warren, who may not have

3   been enforcing the law?

4   A.   I did.

5   Q.   Did you speak with Mr. Larizza, the State Attorney from the

6   Seventh Judicial Circuit --

7   A.   I did.

8   Q.   -- related to your review?

9   A.   I'm sorry.

10  Q.   Did you speak with State Attorney Brian Kramer?

11  A.   I did.

12  Q.   Did you speak with State Attorney Brian Haas?

13  A.   I did.

14  Q.   Did you speak with State Attorney Ed Brodsky?

15  A.   I did.

16  Q.   Did you speak with State Attorney Dennis Ward?

17  A.   I did.

18  Q.   Did you speak with State Attorney Tom Bakkedahl?

19  A.   I did.

20  Q.   Did you speak with State Attorney Ms. Fox?

21  A.   I did.

22  Q.   Did you speak with Mr. Antonacci?

23  A.   I did.

24  Q.   Did Mr. Warren's name come up in your discussion with

25  Mr. Antonacci?

1  A.   It did.

2  Q.   And what did Mr. Antonacci have to say?

3  A.   I cannot remember the specific words that Mr. Antonacci

4  said, but he was well familiar with Mr. Warren and shared the

5  views that he felt that Mr. Warren's approach to law enforcement

6  was a threat and was in conflict with and antagonistic to

7  protecting people and good law enforcement in Florida.

8  Q.   Did you speak with State Attorney Durrett in the Third

9  Judicial Circuit?

10  A.   I did.

11  Q.   Did you speak with State Attorney Archer?

12  A.   I did.

13  Q.   Did you speak with Anthony Pedicini as part of your

14  investigation?

15  A.   I don't know him, and I don't believe I've ever spoken with

16  him.

17  Q.   And in terms of your investigation, I think the only two

18  remaining people are people in the Governor's office --

19        MR. CABOU:  I'm sorry.  Your Honor, objection.  There

20  is no testimony that there is an investigation --

21        MR. LEVESQUE:  I apologize, Your Honor.

22  BY MR. LEVESQUE:

23  Q.   As part of your review, did you speak with Mr. Pedicini?

24  A.   No.

25  Q.   And I believe the other two are law clerks in the Executive

1    Office of the Governor.  Did you speak with them related to

2    Mr. Warren?  Did they provide any information about Mr. Warren

3    as part of your review?

4    A.   I don't believe so.  One of them, Licata, I know who that

5    person is.  The other one, Leonardi, to my knowledge, I have

6    never met, seen and do not know who he is.  And I have never, to

7    my knowledge, ever communicated with them about this project.

8    Q.   Okay.  If we could -- if I could have you flip to Joint

9    Exhibit 41.001.

10   A.   Which exhibit?  Joint Exhibit what?

11   Q.   Joint Exhibit 41.

12   A.   Is that up here?  Is that up here?  Is that the one?

13   Q.   Yeah.  That's the one.

14   A.   I'll put these aside for a moment.

15          MR. LEVESQUE:  If we could scroll down just a little

16   bit more in the exhibit.

17          A little bit more.

18          And the original email.

19          And stop right there.

20   BY MR. LEVESQUE:

21   Q.   Do you recognize this email?

22   A.   Beginning here?

23   Q.   Yes, sir.

24   A.   It appears to be an email from me to Ryan Newman forwarding

25   another email.  Yes, I obviously wrote it.  Yes.

1   Q.   And the email that you are forwarding, what is that email?

2        And if we need to scroll down --

3   A.   I believe this is the newspaper article that -- yeah.  I

4   believe this is the newspaper article that came up during the

5   course of my testimony yesterday where local State Attorney Jack

6   Campbell was quoted and his picture was in a text message in

7   which Mr. Campbell said in regard -- I believe in the context of

8   the abortion statute that he would follow the law and enforce

9   the law.

10  Q.   Now, that's a June 30th email.  Had you already located the

11  Fair and Just Prosecution abortion statement by that time?

12  A.   I believe so.

13  Q.   And what is the headline of that news article that you were

14  forwarding to Mr. Warren?

15  A.   The heading is:  *With Florida's new abortion laws set to go*

16  *into effect, a local state attorney has vowed not to prosecute*

17  *abortion.  WMNF.*

18       That is what I'm forwarding to Ryan Newman on June the

19  30th.

20  Q.   Okay.  And you understood that article to be talking about

21  Mr. Warren; correct?

22  A.   That's what I recollect, yes.

23            MR. LEVESQUE:  If we could pull up Plaintiff's Exhibit

24  62.

25            If we could scroll down to the fourth page.

1   BY MR. LEVESQUE:

2   Q.   I think when we were looking at this there was a

3   representation that this text exchange may have been with

4   Ryan Newman, the Governor's chief of staff.  If I could ask you

5   to look at that last text there and read that text.

6   A.   The blue or the --

7   Q.   The gray one.

8   A.   *Please call when able re Tampa.*

9        *I think I resolved with Ryan and Taryn.  You need not call.*

10  *Thanks.*

11  Q.   And I believe, if I'm correct, your responses are going to

12  be on the left in gray and whoever you are texting with are

13  going to be on the right in blue.

14       With that caveat, does this refresh your recollection as to

15  whether that text exchange was with Ryan or someone else?

16  A.   Is there anything more below here that I can see?

17  Q.   I think it goes on to another exhibit.

18  A.   Okay.  Can you scroll up to the top and just let me see it

19  all at one time again?

20       Yeah.  I think this is a text from me to the Chief of Staff

21  James Uthmeier telling him I don't need to speak to him because

22  I've already spoken with Ryan Newman and Taryn Fenske, the

23  general counsel and the comms director, about whatever it is we

24  were going to discuss.

25  Q.   And so that text exchange where you had referred -- or

1   forwarded an article in the text -- if we could control back up

2   to page 1 of that text -- that article you are sending is

3   actually being sent to James Uthmeier, the chief of staff?

4   A.   That's correct.

5          MR. LEVESQUE:  And if we could pull up

6   Plaintiff's Exhibit 11.

7   BY MR. LEVESQUE:

8   Q.   Yesterday you were shown several policies of different

9   State Attorneys.

10      Do you recognize this particular policy?

11   A.   I think it is Jack Campbell, the State Attorney here in

12   Tallahassee area, a document from him relating to marijuana

13   prosecutions in the state system.

14   Q.   When you were canvassing the law enforcement community

15   about State Attorneys, were you aware of this policy?

16   A.   I was aware that various State Attorneys in the state of

17   Florida, including Mr. Campbell, back in the 2019 time frame

18   where the hemp issue arose, that there was a great degree of

19   controversy in the law enforcement community, federal, state and

20   local, on what would be done with marijuana prosecutions in the

21   state system.  And there were various policies from various

22   State Attorneys around the state on how to deal with that

23   problem.

24   Q.   But in terms of having a personal knowledge of this

25   particular policy, were you aware that it existed?

1    A.    Yes.

2              MR. LEVESQUE:   Okay.   If we could scroll down.

3    BY MR. LEVESQUE:

4    Q.    As part of your review, did you review this policy?

5    A.    When -- you finished with your question?

6    Q.    Yes, sir.

7    A.    When I was the United States Attorney, I had presented to

8    me, I believe, this particular policy on marijuana prosecution

9    from Mr. Campbell and a number of others because there were a

10   number of State Attorneys in the state of Florida that had

11   ceased prosecuting marijuana cases.   And there was a request by

12   federal, state and local law enforcement that I do so even in

13   situations where the federal Department of Justice would not do

14   so.

15   Q.    But in terms of your view of State Attorneys, did you

16   review this specific policy when you were looking at State

17   Attorneys across the state and talking about -- talking to

18   people about whether there are State Attorneys who are not

19   enforcing the law?

20   A.    No.   I already had it in my mind.   When I began this

21   project, this look into State Attorneys, this whole notion of

22   what is the role of a state prosecutor, what are the bounds and

23   parameters and what they can or can't do, I had in my head -- I

24   had lived experience with regard to my role as a federal

25   prosecutor, and I was fully aware that the State Attorneys had

1  dealt with these issues of whether to prosecute or not or

2  whether they felt they could prosecute or not marijuana cases.

3  I already knew this stuff well before when I was a U.S.

4  Attorney, well before I came into this particular project

5  working for the State.

6  Q.   Got it.

7        So just as a broad category then, marijuana policies are

8  something that would be a different bird than when we're talking

9  about, say, a blanket policy on abortion or a presumption of

10  nonprosecution policy for certain low-level crimes or bike

11  stops?

12  A.   Absolutely.

13  Q.   If I could also ask you to look on that page, the part that

14  I'm highlighting.  And in that document, it says:  *It is clear*

15  *that cannabis is still illegal, and I intend to enforce the law*

16  *as written.*

17        Is that the type of statement in the policy that would give

18  you some comfort that the State Attorney would be enforcing the

19  law?

20  A.   It did.  And I worked very closely with State Attorney

21  Campbell on this issue, and we grappled with and went back and

22  forth on the importance, even when there were obstacles

23  encountered in terms of prosecution, always -- particularly in

24  outward publications to the public, making clear that there was

25  going to be individualized assessment and analysis and use of

1   discretion in each case.

2        And Mr. Campbell was very mindful that it is not the

3   prerogative of a State Attorney to declare an entire criminal

4   statute to be null and void and not enforceable.  He and I

5   discussed those issues at length during the time frame that I

6   was U.S. Attorney and he was and still is the State Attorney

7   here in Tallahassee.

8             MR. LEVESQUE:  If we could pull up Plaintiff's Exhibit

9   13.

10  BY MR. LEVESQUE:

11  Q.   This is the State Attorney's Office manual from State

12  Attorney Gladson's office.

13       Were you aware of this policy when you were conducting your

14  review?

15  A.   I very may well have been.  I don't specifically recollect

16  it.

17  Q.   And what about Plaintiff's Exhibit 14?

18            MR. LEVESQUE:  If we could pull that up.

19  BY MR. LEVESQUE:

20  Q.   Do you recall looking at this policy yesterday?

21  A.   I believe so, yes.

22  Q.   And were you aware of this policy?

23  A.   I don't believe so.

24  Q.   In looking at that policy, is that a policy that would be

25  of a concern to you?

1   A.   No.

2   Q.   Why not?

3   A.   When you have State Attorneys that acknowledge the validity

4   and the legitimacy of a state criminal statute, and they're

5   coming up with ways to achieve justice in the course of that

6   case, without declaring the underlying law to be null, void, and

7   invalid, it's quite common and I think entirely appropriate to

8   come up with pretrial intervention and other types of diversion

9   programs.  I don't think that's repugnant to heeding the will of

10  the legislature with a duly promulgated statute.

11  Q.   Now, yesterday, and even again this morning somewhat, there

12  were some policies that were discussed and shown to you.

13       Do you have any information about how those policies are

14  actually implemented in any of the various State Attorneys'

15  Offices?

16  A.   I do not.  I mean, I don't recollect specifically the

17  testimony and the line of questioning earlier as it pertains to

18  your question.  But, no, I did not get into each different State

19  Attorney's Office and how they exercise their policies and

20  procedures in regard to determining which cases will be brought

21  for prosecution or not on a case-by-case basis.  I did not

22  pursue that.

23  Q.   And do you know if those offices have other policies that

24  might override or modify the way -- the policies that we've

25  looked at yesterday and today?

1    A.    I'm not sure I follow your question.

2    Q.    Are you aware if those various State Attorneys' Offices may

3    have additional policies that might modify or alter the way the

4    policies that we looked at yesterday and today are implemented?

5    A.    I don't know.

6    Q.    Now, you've been asked some questions about your work as a

7    prosecutor.

8          What were the dates of your service for the U.S. Attorney's

9    Office?

10   A.    January of 2019 until the last day of February 2021.

11   Q.    And I will represent that the *Ayala v. Scott* decision that

12   has been discussed a few times and I believe even brought up in

13   your testimony came out on August 30, 2017.

14         Would that state Supreme Court opinion have governed your

15   contact -- conduct as a State Attorney -- as a U.S. Attorney?

16   A.    No.

17   Q.    Why not?

18   A.    The state system of prosecution is fundamentally and

19   distinctly different than the Department of Justice and the 93

20   U.S. Attorneys that work in the Department of Justice in terms

21   of their approach and their policies and how they operate,

22   completely different animals.

23   Q.    Now, Mr. Keefe, when you were doing your review of State

24   Attorneys and began digging into specifically Mr. Warren, did

25   you review his Twitter account or his social media posts?

Redirect Examination – Mr. Keefe

1    A.    I did not.

2    Q.    Were you aware that Mr. Warren worked with law enforcement

3    to arrest a pastor that was holding church services in the midst

4    of a pandemic?

5    A.    I was not.

6    Q.    Were you aware that Mr. Warren called the Governor's entry

7    of an Executive Order that added attending religious services

8    conducted in churches, synagogues, and houses of worship to the

9    list of essential services a weak and spineless move?

10   A.    I was not aware of that.

11   Q.    Were you aware that Mr. Warren opposed House Bill 1, the

12   Anti-Riot Act?

13   A.    I was not.

14   Q.    Prior to focusing on Mr. Warren, were you aware that he was

15   a vocal opponent of the Governor or his policies?

16   A.    I was not.

17   Q.    When it comes to blanket policies, do blanket policies that

18   enforce the law create lawlessness?

19   A.    Not in my view.

20            MR. LEVESQUE:  No further questions, Your Honor.

21            THE COURT:  Redirect?

22                        REDIRECT EXAMINATION

23   BY MR. CABOU:

24   Q.    I'm going to ask that we look at Plaintiff's Exhibit 3,

25   which you reviewed at length just a moment ago.  These are the

1    interrogatory responses.

2         Do you have that in front of you, sir?

3    A.   I believe so.

4    Q.   Great.   Thank you.

5         Now, sir, I'm just going to start with a couple of

6    examples.   On page 8, 3.008, it says -- there's a listing for

7    Sheriff Eric Aden.

8         Do you see that?

9    A.   I do.

10   Q.   And am I pronouncing the sheriff's name correctly?

11   A.   You are.

12   Q.   Aden.   Thank you.

13        You spoke with Sheriff Aden during your review; correct?

14   A.   I did.

15   Q.   And what specifically did Sheriff Aden tell you about any

16   law in Mr. Warren's jurisdiction that he wouldn't enforce?

17   A.   I don't recollect the specifics of that call, but I'm

18   pretty sure Sheriff Aden didn't mention any particular specific

19   statute or law.

20   Q.   Okay.   And did you take notes of your call with Sheriff

21   Aden?

22   A.   I don't believe so.

23   Q.   Did you take notes of your call with any of the sheriffs

24   you mentioned on direct?

25   A.   I don't recall doing so.

Redirect Examination – Mr. Keefe

1   Q.   Do you think that would have helped you remember what they

2   said?

3   A.   I don't think the calls with the sheriffs got into

4   particularity in regard to specific examples or specific

5   instances that would have caused me to say, Hey, I want to take

6   a note of this so I don't forget this.  It was more general.  I

7   used the expression "reputational."

8   Q.   So, in general, Sheriff Aden and the others with whom you

9   spoke just talked about Mr. Warren's reputation amongst their

10  community?

11  A.   Yes.

12  Q.   Sir, I think we all have established that I am not from

13  Florida.

14       Where is Shalimar, Florida?

15  A.   Shalimar, Florida, lies in Okaloosa County.  It's my

16  hometown, home county.

17  Q.   Okay.

18       Do you know if Sheriff Aden as ever been to

19  Hillsborough County?

20  A.   Pretty sure he has, but I don't know that as a fact.

21  Q.   Do you know if he's ever worked in Hillsborough County?

22  A.   I don't know.

23  Q.   Okay.  Do you know if he's ever worked in law enforcement

24  in Hillsborough County?

25  A.   I don't know.

1   Q.   Of all the sheriffs you spoke to, other than, of course,

2   Sheriff Chronister in Hillsborough County and former Chief Dugan

3   in Tampa, do you know if any of those law enforcement officers

4   have ever been a law enforcement officer in Hillsborough County?

5   A.   I don't know.

6   Q.   I understand you might know Sheriff Aden better than most,

7   since he's from your home county, but do you know if the other

8   sheriffs you talked to have ever been to Hillsborough County?

9   A.   I don't know.

10  Q.   And none of those people provided any specific --

11  A.   Well, that's -- I'm sorry.  That's not true.

12       I'm aware that Sheriff Nocco in Pasco County and Sheriff

13  Gualtieri in Pinellas County and Sheriff Judd in Polk County had

14  been to Tampa.  I do know that as a fact.

15  Q.   And is that because they were invited to speak at the press

16  conference removing Mr. Warren?

17  A.   I believe that, distinct from that, that they are in

18  adjacent counties, and I've been there and near and around them.

19  And I can qualify my testimony.  There are very likely instances

20  that I can sit here and think of where I have seen sheriffs from

21  other counties that I spoke to about the situation with

22  Mr. Warren that have been to Hillsborough County.

23  Q.   Okay.  Now, in the long list of State Attorneys that we've

24  reviewed -- I'm sorry.  In the long list we reviewed, there were

25  several State Attorneys; correct?

1    A.    Yes.

2    Q.    Do you recall specifically speaking to any State Attorney

3    who is a Democrat in the course of your review?

4    A.    I honestly don't know whether the ones that I spoke with

5    were Republicans or Democrats.  Some of them I know for sure

6    were Republicans, but others with whom I spoke I don't know.  I

7    don't know what their political affiliation is.

8    Q.    Okay.  My understanding is that the -- let's skip that.

9          Sir, let's talk about policies and the difference between

10   policy and practice.

11         Can we see Plaintiff's Exhibit 11, please, which you also

12   reviewed on direct?

13   A.    I see it.

14   Q.    On direct you highlighted a sentence -- I'm sorry.  I'm

15   making a mess of things.

16         MR. CABOU:  Okay.  If we could scroll down.

17   BY MR. CABOU:

18   Q.    You highlighted a sentence that you said gave you comfort;

19   is that right?

20   A.    Well, there was a sentence, I believe, that Mr. Levesque

21   highlighted.

22   Q.    I'm sorry.

23   A.    Yes.

24         MR. CABOU:  I think it's a little bit further down.

25   Maybe on the next page, please.  My apologies.

 1   BY MR. CABOU:

 2   Q.   Right here.

 3   A.   Correct; I see it.

 4   Q.   And that statement gave you comfort?

 5   A.   Well, I had a lot more dialogue with Jack Campbell than

 6   just looking at this memo and looking at that sentence.  That

 7   sentence is a manifestation of an ongoing dialogue I had with

 8   him about the importance -- even when there are challenges to

 9   prosecuting certain cases, you don't just quit and walk away and

10   declare the statute meaningless.  You do everything you can to

11   try to move forward and adapt to it and enforce the law.

12        And that was an ongoing theme of my discussion as a

13   United States Attorney and him as the State Attorney on how to

14   deal with the problem that we were in caused by that hemp issue.

15   Q.   Okay.  But here -- and -- so whether because of your

16   conversations with him or otherwise, when he wrote*: *It's clear*

17   *that cannabis is still illegal and I intend to enforce the laws*

18   *as written*, you took him at his word; right?

19   A.   I've never had a reason to doubt Jack Campbell's word.

20   Q.   Okay.  But, yet, we've reviewed in evidence, including

21   through -- with you earlier, Mr. Warren had a number of written

22   policies, including the bike stop policy, including the

23   low-level offense policy, and the pièce de résistance which was

24   the general prosecutorial discretion memo.

25        You didn't believe those; right?

Redirect Examination - Mr. Keefe

1   A.   I did not believe that when Mr. Warren made the statement

2   that he made, particularly on his policy statement and the joint

3   statement with regard to abortion and transgender rights -- I

4   did not believe that that statement was overcome or undercut or

5   vitiated by any previous policy statements that Mr. Warren had

6   in his office that said, In every case we will approach each

7   case with an individualized assessment of the case.

8        I believed that Mr. Warren was expressing his intentions

9   and his plans very clearly, openly, notoriously, and

10  contumaciously, as I said, in those policy statements, and I did

11  not believe that that was impacted by what I call an inoculating

12  incantation at page 2 of a nine-page 2001 policy memo back at

13  the office.

14       That was my belief and it is my belief.

15  Q.   And it was, in part, your conversations, your ongoing

16  dialogue with State Attorney Campbell that gave you comfort in

17  what he meant when he had his policy; correct?

18  A.   These are so fundamentally dissimilar --

19  Q.   Sir, that wasn't my question.  It was, in part, your

20  conversation with State Attorney Campbell that gave you comfort

21  about his actual practice in enforcing the law?  Yes or no.

22  A.   It was an ongoing relationship.

23  Q.   So the answer to my question is "yes"?

24  A.   I'm not really quite sure I follow your question.

25  Q.   Sir, you said a moment ago that your conversations and

Redirect Examination - Mr. Keefe

1   ongoing dialogue with State Attorney Campbell gave you comfort

2   as to his actual approach in enforcing the law; correct?

3   A.   We were working together to try to enforce the law.

4   Q.   So the answer is "yes"?

5   A.   True, yes.

6   Q.   But yet you didn't speak to Mr. Warren at all; correct?

7   A.   I did not speak to Mr. Warren --

8   Q.   I understand.

9   A.   -- who was declaring he would not enforce the law.

10  Q.   Sir, there's no question pending.

11       Does it matter how a policy is carried out in practice as

12  opposed to just what's written on the paper?

13  A.   Does it matter?

14  Q.   Yeah.

15  A.   Yes, it would matter.

16  Q.   Okay.

17           MR. CABOU:  Your Honor, I have no further questions.

18           THE COURT:  I had one I didn't ask earlier.

19           I know you're familiar with state prosecutions in

20  connection with your role as the federal prosecutor.  You, of

21  course, have some overlap, and you've testified about some of

22  that.

23           Leaving out your experience as U.S. Attorney, tell me

24  who, if anyone, was involved in this decision-making for the

25  Governor who had ever been involved in state criminal

 1  prosecutions.

 2          THE WITNESS:  I'm recounting in my head who I believe

 3  may have been involved, because I don't know who was involved in

 4  the decision-making with the Governor.  I don't know that

 5  universe of people.  I can predict it.  I think I know.  So do

 6  you mind if I just go through my head each one and -- to try to

 7  answer your question that has some professional experience in

 8  state prosecutions?

 9          THE COURT:  Ever been a state prosecutor, ever been a

10  State Attorney, ever been a criminal defense lawyer.  Looking

11  for people who actually know what goes on in state criminal

12  courts.

13          THE WITNESS:  I don't know the backgrounds -- the

14  complete backgrounds of the people who I believe are likely,

15  because I don't know who was in the decision-making loop.  I

16  don't know who was in that room.

17          THE COURT:  I got it.  My only question is so far as

18  you know, who involved in the decision-making had any experience

19  in state criminal law?

20          THE WITNESS:  Can you give me a second to try to think

21  through each one of these people and what I know about their

22  backgrounds?

23          THE COURT:  Sure.

24          THE WITNESS:  I just don't know.  I don't know.

25          THE COURT:  So the answer is?

1            THE WITNESS:  I'm not aware of any.

2            THE COURT:  No expertise in that area that you know

3  of?

4            THE WITNESS:  Not that I know of.

5            THE COURT:  Questions to follow up on that?

6            MR. CABOU:  No, Your Honor.  Thank you.

7            THE COURT:  Mr. Levesque, questions to follow up on

8  mine?

9            MR. LEVESQUE:  Just briefly, Your Honor.

10                          EXAMINATION

11  BY MR. LEVESQUE:

12  Q.   To the extent that you're familiar with the background and

13  experience of Attorney General Moody, do you know if her

14  experience as a judge -- whether she served on the criminal

15  bench or had that experience?

16  A.   Yes.  And I'm sorry if that's -- I have no idea whether she

17  was in the decision-making loop with the Governor or not.  I do

18  not know who was in the decision-making loop with the Governor.

19       I'm trying to guess who it might have been, and for the

20  ones that I'm guessing in my head, I really don't know what

21  their backgrounds are.  Obviously with Attorney General Moody,

22  yes; any number of other people, it would be yes, but the ones

23  that I'm guessing were involved in the decision-making on this,

24  I just don't know.

25            MR. LEVESQUE:  And to be clear for Your Honor, I don't

1    want to mislead the Court in any way.  My question was sort of

2    like, more general.  I'm not aware that Attorney General Moody

3    was in the room at any time or that the Governor ever spoke with

4    her.

5           THE COURT:  She is a state judge in the criminal

6    division.  She certainly has experience with the state criminal

7    system.

8           MR. CABOU:  Your Honor, could I be heard on just one

9    follow-up question on that direct line of questioning?

10          THE COURT:  Sure.

11          MR. CABOU:  Thank you.

12                        EXAMINATION

13   BY MR. CABOU:

14   Q.   Sir, are you familiar with the motions practice in this

15   case regarding whether the Governor and Mr. Uthmeier would

16   testify here?

17   A.   Just what I read in the newspaper.

18   Q.   Okay.  The Governor and Mr. Uthmeier are not here, and in

19   part they argued that the three senior advisers who were most

20   responsible for the Executive Order of Suspension would be here.

21   And they named you, and they named Mr. Newman, and they named

22   Mr. Treadwell.  And you're all here, and we appreciate your

23   time.

24       Do any of the people the Governor identified in that

25   motions practice as being most involved in the decision-making

1  have, to your knowledge, specific state criminal prosecution or

2  other criminal law experience?

3  A.   I don't know.

4          MR. CABOU:  Thank you.

5          THE COURT:  That all for Mr. Keefe?

6          Thank you, Mr. Keefe.  You may step down.

7          THE WITNESS:  Yes, sir.

8      (Larry Keefe exited the courtroom.)

9          THE COURT:  Please call your next witness.

10         MR. CABOU:  Your Honor, the next witness will be

11  Andrew Madry.

12         Apologize for the delay, Your Honor.

13     (Andrew Madry entered the courtroom.)

14         THE COURTROOM DEPUTY:  Please remain standing and

15  raise your right hand.

16         **ANDREW MADRY, PLAINTIFF WITNESS, DULY SWORN**

17         THE COURTROOM DEPUTY:  Please be seated.

18         Please state your full name and spell your last name

19  for the record.

20         THE WITNESS:  Andrew Madry.  Last name is spelled

21  M-a-d-r-y.

22                    DIRECT EXAMINATION

23  BY MR. CABOU:

24  Q.   Good morning, Mr. Madry.  Thank you.

25     Mr. Madry, are you currently in school?

Direct Examination - Mr. Madry

```
 1   A.    Yes, I am.

 2   Q.    Where are you in school?

 3   A.    I'm a law student at Stetson University College of Law.

 4   Q.    And that's in Hillsborough County; right?

 5   A.    I believe it's in Pinellas County, sir.

 6   Q.    Okay.  Right next door?

 7   A.    Yes, sir.

 8   Q.    Great.

 9         Last summer did you work in the Executive Office of the

10   Governor?

11   A.    Yes, I did.

12   Q.    And at some point in your work in the Executive Office of

13   the Governor, did you learn of a plan to suspend State Attorney

14   Andrew Warren?

15   A.    Yes.

16   Q.    When did you first learn about that plan?

17   A.    It was on July 18th, 2022.

18   Q.    And, sir, on July 18, 2022, what happened that brought this

19   plan to your attention?

20   A.    There was a routine meeting in the Office of General

21   Counsel in the morning during which Mr. Ryan Newman noted that

22   the Governor was looking to suspend Mr. Andrew Warren.

23   Q.    Okay.  Would you characterize the discussion -- I'm not

24   asking about other potentially privileged matters.  I'm only

25   asking about matters pertaining to Mr. Warren, just so we're
```

1   clear; okay?

2   A.   Understood.

3   Q.   Thank you.

4        Tell me everything you remember about the discussion

5   relating to Mr. Warren.

6   A.   As I remember, in this meeting the discussion about this

7   was pretty brief.  I remember, I think Mr. Newman referenced a

8   letter that he said Mr. Warren signed that could be grounds for

9   suspension and that it was something that he wanted the office

10  to look into.

11  Q.   Okay.  And do you recall the subject matter of the letter

12  to which Mr. Newman referred in that meeting?

13  A.   It was a letter that multiple, many, state and district

14  attorneys signed regarding abortion following the *Dobbs*

15  decision.

16  Q.   Okay.  Thank you.

17       I'd like to show you what's been marked and what has been

18  admitted into evidence as Plaintiff's Exhibit 54.

19       All right.  Sir, do you recognize Exhibit 54?

20  A.   Yes, I do.

21  Q.   What is this, sir?

22  A.   It is a copy of my notes from -- that I took on 18 July

23  2022, in the meeting.

24  Q.   Okay.  Now, just to be clear about the record, there are

25  several black boxes of redactions, and my understanding is that

Direct Examination - Mr. Madry

1  those refer to other matters discussed during the meeting and

2  have no relationship to Mr. Warren.  Is that correct?

3  A.   Yes, that's correct.

4  Q.   Okay.  So the sentence here that appears unredacted -- or

5  that -- the bullet point, let's call it, that appears here

6  unredacted, can you please read that aloud for us?

7  A.   Sure.

8       Verbatim it states:  *13th Cir SAO - Gov wants to suspend*

9  *the SA.*

10 Q.   Okay.  And understanding that you do, as I believe we all

11 probably do, use shorthand or abbreviations when you're taking

12 notes, can you please tell us what you meant by the shorthand

13 you just read?

14 A.   That the Governor wanted to suspend the State Attorney for

15 the Thirteenth Circuit State Attorney's Office.

16 Q.   Thank you.

17      Sir, after that meeting, did you at some point come to

18 undertake a project relating to the suspension of Mr. Warren

19 that was discussed at that meeting?

20 A.   Yes, sir.

21 Q.   And what was the project that you undertook?

22 A.   The project I undertook was to research what grounds would

23 the Governor need to suspend Andrew Warren.

24 Q.   And, specifically, was the project a memo?

25 A.   Yes.

1   Q.   And to whom was the memo to be written?

2   A.   Mr. Ray Treadwell.

3   Q.   And Mr. Ray Treadwell is here with us in court, and he's

4   the Chief Deputy General Counsel for the Governor; correct?

5   A.   Yes.

6   Q.   In your work on the memo, did you review the FJP abortion

7   letter that Mr. Newman referenced in the meeting?

8   A.   Yes, I did.

9   Q.   Have you reviewed the Executive Order of Suspension of

10   August 4th that suspended Mr. Warren?

11   A.   I looked at it with you during the deposition.  I haven't

12   looked at it before then.

13   Q.   Okay.  And, among other things, the Executive Order of

14   Suspension references what we've called the bike stop policy.

15      Are you familiar with what I mean when I say the bike stop

16   policy?

17   A.   I'm familiar with it to the extent that it was reported in

18   the media.

19   Q.   Okay.  Is it fair to say that you did not review that

20   policy in your work in the Governor's Office on the subject of

21   Mr. Warren's suspension?

22   A.   Yes, that's fair to say.

23   Q.   And would the same be true as to what we've called the

24   low-level offense policy?

25   A.   I did not review those either.

Direct Examination - Mr. Madry

1   Q.   So in your work on the memo, in terms of documents written

2   by FJP, you only reviewed the abortion letter; is that right?

3   A.   Yes, that's correct.

4   Q.   Okay.  And you didn't review the bike stop policy or the

5   low-level offense policy; correct?

6   A.   That's correct.

7   Q.   Now, my understanding is that there was another similar

8   regularly scheduled meeting that took place with lawyers in the

9   Governor's Office on July 25th; is that right?

10  A.   That's how I remember it, yes.

11  Q.   Did you take notes at that meeting as well?

12  A.   Yes.

13  Q.   Okay.  Let's look at Plaintiff's Exhibit 55.

14       Sir, what is Plaintiff's Exhibit 55?

15  A.   Notes I took during the meeting on July 25, 2022.

16  Q.   Okay.  And, again, it contains certain redactions, and can

17  you just please confirm for me my understanding that those

18  redactions have nothing to do with Mr. Warren and, rather, are

19  about other matters, legal matters, that were discussed at that

20  lawyers' meeting?

