# Exhibit A

```
            IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF FLORIDA
                  TALLAHASSEE DIVISION




ANDREW H. WARREN,

        Plaintiff,
                            Case No.:  4:22-cv-302-RH-MAF
v.

RON DESANTIS, individually
and in his official
capacity as Governor
of the State of Florida,

        Defendant.
-----------------------------------------------------/




VIDEOTAPED
DEPOSITION OF:   SHERIFF CHAD CHRONISTER

DATE TAKEN:      November 2, 2022

TIME:            9:55 a.m.

PLACE:           Guerra & King
                 1408 North Westshore Boulevard
                 Suite 1010
                 Tampa, Florida  33607

REPORTED BY:     Michele Coburn, FPR
```

Sheriff Chad Chronister
November 02, 2022

```
 1    APPEARANCES:

 2

 3    JEAN-JACQUES CABOU, ESQUIRE
            Perkins Coie, LLP
 4          2901 North Central Avenue, Suite 2000
            Phoenix, Arizona  85012
 5          602-351-8000
            jcabou@perkinscoie.com
 6
      MATTHEW T. NEWTON, ESQUIRE
 7    ELIZABETH J. KELLAR, ESQUIRE
            Shumaker, Loop & Kendrick
 8          101 East Kennedy Boulevard, Suite 2800
            813-229-7600
 9          mnewton@shumaker.com
            ekellar@shumaker.com
10
                  APPEARING ON BEHALF OF THE PLAINTIFF
11

12
      JEFF AARON, ESQUIRE
13          GrayRobinson, PA
            301 South Bronough Street, Suite 600
14          Tallahassee, Florida  32302
            850-577-9090
15          jeff.aaron@gray-robinson.com

16                APPEARING ON BEHALF OF THE DEFENDANT

17

18    APRIL KIRSHEMAN, ESQUIRE
            Hillsborough County Sheriff's Office
19          2008 East 8th Avenue
            Tampa, Florida  33605
20          813-247-8185
            akirsheman@teamHCSO.com
21
                  APPEARING ON BEHALF OF THE WITNESS
22

23
      ALSO PRESENT:
24
            KYLE HANKINS, VIDEOGRAPHER
25
```

Sheriff Chad Chronister
November 02, 2022

INDEX

1                              INDEX

2                                            PAGE

3    Direct Examination by Mr. Cabou             7

4    Certificate of Oath                       327

5    Certificate of Reporter                   328

6    Witness Notification Letter               329

7    Errata Sheet                              330

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sheriff Chad Chronister
November 02, 2022

1                          EXHIBITS

2                                                    PAGE

3    Exhibit 1
         Notice of Subpoena and Notice of
4        Deposition                              10

5    Exhibit 2
         "Hillsborough County Sheriff's
6        Office Confidential/Exemption"          18

7    Exhibit 3
         Text Messages                           28
8
     Exhibit 4
9        Text Messages                           30

10   Exhibit 5
         Text Messages                           34
11
     Exhibit 6
12       Package Sent to Larry Keefe from
         Hillsborough County Sheriff's Office    80
13
     Exhibit 7
14       News Article from WTSP                  87

15   Exhibit 8
         Press Release from Hillsborough
16       County Sheriff's Office                 110

17   Exhibit 9
         1/31/18 Article from
18       "Tampa Bay Times"                       116

19   Exhibit 10
         Policy of Bicycle and
20       Pedestrian Stops                        119

21   Exhibit 11
         Response to Memorandums Re:
22       Bicycle and Pedestrian
         Violations                              146
23
     Exhibit 12
24       2/3 Letter to Chad Chronister
         from Andrew Warren                      171
25

Sheriff Chad Chronister
November 02, 2022

1   Exhibit 13
          8/12 Article from
2         "Tampa Bay Times"                       187

3   Exhibit 14
          "Presumption of
4         Non-Prosecution"                        196

5   Exhibit 15
          Executive Order of Suspension           219

6

7   Exhibit 16
          Text Messages                           244

8   Exhibit 17
          Chad Chronister's Remarks
9         at Press Conference                     250

10  Exhibit 18
          Version 5 of Chad Chronister's
11        Remarks at Press Conference             256

12  Exhibit 19
          Emails between Ms. Lusczynski
13        and Mr. Robinson                        269

14  Exhibit 20
          Emails between April Kirsheman
15        and Ray Treadwell                       291

16  Exhibit 21
          Large Packet of Information             299

17

18  Exhibit 22
          Email to 19lkeefe@gmail.com
          from chadchronister1@gmail.com          303

19

20  Exhibit 23
          Texts between Chad Chronister
          and Larry Keefe                         309

21

22

23

24

25

Sheriff Chad Chronister
November 02, 2022

```
1      REPORTED REMOTELY FROM HILLSBOROUGH COUNTY, FLORIDA

2            WEDNESDAY, NOVEMBER 2, 2022, 9:55 A.M.

3            THE VIDEOGRAPHER:  Good morning.

4            We're now on video record.

5            Today is Wednesday, the 2nd of November, 2022.

6      The time is 9:55 a.m. Eastern Standard Time.

7            This is the video-recorded deposition of Chad

8      Chronister taken at 1408 North Westshore Boulevard,

9      Suite 1010, Tampa, Florida 33607.

10           My name is Kyle Hankins.  I'm the videographer.

11     The court reporter is Michele Coburn.

12           This is the matter of Andrew Warren versus Ron

13     DeSantis.

14           At this time would all counsel state their

15     appearances for the record, beginning with

16     plaintiff's counsel first, please.

17           MR. CABOU:  Good morning.  Jay Cabou from

18     Perkins Coie on behalf of plaintiff Andrew Warren.

19           MR. NEWTON:  Matt Newton from Shumaker, Loop &

20     Kendrick on behalf of plaintiff Andrew Warren.

21           MS. KELLAR:  Elizabeth Kellar from Shumaker,

22     Loop & Kendrick on behalf of Andrew Warren.

23           MR. AARON:  Jeff Aaron from GrayRobinson, PA,

24     on behalf of defendant Ron DeSantis.

25           MS. KIRSHEMAN:  April Kirsheman on behalf of
```

Sheriff Chad Chronister
November 02, 2022

```
 1        Sheriff Chronister.
 2              THE VIDEOGRAPHER:  Madam Court Reporter, will
 3        you please swear in the witness.
 4              THE COURT REPORTER:  Please raise your right
 5        hand.
 6              Do you swear to tell the truth, the whole truth
 7        and nothing but the truth?
 8              THE WITNESS:  Yes, ma'am.
 9              THE COURT REPORTER:  Okay.  Thank you.
10   THEREUPON,
11                   SHERIFF CHAD CHRONISTER,
12   having been duly sworn, was examined and testified as
13   follows:
14                   DIRECT EXAMINATION
15   BY MR. CABOU:
16        Q    Sheriff Chronister, good morning.
17        A    Good morning.
18        Q    I know that you're an experienced law
19   enforcement officer and some of this may be review, but
20   we're going to start with just a few rules of the road.
21   Okay?
22        A    Yes.
23        Q    Okay.  So first of all, you just took the same
24   oath that you would take to testify if you were
25   testifying in court.
```

Sheriff Chad Chronister
November 02, 2022

1           Do you understand that?

2      A   Yes.

3      Q   Okay.  So you've testified in court previously?

4      A   Yes, sir.

5      Q   Okay.  Have you ever had your deposition taken

6  before?

7      A   Yes, sir.

8      Q   Okay.  About how many times have you had your

9  deposition taken?

10      A   I don't know.  I'd be guessing.  Good question.

11          MR. CABOU:  Okay.  Is -- is everyone able to

12      hear the sheriff.  Okay?  I know he's speaking

13      rather softly.

14          Okay.  Great.  That's fine.

15  BY MR. CABOU:

16      Q   Would it be more than ten --

17      A   Yes.

18      Q   -- depositions?

19      A   Yes, sir.

20      Q   Okay.  All right.  So you're a pro at this.

21  But if at any time you have questions or if you need to

22  take a break, just let us know.  The only thing I'll ask

23  is that we don't take a break while there's a question

24  pending.  We'll wait to finish the question and then we

25  can take a break if you need to.

Sheriff Chad Chronister
November 02, 2022

1      A    Understand.

2      Q    Another thing is I know that sometimes in

3    regular conversation we might, you know, shake our head

4    or nod our head or say things like "uh-uh" or "huh-huh."

5         That's very difficult for the court reporter to

6    transcribe, so I will try not to do that.  I'm going to

7    ask you not to try to do it as well.

8      A    Yes, sir.

9      Q    Okay.  So we'll give verbal -- verbal answers.

10        If there's any question that you don't

11    understand -- and I'm sure that will happen.  Sometimes

12    I'm not the best asker of questions -- but just let me

13    know and I will try to rephrase that.

14        But if you answer the question, I'm going to --

15    I'm going to assume that we-- you understood what I was

16    talking about.  Okay?

17     A    Correct.

18     Q    All right.  Anything about what you've been up

19    to in the last day or so that would make it hard for you

20    or difficult for you to answer my questions?  For

21    example, are you taking any medications that would

22    impair your ability to answer questions?

23     A    No, sir.

24     Q    Okay.  All right.  So are we ready to proceed

25    at this point?

Sheriff Chad Chronister
November 02, 2022

1      A    Yes, sir.

2      Q    Okay.  What did you do to get ready for this

3   deposition today, Sheriff?

4      A    I looked over some text messages and met with

5   my legal counsel.

6      Q    Okay.  Did you speak to anyone about this

7   deposition other than your legal counsel?

8      A    I have not.

9      Q    Sheriff, you understand that you were

10  subpoenaed to be here today, both to appear and to

11  produce some documents.

12           Do you understand that?

13      A    Correct.

14      Q    All right.  I'm going to ask you to take a look

15  at what we're going to ask the court reporter to mark as

16  Exhibit 1.  And that copy will be for you, so I'm going

17  to pass the rest of these out to my colleagues.

18           (Exhibit 1 marked for identification.)

19  BY MR. CABOU:

20      Q    Okay.  Sir, I've placed in front of you what's

21  been marked for identification as Exhibit 1.  This is

22  the notice of subpoena and notice of deposition for Chad

23  Chronister.

24           Is this a document that you've seen before?

25      A    I don't believe I have seen this one.

Sheriff Chad Chronister
November 02, 2022

1     Q   Okay.  Do you understand that you appeared here

2   subject to -- to a subpoena?

3     A   Correct.

4     Q   Is it possible that perhaps your lawyer

5   reviewed this but they didn't share the actual document

6   with you?

7     A   Correct.

8     Q   All right.  And you understand that the

9   subpoena required you not just to appear for this

10   deposition but also to produce documents.  Right?

11     A   Correct.  I understand.

12     Q   Okay.  So I'm going to ask you to flip towards

13   the back of Exhibit 1.  There's a sheet that says

14   Exhibit A on it.

15         Sorry.  It's maybe -- close.  There you go.

16         Okay.  So Exhibit A -- this is part of the

17   notice of deposition and it sets forth the documents

18   that you were asked to produce today.

19         Do you understand that?

20     A   Yes, sir.

21     Q   All right.  Let's flip to Page 4 of Exhibit A.

22   It's entitled Request For Production.

23         Is this a document you've seen before:  the

24   requests for production that were attached to your

25   subpoena?

Sheriff Chad Chronister
November 02, 2022

 1      A    I have not.

 2      Q    Okay.  Well, let's go through it briefly.

 3           It says Request Number 1:  "All communications

 4   with the governor's office relating to Andrew Warren or

 5   the suspension or removal of any official."

 6           Do you see that there?

 7      A    Yes, sir.

 8      Q    Have you gathered and produced to us all such

 9   communications?

10      A    I believe we've satisfied that, Request

11   Number 1.  Yes.

12      Q    Okay.  What did you personally do to satisfy

13   Request Number 1?

14      A    Asked my attorney to gather all the appropriate

15   documents.

16      Q    Okay.  Now, had you seen these requests for

17   production before today?

18      A    I have not.

19      Q    Okay.  So who made the decision about what to

20   gather and what to produce?

21      A    My chief legal counsel.

22      Q    Okay.  And is that Ms. Kirsheman, who is here

23   with you today?

24      A    It is.

25      Q    Okay.  Do you recall speaking with her about

Sheriff Chad Chronister
November 02, 2022

1    that subject?  I'm not asking the subject -- I'm not

2    asking you to tell me what you did or didn't say.  But

3    do you recall speaking with Ms. Kirsheman about the

4    request for production?

5         A    Yes, sir.

6         Q    Okay.  And is it your understanding that you've

7    produced all communications with the governor's office

8    relating to Andrew Warren or the suspension or removal

9    of any official?

10        A    Yes, sir.

11        Q    Request Number 2 says "All documents and

12   communications relating to the suspension" --

13   "Suspension" is a defined term, and that's the

14   suspension of Andrew Warren -- along with other related

15   topics.

16             Do you believe you've produced all those

17   documents as well?

18        A    Yes, sir.

19        Q    Okay.  Request Number 3 is "All communications

20   between you and Andrew Warren."

21             Do you see that?

22        A    Yes, sir.

23        Q    Okay.  How do you -- do you communicate with

24   Mr. Warren?

25        A    Not frequently.  No.

Sheriff Chad Chronister
November 02, 2022

 1      Q    Okay.  Have you ever communicated with

 2  Mr. Warren by text message?

 3      A    Probably.  Yes.

 4      Q    Okay.  I'm not sure that we have any text

 5  messages between you and Mr. Warren.

 6          Do you know why that would be?

 7      A    No.

 8      Q    Okay.  Did you -- how did you ensure that your

 9  text messages were produced to us as required by the

10  subpoena?

11      A    I believe I asked my administrative lieutenant

12  to try to find any -- any text messages between us

13  through -- through phone records.

14      Q    Okay.  So when you say "through phone records,"

15  what -- just tell me what the process was there.

16      A    I believe he asked my wife to check phone

17  records to make sure that there weren't any text

18  messages or if there were to produce them.

19      Q    Okay.  So your administrative lieutenant was in

20  touch with your wife?

21      A    Correct.

22      Q    And why was your -- is it because your wife

23  receives the phone bill?  Is that --

24      A    Yes.

25      Q    Okay.  Did you actually look on your phone?

Sheriff Chad Chronister
November 02, 2022

1      A    Me?

2      Q    Yeah.

3      A    No, I did not.

4      Q    Do you think you have text messages on your

5   phone with Mr. Warren?

6      A    I believe I do.

7      Q    Okay.  My understanding is that you and

8   Mr. Warren, at least at one point, communicated

9   regularly and including by text message.

10          Is that not true?

11     A    Yes.  You -- your subpoena was for a certain

12  period of time.  So during that period of time I

13  produced -- I asked the records to be produced that

14  would be relevant to any communication between me and

15  Andrew Warren.

16     Q    Okay.  That period of time is June 1, 2021,

17  through August 30, 2022.

18          So just to be clear, you're saying that -- that

19  you searched on your phone for records between that

20  time, including texts with Mr. Warren, and you don't

21  have any.

22          Do I understand your testimony correctly?

23     A    That's correct.

24     Q    Okay.

25     A    But if there were any text messages you would

Sheriff Chad Chronister
November 02, 2022

1    have them.

2          Q    Okay.  Great.

3                And I just want to make sure I understand this

4    correctly.

5                Did you personally go through your phone or did

6    someone do that for you?

7          A    My administrative lieutenant did it for me.

8          Q    Okay.  So what instructions did you give to

9    your lieutenant for that?

10         A    To try to find any text messages relevant to

11   that time period that would be any communication between

12   me and Andrew Warren.  I believe it was phone calls as

13   well:  any record of any phone call back and forth.

14         Q    Okay.  And -- and to the best of your

15   knowledge, all -- whatever was found was produced?

16         A    Correct.

17         Q    And if there isn't anything that was produced,

18   then there wouldn't --

19         A    If it wasn't on the phone, to go back through

20   phone records and get whatever during that time frame

21   and have it produced.

22         Q    Okay.  Thank you.

23         A    Yes, sir.

24         Q    Okay.  Request -- so other than text message

25   and phone call is there any other way that you

Sheriff Chad Chronister
November 02, 2022

1    communicated with Andrew Warren?

2        A    Not that I can recall.

3        Q    Well, just to be clear, I mean, I know you

4    emailed Mr. Warren.  Is that true?

5        A    Maybe.

6        Q    That's okay.

7        A    I don't -- again, to the best of my

8    recollection, you know, it could be.  I don't know.

9             I don't remember right now any emails between

10   us, but if there is, you would -- you would have them.

11       Q    Okay.  Who helped collect the emails?

12       A    Again, my administrative lieutenant would look

13   into -- look into any of that.

14       Q    Okay.  What's that lieutenant's name?

15       A    He helped -- Gerald Carey.  He, along with

16   anyone else at the office that was accumulating any --

17   any of the records -- I'm sure there were several people

18   involved to get you whatever -- whatever you had asked

19   for to make sure that we were -- we were complying with

20   the subpoena.

21       Q    Okay.  Do you use any messaging apps like

22   Signal or What'sApp?

23       A    I do.

24       Q    Okay.  And did you or someone at your direction

25   search those apps as well for communications that would

Sheriff Chad Chronister
November 02, 2022

1    be responsive to the subpoena?

2         A    I did.

3         Q    Okay.  And was -- was Lieutenant Carey involved

4    in that as well?

5         A    Correct.

6         Q    Is it fair to say that Lieutenant Carey was the

7    point person for the collection of documents on this?

8         A    Yes.

9         Q    Okay.  All right.  Let's just make sure we're

10   on the same page here.  Let's take a look at Tab 24.

11            MR. CABOU:  I'm going to ask that we mark as

12        Exhibit 2 this right here.

13            (Exhibit 2 marked for identification.)

14   BY MR. CABOU:

15        Q    All right.  Sheriff, I've handed you what the

16   court reporter has marked for identification as

17   Exhibit 2.

18            Are you familiar with Exhibit 2?

19        A    I'm not.

20        Q    You're not?

21        A    (Shaking head.)

22        Q    Okay.  Well, for the record I'll say that this

23   is a document that begins with the stamp

24   Chronister0033659 -- you can see the bottom right-hand

25   corner of the page -- and continues through

Sheriff Chad Chronister
November 02, 2022

```
 1    Chronister0036638.

 2           Do you see that?

 3    A    Yes, sir, I do.

 4    Q    Okay.  You've not seen this document before?

 5    A    I have not.

 6           MR. AARON:  I'm sorry to interrupt you.

 7           Is that Bates stamp something your office

 8    affixed?

 9           MR. CABOU:  I believe the answer is yes because

10    we did not get stamped copies.

11           MR. AARON:  Okay.

12           MS. KIRSHEMAN:  Is this the stamp?

13           MR. CABOU:  Well, that's -- that's about what

14    I'm trying to clarify here --

15           MS. KIRSHEMAN:  Oh.

16           MR. CABOU:  -- because this is a format that's

17    not familiar to me.

18    BY MR. CABOU:

19    Q    So, Sheriff, you don't know what the number

20    2-29 001 means, do you?

21    A    No, sir.

22           MR. CABOU:  Would counsel like to tell us what

23    that is?  Is that your Bates stamp?

24           MS. KIRSHEMAN:  Uh-uh.

25           MR. CABOU:  Okay.  So -- so just to be clear
```

Sheriff Chad Chronister
November 02, 2022

```
 1        for the record, we're -- we're understanding through
 2        the avowal of counsel that the stamp 2-29 001 was
 3        affixed by the sheriff's office as part of its
 4        production efforts?
 5             MS. KIRSHEMAN:  Uh-uh.
 6             MR. CABOU:  Okay.  Let the record show that
 7        counsel is nodding her head, which I appreciate.
 8             Okay.  That helps me because I honestly wasn't
 9        sure what that was.
10             Okay.  So now that we've get clarity on the
11        numbering.  So your office produced this to us and
12        stamped the number 2-29 001 on there.
13   BY MR. CABOU:
14        Q   It also -- this -- this first sheet -- it's a
15   document that says Hillsborough County Sheriff's Office
16   and then it says Confidential/Exemption.  It's a form.
17             Are you familiar with this form?
18        A   I'm not.
19        Q   Okay.  You've never seen this form before?
20        A   I haven't.
21        Q   Okay.  There's a red "X" next to the box that
22   says Undercover Personnel.
23             Do you know why that "X" is there?
24        A   I do not.
25        Q   Okay.  There's a watermark across the front of
```

Sheriff Chad Chronister
November 02, 2022

1    each page of this document that says Subpoena.

2         Did you put that watermark on there?

3    A    No, I did not.

4    Q    Okay.  Was it -- do you know anything about

5    that watermark?

6    A    I do not.

7         MR. CABOU:  Okay.  Counsel, do I assume that

8         all the documents that you produced responsive to

9         our subpoena are watermarked Subpoena?

10        MS. KIRSHEMAN:  Is this a deposition of me?

11        MR. CABOU:  Well, Counsel, I mean, we could --

12        we could certainly move to compel on the fact that

13        you spoliated the documents by changing them and

14        stamping them and doing all kinds of stuff.

15        But just so we're clear, was that affixed by

16        your office?  And he doesn't know and he should

17        know, frankly.

18        MS. KIRSHEMAN:  Uh-uh.

19        MR. CABOU:  Was it?

20        MS. KIRSHEMAN:  Is this the deposition of me?

21        MR. CABOU:  Sorry.  You just don't want to

22        answer?

23        MS. KIRSHEMAN:  Well, isn't it obvious?  I said

24        it in my email to you that you were getting records

25        responsive.

Sheriff Chad Chronister
November 02, 2022

```
 1              MR. CABOU:  Counsel, I'm jus trying to decide

 2        if the original document contained this watermark

 3        across the front or if that was affixed as part of

 4        the production.

 5              MS. KIRSHEMAN:  Affixed as part of the

 6        production.

 7              MR. CABOU:  Thank you.

 8   BY MR. CABOU:

 9        Q    Okay.  So at the bottom of the second page,

10   which is stamped 2-29 002, in the left-hand margin and

11   the right-hand margin there are like little boxes.  One

12   says Reviewed on the left-hand side.

13              Do you see that?  It's like really small print.

14        A    Yes, sir.

15        Q    Okay.  Do you know what that means?

16        A    I do not.

17        Q    Okay.  And then on the right-hand side in a

18   green box it says Approved by brizzo, b-r-i-z-z-o.

19              Do you know what that means?

20        A    I do not.

21        Q    Do you know who brizzo is?

22        A    No, sir.

23        Q    Okay.  Do you -- okay.  So sticking with that

24   page, which is 2-29 002, do you know what appears on

25   this page?
```

Sheriff Chad Chronister
November 02, 2022

1      A    I do not.

2      Q    Is this a text message from you?

3      A    Not that I'm aware of.

4      Q    Okay.  Well, do you know why we would have

5   received it from you if you don't know what it's about?

6      A    I'm sure it's someone being compliant with one

7   of the requests.

8      Q    Okay.  You don't recognize this as a text

9   message to or from you?

10     A    No, sir.

11     Q    Okay.  There's a black box that appears over

12  the -- one of the messages from Wednesday, August 3rd.

13          Do you know why that black box is there?

14     A    No, sir.

15     Q    Okay.  What were you doing on Wednesday,

16  August 3rd?

17     A    I have to go back and look at my calendar.  I'm

18  not sure.

19     Q    Okay.  Well, if I represent that the suspension

20  of Mr. Warren took place on August 4th, does that

21  refresh your recollection about what's going on on

22  August 3rd?

23     A    To a degree.  But I wouldn't --

24          THE COURT REPORTER:  I'm sorry.  "To a degree,

25          but I wouldn't" --

Sheriff Chad Chronister
November 02, 2022

1          THE WITNESS:  Hmm?

2          THE COURT REPORTER:  "To a degree," but I

3     wouldn't -- I couldn't hear you.

4     A    To a degree, but I wouldn't be able to recall

5     what I did all hours of the day that day.  I don't know

6     what your question is.

7     BY MR. CABOU:

8     Q    Okay.  So you were subpoenaed to produce

9     documents in this case and this is what you produced.

10    A    (Nodding head.)

11    Q    Okay.  So do you know if, as part of the

12    subpoena to you, anyone's text messages other than your

13    own were produced?

14    A    Might have to look at all the requests.  I

15    don't know.  Whatever request that you -- that you had

16    asked for, I feel confident we gave you everything we

17    had.

18          Now, if there were text messages in there for

19    other people, I'm sure that's what you have there.  I've

20    never seen this.  I don't -- I don't know what this is.

21    Q    Okay.  This is a new conversation because it

22    says at the top.  I don't know either, Sheriff.  I --

23    you know, this is -- this is why we're here is to

24    discover what's happening in some of these documents.

25          Does this look like a message either from

Sheriff Chad Chronister
November 02, 2022

1    texting or from Signal that you sent or received?

2        A    No, sir.

3        Q    Okay.  What about the next page, which is

4    2-29 003?

5        A    No, sir.

6        Q    Okay.  Let's flip to the fourth page.

7             Do you recognize that?

8        A    No, sir.

9        Q    Okay.  What about the fifth page 2-29 005?

10       A    No, sir.

11       Q    So on the sixth page the text says, "Yes,

12   ma'am," and then it says, "Anytime frame," and then it

13   says, "Order is printed."

14            Does that text give you any clue about who this

15   conversation is with?

16       A    No, sir.

17            MR. CABOU:  Okay.  For the record, I'd like to

18       say that these documents were produced without

19       metadata, without any indication of who the

20       custodian was, and it's impossible to tell who the

21       custodian was.

22            And we would like you to change that and

23       produce them with some information so that we know

24       who was talking here.

25   BY MR. CABOU:

Sheriff Chad Chronister
November 02, 2022

 1     Q    Sir, do you understand that Mr. Warren served

 2   you with a subpoena?

 3     A    Yes, sir.

 4     Q    That it's not a public records request under

 5   Section 119.  Right?  You understand that?

 6     A    A subpoena to be here or a duces tecum subpoena

 7   to produce all documentation in regards to Andrew

 8   Warren's suspension?

 9     Q    Both.

10     A    Yes.

11     Q    Okay.  So the production -- in fact -- in fact,

12   your lawyer stamped Subpoena on all the documents.

13   Right?  But yet on the first page of Exhibit 2 there's a

14   form that says that, "Records are provided in accordance

15   with Florida Statutes and the Public Records Law."  And

16   then there appear to be redactions and other omissions

17   based on the exemption that's "X'd" out here for

18   undercover personnel.

19          Do you see that?

20     A    Yes.

21     Q    Looking at this document and being familiar

22   with the Florida Statutes and those governing undercover

23   personnel, does it appear to you that -- that

24   information has been redacted or withheld from this

25   production based on an exemption for undercover

Sheriff Chad Chronister
November 02, 2022

1    personnel?

2        A    Well, with it being marked like that, I could

3    assume.  But again, I -- your guess is as good as mine.

4    I don't -- I don't know.

5        Q    Okay.  It's not really as good as yours,

6    though, because these came from you and your agency.

7        A    These -- these --

8        Q    I don't know anything about that.

9        A    These came from our agency.  And to be in

10   complete compliance with your request, I've never seen

11   this document before.  It says that it's labeled -- that

12   the discussion, I believe, or whatever the redaction may

13   be because it pertains to undercover personnel.

14            So I believe that's the case here.  But

15   never -- not being familiar with the documentation, I

16   can't say with all certainty.

17       Q    Okay.  Well, you know, you produced them.  So I

18   assume that you would know.  If you don't know, that's

19   fine.  Just -- just say that and that's fine.

20       A    Well, I've -- I've said that several times.

21       Q    Okay.  Great.

22            Do you know when these documents were produced

23   to us?

24       A    No, sir.

25       Q    Okay.  Let's look back at Exhibit 1, which is

Sheriff Chad Chronister
November 02, 2022

1    your subpoena and notice.

2           So about six pages in is the actual subpoena.

3    It's a form from the United States District Court for

4    the Northern District of Florida.  There you go.

5           Do you have that page -- page in front of you,

6    sir?

7        A    Yes, sir.

8        Q    Okay.  It says -- there's two boxes --

9    right? -- Testimony and Production.  They're both

10   checked.  Production says that the documents are to be

11   produced on 10/19/22.

12          Do you see that?

13       A    Yes.

14       Q    Okay.  Do you know if the documents were

15   produced by 10/19/2022?

16       A    I do not.

17       Q    Okay.  I'll tell you that they were not.

18          Did you text with anyone about the suspension

19   of Andrew Warren?

20       A    I don't believe so.  Can't recall.  But if I

21   did, you would have it.

22       Q    Okay.  Well, let's explore that a little bit.

23          MR. CABOU:  I'm going to ask that we mark

24       Exhibit 3.

25          (Exhibit 3 marked for identification.)

Sheriff Chad Chronister
November 02, 2022

```
 1    BY MR. CABOU:

 2        Q    All right.  I'm handing you a document that

 3    bears your stamp 2-30 001.

 4             What does this look like to you?

 5        A    If you're asking me to guess, it looks like

 6    some text messages.

 7        Q    Is it from you?

 8        A    It is not.

 9        Q    Okay.  Do you know anyone named Lieutenant Ed?

10        A    I do.

11        Q    Who is that?

12        A    Lieutenant Ed -- Lieutenant Ed would be Major

13    Ed Rayburn, I would tend to believe.

14        Q    So maybe since the time this person put them in

15    their contacts they got a promotion?

16        A    Correct.

17        Q    Okay.  Do you know someone -- can you think of

18    anyone with the initials LR that Lieutenant Ed would be

19    texting with on August 4th, the date of Andrew Warren's

20    suspension?

21        A    Can't offhand.

22        Q    Okay.  The message is on August 4th at 8:21.

23        A    I believe the LR makes -- if it's Lieutenant

24    Ed, which is Major Ed, his last name is Rayburn.  So

25    maybe the L is lieutenant and R for Rayburn.
```

Sheriff Chad Chronister
November 02, 2022

1      Q   Okay.

2      A   But again, that's --

3      Q   Do you know who the other side of the

4  conversation is?

5          THE COURT REPORTER:  I'm sorry.  I didn't hear

6      you.

7          THE WITNESS:  I said but that's only a guess.

8      I don't know.  I don't know what LR is.

9  BY MR. CABOU:

10     Q   Okay.  So one person we think is Lieutenant,

11 now Major Ed Rayburn and the other person we don't know

12 about?

13     A   No, sir.

14     Q   Okay.  Let's move on.

15         MR. CABOU:  We'll mark this as Exhibit 4.

16         (Exhibit 4 marked for identification.)

17 BY MR. CABOU:

18     Q   All right.  I have handed you what's been

19 marked as Exhibit 4.  It bears your stamp 1-8 001.

20         First of all, do you have any idea what 1-8 001

21 is designed to communicate?

22     A   No, sir.

23     Q   Okay.  You didn't take any part in the

24 numbering convention here?

25     A   No.

Sheriff Chad Chronister
November 02, 2022

```
 1        Q   Okay.  All right.  So this looks to me to be a
 2    screenshot of some text messages.
 3            Do you agree with that?
 4        A   Yes, sir.
 5        Q   Okay.  And it's from Jerry Carey.
 6            Is that your Administrative Lieutenant Carey
 7    that you referred to a few moments ago?
 8        A   Yes, sir.
 9        Q   Okay.  It appears to be with someone named Jeff
10    Aaron.
11            Do you see that?
12        A   Correct.
13        Q   Do you know someone in the sheriff's office
14    named Jeff Aaron?
15        A   I do not.
16        Q   Do you know anybody associated with this case
17    named Jeff Aaron?
18        A   I do.
19        Q   Who's that?
20        A   Attorney.
21        Q   Okay.
22        A   An attorney for Governor DeSantis.
23        Q   Okay.  Is he here in the room with us?
24        A   He is.
25        Q   Okay.
```

Sheriff Chad Chronister
November 02, 2022

```
 1      A    You want me to point out a description of what
 2   he's wearing?
 3      Q    No.  This isn't a jury trial.  But I appreciate
 4   you're been asked to do that before in your long career
 5   in law enforcement.
 6           I can tell you that as a defense lawyer I'm
 7   often baffled why they ask people to point out the
 8   defendant, because we would usually stipulate to that
 9   anyway.  But nonetheless, there they are.
10           Okay.  The -- the text string -- is it fair to
11   say that you are -- this is not a text with you?
12      A    It's not.
13      Q    Okay.  Do you know if Mr. Carey -- sorry --
14   Lieutenant Carey's phone was -- was collected and
15   searched as a part of this effort?
16      A    I do not.
17      Q    Okay.  Who would know?
18      A    No, I should say.
19      Q    Sorry.  Who would know?
20      A    I could confer with our -- with my legal
21   counsel to see if he was subject to the duces tecum, but
22   I don't know.
23      Q    Okay.  Supposedly he would know.  Right?
24      A    He would know.
25      Q    All right.  Do you know anyone named Stacy?
```

Sheriff Chad Chronister
November 02, 2022

1      A   I do not.

2      Q   Okay.  This is a text message on Friday,

3    September 16th.  So this is, you know, six weeks after

4    the suspension of Mr. Warren and a month after our

5    lawsuit in this matter was filed.

6      A   Yes, sir.

7      Q   Okay.  Do you know someone named Stacy in

8    Orlando who would be meeting with Mr. Carey?

9      A   I do not.

10     Q   Okay.  The text goes on, although it's not very

11   well copied because it's not a native copy.  It's just a

12   screenshot of an email.

13         It goes on to talk about a package on Page 2.

14   Do you see that:  "Stacy, the package"?

15     A   Correct.

16     Q   Do you know what the package is?

17     A   I don't.

18     Q   Okay.  On Page 3 it says the package is "ready

19   for pickup from our Access Control Center."

20         Do you know anything about that?

21     A   Not that I can recall.  No.

22     Q   Is the address on her, 2008 East 8th Avenue,

23   Tampa, Florida, an address with which you're familiar?

24     A   Correct.  That's our -- our sheriff's office

25   headquarters.

Sheriff Chad Chronister
November 02, 2022

```
 1        Q   Okay.  Do you know if the Jeff Aaron referred

 2   to in this text message is the governor's counsel,

 3   Mr. Aaron, who's here today?

 4        A   I couldn't say with all certainty.  No.

 5            MR. CABOU:  Is it?

 6            MR. AARON:  This is a text thread with me on

 7        it.  And just so you know, Stacy is a runner at my

 8        law firm who was only used for collecting this one

 9        thing, and that's it.

10            MR. CABOU:  Okay.  I appreciate it.

11            MR. AARON:  Yeah.

12   BY MR. CABOU:

13        Q   But you don't know what she was -- what the one

14   thing is that she was collecting.  Right?

15        A   No.

16        Q   Okay.

17        A   I don't recall.

18        Q   Okay.  All right.  Let's -- let's take a look

19   at this.  It's going to be Exhibit 5.

20            (Exhibit 5 marked for identification.)

21            MR. CABOU:  This is going to be Exhibit 5.

22        This may also be familiar to Mr. Aaron.

23   BY MR. CABOU:

24        Q   All right.  Exhibit 5:  also text messages that

25   appear to be between Lieutenant Carey and Mr. Aaron.
```

Sheriff Chad Chronister
November 02, 2022

1             Do you see that?

2       A    Yes, sir.  I don't see the Lieutenant Carey.

3       Q    Well, the -- sorry.  So let's go through that.

4   Maybe I misunderstood.

5             So the email is from Lieutenant Carey.

6       A    I gotcha.

7       Q    And then it says -- and then it's a text that

8   is just with Mr. Aaron.  So that my inference, but --

9       A    Yes, sir.

10      Q    -- correct me if I'm wrong.

11      A    I wouldn't have the ability to correct you.

12      Q    Okay.  Mr. -- they're texting about, as you can

13  see on Page 2, an arrest of Santavious Wright.  And

14  again, this is a text on September 22nd of this year, so

15  after Mr. Warren has been suspended, just a few weeks

16  ago.

17            Do you know why someone from your office would

18  be in touch with Mr. Aaron regarding the arrest of a

19  perpetrator?

20      A    I do not.

21      Q    Okay.  Do you know if people from your office

22  have remained in touch with the governor's office about

23  matters relating to Mr. Warren's suspension after

24  August 4th?

25      A    I don't.

Sheriff Chad Chronister
November 02, 2022

1      Q   Since August 4th have you been in touch with

2   anyone from the governor's office about the suspension

3   of Mr. Warren or this litigation?

4      A   About this case?

5      Q   Yes.  About -- about the litigation or about

6   the suspension of Mr. Warren.

7      A   Are you including his legal counsel in that?

8      Q   Sure.

9      A   I've been in contact with his legal counsel

10   since the suspension.  Yes.

11      Q   About how many times?

12      A   We've met one time in person and maybe talked

13   on the phone once, maybe twice just to err on the side

14   of caution.

15      Q   Okay.  When was the first time you were in

16   touch with Mr. DeSantis's legal counsel after the

17   suspension on August 4th?

18      A   Don't recall the date.

19      Q   Okay.  Are you able to estimate, or no?

20      A   No.

21      Q   Okay.

22      A   Sorry.

23      Q   What was the purpose of -- was it a phone call

24   or a meeting?

25      A   It was a meeting.

Sheriff Chad Chronister
November 02, 2022

```
 1          Q    Okay.  What was the purpose of the meeting?

 2          A    To discuss some of the cases that we had

 3    provided to the governor's counsel, or I should say to

 4    the governor, one of the governor's chief of staff.

 5          Q    So let's -- let's unpack that a little bit.

 6               So you provided case materials -- is that what

 7    I'm understanding -- to the governor's office?

 8          A    Correct.

 9          Q    Okay.  When did you provide those materials?

10          A    I can't recall the date.

11          Q    Okay.  So are the materials to which you're

12    referring right now materials that were provided after

13    the suspension or before the suspension?

14          A    Before the suspension.

15          Q    Okay.  And the meeting with the governor's

16    legal counsel that we're talking about right now -- was

17    that after the suspension or before the suspension?

18          A    After the suspension.

19          Q    Okay.  So why were you meeting after the

20    suspension to discuss the materials you provided before

21    the suspension?

22          A    You'd have to ask their counsel.

23          Q    Well, you were there, sir.

24          A    They wanted to meet.  Well, I could tell you

25    why.  Why we met with them is we were asked to
```

Sheriff Chad Chronister
November 02, 2022

 1    present -- present those documents, present some further

 2    details of those documents.

 3        Q    Okay.  So who was present at this meeting?

 4        A    Lieutenant Carey and my legal counsel and then

 5    Governor DeSantis's legal representatives.

 6        Q    Okay.  Were you present?

 7        A    I was.

 8        Q    Okay.  So you were present.

 9             Who -- so then from your agency it's yourself,

10    it's Ms. Kirsheman?

11        A    Lieutenant Carey.  And Lieutenant Carey

12    presented some of the cases --

13        Q    Okay.

14        A    -- that they had collected and submitted prior

15    to the suspension.

16        Q    Okay.  Where did the meeting take place?

17        A    At our office.

18        Q    In Tampa?

19        A    Yes.

20        Q    Okay.  Talking now about this meeting for a

21    couple minutes and recalling that it was in Tampa and

22    that it was about these cases, does that refresh your

23    recollection at all about the date of the meeting?

24        A    No.  I couldn't tell you the date.  I knew it

25    was after the suspension.  I would -- I would just be

Sheriff Chad Chronister
November 02, 2022

1    guessing.

2        Q   Okay.  Was it more than a week after the

3    suspension?

4        A   I believe so.  But again, I don't want to

5    guess.

6        Q   Okay.  That's fine.  I'm just, you know, trying

7    to see if we can jog your memory a little bit.  And if

8    you can't that's okay.

9        A   No.

10       Q   Do you know if it was before or after the

11   lawsuit was filed in this case?

12       A   I can't recall.

13       Q   Okay.  So yourself, Ms. Kirsheman and

14   Lieutenant Carey were present on the sheriff's side of

15   the meeting.

16           Who was present on the governor's side?

17       A   His legal counsel.  I'm sorry.  I don't know

18   their -- all their names.

19       Q   Okay.  Do you know if these were people -- like

20   was Mr. Aaron present?

21       A   Mr. Aaron was present.  I couldn't tell you who

22   else was there.

23       Q   Okay.  Do you know if a gentleman named Ryan

24   Newman was present?

25       A   Doesn't ring a bell.

Sheriff Chad Chronister
November 02, 2022

1    Q    Okay.  Do you know if anyone was present who

2    actually works in the governor's office as opposed to

3    someone who is Mr. DeSantis's outside legal counsel?

4    A    Not that I'm aware of.  If my memory serves me

5    correct, it was just his legal -- legal counsel.

6    Q    His outside counsel?

7    A    Outside counsel.

8    Q    For this litigation?

9    A    I'm sorry.  Yes, sir.  Yes, sir.

10   Q    Well, do you know why he would be presenting to

11   his outside counsel for this litigation about cases in

12   your office?

13   A    You want me to guess why I think?

14   Q    I'm just asking you if you know, sir.  If you

15   don't know, that's okay.  But I wasn't at this meeting,

16   and it's pretty relevant.  So if you don't know, that's

17   okay.

18   A    I'm sure they had a reason.  They didn't really

19   get into it.  They asked for some clarity, and we

20   provided the clarity on those cases that we provided.

21   Q    Do you know how they asked for that clarity?

22   Was it in an email, a text message?

23   A    Don't recall.

24   Q    Is it your understanding that that meeting was

25   in part to prepare for this litigation?

Sheriff Chad Chronister
November 02, 2022

```
 1        A    I'm -- I'm sure it was.
 2        Q    Okay.  Do you recall the cases that were
 3   presented at this meeting?
 4        A    I know there was a group of cases.  I couldn't
 5   tell you one from the other.  No, sir.
 6        Q    Is there anything distinctive about these
 7   cases?
 8        A    They were cases that weren't prosecuted.
 9        Q    Okay.  So tell me a little bit more about that.
10        A    All I could tell you is that the cases were
11   representative of individuals that were arrested and
12   the charges were -- were dropped -- the cases that
13   weren't -- weren't prosecuted.
14        Q    So these were cases -- just to make sure I'm
15   understanding --
16        A    Yes, sir.
17        Q    -- cases that were investigated by your office?
18        A    Correct.
19        Q    And that were referred to the State Attorney's
20   Office for the Thirteenth Judicial Circuit?
21        A    Correct.
22        Q    And that charges were not filed.  Is that
23   correct?
24        A    Charges were not filed.  Yes, sir.
25        Q    Okay.  Was anybody present at the meeting from
```

Sheriff Chad Chronister
November 02, 2022

1    the state attorney's office?

2        A    Not that I recall.  No.

3        Q    Okay.  Why not?

4        A    When the governor's legal team asked, they

5    didn't ask for a representative from the state

6    attorney's office to be present, I would presume.

7        Q    Okay.  I mean, you work with the state

8    attorney's office a lot.  Right?

9        A    Our agency does.  Correct.

10       Q    Okay.  But you don't personally?

11       A    I don't personally work with the state

12   attorney's office a lot.  No.

13       Q    Okay.  Do you have contact with the state

14   attorney's office?

15       A    I do.

16       Q    Okay.  I mean, you're fond of referring to

17   yourself as the chief law enforcement officer of

18   Hillsborough County.  Is that right?

19       A    I'm sorry.  What was the first part?

20       Q    I've seen you refer to yourself in the press

21   and --

22       A    Yes.

23       Q    -- in your bio --

24       A    Yes.

25       Q    -- as the chief law enforcement officer of

Sheriff Chad Chronister
November 02, 2022

1    Hillsborough County.

2         A    Yes.  Yes, sir.

3         Q    Okay.  The state attorney is an elected

4    countywide officer.  Right?

5         A    Yes.

6         Q    Okay.  Circuit-wide officer?

7         A    Correct.

8         Q    How do you guys decide who's the chief law

9    enforcement officer?

10        A    Well, the sheriff is the only -- is the only

11   person -- the only law enforcement officer that's --

12   that has county-wide jurisdiction.

13        Q    What about the state attorney?

14        A    The state attorney prosecutes cases.  He's not

15   a law enforcement officer.

16        Q    I think the state attorneys would be upset with

17   that characterization, sir.  I mean, people often --

18   people often --

19        A    I don't know how that would be.  A state

20   attorney is a prosecutor, not a law enforcement officer.

21        Q    Do you know if they are part of the --

22        A    Are they certified to enforce the law?

23        Q    Well, I have no idea.  I'm just asking.

24        A    I feel confident that they're not.

25        Q    Okay.  I mean, they're constitutional officers

Sheriff Chad Chronister
November 02, 2022

1   who are charged with enforcing the law.

2       A   They're -- they're charged with prosecuting the

3   law.

4       Q   Okay.

5       A   They don't enforce laws.  They prosecute the

6   laws.  That's what they took an oath to do.

7       Q   Okay.  What's their oath?

8       A   They take -- they take a sworn oath to

9   prosecute the laws of the -- of the state, just like I

10  took an oath to uphold and enforce the laws of the

11  state.

12      Q   Okay.  How do you know what their -- what their

13  oath is?  Have you read it?

14      A   I have -- I have not.

15      Q   Okay.  So how do you know?  Are you just

16  guessing?

17      A   No.  I would believe through the constitution.

18  That's the office that they sought.  They sought

19  election to be the constitution officer to prosecute the

20  laws of the state.

21          I would have to -- I feel pretty confident it

22  would be the same, just as in my case would be to

23  enforce the laws of the state.  It would be in that

24  constitutional office.

25      Q   Okay.  So just to be clear, your position is

Sheriff Chad Chronister
November 02, 2022

1    that prosecutors are not law enforcement officers?

2         A    They are not.

3         Q    Okay.  Are you familiar with the case of a --

4    of an offender named Santavious -- that's

5    S-a-n-t-a-v-i-o-u-s -- Wright?

6         A    I am not.

7         Q    Okay.  Was Mr. Wright's case discussed in this

8    meeting with the governor's outside legal counsel in

9    preparation for this litigation?

10        A    I can't recall.

11        Q    Do you recall anything about this meeting other

12   than being there?

13        A    Just the fact that there were cases that were

14   presented to the governor's counsel.  Other than that, I

15   couldn't tell you what the cases involve and I can't

16   recall intimate details of the cases.  I didn't present

17   the cases.

18        Q    Okay.  I mean, it's November 2nd today.

19        A    Correct.

20        Q    The meeting was sometime between today and the

21   suspension on August 4th.  It wasn't that long ago.

22        A    Right.

23        Q    Is there anything about the meeting that you

24   can recall other than being there?

25        A    Again, I can recall that we presented the cases

Sheriff Chad Chronister
November 02, 2022

1   that we sent forward to the governor's office prior to

2   Andrew Warren's suspension.  Those cases were presented

3   in detail of why we felt that these were examples of

4   individuals that were not prosecuted.

5        Q   Okay.  And is it fair to say that the position

6   of your office was that those individuals should have

7   been prosecuted?

8        A   That's correct.

9        Q   Okay.  Did your office discuss any of those

10  cases with the state attorney's office?

11       A   Some of them may have been.  But again, I don't

12  know which ones were or weren't.

13       Q   Why were you at this meeting, Sheriff?

14       A   Good question.

15       Q   Yeah.  I mean, I just -- it seems like you're

16  talking about a meeting with the governor's outside

17  legal counsel to talk about cases that you had

18  previously shared with them as part of their suspension

19  procedure.

20       A   Correct.

21       Q   Did you speak at this meeting?

22       A   I did not.  Not very -- not very much.

23       Q   Okay.  I mean, don't you have a lot of things

24  to do?

25       A   Yes, sir.

Sheriff Chad Chronister
November 02, 2022

1      Q    Why were you there?

2      A    I was asked to be at a meeting to where we

3    could present those cases to -- to their counsel.  So I

4    was at the meeting.

5      Q    Okay.  Who asked you to be there, sir?

6      A    The governor's counsel asked me to be at a

7    meeting with my legal counsel and Lieutenant Carey to

8    present -- present the cases to -- to their counsel.

9      Q    Okay.  Did you personally speak with the

10   governor's legal counsel?

11     A    If memory serves me correct, I believe I did,

12   just to ask me if we could meet at the office on a

13   certain date, I believe.

14     Q    Okay.  Was that with Mr. -- Mr. Aaron?

15     A    I could be wrong.

16     Q    Okay.  To the best of your recollection.

17     A    Best of my recollection, I think I was

18   contacted by Mr. Aaron and asked if a certain date would

19   work to sit down and go over those cases.

20     Q    Okay.  Did he say why he wanted to go over

21   these cases?

22     A    No, sir.

23     Q    Do you know why he wanted to go over those

24   cases?

25     A    No, sir.

Sheriff Chad Chronister
November 02, 2022

1        Q    Okay.  And you had previously shared

2    information about those cases with the governor's office

3    prior to the suspension.  Correct?

4        A    Try it again one more time.

5        Q    Sorry.

6             These cases that were the subject of this

7    meeting --

8        A    (Nodding head.)

9        Q    You had shared information about those cases

10    with the governor's office prior to the suspension.

11    Right?

12        A    Correct.

13        Q    And then this meeting is after the suspension.

14    Right?

15        A    Correct.

16        Q    Okay.  Who spoke at this meeting from your

17    office?

18        A    Lieutenant Carey.

19        Q    Okay.  Do you know if in preparing his remarks

20    for the meeting Lieutenant Carey spoke with anyone from

21    the state attorney's office?

22        A    I do not know.

23        Q    You don't know?

24        A    I don't know.

25        Q    Okay.  But no one from the state attorney's

Sheriff Chad Chronister
November 02, 2022

1    office was present at this meeting?

2         A    Not at this meeting.

3         Q    At this point Andrew Warren is not in office --

4    right -- at the point of the meeting?

5         A    Correct.

6         Q    Okay.  No one reached out to the -- the new

7    administration to say, "Hey, we're going to talk about

8    your cases with the governor's office.  Would you like

9    to be present?"

10        A    I'm not aware of that.

11        Q    Okay.  But in any event, they weren't there.

12   Correct?

13        A    They were not there.

14        Q    Okay.  Sir, the governor has said that his

15   office engaged in what he called a thorough, quote,

16   unquote, investigation -- thorough review -- excuse

17   me -- of all state attorneys in the State of Florida.

18             Do you believe that's true?

19        A    I don't -- I don't know.

20        Q    Sir, you hosted the press conference where he

21   made these remarks.

22             Do you think what he said is true?

23        A    Correct.  You'd have to ask the governor's

24   office.  You're asking me to speculate about someone

25   else's decision.  I have no idea.  I haven't talked to

Sheriff Chad Chronister
November 02, 2022

1     the governor about that.

2         Q   Okay.  I know -- I know you're eager to tell me

3     that you haven't talked to the governor about his

4     decision, but that wasn't my question.  So let's just

5     stick to the question.

6             The question was, do you believe the governor

7     engaged in a thorough review of all state attorneys in

8     the State of Florida?

9         A   I believe if the governor said he did something

10    that I would -- I would say that that's a credible

11    statement.

12        Q   Okay.  I don't think that's true.  So I want to

13    talk about whether it was thorough.  Okay?

14        A   (Nodding head.)

15        Q   You've been in law enforcement a very long

16    time.  Right?

17        A   Yes, sir.

18        Q   How long have you been a certified peace

19    officer?

20        A   Thirty years.

21        Q   Okay.  Have you ever participated in an

22    investigation?

23        A   Yes, sir.

24        Q   Many times.  Right?

25        A   Yes, sir.

Sheriff Chad Chronister
November 02, 2022

1        Q    Okay.  During the course of an investigation do

2    you think it's important to gather all the relevant

3    evidence?

4        A    Yes, sir.

5        Q    Okay.  During the course of an investigation if

6    it focused on one particular person, would you think

7    it's important to speak with that person?

8        A    If that person is the target of your

9    investigation?  Not necessarily.

10        Q    Okay.  Well, when your detectives and

11    investigators investigate a crime, do they often try to

12    speak with the target?

13        A    Prior to an arrest?

14        Q    At any time.

15        A    Maybe post arrest it's not necessary.  We have

16    a lot of people that -- that execute their Miranda

17    warnings and they don't -- they don't -- they don't

18    speak to the police afterwards.  It doesn't mean the

19    investigation still doesn't occur or the arrest still

20    doesn't happen.

21        Q    Okay.  That wasn't -- that wasn't quite my

22    question.

23        So I understand that people might invoke their

24    right to remain silent.  But don't investigators want to

25    speak with them?  Don't they at least ask, "Do you want

Sheriff Chad Chronister
November 02, 2022

1    to talk to me?"

2        A    Sure.  You asked me if it was required.  It's

3    not required.

4        Q    That's not what I said, sir.  I never used the

5    word "required."  Okay?  So --

6        A    What word did you use?

7        Q    I asked if they try to speak to or seek to

8    speak to -- I can't remember which -- the target of

9    their investigation.

10       A    They can.

11       Q    Okay.  Do you think that the target of the

12   investigation would have important information to

13   consider?

14       A    Possibly.

15       Q    Probably.  Right?  Probably the person who is

16   suspected of wrongdoing knows whether they did it or

17   not.  Right?

18       A    We're speculating here.  It doesn't necessarily

19   impact the investigation.

20       Q    Sir, come on now.  Okay.

21            Someone is accused of a crime.

22       A    You're -- you're assuming that most people who

23   are a target of an investigation either don't invoke

24   their Miranda warnings or are truthful afterwards.

25       Q    No.  No.  That's not what I'm assuming.

Sheriff Chad Chronister
November 02, 2022

```
 1              I'm saying -- let me put it another way.
 2              As part of an investigation, do you try to get
 3    the target to confess?
 4         A   Of course.
 5         Q   Okay.  A confession would be speaking to the
 6    target.  Right?
 7         A   Correct.
 8         Q   Okay.  So I understand that sometimes they
 9    won't speak to you -- right? -- because they invoke
10    their Fifth Amendment right.  And I understand -- I
11    don't think this will shock anyone in the room --
12    sometimes criminal defendants don't tell the truth.
13         A   Yes, sir.
14         Q   Right?
15              But if they confess, it makes it real easy for
16    you.  Right?
17         A   Yes, sir.
18         Q   Okay.  So as part of an investigation would you
19    usually speak -- seek to speak with the target?
20         A   Yes.
21         Q   Okay.  Would it surprise you to know that
22    during the course of the governor's investigation no one
23    from his office spoke to Mr. Warren?
24         A   Repeat the question.  I'm sorry.
25              MR. CABOU:  Could you read the question back to
```

Sheriff Chad Chronister
November 02, 2022

```
 1          Sheriff Chronister, please.

 2              (The court reporter read back as requested.)

 3      A    I don't know how you want me to react to that.

 4  It wasn't my investigation.

 5  BY MR. CABOU:

 6      Q    Yeah.  Again, that wasn't my question either.

 7              If it was your investigation you would have

 8  spoken to Mr. Warren.  Right?

 9      A    Possibly.

10      Q    Okay.  Right.  Because -- because he would --

11  if he -- if he did it, he would tell you or he might

12  tell you.  Right?

13      A    Correct.

14      Q    And if he didn't do it, he might explain to you

15  and share information with you that might cause you to

16  reconsider your position.  Right?

17      A    It's -- it's possible.

18      Q    Sure okay.

19              Would it surprise you to know that during the

20  course of the governor's office review they didn't speak

21  to a single attorney in the state attorney's office?

22      A    Again, it wasn't my investigation.  I don't

23  know if I can be surprised or not surprised on how

24  someone handled what they thought was a plausible

25  investigation into whatever target they had.
```

Sheriff Chad Chronister
November 02, 2022

```
 1        Q    Yeah.  I don't think there was an
 2   investigation, which is sort of why I'm trying to ask
 3   you, an expert in investigations, all about it.
 4        A    But you're asking me just to speculate and
 5   guess.  And I don't know if I can say I'm surprised or
 6   not surprised.
 7        Q    Okay.  Well, the governor stood on your stage
 8   and said they did a thorough statewide review of
 9   prosecutors -- right? -- across the state.
10        A    That's correct.
11        Q    Okay.  Well, they didn't do that.
12             Does that surprise you?
13        A    You're saying that that wasn't done.
14        Q    I'm telling you that Larry Keefe said they
15   didn't speak to all 20 state attorneys.  I'm telling you
16   Larry Keefe said they didn't speak to Andrew Warren.
17   I'm telling you that Larry Keefe said under oath that
18   they didn't speak to a single lawyer in the state
19   attorney's office.
20             And knowing that, does that surprise you?
21        A    I wouldn't say I'm surprised.  No.
22        Q    Why aren't you surprised?
23        A    Again, it's not my investigation.  I don't --
24   you're asking if my reaction is that I'm surprised or
25   not surprised.  I can't comment.
```

Sheriff Chad Chronister
November 02, 2022

1        Q    You can't or you won't?

2        A    No.  I can't.  I don't know.  You're asking me

3    to speculate.  I don't know enough about it or what was

4    done or wasn't -- wasn't done to tell you whether I'm

5    surprised or not.

6              I'm not familiar with the intimate details of

7    what went into their investigation.  So I would just be

8    speculating.  You're asking me to guess.

9        Q    I'm really not.  But let's try -- let's try it

10   another way.

11             Were you the main source for Mr. Keefe's

12   investigation of Mr. Warren?

13       A    I don't know.

14       Q    Okay.  What was your role in the investigation

15   by Mr. Keefe of Mr. Warren?

16       A    Asked if we had had any type of difficulties

17   with our state attorney prosecuting cases.

18       Q    Okay.  That's -- that's what he asked you?

19       A    Correct.

20       Q    So let's -- let's back up a little bit.

21             When was the first time you learned that the

22   governor's office was looking into state attorneys?

23       A    I don't know the exact date.

24       Q    Was it in 2022?

25       A    It was.

Sheriff Chad Chronister
November 02, 2022

```
 1        Q   Okay.  When was the first time you spoke with
 2    anyone from the governor's office about Andrew Warren?
 3        A   I can't recall.  I believe it was sometime in
 4    April, but I could be -- I could be wrong.
 5        Q   April of this year, 2022?
 6        A   Correct.
 7        Q   Okay.  Who participated -- so this -- this
 8    first conversation that you can't precisely place but
 9    was on or about April of 2022 --
10        A   (Nodding head.)
11        Q   Who -- who were the participants in that
12    conversation?
13        A   The first conversation I had with Mr. Keefe?
14        Q   Yeah.  Yes.  Was it with Mr. Keefe?
15        A   Yes.
16        Q   In April of 2022?
17        A   Yes.
18        Q   Okay.  And how did -- did you come to be in
19    touch?
20        A   It was March or April, one of those -- one of
21    those two.
22        Q   Okay.  Great.  That's all.
23            So March or April.  I don't need to know the
24    exact date --
25        A   Yes.
```

Sheriff Chad Chronister
November 02, 2022

1        Q   -- you spoke with Mr. Larry Keefe.

2        A   Yes, sir.

3        Q   And he's the governor's safety czar.  Is that

4    right?

5        A   Correct.  I believe so.

6        Q   That's a -- that's a good title.

7            How did you come to be in touch with Mr. Keefe

8    at that time?

9        A   I went -- I went to lunch with a mutual friend

10   and at the lunch they asked me if I would jump on a

11   quick call with Larry Keefe.

12       Q   Okay.  Who was the friend?

13       A   Presley Farrier.

14       Q   I'm sorry.  What was the last name?

15       A   Preston Farrier.

16       Q   Preston Farrier, F-a-r-r-i-e-r?

17       A   I believe so.

18       Q   Okay.  Who's Preston Farrier?

19       A   A friend.

20       Q   But what is -- I mean, does he work for the

21   sheriff's office?

22       A   No.  I'm sorry.  He does not work for the

23   sheriff's office.

24       Q   Okay.  Does he have a role in law enforcement?

25       A   He does not.

Sheriff Chad Chronister
November 02, 2022

```
 1          Q    What does he do for a living?

 2          A    I believe he works for the Ferman Motor

 3     Corporation.

 4          Q    Sorry.  Ferman Motor --

 5          A    The Ferman Auto Group.  I believe that's who he

 6     works for.

 7          Q    Is that like a -- like a -- like a car sales

 8     place?

 9          A    Yes.

10          Q    Okay.  How do you know Mr. Farrier?

11          A    Became friends several years ago.  I don't

12     know -- how did I meet him?

13          Q    Yeah.

14          A    I believe introduced by another friend several

15     years ago.

16          Q    Okay.

17          A    Couldn't tell you who, though.  I'm sorry.

18          Q    Okay.  So you were at lunch with Mr. Farrier.

19     Is that right?

20          A    Correct.

21          Q    Was Mr. Keefe at the lunch?

22          A    He was not.

23          Q    But -- but Mr. Fairer asked you to speak with

24     Mr. Keefe?

25          A    At the end of the lunch he said, "Would you
```

Sheriff Chad Chronister
November 02, 2022

 1    talk to Larry O' Keefe?"

 2        Q    Did you know -- did you know who that was?

 3        A    He told me he worked for the governor's office.

 4        Q    Okay.  And did Mr. Farrier tell you what the

 5    conversation would be about?

 6        A    I can't recall.  I don't believe so.

 7        Q    Okay.  Is it -- is it fair to say you said,

 8    "Sure.  I'll talk to the governor's office"?

 9        A    Sure.

10        Q    Okay.  How long after your lunch with

11    Mr. Farrier did you speak with Mr. Keefe?

12        A    Right after the lunch?  Is that what you're

13    asking?

14        Q    I'm just asking how long.  I mean, was it a

15    month?  Was it a day?  Was it -- like did you hop right

16    to it?  I'm just --

17        A    Yeah.  Right --

18        Q    Right away?

19        A    During the lunch.  Yeah.  At the end of the

20    lunch.

21        Q    Oh, he put him on the phone?

22        A    Correct.

23        Q    Okay.  So where was the lunch?

24        A    Santo Stefano -- I believe I'm saying it

25    correctly.  Sorry if I'm butchering it up -- in Ybor

Sheriff Chad Chronister
November 02, 2022

```
1    City.

2         Q    Okay.  A restaurant here in the Tampa area?

3         A    Right.

4         Q    And during this lunch Mr. Farrier pulls out his

5    phone and calls Mr. Keefe.  Is that right?

6         A    At the end of the lunch we went to

7    Mr. Farrier's car where he initiated the phone call.

8         Q    And did you sit in his car on the speakerphone

9    while you had the call?

10        A    We did.

11        Q    Okay.  And was that the first time you'd spoken

12   with Mr. Keefe?

13        A    First time.

14        Q    Do you know who he was?

15        A    I did not.

16        Q    Mr. Keefe was -- he was the United States

17   attorney in Tallahassee under the Trump administration.

18   Is that right?

19        A    I don't know.

20        Q    Okay.  Yeah.  I'm just asking you if you

21   crossed paths in your law enforcement career.

22        A    No.  No.  This was the first time I spoke with

23   him.  I had no idea who he was.

24        Q    Okay.  Did Mr. Keefe introduce himself on that

25   call?
```

Sheriff Chad Chronister
November 02, 2022

1        A    He did.

2        Q    What did he say?

3        A    Introduced himself, who he worked for, what he

4    was doing and then what he was working on.

5        Q    Okay.  So what did he say he was doing?

6        A    He said he was tasked by the governor to review

7    all the state attorneys to determine which ones weren't

8    prosecuting cases, and his investigation kept leading

9    him back to our state attorney.

10            He asked me if we had any difficulties getting

11   cases prosecuted here.  I indicated that we did.

12   Indicated that we had already started compiling a list

13   of cases, and I'd directed our staff to start keeping

14   track of these cases that weren't being prosecuted and

15   that I would send him those cases of what I had to date.

16       Q    And that date being sometime in March or April?

17       A    In March or April.

18       Q    Okay.  What did Mr. Keefe say?

19       A    That was about the end of the conversation.

20   "Thank you."

21       Q    He asked you to send them?

22       A    I believe he did.  Yes.  I believe during that

23   conversation or a subsequent conversation shortly

24   thereafter he asked that could I send him those cases.

25   So I don't know if it was that initial phone call or a

Sheriff Chad Chronister
November 02, 2022

1    subsequent phone call after that.

2        Q    Okay.  Was the topic of the state attorney's

3    office discussed at your lunch with Mr. Farrier prior to

4    the phone call?

5        A    Not that I can recall.

6        Q    Do you know why Mr. Farrier thought to ask you

7    to speak with Mr. Keefe?

8        A    No, sir.

9        Q    You don't know what was in Mr. Farrier's mind?

10       A    No, sir.

11       Q    Who would know that?

12       A    Mr. Farrier.

13       Q    Fair enough.

14            Tell me about the effort before the phone call

15   to gather cases that you said you had difficulty with.

16   Right?  Is that right?

17       A    Yes.

18       Q    Okay.  How many cases were there that you --

19   that you in your judgment thought your office had had

20   difficulty in having prosecuted?

21       A    How many?

22       Q    Yeah.

23       A    I don't know what the number is.

24       Q    Is it more than 5?

25       A    Yes.

Sheriff Chad Chronister
November 02, 2022

1        Q    Is it more than 1,000?

2        A    I don't believe so.

3        Q    Okay.  Somewhere between 5 and 1,000?

4        A    (Nodding head.)

5        Q    Okay.  On any of these cases had you discussed

6    them with the state attorney?

7        A    Me personally?

8        Q    Anyone in your office.

9        A    Yes.  I believe some of them were discussed

10   with a representative from the state attorney's office.

11       Q    Okay.  And in the materials that your office

12   put together about these cases did they discuss what the

13   state attorney's office's perspective was?

14       A    Good question.  I don't -- I don't know.  I'd

15   have to ask Lieutenant Carey --

16       Q    Okay.

17       A    -- or -- or our chief deputy, who I instructed

18   to start compiling these cases a few months back because

19   people kept -- people kept bringing up their concerns at

20   command staff meetings about the lack of prosecution of

21   cases.

22       Q    Okay.  So let's talk about that.

23            You said that at some point you had instructed

24   your chief deputy, perhaps aided by Lieutenant Carey, to

25   assemble these cases that people were complaining about.

Sheriff Chad Chronister
November 02, 2022

```
 1    Is that a fair summary?

 2        A    Correct.  As a matter of fact, I think she had

 3    already started doing that before I asked her to do it.

 4    And I believe she was already working on that because

 5    she meets with them more frequently than I do.

 6             So if memory serves me correct, she was already

 7    working on compiling cases because the discussion kept

 8    coming back again how the commanders were saying that it

 9    was being expressed to them by victims not getting the

10    justice that they deserve along with frustration by

11    deputies and detectives who put forth a lot of effort

12    and their cases weren't being pursued.

13        Q    Okay.  Sir, in this period of time were you in

14    touch with Mr. Warren?

15        A    I don't -- you have to explain what you mean by

16    that.

17        Q    In the course of your duties as the sheriff did

18    you communicate with the state attorney Mr. Warren?

19        A    Yes.

20        Q    Okay.  You guys would text?

21        A    At times.  Yes.

22        Q    Your families would have dinner together?

23        A    Maybe one time.  Yes.

24        Q    Okay.  I mean, you said -- I've reviewed many

25    public statements of yours where you called Mr. Warren a
```

Sheriff Chad Chronister
November 02, 2022

```
 1    friend.

 2              Is he a friend?

 3      A    I think that's subjective.  I don't know.

 4              What are you -- what are you describing a

 5    friend as?

 6      Q    Well, sir, come on.  I'm asking you.

 7              Did you consider Mr. Warren to be a friend?

 8      A    Yeah.  I think a work friend.  I don't know if

 9    I would call him some personal, you know,

10    close-in-the-circle friend by maybe having dinner one

11    time in six years.

12      Q    Okay.

13      A    I know there's different degrees of friends.  I

14    don't --

15      Q    Okay.  Did you donate to his campaign?

16      A    I did.  I donated to his first campaign.

17      Q    Okay.  Did you ever call Mr. Warren to discuss

18    cases?

19      A    I have.

20      Q    Okay.  Did he take your concerns seriously?

21      A    I believe so.

22      Q    Okay.  So once your chief deputy sort of -- did

23    you learn that the commanders were expressing

24    frustration?  Did you learn that from your chief deputy?

25      A    I did.
```

Sheriff Chad Chronister
November 02, 2022

```
 1        Q    You did.  Okay.

 2             Once you learned that did you reach out to

 3   Mr. Warren to talk about these cases?

 4        A    Not those cases specifically.  No.  But there

 5   were several conversations about frustration for lack of

 6   prosecution of cases --

 7        Q    Did you --

 8        A    -- either with him or his chief of staff at the

 9   time Gary Weisman.

10             So some of those came from me.  Some of those

11   came from other members of the office, whether it was

12   the chief deputy, commander, colonel, department

13   commander, whatever, detective, state attorney,

14   whatever.  Whatever the conversation was.

15        Q    Okay.  Do you know Mr. Weisman personally?

16        A    I do.

17        Q    Okay.  Is he a friend?

18        A    Again, I think "friend" is subjective.  Yes.  I

19   guess.  As long as we can concede there's varying

20   degrees of friends, I would consider him a friend.

21        Q    We will concede that, Sheriff.

22             Have you ever been on vacation with

23   Mr. Weisman?

24        A    I have.

25        Q    How many times?
```

Sheriff Chad Chronister
November 02, 2022

1       A    Maybe twice.

2       Q    Okay.  I mean, I would have no trouble saying

3    that anyone -- was your -- was your wife with you on

4    this vacation?

5       A    She was.

6       Q    Okay.  I mean, I think we can agree that

7    someone you go on vacation with your wives with is a

8    friend.  Fair?

9       A    Fair.

10      Q    Okay.  When did you go on vacation with

11   Mr. Weisman?

12      A    Maybe two or three years ago.

13      Q    Okay.  That was during the time Mr. Warren was

14   state attorney.  Right?

15      A    Correct.

16      Q    Okay.  Did you talk business?

17      A    Not that I can recall.

18      Q    Okay.  But certainly you knew how to reach

19   Mr. Weisman.  Right?

20      A    Yes, sir.

21      Q    And if you had a concern about their office's

22   prosecution you could reach out to him?

23      A    Yes.

24      Q    Okay.  Any reason to think he wouldn't take

25   your call?

Sheriff Chad Chronister
November 02, 2022

```
1        A   No, sir.

2        Q   Did you text with Mr. Weisman?

3        A   I'm sure I have.

4        Q   Okay.  About -- so these cases that were

5   discussed with the governor's office after the

6   suspension but that you had sent them before the

7   suspension -- what were the particular crimes at issue

8   in these cases?

9        A   I don't know.

10       Q   What were the names of the defendants in these

11  cases?

12       A   I can't recall.

13       Q   What was it that you thought was wrong with the

14  prosecution of these cases?

15       A   The fact that there was no valid reason why

16  they were -- they were not prosecuted.

17       Q   What were the reasons they weren't prosecuted?

18       A   If I can recall, some were depositions would be

19  too complicated and lengthy.  Some was --

20       Q   Let me stop you there.

21           So depositions would be too complicated and

22  lengthy.

23           You said that at your press conference with the

24  governor.  Right?

25       A   Correct.
```

Sheriff Chad Chronister
November 02, 2022

1        Q    What case was that?

2        A    That was a case -- and I can't recall the

3    defendant's name, but it was someone who shot at some

4    victims inside of a house.

5             That case was not prosecuted and he went on to

6    commit another burglary.  That case was -- both cases

7    were not prosecuted, and I think he went on to commit a

8    third burglary.

9        Q    So at your press conference with the governor

10   you talked about this case.  Right?

11       A    Yes.

12       Q    You can't remember the name of it.  You don't

13   know who the defendant was.  Right?

14       A    No.

15       Q    And all you know is that it wasn't prosecuted?

16       A    Due to the fact that the -- the memo line was

17   that the depositions would be too lengthy and

18   complicated.

19       Q    The memo line on what document, sir?

20       A    What we received from the state attorney's

21   office, if you go into their log on why cases are or are

22   not prosecuted.

23       Q    Okay.  So that document that -- that you're

24   talking about now is -- is about a case that you

25   discussed with the governor's office --

Sheriff Chad Chronister
November 02, 2022

 1        A    (Nodding head.)

 2        Q    -- that you mentioned at the press conference?

 3        A    Yes.

 4        Q    And we do not have that document.  That was not

 5    produced to me.

 6        A    What document are you talking about?

 7        Q    The thing you just said about the memo line,

 8    the law and whatever else it was.

 9             MR. CABOU:  So I just know that that is not in

10        the production.  It's clearly encompassed by

11        subpoena and I'm going to ask you produce it

12        promptly.  Are you going to do that?

13             MS. KIRSHEMAN:  It's in there.

14             MR. CABOU:  I don't think it is.

15             MS. KIRSHEMAN:  I think it is.

16             MR. CABOU:  Okay.  Well, do you know anything

17        about it that might help me identify it since you

18        produced documents with no metadata or searchable

19        format whatsoever?

20             MS. KIRSHEMAN:  We'll look into it.

21             MR. CABOU:  Okay.

22    BY MR. CABOU:

23        Q    So you believe that that case was not

24    prosecuted because of a difficulty in depositions.

25             Is that your belief?

Sheriff Chad Chronister
November 02, 2022

 1       A    That was the reason given, yes, that -- that it

 2    was not -- that prosecution was not sought.   Correct.

 3       Q    Okay.  Do you know that in that case the victim

 4    refused to cooperate?

 5       A    Do I know that?

 6       Q    Uh-uh.

 7       A    I was told just the opposite.

 8       Q    Yeah.

 9            So would it surprise you to learn that the

10    victim didn't cooperate?

11       A    That now would be a surprise.

12       Q    Okay.  Who told you that the victim cooperated?

13       A    It might have been Lieutenant Carey.

14       Q    Okay.  It might have been Lieutenant Carey.

15    And I understand you're not sure, and that's okay.

16            Who else could it have been?

17       A    Any one of 4,000 employees.  I don't --

18       Q    Come on, Sheriff.  That's not true either.

19    Like I'm not -- I'm not -- this isn't a trap, but I'm

20    allowed to ask.

21       A    Listen --

22       Q    You wouldn't have discussed this with some

23    patrol deputy in some random district.  Right?  I mean,

24    it would be Lieutenant Carey.

25            Would it -- could it be your chief deputy?

Sheriff Chad Chronister
November 02, 2022

1        A    One of the two.  But I mean --

2        Q    Okay --

3        A    You're -- you're asking where the information

4    could have came from.  It could have came from anybody.

5        Q    Well, Sheriff, it's pretty important

6    information.  You stood up in public at a press

7    conference with the governor of the State of Florida and

8    said things that my understanding is aren't true.  And

9    I'm trying to figure out if you knew they were true.

10       A    What wasn't true?

11       Q    That the victim was cooperative.  That is not

12   true.

13            MR. AARON:  Is there a question pending?

14            MR. CABOU:  I'm asking if it surprised him and

15       I'm asking him who he heard it from.

16       A    And I believe I answered by saying it was

17   Lieutenant Carey.  You asked me if it wasn't Lieutenant

18   Carey who would it be, and I would be guessing.

19   BY MR. CABOU:

20       Q    Okay.  Well, Sheriff, just to be clear, you

21   said it could have been Lieutenant Carey and I was just

22   asking who else it could have been.  So that's sort of

23   why we got down this rabbit hole.  If you're pretty sure

24   it was Lieutenant Carey, I'm happy to leave it there.

25       A    I would -- to -- to be completely conservative,

Sheriff Chad Chronister
November 02, 2022

```
1        I would say either the chief deputy or Lieutenant Carey.

2            Q    Great.  Okay.

3            A    I believe we would have it --

4            Q    Okay.  When did you discuss this with -- this

5    case, which I believe is called the Rodriguez case.

6    When did you -- and -- and if I'm wrong about that, if I

7    call it the Rodriguez case, this is the case I'm talking

8    about.  Okay?

9            A    Correct.

10           Q    It's the case that you spoke about at the press

11   conference where you said that the victim wasn't getting

12   justice.

13           A    Correct.

14           Q    Okay.  Does it surprise you to know that the

15   criminal investigators from your office on that case

16   could not identify the shooter?

17           A    I would -- I would say that's a surprise and

18   highly unlikely.

19           Q    Okay.  Have you reviewed the file from this

20   case?

21           A    I have not.

22           Q    So everything you know you learned from

23   Lieutenant Carey?

24           A    Correct.

25           Q    Okay.  Why didn't you review the file prior to
```

Sheriff Chad Chronister
November 02, 2022

1    having a press conference where you -- where you

2    discussed this matter?

3         A    Well, I trust the people who work with me and

4    around me if they tell me something I wouldn't have to

5    go verify it.

6         Q    Okay.  But, I mean, this wasn't like an

7    ordinary day.  Right?  I mean, this was a big deal.

8         A    Still, I trust the people that I work with

9    implicitly.  If they told me something I would -- I

10   would give it the utmost confidence and trust that

11   that -- that was the case.

12        Q    Okay.  Who decided to discuss the Rodriguez

13   case in your prepared remarks at the governor's press

14   conference on August 4th?

15        A    Lieutenant Carey.

16        Q    Okay.  He wrote the draft of the remarks that

17   inserted the information about this case?

18        A    Correct.

19        Q    Okay.  They weren't in your -- details about

20   the Rodriguez case were not in your original draft.  Is

21   that right?

22        A    I don't know, sir.

23        Q    Who --

24        A    You have copies of all the drafts.

25        Q    Yeah.  But they're your drafts, Sheriff.  So

Sheriff Chad Chronister
November 02, 2022

```
1    you're sort of the best-case scenario about where they

2    came from.  And I don't have them produced in date

3    order.  I don't have them produced with metadata that

4    tells me the date and time they were created.  And I

5    have several drafts, at least six.

6         A    But you requested -- everything you requested

7    you -- you have.

8         Q    But I didn't get it in any type of intelligible

9    format that would help me avoid some of these, what I

10   agree are laborious questions.

11        A    You have copies of every single draft, all six

12   of them, I believe.

13        Q    Okay.  Did you write those drafts?

14        A    I was part of them.  I can't say I wrote them.

15   No.  Lieutenant Carey wrote them.  We -- we kind of

16   worked on it together.

17        Q    Okay.  Did Mr. Keefe weigh in on these drafts?

18        A    I sent the final version to Mr. Keefe.  It

19   wasn't for him to weigh in, just so he was aware of what

20   I'd be sending -- final.

21        Q    Did the final version that you sent to

22   Mr. Keefe have the information about Mr. Rodriguez's

23   case in there?

24        A    Yes.  I'd -- I'd have to look at Version 6

25   to -- so I wouldn't be guessing, but I feel confident I
```

Sheriff Chad Chronister
November 02, 2022

```
 1    did.

 2         Q    Okay.  After your conversation with Mr. Keefe

 3    in the car with Mr. Farrier did you leave that

 4    conversation with any action item, anything to do?

 5         A    I don't believe so.

 6         Q    Okay.  Did he ask you to do anything?

 7         A    I don't believe during that conversation.  No.

 8         Q    Okay.  When was the next time that you -- that

 9    you did anything, including speak with Mr. Keefe,

10    relating to the conversation you had about Mr. Warren?

11         A    Maybe within a few days after that.

12         Q    Okay.  And what did you do?

13         A    Provided copies of what we had collected, so to

14    date any type of cases that we felt were a lack of

15    prosecution.

16         Q    Okay.  Did you review the copies before you

17    sent them to Mr. Keefe?

18         A    I did not.

19         Q    Okay.  Did you satisfy yourself that there was

20    actually a lack of prosecution there?

21         A    Yes.

22         Q    How did you do that?

23         A    Chief deputy and lieutenant informed me that

24    these were the cases that they had as examples of a lack

25    of prosecution.
```

Sheriff Chad Chronister
November 02, 2022

```
 1        Q   Okay.  And do you know if the chief deputy or

 2   your administrative lieutenant spoke with anyone from

 3   the state attorney's office about these cases?

 4        A   I don't know that.

 5        Q   Okay.  I mean, why wouldn't they speak with

 6   them?

 7        A   They may have.

 8        Q   Okay.  I don't think they did.

 9            But I guess what I'm trying to understand is,

10   you're the sheriff.  Right?  You're elected.  You're the

11   boss.  Fair?

12        A   Fair enough.

13        Q   Okay.  Depending on who you listen to, you're

14   the chief law enforcement officer of Hillsborough

15   County.  Right?

16            Before engaging with the governor's office on

17   this topic about --

18        A   Yes.

19        Q   -- the performance of the elected state

20   attorney, who's sort of your law enforcement partner in

21   Hillsborough County, what did you personally do to

22   satisfy yourself that the information that you were

23   forwarding to the governor's office was accurate?

24        A   Working with the people that I trust the most

25   in the entire office.  My administrative lieutenant and
```

Sheriff Chad Chronister
November 02, 2022

1   chief deputy -- when they tell me these are the best

2   examples that they collected to date, I take that at --

3   at fair value.

4        Q    So you just took what they gave you.  You boxed

5   it up and you sent a physical copy to Tallahassee.  Is

6   that right?

7        A    Lieutenant Carey shipped it to -- to

8   Tallahassee.  Correct.

9        Q    What -- did you see the -- the package of

10  materials before it went out?

11       A    I did not.

12       Q    Did you put a cover letter in there that said,

13  "Hey, Larry.  Here's the stuff.  Best, Chad"?

14       A    No, sir.

15       Q    Okay.  So tell me everything that you

16  personally did from the moment you spoke with Mr. Keefe

17  in the car with Mr. Farrier until the time the box went

18  to Tallahassee that was related to the box.

19       A    Spoke to the chief deputy and Lieutenant Carey

20  about collecting whatever cases we had and getting them

21  mailed to Mr. Keefe.

22       Q    All right.  Let's take a look at what I think

23  was in the box.

24            MR. CABOU:  All right.  This is going to be

25       Exhibit 6.

Sheriff Chad Chronister
November 02, 2022

 1              (Exhibit 6 marked for identification.)

 2      BY MR. CABOU:

 3         Q    All right.  Sheriff, now for the record, I've

 4      handed you a stack of documents that's long that begins

 5      with the Bates Stamp DEF 2188 and ends with DEF 2313.

 6      That's on the last page.  And it's been marked as

 7      Exhibit 6 for this deposition.

 8              This has been previously identified as the

 9      contents of the package that were sent to Mr. Keefe by

10      your office.

11              Have you ever seen this before?

12         A    I have not.

13         Q    Okay.  So let's go through a few things.

14              The first page, the first couple pages, the

15      first -- the first eight pages are a memorandum on

16      Office of the State Attorney for the Thirteenth Judicial

17      Circuit stationery, Andrew Warren.  It's entitled

18      Memorandum to Assistant State Attorneys from Andrew H.

19      Warren, State Attorney.

20              Have you ever seen this document before?

21         A    I have.

22         Q    Okay.  When have you seen this document

23      previously?

24         A    I believe it was right around Christmastime of

25      last year.

Sheriff Chad Chronister
November 02, 2022

1        Q    Okay.  So this document -- I'll tell you,

2    there's a -- there's a Post-It note on the front that

3    was stuck to the package that's over the date.  But I

4    will tell you that this document was dated December

5    14th, 2021.

6              So is that -- to me, that's consistent with you

7    seeing it shortly after it came out.  Is that --

8        A    Correct.

9        Q    Okay.  So you saw it around Christmastime 2021.

10             How did you get it?

11       A    The chief deputy had shown it to me.

12       Q    Okay.  What did she say about it?

13       A    She -- she expressed some concerns that she

14   felt was contained within the memo.

15       Q    Well, the memo is in front of us.  So to the

16   best of your recollection, tell me what her concerns

17   were.  Can you -- can you point out the concerns?

18       A    The lack of prosecution and some of the -- the

19   presumption of innocence in some crimes and then the

20   examples that you could look and see.  Under Page 8,

21   DEF 002195.

22       Q    Okay.  What -- what's the problem with some --

23   one of these examples?

24       A    The problem would be is Mr. Warren would --

25   with his presumption of innocence, would -- would --

Sheriff Chad Chronister
November 02, 2022

 1   would cause public safety concerns for us because he

 2   would be deciding which laws would be criminal or

 3   noncriminal.

 4        Q    The presumption of innocence is a public safety

 5   concern?

 6        A    Yes.  If we're not able to have laws that were

 7   created by a legislative body for us to enforce and he

 8   was -- if you can look at this, you can see that there's

 9   going to be a presumption of innocence that he's not

10   going to prosecute certain crimes.

11        Q    Okay, Sheriff.  I want you to look at this memo

12   and I want you to take however much time you need and I

13   want you to find the statement in this memo that

14   supports what you just said, that the presumption of

15   innocence is a problem.

16        A    Well, look at each bullet point.

17        Q    I'm looking.  I just want you to read them

18   aloud.

19        A    Homeless defendants who are sleeping in a

20   business's parking lot generally should not be charged

21   with trespass because a prosecutor is not going to solve

22   the underlying problem in terms of the trespassing or

23   the homelessness.

24             So what they're saying is a homeless individual

25   can't trespass on a business.  So when -- the public

Sheriff Chad Chronister
November 02, 2022

1   safety concern is caused when a business calls us and

2   asks us to do our job and we can't do it because this

3   person won't be prosecuted.

4           So that opens us up now for a liability of

5   false arrest because we were already made aware that

6   they weren't -- will not be prosecuting.

7       Q   So you're telling me that if a case isn't

8   prosecuted that means that you could be liable for

9   unlawful arrest?

10      A   100 percent.

11      Q   Why do you think that?

12      A   That's -- that's a case.  We're much more

13  liable if a case isn't prosecuted.  Then the burden

14  comes back on us:  why did we arrest them?  The state

15  attorney didn't feel that there was sufficient evidence

16  to move forward with this case.

17      Q   Have you ever talked about what you just said

18  with a lawyer?

19      A   Yes.

20      Q   Who?

21      A   Several attorneys.

22      Q   Who?

23      A   You want me to give you a list of people over

24  the years?

25      Q   Yeah.  I want you to tell me --

Sheriff Chad Chronister
November 02, 2022

```
 1       A   I think if you'd ask my chief legal counsel
 2   right now she would agree.
 3       Q   I'm not asking her what her opinion is.  I'm
 4   not sure she would agree, but I'm asking who you
 5   discussed it with.
 6           Which lawyer told you that you could be liable
 7   for false arrest based on a prosecution decision in a
 8   homelessness case?
 9       A   We're absolutely much more liable if a case
10   isn't prosecuted.
11           If we get a memorandum like this saying, "I
12   won't prosecute these individuals," and we arrest them
13   anyway, who does the burden fall on?
14       Q   Burden for what?
15       A   Burden for this person being arrested knowing
16   that they wouldn't be prosecuted.
17       Q   I truly don't understand your question, but --
18       A   And I'm trying to make you understand.  I'm
19   sorry.  I'm not trying to be difficult.  I'm --
20       Q   Okay.  All right.  Let's try this.
21           Did you bring your concerns about homeless
22   defendants sleeping in a business parking lot to
23   Mr. Warren?
24       A   Not specifically homeless defendants but
25   specifically crimes that weren't being prosecuted.  Yes.
```

Sheriff Chad Chronister
November 02, 2022

```
 1        Q    Okay.  What specific crimes did you discuss
 2   with Mr. Warren?
 3        A    Homeless individuals that he refuses to press
 4   charges on.  Our prostitution during our human
 5   trafficking sting that he refuses to prosecute and hold
 6   accountable any -- any -- anyone that's involved in
 7   solicitation of sex.
 8             We -- we had addressed some concerns with the
 9   state attorney's office by -- we -- we had a rash of
10   introduction of contraband into our detention
11   facilities, and almost all of them were non-prosecuted
12   when we had people overdosing inside our detention
13   facilities.
14        Q    Why -- why didn't they prosecute the detention
15   facility cases?
16        A    We -- we could never get a valid reason.  It
17   was always manpower constraints or --
18        Q    Well, let me stop you there.
19             One of the reasons was manpower constraints?
20        A    Correct.
21        Q    Okay.  Are there any crimes that your office
22   can't investigate because you don't have enough
23   manpower?
24        A    No, sir.  We investigate every single one.
25        Q    You investigate every crime that occurs in
```

Sheriff Chad Chronister
November 02, 2022

```
 1    Hillsborough County?

 2       A    Every crime that occurs in Hillsborough County.

 3    Manpower wouldn't -- I can never --

 4       Q    Sheriff, that can't possibly be true.

 5       A    Well, it is true.

 6       Q    Okay.  I didn't drive here.

 7       A    You're saying that I make a determination of

 8    which crimes are beings investigated and not

 9    investigated?

10       Q    Yes.

11       A    Our job is to enforce the law.  Every crime is

12    investigated.

13       Q    Okay.  What does the word "amnesty" mean?

14       A    What do you -- what do you mean?

15       Q    I'm -- I'm asking you what that word means.

16    That's an English word.  I want to know if you know what

17    it means.

18       A    Well, it depends on the context.  I don't know

19    what you're --

20       Q    In the context of, you know, potential criminal

21    behavior what does the word "amnesty" mean?

22       A    Amnesty, I believe, would be the same as

23    immunity.

24       Q    Okay.  So it's -- it's -- you're not going to

25    be prosecuted.  Right?
```

Sheriff Chad Chronister
November 02, 2022

```
1          A    Correct.

2          Q    You're not going to be found responsible.

3    You're not going to be arrested.  Right?

4          A    Correct.

5               MR. CABOU:  All right.  Let's mark Tab 8.

6               THE COURT REPORTER:  Exhibit 7.

7               MR. CABOU:  It is Exhibit 7.  Sorry.  It's Tab

8          8 in mine.  Exhibit 7.  Sorry.

9               (Exhibit 7 marked for identification.)

10   BY MR. CABOU:

11         Q    Sheriff, you've been handed what I've marked --

12   what the court reporter has marked, actually, hopefully,

13   as Exhibit 7 to your deposition.  It is a news article

14   from WTSP.  It's dated August 21st, 2019.

15              Do you see that?

16         A    Correct.

17         Q    Okay.  It says, "The Hillsborough County

18   Sheriff's Office will allow anyone voluntarily seeking

19   treatment to drop off drugs without getting in legal

20   trouble."

21              It says that.  Right?

22         A    Yes.

23         Q    Okay.  Is this true?

24         A    It is.

25         Q    Did you run a program where criminals could
```

Sheriff Chad Chronister
November 02, 2022

1    bring drugs to your deputies and they wouldn't be

2    prosecuted?

3        A   We still have the program.  And it's not

4    criminals.  They're addicts who wish to seek any type of

5    treatment can drop off that narcotic, whatever they're

6    addicted to at our office and we will give them a ride

7    to whatever type of facility to try to get them help.

8        Q   Okay.  So give me an example of the kinds of

9    narcotics that might be brought to this facility for --

10   for amnesty.

11       A   It -- it could be any type of illicit drug,

12   prescription drug, anything?

13       Q   Cocaine?

14       A   Yes, sir.

15       Q   Fentanyl?

16       A   Yes, sir.

17       Q   And if they drop it off you won't arrest them?

18       A   That's correct.

19       Q   Okay.  Possession of cocaine is against the

20   law.  Right?  It's a crime just to have it in your car.

21       A   It is.

22       Q   So these people come to this facility carrying

23   drugs.

24           Carrying the drugs is illegal.  Right?

25       A   Yes.  But we all --

Sheriff Chad Chronister
November 02, 2022

1       Q    And you don't arrest them?

2       A    Well, we have to look at the intent there,

3    Counselor.

4       Q    Go on.

5       A    Look at the -- look at the intent.  You're --

6    talking about prosecuting any crime.  They're not a

7    crime.  We didn't discover them with that drug.

8            Their intent was to bring it to the office and

9    voluntarily surrender it so they can get -- they could

10   seek treatment.

11      Q    Okay.  So let's say your deputy does a car stop

12   on Dale Mabry.  Okay?  In the passenger door pocket is

13   an 8 ball of crack.  Okay?

14           Do you arrest the driver for possession?

15      A    Most likely.

16      Q    Do you address -- do you arrest the passenger

17   who's sitting in the seat next to the pocket tell where

18   the 8 ball of crack is?

19      A    I mean, there's a million different scenarios.

20   You're asking me to speculate.

21           If -- if we can prove that possession, sole

22   possession -- it wasn't constructive possession -- it

23   was just with the driver, then that would be the

24   individual we hold responsible.

25      Q    Okay.  But let's say no one confesses.  Right?

Sheriff Chad Chronister
November 02, 2022

1    Because the cop is going to say, "Hey, whose drugs are

2    those?"  Right?

3        A    Then it would be the person closest to it, so

4    it would end up being the driver.

5        Q    No.  In my hypothetical the person closest to

6    it is the passenger that's seated in the passenger seat

7    next to the passenger door pocket where the 8 ball of

8    crack is.

9        A    I'm sorry.  I thought you said in the driver's

10   door.

11       Q    No.  Well, let's be clear.  Okay?

12            So there's a -- there's a Ford Taurus.  Okay?

13   It's on Dale Mabry.  It gets pulled over for illegal

14   left turn, let's say.  Okay?

15       A    (Nodding head.)

16       Q    And there's two individuals in the car.

17   There's a man in the passenger seat and a woman in the

18   driver's seat, and the crack is in the passenger side

19   door pocket.  No one will tell you whose drugs it is.

20   They're both, "I don't know.  I don't know."

21            The passenger is closest to the drugs.

22   Correct?

23       A    She is.

24       Q    And the passenger gets arrested?

25       A    Possibly.

Sheriff Chad Chronister
November 02, 2022

1        Q    Probably?

2        A    Possibly.

3        Q    Okay.  Well, someone is going to get arrested.

4    Right?

5        A    Not in every case.

6        Q    How do you decide that someone wouldn't be

7    arrested in a car where there's two people and an 8 ball

8    of crack?

9        A    Well, the person that owns the car, the

10   registered owner, is the person responsible for the car.

11       Q    Let's say the driver.  Yeah.

12       A    Then that weighs in too.  So you're asking me

13   to speculate on a case.

14       Q    I mean, this is a pretty familiar case.  If

15   there's a hypothetical you'd be more familiar with -- I

16   mean, I would think that someone who has been in law

17   enforcement as long as you has had a car stop where

18   there was drugs in the car.  Right?

19       A    Absolutely.

20            And I thought I answered your question.  The

21   first person closest to the narcotic would be the person

22   placed under arrest.

23       Q    Okay.  So that's -- that's a case where they

24   say it's not theirs.  They're not even touching it,

25   and -- and still, you're going to arrest them --

Sheriff Chad Chronister
November 02, 2022

1    right -- because they're closest to it?

2         A    Correct.  Possibly.  Not in every case, but

3    yes.

4         Q    In the overwhelming majority of cases?

5         A    I'll concede to that.  Correct.

6         Q    Okay.  At the same time you run a program

7    that's in the news where someone walks in holding the

8    same 8 ball of crack and they're not arrested --

9    right --

10        A    (Nodding head.)

11        Q    -- because they're there to get treatment.

12        A    Correct.

13        Q    Is that right?

14        A    It goes back -- it goes back to the intent.

15        Q    Okay.  But you said that the intent isn't part

16   of the statute that criminalizes drug possession.

17   Right?

18        A    I think intent weighs in on there and the

19   statute, sir.

20        Q    There's a lot of criminal defense lawyers that

21   would like to speak to you about that.  And I -- and

22   right now I'm not one of them, but --

23        A    That's fine.  You're the same person making the

24   statement that we don't -- we don't investigate every

25   crime.

Sheriff Chad Chronister
November 02, 2022

1      Q   You don't investigate every crime.

2      A   I disagree.

3      Q   Okay.  Is it fair to say that there are lots of

4   crimes that go on that you don't know about?

5      A   Maybe we should have been more -- I didn't -- I

6   didn't realize in this universe you were going to say

7   "ones that we weren't made aware of" either.

8      Q   Sheriff, this isn't a universe.

9      A   We're --

10     Q   This is the real world.

11     A   We're going to investigate every crime that

12  we're made of -- how about that? --

13     Q   Okay.

14     A    -- that's reported in any form, shape or form

15  it could be reported to us.  Any crime that's reported

16  to us, any lead, anything, we are going to investigate.

17        I'm sorry.  I didn't know you were talking

18  about we're supposed to be able to investigate every

19  crime even if we're not made aware of it or not.

20     Q   Sheriff, I'm not saying that you're supposed

21  to.  I'm saying that you can't because you don't have

22  enough cops.  That's the point.

23        You've got to make a choice about how to

24  allocate your resources.  Right?

25     A   100 percent.

Sheriff Chad Chronister
November 02, 2022

1      Q    Okay.  So if you get to make a choice about how

2   to allocate your resources, why doesn't Mr. Warren get

3   to make that same choice and say, "We're not going to

4   prosecute a guy who might be an addict who's homeless

5   who's just sleeping on the street outside of a business

6   or on the parking lot of a business."

7      A    Because I don't -- I don't believe -- his job

8   is to prosecute crimes.

9          So far with me there?  So far?

10     Q    Sure.

11     A    How can you issue a policy, a blanket policy

12  saying that anyone who commits a certain crime is not

13  going to be prosecuted?

14     Q    Where does it say that in this policy that

15  we've marked as Exhibit 6?  A blanket policy that

16  anyone who commits these crimes is not going to be

17  prosecuted -- where does it say that?

18     A    Maybe I misunderstood the memo.  But it says,

19  "Homeless defendants who are sleeping in a business's

20  parking lot generally should not be charged with

21  trespass because the prosecutor is not going to solve

22  the underlying problem."  How do you interpret that?

23          That a homeless individual who's trespassing in

24  a business will not be prosecuted.  We're not going to

25  prosecute those crimes.  That's not a blanket policy?

Sheriff Chad Chronister
November 02, 2022

1        Q   It is not.  And you know why?  Because I read

2    the whole memo, the whole thing, not just a little

3    thing.

4            And what it says, for example -- just above it

5    on that same page.  There's a heading that says examples

6    and then it says, quote, Case-specific decisions" -- why

7    don't you follow along?

8            "Case-specific decisions must be made according

9    to the unique facts and circumstances of the case.

10   Therefore, it is impossible to provide examples that

11   dictate the appropriate decision in every situation

12   across a category of cases.

13           "The examples below are intended to provide

14   guidance for certain issues in terms of evaluating

15   charging decisions but are not mandatory charging

16   policies that must be followed in every situation."

17           Did I read that correctly, sir?

18       A   You did.

19       Q   Does that change your opinion about whether

20   anything in this memo is a blanket policy?

21       A    It does not.  And the reason being is every

22   single one he has here -- these individuals won't be

23   prosecuted here in Hillsborough County.

24           So he put that caveat in there.  But I'm

25   telling you that's not how his state attorneys --

Sheriff Chad Chronister
November 02, 2022

1    assistant state attorneys take it because these

2    individuals in these types of cases are not and will not

3    be prosecuted in Hillsborough County.

4        Q   Are you saying that his assistant state

5    attorneys do not review every single one of these cases

6    individually and make a decision about whether it's

7    worth the resources to prosecute that case?

8        A   What I'm saying is they do not prosecute these

9    types of crimes.

10       Q   Well, sir, isn't that their job to determine

11   which individual case gets prosecuted and which

12   individual case doesn't for a variety of reasons?

13       A   But when you issue a memorandum saying that

14   these cases shouldn't be prosecuted, that's where we

15   disagree.

16       Q   Sir, it doesn't say that.  Tell me where it

17   says these cases should not be prosecuted.

18       A   Do you want to just keep going to the next

19   thing of what -- what is being stated?

20       Q   Sir, what I want you to do --

21       A   How they should generally dismiss a case

22   against a defendant charged with driving on a suspended

23   license who subsequently gets his or her license

24   reinstated -- underlying problem.  Where a person has

25   committed a --

Sheriff Chad Chronister
November 02, 2022

1      Q   Sir, the court reporter is trying to type what

2   you're saying.

3      A   Oh, I'm sorry.

4      Q   And that's way too fast.

5      A   I'm sorry.

6      Q   So I want you to say what you're going to say,

7   but I just want you to do it at a pace that our able

8   court reporter can keep up.

9      A   Understand.

10      Q   Okay.

11      A   You look at each one of his bulletin points.

12   He states why this person should not be prosecuted --

13      Q   Sir, those are --

14      A   -- for this type of crime.  And I can tell you

15   based on the track record that they're not being

16   prosecuted.  So, to me, this is a policy of

17   non-prosecution on certain types of crimes.

18      Q   Does it surprise you to know that lots of state

19   attorneys' offices have a policy like this, a case --

20   case-specific discretion in every case?

21      A   You're talking about discretion versus policies

22   that they implement where they don't prosecute certain

23   cases.

24          Yes.  I would be surprised if other state

25   attorneys have a memorandum issued like this about cases

Sheriff Chad Chronister
November 02, 2022

```
1    that they're not going to prosecute, this presumption of

2    innocence in these types of offenses.

3         Q    Aren't criminal defendants presumed innocent?

4         A    As a defense attorney, you're asking me if

5    criminal defendants are -- are innocent till proven

6    guilty?  Is that what you're asking?

7         Q    Are presumed innocent.

8         A    So why arrest anybody?

9         Q    Well, Sheriff, I'm not the cop.  I'm asking

10   you.

11        A    Well, you're -- you're making a bold statement

12   that if they're -- if probable cause is -- is determined

13   to believe that someone has committed an offense,

14   committed a violation of the law --

15        Q    Uh-uh.

16        A    -- then I think we're past the presumption of

17   innocence once they've been placed under arrest.

18        Q    I mean, you swore an oath to uphold the

19   constitution.  Right?

20        A    That's correct.

21        Q    That includes a presumption of innocence at all

22   stages of the criminal proceeding until a jury verdict

23   of guilt.

24        A    I understand that.  We're talking about two

25   different perspectives.
```

Sheriff Chad Chronister
November 02, 2022

1              I'm talking about if we place someone under

2    arrest, what you're -- what you would like me to concede

3    to is that person is innocent that we placed under

4    arrest because they haven't finished the judicial

5    system?

6         Q    Yeah.  That's the law in this country, Sheriff.

7         A    I understand the law, Counselor.

8              What I'm saying is we deal with different

9    thresholds.  If we have probable cause to -- to believe

10   that someone has committed an offense of the law, we

11   certainly believe that they're guilty of that.

12             Now, are they presumed innocent until they're

13   convicted and it's done?  Well, of course I understand

14   that.  I understand the law.  What I'm saying here is

15   they're going to be innocent before the process even

16   begins.

17             This memorandum clearly states to me that these

18   charges, these violations of the law aren't violations

19   of the law.

20        Q    It definitely -- show me where it says they're

21   not violations of law.  Point out that language and read

22   it out loud.

23        A    You want me to go back to the first paragraph

24   or --

25        Q    I want you to point out anyplace in that

Sheriff Chad Chronister
November 02, 2022

1   memorandum where --

2        A   Every single bullet --

3        Q   Let me ask my question.  Then you can answer.

4        A   Sorry.

5        Q   That will make it easier for her.

6            Point out, please, any place in this memorandum

7   where it says that a certain thing is not a violation of

8   the law.

9        A   I think if we look at each and every bullet

10  point.  There's a presumption of innocence for whatever

11  crime, offense the state attorney is talking about in

12  this memorandum.

13       Q   Let's look at Page 2.  There's a highlighted

14  sentence on Page 2.  It's in yellow highlighting.

15           Do you see that?

16       A   (Nodding head.)

17       Q   It begins with the phrase "In every case."

18           You're nodding your head.  That's yes.  Right?

19       A   Yes, sir.

20       Q   That's okay.

21           You didn't highlight that.  Right?

22       A   I didn't.

23       Q   Okay.  This is a copy that we got in hard copy

24  from the defendant in this case, Mr. DeSantis.

25           So just to be clear, you're not the one who

Sheriff Chad Chronister
November 02, 2022

```
 1    highlighted it.  Right?

 2         A    I'm not.

 3         Q    Someone did that on their end, presumably?

 4         A    Yeah.

 5         Q    Or maybe it was someone on your end?

 6         A    I thought it was you.

 7         Q    Yeah.  It wasn't me.  But I agree that sentence

 8    is important.  It's real, real important.

 9              It says -- this highlighted sentence says, "In

10    every case ASAs must exercise discretion based on the

11    facts of that case -- the nature and circumstances of

12    the offence, the defendants's criminal history or lack

13    thereof, victim input and other factors."

14              And then the next sentence says, "ASAs must

15    exercise that discretion at every stage from charging

16    through plea negotiation, trail and sentencing."

17              Do you see that?

18         A    Correct.

19         Q    Where in there does it say that a crime isn't a

20    crime or that something in this policy will never be

21    prosecuted?

22         A    There, it does -- it does not.

23         Q    Okay.  Where --

24         A    In this paragraph it does not.

25         Q    Okay.  So where in the memo does it say that?
```

Sheriff Chad Chronister
November 02, 2022

1        A    My contention is when you go back to Page 8

2    when he lists his examples of crimes that won't be

3    prosecuted, and the track record base since this memo

4    has been issued that these types of crimes aren't

5    prosecuted -- hence, why I'm stating to you that these

6    types of misdemeanor crimes aren't prosecuted in

7    Hillsborough County.

8        Q    Okay.  The cases you discussed with the

9    governor's office both before the suspension and

10   after --

11       A    Yes, sir.

12       Q    Are these the kinds of cases:  homelessness,

13   driving on suspended license, misdemeanor cases?

14       A    I don't -- I can't recall.

15       Q    Well, certainly the case you discussed at the

16   press conference wasn't a misdemeanor case.  Right?

17       A    That was not a misdemeanor.  No, sir.

18       Q    No.  That's a violent felony.  Right?

19       A    Right.

20            And you're asking about the cases sent to the

21   governor's office?

22       Q    Yeah.

23       A    I don't know what was in those cases.  I didn't

24   read them.

25       Q    Okay.  And prior to today had you read this

Sheriff Chad Chronister
November 02, 2022

1    whole memo?

2       A    I have.

3       Q    In the conversation with your chief deputy

4    around Christmas.  Right?

5       A    Correct.

6       Q    Okay.  Did any of you discuss the other

7    statements in the memo other than the examples?  Did you

8    discuss the -- the rest of the memo in your

9    conversation?

10      A    Correct.  We did.

11      Q    Okay.  What is it about the exercise of

12   prosecutorial discretion in every case, based on the

13   facts of the case, that you think is inconsistent with

14   the role of a prosecutor?

15      A    Repeat the question again.  What was the actual

16   question?

17         MR. CABOU:  Can you read the question back.

18      Thank you.

19         (The court reporter read back as requested.)

20      A    I don't take issue with discretion in the role

21   of a prosecutor.

22   BY MR. CABOU:

23      Q    Okay.  I mean, this memo is entitled

24   Prosecutorial Discretion and the M and then there's a

25   sticky note that covers Mission of Criminal Justice.

Sheriff Chad Chronister
November 02, 2022

```
 1              Do your officers exercise discretion?
 2         A    Yes, sir.
 3         Q    Okay.  Is there any type of offense that your
 4    officers, just generally speaking, don't -- don't stop
 5    people for?
 6         A    Not that I'm aware of.
 7         Q    Okay.  I don't know what the speed limit is on
 8    Dale Mabry.  Let's say it's 45.
 9              Do they pull over someone going 46?
10         A    They could.
11         Q    But do they?
12         A    I don't -- I don't know.  They could.
13         Q    Okay.  Did you ever work traffic enforcement?
14         A    I did.
15         Q    For how long?
16         A    As part of my being a deputy sheriff, within
17    the first couple years out on the road I did traffic
18    enforcement.
19         Q    Okay.  I mean, you're probably the only person
20    in the room that has actual hands-on law enforcement
21    experience.  I do not.  So I'm just trying to get your
22    perspective.  Okay?
23         A    Yes.
24         Q    Okay.  How many times did you see someone going
25    one or more miles over the speed limit?
```

Sheriff Chad Chronister
November 02, 2022

1        A    Generally not the -- not the type of behavior

2    you --

3            THE COURT REPORTER:  I'm sorry.  Can -- I could

4        barely hear you.

5            THE WITNESS:  I'm sorry.

6        A    How many times did I see someone doing one mile

7    an hour over the speed limit?

8    BY MR. CABOU:

9        Q    Like a bajillion.  Right?

10       A    Most likely.

11       Q    Okay.  Did you pull all those people over?

12       A    I did not.

13       Q    Why not?

14       A    Because --

15       Q    They're breaking the law.

16       A    Because there were always more egregious

17   offenders.  If you're going to dedicate your time, it

18   was the people that were doing -- traveling in his own

19   traffic enforcement that were the -- the bigger

20   violator.

21           MR. CABOU:  All right.  We've been going for a

22       little while.  Let's take a break.  Okay?  Thank

23       you.

24           THE VIDEOGRAPHER:  The time is 11:33 a.m.

25       We're off video record.

Sheriff Chad Chronister
November 02, 2022

```
 1              (Recess from 11:33 a.m. to 11:49 a.m.)

 2              THE VIDEOGRAPHER:  The time is 11:49 a.m.

 3       We're back on the video record.

 4    BY MR. CABOU:

 5       Q   Okay.  So before we took a break we --

 6              THE WITNESS:  The volume?  Still good with the

 7       volume?

 8              THE VIDEOGRAPHER:  Uh-uh.

 9              MR. CABOU:  Sorry.

10    BY MR. CABOU:

11       Q   Before we took a break we looked at Article 7,

12    which is this article about the drug treatment amnesty

13    program that you had.

14              Will you just tell me what that -- when that

15    program occurred and sort of how it worked?

16       A   When I initiated it?

17       Q   Yeah.  I mean, all I know is from this article.

18    So I'm just wondering if you could tell me, was it your

19    personal initiative?

20       A   In collaboration with the chief deputy, yes.  I

21    wanted to -- I wanted to do something.  I wanted to do

22    something to make it easier for the people to get help.

23       Q   Okay.  And how long did the program last?

24       A   It's still -- it's -- it's a continuous

25    program.
```

Sheriff Chad Chronister
November 02, 2022

```
 1        Q    Oh, okay.  Thank you.

 2        A    Yeah.

 3        Q    So how does that work?

 4        A    Once it's launched it's still -- they could go

 5   right now.

 6        Q    Okay.  So like where do they go?

 7        A    They go to any of our substations.  Good

 8   question.  We split the -- we split the county up into

 9   five separate divisions.  They can go to any one of

10   those local sheriff's office substations and turn in

11   whatever illicit narcotic, whether it's a prescription

12   drug, whatever it is, and we will give them a ride to

13   any type of care facility.

14        Q    And what happens to the illicit narcotics?

15        A    We seize it and destroy it.

16        Q    Okay.  So someone comes with, you know,

17   whatever -- 8 ball of crack.  They turn it in.  They go

18   get treatment.  And then you just destroy the crack.

19   Right?

20        A    Correct.

21        Q    Okay.  Do you hold it as evidence?

22        A    We do not.

23        Q    It goes right to destruction?

24        A    Which still takes some time.  But, yes.  I

25   don't want you to --
```

Sheriff Chad Chronister
November 02, 2022

1        Q    Oh, no.  I understand.

2        A    I don't want you to feel like it's immediate.

3    Within a couple of days.  Yes.

4        Q    Okay.  What if they show up with a kilo of

5    cocaine?  Like it's wrapped up.  It's a brick and they

6    show up.  What happens then?

7        A    Same thing.  Certainly I would hope that more

8    questions would be asked.  But if they're coming in and

9    saying, "I need help," and they're turning it in, we

10   would take it and get them the help that they need.

11            There's no quantitative measurement for who we

12   would help or who we wouldn't help.

13       Q    A kilo of Fentanyl.  Same thing?

14       A    Yeah.  I would hope they would use a little

15   more discretion.  There would be enough to kill a lot of

16   people, and we wouldn't want a lot of people handling

17   that.

18            But the same -- same type of measurements --

19   same type of protocol.

20       Q    Okay.  So anybody can show up with a kilo of

21   Fentanyl and give it to your officers, your deputies,

22   and they would not be charged with a crime?

23       A    They would not be charged with a crime.  I

24   certainly hope they would ask more questions.  I think

25   they're -- they would be smart enough to determine who

Sheriff Chad Chronister
November 02, 2022

```
 1    is an addict and who is a dealer.

 2              I find that scenario that you're asking highly

 3    unlikely.

 4         Q    Yeah.  So I do too, sir.

 5              But the point is that the only way to get to

 6    the outcome there is to exercise discretion.  Right?

 7         A    Correct.  Yeah.

 8         Q    Okay.

 9         A    It goes back to what we were talking about

10    earlier, and that's the intent.  You have to have the

11    intent there.

12         Q    Okay.  Sir, continuing on a theme -- actually,

13    before we leave this amnesty program, did you talk with

14    the state attorney's office about this program?

15         A    I don't believe I did.  No.

16         Q    Well, you were -- so you made a decision that

17    people wouldn't even be referred for prosecution to the

18    state attorney's office if they showed up with illicit

19    drugs at one of these amnesty centers.  Right?

20         A    And asked for help.

21         Q    Okay.

22         A    Correct.

23         Q    What if they didn't get the help?

24         A    You mean if they left the facility?

25         Q    Sure.
```

Sheriff Chad Chronister
November 02, 2022

```
 1        A    I'm not sure what the question is.

 2             Would we go back and try to prosecute them?

 3        Q    Correct.

 4        A    No.

 5        Q    So you're not really holding them accountable.

 6   Right?

 7        A    Yeah.  We're holding them accountable.  They

 8   want to get treatment.  Whether they stay there or the

 9   treatment works, certainly we can't hold them to that

10   degree of accountability.

11        Q    Okay.

12        A    It would be impossible.

13             MR. CABOU:  Are we on 8, Exhibit 8?

14             All right.  Let's look at Exhibit 8.

15             (Exhibit 8 marked for identification.)

16             THE WITNESS:  Thank you.

17   BY MR. CABOU:

18        Q    Exhibit 8 is a press release from your office

19   that we took from the internet and it says "HCSO

20   announces changes to the juvenile arrest avoidance

21   program."

22             Do you see that?

23        A    I do.

24        Q    Is this -- are you familiar with this press

25   release?
```

Sheriff Chad Chronister
November 02, 2022

1        A    I'm not familiar when this happened.  I haven't

2    read the whole entire press release, but --

3        Q    That's okay.

4             Is that -- there's a photograph on the front

5    page of Exhibit 8.

6             Is that you at the podium?

7        A    It is.  Yes, sir.

8        Q    Okay.  And then standing behind you are a

9    number of other officials.  Right?

10       A    Correct.

11       Q    And standing two to your -- to the left of the

12   photo is State Attorney Warren.  Right?

13       A    Correct.

14       Q    And this -- is this in the same room that you

15   held the governor's suspension press conference?

16       A    It is.  Yes, sir.

17       Q    Okay.  What was the purpose of this press

18   conference?

19       A    To announce our expansion of the juvenile

20   arrest avoidance program.

21       Q    Tell me what that program is, sir.

22       A    It is a program when a juvenile commits a

23   low-level misdemeanor that we will put them into some

24   type of diversion program versus saddling -- saddling

25   them with a criminal history and involving them in the

Sheriff Chad Chronister
November 02, 2022

1    criminal justice system.

2        Q    Is it a non-prosecution policy for these?

3        A    Yes.  If -- if they complete it, correct.  If

4    they complete the program, correct.

5        Q    Okay.  The program was started under a prior

6    sheriff, Sheriff Gee.  Right?

7        A    The initial program was.  Yes.

8        Q    And you've -- you've continued it?

9        A    I expanded it several times.

10       Q    Okay.  Tell me about the expansion.

11       A    The first time included a round of additional

12   offenses.  And then at the -- the final -- final

13   revision that I implemented was all low-level nonviolent

14   misdemeanors.

15           And it also included family violence.  We

16   changed that to include family violence where the

17   individual, the aggressive child, would go right to

18   respite care.

19       Q    I'm just curious.  What is respite care?

20       A    Right to a facility.  At Lake Mag it's a

21   juvenile facility where they would go and get immediate

22   counseling, any type of help that they would need.  And

23   at the same time we wouldn't have to worry about the

24   violence continuing.

25       Q    Okay.  My understanding is that other police

Sheriff Chad Chronister
November 02, 2022

1    agencies in Hillsborough County are part of this

2    program.  Is that correct?

3         A    Correct.

4         Q    The Tampa Police are part of the program?

5         A    Yes.

6         Q    Temple Terrace?

7         A    USF, Airport, Plant City.  All the other

8    municipal chiefs agreed to sign on it too.  Correct.

9         Q    Okay.  Did anyone express concern about like

10   letting people get away with crime?

11        A    No.  This isn't letting someone get away with

12   crime.  This is just putting them into a diversion

13   program.

14        Q    Okay.

15        A    There's still accountability.  A diversion

16   program still allows for accountability.

17        Q    But they're not prosecuted.  Right?

18        A    They're not prosecuted.  Correct.

19        Q    This program is still ongoing.  Right?

20        A    Yes, sir.

21        Q    Did you discuss this program with the

22   governor's office at any time?

23        A    This program?

24        Q    Yeah.

25        A    No, sir.

Sheriff Chad Chronister
November 02, 2022

1      Q   Well, it's a program whereby people commit

2   crimes and then are not prosecuted for it.  Right?

3      A   If they complete the diversion program they're

4   not prosecuted for it.  There's still accountability.

5   Yes.

6      Q   So there's facts and circumstances that weigh

7   into the decision in every case whether they get

8   prosecuted or not?

9      A   No.  There's no facts or decisions that -- that

10   would play into it.

11        The deputy at the time of this person

12   committing the offense makes a decision whether to enter

13   them into the program or not.  And that decision is

14   based on if they had been arrested for and prosecuted

15   for a crime prior to this.

16      Q   Okay.  But if this program didn't exist that --

17   that offender could be prosecuted.  Right?

18      A   Yes.

19      Q   Okay.  So isn't that you and your deputies

20   deciding who gets prosecuted and who doesn't?

21      A   To a degree.  Yes.

22      Q   Okay.  Do you think that that means you should

23   be suspended from office?

24      A   No, sir.

25      Q   But you're not faithfully upholding the law.

Sheriff Chad Chronister
November 02, 2022

1          A    I am faithfully upholding the law.

2               What I'm saying is I'm not -- I'm not -- I'm

3     still recognizing the fact that this person committed a

4     crime.  I'm still holding this individual accountable.

5               They go into a diversion program.  Upon

6     successful completion they're not prosecuted for that

7     crime.  So there's still accountability.

8               Committing a violation of the law -- I think

9     it's important to still have accountability.  These

10    diversion programs still allow for accountability.  It's

11    not like it just had never happened.

12         Q    Okay.  But that's not what the law says.

13    Right?  That's just what you and your fellow law

14    enforcement agencies have determined as a matter of

15    policy is best for the citizens of Hillsborough County.

16    Right?

17         A    Correct.  You're still acknowledging, you're

18    not overlooking, you're not deciding which laws are

19    enforceable or not.  You're just allowing for a

20    diversion.  You're saying that there's other options

21    versus being involved in the criminal justice system or

22    being prosecuted to -- to protect statutes.  The

23    statutes allow for diversion programs for low-level

24    misdemeanors.

25         Q    Okay.  And State Attorney Warren is in this

Sheriff Chad Chronister
November 02, 2022

1     picture with you.  Right?  He supports this program?

2          A    He supported it.  Yes.

3          Q    Yeah.  Okay.

4               MR. CABOU:  Okay.  I'm going to mark Exhibit --

5          I'm going to ask the court reporter -- excuse me --

6          to mark for identification Exhibit 9.

7               (Exhibit 9 marked for identification.)

8               MR. CABOU:  I'm going to keep one.  Sorry.

9               THE WITNESS:  I have to make sure I can give

10         all these back to you.  You've got the special ones.

11              MR. CABOU:  She'll -- she'll -- I would say you

12         stand a greater chance than most of making off with

13         them, but I also think she'll at least ask.

14    BY MR. CABOU:

15         Q    I've handed you what's been marked as

16    Exhibit 9.  It's an article from the "Tampa Bay Times"

17    from 2018, January 31st, 2018.  It's a press

18    conference -- it's an article about a minor offender

19    program.

20              And I believe the photo is you at a podium.  Is

21    that right?

22         A    It is.

23         Q    And just to be clear, is State Attorney Warren

24    in this photo?

25         A    Yes, sir.

Sheriff Chad Chronister
November 02, 2022

1      Q    He's right over your left shoulder.  Right?

2      A    Yes, sir.

3      Q    Okay.  Tell me what this press conference was

4   for.

5      A    Well, the juvenile program was working so well

6   with a low recidivism rate.  So I said why not implement

7   one for -- for adult offenders that commit low-level

8   offenses who still make these mistakes.

9           Again, so it's -- it's a similar program.  Just

10   the programs, diversion programs are targeted towards

11   adults who commit low-level misdemeanors.

12      Q    Okay.  So this is a program.

13           Who -- were you the -- sort of the impetus

14   behind this?

15      A    I was.

16      Q    Okay.  Was State Attorney Warren supportive?

17      A    He supported it.  Yes.

18      Q    And together, along with other law enforcement

19   leaders in the county, you-all instituted a diversion

20   program for low-level misdemeanor adult offenders.  Is

21   that correct?

22      A    Correct.

23      Q    Okay.  These are all -- the -- the participants

24   in the program -- in other words, the -- the offenders

25   themselves -- all people that broke the law.  Right?

Sheriff Chad Chronister
November 02, 2022

1       A    Correct.

2       Q    And then pursuant to this program it was

3  presumed that there would be no prosecution of these

4  people.  Right?

5       A    If they successfully complete diversion

6  programs, yes.

7       Q    This program allows eligible offenders to avoid

8  arrest.  Right?

9       A    It does.

10      Q    What does -- what's the name of this program?

11           If you want to refresh your recollection,

12  perhaps I can point you to Page 2 of the article and

13  maybe the second paragraph in.  And if that refreshes --

14      A    Yes.

15      Q    -- your recollection --

16      A    Arrest diversion program.  There's a fancy

17  acronym I was trying -- I apologize.

18      Q    So what's the name of the program, Sheriff?

19      A    It's the Adult Pre-Arrest Diversion Program.

20      Q    Okay.  So it allows eligible offenders to avoid

21  arrest.  Right?

22      A    Yes.

23      Q    It's an exercise of discretion by the deputy at

24  the time of the potential arrest.  Right?

25      A    Correct.

Sheriff Chad Chronister
November 02, 2022

1          Q    How is this different than the -- the bike stop

2     policy that the state attorney's office has?

3          A    The -- great question.   This still allows for

4     accountability.   It's not like it never happened.   The

5     crime still occurred.   They successfully complete the

6     diversion program and they're not prosecuted for

7     committing that offense.

8               The memorandums that we receive from the state

9     attorney's office say there will be no bicycle stops.

10    They won't prosecute bicycle stops or pedestrian stops,

11    either one.

12              So in essence, we can't do bicycle stops or

13    pedestrian stops.   If there's something -- some crime

14    subsequent to that bicycle stop, the charges will be

15    dismissed.

16         Q    All right.   Let's talk about the bike stop

17    policy because I don't think it says that.   But I've

18    been wrong before.

19              MR. CABOU:   This is going to be Exhibit 10 to

20         your deposition.   It was previously marked just

21         for the spelling on it -- previously marked as

22         Exhibit 8E as in Edward to Ms. Pushaw's deposition.

23         (Exhibit 10 marked for identification.)

24    BY MR. CABOU:

25         Q    Sir, I've handed you a policy of the state

Sheriff Chad Chronister
November 02, 2022

1    attorney's office from Mr. Warren that's marked as

2    Exhibit 10 to your deposition.  And it says "Policy

3    regarding prosecution of cases based on pedestrian and

4    bicycle violations."

5            Do you see that?

6        A   Yes, sir.

7        Q   Are you familiar with this policy?

8        A   I am.

9        Q   Okay.  Where does it say in here that they will

10   not prosecute bike stop cases?

11       A   "In reviewing this category of cases, an area

12   of focus that has emerged involves a subset of cases

13   involving bicycle and pedestrian stops where the only

14   charge resulting from the stop is resisting arrest

15   without violence.

16           "Of the resisting arrest without violence cases

17   referred to our office in which a bicycle or pedestrian

18   violation was the" only -- "was the reason for the

19   initial contact, 71 percent involved Black defendants."

20           That wasn't the paragraph I was referring to.

21           Here we go.  It's on the second page.  "Filing

22   police {sic} regarding cases beyond bicycle or

23   pedestrian violations."

24           THE WITNESS:  I'm sorry I have to read all this

25   to you.

Sheriff Chad Chronister
November 02, 2022

```
 1        A   "For any case referred to our office arising

 2    out of a stop exclusively for a bicycle or pedestrian

 3    violation, there is a presumption that our office will

 4    not file charges against the defendant.  This policy is

 5    based on our determination that prosecuting offenses

 6    resolving {sic} from some stops has a limited impact on

 7    public safety."

 8             I don't know if the rest is relevant.

 9        Q   Why don't you finish the sentence?

10        A   -- "impact on public safety as most such

11    offenses are low-level, nonviolent and has a disparate

12    impact on Black bicyclists and pedestrians."

13        Q   Okay.  Thank you.

14             That doesn't say they won't prosecute anything.

15    It says there's a presumption.  Right?

16        A   I think it's pretty clear that our office will

17    not file charges against the defendant.

18        Q   The beginning of that sentence is, "There is a

19    presumption that our office will not file charges."

20    Right?

21        A   Yes.

22        Q   What's a presumption, Sheriff?

23        A   A presumption would be the likelihood that

24    something is going to occur or not occur.

25             So my interpretation of this statement is,
```

Sheriff Chad Chronister
November 02, 2022

1     "We're not going to file charges against the defendant

2     due to bicycle or pedestrian stops."

3          Q    Well, it doesn't say "due to."  It says

4     "exclusively for bicycle and pedestrian violation."  But

5     I think I get your gist.

6               What does the next paragraph say?

7          A    The reason that he's making this statement.

8          Q    Why don't you read that out loud.

9          A    The second sentence?

10         Q    The second paragraph.  It starts with the word

11    "If."

12         A    Ob, okay.  I'm sorry.

13              "If, based on the facts and circumstances of

14    the case, the public safety needs of the community

15    outweigh the presumption to not file the case, the

16    charge may be filed with the approval of a supervisor.

17    The reason for the" exemption -- "exception and the

18    supervisor's approval is to be documented in this file.

19              "This exception should be reserved for cases

20    that pose a direct threat to public safety, such as

21    where an individual has suffered physical harm or where

22    a forearm is involved."

23         Q    Okay.  And then the last sentence in the last

24    paragraph says, "This policy does not apply to arrests

25    that arise out of a criminal violation independent from

Sheriff Chad Chronister
November 02, 2022

1    the bicycle or pedestrian stop, even if the defendant is

2    ultimately apprehended while riding a bicycle or

3    violating pedestrian laws."  Right?

4        A    That's what it says.

5        Q    Okay.  So would you agree with me that the

6    policy sets forth a number of circumstances in which

7    bicycle and pedestrian cases are still prosecuted?

8        A    I hear what you're saying.

9             What I'm saying is based on this policy, there

10   are no bicycle stops or pedestrian that are prosecuted.

11       Q    Okay.  Well, would it surprise you to know that

12   there are actual cases of bicycle and pedestrian stops

13   that were prosecuted after the date of this memo?

14       A    That would surprise me.  Yes.

15       Q    Okay.  Would that change your view about

16   whether this is in all cases blanket policy?

17       A    It would not.

18       Q    What would change your view?

19       A    At this point?

20       Q    Yeah.

21       A    Based on what had occurred with this historical

22   information that he puts out this memo and bicycle stops

23   and pedestrian stops are not being prosecuted?

24            I don't if there's anything that -- that would

25   change my mind.

Sheriff Chad Chronister
November 02, 2022

1        Q    Okay.  So this is -- this is -- in your mind,

2    this is a breach of Mr. Warren's duty as a prosecutor?

3        A    Yes.  I believe this is a policy.  It even goes

4    back to your speed limit discretion:  one mile per hour

5    over.  Yes.

6             But if I issued a memorandum and I could put

7    some language in here and say that -- that I'm not

8    enforcing violations of speed limits anymore, would that

9    still be discretion?

10       Q    Okay.  So let's follow up on that.

11       A    Uh-uh.  Yes.

12       Q    If you issued a memorandum that said -- an

13   internal memorandum that said -- an internal memorandum.

14   Right?  I mean, maybe you could get it through a 119

15   request, but it's an internal directive to your

16   deputies.  Okay?

17            And it says "From Sheriff Chronister to all

18   patrol deputies."  Okay.  "We're short-staffed," which I

19   assume that you, like other law enforcement agencies

20   across the country are short-staffed?

21       A    Yes.

22       Q    Okay.  "We're short-staffed.  Our office is

23   focused on violent crime and other major priorities."

24            Would you agree me that violent crime is a

25   focus of your office?

Sheriff Chad Chronister
November 02, 2022

1        A    Correct.  Yes.  Always.

2        Q    Okay.  "So our office is short-staffed.  Focus

3    on violent crime.  And therefore, to make sure the

4    deputies are focused on the things that have the

5    greatest impact on public safety, we are not going to

6    conduct any vehicle stops where the only offense is

7    going between one and ten miles over the speed limit."

8             Would that directive to your staff, your

9    deputies violate your duty to uphold the law?

10       A    It would.  I would find that negligent.

11       Q    Okay.  But isn't that what they do anyway?

12       A    Based on what data?  I don't understand.  What

13   do you mean "that's what they do"?

14       Q    I thought we discussed earlier that people

15   going, you know, one mile, two miles, three miles, four

16   miles, say five miles over the speed limit -- very

17   unlikely to get pulled over.

18       A    What I'm saying is one mile per hour is still a

19   violation.  They could pull them over.  Is that the

20   likelihood?  No.

21            But to issue a memorandum saying that, "Anyone

22   who violates the speed limit law between one and ten

23   miles per hour, I will not -- I'm -- I'm going to

24   instruct -- I'm going to give you a presumption of

25   innocence in that we're not going to issue citations,"

Sheriff Chad Chronister
November 02, 2022

1    what if that ten miles per hour over or five miles per

2    hour is in your neighborhood where the speed limit is

3    15 miles an hour?  I think we would feel different.

4         Q    Okay.  Let's say it was -- let's say the policy

5    was between one and three miles an hour.  You've issued

6    a written policy that says, "For all the reasons we

7    talked about -- priorities, manpower and public

8    safety -- we're not going to pull people over where the

9    principal offense and the reason for the stop is

10   speeding from one to three miles an hour."

11             Would that be okay?

12        A    No.  It would not be okay.

13        Q    But that's what they do anyway.  Right?

14        A    Not necessarily.  It depends on the

15   circumstances.

16        Q    Under what circumstances would a deputy pull

17   someone over whose only offense is going one mile an

18   hour over the speed limit?

19        A    You're asking me to speculate.

20             What if they -- what if the driver is impaired

21   and they're doing three over or --

22        Q    Then that's not the offense then because

23   they're impaired.

24        A    What you're saying is you want me to instruct

25   my deputies as the sheriff saying that that's not a

Sheriff Chad Chronister
November 02, 2022

1    violation of the law.  I could never do that.

2        Q   That's not what this says.  It doesn't say it's

3    a violation of the law.  It says, "In an exercise of

4    prosecutorial discretion we're not going to enforce by

5    filing charges."  It doesn't say it's not a violation of

6    the law.  It doesn't say that.

7        A   It says he's not going to prosecute those

8    cases.

9        Q   Isn't that the same as you not arresting

10   someone for showing up with a bag of Fentanyl?

11       A   No.  You're trying to compare apples and

12   oranges.

13           This is an addict that comes forward.  This

14   isn't something that we had effected arrest on, part of

15   our investigation.  This is someone, an addict coming

16   and asking for help.

17           It's difficult to compare that to, "Hey,

18   listen.  Bicycle stops and pedestrian stops are illegal

19   in Hillsborough County.  We're not going to file those

20   charges."

21       Q   It doesn't say they're illegal.

22       A   Well, if you say they're not prosecuting and

23   you're a prosecutor sworn to prosecute this -- these

24   types of offenses and you're saying you won't prosecute

25   them, and evidence that I've seen shows that they're not

Sheriff Chad Chronister
November 02, 2022

1    prosecuting any type of pedestrian or bicycle stops, I

2    would feel much differently.  I wouldn't believe that

3    that is discretion.

4         Q    Why?

5         A    Because you're issuing a memorandum.  Same --

6    same thing --

7         Q    So it's written down?

8         A    -- back to the -- back to the speed limit?

9         Q    What if -- what if --

10        A    If I instruct my deputies not to enforce anyone

11   who breaks the speed limit one to three miles per hour,

12   I think I'm being negligent.

13             I didn't create the law.  There has to be

14   separation of powers.  The legislators say, "This is a

15   violation and this is how you enforce those -- those

16   violations."

17             How could I just be a person as a -- as a

18   constitutional officer saying that these aren't --

19   speeding one to five is not illegal anymore, it's not

20   illegal, it's not a -- it's not a violation?  Even

21   though it's a civil infraction, it's not a violation

22   anymore.  I would be negligent.  I don't have that type

23   of flexibility.

24        Q    But, Sheriff, don't we agree that people aren't

25   pulled over for going one to five over?

Sheriff Chad Chronister
November 02, 2022

 1        A    In most cases I am conceding to that.

 2        Q    Okay.  So --

 3        A    But I'm not issuing a memorandum saying that

 4    they can't.

 5        Q    Okay.  So the -- so the issue for you in your

 6    judgment is the memorandum.  It's -- it's putting it on

 7    paper and saying it out loud?

 8        A    And -- and notifying other law enforcement

 9    agencies that you're not going to -- there's a

10    presumption of innocence that you're not going to

11    prosecute these types of cases.  In essence, you're

12    telling law enforcement that bicycle stops and

13    pedestrian stops aren't going to be prosecuted.  And --

14    and -- and they haven't.

15        Q    Okay.  So Exhibit -- Exhibit 7 -- right? -- is

16    the one about the -- yes.  Exhibit 7 is the one where

17    you announce and had a big presser and -- and media

18    splash about it -- not arresting people in possession of

19    narcotics.  Right?

20             MR. AARON:  Object to form.

21    BY MR. CABOU:

22        Q    You can still answer.

23        A    I didn't hear what he said.

24        Q    He said "object to form," which is -- you know,

25    that's just his thing.

Sheriff Chad Chronister
November 02, 2022

```
 1        A    One thing I would ask you to concede to is

 2    these people that are in possession of drugs that come

 3    into our office wanting to relinquish their drugs in

 4    turn of getting some help.

 5        Q    Okay.  Sure.  I concede that.  But let's get

 6    back to my question.  Okay?  Okay.

 7        A    Well, you keep omitting that one part that --

 8        Q    Well, they're my questions to ask, Sheriff.

 9    Okay?

10        A    All right.  That's true.

11        Q    The record is clear about what your program is.

12    And, I mean, for whatever it's worth, I think it's a

13    great program.  Okay?  Because we shouldn't be arresting

14    people for being addicted to substances.  Okay?

15        A    I agree.

16        Q    I'm with you on that.

17        A    We agree.

18        Q    But everyone has a job to do.  Okay?

19            This is a program -- the program in

20    sheriff's -- described in Exhibit 7 is a program where

21    people come in in possession of illegal narcotics and

22    they are not arrested.  Correct?

23        A    Correct.

24        Q    Okay.  And the program announced in Exhibit 8

25    is a program where juveniles who commit certain
```

Sheriff Chad Chronister
November 02, 2022

1    low-level offenses are not arrested.  Correct?

2         A    Correct.

3         Q    And the program announced in Exhibit 9 is a

4    program where adults who commit certain low-level

5    offenses are not arrested.  Correct?

6         A    Yes, sir.

7         Q    Okay.  Now, in the cases discussed in the bike

8    stop policy that's Exhibit 10 these people were

9    arrested.  Right?

10        A    Yes.

11        Q    It's just that they weren't prosecuted?

12        A    Correct.

13        Q    Okay.  So you think it's okay to not even

14   arrest someone for possessing Fentanyl, but it's okay

15   and, in fact, expected that you're going to arrest

16   someone for sleeping on a business's parking lot and

17   they have to be prosecuted; otherwise, Mr. Warren isn't

18   doing his job?

19             MR. AARON:  Object to form.

20        A    Yes.  I think you're trying to compare apples

21   and oranges.

22             With the diversion programs there's still

23   accountability.  If you issue a memorandum that you're

24   just not prosecuting certain laws, then you're deeming

25   which laws are lawful or unlawful.

Sheriff Chad Chronister
November 02, 2022

```
 1    BY MR. CABOU:

 2        Q   When did you first decide that?  When did you

 3    first come to the belief -- and you've expressed many

 4    times and I believe it's sincere.

 5            When did you first come to believe that a

 6    prosecution policy could amount to something improper,

 7    something that was in a -- was a breach of a

 8    prosecutor's duty?

 9        A   You mean with Mr. Warren?

10        Q   I mean in general.  If it was with Mr. Warren,

11    which it may be, then that's fine.  But in general I'm

12    trying to understand your thinking about this because

13    I -- it's hard for me to square what you're doing with

14    your vigorous objection to what Mr. Warren is doing.

15            So when did you first come to believe that a

16    prosecutor violates their duty?

17        A    If they issue policies that say they won't

18    prosecute certain crimes?

19        Q   Uh-uh.

20        A   You're asking me when I came to that

21    conclusion?

22        Q   I am, sir.

23        A   When memorandums -- quite honestly, when these

24    memorandums started coming out with him making

25    declarations that he wasn't going to prosecute certain
```

Sheriff Chad Chronister
November 02, 2022

1    crimes.

2        Q    Okay.  I mean, again, it was certain crimes in

3    certain circumstances.  Right?

4        A    And when it came to my attention in some of the

5    cases that you have copies of where there was no valid

6    reason for a person to not be prosecuted, some of them

7    violent offenders.

8        Q    Okay.  In the cases of violent offenders where

9    you believe there was no valid reason for not

10   prosecuting them, did you discuss that with anyone at

11   the state attorney's office?

12       A    I did not.  That doesn't mean they weren't

13   discussed, but I did not personally call Andrew Warren

14   and discuss it with him.

15       Q    Did you call Andrew Warren at any time prior to

16   his suspension to say, "Hey, I've been squealing to the

17   governor's office on you"?

18       A    Squealing to the governor?

19           MR. AARON:  Object to form.

20       A    I didn't contact Andrew Warren and told {sic}

21   him he was under investigation, review, whatever you may

22   call it, by the governor's office.  I did not.

23   BY MR. CABOU:

24       Q    Okay.  You didn't tell him you'd been providing

25   information to Mr. Keefe.  Correct?

Sheriff Chad Chronister
November 02, 2022

```
 1        A    No, sir.

 2        Q    You didn't tell him that you had spoken with

 3   Mr. Keefe.  Correct?

 4        A    No, sir.

 5        Q    You didn't ask him for his view of the cases

 6   and materials you provided to Mr. Keefe.  Correct?

 7        A    I did not.

 8        Q    Why not?

 9        A    I wasn't the one that was investigating State

10   Attorney Warren or considering suspending him.  I

11   wouldn't -- I wouldn't do that.

12        Q    Why?

13        A    It wasn't my investigation.

14        Q    Well, I understand.  But there was nothing

15   prohibiting you from calling Mr. Warren and saying like,

16   "Hey, I think, you know, you should know that I've been

17   asked to do this and, you know, you might want to weigh

18   in."

19        A    I don't think that's my fiduciary

20   responsibility.  When I was asked to provide a certain

21   task, provide cases of this lack of prosecution and

22   memorandums that I discussed.  So my involvement was to

23   provide that information, and that's what I did.

24        Q    Did you say it wasn't your fiduciary

25   responsibility?
```

Sheriff Chad Chronister
November 02, 2022

```
 1        A    Correct.  It wasn't --

 2        Q    What do you mean by that?

 3        A    It wasn't my responsibility to -- to call any

 4   target of any type of review or investigation and inform

 5   them that they may be a target of the investigation or

 6   the fact that what -- what my involvement was during the

 7   time.

 8        Q    Is that because you wanted Mr. Warren to lose

 9   his job?

10        A    No.  It wasn't my decision to be made.

11        Q    Are you glad he's not the state attorney right

12   now?

13        A    I don't know if I can say I'm glad.  I think a

14   lot of the people in my office are refreshed the fact

15   that their hard work won't go unnoticed and there will

16   be people held accountable for the crimes for

17   committing.

18             So I can't say I'm glad.  I would never want to

19   see anybody lose their job.  I would be far from glad.

20        Q    You think that Mr. -- Mr. Warren -- this isn't

21   his first job as a prosecutor.  Right?  You know that.

22   Right?

23        A    Yes.

24        Q    Okay.  He was a federal prosecutor for many

25   years?
```

Sheriff Chad Chronister
November 02, 2022

1      A   (Nodding head.)

2      Q   Locked up a lot of guys?

3      A   I don't know that.  I don't -- that, I don't

4  know.  I know he was a federal prosecutor.  I can't

5  speak on his track record.

6      Q   Okay.  It's not like he came to this job

7  suddenly and this is his first gig as a prosecutor.

8          Can we agree on that?

9      A   Correct.  I don't -- I don't -- yes.

10     Q   Okay.  Did you ever tell Mr. Warren, "I am very

11  upset that your office is not holding criminal offenders

12  responsible"?

13     A   We've had those discussions at some lunches and

14  some other interactions.  We've had those discussions

15  several times.

16     Q   Okay.  In what context?  Like do you remember

17  what brought it?

18     A   It depended on the case.  It depended on the

19  lack of prosecution.  I even responded back to his bike

20  memo.  I sent a memo back to him expressing my concern

21  for public safety because you've taken another tool away

22  from us.

23     Q   Okay.  I want to talk about that memo.  I'm not

24  sure we should do it now.

25          Okay.  Let's -- let's stick with the bike stop

Sheriff Chad Chronister
November 02, 2022

1    policy.

2          Do you -- do you know what -- what I'm talking

3    about when I say biking while Black?

4      A    Yes.  That's a term that's used because the

5    Tampa Police Department was found to disproportionately

6    ticket African-American individuals who were operating

7    bicycles.

8      Q    Okay.  And in the bike stop policy that's

9    Exhibit 10 one of the things you read out loud was that

10   of the certain type of cases, 71 percent involved Black

11   defendants.  Right?

12     A    Correct.

13     Q    Okay.  Would you agree with me that arresting a

14   disproportionate number of Black bicyclists is a bad

15   thing?

16     A    If they were targeted solely based on race, I

17   would say it's a bad thing.

18     Q    Okay.  The justice department -- well, there

19   was an investigation by the "Tampa Times" and then

20   subsequently an investigation by the justice department

21   that found that in Hillsborough County this was exactly

22   what was happening -- right? -- that bicyclists --

23     A    In the City of Tampa, just to clarify.

24     Q    Sure.  Yes.

25          But that's -- that's part of Hillsborough

Sheriff Chad Chronister
November 02, 2022

1    County.  Right?

2         A    Yes.  Because we can't -- I can't speak for --

3    I can only speak for our agency.  In our agency the

4    numbers were not even close to being reflective of these

5    numbers.

6         Q    Okay.  Did you or someone at your direction

7    undertake a review of the data to determine what

8    percentage of defendants stopped for a bicycle violation

9    were Black?

10        A    Yeah.  Not just bicycle stops but overall

11   traffic stops, period.  I wanted to know all that.

12        Q    Okay.  What did you find?

13        A    That we weren't disproportionately targeting

14   African-Americans or any other type of minority, whether

15   it was bicycle stops or traffic-related stops --

16        Q    Okay.

17        A    -- or pedestrian stops too.

18        Q    Okay.  Do you know if most of the bicycle stops

19   within Hillsborough County are within the City of Tampa?

20        A    They were.

21        Q    Okay.  So do you know -- do you have any

22   idea -- and it's fine if you don't because I literally

23   don't.  But do you have any idea what percentage of

24   bicycle stops in the county occurred in the City of

25   Tampa?

Sheriff Chad Chronister
November 02, 2022

```
1          A   I would say a large majority of them, but I

2     wouldn't be able to provide you the percentage.  No.

3          Q   Okay.  Fair.

4               So how many bicycle stops that were stops by

5     your deputies are actually impacted by this policy?

6          A   I don't know.

7          Q   Like in a given year, how much -- how many

8     bicycle stops would you guess are impacted by

9     Mr. Warren's policy stated in Exhibit 10?

10         A   It's hard to quantify because they weren't

11    allowed to do that.

12         Q   No.  No.  No.  No.  That's not what this says,

13    sir.

14              This says they're not going to prosecute where

15    the initial contact involves a bicycle or pedestrian

16    stop.  It does not say they're not allowed to arrest

17    them.  In fact, the only way to make a decision about

18    prosecution is after an arrest.

19         A   And what I'm communicating to you is a lot of

20    times deputies take this policy -- why would they waste

21    their time if they know that, "I'm going to go put forth

22    this effort and it's not going to be prosecuted anyway,

23    whether I stop a pedestrian or a bicyclist"?  Why would

24    they waste their time?

25         Q   Well, I don't know why they wouldn't enforce a
```

Sheriff Chad Chronister
November 02, 2022

1    given violation.  That would be up to them.

2        A   Knowing that it would be dismissed immediately?

3        Q   That's not what this says either.

4            It says that, "Under certain circumstances

5    we're going to dismiss it and other circumstances we're

6    going to prosecute it."

7            And the presumption, because of all these

8    reasons, including a disproportionate impact on Black

9    defendants -- the presumption is that for stops that are

10   only about bicycles.

11       A   So why do it?

12       Q   I don't know.  You'd have to ask them.

13       A   Well, no.  I'm -- I'm disagreeing with you.

14           You're saying for any case referred to our

15   office, referring {sic} out of a stop exclusively for a

16   bicycle or pedestrian violation, there's a presumption

17   that our office will not file charges against the

18   defendant.

19           So why would our deputies waste our time, waste

20   their time in the normal course of their duties stopping

21   a bicycle or a pedestrian violation knowing that it's a

22   waste of time, it's a waste of effort, it's a waste of

23   all their work because it won't be prosecuted?

24           So I believe my interpretation of this memo is

25   much different than yours.

Sheriff Chad Chronister
November 02, 2022

```
 1        Q    Okay.  And the memo speaks for itself.  The

 2   court will decide what it says and doesn't say.  But

 3   here's my question.

 4            Where the -- the primary violation was just a

 5   bicycle violation -- right?  Let's say riding on a

 6   sidewalk.  Right?  Riding your bike on a sidewalk is a

 7   bicycle violation -- right? -- because you've got to

 8   ride in the street.

 9        A    Correct.

10        Q    So wasn't it always a waste of time to stop

11   people from riding their bike on the sidewalk just like

12   it's a waste of time to stop people driving one mile an

13   hour over the speed limit?

14        A    Not necessarily.

15        Q    So what are the circumstance under which it's

16   not a waste of time?

17        A    Well, the -- the largest investigative tool,

18   crime-solving tool that we have in law enforcement is

19   traffic stops.  And that traffic stop could be on a

20   bicyclist, whether the person has a warrant, whether the

21   person is holding narcotics, whether the person --

22   whatever the case may be.

23            So there's a lot of scenarios where it would be

24   relevant whether they're able to make the stop or not.

25        Q    And it's not a waste of time because you're not
```

Sheriff Chad Chronister
November 02, 2022

```
 1    really interested in the bicycle stop.  You're

 2    interested in the drugs or the whatever else.  Right?

 3         A   Always interested in a larger crime.  Sure.

 4    But the fact is, you can't even initiate the stop.

 5         Q   Okay.  But this is -- so then your complaint

 6    isn't really about whether they're prosecuting the

 7    bicycle violation.  Your complaint is about the fact

 8    that they're taking away the ability for your deputies

 9    to stop these people on the pretext of a bicycle

10    violation when you're really investigating drugs --

11         A   Not a pretext.

12         Q   -- or whatever else?

13         A   Not a pretext.  You asked -- if I understood

14    the question correctly was, how does it impact us?

15         Q   Uh-uh.

16         A   It impacts us.  It impacts crime and everything

17    else if drug dealers know that law enforcement can't do

18    traffic stops, that they won't be prosecuted.

19             And a lot of times the possession charge comes

20    from the initial contact in a bicycle stop.  Go back and

21    look at historical data.  Those individuals aren't being

22    prosecuted.

23         Q   Were they ever prosecuted for the bike stop

24    itself or were they prosecuted for the narcotics or the

25    warrant or the whatever else that your deputies are
```

Sheriff Chad Chronister
November 02, 2022

1    interested in?

2        A    Correct.

3            But we're not saying in terms of like the fruit

4    of the -- the poisonous tree at this point because they

5    won't be prosecuted for the bicycle stop.  The state

6    attorney is going to throw out that case because they

7    made a bicycle stop and got the drugs subsequently to --

8    to making that stop.

9            If a -- if a person is wanted on an arrest

10   warrant and they -- we go to do a stop and they run,

11   that will be null and void.  Well, the arrest warrant is

12   the arrest warrant.

13           But if any subsequent charges from that bicycle

14   stop from that individual fleeing from that bicycle stop

15   is considered fruits of the poisonous tree under this

16   memorandum -- and the state attorney is not pursuing

17   charges on -- on bicyclists or pedestrians.

18       Q    And isn't that because after working with the

19   Racial Justice Work Group and a whole bunch of other

20   people, they determined that these stops

21   disproportionately affected Black defendants?

22       A    That's what the memorandum states.

23       Q    Do you disagree that there was a

24   disproportionate racial impact from bicycle stops?

25       A    I'm only speaking for the Hillsborough County

Sheriff Chad Chronister
November 02, 2022

 1    Sheriff's Office.

 2         Q    Uh-uh.

 3         A    And I'm -- to reiterate, that wasn't the case

 4    with the sheriff's office.  So why take a tool away from

 5    law enforcement that we can't use to -- to create a

 6    safer community because bicycle stops and pedestrian

 7    stops are illegal, according to Mr. Warren, and they

 8    won't be prosecuted?  I should say aren't illegal.

 9         Q    I think there may be one too many negatives in

10    there, but -- but I think I get your gist.

11              You're saying that because Mr. Warren has said

12    they won't prosecute this category of bicycle and

13    pedestrian stops, your deputies have lost the ability to

14    execute those kind of stops and that impacts public

15    safety?

16         A    Yes, sir.

17         Q    Can we agree that the public safety impact is

18    not from the bicycling or the walking, but it's from the

19    other things that those people might be doing or

20    carrying?

21         A    Yes.

22         Q    The drugs?  The guns?

23         A    Sure.

24         Q    Other contraband?

25         A    (Nodding head.)

Sheriff Chad Chronister
November 02, 2022

1        Q    Okay.

2        A    But a lot of times -- let me just make note --

3    if those charges resulted in a pedestrian stop or an

4    individual stop, there's still a presumption of

5    innocence and those cases aren't filed and prosecuted.

6        Q    Where the initial stop is -- and you said you

7    weren't -- I think you said it.

8             Just to be clear, you're not aware of any case

9    covered by the bike stop policy that was still

10   prosecuted.  Right?

11       A    I am not aware.

12       Q    Okay.  So if I told you that I know there are

13   some, would that surprise you?

14       A    It would surprise me.  I was -- I was informed

15   that there are -- there are none.

16            Now, I'm talking about the Hillsborough County

17   Sheriff's Office.

18       Q    Uh-uh.

19       A    So if there was one in the City of Tampa, I

20   wouldn't be aware of that.

21       Q    Okay.  Okay.  Did you ever explain to

22   Mr. Warren your concerns about the bike stop policy and

23   its impact on your -- your office in the way that you

24   just explained it to me?

25       A    No.  Because the first time that I learned

Sheriff Chad Chronister
November 02, 2022

1    about it was once I got the memo.  So I had a memo sent

2    back to him.

3         Q    Okay.

4         A    And in that memo I explained the impact on

5    public safety.  Yes.

6         Q    All right.  Let's look at it.

7              MR. CABOU:  This is going to be Exhibit 11, I

8         believe.

9              (Exhibit 11 marked for identification.)

10   BY MR. CABOU:

11        Q    All right.  So I've handed you Exhibit 11.

12             Do you recognize that document, sir?

13        A    I do.

14        Q    What is it?

15        A    It's a response to the memorandums I received

16   regarding policing and prosecution of cases based on

17   pedestrian and bicycle violations.

18        Q    All right.  So just to be clear, Exhibit 10 is

19   what we've called the bike stop policy.  Right?

20        A    Yes, sir.

21        Q    Okay.  And this exhibit, Exhibit 11, is a

22   response by you to that policy.  Is that correct?

23        A    Correct.

24        Q    Okay.  So why did you send this letter?

25        A    Because I felt it was important, since he had

Sheriff Chad Chronister
November 02, 2022

 1   put something in writing, that I put something in

 2   writing back to him expressing my concerns on how this

 3   would impact law-enforcement-related services and public

 4   safety in Hillsborough County.

 5        Q   Okay.  Who did you discuss this letter with

 6   prior to sending it?

 7        A   My chief deputy and legal counsel.

 8        Q   Okay.  Is that the same legal counsel that's

 9   with you today?

10        A   Yes.

11        Q   Okay.  Did you discuss any of the concerns in

12   here with anyone outside of the office of the sheriff,

13   outside the Hillsborough County Sheriff's Office?

14        A   I did not.

15        Q   Okay.  So like at this point you hadn't spoken

16   to Mr. Keefe?

17        A   No, sir.

18        Q   You hadn't spoken to Mr. Warren about this at

19   this point?

20        A   No, sir.

21        Q   Okay.

22        A   Now, you say "not spoke."  I provided -- he

23   received a copy of --

24        Q   No.  No.  I understand.  I'm just saying

25   like -- like, you know, whatever.  I don't --

Sheriff Chad Chronister
November 02, 2022

```
 1        A    Okay.

 2        Q    This memo was dated --

 3             MR. CABOU:  Are you okay?

 4             MR. AARON:  Okay.  Sorry.

 5             MR. CABOU:  No problem.

 6   BY MR. CABOU:

 7        Q    This -- this letter is dated January 25th,

 8   2022 -- right -- Exhibit 11?

 9        A    Yes, sir.

10        Q    So let's say on January 24ht -- okay.  So

11   before the letter goes out had you spoken to, texted

12   with, emailed with anybody outside of your agency about

13   your feelings on the bike stop policy and your decision

14   to send this letter?

15        A    Not that I'm aware of.

16        Q    Okay.  Had you ever sent a letter to Mr. Warren

17   like this before?

18        A    I don't believe so.

19        Q    Yeah.  I think -- I think this is maybe the

20   only letter that you sent to Mr. Warren, but I just want

21   to make sure.

22        A    It could be.

23        Q    Okay.  I'm really trying to understand why,

24   instead of calling Mr. Warren, who was someone you

25   interacted with officially and otherwise -- why you sent
```

Sheriff Chad Chronister
November 02, 2022

1    this letter instead of just like trying to have a

2    meeting with him about it.

3        A    Great question.

4             Because I wanted it documented.  I was tired of

5    getting surprised by memorandums of what he was not

6    going to prosecute.  And then it was incumbent on me to

7    have a follow-up and try to have a discussion with him.

8             If he wanted to keep continuing by memorandum

9    on what he wasn't going to prosecute, then I was going

10   to continue to express my concerns and the public safety

11   hazards that I believe it caused.

12       Q    Okay.  And you said you were assisted by your

13   chief deputy with this?

14       A    Correct.

15       Q    And by your legal counsel?

16       A    Correct.

17       Q    Okay.  Anybody else help you guys get this

18   letter out?

19       A    If they used someone else, I'm -- I'm not aware

20   of that.

21       Q    Okay.  Fair.

22            Not -- not to your knowledge?

23       A    Yeah.  To my knowledge, it was the two of them.

24   Correct.

25       Q    Okay.  So I want to go over some things in the

Sheriff Chad Chronister
November 02, 2022

```
 1    letter.

 2           The last sentence of the first paragraph starts

 3    with the phrase "It is."

 4           Do you see that?

 5    A    Yes.

 6    Q    Okay.  It says, "It is particularly disturbing

 7    that two recent memorandums/policies issued by you were

 8    not ever discussed or provided to our office when they

 9    were issued and placed into effect."

10           Did I read that correctly?

11    A    Correct.

12    Q    Okay.  So one of those two memorandums is then

13    discussed:  the bike stop policy.  Right?

14    A    Correct.

15    Q    That's the policy we discussed in Exhibit 10?

16    A    Correct.

17    Q    What's the other policy to which you are

18    referring in this letter?

19    A    The other interoffice memorandum that we

20    discussed:  the prosecutorial discretion memorandum.

21    Q    Sorry.  What's the exhibit number of the other

22    policy?

23    A    Exhibit 6.

24    Q    Okay.  So Exhibit 6 is a package of documents

25    that you sent to Mr. Keefe.  But I think what you're
```

Sheriff Chad Chronister
November 02, 2022

1    referring to is the memo that's at the beginning of

2    Exhibit 6 that starts with Bates Stamp DEF 2188 and goes

3    through Bates Stamp 2196.  Is that correct?

4         A    Yes, sir.

5         Q    Okay.  I just want to make sure we're on the

6    same page.

7         A    Yes, sir.

8         Q    So the memo that's the start of Exhibit 6 was

9    sent in December of 2021.  Right?

10        A    (Nodding head.)

11        Q    The bike stop policy -- my copy doesn't have a

12   date, but suffice it to say it was sent before

13   January 25th of 2022?

14        A    Yes, sir.

15        Q    Okay.  And these are the two policies to which

16   you're referring in this letter?

17        A    Yes.

18        Q    Okay.  Where does the letter discuss the

19   prosecutorial discretion policy that's in Exhibit 6?

20        A    I'm not sure I understand the question.

21        Q    Yeah.

22             So I'm just -- so the sentence that -- that I

23   read aloud says that you're writing him about two recent

24   memorandums/policies issued by you.  Right?

25        A    Correct.

Sheriff Chad Chronister
November 02, 2022

 1        Q    And then you discuss one of them, which I've

 2    identified as the -- we've identified together as the

 3    bike stop policy.

 4        A    Yes.

 5        Q    Right?

 6             But where in the letter does it talk about the

 7    second policy?

 8        A    Well, throughout the memo.  But it's more

 9    specifically under the examples and case-specific

10    decisions that he has in the bulletin points that we

11    talked about.

12        Q    Sorry.  I must not have asked that clearly.

13             Where in your letter do you discuss the policy

14    that's in Exhibit 6?

15        A    Only to the point that I make inference to it

16    in that last sentence.  I didn't issue a memo specific

17    to -- to the memorandum.

18             This wasn't sent to me.  I believe this was an

19    employee -- and I could be mistaken -- this was an

20    employee at the state attorney's office that shared that

21    with an employee in this office -- in our office.  Let

22    me be more specific -- and it was brought to my

23    attention.

24             This was never shared or provided to me by the

25    state attorney's office and -- or by the State Attorney

Sheriff Chad Chronister
November 02, 2022

1    Warren.  Let me be more -- a little more clarity.

2         Q    Okay.  So at the time you wrote the letter

3    that's Exhibit 11 you -- had you read the memo that's in

4    Exhibit 6?

5         A    The first part of the -- the prosecutorial

6    discretion memo?

7         Q    Yes.

8         A    Yes.

9         Q    Okay.  So you read it and you -- and that's the

10   other policy that you were referring to in your letter

11   that's Exhibit 11?

12        A    And shortly thereafter they make the bicycle --

13   the -- the bicycle memo.

14        Q    Okay.  I think I understand.

15             So -- so you're saying, look, it's around

16   Christmastime.  Someone brings to your attention the

17   memo that's in Exhibit 6 and they're -- you know, they

18   have reservations about it.

19             Fair to say you have reservations about it?

20        A    Sure.

21        Q    And then right after that you get the bike stop

22   policy that's Exhibit 10?

23        A    Correct.

24        Q    And at this point you're like, "Okay.  Enough

25   of these.  I want to put my position in writing"?

Sheriff Chad Chronister
November 02, 2022

1        A    Yeah.

2        Q    Okay.  This says -- I'm sorry.  "This."

3             Exhibit 11 on Page 2 in the first full

4    paragraph there's a sentence that starts "It is my

5    belief."

6             Do you see that?

7        A    Yes.

8        Q    Can you read that sentence out loud for us,

9    please?

10       A    Well, hold on a second.

11            "It is my belief that the state attorney's duty

12   is to make a charging decision based upon the facts of

13   each individual case, not pronounce as a political

14   statement a blanket solution to a problem that does not

15   exist in the raw data."

16       Q    Okay.  So the memo that's in Exhibit 6 --

17   doesn't it say exactly what you believe it says, "In

18   every case ASAs must exercise discretion based on the

19   facts of the case"?  It says that right on Page 2 of

20   Exhibit 6.

21       A    Again, I'm sorry.  I don't -- I'm not sure I --

22       Q    Well, I just --

23       A    You're -- you're dissecting just part of the

24   sentence?

25       Q    Well, no.  I'm saying that you -- you read

Sheriff Chad Chronister
November 02, 2022

1    aloud a sentence from your letter --

2         A    Right.

3         Q    -- that stated your belief about the state

4    attorney's duty.  Right?  It says "duty to make a

5    charging decision based upon the facts every individual

6    case"?

7         A    Correct.

8         Q    And then the memo that's in Exhibit 6 that is

9    in part what this letter in Exhibit 10 -- 11 responds

10   to --

11        A    Yes.

12        Q    That memo in that Exhibit 6 says, and I quote,

13   In every case ASAs must exercise discretion based on the

14   facts of that case.

15             So isn't the memo doing exactly what you belive

16   the duty is?

17        A    I don't think the memo is doing exactly what it

18   says the duty is.  I believe that there's a sentence in

19   the memo that says exactly what I said.  Yes.

20        Q    So you believe that when Mr. Warren wrote to

21   every single ASA that they must exercise discretion

22   based on the facts of every case and the nature and

23   circumstances of the offense and the defendant's

24   criminal history and victim input and other factors, you

25   believe that wasn't true?

Sheriff Chad Chronister
November 02, 2022

1        A    I believe that -- that there's portions in the

2    memo that contradict what he's saying.  And I also

3    believe that the lack of prosecution proves that that's

4    not occurring based on his examples, the bulletin points

5    that we've talked about at length.

6        Q    Okay.  Those are on Page 2195 and 2196 of the

7    exhibit.  Right?

8        A    Yes, sir.

9        Q    Okay.  You had a policy that if people showed

10    up and said they wanted treatment, they could turn in a

11    kilo of heroin and no questions would be asked.  Right?

12        A    That's correct.

13        Q    Okay.  He has a policy that he won't

14    presumptively prosecute people for sleeping on a

15    business's property.

16            But you're holding people accountable and he's

17    subject to suspension from office?

18        A    Again, I disagree with you because if someone

19    who's seeking treatment and wants to voluntarily

20    relinquish their drug versus someone who's committing a

21    criminal offense of -- of sleeping in a parking lot --

22    of trespassing may be more -- trespassing in a parking

23    lot of a business.

24        Q    Where in the law passed by the legislature that

25    you were eager to talk about earlier -- where in the law

Sheriff Chad Chronister
November 02, 2022

1    passed by the legislature does it says intent of the

2    defendant is an element of the crime of possession of

3    narcotics?

4         A    I believe that every law has to be -- I mean,

5    you have the letter of the law and then you have the

6    intent of the law.  I think -- I think intent in -- in

7    every criminal violation.

8         Q    Sheriff, here's the thing.  I think you and I

9    and, frankly, Mr. Warren agree on a lot of how law

10   enforcement should work.

11        A    We -- we -- we most certainly do.

12        Q    And -- and what I'm really struggling with is

13   why you placed such an enormous role in getting him

14   suspended from office when you guys seem to agree on a

15   lot of things.  Why did do you that?

16        A    Because you're saying an enormous role, a role

17   of asking to provide cases, and I don't know if there

18   was other agencies that provided cases or not.

19        Q    Okay.  I will tell you --

20        A    Providing cases -- I wouldn't call that an

21   enormous role.

22             "Hey, listen.  Do you have a problem with your

23   prosecutor prosecuting laws?"

24             "Yes, I do.  Here's everything I have," and I

25   sent that to them.  I don't know if I would call that an

Sheriff Chad Chronister
November 02, 2022

```
 1    enormous role.  I don't know if it even impacted his

 2    decision to -- to suspend our state attorney or not.

 3         Q   It was the only state attorney for which

 4    Mr. Keefe reviewed any information, and the majority of

 5    the information came from you.

 6             MR. AARON:  Object to form.

 7         A   I understand why you're -- why you're making

 8    the statement that --

 9             MR. AARON:  Is there a question pending?

10             MR. CABOU:  Yes.

11    BY MR. CABOU:

12         Q   Why did you do it?

13         A   Why did I do what?  Provide the information?

14         Q   Uh-uh.

15         A   Because I was asked to provide the information.

16    Why would I not provide the information?

17             If you came to me and said, "Do you have a

18    problem with such-and-such or" -- and I have the

19    evidence or I believe that -- that I do have the

20    information, wouldn't I be negligent in not providing

21    it?

22         Q   No.

23         A   Okay.  Well, we disagree.

24         Q   Say like, "Look, you know, I don't have much to

25    say."
```

Sheriff Chad Chronister
November 02, 2022

 1            You could have said that.  Right?

 2       A    But I did have much to say.  I believe there's

 3  a lot of -- a lot of victims in Hillsborough County that

 4  don't get the justice that they deserve because their

 5  cases aren't being prosecuted.

 6       Q    Victims of sleeping on a business property?

 7            Come on, Sheriff.

 8       A    If you owned a business and you had a homeless

 9  issue, I'm sure you would -- you would feel different.

10  People defecating in your business and -- and the acts

11  that come along with it -- I'm sure you would feel

12  different.

13       Q    Yeah.  Maybe.  I don't know.

14            We talked about why you played a major role,

15  and you said, "I don't know how big of a role I played."

16  Fair enough.

17            But you didn't just give them the info.  Right?

18  That wasn't the only thing you did as part of the

19  suspension of Mr. Warren.  Right?

20       A    You'll have to define -- what -- what process

21  are you talking about?

22       Q    Sheriff, was there a press conference at your

23  office --

24       A    Oh, yes, sir.  Yes, sir.

25       Q    -- where the governor announced the

Sheriff Chad Chronister
November 02, 2022

```
 1    suspension --
 2        A    Listen, I just didn't understand your question.
 3             Yes.  Yes.  Of course, it's no secret that I
 4    held a press conference at the -- at the sheriff's
 5    office.
 6        Q    Okay.  Why did you do that?
 7        A    That's where the governor wanted to have the
 8    press conference.
 9        Q    Did you ask him why?
10        A    No, sir.
11        Q    Did the governor -- did you speak to the
12    governor about scheduling the press conference?
13        A    No.
14        Q    Did you speak to the governor at any time on
15    August 4th?
16        A    August 4th was the day of the suspension.
17        Q    Yes.  August 4th is the day of the press
18    conference.
19        A    Briefly we walked into the room.  Yes.
20        Q    Okay.  So the only time you spoke to the
21    governor throughout this whole process -- was that on
22    August 4th?
23        A    About the suspension?
24        Q    Or about Mr. Warren.
25        A    And about Mr. Warren.  That's correct.
```

Sheriff Chad Chronister
November 02, 2022

1      Q   Okay.  So just so that we're clear --

2      A   Yeah.

3      Q   -- the only time from your initial phone call

4   with Mr. Farrier and Mr. Keefe through August 4th, the

5   date of the suspension -- the only time you spoke with

6   the governor was on August 4th.  Is that correct?

7      A   The only time I spoke to the governor in

8   regards to Andrew Warren.  That's correct.

9      Q   Okay.  Well, let's start with this.

10         What did you and -- how long did you and the

11   governor speak on August 4th?

12      A   "Hi."  "Hello."

13      Q   It was a brief conversation?

14      A   And he went into the room and addressed the new

15   state attorney, which I didn't know that was happening

16   till then.  Made some comments and we walked in the

17   room.  So it wasn't anything more than an introductory

18   hello.

19      Q   Okay.  He didn't explain why he was suspending

20   Mr. Warren?

21      A   No, sir.

22      Q   You didn't say, "Thanks for helping me out,"

23   or, "Thanks for taking my concerns seriously," anything

24   like that?

25      A   No, I did not.

Sheriff Chad Chronister
November 02, 2022

```
1        Q    Okay.  It was -- it sounds to me like this was
2    a very brief exchange of pleasantries.
3             Is that a fair characterization?
4        A    Extremely.
5        Q    Was there any substance to the conversation?
6        A    No.
7        Q    Okay.  Other than that exchange did you speak
8    to the governor at any time between your phone call with
9    Mr. Farrier and August 4th about anything?
10       A    What do you mean "anything"?
11       Q    Was there anything other --
12       A    In regards to Andrew Warren?
13       Q    Right.  I'm trying to -- okay.
14            So we've established the only time you talked
15   about the suspension of Andrew Warren was on August 4th,
16   the date of the press conference.
17       A    We really never talked about it at that point.
18       Q    Right.  I understand.  Other than he made
19   remarks and you made remarks.
20            But you guys didn't converse about it?
21       A    No.
22       Q    Okay.  So now I'm trying to figure out, how
23   well do you know the governor?
24       A    Okay.
25       Q    Have you spoken -- between the time of your
```

Sheriff Chad Chronister
November 02, 2022

```
1    phone call with Mr. Keefe in the car with Mr. Farrier

2    and August 4th did you have any other conversation at

3    any time with the governor?

4         A   I have.

5         Q   Okay.  How many such conversations?

6         A   I've seen him at some different fundraisers.

7    I'm attended some other press conferences that he's had.

8    And my family, as a fundraiser and more of a friendship

9    with him, hosted him in Montana over the July 4th

10   holiday.

11        Q   Your family hosted the governor over the July

12   4th holiday?

13        A   Correct.

14        Q   In 2022?

15        A   Correct.

16        Q   Okay.  I assume that your family has property

17   in Montana?

18        A   They do.  Yes.

19        Q   Okay.  Did the governor --

20        A   I say my in-laws.  Yes.

21        Q   Well, that's your -- yeah.  I mean, sometimes I

22   lie and I want my in-laws, my family.  But sometimes I

23   do.  They're --

24        A   I claim mine.  I love mine.

25        Q   Yeah.  I claim mine too.
```

Sheriff Chad Chronister
November 02, 2022

1           Okay.  But your in-laws have property in

2    Montana?

3       A    Correct.

4       Q    And this 4th of July you were there with your

5    family?

6       A    Correct.

7       Q    And do I understand you correctly that the

8    governor was there?

9       A    He was.  With his family.

10      Q    Okay.  And did they stay at your family's

11   property?

12      A    They did not.

13      Q    Okay.  What was the -- when you say they were

14   at the property, was -- was there an event taking place

15   there?

16      A    There was -- maybe I should explain a little

17   better.

18           Every year my father-in-law has a big July 4th,

19   has a carnival for kids, a bunch of activities for

20   people to participate.  And people usually come for

21   three, four -- four days during that time period.

22      Q    And are there like -- do they stay with you or

23   do they stay sort of at commercial lodging?

24      A    Commercial lodging.

25      Q    Okay.

Sheriff Chad Chronister
November 02, 2022

```
 1        A    Too many people to stay on the range.

 2        Q    Okay.  I probably blew my chance for an invite,

 3   but I'm sure my kids would like it.

 4        A    Not necessarily.

 5        Q    I appreciate it.

 6        A    You're acting like this is personal.  It is

 7   not.

 8        Q    I don't think it's personal.

 9        A    It's not personal.  Because we disagree on

10   things don't -- it doesn't make -- it certainly doesn't

11   make it personal on me, so don't -- don't think for a

12   second you wouldn't wager an invite to my family.

13        Q    Okay.  All right.  There's a presumption.

14        A    There's a presumption.

15        Q    Fair enough.

16        A    Fair.

17        Q    All right.  Okay.  So, I mean, did you and the

18   governor discuss Mr. Warren at this event?

19        A    We did not.

20        Q    Did you have any discussion whatsoever relating

21   to Mr. Warren?

22        A    No.  Still haven't to this date ever discussed

23   it.

24        Q    Okay.  I mean, I'm trying to like cut to the

25   chase.  Right?
```

Sheriff Chad Chronister
November 02, 2022

1        A    Yeah.

2        Q    I could ask you a whole bunch of questions.

3        A    No.  I agree.  And I'm just making it easy for

4    you.

5        Q    Yeah.  I appreciate it.

6        A    I've never had a discussion with Governor

7    DeSantis about Andrew.

8        Q    Okay.  I mean, did he like thank you for the

9    invite?

10       A    No.  I wasn't the one that invited him.  My

11   father-in-law invited him at one of the fundraisers.  So

12   he invited him.

13       Q    Okay.  So I appreciate that clarification.

14       A    Yes.

15       Q    You knew he was going to be there?

16       A    Yes.  I did know he was going to be there.

17       Q    Okay.  But you didn't talk shop?

18       A    No.

19       Q    Did you talk to him at all at the event?

20       A    I mean, throughout the -- the course of the

21   four or five days --

22       Q    Yeah.

23       A    -- that he was there?  Not a lot.

24       Q    Okay.  I mean --

25       A    He was there with his family.  I didn't want to

Sheriff Chad Chronister
November 02, 2022

1    bug him and his family.  Let them enjoy their family.

2         Q    Sure.  Okay.

3              Like just to be like real human about it --

4         A    Yeah.

5         Q    Like Andrew gets suspended on August 4th.  On

6    July 4th the governor is at your family's ranch.  Now, I

7    wouldn't be very good at my job if I didn't ask you if

8    that was related.  Right?

9         A    No.

10        Q    It's an -- it's an unusual fact.

11        A    I understand.

12        Q    Okay.  But --

13        A    I appreciate the fact if you were my attorney

14   that you would ask such a question.

15        Q    I appreciate that.  Maybe someday.  You never

16   know.

17             But -- but you didn't talk about business.

18   Right?

19        A    No.

20        Q    Didn't talk much.

21             Did you talk about Mr. Warren's suspension with

22   anyone at that event over the July 4th weekend?

23        A    No.

24        Q    Okay.  You were just off duty doing your family

25   thing?

Sheriff Chad Chronister
November 02, 2022

1        A    Yes.

2        Q    Okay.  All right.

3        A    During that time there wasn't even a

4    suspension.  I mean, if there was a suspension, working

5    towards a suspension, I wasn't aware of it at that

6    point.

7        Q    Okay.  I mean, when did you provide the box of

8    materials to Mr. Keefe?

9        A    Before that, I believe, if memory serves me

10   correct.  But there was nothing -- no inference to a

11   suspension being made during that time frame.

12       Q    Okay.  So just to make sure I understand you

13   correctly, what you're saying is that you understood

14   that Mr. Keefe was asking for information about

15   Mr. Warren?

16       A    Yeah.

17       Q    And you provided the information?

18       A    Right.

19       Q    But you didn't understand that he was

20   considering potential suspension action.

21            Is that what you're saying?

22       A    That's exactly what I'm saying.  As a matter of

23   fact, I disagreed with you and you've heard differently.

24            I was told that he was looking at state

25   attorneys that were -- that were not practicing or

Sheriff Chad Chronister
November 02, 2022

1    prosecuting cases throughout the State of Florida.

2            Did I have difficulty?  Yes, I did.

3            "I'll send you what I have," and I sent that

4    information.  That was it until the end of July when,

5    "Hey, listen."  You saw the text messages.  Things are

6    moving rather quickly.  And -- and then -- then the

7    phone calls, more subsequent phone calls start.

8        Q    All right.  So let's -- let's -- let's --

9    before we leave this letter, which is a jumping-off

10   point for a lot of things, I just want to ask you about

11   that sentence we talked about earlier about your belief.

12   It's on Page 2 of Exhibit 11.

13           And it says -- you accuse him of -- of

14   pronouncing "as a political statement a blanket solution

15   to a problem that does not exist in the data."

16           Where did you -- who came up with that term

17   "blanket solution"?  Was that your term?

18       A    One of the three of us.  I don't -- I don't

19   know.

20       Q    I mean, is that term that prior to this -- you

21   know, this matter you -- you used to describe a policy?

22       A    No.

23       Q    Okay.  Do you -- do you know where that term

24   comes from?

25       A    These policies were just being implemented.  As

Sheriff Chad Chronister
November 02, 2022

1    we discussed, this end of December back-to-back

2    memorandums that come, and that's how I perceived it.

3        Q    Yeah.  But I'm just asking if you came up with

4    the term "blanket solution."

5        A    I can't -- I can't remember.  I wish I

6    remembered a finite detail like that.

7        Q    Okay.  You know, I mean, I think there are lots

8    of different phrases you could use to -- to -- you know,

9    to say that the policy applies in all circumstances or

10   it's a broad policy.  It's just an odd term or phrase.

11       I was just wondering if it was -- do you

12   remember it being yours personally or do you remember if

13   someone helped you?

14       A    I can't remember.

15       Q    Okay.  No sweat.

16       And if I'm remembering the timeline correctly,

17   you said your conversation with Mr. Keefe and

18   Mr. Farrier was in March or April.

19       So that was well before this letter -- right --

20   or well after this letter?  Excuse me.

21       A    Yes.

22       Q    March/April of '22 was your conversation with

23   Mr. Keefe.  The letter is in January of 2022?

24       A    (Nodding head.)

25       Q    You're nodding your head yes?

Sheriff Chad Chronister
November 02, 2022

1        A    Yes.  I'm sorry.

2        Q    No sweat.

3             Okay.  Mr. Warren responded to your letter.

4    Right?  Do you recall that Mr. Warren responded to your

5    letter?

6        A    I do.

7             MR. CABOU:  Okay.  All right.  Let's mark this

8        as Exhibit 12.

9             Give this to your counsel.  I think I might

10       have given you one extra.  Sorry.

11            (Exhibit 12 marked for identification.)

12   BY MR. CABOU:

13       Q    I've handed you what's been marked as

14   Exhibit 12.  It's Bates-stamped AW 10.  This is a letter

15   to you from Mr. Warren on letterhead dated February 3rd.

16            So it's about a week or so after your letter

17   that's Exhibit 11.  Right?

18       A    Correct.

19       Q    Okay.  Have you read this document before:

20   Exhibit 12?

21       A    I have.

22       Q    Okay.  Do you recall receiving it on

23   February 3rd?

24       A    I recall seeing it.  I don't know about who

25   received it.

Sheriff Chad Chronister
November 02, 2022

```
 1        Q    Okay.  Do you recall having a reaction to this
 2   document?  Right now it's just yes or no.  Do you recall
 3   having a reaction to this document?
 4        A    Yes.
 5        Q    Okay.  What was your reaction?
 6        A    That it was just him being defensive of his --
 7   of his memorandum.
 8        Q    Okay.  So let's -- let's unpack that a little
 9   bit.
10             Do you agree that prior to this date your --
11   your office and his office had had a productive
12   partnership?
13        A    Correct.
14        Q    Okay.  And then he says that, "In the spirit of
15   candor, let me express that your letter comes from a
16   fundamental misunderstanding of our pedestrian and
17   bicycle stop policy."
18             Do you see that?
19        A    I do.
20        Q    Okay.  And then in very lawyerly fashion -- we
21   like paragraphs that begin with numbers.  It's like a
22   thing -- he goes on and says in several paragraphs --
23   you see all the paragraphs start with a number.  That's
24   a -- that's a thing.
25        A    Yes.  Yes.
```

Sheriff Chad Chronister
November 02, 2022

```
 1          Q   I don't like it, but it's what we do.

 2              Okay.  But he's got a number of numbers.   I

 3     think he's got five paragraphs.

 4              He says here that you and he spoke over the

 5     phone in fall of 2021 about the intention to create the

 6     bike stop policy.  He seems to have a very specific

 7     recollection of that.

 8              Do you think he's telling the truth there that

 9     you spoke over the phone?

10          A   I don't -- I don't recall it.  And again,

11     you're talking over a year or so later too.

12              So -- but, no.  My recollection -- I don't

13     recall having a conversation about him not prosecuting

14     bicycle or pedestrian stops.

15          Q   I mean, he seems to have a very specific

16     recollection about the conversation.  He says, "You

17     raised no objection and accurately pointed out that the

18     policy would have limited impact on cases arising from

19     the sheriff's office because your agency makes few

20     arrests from civil bicycle (and pedestrian)

21     infractions."

22              That's pretty consistent with what we discussed

23     earlier.  Right?  Most of them come from the City of

24     Tampa?

25          A   Correct.
```

Sheriff Chad Chronister
November 02, 2022

1        Q    Okay.

2        A    I don't -- I don't recall that conversation.

3        Q    Okay.  Do you -- are you insisting that it

4    didn't happen or you just don't recall it?

5        A    I don't recall it.  I would never -- I would

6    never call anyone a liar.

7        Q    Okay.  I mean, your letter does say that you --

8    that the policy was never discussed with your office.

9        A    Correct.

10       Q    Is it possible that you just forgot the

11   discussion?

12       A    I still firmly stand that we didn't have that

13   discussion.

14       Q    Okay.

15       A    Having a -- having a quick telephone call with

16   me wouldn't be discussing this with our office anyway.

17       Q    Go on.

18       A    So I don't recall the conversation and I

19   believe it didn't happen.  But I certainly would never

20   call Mr. Warren a liar.

21       Q    Okay.  Do you agree that the policy would have

22   limited impact on cases arising from sheriff's office

23   because your agency makes few arrests from civil bicycle

24   and pedestrian infractions?

25       A    I don't know if that's the case or not.

Sheriff Chad Chronister
November 02, 2022

1      Q    Okay.  But the statement in Mr. Warren's letter

2    that I just read out loud is consistent with the

3    discussion you and I had earlier about how most bicycle

4    stops come from the City of Tampa.  Right?

5      A    Yes, sir.

6      Q    Okay.  He goes on in the second paragraph to

7    say the contention that the policy is a political

8    statement is inaccurate.  And then he goes on to say

9    that the policy articulates consistent criteria, that

10   it's expressly limited to certain stops.

11         Why do you think it's a political statement?

12     A    Because the policy came within weeks of this --

13   the other presumption of innocence for low-level

14   misdemeanors.  So two policies back to back -- I believe

15   he was trying to make a political statement.

16     Q    Okay.  I mean, fair enough.

17         What's the statement that he's trying to make?

18     A    That he wasn't going to prosecute certain types

19   of crimes.

20     Q    And what makes that statement political?

21     A    Well, I think there's a lot of things that make

22   that statement political.  I think -- I don't know.  I

23   would be speculating.

24         So does -- does my opinion really matter at

25   that point?  Because it would be opinion.  I'm a facts

Sheriff Chad Chronister
November 02, 2022

1     guy.  I don't know if I can give you the facts.

2            I believe it was a political statement.  I

3     believe that he was trying to garnish more Democratic

4     support.  And at the time there was a lot of defund the

5     police and take a lot of power away from police.  And I

6     think that's what his memos and lack of prosecution

7     presented.

8        Q    Did Mr. Warren ever support defunding the

9     police?

10       A    I don't know.  I'd have to look into that.  I.

11    Don't know that.

12       Q    Yeah.  Okay.

13       A    I don't know.

14       Q    So you said there were a lot of things about

15    his -- his statement that make it political.  You

16    said -- you accused him of making a political statement

17    in your letter, which is one of the few, maybe the only

18    letter you ever sent him.

19           So I'm asking you, what else makes it

20    political?

21       A    I think Andrew Warren was searching for higher

22    office, so he was trying to make himself more relevant.

23    I think with a lot of -- a lot of statements that he was

24    making and a lot of actions that he was taking because

25    it was the popular view, the popular view that he

1    thought would help him seek a higher office.

2         Q    Okay.  Do you think it would help you seek

3    prior office to hold a press conference with the

4    governor announcing the suspension of one of the --

5         A    Try that one more time.

6              MR. CABOU:  Can you read the question back?

7              THE COURT REPORTER:  I didn't get the end of

8         it.

9              MR. CABOU:  Okay.

10             THE COURT REPORTER:  "Do you think it would

11        help" --

12             MR. CABOU:  No.  I'll -- I'll start again.

13   BY MR. CABOU:

14        Q    Do you think it would help you seek higher

15   office to host the press conference at which the

16   governor of the State of Florida stood with armed

17   members of law enforcement to announce the suspension of

18   a state attorney that you and he said wasn't doing his

19   job?

20        A    Would it help me?

21        Q    Uh-uh.

22        A    I don't believe so.

23        Q    Okay.  Why did you have the press conference?

24        A    There was no reason for me not to.  I didn't

25   think -- I can't think of a reason why I would decline

Sheriff Chad Chronister
November 02, 2022

```
 1    the -- the governor's staff's offer to have it at a --

 2    at a law enforcement office when my position was that

 3    what he was doing affected law enforcement.

 4         Q   Mr. Warren ran -- you donated to Mr. Warren's

 5    campaign.  Right?

 6         A   His first campaign.  Yes.

 7         Q   Okay.  And he was elected in 2016 and elected

 8    again in 2020.  Right?

 9         A   Correct.

10         Q   Okay.  Do you -- do you think that these

11    policies that Mr. Warren announced in Exhibit 10 and

12    Exhibit 6 are consistent with the things he ran for

13    office on?

14         A   I don't really know what he ran for office on.

15    I wasn't --

16         Q   Okay.  You donate to his campaign.  Right?

17         A   I did the first time.

18         Q   Okay.

19         A   His first campaign.  Yes, I did.

20         Q   Okay.

21         A   And I did based on the fact that I thought

22    there had to be some criminal justice reform, and we've

23    accomplished that.  So I did support him after having

24    lunch with him and believed in what he wanted to do.

25             But -- but since then I think that
```

Sheriff Chad Chronister
November 02, 2022

1    accountability was going a different direction.  And I

2    expressed that to him, that there -- that he was causing

3    a public safety concern.  And again, then it got to the

4    written policy.  So then I issued a written -- a written

5    response to it.

6              I hope I'm answering your question.

7        Q   Close enough.

8              Crime is down in Hillsborough County.  Right?

9        A   Certain crimes are down.  Yes.  Crime -- crime

10   is down overall right now 4.2 percent this year.

11       Q   Okay.  And the year before?  Also down.  Right?

12       A   No.  The year before it went up.

13       Q   Okay.  What about the year before that?

14       A   It was down.

15       Q   Okay.  The year before that?

16       A   It was down every year he was in office.

17       Q   Okay.  So you've -- you've taken credit,

18   deservedly so, for a lot of the crime reduction in

19   Hillsborough County.  Right?

20       A   Correct.

21       Q   Okay.  Wasn't he the state attorney the whole

22   time?

23       A   He was.

24       Q   So how can you blame him for increased crime

25   but absolve yourself, especially when crime is down?

Sheriff Chad Chronister
November 02, 2022

```
 1        A    I don't know what you mean by "resolve" myself.

 2        Q    Sheriff, whether you're the chief law

 3   enforcement officer or he's the chief law enforcement,

 4   either way you guys are both the high-ranking law

 5   enforcement officers in Hillsborough County.  Right?

 6        A    How do you call him a law enforcement officer?

 7   I'm still struggling with that.  He's a prosecutor.

 8        Q    Okay.

 9        A    He's not a sworn law enforcement officer.  He

10   can't place anyone under arrest.  Look, how is he a law

11   enforcement officer?

12        Q    Okay.  When we get done with the deposition

13   we'll talk about that at length.  I think it's actually

14   an interesting policy discussion.

15             I think it's fair to say that many people --

16   and I'm not speaking for anyone in the room -- but many

17   people would say that a prosecutor is a law enforcement

18   officer.  In many states they get law enforcement

19   pensions.  In many states, and I think in the State of

20   Florida, although I'm clearly not as an expert as you.

21   I think in the State of Florida assault on a prosecutor

22   is just like assault on a cop, I think.  Could be.  In a

23   lot of states it's the law.

24             Either way, people regularly refer to the

25   attorney general of the United States as the chief law
```

Sheriff Chad Chronister
November 02, 2022

```
 1    enforcement officer in the United States.  So just

 2    throwing it out.

 3         A   Understand.

 4         Q   Either way, would you agree with me that you're

 5    both high-ranking members of the public safety

 6    enforcement team in Hillsborough County?

 7         A   I don't know about the enforcement team, the

 8    enforcement part.  But it's hard for me --

 9         Q   Are you both involved in public safety,

10    Sheriff?

11         A   We're both involved in the criminal justice

12    system here in Hillsborough County.  Yes.

13         Q   Okay.

14         A   We're criminal justice partners.

15         Q   Okay.  Well --

16         A   Equally as important as the chief judge, the

17    public defender, the clerk of the court.

18         Q   The clerk of the court?

19         A   Yes.

20         Q   Okay.

21         A   One of the --

22         Q   Well --

23         A   One of the constitutional office elected

24    officials in Hillsborough County.

25         Q   I agree, sir.  But you could have a conviction
```

Sheriff Chad Chronister
November 02, 2022

```
1    and send someone to prison without the clerk of the

2    court.  Right?

3         A   Well -- well, they're going to be involved with

4    the paperwork.  So they are involved.

5         Q   I agree with that.

6         A   You can't say they can do it without them.

7         Q   They can be convicted.  The judgment can't be

8    certified, but the jury could return a verdict and it

9    wouldn't be certified.

10        A   Yes, sir.

11        Q   Okay.  But no one gets through the criminal

12   justice system without an arrest.  Right?

13        A   Correct.

14        Q   Okay.  That's -- that's you.

15        A   Yes, sir.

16        Q   And no one gets through the criminal justice

17   system without a prosecutor.  Right?  That's Mr. Warren?

18        A   Yes, sir.  Yes, sir.

19        Q   Okay.  All right.  Fair enough.

20            Crime is down while you're in office.  You're

21   in office while Mr. Warren is in office.  Right?

22        A   (Nodding head.)

23        Q   So I'm trying to understand why it is that you

24   say he's creating a threat to public safety at the same

25   time that crime is down.  Just help me -- help me match
```

Sheriff Chad Chronister
November 02, 2022

1    that up.

2        A    Because I think a lot of times the lack of

3    prosecuting offenders leads you to a higher crime rate.

4        Q    But that doesn't seem to be borne out by the

5    data -- right? -- because the crime is down.

6        A    Well, crime can still be down.  But I -- my --

7    my contention would be crime could be lower if

8    individuals would be held accountable for the crimes

9    that they committed.

10       Q    Okay.  So you're saying crime could be even

11   lower?

12       A    Yes.

13       Q    And you think that if we arrested people and

14   prosecuted people solely for bike stop violations crime

15   would be even lower?

16       A    I do belive that.

17       Q    So this is like a broken window theory.

18            Are you familiar with that?

19       A    Yes.  Absolutely.

20            I think a lot of broken window -- when it comes

21   to homelessness, it comes to prostitutes, a whole

22   laundry list of crimes that I think would -- you're

23   exactly right to that point -- the broken glass theory.

24   100 percent.

25       Q    Okay.  So what's your -- what's your

Sheriff Chad Chronister
November 02, 2022

1    understanding of the broken window theory of policing?

2         A    Well, I know that a lot of the small offenses

3    are the same individuals committing the larger offenses.

4              I'll give you a perfect example:  homelessness.

5    A lot of them are addicted.  They're breaking in to

6    commit their -- to feed the addiction, committing

7    additional crimes, victimizing our community when, if

8    we could hold them accountable from the beginning,

9    either get them treatment or whatever the case may be,

10   that they wouldn't be committing further crimes.  No

11   different than prostitution and a lot of the other

12   low-level offenses that ended up contributing to

13   victimizing our community.

14        Q    So are you familiar with the fact that broken

15   window policing was started by Commissioner Bill Bratton

16   in New York?

17        A    Yes.  I knew that.

18        Q    Okay.  And his theory -- basically you just

19   described it.  In New York it was turnstile jumping and,

20   you know, a lot of other similar low-level offenses.

21   Right?

22        A    Yes.

23        Q    And it got really popular and he wrote a book

24   about it.  It got really popular in municipal policing

25   in America.  Fair?

Sheriff Chad Chronister
November 02, 2022

```
 1        A    Yes.

 2        Q    Okay.  Are you aware that a lot of people think

 3   that also led to disproportionate arrests of people of

 4   color?

 5        A    I'm not aware of that.  No.

 6        Q    Okay.  And are you aware that many in the

 7   criminal justice reform community belive that broken

 8   windows policing played a major role in people of color

 9   being put through the criminal justice system at unfair

10   rates compared to white people?

11        A    I'm not aware of that.  I've never heard that.

12        Q    Okay.  Did you take any part in the Racial

13   Justice Work Group that in part was worked on by the

14   state attorney's office?

15        A    I didn't.

16        Q    Okay.  Have you -- are you familiar with any

17   study or literature or lecture or training material,

18   anything at all that draws a link between broken windows

19   policing and a disproportionate impact on communities of

20   color?

21        A    I'm -- I'm not aware of that.

22             But I will tell you what I am aware is the

23   sensitivity that anyone could be disproportionately

24   targeted.  Anything we talked about someone could be

25   disproportionately targeted.
```

Sheriff Chad Chronister
November 02, 2022

```
 1          I think that goes back to who you hire.  I

 2    think it's how you train them and how you supervise them

 3    and the fact that you have accountability that you're

 4    constantly looking to make sure that that's not

 5    happening within your agency.

 6          So I don't know if your questions would have

 7    stopped me from still believing that the broken glass

 8    theory is an effective theory.  I still think it's an

 9    effective theory.  I think maybe it has to be

10    monitored -- I shouldn't say maybe.  It has to be

11    monitored to make sure that it's not occurring, and it's

12    not here.

13      Q   Okay.  But it was in the City of Tampa.

14    Right?  Biking while Black -- that was a classic example

15    of broken windows policing gone awry.

16      A   Correct.

17          MR. CABOU:  Okay.  All right.  Let's --

18          let's -- frankly, I just need to take a break.  So

19          let's do that and maybe we'll take our lunch break

20          and do that at this point because it's about 1:00.

21          MR. AARON:  Yeah.  It's 1:10.

22          MR. CABOU:  Perfect.  Okay.

23          THE VIDEOGRAPHER:  The time is 1:09 p.m.  We're

24          off video record.

25          (Lunch recess from 1:09 p.m. to 2:23 p.m.)
```

Sheriff Chad Chronister
November 02, 2022

1           THE VIDEOGRAPHER:  The time is 2:23 p.m.  We're

2      back on the video record.

3           MR. CABOU:  Okay.  We are back.

4           And if I could ask the court reporter to remind

5      me what number we're on.

6           THE COURT REPORTER:  The next would be 13.

7      Yes.

8           MR. CABOU:  13?

9           THE COURT REPORTER:  13.  Yes.

10           MR. CABOU:  Okay.  Let's mark that as

11      Exhibit 13.

12           (Exhibit 13 marked for identification.)

13      BY MR. CABOU:

14      Q   All right.  You've been handed what's been

15      marked for identification as Exhibit 13.  It's a

16      Hillsborough -- or sorry -- "Tampa Bay Times" article

17      dated August 12th.  It has a picture of you on the front

18      and next to a picture of Mr. Warren.

19           Do you see that?

20      A   I do.

21      Q   Is this an article that you're familiar with,

22      sir?

23      A   I'm not.

24      Q   Have you seen this article before?

25      A   I have not.

Sheriff Chad Chronister
November 02, 2022

```
 1        Q    Okay.  It's written by Tony Marrero.

 2             Do you know who that is?

 3        A    I do.  Yes.

 4        Q    Who is that?

 5        A    A reporter for the "Tampa Bay Times."

 6        Q    Okay.  The article quotes you.

 7             I take it these are quotes you gave previously

 8   but not for this article.  Is that right?

 9        A    I may have provided a quote for this article.

10   I just hadn't seen the article.

11        Q    Okay.  So on Page 4 of Exhibit 13 --

12        A    Can I have it one more time?

13        Q    Sorry.  Page 4.

14             Yeah.  I want to direct you to one of your

15   quotes.  You say, "The issue I've always had with State

16   Attorney Warren is his lack of prosecution, his lack of

17   fighting."

18             Is that an accurate quote?

19        A    Yes.

20        Q    Okay.  And then you went on to say that,

21   "Mr. Warren has said he won't prosecute a case he

22   doesn't know he can win," and that you've always

23   disagreed with that.

24             Is that accurate too?

25        A    Yes.
```

Sheriff Chad Chronister
November 02, 2022

1      Q    Are you aware that it's ethically required of

2    prosecutors that they only prosecute certain cases?

3      A    Ethically required only certain -- to prosecute

4    certain types of cases.

5      Q    Only certain cases.  Right.

6      A    No.  I'm not aware of that.

7      Q    Okay.  Well, if I told you that, for example,

8    it's ethically required that they only pursue cases that

9    they believe they can prove beyond a reasonable doubt,

10   would that surprise you?

11     A    No.  That part wouldn't surprise me.

12     Q    Okay.  So if, for example, a prosecutor

13   thought, "Hey, we don't have a witness that can ID the

14   shooter and we don't think we can, therefore, prove the

15   case to a jury," they'd be doing their job by not

16   prosecuting that case.  Right?

17     A    Yes, sir.

18     Q    Okay.  This article -- I want to ask you one

19   more thing about this article.

20          The article talks about, you know, basically a

21   lot of your work with Mr. Warren and it involved a

22   number of the topics we discussed earlier:  the APAD,

23   the juvenile citation program, all that stuff.

24          Do you recall talking to the "Tampa Bay Times"

25   about this recently?

Sheriff Chad Chronister
November 02, 2022

1      A    I do.  It's the article January 10th?

2      Q    This article is -- I'm sorry.

3      A    I'm sorry.

4      Q    Yeah.  I'm going to point you, if I may, just

5  to the -- the stamp on the first page.  It says what

6  date it's from right there.

7      A    Okay.  August.

8      Q    It says August 12th.  It's pretty recent,

9  within -- this was right after the suspension,

10 basically, a week after.

11          So I want to ask you to look at Page 6, 6 -- 6

12 of 10.

13          Do you know Brian Dugan?

14     A    I do.

15     Q    Who is that?

16     A    The previous chief of police for the City of

17 Tampa.

18     Q    Did you work closely with Mr. Dugan when he was

19 the chief of police?

20     A    We did.  Yes, I did.

21     Q    Would you consider him a friend?

22     A    Consider him a friend.

23     Q    Are you still in touch with Mr. Dugan?

24     A    Rarely.  Maybe once, twice in the past year.

25     Q    Okay.  Were you in touch with Mr. Dugan about

Sheriff Chad Chronister
November 02, 2022

1      Mr. Warren within the last year?

2          A    I did.  I was.

3          Q    Okay.  As part of your providing information to

4      the governor's office about Mr. Warren, were you in

5      touch with Mr. Dugan?

6          A    I was not.

7          Q    You didn't speak to Mr. Dugan about Mr. Warren

8      and pass any information on to the governor's office

9      about that?

10         A    A phone number is what I passed.  Correct.

11         Q    You did -- sorry.  I must have misheard.

12             You did speak with Chief Dugan about something

13     relating to the governor's inquiry into Mr. Warren.  Is

14     that correct?

15         A    Correct.  Not -- not about passing information

16     or anything like that.

17         Q    Okay.  So you spoke to Mr. Dugan?

18         A    (Nodding head.)

19         Q    About Mr. Warren?

20         A    Maybe I can clarify this.

21         Q    Great.

22         A    If I'm out of bounds, let me know.

23             The governor asked -- or the governor's staff

24     asked if Brian Dugan would be willing to talk.

25             I said, "Let me call and ask him."

Sheriff Chad Chronister
November 02, 2022

1           "Would you be willing to talk to the governor's

2     office?"

3           "Yes."

4           "Tomorrow at 8 a.m. okay?"

5           "Yes."  So the two of them connected and spoke.

6      Q    Got it.  I appreciate that.  That will move us

7     along.

8           You weren't on that call?

9      A    I was not.

10     Q    Okay.  Did you talk to Chief Dugan about the

11    call afterwards?

12     A    I'm trying to recall.  Maybe -- maybe briefly,

13    just the fact that he was going to be at the press

14    conference as requested by the governor's staff.  So if

15    it was, it was just briefly about he would be in

16    attendance.

17     Q    Okay.  How long after you passed along Chief

18    Dugan's number to the governor's staff was the press

19    conference?

20     A    I think it was the day before.  I, of course,

21    can't be certain, but I believe it was the day before.

22     Q    Okay.  So -- but to the best of your

23    recollection, is it fair to say that it was --

24     A    Within --

25     Q    -- very close in time?

Sheriff Chad Chronister
November 02, 2022

```
 1        A    Within a couple of days.  Yes.

 2        Q    Okay.  And other than speaking, putting

 3   Mr. Dugan in touch with -- was it Mr. Keefe?

 4        A    Yes.

 5        Q    Okay.  Other than putting Mr. Dugan in touch

 6   with Mr. Keefe from the governor's office a couple days

 7   before the press conference --

 8        A    Yes.

 9        Q    -- did you speak with Mr. Dugan at any other

10   time about the fact that the governor's office was

11   looking into Mr. Warren?

12        A    I did not.

13        Q    Okay.  This document here that we're looking

14   at, Exhibit 13 -- it says -- it reports that -- about

15   the middle of the page -- "Dugan said later in an

16   interview with the 'Times' that in 2021, June 2021, when

17   DeSantis was in Pinellas County to sign a bill naming

18   roads after a Pinellas sheriff's deputy and a Tampa

19   officer who died in the line of duty, he and Chronister,

20   quote, had a conversation with Governor DeSantis about

21   Warren's lack of prosecution and just his laissez-faire

22   approach to things."

23            Do you see that?

24        A    I do.

25        Q    Did you have a conversation in June of 2021
```

Sheriff Chad Chronister
November 02, 2022

1    with Dugan and DeSantis about this issue?

2         A    Not that I can recall, but I may have.

3         Q    Okay.  Do you recall the event that they're

4    talking about to honor these two fallen officers?

5         A    I do.  I remember being at the event.  I don't

6    remember having a conversation, you know, this long ago.

7    I don't.

8         Q    Okay.  Yeah.  Fair enough.

9              Earlier you told me that the first conversation

10   you can recall with anyone in the governor's office

11   was the conversation in the car with Mr. Farrier and

12   Mr. Keefe.  Right?

13        A    Yes.

14        Q    And that was in March or April of 2022?

15        A    Yes, sir.  You're exactly right.

16        Q    Okay.  And then this one that they're talking

17   about might have happened, might not have happened.  It

18   doesn't stand out in your mind?

19        A    In regard to the suspension, this had nothing

20   to do with the suspension.

21             I've talked to several chiefs of police over

22   the past couple of years who have expressed their

23   discord with the state attorney for not filing charges

24   or properly prosecuting individuals, but it had nothing

25   to do with the suspension.

Sheriff Chad Chronister
November 02, 2022

1       Q    Okay.  Well, I mean, at least according to the

2    executive order that suspended him and according to the

3    press conference that you guys all gave, it was in part

4    these prosecution policies that led to the suspension.

5    Right?

6       A    Certainly.  Certainly understand --

7       Q    Okay.

8       A    -- that that played a part.

9            What I'm -- what I'm trying to clarify is I've

10    spoken to several different chiefs here within

11    Hillsborough County about them expressing their discord

12    with State Attorney Warren not prosecuting individuals.

13            It had nothing to do -- you're talking a lot of

14    distance between then and the end of July when there was

15    talk about suspending the -- Mr. Warren.

16       Q    Okay.  So I understand that you've spoken with

17    other chief law enforcement officers about your feeling,

18    your respective, you know, feelings about Mr. Warren's

19    policies.

20            Do you recall -- but this -- this article

21    reports that you had a conversation that included Chief

22    Dugan and the governor, and that's why I'm -- I'm asking

23    about this particular conversation because it stands out

24    in light of why we're here.

25            So if you don't remember it, that's fine.  But

Sheriff Chad Chronister
November 02, 2022

```
1   do you recall this conversation?

2       A    I don't recall it.

3       Q    Okay.  Do you recall where -- do -- do you

4   recall any conversation with the governor himself on the

5   subject of Andrew Warren at any time?

6       A    I do not.

7       Q    Okay.

8       A    And if the police chief was having a

9   conversation with him and I was there, I just don't

10  remember the conversation.

11      Q    Fair enough.

12           MR. CABOU:  Okay.  All right.  I believe this

13      is Exhibit 14.

14           (Exhibit 14 marked for identification.)

15           THE WITNESS:  Thank you, ma'am.

16  BY MR. CABOU:

17      Q    Earlier we talked about the bike stop policy

18  and we talked about a December 2021 memo that was the

19  first few pages of Exhibit 6.

20           Do you recall those discussions?

21      A    Yes, I do.

22      Q    Okay.  And you've been handed what's been

23  marked as Exhibit 14.

24           Does this look familiar to you?

25      A    It does not.
```

Sheriff Chad Chronister
November 02, 2022

1        Q    Okay.  This is -- I will happily tell you that

2    this is a policy of the state attorney's office from

3    Warren's tenure.  It's titled Presumption of

4    Non-Prosecution.

5            And are you saying this is the first time

6    you've seen this document?

7        A    It is.

8        Q    Okay.  My understanding is that this is one of

9    the four bases for suspension of Mr. Warren set forth in

10    the executive order.

11            Does that representation refresh your

12    recollection at all about whether you've seen it before

13    or not?

14        A    No.  I've never seen this before.

15        Q    Okay.  Fair enough.

16            Did your office institute any changes in

17    charging or detention of offenders in response to COVID?

18    Sorry.  Your office doesn't charge people.  Sorry.

19            Did your office institute any changes in

20    response to COVID with regard to arrests or detention of

21    offenders?

22        A    Yes.

23        Q    Can you describe it for us?

24        A    As far as the arrest, we asked all of law

25    enforcement in Hillsborough County to issue a notice to

Sheriff Chad Chronister
November 02, 2022

1    appear at the height of the pandemic as to try to stop

2    the -- the spread during the pandemic.

3         Q   So a notice -- notice to appear would be in

4    lieu of detaining someone in custody?

5         A   Yes.  Instead of placing someone under arrest

6    and putting -- placing them into custody, it was to give

7    them a court date to answer to that criminal act at a

8    later date.

9         Q   Got it.

10            Did your office institute any policy with

11   regard to the suspension of eviction notices in regard

12   to COVID?

13        A   Yes.

14        Q   Tell me about that.

15        A   During the height of the pandemic I worked with

16   the chief judge and decided to cease evictions -- I

17   shouldn't say "cease" -- suspend evictions for a period

18   of time because I thought it was lunacy that we were

19   giving everyone stay-at-home orders and then we were

20   going to go throw people out of their homes and evict

21   them from the homes during the height of the pandemic.

22        Q   Yes.  So again, I'm with you on that one.  I

23   think that makes complete sense.

24            Did you hear from property owners about that?

25        A   Yes.

Sheriff Chad Chronister
November 02, 2022

1      Q    Were they upset?

2      A    Some of them were.

3      Q    Because people were living in their property

4   essentially rent-free.  Right?

5      A    Correct.  Some were behind on their rent; some

6   of them were upset.

7      Q    Right.

8           And presumably if they were subject to eviction

9   they were there unlawfully?

10     A    Technically, yes.

11     Q    And you decided that given all the challenges

12   of the pandemic and the things that law enforcement had

13   to deal with that you weren't going to enforce that

14   particular law?

15     A    Enforce law.  This was about we serve

16   evictions.  We don't -- we don't arrest people for

17   evictions.  So we suspended service of evictions during

18   that period.

19     Q    Okay.  But, I mean, part of your duty is to

20   serve eviction notices.  Right?

21     A    Yes.

22     Q    And you suspended that?

23     A    Suspended that.

24     Q    Okay.  We talked about -- and was there a law

25   passed by the legislature authorizing you to suspend

Sheriff Chad Chronister
November 02, 2022

1    evictions?

2        A    Yeah.  There's a -- there is a provision in

3    there that we're able to suspend eviction notices.  It

4    was only for a short period of time, and then Governor

5    DeSantis issued a statewide moratorium on evictions

6    then.

7        Q    You're saying Governor DeSantis said, "We're

8    not doing this for right now because it's too

9    dangerous"?

10       A    Yeah.  Then I believe -- I'll be honest with

11   you.  My memory could be misguided here -- that the

12   federal government did the same thing, that they

13   followed suit.

14       Q    Okay.

15       A    Then it was -- it was a federal order.

16       Q    Okay.  I don't know that.  I don't know.

17            So other than the policy in Exhibit 14 that

18   you hadn't seen before today and the memo from

19   Exhibit 6 and the bicycle stop policy, are there any

20   policies of Mr. Warren's office that you brought to the

21   attention of or discussed with the governor's office?

22       A    Or included in the specific cases that we had

23   forwarded too.  Correct?  It wasn't just low-level

24   misdemeanors.  There were some cases that -- that I felt

25   should have been prosecuted too.  I just want to make

Sheriff Chad Chronister
November 02, 2022

1    sure we're agreeing to the same thing.

2        Q    Okay.  So I understand that there was more than

3    just policies that you included in your packet in

4    discussions.

5        A    Yeah.

6        Q    So I'm just trying to figure out if there are

7    any other policies --

8        A    No.

9        Q    -- that were in the packet or that you

10   discussed with Mr. Keefe.

11       A    No, sir.

12       Q    So the bike stop policy; the December 14th,

13   2021, memo --

14       A    (Nodding head.)

15       Q    Those were the policies.

16       A    There was one other one.  It was the -- when he

17   issued an office-wide memo to stop prosecuting

18   misdemeanor amounts of marijuana cases as well.  And I

19   don't have that policy.

20       Q    Okay.

21       A    I don't have that memorandum.  So I don't know

22   if they have it.

23       Q    Okay.  I've -- I've seen a memorandum from a

24   number of state attorneys' offices that announced some

25   change or another in response to the passage of what I

Sheriff Chad Chronister
November 02, 2022

1   think folks in Florida called the hemp law in 2019.

2          Does that ring a bell?

3      A    Yes.

4      Q    Is this the -- is this the policy that you're

5   referring to here?

6      A    Yes, sir.

7      Q    Okay.  I will tell you I don't believe I've

8   seen that policy --

9      A    Okay.

10     Q    -- from Mr. Warren's office, but I have seen

11  some from Mr. Gladsen and others in law enforcement

12  basically saying that, "After the hemp law it got really

13  hard to prosecute these cases and we're going to take

14  action because of that."

15     A    Just making sure you're aware of it that --

16  that I had discussed that as well.

17     Q    Yeah.  No.  I appreciate that very much.

18          So are you -- you're aware that this -- the

19  passage of the hemp law was a significant event for law

20  enforcement in Florida?

21     A    100 percent.

22          Again, I'm just making sure you're aware.  You

23  said, "Is this everything?"  Well, I had spoken to the

24  governor's office about that as well.

25     Q    Yeah.  And I appreciate that.  That's why I

Sheriff Chad Chronister
November 02, 2022

```
 1   asked the question.

 2       A    Yeah.  No.  I'm just making sure.  You knew I

 3   want to make sure I was covering everything.  I didn't

 4   want to leave anything out.

 5       Q    Okay.  So about -- yes.  I appreciate that very

 6   much.

 7            So about the -- the marijuana policy, what did

 8   Mr. Warren's policy say with regard to marijuana that

 9   came out after the hemp law?

10       A    That he would not prosecute any more possession

11   of marijuana violations.

12       Q    Okay.  And did it say why?

13       A    I don't have the memorandum to refresh my

14   memory.

15       Q    That's okay.

16       A    I'm sure it was in regards to the hemp law at

17   the time and they were trying to work that out.  Yes.

18       Q    Okay.  And is it your understanding that with

19   the passage of the hemp law it became more difficult to

20   prosecute marijuana possession cases in part because of

21   the provisions of that law?

22       A    Certainly more difficult.  Yes.

23       Q    Okay.  Do you know why?

24       A    Well, the testing.  It all came back to the

25   testing and testing the drugs.
```

Sheriff Chad Chronister
November 02, 2022

1      Q   So part of that law that was passed by the

2   legislature included requirements for testing?

3      A   Correct.  Well, no.  It made testing more

4   difficult because it became much more expensive.  There

5   were other provisions that played into making it more

6   difficult.

7      Q   Okay.  But the legislature passed it.  Right?

8      A   Yes.

9      Q   They enacted the hemp law?

10     A   Yes.

11     Q   Okay.  What did -- do you recall what you

12   discussed with Mr. Keefe about the hemp law and the memo

13   that Mr. Warren promulgated after it?

14     A   Well, I personally thought that there were

15   other steps that we could take.  I was willing to incur

16   the -- the -- some of the cost of the testing.

17        I just didn't agree with Mr. Warren that he was

18   arbitrarily going to make marijuana possession legal in

19   Hillsborough County; he just wasn't going to prosecute

20   any cases.

21        I thought that there had to be some discretion.

22   I thought we should look at each -- each case

23   individually.

24        And he wrote a memo telling his -- informing --

25   instructing his staff that we won't be prosecuting

Sheriff Chad Chronister
November 02, 2022

1    misdemeanor possession of marijuana cases.

2             As a matter of fact, if memory serves me

3    correct, it was felony amounts as well, the larger

4    quantities too.  He wasn't going to prosecute those

5    cases.

6             So two weeks after issuing a memorandum that we

7    get a hold of it, he has a meeting with us saying --

8    with all the criminal justice stakeholders -- I'm

9    sorry -- of the different law enforcement, "What are you

10   guys going to do about this?"

11            I'm like, "Well, we're just being made aware of

12   it."

13            So then I went to the county commission and

14   passed a civil citation program again just so there

15   would at least be accountability.

16            Marijuana is not legal yet and I just thought

17   there had been to be some accountability.  Do I think

18   that people have to go jail for it?  Do I think they

19   have to be thrown under the jail for it?  No.

20            But I believe, once again, like the diversion

21   programs, there has to be accountability until the law

22   is deemed -- until possession is deemed legal.

23       Q    Okay.  But Mr. Warren said he wasn't going to

24   prosecute low-level marijuana possession for the hemp

25   law?

Sheriff Chad Chronister
November 02, 2022

```
 1        A    Any marijuana cases.

 2        Q    A guy has got a kilo of marijuana.  Mr. Warren

 3   said he wouldn't prosecute it?

 4        A    I don't -- I don't believe so.  I think he was

 5   pretty clear that he wasn't -- he wasn't going to

 6   prosecute any marijuana cases.

 7        Q    Well, I haven't seen this memo at least

 8   recently, although Mr. Newton has got it for me.

 9             Okay.  Here we go.  It's in Exhibit 6.  Let's

10   look at it.

11             All right.  It's on Page 2284.  So it's like

12   two -- let's say maybe four-fifths of the way through

13   the packet.

14             This is a memo dated September 4th, 2019.  It's

15   part of Exhibit 6 and it's Bates Number 2284 through

16   2287.

17             Do you see that, Sheriff?

18        A    Yes, sir.

19        Q    Okay.  Is this the policy that you were talking

20   about?

21        A    Correct.

22        Q    That I had obviously forgotten about.

23             Okay.  So let's talk about that.

24             It -- it references the hemp law.  Right?  It

25   says, "Florida's new hemp law took effect on July 1st,
```

Sheriff Chad Chronister
November 02, 2022

```
 1    2019."  Right?

 2         A    Yes.

 3         Q    Okay.  And then it talks about the hemp law?

 4         A    Correct.

 5         Q    So in the middle of Page 2 it talks about

 6    something you and I were just talking about.  It says,

 7    "Prosecutorial ethics preclude us from charging an

 8    offense without a good-faith belief that we can prove

 9    the offense beyond a reasonable doubt."

10              Do you see that?

11         A    Yes.

12         Q    Okay.  Does that statement surprise you that

13    that's an ethical requirement for prosecutors?

14         A    No.  That doesn't surprise me.  That's

15    extremely accurate.

16         Q    Okay.  Great.

17              Now, you said that this policy said they

18    wouldn't prosecute any marijuana cases -- right -- even

19    a kilo, I think?

20         A    Yes.

21         Q    Although I think maybe -- I was going to say,

22    we measure marijuana in pounds -- right -- which I've

23    never understood.

24         A    That's okay that you don't.  That's a good

25    thing that you don't.
```

Sheriff Chad Chronister
November 02, 2022

 1       Q    I appreciate that.

 2       A    Give me a -- give me a -- never mind.

 3       Q    Yeah.

 4       A    That's not a bad thing.

 5       Q    No.  I mean, it just is what it is.  It's the

 6    truth.  But it used to always sort of bother me.  Like

 7    if we're weighing the drugs, why don't we weigh them the

 8    same?

 9       A    Why -- why is that the only thing that's

10    different?  Right?  Everything is in kilos except for

11    marijuana was always in pounds.

12       Q    Yeah.  I don't know.  Okay.  It's a mystery.

13            Okay.  Does it say in here that they're not

14    going to prosecute marijuana cases ever at all?

15       A    Beginning on Page 1:  "Effective immediately,

16    our office will not file charges nor prosecute any

17    cannabis case with an offense date on or after July 1st

18    without a scientific reliable admission {sic} test that

19    proves beyond a reasonable doubt that the substance

20    contains a THC level above the 0.3 percent threshold

21    that distinguishes illegal cannabis from" illegal --

22    "from legal hemp."

23       Q    But that's --

24       A    The state attorney is responsible for testing.

25    He said he won't spend the money to test the drug.

Sheriff Chad Chronister
November 02, 2022

1        Q    Why would the state attorney's office be

2    responsible for testing?

3        A    That's their -- they're required to test all

4    drugs.  They send it for further testing in preparation

5    of trial or file additional charges.  That's in Florida

6    that they're responsible for that.

7        Q    Okay.  Who runs the labs?

8        A    The Florida Department of Law Enforcement, or

9    they -- or they can use a private accredited laboratory

10   as well.

11       Q    Okay.  Who pays for the testing?

12       A    The state attorney's office.

13       Q    So if in response to a law the state attorney's

14   office realizes that their budget for other things is

15   going to be completely exhausted by testing for the

16   difference between hemp and marijuana and they decide

17   they're going to focus on other more serious crimes

18   instead, wouldn't that be a pretty reasonable exercise

19   of their discretion?

20       A    Well, again we disagree, but we have a

21   different perspective.

22            Probably half of my homicides this year are

23   marijuana-related homicides.  So I certainly feel

24   different about marijuana distribution and prosecuting

25   those individuals.

Sheriff Chad Chronister
November 02, 2022

1              I believe it does directly relate to -- to

2     crime.  So I feel much differently about marijuana

3     possession.  And I'm not talking even large amounts.  We

4     think the movies, you know, pounds of marijuana.  These

5     are misdemeanor amounts of marijuana:  dime bags, nickel

6     bags that people are losing their lives over.

7         Q   Yeah.  I'm not going to argue with you about

8     the evils of drug trafficking.  I think you and I

9     probably share a view on that.

10             I guess my question is, the legislature passes

11     a law.  It has this -- intended or unintended, but it

12     has this impact on the prosecution of these cases?

13         A   Yes.

14         Q   Did you ever talk with Mr. Warren about the

15     budgetary impact that this would have on his office and

16     about sort of what the opportunity cost was of

17     prosecuting and testing these -- these cases?

18         A   We have, and we did.

19             He brought, again, every chief, municipal chief

20     and law enforcement officer or leader in the -- in

21     Hillsborough County in to tell us that he wasn't doing

22     it.

23             He did explain part of the reason was this.

24     Some part, I believe, was manpower constraints.  Some of

25     it -- there was a lot of different reasons why he wasn't

Sheriff Chad Chronister
November 02, 2022

1   doing it.

2          You know, but, Counsel, with all due respect,

3   it doesn't mean I have to -- I have to agree with it.

4   Hence, why when I thought it played a role -- I don't

5   know if this came from us or not.

6          Q   It came from the governor's office.  It was

7   stamped.

8          A   I certainly have brought it up.

9          Q   Okay.

10          A   And I wanted to make you aware of it.

11          Q   Yeah.

12          So this is part of the packet that we learned

13   about through the case and that we, I think, have

14   established that this packet of documents that is

15   Exhibit 6 came from your office to their office.

16          A   That very well could be.

17          Q   Okay.

18          A   Again, like I said, I just wanted to make sure

19   you were aware.  When I'm answering your question I'm

20   being as forthright as possible.

21          Q   Yeah.  I appreciate that.

22          But what I'm -- what I'm really struggling with

23   is, I mean, you don't think that the state attorney's

24   office was lying when it said had manpower issues and

25   budget issues and all that stuff.  Right?

Sheriff Chad Chronister
November 02, 2022

```
 1        A    No, sir.

 2        Q    Prior to the law coming out, the hemp law, had

 3    the state attorney's office been prosecuting these

 4    cases?

 5        A    I think they were on the decline.  I can't give

 6    you percentages.

 7        Q    But they were prosecuting marijuana cases.

 8    Correct?

 9        A    There were some cases that were being.  I think

10    it was just -- at that point it was just the felony

11    amounts not the misdemeanor amounts.

12        Q    Okay.  But, again, like they could reasonably

13    decide that like felony marijuana, that's like driving

14    20 over and misdemeanor marijuana was like driving three

15    over, and they made a decision about where to allocate

16    their resources.  Right?

17        A    That could possibly be a view.  Yes.

18        Q    Okay.

19        A    Being reasonable.

20        Q    Okay.  So I guess what I'm saying is --

21        A    It doesn't make it right but reasonable.

22        Q    The -- the hemp law wasn't passed by State

23    Attorney Warren.  It was passed by the legislature?

24        A    Yes, sir.

25        Q    And he assessed its impact on his agency and
```

Sheriff Chad Chronister
November 02, 2022

1    made a decision about how to allocate resources in

2    response to legislative change.  Fair?

3         A    Yes.

4         Q    So why was this, in your view, something that

5    made him -- this -- this memo and this practice as

6    announced in this memo that's on Page 2284 of

7    Exhibit 6, something that made him derelict in his duty

8    as a prosecutor?

9         A    Because I believe that he out-exercised his

10   authority of making all marijuana possession legal in

11   Hillsborough County because he wasn't going to prosecute

12   any marijuana cases.

13             If we would get 100 pounds of marijuana, I

14   think maybe then we should -- there should be certain

15   cases -- I understand discretion -- certain cases where

16   the state attorney's office would think, "This is

17   important enough that I'm going to expend the expense,

18   the expenditure to -- to prove this case beyond a

19   reasonable doubt."

20             It shouldn't just be an office -- another

21   office-wide policy that, "We're not prosecuting

22   marijuana cases."

23        Q    Okay.  Page 3 of the memo at the top says that

24   they're going to do exactly what you basically just said

25   they should do.

Sheriff Chad Chronister
November 02, 2022

```
 1              It says, quote, The hemp law does not affect
 2     our current prioritization of cannabis cases.  Among
 3     cannabis-related offenses, our office will continue to
 4     prioritize felonies:  trafficking, manufacturing,
 5     delivery, sale, possession with intent, and
 6     felony-amount possession cases.
 7        A   They will prioritize.  It doesn't mean they're
 8     going to prosecute it.
 9        Q   What does it mean, sir?
10        A   It means that they can -- they can prioritize
11     it.  It never says they're going to prosecute those.
12        Q   It does say that.  Keep reading.
13              "Also, we will continue to prioritize the
14     prosecution of cannabis-related felonies in which other
15     felonies are part of the same transaction or
16     occurrence."
17              This says that they're going to continue to do
18     the big stuff.  That's what it says.
19              So I guess what I'm --
20        A   I think, like some of the memos, it contradicts
21     itself.  It says here where, "We're not going to" -- I'm
22     sorry.  I went too far.
23              "Here we're not going to prosecute any -- any
24     cannabis case," and then here it says, "We'll prioritize
25     the -- the larger amounts or the more serious ones or
```

Sheriff Chad Chronister
November 02, 2022

1    the possession was linked to another type of crime."

2         Q   But, sir, it doesn't even say that in the

3    summary you're reading.  That language I just read from

4    Page 3 of the memo is in the bold-faced summary in the

5    middle of the paragraph.  Let's read it together.

6              After the line that you read, "Effective

7    immediately," it then says the line I just read from

8    the -- Page 3.  It says in bold type, like literally in

9    the center of the page:  "Among cannabis-related

10   offenses, our office will continue to prioritize

11   felonies:  trafficking, manufacturing, deliver, sale,

12   possession with intent and felony-amount possession

13   cases while continuing to deprioritize the prosecution

14   of misdemeanor cannabis cases in favor of established

15   diversion and" --

16              THE COURT REPORTER:  I'm sorry.  "In favor

17       of" --

18   BY MR. CABOU:

19        Q   -- "established diversion in civil citation

20   programs."

21              So the summary in bold type says exactly what I

22   read from the back page.

23              Does focusing on this together here today and

24   reading this bold type and reading the memo itself

25   change your view about what the actual policy was in the

Sheriff Chad Chronister
November 02, 2022

1   office?

2       A   It doesn't because I feel comfortable that even

3   the larger cases weren't being prosecuted.

4       Q   What gives you that comfort, Sheriff?

5       A   I've heard about several different cases

6   that -- where the charges weren't filed against the --

7   the other provisions:  the -- the trafficking,

8   manufacture, deliver, possession with intent and

9   felony-amount cases -- that that's -- that's -- that's

10   not the norm of the state attorney's office.  Those

11   cases aren't being prosecuted.

12       Q   Just because there are some cases that weren't

13   prosecuted doesn't mean that they were not prosecuting

14   all marijuana cases, though.  Right?

15       A   I agree with you.  Yes.

16       Q   Are you familiar with any of the specifics of

17   any of the cases involving marijuana that weren't

18   prosecuted that you think should be?

19       A   Try it one more time.

20       Q   So you told me that you're sure there are cases

21   involving marijuana that weren't prosecuted.

22           And I guess what I'm asking you is, what do you

23   know about those cases?

24       A   Only the fact that they weren't being

25   prosecuted.  Do I know the percentage or if we broke it

Sheriff Chad Chronister
November 02, 2022

 1   down how many felony possession that -- that pertained

 2   to one of these enhanced charges that he said that they

 3   would pursue and that they didn't?  I don't know what

 4   that percentage was.

 5           I was led to believe that it's -- it's very

 6   few, if any.

 7       Q   Okay.  Who led you to believe that?

 8       A   Different commanders within the office.  The

 9   chief deputy, hearing from different detectives that

10   were conducting the cases.

11       Q   Okay.  And did you ask any of these people who

12   led you to believe that they weren't prosecuting

13   marijuana offenses in the state attorney's office,

14   furnished specifics about the cases they were

15   complaining to you about?

16       A   I did not.

17       Q   For example, if the deputy had lost the drugs

18   in the process of vouchering this evidence, that would

19   not be a reason.  Right?

20       A   Of course it would be.  Anything within reason.

21   No one --

22       Q   Sure.

23       A   No one -- I should say when they were providing

24   that information no one ever offered a reasonable

25   explanation of why the charges were being dropped.

Sheriff Chad Chronister
November 02, 2022

1           As a matter of fact, if memory serves me right,

2   it was always a reason why they would lead one law

3   enforcement officer to believe that they shouldn't

4   pursue the case.

5       Q    Okay.  Did you discuss any of these cases with

6   anyone in Mr. Warren's office?

7       A    I personally did not.  I did not.

8           As a matter of fact, I didn't even discuss this

9   with the governor's staff.  I just passed it along.

10      Q    The memo?

11      A    Just the memo along, if it came from us.

12      Q    Yeah.  I think -- I think I've been reminded.

13  Its Bates-stamped from the governor's office and it's an

14  exhibit that came from you.

15      A    All right.

16      Q    I think we can establish that.

17          So you're saying you don't recall discussing

18  this memo on marijuana prosecution with Mr. Keefe.  Is

19  that what you're saying?

20      A    I don't remember discussing this.  I just

21  provided it.  I believe that I had asked them to add

22  that to the thing that I had heartburn with it.

23      Q    Okay.  You have heartburn with not prosecuting

24  low-level marijuana offenses, but yet you strongly

25  defended a program where I can turn in a pound of

Sheriff Chad Chronister
November 02, 2022

1    marijuana, no questions asked, if I -- if I say I'm

2    seeking treatment.  Is that right?

3        A    I don't -- I don't have heartburn with it.

4             And you keep going back to the -- to the amount

5    of drugs and the amnesty program when someone is trying

6    to seek rehabilitation.

7             The -- the quantity of drugs that would come

8    in, if any, when they ask for that help -- I don't think

9    we've ever seen it and I think it's highly unlikely that

10   we would ever see it.  You're talking about addicts, not

11   someone who's a trafficker who decides, "I'm going to go

12   get some help."

13       Q    Okay.  Are you familiar with the -- with the

14   group called Fair Just Prosecution?

15       A    I'm not.

16       Q    Have you read the executive order that

17   suspended Mr. Warren?

18       A    I have not.

19       Q    Okay.  Well, we can do it together.

20            MR. CABOU:  I'm going to ask that we mark

21       Tab -- I'm sorry.  This is going to be Exhibit --

22            THE COURT REPORTER:  15.

23            MR. CABOU:  -- 15.

24            (Exhibit 15 marked for identification.)

25            THE WITNESS:  I'll leave my stack over here.

Sheriff Chad Chronister
November 02, 2022

```
 1            MR. AARON:  Oh, I've seen this before.

 2    BY MR. CABOU:

 3        Q   Sheriff --

 4        A   Yes, sir.  Yes, sir.

 5        Q   -- Exhibit 15 appears to be -- and apparently

 6    Mr. Aaron would vouch -- that this is the executive

 7    order of suspension that brings us all together today

 8    suspending Mr. Warren.

 9            Do you see that?

10        A   Yes, sir.

11        Q   Is this -- is this the first time you've seen

12    it?

13        A   First time I've seen it.

14        Q   Okay.  All right.  I want to ask you about some

15    of its parts.  The -- the order itself goes -- is ten

16    pages.  It ends on Page DEF 240, 2-4-0.  And then after

17    that there's some exhibits.

18            Exhibit A is a letter from the group Fair and

19    Just Prosecution.  It's dated June 20- -- excuse me --

20    2021.  It begins on Page 242 of the exhibit.  And it's

21    on the subject of the criminalization of transgender

22    people and gender-affirming healthcare.  It's in the

23    title.

24            Do you see that?

25        A   Yes, sir.
```

Sheriff Chad Chronister
November 02, 2022

1      Q    Have you ever seen this letter before?

2      A    I have not.

3      Q    Do you understand that this is one of the two

4   letters that the governor attached to his executive

5   order suspending Mr. Warren?

6      A    Seeing it now, I understand.  Yes.

7      Q    Were you previously aware that part of the

8   governor's reasons for suspending Mr. Warren was this

9   letter?

10     A    I did learn something about the day of the

11  press conference when the governor was speaking that I

12  guess a portion of his suspension or decision to suspend

13  the state attorney was in regards to some type of

14  abortion or transgender declaration that he signed.  But

15  I wasn't aware it.

16     Q    Okay.  I guess, let me ask you, do you know why

17  the governor suspended Mr. Warren?

18     A    No, sir.

19     Q    The governor never told you that?

20     A    Never told me.

21     Q    Okay.  Who would know why the governor

22  suspended Mr. Warren?

23     A    Probably the governor's staff would know.

24     Q    Okay.  Would the governor know?

25     A    Maybe.  I would believe.  I mean, a reasonable

Sheriff Chad Chronister
November 02, 2022

1    person would believe that the governor may know, but I

2    don't know.  There's things that you asked me today that

3    my staff would know that -- that I wouldn't necessarily

4    another.

5         Q   Okay.  But if you carried out a decision that,

6    you know, you alone had the power to carry out and it

7    required you personally to sign, would you know the

8    reasons for that decision?

9         A   I would.

10        Q   Okay.  You've never seen this letter about

11   transgender people and gender-affirming healthcare --

12   correct -- prior to today?

13        A   No, sir.

14        Q   Okay.  Let's -- you have, however, seen

15   policies of the state attorney's office.  Right?  You've

16   seen policies of the state attorney's office?  We just

17   talked about them.

18        A   As in regards to memorandums that he issued?

19        Q   I'm saying -- yeah.  You talked about his

20   office policy of non-prosecution and his policy about

21   discretion.

22            Those are policies issued from his office.

23   Right?

24        A   Sure.  I've seen -- I'm sorry.  You're calling

25   them policies; I'm calling them memorandums.  But I

Sheriff Chad Chronister
November 02, 2022

1    guess they could be considered the same.

2         Yes.  Do I know of all of his policies?  No.

3    Q    Okay.

4    A    Are we talking about the ones --

5    Q    But you know what a policy looks like --

6    right? -- from his office.  It's got a letterhead maybe.

7    It says "From Andrew Warren to ASAs," like Exhibit 6 --

8    right -- that memo?

9    A    Yes.

10    Q    Okay.  That's -- that's from his office, his

11    policy.  Right?

12    A    My -- my question was, are you talking all his

13    policies or just the ones that -- that we were talking

14    about today?

15    Q    Yeah.

16    A    I certainly don't -- I'm not aware of all his

17    policies.

18    Q    I'm not asking that.  I'm just asking if you

19    have ever seen a policy of his office.

20    A    I have.

21    Q    Okay.  And one of them is in Exhibit 6.  Right?

22    That's that December 14th, 2021, memorandum.  It's the

23    first few pages of Exhibit 6, that one right there.

24    A    I have.

25    Q    Okay.  That's a policy of his office.  Right?

Sheriff Chad Chronister
November 02, 2022

```
 1          A   Yes, sir.

 2          Q   Okay.  And then another one was the bike stop

 3    policy.  Right?  We talked about that?

 4          A   Yes, sir.

 5          Q   And after receiving a copy of the policy that's

 6    in Exhibit 6 and the bike stop policy, you then wrote

 7    Mr. Warren a letter that's Exhibit 11.  Right?

 8          A   Yes.

 9          Q   And in this document, Exhibit 11, you said,

10    quote, It is particularly disturbing that two recent

11    memorandums/policies issued by you were not ever

12    discussed or provided to our office when they were

13    issued and placed into effect.

14              That's correct.  Right?

15          A   Correct.

16          Q   Okay.  So Exhibit 6 is the policy of his

17    office.  The bike stop policy is a policy of his office.

18    You wrote him a letter about these policies.

19              But you've never heard of the letter that's

20    attached to the executive order on transgender care.

21    Right?

22          A   No, sir.

23          Q   Okay.  Are you aware if there's a law in

24    Florida prohibiting gender-affirming surgery?

25          A   I'm not aware.  No.
```

Sheriff Chad Chronister
November 02, 2022

```
1          Q    There isn't one.  Right?

2          A    Not -- not to my knowledge.

3          Q    Okay.  Have you -- let me ask you this.

4               Are you aware of your agency ever being

5     referred a case alleging violation of a law relating to

6     gender-affirming surgery?

7          A    No, sir.

8          Q    Okay.  The second exhibit to the governor's

9     executive order, that's been marked to your deposition

10    as Exhibit 15, is on Page 251 of the exhibit.  Okay?

11              This is a Joint Statement from Elected

12    Prosecutors.  It's dated June 24th, 2022.

13              Do you see that?

14         A    Yes, sir.

15         Q    And have you seen this document before?

16         A    I have not.

17         Q    Okay.  This is a document that you referred to

18    a minute ago, a statement on abortion that I believe you

19    may have heard people discuss at the press conference.

20         A    Correct.

21         Q    Okay.  You've never seen this before.  Right?

22         A    I have not.

23         Q    You're unaware of this being a policy of

24    Mr. Warren's office.  Right?

25         A    Unaware of it.  Yes.
```

Sheriff Chad Chronister
November 02, 2022

1      Q    Yeah.  It's just a letter from a whole bunch of

2    people.  Right?

3      A    Well, I haven't read it, but I --

4      Q    All right.

5      A    There would be no reason for me not to believe

6    that it's a letter.  Right.

7      Q    Okay.  So like on Page 253 it starts the

8    various signatures.  Right?  It starts with Michael

9    Atwell, district attorney Alpine County, California.  It

10    lists a whole bunch of elected prosecutors on that page,

11    on the next page, on the next page, on the next page, on

12    the next page, on the next page, on the next page, and

13    finally on the last page, Page 259.  Right?

14          Did Mr. Warren ever distribute this letter to

15    your agency?

16      A    He did not.

17      Q    Okay.  What about the letter on

18    transgender-affirming care?  Did he distribute that

19    letter to your agency?

20      A    He did not.

21      Q    Are you -- so you've been with the sheriff's

22    office for -- I'm sorry.  Was your whole career in law

23    enforcement with the Hillsborough County Sheriff?

24      A    It was.

25      Q    Okay.  Wow.

Sheriff Chad Chronister
November 02, 2022

1            How long have you been with the sheriff's

2    office?

3        A    Thirty years.   February will be year

4    thirty-one.

5        Q    Okay.   And Mr. Warren like recorded a little

6    blurb for your anniversary video.   Right?   Wished you

7    well.   It was on YouTube.   I saw it.   It was nice.

8            Do you remember that?

9        A    No.   But that doesn't mean it didn't happen.   I

10   don't -- I don't -- I don't look at social media.   So --

11       Q    But it was to you.   It was for you.   It was

12   like all the competition officers in Hillsborough

13   County.   It was Mr. Warren.   It was the county clerk.

14   It was all these people, the election supervisor.   It

15   was all --

16       A    Oh, for my 30 years at the office.

17       Q    Right.

18       A    Yes, sir.   Yes, sir.

19       Q    Okay.

20       A    You're -- you're exactly -- you're exactly

21   right.   Sorry.

22       Q    That's okay.

23       A    I'm sorry.

24       Q    It's fine.

25       A    I just celebrated my five-year anniversary

Sheriff Chad Chronister
November 02, 2022

```
 1    being the sheriff.  I don't know if he was a part of

 2    that.

 3           Excuse me.  Yes.  Thirty-years' anniversary of

 4    being in law enforcement.

 5       Q   When was your five-year anniversary of being

 6    the sheriff?

 7       A   September 30.

 8       Q   Oh, so like a couple weeks ago?

 9       A   A couple weeks ago.

10       Q   Yeah.  Mr. Warren might not have been there.

11       A   Probably missed that one.

12       Q   Yeah.  Been there.  Just wasn't there.

13           Okay.  Look, Sheriff --

14       A   Yes, sir.

15       Q   -- in your time, 30 years of law enforcement,

16    all in Hillsborough County, have you ever even heard of

17    your office investigating an allegation that one of

18    Florida's laws regarding abortion was violated?

19       A   No, sir.

20       Q   These letters from Fair and Just Prosection

21    that Mr. Warren lent his name to -- have you ever lent

22    your name to a letter from an organization whose purpose

23    you supported?  Ever co-signed a letter about anything?

24    You know, lobbying for -- lobbying for funding for law

25    enforcement or the Boys and Girls Club or anything like
```

Sheriff Chad Chronister
November 02, 2022

1    that?

2         A    Yes.  Mental health funding, stuff like that.

3         Q    Okay.  So tell me about the example that you

4    seem to remember.

5         A    I remember signing on for one of the crisis

6    centers here asking for additional funding towards

7    mental health.

8         Q    So --

9         A    I do -- I do remember that.

10        Q    So you were approached by an outside agency

11   whose mission you support?

12        A    Correct.

13        Q    And you agreed to lend your name?

14        A    Correct.

15        Q    And presumably your name appeared and your

16   title appeared?

17        A    Correct.  With a letter of recommendation why I

18   felt it was important, no different than the crisis

19   center for additional funding or another crisis center

20   to have less of an impact on victims of sexual abuse.

21        Q    Okay.  Did that letter set policy for your

22   office?

23        A    It did not.

24        Q    All right.  Let's move to the days right before

25   the suspension.  So this is sort of late July/early

Sheriff Chad Chronister
November 02, 2022

1      August of this year.  Okay?

2          A    Yes, sir.

3          Q    Did you speak with anyone in the state

4      attorney's office about Mr. Warren's suspension before

5      it happened?

6          A    I did not.

7          Q    You didn't speak to Mr. Weisman?

8          A    No, sir.

9          Q    Or anybody else sort of in the command staff at

10     the state attorney's office?

11         A    No, sir.

12         Q    Okay.  When did you first personally learn that

13     Mr. Warren was going to be suspended on the 4th?

14         A    A couple days before.

15         Q    And how did you learn that?

16         A    Through a conversation with Larry Keefe.

17         Q    Okay.  And did he call you or did you call him?

18         A    He called me.

19         Q    Okay.  And what did he say?

20         A    That they were moving towards suspending the

21     state attorney.

22         Q    Okay.  What did you say?

23         A    "Okay."

24         Q    How long was the conversation?

25         A    I don't believe it was very long.  It was that

Sheriff Chad Chronister
November 02, 2022

1     they were suspending him.  The governor's staff wanted

2     to hold the press conference at our office.  And then

3     subsequent conversations, Counselor, from there was the

4     service of the -- of the order.

5         Q    Okay.  When did you first learn that Susan

6     Lopez would be appointed as Mr. Warren's replacement?

7         A    Moments before the governor walked into the

8     press conference.  When he walked in he had said Susie

9     Lopez was who he was replacing Andrew Warren with.

10        Q    Okay.  When you spoke with Mr. Keefe in the

11    couple days before announcing the suspension do you

12    recall anything else that he told you?

13        A    No, sir.

14        Q    Do you recall anything else that you told him?

15        A    Not that I can recall.  No.

16        Q    Okay.  So so far we've identified two

17    conversations that you've had with Mr. Keefe.  One was

18    in the car with Mr. Fairer --

19        A    Yes.

20        Q    -- in March or April.  The other one was a

21    couple of days before the suspension when you learned

22    that the suspension would happen and when you were asked

23    to hold the press conference.

24        A    Correct.

25        Q    Correct?  Okay.

Sheriff Chad Chronister
November 02, 2022

```
 1          Okay.  In between those two conversations were
 2    there any other conversations that you had with
 3    Mr. Keefe?
 4        A   There were.  I think most of it pertained
 5    during that -- that time period between was just mailing
 6    and we were FedEx-ing and then receiving the documents,
 7    the -- the packet that I sent.
 8          You should have that, Counselor.  You should
 9    have those conversations.
10        Q   Yeah.
11        A   Okay.
12        Q   Do you recall how many conversations occurred
13    in between the first conversation and the last
14    conversation?
15        A   I don't.  I couldn't tell you.
16        Q   Okay.  Do you have any -- any idea whatsoever?
17    Is it 20?
18        A   Maybe.  I don't -- I don't recall.
19        Q   Okay.  But it's not one or two?
20        A   No.  No.  It's not one or two.
21        Q   It's a number of conversations?
22        A   Sure.
23        Q   Okay.  Prior to speaking with Mr. Keefe in the
24    call where he told you Mr. Warren would be suspended
25    when was the call before that?
```

Sheriff Chad Chronister
November 02, 2022

1    A    There was a lag time in between him receiving

2    the documents and the time period between the end of

3    July when he wanted to jump on a phone call to discuss

4    that they were going to suspend Andrew Warren.

5    Q    Okay.  So the phone call at the end of July

6    where he didn't want to discuss the suspension -- is

7    that the same phone call where he asked you to hold the

8    press conference?

9    A    Yes.  There were -- there were several

10   different phone calls that happened with that short --

11   within that short period of time leading up to the

12   Andrew Warren suspension.  So a lot of that was

13   discussed over -- over probably several phone calls.

14   Q    Okay.  Who participated in those phone calls

15   other than you and Mr. Keefe?

16   A    There was another person from the governor's

17   office that was there.

18   Q    Does the name Ryan Newman ring a bell?  That's

19   the governor's head lawyer.

20   A    That sounds familiar.

21   Q    There's also a gentleman named Ray Treadwell

22   who is also a lawyer for the governor's office.

23       Do you recall speaking with Mr. Treadwell?

24   A    That name doesn't ring a bell.

25   Q    Mr. Newman's name rings a bell?

Sheriff Chad Chronister
November 02, 2022

1      A    It does.  But again, I can't say with entire

2   certainty, but it seems like he was part of the phone

3   call.

4      Q    Okay.  What about James Uthmeier?  Have you

5   ever spoken to him?

6      A    I believe that he was on the phone call as

7   well.  Yes, sir.

8      Q    Okay.  Do you recall Mr. Uthmeier saying

9   anything on the call?

10     A    I wish I had that good of a memory.

11          There was discussions.  Like I said, it wasn't

12   a very lengthy phone call.  It was the fact that, "We're

13   suspending him and we want to do it at your office and

14   this is when we're going to do it."

15          It wasn't a -- it wasn't a lot of information

16   to go back and forth.

17     Q    Okay.

18     A    So who participated in that phone call?  I

19   don't recall who did the talking and who didn't.

20     Q    Okay.  In the other phone calls that you had

21   with Mr. Keefe was it just the two of you?

22     A    Almost every phone call was just me and

23   Mr. Keefe.

24     Q    Okay.  Until sort of right close to the end

25   when you had one or more calls that might have

Sheriff Chad Chronister
November 02, 2022

```
 1    involved -- that involved other people but it might have

 2    been Mr. Newman and it might have been Mr. Uthmeier.

 3    You're not quite sure.

 4        A    I remember individuals getting introduced and

 5    those names sound familiar.  But who did what talking,

 6    who said what -- I'm sorry.  My -- my memory is not that

 7    good.

 8        Q    Okay.  Was the governor on any of these calls?

 9        A    No, sir.

10        Q    Okay.  Why did you agree to host this event?

11        A    There wasn't a reason for me not to host the

12    event.  The governor wanted to have it at the sheriff's

13    office.

14             He felt that law enforcement would benefit the

15    most with Mr. Warren's suspension, that people would

16    start being held accountable for the crimes they

17    committed in Hillsborough County.

18        Q    How do you know that's what the governor felt?

19        A    Some one of the three people on that phone call

20    said that was the reason they wanted to have it at a

21    sheriff's office, at one of our facilities.

22        Q    Okay.  So someone on the call -- it might have

23    been Mr. Keefe.  It might have been Mr. Uthmeier.  It

24    might have been Mr. Newman, or it might have been

25    someone else if they, in fact, weren't the people on the
```

Sheriff Chad Chronister
November 02, 2022

```
 1    call.  Right?

 2         A    Yes.

 3         Q    Someone that wasn't you --

 4         A    -- gave a reason why they felt it should be --

 5    that the press conference should occur at the -- at

 6    the -- a law enforcement building at the sheriff's

 7    office.

 8         Q    Okay.

 9         A    And I didn't have a valid reason to -- to -- to

10    disagree.

11         Q    Well, what if you just said, "Hey, like I

12    just -- you know, I have a working relationship with the

13    state attorney's office.  I don't -- I don't want to do

14    this?  It's just -- it's going to make things hard for

15    me"?  You could have -- you could have said that.

16    Right?

17         A    Of course I could have done that.

18              But again, I supported the -- the governor's

19    suspension of Andrew Warren.  So I felt through that

20    support that hosting it at my office -- was it going to

21    be difficult?  Was it going to make things hard?  Of

22    course -- of course it has and will.

23         Q    How has it made things hard on you?

24         A    Because we're in a Democratic county and I'm --

25    I'm the only county-wide elected official here.  So I
```

Sheriff Chad Chronister
November 02, 2022

1    think I've upset a lot of people by -- by even playing a

2    role in -- like people like you and other people think I

3    played a major role, an enormous role -- I believe the

4    words that were being used -- when, indeed, I support

5    it -- support it for the reasons we spoke about:  the

6    memorandums that we spoke about.  The information that I

7    provided is the reason I supported his decision to -- to

8    suspend Andrew Warren.

9          So participating in the press conference alone

10   came along with all those -- with the same things.  I

11   believed it was the right thing.  Certainly not the easy

12   thing and the more difficult thing.

13        Q   At any time before the press conference did you

14   consider reaching out to Mr. Warren and saying, "We

15   really need to talk about some stuff," and explain to

16   him that you've been providing information to the

17   governor's office, that you valued your working

18   relationship and you wanted him to know that?

19        A   No, sir.

20        Q   Okay.  Mr. Warren was elected by the same

21   voters that elected you?

22        A   Yes, sir.

23        Q   Are you concerned that by supporting a

24   suspension you're going to alienate those voters?

25        A   Sure.  I think it's always a concern.

Sheriff Chad Chronister
November 02, 2022

1    Everybody should be concerned.  But again, I did it

2    believing it was the right thing to do.

3        Q    Okay.

4        A    But let's just make it clear that the decision

5    to suspend Andrew Warren wasn't mine to make, and I

6    don't believe it was going to be made whether I agreed

7    or disagreed.

8        Q    Tell me more about that.

9        A    I think the governor suspended Andrew Warren,

10   not me.  I don't -- I don't think my -- I don't think --

11   I don't think the governor did it or didn't do it

12   because of me, because of Chad Chronister or our

13   involvement with -- with the sheriff's offs.

14       Q    I mean, so it would surprise you then if it

15   were true that you were the main source of investigative

16   material for Mr. Keefe?

17       A    Yeah.  Again, I think we expressed that

18   earlier.  I disagree with that.  I don't think I was the

19   main source.

20            If the material I provided played a role in his

21   suspension, that's -- you know, I provided the material

22   based on them conducting an investigation of state

23   attorneys not prosecuting cases.

24       Q    Okay.  We asked in this litigation for all the

25   materials relating to the suspension of Andrew Warren,

Sheriff Chad Chronister
November 02, 2022

1    and all the records from the review or investigation

2    that the governor said they did, and the biggest part of

3    the stack is from you.

4        A    Yeah.  Your -- your duces tecum subpoena was to

5    my office.  Of course, I would believe all it would

6    be --

7        Q    Oh, I'm talking about to you, sir.  I'm talking

8    about we asked the governor's office, "Give us your file

9    on the suspension," and what we got was a file that the

10   majority of the printouts that you sent.

11       A    I understand.

12       Q    Does that -- if that's true, does that change

13   your view on whether you played a major role?

14       A    No, sir.

15       Q    Okay.  Did you feel like you had a choice in

16   hosting this press conference?

17       A    Yes.

18       Q    Okay.  And you never told anyone you didn't

19   have a choice to host it?

20       A    No.  I certainly had a choice.  I could have

21   said no.

22       Q    Okay.  There were about 15 armed uniformed

23   deputies on the stage with you.  Right?

24       A    I don't know if it was 15, but there were some.

25   Yes.

Sheriff Chad Chronister
November 02, 2022

```
 1        Q    Okay.  What was their purpose?

 2        A    I invited some of the command staff members to

 3    participate in the press conference.

 4        Q    Okay.  But the people on the stage weren't just

 5    the command staff, were they?

 6        A    Yes.

 7        Q    Only command staff?

 8        A    Only command staff.

 9        Q    Okay.  What would they have been doing if they

10    weren't there?

11        A    If they weren't at the press conference?

12        Q    Yeah.

13        A    A variety of whatever their daily duties are.

14        Q    Okay.  Did -- you said you invited them to be

15    there?

16        A    Yes.

17        Q    Did people say no?

18        A    No.  Everyone I asked to be there showed up.

19        Q    Okay.  But, I mean --

20        A    Unless they had a previous something they

21    couldn't get out of.

22        Q    Okay.

23        A    I asked the chief deputy to have some command

24    staff members there.  So if some couldn't make it, if

25    some said no, I don't know that.  I was never informed
```

Sheriff Chad Chronister
November 02, 2022

1    that somebody said no, that they -- that they

2    wouldn't -- wouldn't participate.

3         Q   Not surprising.  Right?  I think you're the

4    boss.  I imagine that usually when you -- when you make

5    a request of a subordinate it's not optional.

6         A   Yeah.  But the reason I requested that they be

7    there -- and that's a logical statement, obviously.  We

8    all want to please our -- our boss.

9              But the very same reasons for -- for the

10   suspension -- the victims, having to talk to the victims

11   that weren't getting the justice they deserve and all

12   the other reasons we spoke about.  The commanders were

13   dealing with that firsthand.  So I felt that they would

14   want to be a part of the press conference.

15        Q   Okay.  Were they on duty?

16        A   They were.

17        Q   So instead of doing what their duty was they

18   were doing that?

19        A   Well, press conferences are their duty too.

20   They do press -- they participate in press conferences.

21        Q   Okay.  Was the Tampa police chief there?

22        A   One of the previous police chiefs was there.

23        Q   Mr. Dugan was there?

24        A   Yeah.

25        Q   Who -- who you had spoken with about your

Sheriff Chad Chronister
November 02, 2022

```
 1    mutual frustration with State Attorney Warren?

 2         A    Correct.

 3         Q    And who you put in touch with Mr. Keefe?

 4         A    Yes.

 5         Q    Okay.  But he's not the chief anymore.  Right?

 6         A    No.  The previous chief of police.

 7         Q    Okay.  Was the current Tampa police chief

 8    there?

 9         A    She was not.

10         Q    Why not?

11         A    I wouldn't have asked any of the municipal

12    police chiefs to come.  Number one, I don't think their

13    mayors would have came -- would have allowed them to

14    come.

15              Number two, they're appointed not elected.  So

16    I would never put them in that position.  Do they all

17    express their frustration?  They absolutely do, quite

18    frequently.

19              But I would never -- I'm -- I'm the one that's

20    elected.  I answer to the people, so I would never put

21    them in that position and ask the chief of police to

22    have to come speak out at a press conference.

23         Q    At a political event?

24         A    At a press conference.

25         Q    Was it a political event?
```

Sheriff Chad Chronister
November 02, 2022

1      A   I don't believe it was a political event.

2      Q   How do you draw the distinction between this

3   and whatever would happen at a political event?

4      A   I've been to several fundraisers and campaign

5   political events.  I don't believe this was a political

6   event.  This was the governor exercising his ability to

7   suspend a state attorney who he felt was negligent in

8   his duties.

9      Q   Okay.  But certainly it's not required that the

10   governor have a press conference for that.  Right?  He

11   could have just filed the document with the Secretary of

12   State and that would have been the end of it.

13      A   Yes, sir.  That's quite plausible.

14      Q   Okay.  So what purpose does the press

15   conference serve if not a political purpose?

16      A   I think just like every press conference we do.

17   We're announcing something that he felt it was important

18   to him.  And again, I'm speculating.  I hadn't spoke to

19   him then -- that he felt it was important that he speak

20   to the press of his suspension and why he was suspending

21   him.

22      Q   Okay.  You mentioned victims.

23      Did you attempt to identify victims who would

24   attend this event?

25      A   We did.

Sheriff Chad Chronister
November 02, 2022

1      Q    Did you reach out to any victims personally?

2      A    I did not.

3           MR. CABOU:  Okay.  Let's look at this.  This

4      might be Exhibit --

5           THE COURT REPORTER:  16.

6           MR. AARON:  16.

7           MR. CABOU:  I'm going to mark that.

8           (Exhibit 16 marked for identification.)

9  BY MR. CABOU:

10     Q    This was produced to us by the governor's

11 office, and I believe this is a text chain involving

12 you.  I believe that in part because at the top it says

13 Sheriff and the little initials are SC, which I assume

14 is Sheriff Chronister.

15          Looking at his -- it also starts with, "Hey,

16 Sheriff."

17          Do you know who this text is with?

18     A    I don't.  I would have to assume it's one of

19 the governor's staffers, but --

20     Q    I assumed that as well.  I was hoping you might

21 be able to tell me who it comes from.

22     A    I can't.  But not being tech savvy -- forgive

23 me -- doesn't it say who the text is to or from?

24     Q    So your guess is only marginally better than

25 mine.  But I would point out at the top of the page it

Sheriff Chad Chronister
November 02, 2022

1    says Sheriff.  I don't know.

2          MR. CABOU:  Do you know who this is from?

3          MR. AARON:  Yes.

4      A    So it came -- so it came from someone who has

5    my name.

6          MR. AARON:  I can -- I can clarify this.

7          THE WITNESS:  Please do.

8          MR. AARON:  I already emailed your office that

9      Bates 3652 through 3686 are text messages that came

10     from Savannah Kelly.

11         MR. CABOU:  Savannah Kelly Jefferson?

12         MR. AARON:  Yes.

13         MR. CABOU:  Okay.  Got it.

14   BY MR. CABOU:

15     Q    Do you -- do you know Ms. Jefferson?

16         MR. CABOU:  Thank you, Mr. Aaron.

17     A    Yes.  I've met her before.  Yes.

18   BY MR. CABOU:

19     Q    Okay.  And were you in touch with her in the

20   days leading up to the press conference?

21     A    Yes.

22     Q    Okay.  Had you met her previously or did you

23   meet her in conjunction with this event?

24     A    I've met her before.

25     Q    How do you know her?

Sheriff Chad Chronister
November 02, 2022

1      A   We've done other events, other press events

2   that have involved the governor.  And I believe part of

3   her responsibility, unless it changed, was to coordinate

4   some of the different press events.

5      Q   Okay.  Do you know which victim was going to

6   speak as Ms. Jefferson is referring to in this text

7   chain with you?

8      A   Yes.  It was the case that we spoke about, the

9   one that you said the victim was uncooperative.

10      Q   Uh-uh.

11      A   She wanted to come.  She was coming and at the

12   last minute said she couldn't get off work and that she

13   would lose her job if she came.

14      Q   Okay.  So the victim who I have been led to

15   believe was uncooperative in fact didn't show up?

16      A   Correct.

17      Q   Okay.  Did you reach out to other victims?

18      A   I don't -- I don't -- I didn't reach out to

19   anybody.  If they reached out --

20      Q   I gotcha.

21      A   -- to speak to another victim, I'm -- I'm not

22   aware of.  I am aware of that one because she was coming

23   and then decided that she couldn't come.

24      Q   Okay.  You asked about security and a

25   magnetometer and things like that at the event?

Sheriff Chad Chronister
November 02, 2022

1      A    They had asked us about it.   Right.   They

2    inquired about it.

3      Q    Okay.   And -- and it seems like you ultimately

4    decided against that.   Right?

5      A    They decided against it.   Yes.

6      Q    Okay.   Do you know why?

7      A    I do not.

8      Q    The case that the victim was supposedly from

9    that didn't show up -- did you speak to the arresting

10   deputy about that case?

11     A    I didn't.

12     Q    Okay.   Did you review the case file?

13     A    I didn't.

14     Q    Did you speak to the assigned assistant state

15   attorney?

16     A    I did not.

17     Q    Did you ask anyone from your office to do that

18   before you criticized these people openly at a press

19   conference?

20     A    Yeah.   I assumed that they would do all of the

21   above.   Speak to them.   Now, whether they would speak to

22   an assistant state attorney -- I don't know if that was

23   done.   But, yes.   I would -- I would hope that all of

24   that would be done.

25     Q    But you didn't ask that it be done.   Right?

Sheriff Chad Chronister
November 02, 2022

1    You just expected it would be done?

2        A    I just expected it to be done.  Correct.

3        Q    And I think we talked about this before.  But

4    you didn't call Mr. Warren about that case at any time.

5    Right?

6        A    Not about what case?

7        Q    About the Rodriguez case.

8        A    No, sir.

9        Q    Okay.  Again, my understanding --

10       A    I believe there was communication between the

11   two offices about the case, but just not at -- not at

12   that time.  No, sir.

13           MR. CABOU:  Okay.  And I'll just say,

14       Counselor, I cannot find that case file if it's been

15       given to us.

16           Are you confident it's in those materials?

17       Because if so, we'll just obviously look again.  But

18       if not, I don't want to be in a wild goose chase.

19           MS. KIRSHEMAN:  I don't think it's in there.

20           MR. CABOU:  Okay.  I thought you told me

21       earlier that it was in there.

22           MS. KIRSHEMAN:  Oh, the case or this?

23           MR. CABOU:  The case.

24           MS. KIRSHEMAN:  Oh.  Yeah.  I think it is in

25       there.

Sheriff Chad Chronister
November 02, 2022

1         MR. CABOU:  Okay.  We can talk afterwards.

2         THE WITNESS:  We'll certainly get it to you.

3         MR. CABOU:  Okay.  Great.  I just would like to

4     have it.

5         THE WITNESS:  Anything else you feel you're

6     missing, we'll make sure you have it.

7         MR. CABOU:  Okay.  Thank you.

8         THE WITNESS:  Yes, sir.

9  BY MR. CABOU:

10     Q    My understanding from speaking with

11  knowledgeable folks is that the file reflects that there

12  were significant evidentiary issues with the case.

13         Is that consistent with your understanding?

14     A    No.  It was just like we expressed before.  I

15  believe we were told two separate things.

16         I was told just the opposite.  The comment for

17  the lack of prosecution, the fact that she's so scared

18  she can't even go back to her home, she's been living in

19  a hotel room, that she was coming because she wanted to

20  be heard and then changed her mind and said she couldn't

21  get off work.

22     Q    And that was information provided to you.

23  Right?

24     A    Correct.  That was information --

25     Q    You didn't get it firsthand from her?

Sheriff Chad Chronister
November 02, 2022

1      A    No.

2      Q    Were you ever told that neither the deputy nor

3   the witness could actually ID the shooter?

4      A    No, sir.

5      Q    Would that surprise you?

6      A    It would surprise me.

7      Q    Okay.  Let's look at --

8      A    It would not only surprise me; it would upset

9   me.

10      Q    Yeah.  I can see why.

11           All right.  I'm going to hand you what was

12   marked in your Bates stamp as 4-3 001 and ask that we

13   mark that as Exhibit 17.

14           (Exhibit 17 marked for identification.)

15   BY MR. CABOU:

16      Q    Sir, are you familiar with Exhibit 17?

17      A    I am.

18      Q    What's Exhibit 17?

19      A    This is a speech that I provided at the press

20   conference.

21      Q    Okay.  This version of your remarks has a

22   number of handwritten edits and addenda that I'd like to

23   chat about briefly.  Okay?

24      A    (Nodding head.)

25      Q    On the first page in sort of what I would say

Sheriff Chad Chronister
November 02, 2022

1    is a thicker-tipped pen or marker there's a cross-out of

2    "and" in favor of the word "we" and then above there it

3    says "our."

4            Do you see that?

5        A    Yes, sir.

6        Q    Do you recognize the handwriting there?

7        A    I do not.

8        Q    Okay.  This was produced by your office, so I

9    assume that it was someone in your office.

10           But you don't know who that is?  Okay.

11       A    I couldn't identify the -- the penmanship.

12       Q    Okay.  On the next page there's a bracket

13   that's in the same sort of thick-tipped pen and then in

14   between there's writing in a dark-colored ink.

15           Do you see that?

16       A    I do.

17       Q    And the writing says "It's about law and

18   order."

19           Do you see that?

20       A    Yes, sir.

21       Q    Do you know whose penmanship that is?

22       A    I do not.

23       Q    Okay.  There's a cross-out of a line about

24   checks and balances.

25           Do you know whose that is?

Sheriff Chad Chronister
November 02, 2022

1       A    I do not.

2       Q    Okay.  Do you recognize any of the handwritten

3   changes to this draft as coming from you or anyone whose

4   handwriting you recognize?

5       A    I do not.

6       Q    Who were the people within your office who were

7   involved with editing or drafting the remarks?

8       A    Lieutenant Carey.  And I think, full

9   transparency, I also met with a friend of mine, Anthony

10  Pedicini.  So the three of us sat down and went over

11  this version.  So the three of us.  So that could be one

12  of their handwriting and someone could have been the

13  other handwriting.

14          To my -- to my knowledge and recollection, no

15  one else made any other revisions to this.

16      Q    Mr. Pedicini?

17      A    Yes.  Lieutenant Carey.

18      Q    Lieutenant Carey?

19      A    And myself.

20      Q    And yourself?

21      A    And it's not my handwriting.  So one would have

22  to be one and one would have to be the other.

23      Q    Okay.  Do you know if Mr. Pedicini played a

24  role in drafting the executive order that Governor

25  DeSantis used to suspend Mr. Warren?

Sheriff Chad Chronister
November 02, 2022

 1      A    Not that I'm aware of.

 2      Q    Would it surprise you to learn that there are

 3   emails that showed that he played a role in drafting

 4   that order?

 5      A    That would -- that would surprise me.  Yes.  He

 6   had never informed me of that.

 7      Q    Okay.  Did he inform you that he had played any

 8   role in the governor's process with regard to Andrew

 9   Warren?

10      A    Yeah.  He never -- he never told me any of

11   that.

12      Q    Okay.  What -- how do you know Mr. Pedicini?

13      A    A friend, but someone who was my campaign

14   strategist for the first of the campaigns that I ran.

15      Q    Got it.  Okay.

16           Is he -- so is he -- he's sort of a

17   professional campaign strategist, political operative,

18   whatever you want to call it?

19      A    He is.  And at the same time, like I said, a

20   friend of mine that I -- that I went to confer with.

21   Yes.

22      Q    Okay.  Why did you go confer with him then?

23      A    Because I trust him with a lot of things

24   that -- that have to do with issues like this.  There's

25   a lot of times that I confer with him.

Sheriff Chad Chronister
November 02, 2022

1          He's a friend.  I mean, we all confer with our

2     friends.  I was conferring with a friend.

3          Q    Sure.  But as I'm sure you could understand,

4     although we're in slightly different business, we're

5     both in a business that requires secrecy and

6     confidentiality at times.  Right?

7          A    (Nodding head.)

8          Q    He's not a member of your command staff.

9     Right?

10         A    No.  He's a -- he's a friend.

11         Q    But he -- and he doesn't work for your agency

12    in any capacity.  Right?

13         A    He does not.

14         Q    So when did you first confer with Mr. Pedicini

15    about the topic of Andrew Warren's suspension?

16         A    A few days before the suspension when I was

17    authoring the speech.

18         Q    Okay.  Did you tell the governor's office that

19    you were going to talk with people about it?

20         A    I did not.

21         Q    Okay.  Do they know that you spoke with

22    Mr. Pedicini about it?

23         A    I don't believe they did.

24         Q    Okay.  And you didn't know that he had also

25    been helping them draft the order -- right -- or at

Sheriff Chad Chronister
November 02, 2022

1    least providing language for the order?

2         A    No, sir.  I'm not aware of him participating in

3    any of the process.

4         Q    Okay.  What do you make of that, the fact that

5    he was helping you and also helping the governor?

6         A    Am I supposed to assume that it's true?

7         Q    Yeah.  Assume that it's true.

8         A    I don't know what to think about it.  You're --

9    you're just telling me something I was unaware of.  It's

10   never been communicated with me in any way, shape or

11   form.  So you're going to favorite questions if I'm

12   surprised.  Yeah.  I'm surprised.

13        Q    I didn't even have to ask.

14             Okay.  This draft that we're reviewing that

15   Mr. Pedicini and Lieutenant Carey had input on does not

16   contain an explanation about the Rodriguez case.  Right?

17        A    Not that I see, Counselor.

18        Q    Okay.  That came in a later draft?

19        A    Yeah.  And I don't know what version this is.

20        Q    You and me both.

21        A    They all should be labeled.  There were six of

22   them, so they all should be labeled from the --

23        Q    They should be labeled.  I agree.  But yet here

24   we are:  unlabeled.

25             Can you tell me looking at this draft which of

Sheriff Chad Chronister
November 02, 2022

1    the six versions it is?

2        A    I cannot.

3        Q    Okay.  In your documents as you -- do you store

4    these on your computer, I assume?

5        A    Lieutenant Carey would have them on -- on his.

6        Q    And to the best of your knowledge, they're

7    labeled draft one, draft two?

8        A    Yes, sir.

9        Q    Okay.

10       A    Yes, sir, they are.

11       Q    We'd like to get that information.

12       A    Which version is which?

13       Q    Yeah.

14       A    Yeah.

15       Q    Okay.  Thank you.

16       A    Understood.

17       Q    Okay.  Let's look at --

18            THE WITNESS:  You guys are all warm.  Are you

19       drinking coffee on top of it?

20            MS. KELLAR:  Tea.

21   BY MR. CABOU:

22       Q    All right.  Now, this one we're going to ask to

23   mark as Exhibit 18.

24            (Exhibit 18 marked for identification.)

25   BY MR. CABOU:

Sheriff Chad Chronister
November 02, 2022

1     Q    This one hopefully says Version 5 on the top.

2     A    They usually all say that on the speeches.

3     Q    All right.  So -- all right.  So in an attempt

4    to piece together which version Number 17 is, the label

5    that your office affixed to 17 is 4-3-001.

6          Do you see that?

7     A    Yes, sir.

8     Q    The label that's affixed to Version 5, which is

9    Exhibit 18, is 4-5-001.

10         Does that help you determine which version

11   Exhibit 17 is?

12    A    It does not.

13    Q    Okay.  It doesn't help me either, but I thought

14   maybe you knew and I didn't.  Okay.

15    A    As of today I didn't even know about the

16   numbers.  So we have learned that together.  So I

17   don't --

18    Q    We have indeed learned that together.

19         Okay.  This version, Version 5, Exhibit 18 --

20   this adds -- without naming names, it adds a recitation

21   on Page 3 about this case, the Rodriguez case.  Right?

22    A    Yes.

23    Q    What -- who -- just -- we might have touched on

24   this already, but forgive me.  Who added that?

25    A    We did.  Lieutenant -- Lieutenant -- Lieutenant

Sheriff Chad Chronister
November 02, 2022

 1   Carey and I as we were authoring the speech.

 2       Q    Okay.  Who drafted the first version of the

 3   speech?

 4       A    Lieutenant Carey and I worked on that together

 5   as well.

 6       Q    Okay.  So at what point did you inform

 7   Lieutenant Carey that there was going to be a press

 8   conference and that Mr. Warren was going to be suspended

 9   and that you needed remarks?

10       A    Maybe a day or two before.

11       Q    Okay.  And he drafted the initial version of

12   this speech.  Is that right?

13       A    We drafted it together.

14       Q    Did you physically sit together and --

15       A    Yes.

16       Q    -- pounded it out on the keyboard?

17       A    We did.

18       Q    In your office?

19       A    No.  We did.  Yes, sir.

20       Q    I believe you.

21            Okay.  Was anybody else there?

22       A    There were not.

23       Q    At the end of Page 2 it says, "State Attorney

24   Warren has acted as the adjudicator of all, as if a

25   supreme authority."

Sheriff Chad Chronister
November 02, 2022

1      A    Hold on.  Where are you at again?

2      Q    The end of Page 2 of Exhibit 18.

3           Do you see that?

4      A    Yes, sir.

5      Q    Did you write those words?

6      A    We wrote those words.  Yes.

7      Q    Okay.  What do you mean by "the adjudicator of

8  all"?

9      A    By deeming which laws were going to be legal or

10  not legal in Hillsborough County.

11     Q    Okay.  And "as if a supreme authority" -- what

12  do you mean by that?

13     A    As someone who was going to bypass legislators

14  that deemed certain laws or laws that are illegal, he

15  was going to decide.  As the supreme authority, he was

16  going to decide which laws were legal or illegal.

17     Q    Okay.  And I don't want to belabor this point

18  because we talked about it a lot.

19          But how is that different than you deciding not

20  to arrest someone with a pound of Fentanyl at your

21  amnesty site?

22     A    And again, I think I've talked about it

23  ad nauseam.

24          Someone who we didn't catch committing a crime,

25  someone who's coming in to relinquish whatever illicit

Sheriff Chad Chronister
November 02, 2022

1    drug -- an addict that they're addicted to, if any.  I

2    don't even know if there's ever been any -- and in

3    return giving that -- giving someone that ride,

4    transportation to a rehabilitative facility, is

5    certainly much different than issuing office-wide

6    policies of which crimes are going to be prosecuted or

7    not prosecuted.

8         Q    Okay.  And to be clear, there's no crime that

9    he said wouldn't be prosecuted.  He talked about the

10   circumstances under which they would and wouldn't be

11   prosecuted.  Right?

12        A    Well, anything -- I don't know if we agree on

13   that.  Anything involving bicycle stops, pedestrian

14   stops.

15        Q    That's not what the policy says, though, sir.

16   The policy on bicycle stops says, "We're not going to

17   prosecute certain bicycle stops and that" -- it says it

18   right in the policy that all these other things will

19   still be prosecuted:  if there's another crime, if

20   there's violence.

21             There's all kinds of stuff.  Right?

22        A    So I thought some of the examples he gave --

23   and I'm sure it was only a short list of examples:  a

24   homeless person that -- that a business owner once

25   removed.

Sheriff Chad Chronister
November 02, 2022

```
 1              Does that -- does that -- does that pertain
 2     to -- to your rationale?
 3         Q   Well, the policy says it does.  It will be
 4     evaluated on a case-by-case, and the presumption is that
 5     they won't be prosecuted unless there are some other
 6     factors.  Right?
 7         A   Well, aren't we saying the same thing?  A
 8     presumption of innocence -- that means that's -- that's
 9     not a crime.
10         Q   But it doesn't say a presumption of innocence,
11     Sheriff.  It says a presumption of non-prosecution; in
12     other words, here's how we think we're going to do our
13     job.
14         A   I can only assume that if you're not holding
15     anyone accountable for breaking the law that you -- that
16     you think they're innocent.
17         Q   Come on, Sheriff.  You don't really think that.
18     Right?
19         A   Well, I mean, his memo stated a presumption of
20     innocence.
21         Q   It actually doesn't say that phrase.  You say
22     that phrase.  But if you can find that phrase in any of
23     his memos, drinks are on me tonight.
24         A   Well --
25         Q   Do you want to spend the time to do it, or
```

Sheriff Chad Chronister
November 02, 2022

1    you're just going to take my word for it?

2         A    You know what.  I'm going to take your word at

3    it.  I think there's -- maybe we're calling it two

4    different things.

5              But a presumption of non-prosecution, to me, is

6    a presumption -- I see what you're saying.

7         Q    Okay.  Do we agree that the phrase "presumption

8    of innocence" does not apply -- sorry.

9              Do we agree that the phrase of "presumption of

10   innocence" does not appear in any of the policies that

11   you have reviewed with me today for Mr. Warren?

12        A    Which is equally as important to me as a -- as

13   a presumption of non-prosecution.  You're not

14   prosecuting cases that you're deeming which laws are

15   legal or illegal in Hillsborough County.

16        Q    Do you think that a governor could think that

17   your narcotics amnesty program is an example of not

18   enforcing a law?

19        A    I don't -- I don't believe so.

20        Q    Okay.

21        A    We're not catching people breaking a crime

22   {sic} and saying, "Hey, if you go to rehab and give us

23   your drugs, we're going to let you go scot-free.  We're

24   not going to prosecute you."  That's not what we're

25   doing here.

Sheriff Chad Chronister
November 02, 2022

1          Every one of the diversion programs I've

2     implemented still have accountability.  Just not

3     prosecuting certain cases isn't -- isn't -- isn't

4     discretion or -- you know, I believe we're talking about

5     two separate things here.

6          Q    Okay.  One of the lines in the speech that's on

7     Page 5 towards the bottom talks about your efforts about

8     diversion and using recidivism, things I think you and I

9     agree on, for whatever that's worth.

10          And then it says, "These efforts do not involve

11     blatant refusal to uphold the laws of our state."

12          Do you believe that Mr. Warren has blatantly

13     refused to uphold the laws of the State of Florida?

14          A    He has.

15          Q    How many cases has Mr. Warren prosecuted in the

16     time that you were both serving in your capacities?

17          A    I'd have to go research it.  I don't have -- I

18     don't have that with me.

19          Q    It's like tens of thousands.  Right?

20          A    I couldn't tell you.

21          Q    Do you know how many cases, just for example,

22     your office refers to the state attorney's office every

23     year?

24          A    I do not.

25          Q    Okay.  Would it surprise you that it's well

Sheriff Chad Chronister
November 02, 2022

1   into the thousands?

2        A    No.   It wouldn't surprise me.

3        Q    It's got to be.   Right?   I mean, just think

4   about your arrests and prosecutions.

5        A    Yes, sir.

6        Q    So thousands of times he's upheld the law.

7   Right?

8        A    Sure.

9        Q    Okay.   I guess I'm still -- I know we discussed

10  this, but I'm still struggling how you think it is that

11  you can stand up at a podium in front of a national

12  television audience and a bunch of Republicans -- and

13  they were all Republicans.   The Republican party got

14  them there from what I understand.

15       A    Good question.   I didn't need the invite.

16       Q    Yeah.   Fair enough.   You didn't need the

17  invite.   You were -- you were the host.

18       A    But I didn't invite anybody to be at the press

19  conference, with the exception of my command staff.   So

20  I couldn't tell you who was in the audience.

21       Q    Okay.   But this is a guy you've worked with who

22  has prosecuted thousands of cases, and you tell

23  everybody he's blatantly refusing to uphold the laws of

24  the state?

25       A    Yes.   That's exactly what I'm saying.   When you

Sheriff Chad Chronister
November 02, 2022

```
 1   issue memorandums that you're not prosecute certain

 2   crimes, that's blatantly disregard of enforcing the law.

 3       Q   Okay.  I think either in your prepared remarks

 4   or maybe in subsequent remarks you talked about

 5   separation of powers.

 6       A   Yes.

 7       Q   How does the concept of -- and you talk about

 8   with regard to Mr. Warren.  Right?

 9       A   Yes, sir.

10       Q   Is it my understanding that you believe that

11   what he's done in promulgating these policies violates

12   the separation of powers?

13       A   Yes.

14       Q   Explain that to me.

15       A   Separation of powers.  The legislators who deem

16   what's going to be a law and what's going to be a

17   criminal act or not a criminal act.

18           I don't think the state attorney, unlike me --

19   I have to enforce the law.  Regardless of what the law

20   is, I have to enforce the law.

21           I think that he circumvented that separation of

22   powers by deeming certain laws not unlawful in -- in

23   Hillsborough County.

24       Q   Okay.  And I take it we're just going to get

25   right back into the loop we've been in.  So I'm
```

Sheriff Chad Chronister
November 02, 2022

1    hesitant --

2         A    Are you going to go back to the kilo of --

3         Q    No.  This time I was going to talk about --

4         A    The amnesty program?

5         Q    I was talking about -- about the what?

6         A    The speeding.

7         Q    My point is law enforcement uses discretion all

8    the time to decide which case they're going to prosecute

9    or which person they're going to arrest.  Right?

10        A    Understand.  I'm a firm believer in discretion.

11   I certainly understand all the things you're pointing

12   to.

13             But would it be different if I issued a

14   memorandum saying, "Anyone who violates the speed limit

15   between one and three miles shall be a presumption that

16   we will not issue a civil citation"?  You don't think

17   I'd be negligent in my duties?

18        Q    I do not.  I think you'd be saying the quiet

19   part out loud for once.  I think we'd be very

20   transparent with each other.

21        A    And I'm just using your example.  There's other

22   examples I could use to prove my point.  But again, I

23   disagree.

24        Q    Okay.  Fair.

25        A    I'm -- I'm --

Sheriff Chad Chronister
November 02, 2022

1    Q   I mean, I think -- I think if that is -- if

2    that is what happens in your office, I would think that

3    putting it on paper would be sort of transparent and

4    open and exactly what we would want.

5    A   Yeah.  But what I'm saying is there wouldn't --

6    there is cases where someone who's traveling one to

7    three, one to five should receive a citation.

8        So I think I would be negligent by telling

9    them, "You can't enforce that -- that violation or that

10   civil infraction."

11   Q   What would --

12   A   I'm not the one that created the civil

13   infraction.  The statute doesn't say you have to be

14   going a certain amount for the fine schedule to apply.

15   It starts at one mile per hour, two miles per hour and

16   it works it way up up until reckless driving.

17       It would be a lack of the separation of powers

18   if I would circumvent that and come up with my own fee

19   schedule and what I'm doing and what I'm not doing.

20   Q   Okay.  So we talked about the legislative

21   branch.  Right?

22   A   (Nodding head.)

23   Q   That's not your branch, though.  Right?

24   A   No, sir.

25   Q   Which branch are you in?

Sheriff Chad Chronister
November 02, 2022

1      A    The enforcement branch.

2      Q    Yeah.  The executive branch?

3      A    Yeah.  Right.  Right.

4      Q    Okay.  So there's discretion that comes with

5   that.  We agree on that.  Right?

6      A    Yes, sir.  We agree on that.

7      Q    Okay.  We just disagree when it's discretion

8   and when it's something else?

9      A    Yes.

10      Q    Okay.  It's discretion or it's a blanket policy

11   that's not discretion?

12      A    Yes, sir.

13          MR. CABOU:  All right.  Let's take a -- let's

14      take a five-minute break.  I would like a

15      five-minute break, please.

16          THE VIDEOGRAPHER:  The time 3:48 p.m.  We're

17      off video record.

18          (Recess from 3:48 p.m. to 4:06 p.m.)

19          THE VIDEOGRAPHER:  The time is 4:06.  We're

20      back on video record.

21   BY MR. CABOU:

22      Q    All right.  Okay.  Let's look at some stuff.

23      A    Here comes our maintenance guy on cue.

24          MR. CABOU:  Could we be off the record while

25      the maintenance guy comes in?

Sheriff Chad Chronister
November 02, 2022

1          THE VIDEOGRAPHER:  The time is 4:06 p.m.  We're

2      back off the video record.

3          (Recess from 4:06 p.m. to 4:08 p.m.)

4          THE VIDEOGRAPHER:  The time is 4:08.  We're

5      back on video record.

6          MR. CABOU:  All right.  So we're going to mark

7      Exhibit 19.

8          (Exhibit 19 marked for identification.)

9  BY MR. CABOU:

10     Q   Exhibit 19 was produced by your office to us in

11  this litigation.  It has your Stamp 2 -- which I think

12  corresponds to our second document request -- -25 001

13  through 017.

14         Are you familiar with this document?

15     A   I'm not.

16     Q   Okay.  Let's just leaf through it and see if we

17  can learn anything about it together.

18         On the second page it says -- the subject is

19  SAO cases and it's an email between Ms. Lusczynski --

20     A   Yes.

21     Q   -- and Mr. Robinson.

22         I know Ms. Lusczynski is your chief deputy.

23  Yes?

24     A   Yes.

25     Q   And who is Mr. Robinson?

Sheriff Chad Chronister
November 02, 2022

1        A    Kyle Robinson was one of our five department

2    commanders who since has retired.

3        Q    Okay.  So these are people within your office?

4        A    Yes, sir.

5        Q    And they were in the office at the time of this

6    email March 24th, 2022.  Right?

7        A    Yes.

8        Q    This appears to be an email with several

9    attachments, one of which is entitled KID-SAO.pdf and

10    the other one is entitled SAO cases.

11            Do you have any idea what these documents are?

12        A    I don't.

13        Q    Okay.  You've never seen them before today?

14        A    I have not.

15        Q    Okay.  Do you know if -- so did you have any

16    involvement in -- in ordering or asking anyone to

17    compile the documents that are contained in

18    Exhibit 18 -- 19?

19        A    Good question.  Because I don't know.

20        Q    Okay.  Is there anything that you and I could

21    do together today that would help you figure what that

22    is, or are we just going to leave this as a mystery

23    between you and this case?

24        A    I don't believe me just looking at this today

25    is going to help me provide any information to you.

Sheriff Chad Chronister
November 02, 2022

```
1        Q    Okay.

2        A    I don't know.  I don't know exactly what it is.

3        Q    Fair to say that Chief Lusczynski might know

4    what it is?

5        A    Yes.

6        Q    Okay.

7        A    She received the email, so she would have to

8    know what it is.

9        Q    Okay.  You can put that aside.

10            Sir, when was the -- when was the last time you

11   spoke with Larry Keefe?

12       A    Maybe a month ago.

13       Q    Okay.

14       A    I'd have to refer to the text message to be

15   ultimately sure, but --

16       Q    Okay.  And so I understand that there might be

17   some text messages from about a month ago.

18            Do you recall speaking with him by phone within

19   the last month?

20       A    Yes.  There was -- there was a text message,

21   but there was a phone call after that making him aware

22   that the context of the conversation was a brief one,

23   just making sure he was aware that someone from here had

24   served the governor's office a subpoena that ultimately

25   trickled -- trickled its way down to me.
```

Sheriff Chad Chronister
November 02, 2022

1       Q    Okay.  I want to make sure I understand.

2            When you say "someone from here," where is

3       "here"?

4       A    Whoever issued the subpoena.  I thought it

5       was from this law firm.  I've never seen the subpoena,

6       so I can't tell you.  Whoever issued a duces tecum

7       subpoena -- and I believe we had several.

8            No.  Let me back up.  I'm confusing a public

9       records request with a subpoena.

10           Whoever issued the subpoena, it went to the

11      governor's office.  It was served at the governor's

12      office.  It ultimately trickled its way and made its way

13      down to the sheriff's office.

14           So I was -- the phone call was to inform him

15      that I had received the subpoena.

16      Q    Okay.  And when you were talking -- the

17      subpoena you're talking about -- was that the subpoena

18      that we marked as Exhibit 1 to the deposition?

19      A    That's a good question because I've never seen

20      the subpoena.

21      Q    Okay.  Okay.

22      A    Just was informed that -- that received a

23      subpoena from the governor's office.

24      Q    You said you don't personally review all the

25      subpoenas that name you that are delivered to your

Sheriff Chad Chronister
November 02, 2022

1    office?

2        A    No, sir.

3        Q    That doesn't surprise me.

4        A    Well, good.

5        Q    Okay.  So you talked about the fact that you'd

6    received a subpoena from this litigation.  Right?

7        A    Yes, sir.

8        Q    Okay.  Do you -- can you tell me as much as you

9    can remember about that conversation?

10       A    That was the nexus of it.  It wasn't a very

11   long conversation:  that I had -- that I had received a

12   subpoena, and that was --

13       Q    Did you call him to tell him this?

14       A    I believe I did call him.  Yes.  Again, I could

15   confirm by looking at the records that I provided you.

16       Q    The text messages?  Is that what you're talking

17   about?

18       A    No.  No.  The -- I believe I provided you -- at

19   least I thought I did -- with the phone records too, and

20   any phone calls to him as well.  I'm pretty confident

21   that's in there as well.

22           MS. KIRSHEMAN:  I don't think so.

23   BY MR. CABOU:

24       Q    I don't think so either.

25       A    No?  Okay.

Sheriff Chad Chronister
November 02, 2022

1        Q    That might be a separate subpoena and it might

2    be a separate matter.

3        A    Then if it's -- and if it wasn't through a text

4    message, it was a phone call.

5        Q    Okay.

6        A    And, yes.  I initiated the conversation.

7        Q    Okay.  Okay.  We -- you talked before the -- so

8    you called Mr. Keefe to say that you had gotten the

9    subpoena in this litigation.  Correct?

10       A    (Nodding head.)

11       Q    Sir, you're nodding your head.

12       A    Yes, sir.  Yes, sir.

13       Q    No problem.

14            Why did you think it was important to call him

15    to tell him that?

16       A    I didn't know if he had been served.  I didn't

17    know what was going on with the case.  So I certainly

18    called him to tell him, "Hey, just so you know, the

19    office had informed me that I received a subpoena in

20    reference to the Andrew Warren suspension."

21       Q    And did what did he say?

22       A    Same thing with him:  that he was scheduled for

23    a deposition as well.  Again, that was -- that was it

24    for the nexus of the conversation.

25       Q    Nothing else was discussed?

Sheriff Chad Chronister
November 02, 2022

1      A    No.

2      Q    No particulars about the details?

3      A    No.

4      Q    The facts?

5      A    No.

6      Q    Strategy?

7      A    No, sir.

8      Q    Okay.  All right.  I just want to -- so before

9   the break you mentioned a guy named Anthony Pedicini who

10  helped you with your remarks.  Is that right?

11     A    Yes, sir.

12     Q    Okay.  How did you communicate with

13  Mr. Pedicini about those remarks?

14     A    Went to his office and sat down and talked

15  to -- it was me, him and Jerry that sat and talked about

16  it.

17     Q    Okay.  Did you set that meeting up over the

18  phone, by a text, through an email?

19     A    No.  I believe that was just -- his office is

20  right down the street from mine.  I think we stopped by

21  there at some point on the way back to -- to or from the

22  office.

23     Q    Okay.  Do you -- you said Mr. Pedicini is a

24  friend.  Do you ever email with him?

25     A    Sure.

Sheriff Chad Chronister
November 02, 2022

1    Q    Is his email address anthony@simwinds.com?

2    A    Could be.

3    Q    Sound familiar?

4    A    It sounds familiar.  I mean, I know something

5    to do with simwinds.  So --

6    Q    Do you know a man named Tom Piccolo?

7    A    Yeah.  Tom Piccolo.

8    Q    Yeah.  Sorry.  Piccolo.

9         Who is that?

10   A    That's his partner in the business.

11   Q    Okay.  And what's their business?

12   A    Campaign strategy, strategic campaign.

13   Q    Okay.  And prior to me telling you today you

14   had no idea that Mr. Piccolo and Mr. Pedicini were

15   involved in the governor's drafting of the executive

16   order.  Correct?

17   A    Absolutely did not know till -- till you

18   mentioned it, and I'm still surprised.

19   Q    Okay.  Do you know why they would be involved

20   in helping the governor and his staff draft the

21   executive order?

22   A    I do not.

23   Q    Did you know if either Mr. Piccolo or

24   Mr. Pedicini had any reason to dislike Mr. Warren or

25   oppose his policies?

Sheriff Chad Chronister
November 02, 2022

1        A    No, sir.

2        Q    When you spoke to Mr. Pedicini about the speech

3    did he comment at all about the suspension?

4        A    No.

5        Q    He didn't say anything at all about it?

6        A    Not that I recall.  It was strictly the speech.

7    I don't -- I don't remember him making any remarks.

8        Q    Okay.  About how long was your meeting?

9        A    It wasn't very long.

10       Q    Fifteen minutes?

11       A    As long as it took to go over a speech and make

12   a couple suggestions.  Between him and Jerry and me, 10,

13   15 minutes --

14       Q    Okay.

15       A    -- would probably be reasonable --

16       Q    Okay.  All right.  I mean, you know --

17       A    -- if -- if that long.

18       Q    Okay.  I mean, some people might take an hour

19   to draft a speech.  Some people might take two hours.

20       A    This wasn't some long speech.

21       Q    Okay.  So the last time you were in touch with

22   Mr. Keefe was this conversation where you alerted him to

23   the fact that you had gotten a subpoena and he said he'd

24   also gotten one.

25            Is that a fair summary?

Sheriff Chad Chronister
November 02, 2022

1      A    Yes.

2      Q    Okay.  What about the time before that one?

3   Had you been in touch with Mr. Keefe at any time

4   following the suspension until the call where you told

5   him about the subpoena?

6      A    Yeah.  A couple times.  As a matter of fact, I

7   don't know if this equates to following the suspension.

8   But was in contact with him to make sure that execution

9   of the order went as well.

10     Q    Yes.

11     A    So, yes.  I talked to him about that.  And I

12  think I called him the next day or texted him the next

13  day just to make sure that everything was okay and he

14  had everything he needed from the sheriff's office.

15  Then there was some thank-you back and forth.  "Thanks

16  for office assisting."

17          And then the next time I communicated with him

18  was a problem he had with some protesters outside.

19  Someone participating with the governor with something,

20  someone who lived down in -- in Hillsborough County.

21  But I guess it had resolved itself.

22     Q    That was unrelated to Mr. Warren?

23     A    Totally unrelated.  I just wanted to again --

24     Q    Yeah.

25     A    I'm just being completely transparent with

Sheriff Chad Chronister
November 02, 2022

1    everything I can recall.

2        Q   I appreciate that.  I just wanted to make sure

3    that I correctly understood that it was not related to

4    Mr. Warren.

5        A   Yes, sir.

6            You talk about after the suspension.  Well,

7    technically it was after the suspension, but the

8    execution of the -- of the order.

9        Q   Right.  So let's talk about that.

10           So my understanding is a senior deputy from

11   your office went with Mr. Keefe in person to

12   Mr. Warren's office to remove him from office.

13       A   Correct.  A command staff officer.

14       Q   Who was that?

15       A   Ed Rayburn.

16       Q   Major Ed Rayburn?

17       A   Major Ed Rayburn.  Yes, sir.

18       Q   Okay.  How did he get that job?

19       A   I had asked the chief deputy to have a senior

20   level.  I was trying to use as much diplomacy and tact

21   as I could.  So I certainly thought a higher-ranking

22   official would be less intrusive to Mr. Warren.

23       Q   Okay.  Whose idea was it to send a uniformed

24   armed law enforcement officer to serve a gubernatorial

25   notice on Mr. Warren?

Sheriff Chad Chronister
November 02, 2022

1        A    Well, uniformed officers serve all of our --

2    our orders.  So I thought -- again, I thought by using a

3    major it would be less intrusive or there would be more

4    tact and diplomacy using a higher-ranking official than

5    having some deputy escort him out.

6             As a matter of fact, I also told him or asked

7    the chief deputy to let him know -- because part of the

8    suspension would be his car and everything else -- that

9    he was certainly -- feel free to offer him a ride home.

10       Q    That was nice.

11       A    Yeah.

12       Q    But this wasn't one of your orders.  Right?

13   This was the governor's order?

14       A    Yeah.  But the sheriff's office has to -- is

15   responsible for serving our orders.  We -- we have to

16   serve the order.

17       Q    What --

18       A    As a matter of fact, I believe in the order,

19   from what I've been told, that it instructs the sheriff

20   to serve the order.

21       Q    Yeah.  It instructs the sheriff.  Well,

22   let's -- let's not do what every law professor tells us

23   not to do, which is paraphrase the document.  Right?  So

24   let's just look at it.

25            That's Exhibit 15.

Sheriff Chad Chronister
November 02, 2022

1       A    15.

2            MS. KIRSHEMAN:  Have you seen this?

3            MR. AARON:  I have.

4    BY MR. CABOU:

5       Q    On Page 8 and 9 -- sorry -- Page 9 -- I'm going

6    to -- one more page.  Sure.  There we go.

7            On Page 9 it says Section 3.  It's like the

8    bottom section.

9            It says, "The Hillsborough County Sheriff's

10   Office is requested to assist in the immediate

11   transition of Mr. Warren from the office.  Ensure he

12   doesn't take anything other than his personal

13   belongings."  Right?

14      A    Yes, sir.

15      Q    Okay.  So, I mean, I guess my question is, was

16   it your understanding that you -- that your office was

17   legally obligated to serve this on Mr. Warren?

18      A    Yes, sir.

19      Q    Why do you think that?

20      A    We're responsible to serve all orders.  An

21   order from the governor would be no different.  We -- we

22   serve all civil processes in -- in Hillsborough County.

23   Every sheriff is responsible for that.  It's part of the

24   duties of -- of being a sheriff.

25      Q    Yeah.  No.  I get that.

Sheriff Chad Chronister
November 02, 2022

1              But this isn't really civil process.  Like the

2      governor doesn't have to serve this on him, does he?

3          A    How else would you serve the -- the order?

4      It's an executive order, no different than any other

5      civil process that would have to be executed.

6          Q    I think it -- I think it actually is quite

7      different from civil process.  But you're talking about

8      judicial process -- right? -- from the judicial branch,

9      from a court.

10         A    Correct.

11         Q    This isn't that.  This is from your branch,

12     from the executive branch.

13         A    Sure.  But we're still responsible for serving

14     those as well.  As a matter of fact, it's mandated in

15     the -- in the actual order.

16         Q    Well, it says that you're requested to assist

17     in the transition and ensure that papers and files

18     aren't taken, but it doesn't say you're to serve it.

19         A    It says we're to serve it.  If -- if -- if

20     requested, if -- as necessary is requested to assist in

21     the immediate --

22         Q    Here's -- here's my question, Sheriff, just to

23     not hide the ball.

24         A    Right.

25         Q    Like I'm not aware of any other gubernatorial

Sheriff Chad Chronister
November 02, 2022

1    suspension where armed peace officers went to the

2    person's office and like threw them out of office.  And

3    I'm trying to figure out why that happened in this case

4    because it was quite a dramatic scene.

5         And I've read the statute about executive

6    suspension, and it doesn't say anything about that.  It

7    just says you have to file it with the Secretary of

8    State.

9    A    We were in the official lawful performance of

10   our duties, so we served that.  And that -- and those

11   processes are usually served by a deputy sheriff.  When

12   you say "armed," every deputy sheriff is armed.

13        So a deputy sheriff -- I asked that be served

14   from a command staff officer, again, to be less

15   intrusive, to -- to serve the order.  It needed to be

16   served.  We served the order like we would serve any --

17   any civil process.

18   Q    Okay.  Did someone from the governor's office

19   ask you to do this?

20   A    To serve the order?

21   Q    Yeah.

22   A    I don't believe so.

23   Q    Okay.  Mr. Keefe was present with Major

24   Rayburn.

25        Did I get his name right?  Major Rayburn?

Sheriff Chad Chronister
November 02, 2022

```
1        A    Yes.

2        Q    Okay.  Mr. Keefe was present with Mr. Rayburn

3    at the service of this order.  Right?

4        A    Correct.

5        Q    Okay.  Did anyone at any time explain to you

6    personally why Mr. Keefe was physically present to see

7    that Mr. Warren vacated his office?

8        A    No, sir.  I wasn't involved in those type of

9    intimate details.  No.

10            We were -- we were asked to serve the order.  I

11   had a command staff officer serve the order.

12       Q    Sure.

13            And who asked you to serve the order?

14       A    I believe -- I believe Mr. Keefe.

15       Q    Okay.  Mr. Warren left the office when he was

16   asked to leave.  Right?  Major Rayburn didn't report any

17   problems.  Right?

18       A    I didn't hear about any problems.  No.

19       Q    Okay.  What was Major Rayburn going to do if

20   Mr. Warren said like, "This is my chair and I'm not

21   leaving"?

22       A    Well, he would probably be placed in custody

23   for violating the order if -- if he ultimately didn't

24   vacated the office because the order mandates that he

25   has to vacate the office.
```

Sheriff Chad Chronister
November 02, 2022

1      Q   Okay.  But, I mean, I'm glad it didn't come to

2   that.

3      A   Yeah.

4      Q   Okay.

5      A   So am I.

6      Q   Sir, do you know Sheriff Lemma?

7      A   Sheriff Lemma.

8      Q   Dennis.  It's L-e-m-m-a.  But I trust you

9   pronounce it --

10      A   Sheriff Lemma.

11      Q   Okay.  Lemma.

12      A   Yes.

13      Q   Who's that?

14      A   He's a sheriff.  I believe -- is he Osceola

15   County sheriff?

16      Q   I think it's Seminole County, but --

17      A   Seminole.

18      Q   -- but you would know better than me.

19      A   Sixty-seven of them.  I can't keep track of

20   them.  Seminole County sheriff.  Correct.

21      Q   We won't tell him you said that.

22          Okay.  Do you -- do you know Sheriff Lemma?

23      A   I do know him.  Yes.

24      Q   Okay.  In the wake of the shooting at Marjory

25   Stoneman Douglas School there was significant efforts in

Sheriff Chad Chronister
November 02, 2022

1    the State of Florida to ban assault weapons.

2            Do you recall that?

3        A   Somewhat familiar.  Correct.

4        Q   Okay.  And Sheriff Lemma openly declared that

5    it's up to the sheriffs what they're willing to enforce;

6    and if the legislature passes a ban on assault weapons,

7    he won't enforce it.

8            Do you recall that happening?

9        A   I do not.

10       Q   Okay.  Does it surprise you that that happened?

11       A   It does surprise me.

12       Q   Do you think that Sheriff Lemma saying that he

13   would not enforce an assault weapons ban, even if it

14   were passed by the legislature is a suspendable offense?

15       A   You're going to have to ask the governor.  He's

16   the one making those decisions.

17       Q   Okay.  But do you think it is?

18       A   Do I think if you say you're going to enforce

19   the law that you could be subject to suspension?  Yeah.

20   I think you could be subject to suspension if you

21   refused to perform the duties of your -- of your oath.

22   Yes.

23       Q   Okay.  Are you aware of any effort to

24   investigate Sheriff Lemma after he made that statement

25   about not enforcing a gun law?

Sheriff Chad Chronister
November 02, 2022

 1      A    Counsel, I didn't even know it was -- I didn't

 2   know it was said until you just told me and I didn't --

 3   I'm not real familiar with the effort of people trying

 4   to ban assault rifles.

 5      Q    Okay.  I mean, it was -- it was widely

 6   reported.  It was in the "Orlando Sentinel."  It was

 7   everywhere.

 8           I'm just -- but what you're saying is that --

 9   that didn't make it to you?  You never heard of it

10   before?

11      A    Anytime we have a mass shooting I think you

12   hear -- you hear this.  I think that's -- that's the

13   same thing you hear every time we have a mass shooting,

14   that we need to ban assault rifles.

15      Q    Do you think we need to ban assault rifles?

16      A    That's -- that's -- that's not my decision.  I

17   would enforce the law if they are banned and I'll

18   enforce the law.  That's -- that's -- that's -- that's

19   what I think.

20      Q    Okay.

21      A    Again, I'm not a legislator.  I don't create

22   laws.

23      Q    Sure.  But you're the chief law enforcement

24   officer of Hillsborough County and you're an expert on

25   law enforcement certainly after 30 years in the

Sheriff Chad Chronister
November 02, 2022

```
1    business.
2            Do you think --
3       A    Yeah.  But I'm not --
4            THE COURT REPORTER:  I'm sorry.  "After 30
5       years in the business" --
6    BY MR. CABOU:
7       Q    -- we should ban assault rifles?
8       A    Listen, again, that's -- that's not my
9    decision.  I'm not a lawmaker.
10      Q    That wasn't my question.
11           My question was, do you think we should ban
12   assault rifles?
13      A    I don't think we should ban all assault rifles.
14   No.
15      Q    Okay.  Have you ever heard of the
16   Constitutional Sheriff Movement?
17      A    I have not.
18      Q    Okay.  Members of the Constitutional Sheriffs
19   and Peace Officers Association believe, quote, The law
20   enforcement powers held by the sheriff supersede those
21   of any agent, officer, elected official or employee from
22   any level of government when in the jurisdiction of the
23   county.
24           That's from your website.  Are you familiar
25   with that belief?
```

Sheriff Chad Chronister
November 02, 2022

1       A    No.

2       Q    Okay.

3       A    Not the group or that belief.

4       Q    Okay.  Sorry.  What did you say?

5       A    I've never heard of that -- that group or -- or

6    that belief.  No.

7       Q    There was another article recently.  In fact,

8    after Mr. Warren's suspension people were saying, "Well,

9    there's all these other officials that have declared

10   that they won't follow the law and they weren't

11   suspended.

12           But you're not familiar with the Constitutional

13   Sheriffs Movement?

14      A    I'm not.  Never heard of it.

15      Q    Frankly, I hadn't either until this event.

16           Have you heard of George Soros?

17      A    I have.

18      Q    Who is that?

19      A    A wealthy individual who tends to donate a lot

20   the money to Democratic candidates.

21      Q    Okay.  Do you -- do you -- do you associate him

22   particularly with the cause of criminal justice reform?

23      A    No.

24      Q    Okay.  The governor referred to Mr. Soros

25   several times in his remarks suspending Mr. Warren.

Sheriff Chad Chronister
November 02, 2022

1          Do you recall that?

2     A    I do.  I do -- I do remember something being

3     said about a connection with George -- Soros is his

4     name?

5     Q    Yes.

6          Do you know what the connection is, if any,

7     between Mr. Warren and Mr. Soros?

8     A    I don't, sir.

9     Q    Okay.  Have you ever heard the phrase

10    "Soros-funded prosecutor"?

11    A    I've heard that before.  Yes.

12    Q    Where did you hear that phrase?

13    A    That -- now, have I heard of it?  Yes.  Can I

14    tell you where I've heard it from?  No.

15    Q    Did you hear it from the governor?

16    A    No.  I didn't hear it from the governor.

17         I remember hearing it -- I believe you hear it

18    in campaigns or maybe commercials or something like

19    there.

20    Q    You do hear it in campaigns and you do hear it

21    in commercials.  I think -- I agree with that.

22         Do you believe Mr. Warren is a Soros-funded

23    prosecutor?

24    A    I don't -- I don't know.

25    Q    Okay.  When you hear the phrase "Soros-funded

Sheriff Chad Chronister
November 02, 2022

1    prosecutor," do you interpret that to mean a prosecutor

2    who has received contributions from Mr. Soros?

3        A    That's what I would be led to believe.  Yes.

4        Q    Okay.  Do you believe has Mr. Warren has

5    received contributions from Mr. Soros?

6        A    I don't know.  I never looked at his

7    contributions.  I don't know who's contributed to his

8    campaigns.

9        Q    Well, we know you did -- right -- at least one

10   time?

11       A    I know I did and I can speak on that, and my

12   wife did and I can speak on that.

13       Q    Okay.

14       A    Anything outside of that I couldn't tell you.

15       Q    So at a minimum we know he's a -- that

16   Mr. Warren is a Chronister-funded prosecutor?

17       A    Yes, he was.

18       Q    Okay.  At least at one point.

19       A    Yes he was.

20       Q    Okay.  Let's take a look at -- all right.

21            MR. CABOU:  This is Exhibit 20.

22            (Exhibit 20 marked for identification.)

23   BY MR. CABOU:

24       Q    All right.  This has been marked as Exhibit 20.

25   This is an email string produced by your office in

Sheriff Chad Chronister
November 02, 2022

1    response to our Request Number 1.  And it is between

2    Ms. Kirsheman, who's here with you today, and Ray -- Ray

3    Treadwell, who is chief deputy general counsel in the

4    executive office of Governor DeSantis.  Okay?

5           This email is dated September 16th, 2022, and

6    it -- in the -- in Mr. Treadwell's email he requests

7    certain information pursuant to the governor's authority

8    under the Florida Constitution.

9           Specifically he requests from your office

10   copies of Santavious Wright's entire file and then

11   copies of the entire case file for each of 11 cases in

12   your office.

13          Do you see that?

14       A   Yes, sir.

15       Q   Okay.  Are you aware of this request having

16   been made?

17       A   I was.

18       Q   How did you become aware that this request

19   contained in Exhibit 20 had been made of your office by

20   the governor's office?

21       A   I believe Lieutenant Carey informed me that we

22   had received such a request.

23       Q   Okay.  What was your response to Lieutenant

24   Carey informing you of that?

25       A   Like any other public records request, to

Sheriff Chad Chronister
November 02, 2022

```
 1    fulfill the request.

 2         Q    Okay.  I mean, to be clear, this isn't a public

 3    records request.  All right.  This is a request that

 4    only the governor can make.  It says, "Pursuant to

 5    Article 4, Section 1 of the Florida Constitution which

 6    grants the governor authority to require information in

 7    writing from all executive or administrative state,

 8    county and municipal officers upon any subject relating

 9    to the duties of their respective offices."

10             The governor can demand information.  Right?

11         A    The instruction would remain the same, to

12    fulfill the request.

13         Q    Okay.  Do you know why the governor in

14    September of 2022 -- so this is six weeks after the

15    suspension.  Do you know why the governor's office is

16    looking for files from your office during Mr. Warren's

17    term of office?

18         A    During a meeting with Mr. Aaron when we

19    provided cases, the same cases that we provide, we were

20    still collecting cases.  We were still looking into some

21    people -- individuals that weren't prosecuted that went

22    on to commit other crimes.

23             So I believe that these cases -- this request

24    came to receive whatever new cases that we had in our

25    possession.
```

Sheriff Chad Chronister
November 02, 2022

```
 1        Q    Okay.  So a couple things.

 2             So first of all, what are these cases?  I

 3   understand number one asks for a specific case file.

 4   Right?  But number two is 11 other cases.

 5             Do you know what they are?

 6        A    I do not.

 7        Q    Do you know what they all have in common?

 8        A    I do not.  I haven't -- I haven't seen them.

 9        Q    Do you know why the governor of Florida's chief

10   deputy general counsel is particularly interested in

11   these cases?

12        A    I do not.

13        Q    Do you know if they are cases in which the

14   state attorney's office, in your opinion, refused to

15   prosecute?

16        A    That's -- that's what I'm going to believe they

17   are.  Yes.

18        Q    Okay.  Mr. Warren was suspended from office on

19   August 4th.  Correct?

20        A    (Nodding head.)

21        Q    Do you know why on September 16th, six weeks

22   later, the governor's office is still looking for

23   information about Mr. Warren's tenure in office?

24        A    I do not, sir.

25        Q    Is it your understanding that the governor's
```

Sheriff Chad Chronister
November 02, 2022

1    office is trying to compile other evidence of

2    suspendable offenses by Mr. Warren?

3        A    It may be.  We -- that certainly came up during

4    our meeting with the counsel at the time that we had --

5    that we spoke about earlier sitting around the table

6    they should -- they should do a public records request

7    or have the governor's office do a request of all the

8    law enforcement agencies.  I'm only one.  They should

9    get with all the law enforcement agencies and -- and see

10   what type of cases weren't prosecuted, what -- what

11   individuals were not prosecuted and went on to commit

12   additional offenses.

13            That conversation came up, so maybe this

14   subpoena is a part of that.

15       Q    This request that's in Exhibit 20?

16       A    Yes.

17       Q    Okay.  That conversation that the governor's

18   office should tender these requests to other law

19   enforcement agencies -- who suggested that?

20       A    I can't recall.  I don't know.  I remember it

21   being spoke about.  I don't know who brought it up.

22       Q    Okay.  So you were present at the meeting,

23   though.  Right?

24       A    Yeah.

25       Q    Who else was present at the meeting?

Sheriff Chad Chronister
November 02, 2022

```
 1        A    Lieutenant Carey, April Kirsheman, Mr. Aaron,

 2   and there was another attorney there.  And I'm sorry.

 3   His name escapes me.

 4        Q    George Levesque?  Do you know if it was an

 5   attorney from Mr. Aaron's law firm?

 6        A    Yes.  I believe it was -- he was from

 7   GrayRobinson, I believe.

 8        Q    Okay.  Okay.  And is it your understanding that

 9   GrayRobinson represents the governor in this lawsuit

10   that we're here today about?

11        A    Yes.

12        Q    Okay.  And you had a meeting with Mr. Aaron,

13   Ms. Kirsheman, your lieutenant, yourself and one other

14   of Mr. Aaron's colleagues.  Is that right?

15        A    Correct.

16        Q    And refresh my recollection a bit.

17             When was this meeting?

18        A    I can't remember the date.  I don't know.

19        Q    But after August 4th?

20        A    After August 4th.

21        Q    And it was at your office?

22        A    At my office.

23        Q    Okay.  Who called the meeting?

24        A    The governor's attorneys asked to -- asked to

25   see us.
```

Sheriff Chad Chronister
November 02, 2022

1        Q    Okay.  Was there an agenda?

2        A    Not on our part.  If they had an agenda they

3    didn't share it with us.

4        Q    I mean, was there a written agenda for the

5    meeting?  Sorry.

6        A    Oh, no, sir.

7        Q    I didn't mean like --

8        A    No.

9        Q    -- an agenda.

10        I meant, did anyone, as often happens in an

11    interagency meeting sometimes --

12        A    Yeah.

13        Q    -- they have agendas.

14        Was there a written agenda?

15        A    No, sir.  No, sir.  "If you have a couple

16    minutes we could stop by."  That was it.

17        Q    Okay.  And you remember it being after

18    August 4th.

19        Like a day after or like several weeks after?

20        A    I think it was a few weeks after.

21        Q    Okay.

22        A    At least a week or two.

23        Q    And at that meeting you discussed, among other

24    things, the governor tendering requests for records to

25    different law enforcement agencies in Hillsborough

Sheriff Chad Chronister
November 02, 2022

1    County.  Correct?

2        A    Correct.

3        Q    Okay.  What else was discussed?

4        A    I also believe it was discussed that they

5    should do the same public records request or serve a

6    subpoena to the state attorney's office to see how many

7    individuals were -- were not prosecuted and went on to

8    commit additional crimes.  I'm sure they had records of

9    it.

10       Q    Why would -- why do this?  Like it's a big

11   state.  The governor has got a lot to do.  I mean, he's

12   already suspended Mr. Warren.  Why engage in this

13   multi-agency demand for documents?  What was the

14   purpose?

15       A    You would have to ask the governor's staff.  I

16   don't know.

17       Q    Well, I thought -- I thought it was either you

18   or the lieutenant or someone on sort of your team at the

19   meeting who suggested that the governor's staff send

20   these requests out.

21       A    Well, I think as you're building any type of

22   lawsuit you'd want all the information you could gather.

23   If you had one thing, 50 would be better.  Right?

24   50,000 would be even better.

25            So I don't think it's illogical to think that

Sheriff Chad Chronister
November 02, 2022

1   you would want cases or more examples to -- to prove the

2   fact that the state attorney was negligent and -- and,

3   hence, required the governor suspending him from office.

4           So why just have records from the Hillsborough

5   County Sheriff's Office?  We're only one law enforcement

6   agency.  It would be reasonable to believe that they

7   have them from every office.  See how every law

8   enforcement struggled with prosecution.

9           As a matter of fact, the state attorney should

10  have those records as well.

11      Q   So you wanted to help the governor with his

12  case?

13      A   I would certainly help the governor with the --

14  with the case.  If the -- if the suspension was

15  warranted, I would certainly provide information that I

16  could.  Hence, why I assisted the governor and provided

17  the information to begin with.

18          MR. CABOU:  All right.  This is 21?

19          THE COURT REPORTER:  Yes.

20          (Exhibit 21 marked for identification.)

21  BY MR. CABOU:

22      Q   Sir, you've been handed Exhibit 21.  It's a

23  lengthy packet of information.  This has been copied

24  double-sided to cut down on the number trees sacrificed

25  for this litigation.  And it's Bates-stamped 1-9 001,

Sheriff Chad Chronister
November 02, 2022

1    which I understand corresponds to our document request

2    to you number one.

3           Is this information that's in Exhibit 21 -- was

4    this part of the packet of materials that your office

5    provided to Mr. Keefe?

6        A    I don't know.

7        Q    Okay.  Is that because you didn't see the

8    packet before it went out the door?

9        A    Well, it's because I didn't see the packet that

10   went out the door, but all -- I was informed that

11   everything you asked for we provided.  I didn't really

12   go into minutia detail of what -- what -- what was asked

13   for.

14       Q    But, yeah.  I'm not asking what we asked for.

15   What I'm trying to figure out is, was this packet that

16   I've just handed to you -- was this part of the

17   materials that your office provided to Mr. Keefe?

18   Because I'm trying to determine what you gave to him.

19       A    Oh.

20       Q    So that's the question.

21       A    I don't know that either.

22       Q    Okay.  There are -- for example, on Page 29 in

23   here there are -- which is Bates 1-9 029.  It's like a

24   copy of a magazine article from the Hillsborough County

25   Bar Association.

Sheriff Chad Chronister
November 02, 2022

1        Do you see that?

2        Yeah.  It looks to me like --

3    A    Same thing.

4    Q    Yeah.

5        It looks to me like this is a copy of a

6    magazine article.  That article begins on the page

7    before and it talks about the state attorney continuing

8    a conviction review unit.

9        Do you see that?

10   A    Yes.

11   Q    All right.  And there's a number of copies in

12   the packet that are from the state attorney column that

13   appears to be a part of this magazine.

14       Have you ever read any of these columns before?

15   A    No.

16   Q    Do you have any idea why it would have been

17   provided to the governor's office by your office?

18   A    I do not.

19   Q    Okay.  Since the suspension of Mr. Warren have

20   you had occasion to explain to anyone why Mr. Warren was

21   suspended?

22   A    I have not.

23   Q    No friend has asked you, "Hey, what happened

24   with that?"

25   A    No.  I've gotten a few emails of people being

Sheriff Chad Chronister
November 02, 2022

```
 1   upset, some commending me for being a part of it.  A

 2   little bit of both, but no discussion.

 3       Q   Are these like emails from the general public

 4   or people -- emails from people you know?

 5       A   General public.  Some -- some emails from

 6   people I know.

 7       Q   Okay.

 8       A   Yeah.

 9       Q   Are those emails to your sheriff's office email

10   account or to a private account?

11       A   My private -- my personal account.

12       Q   Okay.  Did you turn those over so we could see

13   them?

14       A   I -- whatever I had I turned over.  So whatever

15   I had would be in that packet you have.

16       Q   Okay.  When Mr. Warren was serving as state

17   attorney, you would email with him.  Right?

18       A   On occasion.  Yes.

19       Q   Okay.

20       A   It wasn't very frequent, I don't believe.

21       Q   Okay.  I think you told me the same about

22   texting.  Right?  On occasion, not very frequent?

23       A   Yes.

24           MR. CABOU:  All right.  22, I believe.  Marked

25       for identification Exhibit 22.
```

Sheriff Chad Chronister
November 02, 2022

```
 1              (Exhibit 22 marked for identification.)

 2    BY MR. CABOU:

 3        Q    This document was produced to us by the

 4    governor's office.  It's Bates-stamped Defense 00872

 5    through 876.

 6              Do you see that?

 7        A    Yes, sir, I do.

 8        Q    Okay.  It says Remarks.  The attachment is

 9    Remarks V2.

10              Do you see that?

11        A    I do.

12        Q    And it's an email from

13    chadchronister1@gmail.com to 19lkeefe@gmail.com.  Right?

14        A    Yes.

15        Q    Is chadchronister1@gmail.com your private email

16    account?

17        A    It is.

18        Q    Is 19lkeefe@gmail.com Mr. Keefe's private email

19    account?

20        A    That, I don't know.  I believe it is.  It shows

21    that that's who it was addressed to.

22        Q    By you.  Right?

23        A    By me.

24        Q    And then the top email shows from lkeefe, that

25    same 19lkeefe@gmail.com, to Larry Keefe,
```

Sheriff Chad Chronister
November 02, 2022

```
 1    larry.keefe@eog.myflorida.com, which is his official

 2    email address?

 3        A    I assume that's his official email, his work

 4    email.  Right.

 5        Q    Okay.  Why did you guys use your gmail for

 6    this?

 7        A    I asked him -- I didn't have his email.  I

 8    asked him to provide me his email, and that's the email

 9    that he provided.

10             This solves a mystery for me because I was

11    looking like crazy in my work email and I couldn't find

12    the email that I -- that I sent to.

13        Q    Sheriff, I'm here to help.

14        A    Thank you.  I appreciate that help.  Don't

15    think for a second I don't.

16             But I also looked at my gmail and I couldn't

17    find this email either.

18        Q    Okay.

19        A    Yeah.  Obviously, I would never deny the fact

20    that I sent the version.  I admitted that at the very

21    beginning, but --

22        Q    No one is accusing of that.

23        A    I know better than that.  I'm just going to

24    save us a bunch of time.  I thought it was at the

25    office.  I think because I was working at home maybe I
```

Sheriff Chad Chronister
November 02, 2022

1   sent it from my home email, but -- maybe that popped up.

2   But I don't know.  I couldn't find this email.

3        Q   I mean, you have access -- even when you're

4   working at home you have access to your work email.

5   Right?

6        A   Yeah.  I sure do.

7        Q   All right.  And you sent it to Mr. Keefe at

8   gmail -- at his gmail address because that's what he

9   told you to use?

10       A   Correct.

11       Q   Did you think it was weird that like a senior

12   member of the governor's office was gmail-ing you about

13   official business?

14       A   No.  I wouldn't think it was weird.

15           I don't -- I didn't know what his email -- and

16   to be honest with you, I didn't pay enough attention to

17   it to even think about it.  "Give me your email.  I'll

18   send you a final version so you'll know what I was going

19   to say."  I didn't really think that heavily into it.

20       Q   Okay.  This turned out not to be the final

21   version, though.  Right?

22       A   I thought it was.

23       Q   Well, so, I mean, this one doesn't talk about,

24   for example -- among other things, this one does not

25   talk about the Rodriguez case.  Right?  This version

Sheriff Chad Chronister
November 02, 2022

1   that's in Exhibit 22 that you -- that you thought was

2   the final version -- it -- it doesn't talk about the

3   Rodriguez case, does it?

4        A    It does not.

5        Q    Okay.  And it says Remarks V2 in the

6   attachment.  Right?

7        A    I thought I sent him the final version.  I

8   guess I didn't.

9        Q    Okay.

10       A    Thank you.  You said you were going to help me

11   today.

12       Q    I do what I can, Sheriff.

13       A    I thought I sent him the final version, which,

14   if memory serves me correct, it was Version 6 and I sent

15   him Version 2.

16       Q    Yeah.  I mean, so this is 7 in the morning --

17   7:53 -- 7:51 a.m. on August 3rd, which is the day before

18   the suspension.

19       A    Yeah.  But I had sent him -- I had sent him the

20   version the night before.  When you look where it was

21   sent from me --

22            MR. AARON:  I'm sorry to interrupt you.

23            Just to be clear, 7:50 a.m. -- right -- that's

24       Larry Keefe sending it to Larry Keefe.

25            THE WITNESS:  To himself.

Sheriff Chad Chronister
November 02, 2022

1          MR. CABOU:  Yeah.  I think the sheriff was just

2      about to correct me on that.

3      A    Not correct you.  Just point it out.

4  BY MR. CABOU:

5      Q    Either way.  But I've been wrong before.

6      A    I sent it to him the night of August 2nd --

7      Q    So you --

8      A    -- at night.

9      Q    Okay.  You sent it to him on August 2nd.

10          Do you know if you worked on it after

11  August 2nd?

12      A    Yes, sir.

13      Q    So did you send him the updated version at some

14  point or did that like slip your mind?

15      A    No.  That would be it.  Like I said, you

16  refreshed my memory.  I thought I sent him the final

17  version the -- the night before the suspension.

18  Obviously, that's not true.  I only sent it to him one

19  time, so this was the time.

20      Q    Okay.  All right.  That was -- that was -- that

21  was my question.

22          The version that's in Exhibit 17 -- that --

23  that one with the handwritten changes from

24  Mr. Pedicini -- that you didn't send to him.  Right?

25      A    No.  Lieutenant Carey and Pedicini -- once they

Sheriff Chad Chronister
November 02, 2022

```
1    made their changes -- like I said, that -- what version

2    was that?

3        Q    The one with the handwritten changes that came

4    from the lieutenant and Mr. Pedicini was Exhibit 17,

5    which could be Version 3, if I'm interpreting the Bates

6    stamp correctly.  But then there's also a big number 4

7    at the bottom of Exhibit 17.  So I don't know what that

8    means exactly.

9             That sounds like you might not know either.

10   So --

11       A    (Shaking head.)

12       Q    It's not that important.

13       A    I assure you you have all the versions.

14            And like I said, to clarify this, I sent this

15   to him in the evening.  I only mailed it to him one time

16   and I didn't email it to anyone else.

17       Q    Okay.  And -- and said you looked for this

18   yourself and you didn't find your -- your copy of this.

19   You're not sure what happened there.

20       A    I couldn't find it.

21       Q    Okay.  All right.  Because we got this from the

22   governor's office, but not from you.

23            MR. CABOU:  Okay.  Let's take a quick break

24       while I reorganize the few questions I have left,

25       and then I think we might circle for a landing.
```

Sheriff Chad Chronister
November 02, 2022

```
 1              THE VIDEOGRAPHER:  The time is 4:52 p.m.  We're
 2         off video record.
 3              (Recess from 4:52 p.m. to 5:06 p.m.)
 4              THE VIDEOGRAPHER:  The time is 5:06 p.m. and
 5         we're back on the video record.
 6              MR. CABOU:  All right.  I'm going to ask that
 7         we mark Exhibit 23.
 8              (Exhibit 23 marked for identification.)
 9    BY MR. CABOU:
10         Q    Sir, you've been handed what's been marked for
11    identification as Exhibit 23.
12              These were produced to us.  These are texts
13    with you and Larry Keefe, I believe.  Is that correct?
14         A    Yes, sir.
15         Q    Okay.  So just to be clear, these are the texts
16    we spoke about earlier between you and Mr. Keefe?
17         A    Yes, sir.
18         Q    And are these all the texts you had with
19    Mr. Keefe?
20         A    I believe so.  I didn't look at the whole
21    document, but no reason for them not to be.
22         Q    Okay.
23              MR. AARON:  While -- while you're looking at
24         the document, do you know what Bates -- I don't
25         recall ever producing them without Bates number.
```

Sheriff Chad Chronister
November 02, 2022

```
 1              MR. NEWTON:  I think they were Bates.  They're
 2         just small and on the colored portion of the
 3         pictures.
 4              MR. CABOU:  Yeah.  So I believe if you hold it
 5         like -- they're like branded on the text message
 6         itself.  It's black on black ink, in other words.
 7         And it's in the lower right-hand corner.
 8              MR. AARON:  Okay.
 9              MR. CABOU:  But they're -- they're prints of
10         what we got from --
11              MR. AARON:  Yeah.  I trust your representation.
12              MR. CABOU:  Yeah.  If it's helpful, we can
13         certainly email you guys after the deposition with
14         the Bates pages to confirm.
15              MR. AARON:  I'll figure it out by them.
16              MR. CABOU:  Sorry.
17              MR. AARON:  I'm the one that produced them.
18         So --
19              MR. CABOU:  Fair enough.
20         BY MR. CABOU:
21         Q    All right.  The first page starts on April 6th.
22              Is that, to the best of your recollection, the
23    first message you exchanged with Mr. Keefe?
24         A    Yes.  Yes.
25         Q    You called him Mr. Larry?
```

Sheriff Chad Chronister
November 02, 2022

1      A    Yeah.

2      Q    You guys hadn't -- hadn't progressed to a

3   familiar stage by that point?

4      A    No.  Just met him.

5      Q    Okay.  All right.  Fair enough.

6           And these are -- these are messages through the

7   app Signal.  Right?

8      A    Correct.

9      Q    Is that an app you use regularly?

10     A    It's not.  This is the first and only time.

11     Q    Did Mr. Keefe ask you to use Signal?

12     A    He did.

13     Q    Did he tell you why?

14     A    Because it's encrypted, nobody would -- either

15  receiving or sending it, nobody would see what we were

16  talking about.  It would stay encrypted.

17     Q    Okay.  Now, your name, your last name is

18  misspelled at the top.  Right?

19     A    It is.

20     Q    Okay.  The next time you see Mr. Keefe you can

21  clarify that.

22     A    Usually I get KR.  I get a lot of versions.

23     Q    Understood.  Okay.

24          All right.  So on April 6th you -- is this like

25  the first Signal exchange you ever had with anyone?

Sheriff Chad Chronister
November 02, 2022

1      A    It is.

2      Q    Okay.  All right.

3      A    Downloaded the app.

4      Q    Did you use it for anything else other than

5    communicating with Mr. Keefe?

6      A    I don't believe so.

7      Q    Okay.  Mr. Keefe on the second page asks you to

8    Federal Express -- which I will tell you it's the first

9    time I've heard the term Federal Express in quite some

10   time.  He asks you to Federal Express the materials to

11   the executive office of the governor.

12         Do you see that?

13     A    Correct.

14     Q    Do you know why they were FedEx'd as opposed to

15   just PDFs?

16     A    No idea.  That's how he requested it.  It's how

17   he requested to receive it.

18     Q    So do you know if you like printed them out and

19   then FedEx'd them?

20     A    I believe we already had them, so we probably

21   photocopied them and sent them.

22     Q    Okay.  Okay.  A little bit further in in an

23   exchange that takes place on Tuesday -- let me ask you

24   this.

25         This -- the Signal app, in addition to being

Sheriff Chad Chronister
November 02, 2022

1   used for -- for written messaging, can also be used for

2   voice calls.  Right?

3       A   Yes.

4       Q   When you called Mr. Keefe did you use Signal

5   for that?

6       A   At times, I believe.  Yes.

7       Q   Okay.  So on here sometimes it says you --

8   you -- in other words, Mr. Keefe, because these are his

9   messages --

10      A   Yes.

11      Q   -- you called Chad April 7, 1349 hours.

12          Do you see that?

13      A   I was going to say, I think it notates when you

14  make a call versus a text message.

15      Q   Yeah.  It looks like it did.

16      A   Yeah.

17      Q   Okay.  So then, for example, on April 7th at

18  1350 Chad called you?

19      A   One more time.  I'm sorry, Counsel.

20      Q   Sorry.  April 7th, 1350 hours.

21          MS. KIRSHEMAN:  -- page.

22          MR. AARON:  Go back a page.

23      A   Too far ahead.  Yes.

24  BY MR. CABOU:

25      Q   Do you recall speaking verbally with Mr. Keefe

Sheriff Chad Chronister
November 02, 2022

```
1    in regular phone calls in addition to Signal calls?

2         A    I believe we did.

3         Q    Okay.  Do you still have the Signal app on your

4    phone?

5         A    I do.

6         Q    Is that how you communicate with Mr. Keefe?

7         A    At times.  Yes.  But I believe -- I believe

8    there were some phone calls as well.

9         Q    Okay.  Do you communicate with anyone else

10   through Signal?

11        A    Not that I'm aware of.

12        Q    So Friday, May 13th, which is several pages

13   in -- yeah -- there's a message from you on the left

14   side of the page that says, "Still trying to get all the

15   City of Tampa's cases.  Then will ship it.  Let me know

16   when can I expect it."

17             Do you see that?

18        A    Yes.

19        Q    What do you mean by "still trying to get all

20   the City of Tampa's cases"?

21        A    I had spoken to then Chief Butch Delgado at the

22   Tampa Police Department.  And we had spoke several

23   months before any of this process -- any of this was in

24   process about keeping track of cases that weren't being

25   prosecuted that we thought were the more egregious
```

Sheriff Chad Chronister
November 02, 2022

1   cases.

2           So one time during an encounter he told me he

3   had been keeping track of the cases.  I asked him if I

4   could have a copy of those cases as well.

5       Q   A few pages in -- we're on July 28th now, so

6   we're pretty close in time to when the suspension

7   ultimately occurs.

8           Well, let me -- let me -- let me start on July

9   27th.

10          On July 27th you -- you said to him, "May I

11  call you when I land back in Key West.  It will be a

12  couple of hours."

13          Do you see that?

14      A   Yes.

15      Q   Do you recall being in Key West?

16      A   Yeah.  I was in Key West for mini lobster

17  season.  And I had to go participate in a human

18  trafficking conference up in Atlanta, and I was on my

19  way back to Key West.

20      Q   Okay.  And then later that same day Mr. Keefe

21  asked if you can "teleconference with the general

22  counsel and me at 0900 tomorrow morning."

23          Do you see that?

24      A   Yes.

25      Q   Okay.  Do you recall that teleconference

Sheriff Chad Chronister
November 02, 2022

1    between you, Mr. Keefe and the general counsel?

2         A    Yes.

3         Q    What was discussed on that teleconference

4    between you, Mr. Keefe and the general counsel on July

5    27th?

6         A    I believe that's when they informed me that

7    they were going to suspend Andrew Warren.

8         Q    Okay.  How long did that teleconference last?

9         A    It doesn't say the duration of the call.

10        Q    No.  I'm asking if you recall -- if you recall

11   about how long it lasted.

12        A    I do not.  I know it didn't -- I know it didn't

13   last that long because I had missed the first day of

14   mini lobster season being in Atlanta for a human

15   trafficking conference.  The second day I had my whole

16   family waiting to go out, and we usually go out early in

17   the morning.  It didn't last long.  I had everybody

18   downstairs waiting.

19        Q    Okay.

20        A    So I know the phone call didn't last that long.

21        Q    Okay.  You had mini lobsters to catch.

22        A    I had to go do my part and catch the mini

23   lobsters.

24        Q    Okay.

25        A    Mini lobster season.  They mean the lobsters

Sheriff Chad Chronister
November 02, 2022

1    were mini.

2         Q   Is it called mini season because it only lasts

3    two days?  I get it.  I get it.

4         A   The lobsters are still regular length.

5         Q   I appreciate that clarification because I

6    absolutely would not have understood that.

7             Is there like maxi lobster season too, like

8    mini/maxi?

9         A   No.  It's a great question.

10            Mini lobster season only opens for two days.

11   Then it closes for a certain amount of time and then

12   it's open for months.

13            MR. AARON:  Right.

14   BY MR. CABOU:

15        Q   Okay.  I get it.

16        A   That's why they call it mini lobster season

17   because it's just two days.

18        Q   I gotcha.

19            Okay.  So you had a mini call during mini

20   lobster season?

21        A   Yes, I did.

22        Q   With the general counsel.

23            MS. KIRSHEMAN:  Right.  Floridian.

24            MR. CABOU:  I am not a Floridian.  My

25        grandparents were Floridians.

Sheriff Chad Chronister
November 02, 2022

```
 1    BY MR. CABOU:

 2        Q    Okay.  And -- and you recall being informed on

 3    this short call about the suspension.  Is that correct?

 4        A    I believe it was right around this time period.

 5    So I think this is when they told me that -- yes.  This

 6    is when they told me that they were going to suspend

 7    Andrew.

 8        Q    Okay.  And Mr. Keefe and the general counsel

 9    are on the phone?

10        A    Yes.

11        Q    Okay.  Did they say why they were suspending

12    Andrew Warren?

13        A    They did not.

14        Q    Did you ask?

15        A    I did not.

16        Q    Was there any information exchanged on the

17    phone call about the reasons why the governor was

18    suspending Andrew Warren?

19        A    They kept saying because of lack of prosecuting

20    cases.

21        Q    Okay.  And then a little bit later on August

22    1st there's a message from you saying you had a very --

23    another very qualified candidate:  Nick Cox with the

24    AG's office.  He was at the state attorney's office for

25    years.
```

Sheriff Chad Chronister
November 02, 2022

1            Do you recall that message?

2       A    Yes.

3       Q    Okay.  Were you discussing on or about August

4    1st with Mr. Keefe potential replacements for

5    Mr. Warren?

6       A    They had asked me for recommendations, who I

7    thought, and I provided three names.  One was our chief

8    judge, Democratic Judge Ron Ficarrotta.  And the other

9    candidate was Nick Cox with the attorney general's

10   office.

11      Q    Okay.  And who was the third name?

12      A    Might have only been two.  I said three, but I

13   think there was only two.

14      Q    Okay.

15      A    I can't think of a third.  These are the two

16   individuals that I recommended.

17      Q    Okay.  To the best of your recollection sitting

18   here now, you remember Mr. Cox and you remember the

19   judge, but --

20      A    If there was a third one, I can't remember who

21   that was.

22      Q    Fair enough.

23           Okay.  And then over the next couple of days --

24   August 1st, August 2nd -- you guys are in touch.

25           On -- on the August 2nd one -- yeah.  This one

Sheriff Chad Chronister
November 02, 2022

1    that you've got in front of you.  It's a message from

2    August 2nd at 1800.  You say to Mr. Keefe, "Do you have

3    an email?  I can send the speech to you this evening."

4         A    Yes.

5         Q    And he writes back providing his Gmail account?

6         A    (Nodding head.)

7         Q    He didn't tell you why the Gmail.  Right?

8         A    No, sir.

9         Q    He gave you the email and you did as you were

10   asked to do?

11        A    That's it.

12        Q    On the next page, which is August 3rd, at

13   810 hours there's a phone number there that ends in

14   7070.

15             Do you see that?

16        A    Yes, sir.

17        Q    Do you know whose number that is?

18        A    I do not.

19        Q    Okay.  And then later on August 3rd he asked

20   you to text him Gary Weisman's email and personal cell.

21             Do you see that?

22        A    Yes.

23        Q    Mr. Weisman is the chief of staff at the state

24   attorney's office.  Right?

25        A    Yes.

Sheriff Chad Chronister
November 02, 2022

1      Q   He was Mr. Warren's chief of staff?

2      A   Yes.

3      Q   And he's still the chief of staff?

4      A   Yes.

5      Q   Okay.  When was the last you were in touch with

6  Mr. Weisman?

7      A   Probably a couple weeks ago.

8      Q   Okay.  What was that about?

9      A   He was calling just to check in, not about

10  anything substantive.  "How are you doing?"  "How are

11  you doing?"

12      Q   Did you talk about this litigation?

13      A   We did not.

14      Q   Okay.  Have you ever discussed the suspension

15  of Mr. Warren or the litigation about the suspension of

16  Mr. Warren with Mr. Weisman?

17      A   I called him after the suspension and after the

18  execution of the order just to check on him to see how

19  he was -- how was he doing.

20      Q   How was he doing?

21      A   Overwhelmed.

22      Q   Okay.  Is that what he told you or is that what

23  sort of what you inferred from the conversation?

24      A   That's certainly -- I believe -- maybe not that

25  exact word, but he was overwhelmed with everything going

Sheriff Chad Chronister
November 02, 2022

1    on at the office:  exiting state attorney, state

2    attorney coming in, the governor's chief of staff there.

3    I'm sure he was overwhelmed, and he seemed to relay

4    that.

5        Q   Okay.  Mr. Keefe was in the office.  That's

6    what you're referring to there?

7        A   Yes.

8        Q   At the state attorney's office?

9        A   Yes.

10       Q   I just asked.  It was titled something else.  I

11   just wanted to make sure I understood the people that

12   were there.

13       A   Yes.

14       Q   You're not aware of anybody else from the

15   governor's office who was present in the state

16   attorney's office, are you?

17       A   I'm not aware of anyone else there.

18       Q   Just Mr. Keefe?

19       A   Yes.

20       Q   Okay.

21       A   But again, I wasn't there.  So --

22       Q   I understand.

23           This message -- also you sent a message that

24   same day, August 3rd.  It says, "Jay Don McDarby," with

25   a telephone number, "will be contacting you."

Sheriff Chad Chronister
November 02, 2022

1           Do you see that?

2       A   Yes.  Detective John McDarby.

3       Q   Oh, it's a typo?

4       A   Yes.

5       Q   I get it.

6           Okay.  Who is Detective John McDarby?

7       A   The -- I believe he was the person that picked

8   Larry O' Keefe up and took him to the office, to the

9   state attorney's office.

10      Q   When Mr. Keefe landed from Tallahassee on the

11  day of the suspension?

12      A   No.  He was staying, I believe, at Preston

13  Farrier's home, his friend, a mutual friend that we had.

14  And I think I -- if I recall correctly, John McDarby

15  went to pick him up and bring him to the state

16  attorney's office.

17      Q   Okay.  So your understanding is that Mr. Keefe

18  did not fly to Tampa with the governor.  He was already

19  here staying at Preston Farrier's house?

20      A   Yeah.  I believe he was already here.

21      Q   Okay.  How did you learn that?

22      A   I believe we spoke and he told me he was in

23  town.

24      Q   And that he was staying at your mutual friend,

25  Preston Farrier's house?

Sheriff Chad Chronister
November 02, 2022

1       A    Yeah.  Yeah.  That he was staying there.

2   Right.

3       Q    Does Mr. Farrier have any -- to your knowledge,

4   is Mr. Farrier involved in law enforcement or criminal

5   justice policy in any way?

6       A    No, sir.

7       Q    Does he have any --

8       A    Not that I'm aware of.

9       Q    Okay.  Are you aware of him having strong

10  feelings about Andrew Warren?

11      A    Don't know.

12      Q    Have you ever discussed Andrew Warren with

13  Mr. Farrier?

14      A    No.  No, sir.

15      Q    Okay.  Do you know anything else about

16  Mr. Keefe's stay with Mr. Farrier other than that that

17  happened and that one of your detectives picked him up

18  at his house?

19      A    I don't know.

20      Q    Okay.  It's a little bit weird that a detective

21  went to pick up Mr. Keefe.  Right?  Why did he do that?

22      A    Didn't know his way around town, and I thought

23  it would be easier to have him brought him over so

24  someone could show him where to go and everything else.

25      Q    Okay.  No Uber for Mr. Keefe?

Sheriff Chad Chronister
November 02, 2022

```
 1        A    I thought this was the preferred method.  So I
 2   offered.
 3        Q    Anytime I have a chance, I would prefer to get
 4   a ride from a law enforcement officer than Uber.  But
 5   that's --
 6             MS. KIRSHEMAN:  Are you sure?
 7             MR. CABOU:  Yeah.  I haven't done anything
 8        wrong.
 9   BY MR. CABOU:
10        Q    Okay.  I get it.
11             All right.  Thank for you going through the
12   text messages or the Signal messages between you and
13   Mr. Keefe that were in Exhibit 23 for me.
14             MR. NEWTON:  Just for the record, Exhibit 23 --
15        its Bates are DEF 1272 to 1287.
16             MR. CABOU:  Thank you.
17             THE WITNESS:  Thank you.
18   BY MR. CABOU:
19        Q    The -- I understand that you eventually invited
20   some command staff members to join you at the press
21   conference.
22             Had you been asked to have uniformed people at
23   the press conference with you?
24        A    I believe that was discussed that -- from the
25   governor's office that there -- it would be nice to have
```

Sheriff Chad Chronister
November 02, 2022

1    some uniforms there to show their support.  Correct.

2        Q   Okay.  Sheriff, I don't believe I have any

3    other questions.  So that's going to do it for me.

4        A   Are you sure?

5        Q   I don't know if Mr. Aaron or Ms. Kirsheman have

6    questions, but that's it for me for now.

7            MR. AARON:  Probably two hours of questions for

8        me.

9            MR. CABOU:  Object to form.

10           MR. AARON:  Sustained.  I have no questions.

11           MS. KIRSHEMAN:  No questions.

12           MR. CABOU:  Okay.  That's it.

13           THE VIDEOGRAPHER:  The time is 5:24 p.m.  We're

14       off the video record.

15           THE COURT REPORTER:  Sheriff, would you like to

16       read or waive?

17           MS. KIRSHEMAN:  He'd like to read.

18           THE WITNESS:  I read.  I always read.

19           THE COURT REPORTER:  Thank you.

20           (The deposition was concluded at 5:24 p.m.)

21           (Reading and signing of the deposition was not

22       waived by the witness and all parties.)

23

24

25

1                      CERTIFICATE OF OATH

2

3     STATE OF FLORIDA

4     COUNTY OF HILLSBOROUGH

5

6          I, Michele Coburn, Florida Professional Reporter

7     and Notary Public, State of Florida, certify that the

8     witness, SHERIFF CHAD CHRONISTER, appeared before me

9     remotely on the 2nd day of November, 2022, and was duly

10    sworn.

11

12         Signed this 4th day of November, 2022.

13

14

15                    *Michele Coburn*

16                    Michele Coburn, FPR
                      Notary Public
                      State of Florida
17                    Commission # GG265882
                      My Commission Expires:  11/21/22

18

19             MICHELE COBURN
               Commission # GG 265882
               Expires November 21, 2022
20             Bonded Thru Troy Fain Insurance 800-385-7019

21

22

23

24

25

Sheriff Chad Chronister
November 02, 2022

1                   CERTIFICATE OF REPORTER

2

3     STATE OF FLORIDA

4     COUNTY OF HILLSBOROUGH

5          I, Michele Coburn, Florida Professional Reporter

6     and Notary Public, do hereby certify:

7          That prior to being examined the witness in the

8     foregoing proceedings was by me duly sworn to testify to

9     the truth, the whole truth, and nothing but the truth;

10         That said proceedings were taken before me at the

11    time and places therein set forth and were taken down by

12    me in shorthand and thereafter transcribed into

13    typewriting under my direction and supervision.

14         I further certify that I am neither counsel for,

15    nor related to, any party to said proceedings, not in

16    anywise interested in the outcome thereof.

17

18              DATED this 4th day of November, 2022.

19

20            *Michele Coburn*
              _____
21            Michele Coburn, FPR
              Florida Professional Reporter

22

23

24

25

Sheriff Chad Chronister
November 02, 2022

1                    WITNESS NOTIFICATION LETTER

2
        November 4, 2022
3

4       April Kirsheman, Esquire
        Re:  Sheriff Chad Chronister
5       Hillsborough County Sheriff's Office
        2008 East 8th Avenue
6       Tampa, Florida  33605
        akirsheman@teamHCSO.com
7
        In Re:  Warren vs. DeSantis
8               Deposition Taken on November 2, 2022
                U.S. Legal Support Number 6248440
9

10      Dear Ms. Kirsheman:

11      We respectfully request that the witness complete his
        review within a reasonable amount of time and return the
12      errata sheet to our office.

13      Please have the witness complete his review within a
        reasonable amount of time and return the errata sheet to
14      our office at the below address or via email to:
        southeastproduction@uslegalsupport.com.
15

16      Sincerely,

17      Michele Coburn, FPR
        U.S. Legal Support, Inc.
18      4200 West Cypress Street
        Suite 750
19      Tampa, Florida  33607

20

21      cc via transcript:

22      Jean-Jacques Cabou, Esquire
        Jeff Aaron, Esquire
23      April Kirsheman, Esquire

24

25

Sheriff Chad Chronister
November 02, 2022

1                          ERRATA SHEET

2      DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES HERE

3                    IN RE:  WARREN vs. DESANTIS
              DEPOSITION OF:  SHERIFF CHAD CHRONISTER
4                   TAKEN ON:  NOVEMBER 2, 2022

5
       PAGE  LINE  CHANGE              REASON
6
       ----  ----  ------------------------------------
7
       ----  ----  ------------------------------------
8
       ----  ----  ------------------------------------
9
       ----  ----  ------------------------------------
10
       ----  ----  ------------------------------------
11
       ----  ----  ------------------------------------
12
       ----  ----  ------------------------------------
13
       ----  ----  ------------------------------------
14
       ----  ----  ------------------------------------
15
       ----  ----  ------------------------------------
16
       ----  ----  ------------------------------------
17
       ----  ----  ------------------------------------
18
       ----  ----  ------------------------------------
19
       ----  ----  ------------------------------------
20
       ----  ----  ------------------------------------
21

22     Under penalty of perjury, I declare that I have read the
       foregoing document and that the facts stated in it are
23     true.

24     _____

       SHERIFF CHAD CHRONISTER              DATE
25