# Exhibit B

**ANDREW H. WARREN vs RON DESANTIS**
**Grayson Kamm on 11/10/2022**

```
 1   IN THE UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF FLORIDA
 2   TALLAHASSEE DIVISION

 3
     CASE NO. 4:22-cv-302-RH-MAF
 4

 5   ANDREW H. WARREN,

 6           Plaintiff,

 7   vs.

 8   RON DESANTIS,
     Individually, and in His Official Capacity as
 9   Governor of The State of Florida,

10           Defendant.

11   _____/

12

13   VIDEO TELECONFERENCE

14   DEPOSITION OF:      GRAYSON KAMM.

15   DATE:              Thursday, November 10th, 2022

16   TIME:              1:00 p.m. - 4:41 p.m.

17   LOCATION:          All parties appeared remotely
                        via Zoom video teleconference
18                      from their respective locations

19

20

21   STENOGRAPHICALLY
     REPORTED BY:       LISA SELBY-BROOD, RMR,
22                      Registered Merit Reporter and
                        Notary Public,
23                      State of Florida at large.

24

25
```

```
 1

 2    APPEARANCES:

 3
      DAVID B. SINGER, ESQ.
 4    Shumaker,Loop & Kendrick, LLP
      101 East Kennedy Blvd., Suite 2800
 5    Tampa, FL  33602
      Dsinger@shumaker.com
 6    (813) 227-2349

 7             Counsel for the Plaintiff

 8

 9    GEORGE T. LEVESQUE, ESQ.
      GrayRobinson, PA
10    301 South Bronough Street, Suite 600
      Tallahassee, FL  32302
11    George.Levesque@gray-robinson.com
      (850) 577-9090
12             Counsel for the Defendant
13

14
      JUSTIN L. DEES, ESQ.
15    Dees Legal Group, PLLC
      5180 Venetian Blvd., NE,
16    St. Petersburg, FL  33703
      JDees@DeesLegal.com
17             Counsel for the Deponent
18

19
      ALSO PRESENT:
20

21    Jeff Aaron, Esq., Co-Counsel for the Defendant

22    Plaintiff, Andrew Warren

23

24

25
```

```
 1

 2                    I N D E X

 3   Thursday, November 10th, 2022

 4   DEPOSITION OF:    Grayson Kamm

 5       Direct Examination by Mr. Leveszue      5
         (No cross examination)
 6

 7   CERTIFICATE OF OATH                        96
     CERTIFICATE OF THE REPORTER                97
 8

 9                *   *   *   *   *   *

10              E X H I B I T S

11   Defendant's Exhibit 1                      23
     (Notice of Deposition, and Schedule 'A')
12
     Defendant's Exhibit 2                      31
13   (E-mail)

14   Defendant's Exhibit 3                      35
     (2nd e-mail, with a Link)
15
     Defendant's Exhibit 4                      39
16   (3rd e-mail)

17   Defendant's Exhibit 5                      47
     (Letter)
18
     Defendant's Exhibit 6                      49
19   (e-mail)

20   Defendant's Exhibit 7                      55
     (E-mail, ("Tool Kit")
21
     Defendant's Exhibit 8                      58
22   (E-mail)          *Late-filed*

23   Defendant's Exhibit 9                      59
     (E-mail)
24

25
```

ANDREW H. WARREN vs RON DESANTIS
**Grayson Kamm on 11/10/2022**                                    Page 4

 1    Index (continued)

 2    Defendant's Exhibit 10                                    59
      (Letter/Policy Re pedestrian and bike violations)
 3
      Defendant's Exhibit 11                                    67
 4    (E-mail, (Re Sheriff, Ms. Quince)

 5    Defendant's Exhibit 12                                    70
      (E-mail, (Reference 013)
 6
      Defendant's Exhibit 13                                    70
 7    (E-mail, Safety & Justice Task Force)

 8    Defendant's Exhibit 14                                    74
      (E-mail, (Reference 019)
 9
      Defendant's Exhibit 15                                    78
10    (E-mail, (Reference 018)

11    Defendant's Exhibit 16                                    80
      (Document, (Reference 024)
12
      Defendant's Exhibit 17                                    85
13    (Memo, (Reference 027)

14    Defendant's Exhibit 18                                    85
      (Memo, Reference 025 )
15
      Defendant's Exhibit 19                                    87
16    (Document, (Re Gender/transgender policy)

17                                - - -

18

19

20

21

22

23

24

25

```
 1                    (1:03 p.m., on the record.)
 2                         GRAYSON KAMM,
 3    the witness herein, being first duly sworn, was examined
 4    and testified as follows:
 5                       DIRECT EXAMINATION
 6         MR. LEVESQUE:  This is Mr. George Levesque.
 7         Good afternoon, Mr. Kamm; my name in
 8    George Levesque.
 9         I represent Governor DeSantis in this lawsuit.
10         Before we get started, if I could ask Counsel
11    who are attending if they could identify themselves
12    for the record, and who they represent.
13         MR. DEES:  Justin Dees of Dees Legal Group.
14         I represent Mr. Grayson Kamm.
15         MR. SINGER:  David Singer for Plaintiff,
16    Andrew Warren.
17         MR. LEVESQUE:  And I believe he might be on
18    mute, but Mr. Aaron with our law firm, who also
19    represents Governor DeSantis, is online as well.
20         For the record, I would note that Plaintiff
21    appears to be observing the deposition as well.
22    BY MR. LEVESQUE:
23    Q    Mr. Kamm, have you ever been deposed before?
24         MR. DEES:  One moment.
25         George -- or Mr. Levesque -- it's, Mr. Kamm.
```

```
 1              It's "com"; like "dot com".

 2              MR. LEVESQUE:  I apologize.

 3              MR. DEES:  No problem at all.

 4              MR. LEVESQUE:  I didn't catch that earlier.

 5   BY MR. LEVESQUE:

 6       Q    Mr. Kamm, have you ever been deposed before?

 7       A    No.

 8       Q    And I will tell you, as somebody who has a

 9   different last name I can appreciate people

10   mispronouncing it frequently.

11              What I'd like to do is go over a few rules of

12   the road.

13              Obviously the format is I'll be asking

14   questions; you'll be giving answers.  If there's any

15   question that I don't -- that I ask that you don't

16   understand, just let me know and I'll try my best to

17   rephrase it or repeat it.

18              At different times opposing counsel may have

19   an objection to one of my questions.  If they do, just

20   allow them to get their objection on the record.  I may

21   ask them for some more details, but unless they've

22   instructed you not to answer, what I'll do is I'll sort

23   of either point at you or direct it at you, and you can

24   answer the question if you understood it.

25              This is not intended to be the
```

```
 1   Spanish Inquisition.  If at any time you need to take a
 2   break, just let me know.
 3            The only thing that I'd ask is if we've got a
 4   question pending that you go ahead and answer the
 5   question pending, and then we can take a break.
 6            What have you done to prepare for your
 7   deposition today?
 8       A    I have talked with Counsel.
 9            I have reviewed documents.
10       Q    And I don't want to know anything in terms of
11   your conversation with Counsel.
12            Have you had any other conversations with
13   anybody about your deposition, other than counsel?
14       A    Yes.
15       Q    Who have you spoken with, other than Counsel?
16       A    I've talked with Mr. Singer, Mr. Warren.  My
17   wife.
18       Q    What did you speak with Mr. Warren about?
19            MR. DEES:  Objection.  Objection.
20            Maybe it's a preliminary matter; we can lay
21       this out, and my intent is certainly to streamline
22       this process.  And I do know we -- again, we have a
23       hard stop at 5:00, so I don't want to have any
24       issues.
25            But the subpoena that we're appearing here
```

1    today under is arguably inoperative.

2        That being said, the subpoena was directed to

3    Mr. Grayson Kamm in his individual capacity, and

4    also referenced his prior employment with the State

5    Attorney's Office of the 13th Judicial Circuit.

6        It also referenced a distinct entity,

7    incorrectly named as Catalyst Communications.

8        So there are some issues with the subpoena,

9    both procedurally and substantivally.

10       I think we can iron those out.

11       We're appearing; we've produced documents in

12   good faith, even though the subpoena itself didn't

13   comply with Federal Rule of Civil Procedure

14   45(a)(4).

15       To the extent that we're going to get into

16   information where you're asking him communications

17   with Mr. Warren, we're going to object to those.

18   However, if the communications predate the

19   suspension, predate August 4th, 2022, I think those

20   are fair game.

21       However, any oral discussions would be

22   protected by attorney/client privilege.  Any

23   tangible products would be protected underneath

24   26(b)(3)(A) as work product.

25       I set forth that in my response.

 1         I note that the amended notice -- which

 2    there's been two of in this case -- neither one of

 3    them set forth any request for documents, and there

 4    hasn't been a formal response provided to my notice

 5    to you, George, regarding our position.

 6         Again, we don't -- we're not trying to be

 7    obstructionist whatsoever at all, but we're going

 8    to proceed underneath those contours.

 9         So to the extent that you're asking him about

10    conversations he had about his deposition with

11    Mr. Warren, we're going to object and he's going to

12    be instructed not to answer.

13         To the extent that you're going to ask him

14    about any pre-suspension discussions with

15    Mr. Warren, certainly please proceed.

16         MR. LEVESQUE:  Before I get started, Mr. Dees,

17    you indicated attorney/client privilege.

18         Does Mr. Warren represent Mr. Kamm?

19         MR. DEES:  I'm not here to answer any of your

20    questions today.  We already --

21         MR. LEVESQUE:  You're asserting

22    attorney/client privilege, and I allowed you to get

23    your objections on the record.

24         I'm just trying to understand your objection,

25    because there was nothing in your objection that

1   was filed with the Court that I understood

2   addressed attorney/client privilege.

3        There might have been some work product issues

4   related to the subpoena.  I'm at least entitled to

5   have a good understanding and a basis, and ask

6   questions not to get into the substance --

7        MR. DEES:  Sure --

8        MR. LEVESQUE:  -- but -- and the basis for

9   that.

10        MR. DEES:  Sure, sure.

11        MR. LEVESQUE:  To the extent that you've given

12   me a hard stop at 5:00, I'm just asking you to

13   expedite the process.

14        MR. DEES:  Indeed, but I'm not going to waive

15   my client's substantive rights, or those of

16   Mr. Warren, so -- but you're right.

17        So the notion is there's a threshold issue

18   too, that we're glossing over.  The notion is that

19   the principal objection is it's not relevant.

20        Any discussions with Mr. Warren

21   post-suspension are not relevant to the basis for

22   the suspension, and he's not going to talk about

23   that.  We can call the judge on that; okay?  We're

24   not going to get into that.  So we're going to

25   streamline the process.

1        So if it's a threshold matter, the objection

2   is not relevant -- it's not lead to discovery of

3   admissible evidence.  Certainly Mr. Singer, I'm

4   sure, can opine on this as well.

5        And again, I don't want to be an

6   obstructionist.  I want these questions to flow,

7   and I want us to get going; okay?

8        However -- he is; he's a consultant.  He was a

9   consultant.  He's been in meetings with Mr. Singer,

10  Mr. Warren's legal counsel.  They've discussed

11  reasons for certain legal moves, what to do, etc.

12  He's a consultant on Mr. Warren's legal team; okay?

13       So again, there are -- you got a lady to

14  depose tomorrow that might have more information

15  for you that may be more prudent, and bear more

16  fruit.

17       But again, we've got -- we've got different

18  issues.  You've got a deficient subpoena that we're

19  appearing for to try to streamline the process,

20  make sure you guys are set for trial the 29th, but

21  I've got to assert these certain rights; okay?

22       The subpoena's wrong, but we're here to answer

23  questions, but were not going to get into anything

24  post-suspension, and that would include your

25  pending question about his deposition prep and his

1           conversation with Mr. Warren.  So please proceed.

2      BY MR. LEVESQUE:

3           Q      Mr. Kamm, are you a consultant for Mr. Warren?

4           A      Yes.

5           Q      In what capacity are you a consultant for

6      Mr. Warren?

7           A      I advised him on his media relations, and

8      coordinate media appearances, and work on messaging for

9      the media.

10          Q      And how long have you been a consultant for

11     Mr. Warren?

12          A      Since August 4th.

13          Q      Is there a formal document that memorializes

14     that relationship?

15          A      There's not.

16          Q      How much are you being paid to be a consultant

17     for Mr. Warren?