21  A.   That's correct.

22  Q.   Can you read aloud for us the unredacted notes?

23  A.   Yes.  I wrote:  *State Attorneys, arrow, war.*

24  Q.   And "war" is underlined; right?

25  A.   That's correct.

Direct Examination - Mr. Madry

 1  Q.   Now, sir, I'm going to ask you to look --

 2           MR. CABOU:  We can take that down.

 3  BY MR. CABOU:

 4  Q.   I'm going to ask you to look now at what's been marked as

 5  Joint Exhibit 3 -- it is in a hard copy binder sitting next to

 6  you; it will also be on the screen for you -- in whatever way is

 7  most convenient, sir.

 8           Now, Joint Exhibit 3 is the Executive Order of Suspension,

 9  and then we're going to move forward to what is Exhibit B to the

10  suspension order, which is the FJP abortion statement.

11           Okay.  Now, sir, I'm going to ask that we move to the

12  second page.

13           Well, first of all, do you recall at the meeting on July 25

14  that Mr. Newman, while addressing the group, specifically read

15  out loud a statement from this document?

16  A.   Yes, I do.

17  Q.   Okay.  And looking on the second page of the document,

18  there's -- it might be easier for you to do this in hard copy if

19  you're not able to scroll with that.  Let me just let you get

20  the hard copy.  I apologize.

21  A.   Which Joint Exhibit is it, sir?

22  Q.   Joint Exhibit 3, and specifically Exhibit B to that.

23  A.   I'm there, sir.

24  Q.   Thank you.  Can you please -- within Exhibit B of the

25  Executive Order of Suspension, can you please read out loud for

Direct Examination - Mr. Madry

1  us today the sentence that Mr. Newman read out loud at the

2  meeting?

3  A.   Mr. Newman pointed out the sentence found on the last

4  page of the letter that includes the actual substantive matter

5  in the letter, excluding the signatures.  It's in the

6  second-to-last paragraph.

7      It reads:  *Our legislatures may decide to criminalize*

8  *personal healthcare decisions, but we remain obligated to*

9  *prosecute only those cases that serve the interests of justice*

10 *and the people.*

11 Q.   Thank you, sir.

12     Now, after the meeting where you wrote "State Attorneys,"

13 arrow, "War," underlined, and where Mr. Newman read that

14 sentence out loud that you just read for us, you undertook to at

15 some point write a memo; correct?

16 A.   That's correct.

17 Q.   Okay.  Let's look at Plaintiff's Exhibit 9.

18     Do you recognize -- I'm going to give you a moment to get

19 there, sir.  I'm sorry.

20 A.   I'm ready, sir.

21 Q.   I appreciate that.  Thank you.

22     What's Plaintiff's Exhibit 9?

23 A.   Plaintiff's Exhibit 9 -- what's on the screen is a printout

24 of an email that I sent to Ray Treadwell on July 25, 2022.

25 Q.   Okay.  And among the attachments to that email is your memo

1  entitled "Suspension and Removal of Andrew Warren"; is that

2  correct?

3  A.   Yes, that's correct.

4  Q.   Okay.  And as we page forward -- and the memo begins on the

5  next page of the exhibit; is that right?

6  A.   That's correct.

7  Q.   Okay.  What's the title of the memo?

8  A.   "Suspension and Removal of Andrew Warren."

9  Q.   Okay.  And there's a handy table of contents.  It lists an

10  overview, an introduction, four subparts of "Legal Analysis,"

11  "Potential Courses of Action," and "Conclusion"; correct?

12  A.   That's correct.

13  Q.   Okay.  And is it fair to say that when you wrote this memo,

14  you were trying to go above and beyond what your supervisors in

15  the General Counsel's Office expected?

16  A.   That's definitely true I was trying to make a good

17  impression.

18  Q.   Excellent.

19      Okay.  Let's look at the chart that's on Bates No. 1058,

20  which I believe is right there.

21          MR. CABOU:  For the record, that's Exhibit page 7,

22  9.007.

23  BY MR. CABOU:

24  Q.   So my understanding of the chart is that it has various

25  potential courses of action in the rows, and then for each

Direct Examination - Mr. Madry

1   potential course of action, various items in columns to the

2   right.  Is that right?

3   A.   Yes, that's correct.

4   Q.   Okay.  So we're going to focus first on the top course of

5   action, which is *Suspend Mr. Warren from office and proceed to*

6   *removal.*

7        Do you see that?

8   A.   That's correct.  I see that.  I'm sorry.

9   Q.   Now, there's a column that says "Benefits."  Do you see

10  that?

11  A.   I do.

12  Q.   Okay.  And then there's a column next to it that says

13  "Drawbacks."  Do you see that?

14  A.   Yes.

15  Q.   Okay.  Starting with the "Benefits," there's a highlighted

16  bullet here, the third bullet down.  Can you read that out loud?

17  A.   *A leftist prosecutor is removed from a position of power.*

18  Q.   Okay.  It also above that says: *Unlawful abortions in the*

19  *13th Circuit stop.*

20        Do you see that?

21  A.   I see that.

22  Q.   Now, you don't have any evidence that even one such

23  unlawful abortion happened during Mr. Warren's entire tenure as

24  State Attorney, do you?

25  A.   That's correct, I don't.

Direct Examination - Mr. Madry

1  Q.   And under the "Benefits," you listed stopping something

2  that never started and that a leftist prosecutor is removed from

3  power; right?

4  A.   That's correct.

5  Q.   Okay.  I guess, to be fair, you also listed that the

6  Governor reaffirms the commitment to the law; right?

7  A.   Yes.

8  Q.   Let's move to "Drawbacks."  The first bullet says:

9  *Political battle is likely to increase Warren's profile.*

10      Do you see that?

11 A.   Yes.

12 Q.   You wrote that was a drawback to the State?

13 A.   That's correct.

14      MR. CABOU:  Can we zoom out for a moment, please?

15 BY MR. CABOU:

16 Q.   Now, I know this isn't what ultimately happened, but down

17 there in the third row, "Issue a Statement," one of the benefits

18 is *Progressive prosecutors will lose power to campaign on*

19 *refusal to prosecute certain laws.*

20      Do you see that?

21 A.   Yes.

22 Q.   And below that:  *Warren will lose political capital*

23 *associated with his declaration.*

24      Do you see that?

25 A.   Yes.

Cross-Examination - Mr. Madry

1  Q.   And that was among the benefits to the State that you

2  listed in your memorandum?

3  A.   That's what I wrote.

4          MR. CABOU:  No further questions, Your Honor.

5          THE COURT:  Cross-examine?

6                      CROSS-EXAMINATION

7  BY MR. AARON:

8  Q.   Good morning, Mr. Madry.

9          Can you tell the Court, please, what were the dates of your

10 position at the Governor's Office?  Do you remember when you

11 started and finished?

12 A.   I started very early in June.  It might have been June 1st,

13 even, but around that time.  And my last date there was

14 July 28th, both of 2022.

15 Q.   So about two months; is that right?

16 A.   That's correct.

17 Q.   And while you were working for the Governor's Executive

18 Office, what was your title there?

19 A.   I was an intern.

20 Q.   Were you paid?

21 A.   No, I was not paid.

22 Q.   Do you recall whether you offered to write this memo or

23 whether you were asked to write that memo?

24 A.   I offered to write the memo.

25 Q.   Why?

Cross-Examination – Mr. Madry

1   A.   I was interested in the subject, and I'm from the general

2   area of Tampa Bay, so I thought it would be interesting to

3   involve myself in this matter.  Also, as an intern in the office

4   for a very short time, it's a general benefit to take on as many

5   different assignments as possible.

6   Q.   Why did you include that chart in your memo?

7   A.   I wanted to show that I wanted to put extra thought into an

8   assignment that is given to me, and I'm willing to think through

9   some of the issues and go above and beyond.

10  Q.   And just to be clear, I think you said an assignment that

11  was given to you.  It was an assignment that you sought; right?

12  A.   Yes, I did.

13  Q.   Is it fair to say that you were trying to get your

14  supervisor's attention with some type of flashy chart?

15  A.   Yes, that's absolutely correct.

16  Q.   At the time you wrote that memo, did you already know that

17  Governor DeSantis wanted to suspend Mr. Warren?

18  A.   I believe I did, yes.

19  Q.   And just to be clear, when you asked to draft this, the

20  memo, who did you ask?

21  A.   I asked Mr. Ray Treadwell.

22  Q.   Did Mr. Treadwell give you any materials as a part of this

23  assignment?

24  A.   No, he did not.

25  Q.   Did he give you any specific direction?

1    A.   From what I recall, he wanted me to research the legal

2    grounds that the Governor could rely upon to suspend Mr. Warren.

3    Q.   A moment ago we looked at Plaintiff's Exhibit 55.  That was

4    the page -- I think we can pull it up.  But that was the page of

5    your notes where you wrote "State Attorneys," and there's an

6    arrow, and you wrote "war" in all caps and underlined it.  What

7    did you mean when you wrote "war"?

8    A.   Well, I've been a member of the United States Armed Forces

9    for seven years.  In my time in the military, it's sort of the

10   shorthand that we use to distinguish planning to take action

11   versus actually going forward and taking that action.

12   Q.   So it just meant someone was going to take action?

13   A.   Yes, that's correct.

14   Q.   Do you know whether anyone in the Executive Office of the

15   Governor or, frankly, anyone, for that matter, ever saw this

16   page of notes or the other page of notes that you were shown

17   prior to the suspension?

18   A.   No, they did not.

19   Q.   When did someone else first see your notes?  Was it in

20   connection with this litigation?

21   A.   Yes, it was when I provided it under the subpoena.

22   Q.   When you got -- when Mr. Treadwell asked you to write this

23   memo in response to you asking for an assignment, did he give

24   you any documents or materials to review?

25   A.   No, he did not.

Cross-Examination – Mr. Madry

1  Q.   So whatever you reviewed as a part of, you know, forming

2  the basis for your memo, where did you get that information?

3  A.   Just through Google searches and Westlaw case research.

4  Q.   And do you recall how much time you spent on this memo?

5  A.   Maybe half a day, but I'm not certain.

6  Q.   Do you recall, when you were drafting the memo, did you

7  confer with anyone?

8  A.   I may have told other interns that this was something I was

9  working on, but I didn't ask for input or ask them to review

10 anything.

11 Q.   Did you show them a copy of the memo?

12 A.   No.

13 Q.   Did you show anyone a copy of the memo?

14 A.   I only showed it to Mr. Treadwell.

15 Q.   Do you recall when you showed it to Mr. Treadwell?

16 A.   It would have been on the same date that I emailed it to

17 him, which was July 25, 2022.

18 Q.   Did you email that memo to anyone else?

19 A.   No.

20 Q.   Did you show the memo to anyone else?

21 A.   No.

22 Q.   Did you ever discuss this memo with Ryan Newman?

23 A.   No.

24 Q.   Did you discuss the memo with anyone else in the Governor's

25 Office?

1   A.   No, I did not.

2   Q.   Just Mr. Treadwell?

3   A.   Only Mr. Treadwell.

4   Q.   What did he tell you?

5   A.   From what I recall, Mr. Treadwell pointed me to a section

6   in the memo that I wrote -- if I could have a moment.  It's

7   Section C, "Removal Proceedings" -- in which I cite a case from

8   the Florida Supreme Court from 1951.  Mr. Treadwell told me that

9   this case predates the most current Florida Constitution, and it

10  would probably not be applicable to any current proceedings that

11  might take place.  And he sort of gave me an informational --

12  educational background on how to cross-reference things when

13  doing legal research to make sure that you are looking at the

14  most updated law that corresponds to other law that is in force.

15  Q.   So is it a fair characterization to say that he told you

16  the memo was wrong?

17  A.   In part, yes.

18  Q.   The portion that you just referenced about being wrong, do

19  you recall whether that was positioned before or after that

20  chart that we just focused on?

21  A.   It was before.

22  Q.   Do you know whether Mr. Treadwell even read past that part

23  that was wrong?

24  A.   I have no idea.

25  Q.   Do you know whether anyone ever reviewed that chart prior

1   to the suspension?

2   A.   I have no knowledge of that.

3   Q.   Did Mr. Treadwell seem pleased with your memo when he came

4   to talk to you about it?

5   A.   It's hard for me to say.  I'm not sure if he seemed

6   pleased.  He didn't seem in any particular way.

7   Q.   To the best of your knowledge, was that memo reviewed by

8   anyone other than you and Mr. Treadwell prior to the suspension?

9   A.   To the best of my knowledge, it wasn't reviewed by anyone

10  else.

11  Q.   Did you ever speak to the Governor about Andrew Warren?

12  A.   No.

13  Q.   Have you ever spoken to the Governor?

14  A.   Never.

15  Q.   Did you ever speak to Ryan Newman about Andrew Warren?

16  A.   No.

17  Q.   Did you respect Andrew Warren before you wrote this memo?

18  A.   Absolutely.

19  Q.   Did you actually respect him enough to apply for a job with

20  him that same summer?

21  A.   Yes, I did.

22       MR. AARON:  If you could just allow me one second to

23  speak to my colleagues, I might be done.

24       (Discussion was held.)

25       MR. AARON:  Nothing further, Your Honor.

1          THE COURT:  Redirect?

2                  REDIRECT EXAMINATION

3    BY MR. CABOU:

4    Q.   Mr. Madry, you said that Mr. Treadwell didn't give you any

5    materials to use in your work on the memo; right?

6    A.   That's correct.

7    Q.   So is it fair to say that your work was based entirely on

8    what you heard in the meetings and on your own research?

9    A.   Yes, that's correct.

10   Q.   And you expected -- in the memo you told us that you were

11   trying to go above and beyond; is that right?

12   A.   Yes.

13   Q.   To make sure that your superiors -- excuse me -- to make

14   sure that your supervisors noticed the memo; right?

15   A.   I don't know if that's accurate.  I would say that I wanted

16   to show that I'm someone that's willing to go above and beyond

17   just generally in terms of my work ethic.

18   Q.   But it's fair to say that you wanted them to like the memo;

19   correct?

20   A.   Yeah, that's fair.

21   Q.   Okay.  Now, Mr. Treadwell sat down with you to review the

22   memo at some point?  Did I understand that?

23   A.   He came into the workspace that I was working in.  Our

24   conversation was rather brief about the memo.  It took less than

25   five minutes, maybe three minutes.

1   Q.   Okay.  And he told you that some of the legal analysis

2   wasn't quite right; is that right?

3   A.   Yes, that's correct.

4   Q.   But to be clear, we've all done that.  We've all looked at

5   a hard issue and gotten a legal analysis wrong.

6   A.   That's encouraging, sir.

7   Q.   No problem.

8        He never told you the chart was wrong, did he?

9   A.   He never referenced the chart with me.

10            MR. CABOU:  No further questions.

11            THE COURT:  Thank you, Mr. Madry.  You may step down.

12            THE WITNESS:  Thank you, Your Honor.

13       (Andrew exited the courtroom.)

14            THE COURT:  Next witness 15 minutes or longer?

15            MR. CABOU:  Longer, Your Honor.

16            THE COURT:  Let's take the morning break.  We'll start

17   back at 10:45 by that clock.

18       (Recess taken at 10:29 AM.)

19       (Resumed at 10:47 AM.)

20       (Taryn Fenske entered the witness stand.)

21            THE COURTROOM DEPUTY:  Please stand and raise your

22   right hand.

23            **TARYN FENSKE, PLAINTIFF WITNESS, DULY SWORN**

24            THE COURTROOM DEPUTY:  Please be seated.

25            Please state your full name and spell your last name

1   for the record.

2          THE WITNESS:  Taryn Fenske, F-e-n-s-k-e.

3          MS. SWAIN:  Good morning, Your Honor.  I'm Alexandra

4   Swain for the plaintiff.

5                    DIRECT EXAMINATION

6   BY MS. SWAIN:

7   Q.   Good morning, Ms. Fenske.

8   A.   Hi there.

9   Q.   Now, Ms. Fenske, you are the communications director for

10  Governor DeSantis; right?

11  A.   I am.

12  Q.   And what does your role as communications director entail?

13  A.   I primarily communicate on the Governor's proposals and

14  priorities to the media and to Floridians.

15  Q.   And do you have any other duties as communications

16  director?

17  A.   Anything from writing talking points to social media to

18  planning, helping plan events.

19  Q.   Events like press conferences?

20  A.   Yes.

21  Q.   And, in fact, you were involved in planning the press

22  conference on August 4th where the Governor announced

23  Mr. Warren's suspension; right?

24  A.   Yes.  I collaborated with our external affairs director.

25  Q.   And, in fact, you were involved in drafting the talking

1    points for the Governor for the press conference?

2    A.   My office, yes.  My office oversees and does those

3    typically.  I review, you know, close to the last draft.

4    Q.   Okay.  So I will show you what is marked as Joint

5    Exhibit 44, and we'll go to the first page.

6         And do you recognize this document, Ms. Fenske?

7    A.   I would like to use a binder if possible.

8    Q.   Yeah.  There's binders up on the podium, and this is Joint

9    Exhibit 44.  So there should be a binder with all the joint

10   exhibits.

11   A.   Okay.

12        Sorry about that.  Got it.

13   Q.   Okay.  And, Ms. Fenske, you recognize this document?

14   A.   It appears to be an email from Ryan Newman to myself and

15   some of my team members.

16        MS. SWAIN:  And can we just control down to the bottom

17   of that document and we'll look at the first email in the chain?

18        Ms. Fenske -- all the way to the bottom, Dan.

19        THE WITNESS:  Okay.  Yep.

20   BY MS. SWAIN:

21   Q.   So, Ms. Fenske, this looks like an email that Sydney Booker

22   sends to you and Ryan Newman on August 3rd; is that right?

23   A.   Yes.

24   Q.   And Ms. Booker, Sydney Booker, works in your department?

25   A.   She does.

1   Q.   She directly reports to you?

2   A.   Yes.

3   Q.   And what is her role?

4   A.   A communications specialist.

5   Q.   Okay.  And Mr. Ryan Newman is the General Counsel for the

6   Office of the Governor; correct?

7   A.   Yes, yes.

8   Q.   So Sydney –– Ms. Booker writes:  *Hello, Ryan.  Taryn says*

9   *you might have some additions for the Governor for the talking*

10  *points attached.*

11      So I take it from Ms. Booker's email that you are

12  soliciting feedback from Mr. Newman on the talking points;

13  right?

14  A.   Yes.  We typically have our legal team review anything that

15  resolves around the legal aspects of our roles.

16  Q.   Okay.  And this was –– and this was important legal

17  feedback that you were seeking from Mr. Newman?

18  A.   It's oversight and review to make sure everything was

19  legally correct.

20  Q.   And it was important that Mr. Newman took a look at this

21  document?

22  A.   It was important that he took a look, yes.

23  Q.   But before Mr. Newman took a look, you had Sydney Booker

24  draft the first draft?

25  A.   Yes.

Direct Examination – Ms. Fenske

1    Q.   And you reviewed the draft and provided Ms. Booker with

2    feedback or edits?

3    A.   I typically -- I think I reviewed -- I don't recall this

4    specific instance, but I think I usually review it after the

5    legal team, or maybe before.  I don't remember.

6    Q.   So you don't know if you -- you don't remember giving

7    feedback before Mr. Newman, but you would have given feedback at

8    some point?

9    A.   I would have given feedback at some point, but I don't

10   recall exactly the point in this situation.

11            THE COURT:  Let me back up for a minute so that I

12   don't get off track or maybe the record doesn't.  I think maybe

13   as you read this you said "additions for the Governor."  This

14   email that is on my screen says "additions from the Governor."

15            MS. SWAIN:  I'm sorry, Your Honor.  *Taryn said you*

16   *might have some additions from the Governor.*  I'm sorry for

17   misspeaking.  Thank you, Your Honor.

18   BY MS. SWAIN:

19   Q.   So these were edits from the Governor or from Mr. Newman?

20   A.   Ryan Newman made the edits.  As I said in deposition, they

21   primarily discussed any of the legal issues or the EO with the

22   Governor, so I figured he might have some feedback from his

23   discussions with the Governor.

24   Q.   With the Governor?  Okay.

25            So the next email -- it looks like Mr. Newman did not

Direct Examination - Ms. Fenske

1   respond immediately to this email, so it looks like Mr. Williams

2   followed up.

3       And Mr. Williams is one of your direct reports as well?

4   A.   Yes.

5   Q.   And he followed up because it was important to get

6   Mr. Newman's additions from the Governor and put it in the

7   talking points; correct?

8   A.   Yes.

9   Q.   Okay.  And then we'll scroll down a little bit more.

10      You said:  *He's working on them.*

11      And, finally, Mr. Newman writes:  *Sorry for the delay.*

12  *Redline edits attached.*

13      And so we'll go to the attachment.

14      And so these were the edits that Mr. Newman put into the

15  talking points from his discussions with the Governor?

16  A.   I can't say if it was from his discussions or his own

17  personal thoughts.

18  Q.   Okay.  But he put -- Mr. Newman put these edits into the

19  document?

20  A.   Yes.

21  Q.   Okay.  So let's scroll down to the bottom of that page.

22  A.   I see it.

23  Q.   Okay.  And the last bullet point has language about:  *When*

24  *an official abandons his duty and chooses woke activism over his*

25  *oath of office, it is my duty to step in.*

1    And so, Ms. Fenske, there is some edits in this bullet

2    point, and those were the edits from Mr. Newman?

3    A.   Yes.

4    Q.   Okay.  But you all -- and "you all" meaning employees from

5    the Office of Communications -- add in the language "chooses

6    woke activism over oath of office" before Mr. Newman had put the

7    edits?

8    A.   Yes.

9    Q.   And what does woke mean?

10   A.   It's a slang term for -- I believe it originally was to

11   identify social injustices or prejudice or racism, but it's kind

12   of turned into a more slang term for activism, progressive

13   activism.

14   Q.   And Governor DeSantis is notoriously anti-WOKE; right?

15   A.   Yeah.

16   Q.   And, in fact, he has famously said:  *Florida is where woke*

17   *goes to die*?

18   A.   He did say that, yes.

19   Q.   So I'll go -- we'll go to the next page.

20       And there's language here, it's the fourth bullet point:

21   *Instead of using his office to fight crime, protect people, and*

22   *enforce the law, he uses it for Soros-funded social justice*

23   *activism.*

24       Now, Ms. Fenske, what is this reference to Soros?  Do you

25   know who Soros is?

Direct Examination - Ms. Fenske

1   A.   I do know who Soros is, but Ryan wrote these, added these

2   edits.

3   Q.   Okay.  I asked you if you knew who Soros was.  Who is

4   Soros?

5   A.   He is a philanthropist, a wealthy philanthropist and

6   political donor.

7   Q.   And it's a reference to George Soros; right?

8   A.   It appears to be, yes.

9   Q.   And is Mr. George Soros affiliated with any particular

10   political party?

11   A.   I believe the Democratic Party.

12   Q.   And this language that's added here is used to describe

13   Mr. Warren being involved in Soros-funded social justice

14   activism; is that correct?

15   A.   It appears to be, yes.

16        MS. SWAIN:  So we'll go to the bottom of that

17   page now, and I think it might --

18        Okay.  You can stop there.

19   BY MS. SWAIN:

20   Q.   So here -- there is language here that says:  *The law is*

21   *the law, and it should not be subject to the whims of a woke*

22   *ideologue masquerading as a prosecutor.*

23        So, first of all, the "woke ideologue," that's language

24   that the communications department had in the talking points

25   before Mr. Newman made his edits?

1  A.    Yes.

2  Q.    And then Mr. Newman added "masquerading as a prosecutor"?

3  A.    It appears that way, yes.

4  Q.    And then we'll just look at this next point, which says:

5  *Despite his nonenforcement policies and friction with law*

6  *enforcement, Mr. Warren crossed the line in June when he joined*

7  *a statement with Soros-affiliated prosecutors from across the*

8  *country.*

9        And that, again, is something that Mr. Newman added;

10 correct?

11 A.    It is.

12 Q.    But, Ms. Fenske, these weren't the -- this isn't the last

13 draft of the talking points that the Governor eventually saw,

14 was it?

15 A.    I don't believe so, no.

16 Q.    Okay.  So I'd like to bring up Joint Exhibit 43.

17       And, Ms. Fenske, you are familiar with this document?

18 A.    Yes.  It's the evening briefing and talking points email.

19 Q.    Okay.  And this document would have included -- this

20 document includes information on the schedule for the press

21 conference, and it includes information on the speakers and, as

22 you said, it also includes the talking points; right?

23 A.    Typically, yes, it does.

24 Q.    And this would have been the final set of talking points

25 that you put in a binder for the Governor to prepare him for the

 1   press conference; right?

 2   A.   Typically, yes.

 3          MS. SWAIN:   Okay.   So let's go to page 19 of this

 4   document.

 5          Okay.   You can stop there.   Thank you, Dan.

 6   BY MS. SWAIN:

 7   Q.   So at the top, the first bullet point says:   *When an*

 8   *official abandons his duty and chooses woke activism over his*

 9   *oath of office, it is my duty to step in.*

10       And so you saw that language in the draft from Mr. Newman;

11   right?

12   A.   I did.

13   Q.   And it's now in the final set of talking points?

14   A.   Yes.

15   Q.   And the -- let me see -- the fifth bullet point, it

16   starts -- the sentence starts "Instead"?

17   A.   Yeah.

18   Q.   So that sentence says:   *Instead of using his office to*

19   *fight crime, protect the people, and enforce the law, he uses it*

20   *for Soros-funded social justice activism.*

21       And that language was in the draft that Mr. Newman edited;

22   right?

23   A.   Yes.

24   Q.   And that is language that Mr. Newman added?

25   A.   Yes.

1   Q.   And so it made it -- that language made it into the final

2   talking points?

3   A.   Yes.

4   Q.   Okay.  We'll keep going on this page.

5        So I want to draw your attention to language that's bolded.

6   It says:   *The law is the law, and it should not be subject to*

7   *the whims of a woke idealogue masquerading as a prosecutor.*

8        And that's the same language that Mr. Newman added to -- or

9   you -- the communications department had in the talking points

10  and Mr. Newman edited, and it made it into the final set of

11  talking points; right?

12  A.   Yes.

13  Q.   And this language is being used to describe Mr. Warren;

14  right?

15  A.   Yes.

16  Q.   And we have another bullet point that was in Mr. Newman's

17  draft:   *Despite his nonenforcement policies and friction with*

18  *law enforcement, Mr. Warren crossed the line in June when he*

19  *joined a statement with the Soros-affiliated prosecutors from*

20  *across the country.*

21       And that's in -- that was language that Mr. Newman added?

22  A.   I believe so.  I'd have to look back.

23  Q.   And it's in the final set of talking points?

24  A.   It is.

25  Q.   And the Governor gave an interview after the press

Direct Examination – Ms. Fenske

1  conference announcing Mr. Warren's suspension; right?

2  A.   Yes.

3  Q.   And the interview was with Tucker Carlson on FOX News;

4  correct?

5  A.   Yes.

6  Q.   And you oftentimes will coordinate which interviews the

7  Governor takes --

8  A.   Yes.

9  Q.   -- with news outlets; right?

10  A.   Yes.

11  Q.   And you chose Tucker Carlson to interview Governor DeSantis

12  because the Tucker Carlson show had extended an invite for

13  Governor DeSantis to go on the show; right?

14  A.   Yes.

15  Q.   But you don't grant interviews to just anyone who extends

16  an invite to speak to Governor DeSantis, do you?

17  A.   Not always, no.

18  Q.   You only grant interviews to news outlets that you consider

19  to be fair and balanced; right?

20  A.   We've done other interviews, but, typically, yes, we try to

21  focus on fair and balanced news, yes.

22  Q.   And for this particular interview, you didn't choose any

23  other -- you didn't consider any other national news outlets to

24  interview Mr. -- Governor DeSantis about Mr. Warren?

25  A.   We got a lot of requests.  I think he was traveling for the

1   rest of the day, so I can't recall directly, but I do remember

2   getting a lot, but this one worked out in the timing.

3   Q.   But this one was the one that you seriously considered

4   above the others?

5   A.   I mean, you saw that there was one scheduled that ended up

6   getting canceled in the brief.  So there was quite a few.

7   Again, I don't remember all of them at the time.

8   Q.   Okay.  But the -- I'm asking you about news outlets.  You

9   didn't consider any other news outlet; right?

10       The interview that you are referring to in the materials

11   was an interview with other FOX News personalities that didn't

12   work out; right?

13   A.   I believe there was local people, too, that were there, and

14   that was considered, but it didn't work out with the timing.

15   Q.   Yeah, I said national news, Ms. Fenske.  Or if I didn't say

16   national news, I meant to say national news.

17       So you didn't consider any other national news outlets

18   seriously other than FOX News?

19   A.   I don't believe so.

20   Q.   And you consider FOX News to be fair and balanced?

21   A.   I do.

22   Q.   And you -- many people across the country find FOX News or

23   believe FOX News to be a conservative news outlet.

24   A.   Sure.

25   Q.   Do you consider MSNBC to be fair and balanced?

Direct Examination – Ms. Fenske

1   A.   No.

2   Q.   And you didn't consider MSNBC for an interview with the

3   Governor on this subject of suspending Mr. Warren; right?

4   A.   I don't believe they reached out.  But, no.

5   Q.   So no.

6       Okay.  And Mr. Carlson's show was interested in this story

7   about Governor DeSantis suspending Mr. Warren because he had

8   been covering news on prosecutors across the country; right?

9   A.   Yes, he tends to cover it extensively.

10  Q.   And specifically Soros-funded or Soros-backed prosecutors;

11  right?

12  A.   I believe so.

13  Q.   Okay.  Now, this interview was about five minutes; right?

14  A.   Yes.

15  Q.   So the Governor only had a short amount of time to speak;

16  right?

17  A.   Yes.

18  Q.   He wouldn't have had time to veer off on extraneous topics,

19  topics that didn't have any relevance to Mr. Warren's

20  suspension; right?

21  A.   I mean, sometimes they do, depending on the conversation

22  and how it flows, but not usually.

23  Q.   Okay.

24       MS. SWAIN:  And now, Your Honor, I know we've played

25  the video that's at Joint Exhibit 10 a few times, and I don't

Direct Examination - Ms. Fenske

1    want to bother the Court with playing it again, but I might just

2    read a couple of --

3             THE COURT:  Play it, read it, however you want to do

4    it.

5             MS. SWAIN:  Okay.

6    BY MS. SWAIN:

7    Q.   So you're aware that Mr. Carlson opened his interview with

8    Governor DeSantis saying:  *Governor, thanks so much for coming*

9    *on.  So this kind of -- this is kind of a big move.  It seems*

10   *like -- why did you do it?*

11            And Governor DeSantis replied:  *Well, Tucker, you*

12   *documented the destruction that we've seen with these Soros*

13   *prosecutors around the country where they basically take it upon*

14   *themselves to determine which laws should be followed and which*

15   *laws should not be followed.*

16            Do you remember that?

17   A.   Vaguely, yes.

18   Q.   And so Governor DeSantis was coming onto the show to

19   discuss Mr. Warren because Mr. Carlson was interested in

20   Soros-backed prosecutors, and the Governor believed Mr. Warren

21   to be a Soros-backed prosecutor; right?

22   A.   I mean, his reasoning for suspension was outlined in the

23   Executive Order.

24   Q.   That's not what I asked, Ms. Fenske.  I asked if the

25   Governor believed Mr. Warren to be a Soros-backed prosecutor.

1   A.   That's what he said.

2   Q.   That was indeed what he said.  And, in fact, he -- when

3   Mr. Carlson went on to say: *They don't have the legal right,*

4   *the Constitutional right to selectively enforce the law, or am I*

5   *missing something,* speaking about prosecutors, Governor DeSantis

6   replied: *No, you're right.  But here's what Soros is doing.*

7   *It's actually smart on his part.  They can't get these things*

8   *enacted in the legislature where you're going to let criminals*

9   *run -- just run.  So what they do, they will get involved in*

10  *these Democrat primaries in a Democrat area.  He'll flush a*

11  *million dollars to get radical -- to get the radical to win in*

12  *the primary.*

13       Do you recall Governor DeSantis making statements to that

14  effect?