18                 MR. DEES:  Objection.  Relevance.

19                 Go ahead and answer the question.

20                 THE WITNESS:  So -- yes --

21                 MR. DEES:  Go ahead.

22                 THE WITNESS:  $15,000 per month.

23     BY MR. LEVESQUE:

24          Q      And so how much have you been paid to date?

25          A      Let's see.  It would be 45,000.

 1       Q    And is that amount that you've billed and
 2   collected, or is that still sort of owing?
 3             MR. DEES:  Objection as to relevance.  I don't
 4        know what relevance this has in relation to --
 5             MR. LEVESQUE:  Mr. Dees --
 6             MR. DEES:  -- claims at issue --
 7             MR. LEVESQUE:  Mr. Dees, just object to the
 8        form of the question.  These questions all go to
 9        the bias of the witness.  These are all appropriate
10        questions to ask.
11             MR. DEES:  Okay.  I will not take instruction
12        from you; let's understand that at the outset.  I
13        will take instructions by the principles of law and
14        the judge presiding over this case; okay?  Let's be
15        mindful of that; okay?  You can ask him --
16             MR. LEVESQUE:  Then you should be well --
17        Mr. Dees, you should be well aware that speaking
18        objections are wholly improper.
19             MR. DEES:  Which is -- you can ask him, is he
20        present in the meetings with Mr. Warren and his
21        attorneys, and the answer is yes.  Move on, please.
22   BY MR. LEVESQUE:
23       Q    Mr. Kamm, is the $45,000 that you mentioned,
24   has that been collected and paid?
25       A    Yes.

```
 1        Q     Mr. Kamm, can you tell me a little bit about

 2   your educational background?

 3        A     Yes.  I -- let's see.

 4              Graduated high school from Rockledge School

 5   here in Florida.  Have a Bachelor's of Science in

 6   telecommunications from the University of Florida.

 7        Q     And when did you earn that degree from UF?

 8        A     2002.

 9        Q     And how do you know Mr. Warren?

10        A     We met when our kids were in preschool class

11   together.

12        Q     And when about was that?

13        A     Would have been about five years ago.

14        Q     Is that before or after he was elected

15   State Attorney?

16        A     After.

17        Q     And how did you come to be employed in the

18   State Attorney's Office?

19        A     We remained friends, and he -- the

20   superintendent at my job was retiring and he had an

21   opening in Communications in his office, and reached out

22   to me.

23        Q     And what did he say when he reached out to

24   you?

25        A     He asked if I'd be interested.
```

 1        Q     And your response was?

 2        A     I have to think about it.

 3        Q     And how did that conversation go?

 4        A     I thought about the option of heading to the

 5   State Attorney's Office versus staying in the position I

 6   was in, or trying something different, and ultimately I

 7   decided that State Attorney's Office was where I wanted

 8   to be.

 9        Q     And what position were you in at that time?

10        A     I was the Chief Communications Officer for

11   Hillsborough County Public Schools.

12        Q     And how long had you been in that position?

13        A     I was there about 2 and a half years, total.

14        Q     And before then where were you employed?

15        A     MOSI.  The Museum of Science and Industry.

16        Q     And where is that located?

17        A     In Tampa.

18        Q     How long have you lived in Tampa?

19        A     Since 2008.

20        Q     I want to go back and talk a little bit about

21   what you did to get ready for this deposition.

22              From the standpoint of documents, what

23   documents did you look at?

24        A     I went back and looked at e-mails.  I looked

25   at text messages.  I looked at documents that were in

1   folders in my computer.  I looked at Google Docs.

2          That's it.

3      Q    And related to the e-mails, the text messages,

4   and the Google docs, did you collect records and produce

5   them in this litigation?

6      A    Yes.

7      Q    Okay.  And I am going to share my screen for a

8   moment.  Can you see that document Mr. Kamm?

9      A    Yes.

10     Q    Do you recognize that document?

11         And I can scroll down for you.

12         I will represent this was the initial Notice

13  of Intent to subpoena your records, and for your

14  testimony.  See that there; and I can make it probably a

15  little bit bigger.

16     A    I -- I think it's the same thing as the

17  document I received.

18     Q    And -- Catalyst Communications Group.

19         Do you know what that business is?

20     A    Yes.

21     Q    What is that business?

22     A    It is a media and public affairs consulting

23  firm.

24     Q    Is that your current employer?

25     A    No.

1      Q     Who's your current employer?

2      A     I am employed by Skyward Strategies, LLC.

3      Q     And how long have you been employed with

4   Skyward Strategies?

5      A     Since April.

6            MR. DEES:  Specify what year, Mr. Kamm.

7            THE WITNESS:  Oh; sorry.  April of this year.

8            MR. LEVESQUE:  Thank you, Mr. Dees.

9   BY MR. LEVESQUE:

10     Q     Have you ever been employed with Catalyst?

11     A     No.

12     Q     Scroll down a little bit more.

13           And in producing records in response to this

14   request, did you review this entire list of records that

15   we were requesting?

16     A     I did.

17     Q     So to the best of your ability, did you

18   collect all documents and communications related to the

19   June 2021 joint statement that was disseminated by Fair

20   and just Prosecution?

21     A     Yes.

22     Q     And I think you indicated that you looked

23   through e-mails, text messages, some of the folders on

24   your computer, and Google docs.

25           When you describe text messages, what are the

**ANDREW H. WARREN vs RON DESANTIS**
**Grayson Kamm on 11/10/2022**                                    Page 18

```
 1    different ways that you communicate with Mr. Warren?

 2         A    Text messages, e-mail, and phone calls.

 3         Q    Okay.  For text messages, do you use the

 4    typical messaging app that comes with the phone, or do

 5    you use other applications like WhatsApp or Signal or

 6    one of the other communications apps?

 7         A    I -- up until August I had only used the

 8    included messaging app on my phone.  Then in August --

 9    then in August I added the Signal app on my phone.  I've

10    used that for some communications with Andrew; just --

11    depends on the situation.

12         Q    And related to e-mails -- let me go back to

13    that.  So prior to that time, including during your

14    employment, the only text messaging application that you

15    would have used would have been the application that was

16    built into the phone.  Is that correct?

17              MR. DEES:  Objection to form.  Which

18         employment?

19              George -- just to expedite, I apologize;

20         what's the correction pronunciation of your last

21         name, so I can refer to you properly?

22              MR. LEVESQUE:  Levesque.

23              MR. DEES:  Levesque.  Levesque.

24              Thank you, sir.

25              Mr. Levesque, again, just to clarify things,
```

```
 1         so Mr. Kamm was employed by the State Attorney's

 2         Office from April in 2020 through April 2022.

 3               He left there unemployed, State Attorney's

 4         Office -- in 2022, and went to work for Skyward.

 5               And then when the suspension occurred on

 6         August 4th, 2022, he became Mr. Warren's

 7         consultant.

 8               So with respect to the references to

 9         employment, if we could just clarify, just to make

10         sure that the record's good, and so you have full

11         understanding.  Thank you.

12    BY MR. LEVESQUE:

13         Q    Mr. Kamm, are you an employee of Mr. Warren

14    right now?

15         A    A consultant.

16         Q    So prior to becoming a consultant for

17    Mr. Warren, did you only use the text messaging app that

18    was built in the phone for text messages --

19         A    Yes --

20         Q    -- between you and him?

21         A    Yes.

22         Q    Related to your relationship as a consultant

23    for Mr. Warren, is that between you and him

24    individually, or is that run through Skyward Strategies?

25         A    The latter.  Through Skyward.
```

```
 1        Q     And just to be clear, there is no formal
 2   document that memorializes that relationship between
 3   Mr. Warren and Skyward Strategies?
 4        A     That's correct.
 5        Q     Is Skyward Strategies your company?
 6        A     Yes.
 7        Q     How many other employees does it have?
 8        A     None.
 9        Q     Prior to becoming a consultant for Mr. Warren,
10   what e-mail platforms did you use to communicate with
11   Mr. Warren?
12        A     G-mail, and Outlook.
13        Q     And when you were using Outlook, was that
14   exclusively for the e-mail that was affiliate -- e-mail
15   address that was affiliated with the State Attorney's
16   Office?
17        A     No.
18        Q     Okay.  What other e-mail addresses would you
19   have used Outlook for?
20        A     Well, we've got -- sure.
21              I would have had the State Attorney's Office
22   e-mail address for a time, and the other one is
23   Grayson at Catalyst Communications Group dot com.
24        Q     What is Catalyst Communications Group?
25        A     It is a media public affairs consulting firm
```

```
 1    that I work with as a contractor.

 2              I'm affiliated -- my firm is affiliated with

 3    them.

 4       Q    So if I understand correctly,

 5    Skyward Strategies works as -- or is affiliated with

 6    Catalyst Communications Group.

 7              Is there a formal agreement that memorializes

 8    that relationship?

 9       A    Yes.  I think so; yes.

10       Q    Okay.  And is -- would the nature of that

11    relationship be that Skyward Strategies works as sort of

12    a subcontractor under Catalyst Communications Group?

13       A    I think that's a reasonable way to

14    characterize it.  I don't know the -- the definitions of

15    those things, but probably in the common way of

16    thinking; yeah.

17       Q    Do you know if the Catalyst Communications

18    Group website includes you as some of the people who

19    performed work for that entity?

20       A    It does.

21       Q    It does?  Okay.

22              When you searched your emails, you've produced

23    e-mails from your G-mail account.

24              Did you search your e-mails that were

25    affiliated with the Catalyst Communications Group
```

1   account?

2      A    Yes.

3          MR. DEES:  Tried to capture it all for you,

4      Mr. Levesque.

5          MR. LEVESQUE:  Appreciate that, Mr. Dees.

6   BY MR. LEVESQUE:

7      Q    Other than the G-mail account, the

8   Catalyst Communications Group account, and the State

9   Attorney's Office account, are there any other e-mail

10  addresses that you might have used to communicate with

11  Mr. Warren, prior to becoming a consultant for him?

12     A    No.  When I was at the State Attorney's Office

13  I had access to two e-mail accounts.  My own, and then

14  the general communications inbox.

15          So that would be another address, but that was

16  during my time there.

17     Q    And as you sit here today, would it be fair to

18  assume that you don't have access to your

19  State Attorney's Office e-mails?

20     A    That's correct.

21     Q    Okay.  And so for your efforts in Number 2,

22  respond to Request Number 1 and Number 2, the places

23  that you looked were your e-mails, your text messages,

24  folders on your computer, and Google docs.

25          Do I understand that correctly?

1      A      That -- that sounds right to me.

2      Q      Are there any documents that would be in a

3  hard copy form that you possess?

4      A      Not that I'm aware of; no.

5      Q      Are there any other locations where documents

6  might exist that you haven't searched?

7      A      At the State Attorney's Office is the only

8  place that I'm aware of that would have communications.

9      Q      And to be clear -- and I'm not trying to set

10  you up.  I understand that there would be records that

11  you might be able to go and request from somebody else,

12  but I'm referring to any locations or anything that you

13  would have an unfettered right of access to.

14            So whether it be your personal computer, or --

15  I don't know if you maintain a computer, a separate

16  computer at Skyward Strategies or if there's access to

17  files at Catalyst Communications Group, but is there any

18  other location where records responsive to

19  Request Number 1 and 2 might be?

20      A      No.  Not that I have access to; no.

21      Q      Okay.

22      A      Not -- that you just described; no.

23            MR. LEVESQUE:  We will mark that as Exhibit 1.

24      (Defendant's Exhibit 1 marked for identification.)

25

```
 1    BY MR. LEVESQUE:

 2         Q    Now, what was your role in the State

 3    Attorney's Office?

 4         A    I was Chief Communications Officer.

 5         Q    And what were your responsibilities?

 6         A    Media relations, interact with the media and

 7    community engagement, which was interacting with

 8    community groups.

 9         Q    And what were some of your responsibilities as

10    someone who was responsible for media relations?

11         A    Handle incoming calls from the news media,

12    prepare press releases or press conferences for

13    developments within the office, editing and word

14    Smithing statements, remarks.  Handle the social media

15    accounts, and -- did you ask -- broadly, did you ask

16    just about the media relations part, or did you ask

17    about --

18         Q    No; I just asked about the media relations so

19    far, but it sounds like you were getting to the end of

20    that answer.  Is that correct?

21         A    Yes.

22         Q    Okay.  On the community engagement side, what

23    were -- what were your responsibilities?

24         A    Work to -- well, we had a community counsel,

25    which was a group of community leaders who came in and
```

```
 1   met with the staff and learned about how the office

 2   worked.  I oversaw that.

 3             And then I would just seek out meetings with

 4   different community groups, or if community groups

 5   reached out to us to take part in a meeting, or --

 6   parade, or something like that, I would help coordinate

 7   that.

 8        Q    Have you reviewed the Executive Order?

 9        A    Yes.

10        Q    And by "Executive Order," I'm referring to the

11   order suspending Mr. Warren from the Office of State

12   Attorney.

13        A    Yes.

14        Q    So are you aware that the Governor has

15   suspended Mr. Warren for pledging not to use his

16   resources or the resources of his office to prosecute

17   those who provide or assist abortions?

18        A    I haven't looked at what the Order said in a

19   while.

20        Q    But do you understand that that's the general

21   gist of -- one of the reasons why Governor DeSantis was

22   suspending Mr. Warren?

23        A    You'll have to summarize it again; see if I

24   can tell you if I agree with that.

25        Q    That Mr. Warren pledged not to use the
```

 1   resources of his office to prosecute those who provide

 2   or assist in abortions?