15  A.   Vaguely, yes.

16  Q.   Okay.  So, next, in your role as director of

17  communications, you sometimes provide the Governor with

18  background research on information relevant to particular topic;

19  right?

20  A.   Yes.

21  Q.   And, in fact, on this occasion you ordered one of your

22  direct reports to look into the connection between Mr. Warren

23  and Mr. Soros, if any existed; right?

24  A.   I did.

25  Q.   And also in your role as communications director, I think

Direct Examination - Ms. Fenske

1  you said before you sometimes put together briefing binders for

2  the Governor when he's getting ready for media appearances or

3  appearances in general; right?

4  A.   I typically put together documents to put in the briefing

5  binders, yes.

6  Q.   And you put these briefing materials together to make him

7  aware of important information on those topics; right?

8  A.   Sometimes important, sometimes just things that are

9  happening in the area, sometimes approvals.  It just depends on

10  the topic and subject area.

11  Q.   And Governor DeSantis is a busy, high-ranking official,

12  isn't he?

13  A.   Yes.

14  Q.   So I'm assuming he often has very little time to prepare

15  for media appearances or appearances?

16  A.   I mean, he typically reviews things, but he also is into

17  reading and research so he might --

18  Q.   That's not what I asked, Ms. Fenske.

19          THE COURT:  One at a time.

20          MS. SWAIN:  Okay.  I'm sorry, Your Honor.

21  BY MS. SWAIN:

22  Q.   I asked if he often has little time to prepare for media

23  appearances.

24  A.   As I said, he likes to do research and read a lot.  So it

25  depends on the timing and what his timing constraints are that

Direct Examination – Ms. Fenske

```
 1   day.
 2   Q.   Can you hear me?  Am I speaking loudly enough?
 3   A.   You sure are.
 4   Q.   So my question was he often has little time to prepare for
 5   media appearances?
 6   A.   Sometimes he has more time than other times.  It really
 7   just depends on his schedule that day.
 8   Q.   Okay.  And in the little time he does, he wants to, I'm
 9   sure, read information that's relevant to what he's talking
10   about?
11   A.   It depends on the topic and the day, and sometimes he
12   doesn't read the briefing binders; sometimes he does.
13   Q.   Okay.  So the -- we'll pull up Plaintiff's Exhibit 21.
14        So, Ms. Fenske, are you familiar with this document?
15   A.   One second.  Let me get it.
16   Q.   No problem.
17   A.   51?
18   Q.   Plaintiff's Exhibit 21.
19   A.   Oh, 21.  Got it.
20   Q.   Okay.  So, Ms. Fenske, are you familiar with this document?
21   A.   Yes.
22   Q.   And this is an email where you're talking to Kyle Lamb.
23        And who is Kyle Lamb?
24   A.   He's an analyst in our office.
25   Q.   And he directly reports to you?
```

1   A.   Yes.

2   Q.   And you're talking about this research that you just spoke

3   about that you had Mr. Lamb do about the connection, if any,

4   between Mr. Warren and Mr. Soros; right?

5   A.   Yes.

6   Q.   And so Mr. Lamb sends you the information on August 3rd,

7   says: *Here is the background on what you asked for.  If you*

8   *need anything else added or edited, or if it's good to go, let*

9   *me know.*

10       So when Mr. Lamb sent you this email, you reviewed what was

11   attached to it; right?

12   A.   Yes.

13           MS. SWAIN:  And so we'll go to the attachment, the

14   next page.  And on the bottom of the last page -- can we scroll

15   to the bottom.  Sorry.  I meant the bottom of the first page.

16   I'm sorry.

17   BY MS. SWAIN:

18   Q.   This is 002.  The last bullet point talks about George

19   Soros being affiliated with the Fair and Just Prosecution

20   project; right?

21   A.   Yes.

22   Q.   And that's the same organization that Mr. Warren is

23   affiliated with; right?

24   A.   Yes.

25   Q.   Okay.  So let's go to page 3 of this document, and we'll go

1    to the second half.  And on the second half, it has four bullet

2    points noting the ties between Mr. Soros and Florida; right?

3    A.    Yes.

4    Q.    And it notes that Mr. Soros may have in some way funded

5    Mr. Warren's campaign; right?

6    A.    Yes.

7    Q.    But it actually says that Mr. Soros gave money to the

8    Democratic Party who, in turn, gave money to Mr. Warren; right?

9    A.    Yes.

10   Q.    So it doesn't say that Mr. Warren received direct funding

11   from Mr. Soros, does it?

12   A.    No.  It says:  *We think (it helped).*

13   Q.    And Mr. Warren is a Democrat?

14   A.    I believe so.

15   Q.    And it's not a neglect of duty to be a Democrat, is it?

16   A.    No.

17   Q.    So the only connection between Mr. Warren's campaign and

18   George Soros that this document identifies is that Mr. Soros

19   gave money to the Democratic Party in Florida, and Mr. Warren is

20   a Democrat in Florida, and Mr. Warren received money from the

21   Democratic Party in Florida; right?

22   A.    It does explain more than that on the first page.

23   Q.    But it doesn't say that Mr. Soros directly funded

24   Mr. Warren's campaign; right?

25   A.    It says that he -- we think that he gave money to the

Direct Examination - Ms. Fenske

```
 1   Democratic Party which then funded his campaign.
 2   Q.   The Democratic Party funded Mr. Warren's campaign; right?
 3   A.   That's what it says.
 4   Q.   And the only other connection between Mr. Soros and
 5   Mr. Warren in this document is that Mr. Soros supports Fair and
 6   Just Prosecution and so does Mr. Warren; right?
 7   A.   I need to review it again.  The first page has a lot of
 8   details that I haven't read up on in awhile.
 9        I mean, if you look on the first page, it has multiple
10   reasons that they're connected, but --
11   Q.   Okay.  Let's go to the first page.  You think these are
12   reasons why Mr. Warren is connected with Mr. Soros?
13   A.   Yes.
14   Q.   Okay.  And let's go to page 7 of this document.
15        So this -- let me see.  It's the second-to-last bullet.
16        It says:  *Most recently, Warren pledged a dereliction of*
17   *his sworn duty when he announced he would not follow Florida law*
18   *and decline to prosecute crimes relating to abortion services;*
19   right?
20   A.   Yes.
21   Q.   And you believe that to be one of the reasons why the
22   Governor suspended Mr. Warren?
23   A.   Yes.  That's one of the reasons outlined in the Executive
24   Order.
25   Q.   In this document -- that information is in this document
```

Direct Examination - Ms. Fenske

1    about the connection between Mr. Soros and Mr. Warren?

2    A.    It's just a summary background research document so it's

3    extensive, and it doesn't necessarily have everything to do with

4    Soros; just bullet point research.

5    Q.    So let's go to page 3.

6          And the last bullet in this first half says: *Soros uses*

7    *shell organizations, affiliates and pass-through committees to*

8    *steer contributions to both candidates and his robust network*

9    *for progressive prosecutors which provide gravitas and perks to*

10   *preferred prosecutors.*

11         Now, Ms. Fenske, you ordered this to be put in the

12   Governor's briefing materials; right?

13   A.    Yes.

14   Q.    And did you -- did you confirm the veracity of this

15   statement before you passed it on to the Governor?

16   A.    Typically I have -- make sure that there's citations, yes.

17   Q.    Did you specifically confirm the veracity of this point?

18   A.    I believe I did, yeah.  It's been awhile so I can't

19   remember the exact findings and things I clicked and the links I

20   looked up, but, typically, yes, I confirm.

21   Q.    Okay.  So, Ms. Warren, this -- sorry.

22         Ms. Fenske, this document contains information about

23   Mr. Warren and his -- what the document says to be affiliation

24   with Mr. Soros.  It also contains one of the reasons why the

25   Governor gives for suspending Mr. Warren, and you ordered it to

Direct Examination - Ms. Fenske

1   be put in the binder preparing the Governor to announce the

2   suspension of Mr. Warren.

3        So this document entitled "Soros Plan" is relevant to

4   Mr. Warren's suspension; right?

5   A.   No.  It's just a research document.  I put a lot of

6   documents in the binder, and sometimes he reviews; sometimes he

7   doesn't.  I can't even say if he looked at this one.

8   Q.   So even though it has reference to one of the reasons why

9   Mr. Warren was suspended, it -- and even though the Governor got

10  on national television and talked about suspending Mr. Warren in

11  the context of Soros-backed prosecutors, and even though the

12  talking points for the press conference specifically referenced

13  Soros-backed prosecutors, this document, "The Soros Plan," is

14  not relevant?  That's your testimony today?

15  A.   Yes.

16  Q.   Okay.  So let's go to Plaintiff's Exhibit 27.

17       So this -- I'll give you a second to get there.

18       Are you there?

19  A.   Yes.

20  Q.   Okay.  So do you recognize this document?

21  A.   It appears to be a tweet from the campaign.

22  Q.   Governor DeSantis's campaign?

23  A.   Yes.

24  Q.   This is his campaign's official Twitter handle?

25  A.   It's their team account.  I think he has his own official

1   Twitter, too.

2           MS. SWAIN:  Okay.  So can we scroll and see the

3   timestamp on this.

4   BY MS. SWAIN:

5   Q.   So this is 9:35 p.m., August 4.  That's the day that

6   Mr. Warren was suspended; right?

7   A.   Yes.

8   Q.   And -- we'll scroll up back to the top.

9           And it says:  *Soros* -- sorry.  *Soros-backed activist*

10  *prosecutors think they can take it upon themselves to determine*

11  *which laws should be enforced, but not in Florida thanks to the*

12  *leadership of Governor @Ron DeSantisFL.*

13          And Ron DeSantis Florida is the Governor's personal

14  Twitter?

15  A.   It's his campaign Twitter, yes.

16  Q.   Okay.  So this is his personal campaign Twitter?

17  A.   Yes.

18  Q.   As opposed to Team DeSantis which is his campaign team's

19  Twitter?

20  A.   Yes.

21  Q.   And if we scroll a little lower, there's a picture.  It

22  looks like a screen grab from the Governor's -- the Governor's

23  interview on Tucker Carlson where he announced to the nation

24  that he was suspending Mr. Warren?

25  A.   Can you repeat the question?

Direct Examination - Ms. Fenske

1   Q.   This is a screen grab from the Tucker Carlson interview?

2   A.   Yes.

3   Q.   The Tucker Carlson interview about Mr. Warren?

4   A.   Yes.

5   Q.   Okay.  And let's go to Plaintiff's Exhibit 74.

6        Just let me know when you are there.

7   A.   Will do.

8        Got it.

9   Q.   Okay.  So this is a tweet from Kyle Lamb?

10  A.   Yes.

11  Q.   The same Kyle Lamb that wrote "The Soros Plan" and works

12  for the Governor?

13  A.   He works for me, but, yes.

14  Q.   And you work for the Governor?

15  A.   Yes.

16  Q.   And Kyle Lamb writes on August 4th:  *Today, @GovRonDeSantis*

17  *announces we are suspending Soros-backed 13th circuit state*

18  *attorney Andrew Warren for neglecting his duties as he pledges*

19  *not to uphold the laws of the state.*

20       That's Mr. Lamb's tweet?

21  A.   Yes.

22  Q.   Okay.  And we'll go to Exhibit 17.  It's the fourth page;

23  .004.

24       I'm sorry.  Exhibit 16, Plaintiff's Exhibit 16.004.

25  A.   There.

Direct Examination – Ms. Fenske

1   Q.   And this is a tweet from Christina Pushaw on August 4th?

2   A.   Yes.

3   Q.   And at the time Christina Pushaw was the Governor's Press

4   Secretary; right?

5   A.   Yes.

6   Q.   And she writes:  *Progressive prosecutors backed by Soros*

7   *have refused to enforce the laws across the country.*

8   A.   Yes.

9   Q.   And this she tweeted the same day that Mr. Warren was

10  suspended; right?

11  A.   Yes.

12  Q.   So most likely she's referring to Mr. Warren?

13  A.   Yes.

14  Q.   And we'll go next to -- sorry.

15       Ms. Pushaw is one of the employees in the communications

16  department that at the time was authorized to speak on the

17  record?

18  A.   She is, yes; Kyle was not.

19  Q.   So we'll go to Plaintiff's Exhibit 64.

20       Just tell me when you're there.

21  A.   I'm here.

22  Q.   Okay.  And this is -- what is this document?

23  A.   It's a social media grid.

24  Q.   And this is something you sent or is circulated within the

25  communications department --

1    A.   Yes.

2    Q.   -- regularly --

3    A.   Yes.

4    Q.   -- when announcing news?

5    A.   Uh-huh.

6    Q.   So we'll go to the second page.  In the last -- these are

7    suggested tweets or suggested social media posts for announcing

8    Mr. Warren's suspension?

9    A.   Yes.

10   Q.   And the last one says:  *In Florida, the law is the law.  It*

11   *will not be subject to the whims of a woke idealogue*

12   *masquerading as a prosecutor?*

13   A.   Yes.

14   Q.   And that's very similar, if not the same, language to what

15   was in the talking points that you and Mr. Newman wrote with

16   feedback from the Governor; right?

17   A.   Yes.

18   Q.   We'll go to Joint Exhibit 6, page 10.

19   A.   I'm here.

20   Q.   So you're responsible -- or sometimes you communicate with

21   members of the press when they have inquiries?

22   A.   Yes.

23   Q.   And so this is a text message thread, it looks like.

24        MS. SWAIN:  Can we scroll to the top.

25   BY MS. SWAIN:

Direct Examination - Ms. Fenske

1   Q.   And it's a text message thread "EOG Press."

2        What's EOG press?

3   A.   It's just our group account that everyone on my team is a

4   member of.

5   Q.   Okay.  So someone posts in the EOG Press text thread on the

6   day after Mr. Warren was suspended, August 5th --

7   A.   Let me clarify, actually.  Sorry.

8   Q.   Uh-huh.

9   A.   It's actually just the press members on my team that are on

10  this thread, so Christina and Bryan and me would have been on

11  this thread.

12  Q.   Okay.  So someone -- let me see if we can tell from going

13  from the first page.

14       MS. SWAIN:  If we could go back to -- if we would go

15  to page 9 at the bottom.

16  BY MS. SWAIN:

17  Q.   So it looks like this is where the message starts.  It's

18  from Christina Pushaw, and then we'll move to the next page, the

19  page we were just on, page 10.

20       And so Ms. Pushaw is posting a screenshot of a question

21  from Marlei from NBC Orlando, and Marlei asks:  *Did the*

22  *Hillsborough County Sheriff's Office escort Andrew Warren out of*

23  *the State Attorney's Office?*

24       And Ms. Pushaw writes:  *I think we should confirm this -*

25  *gets some buzz and being tough.*

1        Can -- that's Ms. Pushaw's text message?

2   A.   I don't believe so.  I think that's Bryan's.

3   Q.   Oh, is it Bryan?

4        Okay.  Either Bryan or Ms. Pushaw?

5        Bryan Griffin, who's in the Press Secretary's Office?

6   A.   Yes.

7   Q.   And you write back:  *We need to do it off record.  I'll*

8   *call her.*

9        So you are -- the communications department was interested

10  in getting some buzz for the suspension of Mr. Warren?

11  A.   That was a suggestion from Bryan.  I said "off the record"

12  because I don't speak for the sheriff's office so I figured it

13  would be best to call her and say, Hey, I believe that happened.

14  You'll have to call and confirm with the sheriff's office.

15  Q.   But Bryan in the Press Secretary's Office was interested in

16  getting some buzz on the suspension of Mr. Warren?

17  A.   It appears that way.

18  Q.   And by "getting buzz," that means to attract the media to

19  cover the story?

20  A.   You'd have to ask him what he meant by that.

21  Q.   And specifically -- specifically on the fact that

22  Mr. Warren was escorted out by uniformed members of the

23  Hillsborough County Sheriff's Office; right?  That's what you

24  all are discussing?

25  A.   Yes.

Direct Examination - Ms. Fenske

1    Q.   So let's go to Plaintiff's Exhibit 31.

2         So, Ms. Fenske, this is a -- oh, I'll wait again until you

3    get to it.

4    A.   I see it.

5    Q.   Okay.  Ms. Fenske, this is an email to you on August 17

6    entitled "Echo Report"?

7    A.   Yes.

8    Q.   And this is -- the first line tells that the Governor's

9    Office received *Total free earned media coverage of $2.4 million*

10   *in the last 14 days;* right?

11   A.   That's what it says.

12   Q.   And this email -- and the $2.4 million of free media

13   coverage is coverage on Mr. Warren's suspension?

14   A.   Yes.

15   Q.   So you are keeping track of how much free media attention

16   you were getting by announcing Mr. Governor's -- Mr. Warren's

17   suspension?

18   A.   So typically we do Echo Reports on pretty much all of our

19   announcements, but since then I've made sure to focus more on

20   the viewership.  The problem is is the system we use doesn't

21   necessarily always say how many viewers, so it says 2.4 million,

22   but that's just the industry standard from TVI on how they --

23        (Reporter requested clarification.)

24             THE WITNESS:  2.4 million in free earned media

25   coverage, but typically that's how TVI does it and doesn't

 1    always put the viewership.

 2    BY MS. SWAIN:

 3    Q.   And -- but you were tracking free media coverage of

 4    Andrew Warren's suspension; right?

 5    A.   Yes.

 6         But, again, it would have probably been better -- and I've

 7    course corrected since -- to put the viewership, if that's

 8    possible based on the system we use.

 9    Q.   So we'll go back to the exhibit we were looking at before,

10    which was 6, and we'll go to page 4.

11    A.   What was the exhibit number?

12    Q.   Plaintiff's Exhibit -- I'm sorry.  Plaintiff's Exhibit 64.

13    I said 6 before, but I meant 64.004.

14    A.   Got it.

15         MS. SWAIN:  Can we put up Plaintiff's Exhibit 64.004?

16    I'm sorry.  67.004?

17         Yes, that's it.

18    BY MS. SWAIN:

19    Q.   So this is the same text thread that we were looking at

20    before?

21    A.   Yes.

22    Q.   And this is a message from you, it looks like, in the text

23    thread?

24         MS. SWAIN:  If we can go up the next page, I think it

25    has who it's from.  Go up to the 3.

Direct Examination – Ms. Fenske

1    BY MS. SWAIN:

2    Q.   Okay.  So this is a message from you that says:  *Working on*

3    *it* -- starting with *Working on it*?

4    A.   Yes.

5    Q.   And it says it's --

6           MS. SWAIN:  Can we go to 4 now?

7    BY MS. SWAIN:

8    Q.   So that's on August 5th, the day after Mr. Warren is

9    suspended?

10   A.   Yes.

11   Q.   It says:  *Working on it.*

12       *He had a State laptop at his house.*

13       *Fred Piccolo is now doing their comms.*

14       Who is Fred Piccolo?

15   A.   He was a -- I believe he at the time was working on a

16   campaign for Jackie Toledo, but he is a communicator that's

17   worked in, like, the Florida House and other places throughout

18   the state, and he's from the area.

19   Q.   And why is he relevant to what you were talking about?

20   A.   As we were getting a lot of inquiries, typically we -- if

21   it's something specific to a case or something that we can't

22   answer, we send to it the communications office and State

23   Attorney or whatever agency, depending on the topic area.  So I

24   was letting the team know that Fred Piccolo would be the new

25   contact.

Direct Examination – Ms. Fenske

1   Q.   At the State Attorney's Office for the Thirteenth Judicial

2   Circuit?

3   A.   Yes.

4   Q.   And this is -- he started -- Mr. Piccolo started working

5   there after Mr. Warren was suspended?

6   A.   Yes.

7   Q.   And it says -- so you say:   *So I'm going to call him and*

8   *have him get counter stories out there.*

9        What does counter stories -- what are counter stories?

10  A.   I don't -- this is a very stream of consciousness text.   I

11  can't really recall exactly the topic I was discussing at the

12  time.

13  Q.   Okay.   So -- but what is a counter story?

14  A.   A story to counter different -- another story that had

15  incorrect information or -- again, I'd have to see a specific

16  instance of the counter story to clearly tell you exactly what I

17  meant there.

18  Q.   But these were text messages for -- I can represent they

19  are text messages produced in the course of litigation --

20  A.   Yes.

21  Q.   -- on this topic and specifically about the topic of

22  Mr. Warren.

23  A.   Yes.

24  Q.   So presumably you were talking about getting out counter

25  stories about Mr. Warren?

1   A.   Or just the situation at hand.  I don't -- I mean, there's

2   a few stories afterwards, so, again, I don't know exactly what

3   I'm referencing in that text.

4   Q.   If you were referencing counter stories about stuff that

5   doesn't have anything to do with Mr. Warren, it wouldn't be

6   relevant to this litigation; right?

7   A.   I mean, no.

8   Q.   And in the message that you sent -- or the phrase right

9   before was talking about someone, Fred Piccolo, who worked in

10  the State Attorney's Office for the Thirteenth Judicial Circuit;

11  right?

12  A.   Yes.  But, again, it was stream of consciousness, so I

13  can't really recall exactly what I was --

14  Q.   So did you --

15  A.   -- talking about.

16  Q.   -- try to get any counter stories about Mr. Warren out in

17  the media?

18  A.   Yes.

19  Q.   Counter stories to counter the negative news that the

20  Governor was getting by suspending Mr. Warren?

21  A.   Not necessarily.  There was a lot of stories just about the

22  details of the suspension or to highlight the overall Executive

23  Order or focus on the entirety of the situation, not just one

24  piece.  So it really depends.

25  Q.   But counter to what?

Direct Examination – Ms. Fenske

1  A.   Counter to another story that I -- again, there was a lot

2  of stories.  I can't recall exactly the ones right now.

3  Q.   So the last phrase says:  *Will's team can focus on this*

4  *one.  We'll put a nail in the coffin.*

5       Who is Will?

6  A.   He's a reporter.  But, again, I don't really recall what

7  exactly I was talking.  It's kind of -- like, you know, there's

8  a lot of stream of consciousness in this.

9  Q.   So, again, this is a text thread, the section of which was

10 produced in this litigation, speaking about Mr. Warren's

11 suspension, and you say:  *Will's team* -- Will being a

12 reporter -- *can focus on this one.  We'll put a nail in the*

13 *coffin*?

14 A.   I do.

15 Q.   Okay.  So let's move to Plaintiff's Exhibit 69.

16      So -- okay.  Are you there?

17 A.   I am.

18 Q.   Okay.  So, Ms. Fenske, what is this document?

19 A.   It's an email from me to a reporter.

20 Q.   A reporter at the Florida Voice?

21 A.   Yes.

22 Q.   And the Florida Voice is a conservative outlet?

23 A.   Yes, it's -- of many.

24 Q.   And you say to Lydia from the Florida Voice:  *Hi, Lydia.*

25 *It's not surprising Warren, who was suspended for refusing to*

1  *follow the law, would file a legally baseless lawsuit*

2  *challenging his suspension.  We look forward to responding in*

3  *court.*

4       We are in court now.

5       *I also shared some documents with Brendon this morning that*

6  *might add some color to your story.*

7       What -- what did you mean by:  *I shared some documents with*

8  *Brendon this morning that might add some color to your story*?

9  A.   I shared some documents with Brendon that might add some

10  information to the story she was working on.

11  Q.   About Mr. Warren?

12  A.   I'd have to see the documents.  I definitely produced

13  those.  Again, I do this every day, so I can't recall exactly

14  off the top of my head what I was sharing.

15  Q.   And we'll go to Exhibit 71 -- Plaintiff's Exhibit 71.

16       Oh, I'm sorry.  I skipped a page in my outline.

17  Plaintiff's Exhibit 102.

18       And this is -- okay.  I'll wait for you to get there.

19  A.   I got it.

20  Q.   And this is you sending -- you sending information about

21  Mr. Warren to Brendon from Florida Voice?

22  A.   Oh, yes, this is it.

23  Q.   Are you just reviewing the document?

24  A.   I said, "Yes, this is it."

25  Q.   Oh, okay.

1      So, Ms. Fenske, is it still your testimony under oath that

2  Mr. Warren's supposed connection to Mr. Soros had nothing to do

3  with the suspension?

4  A.   Yes, it is.  The reasons are outlined in the EO.

5           MS. SWAIN:  Okay.  I don't have any further questions,

6  Your Honor.

7           THE COURT:  Cross-examine.

8           I guess before you start, let me ask my one question.

9           You can come on up.

10          You told Ms. Swain a couple of times that the Soros

11  connection was irrelevant to the suspension.  I'm going to ask a

12  question that may be different.

13          THE WITNESS:  Okay.

14          THE COURT:  I'm not sure how you're interpreting her

15  question about Mr. Soros.

16          My question deals more generally with what you could

17  use by any of a number of labels, and probably none of them are

18  very accurate, but let's just call it a left-leaning prosecutor.

19          Was the fact that Mr. Warren was perceived to be a

20  left-leaning prosecutor relevant to his suspension at all?

21          THE WITNESS:  I don't believe so, no.  I would say

22  that primarily it was for negligence of duty, and that's all

23  outlined in the Executive Order.

24          THE COURT:  Oh, I've read the Executive Order many

25  times.

Direct Examination - Ms. Fenske

1              You're the witness who is here on the stand.  You're

2    telling me that his being left leaning was not relevant at all?

3              THE WITNESS:  No.

4              THE COURT:  If he'd been a right-leaning prosecutor, a

5    major supporter of the Governor, but he joined this abortion

6    statement, he'd have still been suspended?

7              THE WITNESS:  I believe so, yes.  I mean, he in

8    writing signed a letter that said he was not going to prosecute

9    the law, so if -- the law is the law, and I think that if that

10   were to come up, it would be considered in any State Attorney or

11   any situation.

12             THE COURT:  Do you know that there are other officials

13   who have said they wouldn't prosecute certain laws if enacted

14   who are still out there serving?

15             THE WITNESS:  I would have to look into it more.  Off

16   the top of my head I can't name one.

17             THE COURT:  But your testimony is if that's true, they

18   will be suspended?

19             THE WITNESS:  Again, I'm not the Governor, so I don't

20   actually direct anyone to be suspended.  But I think it would be

21   considered, certainly.

22             THE COURT:  And you told me it's completely irrelevant

23   which way he leans.  So why would it be different if you had a

24   different -- if you had an officer who said, If a law is enacted

25   that makes it a crime to do X, I will not enforce that law --

1    and you've told me that Mr. Warren got suspended just because he

2    said he wouldn't enforce abortion laws -- why would the person

3    who said that he would not enforce X still be working?

4              THE WITNESS:  I would have to ask -- again, I don't

5    know who you are talking about specifically, so I'd have to

6    review kind of a fuller picture of that person's dealings and

7    job description and what they are supposed to do and what they

8    weren't supposed to do.  I'm happy to --

9              THE COURT:  But you're sure as you sit here that

10   Mr. Warren's political view had nothing to do with it?

11             THE WITNESS:  Yes.

12             THE COURT:  Got it.

13             Cross-examine.

14                      CROSS-EXAMINATION

15   BY MR. AARON:

16   Q.   Good morning, Ms. Fenske.  I know you've been very busy

17   working what seems like 23-hour days and running around the

18   state in response to the hurricane, so thank you for being here

19   this morning.  I have just a few questions for you.  I don't

20   think I'll be that long.

21        Can you -- can you just tell us just for full disclosure

22   here, who is it that you report to?

23   A.   James Uthmeier, the chief of staff.

24   Q.   And do you work closely with Mr. Uthmeier?

25   A.   Yes.

Cross-Examination - Ms. Fenske

1   Q.   How often do you communicate with him?

2   A.   Like a zillion times a day.  A lot.

3   Q.   Okay.  And how often do you communicate with the Governor?

4   A.   Frequently.  A few times a week.

5   Q.   Are any of your duties as director of communications -- as

6   the director of communications including drafting or issuing

7   executive orders?

8   A.   No.

9   Q.   Did you draft the Executive Order suspending Mr. Warren?

10  A.   No.

11  Q.   Did you draft -- or did you edit the Executive Order?

12  A.   I don't believe so.  If I did, it was grammatical or

13  something of that nature.

14  Q.   Were you a part of the decision to suspend Mr. Warren?

15  A.   No.

16  Q.   Did you ever talk to the Governor directly about the

17  suspension?

18  A.   Not that I recall.

19  Q.   Earlier I believe you testified -- or perhaps at deposition

20  you testified that you at some point became aware of the

21  letters -- the Fair and Just Prosecution letters -- I think we

22  know them as the trans policy, the abortion policy -- is that

23  right?

24  A.   Yes.

25  Q.   When did you become aware of those letters?

1    A.    I think late July.

2    Q.    And when did you first learn about the decision to suspend

3    Mr. Warren?

4    A.    Maybe a day before.

5    Q.    Do you recall how you learned about the decision to suspend

6    him?

7    A.    Not really, no.

8    Q.    Do you recall how you learned about the reasons for the

9    suspension?

10   A.    I believe Larry Keefe dropped off a few letters one day in

11   late July, and I took a look at them, and I saw that he said

12   that he was not going to prosecute abortion crimes.

13         And I believe the Governor had previously asked someone,

14   maybe Larry or someone in our Office of Policy and Budget, to do

15   a statewide review of State Attorneys, and from there I think

16   there was discussions outside my purview, and they made that --

17   the Governor made that decision.

18   Q.    Thank you.

19         Do you recall what your reaction was when you first saw

20   that abortion policy?

21   A.    I was surprised that a State Attorney would sign a letter

22   abdicating his duties so blatantly.

23   Q.    And what forms your basis of stating that signing that

24   letter was an abdication of duty?

25   A.    I mean, basic civics that people have duties in law and

1    order.  And his job is to prosecute crimes, and so it was just

2    interesting that the letter insinuated that he wouldn't be

3    prosecuting abortion crimes, as it was a law.

4    Q.    I think you testified earlier that you were part of the

5    decision to hold a press conference.

6          Did I have that right?

7    A.    Yes.

8    Q.    Talk to me about that.  Why was there a press conference?

9    A.    I mean, I think it's important to inform the public of a

10   decision like this and to have, you know, local officials or

11   sheriffs kind of tell their story and have the Governor explain

12   why Warren was suspended.  So it was pretty quick turnaround to

13   plan it, but I thought it was beneficial and important for

14   Hillsborough County residents to know.

15   Q.    And earlier you testified that you worked -- I think your

16   words were you worked in collaboration with the director of

17   external affairs?

18   A.    Yes.

19   Q.    Who is the director of external affairs?

20   A.    Savannah Kelly.

21   Q.    Okay.  Do you recall what portions of the press conference

22   you planned as opposed to her?

23   A.    In this situation I mostly just planned the media aspects,

24   you know, advising to the media, letting them know to show up at

25   a certain place at a certain time, and that was it.  Sometimes I

1   have more oversight; sometimes I don't.  It just depends on the

2   day and the time.

3   Q.   So for this press conference it sounds like your role was

4   limited to recommending to do a press conference and inviting

5   the media; is that right?

6   A.   Yes.

7   Q.   So you didn't invite the individuals that spoke at the

8   press conference --

9   A.   No.

10  Q.   -- or the attendees or other participants?

11  A.   No.

12  Q.   After the suspension, what was your understanding of the

13  messaging that the Governor wanted conveyed to the media or to

14  the public?

15  A.   I mean, to explain the reasons that are outlined in the EO.

16  And so I primarily really focused on the EO.  We have -- I think

17  there has been 100 or so EOs this year.  So, off the top of my

18  head, I can't recall the exact phrasing of everything, but it

19  was pretty clear and well written in the order, from what I

20  recall.

21  Q.   Just to be clear -- I think this is obvious -- but when

22  you're saying EO, you mean the Executive Order?