 3            MR. DEES:  Objection to form, to the -- point

 4       of clarify.

 5            Mr. Kamm; he's not asking if you agree with

 6       it; he's asking you if you're aware of it.

 7            THE WITNESS:  Sure.  I understand that the

 8       Governor has said something to that effect.

 9   BY MR. LEVESQUE:

10       Q    Okay.  Related to the issue of abortion, do

11   you recall when that became an issue of concern in the

12   State Attorney's Office?

13            MR. SINGER:  Object to the form.

14            You can answer.

15            THE WITNESS:  It's been an issue the entire

16       time -- I mean, it's been an issue since -- the

17       1970s, I would assume, or whenever Roe was passed.

18   BY MR. LEVESQUE:

19       Q    Okay.  But in terms of an issue that the

20   State Attorney's Office is particularly engaged in or

21   particularly concerned with.

22            I understand the precedent's been out there

23   since the '70s, but from the standpoint of actually

24   starting to take up your time, is there a particular

25   point in time where that came on your radar, such that

 1    this was something that -- in your role as Chief

 2    Communications Officer that you had to deal with?

 3              MR. DEES:  Object to the form.

 4              The form -- does that include the notion that

 5         if it ever did or did not; it may not have ever

 6         come to that point.

 7              Proceed, and answer the question, please.

 8              THE WITNESS:  Yeah; I wouldn't say it ever

 9         became an issue while I was -- during my time

10         there.  My recollection.

11    BY MR. LEVESQUE:

12         Q    Give me one second; let me share my screen

13    again --

14         A    Certainly not in a standout way.

15         Q    Mr. Kamm, this is an e-mail that was provided

16    to us by you and your production -- in your production.

17              Do you recognize that e-mail?

18         A    Yes.

19         Q    And do you see where the date on that e-mail

20    is October 7th, 2021?

21         A    Yes.

22         Q    Who is Chris Mitchell?

23         A    Chris Mitchell is a -- a political advisor.

24         Q    Okay.  Did he provide political advice to the

25    State Attorney's Office?

```
 1        A    No.

 2        Q    In what capacity was he a political advisor?

 3        A    Directly to Andrew.

 4        Q    And in this e-mail there's a provision

 5   there -- and I don't know if you can see it 'cause it's

 6   kind of small -- it says, "Quoted text hidden."

 7             Do you know what text is hidden in that

 8   e-mail?

 9        A    Just based on using G-mail; presumably it's

10   Chris' original message.

11        Q    So it would be this original message right

12   here.

13        A    Based on my understanding of G-mail; yeah.

14        Q    Okay.  And what was the nature of the

15   communications that were had in this e-mail?

16             Can you describe them -- can you describe what

17   was going on?

18             MR. DEES:  Object to the form.

19             Go ahead and answer.

20             THE WITNESS:  Do you know mean -- do you mean,

21        like, follow it -- like -- the communications that

22        followed this e-mail, or what prompted the

23        e-mail -- I guess I'm --

24   BY MR. LEVESQUE:

25        Q    Well, just -- and that's a fair -- what I'm
```

1    looking for is just Mr. Mitchell e-mailed Mr. Warren and

2    included you and several others with a state craft

3    digital, and I'm curious as to if you can describe in

4    your understanding of what he's raising in his e-mail,

5    and what Mr. Warren's response is?

6         A    Yes.  As a political advisor, Chris saw

7    discussion about this in the news, and it looks like he

8    wanted to have a discussion with Andrew and a few other

9    people about whether Andrew -- again, personally -- was

10   going to put out a statement, or -- how he describes his

11   take on abortion, and the issue.

12        Q    And so at least going back as far as

13   October 2021, how Mr. Warren would publically respond to

14   the question of abortion was something that was being

15   discussed.  Would that be a fair characterization?

16        A    Yes.

17        Q    Now, in Mr. Warren's response, he indicates,

18   "There's a nuance in how we approach the issue from

19   State Attorney perspective; e.g., will I refuse to

20   prosecute anyone under a Texas-style law."

21             Do you know what he -- what is your

22   understanding of what he's referring to there?

23        A    I don't remember the specific conversation

24   that followed this message.

25        Q    Do you know if that conversation happened by

1   e-mail, or Zoom?

2       A    I don't.  Or if it happened.  I don't.

3       Q    **After this e-mail, did you have any**

4   **conversations with Mr. Warren related to how they were**

5   **supposed -- how he wanted to respond publically on the**

6   **issue of abortion?**

7            MR. DEES:  Object to the form.  Let's be

8        mindful of the timeframes that we set forth.

9            I presume, Mr. Levesque, the question is

10       pre-suspension.  So any conversations with

11       Mr. Warren regarding abortion pre-suspension.

12           MR. LEVESQUE:  At this point, Mr. Kamm, any

13       question that I ask you about your conversations

14       with Mr. Warren --

15           MR. DEES:  Thank you --

16           MR. LEVESQUE:  -- stop on August 4th.

17           MR. DEES:  Thank you, sir.

18           MR. LEVESQUE:  Unless I specifically say after

19       August 4th, let's assume that every question I ask

20       stops on August 4th.

21           MR. DEES:  Thank you.

22           MR. LEVESQUE:  I'll even cut it off on

23       August 3rd at midnight.

24           MR. DEES:  Appreciate the grace, Mr. Levesque.

25           THE WITNESS:  Sorry.  Your question, sir?

```
 1    BY MR. LEVESQUE:

 2        Q    After this e-mail, did you have conversations

 3    with Mr. Warren about how he would respond publically to

 4    the issue of abortion, particularly whether he would

 5    refuse to prosecute anyone under a Texas-style law?

 6        A    I don't remember having any conversation like

 7    that.

 8        Q    Do you remember having any conversations with

 9    Mr. Warren about how he would respond on the issue of

10    abortion generally?

11        A    Oh.  Sorry; we're talking about

12    pre-suspension; not -- not while I was at the State

13    Attorney's Office.

14             Yes; but it was after my time at the State

15    Attorney's Office.

16        Q    So while you were employed in the State

17    Attorney's Office, you never had conversations with him

18    about how that response should be crafted, what should

19    be in, what should be out?  Would that be fair?

20        A    Not that I remember; yeah.

21        Q    Okay.

22             MR. LEVESQUE:  We're going to mark that as

23        Exhibit 2.

24        (Defendant's Exhibit 2 marked for identification.)

25
```

```
 1   BY MR. LEVESQUE:

 2       Q    Mr. Warren, (sic), I'm going to show you

 3   another e-mail that you've produced, and I'm going to

 4   ask, do you recognize that e-mail?

 5       A    Yes.

 6       Q    What is that e-mail?

 7       A    It's a --

 8            MR. DEES:  Object to form.

 9            Please go ahead and answer.

10            THE WITNESS:  It's an e-mail from Gary Weisman

11       to me and Andrew Warren from our non-State

12       Attorney's Office; our personal e-mail accounts.

13       Incorporating our personal e-mail accounts.

14   BY MR. LEVESQUE:

15       Q    And when he says, "You guys are reaching out,"

16   do you know what that's in reference to?

17       A    I don't.  I don't.

18       Q    And I'm going to scroll down.

19            When you received that e-mail, there was an

20   article -- a link to an article attached, and I will

21   represent to you that that is the copy of the article

22   that comes up when you click that link.

23            Can you see that, and read that?

24       A    Yes, I can.

25       Q    Does that article look familiar to you?
```

```
 1       A    Yes.  I clicked on the link, and I've seen it.

 2       Q    And is Mr. Warren quoted in this article, to

 3   your recollection?

 4       A    He's either quoted or talked about; I can't

 5   remember.

 6       Q    And I'm going to go -- I'm going to

 7   highlight -- or at least try to highlight -- that is

 8   just to draw your attention specifically to that

 9   paragraph.  Can you read that?

10       A    I can.

11       Q    Do you recognize -- in that paragraph they

12   reference a new state law, an assault -- that Mr. Warren

13   refers to "An assault on our democracy," and they

14   describe the law as, "It stiffens penalties for crimes

15   committed during a riot or violent protest, and was

16   passed after protests in the wake of George Floyd's

17   death."

18            Do you know what law that is referencing?

19       A    Yes.

20       Q    What law is that referencing?

21       A    House Bill 1 in that legislative session.

22            I believe it was called something like the

23   Antiriot Law.

24       Q    And at least in that paragraph, did Mr. Warren

25   ever indicate that he would not prosecute crimes
```

ANDREW H. WARREN vs RON DESANTIS
Grayson Kamm on 11/10/2022                                    Page 34

 1   committed under that law --

 2              MR. DEES:  Objection to form.

 3              That -- that's way, way stretching.  We cannot

 4        authenticate this document; whether or not that

 5        statement was actually made by Mr. Warren, etc.

 6              Subject to those objections, please go ahead

 7        and answer the question.

 8              THE WITNESS:  Yeah; there's nothing in this

 9        article that says Andrew will not enforce that law.

10              The summary of the law is incorrect.

11              It doesn't characterize what Andrew's actual

12        concern about the law was.

13              But at no point did Andrew say he was not

14        going to enforce any provision of that law, here or

15        any other time.

16   BY MR. LEVESQUE:

17        Q    And to be clear, Mr. Kamm, I'm not suggesting

18   that he ever said that -- or at least I'm not aware of

19   any statement publicly that he's ever said that he

20   wouldn't enforce that law.

21              Do you know if he referred to it as, "An

22   assault on our democracy"?

23        A    He -- the element of the law that he was

24   speaking of was the provision that would -- that

25   broadened the definition of a riot, to where people who

```
 1    were peacefully protesting and near where a crime

 2    occurred could be charged with a felony.

 3              MR. DEES:  Mr. Kamm, I'm going to remind you

 4         just to go ahead and answer the question asked.

 5              Thank you very much.

 6              THE WITNESS:  All right.

 7    BY MR. LEVESQUE:

 8         Q    But to be clear, House Bill 1 was a bill that

 9    Mr. Warren publically opposed; correct?

10         A    Yes.

11              MR. LEVESQUE:  And we will mark that as

12         Exhibit 3.

13         (Defendant's Exhibit 3 marked for identification.)

14    BY MR. LEVESQUE:

15         Q    I'm going to show you another e-mail, and this

16    is another e-mail between Mr. Warren and Mr. Mitchell,

17    where he is including you in that conversation.

18              Do you recognize that e-mail?

19         A    Yes.

20         Q    And this is an e-mail in May 2022 that

21    addresses abortion.  Correct?

22         A    Yes.

23         Q    At that time, were you familiar with who Fair

24    and Just Prosecution is?

25         A    Yes.
```