23  A.   Sorry.  Executive Order, yes.

24  Q.   The Executive Order that suspended Mr. --

25  A.   Yes.

1   Q.   Okay.  Do you recall roughly how many media outlets you

2   conveyed that message to, that the basis for the suspension is

3   what's outlined in the Executive Order?

4   A.   I mean, it was outlined in the press release that goes to a

5   list of about 20,000 individuals.  I don't know if -- I mean,

6   it's media, but it's also general population, Floridians that

7   are interested in getting updates on the Governor.  So 20,000

8   people are on that email list, roughly.

9   Q.   Do you know whether there's any scrutiny on that outside

10  email list of whether it just goes to predominantly, you know,

11  Republican outlets or Democrat outlets?  Do you know about that?

12  A.   It's any and all media that wants to sign up.  So we have

13  local.  We have national.  We have even just local TV reporters

14  from other states.  It's pretty extensive.

15  Q.   To the best of your knowledge, do you know whether the

16  communications office always stuck to that message that the

17  Executive Order was the basis?

18  A.   From my perspective, in any media inquiries we answered,

19  you know, not via Twitter but in writing via email, I tried my

20  best to keep it on message and focus on the Executive Order.

21  Q.   Earlier today counsel for Mr. Warren showed you PEX74.  If

22  you don't mind pulling that up.

23       This is -- these are -- you looked at this just a few

24  minutes ago.  These are tweets from a gentleman named Kyle Lamb?

25  A.   Yes.

Cross-Examination - Ms. Fenske

1  Q.   Is -- sorry.

2       Is -- are these tweets consistent with your office's --

3  with the Governor's message?

4  A.   No.  Kyle is not authorized to speak on the record.  He

5  gets a little excited and decided to tweet this himself.  And he

6  was reprimanded for it.

7  Q.   Tell me about that.

8  A.   I believe James texted him and said, Kyle, cease all

9  tweets.  Make sure to get things -- I have to reread the text --

10  but, Make sure to get things approved by Taryn.  I think he said

11  something along the lines of, I know you are just trying to

12  stick up for the Governor, but this is a serious, you know,

13  legal matter, and you can't willy-nilly say things like that, or

14  something along those lines.

15  Q.   Let me help you and not have you guess.

16       We'll pull up DEX61.006.

17       Are you familiar with this document?

18  A.   Yes.

19  Q.   What is this document?

20  A.   This is the text from James to Kyle and myself.

21  Q.   All right.  Do you mind reading what Mr. Uthmeier had said

22  to you and Kyle?

23  A.   Sure.

24       *Kyle, please immediately cease all tweets until we have a*

25  *chance to meet one-on-one.  I know you're just trying to help,*

1   *but the boss is not pleased with the sensationalism of this*

2   *overly legal proceeding.  Every comment impacts what will be*

3   *contentious litigation.  No tweets at all unless directed by*

4   *Taryn.  I mean it.*

5   Q.   And, to the best of your knowledge, this is in response to

6   the tweets that we just looked at from Mr. Lamb?

7   A.   Definitely in response to that, yes.

8   Q.   Did Mr. Uthmeier ever talk to you about those tweets?

9   A.   Yes.  And we proceeded to follow up with Kyle in person --

10   I don't remember the date -- but to reiterate, You need to stay

11   on message and you're not approved to be on the record and you

12   shouldn't be sensationalizing.

13   Q.   So Mr. Lamb's departure from the Executive Order got him

14   reprimanded both by the chief of staff in writing and an

15   in-person meeting?

16   A.   Yes.

17   Q.   And you were present at that meeting?

18   A.   Yes.

19   Q.   Just to be clear, Kyle Lamb -- I think you said this

20   earlier, but Kyle Lamb is one of your direct reports; is that

21   right?

22   A.   Yes.

23   Q.   What's his role?

24   A.   He does research and data analysis.  He came in during

25   COVID and just crunched numbers for us.  But he is a lower level

1    staffer and not approved and usually is not and should not be on

2    the record.

3    Q.   What is -- what's his title?

4    A.   I think it's analyst 1.

5    Q.   What does an analyst 1 do?

6    A.   A lower level, like, administrative staff, writes talking

7    points sometimes.  Like, Sydney, I think, and him are classified

8    the same.  But it just depends on their skill set.  So he

9    primarily just does research or any data number collection that

10   we need.

11       Again, he came in during COVID specifically to kind of help

12   with the data and research and is housed in my office

13   administratively but has moved around within EOG a few times.

14   Q.   And just to be clear, the text that's on the screen from

15   Mr. Uthmeier -- it seems like it says it right there on the

16   screen -- but can you read to me when Mr. Uthmeier is

17   reprimanding?

18           THE COURT:  But read it slowly.

19   A.   Thursday, August 4, 10:39 a.m.

20           THE COURT:  I'm sorry.  I misunderstood the question.

21   You weren't going to read it at all.

22           MR. AARON:  Oh, yeah.  Sorry.  Don't read the whole

23   thing again.

24   BY MR. AARON:

25   Q.   So Thursday, August 4, 10:39 a.m.  So this is -- this is

1    the morning of the suspension?

2    A.   Yes.   I think it probably was right after Kyle tweeted

3    that.

4    Q.   So almost immediately after Kyle tweeted that James is

5    reprimanding him?

6    A.   Yes.

7    Q.   Do you know whether anyone else in your office went rogue,

8    if you would, and conveyed any message about the suspension that

9    wasn't consistent with the Governor's intent?

10   A.   Yes.   I believe I forwarded this to Christina and Bryan as

11   well just to make sure we were all on the same page.   Also,

12   Christina got reprimanded for her tweet about liberal media

13   melting down, I believe directly by the Governor on the way to

14   the press conference.

15          MS. SWAIN:  All right.  And I don't want to guess, so

16   let's pull up Joint Exhibit 57.

17          Zoom in just to the tweet.

18   BY MS. SWAIN:

19   Q.   Just to be clear, is this -- it looks like there is some

20   other things on the screen, but is this the tweet that you were

21   just referencing from Christina?

22   A.   Yes.

23   Q.   What was the problem with this tweet?

24   A.   It's sensationalized.  We obviously had very explicit

25   reasons outlined in the EO for suspending Andrew Warren, and

1  this was sensationalized to draw attention to a serious issue.

2  Q.   Got it.

3       And if I understand you correctly, you said the Governor

4  himself yelled at or reprimanded Christina for this?

5  A.   Yes.  It was very stern from my understanding, yes.

6  Q.   Do you know why he was upset?

7  A.   Because, obviously, his reasoning was outlined.  I believe

8  he even made hand edits to the Executive Order, and he wanted to

9  stick to that message.  And this, again, teased out a

10  sensationalized announcement when it was something that should

11  have been taken more seriously from our team.

12  Q.   I understand.

13      And did I understand you correctly that you took the James

14  Uthmeier text that we just looked at and forwarded it to

15  Christina and Bryan Griffin?  Is that right?

16  A.   Yes.

17  Q.   And who's Bryan Griffin?

18  A.   He was at the time the deputy press secretary, and he's

19  currently the press secretary.

20  Q.   Let's pull up DEX58.003.

21  A.   DEX58.003?

22  Q.   DEX58.003.

23  A.   Got it.

24  Q.   Are you familiar with this document?

25  A.   This is -- yeah.  This is me forwarding the message from

1    James to Kyle to Christina and Bryan.

2    Q.   And just to be clear, you're sending it to Christina

3    because you -- well, had you already seen Christina's tweet?

4    A.   Yeah.  I believe I saw it around the same time I saw

5    Kyle's, so I was trying to course correct quickly.

6    Q.   What was your response?  What was your reaction when you

7    saw those tweets from Kyle and Christina?

8    A.   I was frustrated because, obviously, the talking points get

9    edited, but sometimes the Governor just uses them as a

10   guideline.  He doesn't frequently always stick to them word for

11   word.  So I wanted the Governor's Executive Order and words to

12   speak for themselves instead of our team, you know,

13   sensationalizing it before we had a chance to have the message

14   resonate.

15   Q.   Okay.  And so this -- you forwarding it, this is your way

16   of reprimanding Christina yourself; is that right?

17   A.   Yes.  I think I also called her, but she was on the road.

18   So the timing was probably well after that tweet was posted, but

19   I think I also spoke to her in person, if I recall.

20   Q.   What did you say to her?

21   A.   Basically reiterated what James said, and that's when I

22   believe she told me that the Governor had also spoken to her.

23   So I figured that was sufficient if the Governor told her

24   directly.

25   Q.   Let's go back for a moment and take a look at PEX31.

1        I think --

2    A.   I'm here.  Sorry.

3    Q.   I think you testified earlier you were familiar with this

4    document; is that right?

5    A.   Yes.

6    Q.   Focusing in on that first line in the body of the email, it

7    says:  *BLUF:  Total free earned media coverage: $2.4 million in*

8    *14 days.*

9        You testified a little bit about that earlier, but in your

10   testimony you had mentioned something called TVIs.

11       Did I understand that correctly?

12   A.   Yes.

13   Q.   What is that?

14   A.   It's a system that tracks mentions and media coverage you

15   get, you know, by name or topic on a wide variety of local news

16   and radio and sometimes national.

17   Q.   So is that organization the organization that calculated

18   this $2.4 million?

19   A.   Yes.

20   Q.   Do you have any idea how they came up with this number?

21   A.   I believe it's just an aggregate of viewership and what the

22   cost would be if you were to buy an ad during that specific hour

23   time slot, so, obviously, like, prime time would be more

24   expensive.

25       But, again, this isn't necessarily a good metric to use

 1   when you're -- the whole point is to inform local Floridians

 2   about the suspension.  It's just sometimes the most consistent

 3   post-event.  It doesn't always say viewership totals.  It's a

 4   guesstimate, really.

 5   Q.   Got it.

 6        And it's essentially -- if I'm understanding you correctly,

 7   it's what the equivalent amount of air time would be if you were

 8   placing advertisements; right?

 9   A.   Yes.

10   Q.   But you weren't placing advertisements?

11   A.   No.  And it's free-earned media because it's the -- it

12   could be a reporter in the 5 o'clock hour reproducing the

13   footage from the earlier press conference and, you know,

14   portraying it on their end as a certain way.  So it's just the

15   repurposing of it.

16        But, again, it's a guesstimate, and it's not -- you

17   couldn't buy $2.4 million of -- you can't pay a TV station to

18   reproduce all of your content.  I couldn't say, Hey, local

19   media, I think I said, if I give you $2.4 million, would you

20   cover this?  It's just based on the business industry standard

21   for typically buying adds in that coverage time.

22   Q.   The airtime that we're talking about in this $2.4 million,

23   that's specifically time where the news is talking about

24   Mr. Warren's suspension and the Governor's involvement there; is

25   that right?

1    A.    Yes.  So it would have -- it would have also -- it would

2    have also given Mr. Warren $2.4 million in free-earned media as

3    well because it's mentioning both of them.

4    Q.    Earlier you were asked about a document titled "The Soros

5    Plan."  Do you recall that just a few minutes ago?

6    A.    Yes.

7    Q.    At the time that that document was drafted, had the

8    Governor already made the decision to suspend Mr. Warren?

9    A.    Yes, I believe so.

10   Q.    So did the Governor see that document before he finalized

11   and signed off on the Executive Order?

12   A.    No, it was done afterwards.  And, again, sometimes I put in

13   local news or any pertinent -- I don't know if -- I'm trying to

14   think of another example.  Any local news that would be

15   efficient or effective to the area he's going to.  So sometimes

16   I put things in the binder.  And if I'm not traveling, I don't

17   know if he looks at it, but sometimes he doesn't review the

18   binder.  Sometimes he does.  It really just depends on the

19   timing -- sorry.  I'll slow down -- the timing and the -- what

20   he's interested in that day.  So I didn't speak with him about

21   it nor was it produced before the EO.

22   Q.    So just to be clear, it wasn't the only document in the

23   binder; right?

24   A.    No.

25   Q.    You don't know whether he even ever looked at it?

Cross-Examination - Ms. Fenske

1   A.   I do not know if he even looked at it, no.

2   Q.   You're employed by the Executive Office of the Governor; is

3   that right?

4   A.   Yes.

5   Q.   You don't work for the campaign; right?

6   A.   No.

7   Q.   Did you ever work for the campaign?

8   A.   No.

9   Q.   That's a separate entity, right, entirely not part of

10  EOG --

11  A.   Yes.

12  Q.   -- the Executive Office of the Governor?

13       And not part of the State of Florida; right?

14  A.   No.

15  Q.   I want to turn your attention to one more document,

16  DEX25.003.  I'll represent to you this is the transcript of the

17  Tucker Carlson interview with Governor DeSantis.  The entire

18  interview has been admitted in as evidence in this case.

19       You were asked about specific portions of the Governor's

20  statements.  I just want to make clear this -- the top of the

21  page here, it's highlight.  Can you read what Governor DeSantis

22  said in the highlights on lines 11 through 13?

23  A.   *They basically take it upon themselves to determine which*

24  *laws should be followed and which laws should not be followed.*

25  Q.   Is that -- do you believe that to be a comment in

1   connection with Mr. Warren?

2   A.   Yes.

3   Q.   And part of the basis why he was suspended?

4   A.   Yes.

5   Q.   How about the portion at the bottom there, lines 22 through

6   24?

7   A.   *And he actually signed letters saying he wouldn't force*

8   *laws against transgender surgeries for minors, laws protecting*

9   *the right to life.*

10  Q.   And do you understand that to mean the trans policy and the

11  abortion policy that we've been talking about, the ones that are

12  attached to the Executive Order?

13  A.   Yes.

14       MR. AARON:   Just give me 30 seconds, and I might be

15  done.

16       (Discussion was held among attorneys.)

17  BY MR. AARON:

18  Q.   Just one last question for you.

19       The Echo Report that we looked at a minute ago, does your

20  office do those Echo Reports on all major events?

21  A.   Yes, they do.

22  Q.   Okay.   Thank you.

23       MR. AARON:   Nothing further.

24       THE COURT:   Redirect.

25                      REDIRECT EXAMINATION

Redirect Examination - Ms. Fenske

1   BY MS. SWAIN:

2   Q.   So, Ms. Fenske, you mentioned Ms. Pushaw, Christina Pushaw.

3   When she was press secretary for Governor DeSantis, she was

4   authorized to speak on the record?

5   A.   Yes.

6   Q.   You noted that she was chastised by both the Governor, and

7   you sent her the message from Mr. Uthmeier --

8   A.   Yes.

9   Q.   -- for tweeting?

10        MS. SWAIN:  Can we pull up what Mr. Aaron just showed

11  you?  It was Defendant's 58.003.

12  BY MS. SWAIN:

13  Q.   So this is -- I'll wait for you to pull it up.

14  A.   Got it.

15  Q.   Okay.  So you screenshoted this message from Mr. Uthmeier

16  at 10:39 a.m. on August 4th.  And we'll scroll down.  And then

17  you say to Ms. -- you say to Ms. Pushaw:  *Just between us so*

18  *let's tread lightly and let the press sensationalize it through*

19  *our facts and us walking the line.*

20        MS. SWAIN:  And let's scroll down some more.

21  BY MS. SWAIN:

22  Q.   So it doesn't have a timestamp on this; right?  It doesn't

23  have a timestamp that you sent this one particular message;

24  right?

25  A.   I mean, I think the Android has it somewhere.  It was

1   probably an ongoing conversation.  So if you go back to the

2   originally page, it might be on there.

3   Q.   Yeah, let's keep scrolling.

4   A.   I'm not sure.  I don't have an Android.

5   Q.   So -- but it was at least before 12:28 p.m. on August 4th;

6   right?

7   A.   Yes.

8   Q.   Because this next timestamp comes up on the next page at

9   12:28 p.m. on August 4th?

10  A.   Yes.

11  Q.   So I'd like to show you Plaintiff's Exhibit 87.001.

12  A.   87 you said?

13  Q.   Plaintiff's Exhibit 87 and it's the first page.

14  A.   Got it.

15  Q.   Okay.  So this is a tweet from someone named Jack Posobiec.

16  I don't know exactly how to pronounce that.  But it was on the

17  day that Mr. Warren was suspended, and it looks like he's

18  tweeting out an article in which governor -- it says:

19  *Governor DeSantis Sends Cops to Physically Remove Suspended*

20  *Soros-Backed* -- you can't see what's next, but assuming this is

21  about Mr. Warren; correct?

22  A.   It appears that way, yes.

23  Q.   Okay.

24       MS. SWAIN:  So let's scroll down to the rest of the

25  page.  And do -- can we zoom in to see what they say?  Okay.  So

Redirect Examination - Ms. Fenske

1   you can stop there.

2   BY MS. SWAIN:

3   Q.   This is a retweet that -- Ms. Pushaw was retweeting that

4   article that Jack Posobiec tweeted out; right?

5   A.   It looks like a reply.  It's not a retweet.

6   Q.   It's a reply.  Sorry.  I don't use Twitter that often.

7         MS. SWAIN:  Okay.  Let's scroll to the bottom.

8   BY MS. SWAIN:

9   Q.   Now, the timestamp on this says it's 9:30 p.m.; right?

10  A.   Yes.

11  Q.   This is after you sent Ms. Fenske -- oh, sorry --

12  Ms. Pushaw the message from Mr. Uthmeier?

13  A.   Yes.

14  Q.   And that message was saying, you know, keep it -- I think

15  it was something along the lines of *Toe the line* and *Let the*

16  *press sensationalize it*; right?

17  A.   Yes.

18  Q.   And is -- this tweet from Ms. Pushaw, is this consistent

19  with the serious legal tone that the Governor purportedly wanted

20  Ms. Pushaw to uphold?

21  A.   You'd have to ask her.  I didn't tweet it.

22  Q.   What do you think?

23  A.   I think it's a meme.  It's Twitter, and so it's a little

24  more free flowing than official work.

25        But I would like to point out that this headline is even

1  sensationalized in itself because we don't oversee the

2  Hillsborough, you know, Sheriff's Office, so we can't send them

3  to do anything.

4          MS. SWAIN:  No further questions.

5          THE COURT:  Anything further?  No?

6          Thank you, Ms. Fenske.  You may step down.

7          THE WITNESS:  Thank you.

8      (Ms. Taryn Fenske exited the courtroom.)

9          THE COURT:  This makes this is a good time probably to

10  break for lunch.  We'll take about an hour.

11          Tell me where we stand.  Where are we going?  What do

12  we have for the afternoon?  What do you expect?  Give me a

13  preview for the afternoon.

14          MR. O'NEIL:  Your Honor, Mr. Warren will call

15  Mr. Treadwell, and I imagine that will go a couple of hours, and

16  then -- I imagine that will go the afternoon, although I can't

17  speak for Mr. Levesque's cross.

18          THE COURT:  All right.  That at least tells me what's

19  next, I guess.

20          We'll be in recess until 1:15 by that clock.

21      (Recess taken at 12:13 PM.)

22      (Resumed at 1:15 PM.)

23          THE COURT:  Please be seated.

24          Please call your next witness.

25      (Mr. Treadwell entered the courtroom.)

 1          MR. O'NEIL:  Thank you, Your Honor.  Mr. Warren calls

 2    Ray Treadwell.

 3          THE COURTROOM DEPUTY:  Please stand and raise your

 4    right hand.

 5          **RAYMOND F. TREADWELL, PLAINTIFF WITNESS, DULY SWORN**

 6          THE COURTROOM DEPUTY:  Please be seated.

 7          Please state your full name and spell your last name

 8    for the record.

 9          THE WITNESS:  Raymond Frederick Treadwell,

10    T-r-e-a-d-w-e-l-l.

11                        DIRECT EXAMINATION

12    BY MR. O'NEIL:

13    Q.   Good afternoon, Mr. Treadwell.  My name is Dave O'Neil.

14    You recall I took your deposition, although we were by video, so

15    it's nice to meet you in person.

16    A.   You, too.

17    Q.   Now, you are the Chief Deputy General Counsel to the

18    Governor; right?

19    A.   I am.

20    Q.   And before that you were the Deputy General Counsel?

21    A.   Correct.

22    Q.   And in both of those positions, you were responsible for

23    suspensions within the Governor's Office; right?

24    A.   Correct.

25    Q.   And you had the lead for the Office of General Counsel on

Direct Examination - Mr. Treadwell

1    Mr. Warren's suspension --

2          (Reporter requested clarification.)

3    BY MR. O'NEIL:

4    Q.   And you had the lead for Mr. Warren's suspension in the

5    General Counsel's Office; right?

6    A.   I played what I would consider to be the largest role in

7    drafting the Executive Order, but, I mean, obviously Mr. Keefe

8    was working on it before I got involved.

9    Q.   Well, you heard Mr. Keefe talk about all the work that the

10   General Counsel's Office did, and we'll get back to that.

11         But when he says "General Counsel's Office," he's really

12   referring to you; right?

13   A.   Me and Mr. Newman.

14   Q.   You and Mr. Newman.

15         Okay.  But you were the lead draftsperson of what became

16   the Executive Order; is that fair?

17   A.   I think that's fair.

18   Q.   Okay.  We'll talk obviously a lot more about that.

19         But, first, Mr. Treadwell, you worked at two law firms

20   before joining the government, the government of the State of

21   Florida; right?

22   A.   Correct.

23   Q.   Okay.  And the first of those was Holland & Knight; right?

24   A.   Correct.

25   Q.   Okay.  And you did purely commercial litigation there;

1  right?

2  A.   That is correct.  I think there was one or two pro bono

3  matters we did in 1983, but, yes, civil as well.

4  Q.   No criminal litigation?

5  A.   Not at that stage in my career, no.

6  Q.   You then you worked at Shutts & Bowen?

7  A.   That's right.

8  Q.   And you did -- you had a civil litigation practice there,

9  too; right?

10  A.   Correct.

11  Q.   Okay.  And before joining the Governor's Office, you worked

12  at the Florida Department of Business and Professional

13  Regulation; right?

14  A.   Correct.

15  Q.   Your primary responsibilities were the Division of

16  Alcoholic Beverages & Tobacco and the Division of Pari-Mutuel

17  Wagering?

18  A.   Those are the divisions I spent my most time with, but I

19  obviously helped with legal issues from all of the department's

20  divisions.

21  Q.   You didn't stand up in court and represent the people of

22  the State of Florida in criminal cases?

23  A.   No, sir.

24  Q.   Did you work with any criminal prosecutors in the Florida

25  Department of Business and Professional Regulation?

1    A.    Former criminal lawyers, but not anybody that were

2    currently at the department.

3    Q.    Okay.  And at the Executive Office of the Governor your

4    responsibilities don't include criminal prosecution; right?

5    A.    Correct.

6    Q.    You don't have any law enforcement experience?

7    A.    Correct.

8    Q.    You've never worked in the State Attorney's Office?

9    A.    Correct.

10   Q.    Other than what you've learned from hearing the testimony

11   in this case, you have no experience with how State Attorney's

12   Offices function, do you?

13   A.    I wouldn't say no experience, but probably the knowledge

14   that the general public has.

15   Q.    So whatever knowledge someone would have -- just a person

16   off the street -- is what knowledge you have of how a State

17   Attorney's Office works?

18   A.    I mean, I have a fair number of friends who have worked in

19   State Attorney's Office, but you're right.  I have never had

20   firsthand experience in a State Attorney's Office.

21   Q.    Do you have any experience making judgments about how to

22   allocate resources in a State Attorney's Office?

23   A.    In a State Attorney's Office?

24   Q.    Yes.

25   A.    No.

1    Q.    Now, Mr. Treadwell, you listened to the testimony yesterday

2    of Mr. Warren; right?

3    A.    I did, yes.

4    Q.    About his life and career as a federal and then a state

5    prosecutor; right?

6    A.    Yes.

7    Q.    You listened to the testimony of Ms. Wilds?

8    A.    Yes.

9    Q.    Her career as a state prosecutor?

10   A.    Yes.

11   Q.    And Ms. Hindman's career as a federal and state prosecutor.

12   A.    Yes.

13   Q.    Okay.  Now, we'll get to this, but you judged Mr. Warren

14   incompetent in your recommendation to suspend him; right?

15   A.    That's correct.

16   Q.    Okay.  You drew that conclusion based on your views on how

17   he was performing his duties as a prosecutor?

18   A.    That's correct.

19   Q.    Okay.  I asked you in your deposition what made you

20   qualified to make that judgment.

21         Do you recall your answer?

22   A.    Not offhand.

23   Q.    *A life of experience*; is that fair?

24   A.    Okay.  Yes.

25   Q.    Okay.  Anything else?  Any other experience that would make

Direct Examination - Mr. Treadwell

1   you qualified to pass judgment?

2   A.   I mean, because you only started with my law firm

3   experience, you missed my prior criminal law experience, both as

4   a law clerk for a United States District Court judge for two

5   years where I worked on criminal matters, and then prior to that

6   in law school I had internships and classes relating to criminal

7   law.

8   Q.   Okay.  So you took law school -- you took criminal law in

9   law school?

10  A.   Yes.

11  Q.   And you were an intern at a U.S. Attorney's Office?

12  A.   That's right.

13  Q.   Kind of like Mr. Madry?

14  A.   Well, it was a U.S. Attorney's Office.

15  Q.   How long was the internship?

16  A.   For the summer.

17  Q.   A couple of months?

18  A.   Yes.

19  Q.   Okay.  Mr. Treadwell, I'm going to ask you some questions

20  first about the Office of the Governor, and I'll show you Joint

21  Exhibit 34.  And I know you've been sitting here through this

22  testimony, so I'm hoping we can be a little bit more efficient

23  because you are familiar with these documents.

24       So this is an org chart for the Office of the Governor.

25  Where do you fit on this chart?

Direct Examination – Mr. Treadwell

1  A.   So if you see on the right-hand side there is a column for

2  General Counsel Ryan Newman.

3  Q.   Okay.

4  A.   I would be in that area.

5  Q.   Okay.  So you report to Ryan Newman; he's your boss?

6  A.   Correct.

7  Q.   You don't report directly to the Governor?

8  A.   Correct.

9  Q.   In fact, you only speak to the Governor maybe once or twice

10  a month, is that fair -- I'm sorry.  Once -- only one -- every

11  couple of months; is that fair?

12  A.   That's fair.

13  Q.   Mr. Newman reports to the Chief of Staff, Mr. Uthmeier; is

14  that right?

15  A.   That's my understanding.

16  Q.   And Mr. Uthmeier speaks with the Governor often?

17  A.   That's my understanding.

18  Q.   Okay.  Would you say that Mr. Uthmeier attends most of the

19  Governor's meetings with his staff?

20  A.   That's my understanding.

21  Q.   Is he the Governor's closest employee adviser?

22  A.   Yes, in my experience.

23  Q.   Now, there's no org chart, as far as I see, on this -- no

24  box on this org chart for State Attorneys; right?

25  A.   Not that category in and of itself, no.

Direct Examination – Mr. Treadwell

1  Q.   Okay.  And that's because the Governor doesn't supervise

2  State Attorneys on a day-to-day basis, does he?

3  A.   Not on a day-to-day basis, no.

4  Q.   Okay.  Now, Mr. Treadwell, we talked a little bit about

5  your job.  Since this lawsuit's been filed, you basically had a

6  second job; right?

7  A.   That's fair.

8  Q.   Okay.  I mean, you had to manage this case for the

9  Governor's office?

10  A.   I've helped with the management of it, yes.

11  Q.   So as part of that responsibility, you've prepared and then

12  signed discovery responses?

13  A.   That is correct.

14  Q.   And we looked at a long list of people on Exhibit 3 that

15  Mr. Levesque went through.  You've probably spoken to most of

16  those people?

17  A.   The long list of people in the interrogatories?

18  Q.   Yes.

19  A.   No.  I have not spoken to those people.

20  Q.   Okay.  Well, do you remember when I asked you who you'd

21  talked to in connection with this case at your deposition, and

22  you said, I mean, if they're on one of our lists, I've probably

23  spoken to them?

24  A.   It depends on what question you're looking at.  I mean, in

25  terms of who did the office talk to, I didn't talk to everybody

Direct Examination - Mr. Treadwell

1   on that list.

2        But in terms of internal within EOG, if they've been a part

3   of this matter, I have probably spoken to them.

4   Q.   Okay.  And you're familiar with the filings in this case;

5   right?

6   A.   Generally, not every one.

7   Q.   You're familiar with the legal arguments on both sides?

8   A.   I have looked at the legal arguments, yes.

9   Q.   You know what Mr. Warren needs to show to prevail in this

10  case?

11  A.   Well, I understand that there's --

12  Q.   Yes or no?  Do you know what Mr. Warren needs to show to

13  prevail?

14  A.   To the extent that settles the dispute between the party as

15  to what legal standards apply, I can't give you a yes or no.

16  Q.   Okay.  You know what the defendant believes that he needs

17  to prove in order to prevail?

18  A.   Sure.

19  Q.   You've discussed those issues with your immediate boss,

20  Mr. Newman?

21  A.   Maybe.  I mean, we exchanged draft -- well, actually, this

22  is talking about what we're doing in defense of this case?

23  Q.   Okay.  Whatever you feel comfortable testifying about.

24            MR. LEVESQUE:  Your Honor, at this point I'd object

25  and assert attorney/client privilege, attorney work product

1   privilege.

2            THE COURT:  I thought you'd waived all that.

3            MR. LEVESQUE:  Not related to the defense of the case;

4   just related to the order.

5            THE COURT:  Fair enough.

6            MR. O'NEIL:  That's fine, Your Honor.  I'll move on.

7   BY MR. O'NEIL:

8   Q.   So I'm going to ask you some general questions about the

9   timeline that led to Mr. Warren's suspension.

10       From your perspective, whose idea was it to suspend

11   Mr. Warren?

12   A.   Mr. Larry Keefe.

13   Q.   Okay.  And you first became aware of that idea on July 18,

14   2022; right?

15   A.   Correct.

16   Q.   That was a Monday?

17   A.   Yes, sir.

18   Q.   And you began working on it at that time because your

19   responsibilities included suspensions?

20   A.   Correct.

21   Q.   Now, you're aware that at the press conference that the

22   Governor held to announce Mr. Warren's suspension, he stated

23   that there had been a statewide review of State Attorneys;

24   right?

25   A.   Correct.

1    Q.    Okay.  But when you were drafting this Executive Order, you

2    didn't have any idea that that statewide review was going on;

3    right?

4    A.    That's right.

5    Q.    You learned about it after the fact?

6    A.    That's right.

7    Q.    You had no involvement in it?

8    A.    None.

9    Q.    You don't know what steps were taken to carry out that

10   statewide review?

11   A.    I do not.

12   Q.    Okay.  Other than what Mr. Keefe and the defendant have

13   said, you have no idea what was done in that statewide review?

14   A.    That's right.

15   Q.    Okay.  There's no written summary of what Mr. Keefe did in

16   that statewide review?

17   A.    No written summary?

18   Q.    Correct.

19   A.    None that he provided to the legal office, and I --

20   Q.    And you --

21   A.    And so I'm fairly confident to say that there was no formal

22   write-up to conclude his review.

23   Q.    Well, forget formal write-up.  You gathered documents for

24   purposes of producing them in this litigation; right?

25   A.    Correct.  Correct.

Direct Examination - Mr. Treadwell

1   Q.   Did Mr. Keefe have any notes at all of those conversations?

2   A.   Whatever documents existed, I'm confident we produced to

3   you.

4   Q.   Okay.  You do know that Mr. Keefe didn't speak to

5   Mr. Warren; right?

6   A.   I do know that now.

7   Q.   Okay.  And you know that no one else from the Governor's

8   Office spoke to anyone in Mr. Warren's office before the

9   suspension?

10  A.   I do know that now.

11  Q.   In fact, the way that this came in to you was, here's

12  Andrew Warren's abortion statement, is this worthy of

13  suspension; is that fair?

14  A.   That's fair.

15  Q.   When this topic was introduced to you, you didn't know

16  anything about Mr. Warren's official policies as State Attorney?