**ANDREW H. WARREN vs RON DESANTIS**
**Grayson Kamm on 11/10/2022**                                    Page 36

```
 1        Q     And how did you become acquainted with Fair

 2    and Just Prosecution?

 3              MR. DEES:  Objection to form, as to the use of

 4        the term "acquainted".

 5              THE WITNESS:  When I started working at the

 6        State Attorney's Office, Andrew told me about the

 7        organization.

 8    BY MR. LEVESQUE:

 9        Q     And how did he describe the organization?

10        A     Group of prosecutors from across the country.

11        Q     Did he provide anything additional to that?

12              Were they prosecutors that all rooted for the

13    same basketball team, or was there something more

14    specific?

15              MR. DEES:  Well done.

16              THE WITNESS:  Got 'ya.  Slam-dunk question.

17              Yeah; he did.

18              He said that it was a group of prosecutors

19        from across the country who were interested in

20        criminal justice reform, that had varied

21        backgrounds, and varied levels of interest in

22        justice reform.

23    BY MR. LEVESQUE:

24        Q     When you refer to "criminal justice reform",

25    what are you referring to there?
```

```
 1        A     Common sense changes in the justice system

 2    that focus on public safety, preventing crime, and

 3    reducing recidivism.

 4        Q     Can you provide some examples of some of those

 5    common sense changes?

 6              MR. DEES:  Objection as to relevance.

 7              I'm not quite sure what Mr. Kamm's views on

 8        that is relevant to this.  We're certainly trying

 9        to streamline the deposition and be done by 5,

10        Mr. Levesque, I don't see any relevance at all to

11        the --

12              MR. LEVESQUE:  Mr. Dees, he was his Chief

13        Communications person.  I'm at least entitled to

14        get some understanding of how well he's familiar

15        with his job, if I can.

16              I mean, he was Mr. Warren's spokesperson.

17              He was the spokesperson for the

18        State Attorney's Office.

19              MR. DEES:  Object to the characterization, to

20        the extent it was Mr. Warren's spokesperson at that

21        particular point.

22              Agree that he was a spokespersons for the

23        State Attorney's Office, lead by Mr. Warren.

24              Please go ahead and answer the question,

25        Mr. Kamm.
```

```
 1              THE WITNESS:  Juvenile civil citation
 2         programs, speciality courts, like drug court,
 3         mental health court.  Does that work?
 4    BY MR. LEVESQUE:
 5      Q    That's helpful.
 6              And in the communications here, what is
 7    Mr. Warren working on?
 8      A    This looks to be either a public statement,
 9    right, or something for an e-mail that would go out to
10    the e-mail list that he has of supporters who've signed
11    up to get e-mails from Andrew Warren.
12              Not the State Attorney's Office, but from
13    Andrew.
14      Q    Okay.  And when you say, "From Andrew," in
15    what capacity would he be mailing those out?
16      A    As an individual, it would probably come
17    from -- like, his -- a list he compiled while
18    campaigning for office, I would assume.
19      Q    So -- it would be a statement that would be
20    put out in his capacity as someone who may be running
21    for office, or may be considering running for office.
22              Would that be fair?
23      A    I'll be honest; I don't know.
24              I don't know how the list is compiled.
25              I don't know who gets those e-mails.
```

1      Q      Do you know who maintained that list?

2      A      I think Chris Mitchell.

3             Again -- I'm doing a bad job; just answer the

4      question.  I do not know.

5      Q      I'm going to scroll down.

6             In one of these -- believe it's -- here we go.

7      On the May 5th, 2022 at 8:47, Mr. Warren is e-mailing

8      you and Mr. Mitchell, and he's indicating that he likes

9      your edits, and "Will have Alex look at it."

10            Do you know who Alex is?

11     A      I do.

12     Q      Who is Alex?

13     A      His wife.

14            MR. LEVESQUE:  We will mark that as Exhibit 4.

15         (Defendant's Exhibit 4 marked for identification.)

16     BY MR. LEVESQUE:

17     Q      Going to show you another document.

18            You may or may not have seen this document,

19     but before we go I'll kind of scroll down so you can see

20     it.  Do you recognize this document?

21     A      Yes.

22     Q      What is this document?

23     A      This is the joint statement from elected

24     prosecutors, produced by Fair and Just Prosecution.

25     Q      Did you work with Fair and Just Prosecution in

 1   your role as the Chief Communications Officer?

 2        A    Yes.

 3        Q    And after leaving the State Attorney's Office,

 4   did you continue to work with them --

 5             MR. DEES:  Objection.  My apologizes,

 6        Mr. Levesque, for not letting you get the question

 7        out; my sincere apologies.

 8             But object to form.  To the extent that, "work

 9        for/work with," Mr. Kamm, be careful of what you're

10        saying; work for/work with.

11             Let's be specific about how that interaction

12        worked.

13             THE WITNESS:  Yeah; if you could just read the

14        question, Mr. Levesque; I'm sorry.

15   BY MR. LEVESQUE:

16        Q    Did you conduct communications with Fair and

17   Just Prosecution after you left the State Attorney's

18   Office on Mr. Warren's behalf?

19        A    Not that I remember.

20        Q    Did Mr. Warren show you this joint statement

21   before he agreed to sign onto it?

22        A    No.

23        Q    Did he discuss it with you?

24        A    No.

25        Q    When did you first become aware that he had

```
 1    signed onto this statement?
 2         A    My recollection is afterward.
 3              Yeah; my recollection is probably within a
 4    few -- probably within a few days afterward.
 5         Q    I'm going to highlight some language here --
 6    or read some language there where my cursor is.
 7              In that, it says, "As such, we decline to use
 8    our office's resources to criminalize reproductive
 9    health decisions, and commit to exercise our
10    well-settled discretion, and refrain from prosecuting
11    those who seek, provide or support abortions."
12              Did I read that accurately?
13         A    You did.
14         Q    Would you agree that reading that sentence,
15    that the prosecutors that signed onto this particular
16    statement were agreeing to not prosecute those who seek,
17    provide, or support abortions?
18         A    No.
19              MR. DEES:  Object to form.
20              THE WITNESS:  No.
21    BY MR. LEVESQUE:
22         Q    That's not what Fair and Just Prosecution and
23    the signatories to the document were trying to
24    communicate?
25              MR. DEES:  Object to form.
```

1           THE WITNESS:  I don't think so.

2     BY MR. LEVESQUE:

3           Q    **What do you think that they were trying to**

4     **communicate?**

5           A    I think you have to take it in the context of

6     the entire letter, which is a value statement and a

7     statement of opinion and opposition to this concept.

8           I don't take that sentence as a specific --

9     from anybody who signed it.  I mean, they didn't write

10    it themselves.

11          Q    **When you say "a value position," I would agree**

12    **with you that to the extent it's clear that they oppose**

13    **restriction on abortions, that's clearly communicated.**

14          **But where it says, "We decline to use our**

15    **office's resources," wouldn't you agree that that's**

16    **crossing over from just we oppose restrictions on**

17    **abortion to we are not going to prosecute abortions?**

18          MR. SINGER:  Objection.  Form.

19          Objection; asked and answered.  He said no.

20          MR. DEES:  Also, Rule of Completeness,

21          Mr. Levesque.  Footnote 2 that's referenced there

22          has not been referenced in your question.

23          Additional language at the bottom regarding the

24          fact that they're going to prosecute cases that

25          serve the interest of justice of the people was not

1         referenced in the question, so all of those are set

2         forth in the objection to form.

3              MR. LEVESQUE:  Mr. Dees, should I put you

4         under oath and have you testify as well?

5              MR. DEES:  Is that a threat, Mr. Levesque?

6              MR. LEVESQUE:  No, no, Mr. Dees, but it --

7              MR. DEES:  Marshal yourself accordingly in

8         accordance with the law, please, and direct your

9         questions to the Deponent.  Thank you,

10        Mr. Levesque.

11             MR. LEVESQUE:  Mr. Kamm, can you answer the

12        question, please.

13             THE WITNESS:  If there is more to it.  I'd

14        like to see what more there is to it.

15   BY MR. LEVESQUE:

16        Q    Okay.  Can you read that language at the

17   bottom of the screen, or do I need to make it bigger?

18        A    No.  It's good; I can read it.

19        Q    Now, after reading the footnote -- and I'll go

20   ahead and read the footnote for the record, for

21   completeness.

22             It says, "We use abortion to refer to a

23   personal choice made by a pregnant person to terminate a

24   pregnancy.  We will continue to consider the prosecution

25   of individuals who violate the autonomy of a pregnant

1    person by carrying out a forced abortion, or perform an

2    abortion negligently, or with intent to cause harm to

3    the pregnant person."

4            So in reading that for completeness, do you

5    understand their reference to not prosecuting abortions

6    to refer to voluntary abortion?

7       A    Sorry; can you scroll back up so I can see

8    that.

9       Q    Yes, sir.

10           MR. SINGER:  Mr. Levesque, before Grayson

11           answers, just so I can perhaps formulate an

12           objection, in what capacity are you asking Mr. Kamm

13           to opine?

14           MR. LEVESQUE:  Not as an expert; just somebody

15           who's doing communications and has walking-around

16           common sense.

17           MR. SINGER:  So just as a private citizen

18           reading this?

19           MR. LEVESQUE:  Yes, sir.

20           MR. SINGER:  Okay.

21           THE WITNESS:  I mean -- I don't -- even the

22           footnote makes it clear that it's not an absolute

23           statement.

24    BY MR. LEVESQUE:

25       Q    Well, what voluntary abortions would be

```
 1    covered or excepted out by the footnote?
 2            MR. DEES:  Objection -- objection to form.
 3        again, in -- particularly in the capacity you're
 4        asking, Mr. Levesque, and I appreciate your task
 5        before you, and you're doing a great job.
 6            But nonetheless, this is irrelevant.  His view
 7        of that particular point in his personal capacity
 8        is irrelevant.
 9            This document was authored at a time when he
10        wasn't employed by the State Attorney's Office,
11        okay, and he wasn't -- obviously it was
12        post-suspension.  So please, let's move forward.
13    BY MR. LEVESQUE:
14        Q    Mr. Kamm, would you agree that a forced
15    abortion is not a voluntary abortion?
16            MR. SINGER:  Object to the form.
17            Mr. Levesque, he's not a lawyer.
18    BY MR. LEVESQUE:
19        Q    You can answer, Mr. Kamm.
20        A    Is a forced abortion different from a
21    voluntary -- well -- yes.
22        Q    And so your understanding of what Fair and
23    Just Prosecution was trying to communicate, and the
24    many, many prosecutors that signed onto that statement,
25    they weren't actually pledging to not prosecute
```

1    abortions.  Is that fair?

2            MR. SINGER:  Object to the form.

3            THE WITNESS:  Yes.  I agree with that

4        statement; that that's what they were pledging --

5        however you said it sounded right at the time.

6    BY MR. LEVESQUE:

7        Q    That they were not pledging to not prosecute

8    abortions.

9        A    Correct.

10        Q    What were they pledging to do?

11        A    You would have to ask them.

12        Q    Well, you as somebody who is walking around,

13    what would you read that as them pledging to do?

14            MR. DEES:  Objection.  Asked and answered.

15        Badgering the witness at this particular point.

16    BY MR. LEVESQUE:

17        Q    Mr. Kamm?

18        A    Is the word pledge -- I don't know if the word

19    "pledge" is in the document at all.

20        Q    Is the use of the term "pledge" significant?

21        A    Well, you asked, what are they pledging.

22            I mean, you asked what are they pledging

23    and -- if it doesn't say "pledge", or -- a synonym,

24    then -- I mean, I would say that there's not a pledge at

25    all.

1        Q     Okay.  That's fair.  Going to show you another

2    document; give me one moment.

3        (Defendant's Exhibit 5 marked for identification.)

4    BY MR. LEVESQUE:

5        Q     Okay.  Mr. Kamm, let me get the share screen

6    up again.  And this is not an e-mail that I believe you

7    have produced, so I'm going to scroll down so that

8    you're able to view it.

9              MR. SINGER:  Mr. Levesque, has this been

10             produced to us?

11             MR. LEVESQUE:  My understanding is you've got

12             all the same e-mails from the State Attorney's

13             Office that we do.  I don't know if it's a document

14             that we intend to rely on for our defense of the

15             case.  I don't think it's responsive to any of your

16             records requests, so I don't believe it has.