17  A.   That's correct.

18  Q.   All you had was these FJP statements; is that correct?

19  A.   The FJP statements and then, probably within days, I got

20  the packet of material that Sheriff Chronister had delivered to

21  our office.

22  Q.   So what did you do to learn about the policies of

23  Mr. Warren's office?

24  A.   Well, the policies that he had either signed or that we had

25  from his office that he had issued, I mean, I took for face

1    value.

2    Q.    Okay.  What did you do to learn what policies he had in his

3    office?

4    A.    I read the policies myself.

5    Q.    What policies did you read?

6    A.    I read the transgender policy, the abortion policy.  I read

7    the prosecutorial discretion memo.  I read the presumption of

8    nonprosecution policy.

9    Q.    How did you get those policies?

10   A.    Some of them were delivered by Sheriff Chronister and

11   others, you know, were found either online or --

12   Q.    Did you do anything to request any policies of Mr. Warren's

13   office outside of whatever materials Sheriff Chronister gathered

14   for you?

15   A.    Did we go search for more internal policies?

16   Q.    Yes.

17   A.    Not before the suspension.

18   Q.    You did after the suspension?

19   A.    After the suspension I believe we asked for a lot of

20   documents from the State Attorney's Office.

21   Q.    You started investigating at that point?

22   A.    Well, we had a case to try.  We have a case to try in front

23   of the Florida Senate.

24   Q.    And your position in that case is that all of the reasons

25   for the Executive Order are stated -- all the reasons for the

Direct Examination – Mr. Treadwell

1   suspension are stated in the Executive Order?

2   A.   Constitutionally we have to do that.

3   Q.   Okay.  And you began asking for policies of the State

4   Attorney's Office after the suit was filed?

5   A.   Well, I think like any case, discovery takes place after

6   the initial pleading.

7   Q.   Well, I want to go back to the time that you are drafting

8   this Executive Order.  Okay.

9        If a policy or a document wasn't in the packet that

10   Mr. Chronister provided for you, you didn't have it; is that

11   right?

12   A.   There were some news articles I looked at that were

13   probably not in that packet.  I mean, whatever was available

14   online they could find, or at least, you know, somebody was

15   circulating in the office, that's what I was able to look at.

16   Q.   All right.  Did you ask Mr. Chronister how he assembled

17   those materials?

18   A.   No.

19   Q.   Okay.  And, in fact, your communications with

20   Sheriff Chronister were pretty limited, weren't they?

21   A.   I think I was on one phone call where he was on phone prior

22   to the suspension.

23   Q.   You talked to him maybe once?

24   A.   Yeah, and I don't know if I spoke during that phone call.

25   Q.   So your entire interaction with Sheriff Chronister when you

1   were preparing the Executive Order was that both of you were on

2   the same phone call in which you may or may not have spoken?

3   A.   I mean, he spoke a great deal during that phone call.

4   Q.   You don't know whether you asked any questions?

5   A.   I don't recall asking anything.

6   Q.   Okay.  You heard Mr. Keefe testify yesterday.  You heard

7   that the General Counsel's Office -- and I'm using his words, so

8   pay close attention -- conducted an intensive analytical process

9   based on the laws as a basis for the suspension.  You heard him

10  say that?

11  A.   I'm sorry.  Can you repeat that, please?

12  Q.   Did Mr. Keefe testify that the General Counsel's Office

13  conducted an analytical process based on the law in relation to

14  the facts that he provided?

15  A.   Yes, we did our own independent --

16  Q.   I'm just asking if you heard him testify to that.

17  A.   Oh.  I don't recall that exact testimony, but I take your

18  word for it.

19  Q.   You heard Mr. Keefe testify that the General Counsel's

20  Office -- and, again, I'm using his words -- zeroed in on the

21  SAO policies and how that was playing out in the field, what

22  particular statutes were involved, all those sorts of very

23  granular, on-the-street law enforcement issues, based on their

24  own line of communication with Sheriff Chronister and former

25  Chief Dugan?  Do you remember him saying that?

Direct Examination - Mr. Treadwell

1   A.   I can't recall the exact quote.  I just take your word for

2   it.

3   Q.   You don't disagree that that's what he said?

4   A.   I can't recall that those were his exact words.  I can tell

5   you about the process we undertook.

6   Q.   Well, I want to ask you when he said General Counsel's

7   Office was doing those things, again, you're leading this for

8   the General Counsel's Office; right?

9   A.   Yes, primarily me and Mr. Ryan Newman.

10  Q.   Did you zero in on how the policies were playing out in the

11  field, what particular statutes were involved, all those sorts

12  of very granular, on-the-street law enforcement issues?

13  A.   I did do independent research on the abortion laws that

14  Mr. Warren pledged not to enforce, and I know that we did a

15  thorough -- or at least we tried to find statistics in terms of

16  how these policies might have impacted the number of cases that

17  were being charged.

18  Q.   Okay.  We'll come back to the statistics, but the only

19  thing you did, in fact, was to read the policies once, talk to

20  Sheriff Chronister, and read an article or two in relation to

21  the SAO policies; is that fair?

22  A.   In drafting the Executive Order?

23  Q.   Yes.

24  A.   No, I did more than that, sir.

25  Q.   Now, you were principally looking at this from what was

Direct Examination - Mr. Treadwell

1   necessary to justify and defend the suspension in a Senate

2   trial; right?

3   A.   Factually and legally, yes.

4   Q.   Right.  And so your job was to determine how a Court or the

5   Senate was going to review this?

6           MR. LEVESQUE:  Objection, Your Honor.  The -- we've

7   always --

8           THE COURT:  Overruled.

9           MR. LEVESQUE:  Thank you, Your Honor.

10          THE WITNESS:  Can you repeat the question, please?

11  BY MR. O'NEIL:

12  Q.   Your job was to determine how a Court or the Senate,

13  whatever form was going to review this decision, was going to --

14  how they were going to go about reviewing that?

15  A.   Yes, part of my job is assessing how this is going to be

16  analyzed or scrutinized legally.

17  Q.   Okay.  And part of that was to decide what reasons should

18  go in the Executive Order and which ones shouldn't; right?

19  A.   Correct.

20  Q.   Now, an intern we just heard from him, Mr. Madry, he wrote

21  a memo for you on -- touching on some of those issue; right?

22  A.   Correct.

23  Q.   After -- after he prepared that memo, you provided advice

24  to Mr. Newman; right?

25  A.   Yes, sir.

Direct Examination - Mr. Treadwell

1   Q.   And that advice included what type of judicial review was

2   going to be applied to this?

3   A.   Yes, we had a sense that we were facing either a quo

4   warranto or a due process challenge, but since Mr. Warren's term

5   was nowhere near ending, we didn't think a due process challenge

6   would be likely.

7   Q.   All right.  So your advice was that the Florida Supreme

8   Court really wasn't going to weigh the evidence here, and that

9   the allegations in the Executive Order just needed to be

10  reasonably related to the constitutional grounds that you were

11  citing for suspending Mr. Warren; is that fair?

12  A.   That's what we thought would be under court review.

13  Q.   All right.  You said you thought there might be a quo

14  warranto challenge?

15  A.   Yes.

16  Q.   You thought maybe a due process challenge?

17  A.   Yes, sir.

18  Q.   You didn't anticipate a First Amendment challenge; right?

19  A.   Not at all.

20  Q.   You thought the venue where you were going to most likely

21  have to defend this case was the Florida Senate; is that fair?

22  A.   I mean, that's where the Constitution puts this case.

23  Q.   Okay.  You anticipated that you would be defending this in

24  the Florida Senate; right?

25  A.   I mean, the statute reads, you know, the Governor's --

Direct Examination - Mr. Treadwell

1   Q.   I'm just asking what you were anticipating.

2   A.   I don't recall if I was anticipating having to personally

3   defend it or that we were going to hire counsel for it.

4   Q.   That the Office of the Governor -- that that was the venue

5   in which this case was going to play out?

6   A.   The Governor would be the defendant.

7   Q.   In what forum?

8   A.   In the Florida Senate proceeding.

9   Q.   Whose decision was it to suspend Mr. Warren?

10   A.   The Governor's.

11   Q.   Did you ever discuss that issue a single time with the

12   Governor?

13   A.   I never spoke to the Governor about this.

14   Q.   You never talked with him about Mr. Warren at all?

15   A.   Correct.

16   Q.   You're the Deputy General Counsel in the Governor's Office,

17   so you have familiarity with how the Governor works; right?

18   A.   Given my limited interaction, yes.

19   Q.   All right.  The Governor is both -- he's an elected

20   official, right, and he's also the chief -- I think I've heard

21   you use the term "supreme executive authority" of the State of

22   Florida; is that right?

23   A.   Yes.

24   Q.   Okay.  So --

25   A.   I mean, yeah, chief executive officer.  Well, yeah,

Direct Examination - Mr. Treadwell

1    something along those lines.  The Constitution has the language.

2    Q.   So he has two roles.  He announces policies and

3    instructions to members of the executive branch.  That's one

4    thing he does; right?

5    A.   He announces policies --

6    Q.   Policies --

7    A.   -- to the executive branch?

8    Q.   -- and instructions for the executive branch.

9    A.   To the portion of the executive branch that reports to him,

10   he does, yes.

11   Q.   And he might do that through issuing official policies and

12   directions?

13   A.   He can, yes.

14   Q.   Okay.  Now, in his capacity as governor, he also gives

15   speeches; right?

16   A.   Yes.

17   Q.   He makes statements of opinion?

18   A.   Correct.

19   Q.   In those speeches and statements, sometimes he gives his

20   opinion on what the law should be?

21   A.   Yes.

22   Q.   What the law shouldn't be?

23   A.   Yes.

24   Q.   And every time the Governor speaks, he's not announcing a

25   policy for the portion of the executive branch that he oversees,

Direct Examination – Mr. Treadwell

1   is he?

2   A.   No, not always.

3   Q.   Okay.  Now, that's true even if he introduces, you know,

4   Ron DeSantis, the governor of the freest state in these

5   United States; right?

6   A.   Correct.

7   Q.   Okay.  In fact, whether the Governor's statements

8   constitute official policy depends on the context of his

9   statements, would you agree?

10  A.   I agree.

11  Q.   So who's the audience; relevant?

12  A.   Yes.

13  Q.   What process do the statements follow?

14  A.   Yes.

15  Q.   Where do they appear?

16  A.   Yes.

17  Q.   How are they communicated?

18  A.   Yes.

19  Q.   How are they received?

20  A.   Yes.

21  Q.   All relevant; right?

22       That helps you determine as an employee of the Governor

23  whether he is making -- stating opinions in his role as an

24  elected official or, on the other hand, making official policy;

25  fair?

Direct Examination – Mr. Treadwell

1   A.   Sometimes you can gather the nature of the statement as an

2   opinion based on the statement itself, regardless of the

3   context.

4   Q.   Now, do you follow the Governor on social media?

5   A.   Instagram.

6   Q.   Okay.  And you are aware he gave a big speech at CPAC

7   earlier this year?

8   A.   I'm not -- I did not watch it.  I'm aware that he spoke

9   there, yes.

10  Q.   Are you aware that that was a big speech for the Governor?

11  A.   I am not aware that -- how big it was for him.  He gives a

12  lot of speeches.

13  Q.   You don't know what he said?

14  A.   No.

15  Q.   Okay.  Did you -- were you aware that he had a big speech

16  in Las Vegas last week?

17  A.   Was that the -- I really don't follow.

18  Q.   Okay.

19  A.   Sorry.

20  Q.   So do you know that when he was there, he announced that he

21  would, quote, fight the WOKE mind virus and invoking Winston

22  Churchill to say he was going to fight it in the streets, the

23  classrooms, the corporations, and the halls of the legislature?

24  Were you aware that he said that?

25  A.   No, I'm not aware he said --

Direct Examination - Mr. Treadwell

1   Q.   Is that the official policy of the executive branch of

2   Florida?

3   A.   When he says he's going to fight WOKE everywhere?

4   Q.   WOKE mind virus.

5   A.   It depends on what you consider under that umbrella

6   fighting wokeness.  I mean, I am working on lots of things that

7   could fit under the umbrella, and that would be considered

8   official policy of our agencies.

9   Q.   So when he talks -- so when he says, We're going to fight

10  the WOKE mind virus, you took him to be announcing official

11  policy for the executive branch of Florida?

12  A.   I'm not familiar with that statement, so I can't interpret

13  it.

14  Q.   Now, State Attorneys are also elected officials; right?

15  A.   They are.

16  Q.   And they set policies for their office?

17  A.   They do.

18  Q.   And they, as elected officials, may express opinions on

19  matters of public importance; right?

20  A.   Yes.

21  Q.   That's America; right?

22  A.   Yes.

23  Q.   Okay.  And just like with the Governor, what they say --

24  whether their statement is a matter of opinion or a matter of

25  policy, that depends on context; right?

Direct Examination – Mr. Treadwell

1   A.   I agree.

2   Q.   Mr. Treadwell, what -- based on your life of experience,

3   what do you think prosecutorial discretion is?

4   A.   Well, I mean, my opinion is largely shaped by Florida law

5   on this subject, and that is assessing each case on an

6   individualized basis and based on the facts of each case.

7   Q.   Okay.  And do you agree the prosecutorial discretion

8   includes assessing what charges, if any, to bring on the

9   individual facts of a case?

10   A.   I agree.

11   Q.   That includes deciding how to use limited resources?

12   A.   I tend to agree.

13   Q.   How best to promote public safety?

14   A.   That -- that may be a closer call.

15   Q.   So you don't think prosecutors are supposed to consider how

16   the exercise of their discretion impacts public safety?

17   A.   Well, if you're talking about sort of a society-wide

18   question on what's appropriate for public safety, I mean, that

19   gets into more of the legislative realm.  But if on an

20   individual case the State Attorney is assessing the best use of

21   the resources versus public safety concerns, then it can be

22   prosecutorial discretion.

23   Q.   And the key there is it has to include the facts and

24   circumstances of the case; right?

25   A.   Yes.

Direct Examination - Mr. Treadwell

```
 1            MR. O'NEIL:  Can we look at Plaintiff's Exhibit --
 2   sorry -- Joint Exhibit 7?
 3   BY MR. O'NEIL:
 4   Q.   I know you're familiar with this one, but -- I'll give you
 5   a minute.
 6        (Pause in the proceedings.)
 7   Q.   Okay.  Did you review this document when you were
 8   formulating the Executive Order?
 9   A.   I did.
10   Q.   How many times did you read it?
11   A.   Probably only once.
12   Q.   One time.  Did you understand that this was a policy of the
13   State Attorney's Office?
14   A.   I did.
15   Q.   How did you know that?
16   A.   Because I took it at face value as a memorandum, it looked
17   like, from Mr. Warren to his office, or at least the ASAs within
18   his office.
19   Q.   I'd like you to read the -- or just look at -- we've all
20   seen it enough at this point -- the portion on page 2 under
21   "Exercise Discretion at Every Stage."
22   A.   Yes.
23   Q.   *There is no simple formula,* that paragraph, is that
24   consistent with your understanding of prosecutorial discretion?
25   A.   Yes, sir.
```

Direct Examination - Mr. Treadwell

```
 1              MR. O'NEIL:  And can we turn to page 8?

 2   BY MR. O'NEIL:

 3   Q.    Case-specific decisions must be made according to the

 4   unique facts and circumstances of the case.  Is that consistent

 5   with your understanding of prosecutorial discretion?

 6   A.    Yes, sir.

 7   Q.    Do you see any instructions not to prosecute any cases in

 8   this memo?

 9   A.    No, I do not.

10   Q.    This memo instructs prosecutors to exercise their

11   discretion on a case-by-case basis?

12   A.    That is my understanding.

13   Q.    Would you say -- well, does this memo exempt any areas or

14   categories of cases from its guidance?

15   A.    No, sir.

16   Q.    Would you say that this is a strong piece of evidence for

17   what the actual policy is for the State Attorney's Office?

18   A.    It is a piece of evidence as to what the policy --

19   Q.    Sir --

20   A.    Yes, sir.

21   Q.    Would you say it's a strong piece of evidence?

22   A.    That will be for the Florida Senate to decide what evidence

23   is strong and what is not.

24   Q.    Well, I'm now using your words from the deposition, and at

25   the deposition you said it certainly is a strong piece of
```

1  evidence with respect to what the policies of the Thirteenth

2  Judicial State Attorney's Office are.

3  A.   I mean, this was the most on point, yes.

4  Q.   Okay.  Does this policy describe a blanket policy of

5  nonenforcement?

6  A.   No, it does not.

7  Q.   All right.  You spent a long time with Mr. Levesque on

8  Plaintiff's Exhibit 3, the "Responses and Objections to

9  Plaintiff's First Set of Interrogatories to Defendant."  Do you

10 remember this?  We went through all the list of people he talked

11 to -- Mr. Keefe had talked to.

12 A.   I believe so, yes.

13 Q.   Can you pull up that document?

14 A.   I'm sorry.  Which exhibit?

15 Q.   Joint Exhibit -- I'm sorry -- Plaintiff's Exhibit 3.

16      You got it?

17 A.   Yes, sir.

18 Q.   Can you turn to page 17?

19      Is that your signature?

20 A.   Yes, sir.

21 Q.   Okay.  And did you declare under penalty of perjury that

22 you read all the foregoing answers?

23 A.   I did.

24 Q.   Did you declare under penalty of perjury that they were

25 true and correct?

1    A.    I did.

2    Q.    Were they true and correct?

3    A.    There was a mistake.

4    Q.    Well, I'll point you to page 12.  And the interrogatory

5    here asks:  *Identify each and every fact contained in or*

6    *supporting the Executive Order that you claim constitutes*

7    *"neglect of duty," "incompetence," or both, as those terms are*

8    *used in the Executive Order.*

9         Now that's kind of an important interrogatory in this case;

10   right?

11   A.    I'm not going to say what interrogatories are more

12   important than others.

13   Q.    Okay.  And if you turn to the following page, paragraph 6,

14   you see it references:  *Prosecutorial Discretion and the Mission*

15   *of Criminal Justice...and describing blanket policies for*

16   *nonenforcement of certain crimes.*

17        Is that accurate?

18   A.    No, sir.

19   Q.    Okay.  When you prepared this, did you believe that that

20   memo described blanket policies for nonenforcement of certain

21   crimes?

22   A.    Let me clarify one thing from earlier.  I reviewed these; I

23   attested to them, but I was not the only person who prepared

24   them.

25   Q.    Okay.  You testified under oath that you read the whole

1    thing; right?

2    A.   That's right.

3    Q.   Okay.  Did you believe at the time that you read this that

4    this policy described the blanket policy for nonenforcement of

5    certain crimes?

6    A.   I don't recall what I believed on this paragraph, but, sir,

7    I missed this.  This was a mistake.

8    Q.   Now, do you think you would have known whether it described

9    blanket policies for nonenforcement if you'd read it more than

10   once?

11   A.   This interrogatory response?

12   Q.   The policy.

13   A.   No.  I mean, I admit that this was a mistake from the

14   get-go.  I mean, this is not -- this should not have been

15   included on the list, and it doesn't matter how many times I

16   read the actual document that's being referred.

17   Q.   This isn't the only policy -- official policy of

18   Mr. Warren's office -- we can take that down, although you

19   should keep it handy.

20        This isn't the only official policy of Mr. Warren's office

21   that talks about the case-specific exercise of prosecutorial

22   discretion; right?

23   A.   I mean, he has a number of policies governing his office.

24   Q.   All right.  Well, let's look at Plaintiff's Exhibit 57.

25        Now, we've all seen this.  This is guidance from Mr. Warren

1  to prosecutors in the Thirteenth Judicial Circuit about how to

2  prosecute firearm offenses; would you agree?

3  A.   It appears to be.

4  Q.   Is this official guidance to the State Attorney's Office?

5  A.   This looks like guidance.

6  Q.   Okay.  That's fair.  When was it issued?

7  A.   July 7, 2022.

8  Q.   When did you start working on Mr. Warren's suspension?

9  A.   It came to me July 18.

10 Q.   So 11 days before you started working on this; right?

11 A.   Correct.  But I did not have this in front of me.

12 Q.   Okay.  You didn't ask for this policy?  You weren't aware

13 of this policy?

14 A.   I was not aware of this policy as I was working on the

15 draft.

16 Q.   And that's because Sheriff Chronister didn't give it to

17 you; right?

18 A.   I don't recall this being in the packet from

19 Sheriff Chronister.

20 Q.   If Sheriff Chronister didn't provide you a document in that

21 packet, you didn't have it; right?

22 A.   Other than what I could find on my own on the Internet,

23 generally, yes.

24 Q.   Right.  And I think you said you read one or two articles?

25 A.   And the Fair and Just Prosecution statements, and, I mean,

1    there was a number of things I took a look at.

2    Q.   Okay.  But whatever policies you had from the State

3    Attorney's Office were the ones that Sheriff Chronister put

4    together and handed to your office?

5    A.   Yes.

6    Q.   And if a policy wasn't in that packet, you weren't aware of

7    it?

8    A.   Yes.

9    Q.   Can you turn to page 3?

10   A.   Can I say something on that front?

11       I mean, the internal documents from the State Attorney's

12   Office came to us from Sheriff Chronister, but to the extent

13   that Mr. Warren had policies that affected his office, some of

14   those are publicly available, like the Fair and Just Prosecution

15   statements.

16   Q.   Okay.  Well, you're characterizing those documents as

17   policies, and our position is they are not.  We'll talk about

18   that.

19   A.   Okay.

20   Q.   I'm asking about policies that look like these policies.

21   Okay.

22       If they didn't come from Sheriff Chronister, you didn't

23   have them; right?

24   A.   Internal documents from the State Attorney's Office came

25   from Sheriff Chronister.

Direct Examination - Mr. Treadwell

1    Q.    Did you ever ask him how he put them together?

2    A.    No.

3    Q.    Can you turn to page 3?

4          By the way, the first time you saw this document was when

5    you were deposed; is that right?

6    A.    That's right.

7    Q.    Can you look at page 3 and the sentence that says:  *As with*

8    *any category of crimes, the threat to public safety depends on*

9    *the particular facts of the case and the defendant's criminal*

10   *history* -- we can all read it here.  We've read it a number of

11   times.

12         Is this consistent with your understanding of prosecutorial

13   discretion?

14   A.    Would you please give me a minute just to --

15   Q.    Sure.

16   A.    -- refresh on the context here?

17         Okay.  Would you repeat the question?

18   Q.    The highlighted sentence, is that consistent with your

19   understanding of prosecutorial discretion?

20   A.    Generally, but to the extent the focus of the sentence is

21   the threat to public safety, you know, a lot of people can make

22   that decision.  So, I mean, the threat to public safety can be

23   one factor in determining whether to bring a charge.

24   Q.    Do you think it's an important factor in deciding whether

25   to bring a charge?

1   A.   It can be, but it shouldn't the overriding and only factor

2   that's looked at.

3   Q.   Mr. Treadwell, would this have influenced your judgment

4   about whether Mr. Warren was incompetent as a prosecutor if

5   you'd seen it?

6   A.   No.

7   Q.   It wouldn't have mattered to you at all?

8   A.   No, sir.

9   Q.   Okay.  Can you turn to the next page?

10      You see the bolded portion at the bottom?

11  A.   That begins*:  Where a minimum mandatory*?

12  Q.   *Where a minimum mandatory sentence is applicable* -- I won't

13  make you read it aloud, but you can see -- *there is a*

14  *presumption that the assigned ASA will seek enforcement of the*

15  *mandatory minimum.  Offers below the guideline...minimum*

16  *mandatory should not be made absent substantial mitigation and*

17  *must be clearly documented within the file.*

18      This sentence establishes a presumption that ASAs should

19  follow; fair?

20  A.   Yes.

21  Q.   And what in the context of this memo does the word

22  "presumption" mean to you?

23  A.   In the context of this memo?

24  Q.   Sure.

25  A.   So, I mean, the presumption is what action is going to be

Direct Examination – Mr. Treadwell

1  taken unless the presumption is overcome by something.

2  Q.   Is that fair that that's a generally accurate description

3  of a presumption?

4  A.   That's my understanding.  I mean, to me a presumption is

5  not just a starting point, but it's the ending point if the

6  presumption is not overcome.

7  Q.   Okay.  A presumption, fair to say, is a starting point that

8  can be overcome by other factors?  We're just asking you what

9  presumption means.

10  A.   A presumption means you are going to end up there unless

11  it's overcome by other factors.

12  Q.   So you don't regard a presumption as a starting point, a

13  baseline?

14  A.   No.  I mean, to me the baseline is the language of the

15  criminal law.  But if we're just speaking about, you know, where

16  you should start, you should start on a blank slate.  But a

17  presumption says we're only going to take -- we're going to take

18  this action unless some burden is met.

19  Q.   We had this exchange at your deposition.  Do you remember

20  your answer at that time was:  *It means that it's going to be*

21  *the default course of action unless it's overcome by something*?

22  A.   That's right.

23  Q.   You're comfortable with that?

24  A.   Yes, sir.

25  Q.   Okay.  This policy establishes a presumption that assistant

Direct Examination - Mr. Treadwell

1  State Attorneys should seek a mandatory minimum sentence; right?

2  A.   It appears that, yes.

3  Q.   And then it says that mandatory -- that:  *Offers below that*

4  *mandatory minimum should not be made absent substantial*

5  *mitigation and must be documented.*

6       Right?

7  A.   Okay.

8  Q.   In your view under this policy, can assistant State

9  Attorneys make offers below the mandatory minimum?

10 A.   They can.

11 Q.   Okay.  Is this a blanket policy of enforcement of mandatory

12 minimums?

13 A.   I mean, maybe the portion on substantial mitigation, but

14 the documentation within the file, I mean, that may not go to

15 the --

16 Q.   I just --

17 A.   -- sentencing aspect.

18 Q.   I mean, it's a pretty simple question.  Is this a blanket

19 policy for seeking mandatory minimums?

20 A.   It could be in practice, yes.

21 Q.   On the page?

22 A.   On the page?  It depends by what you mean by blanket.  How

23 are you using blanket here?

24 Q.   Absolute.

25 A.   Absolute?  Well, in that sense, no, it's not a blanket

Direct Examination - Mr. Treadwell

 1   policy.

 2   Q.   What does blanket mean to you?

 3   A.   Generally applicable.

 4   Q.   Blanket policy means generally applicable?

 5   A.   Yeah, it applies to a broad category of cases.

 6   Q.   This presumption uses the word "should"; right?

 7   A.   That's right.

 8   Q.   Okay.  Should carries a different meaning than the word

 9   "must;" do you agree?

10   A.   It depends on the context.

11   Q.   Well, we discussed this again at your deposition.  And I

12   said:  *That's because should means that's the general guidance,*

13   *but, you know, there can be exceptions, and it should be done on*

14   *a case-by-case basis.*

15        And you answered:  *Sure.*

16        Is that consistent with your understanding of the meaning

17   of the word "should"?

18   A.   Can you say that again, what our exchange was?

19   Q.   That it's general guidance, not mandatory guidance.

20   A.   Depending on the context.

21   Q.   In fact, what makes a presumption a presumption and not a

22   rule is that there can be exceptions to it, right, that it can

23   be overcome?

24   A.   That's fair.

25   Q.   Okay.  I'm showing you now Joint Exhibit 23.

Direct Examination – Mr. Treadwell

1       Do you recognize this document?

2   A.   Yes, sir.

3   Q.   You've read this one; right?

4   A.   Yes, sir.

5   Q.   And you were aware of this one when you were preparing the

6   Executive Order?

7   A.   Yes.

8   Q.   Because Sheriff Chronister gave it to you?

9   A.   Yes.

10  Q.   Is this an official policy of Mr. Warren's office?

11  A.   It appears to be.

12  Q.   What makes you say that?

13  A.   It's on his letterhead.  I mean, even though the title and

14  the formatting is different than the other internal memos and

15  such, it looks like an official internal document transmitted to

16  the appropriate people within his office.

17  Q.   It's called a "Policy"?

18  A.   Also a good point.

19  Q.   Okay.  Now the Executive Order identified this as one basis

20  for suspending Mr. Warren; right?

21  A.   That is correct.

22  Q.   When you were reviewing this -- by the way, how many times

23  did you read this memo?

24  A.   Before the suspension?

25  Q.   Yeah.

Direct Examination - Mr. Treadwell

1   A.   Probably once or twice.

2   Q.   Okay.  Did you know anything about where this policy had

3   come from, what the origin of it was, when you were reviewing it

4   for purposes of the Executive Order?

5   A.   Other than what was explained within the four corners of

6   this policy and the correspondence with Sheriff Chronister, I

7   did not have any background knowledge.

8   Q.   In your words, what does this policy do?

9   A.   So, in my words, this means that charges will not be

10  brought for any criminal activity that stems from a civil

11  pedestrian or bicycle stop.

12  Q.   Period?

13  A.   Well, except for when -- I think the language is when it's

14  a direct threat to public safety.

15  Q.   Well, why don't we go ahead and look at that language.

16       So let's look at the top of page 3 -- I'm sorry -- top of

17  page 2.

18       By the way, you said you're generally familiar with the

19  background of the policy.  This was intended to address

20  perceived and actual racial disparities in law enforcement

21  techniques.  Is that your understanding?

22  A.   That's consistent with what I've read.

23  Q.   Is that a legitimate consideration for prosecutors?

24  A.   Racial disparities?

25  Q.   Yes.

1   A.   Yes, sir.

2   Q.   So let's read the actual language, okay.

3       *For any case referred to our office...there is a*

4   *presumption that our office will not file charges against the*

5   *defendant.*

6       And then the following paragraph:  *If, based on the facts*

7   *and circumstances of the case, the public safety needs of the*

8   *community outweigh the presumption to not file the case, the*

9   *charge may be filed with the approval of a supervisor.  The*

10  *reason for the exception and the supervisor's approval...* -- you

11  can read the rest.  It *should be reserved for cases that pose a*

12  *direct threat to public safety, such as where an individual has*

13  *suffered physical harm or a firearm is involved*; right?

14  A.   Yes, sir.

15  Q.   That's what it says.

16      This policy uses the world "should," right, just like that

17  firearms policy we just looked at?

18  A.   Regarding the exception, yes, sir.

19  Q.   Now, this is not a blanket policy on its face, is it?

20  A.   It seems generally applicable to me, but I understand that

21  there is the exception --

22  Q.   Okay.  I'm sorry.

23  A.   -- in writing at least.

24  Q.   Where did you go to law school?

25  A.   I went to Yale.

Direct Examination – Mr. Treadwell

1            THE COURT:  We can't all go to Florida.

2   BY MR. O'NEIL:

3   Q.   Your testimony is that a blanket rule, as you use that

4   term, in the Executive Order means generally applicable?

5   A.   That is -- that's my understanding of --

6   Q.   So the problem with Mr. Warren is he had generally

7   applicable policies?

8   A.   Where he is adding elements to crimes that the Florida

9   Legislature has not approved of, yes, to me that is a generally

10  applicable blanket policy.

11  Q.   Doesn't a blanket policy mean, as you were using it in the

12  context of the Executive Order -- I mean, you sat through this

13  whole trial.  Doesn't it mean across the board, absolute, no

14  exceptions?  Isn't that your concern in the Executive Order?

15  A.   Regarding the abortion statement, I think even that, you

16  know, should be read as a blanket policy, even though they

17  dropped the footnote, "the exceptions are".

18            So, yes, I think you can have a blanket policy that says

19  we're not going to bring First Amendment murder charges unless

20  the defendant tortures the defendant -- or the victim for an

21  hour.  I mean, to me that's still a blanket policy.  Just

22  because there's that narrow carve out, doesn't take it outside

23  that umbrella of blanket policies.

24  Q.   Your objection to a blanket policy is that it doesn't allow

25  consideration of the individual facts and circumstances; right?

Direct Examination – Mr. Treadwell

1   A.   Here's where we may be missing each other.  I do not see

2   Mr. Warren's policies as suggesting these are additional factors

3   to consider in prosecutorial discretion.  I read them as saying,

4   these are additional criteria to the elements of the crime that

5   must be met before we even get to the prosecutorial discretion

6   stage.