17             MR. SINGER:  Okay.

18             MR. DEES:  Mr. Levesque, if you could give me

19             the benefit of reviewing it, note that I did

20             request multiple times via e-mail to your office to

21             provide me with documents you intended to use

22             during the deposition and received no response to

23             that, so I'd just like the benefit to just quickly

24             peruse this if you don't mind, given that you're

25             controlling it, if we can perhaps start, or --

 1        decent starting point where you think I can review
 2        it.
 3              MR. LEVESQUE:  Sure.  If you'd like, if it's
 4        easier, I can try to drop it in the Chat so that
 5        everybody has a copy, if they're familiar with
 6        that, so let me do stop share.
 7            If you're able to click that and open it up,
 8        that might be a better way for me to share some of
 9        the documents.
10              MR. DEES:  Are you able to see it, Mr. Kamm?
11              THE WITNESS:  I am.  I'm saving it.
12              Give me just a moment; I'll look at it.
13              MR. DEES:  If you don't mind also pulling it
14        up in the shared screen, Mr. Levesque, I'd
15        appreciate that.
16              Thank you, sir.
17                (2:05 p.m., off the record.)
18                (2:07 p.m., back on the record.)
19              MR. LEVESQUE:  Have you had the ability to
20        review that document, Mr. Kamm?
21              THE WITNESS:  Yes.
22     BY MR. LEVESQUE:
23        Q    Do you recognize that document?
24        A    No.
25        Q    Do you recognize that that's your e-mail

```
 1    address at the State Attorney's Office, the

 2    13th Judicial Circuit?

 3        A    Yes.

 4        Q    Do you recognize Alyssa Kress?

 5        A    Yes.

 6        Q    Who is Alyssa Kress?

 7        A    I don't know her formal job title.

 8        Q    Okay.  Is she an employee with Fair and Just

 9    Prosecution?

10        A    It's at the bottom of the e-mail.

11             The e-mail says she's the Communications

12    Director for Fair and Just Prosecution.

13        Q    So would it be fair to say that she might be

14    sort of a counterpart at Fair and Just Prosecution?

15        A    Yes.

16        Q    Would it be a fair characterization of the

17    e-mail exchange that you're requesting to be included on

18    e-mails from Fair and Just Prosecution related to the

19    resources they provide to state prosecutors?

20        A    Yes.

21             MR. LEVESQUE:  We will mark that as Exhibit 6.

22        (Defendant's Exhibit 6 marked for identification.)

23    BY MR. LEVESQUE:

24        Q    And this is another document that I will drop

25    in the Chat.  I think I need to --
```

1          MR. SINGER:  Mr. Levesque, same question; have

2     you produced this document to us?

3          MR. LEVESQUE:  I actually don't recall if this

4     document was in our production or not.  It's a

5     document that I believe we obtained after the fact,

6     so probably not.

7          MR. SINGER:  Okay.  To the extent there's

8     documents that you're going to use, again, we'll

9     reiterate, we would appreciate them being produced.

10          I know that you and I have had discussions

11     about this in previous depositions.

12          I understand your position; I'm putting it on

13     the record that we have not seen this document

14     before.  We believe it should have been produced

15     during discovery, and we would appreciate you

16     updating your discovery, if documents have not been

17     produced.

18          MR. LEVESQUE:  Thank you, Mr. Singer.  Noted.

19  BY MR. LEVESQUE:

20     Q    Mr. Kamm, do you recognize this document?

21     A    Yes.

22          MR. DEES:  Mr. Levesque, if you would, put the

23     document back up in the shared screen, please.

24          MR. LEVESQUE:  Oh.  There you go.

25          MR. DEES:  Thank you, sir.

```
 1   BY MR. LEVESQUE:

 2        Q    What is this document?

 3        A    It says it is the Social Tool Kit for

 4   signatories, for the Fair and Just Prosecution joint

 5   statement from elected prosecutors on abortion.

 6        Q    And so this would have been sent out from Fair

 7   and Just Prosecution around the time they released the

 8   joint statement.  Correct?

 9             MR. DEES:  Objection to form.

10             THE WITNESS:  I -- it's, like, speculation.  I

11        don't --

12   BY MR. LEVESQUE:

13        Q    But you've seen this document before.

14        A    Yes.

15        Q    Do you recall if it was before or after you

16   saw the joint statement?

17        A    After.

18        Q    Okay.  And so in one of the things that

19   they're doing, they are providing suggested sample posts

20   for Facebook and Twitter.  Do you see that?

21        A    I do see that.

22        Q    Okay.  And at least in terms of the sample

23   Facebook posts, if we look at the first one, in that

24   sentence it says in response, "I joined with 89 other

25   elected prosecutors in pledging to use my discretion and
```

```
 1   no prosecute those who seek or perform abortion care."

 2            Do you see that?

 3      A    I see that.

 4      Q    So at least the way Fair and Just Prosecution

 5   was articulating their intent, that they were pledging

 6   to use their discretion and no prosecute those who seek

 7   or perform abortion care.  Would you agree with that?

 8            MR. SINGER:  Object to form.

 9            THE WITNESS:  I think "no prosecute" is

10       probably a typo.  It's clearly -- I mean, that's

11       what it says.

12   BY MR. LEVESQUE:

13      Q    Right.  And if you look at the second one, it

14   allows you to fill in the location.

15            So assuming Mr. Warren would have used

16   something like that this -- and I'm not suggesting that

17   he did -- but hypothetically, if he did they're

18   suggesting that it would be, "I promise the people of

19   Hillsborough County that no one will be charged for

20   seeking or assisting abortion care."  That's another

21   promise that would be made or that was implied by the

22   joint statement.  Correct?

23            MR. SINGER:  Object to form.

24            MR. DEES:  Object to form.

25            THE WITNESS:  That's just what's in this Tool
```

```
 1        Kit.  I don't --
 2    BY MR. LEVESQUE:
 3        Q    In relation to the tool kit, this is a Tool
 4    Kit that's provided by Fair and Just Prosecution so that
 5    the state prosecutors who sign onto their letters can
 6    engage with the public on social media on the joint
 7    statement that they just signed.  Correct?
 8        A    Yes.
 9        Q    And in every single statement from Facebook
10    that they recommend on Facebook and Twitter, that the
11    respective state attorney can use, every single one of
12    those statements talks about pledging or promising not
13    to prosecute abortions, or not to charge people for
14    abortions.  Correct?
15        A    Yes.  I mean -- let me -- if you want I can
16    read all of them.  I was kind of taking your word for
17    it.
18        Q    Yeah.  If -- yeah.  Please; take your time.
19             Read all of them.
20             MR. SINGER:  Mr. Levesque, can I again, before
21        I formulate an objection, understand in what
22        capacity you're asking Mr. Kamm to opine on this?
23             MR. LEVESQUE:  Just someone who's walking
24        around.  I mean, he was his Coms person.
25             MR. SINGER:  But he was not his Coms person
```

```
 1        when you're alleging the joint statement was signed

 2        onto?  Can we agree with that?

 3             MR. LEVESQUE:  I think he's indicated that he

 4        has had communications with Mr. Warren about this.

 5             MR. SINGER:  Well, he said he saw the

 6        statement after the fact, and now you're asking him

 7        to opine on a tool kit when he wasn't his press

 8        person.

 9             I mean, if we can agree that you're asking him

10        in his capacity just as a private citizen, walking

11        around, then -- you know; whatever.

12             MR. LEVESQUE:  Sure.  Private citizen, walking

13        around, somebody who might be looking at this and

14        wondering what it means.

15             MR. SINGER:  Okay.

16             MR. DEES:  When he's not working with the

17        State Attorney's office, when the statement came

18        out which he said he discussed with -- the fact

19        that he signed it after it came out, and then he

20        saw this after it came out.  If we're going to lay

21        it out, let's lay it out.

22   BY MR. LEVESQUE:

23        Q    So Mr. Warren -- I'm sorry.

24             Mr. Kamm --

25        A    That's a compliment.  I'll take it.
```

 1      Q    Mr. Kamm, every single one of those are either

 2   pledging or promising not to prosecute or not to charge

 3   people for abortions.  Correct?

 4      A    From what I can see, yes.

 5           MR. LEVESQUE:  And we will mark that as

 6      Exhibit 7.

 7      (Defendant's Exhibit 7 marked for identification.)

 8   BY MR. LEVESQUE:

 9      Q    Mr. Kamm, are you familiar with the Racial

10   Justice Work Group?

11      A    Yes.

12      Q    What is the Racial Justice Work Group?

13      A    It's a group of citizens and leaders from the

14   black community that works with the State Attorney's

15   Office on a wide variety of things.

16      Q    How did that work group come about?

17      A    After the murder of George Floyd, Andrew set

18   about creating several different steps to undertake in

19   the office to try to continue to be deliberate about

20   equity and justice, and one of those points was

21   establishing this work group.

22           MR. LEVESQUE:  Give me one moment; just

23      dropped a document in.  And I will share my screen

24      as well.

25

```
 1   BY MR. LEVESQUE:

 2        Q    Do you recognize this e-mail?

 3        A    I'm going to need a second to read it.

 4        Q    Sure.

 5             MR. SINGER:  Again, same question,

 6        Mr. Levesque:  Was this produced to us?

 7             MR. LEVESQUE:  Probably not, Mr. Singer.

 8             MR. SINGER:  All right.  In the future if you

 9        would update your production, that would be much

10        appreciated, and we'd ask that you do so.

11             THE WITNESS:  Yes.  I recognize it.  If you're

12        going to ask me specific questions, I'm going to

13        need to take a minute to read it.

14   BY MR. LEVESQUE:

15        Q    Sure.

16        A    Should I do that.

17        Q    Yes; go ahead.

18             MR. LEVESQUE:  And in the meantime,

19        Mr. Singer, are you representing that you've never

20        received any e-mails from the State Attorney's

21        Office related to the records request that we made?

22             MR. SINGER:  We have not received records from

23        the State Attorney's Office in any sort of legible,

24        readable, organized form.  We are going through

25        what we have received, which I believe was
```

```
 1        yesterday, so it's very difficult to say if we have

 2        this document or not.

 3              I'm curious if you've produced it or not.

 4              MR. LEVESQUE:  I've not.  I will tell you, I

 5        only went through it the other day myself, so --

 6              THE WITNESS:  All right.  I read down through

 7        the race and prosecution work group section.

 8              Should I read the rest?

 9   BY MR. LEVESQUE:

10        Q     No, I think that will be sufficient.

11              Can you tell me, what is this document, and

12   what is the press release looking to announce?

13        A     The press release is announcing -- what is it;

14   six steps -- or however many steps there are -- a series

15   of steps that the office was intending to take in -- you

16   know, following the murder of George Floyd.

17        Q     Okay.  And one of the steps was to create a

18   racial justice work group; correct?

19        A     Yes.

20        Q     And what was the purpose of that racial

21   justice work group?

22        A     Let me read what it says in the summary of it.

23              It says, "Creating a focused working group

24   with representatives from the community and

25   State Attorney's Office to identify important community
```

 1   issues related to racial injustice, and develop

 2   consistent responses to address them."

 3        Q      And do you know if Mr. Warren held a press

 4   conference on these actions steps and the creation of

 5   the racial justice work group?

 6        A      Yes.

 7             MR. LEVESQUE:  And I believe we will mark that

 8        as Exhibit 8.

 9             MR. DEES:  Correct.

10      (Defendant's Exhibit 8 marked for identification.)

11   BY MR. LEVESQUE:

12        Q    Now Mr. Kamm, this is another document I'm

13   sharing on the screen, and I will drop it in the share

14   area for the purposes of --

15        A    I have it downloaded; if I could have a minute

16   to read it, please.

17             MR. LEVESQUE:  Absolutely.

18             THE WITNESS:  Can you share it on the screen

19        again?  Thanks.

20             MR. LEVESQUE:  I'm getting the hang of it.

21   BY MR. LEVESQUE:

22        Q    And so if I understand correctly, this was --

23   for lack of a better term -- maybe a press packet that

24   was used to publicize this -- the first meeting of the

25   racial justice work group.  Would that be fair?

1       A     Yeah.

2       Q     And as part of that they identified the

3   different members of the racial justice work group.

4             To the best of your recollection, is that an

5   accurate list of the members of the racial justice work

6   group?

7       A     Yes.

8       Q     Do you know how those members were selected?

9       A     I don't.

10           MR. DEES:  Mr. Levesque, I'm going to continue

11       to give you leeway.  You certainly know the case

12       better than I do, given my recent introduction into

13       the case.  To the extent we can streamline and stay

14       focused on what's at issue.

15   BY MR. LEVESQUE:

16       Q     Mr. Kamm, I'm going to show you another

17   document.

18     (Defendant's Exhibit 9 marked for identification.)

19           MR. LEVESQUE:  Just to be clear, Exhibit 9

20       starts with 010, and the document that I'm showing

21       on the screen will be Exhibit 10 --

22     (Defendant's Exhibit 10 marked for identification.)

23           MR. LEVESQUE:  -- and starts 011.

24   BY MR. LEVESQUE:

25       Q     Do you recognize that document?

 1        A    I do.

 2        Q    What is that document?

 3        A    This is the policy regarding prosecution of

 4    cases based on pedestrian and bicycle violations.

 5        Q    And if I understand correctly, this was a

 6    document -- or this was a policy that came out of the

 7    racial justice work group?

 8        A    Yes.

 9        Q    What is your understanding of what this policy

10    requires?

11             MR. DEES:  Objection.  Relevance.

12             Mr. Kamm, do not answer at this particular

13        point.

14             Mr. Levesque, please enlighten me on the

15        relevance --

16             MR. LEVESQUE:  Mr. Dees, I've got another hour

17        and a half that you've given me -- or two and a

18        half hours, if my calculations are correct; math

19        was never my strong point.