7   Q.   So a policy that said there is a presumption that juveniles

8   will not be charged as adults unless there are particular

9   egregious factors, to you that's a blanket policy?

10   A.   To me it is, but it's not a problematic one because

11   juveniles are not adults.

12   Q.   Okay.  Mr. Treadwell, we've read the words on the

13   page here.  Your testimony under oath is that this is a blanket

14   policy?

15   A.   My testimony under oath is that the words on this page are

16   not the only evidence that will go to what Mr. Warren's policies

17   are.  And we are prepared to put forward evidence in the Florida

18   Senate as to how the policy was actually carried out.

19   Q.   Well, right now we're in this court, okay?

20   A.   That's right.

21   Q.   And my question to you right now is, as the words on this

22   page are written, is your testimony under oath that this is a

23   blanket policy?

24   A.   Yes.

25   Q.   Does it matter to you how this policy was carried out in

1  practice in determining whether it was a blanket policy?

2  A.   It does, and it did.

3  Q.   What did you do to figure out how this policy had been

4  carried out in practice?

5  A.   We looked at the correspondence between Sheriff Chronister

6  and Mr. Warren and we spoke to Sheriff Chronister.

7  Q.   Well, let's -- let's go ahead and -- well, before we get

8  there.

9       Yeah, let's look at -- let's look at that correspondence.

10 I'm showing you Plaintiff's Exhibit 34.

11          MR. O'NEIL:  And if we can go to the top of the second

12 page.  We'll highlight where it says "in fact" -- the sentence

13 beginning "in fact."

14 BY MR. O'NEIL:

15 Q.   Mr. Treadwell, you had this letter when you were

16 considering suspension; right?

17 A.   Yes, sir.

18 Q.   Because Sheriff Chronister gave it to you?

19 A.   Right.

20 Q.   At page 2, you see the highlighted sentence.  Did you not

21 believe that this had, in fact, happened, that there had been

22 charges in this case?

23 A.   No, I believe that charges were brought here.  I have no

24 reason to doubt this.

25 Q.   So you were aware that there was at least one instance

Direct Examination - Mr. Treadwell

1  where Mr. Warren did bring charges where the presumption had

2  been overcome in fact?

3  A.   If the presumption had been overcome, that would make

4  sense.

5  Q.   How long had the policy been in place when these letters

6  were exchanged?

7  A.   According to this letter, it says just days after the

8  policy was implemented.

9  Q.   So you knew that just days after the policy had been

10  implemented, he had already brought one case?

11  A.   That's -- that's fair.

12  Q.   Okay.  And the presumption had already been overcome in

13  that case?

14  A.   Apparently.

15  Q.   Okay.  So this wasn't a blanket policy in practice, was it?

16  A.   If you're using "blanket policy" as meaning charges will

17  never be brought after a bike and pedestrian stop, then, under

18  your understanding of a blanket policy, then, no, this wouldn't

19  be a blanket policy.

20      Under my understanding of a blanket policy, you can have --

21  you can have charges being brought against, you know, one

22  defendant.  Furthermore, it wasn't all that critical to our

23  recommendation to suspend Mr. Warren for neglect of duty,

24  because there is case law that even a prosecutor in Tampa, for

25  example, can bring some charges, but the Governor may still

1   suspend the prosecutor.

2   Q.   Mr. Treadwell, you're not testifying here to the law.  I

3   mean, I'm going to ask you questions, and we'll get to that.

4   And I promise you'll have an opportunity when Mr. Levesque is

5   questioning you to say all the things you want to say, but I'd

6   like to keep you focused because we have a lot to cover.

7   A.   That's fine.  This is --

8           THE COURT:  In fairness, when you ask an argumentive

9   question, you're going to get an argumentive answer.

10          MR. O'NEIL:  That's fair, Judge.  That's fair, Judge.

11  BY MR. O'NEIL:

12  Q.   What did the statistics show about this policy?

13  A.   What did the statistics -- can you explain what statistics

14  you're referring to?

15  Q.   What did the statistics about law enforcement activity in

16  Hillsborough County tell you about how this policy had been

17  carried out in practice?

18  A.   I'm sorry.  I'm lost.  I don't -- I'm not following which

19  statistics you're talking about.

20          Is this the one that caused the concerns about racial

21  disparity or are these the statistics we looked at regarding the

22  number of cases being filed in recent years?

23  Q.   Did you request statistics on how the policy had been

24  carried out in practice?

25  A.   No, we did not.

Direct Examination - Mr. Treadwell

1    Q.   Now, this letter also says:  *I discussed this policy at*

2    *length with the Tampa Police Department before implementation*

3    *because they had recommendations, whereas you did not.*

4         Do you remember that line from this letter?

5    A.   I do.

6    Q.   Okay.  What did the Tampa Police Department tell you about

7    how the policy was being carried out in practice?

8    A.   We did not speak to the Tampa Police Department prior to

9    the suspension.

10   Q.   So when Mr. Keefe testified that you had a separate line of

11   communication to former Chief Dugan, was that accurate?

12   A.   Sorry.  I guess when I use the term "we" there, I meant the

13   legal office.

14        So to the extent -- to the extent Mr. Keefe spoke to the

15   former chief during his statewide review, that's fair.

16   Q.   Well, what Mr. Keefe said is that the General Counsel's

17   Office had its own line of communication to former Chief Dugan.

18   Was that accurate?

19   A.   It may have been.  Mr. Newman may have talked to former

20   Chief Dugan without me being on the phone.

21   Q.   Is the Tampa Police Department a major law enforcement

22   partner of the State's Attorney's Office?

23   A.   I would assume so.

24   Q.   Why would you assume so?

25   A.   Because Tampa is one of the major cities in Florida.

Direct Examination - Mr. Treadwell

1    Q.   Do you know the relationship between the Tampa Police

2    Department and the State's Attorney's Office?

3    A.   I have no firsthand knowledge of that.

4    Q.   Would the views of the Tampa Police Department have

5    influenced your views on whether Mr. Warren was discharging his

6    duties incompetently?

7    A.   Not prior to the suspension.

8    Q.   The views of a major law enforcement partner wouldn't have

9    been relevant to you?

10   A.   Not in a way that would have changed my course of

11   recommendation.

12   Q.   Would the views of the Assistant State Attorneys in

13   Mr. Warren's office have been relevant to you in deciding

14   whether he was competent as a prosecutor?

15   A.   Not prior to the suspension.

16   Q.   So you heard Ms. Heinz [sic] testify yesterday.  She told

17   you these are not blanket policies.  Is she wrong?

18   A.   She has a different opinion about blanket policies than I

19   do.

20   Q.   Well, the basis of her opinion is that she works in the

21   office; right?

22   A.   Okay.

23   Q.   What's the basis of your opinion?

24   A.   That I gathered information from a number of sources,

25   including case law, as to what's appropriate for a prosecutor in

1    the exercise of prosecutorial discretion, and I made my

2    conclusion.

3    Q.   Would it have mattered to you what community groups in

4    Hillsborough County told you about Mr. Warren's policies in

5    deciding whether he was competent?

6    A.   I mean, if we would have had a line of communication and

7    people were steering us in a direction that suggested he was

8    actually, you know, bringing charges, then, okay, it might have

9    influenced us.

10        But this is only one of four reasons why the Governor

11   suspended him.  So I think we probably would have still alleged

12   this and explained that this is one more example of Mr. Warren

13   putting out a blanket policy.

14   Q.   Well, let's look at the next reason that you provided.

15        So showing you Plaintiff's Exhibit -- sorry.  Joint

16   Exhibit 24.  This is the low-level offense policy.  We've seen

17   it a number of times.

18        Now, according to the Executive Order, this was one of the

19   bases for suspending Mr. Warren; right?

20   A.   Which document are we on?

21   Q.   It's actually -- it's Joint Exhibit 24.

22        I'll wait for you to bring it up.

23   A.   I can see it on the screen.

24   Q.   Okay.  Now, these pages are part of a larger policy

25   document; right?

Direct Examination – Mr. Treadwell

1  A.   I have come to learn that, yes.

2  Q.   Okay.  Did you know at the time you were looking at this,

3  when you were drafting the Executive Order, where this came

4  from?

5  A.   I knew it came from a State Attorney's Office because I

6  think the footer had a URL that reflected SAO13.

7  Q.   Okay.  Did you know that it was part of a larger document

8  or do you think it was a standalone page?

9  A.   I gathered that this piece was part of a larger document,

10  but I only had this page.

11  Q.   Okay.  And I'll just ask again, that's because that's what

12  Sheriff Chronister assembled for you?

13  A.   He gave us this page.

14  Q.   He gave you that page?

15  A.   Yes.

16  Q.   So your conclusions about it are based on that single

17  page of a multipage document; right?

18  A.   That's right.  But the way that I read this page is that

19  the presumption of nonprosecution policy was complete in and of

20  itself on this page.

21  Q.   Well, is it possible that other policies that are part of

22  this larger document could have shed light on those other

23  policies?

24  A.   It's possible.

25  Q.   Now, in the memo on the first page it says that the

1   following charges have a presumption of no file, and it says

2   that's:  *Based on the appropriate allocation of resources and*

3   *the impact that a lawful arrest can have on quelling or*

4   *resolving an immediate situation.*

5       Would you agree that those are appropriate considerations

6   for a prosecutor to take into account?

7   A.   Sir, can you scroll back up?

8       Allocation of resources and resolving a situation,

9   absolutely.

10  Q.   Okay.  At the bottom of the list of offenses -- by the way,

11  are those felonies or misdemeanors?

12  A.   These look like misdemeanors at most.

13  Q.   Did you know at the time that they were misdemeanors?

14  A.   I mean, to the extent there's the numbers with the "MIS," I

15  figured that's a misdemeanor and then --

16  Q.   Okay.  And the policy says -- we can scroll down -- *This*

17  *presumption may be overcome by significant public safety*

18  *concerns, such as pending felony charges, a VOP, or the current*

19  *charge is part of a charged course of contact that includes a*

20  *charge not on this list.*

21      So, again, on paper, as you as the draftsman of the

22  Executive Order use the term, this is not a blanket policy;

23  right?

24  A.   No.  I do think that this is a generally applicable policy.

25  Q.   So you think that Assistant Attorneys -- State Attorneys

1   following this won't bring charges even when there's a

2   significant public safety concern?

3   A.    They could, through the exercise of prosecutorial

4   discretion, after they meet that public safety hurdle.

5   Q.    How do you make -- under Mr. Warren's leadership, how did

6   ASAs make that public safety determination?

7   A.    Well, that's tough to tell because we don't even know what

8   Mr. Warren considers to be a public safety concern.

9   Q.    Well, let's -- why don't we go back to Joint Exhibit 57.

10       This is the one you didn't have; right?

11            MR. O'NEIL:  57.003.

12            THE WITNESS:  Was that Joint Exhibit?

13   BY MR. O'NEIL:

14   Q.    Plaintiff's Exhibit.

15   A.    Thank you.

16   Q.    It's page 2 -- page 3.

17            MR. O'NEIL:  Let me just highlight.  It's a very

18   familiar sentence at this point.  We can highlight it.

19            As with any category of crimes -- yeah, if we can blow

20   that up.

21   BY MR. O'NEIL:

22   Q.    So you didn't have this document when you were drafting the

23   Executive Order, and I think you just testified you didn't know

24   how Assistant State Attorneys would make the determination of

25   public safety, right?  At the time you were reviewing the

1   low-level offense policy.

2   A.   Sure.  It seemed pretty open-ended.

3   Q.   Would this have helped you figure out how Assistant State

4   Attorneys make that decision or how they think about it?

5   A.   I mean, this is -- this is certainly helpful, because at

6   least it gives some concrete factors such as the defendant's

7   criminal history and whether there was an overt act of violence.

8   Q.   Okay.  Well, I think you just testified that this document

9   wouldn't have made any difference to you.

10  A.   I'm sorry?

11  Q.   I think you just testified earlier that this document would

12  not have made any difference to you, whether you'd had it or

13  not.

14  A.   I mean, in the context of the presumption of nonprosecution

15  policy, I mean, there isn't any kind of direction on, you know,

16  what is a -- what does Mr. Warren consider to be a, you know,

17  significant public safety concern, other than those three

18  examples that he lists.

19  Q.   According to --

20  A.   I mean, here we --

21  Q.   According to this, does it depend on the particular facts

22  of the case and the defendant's criminal history?

23  A.   Within these firearm offenses, sure.  This is helpful.

24  Q.   All right.  Mr. Treadwell, so we know you didn't talk to

25  Mr. Warren, Ms. Wilds, Ms. Hindman.  You didn't even talk to the

Direct Examination – Mr. Treadwell

1    Tampa Police Department.

2        Did you reach out to other State Attorney's Offices that

3    might have similar policies?

4    A.   I did not.

5    Q.   Were you told not to reach out to anybody in connection

6    with this?

7    A.   I was not told not to talk to anybody.  I just knew that

8    until a decision had been made as to the course of action the

9    Governor may or may not want to take, I didn't have authority to

10   go -- you know, start talking to people where it might have

11   tipped anybody off to what we were contemplating.

12   Q.   Okay.  We'll come back to that.  I do want to show you some

13   policies of other State Attorney's Offices.

14           MR. O'NEIL:  Can we look at Plaintiff's Exhibit 11?

15   And if we can go to page 2, the paragraph that says:  *To

16   conclude*, *this Office will no longer be charging people with*

17   *possession of cannabis absent a confession to what the substance*

18   *is or testing by a lab,* et cetera.

19   BY MR. O'NEIL:

20   Q.   Is this a blanket policy?

21   A.   Yes, sir.

22   Q.   It is.  Okay.

23       And is the requirement of a confession or the testing by a

24   lab -- is that set forth in the statute?

25   A.   I'm not familiar with the statutes, but I would assume not.

1   Q.   Why don't we go to Plaintiff's -- by the way, has anyone

2   suggested to you that Mr. Campbell should be suspended?

3   A.   No one.  And this trial is the first I've seen this

4   document.

5   Q.   Okay.

6          MR. O'NEIL:  Can we go to Plaintiff's Exhibit 36?

7          THE COURT:  I guess I need to interrupt and follow up.

8          Now that you've seen it, are you going to pursue

9   suspending Mr. Campbell?

10         THE WITNESS:  I mean, this is, in my opinion,

11  qualitatively different.  I mean, this is a different criminal

12  law.

13         THE COURT:  That is a yes or no.  I get it's

14  different.

15         THE WITNESS:  I would consider it.  I would absolutely

16  consider it.

17         THE COURT:  All right.

18  BY MR. O'NEIL:

19  Q.   So let's look at Plaintiff's Exhibit 36, the last sentence

20  of the document:  ...*barring exceptional circumstances on a*

21  *particular case, we will not be prosecuting misdemeanor*

22  *marijuana possession cases.*

23       Is this a blanket policy?

24  A.   I would say so.

25  Q.   Even though it can be overcome in exceptional

1    circumstances --

2    A.    That's right.

3    Q.    -- you regard that has a blanket policy?

4          Okay.  I guess I'll anticipate the Court's question.  Has

5    anyone suggested suspending this State Attorney?

6    A.    No, sir.

7    Q.    Now, the Governor's Office thought about reaching out to

8    other State Attorneys to request blanket policies; right?

9    A.    I'm not recalling that right now.

10   Q.    I'm showing you Plaintiff's Exhibit 20.

11         What is this?

12   A.    It looks like a draft letter.

13   Q.    Okay.  And you see on page -- the bottom of page 1:  ...*I*

14   *hereby respectfully require from you information in writing on*

15   *any blanket policy*..., and ask for information.

16         Was this letter ever sent?

17   A.    I'm not familiar with this letter.

18   Q.    Do you know whether it was ever sent?

19   A.    I don't -- I don't have any information to suggest it was.

20   Q.    Is this relevant to you as the lead for suspensions in the

21   Governor's legal office?

22   A.    I mean, this probably would have, yeah, impacted my job had

23   this gone out.

24   Q.    All right.  So, Mr. Treadwell, I want to shift gears a

25   little bit and just ask you, the policies that we've been

Direct Examination - Mr. Treadwell

 1  discussing, these weren't really the reason that Mr. Warren was

 2  suspended, were they?

 3  A.   They were absolutely part of the reason.

 4  Q.   Okay.  But you wouldn't have recommended suspension based

 5  just on these documents, would you?

 6  A.   On these alone, I probably would not have.

 7  Q.   All right.  And if you didn't recommend it, the Governor

 8  probably wouldn't have done it; right?

 9  A.   I mean, it depends on what would have happened after that

10  in terms of crime in Tampa, but --

11  Q.   But --

12  A.   -- I did not envision that scenario.  This was -- these

13  were the two policies as part of kind of a larger pattern.

14  Q.   These policies standing alone would not have caused you to

15  recommend suspending Mr. Warren?

16  A.   I don't know if Mr. Warren would have been on our radar if

17  it were just -- and by "our," I mean the legal office's radar --

18  if it were these policies that were continuing to be out there.

19  Q.   It was his speech that got him on --

20  A.   I'm sorry?

21  Q.   It was speech that got him on the radar?

22  A.   It was his pledge on the abortion statement that brought

23  him to our radar first.

24  Q.   I do want a clear answer from you on this.  You would not

25  have recommended suspension based just on the policies?

Direct Examination - Mr. Treadwell

1    A.    Probably not.

2    Q.    What this is really about is the FJP statements; right?

3    A.    The FJP pledges, yes.

4    Q.    One of the reasons that Mr. Warren was suspended was that

5    he signed Joint Exhibit 4, a letter on the criminalization of

6    gender-affirming care; right?

7    A.    Yes, his signature on that was part of the reasoning.

8    Q.    And the Executive Order identified this statement as one of

9    the bases for suspending Mr. Warren?

10   A.    I'm sorry.  Can you repeat that?

11   Q.    The Executive Order identified this statement as one of the

12   bases for suspending Mr. Warren; right?

13   A.    Yes.

14   Q.    In fact, this letter played a large role in the reasons for

15   the suspension; right?

16   A.    It played a component.  I mean, I can't weigh how much, you

17   know, this played versus the other policies we've already looked

18   at.  I mean, it was the larger pattern with all four involved is

19   what I think, you know, the Governor agreed to suspend

20   Mr. Warren on.

21   Q.    Well, I asked you that question during your deposition, and

22   you said, I'm -- so I do think that played a large role in what

23   we found troubling.

24         Would you agree that this statement played a large role --

25   A.    Yes --

Direct Examination - Mr. Treadwell

1    Q.    -- in the decision to suspend?

2    A.    Yes, sentences within this statement did.

3    Q.    What letterhead is this on?

4    A.    Fair and Just Prosecution.

5    Q.    Do you know who the author was?

6    A.    I don't know who drafted this, but I would credit it to

7    everybody who signed it.

8    Q.    Do you know whether it was ever distributed to anyone in

9    the State Attorney's Office?

10   A.    Not prior -- well, did I know prior to August 4th?

11   Q.    Did you know at the time --

12   A.    Yeah.

13   Q.    -- whether it was ever distributed to anyone in the State

14   Attorney's Office?

15   A.    I'm going to -- I'm going to conclude that it was

16   distributed to Mr. Warren.

17   Q.    Other than Mr. Warren.

18   A.    I have no knowledge of that.

19   Q.    Did you know at the time?

20   A.    Prior to August 4th, no.

21   Q.    In fact, you know now, from the testimony in this case,

22   that it wasn't; right?

23   A.    I don't recall that particular testimony.

24   Q.    Did you know before the -- when you were writing the

25   Executive Order, did you know whether anyone other than

1  Mr. Warren was aware of this statement in the State Attorney's

2  Office?

3  A.   No, I don't have that knowledge.

4  Q.   Now, the topic of transgender healthcare, that's an area of

5  very heated public debate; right?

6  A.   Yes.

7  Q.   And this letter includes expressions of opinion and

8  statements of position on that topic?

9  A.   Yes.

10  Q.   Is it fair to say there are very strong feelings on both

11  sides of this issue?

12  A.   That's fair.

13  Q.   In fact, the reason that statements like this exist is that

14  these are hot-button issues, and so they tend to yield

15  statements like this; right?

16  A.   I tend to agree.

17  Q.   The Governor is against gender-affirming care; right?

18  A.   How are you using gender-affirming care?

19  Q.   Well, let's use two examples.  Laws requiring that

20  transgender people can use the bathroom of the gender of their

21  choice, is he opposed to that or is he in favor of it?

22  A.   I -- you know what?  I don't recall what -- his exact

23  position on that and does it depend on if it's in a school

24  setting or just in public in general.  I don't -- I don't feel

25  comfortable commenting on what the Governor's position might be.

Direct Examination - Mr. Treadwell

1  Q.   The Governor is against transgender surgeries for youth; is

2  that right?

3  A.   That is my understanding.

4  Q.   He speaks often about his opposition to those procedures?

5  A.   He has spoken on it publicly.

6  Q.   In fact, he spoke about his opposition to that in the very

7  press conference that announced the suspension; right?

8  A.   I recall that.

9  Q.   So the Governor, fair to say, disagrees with the viewpoints

10  in this letter?

11  A.   He at least disagrees with some of the viewpoints, I would

12  conclude.

13  Q.   He disagrees with the viewpoints in addition to the ones

14  that were cited in the Executive Order?

15  A.   I'm sorry?

16  Q.   He disagrees with viewpoints and opinions expressed in this

17  letter beyond the ones solely that were cited in the Executive

18  Order?

19  A.   I mean, the sentences that we quoted in the Executive

20  Order, I don't know if I would characterize all of them as

21  simply viewpoints.

22  Q.   Some are viewpoints, some are -- you would characterize

23  differently.  Is your -- is your testimony that you don't know

24  whether the Governor -- that there are some statements of

25  opinion here the Governor might agree with?  Is that your

1  testimony?

2  A.   No, that's not my testimony.  But without having the

3  Governor walk me through sentence by sentence, I'm only

4  speculating.

5  Q.   Well, you disagree with the viewpoints in this letter;

6  right?

7  A.   I do disagree with some of them, yes.

8  Q.   At the time Mr. Warren signed this letter, was there any

9  Florida statute governing transgender care?

10  A.   No.

11  Q.   And you consider Mr. Warren signing this gender statement

12  an act of incompetence?

13  A.   I do view his approach to prosecutorial discretion in this

14  statement a sign of incompetence as defined by Florida law.

15  Q.   Does it matter to you whether -- Mr. Warren's statements of

16  opinion and other statements in this letter, does it matter to

17  you whether they were based on his views of the

18  constitutionality of these laws?

19  A.   His opinions played no role in my conclusion that

20  Mr. Warren was displaying incompetence, and that includes his

21  constitutional opinions.

22  Q.   If he said -- well, why don't you point me to the sentences

23  in here that you think demonstrate incompetence.

24  A.   Okay.  Let's turn to page 3.  There -- the central sentence

25  here is: *As such, we pledge to use our settled discretion and*

1    *limited resources on enforcement of laws that will not erode the*

2    *safety and well-being of our community.*

3          Then if we look at the sentences around that, we see that,

4    okay, he is pledging here not to enforce criminal laws in the

5    realm of transgender healthcare.

6    Q.   What criminal laws?

7    A.   In Florida, they have not been enacted.  They may never be

8    enacted, but if they are enacted, we know where Mr. Warren

9    stands.

10   Q.   Well, do you know whether Mr. Warren is saying this because

11   he believes any such law would be unconstitutional?

12   A.   His -- his reasoning would not have impacted my assessment

13   of his pledge.  I mean, it would have explained it, and that's

14   why, you know, we included it in the Executive Order, because it

15   explains his pledge.  But it would not have changed my opinion

16   about him as a State Attorney being incompetent about his

17   understanding of prosecutorial discretion, that he's nullifying

18   Florida law.

19   Q.   And that's because of this sentence here?

20   A.   This sentence --

21   Q.   Without --

22   A.   -- goes to that.

23   Q.   Without knowing his reasoning, the fact of that sentence

24   alone demonstrates incompetence to you?

25   A.   To me, because incompetence under Florida law means gross

1   ignorance of official duties, and if he has gross ignorance

2   about prosecutorial discretion, then he is not carrying out his

3   duty as a State official.

4   Q.   Is it incompetence, in your opinion, for a State Attorney

5   to express their opinion on the constitutionality of

6   legislation?

7   A.   Not at all.

8   Q.   Okay.  You don't know that there has ever been any arrest

9   for any law related to anything Mr. Warren said in here?

10  A.   Because there's no statutory prohibition, I have to

11  conclude there has not been an arrest.

12  Q.   Let's look at Joint Exhibit 5.

13       Now, the Executive Order listed this statement as one of

14  the bases for suspension; right?

15  A.   Correct.

16  Q.   Now, it also contains multiple statements of opinion and

17  viewpoint, would you agree?

18  A.   I agree.

19  Q.   This statement doesn't reference Florida law?

20  A.   Not specifically.

21  Q.   It's not actually about Florida law at all; is it?

22  A.   It absolutely is.

23  Q.   Tell me where you see a reference to Florida law.

24  A.   Okay.  Florida law governs providers -- or people who

25  provide abortions.  So these sentences regarding Mr. Warren's

1   pledge to decline to use his office's resources regarding those

2   who provide abortions absolutely overlaps with Florida law,

3   which is why he talked about Florida law in the FOX 13 News

4   report.

5   Q.   You actually paraphrased the sentence.  What it says is:

6   *Criminalizing and prosecuting individuals who seek or provide*

7   *abortion care*.

8   A.   I mean, you paraphrased it too.  I mean, should we read the

9   whole sentence?

10   Q.   Actually, I was just reading the sentence.  Why don't you

11   tell me --

12   A.   Maybe I'm looking at a different sentence than you.

13   Q.   Yes, we are, I think, looking at different sentences.

14       Why don't you point me to the sentence you're looking at?

15   A.   I'm looking at the second paragraph, the third sentence

16   that begins with:  *As such.*

17   Q.   You see the end of that sentence it says:  *Prosecuting*

18   *those who seek, provide, or support abortions*?

19       Do you see that?

20   A.   Yes, that's the sentence I'm looking at.

21   Q.   Is it illegal in Florida to seek an abortion?

22   A.   My understanding is that it's not.

23   Q.   You first learned of the idea of suspending Mr. Warren on

24   July 18th; right?

25   A.   Correct.

Direct Examination - Mr. Treadwell

1   Q.   That's not the first time you were aware of the statement,

2   is it?

3   A.   It's the first time I became aware of the substance of the

4   statement, I mean.

5   Q.   Well, let's look at Joint Exhibit 51.

6        Who is Joshua Pratt?

7   A.   He was Deputy General Counsel in the Governor's Office.

8   Q.   Is he a good lawyer?

9   A.   In my opinion, yes.

10  Q.   So in this exchange, Mr. Pratt -- we can go to the email

11  toward the bottom.  Mr. Pratt -- sorry.  Mr. Newman sends around

12  an article to Mr. Pratt, to you, and others.

13            MR. O'NEIL:  And if we can scroll down and look at

14  the -- look at the headline.

15  BY MR. O'NEIL:

16  Q.   *With Florida's new abortion laws set to go into effect, a*

17  *local State Attorney has vowed not to prosecute abortion.*

18       And would you agree that this reports on the FJP letter?

19  A.   I do agree.

20  Q.   Okay.  Now, this was sent on June 30th; right?

21  A.   That's right.

22  Q.   And it was sent to you and Mr. Newman and others?

23  A.   Correct.

24  Q.   And it includes a link to the FJP abortion statement;

25  right?

1    A.    Correct.

2    Q.    You didn't click that link when it first came in; right?

3    A.    That's right.

4    Q.    You did look at the text of the emails?

5    A.    Right.

6    Q.    Okay.

7    A.    Well --

8    Q.    And you concluded that this wasn't something you really

9    needed to be concerned about right now; right?

10   A.    Largely because Mr. Newman, in his first email to me, said:

11   *Let's discuss next week*.  And I would be out of the office the

12   following week, so I did not get into this email chain.

13   Q.    Now, Mr. Pratt's email at the top asks a question.  It

14   asks:  This supposed categorical exercise of prosecutorial -- *I*

15   *wonder if this supposed categorical exercise of prosecutorial*

16   *discretion applies to abortions provided during viability,*

17   et cetera.

18         So did Mr. Pratt think that the statement was ambiguous on

19   that point?

20   A.    I can't speak for Mr. Pratt.

21   Q.    Well, Mr. Newman thought it was ambiguous, because if we

22   look at Joint Exhibit 39 -- you want to take a look at it -- he

23   asks:  *Perhaps we should send a letter inquiring*; right?

24   A.    That's right.

25   Q.    But there was never a letter inquiring, was there?

1    A.    That's right.

2    Q.    You decided against sending that letter because it would

3    have given Mr. Warren the opportunity to say that he considered

4    each case on its facts and circumstances; right?

5    A.    I mean, it would have tipped him off to a number of things

6    and given him an opportunity to walk back his pledge.

7    Q.    I asked you that question in your deposition.

8    A.    Okay.

9    Q.    I said:  *What would be the downside in sending a letter*

10   *asking what the intent of the statement was?*

11       And your answer was:  *Because it would give Mr. Warren an*

12   *opportunity to basically say, Oh, no, I didn't mean what I wrote*

13   *in that joint statement.  And then, of course, nobody would*

14   *believe him because the joint statement is crystal clear as to*

15   *what he will do as State Attorney.*

16       You also didn't -- first of all, is that accurate?

17   A.    That is accurate, including today.  That is still my

18   opinion.

19   Q.    Waiting longer also would have diminished the political

20   impact of the Governor's statement; right?

21   A.    I don't know if I used the word "political impact."  I

22   think, in terms of the timeliness of a suspension, you can't

23   wait forever if it's going to be based on a, you know, late June

24   letter.

25   Q.    Would it have mattered to you what Mr. Warren's actual

Direct Examination - Mr. Treadwell

1  policies were in the office?

2  A.    To me I took him at his written word.  I mean, to me he's

3  announcing in this abortion statement what his office's policies

4  are.  So why would I reach out to get him to explain something

5  different than what he just communicated to the entire public?

6  Q.    But you have many written words from Mr. Warren at this

7  point; right?

8  A.    Right.  But this was the specific words he used for

9  abortion crimes.

10  Q.    But he's told you through his written word what his general

11  approach to prosecutorial discretion is?

12  A.    And we've talked about the fact that I view the specific

13  language on certain crimes more importantly than his overarching

14  approach to prosecutorial discretion.

15  Q.    You chose to believe one set of written words, and you

16  chose not to believe another set of written words?

17  A.    I think it's a pretty standard legal practice to suggest

18  the specific language trumps the general language.  And so, yes,

19  I took him at his written word on his abortion pledge.

20  Q.    Well, he said something specifically about the FJP

21  statement, didn't he?  He gave a statement to the press about

22  the FJP statement.

23  A.    That's right.

24  Q.    And he said:  *It depends on the facts and circumstances of*

25  *the case*; right?  That's what he said?

1   A.   That's one of the things he said.  The fact that he

2   combined that with his pledge that he's not going to prosecute

3   abortion crimes, you can't say both things at the same time.

4   They are mutually exclusive.  So when he says he's not going to

5   prosecute abortion crimes, but then, on the other hand, he says,

6   I am going to prosecute abortion crimes depending on the facts

7   of the case, he's either showing further incompetence or he's

8   being dishonest with the public.

9   Q.   You chose to believe one statement that Mr. Warren made and

10  not believe the other statement; right?

11  A.   I mean, the written FJP statement only had one side of

12  that.  So, yes, I took him at what he signed, his written word.

13  Just because he wants to, you know, insert this caveat with a TV

14  news story -- we consider it.  That's going to be evidence in

15  the Florida Senate trial, and so we knew that that would be

16  evidence that we would have to overcome before the Florida

17  senators.

18  Q.   So the FJP statement is signed by dozens of people.  You

19  have no reason to think that Mr. Warren wrote that, do you?