20             This is a policy that is directly at issue.

21        He was the communications person for the State

22        Attorney's Office.  I think it is perfectly fair to

23        ask him what this document is about.

24             If you would just let me get through my

25        questions without having to justify every single

1        one as being relevant, the Judge will decide

2        whether it's relevant or not.

3               MR. DEES:  Correct.  The Judge may be making

4        that decision here sooner than later.  I

5        appreciate --

6               MR. LEVESQUE:  You know what; I'm happy to get

7        Judge Hinkle on the line right now, if this is

8        going to continue.

9               MR. DEES:  It may continue, depending upon our

10       discussion.

11              So the bike policy is relevant -- again; you

12       got close.  You told me what his position was; you

13       didn't answer why it was relevant.  I'm not trying

14       to be oppositional --

15              MR. LEVESQUE:  It's one of the reasons he was

16       suspended, Mr. Dees.

17              MR. DEES:  The bike policy was?

18              MR. LEVESQUE:  Yes.

19              MR. DEES:  Okay.  Let's go ahead and proceed,

20       then.

21       BY MR. LEVESQUE:

22              Q     Now Mr. Kamm, what is your understanding of

23       this policy.

24              A     My understanding -- I'm not a lawyer --

25              MR. DEES:  Objection to form.

ANDREW H. WARREN vs RON DESANTIS
**Grayson Kamm on 11/10/2022**                    Page 62

```
 1              MR. LEVESQUE:  Hold on a second, Mr. Kamm.

 2              What's the form objection, Mr. Dees?

 3              MR. DEES:  Vague and ambiguous.

 4              "What is your understanding of this policy."

 5         What; the policy's formulation, development,

 6         purpose --

 7              MR. LEVESQUE:  Okay; I understand your

 8         objection.

 9    BY MR. LEVESQUE:

10         Q    Mr. Kamm, you can answer.

11         A    I don't know where to begin.

12              My -- what's my understanding of the policy.

13              I -- I'm not a lawyer.  I guess it is guidance

14    to prosecutors in the office on how to handle specific

15    situations that they face.

16         Q    Mr. Kamm, if you had to communicate with the

17    public to describe this policy, how would you describe

18    it?

19         A    How would I describe this policy.

20              I would -- probably describe it a lot like

21    what I just said.

22              It's a policy that was put in place to provide

23    guidance to assistant state attorneys on how to review

24    and proceed with certain cases that come in;

25    specifically charges of resisting an officer without
```

```
 1   violence when that's the only charge, and they are --

 2   and it starts when they're a pedestrian, or a bicyclist.

 3        Q     And is it your understanding that in those

 4   instances where the only charge is resisting arrest

 5   without violence, and that charge is made incident to a

 6   bicycle or pedestrian stop, that this policy counsels

 7   the assistant state attorneys in the 13th Judicial

 8   Circuit to not prosecute, or nolle prosse those crimes.

 9        Correct?

10        A     No.

11        Q     That's not what it counsels?

12        A     No.

13        Q     What is incorrect about that statement?

14        A     It directs them to file charges when there's a

15   public safety threat.

16        Q     But if there is no public safety threat, it

17   directs them not to file charges.  Correct?

18        A     It says there's a presumption -- I mean --

19   that's not what you were asking -- okay.  So -- can you

20   ask again?  Sorry.

21        Q     Sure.  Under the policy, if there is no public

22   safety concern, and someone is charged or arrested for

23   resisting arrest without violence, and that arrest is

24   incidental to a pedestrian or bicycle stop, this policy

25   would counsel that the assistant state attorney should
```

 1   not file charges; correct?

 2           Or nolle prosse, or not pursue the prosecution

 3   of that defendant.

 4           MR. DEES:  Object to form.

 5           MR. SINGER:  Mr. Levesque, before I can

 6   formulate an objection, can you tell me in what

 7   capacity you're asking Mr. Kamm this question.

 8           Reminder, he was not a state attorney or an

 9   assistant state attorney, and he was not a lawyer.

10           MR. LEVESQUE:  He was the communications

11   person that would have been obligated to

12   communicate this information to the media, and

13   members of the public.

14           MR. DEES:  Correct.  He said that he edited,

15   Wordsmithed, and his role was confined to that.

16           It was not based on policy development, etc.

17           MR. LEVESQUE:  Are you guys instructing him

18   note to answer?

19           MR. SINGER:  I object to the form, in the

20   capacity you're asking.

21           MR. DEES:  Yeah.

22           MR. LEVESQUE:  Okay.

23   BY MR. LEVESQUE:

24       Q    Mr. Kamm, can you answer?

25       A    So -- again -- I mean, I'm not an attorney, so

```
 1   I -- I do not know the definition of -- like, the
 2   specific definition of what it says, when it says
 3   presumption to not file, so --
 4           MR. DEES:  I'm going to instruct the witness
 5       not to guess; I'm going to instruct the witness to
 6       speak only upon what he's qualified about.
 7           So let's please proceed.
 8   BY MR. LEVESQUE:
 9       Q    Mr. Kamm, in the course of your role as the
10   Chief Communications Officer for the State Attorney's
11   Office, did you ever have to explain some of these
12   policies to the press?
13       A    Yes.
14       Q    Do you recall speaking with the press about
15   this particular policy?
16       A    Yes.
17       Q    How did you describe this to members of the
18   press?
19       A    I used the term presumption to not file.
20           I -- that's how I described it.
21       Q    And that presumption could only be overcome if
22   there was two things that happened:  They identified a
23   public safety need, and the supervisor signed off.
24           Correct?
25       A    Yeah.  Yep.  According to this; yes.
```

1     Q      And if those two things weren't present, they

2   weren't going to file.

3           That's the effect of the policy.  Right?

4     A    I -- again, I really don't -- and I'm not --

5   obviously I don't know what the -- like -- I don't know

6   what "presumption" means.

7           I don't know what latitude that gives to

8   somebody.

9     Q    Okay.

10          MR. LEVESQUE:  Just shared another document.

11      I'll get it up on the screen here in just a second.

12          THE WITNESS:  Before we ask any questions, I'm

13      going to take a moment to review.

14          Can I take a comfort break really quick?

15          MR. LEVESQUE:  Yes.  Actually, we can go off.

16      And it appears I might have shared the wrong

17      document, so that will give me time to get my thing

18      organized.

19              (2:36 p.m., off the record.)

20                (Brief recess taken.)

21            (2:43 p.m., back on the record.)

22   BY MR. LEVESQUE:

23      Q    Mr. Kamm, do you recognize this e-mail?

24      A    No.

25      Q    Earlier we had made reference to House Bill 1,

1    the Anti-riot Act.  Do you recall if Mr. Warren was

2    advocating against the passage of that Bill?

3         A     That's correct.

4         Q     And at least in the way that I read this, it

5    appears that you're organizing some press conferences

6    for Mr. Warren and others to speak out against the Bill.

7               Would that be a fair understanding of what's

8    going on in some of these e-mails?

9         A     Yes.

10        Q     And so some of the people that Mr. Warren was

11   looking to work with in opposition includes former

12   Supreme Court Justice Peggy Quince; is that correct?

13        A     That's correct.

14        Q     Was there also a former sheriff that was

15   involved?

16        A     Yes.

17        Q     Who was that former sheriff?

18        A     Let me see.  I think it's in the document.

19              Sheriff Manfree.

20        Q     And what is your understanding of who

21   Sheriff Manfree is?

22        A     My recollection is that he was the former

23   sheriff of a county in northeast Florida.

24              MR. LEVESQUE:  And we will mark that document

25   as Exhibit 11.

```
 1      (Defendant's Exhibit 11 marked for identification.)

 2           MR. LEVESQUE:  Dropping another document in

 3      the share, and opening it up.

 4   BY MR. LEVESQUE:

 5      Q    Have you had the opportunity to review that?

 6      A    I'm -- I'm reading it now.

 7           I've gotten through the e-mail part; you want

 8   me to read the press release part?

 9      Q    Well, I just wanted to -- let me ask you about

10   the e-mail.  In that e-mail you're reaching out to

11   Mayor Geller; correct?

12      A    Yes.

13      Q    To include him in the opposition to

14   House Bill 1.

15      A    Yes.

16      Q    And along with that, there's a press release

17   that describes Mr. Warren's objections to the Bill.

18           Correct?

19      A    Yes.

20      Q    And so from the standpoint of Mr. Warren,

21   would it be fair to say that when the legislature was

22   working on something that he disagreed with, he wasn't

23   necessarily shy about letting them know his opinions on

24   whether he thought the policy was good or bad?

25           MR. DEES:  Object to form.
```

```
 1              THE WITNESS:  Yeah; that seems -- yes.
 2    BY MR. LEVESQUE:
 3         Q    But -- and I'll represent I've read this.
 4    Nowhere in here does he say that if they pass this bill
 5    I'm not going to enforce it; does he.
 6              And if you want to take your time to review
 7    that, I'm happy to let you.
 8              MR. SINGER:  Mr. Levesque, maybe we can make
 9         this easier.  I think -- with Mr. Dees'
10         agreement -- we would probably stipulate that
11         nowhere ever has Mr. Warren ever said he would
12         refuse to prosecute a duly-enacted law.
13              MR. DEES:  Agreed.
14              MR. LEVESQUE:  That's not actually one that I
15         would stipulate to, Mr. Singer, but I appreciate --
16              MR. SINGER:  Just thought we might try to make
17         it easier.
18              MR. DEES:  The Deponent, Mr. Kamm, would join
19         in that stipulation; that he's never heard that
20         either.
21              THE WITNESS:  Yeah; I don't see anything in
22         here where he says that.
23    BY MR. LEVESQUE:
24         Q    And as the Coms person who was working for
25    Mr. Warren's office at this time, do you recall him ever
```

 1   saying that he would not prosecute crimes under the

 2   Anti-riot Act?

 3       A    Never recall him saying that; so that would be

 4   yes to directly answer your question, I think.

 5           I don't want to get caught in the double

 6   negatives and get spun around that way.

 7       Q    Mr. Kamm, are you familiar with the safety and

 8   justice work group?

 9       A    No.

10       (Defendant's Exhibit 12, (013), marked for

11                       identification.)

12   BY MR. LEVESQUE:

13       Q    Okay.  Mr. Kamm, I am going to show you

14   another document.

15           First I will drop it into the chat.

16           MR. LEVESQUE:  We will mark this Exhibit 13.

17     (Defendant's Exhibit 13 marked for identification.)

18   BY MR. LEVESQUE:

19       Q    And I'll give you the opportunity to look over

20   that, and you can let me know if you see any issues with

21   that.

22       A    Not sure what you mean by if I see any issues.

23       Q    Fair point.  Once you've had the opportunity

24   to review that I will have some questions, so just let

25   me know once you've had an opportunity to review it.

1            MR. SINGER:  Mr. Levesque, do you know if this

2       has been produced to us?

3            MR. LEVESQUE:  No idea, Mr. Singer.

4            MR. SINGER:  All right.  Again, remind you of

5       your obligations on document production, as it

6       relates to our subpoena -- or our request.

7            MR. LEVESQUE:  So noted.

8            MR. SINGER:  And the discovery process.

9            MR. LEVESQUE:  And again, none of these

10      documents were in the possession at the time the

11      suspension was entered.

12            THE WITNESS:  Okay.  I've read it.

13   BY MR. LEVESQUE:

14       Q    Okay.  After having the opportunity to review,

15   when I was referring to the safety and justice work

16   group, does that refresh your recollection as to what

17   this group is?

18       A    Yes.

19       Q    What is the safety and justice work group?

20       A    That's -- that's not the name.

21       Q    Okay.  Is the name the Smart Justice Task

22   Force?

23       A    No.

24       Q    Okay.  What would be the name of this group

25   that is being discussed here?

 1      A      The Safety and Justice Task -- or -- sorry;

 2   now I'm -- Safety and Justice Task Force.

 3      Q      Okay.  In your mind, is there a difference

 4   between "work group" and "task force"?

 5      A      Not a massive one.  Not a significant one.

 6      Q      Task force sounds cooler though; right?

 7      A      It depends on the situation.

 8      Q      But in all seriousness, there are some names

 9   on here that I kind of want to go through.

10             Who is Mr. Tyler?

11      A      I don't know.  He works with the Florida

12   Democratic Party.  I don't know his title.

13      Q      And does Jose Para also work for the Florida

14   Democratic Party?

15      A      My understanding is yes.  And I don't know if

16   they're currently there or not; they just were there at

17   the time, to clarify.