20  A.   Whether he drafted it or not is immaterial to me.

21  Q.   This is a specific office -- policy of his office where he

22  says exactly how he approaches prosecutorial discretion.

23       And my question is, you chose to believe one set of words

24  from Mr. Warren, and you chose to disbelieve another set of

25  words from Mr. Warren; right?

1   A.   I mean, I do not believe him when he says he's going to

2   apply abortion cases case by case on an individualized basis.  I

3   do not believe him.

4   Q.   Well, you knew he had said that because you included it in

5   drafts of the Executive Order, right, the FOX News portion?

6   A.   That absolutely appeared in one of the drafts.

7   Q.   Okay.  Would it have been helpful to know how assistant

8   State Attorneys would have viewed which of those statements to

9   believe?  Which is really his policy?  Would that have been

10  useful?

11  A.   I don't think the Governor's Office needed to take a survey

12  of the ASAs.

13  Q.   Well, remember when Mr. Keefe testified, and we looked at

14  the Jack Campbell letter, and he said:  *I see two statements*

15  *here, but I believe him that he's going to enforce the law*

16  *because I know Jack Campbell*?  Remember, that was his testimony?

17  A.   Okay.  I tend to recall that.

18  Q.   Would it have been relevant to actually speak to Mr. Warren

19  to see how these two statements could be reconciled?

20  A.   Not prior to carrying out the suspension.  And, frankly,

21  because he announced his abortion policy to the public, I found

22  that far more egregious, because he's basically telling abortion

23  providers, You can violate these criminal laws in our

24  jurisdiction.  And whatever he was telling his ASAs didn't

25  matter.  The criminal activity was far more likely to happen

Direct Examination - Mr. Treadwell

1   now.

2   Q.   You thought abortion providers would read this and start

3   performing illegal abortions?

4   A.   They can in the Thirteenth Judicial Circuit under his

5   watch.

6        THE COURT:  Let me just follow up.  You really think a

7   doctor in Tampa was going to perform an abortion in violation of

8   a statute because Mr. Warren signed a statement with some

9   national group?  Really, you think a doctor was going to do

10  that?

11       THE WITNESS:  They absolutely might.  They absolutely

12  might because of how political everything is these days, and the

13  fact you may have a doctor that really doesn't care what the law

14  says.  If they believe that providing these abortions is the

15  right thing to do, they may disregard Florida law because they

16  have a prosecutor that's not going to take action.

17  BY MR. O'NEIL:

18  Q.   So you recall in the Executive Order --

19       THE COURT:  Let me follow up.

20       MR. O'NEIL:  Sure.  Sorry, Your Honor.

21       THE COURT:  I take your answer.  Let me ask you

22  another one about this.

23       Do you really think that if someone who is not a

24  doctor performed an abortion in the back alley, the way it used

25  to go on before *Roe v. Wade*, I'm told, or I guess I see on TV --

Direct Examination – Mr. Treadwell

1  do you really think Mr. Warren's office wouldn't prosecute that

2  person?

3            THE WITNESS:  I can only speculate, but if I take him

4  for his word, then he has announced he's not going to prosecute

5  them.

6            THE COURT:  So you have no doubt -- even though the

7  others in here said they weren't sure what this meant, you have

8  no doubt that Mr. Warren would be, I guess, so far off track

9  that if a nondoctor performed a medical procedure in a back

10  alley and botched it, that they wouldn't bring prosecution

11  against the nondoctor?  Really?

12            THE WITNESS:  I mean, there is a caveat in that

13  abortion statement which may talk about negligent performance

14  that harms the woman so that --

15            THE COURT:  It talks about forced abortions, but

16  that --

17            THE WITNESS:  Forced abortions and then a couple other

18  caveats.  So, I mean, that may fit within that exception, even

19  for Fair and Just Prosecution.

20            THE COURT:  You don't leave room for the possibility

21  that when he's talking about not prosecuting, he's talking about

22  not prosecuting cases protected -- that had been protected by

23  *Roe*, not cases that were actually violations of Florida law?

24            THE WITNESS:  I mean, to me he signed the statement

25  which doesn't make those distinctions.  So I -- we took him for

Direct Examination - Mr. Treadwell

1   his word on that, and we didn't inquire where he would

2   subsequently draw the line.

3           Now, he may change his mind later and prosecute a back

4   alley case like that; but as far as what we had to put before

5   the Florida Senate and the people of Florida, we used his own

6   words.

7           THE COURT:  Go ahead.

8   BY MR. O'NEIL:

9   Q.   You recall that in the Executive Order there's a statement

10  that Mr. Warren's signing the abortion statement by itself was

11  sufficient?

12  A.   Yes.

13  Q.   And you believe that's true?

14  A.   I think -- I think so.  The abortion pledge, in and of

15  itself, was sufficient grounds for the suspension.

16  Q.   And does it matter -- I'll just ask you, because I know you

17  never talk to the Governor.

18      Does it matter to you that the pledge not to enforce is

19  about abortion as opposed to some other law?

20  A.   Does it matter to me that that pledge was about abortion?

21  Q.   Abortion as opposed to some other law.

22  A.   It's not determinative.  But, I mean, abortion, like you

23  said, was sort of a hot-button issue, and this was where he was

24  openly defying the State of Florida.

25  Q.   So if it were a law about adultery, and he said, I'm not

1  going to enforce the law; Governor doesn't care -- you know,

2  Governor might care about adultery, but he's not out there

3  talking about it all the time.  Is it the fact that it's a law

4  against abortion -- is that relevant?

5  A.   No, not to the ultimate recommendation, no.  If we had a

6  State Attorney who was going out there saying they're not going

7  to enforce other criminal laws, then that to me puts them in the

8  same category as Mr. Warren's.

9  Q.   Because a law enforcement officer who does that is acting

10 like a law unto themselves?

11 A.   Excuse me?

12 Q.   Because a law enforcement officer who does that is acting

13 like a law unto themselves?

14 A.   I mean, a State Attorney who does that is essentially

15 vetoing state law, even though the Governor signed it.

16 Q.   Whether or not that law is in existence?

17 A.   Excuse me?

18 Q.   Whether or not that law is in existence?

19 A.   Well, Mr. Warren's pledge as to what may become Florida law

20 is relevant here.

21          MR. O'NEIL:  Can we play Plaintiff's Exhibit 38,

22 again?

23     (Plaintiff's Exhibit No. 38 played.)

24 BY MR. O'NEIL:

25 Q.   Thanks.

Direct Examination - Mr. Treadwell

1      Sheriff Lemma -- is it Lemma or Lemma, do you know?

2  A.   I don't know.

3  Q.   Sheriff Lemma, he's a Governor DeSantis supporter; right?

4  A.   I don't know.

5  Q.   Let's look at Joint Exhibit 38.

6      Plaintiff's Exhibit 38, I'm sorry.

7      Sorry, 39.  Thank you.

8          MR. O'NEIL:  Why don't we blow up that top part.

9  BY MR. O'NEIL:

10  Q.   This is a tweet from the Governor?

11  A.   It appears to be.  I'm not active on Twitter.

12  Q.   And he's talking about how nice it was to be with

13  Sheriff Lemma and all the brave men and woman in blue who work

14  every day to keep our communities safe?

15  A.   Okay.

16  Q.   Okay.  Let's look at Joint Exhibit 40.

17      I'm sorry.  Late in the day.

18      Plaintiff's Exhibit 40.

19      Are you familiar with this document?

20  A.   No.  Prior to this trial, I have not seen the last few

21  exhibits.

22  Q.   Have you seen them in connection with the trial?

23  A.   During the trial, yes, I remember them.

24  Q.   Would it surprise you to know that Sheriff Lemma is on the

25  First Lady's drug abuse prevention panel?

Direct Examination – Mr. Treadwell

1  A.   If that's what it says here, then I believe it.

2  Q.   Does that surprise you, given his statements about chaos

3  and lawlessness?

4  A.   I don't have any reason to -- I don't have any reason to

5  judge this appointment.

6  Q.   Now, in that video Sheriff Lemma is talking about a

7  specific constitutional amendment to the Florida Constitution;

8  right?

9  A.   I can barely hear the audio on that, but I'll take your

10 word for it.

11 Q.   He's speaking to a Florida audience?

12 A.   I think I recall a flag in the background that showed

13 Florida.

14 Q.   And it looks like he's answering a question of one of his

15 constituents; right?

16 A.   Yeah, whatever the setting of that was.  I mean, the --

17 Q.   Why is Sheriff Lemma still in office?

18 A.   Excuse me?

19 Q.   Why is he still in office?

20 A.   One, again, do you have -- if -- do you all have a

21 transcript of that or anything that I can familiarize myself

22 with the question and his answer?  He's saying that if something

23 passes constitutionally he won't enforce it, nor will the vast

24 majority of sheriffs in Florida enforce it?

25 Q.   That's what he said.

1   A.   Okay.  So, I mean, to me I would look at that as evidence

2   of the kind of incompetence Mr. Warren showed.

3   Q.   Well, what more do you need?

4   A.   What more do you need?  I would say a pattern of this kind

5   of nullification of Florida law.  That at least would put it in

6   a, you know, comparable category to Mr. Warren.

7   Q.   But the Executive Order says that the abortion statement by

8   itself is sufficient?

9   A.   Yeah.  I mean, that's a blanket pledge.  I mean, that --

10  Q.   What's that?

11  A.   What is that?

12  Q.   What you just watched?

13  A.   Well, it certainly wouldn't qualify, I don't think, as

14  neglect of duty if there's no law in place as of right now.  I

15  mean, that's -- that's why we focused in on the incompetence

16  piece, and I -- I am acknowledging to you that if

17  Sheriff Lemma's statement was what you're representing it was,

18  then that would be evidence of incompetence.

19  Q.   Based on that statement alone, are you going to go back and

20  write a memo about suspending him?

21  A.   I would consider it, absolutely.  I would absolutely

22  consider it.

23  Q.   I'm sorry.  What more would you need to know?

24  A.   On that piece?  I mean, if that -- how many years ago was

25  that, and what have his subsequent statements been?  How

1    comparable is it to the kind of, you know, crimes that

2    Mr. Warren's willing to nullify?  Has there been a pattern of

3    this nature?

4         I mean, it -- the Governor's Office doesn't have to do a

5    broad survey of every public official in the state before it

6    decides it has probable cause and takes action to suspend one

7    and say that, okay, we have enough to go before the Florida

8    Senate on this official.

9    Q.   So it would matter to you, in deciding whether to suspend

10   Sheriff Lemma, if he had made subsequent statements that shed

11   light on this?

12   A.   It would be.

13   Q.   Would you believe Sheriff Lemma if he made subsequent

14   statements that seemed inconsistent with this?

15   A.   I mean, if it's not in the context of, hey, we're

16   considering suspending you, what do you say about this, then I

17   would tend to credit subsequent statements.

18        The problem is, if I had reached out to Mr. Warren saying,

19   look, our office is looking at this statement, then that would

20   immediately show him he better walk that back or he's going to

21   lose his job.

22   Q.   Well, when he was speaking to FOX 13 News, he wasn't being

23   contacted in connection with suspension, was he?

24   A.   No, he wasn't.

25   Q.   That was a subsequent statement to his FJP -- his signature

Direct Examination – Mr. Treadwell

1   on the FJP statement; right?

2   A.   Right.  And I think I've already explained how I didn't

3   credit his completely inconsistent statement that he's going to

4   treat these on a case-by-case basis because he's made the

5   blanket pledge.

6   Q.   And you just said that you would credit Sheriff Lemma if he

7   made a similar subsequent statement?

8   A.   So, I mean, to me Sheriff Lemma could come and say, you

9   know what, actually I will.  I will follow the Constitution.  I

10  mean, that to me I'm envisioning is the subsequent

11  communication -- you know, subsequent comment Sheriff Lemma

12  might make.

13       But if Sheriff Lemma displayed the same kind of talking out

14  of both sides of his mouth, then I probably would not credit his

15  case-by-case statement.

16            MR. O'NEIL:  Your Honor, I have some more questions.

17  I don't know if you want to take a break now or if you want me

18  to keep going.

19            THE COURT:  This is as good a time as any.  Let's take

20  15 minutes.  We'll start back at five after three.

21       (Recess taken at 2:50 PM.)

22       (Resumed at 3:05 PM.)

23            THE COURT:  Please be seated.

24            Mr. Treadwell, you are still under oath.

25            Mr. O'Neil, you may proceed.

 1          MR. O'NEIL:  Thank you, Your Honor.

 2   BY MR. O'NEIL:

 3   Q.   Mr. Treadwell, I'd like to return your attention to the

 4   process of drafting the Executive Order suspending Mr. Warren.

 5          Now, you testified that you were the principal draftsperson

 6   of that order; right?

 7   A.   Yes.

 8   Q.   And you learned of the idea of suspending Mr. Warren on

 9   Monday, July 18?

10   A.   Correct.

11   Q.   That's when Mr. Newman announced the idea at the meeting of

12   the legal office?

13   A.   Yes, sir.

14   Q.   And then you asked Mr. Keefe to prepare a first draft of

15   the order because this was his idea?

16   A.   I either asked him or confirmed that he was working on a

17   draft.

18   Q.   All right.  I'm going to direct your attention to Joint

19   Exhibit 13.

20          What is this?

21   A.   So this would have been an email from Mr. Keefe to me the

22   following Monday giving me an electronic version of his draft,

23   which I had asked for.

24   Q.   And why is Mr. Keefe emailing from his personal address, do

25   you know?

1  A.    I could guess.  I think he was transmitting documents from

2  his work computer to his home computer through his Gmail, at

3  least that's my understanding.  I mean, that's why this came

4  from his Gmail.

5  Q.    Now, is this the first electronic draft of the Executive

6  Order that you received?

7  A.    Electronic draft, yes.

8  Q.    Go to Joint Exhibit 12.

9        This is another email from Mr. Keefe on his personal email;

10 is that right?

11 A.    Yes, sir.

12 Q.    And this attaches an updated draft of the Executive Order

13 from later that day it looks like; is that right?

14 A.    Yes, sir.

15 Q.    Now, if we can turn to the attachment.

16       This draft cites four documents in support of the

17 suspension, and all of them are FJP statements; right?

18 A.    Yes.

19 Q.    So the two we're familiar with, the abortion statement, the

20 trans statement, but also a statement on election security laws

21 and the death penalty; right?

22 A.    Yes.

23 Q.    So if we look at Joint Exhibit 12 at .004, at page 4

24 Mr. Keefe draft cites as a reason for his suspension -- and I'm

25 just reciting here -- that:  *Warren has also publicly declared*

1    *functional vetoes of other existing and potential future Florida*

2    *laws and has publicly announced his blanket refusal to enforce*

3    *those laws.*

4         And then on the following page, the first example is a

5    statement that Mr. Keefe in his draft describes as a statement

6    condemning the election security laws of the Florida Legislature

7    enacted in 2021 and proposed security legislation.

8         Did that FJP statement constitute a blanket policy?

9    A.   Not in my opinion, no.

10   Q.   And Mr. Keefe's next example was the -- an FJP statement on

11   the death penalty; right?

12   A.   That's right.

13   Q.   And it's introduced on page 6, middle of the "whereas"

14   paragraph:  *Warren made the following public declarations, and*

15   *others, stating his preemptive, blanket refusal to seek the*

16   *death penalty in entire categories of death penalty-eligible*

17   *cases.*

18        But this was not a preemptive blanket refusal to do

19   anything, was it?

20   A.   Not in my opinion.

21   Q.   So Mr. Keefe's reading of these statements was wrong?

22   A.   I took them out of the draft because I didn't agree with

23   his inclusion of them.

24   Q.   Well, you removed them because they were statements of

25   opinion; right?

Direct Examination - Mr. Treadwell

1    A.    Largely, yes.  And they didn't go to Mr. Warren's duty to

2    enforce Florida criminal law.

3    Q.    In fact, they had no place in an Executive Order suspending

4    an elected official; right?

5    A.    I agree.

6    Q.    That draft didn't mention a single policy in Mr. Warren's

7    office; right?

8    A.    Well, to the extent it includes the abortion and

9    transgender statements and those go to how he would conduct his

10   office.

11   Q.    Putting aside our -- I understand your position on that.

12         Now, this version also contained a reference to

13   George Soros; right?

14   A.    It did.

15   Q.    And you received this draft on July 25th?

16   A.    I did.

17   Q.    The next day, July 26th, finishing this draft became a real

18   priority for you; right?

19   A.    That's right.

20   Q.    And that's because that day Mr. Newman came in, he said

21   he'd met with the Governor and said, okay, prioritize this

22   draft, get it done, the event to announce this could be as early

23   as August 1st; right?

24   A.    If the Governor would ultimately decide to do this, yes.

25   Q.    And they were discussing an event to announce it at that

Direct Examination – Mr. Treadwell

1    point; right?

2    A.    Yes.

3    Q.    Okay.  The George Soros language didn't get taken out right

4    away, did it?

5    A.    No.

6    Q.    Why don't we look at Joint Exhibit 27.

7          Now, this document, did this document live on your

8    computer?

9    A.    I believe all of the drafts that look in this format lived

10   on my computer at some point or another.

11   Q.    So if you look at page 006 --

12         MR. O'NEIL:  And if we can focus on the blue

13   highlighted portions.

14   BY MR. O'NEIL:

15   Q.    Are these your edits?

16   A.    That is my comment, yes.

17   Q.    That's your comment.

18         And if we go back, if we look at the actual language -- so

19   the language in here:  *Whereas, Soros has supported Warren and*

20   *other "progressive prosecutors" through a series of shell*

21   *organizations, affiliates, and pass-through entities, including*

22   *the Democratic Party*, we're familiar with that language; right?

23   A.    I'm familiar with this draft, yes.

24   Q.    Yeah, but you're familiar with that specific language

25   because it ends up in The Soros Plan; right?

Direct Examination - Mr. Treadwell

1    A.   The Soros Plan?

2    Q.   The document we reviewed earlier with Ms. Fenske.

3    A.   That's the -- that was the document that -- what's the --

4    Kyle -- The Soros Plan document.  That was a comms document;

5    right?

6    Q.   Mr. Lamb prepared?

7    A.   Mr. Lamb, yeah, thank you.  Kyle Lamb.  Thank you.

8    Q.   So this same language about shell organizations.  We see

9    that again, *affiliates and pass-throughs, including the*

10   *Democratic party*; right?  Do you see that?

11   A.   Yeah, but I'd never drawn that comparison before in terms

12   of the same exact phrase ended up in Mr. Lamb's draft.  I'll

13   take your word for it.

14   Q.   Well, we can discuss that at a separate time.

15        And then it says:  *Whereas, FJP is affiliated with Soros*

16   *through an organization named "The Tides Center," which*

17   *represents itself publicly as an "incubator" that helps stand up*

18   *progressive groups.*

19        Do you see that?

20   A.   Yes.

21   Q.   And:  *The Tides Center receives funding from Soros' "Open*

22   *Society" network of entities.*

23        That's what the draft says; right?

24   A.   Yes.

25   Q.   Did Mr. Keefe prepare this?

1   A.   Yes.

2   Q.   Now, your comment says:   *I'd prefer to remove these*

3   *allegations but they may be valuable for the larger political*

4   *narrative.*

5        This, in your view, was not an appropriate basis for

6   suspending Mr. Warren; right?

7   A.   Correct.

8   Q.   But you did think it would be helpful for the broader

9   political narrative?

10  A.   I thought it could be helpful background information.

11  Q.   What is the larger political narrative about the

12  suspension?

13  A.   I think to the extent that there are numerous prosecutors

14  around the United States that are deciding to nullify criminal

15  laws within their jurisdiction, I think that is kind of a

16  political movement in and of itself that could be worth

17  explaining how you get, you know, Mr. Warren here in Florida

18  deciding on his own which criminal laws are going to apply.

19  Q.   Well, you gave a slightly different answer at your

20  deposition.

21       MR. O'NEIL:  If we can play -- play page 239, lines 4

22  through 20.

23       MR. LEVESQUE:  Your Honor, if they're going to impeach

24  him, can they at least have the question go as well so we

25  understand the same questions are being asked?

1          THE COURT:  He can play what he wants, and if there is

2  something else that ought, in fairness, to be considered at the

3  same time, you can play it.

4          MR. LEVESQUE:  Thank you, Your Honor.

5      (Video played.)

6  BY MR. O'NEIL:

7  Q.   You didn't know you'd be defending a First Amendment

8  action; right?

9  A.   At the time I would not have contemplated this.

10 Q.   Can you please turn your attention to Plaintiff's Exhibit

11 30?

12     Okay.  This document contains proposed language for the

13 Executive Order.  Am I characterizing it fairly?

14 A.   It appears to be so, but I'm not familiar with this

15 document.

16 Q.   You are the principle draftsperson of this document; right?

17 Not the document we're looking at, the Executive Order.

18 A.   The principle one, not the only one.

19 Q.   All right.  Do you see the language that's proposed there?

20 A.   Yes.

21          MR. O'NEIL:  And if we can scroll down.

22 BY MR. O'NEIL:

23 Q.   Do you see the language that is quoted here from Senator

24 Ted Cruz:  *One Vote Away*?

25 A.   Okay.

Direct Examination - Mr. Treadwell

```
 1   Q.    What is One Vote Away?  Do you know?

 2   A.    I'm not familiar with that.

 3   Q.    You are familiar with Senator Cruz?

 4   A.    Yes.

 5   Q.    Okay.  And you see the language there that suggests that --

 6   now, were these suggestions for inclusion in the Executive

 7   Order?

 8   A.    I don't know what this document is, who it went to, so -- I

 9   mean, I can only guess that maybe this was given to Mr. Newman

10   for inclusion.

11   Q.    Who --

12              MR. O'NEIL:  If we can scroll up.

13   BY MR. O'NEIL:

14   Q.    Who is Tony?

15   A.    Tony -- I want to say Tony refers to Anthony Licata, and

16   Anthony probably refers to Anthony Leonardi.  We had two

17   Anthonys in our office this summer.

18   Q.    Could it be Anthony Pedicini?

19   A.    On proposed language in the Executive Order?  I highly

20   doubt that.

21   Q.    This language, in fact, finds its way into the Executive

22   Order, doesn't it?

23   A.    I believe it did.

24   Q.    Do you know who Anthony Pedicini is?

25   A.    Only since the suspension and the information that I've
```

1  gathered since for this case.

2  Q.   Like Mr. Cabou, I'm not from Florida.  Who is Mr. Pedicini?

3  A.   I know that he is an individual in the Tampa area.  At

4  least one of the things I've heard about him is that he has

5  been, I guess, politically involved.

6  Q.   What do you mean "politically involved"?

7  A.   I know nothing more than that.  I'm sorry.  I've never met

8  him.  I've never --

9  Q.   Politically involved for whom?

10  A.   I want to say he's been involved in Republican causes.

11  Q.   Why don't we look next at Joint Exhibit 16.

12      By the way, Mr. Treadwell, who is Thomas Piccolo?

13  A.   Thomas Piccolo?  I'm sorry.  I'm drawing a blank.

14  Q.   You don't know?

15  A.   Not without any more context.

16  Q.   Okay.  Thanks.

17      Let's look at Joint Exhibit 16.  This is another draft of

18  the Executive Order.  And I'll give you an opportunity to flip

19  through it.

20      You see that there is large blue writing on it?

21  A.   Yes.

22  Q.   Now, this is a draft from beginning of August; is that

23  right?

24  A.   I believe this draft is from August 3rd.

25  Q.   And this reflects the Governor's edits to the Executive

1    Order?

2    A.   That is my understanding of this document.

3    Q.   And you were told that by Mr. Newman?

4    A.   Correct.

5    Q.   So if you look at page 4, the Governor adds the statement:

6    *Florida law does not impose penalties on pregnant women.*

7         Do you understand the purpose of that addition?

8    A.   Not exactly, but I could speculate that it's the Governor's

9    insistence that we make clear that Florida law will not lead to

10   the prosecution of any pregnant women.

11   Q.   And the next edit looks like he proposed or directed,

12   because it's his Executive Order, a new addition, a new

13   paragraph:   *Whereas, abortions performed after 3 1/2 months are*

14   *performed against an unborn child that has a beating heart, can*

15   *feel pain, dismemberment against the individual performing the*

16   *abortion.*

17        Do you see those edits?

18   A.   I do.

19   Q.   What is the legal significance of those edits?

20   A.   I would say these were not legally required at all.

21   Q.   Do you understand why they -- the Governor wanted them in

22   there?

23   A.   Probably to emphasize the harms to unborn children by

24   Mr. Warren's policy not to prosecute criminal violations of the

25   abortion laws.

Direct Examination - Mr. Treadwell

1   Q.   Are Mr. DeSantis's views on the importance of laws against

2   abortion relevant to his decision to suspend Mr. Warren?

3   A.   Sorry.  Can you repeat that question?

4   Q.   Are Mr. DeSantis's -- the defendant's views on the morality

5   of abortion, do you think they're relevant to his decision to

6   suspend Mr. Warren for what you describe as a pledge not to

7   prosecute abortion laws?

8   A.   I mean, my opinion would be that his viewpoint on the issue

9   of abortion is not relevant.  What was relevant was Mr. Warren's

10  pledge not to enforce the criminal law in that area.

11  Q.   So what would be the purpose of adding this language?

12  A.   I mean, a lot of our publications, whether they're

13  executive orders or press releases, I mean, have to include both

14  legal grounds and messaging.  And so here's the Governor, he's

15  got the legal grounds in front of him, and he wants to

16  emphasize -- I would assume.  I'm speculating here.  He wants to

17  emphasize a certain message as to the importance of why he's

18  doing what he's doing, and, you know, upholding the criminal

19  laws in Mr. Warren's jurisdiction.

20  Q.   Because he believes that laws against abortion are

21  important?

22  A.   I think that's fair.

23  Q.   You see on page 5 he makes edits to the quotation from the

24  FJP statement; right?

25  A.   Right.

Direct Examination – Mr. Treadwell

1   Q.   And his edit is to remove the words "seek or" and replace

2   it with an ellipse; is that fair?

3   A.   That's right.

4   Q.   That's because he wanted to make clear that in Florida

5   women won't be prosecuted for seeking abortions?

6   A.   That's what I would guess.

7   Q.   If you'd turn to page 6 -- sorry, not 6 -- 8.

8        Now, he's Xed out three paragraphs, and you had mentioned

9   earlier that you tried to find out information about crime

10  statistics in Hillsborough County; is that right?

11  A.   That's right.

12  Q.   And are the three paragraphs here an attempt to cast those

13  statistics in a way that supports the Executive Order?

14  A.   Yes, they are an attempt to do that.

15  Q.   And the Governor wanted them removed?

16  A.   It appears so.

17  Q.   Do you know why he wanted them removed?

18  A.   I was not in this meeting, so I don't know if he

19  communicated a reason for removing these paragraphs.  But, I

20  mean, if I were to guess, it's because we couldn't draw a

21  definitive causation between the policies we were condemning and

22  the, you know, charging statistics within that jurisdiction.

23  Q.   Could you draw any conclusions about the violent crime rate

24  in Hillsborough County under Mr. Warren's tenure?

25  A.   I didn't look at that.

1    Q.   Could you have taken longer to try to drill down on that

2    and try to get some reliable statistics?

3    A.   Potentially, if we would have considered that the critical,

4    you know, piece of information before moving forward.

5    Q.   It didn't matter to you whether, in fact -- what was going

6    on with the crime in Hillsborough County?

7    A.   I mean, of course, it matters to all of us, but it's not --

8    it's not critical to the decision to move forward with the

9    suspension.

10        MR. O'NEIL:  Your Honor, I'll -- I think I'm out of

11   questions for Mr. Treadwell.

12        THE COURT:  Cross-examine?

13                  CROSS-EXAMINATION

14   BY MR. LEVESQUE:

15   Q.   Mr. Treadwell, you were answering some questions earlier

16   about being on the call with Sheriff Chronister.

17        Who else was on that call with you?

18   A.   I know for sure Mr. Newman was.  And the date of this I

19   want to say was probably Thursday, July 28th.

20   Q.   And other than Mr. Newman, was there anybody else?

21   A.   Quite possibly.  I can't recall offhand.

22   Q.   Would it be fair to say that you worked collaboratively

23   with Mr. Newman on this process of drafting up the order and

24   analyzing it from a legal standpoint?

25   A.   Absolutely.  We were trading drafts on a daily and hourly

Cross-Examination – Mr. Treadwell

1   basis sometimes.

2   Q.   Now, you were here for Mr. Madry's testimony earlier.

3        Did you rely in any way on Mr. Madry's memo?

4   A.   No.

5   Q.   Did you share Mr. Madry's memo with anyone else?

6   A.   No.

7   Q.   Are you aware of any indication that Mr. Madry's memo was

8   seen by anybody other than you and Mr. Madry?

9   A.   I think we were the only ones who saw it until this case.

10  Q.   And when Mr. Madry provided the memo to you and you read

11  it, what did you do?

12  A.   I mean, he came and asked me for the assignment, and so

13  I -- I'm familiar with the, you know, half dozen cases on

14  Governor's removal -- you know, suspension power, and I thought

15  this would be a great teaching tool for him.

16       And so he comes back with this memo, and I read it quickly.

17  And toward the end of kind of the legal analysis he has these

18  statements in there, like the Governor cannot suspend the public

19  official during session, and that immediately struck me as

20  probably wrong.  I mean, that is -- I've never heard that

21  before.

22       So I went and looked at the case he was citing.  It was the

23  1951 *Kelly versus Sullivan* case, and, sure enough, the Florida

24  Supreme Court was quoting the old Constitution, which did have

25  language about when the Governor could suspend public officials.

Cross-Examination - Mr. Treadwell

1    So I pretty much stopped reading the memo there.  I mean, I

2    think I did glance at the chart very briefly and saw that the

3    conclusion was right after it.  And then the next time -- then I

4    moved on.

5         But the next time I walked by the law clerk intern office,

6    I popped in there.  We talked about his reliance on that 1951

7    case, and that was that.

8    Q.   And at any point have you indicated to him that, in terms

9    of Shepardizing those cases, you can't always rely on Westlaw to

10   do your Shepardizing for you?

11   A.   Sure.  I mean, I know because I've looked in Westlaw on

12   that case, and it's not flagged, right, and so you have to kind

13   of get into it and then cross-check the constitutional language

14   they're quoting with the constitutional language that exists

15   today.

16        And so I think it was a great teaching tool, and I'd be

17   surprised if he makes that mistake again, especially after this

18   ordeal.

19   Q.   You were asked some questions about the context of a public

20   official's statements and whether they would be setting policy

21   or not.

22        If a public official is making a declaration, and they are

23   the only official in charge of the agency, would you give the

24   public official's statements about their intended course of

25   conduct a little more weight?

1   A.   Sorry.  I lost you midway there.  If a public official --

2   Q.   If a public official is the only person in charge of an

3   agency, for example, the Governor -- let's try the Governor when

4   he's a member of a cabinet and he's overseeing the cabinet

5   agency, and he makes a declaration about what he wants to do for

6   an agency like FDLE.

7        Do you give the Governor's declaration the same level of

8   weight as you would give a governor -- the Governor making a

9   declaration about his own office?

10  A.   And I believe FDLE does report directly to the Governor.

11  Q.   Does it -- it's not a cabinet agency?

12  A.   It may be, but it's not in my portfolio.  I apologize if I

13  got that wrong.

14       So, no, the Governor's statements -- if FDLE reports to the

15  cabinet, which I take your assumption on that, then, no, the

16  Governor's statement about his own executive office would carry

17  far more weight about what he wants a cabinet agency to do.

18  Q.   So when State Attorney Andrew Warren made statements about

19  his office at the time, do you believe it was reasonable for you

20  to take those statements at face value?

21  A.   I do.

22            MR. LEVESQUE:  Can we pull up PX57?

23            I started this off there, Your Honor, and I tried to

24  keep it loud.

25

1    BY MR. LEVESQUE:

2    Q.   Now, you were shown this document earlier, and it was

3    pointed out that the date was July 7, 2022.