18      Q      And there are a couple of others.

19             Marcus Dixon, Maries Pasarello, they were all

20   employees of the Democratic Party at the time, as far as

21   you know?

22      A      Yes.  Far as I know they worked either for or

23   with the Democratic Party.

24      Q      Okay.  And what exactly is going on here, in

25   terms of the creation of this task force?

 1      A    It's a discussion about -- all right.  It's a

 2   discussion about the creation and rollout of the task

 3   force.

 4      Q    Okay.  And what was the purpose of this task

 5   force?

 6      A    I think it's on here -- right.  Or at least

 7   this is the proposal.  The document lays out goals,

 8   community leaders from around the state to discuss and

 9   identify practical solutions for criminal justice and

10   police reform, develop and encourage adoption of

11   ordinance and policies for cities and counties regarding

12   criminal justice and police reform -- (garbled

13   communication) -- May 23 session based on practical

14   solutions for criminal justice and police reform, and

15   educate local state and federal regarding criminal

16   justice reform.  Working with the FDP board, municipal

17   victory house, and senate victory.  That was the initial

18   set up, although that did change.

19      Q    When you say that changed, how did it change?

20      A    My recollection is the goals became more

21   focused, and fewer.

22      Q    Whose idea was the task force?

23      A    I don't know.

24      Q    What was your role in the task force?

25      A    My role was messaging work -- like write

```
 1   statements or taking other people's statements and

 2   refining them to put them out, and then I did the --

 3   some of the -- like -- like, logistical setting up of

 4   the meetings.

 5        Q     Do you recall who the task force members were?

 6        A     I do; yes.

 7        Q     And who were they?

 8        A     Let's see.  Andrew Warren.  Sheriff McNeil of

 9   Leon County -- I'm embarrassed on the names; I'm spacing

10   on the names, Public Defender from Miami-Dade County,

11   Marcia Brown, who -- Marcia Brown.

12              Sorry.  Asha -- was her maiden name; she got

13   married while we were doing it -- I think her last name

14   is Pararra, I believe -- inaudible -- I can't remember

15   the name.

16              MR. LEVESQUE:  I'm going to share another

17         document.  And we will mark this Exhibit 14.

18   (Defendant's Exhibit 14 marked for identification.)

19              MR. LEVESQUE:  And it's the file name that

20         starts 019.  I'll give you an opportunity to review

21         that.

22   BY MR. LEVESQUE:

23        Q     This is a little bit later, and I believe you

24   mentioned that the goals got a little more streamlined.

25              Is that reflected in this document?
```

1        A     This -- to some degree.

2              It ended up even more streamlined.

3        Q     Okay.  Now, is there a reason why you were

4   working with the Florida Democratic party and some of

5   the other Florida Democrat campaign committees for this

6   project?

7        A     I'm not sure what you mean with the other

8   campaign committees.

9        Q     If we can go back to Exhibit 13, the house and

10  senate victory, what is your understanding of what house

11  and senate victory is?

12       A     I don't know what it is.  I never communicated

13  with anybody from that, or about that.

14       Q     Okay.  So if it was a fundraising arm for the

15  legislative democratic leadership in the House and in

16  the Senate, you just don't know that?

17       A     Yeah; that's correct.

18       Q     Okay.  All right.  Going back to Exhibit 14 --

19  well, let me go back.  In terms of your communications

20  with Mr. Tyler, Mr. Dixon, Mr. Pasarello, was there a

21  reason why you were working with the Florida Democratic

22  party on this project?

23       A     The task force -- I was told the task force

24  idea came from them, or it was being originated

25  involving the democratic party.

1    Q    Did anybody in your office raise concerns

2    about working for a political group?

3         MR. DEES:  Object to form.

4         MR. LEVESQUE:  And that's a fair objection;

5    let me rephrase it.

6    BY MR. LEVESQUE:

7    Q    Did anybody in your office raise concerns

8    about working on this task force with a political group?

9    A    Yes.

10   Q    Okay.  Who raised those concerns?

11   A    I did.

12   Q    And what was the response?

13   A    Well -- so -- the concern was -- trying to

14   just answer the question right.

15        The response was -- the concern I raised was

16   the -- trying to not overelaborate.

17        The concern was that there was -- I wanted as

18   many people as possible to feel able to participate in

19   the process, and so response was -- that was recognized.

20   Q    Okay.  And why would that have been a concern

21   to you?

22   A    Because it's -- we had a very sincere desire

23   to get people from all perspectives come to these

24   meetings, and if it was seen as a partisan effort, I was

25   worried that wouldn't happen.

1       Q      Do you know if the Democratic party provided

2    funding for this task force?

3       A      Yes.

4              MR. SINGER:  I've got to object.  I got to

5       object to the whole line of questioning.  This has

6       nothing to do with this lawsuit.  This has nothing

7       to do with any executive order.  We're off topic.

8       I would suggest the witness not answer I would

9       leave that to Mr. Dees, but I suggest we move on.

10             MR. LEVESQUE:  Let's get the Judge on the

11      line.  I believe one of the allegations was the

12      press conference that Mr. DeSantis held was a

13      political event, and there have been extensive

14      efforts to seek discovery from the Governor's

15      campaign.

16             To the extent that this is not relevant, I

17      would dispute that, and if we need to go to the

18      Judge on this I'm happy to.  So what's it going to

19      be?  Are you going to allow him to answer the

20      question?

21             MR. SINGER:  I would suggest that we move off

22      this line of questioning as it's completely outside

23      the scope, and you're fishing for something else.

24             Mr. Dees can instruct him to answer or not

25      answer, but I would suggest he not answer, and we

1        move on.

2             MR. DEES:  We'll instruct Mr. Kamm to not

3        answer this, and if Mr. Singer and Mr. Levesque

4        would like to bring it to the Judge, I'm happy to

5        participate in that, to the extent needed.

6             MR. LEVESQUE:  Okay. Go off the record.

7             MR. DEES:  There will be no extension past

8        5:00 p.m. today for these proceedings.

9             MR. LEVESQUE:  We'll ask the Judge to be able

10       to bring him back.  Off the record.

11                 (3:05 p.m., off the record.)

12                 (3:09 p.m., back on record.)

13  BY MR. LEVESQUE:

14       Q    Mr. Kamm, what was Fair and Just Prosecution's

15  role in the Safety and Justice Task Force?

16       A    I don't recall them having any role.

17       Q    Okay.  Going to share another document, and

18  this will be Exhibit 15.

19       (Defendant's Exhibit 15 marked for identification.)

20            MR. DEES:  Pardon the interruption,

21       Mr. Levesque, is that an e-mail that you -- how

22       have you guys been doing this in the past?  You

23       e-mailed the JA, and you copied Mr. Singer?

24            MR. LEVESQUE:  Yes.  My partner's working on

25       the e-mail now, and we'll copy everybody.

```
 1              MR. DEES:  Okay.  Thank you.

 2              THE WITNESS:  Are we staying on the topic?

 3        I'm confused; I'm sorry.

 4   BY MR. LEVESQUE:

 5        Q    Well, I understood the instruction was related

 6   to the Democratic party --

 7              MR. DEES:  We'll move on and try to continue;

 8        get as much done as we can, Mr. Kamm on other

 9        arenas and areas.  If we have to come back, we'll

10        come back to that.

11              MR. LEVESQUE:  I've just shared another

12        document that we will mark as Exhibit 15 that

13        begins 018.

14              MR. DEES:  What's the question?

15              MR. LEVESQUE:  Not yet; I was giving him the

16        opportunity to review it.

17   BY MR. LEVESQUE:

18        Q    Have you been able to review that, Mr. Kamm?

19        A    Yes.

20        Q    And do you recall receiving this e-mail?

21        A    No, I don't.

22        Q    You do recognize that you are one of the

23   recipients of it from Mr. Warren?

24        A    Yes.

25        Q    And you recognize where it says FJP approved
```

```
 1    Marcia Brown being on the task force?

 2        A    I assume that's a typo, and it should be FDP.

 3        Q    FDE?

 4        A    F --

 5             I assume that it's a typo, and that it should

 6    be FDP.

 7        Q    Is it your understanding that the Democratic

 8    Party was dictating who could and could not be on the

 9    Safety and Justice Task Force?

10             MR. SINGER:  Again, we're way off field here,

11        and we can take this up with the Judge.  Move on.

12    BY MR. LEVESQUE:

13        Q    You can answer, Mr. Kamm.

14             MR. DEES:  I'm about to instruct not to

15        answer.  Go ahead and add this to the e-mail to the

16        Judge.

17    BY MR. LEVESQUE:

18        Q    Mr. Kamm, I'm going to show you another

19    document that I'm adding, and we will share it on the

20    screen shortly.

21             MR. LEVESQUE:  We'll mark this as Exhibit 16.

22        (Defendant's Exhibit 16 marked for identification.)

23    BY MR. LEVESQUE:

24        Q    It begins 024.

25        A    Okay.  I've reviewed it.
```

**ANDREW H. WARREN vs RON DESANTIS**
Grayson Kamm on 11/10/2022                                    Page 81

```
 1        Q     And Mr. Kamm, do you recognize that document?

 2        A     I do.

 3        Q     Was this a document that you ever had to speak

 4   to members of the press or the public about?

 5        A     No.

 6        Q     What is this document?

 7        A     I recognize it because it was given to me

 8   after a public records request.  I don't honestly know

 9   what it is, or where it came from.

10        Q     When you say it was given to you after public

11   records request, who made the public records request?

12        A     News reporter.

13        Q     Do you know when that public records request

14   was made?

15        A     Sometime after the suspension.

16              MR. DEES:  We'll cease any further inquiry or

17        discussion about that, given the dates at issue;

18        otherwise I would have raised an objection earlier.

19        I realize, Mr. Levesque, you weren't aware of that

20        either.

21   BY MR. LEVESQUE:

22        Q     Now Mr. Kamm, you recognize this as a policy

23   that was issued while you were with the State Attorney's

24   Office; correct?

25        A     I don't -- I knew nothing about this until
```

1   after the suspension, when a reporter gave it to me.

2       Q    Okay.  You see the date at the top that says

3   approved March 9, 2021?

4       A    I see that.

5       Q    You were still with the State Attorney's

6   Office at that time?

7       A    I was.

8       Q    And you left the State Attorney's Office

9   around April of 2022?

10      A    Correct.

11      Q    Who was your replacement?

12      A    Her name is Melanie Snow Waxler.

13      Q    Were you involved with the decision to hire

14  Miss Waxler?

15      A    In the decision to hire her; no.

16      Q    Was there some occasion that you had to meet

17  her before she was hired?

18      A    Yes.

19      Q    Did you have concerns about her?

20      A    No.

21      Q    Was there some occasion after she was hired

22  where you were brought in to help her get up to speed?

23      A    Yes.

24      Q    Do you recall when that was?

25      A    Well, yeah.  It -- from the -- from the time I

1   left the office, I informally was getting lunch, having

2   a phone call from time to time to help her acclimate.

3   And then there was discussion in late July of bringing

4   me on as a consultant to do that in a more formal

5   capacity.

6        Q    Why was that necessary?

7        A    The -- let's see.  The office communicated to

8   me that they were hoping Melanie would get help getting

9   up to speed, and that there were some big cases that

10  they wanted help with handling the press on.

11       Q    Did you come up with a strategy to help get

12  her up to speed?

13            MR. DEES:  Objection to form.

14            Use the term "strategy".

15            THE WITNESS:  I'm not sure I know what you

16       mean.

17  BY MR. LEVESQUE:

18       Q    I just -- I believe -- shared another

19  document, and I will open it up here.

20            And I believe this is a document that you

21  provided to us as part of your responses.

22            Do you recognize this document?

23       A    Yes.

24       Q    And what is this document?

25       A    This is a memo -- or -- I'm not sure what I

1    would call it.

2            It's a document I put together when I was

3    leaving the office to lay out to Mr. Warren what I could

4    go over in conversations with Miss Waxler.

5        Q    Did you follow through on these things that

6    you indicated you were planning to do as part of the

7    transition meeting?

8        A    Let me look.  So really, just the first two

9    sections what I plan to include, and what I don't plan

10   to cover.

11       Q    Okay.

12       A    Is that what you're asking?

13       Q    Yes, sir.

14       A    Yes.

15       Q    And here where you identified direct

16   responsibilities, was this your effort to let her know

17   these are the areas where you'll be responsible as the

18   Chief Communication Officer?  These are your

19   responsibilities?

20       A    Yes.

21       Q    Do you know if the Chief Communications

22   Officer has a job description?

23       A    I don't know.  Well -- I'll say yes, because

24   there has to be something that was posted in the --

25   like, posted with the position prior.