4         If Sheriff Chronister's documents were provided to your

5    office in April of that year, would there have been any way for

6    this document to be in Sheriff Chronister's documents?

7    A.   Based on that timing, no.

8              MR. LEVESQUE:   And if we can scroll to page 57.003.

9    BY MR. LEVESQUE:

10   Q.   And there's the language that is highlighted at the

11   bottom -- or that was highlighted at the bottom.

12   A.   The sentence:  *As with any category of crimes*?

13   Q.   Yes, sir.

14        So in relation to this policy and the concept that it's a

15   blanket policy, this is a policy to enforce the law; correct?

16   A.   That's my limited understanding of this.

17   Q.   Do you look at a blanket policy to enforce the law as being

18   different than a policy to not en -- a presumptive policy to not

19   enforce the law?

20   A.   If we're talking about suspension, then, yes, they're very

21   different.

22   Q.   And why are they different?

23   A.   Because the Constitution says that a public official can be

24   suspended for neglect of duty, not carrying out his or her

25   duties.

1   Q.   And so at least as you understand that policy, Mr. Warren

2   wasn't threatening to not prosecute gun crimes or pledging to

3   not prosecute gun crimes, was he?

4   A.   That's my understanding.

5   Q.   Now, you were asked some questions --

6          MR. LEVESQUE:   Actually, can we pull up PEX34.002?

7   BY MR. LEVESQUE:

8   Q.   In that highlighted, Mr. Warren was pointing out to

9   Mr. Chronister that they had, in fact, enforced the bike stop

10  policy, at least in that one particular instance, days after.

11      Certainly the Governor wasn't suspending Mr. Warren for

12  enforcing the law consistent with the way Florida law is

13  intended to be applied; correct?

14  A.   Sorry.   What do you mean by that?

15  Q.   I apologize.   I have a tendency to ask convoluted

16  questions.   Let me see if I can frame it this way.

17      Governor DeSantis did not suspend Mr. Warren for his

18  policies that resulted in the enforcement of the law, did he?

19  A.   That's right.

20  Q.   He suspended him for the effect of his presumption policies

21  that resulted in either underenforcement or nonenforcement of

22  the law; isn't that correct?

23  A.   Correct.

24          THE COURT:   So part of it was underenforcement?

25          THE WITNESS:   Well, depending on what the facts show

1    in the course of the Senate, you know, trial, there is --

2              THE COURT:  You do understand we're having a trial in

3    this court this week.

4              THE WITNESS:  And that's fine.  And I could explain my

5    mindset --

6              THE COURT:  Let's leave that out.  I don't want to

7    talk about the trial.  I want to talk about what you did.

8              THE WITNESS:  Sure.

9              THE COURT:  I understand what you just said was, part

10   of the suspension was the underenforcement of the law; is that

11   true?

12             THE WITNESS:  I think that is absolutely one of the

13   grounds in the Executive Order --

14             THE COURT:  All right.

15             THE WITNESS:  -- and it's backed up by Florida case

16   law from the 1937, you know, *Hardee v. Allen* case, that a

17   suspension on neglect of duty can be based on underenforcement

18   and not simply nonenforcement of a criminal law.

19             THE COURT:  And so if Mr. Warren was prosecuting cases

20   but just not all cases, that was a grounds to suspend him?

21             THE WITNESS:  I mean, that is, I think, part of the

22   neglect of duty question that the Senate will look at.

23             THE COURT:  I get it.  So I guess my next question is,

24   do you think there's a State Attorney in the state anywhere who

25   brings every case that there's probable cause to prosecute?

Cross-Examination – Mr. Treadwell

1              THE WITNESS:  No, I don't.

2              THE COURT:  I don't either.  So how do you -- so why

3      aren't they all suspended for underperforming?

4              THE WITNESS:  Because I don't think the standard is

5      universal charges in every instance.  I think, you know, the

6      standard would be based on whatever the, you know, leaders here

7      in Tallahassee decide is insufficient or neglectful, and that

8      really depends on the time and the crime and the impact that

9      it's having on the community.

10             THE COURT:  So when you decided that Mr. Warren had

11     underperformed, how did you determine that he had underperformed

12     as compared to anybody else?  Tell me which cases he

13     underperformed on and how you determined that he was

14     underperforming.

15             THE WITNESS:  Sure.  So I think in his case we

16     determined that his presumption of nonprosecution policies,

17     which we did not find anything comparable all over the state,

18     leads to less charges in those areas than other State's

19     Attorneys would be bringing.  That was our basis to suggest,

20     okay, he might be bringing some of these cases, but not to the

21     extent he should be.  And Sheriff Chronister was telling us much

22     the same.  So we at least knew we had some evidence that we

23     can -- and the policy itself -- to move forward on neglect of

24     duty.

25             THE COURT:  I get it.

1          But you didn't compare other State Attorneys to see

2    how many resisting without violence cases they brought that

3    started with bike stops?  You didn't have any numbers to

4    compare?

5          THE WITNESS:  I did not.

6          THE COURT:  But you knew, because he had a presumption

7    that he wouldn't bring it unless certain factors were met, that

8    he must be bringing fewer cases than he should in order to be

9    competent?

10          THE WITNESS:  That, and what we were hearing from the

11    ground with law enforcement officers gave us enough confidence

12    to move forward, and we'll be amassing the evidence for the

13    Florida Senate trial on that point.

14          THE COURT:  Well, let me just -- so I think all the

15    lawyers know this, but just so you know, I'm going to make a

16    decision in this case, and it's not going to be based on what

17    somebody might present later to the Florida Senate.  The

18    decision in this case is going to be based on the evidence in

19    this case.

20          MR. LEVESQUE:  Thank you, Your Honor.

21          Did you have any more questions before I proceed?

22          THE COURT:  Not right now.

23          MR. LEVESQUE:  Thank you, sir.

24          THE COURT:  We've got another technical glitch.  We'll

25    be at ease for a few minutes.

1          (Recess taken at 3:38 PM.)

2          (Resumed at 3:42 PM.)

3          THE COURT:  All right.  The court reporter has

4    rebooted.

5          During the break, we had a brief discussion of

6    retooling the generator last night and the fact that the tornado

7    watch has passed.  Other than that, there hasn't been any

8    discussion of the case.

9          Mr. Levesque, you may proceed.

10          MR. LEVESQUE:  Thank you, sir.

11    BY MR. LEVESQUE:

12    Q.   We were just talking about underenforcement in one

13    particular context.  Is it possible that there could also be

14    underenforcement by refusing to enforce the law categorically in

15    certain crimes under certain circumstances?

16    A.   I suppose.

17    Q.   So, for example, in the low-level misdemeanor policy, they

18    refuse to enforce the law unless there is a public safety.

19    Would that be a form of underenforcement?

20    A.   Yes.

21    Q.   Now, you are one of the individuals in the General

22    Counsel's Office that's responsible for working on the issue of

23    suspensions.

24          Do you proactively go around the state monitoring different

25    elected officials to figure out if you're going to suspend them

Cross-Examination - Mr. Treadwell

1    or not?

2    A.    No.   I only turn my attention to situations when they're

3    brought to me.

4    Q.    And in this particular instance, Mr. Keefe brought this

5    issue to your office; correct?

6    A.    Yes.

7    Q.    And when he brought this to your office, did you

8    immediately start running, or did you wait for direction to

9    start running?

10   A.    It might have been even at that morning meeting, the

11   Monday, July 18th, that, you know, Mr. Newman turned to me and,

12   because suspension is part of my portfolio, that was then going

13   to be my task for the legal office.

14       But given Mr. Keefe's experience and skill set particularly

15   in prosecution, I confirmed that he would be kind of putting

16   together something in writing first, because I wanted all of his

17   input and thought as to, you know, what might potentially go in

18   an executive order.   And I think in order to do that, either I

19   or Josh Pratt shared with him some examples of other executive

20   order suspensions we had issued.

21   Q.    Traditionally, what are the suspensions that you normally

22   act on when it comes to suspending an elected official?

23   A.    The most common suspension is a felony charge or

24   information.

25   Q.    And why would that be the most common?

1  A.   Because you'd be surprised how many officials around the

2  State of Florida are breaking the law.

3  Q.   But it's an authority that the Governor, at least in terms

4  of nonfelony suspensions, exercises sparingly.  Would that be

5  fair?

6  A.   Yes.

7  Q.   Prior to Mr. Warren, do you know when the last time

8  Governor DeSantis suspended an official for a reason unrelated

9  to a felony?

10  A.   I believe the last suspension based on a ground other than

11  felony would have been Susan Booker, the Supervisor of Elections

12  for Palm Beach County, and if I recall correctly, that

13  suspension would have been in 2019.

14  Q.   And would that have been shortly after Governor DeSantis

15  was first elected to office?

16  A.   I was not in the office at that time that suspension was

17  issued, but that is my understanding.

18          MR. LEVESQUE:  If we can pull up Joint Exhibit 5, and

19  if we can scroll down to the bottom to the footnote.

20  BY MR. LEVESQUE:

21  Q.   And I believe you started to make reference to this earlier

22  related to Footnote 2, where they define abortion to be a

23  personal choice made by a pregnant woman to terminate a

24  pregnancy, and then they define those that would continue to be

25  considered under this prosecutorial statement as including any

1   type of forced abortion or who perform an abortion negligently

2   or with the intent to cause harm to the pregnant person.

3             Do you think it would be negligent to perform an

4   abortion if you're not a doctor?

5   A.   Yes, that would be my opinion.

6   Q.   You were asked some questions about Sheriff Lemma's

7   statement related to whether he would enforce an assault weapons

8   ban that was being proposed to the Florida Constitution.

9        Are you familiar with that proposed Constitution amendment

10  at all?

11  A.   I'm not.

12  Q.   Do you see a fundamental difference between a public

13  official declaring that they will not enforce a law on the books

14  and one where they are refusing to enforce a law that is on the

15  books?

16  A.   Tell me that distinction again.

17  Q.   Do you see a difference between a public official refusing

18  to enforce a law that hasn't been adopted yet compared to a

19  public official refusing to enforce a law that has been adopted?

20  A.   Yes, I do -- I do see a difference there.  I would say that

21  if a law is not on the books currently, then there is no duty to

22  enforce a nonexistent law.  So that does go to the grounds of

23  the suspension.

24  Q.   And I think you indicated earlier in the context of

25  Sheriff Lemma that that would be evidence of incompetence

1    related to his view of his duty.

2         Did I understand that correctly?

3    A.   Yes.

4    Q.   In your opinion, if you were confronted with just that fact

5    and no other facts, would you consider that to be actionable

6    evidence for suspension?

7    A.   I would not recommend it as actionable evidence, but it's

8    ultimately not my call.

9    Q.   And if the trans statement was the only statement that

10   Mr. Warren signed, would you -- and the policies are by the

11   side -- the abortion policy is by the side.  It's only the trans

12   policy -- would you have recommended suspension?

13   A.   On incompetence alone, no.

14   Q.   The State Attorney's policies, the first time those were

15   brought to you -- to your attention was in this litigation?

16   A.   Which State Attorney policy are you referring to?

17   Q.   We'll start with Mr. Campbell's State Attorney policy.  I

18   believe that's Plaintiff's Exhibit 11.

19   A.   I have not seen that prior to this trial.

20   Q.   Were there other State Attorney's policies other than

21   Mr. Warren's policies that you'd seen when you were working on

22   the suspension?

23   A.   I do not recall seeing any other State Attorney's policy

24   prior to trial.

25   Q.   When you were doing the work on Mr. Warren's suspension

1  order, did you review his Twitter account or any of his social

2  media?

3  A.   I did not.

4  Q.   Were you aware that Mr. Warren worked with law enforcement

5  to arrest a pastor who was holding church services in the midst

6  of the pandemic?

7  A.   I was not.

8  Q.   Were you aware that Mr. Warren called Governor DeSantis's

9  entry of an Executive Order that added attending religious

10 services conducted in churches, synagogues, and houses of

11 worship to the list of essential services a weak and spineless

12 move?

13 A.   I was not aware of that.

14 Q.   Were you aware that Mr. Warren opposed House Bill 1, the

15 anti-riot act?

16 A.   I might have read something on that in the lead-up to the

17 suspension, whether it was a news story or something else.

18 Q.   Did that in any way factor into your recommendation that

19 Mr. Warren should be suspended from office?

20 A.   No.

21 Q.   Did the fact that Mr. Warren was a Democrat factor in any

22 way into your recommendation that he should be suspended from

23 office?

24 A.   No.

25 Q.   If there was a Republican State Attorney who had signed the

1   abortion statement and that's all they had done, would you still

2   recommend that they be suspended from office?

3   A.   The abortion statement?

4   Q.   Yes, sir.

5   A.   Yes.

6        MR. LEVESQUE:  No further questions, Your Honor.

7        THE COURT:  Redirect?

8        MR. O'NEIL:  Thank you, Your Honor.

9                   REDIRECT EXAMINATION

10  BY MR. O'NEIL:

11  Q.   Is every reason for Mr. Warren's suspension set forth in

12  the Executive Order?

13  A.   Yes, sir.

14  Q.   Can you point me to where in the Executive Order it alleges

15  that he underenforced certain laws?

16  A.   I don't believe that particular word was used, but it's

17  part of the neglect of duty charge.

18  Q.   Your testimony is that when you say underenforce, you are

19  referring to what you call blanket policies?

20  A.   That can be one of the effects of his blanket policies.  I

21  mean, because there are these presumptions that can be

22  overcome -- it's still a blanket policy, in my opinion, but

23  there will be some enforcement of that law if the public safety

24  threat, as Mr. Warren sees it, is met.  So you're not going to

25  have nonenforcement of, let's say, the prostitution law or the

1    trespassing on a business property law.  It's going to be

2    underenforcement as a result of that blanket policy.

3    Q.   Does it matter if overcoming the presumption requires a

4    consideration of individual facts and circumstances?

5    A.   Well, my understanding of the policy is you have to cross

6    that public safety threat hurdle before you then get to the

7    traditional prosecutorial discretion factors.

8    Q.   Now, we've talked a lot about this term "blanket policy";

9    right?  We're not making up that term.  There's a reason it's in

10   the Executive Order; right?

11   A.   That's right.

12   Q.   That's because it's from the *Ayala* decision?

13   A.   That is -- that is one explanation.  The blanket policy

14   takes away the individualized case-by-case assessment, yes.

15   Q.   The *Ayala* decision doesn't use the words "generally

16   applicable"; right?

17   A.   No, I don't believe it does.

18   Q.   It defines a blanket policy as one where the prosecutor

19   does not exercise discretion based on the particular facts of

20   the case; right?

21   A.   That's right.

22   Q.   And that could be a problem in either direction; right?

23   A.   I think I know what you're saying, and I tend to agree.

24   Q.   So a blanket policy is one where it's an absolute rule to

25   charge or not to charge without regard to the individual facts

Redirect Examination - Mr. Treadwell

1  and circumstances if we're talking about *Ayala*.  Is that fair?

2  A.   I can see that.  So in your scenario, a blanket policy

3  could be, look, if the elements of the crime are there, we're

4  going to charge regardless of what the victims might think,

5  regardless of the criminal history, regardless of those, you

6  know, traditional factors.  Then I would say that's -- yeah,

7  that's a blanket policy in the other direction.

8  Q.   Did you produce a legal memo where you analyzed *Ayala* and

9  applied it to the facts of this case and evaluated all the kinds

10  of things that lawyers do when they consider whether to take an

11  action like this?

12  A.   The legal memo, so to speak, that I wrote would have been

13  the Executive Order itself.

14  Q.   So the only legal analysis of any of this outside of the

15  Executive Order is Mr. Madry's memo?

16  A.   I mean, he's the only one that wrote a standalone memo, but

17  I would say my Executive Order was, I mean, far more thorough in

18  terms of a legal analysis and applying the facts to the law.  So

19  I kind of disagree with your presumption that there was no legal

20  analysis other than Mr. Madry's exercise.

21  Q.   You testified that underenforcement was part of the reason

22  for the suspension; right?

23  A.   I believe so, yes.

24  Q.   Okay.  Are you aware that there is publicly available data

25  from the Florida Department of Law Enforcement, specifically

1    their annual Uniform Crime Reports, that show that the crime

2    rate in Hillsborough County decreased nearly 30 percent from

3    2016 to 2020?

4    A.   Okay.  I can't recall the statistics offhand, but if we are

5    ending in 2020, I think everybody knows why crime rates would

6    have dropped that year.

7    Q.   Do you know that Mr. Warren's office has a public dashboard

8    that's available for anyone to look at that has crime

9    statistics?

10   A.   I believe that website is one of the sources that

11   Mr. Newman and I looked at.

12   Q.   And do you know that the charging rates -- I'm not talking

13   about absolute figures here -- but the charging rates for

14   misdemeanors in the Thirteenth District was above the state

15   average?  Did you know that?

16   A.   I can't recall that offhand.

17   Q.   Do you know it's among the highest in the state?

18   A.   I have no comparison there.

19   Q.   You testified that there is no duty to exist -- to enforce

20   a law that doesn't exist; right?

21   A.   Yeah, there's no existing duty there, right.

22   Q.   And you testified -- I think you just testified a moment

23   ago that you would not have recommended suspension based on the

24   gender statement?

25   A.   Standing alone I would not have.  I mean, that statement

Redirect Examination - Mr. Treadwell

1  has been out since, I believe, June 2021, and it would not have

2  been a basis on its own for suspension.

3  Q.   Do you remember when I asked you that question in your

4  deposition and your answer was maybe?

5  A.   I don't remember that, but...

6  Q.   Is your mind -- have you changed your mind?

7  A.   I guess I'm still wrestling with it.

8  Q.   Do you know what the Governor would have done if the only

9  statement in this whole case was the gender statement?

10 A.   I don't know.

11 Q.   I won't make us all watch the video, but is it fair to say

12 that at your deposition you said, Only the Governor would know

13 that hypothetical?

14 A.   Yeah.  We did not present that hypothetical to the

15 Governor, so I can't speak as to what the Governor might have

16 decided.

17 Q.   You testified that it was important not to wait to suspend

18 Mr. Warren because he had signed the abortion statement on

19 June 24th; is that fair?

20 A.   Sure.

21 Q.   What was the date of the transgender statement?

22 A.   June 2021.

23 Q.   And the date of the bike stop policy?

24 A.   If I recall correctly, that would have been -- I know one

25 of the other ones was March 2021, but help me out here.

Redirect Examination – Mr. Treadwell

1   Q.   The bike stop policy, I believe, is early 2022; right?

2   A.   Okay.

3   Q.   The low-level offense policy is dated March 21st, although

4   Mr. Warren testified that that was just the latest iteration of

5   it.  Do you recall that?

6   A.   Right.

7   Q.   So you were willing to wait for more than a year to suspend

8   Mr. Warren for three of the four stated reasons; right?

9   A.   I wouldn't classify it as waiting, because I wasn't even

10  aware.  And I would be surprised if anybody in the Governor's

11  Office was aware of those policies in connection with some sort

12  of suspension consideration.

13  Q.   There was only urgency after Mr. Warren signed the abortion

14  statement; right?

15  A.   I mean, that was the ultimate sign that he's misusing his

16  office.

17  Q.   You said it's the ultimate sign, but you said you didn't

18  even know anything about this stuff before the abortion

19  statement; right?

20  A.   That's right.  But as I gathered the documents after the

21  abortion statement, I still am of the opinion that the abortion

22  statement was, I mean, the real driver here for this whole

23  suspension, and included the other reasons, but the abortion

24  statement, that's what put him on our radar.

25  Q.   Now, you testified earlier that one of the reasons you

1    didn't want to reach out to Mr. Warren or anyone in his office

2    is because it would tip him off to what you were doing; right?

3    A.   It would have given him, yeah, awareness that we were

4    considering suspension.

5    Q.   But the reason for the suspension, according to you, was

6    protecting public safety; right?

7    A.   I'm sorry?

8    Q.   The reason for the suspension was to protect public safety;

9    is that fair?

10   A.   I don't know if that's what I would say was the reason for

11   the suspension.  I mean, we are trying to protect criminal law

12   in Hillsborough County.

13   Q.   So it was very urgent that you make a statement about

14   criminal law in Hillsborough County?

15   A.   I mean, to the extent we're just going to wait months when

16   we come to the conclusion that Mr. Warren is unfit for office,

17   that would seem more inconsistent.

18   Q.   Wouldn't it have furthered public safety more just to reach

19   out to Mr. Warren, ask him about this statement, and say you had

20   concerns?

21   A.   I don't think so.

22   Q.   Did you keep it under wraps because you wanted it to have

23   the maximum impact when you made the announcement?

24   A.   I mean, whenever somebody is being removed from their

25   position, it's a hard decision to make.  And sometimes a

Redirect Examination - Mr. Treadwell

1    decision gets made without a warning and an opportunity to, you

2    know, correct him or herself.

3              MR. O'NEIL:  Nothing more, Your Honor.

4              THE COURT:  Mr. Treadwell, I've got a couple of

5    questions.

6              Let me start by describing a fairly typical drug

7    transaction.  There may be a supplier and a courier to a street

8    seller.  Each of them is committing a crime.  If a State

9    Attorney has a policy and says, I'm going to prosecute the

10   supplier and the street seller but not the courier, that's my

11   policy, is that a blanket policy?

12             THE WITNESS:  In my opinion, yes.

13             THE COURT:  Is that a grounds for suspension?

14             THE WITNESS:  In my opinion, it very well could be.

15             THE COURT:  Now, I saw the Governor's edits that he

16   was careful to say that in Florida you could prosecute the

17   person who performed the abortion but not the woman.  And I take

18   it -- and I don't want my questions to sound like they are

19   critical.  It seems to me a reasonable thing that a prosecutor

20   might decide in that situation, I'm going to prosecute the

21   provider and not the woman.

22             Florida law doesn't say the woman doesn't commit a

23   crime, does it?

24             THE WITNESS:  Some of the abortion statutes, from what

25   I can recall, do exempt the pregnant woman from prosecution.

Redirect Examination - Mr. Treadwell

1              THE COURT:  One of the statutes, I think, does, but

2       not all of them.  I mean, the one that was just passed, the

3       15-week statute, it says:  *Any person who willfully performs or*

4       *actively participates in a termination of pregnancy in violation*

5       *of the statute commits a felony in the second degree.*

6              Isn't the woman that goes to the doctor and says,

7       Perform the abortion -- she's participating in this event, is

8       she not?

9              THE WITNESS:  I haven't studied this as a legal

10      matter, Your Honor.  I'm sorry.

11             THE COURT:  Well, I'm just wondering how it is that

12      it's okay in this very transaction for the Governor to say,

13      We're not going to prosecute women involved in abortion, and

14      that's not a blanket policy, but this one is.

15             Can you explain that to me?

16             THE WITNESS:  I mean, my understanding of Florida

17      law -- and, again, it's just my understanding.  I haven't

18      thoroughly studied or examined or analyzed the issue -- is that

19      it does not criminalize a woman seeking an abortion.  So the

20      phrase you used, "actively participates," I'm not sure if we can

21      draw that legal conclusion that it includes the woman.

22             THE COURT:  You may not be able to, and I haven't done

23      this either.  And part of the problem is I don't think anybody

24      has been prosecuted in an abortion case in Florida for 50 years.

25      Maybe they have.  I don't know the answer to that either.

Redirect Examination - Mr. Treadwell

1              Before we're done, if the lawyers can enlighten me on

2    the number of prosecutions in abortion cases in Florida, that

3    would probably be useful.

4              But the current regiment in Florida at least, and

5    certainly in the Florida Supreme Court -- the Florida Supreme

6    Court is probably as strong as any court in the country saying,

7    Just read the words; true?

8              THE WITNESS:  That sounds right.

9              THE COURT:  That's probably your position -- at the

10   Governor's Office as legal counsel, your position is, Just read

11   the words; right?

12             THE WITNESS:  Yes, sir.

13             THE COURT:  Just reads these words:  *Who performs or*

14   *actively participates in a termination of a pregnancy.*

15             What part of that says, Not the woman?

16             THE WITNESS:  I mean, to me we have to look at the

17   whole context of the law, and I can't do that on the stand here,

18   Your Honor.  I'm sorry.

19             THE COURT:  Fair enough.  And I can't either.  And

20   I'll be the first one to tell you my questions may be completely

21   off track.

22             I just wondered if the Governor's -- and I'm certainly

23   not being critical of the suggestion that we would prosecute the

24   provider and not the woman.  I just wondered if he was picking

25   and choosing which laws to follow.

Redirect Examination - Mr. Treadwell

1          I guess the answer is you don't really know.  You need

2   to research it.  And so would I.  Fair enough.

3          One of the last things you said was that, It was the

4   abortion statement that put him on our radar.  I'm trying to

5   figure this out, because if I understood it correctly, what

6   Mr. Keefe said was what put him on the radar was that the

7   Governor said to look into whether he had any prosecutors that

8   were what I refer to as left-leaning prosecutors, any

9   prosecutors like those around the country that there had been

10  stories about.  And Mr. Keefe went out and did -- looked into

11  it.  And as the Governor put it, 95 percent came back to

12  Mr. Warren.  None of that had anything to do with abortion.

13         So what was it that put him on the radar?  Was it

14  Mr. Keefe's looking into it, or was it the abortion statement?

15         THE WITNESS:  And that's a great question.  And I

16  guess when I say, Put him on our radar, I meant the legal

17  office.  So it was that June 30th email from Mr. Keefe to

18  Mr. Newman announcing his abortion statement.  That was the

19  first time the legal office, from my understanding, became aware

20  of Mr. Warren and his approach to nullifying criminal law.

21         THE COURT:  So if there hadn't been an abortion

22  statement, would you have suspended him?

23         THE WITNESS:  I probably would not have recommended

24  abortion.  It probably wouldn't have even come --

25         THE COURT:  You said "Abortion."

Redirect Examination - Mr. Treadwell

1              THE WITNESS:  I'm sorry.  I probably would not have

2     recommended the suspension because it was the abortion -- the

3     pledge in the abortion statement that we, as a legal office,

4     found so offensive and so inconsistent with our understanding of

5     prosecutorial discretion.

6              THE COURT:  And you don't know whether the Governor

7     would have seen it the same way?

8              THE WITNESS:  Without the abortion statement, I don't

9     know.

10              THE COURT:  And nobody does but the Governor; is that

11     fair -- or maybe the chief of staff?

12              THE WITNESS:  Yeah, maybe Mr. Newman or the chief of

13     staff had a conversation with the Governor about, you know, what

14     would he lean toward, you know, if you changed out some of these

15     four pieces that ultimately ended up in the Executive Order.

16              THE COURT:  And maybe all that's speculative.  Fair

17     enough.

18              Questions just to follow up on that?

19              MR. LEVESQUE:  No, Your Honor.

20              THE COURT:  Thank you.  Mr. Treadwell, you may step

21     down and return to counsel table.

22         (Raymond Treadwell exited the courtroom.)

23              THE COURT:  Please call your next witness.

24              MR. CABOU:  Your Honor, at this point Mr. Warren

25     rests.

Redirect Examination - Mr. Treadwell

1           THE COURT:  All right.  For the defense?

2           MR. LEVESQUE:  Your Honor, we were anticipating to go

3      just a little bit longer.  I don't know that we'll be able to

4      get our next witness here within the next 45 minutes.  And I

5      apologize, but I don't believe --

6           THE COURT:  Boy, I got to tell you, part of what

7      happens when you get an expedited procedure -- and I know we had

8      a pretrial, and we were talking about some other things, and so

9      I probably didn't do it in this case.  But I got to tell you,

10     part of my pretrial outline in every case -- what I tell people

11     is -- in fact, we just about nailed it.  I usually tell people,

12     Do not let the plaintiffs rest at 3:00 on Tuesday afternoon, and

13     you don't have a witness.  Well, we started on Tuesday.  So this

14     time it's Wednesday, and we got all the way to 4:00.

15          Who is your first witness?

16          MR. LEVESQUE:  I believe we were just informed that

17     Mr. Treadwell would be the last witness about an hour ago.  I

18     haven't been able to consult.  I believe we'll have three

19     witnesses max, and I believe we would be able to finish all

20     three witnesses tomorrow.

21          THE COURT:  Well, that's the kind of thing that

22     usually gets you there.  I used to have one of the --

23          MR. LEVESQUE:  I'm sorry, Your Honor?

24          THE COURT:  I used to have one of the really good

25     prosecutors in this courtroom that would say, I think I can get

Redirect Examination - Mr. Treadwell

1    through this in -- I can cut this stuff out overnight.  If you

2    let me quit now, I'll make it go faster tomorrow.  What am I

3    supposed to say to that?  That works.

4           All right.  Give me the preview.  Who do you expect to

5    have?

6           MR. LEVESQUE:  I think the three witnesses that we are

7    looking at would either be Ryan Newman, Gary Weisman, and

8    Christina Pushaw.  Christina Pushaw, I don't think we would

9    spend very much time with her.  I can't speak for the other

10   side.  I would guesstimate for Ryan Newman we would take no more

11   than maybe an hour on direct and probably 30 to 45 minutes for

12   Mr. Weisman.

13          THE COURT:  All right.  So we are going to finish in

14   the morning.

15          We talked at the pretrial about closings, and it will

16   help to have closings and fairly soon after.  Tell me what's

17   going to help you.  You've all lived with this case and you know

18   it very well.  I don't -- I'm not going to need a break before

19   closings, but you may want a little bit of time.  I would take

20   an hour break -- I mean, if we finish in the morning, that's

21   great.  But we can take a little longer if you want.  Other

22   people have travel arrangements and all that.

23          Tell me what -- how -- and I've got the week blocked

24   out, so, you know, we can take the evidence tomorrow, and if you

25   want that additional time to prepare and you want to argue

 1   Friday morning, we can do that.  Tell me what your preference

 2   is.

 3           MR. O'NEIL:  Mr. Warren -- Mr. Warren is ready

 4   whenever the Court is prepared to hear closings.

 5           MR. LEVESQUE:  We will adjust to that schedule as

 6   well, Your Honor.

 7           THE COURT:  All right.  Well, you know, better for me

 8   to just keep going.  So we'll just play it by ear tomorrow and

 9   see how long the evidence takes, and then obviously take a

10   little bit of a break at least to get the outline together, and

11   then we'll plan to do closings tomorrow.  It looks likely we'll

12   have plenty of time to do that.

13           MR. LEVESQUE:  Thank you, Your Honor.

14           THE COURT:  Very well.  Have a pleasant evening.  Be

15   safe.  I think the weather's passed.  I'll see you tomorrow

16   morning at 9 o'clock.

17      (Proceedings recessed at 4:10 PM on Wednesday, November 30,

18   2022.)

19                       * * * * * * * *

20           I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
21   Any redaction of personal data identifiers pursuant to the
     Judicial Conference Policy on Privacy is noted within the
22   transcript.

23

24   /s/ Megan A. Hague                    11/30/2022

25   Megan A. Hague, RPR, FCRR, CSR          Date
     Official U.S. Court Reporter

1                          **I N D E X**

2    PLAINTIFF'S WITNESSES                          PAGE

3    LARRY KEEFE
     Direct Examination Cont'd By Mr. Cabou         277
4    Cross-Examination By Mr. Levesque              296
     Redirect Examination By Mr. Cabou             314
5    Examination By Mr. Levesque                    323
     Examination By Mr. Cabou                       324

6
     ANDREW MADRY
7    Direct Examination By Mr. Cabou                325
     Cross-Examination By Mr. Aaron                 336
8    Redirect Examination By Mr. Cabou              342

9    TARYN FENSKE
     Direct Examination By Ms. Swain                344
10   Cross-Examination By Mr. Aaron                 381
     Redirect Examination By Ms. Swain              398

11
     RAYMOND F. TREADWELL
12   Direct Examination By Mr. O'Neil               402
     Cross-Examination By Mr. Levesque              493
13   Redirect Examination By Mr. O'Neil             508

14

15

16

17

18

19

20

21

22

23

24

25