 1       Q     And what were the reasons why you were brought

 2   back in to facilitate her transition or training?

 3       A     In the informal way, or in the formal way?

 4       Q     In the formal way.

 5       A     In a formal way, as I said, it was because --

 6   at least it was explained to me -- there was a desire to

 7   help Miss Waxler get up to speed and be successful, and

 8   also we had -- the office had pending large cases that

 9   they wanted help with in media relations -- am I doing

10   okay?

11   BY MR. LEVESQUE:

12       Q     Mr. Kamm, I'm going to share another document.

13       (Defendant's Exhibit 17 marked for identification.)

14             MR. LEVESQUE:  For the record, 17 was 027.

15             And Exhibit 18 will be 025.

16       (Defendant's Exhibit 18 marked for identification.)

17   BY MR. LEVESQUE:

18       Q     Now Mr. Kamm, have you had the opportunity to

19   review that document?

20       A     Not thoroughly.

21       Q     At least from mission of review, do you

22   recognize that document?

23       A     Yes.

24       Q     What is that document?

25       A     This is a prosecutorial discretion and mission

 1    of criminal justice memo, written by State Attorney

 2    Warren.

 3         Q    Did you have any role in drafting or editing

 4    this document?

 5         A    My recollection is that I did some

 6    wordsmithing, and proofreading.

 7         Q    Do you know if this was a policy of the State

 8    Attorney's Office?

 9              MR. DEES:  Object to the form.

10              THE WITNESS:  I guess I'm not sure.

11              I mean, it doesn't say policy on here, that I

12         saw.

13    BY MR. LEVESQUE:

14         Q    Well, let me back up.

15              Do you understand the State Attorney's Office

16    to have formal policies?

17         A    Yes.

18         Q    The presumption of non-prosecution policy that

19    we just looked at was one of those formal policies;

20    correct?

21         A    Yes.

22         Q    And I guess my question is --

23         A    Hold on; just with that?  I don't know.

24         Q    Well --

25         A    The one that we --

```
 1      Q      The one before --

 2             MR. DEES:  Object to the form.

 3             THE WITNESS:  I understand the bike and

 4      pedestrian one would be a policy; I do not know

 5      about the one we just looked at.  Yes -- I'll wait

 6      for the question.  Sorry.

 7   BY MR. LEVESQUE:

 8      Q      This document, you have no understanding of

 9   whether that is actually a policy or not.  Is that fair?

10      A      Yes; that's fair.

11      Q      Okay.  But for -- and that is Exhibit 16.

12             For clarity, I've shown the bike stop policy,

13   which is Exhibit 10.  It's your understanding that that

14   actually is a formal policy.  Correct?

15      A      Yes.

16      Q      And then going back to Exhibit 18, which is up

17   there, do you know if this is a formal policy or not?

18      A      I don't know.

19             MR. DEES:  You can read it.

20             By its express terms, it's not.  Let's go.

21   BY MR. LEVESQUE:

22      Q      Now, I have just shared a document that we

23   will mark as Exhibit 19.

24      (Defendant's Exhibit 19 marked for identification.)

25
```

```
 1    BY MR. LEVESQUE:

 2         Q    I'm sharing it on the screen now, Mr. Kamm.

 3              Do you recognize that document?

 4         A    I do.

 5         Q    Okay.  What is that document?

 6         A    It's a joint statement from elected

 7    prosecutors and law enforcement leaders condemning the

 8    criminalization of transgender people, and gender

 9    affirming health care.

10         Q    You understand this to be one of the joint

11    statements that the Governor signed in his Executive

12    Order suspending Mr. Warren; correct.  Is that correct?

13         A    Yes.

14         Q    Did Mr. Warren discuss this with you before he

15    signed onto this document?

16         A    I don't recall that; no.

17         Q    Did he discuss this document with you at all?

18         A    Not that I recall.

19         Q    Was it unusual for Mr. Warren to make public

20    statements like those contained in this June 2021 letter

21    or the abortion joint statement before speaking with his

22    Chief Communications person?

23         A    No.

24              MR. DEES:  Object to the form.

25              THE WITNESS:  No; it was not unusual.
```

 1   BY MR. LEVESQUE:

 2        Q    Do you recall speaking to members of the press

 3   about this letter that he signed onto?

 4        A    I don't.

 5             MR. LEVESQUE:  All right.  If we can take a

 6        10-minute break.  Let me go through my materials,

 7        we might be on a final approach.  Thank you.

 8                   (3:28 p.m., off the record.)

 9   (3:46 p.m. Telephonic Conference with The Court.  Not

10                        reported)

11   (4:27 p.m., conference with The Court concluded.)

12               (4:28 p.m., back on the record.)

13   BY MR. LEVESQUE:

14        Q    Let's go back to one of the questions that I

15   asked before.

16             What is your understanding of who was paying

17   for the meetings of the safety and justice task force?

18        A    My understanding was that the venues were --

19   clarify.  There were only two meetings that I was

20   involved with, and the two meetings that I was involved

21   with were -- the venues were donated.

22             There was no cost for the venues, and food was

23   the thing that -- I know that the Florida Democratic

24   Party picked up the cost on, and that was what -- that's

25   the only thing I know of funding on it.

1        Q     Do you know if they handled any of the travel
2    for any of the other members?
3        A     I only know that for myself, when we went to
4    the first meeting in south Florida that the State
5    Attorney's Office is who I submitted my travel for.
6    They picked up my travel; the State Attorney's Office
7    did.
8        Q     And would it be a fair characterization of
9    these meetings as fostering a discussion on criminal
10   justice reforms?
11       A     Yeah.
12       Q     And the members that were selected to be on
13   the task force, were they all Democrats?
14       A     I believe so.
15       Q     And let's go back to one of the conversations
16   that we were having earlier.
17             In getting ready for your deposition, did you
18   have any communications with Mr. Warren related to your
19   deposition?
20       A     Yes.
21       Q     What were the communications that you had
22   related to this deposition that we're here for today?
23       A     I remember two phone calls.
24       Q     Okay.  Do you recall when those phone calls
25   were?

```
 1      A    Not specifically.

 2      Q    Would they have been within the last

 3  two weeks?

 4      A    Yeah.  I think so.  I mean -- that's -- yeah,

 5  we've only known about this for -- yeah.

 6      Q    What was the first -- how long was the first

 7  phone call?

 8      A    Five minutes.

 9      Q    Okay.  What did you discuss?

10      A    Discussed -- mostly just words of

11  encouragement.

12           We talked about how we can't discuss with each

13  other or we're not going to discuss with each other

14  what's in each other's depositions, and he asked if I

15  had an attorney that I've worked with, and then

16  suggested a few ways that I could, you know, find an

17  attorney to work with.

18      Q    Did he refer you to Mr. Dees?

19      A    He did not.

20      Q    The second phone call, do you recall when that

21  was?

22      A    No.

23      Q    Do you recall -- I'm assuming the second phone

24  call happened after the first phone call.

25           Would that be fair?
```

```
 1      A    Yes.

 2      Q    Related to the second phone call, do you

 3   recall how long it was?

 4      A    Even more brief.

 5      Q    Okay.  Do you recall what the conversation

 6   was?

 7      A    More words of encouragement, and a follow up

 8   on if I found an attorney.

 9      Q    And in that call, had you found an attorney

10   yet?

11      A    Trying to remember.  I think so -- I don't

12   remember.

13           MR. LEVESQUE:  Guys if you can give me, like,

14       three minutes, I think I can wrap this up pretty

15       quick.

16           MR. DEES:  Thank you.

17               (4:33 p.m., off the record.)

18               (4:37 p.m., back on the record.)

19   BY MR. LEVESQUE:

20      Q    Mr. Kamm, I've just got a few more questions,

21   and I can definitely guarantee you that we'll be done by

22   5:00, or at least I will.

23           We talked a little bit about House Bill 1, the

24   Anti-riot Act, and Mr. Warren's opposition to that.

25           Do you know if he was engaged in opposing
```

```
 1    House Bill 5; the 15-week ban on abortion?

 2         A    No.

 3         Q    So during that time, if that bill passed in

 4    the 2022 legislative session that was held between

 5    January -- I'm sorry; January and March of 2022, that

 6    would have been when you were the Chief Communications

 7    Officer for the State Attorney's Office.  Correct?

 8         A    Until April of 2022.

 9         Q    Okay.  So if that happened in January -- if

10    the bill -- House Bill 5 was passed in March 2022, that

11    would have been during your tenure.  Correct?

12    A    Yeah.  Yes.

13         Q    And as you sit here today, you don't recall

14    being involved in any of the same type of activities

15    that you were involved with for House Bill 1, the

16    Anti-riot Act.  Correct?

17         A    Correct.

18         Q    In your discussions with Mr. Warren, have you

19    ever discussed whether -- strike that.

20              In your discussion with Mr. Warren, have you

21    ever discussed if he has returned to office, who should

22    be kept, and who should be fired?

23         A    Yes.

24         Q    Okay.  And what were -- what were those

25    discussions?
```

```
 1        A     Well, that's a broad question.

 2        Q     We'll start with who did you identify that

 3    should be fired?

 4        A     Who did I identify should be fired?

 5        Q     Yes, sir.

 6        A     Nobody.

 7        Q     Did Mr. Warren identify anybody?

 8        A     No.

 9        Q     Okay.  So you had discussions about who should

10    be fired, but nobody was identified as being fired?

11        A     Sorry.  I took who should be fired to be a

12    conversation about whether someone should be fired.

13        Q     Okay.  Okay.  So if I understand your

14    response, there were discussions, but nobody was

15    specifically identified, this person should be fired.

16              Would that be fair?

17        A     Yes.

18        Q     Okay.  In terms of the names of the people who

19    were discussed, who were some of the people who were

20    discussed?

21        A     Let's see.  Gary Weisman.

22        Q     Okay.  Was there anybody else?

23        A     No.

24        Q     Okay.  And who is Mr. Weisman?

25        A     Chief of Staff.
```

1          MR. LEVESQUE:  No further questions.

2          MR. DEES:  At this point in time we don't have

3     any questions -- any follow-up questions for

4     Mr. Kamm.

5          MR. LEVESQUE:  Mr. Singer?

6          MR. SINGER:  I have nothing; thank you.

7          THE REPORTER:  Mr. Levesque, are you going to

8     order this transcript today?

9          MR. LEVESQUE:  Yes, we will.

10          THE REPORTER:  Mr. Singer, would you like to

11     order Copy on this transcript?

12          MR. SINGER:  Yes, please.

13          THE REPORTER:  Mr. Dees, would you like to

14     order Copy on this transcript?

15          MR. DEES:  No, thank you.

16          Thank you, Madam Court Reporter.

17          THE REPORTER:  Read or waive?

18          MR. DEES:  We'll waive.

19       (THE DEPOSITION WAS CONCLUDED AT 4:41 P.M.)

20                         - - -

21

22

23

24

25

```
 1
 2                          CERTIFICATE OF OATH

 3    STATE OF FLORIDA            )

 4    COUNTY OF PINELLAS          )

 5    I, Lisa Selby-Brood, Notary Public in and for the State
      of Florida, the undersigned authority, certify that
 6    GRAYSON KAMM appeared before me via video
      teleconference, and having displayed a valid form of
 7    identification, was thereafter duly sworn remotely, per
      stipulation and agreement of counsel for all parties.
 8
      WITNESS my hand and official seal this 18th day of
 9    November, 2022.

10

11

12

13    Lisa Selby-Brood, RMR
      Notary Public in and for the State of Florida
14    My commission expires 12/26/2025
      Commission #  GG 162424
15

16

17

18

19

20

21

22

23

24

25
```

1

2                      REPORTER'S DEPOSITION CERTIFICATE

3

4      STATE OF FLORIDA          )

5      COUNTY OF PINELLAS        )

6      I, LISA SELBY-BROOD, Registered Merit Reporter, certify
       that I was authorized to and did Stenographically report
7      the deposition of GRAYSON KAMM; that a review of the
       transcript was Not requested; and that the transcript is
8      a true and complete record of my stenographic notes.

9      I further certify that I am not a relative, employee,
       attorney or counsel of any of the parties, nor am I a
10     relative or employee of any of the parties' attorney or
       counsel connected with the action, nor am I financially
11     interested in the outcome of this action.

12              DATED this 18th day of November, 2022.

13

14

15                                _____
                                  LISA SELBY-BROOD, RMR
16                                Registered Merit Reporter

17

18

19

20

21

22

23

24

25