# Exhibit C

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CASE NO. 4:22-cv-302-RH-MAF

ANDREW H. WARREN,

    Plaintiff,

vs.

RON DESANTIS, individually
and in his official capacity
as Governor of the State
of Florida,

    Defendant.

                                    /

REMOTE VIDEO-RECORDED DEPOSITION OF
SUSAN LOPEZ
{Pages 1 - 169}

Wednesday, November 16, 2022
10:01 a.m. - 1:29 p.m.
U.S. Legal Support, Inc.

(Held Remotely)

Stenographically Reported By:
Deanne M. Moore, RMR, CRR, FPR, FPR-C

Susan Lopez
November 16, 2022

```
 1                         APPEARANCES

 2   On Behalf of the Plaintiff:

 3      PERKINS COIE, LLP
        2901 North Central Avenue
 4      Suite 2000
        Phoenix, Arizona 85012-2740
 5      (602) 351-8000
        jcabou@perkinscoie.com
 6      BY:  JEAN-JACQUES CABOU, Esquire      (Via Zoom)
             MARGO CASSELMAN, Esquire
 7

 8   On behalf of the Defendant:

 9      GRAY ROBINSON, P.A.
        301 South Bronough Street
10      Suite 600
        Tallahassee, Florida 32301-1724
11      (850) 577-9090
        george.levesque@gray-robinson.com
12      jeff.aaron@gray-robinson.com
        BY:  JEFF AARON, Esquire            (Via Zoom)
13           GEORGE T. LEVESQUE, Esquire

14
     On Behalf of the Witness:
15
        JACOBS, SCHOLZ & WYLER, LLC
16      961687 Gateway Boulevard
        Suite 201I
17      Fernandina Beach, Florida 32034-9159
        (904) 261-3693
18      doug@jswflorida.com
        BY:  DOUGLAS WYLER, Esquire          (Via Zoom)
19

20   ALSO PRESENT:

21   Kyle Hankins, Videographer, U.S. Legal Support, Inc.
     Andrew Warren
22

23

24

25
```

Susan Lopez
November 16, 2022

1                    INDEX OF PROCEEDINGS

2                                              PAGE
    Deposition of SUSAN LOPEZ

3
    Direct Examination by Mr. Cabou               6
4   Certificate of Oath                         166
    Certificate of Reporter                     167
5   Witness Notification Letter                 168
    Errata Sheet                                169

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Susan Lopez
November 16, 2022

| | | |
|---|---|---|
| 1 | EXHIBITS | |

| Number | Description | Page |
|---|---|---|
| 1 | Subpoena | 9 |
| 2 | FJP Abortion Statement | 20 |
| 3 | Prosecutorial Discretion Memo 12/14/21 | 34 |
| 4 | Presumption of Non-Prsecution Memo | 40 |
| 5 | Presumption of Non-Prsecution Memo "Larry's originals" | 45 |
| 6 | Text Messages | 75 |
| 7 | Weisman000033 | 90 |
| 8 | Bike Stop Policy | 100 |
| 9 | Press Release | 123 |
| 10 | 8/8/22 Muratti Email | 131 |
| 11 | 8/4/20 Ridgway Email | 134 |
| 12 | Lopez000377 | 141 |
| 13 | Lopez000089 | 145 |
| 14 | SAO13 AW_000001 - 003 | 157 |
| 15 | Gun Violence Memo 7/7/22 | 162 |

Susan Lopez
November 16, 2022

1    Deposition taken before Deanne M. Moore, RMR, CRR,

2   FPR, FPR-C and Notary Public in and for the State of

3   Florida at Large in the above cause.

4                        - - - - -

5        THE VIDEOGRAPHER:  Good morning.  We're now on

6    video record.  Participants should be aware this

7    proceeding is being recorded, and as such, all

8    conversations held will be recorded unless there is

9    a request and agreement to go off the record.

10       This is the video-recorded deposition of

11   Susan Lopez taken on Wednesday, the 16th of

12   November, 2022.  The time is 3:01 p.m. UTC which is

13   10:01 Eastern Standard Time.

14       We're here in the matter Andrew Warren versus

15   Ron DeSantis.  My name is Kyle Hankins, the

16   videographer.  The court reporter is Deanne Moore.

17       At this time would all counsel state their

18   appearances for the record, beginning with

19   plaintiff's counsel first.

20       MR. CABOU:  Good morning, J. Cabou and

21   Margo Casselman on behalf of plaintiff Andrew

22   Warren, who is also present.

23       MR. LEVESQUE:  George Levesque and Jeff Aaron

24   on behalf of Governor DeSantis.

25       MR. WYLER:  And Doug Wyler of Jacobs, Scholz &

Susan Lopez
November 16, 2022

```
1        Wyler on behalf of the deponent, Ms.  Susan Lopez.
2              THE VIDEOGRAPHER:  Madam Court Reporter, will
3        you please swear in the witness.
4              THE COURT REPORTER:  Yes, sir.
5              Ms. Lopez, if you'd raise -- oh, there you go.
6              Do you swear or affirm the testimony you are
7              about to give will be the truth, the whole
8              truth, and nothing but the truth, so help you
9              God?
10             THE WITNESS:  Yes, ma'am.
11             THE COURT REPORTER:  Thank you.
12                     DIRECT EXAMINATION
13   BY MR. CABOU:
14       Q     Ms. Lopez, good morning.
15       A     Good morning.
16       Q     My name is J. Cabou.  I represent Andrew
17   Warren.  Thank you for taking the time to be here today.
18   We appreciate that.  I know that you're an experienced
19   lawyer and formally a judge, so forgive me if some of
20   the ground rules are basic or familiar to you.  But
21   we'll -- we'll plow through them anyways.  If you have
22   any questions, let me know.
23             Also I know your counsel is -- is appearing
24   remotely as well, and given the video -- you know, the
25   video depo, if you need to take a break at any point
```

Susan Lopez
November 16, 2022

1  either for personal reasons or to speak with Mr. Wyler,

2  feel free to let us know, and as long as there's no

3  question pending, we'll certainly accommodate any

4  requests for breaks, okay?

5      A    Thank you.

6      Q    Sure.  Have you had your deposition taken

7  before?

8      A    Yes.

9      Q    How many times?

10     A    Once, I believe.

11     Q    Okay.  You -- you are aware of course the oath

12  you just took is the same oath that you take to tell the

13  truth in court?

14     A    Yes, sir.

15     Q    Okay.  And I know that I will probably do this

16  and you might as well which will be nod my head or shake

17  our head, but in order so that our abled court reporter

18  can take down your answers, I might ask you to clarify

19  something like is that a yes or is that a no.

20          I promise I'm not trying to be difficulty.  I

21  might be difficult at other times, but that -- that

22  isn't not one of them.  I just want to make sure the

23  record is clear.  Fair enough?

24     A    Of course, thank you.

25     Q    Okay.  Like I said if you need a break, let me

Susan Lopez
November 16, 2022

1  know.  If there is an a question that I ask and that you

2  don't understand, please let me know, and I will do my

3  best to rephrase it. If you've answer a question, I'll

4  assume you've understood it.  Fair enough?

5      A    Yes, sir.

6      Q    Anything that would make it difficult for you

7  to give your best and truthful testimony today; for

8  example, are you sick for any reason?  Have you -- are

9  you under the influence of any medication or alcohol or

10  anything like that?

11     A    No, sir.

12     Q    Okay.  Anything else that might make you such

13  that you can't provide true and full answers to my

14  questions today?

15     A    No, sir.

16     Q    Tell me, if you would, please, what did you do

17  to get ready for this deposition?

18     A    I had a telephone conversation as well as a

19  Zoom conversation with Mr. Wyler and Mr. Jacob.  I'm

20  sorry, I don't remember the exact date, but I believe it

21  was last week.

22     Q    Okay.  Did you review any documents to refresh

23  your recollection as to any topic?

24     A    No, sir.

25     Q    Okay.  Ma'am, you understand that you were

Susan Lopez
November 16, 2022

1  subpoenaed for documents in this matter, right?

2      A    Yes, sir.

3      Q    Okay.  I'm going to ask that we mark as

4  Exhibit 1 our tab B, which is the notice of subpoena and

5  subpoena.

6           (Exhibit 1 was marked for identification.)

7  BY MR. CABOU:

8      Q    And, Ms. Lopez, for you and the rest of the

9  participants, we will be displaying the exhibits on the

10  screen.  If they're hard to read or anything, please let

11  us know, and we'll do our best to adjust them.

12          This has been marked as Exhibit 1.  This is the

13  notice of subpoena duces tecum.  Have you seen this

14  before?

15     A    Yes, sir.

16     Q    Okay.  If we could scroll down to the subpoena

17  and specifically the return date for the subpoena.

18  There you go.

19          This notes that documents were to be produced

20  on October 26th, 2022 or on such other date or place as

21  we agreed.  You didn't produce documents on that date,

22  ma'am.  Why was that?

23     A    I -- I'm not aware of the reason why, sir.

24     Q    Okay.  Can you tell me the steps you took to

25  comply with the subpoena and gather the documents

Susan Lopez
November 16, 2022

1   responsive to it?

2       A      I have someone within my office who -- who --

3   that is part of her job is to deal with and respond to

4   public records requests, and so this was treated as

5   such, and so she is the person who compiled all of the

6   documents.  And I am -- I am unaware as to why the

7   October 22nd date was not met.  Yes, sir.

8       Q      Okay.  I mean, we got documents from you as

9   late as August -- sorry, August -- as late as

10  November 14th which is just a couple of days ago.

11          Do you have any further information about why

12  it was so late that we got the documents?

13      A      My understanding with regard to -- to getting

14  things as late as the 14th is that there were some

15  redactions that were going to be made, but the decision

16  was made to go ahead and send everything.

17          The reason that -- that there would have been

18  redactions my understanding is there would be some

19  Marsy's Law -- potential Marsy's Law disclosures, and so

20  that was the concern was that we did not want to violate

21  Marsy's Law.

22          And I understand that I believe you have

23  drafted something or are going to draft something that

24  will protect all of the Marsy's Laws disclosures if

25  there are any in certain emails that had been sent and

Susan Lopez
November 16, 2022

1  other documents.

2      Q     You're referring to a conversation and an email

3  exchange that I've had with your counsel, Mr. Wyler,

4  about keeping certain information confidential.  I can

5  tell that you Mr. Wyler and I have accomplished that.

6      A     Thank you.  Thank you.

7      Q     And I want to thank Mr. Wyler for working

8  through those issues with me.  That was pretty

9  efficient, and I -- and I appreciate his courtesy.

10           Okay.  We might come back to that.  But for

11  now, Ms. Lopez, can you confirm that you are currently

12  serving as the state attorney for the 13th Judicial

13  Circuit in Florida?

14      A     Yes, sir, I am.

15      Q     What did you do before that?

16      A     I was a county court judge in Hillsborough

17  County, Thirteenth Judicial Circuit.

18      Q     Do you recall more or less the date on which

19  you took the bench?

20      A     My commission date was January 3rd of 2022.

21      Q     And before that my understanding is that you

22  were an assistant state attorney in the office of the

23  Thirteenth Judicial Circuit State Attorney; is that

24  right?

25      A     Yes, sir.

Susan Lopez
November 16, 2022

```
 1       Q     What was your -- when do you start in the State
 2   Attorney's Office as an ASA?
 3       A     January 3rd, 2005.
 4       Q     So January 3rd is sort of a big day for you?
 5             Okay.  How -- what was your last day at the
 6   State Attorney's Office prior to taking the bench?
 7       A     December 31st, 2021.
 8       Q     Okay.  Can you describe for me, please, the
 9   roles that you had in the State Attorney's Office
10   including any supervisory roles?  Again this is all
11   prior to taking the bench.
12       A     When I started in January of 2005, I was
13   assigned to the misdemeanor and traffic bureau which is
14   also known as bureau 2.  I was then promoted to bureau 1
15   which is felony and began there on March 6th of 2006.
16             I was then promoted to the position of lead
17   trial attorney around Labor Day of 2008.  I served as a
18   lead trial attorney until roughly Labor Day of 2013 when
19   I was promoted to the position of deputy chief of the
20   drug division.
21             I served in that capacity until roughly the
22   third week of March of 2017, and I remained in a line
23   division until I left to take the bench on December 31st
24   of 2021.
25       Q     Okay.  You weren't promoted higher than deputy
```

Susan Lopez
November 16, 2022

1   chief; is that right?

2       A    I was a deputy chief when I left, yes, sir.

3       Q    Did you ever seek a promotion beyond deputy

4   chief?

5       A    A position is not something that is necessarily

6   applied for.  I -- I would have liked to have been a

7   chief or -- or above a deputy chief before I left

8   though, yes, sir.

9       Q    Okay.  Do you have any idea why those positions

10  were not available to you; in other words, why you

11  weren't promoted as you would have liked?

12      A    I -- there were -- I had conversations

13  regarding -- I had conversations regarding my -- my

14  leadership style that was not approved or appreciated I

15  believe by someone in my division.

16      Q    Tell me about that.  What -- what was your

17  perspective on that?  Let me -- let me ask that a better

18  way.

19          What is your understanding of what was it about

20  your leadership style that -- that made you not

21  appreciated by your superiors?

22      A    I -- I will give you an example.

23      Q    Okay.

24      A    I was asked in front of several people that I

25  supervised how a training was that I participated --

Susan Lopez
November 16, 2022

 1  that I was -- I had -- it was a mandatory training, and

 2  I said that I did not think that it was important and

 3  that I thought that I would have rather been prepping

 4  for a homicide trial that I was trying in two weeks, and

 5  I was told that was not an appropriate answer, that I --

 6  that that was not appropriate for a supervisor to say.

 7      Q    Okay.  I mean, I'm someone who's certainly been

 8  accused of being overly candid in the past, so is that

 9  sort of what you're expressing?

10      A    Yes.

11      Q    I see Mr. Levesque laughing, so he might -- he

12  might agree with me.

13           Is that -- I mean, is it fair to say that you

14  were told that you were too frank?

15      A    I don't think that that was a word that was

16  used, but that -- that was -- that was something that

17  I -- that was specifically mentioned to me.  And I was

18  busy prepping -- I tried four homicide trials in 2021,

19  and I was prepping for the first one.  And I thought

20  that two hours of my time could have been used a little

21  bit better.

22      Q    Who was the supervisor who expressed that to

23  you?

24      A    Courtney Derry.

25      Q    Okay.  Is she still with the office?

Susan Lopez
November 16, 2022

1      A     Yes, sir.  She serves as the chief of the

2    sex -- excuse me, the special victims' unit.

3      Q     Okay.  Have you spoken to her about that now

4    that you are the boss?

5      A     No.

6      Q     Okay.  All right.  Any -- any other concerns

7    about your leadership style that were expressed to you

8    prior to leaving for the bench?

9      A     I supervised someone who -- with Ms. Derry, I

10   supervised someone who was ultimately demoted within the

11   division, and I think that there were some concerns

12   of -- I had a previous relationship with her, and I said

13   that that in no way affected my opinion of her or her

14   ultimate demotion.  She then left the office.

15     Q     Okay.  I assume she hasn't come back to the

16   office?

17     A     No, sir.

18     Q     Okay.  All right.  When did you first learn of

19   the plan to suspend Mr. Warren?

20     A     The afternoon of Monday August 1st, 2022.

21     Q     How did you learn of it?

22     A     I was in court, and I received a telephone

23   call.  I did not answer it, but I ultimately returned

24   the telephone call later that afternoon, and it was

25   during that subsequent conversation that I learned of

Susan Lopez
November 16, 2022

1    the Governor's intention.

2        Q    Who -- so the first you heard of the plan to

3    suspend Mr. Warren was in this call on August 1st,

4    correct?

5        A    Yes, sir.

6        Q    And who was on the other end of the call?

7        A    I called -- I returned Ryan Newman's telephone

8    call.

9        Q    Okay.

10       A    The message -- I just want to clarify.  His

11   message asked me to call him.  His message did not

12   mention why he was calling.  His message just asked me

13   to call him, so I did.

14       Q    Did you know Mr. Newman previously?

15       A    I -- yes, I had met him.  He was the general

16   counsel at the time of my appointment on December 22nd,

17   2021.

18       Q    To the bench?

19       A    Yes, sir.

20       Q    Got it.  Okay.  And was he involved in the

21   judicial appointments and vetting process when you

22   applied to be a judge?

23       A    It is my understanding, yes, sir, and I did

24   have a telephone interview with him prior to my

25   appointment to the bench.

Susan Lopez
November 16, 2022

 1      Q      Back to our August 1st, 2022 call, do I
 2  understand your testimony correctly that he left you a
 3  voicemail asking him to call -- asking you to call him
 4  back?
 5      A      Asking me to call him back, yes, sir.
 6      Q      And that you returned the call; is that right?
 7      A      Yes, sir, I did.
 8      Q      Was there anyone else on the phone with you
 9  when you returned the call?
10      A      To the best of my knowledge, no.
11      Q      So it was just -- just you and Mr. Newman to
12  the best of your knowledge?
13      A      Yes, sir.  He -- he did not let me know that
14  anyone else was on the call, so I presume that it was
15  the two of us, but I frankly don't know.
16      Q      Fair enough.  I -- I appreciate that.
17             Okay.  So about how long -- when you finally
18  reached him back, about what time was it?
19      A      2:30 to 3-ish, I -- I don't recall.  I know
20  that I was in afternoon court.
21      Q      Okay.
22      A      And I was in between hearings, so I don't know
23  a specific time.
24      Q      That's -- that's very specific.  Thank you.
25             What did you discuss?

Susan Lopez
November 16, 2022

1      A     We discussed -- we started out the conversation

2   with -- I said the last time I received a phone call

3   that popped up as Austin, Texas, my life changed because

4   he is the person who called to appoint me to the bench,

5   and we exchanged pleasantries.  He asked how things were

6   going, and then he said he had something to discuss with

7   me.

8      Q     Thank you.

9            What was it that he discussed with you, and

10   please give me -- excuse me -- as many of the details as

11   you can recall?

12      A     My recollection was that he told me that the

13   Governor intended to suspend my predecessor later that

14   week and that the Governor wanted to appoint me to

15   replace him as state attorney.

16      Q     Did he say anything else in the initial

17   discussion?

18      A     I'm going to be honest.  After that, things got

19   a little blurry because I was very shocked.  I said that

20   I would consider it and that I needed some time.

21      Q     Did he describe or in any way indicate why the

22   Governor was planning to take this action?

23      A     Yes, sir.  He -- yes, sir, he did.

24      Q     Please tell me everything he told you about why

25   the Governor was planning to suspend Mr. Warren.

Susan Lopez
November 16, 2022

 1      A     My recollection is that he -- he discussed the

 2   abortion document from June of 2022.  I don't recall if

 3   he discussed anything involving transgender youth and

 4   that there were also a list of presumptive no files,

 5   meaning cases that would not be filed by the State

 6   Attorney's Office, and that the Governor was -- was --

 7   was planning to suspend my predecessor and wanted to

 8   appoint me.

 9      Q     And just to be clear, when you say your

10   predecessor, you mean my client, Andrew Warren, right?

11      A     Yes.  Yes, sir.

12      Q     And you and Mr. Warren have known each other

13   for years, right?

14      A     Yes.

15      Q     Because you were an ASA and he was State

16   Attorney?

17      A     Yes, sir.  We actually met before he became the

18   State Attorney in January of 2017.

19      Q     Got it.  Thank you.  Okay.  So Mr. Newman

20   discussed the abortion statement.  You can't recall as

21   you sit here right now whether or not he discussed the

22   transgender care statement, but he may have; is that

23   fair?

24      A     I -- I -- I don't have an independent

25   recollection of that, and so I -- I don't want to say

Susan Lopez
November 16, 2022

```
 1  that he did.  I -- like I said, I was -- I was very much
 2  in shock, and I was processing everything that he was
 3  saying as best I could being so surprised.
 4      Q    I that's understandable.  I just want to make
 5  sure that I've understood your testimony --
 6      A    Of course.
 7      Q    -- so that we can, you know, talk about it a
 8  little bit further.
 9          Had you previously -- you mentioned the
10  abortion statement or the abortion letter.  What -- what
11  did he call it?
12      A    I do not recall.  I'm sorry.
13      Q    Okay.  Had -- were you -- so -- so when we say
14  the abortion statement, let's mark as Exhibit 2, tab 2.
15  I just want to make sure we're talking about the same
16  thing.  I think we are, but let's just -- let's just be
17  clear.
18      A    Thank you.  I would appreciate that.
19              (Exhibit 2 was marked for identification.)
20  BY MR. CABOU:
21      Q    So, Ms. Lopez, this is a -- the joint statement
22  from prosecutors written by the group Fair Just
23  Prosecution to which Mr. Warren allowed his name to be
24  affixed.  This is in the wake of the Supreme Court's
25  Dobbs decision, and it is on the subject of abortion.
```

Susan Lopez
November 16, 2022

1              Is this the joint statement that Mr. Newman

2     referred to in your initial conversation about the

3     Governor's decision to suspend Mr. Warren?

4        A     Yes, sir.

5        Q     When was the first time you saw this statement?

6        A     August 2nd, 2022.

7        Q     That's -- so that's the day after the

8     conversation with Mr. -- Mr. Newman; is that right?

9        A     Yes -- yes, sir.

10       Q     All right.  So now -- now that we know we're

11    talking about the same statement, let's go back.  We can

12    take that down for a sec.  Let's go back to the

13    conversation on August 1st because I do want to proceed

14    sort of step by step.

15             Mr. Newman told you about that --  that -- is

16    it correct that Mr. Newman told you I was being

17    suspended at least in part for the abortion statement?

18       A     In part, yes, sir.

19       Q     What else do you recall Mr. Newman saying was a

20    reason for Mr. Warren's forthcoming suspension?

21       A     Like I said, there was a mention of a list of

22    presumptive -- or crimes that were presumptive no files.

23       Q     Okay.

24       A     Other than that -- I'm sorry.  Other than that,

25    I don't really recall because the reasons were not why

Susan Lopez
November 16, 2022

```
 1  he was calling me.  It was the fact that the Governor

 2  wanted to appoint me that he was calling me.

 3      Q    Understood.  But, you know, you're a judge, and

 4  you were an ASA, and obviously you're in this -- you've

 5  been a long time in public service in this circuit.

 6  Surely you understood that this was a very consequential

 7  decision, correct?

 8      A    Of course.

 9      Q    Okay.  Did you ask any questions of Mr. Newman

10  about the reasons why Mr. Warren was being suspended?

11      A    No, sir.

12      Q    You didn't ask any questions about the abortion

13  statement?

14      A    No, sir.

15      Q    Or about the presumptive no file policies?

16      A    Other than saying I did not know it existed,

17  no, sir.

18      Q    You didn't know that what existed?

19      A    The presumptive list of no files.

20      Q    Okay.  The no -- I know that no file is sort of

21  a prosecutor's term.

22      A    I'm sorry about that.

23      Q    No, no, that's okay.  I just want to know if

24  you used it or if he used it.

25      A    That's a good question.  I'm going to presume
```

Susan Lopez
November 16, 2022

1  that he did because it's probably not something that I

2  would have used with someone who was not a prosecutor,

3  so I apologize for using it here.

4      Q    No, that that's -- that's okay.  I mean,

5  there's -- you know, there's some prosecutors on the

6  phone.  There's -- I'm a lifelong criminal defense

7  lawyer, so I've heard it before, but in any event.

8  Okay.

9           So you're not sure who used that term.  Do you

10  know -- it might -- it might have been him.  Can you

11  think of any other term that was used to describe these

12  policies during that first call?

13     A    I -- I don't recall any, sir, I'm sorry.

14     Q    No need to apologize.  Thank you.

15          How long did this first call on August 1st

16  last?

17     A    Fewer than 10 minutes.

18     Q    Did you discuss any other topics other than the

19  fact that the Governor wanted to appoint you, the fact

20  that he was suspending Mr. Warren and that the abortion

21  policy and the presumptive no -- no file policies were

22  among the reasons for the suspension?

23          MR. LEVESQUE:  Object to form.

24     A    I'm sorry, could -- I didn't hear what -- what

25  he said.

Susan Lopez
November 16, 2022

1    Q    I think -- I think Mr. Levesque objected to

2  form, you know, but I -- certainly no one is instructing

3  you not to answer.

4         MR. LEVESQUE:  Right.  You can answer.

5         THE WITNESS:  Okay.

6    A    We discussed those things, and as I said

7  earlier, we kind of caught up a little bit.  I hadn't

8  spoken to him since my appointment, so we did discuss

9  how I was doing and how I liked being a judge.

10        And the only other topic of conversation that

11  came up was I asked him if he had been to Bern's, which

12  is a restaurant in Tampa.  Those are really the own

13  things that we had talked about.

14   Q    I love Bern's.

15   A    That was -- he had never been to Bern's, and so

16  I said, Well, I thought maybe you were calling me to

17  tell me you were coming to Tampa, and we could go to

18  Bern's, so that -- those are really -- catching up, the

19  proposed -- my proposed appointment and Bern's are --

20  are all we actually talked about.

21   Q    How did you leave it on the call?  How did the

22  call end?

23   A    I would get back to him.

24   Q    And was there a time frame on which you had

25  promised to get back to him?

Susan Lopez
November 16, 2022

 1      A      I believe I had told him the following morning

 2   which would be Tuesday the 2nd.

 3      Q      Okay.  And in between the time you got off the

 4   phone with Mr. -- and the call ended after that --

 5      A      Yes, sir.

 6      Q      -- after you said you would get back to him?

 7             Okay.  All right.  Tell me the next time and --

 8   well, let's start begin.

 9             Did you discuss -- after Mr. Newman's call, did

10   you discuss your potential appointment as Mr. Warren's

11   successor with anyone?

12      A      No, sir.

13      Q      You didn't discuss the -- so -- so in your --

14   so what did you do after you hung up the phone with

15   Mr. Newman?

16      A      I went back to court.

17      Q      And after you were done in court that day, when

18   was the next time you deliberated over the potential

19   appointment as State Attorney?

20      A      About five o'clock that afternoon I received a

21   call from Mr. Uthmeier.

22      Q      Okay.  Were you expecting that call?

23      A      No, sir.

24      Q      Tell me everything you can remember about that

25   call.

Susan Lopez
November 16, 2022

1        A      I had met Mr. Uthmeier a couple of -- several

2   years before, I think it was in 2019.  He called to let

3   me know that they were eager to get a response from me.

4   He also told me at that time that I could discuss it

5   with my family.

6              So at that point I had the permission to talk

7   about it with my family.

8        Q      Okay.  How long did the call with Mr. Uthmeier

9   last?

10       A      I was at the vet with my dog, and I think the

11  call was maybe 60 seconds because I recall the vet

12  walking in, so it was a very, very short phone

13  conversation.

14       Q      Okay.  I've heard it reported that your dog is

15  named after the Governor; is that true?

16       A      They both changed my life in a very big way in

17  a 24-hour period.

18       Q      Okay.  What's your dog's name?

19       A      Ron De.

20       Q      Does the doing have a last name?

21       A      Oh, her middle -- she has a middle name.  Her

22  last name is Lopez, but her middle name is DeSantis.

23       Q      Ron DeSantis Lopez?

24       A      Yeah.  They both -- I went down and rescued her

25  in Palm Beach on July 31st, and I got the call on the

Susan Lopez
November 16, 2022

```
 1   1st.  So it was -- it was a big week, so that's why I
 2   was at the vet with a newly rescued doing.
 3       Q    Understood.  So you discussed briefly with
 4   Mr. Uthmeier.
 5       A    Yes, sir.
 6       Q    Did you discuss -- tell me everything you
 7   remember about what Mr. Uthmeier said.
 8       A    I said, Thank you very much, I will -- I will
 9   contact Mr. Newman in the morning, which would be
10   Tuesday.
11       Q    Did you discuss the reasons for Mr. Warren's
12   forthcoming suspension?
13       A    No, sir.  No, sir.  Like I said, it was a very
14   short conversation, and there was nothing that was
15   brought up in that conversation as to the why.
16       Q    After speaking with Mr. Uthmeier and after --
17   well, after speaking with Mr. Uthmeier, did you discuss
18   your to terrible appointment as State Attorney with
19   anyone else?
20       A    I went home, and my mom came over, and I talked
21   to her about it.
22       Q    Okay.  Tell me what you said.
23       A    After I took a long walk on the Bay Shore, I
24   walked into the house, and she was there, and I said,
25   Mom, the Governor wants to appoint me to be State
```

Susan Lopez
November 16, 2022

```
 1  Attorney, and I'm going to go to Tallahassee tomorrow.
 2  And she said, Okay.
 3      Q     Did you discuss anything else -- I'm not asking
 4  about, you know, family business, but did you discuss
 5  anything else on the subject of the appointment or the
 6  suspension with that -- in that conversation?
 7      A     I -- I -- to be honest with you, I don't
 8  recall.  My mom's concerns and her main questions were
 9  about me and how I was feeling and what I was thinking,
10  not why I had received the call.
11      Q     Did you discuss any of the reasons that the
12  Governor gave for taking this action?
13      A     I do not recall.
14      Q     On the -- so we're still on August 1st, so you
15  spoke with Mr. Newman.  Then you got a brief call at the
16  vet from Mr. Uthmeier.  Then you spoke with your mother,
17  the details of which you can't recall as they relate to
18  the suspension.  Did you speak to anyone else before
19  going to Tallahassee the next day on the subject of
20  Mr. Warren or the suspension?
21      A     No, sir.
22      Q     So then you went -- so do I understand that
23  sort of the next event that brings us together today was
24  your trip to Tallahassee on August 2nd?
25      A     Chronologically, no.  The next morning I called
```

Susan Lopez
November 16, 2022

 1  Mr. Newman and told him that I was coming up that

 2  afternoon.

 3      Q    Thank you.  Had you previously discussed with

 4  Mr. Newman or Mr. Uthmeier traveling to Tallahassee?

 5      A    No, sir.

 6      Q    What made you decide to go?

 7      A    This was a very important and a very big

 8  decision for me to make, and I wanted to look at the

 9  people who contacted me and asked me to take this

10  appointment.

11      Q    Understandable.  And when you said you were

12  going, who did you intend to meet with?

13      A    I asked for Mr. Newman, for just a few minutes

14  of his time.  Because he -- because he was the one I was

15  on the phone with when I called and said, I'm coming.

16      Q    I -- I can tell you I've made the drive now

17  from Tampa to Tallahassee several times.  It's a long

18  drive.

19      A    Four hours.

20      Q    You drove faster than I did, or at least hit

21  less traffic, but anyways.

22          How long did you expect to meet with Mr. Newman

23  or his colleagues in the Governor's office?

24      A    Just a short period of time.

25      Q    Okay.  Did you -- in between the time you

Susan Lopez
November 16, 2022

1    told -- so you told -- let me just ask you.

2              You called Mr. Newman to tell him you were

3    coming; is that right?

4         A    I called him -- as I had promised I would call

5    him, I called him at about eight o'clock in the morning.

6    I said, I'm coming, I'd like a few minutes of your time.

7    He asked my -- my estimated time of arrival.  I told him

8    I was aiming for four o'clock because I had court in the

9    morning, and we said okay.

10        Q    Did you speak to anyone else about the topic of

11   the suspension or the appointment in between the time

12   you spoke to Mr. Newman to tell him you were coming and

13   you arrived in Tallahassee?

14        A    I -- I -- I definitely checked in with my mom

15   on the phone, but it was more about my travels and the

16   appointment, so nothing about the suspension.

17        Q    Okay.  Did you make it to Tallahassee and speak

18   with Mr. Newman?

19        A    Yes, sir.

20        Q    Where was your meeting?

21        A    I went to Mr. Newman's office, and I -- we --

22   I -- I met him first in the library of the general

23   counsel's office.

24        Q    Was anybody else there?

25        A    No, sir.

Susan Lopez
November 16, 2022

1       Q       So you -- the two of you met privately?

2       A       No.  He came -- we first met in the library.

3   He came and got me and then took me -- we went -- we

4   went to a conference room.

5       Q       Okay.  Got it.  And when you were in the

6   conference room, was anyone else there?

7       A       Mr. Uthmeier.

8       Q       Okay.  About how long did your meeting last?

9       A       With Mr. Uthmeier present, about an hour.

10      Q       Okay.  And then do I -- do I infer correctly

11  that at some point Mr. Uthmeier left and that you and

12  Mr. Newman remained in the room speaking?

13      A       We remained in the room and were joined by

14  Mr. Keefe.

15      Q       Okay.  All right.  So obviously I'm very

16  interested in the details of this meeting, and I would

17  like you to walk me through the meeting to the best of

18  your recollection from start to finish.

19              I understand that Mr. Newman came to meet you,

20  and you went into a conference room and what happened

21  next?

22      A       We discussed -- I was shown a copy of the -- of

23  the -- the -- I don't remember which exhibit number it

24  was, but the June 24th, 2022, documents from Fair and

25  Just.

Susan Lopez
November 16, 2022

```
 1      Q     Okay.  That's Exhibit 2.  And let me put that
 2  back up just so you can refer to it if you need it.
 3      A     I don't need to refer to it.  But I was shown a
 4  copy of that.  That was the first time I had ever seen
 5  that.  Yes, sir, that's it, June 24th.
 6      Q     So just for the record, at the meeting with
 7  Mr. Newman on August 2nd in the conference room of the
 8  general counsel's office, he showed you a copy of what's
 9  been marked as Exhibit 2, the Fair & Just Prosecution
10  letter of August -- of June 24th, 2022, and that was the
11  first time you had seen the letter; is that correct?
12      A     Yes, sir.
13      Q     Okay.  Did you discuss any details of the
14  letter?
15      A     Details, no, sir.
16      Q     Did you read the letter or did he -- did anyone
17  read it to you?
18      A     No, sir.
19      Q     Was the letter -- did he have a copy of the
20  letter with him?
21      A     Yes, sir.
22      Q     And did he hand it to you?
23      A     Yes, sir, I -- I -- I did a very cursory read.
24  I did not do a thorough read of it at all.  I -- I knew
25  from our conversation what -- what it was that was
```

Susan Lopez
November 16, 2022

1    entailed within the letter.

2       Q    What was your understanding of the letter as

3    you sat there in the conference room?

4       A    That there would be no prosecutions for

5    providers who performed abortions past a certain -- past

6    a certain mark and that that there would be a blanket a

7    ban on prosecutions for crimes that -- that existed

8    within the state of Florida.

9       Q    Have you -- you say that you didn't read the

10   letter carefully in the conference room; is that

11   correct?

12      A    Yes, sir.

13      Q    Have you since read the letter?

14      A    No, sir, I haven't.

15      Q    Okay.  The word "Florida" doesn't appear in the

16   letter.  Does that surprise you?

17      A    No -- no, sir, but my concern would be crimes

18   within the state of Florida.

19      Q    Right.  What I'm saying is the word "Florida"

20   isn't in the letter?

21      A    Oh, that -- that -- that is correct, but again

22   my concern would be crimes within the state of Florida

23   and that these -- that this would be something that

24   would be illegal within the state of Florida.

25      Q    Okay.  You said that you left Mr. Warren's

Susan Lopez
November 16, 2022

1   office on December 31st, 2021; is that right?

2       A    Yes, sir.

3       Q    And prior to that, on December 14th, 2021,

4   Mr. Warren had -- had promulgated an office policy in --

5   in the form of a memo on the subject of prosecutorial

6   discretion and the mission of criminal justice.

7            Are you familiar with that document?

8       A    I'm not, and I can explain to you why.

9       Q    Okay.  Well, let -- let's -- I might know the

10  answer, but let's make sure we're on the same page.

11      A    Okay.

12      Q    Can we see and mark as Exhibit 3 tab 21.

13           (Exhibit 3 was marked for identification.)

14  BY MR. CABOU:

15      Q    This was marked at a previous deposition of

16  Mr. Treadwell, but this is the memo to which I just

17  referred.  It's dated December 14th, 2021.  It's a memo

18  on office policy regarding prosecutorial discretion and

19  the mission of criminal justice, and it's Exhibit 3 to

20  your deposition.

21           Have you seen this before?

22      A    No, sir.

23      Q    Okay.  I think you were about to tell me why

24  you're not familiar with this.  Could you please do

25  that?

Susan Lopez
November 16, 2022

1    A    Yes, sir.  I was appointed to the bench on the

2  evening of Thursday, December 2nd, 2021.  There was an

3  office wide meeting that was held the following day,

4  Friday, the December 3rd, 2021.  The division in which I

5  served at the time did not attend this office wide

6  meeting and my understanding was that the topic for this

7  meeting was prosecutorial discretion.

8         I resigned and gave my two weeks notice over

9  the phone and then later in writing on December 2nd, and

10 my last day within the office was December 17th.  I then

11 used two weeks of annual leave.

12        So something -- so a memo that would have been

13 dated August -- December 14th would have been in the

14 early part of my last week when I was finalizing things

15 and working on passing off my caseload, so it was

16 something I am not familiar with.

17   Q    Okay.

18   A    At the time --

19   Q    Understandable.

20   A    -- I was not familiar with it.

21   Q    You anticipated my next question, which is:

22 Since that time and since you left the office, have you

23 subsequently become familiar with the contents of this

24 memo?

25   A    Yes, sir.

Susan Lopez
November 16, 2022

1    Q    And the memo, among other things, said that

2  it's the policy of the office to apply discretion in

3  every case, right?

4    A    Yes, sir, prosecutorial discretion is something

5  that rests within the office of the State Attorney.

6    Q    And it says specifically in the middle of the

7  page here under the heading exercise discretion at every

8  stage, it say, "Case specific review is a hallmark of

9  our criminal justice system.  In every case ASAs must

10  exercise discretion based on the facts of that case,"

11  and it goes on to describe them, correct?

12    A    Yes, sir, that is what it says.

13    Q    Okay.  When you were told that this letter that

14  Mr. Warren had cosigned announced a blanket policy that

15  he wouldn't prosecute certain offenses, did you agree

16  with that characterization?

17    A    I think I need to clarify something, Mr. Cabou.

18  When I was referring to a list of what we call the no

19  files, this is not what I was talking about, and so I

20  want to make sure that we are on the same page with what

21  it is that I -- that I was speaking about.

22    Q    Okay.  Understood.

23        So I guess -- so let's -- I'm sorry if I became

24  confused there, but I appreciate your clarification.

25    A    No, I just want to make that sure you and I are

Susan Lopez
November 16, 2022

1  talking about the same thing.

2      Q    I appreciate that, Ms. Lopez.  Thank you.

3          On the subject of the abortion statement that

4  you were shown in the conference room with Mr. Newman,

5  what was your understanding in the room of why that

6  statement was a basis for Mr. Warren's suspension?

7          MR. LEVESQUE:  Object to form.  You can answer.

8      A    My understanding was that that was one of the

9  factors that the Governor used in making his decision to

10  suspend Mr. Warren and that a blanket statement that --

11  that a law would not be prosecuted, it -- it flies in

12  the face of -- of what it is that a prosector does.

13          A prosecutor looks at every case on a

14  case-by-case basis.  In this office now we look at every

15  single case, exercise our discretion when necessary or

16  when required.  But in every case, we look at the facts,

17  and we look at the law.  We will not make a decision to

18  not file a case based on a blanket statement that, We

19  will not prosecute A-B-C crime.

20      Q    Are you aware of any decision that was made

21  under Mr. Warren that did not involve applying

22  individual assessments of individual cases?

23          MR. LEVESQUE:  Object to form.

24      A    I was not an intake attorney, and so I did not

25  make -- I did not file cases.  I did sign informations,

Susan Lopez
November 16, 2022

1   and I cannot think of any off the top of my head.

2   However, it is my understanding that there were certain

3   crimes that were not prosecuted within the office.

4        Q    I understand that.  But you're not aware of any

5   case that wasn't considered on its individual merits,

6   are you?

7        A    No, sir.

8        Q    So you said now we apply case by case

9   discretion, but that's not a change from Mr. Warren, is

10  it?

11            MR. LEVESQUE:  Object to form.

12       A    We are now prosecuting trespass cases, and

13  trespassing cases were not being prosecuted under --

14  under the presumptive list of no files.  Prostitution

15  was also another case.

16       Q    Okay.  But you're also aware that those cases

17  were prosecuted when individual circumstances warranted

18  even when Mr. Warren was the State Attorney, correct?

19       A    Yes, sir, they were --

20            MR. LEVESQUE:  Object to form.

21  BY MR. CABOU:

22       Q    Okay.  Let's go back to your meeting with

23  Mr. Newman.

24            So you've discussed -- he -- he had a copy of

25  the abortion statement.  Is there anything else that he

Susan Lopez
November 16, 2022

1    told you about that statement that you can remember?

2        A    No, sir.

3        Q    Okay.  What -- other than the abortion

4    statement, was that the first thing you discussed?

5        A    I don't recall, sir.

6        Q    Okay.  So you recall discussing the abortion

7    statement.  That was when you first saw it; is that

8    correct?

9        A    Yes, sir.

10       Q    What else do you recall discussing in the

11   meeting with Mr. Newman?

12       A    There was a piece of paper, and that is what I

13   was referring to earlier, and that's why I wanted to

14   clarify, that was -- I believe it was one page, it may

15   have been two, that was titled presumptive list or list

16   of presumptive no files.  I don't remember exactly how

17   it was titled.

18            But it listed about a dozen crimes, and that's

19   what I was talking about that I had seen, not what --

20   the prosecutorial discretion memo that you just showed.

21       Q    Okay.  And was there any -- and what -- what

22   did you -- is that the first time you had seen that

23   document?

24       A    Yes, sir.

25       Q    What did he say about that?

Susan Lopez
November 16, 2022

1      A      He asked me if I had ever seen it, and I told
2   him no.

3      Q      Okay.  Did you have any other discussion about
4   that document?

5      A      Other than the fact that I said that I was
6   surprised, no, sir.

7      Q      And to the best of your recollection, that
8   document was one page long?

9      A      As I said, it may have been two.  I don't
10   recall.

11      Q      Okay.  You described it as a piece of paper.

12      A      Okay.  I'm sorry, piece or pieces of paper.
13   It -- it may have been two-sided, I -- I frankly do not
14   recall.  It was not a lengthy document.

15      Q      Okay.  Fair enough.

16          Let's look at tab 19, which will be Exhibit 4.

17          (Exhibit 4 was marked for identification.)

18   BY MR. CABOU:

19      Q      This is a document that's entitled "presumption
20   of non-prosecution."  It lists a bunch of crimes.  It
21   says -- is this the document to which you were referring
22   just now that you were shown?

23      A      If you can just give me a second.  The format
24   of it looks different, so that's why I want to review
25   the content.

Susan Lopez
November 16, 2022

1    Q    Yeah, yeah.

2    A    Thank you.

3    Q    Thank you.  Because we also have seen this

4  document in several different forms, so if this isn't

5  the form you're familiar with, let us know, and we'll

6  try to unearth --

7    A    It is not the form I am familiar with.  How

8  many pages is this document?

9    Q    This document is I believe two or three pages.

10    A    Okay.  Like I said, I don't -- okay.  This

11  is -- I -- I have not seen this document.  There's a --

12  it looks like -- on page 3 it looks like a -- I don't

13  want to say flowchart, but it has an punctation: "If

14  this, then this," and I am not familiar with that.

15    Q    Okay.  We are going to hunt up what I think you

16  were shown, and we'll ask you about that.

17    A    Okay.

18    Q    Okay.

19    A    Thank you.

20    Q    All right.  So for now we can take this down.

21  And I'll note that -- okay.  So you talked about that

22  document; is that right?

23    A    Yes, sir, sorry.

24    Q    Okay.  Can you recall anything else about your

25  discussion regarding that -- that document?

Susan Lopez
November 16, 2022

```
 1      A    No, sir, I don't -- I don't.

 2      Q    Okay.  Were there any other documents that you

 3  discussed in the meeting?

 4      A    I -- I don't believe so.

 5      Q    You don't recall any other letters from Fair &

 6  Just Prosecution?

 7      A    I don't.  That doesn't mean that I'm -- that

 8  I'm correct in this.  I -- I don't -- I don't recall.

 9  And I'm -- I'm sorry for that.

10      Q    There is no need to apologize.  I'm just

11  asking:  To the best of your recollection did you review

12  those documents --

13      A    To the best of my recollection -- to the best

14  of my recollection, there was nothing else from Fair &

15  Just Prosecution.  I could be wrong.  I -- I just don't

16  recall.

17      Q    I understand.

18      A    Thank you.

19      Q    Were there any other documents discussed at the

20  meeting?

21      A    I don't believe so.

22      Q    And just so I'm clear, was Mr. Uthmeier in the

23  room when you went through these documents?

24      A    I believe so.

25      Q    Okay.  What did Mr. Uthmeier say?
```

Susan Lopez
November 16, 2022

1    A    I don't recall what he said.  To be honest

2  Mr. Newman did most of the -- of the talking as I

3  recall, so I -- I don't recall what it was that

4  Mr. Uthmeier was saying.

5    Q    Okay.  At any point in the meeting, did anyone

6  express or share with you the reasons why the Governor

7  was suspending Mr. Warren?

8    A    It -- it was my understanding the Governor was

9  suspending Mr. Warren for his failure to follow the law.

10    Q    Okay.

11    A    In the -- in the greater scheme of things,

12  though, my concern was, Am I going to accept this

13  appointment.

14    Q    Yeah.  I -- I understand, and I want to talk

15  all about that part of the discussion too.  But I sort

16  of want -- I'm trying to do each side of the discussion,

17  so first I'm trying to get to the reasons for the

18  suspension.

19       So generally, an alleged refusal to follow the

20  law.  Specifically you discussed the abortion statement.

21  You discussed the -- a document that may have been one

22  page or may have been two that was not Exhibit 4 that

23  we're trying to find for you.

24    A    Okay.

25    Q    Are there any other specifics about the reasons

Susan Lopez
November 16, 2022

1   for Mr. Warren's suspension that were discussed at the

2   meeting?

3        A    No, sir.

4        Q    Okay.  How long did you say the meeting lasted

5   before Mr. Newman left?

6        A    Mr. Newman didn't leave.

7        Q    Oh, I'm sorry, before Mr. Uthmeier left.

8        A    I believe it was 45 minutes to an hour.

9        Q    Okay.  Let's see if we can show you

10  Exhibit 5 --

11       A    Okay.

12       Q    -- which might be the document you were shown

13  in addition to the FJB letter.

14       A    Okay.  Thank you.

15       Q    Sure.

16            (Exhibit 5 was marked for identification.)

17  BY MR. CABOU:

18       Q    So this is sort of a version of the document

19  that we marked as Exhibit 4.  That one was produced to

20  us by Mr. Keefe.

21       A    Okay.

22       Q    It has a sticky on it that says "Larry's

23  originals."  This is how we got it.

24       A    Would you mind scrolling down?

25       Q    Not at all.  This is a one-page document, and

Susan Lopez
November 16, 2022

1    it at the bottom, I just want -- if it jogs your memory

2    call your attention to the fact that there's a footer on

3    the bottom that notes it came from the SAO 13 SharePoint

4    drive?

5        A    Yes, sir, I see that.

6        Q    Okay.

7        A    So -- so what I -- I thought that it was maybe

8    a one-page document, maybe two.  This looks -- this is

9    the format that I -- that I had seen.

10            And as I said, on page 3 of Exhibit 4, there

11   was a -- there were arrows for the, "if this then this,

12   or if this, then that," and this does not contain that.

13            And so this -- this appears to be the format

14   and appears to be the document that I had reviewed.

15       Q    Got it.  So this document obviously without the

16   yellow sticky note was, to the best of your

17   recollection, the second document you reviewed in your

18   meeting in the conference room with Mr. Newman and

19   Mr. Keefe and Mr. Uthmeier?

20            MR. LEVESQUE:  Object to form.

21       A    Without the -- the blue sticker, the exhibit

22   sticker as well, and I think's is an exhibit sticker at

23   the top.

24       Q    Yes.

25       A    -- without the sticky note -- oh, there's not

Susan Lopez
November 16, 2022

1   one, okay.  So without the -- without the blue exhibit

2   sticker, yes, sir, this -- this -- and also there's

3   something that says Monday August 9th, 2021.  I don't --

4   I don't recall there -- I guess there were dates on

5   there.

6           But this does appear to be the doc- -- the form

7   of the document that I reviewed.

8       Q    Okay.  And you agree with me that even this

9   document at the bottom says, "This presumption may be

10  overcome by significant public safety concerns such as

11  pending felony charges," among other things?

12      A    Yes, sir.  It appears that there is a word

13  that's cut off.

14      Q    Agreed.

15      A    Yes, sir.

16      Q    This is -- this is -- this is what we got.

17      A    No, I get it.  I get it.  Yes, sir, this does,

18  yes.

19      Q    Okay.  Perfect.

20          Okay.  So you discussed a document that looks

21  like this.  You discussed the FJP letter.  What else did

22  you discuss in -- in terms of the reasons for which

23  Mr. Warren was about to be suspended?

24      A    I do not recall specifics.  I do not recall

25  specifics.  I don't recall discussing specific cases.

Susan Lopez
November 16, 2022

1    Q    Did you discuss, like, particular hot button

2  issues?  Like did you discuss the death penalty?

3    A    I don't recall discussing the death penalty at

4  all.

5    Q    A general discussion of abortion-related

6  crimes?

7    A    Other than -- than -- than the -- if -- I'm

8  sorry, FJ- --

9    Q    P as in Paul.

10    A    P.  Other than the FJP letter, no, sir.

11    Q    Okay.  Do you -- and I'm just trying to jog

12  your memory a little bit.

13    A    Okay.

14    Q    But do you recall discussing any other -- the

15  enforcement of any other laws or the prosecution of any

16  other crimes during that meeting?

17    A    We didn't talk about specific cases.  As I said

18  there was -- there was discussion of the office's

19  reputation at that time for not being tough on crime --

20    Q    Go ahead.

21    A    --  so -- and following the law in certain

22  respects.

23    Q    Did you agree with that characterization, that

24  the office you had worked at for a long time wasn't

25  tough on crime?

Susan Lopez
November 16, 2022

1      A     I don't think that the cases that were being

2   prosecuted in the previous five and a half years have

3   been prosecuted as harshly or punished as harshly,

4   partially -- defendants punished as harshly as they

5   previously had been.

6      Q     Okay.  Understanding that it might have been

7   different --

8      A     Uh-huh.

9      Q     -- my question is:  Did you disagree with that

10  approach?

11     A     In some -- in some -- everything of course as

12  I've said is on a case-by-case basis.  In some cases,

13  yes, I did.

14     Q     During that period of time that Mr. Warren was

15  in charge though, there was no case in the office

16  relating to abortion, correct?

17     A     To the best of my knowledge, no.

18     Q     Okay.  I mean, no one has identified one.

19     A     To the best of my knowledge.

20     Q     You're not aware of one?

21     A     No, no, sir, I'm not.

22           MR. LEVESQUE:  Object to the form.

23  BY MR. CABOU:

24     Q     So it -- it certainly isn't that he wasn't

25  being tough on abortion crime because there was never a

Susan Lopez
November 16, 2022

```
 1   case referred to him, correct?
 2        A    I don't know if there were any cases referred
 3   for prosecution.
 4        Q    But to the best of your knowledge, you're not
 5   aware of any?
 6        A    I am not aware of any cases that were
 7   prosecuted.  A referral for prosecution is a -- is a
 8   different -- a different animal so to speak.
 9        Q    Understood.  But you're not aware of either,
10   right?
11        A    I am not aware of either.  But I wasn't in a
12   position that I probably would have made aware.
13        Q    Well, you were, you know, a long-time employee
14   who was in a supervisory role.  If there was a
15   prosecution of an abortion case in the office or a
16   referral of an abortion case to the office, don't you
17   think that would have gotten around to you?
18             MR. LEVESQUE:  Object to the form.
19        A    I'm going to be honest, sir, I don't know.
20        Q    Fair enough.  Same regarding a prosecution or
21   referral for prosecution of a case involving
22   gender-affirming surgery, right?  You're not aware of
23   any of those?
24        A    I'm -- I'm not aware of any.
25        Q    You worked in the office prior to Mr. Warren
```

Susan Lopez
November 16, 2022

1    being elected, and then you worked under Mr. Warren; is

2    that correct?

3        A    Yes, sir.

4        Q    Did you change your personal approach to

5    prosecution according to who the elected State Attorney

6    was?

7        A    My personal approach, no, sir.

8        Q    So were you ever directed to be less tough on

9    crime when Mr. Warren was the State Attorney?

10       A    No, sir.

11       Q    You were in the felony bureau, right?

12       A    Yes, sir.  From 2006.

13       Q    I'm sorry, from 2006 through your -- through

14   the end of your tenure, correct?

15       A    Yes, sir.

16       Q    Are there any particular cases that you can

17   name where you were directed not to be tough on crime by

18   Mr. Warren?

19       A    No, sir.

20       Q    Are there types of cases that you can point to

21   that in your mind illustrate that Mr. Warren wasn't

22   tough on crime?

23            MR. LEVESQUE:  Object to form.

24            THE WITNESS:  May I answer?

25   BY MR. CABOU:

Susan Lopez
November 16, 2022

1    Q    I'm talking about felony cases.  Are there any

2  felony cases that you can point to where you were

3  directed by someone under Mr. Warren's tenure to be less

4  tough on crime?

5         MR. LEVESQUE:  Object to form.

6    A    I -- I -- I don't know, sir, and I don't know

7  any specific case names.

8    Q    Do you know -- are you aware of any direction

9  given to anyone in the felony bureau at any time under

10 Mr. Warren's leadership to be less tough on crime?

11        MR. LEVESQUE:  Object to form.

12   A    I -- I -- I don't know, sir.

13   Q    So, no, you can't think of any, correct?

14   A    Not involving my caseload, no, sir.

15   Q    Okay.  And you're not aware of anyone

16 involving -- you're not aware of any such direction

17 regarding anyone else's caseload either, are you?

18   A    I wouldn't necessarily know about someone

19 else's caseload outside of my own division.

20   Q    Understood.  But you were a long-serving

21 employee, you were a supervisor.  I mean, people -- you

22 certainly talked with people at work about work, right?

23   A    Of course.

24        MR. LEVESQUE:  Object to form.

25 BY MR. CABOU:

Susan Lopez
November 16, 2022

1    Q    You -- you would talk with other ASAs about

2  their cases sometimes, yes?

3    A    Sometimes, yes.

4    Q    Sure.  Just like we all do, right?  We talk

5  about you know, projects we're working on; you might

6  want to pick someone's brain about something, right?

7  That happens?

8    A    Of course.

9    Q    Okay.  And in those conversations no one ever

10  said to you, oh, my God I was told not to be tough on

11  crime?

12    A    No, sir.

13    Q    Okay.  Who was it in your meeting with -- with

14  the Governor's office that first expressed the idea that

15  Mr. Warren was perceived as not being tough on crime?

16    A    I don't recall, sir.  That -- the -- that --

17  that was the general reputation of -- of this office.

18    Q    Okay.  Do you think that reputation was --

19  number 1, do you agree that was the reputation of the

20  office?

21    A    I know what the perception is out there, and I

22  believe that there are facts and cases to back up that

23  perception.

24    Q    Uh-huh.  Can you name one such case?

25    A    I don't know case names.  And I -- and I'm

Susan Lopez
November 16, 2022

```
 1   sorry for that.  I -- I -- there -- there is one case
 2   that -- that was brought up to me not in this office --
 3   I'm sorry, not in that office, not in that meeting, but
 4   a case -- a case involving a trespass.
 5           Well, it wasn't one specific case because it
 6   didn't end up being a case, but one specific crime was
 7   trespass, and I know that you are focusing on felonies,
 8   but that -- that is a perception that our downtown is
 9   becoming quite a disaster.
10           And there are people sleeping everywhere and
11   using the restroom everywhere, and that they are not
12   being arrested even two blocks from our police station
13   because there's an understanding that those individuals
14   will not be prosecuted for trespassing at a business.
15       Q    Okay.  Is it fair to say -- is it fair to say
16   that Mr. Warren ran on a platform of what might be
17   called progressive prosecution?
18           MR. LEVESQUE:  Object to the form.
19       A    Yes, sir.
20       Q    You understand what I mean -- when I use that
21   phrase, right, "progressive prosecution"?
22       A    I -- I understand, but if you could explain to
23   me how you're using it in -- in this context I would
24   appreciate that.
25       Q    Sure.  So in this context let's say -- are you
```

Susan Lopez
November 16, 2022

1   familiar with the term "broken windows policing"?

2       A    No, sir.

3       Q    Okay.  This is -- you might know it by another

4   name, but this is a -- a theory made popular in the Y90s

5   and early 2000s by then New York police commissioner,

6   Bill Blanton, and he published a book and wrote an

7   article called "Broken Windows."

8            And it essentially espoused a theory that by

9   arresting offenders for low level offenses -- in

10  New York they talked about trespassing, and they talked

11  about turnstile jumping and these types of things, that

12  you would -- that if the same people who jumped the

13  turnstiles are the same people committing more violent

14  crimes, and if you arrest the turnstile jumpers, then

15  you'll also be catching these people who would otherwise

16  be or may have already committed violent crimes.

17           Is that something you're familiar with?

18      A    The book or the article?  No, sir.

19      Q    So when you say tough on crime, you mean tough

20  on misdemeanor.  Is that -- is that what you're talking

21  about?

22      A    All crimes.

23           MR. LEVESQUE:  Object to the form.

24  BY MR. CABOU:

25      Q    Do you agree that an office can choose where to

Susan Lopez
November 16, 2022

1  focus its resources and that a prosecutor's office might

2  focus on violent crime as opposed to trespassing?

3      A    It's a prosecutor's office's job to focus on

4  all crimes.

5      Q    Okay.  You -- you don't prosecute all crimes,

6  though, right?

7          MR. LEVESQUE:  Object to the form.

8      A    We evaluate every case on a case-by-case basis,

9  but anything that is in violation of a Florida statute

10  is something that -- that this office can and will

11  prosecutes.

12      Q    Right.  But like the cops don't even catch

13  everyone who is committing a crime, right?

14          MR. LEVESQUE:  Object do form.

15      A    Oh, of course not, but any case that is

16  referred to this office for prosecution we will review

17  on a case-by-case basis, and sometimes we get out of the

18  ordinary crimes, and we will, of course, investigate

19  those and make a filing decision on a case-by-case

20  basis.

21      Q    Are you aware of any case referred to or

22  prosecuted by the State Attorney's Office alleging

23  adultery?

24      A    I am not aware of a case being referred for

25  prosecution to this office involving adultery.  That

Susan Lopez
November 16, 2022

1   does not mean that there has not been one.  I am not

2   aware of one.

3        Q     It would be quite unusual if there were an

4   arrest for adultery, agreed?

5             MR. LEVESQUE:  Object to the form.

6        A     It would be unusual.  However, if it were

7   referred for prosecution to this office by any of the

8   law enforcement agencies, we would -- we would look at

9   it again on a case-by-case basis and evaluate it for --

10  for prosecution.

11            But it has to be referred to us before we can

12  prosecute.  We are not an investigating agency.

13       Q     Understood.  But you're not aware of any

14  adultery cases prosecuted in the office since -- since

15  you've been there, correct?

16       A     I am not aware of any that have been prosecuted

17  or referred for prosecution.

18       Q     Okay.  I assume you -- you would agree there is

19  probably adultery going on in Hillsborough County,

20  right?

21            MR. LEVESQUE:  Object to the form.

22       A     I don't have any personal knowledge of any

23  adultery going on in Hillsborough County.

24       Q     Okay.  Fair enough.

25            You say you would review every case on a

Susan Lopez
November 16, 2022

1    case-by-case basis, correct?

2        A    That is referred to this office for

3    prosecution, yes, sir.

4        Q    And to the best of your knowledge, that's

5    exactly what Mr. Warren did, correct?

6              MR. LEVESQUE:  Object to the form.

7        A    To the best of my knowledge cases were -- were

8    evaluated, but there was the list of presumptive no file

9    cases that would have been then evaluated and not been

10   prosecuted.

11       Q    According to their individual facts, right?

12       A    According to their individual facts or the

13   individual charge.

14       Q    Okay.  So let's go back to the meeting with the

15   Governor's people when you're in the conference room in

16   Tallahassee on August 2nd.

17             You talked about the presumptive no file

18   policy.  You've talked about the FJP letter, and there

19   was a general discussion about a perception that the

20   office under Mr. Warren was not tough on crime.

21             Do I have all that right?

22             MR. LEVESQUE:  Object to form.

23       A    Yes, sir.

24       Q    What else did you discuss is?

25       A    This was a very personal decision for me.

Susan Lopez
November 16, 2022

1     Q     Yeah.  I understand, and I'm not intending to
2  pry into that side of it very much --
3     A     No, I'm -- I'm trying to explain what we
4  discussed.
5     Q     Okay.  Thank you.
6     A     I worked very, very hard to become a judge.  I
7  think anyone who reads the newspaper knows.  I applied
8  four times.  I loved being a judge.  And so the thought
9  of leaving that position was a -- was very scary to me.
10  It was a very big decision.
11          But I saw my accepting of this appointment as a
12  call to serve.  It was a call to serve Hillsborough
13  County, the community where I was born and raised.  It
14  was an agency that I loved and I still love to this day,
15  17 years of my life within this agency, and I was called
16  to serve to lead it.
17          And so that's why this was a very big decision
18  for me, and this is not a decision that I made lightly
19  or quickly.  And so I had to do a lot of thinking
20  myself, and so that was what -- and we discussed -- my
21  path to the bench was also something that came up.
22     Q     Okay.  Did you push back at all on the idea of
23  suspending Mr. Warren?
24     A     No, sir.  That -- that's not what I was there
25  to do.  Anything involving the -- the Governor's

1  decision to suspend was not within my control.  What was

2  in my control was whether or not I was going to accept

3  this appointment to serve.

4      Q    Okay.  I mean, you worked for years under

5  Mr. Warren's leadership, right?

6      A    Yes, sir, I did.

7      Q    And, I mean, you knew him, right?

8      A    I -- I -- I -- I do not know him well.  I

9  presume that he would probably agree to that.  Of course

10  I know him.  I -- I have -- we've worked in the same

11  office building, and I worked for him.  That's it.

12      Q    Did you ever tell him, you know, "You are a

13  terrible boss, terrible leader, and I can't imagine

14  continuing to work under your leadership"?

15          MR. LEVESQUE:  Object to form.

16      A    No, sir.  I would never say that to anyone.

17      Q    Okay.  Did you ever express to him or to any,

18  you know, supervisor in the office that you thought the

19  office under his leadership was ignoring the law?

20          MR. LEVESQUE:  Object to form.

21      A    That's not -- no, sir, that's not anything that

22  was discussed.

23      Q    Okay.  Did you ever express to Mr. Warren or

24  any leadership in the office that Mr. Warren was acting

25  as a law on to himself?

Susan Lopez
November 16, 2022

1        A      A law on to himself?  No -- no, sir.

2        Q      That he was ignoring his duties as the State

3   Attorney?

4        A      I did my job.  That was my job was to perform

5   my job duties.

6        Q      And Mr. Warren never told you not to, right?

7        A      No, I didn't have much interaction with him.

8        Q      You were just going about the business of the

9   office the same under Mr. Warren the same as you had

10  under his predecessor and as you have done very

11  admirably for over a decade, correct?

12       A      For 17 years, yes, sir.

13       Q      Understanding that you had worked very hard to

14  become a judge and that you would have to resign as a

15  judge to take this appointment, did you discuss at any

16  point what would happen if Mr. Warren was reinstated?

17       A      I expressed my desire that if he were to be

18  reinstated, I presumed I would not remain on and that I

19  would leave the office, leave the State Attorney's

20  Office and eventually try to be a judge again if that

21  was where I was called.  If not, if I was called into

22  private practice -- I just don't know.

23       Q      Who's doing the calling here, the Governor?

24       A      The call to service came from the Governor.

25  The call to serve -- well, it didn't call from the

Susan Lopez
November 16, 2022

1    Governor personally.  But the call -- a call to serve is

2    something that I think one feels within one's self.  I

3    have been a community -- a public servant my entire

4    career.

5              I was at the Second District Court of Appeal.

6    I then wanted to continue to serve and be a prosecutor

7    where I intended to be for just a couple of years.

8              I then felt called to stay because I enjoyed

9    what I was doing.  I was keeping our community safe.  It

10   then came time for me to move on.  I was ready to move

11   on.

12             And rather than moving into private practice, I

13   wanted to continue to serve my community as a judge, and

14   that is why I sought appointment.  Again it took me four

15   times.  But I see this as a call to service.  And --

16      Q    A lot of -- a lot of lawyers in private

17   practice are on the call.  Just to be clear, you don't

18   have anything against private practice, right?

19      A    Absolutely not.  Absolutely not.  That -- that

20   being said, private practice oftentimes means more

21   money, but I wanted to continue to serve my community.

22             When you're born and raised somewhere, you have

23   a sense of -- of pride in where you live, and this is an

24   agency as I said that I love.  And so that is why I

25   answered the call to serve, but the call comes --

Susan Lopez
November 16, 2022

1   literally came from Tallahassee, but I do believe that

2   it comes from within one's self.

3       Q    Did you discuss with the Governor or any member

4   of his staff during that meeting whether the Governor

5   would reappoint you to the bench if Mr. Warren is

6   reinstated?

7       A    The Governor's was not a part of the meeting,

8   so I want to make that clear -- I want to make sure that

9   that's clear.  I have not mentioned, he -- he was not

10  part of the meeting.  I'm not even sure he was in the

11  Capitol at the time to be honest with you.

12          But I -- I loved being a judge, and if I -- I

13  would like to seek reappointment if necessary.

14      Q    Okay.  And so my question is did you tell the

15  assembled members of the Governor's staff that in that

16  meeting?

17      A    I -- I don't recall, but I presume that I

18  probably -- that I probably would have.  I mean, as you

19  know this stuff goes through the judicial nominating

20  commission locally and then goes up to Tallahassee.

21      Q    Did they express to you whether there was a

22  likelihood that you would be reappointed if Mr. Warren

23  got his job back?

24      A    No, sir, because we didn't really discuss

25  Mr. Warren getting his job back.

Susan Lopez
November 16, 2022

1      Q     Do you have any discomfort about the fact that

2   several hundred thousand people voted for Mr. Warren to

3   have the job that you have, and no one voted for you?

4           MR. LEVESQUE:  Object to the form.

5      A     As I said, my reason for accepting this

6   appointment was -- it was a call to serve -- a call to

7   serve an agency I love.  The decision between the

8   Governor and his staff on what the suspension was based

9   on really doesn't -- that's not something that has

10  anything to do with me.

11          This suspension happened, and I was the person

12  who was chosen to lead the agency.  I see those as two

13  different things.

14     Q     Understood.  But, I mean, you've served the

15  agency for a very long-time, and you've been clear

16  and -- and I absolutely believe you when you say that

17  you love the agency, but the agency is -- is

18  Constitutionally structured to be headed by an elected

19  official.

20          And my question is:  Given your history with

21  the agency and your love for the agency, do you have any

22  discomfort about the fact that you're in charge, but no

23  one voted for you?

24          MR. LEVESQUE:  Object to form.

25     A     No, sir, I don't.

Susan Lopez
November 16, 2022

```
1      Q     Why not?

2            MR. LEVESQUE:  Object to the form.

3      A     Because I was appointed the Governor following

4  the suspension of my predecessor.

5      Q     Your predecessor was elected twice on a

6  platform to do exactly what he was doing in the office;

7  isn't that right?

8            MR. LEVESQUE:  Object to the form.

9      A     I mean, it -- if -- sure.

10     Q     Okay.  Prior to -- so -- okay.  Continuing to

11 unpack this meeting, was there anything else that was

12 discussed in the meeting before Mr. Uthmeier took his

13 leave?

14     A     I don't recall.  I have given you the -- the --

15 the main subjects that we discussed.

16     Q     Did you discuss sort of where it was in the

17 community that people felt that the office was soft on

18 crime -- where was this coming from?  Do you have any

19 insight into that?

20     A     That was not discussed at the meeting.

21     Q     Just that there was a perception, quote,

22 unquote, in the community that the office was soft on

23 crime?

24     A     No, sir, we did not discuss the sources of

25 that, no.
```

Susan Lopez
November 16, 2022

1      Q     Okay.  Had you met Mr. Keefe before?

2      A     Before August 2nd?  No, sir.

3      Q     Do you recall him saying anything in particular

4  in the meeting?

5      A    I -- I don't recall specifics.  He had once

6  lived in Tampa, and so we discussed that and the firm

7  where he had worked.

8      Q     Anything else that you can remember about what

9  Mr. Keefe said in the meeting?

10     A     No, sir, nothing specific.

11     Q     What about Mr. Uthmeier, anything else that you

12  can remember that he said in the meeting?

13     A     Nothing specific.  I mean, this was -- this was

14  just a very generalized conversation of, Will you accept

15  this appointment.

16     Q     Did you talk at all about any actions you would

17  be suggested to take or expected to take if you -- in

18  the office if you did take the appointment?

19     A     Could you give me an example on -- I need to --

20  I want to make sure that I'm understanding exactly what

21  it is that you're asking me.

22     Q     Sure.  I'm asking if -- if there was any part

23  of the conversation that was in the nature of, "Well, if

24  you did accept the appointment, it would be good if you

25  rescinded the bike stop policy?

Susan Lopez
November 16, 2022

```
 1      A    No.

 2      Q    Or --

 3      A    No.

 4      Q    Okay.

 5      A    No.

 6      Q    Was there any specific case that the office had

 7  handled that was discussed?

 8      A    I don't recall.  I -- I -- I do not believe so,

 9  no, sir.

10      Q    Any specific type of case or -- that

11  contributed to their perception or any perception that

12  the office was soft on crime?

13      A    No, sir, other than the list of presumptive no

14  files that we previously discussed, no, sir.

15      Q    Okay.  You know, I spoke with Sheriff Cronister

16  a few weeks ago in -- in a similar setting.  We -- we

17  got to be together in Tampa.  But -- and he said that

18  he -- that crime's down in Hillsborough County, and he's

19  been very proud of that.

20           You agree with that, right?

21           MR. LEVESQUE:  Object to the form.

22      A    I'm going to be honest, I do not know the

23  statistics.  I know that we have the Hillsborough County

24  Sheriff's Office, the Tampa Police Department as well as

25  several other agencies, and so I -- I do not know the
```

Susan Lopez
November 16, 2022

 1  current statistics.

 2     Q    Okay.  After Mr. -- so -- so can you recall

 3  anything else that was said while the four of you were

 4  together in that conference room that we haven't already

 5  discussed?

 6     A    There was not a time that the four of us were

 7  together.

 8     Q    Okay.  Tell me how the meeting went.  I clearly

 9  do not understand what happened.

10     A    I'll just -- I'll -- I'll just kind of paint

11  it.

12          Mr. Newman came and got me from the -- the law

13  library.  It's a very small room within the general

14  counsel's office.  We walked to a conference room.

15  Mr. Uthmeier came in.  As I said I think, he was there

16  for 45 minutes to an hour.  I don't really recall.  He

17  left.  When he left, Mr. Keefe came in.

18     Q    Got it.  Okay.  So who was in the room when you

19  reviewed the documents that we've discussed?

20     A    Mr. Uthmeier.

21     Q    Okay.  And then do you recall sort of like what

22  happened immediately before Mr. Uthmeier left the room?

23     A    I don't.

24     Q    Is there anything else that you can recall

25  discussing with Mr. Newman, Mr. Uthmeier and yourself?

Susan Lopez
November 16, 2022

 1      A     I -- I don't.  And -- and if there -- if there

 2  was, I -- I apologize, I don't remember.  It -- the --

 3  the focus of the meeting was will you take this

 4  appointment got.

 5      Q     Got it.  Okay.  So -- so -- and now -- now

 6  switching to that sort of half of the discussion --

 7      A     Okay.

 8      Q     What was discussed in terms of why you might or

 9  might not take the appointment?

10      A     Like I said, it was a big leap.  I was very,

11  very happy being a judge.  I was on the bench at that

12  point for seven months and a day I think or about seven

13  months, and I was really happy.  I had reached my career

14  goal to serve on the bench.

15          So out of the blue to be asked to leave that

16  position and walk into the -- to leave this agency under

17  these circumstances was a big deal.

18      Q     Understood.  Okay.  So then Mr. Uthmeier

19  leaves?

20      A     Yes, sir.

21      Q     Mr. Keefe comes in?

22      A     Yes, sir.

23      Q     What did he say?

24      A     He introduced himself.  Like I said, he had

25  lived in Tampa for a little while, and he knew that I

Susan Lopez
November 16, 2022

1   was born and raised there.  I was familiar with the firm

2   where he had worked, and we for want of a better term

3   played the name game for a few minutes and realized that

4   we do know several of the same people.  And that was

5   pretty much it.

6        Q    Did he describe his job for the Governor?

7        A    I believe he gave me a general overview, but

8   I'm going to be honest, I don't really remember the

9   specifics of what he said.

10       Q    Did he say he was the czar?

11       A    No, but that -- that's an interesting title.

12       Q    He's often referred to in the press as the

13  public safety czar, and I just -- I've never met anyone

14  who was a public -- was a czar and I've always wondered

15  if that's he introduced himself?

16       A    He didn't.  I wish he did.  Governor Martinez

17  was the drug czar.  Our -- our mayor who became our

18  Governor was our drug czar, so I have met a czar before,

19  but I don't know Mr. Keefe as a czar.

20       Q    Okay.  Yeah, I -- he didn't introduce himself

21  to me as a czar, and -- although that was a less --

22  maybe less informal circumstance under which we met --

23  than under which you met.

24            Did you and Mr. Keefe discuss the reasons for

25  the suspension?

Susan Lopez
November 16, 2022

```
 1     A     By that point that had -- that had all been --
 2  I don't want to say hashed out or covered but there
 3  was -- there was really not a need because again my
 4  reason for being there was am I going to -- am I going
 5  to say yes.
 6     Q     What else did you and Mr. Keefe discuss, if
 7  anything?
 8     A     Mr. Newman was still there for our
 9  conversation.  I -- I don't recall there being any new
10  topic of conversation.  We were down to the wire, and I
11  needed to make a decision.
12     Q     And was it in the room that you made the
13  decision?
14     A     No, sir.
15     Q     Okay.  How did you leave the meeting?  What was
16  the status of the decision when you left the meeting?
17     A     I still had not made it.  I wanted to have
18  one -- I wanted to have one more conversation with my
19  mom.
20     Q     Understood.  Was Ron DeSantis Lopez discussed
21  at the meeting?
22     A     No, because she didn't have a name yet.  She
23  was a rescue, and I didn't like her previous name, and
24  so she was still nameless for about a week.
25     Q     So when did you name the dog Ron DeSantis?
```

Susan Lopez
November 16, 2022

1      A     I think it was the night of my appointment.  I

2  had some friends and neighbors come over, and she was

3  called baby girl at that point because I didn't like --

4  like I said, I didn't like her previous name, and so I

5  didn't know what to call her.

6           And we just sort of joked that this has been a

7  wild and crazy week, and both she and the Governor had

8  changed my life in a big way.

9      Q     So that's like the night of August 3rd?

10     A     My -- my appointment was August 4th.

11     Q     Yeah.  When you say the night of, I didn't know

12  if that was like the night before or the --

13     A     No, no.  Sorry because -- because nobody knew.

14  No -- nobody knew except for my mom --

15     Q     That makes sense.

16     A     -- until they watched the press conference and

17  so no one knew even to come over, that there was an

18  occasion to come over for until the evening of August

19  4th.

20     Q     Got it.  So it was August 4th that the dog got

21  the name?

22     A     I think so.  It might have been the 5th.  I'm

23  not really sure.

24     Q     Okay.

25     A     He now has a brother named August, so I want to

Susan Lopez
November 16, 2022

```
 1   make sure that they -- you -- that there's two now.  I
 2   rescued another one.
 3       Q    Wow, that's a lot -- that's a lot to handle.
 4       A    Why -- why not -- why not make August a crazier
 5   month, so . . .
 6       Q    Well, I hope that's going okay.
 7       A    They're great.  Thank you.
 8       Q    On a little less happy topic -- or I shouldn't
 9   say less happy, but let's go -- well, forget it.
10            Let's go back to the end of the meeting.  So
11   you leave the meeting.  It's undecided.
12            When is the next time you spoke with anyone in
13   the Governor's office?
14       A    I left -- I left the meeting and remained with
15   Mr. Keefe.  I did not see Mr. Newman again.  I think he
16   missed his 20th anniversary dinner, and so -- or he was
17   running -- he needed to rush out to get out.  So I was
18   with Mr. Keefe.
19            And so I remained with Mr. Keefe, and I gave
20   Mr. Keefe my answer shortly after we left.
21       Q    Did you -- did you and Mr. Keefe leave the
22   conference room together?
23       A    Yes, sir.
24       Q    And did you like, I don't know, go for a drink
25   or a meal or something like that?
```

Susan Lopez
November 16, 2022

```
 1      A     We did.  We did, yeah.

 2      Q     Okay.  Where was that?

 3      A     I -- I don't know the name of it.  It was --

 4 I -- I had a reservation at the DoubleTree Hotel if

 5 you're familiar with Tallahassee, it's on.

 6      Q     I have been to the DoubleTree?

 7      A     Okay.  Okay.  So you know the DoubleTree.

 8 There's a restaurant that's -- that's right there.

 9      Q     Okay.

10      A     And I -- I hadn't had anything to eat that day,

11 and so we went and grabbed a bite to eat.

12      Q     Got it.  And was it at your meeting at the

13 DoubleTree, the name of the restaurant of which I can't

14 remember, that you told him you would accept the job?

15      A     It wasn't at the DoubleTree restaurant.  It was

16 just next door, but yes, sir it was.

17      Q     Okay.

18      A     Like I said, I wanted to have an opportunity

19 to -- to talk to my mom.

20      Q     And you were able to do that by phone I assume?

21      A     Yes, sir.

22      Q     Okay.  Once you did -- did you then discuss --

23 after telling Mr. Keefe -- well, first of all in your

24 meeting with Mr. Keefe at the restaurant, did you

25 discuss any of the reasons for the suspension of
```

Susan Lopez
November 16, 2022

1    Mr. Warren?

2        A     No, sir.

3        Q     And after accepting the post, what did you then

4    discuss about the process by which you would take the

5    job; what was going to happen?

6        A     He told me that I -- that I would learn what

7    would happen, but all I knew at that point -- I believe

8    at that point -- and I -- I think I'm correct in this --

9    I knew that it was going to be Thursday which would be

10   the 4th, and I don't know if I knew the location of the

11   press conference at that point, but I did obviously

12   learn it within 24 hours.

13       Q     Okay.  In between the time that you told

14   Mr. Keefe at the restaurant that you would accept the

15   job and the press conference, did you have contact with

16   any members of the Governor's office?

17       A     I have -- there were text messages and phone

18   calls with Mr. Keefe discussing logistics.  I am -- I do

19   not believe I had a conversation with Mr. Newman at all.

20   I believe I spoke with Mr. Uthmeier on my way to the car

21   to the press conference on August 4th, but my

22   conversations with Mr. Keefe were really just logistics.

23       Q     Okay.  Do you recall what you --

24       A     I'm sorry?

25       Q     I'm sorry.  I didn't mean to cut you off,

Susan Lopez
November 16, 2022

1  ma'am.

2      A    Just where you need to be and what time.

3      Q    Okay.  You mentioned that you had a

4  conversation with Mr. Uthmeier on the way to the car on

5  August 4th.  Do you recall what that conversation was

6  about?

7      A    I think -- I think he just told -- he just

8  wished me luck and wished me well.

9      Q    Okay.  You referred to some text messages.

10  Let's -- let's go to tab 4, which I think will be

11  Exhibit 6.

12          (Exhibit 6 was marked for identification.)

13  BY MR. CABOU:

14      Q    Ma'am, these documents were produced to us by

15  the State Attorney's Office.  I believe these are going

16  to be screenshots that were attached to a text message

17  you sent from your Hotmail account to yourself and

18  Ms. Hindman?

19      A    Yes, sir.

20      Q    Do you recognize this document?

21      A    I do.  And the reason it came from my Hotmail I

22  think is that is the default email when I go to email a

23  photograph or a screenshot from my phone, but that is my

24  personal email address.

25      Q    Great.  Okay.  Let's scroll down.  Okay.  So

Susan Lopez
November 16, 2022

1  these are -- just to make sure I orient myself, the blue

2  bubbles are you, right?

3      A    Yes, sir.

4      Q    Okay.  "Hi, it's Suzy Lopez."  These are your

5  text messages to Larry Keefe, right?

6      A    Yes, sir.

7      Q    Okay.  The blue bubbles are you, and the rest

8  are Mr. Keefe?

9      A    Yes, sir.

10     Q    All right.  Prior to the process where you

11 learned of and then executed the plan to be appointed to

12 Mr. Warren's job, were you in touch regularly with

13 Mr. Keefe?

14     A    I had never met him.

15     Q    Like -- like he was the U.S. Attorney for a

16 while in northern Florida in Tallahassee.  You never met

17 him in that capacity?

18     A    I'm going to be honest, I had never heard of

19 him.

20     Q    Okay.  On August 2nd, you thanked Mr. Keefe,

21 and you said that he was -- you told him, You're my

22 greatest blessing through this."

23     A    Yes, sir.

24     Q    Why did you -- why was he such a great blessing

25 to you?

Susan Lopez
November 16, 2022

1      A    It sounds like you had an opportunity to meet

2  him.  He is a very kind person.  He is a very calm

3  person.  And I was experiencing a lot of emotions as you

4  would imagine, and he was just very supportive of me,

5  encouraged my phone conversation with my mom.  We had

6  had some nice conversations.  I told him that I am an

7  only child and that my father died when I was in high

8  school and that my stepfather died shortly after I

9  graduated from law school.

10          And it was -- I said, you know, I -- he asked

11  about my mom, which was important to me because she was

12  the only other person -- well, besides the --

13  Mr. Uthmeier and, you know the Tallahassee crew, she was

14  the only person who knew what I was going through.

15          So it was nice to just sort of have someone to

16  talk things out with when we went to that -- that

17  restaurant next to the DoubleTree.

18          MR. LEVESQUE:  Mr. Keefe had a similar

19      experience there.

20  BY MR. CABOU:

21      Q    I think, Ms. Lopez, not to make light of the

22  situation, but I think it's fair to say that the

23  circumstances under which I met Mr. Keefe were somewhat

24  less genial than the circumstances under which you had

25  met him.

Susan Lopez
November 16, 2022

1     A    I -- I would imagine.

2     Q    And perhaps if I had the chance to get to know

3  him better, I might have a view closer to your own, and

4  I think that was Mr. Loback was referring to.

5     A    I'm guessing it is.  He was -- he was very

6  wonderful to me, and so I -- I -- I have grown to

7  appreciate his friendship.

8     Q    Okay.  Did you -- you gave remarks at the press

9  conference that the Governor threw, right?

10    A    Yes.

11    Q    Who wrote those remarks?

12    A    There was -- as you can see from the text

13 messages, if you keep scrolling down, there was a draft

14 that was written, and I was not really a fan of it, and

15 so I gave input, and the second draft which is what I

16 read I was able to contribute -- to contribute to.

17    Q    All right.  Let's just scroll down a little bit

18 if we can.

19         All right.  So --

20    A    Those were just -- those were just talking

21 points.

22    Q    Okay.

23    A    And I of course could say what I -- what I felt

24 was appropriate, but that was the -- that was the

25 August 3rd, 1:11.

Susan Lopez
November 16, 2022

1     Q     Okay.  Who orchestrated the press conference to
2  your knowledge?
3     A     I -- I --
4     Q     Who was in charge?
5     A     On a grand scheme, I -- I really don't know.
6  It was at the sheriff's office, but I really have no --
7  I was just told where to be when, and that was pretty
8  much it.
9     Q     Did -- at what, point if ever, did you discuss
10  Mr. Warren's suspension or your appointment with the
11  Governor?
12     A     I never discussed Mr. Warren's suspension with
13  the Governor.  The Governor arrived.  I think the press
14  conference started at 10:00, so we arrived before that,
15  and I was in a room with him, and we had a -- a fairly
16  brief conversation, but the subject of Mr. Warren's
17  suspension never came up.
18          Again this was about my accepting the
19  appointment.
20     Q     Did you express to the Governor any reservation
21  about accepting an appointment to a post that under the
22  Constitution is elected to anyone at any time?
23     A     No, sir.
24     Q     Did you express any reservation about accepting
25  an appointment to a post that is elected to anyone at

Susan Lopez
November 16, 2022

```
 1   any time?
 2       A    I'm sorry, could you -- could you repeat that.
 3       Q    Yeah, sorry.  I understand that you didn't tell
 4   Governor, Hey, it's a -- you know, I'm a little
 5   uncomfortable since this is supposed to be an elected
 6   job.
 7            My question is:  Did you ever tell anyone at
 8   any time that you were uncomfortable with or had
 9   reservations about taking the job to which you had not
10   been elected?
11       A    No, sir.
12       Q    Is that something you ever thought about?
13       A    Have I thought about it?
14       Q    Yeah.
15       A    Yes, sir.  Am I uncomfortable with it?  No,
16   sir.
17       Q    Okay.  Do you plan to run for State Attorney?
18       A    Yes, sir, in 2024 when my term is up.
19       Q    Okay.  Had you planned to run for State
20   Attorney prior to being appointed State Attorney?
21       A    No, sir.
22       Q    Okay.  Have you ever discussed -- with whom
23   have you discussed your plan to run for State Attorney
24   in 2024?
25            MR. LEVESQUE:  Object to form.
```

Susan Lopez
November 16, 2022

```
 1      A    I -- I don't know.  I don't -- I have not filed
 2   paperwork, but I don't think it is a secret.  I've
 3   received -- I've received a lot of support in the -- in
 4   the courthouse when people have congratulated me on the
 5   direction that our office is moving, and they have said
 6   that I hope that I run, and I say that I do intend to
 7   run.
 8      Q    Okay.  Have you received any support or
 9   supportive comments from the Republican party of
10   Florida?
11           MR. LEVESQUE:  Object to the form.
12      A    From members of the Republican party or the
13   Republican party?
14      Q    Both.
15      A    I mean, I have a lot of friends who are
16   Republicans and they have expressed their support, but
17   as far as capital -- capital T, the Republican party,
18   no, sir.
19      Q    Okay.  What about support -- expressions of
20   support for your forthcoming candidacy from any member
21   of the Governor's office?
22      A    No, sir, because I hadn't -- I haven't seen
23   anyone from the Governor's office since I made the
24   decision that I was going to run in '24.
25      Q    Okay.  When did you make the decision that you
```

Susan Lopez
November 16, 2022

1  were going to run in '24?

2      A    It -- it took me a few weeks to have the shock

3  wear off a little bit, so I don't have an exact date.  I

4  don't have an exact date.  It's just something that I

5  have come to.  There is -- there is work to be done, and

6  we're doing very good work right now, and I want that to

7  continue.

8      Q    Have you ever heard of the phrase "incumbency

9  advantage"?

10     A    I -- I haven't.  I can -- I can guess what it

11 is, but I would ask for you to define it.

12     Q    Yeah.  As I'm using, it's the idea that it's

13 easier to run for the office when you already hold the

14 office you're seeking.  Fair?

15     A    Fair.  I -- I'll be honest, I don't know -- and

16 Mr. Warren was elected by -- by beating an incumbent, so

17 I don't know how much truth there is to that now, but

18 I -- I -- I understand what you're saying.

19     Q    Well, Ms. Lopez, if the situation were

20 reversed, okay, if you had run for the office and won

21 and then were suspended from office, among other things

22 for the FJP letter, and Mr. Warren was appointed, and

23 then he said he was going to run for the job you were

24 already elected to do, would you think that was unfair?

25          MR. LEVESQUE:  Object to the form.

Susan Lopez
November 16, 2022

 1       A     I don't know because that's not anything I've

 2   ever -- I've ever thought about, and I haven't been in

 3   that situation, so I -- I don't know what's fair.

 4       Q     Well, you know, what the word means, right?

 5       A     I do.  I do.  I don't -- I don't know what --

 6   what fairness necessarily has to do with anything.  I

 7   probably wouldn't like it, but, you know, I --

 8       Q     I mean, you're like literally in the chair he

 9   was elected to sit in right now?

10             MR. LEVESQUE:  Object to the form.

11   BY MR. CABOU:

12       Q     And you're not the least bit uncomfortable with

13   that?

14       A     I'm doing the job that I was appointed to do,

15   and I'm serving the community.

16       Q     And so was he, right?  He was serving the

17   community, right?  He's -- he's been a lawyer for a

18   long-time, several other jobs, and he -- he lives there

19   too with his wife and his two children, right?

20             MR. LEVESQUE:  Object to the form.

21       A     Yes, sir.  To the best of my knowledge, yes,

22   sir.

23       Q     Okay.  I mean, I'll tell you that Andrew lives

24   in Tampa with his wife and his two girls.

25       A     No, I mean, I -- I know, I have not heard that

Susan Lopez
November 16, 2022

 1  he has moved, but, I mean, I -- I do know he lives in

 2  Tampa, yes, sir of course.

 3      Q    Okay.  And he was serving the community to the

 4  best of his ability up until the point he was suspended

 5  by the Governor, agreed?

 6           MR. LEVESQUE:  Object to the form.

 7      A    Okay, agreed.

 8      Q    Okay.  Since the -- so at the press

 9  conference -- actually, let me stop here.  We've been

10  going about 90 minutes and, I just want to ask if

11  anybody including you, Ms. Lopez, would like to take a

12  break or get some water or use the restroom other

13  anything?

14      A    I guess the question would be do you know how

15  much longer you intend to go?

16      Q    I -- I mean, I certainly intend to go longer.

17  I don't expect us to be -- to be more than, you know,

18  another couple hours, but I -- I'm not certain.

19      A    Oh, a couple of hours?

20      Q    I -- I don't expect to be more than that.  But

21  I think we're at a point where it's sort of a natural

22  transition, and perhaps when we get back I can give you

23  a better --

24      A    I'm good for right now, but if somebody else

25  needs a break, that's fine.

Susan Lopez
November 16, 2022

```
 1      Q    No, I'm happy -- I'm happy to press on, but I
 2   did want to ask --
 3           MR. CABOU:  Anyone else?  Mr. Levesque or
 4      Mr. Wyler?
 5           MR. LEVESQUE:  I'm good.
 6           MR. CABOU:  Okay.  Great.
 7   BY MR. CABOU:
 8      Q    When did you first learn about the gender
 9   statement -- the FJP letter on gender-affirming care?
10      A    I think at the press conference.
11      Q    Okay.  The press conference on August 4th where
12   the Governor announced --
13      A    Yes.
14      Q    -- the suspension?
15      A    Like I said, I don't remember that being
16   discussed on August 2nd in Tallahassee, so my
17   recollection is that that was at the press conference.
18      Q    Okay.  At the press conference the Governor
19   said, "We looked into it, and we compiled a lot of the
20   record, and I can tell you it's been a very, very
21   troubling record, so the prosecutor, State Attorney for
22   this judicial circuit, Andrew Warren, has put himself
23   publicly above the law."
24           Do you recall that being said?
25      A    I don't recall that specifically.  But if --
```

Susan Lopez
November 16, 2022

```
 1   if -- if you say that he said that, then I'm sure that

 2   he did.

 3       Q    Yeah.  Okay.  Do you know the record to which

 4   the Governor was referring?

 5       A    No, sir, I don't.

 6       Q    Okay.  Did -- were you present for Sheriff

 7   Cronister's remarks at the press conference?

 8       A    Yes, sir.  I -- I was present for the whole

 9   thing.  I just didn't remember that specific time.  But,

10   yes, sir, I -- I was present for the whole press

11   conference.

12       Q    Yeah, I'm not faulting you for not remembering

13   a specific line.  I -- I wasn't sure if you had come and

14   gone or, you know, I don't know.

15       A    No, so thank you for the clarification.  I was

16   there the whole time.

17       Q    Okay.  Sheriff Cronister made reference to a

18   case in which the victim was very upset and that the

19   State Attorney's Office under Mr. Warren had not brought

20   charges.

21            Do you recall that discussion?

22       A    I recall that there were several cases that

23   were mentioned.  I don't remember the specifics of that

24   case, though.

25       Q    Okay.  Have you since discussed that case with
```

Susan Lopez
November 16, 2022

```
1   Mr. Cronister?

2       A    I have not.

3       Q    Okay.  My understanding is that -- that case,

4   the defendant was a man named Rodriguez.  Is that a case

5   you're familiar with?

6       A    This is Tampa, we do have a lot of Rodriguezes.

7   If you can just -- I -- I -- I don't know -- I don't

8   know which Rodriguez that was.

9       Q    Okay.  That's okay.

10      A    I don't recall having a conversation about a

11  Mr. Rodriguez -- any Mr. Rodriguez with -- with the

12  sheriff.

13      Q    Okay.  I mean, the sheriff had a number of

14  criticisms at the press conference including of what

15  would have been decisions made by line staff about

16  prosecutors telling detectives certain things and things

17  like that.

18          Have you -- have you had any followup from the

19  sheriff about that case?

20      A    No, sir, not from the sheriff, no, sir.

21      Q    Okay.  My understanding is that the sheriff's

22  characterization of that case was --

23      A    Is this the -- I'm sorry, is this the Rodriguez

24  case that you're talking about?

25      Q    Yes.
```

Susan Lopez
November 16, 2022

1       A    Okay.

2       Q    My understanding is that the sheriff's

3  characterization of that case was not accurate, and in

4  fact neither the victim nor the deputy could identify

5  the shooter.  Does that ring a bell to you?

6            MR. LEVESQUE:  Object to the form.

7       A    I -- I -- I don't know, sir.

8       Q    Okay.  But to the best of your recollection --

9  again I'm not asking you to look at other documents.  I

10 know you are at your computer, but please don't do that,

11 at least not right now.

12           You haven't had any follow-up from the sheriff

13 about that, right?

14      A    No, sir.

15      Q    And no one from your office has said, Okay, we

16 should look at that case again?

17      A    I don't know, sir.

18      Q    Okay.  Since your appointment, have you been in

19 contact with the Governor's office about the progress of

20 the office?

21      A    No, sir.

22      Q    Okay.  Do you know if you or anyone in your

23 office has -- has kept them posted on thing you've done

24 or accomplished in your tenure thus far?

25      A    To the best of my knowledge, no, sir.

Susan Lopez
November 16, 2022

 1      Q     Okay.  Are you still in touch with Mr. Keefe

 2  for any reason?

 3      A     No, sir, I have not seen or spoken with him in

 4  several months.

 5      Q     Okay.  Same with Mr. Newman, I assume?

 6      A     I actually ran into him -- I meant to clarify

 7  this I actually ran into Mr. Newman at -- he was at a

 8  speaking event in late October, so that's the only

 9  person I've seen.

10      Q     Okay.  What was the event?

11      A     He spoke at the Federalist Society -- there was

12  an event at the Tampa Club.

13      Q     Are you -- are you a member of the Federalist

14  Society?

15      A     Yes, sir, maybe three weeks ago.

16      Q     Okay.

17      A     It was a publicized event.

18      Q     And was the subject of Mr. Warren's suspension

19  or your appointment discussed --

20      A     No.

21      Q     -- at any time?

22      A     No, sir.  Wait.  He asked me how I was doing.

23  I mean, to that extent --

24      Q     Yeah, that's fine.

25      A     -- I mean.

Susan Lopez
November 16, 2022

1      Q      Anything beyond pleasantries?

2      A      No, no, just -- just pleasantries, How are you

3  doing that -- that type of thing, but the subject of me

4  did come up because I was talking to him.

5      Q      Okay.  I want to ask you now about tab 17,

6  which will be Exhibit 7.

7             (Exhibit 7 was marked for identification.)

8  BY MR. CABOU:

9      Q      Okay.  Do you recognize Exhibit 7?

10     A      Yes, sir.

11     Q      What is it, please?

12     A      It is a memo that I distributed to the

13  attorneys in my office and the first -- Monday my first

14  week in office.

15     Q      Okay.  Who wrote this?

16     A      I wrote it in conjunction with Mr. Weisman, who

17  is the chief of staff.

18     Q      Okay.  Mr. Weisman was also the chief of staff

19  under Mr. Warren, correct?

20     A      Yes, sir.

21     Q      And he has remained on?

22     A      Yes, sir.

23     Q      I want to talk a little bit about the memo.  It

24  talks about going back to basics, right?  It says it is

25  your intention to get this agency back to basics.

Susan Lopez
November 16, 2022

```
1        A     Yes, sir.

2        Q     What do you mean by that?

3        A     Just back to the fundamentals of prosecuting,

4   that a case comes in -- a case comes in referred for

5   prosecution by a law enforcement agency, and that we

6   will look at every case on an individual basis.  We will

7   not have categories of cases that we will not file.

8              We will look at the facts and apply the laws of

9   the state of Florida and make a filing decision based on

10  that rather hand blanket principles of how we will

11  handle any given case.

12       Q     Are you filing charges on every trespass case

13  now?

14       A     We are looking at the -- we are looking at the

15  facts of every case, but there are arrests that are

16  being made for trespass, and we have people who are

17  currently awaiting trial for trespass, and we are -- we

18  are filing every trespass that the law would dictate

19  that we file.

20       Q     So there are some trespass arrests on which you

21  are not filing cases, correct?

22       A     I would presume because there are some -- some

23  charges that we -- that we -- the law does not dictate

24  that we file because the facts do not meet the elements

25  of the crime.
```

Susan Lopez
November 16, 2022

 1            So if the elements of the crime are met for --

 2   for example, for a trespass case, yes, we are filing

 3   those.

 4        Q    Okay.  What about for driving without a

 5   license, are you filing cases for that?

 6        A    Yes, sir.

 7        Q    Okay.  Are there any driving without license

 8   cases that you are not filing cases on?

 9        A    If the elements of the crime are not met based

10   on the facts as we receive them, then we would not be

11   filing them.  We are looking at everything on a

12   case-by-case basis.

13        Q    And again you have no knowledge or evidence

14   that under Mr. Warren cases were not looked at on a

15   case-by-case basis, correct?

16            MR. LEVESQUE:  Object to the form.

17        A    With regard to driving while license suspended

18   and trespassing, I have not been a part of bureau 2 in

19   the better part of 15 years, and so I do not know the

20   answer to that question.  But we are looking at every

21   case on a case-by-case basis now and filing when

22   appropriate.

23        Q    Did anyone tell you, Oh, my God that's not what

24   happened under Mr. Warren?

25        A    That what's not what happened?

Susan Lopez
November 16, 2022

1            MR. LEVESQUE:  Object to form.

2  BY MR. CABOU:

3     Q     That cases were reviewed on an individual

4  basis.

5     A     I believe that cases were reviewed on an

6  individual basis in many scenarios.  However, they just

7  were not filed upon.

8     Q     Okay.  When you say "no State Attorney has that

9  authority, and we will not violate our legal duty by

10  putting ourselves above the law," what do you mean by

11  that?

12    A     Okay.  I'm just -- I'm reviewing again because

13  I want to read -- to read along with you.

14    Q     Sorry.  I'm -- I'm looking at the last

15  sentence --

16    A     Got it.

17    Q     -- of the -- the last sentence of the first big

18  paragraph that starts with the words "no State Attorney"

19  and ends with "the words the law"?

20    A     I of course agree with that statement.

21    Q     Right.  But what do you mean by that?

22    A     We don't have the authority to change the law

23  or make the law or fit it into a certain category or

24  where we want it to be.  That is not -- that is not our

25  responsibility.  That is not our job.  We do not make

Susan Lopez
November 16, 2022

 1  laws.

 2          Laws come from Tallahassee.  They come from the

 3  legislature, and whether or not we agree with them don't

 4  really matter.  If something is a law -- if it is,

 5  quote, unquote, on the books in the state of Florida, if

 6  someone has violated a Florida statute, committed a

 7  crime, we will prosecute.

 8      Q    Okay.  But not always, right; for example,

 9  there are ABA standards for the prosecution function

10  that are binding in Florida, correct?

11      A    Could you give me a statement, please.

12      Q    A prosecution has to serve the interests of

13  justice, right?

14          MR. LEVESQUE:  Object to the form.

15      A    I -- I -- I -- if you could give me a further

16  example.

17      Q    I'm asking if you're familiar with the ABA

18  standards on the prosecutorial function?

19      A    I'm -- I'm not familiar with what the standards

20  -- what the standards specifically say.  We review on a

21  case-by-case basis, and that is where we get our filing

22  decision.  How we then dispose of the case, think is

23  more of along the lines of what -- what it is that

24  you're asking.

25      Q    That's not what I'm asking.  The ABA standards

Susan Lopez
November 16, 2022

```
 1   for the prosecution function set forth circumstances
 2   under which a case should and shouldn't be filed, not
 3   just pursued.
 4           Are you saying that you're not familiar with
 5   that?
 6      A    I'm familiar with the basic principles, but I
 7   don't know -- I'm not sure which principle it is that
 8   you're that -- you're specifically referring to, and I'm
 9   just asking for an example of a -- if you could just
10   give an example for a case.
11      Q    Well, before --
12           (Crosstalk.)
13      A    We exercise our prosecutorial discretion in the
14   review and prosecution of every case.  We do not have
15   a -- we have -- we do not have a policy or have a
16   blanket policy that we will or will not prosecute
17   certain cases in certain categories.
18      Q    Okay.  My question is:  Are you familiar with
19   the ABA standards for the prosecution function with
20   regard to charging and filing of cases?
21      A    Yes, sir.
22      Q    What are they?
23      A    The state of Florida has -- the prosecuting
24   agency must have a good faith basis in order to file the
25   charge, and we have to have a good faith basis based on
```

Susan Lopez
November 16, 2022

1    the facts and the law as applied.

2           And -- but we also again have prosecutorial

3    discretion when it comes to what it is that we are going

4    to file.  You mentioned in the -- in the interest of --

5    of -- in the interest of justice I believe is the term

6    that you used, we will of course take that into

7    consideration when making a filing decision.

8           However, we -- we do not have a policy to have

9    a -- a blanket group or a -- a group of charges that we

10   will not pursue, that we will not file upon.

11       Q    Okay.  Do you agree with me that a prosecutor

12   is a minister of justice and not simply an advocate?

13       A    Yes, sir.

14       Q    Okay.  Do you agree with me that furthering the

15   interests of justice is a core responsibility of a

16   prosecutor?

17       A    Justice for both the community as well as

18   victims, yes, sir.

19       Q    Okay.  What is it about the office under

20   Mr. Warren that you believe needed to be changed?

21       A    Are you asking me specifically what changes

22   that I have made?

23       Q    Or plan to make or believe need to be made.

24       A    The changes that I have made beginning with

25   this August 8th memo include the fact, as you -- as of

Susan Lopez
November 16, 2022

1  course you know, that any policy regarding, for example,

2  the bike stops -- the bike stops of course, they're a

3  very hot button issue -- the bike stops which

4  specifically when -- when this policy went into place

5  was -- I believe it went into place in 2017, but I -- I

6  could be wrong about that, we are looking at every case

7  on a case-by-case basis.  We don't have a group of

8  crimes.

9        For example, something that would stem from an

10 African American individual riding a bike and a stop

11 resulting from that, and if anything were found from

12 that, the presumption of not filing that case whereas if

13 someone were Asian and riding a bike, and the same --

14 the same crime were to have happened with someone with a

15 different race or ethnicity, the case would be filed.

16       We're looking at everything on an individual

17 basis.  I don't tell the Tampa Police Department or the

18 Hillsborough County Sheriff's Office who to arrest

19 and -- just like they don't tell us who to prosecute.

20       And so any case that's brought to us, referred

21 for prosecution, we are reviewing, and we are doing so

22 on a case-by-case basis without any regard for, Well,

23 we're not going to prosecute this type of crime.

24       We will prosecute anything that is referred to

25 us as long as -- as I've stated, as long as the elements

Susan Lopez
November 16, 2022

1  of that crime are met.  Our attorneys, though, every

2  single day are exercising their prosecutorial discretion

3  in the resolution of cases as well as in the filing of

4  cases.

5           So that is a change that has -- that has been

6  made.

7      Q    Ms. Lopez, you're not suggesting that

8  Mr. Warren had a policy of charging certain defendants

9  and not charging other defendants based on their race,

10 are you?

11          MR. LEVESQUE:  Object to the form.

12     A    My experience was that if a case came in

13 involving a bike stop, and you -- you understand what I

14 mean by a bike stop?  The bike stop is for not having --

15 generally not having a light on a bike at night.

16          There is a Florida statute that requires that

17 to ride a bike at night, you have to have a light.

18 There's a light that goes in the front and a light that

19 goes in the back.  And it is considered -- it is -- it

20 is a violation of a Florida statute not to have that

21 light.

22          So if one is riding a bike at night, midnight,

23 for example, and there's no light, that a stop can be

24 conducted.  If a stop can be conduct- -- if a stop is

25 conducted and that person resists arrest or refuses to

Susan Lopez
November 16, 2022

1  stop or in some way commits a crime, at that point a

2  search is conducted, and, for example, cocaine is found.

3       My understanding and what I saw in practice was

4  that if the person to whom that -- against whom the

5  charges were -- were brought was -- the example I used

6  earlier was Asian, that, yes, that person would be

7  charged.

8     Q    But that if they were black, they wouldn't be

9  charged?

10    A    Yes, sir.

11    Q    And you think Mr. Warren had that as a policy?

12    A    That was -- that was my understanding, yes,

13 sir.

14    Q    That is crazy.

15         MR. LEVESQUE:  Object to form.

16    A    Okay.

17 BY MR. CABOU:

18    Q    And I would like to look at tab 20, which is

19 the bike stop policy, and I want you to take as much

20 time as you need to read this policy and tell me where

21 in the policy it says that he has ever asked anyone to

22 make any decision based on a defendants' race.

23    A    And I'm not saying that this was -- this was

24 in -- this was in a written policy.  I want to make sure

25 that's clear, I want to make sure, that this was not --

Susan Lopez
November 16, 2022

1    not in a written policy.

2        Q    Okay.  So this is the bike stop policy, right?

3    It's been marked as Exhibit 8.

4             (Exhibit 8 was marked for identification.)

5    BY MR. CABOU:

6        Q    Are you familiar with this policy?

7        A    Yes, sir.

8        Q    Okay.  Now, previously you told me that your --

9    your experience is in felonies, and presumably bike

10   stops are not felonies, right?

11       A    Well, so that -- that's where there's a

12   distinction because very often the crime that is -- that

13   rise -- that first arises is a resisting arrest without

14   violence.  That is a misdemeanor.

15            It is -- where I would see it would be in the

16   felony form when -- like the example I just gave cocaine

17   was found.

18       Q    Uh-huh.

19       A    Possession of cocaine is of course a felony, so

20   that --

21       Q    Sure.

22       A    -- that's kind of the distinction that -- that

23   I'm making.

24       Q    Okay.  So this policy which is two pages long

25   explains that the bike stop policy grew out of efforts

Susan Lopez
November 16, 2022

1   to -- to address racial disparities in bike stop cases.

2   Is that a fair summary?

3       A    Yes, sir.

4       Q    Okay.  And that specifically the office under

5   Mr. Warren's leadership had worked with Florida

6   International University's Center for Administration of

7   Justice to look at data involving bike stops, and that

8   the researchers -- and I'm in the second paragraph

9   here -- found that black defendants are overrepresented

10  in the category of arresting resisting arrest without

11  violence, fair?

12      A    Yes, sir.

13      Q    Okay.  The policy then goes on -- if we can go

14  to page 2 -- to describe that, quote, "For any case

15  referred to our office arising out of a stop exclusively

16  for a bicycle or pedestrian violation, there is a

17  presumption that our office will not file charges

18  against the defendant."

19           Did I read that correctly?

20      A    That is what it says, yes, sir.  I had to put

21  on my reading glasses.  It's a little small.

22      Q    No -- no problem.  Thank you for doing that.

23           Is there anywhere in this policy that says that

24  the policy applies differently depending on the race of

25  the defendant?

Susan Lopez
November 16, 2022

1    A    No, sir, there's not.

2    Q    Okay.

3    A    There's not.

4    Q    So you're not saying that the office treated

5    defendants of different races differently, are you?

6    A    I'm saying what I saw in practice.  I never

7    said that that is what came from Mr. Warren.  I'm saying

8    that is what I saw in practice, yes, sir.

9    Q    How many bike stop cases did you handle in

10   practice?

11   A    Very few.  Very few.  Because by the time -- by

12   the time the bike stop came around, I was doing cases

13   that were just of a higher degree of felony than -- than

14   these cases generally produce.

15   Q    Would you say that you had more than one?

16   A    I -- I'm not even sure that I -- I had any.  I

17   know that people in my division had some, and as you

18   mentioned earlier, there are times when people within a

19   division will bounce cases off of each other.

20   Q    And they said that they were, what, charging

21   nonblack defendants, but letting black defendants go?

22   A    Yes, sir.

23   Q    Why were they doing that?

24   A    I don't know.

25   Q    It was flatly contrary to this policy.

Susan Lopez
November 16, 2022

```
 1      A     I don't -- I don't have a response for that.
 2   I'm just telling you what I saw.
 3      Q     And when they said that, did you ever raise
 4   concerns about it with anyone?
 5      A     No, sir.
 6      Q     I mean, they're essentially alleging racial
 7   discrimination in the office, and you're a supervisor.
 8   You didn't bring that to anyone's attention?
 9      A     No, sir.
10      Q     Why?
11      A     These were decisions that were being made at
12   the intake level generally.
13      Q     Okay.  If someone at the intake level told you,
14   like, hey, you know, this Brady thing is for the birds,
15   I'm not going to give Brady evidence to anyone in any
16   case, would you have just dismissed it as no big deal?
17      A     No, sir.
18      Q     So why if you were told of an essentially
19   discriminatory practice by attorneys in intake did you
20   not escalate that for further investigation and review
21   by supervisors, including by Mr. Warren?
22      A     Because I was not the one signing the
23   informations for the most part.  Generally there was a
24   division chief doing that.  I just know that that was a
25   case I heard about, and they were not assigned to me.
```

Susan Lopez
November 16, 2022

1      Q      Okay.  Who were the supervisors that were

2  responsible for that if, in fact, that happened?

3      A      Division chiefs.

4      Q      And who were they?

5      A      I mean, I think there's -- I think there's

6  eight or nine division chiefs, and we all -- and there

7  was also the practice that -- know your judge and that

8  there were judges who would not want a bike stop at all

9  or would not want a bike stop involving someone who was

10  African American.

11      Q      Okay.  And are you saying that if an intake

12  prosecutor who was assigned to a court that had a judge

13  was known for not liking bike stops got such a case,

14  they would just not file it for that reason?

15      A      Yes, sir.

16      Q      Did you ever raise a concern about that with

17  anyone?

18      A      No, sir.  I mean, you have to learn your judge,

19  and if you know that's how your judge feels, then that's

20  how decisions are -- are -- are sometimes made.

21      Q      Okay.  Is the know your judge policy still in

22  effect?

23      A      I -- I -- I don't believe there's ever been a

24  policy about know your judge.  That was just something

25  that --

Susan Lopez
November 16, 2022

1    Q    That was a practice?

2    A    That was -- that was -- it wasn't necessarily

3 even a practice, but if you know how a motion is going

4 to land, then you take that into consideration as

5 looking -- for looking at the case.

6    Q    Okay.  But, I mean, even that is an exercise of

7 prosecutorial discretion, right?  You're not --

8 you're --

9    A    Yes.

10    Q    You're making a decision not to charge a case

11 that's on the books as you said, right?

12    A    It is.  It is.

13    Q    Does that mean -- does that mean that the --

14 if -- if -- if that policy -- does that -- if there is a

15 case right now where the prosecutor knows the judge as

16 you said and decides, Hey, I'm not going to file this

17 case because the judge is going to look disfavorably on

18 it, does that mean that your office has a policy of not

19 enforcing the law and that you should be suspended?

20         MR. LEVESQUE:  Object to the form.

21    A    We don't have -- we have a policy not to have a

22 policy about anything.  We look at everything on a

23 case-by-case basis.

24    Q    You have a policy to have no policy?

25    A    That is something that I learned in judicial

Susan Lopez
November 16, 2022

```
 1   conference.

 2       Q     What is it that you learned?

 3       A     It's always a good idea to have a policy not to

 4   have any policies.  We look at everything on a

 5   case-by-case basis, exercise discretion where necessary.

 6       Q     Do you know that the lack of written policies

 7   has been pointed out as furthering racial disparities in

 8   the criminal justice system and that in fact the ABA

 9   encourages prosecutors' offices to have written policies

10   so cases are adjudicated consistently across various

11   prosecutors?

12             MR. LEVESQUE:  Object to the form.

13       A     No, sir.

14       Q     I mean, do you think it should -- that -- are

15   you saying you don't have a single written policy now?

16       A     I'm sure --

17             MR. LEVESQUE:  Object to the form.

18       A     I'm sure that we do, but with regard to what we

19   are going to prosecute and what we are not going to

20   prosecute, no.  We have no such blanket policies.  We

21   are looking at everything on a case-by-case basis when

22   it is referred for prosecution to this office.

23       Q     Do you have any concerns that as the result of

24   not having written guidance for the prosecutors in your

25   office by which they can exercise their discretion,
```

Susan Lopez
November 16, 2022

1  there will be inconsistent decisions reached by

2  different prosecutors in similarly situated cases?

3      A    They're given guidance all along the way.

4      Q    In what form?

5      A    In the form of very involved and active

6  supervisors.

7      Q    And how do the supervisors know what guidance

8  to give?

9      A    Conversations with -- with the felony bureau

10  chief, the chief assistants, the various other higher up

11  chiefs as well as trainings.

12      Q    Are any of those conversations or trainings

13  reduced to written documents?

14      A    I believe that there are some at the county

15  court level.

16      Q    Like can you think of a --

17      A    Regarding, for example -- like regarding, for

18  example, something like driving while license suspended,

19  I believe that that has been -- that there has been --

20  that there has been a document drafted to aid the -- I

21  call them young attorneys, they're not always young, but

22  the newer attorneys who are assigned to bureau 2 how to

23  prosecute a driving while license suspended case.

24      Q    Okay.  When was that document drafted?

25      A    I'm not sure.

Susan Lopez
November 16, 2022

1      Q      But like since you took office?

2      A      I believe that it -- I believe that it has

3   been -- I don't know if it's been revised, but we have

4   had -- there was a heavy turnover for a time, and so I

5   believe that that has been made available on our

6   training page.

7      Q      Okay.  So that's a policy, right?

8      A      I would consider it more like a document for

9   guidance.  It's not a policy of, "We are going to do

10   this, we are not going to do that.  It provides guidance

11   and then says of course there will be the exercise of

12   prosecutorial discretion as there is in every case when

13   we review on a case-by-case basis, not a blanket, We

14   will not do this, we will not do that.

15      Q      Where in the bike stop policy does it provide a

16   blanket statement that, "We will not prosecute bike stop

17   cases?

18      A      Would you put it up again, please.

19      Q      Oh, yeah, sorry.

20      A      Well, the sentence that you had pointed out,

21   "For any case referred to our office arising out of a

22   stop exclusively for a bicycle or pedestrian violation,

23   there is a presumption that our office will not file

24   charges against the defendant."

25      Q      That's not a blanket policy.

Susan Lopez
November 16, 2022

1      A    It is -- it -- it lends to a presumption.  We

2  don't have a presumption of whether or not something is

3  going to be no filed.  Just like there was the -- the --

4  the list of presumptive no files that we've looked at

5  previously that included trespassing at a business,

6  prostitution, other things like that.  We don't have any

7  presumptions.

8           Something comes in, is referred to our office

9  for prosecution, and we will look at it on a

10  case-by-case basis and make a determination.  There will

11  be no presumption whatsoever that we will not file

12  something.

13     Q    What does the word "presumption" mean?

14     A    I don't want to use the word "assumption," but

15  that there -- it is going to be assumed on the front end

16  that something is going to occur.  However, if that --

17  that -- that thing or event can -- can still occur, but

18  you -- but it is likely that the event will not occur.

19     Q    Would you agree with me that there's a

20  presumption that the State Attorney's Office would not

21  file on an adultery arrest?

22     A    I don't know --

23          MR. LEVESQUE:  Object to the form.

24     A    I don't know because I haven't seen the

25  charging document, and I have -- if there is one, I'm

Susan Lopez
November 16, 2022

1   happy to look at it because I know we talked about

2   adultery a couple hours ago.  However, I have not seen

3   one, and I would need to review that as well as the

4   statute, and we would go from there.

5       Q     Okay.  Ms. Lopez, if someone came in to -- if

6   an officer came in today with a woman who he said he

7   caught having sex with a man who was not her husband and

8   that was the only thing she accused, you're telling me

9   you don't presume that that is a case that wouldn't be

10  filed just as a case of humanity and decency?

11          MR. LEVESQUE:  Object to the form.

12      A     I would have to review it.  I would say in the

13  interest -- in the interest of justice as we talked

14  about, it is something that may not be filed.  However,

15  I'm not going to make a blanket decision that based on

16  those facts, which you've done which is define adultery,

17  that we would not file.

18      Q     But --

19      A     And so I'm not going to make a presumption of

20  anything.

21      Q     But what I'm saying, ma'am, that presumption is

22  innate, isn't it?  We don't prosecute those crimes

23  anymore.  We just don't it.  You can't even think of a

24  case of adultery that's ever been referred in your

25  17 years in the office.

Susan Lopez
November 16, 2022

```
 1            MR. LEVESQUE:  Object to the form.
 2      A     What I said was I am not aware of one.  To the
 3  best of my knowledge, there is not one.  I frankly have
 4  no idea.  However, would we file it?  I don't know.
 5  However, I'm not going to make a statement that we
 6  would -- we would not file it without having the
 7  documentation and the specifics of that incident or of
 8  that event in front of me.
 9      Q     Just to be clear, Mr. Warren's prosecutors
10  under his tenure reviewed every case and reviewed the
11  charging document and reviewed the file, right?
12            MR. LEVESQUE:  Object to form.
13      A     To the best of my knowledge, yes, with regard
14  to -- but -- but remember, as I keep saying, there was
15  this -- there were these presumptive cases that were not
16  going to be filed and statements made that we will not
17  file these if they do come in the office.
18      Q     But, ma'am, what you're saying is it was wrong
19  for him to write this down.
20      A     No, I don't -- I don't -- I don't think that.
21  I mean, saying out loud we're not going to prosecute
22  certain crimes I think does the same thing.
23      Q     He didn't say that.  He said that there's a
24  presumption that we're not going to file under these
25  circumstances, and that if based on the facts and
```

Susan Lopez
November 16, 2022

1  circumstances of the case the public safety needs of the

2  community outweigh the presumption not to file, the

3  charge may be.

4          Then it goes on to say it only applies to these

5  and only applies to these.  This is not a blanket

6  policy.  It's just not.

7          MR. LEVESQUE:  Object to form.

8  BY MR. CABOU:

9      Q    Do you know where the phrase "blanket policy"

10 comes from?

11     A    No, sir.

12     Q    When was the first time you ever heard that

13 phrase used?

14     A    Decades ago.  I -- I -- I frankly don't know.

15 It's just something that's always -- I've always heard.

16     Q    Okay.  Do you presume that your office would

17 not file a case alleging miscegenation?

18     A    I don't know the answer to that.  Again I would

19 have to see where -- what was referred to us by law

20 enforcement, and we would make a decision and go from

21 there.

22     Q    I understand that's the public position, but

23 I'm asking if -- and you're under oath, ma'am, if you

24 would presume as you sit here today, knowing nothing

25 else that if you got a case where the only charge was

Susan Lopez
November 16, 2022

1   miscegenation, that that charge would not be filed?

2       A    And my answer under oath to you, sir, is that I

3   do not know.  I -- it would depend on what was referred

4   to my office for prosecution.

5       Q    So you're not sure whether you would file a

6   case alleging that a black man married a white woman?

7       A    I'm not going to make a presumption about

8   anything.  I frankly don't even know if the law is still

9   on the books to be quite honest with you.

10      Q    Okay.

11      A    We would evaluate something on a case-by-case

12  basis, but we have prosecutorial discretion.  We have

13  prosecutorial discretion in every case, and we can

14  choose to exercise that, but I -- I'm not going to make

15  a -- a presumption about anything.

16           So there is a difference between a presumption

17  of, We will and we will not do this, and the exercise of

18  prosecutorial discretion.  Those are two different

19  things, and that's -- that's the point that I'm trying

20  to make.

21           If the elements of a crime A, B, C are met A,

22  B, C, then -- then we decide we're going to exercise our

23  prosecutorial discretion or do we choose to do this.

24  This will not be a presumption of anything.  I see those

25  like I said as two distinct things.

Susan Lopez
November 16, 2022

```
 1        Q     Okay.  So let's say Sheriff Cronister comes in
 2   with a defendant -- let's say not a defendant.  Let's
 3   say the sheriff says to you in the hallway of the
 4   courthouse, Ms. Lopez, you know, I'm glad you're on
 5   board, we've had some complaints about interracial
 6   marriage, we're going to start arresting people for that
 7   and start sending them to your office, what do you tell
 8   them?
 9        A     I'm not going to tell him how to do his job,
10   and he's not going to tell me how to do mine.
11        Q     What if he says, "Will you prosecute these
12   cases?
13        A     I'm not going to tell him how to do his job,
14   and he's not going to tell me how to do mine.  I will
15   review and then exercise prosecutorial discretion.
16        Q     Okay.  The next day he comes in with a black
17   man, and he says, This man is married to a white woman.
18   I arrested him for miscegenation, here you go.  You
19   don't presume that that's insane?  Ma'am, come on.
20   You're not going to prosecute someone for interracial
21   marriage.  Just say that.
22        A     But presuming something is insane, I mean, you
23   know, you're using some far out examples, and I -- I
24   understand why you're doing it presuming something is
25   insane.  Yes, I think that's insane.
```

Susan Lopez
November 16, 2022

```
1              However -- however, that does not mean that I'm
2    going to have a blanket policy.  I'm going to exercise
3    prosecutorial discretion.  I'm still going to look at
4    that case.  I'm not going to say, Well, this is what the
5    charge is, I'm not going to look at it.
6         Q    Mr. Warren didn't do that either, ma'am.  This
7    policy says very clearly that he looks at every case and
8    the facts and circumstances of the case, right?
9              MR. LEVESQUE:  Object to the form.
10        A    Sir, I am not responsible for the suspension or
11   the reasons behind the suspension, and so I don't know
12   if I'm the right person to be answering these questions
13   that --
14        Q    Well, the Governor refuses to answer my
15   questions, so, you know, you're a reasonable facsimiles
16   for someone who has discussed this with his people.
17             MR. LEVESQUE:  Object to the form.
18        A    I don't even recall talking about bike stop --
19   stops other than hh they exist, that the policy existed.
20   I don't recall going into depth about that, but just
21   because the Governor is -- isn't answering the question
22   doesn't mean that I can.
23        Q    No, but you're sitting in the chair now, and
24   I'm -- and certainly you're uniquely qualified to talk
25   about the policies of the office.
```

Susan Lopez
November 16, 2022

1       A     And I -- I am uniquely qualified, and what I am

2   uniquely qualified to say is that we don't have policies

3   regarding any blanket presumptions -- not to use the

4   word blanket now, any all-encompassing presumptions or

5   any all-encompassing charges.

6             We're looking at everything on a case-by-case

7   basis, and there will not be a -- a statement that we

8   will not file charges against a defendant for what has

9   been referred to as the bike stops.

10      Q     Okay.  You mentioned that there wasn't an

11  in-depth discussion of the bike stop policy between you

12  and members of the Governor's office.

13            What was there an in-depth discussion of in

14  terms of the reasons for suspending Mr. Warren?

15      A     Like I said, I was shown a document from FJP,

16  and as I said, I don't recall that there was any

17  conversation about anything involving transgender youth,

18  and there was the presumption of -- the list of

19  presumptive no files.

20            Trespassing was definitely something that drew

21  my attention.  I was not aware of that, and that was

22  something that drew my ascension.

23      Q     Okay.  So this -- sorry, go ahead.

24      A     So I would say that there was probably a more

25  in-depth discussion about trespassing than there was

Susan Lopez
November 16, 2022

 1   about anything else on that list.

 2       Q    Okay.  What did you discuss about trespassing?

 3       A    The fact that downtown Tampa, for example,

 4   Egor City -- I don't know how familiar you are with

 5   Tampa, but Egor City is just downtown Tampa -- has been

 6   overridden with trespassers and that it has become a

 7   public concern, that there are people in the community

 8   who are very concerned about trespassers.

 9            And because the laws were not being enforced --

10   and my understanding has been -- and it has been further

11   explained since I've taken this position was that the

12   cases were not being prosecuted.

13            And so therefore law enforcement wasn't even --

14   law enforcement wasn't -- wasn't going after the

15   trespassers as -- as much as they probably could, and

16   that it was affecting businesses and that there were

17   burglaries and such.

18            And so when there is a presumptive -- a

19   presumption that a case is not going to be filed that is

20   solely a trespass case at a business which, you know,

21   many of them are, that led to other crimes.

22       Q    With whom did you discuss this since taking the

23   job?

24       A    I have had several conversations with business

25   owners.  I've had conversations with criminal defense

Susan Lopez
November 16, 2022

1   attorneys.  Main -- mainly it's been -- and citizens.  I

2   had -- I went to a community event to talk about

3   trespassing in a specific area in Hillsborough County.

4   I was invited to come and -- and listen and learn from

5   them.

6       Q    Understood.  Okay.  I'd like to take break for

7   about 10 minutes at this point, so it's 12:15 your time,

8   so can we come back at 12:25?

9       A    Okay, sure.  Just for -- and I'm not -- I'm not

10  trying to rush or anything, just for my scheduling

11  purposes, do you know about how -- and again I'm not

12  trying to rush, I'm just --

13      Q    I understand.  I -- I can't tell you that right

14  now, but I can tell you hh during this break, I'm going

15  to review my notes, and I'm going to try and give you an

16  idea when we come back about how much longer we expect

17  it to be, and if at that point, if you need to call

18  someone or whatever, we can certainly give you that

19  time.

20      A    That's -- that's all -- that's the only reason

21  I'm asking so I just want to thank you.

22      Q    Okay.  No problem.

23           THE VIDEOGRAPHER:  The time is 12:15 a.m.

24      We're off video record.

25           (Break taken.)

Susan Lopez
November 16, 2022

```
 1          THE VIDEOGRAPHER:  The time is 12:27 p.m.

 2     we're now back on video record.

 3  BY MR. CABOU:

 4     Q    All right.  I want to go back to Exhibit 7

 5  which is your August 8th memo, I -- if my notes are

 6  correct.  And I want to talk specifically about the

 7  paragraph at the bottom of the page that makes reference

 8  to "a despicable heinous murder that meets the legal

 9  standard for consideration of the death penalty."

10          Do you see that?

11     A    I'm going to -- I'm going -- I'm just going to

12  stop at the top of the paragraph just so -- because it's

13  been a while.

14     Q    Of course.

15     A    You know, not a while but, you know.

16     Q    I totally understand.  You should take as much

17  time as you need to read that paragraph.  I'm going to

18  ask you just about the last paragraph at this point.

19     A    Got it.  Thank you.

20     Q    Okay.

21     A    Thank you.

22     Q    So you mentioned convening the homicide --

23  homicide committee to analyze a murder, correct?

24     A    Yes, sir.

25     Q    Now, that wasn't a new murder, right?  That was
```

Susan Lopez
November 16, 2022

1  a murder that had already been the subject of debate

2  within the office under Mr. Warren, correct?

3      A    Subject for debate.  My understanding was it

4  was -- it had been presented to the homicide committee.

5      Q    Okay.  And had a decision -- prior to your

6  taking over, had a decision been made about whether or

7  not to seek the death penalty in that case?

8      A    My understanding at the time because my --

9  my -- my memo answers "We convened the homicide

10  committee," at the time I did not know a decision had

11  been made before the meeting, and I did learn that a

12  decision had been previously made, and I did change that

13  decision, yes, sir.

14      Q    Okay.  So what was it that caused you to

15  convene the homicide committee to talk about this case?

16  And I'm sorry, I forgot the name of the case, but are

17  you familiar with the name of the case?

18      A    State of Florida versus Matthew Terry.  The

19  penalty phase began this morning.

20      Q    Okay.  So what was it that caused you to

21  convene the homicide committee?

22      A    The 45th day in -- in Florida -- and I

23  understand that you're not in Florida.  In Florida, the

24  state of Florida has on a first degree murder case

25  45 days from the date of arraignment in order to -- to

Susan Lopez
November 16, 2022

1   provide a notice of whether -- if the state does intend

2   to seek the death penalty.

3           And the 45th day was on Friday, August 5th,

4   which was the day after I was sworn in.

5       Q    Okay.  And how was it that this issue of the

6   case and the potential expiration of the time frame in

7   which to notice death sort of got on to your radar in

8   one of the first days you were in office?

9       A    The first day that I was in office, that first

10  afternoon, the administrative chief of major crimes came

11  to me and -- and discussed this with me and said that

12  the 45th day was Friday, the 5th.

13          And so we convened the homicide committee on

14  Friday the 5th at 3:00 p.m.

15      Q    And did the administrative chief tell you that

16  the committee under Mr. Warren's leadership had already

17  considered and decided not to seek death?

18      A    I did not understand that at that point, but

19  like I said, I did find out during the meeting or

20  understand during the meeting that that decision had

21  been made.

22          However, before the meeting was -- was

23  concluded, I did file a notice or the office did intend

24  to file a notice -- excuse me -- file a notice of the

25  state's intent to seek the death penalty against

Susan Lopez
November 16, 2022

1  Matthew Terry.

2      Q    Okay.  Were you at all uneasy about revisiting

3  a decision that had already been made by your colleagues

4  and your predecessor?

5          MR. LEVESQUE:  Object to the form.

6      A    The decision ultimately lies in the hands of

7  the State Attorney, and, no, sir, I was not.  And like I

8  said, it wasn't until the end of the meeting when I saw

9  that presentation and saw everything that Mr. Terry --

10  well, now a jury has found him guilty last night -- did

11  to Ms. Baker, I did not have a problem with that, sir,

12  no, I did not.

13      Q    Okay.  Was the committee comprised of the same

14  members when you convened it as when Mr. Warren convened

15  it to discuss this case?

16      A    Yes, sir.

17      Q    So the only difference was you?  You were at

18  the head instead of Mr. Warren, correct?

19      A    Yes, sir.

20      Q    Okay.  Did you speak to anyone outside of the

21  office of the State Attorney about this case at any time

22  prior to making the decision to seek death?

23      A    No, sir.

24      Q    Okay.  I want to ask about the press release

25  that you put out on this subject.

Susan Lopez
November 16, 2022

```
 1      A     Do you have it -- do you have a copy of that?

 2      Q     Yes, I'm going to show you what will be

 3  Exhibit 9.  It's tab 18.

 4      A     Thank you.

 5            (Exhibit 9 was marked for identification.)

 6  BY MR. CABOU:

 7      Q     Okay.  This is going to be Exhibit 9.  This is

 8  the press release -- is this a press release from your

 9  office dated August 8th on the subject of the

10  Matthew Terry case?

11      A     Yes, sir, it appears to be.

12      Q     It says, among other things -- I want to direct

13  your attention to the second paragraph that starts

14  "State Attorney Lopez explained."

15            Do you see that?

16      A     Yes, sir.

17      Q     Okay.  It says, "State Attorney Lopez explained

18  'every capital murder case must be evaluated on its own

19  facts to determine if a reasonable jury made up of

20  Hillsborough County citizens could unanimously sentence

21  a defendant to death,'" and it goes on from there.

22            Did I read that first sentence correctly?

23      A     Yes, sir.  It goes on to say, "It is the most

24  serious penalty available under Florida law, and I

25  approach this responsibility with humility and a sense
```

Susan Lopez
November 16, 2022

1  of duty to the rule of law.  Defendant Matthew Terry's

2  actions were especially heinous, cruel and atrocious.

3  He was merciless in his brutal killing of Ms. Baker, and

4  given his history of violent behavior, we will ask a

5  jury to sentence him to death."

6      Q    Okay.  In between the time that you convened

7  the homicide committee and the time that you noticed

8  death, did you speak to the victim's family?

9      A    No, sir.

10     Q    Were you aware if the victim's family ever

11 expressed hesitancy about the length of time it would

12 take to adjudicate a death penalty case including the

13 appeals?

14     A    The word that was used as "ambivalent."  The

15 victim's families -- family was ambivalent about the

16 death penalty.

17     Q    Okay.

18          (Crosstalk.)

19     A    I --

20     Q    Who used the word "ambivalent"?

21     A    I don't know if Mr. Diaz used that word himself

22 or if that word came directly from Ms. Baker's father

23 and stepmother.  However, I can tell you I've spent the

24 better part of two and a half weeks -- well, about a

25 week and a half actually, the trial has been going on.

Susan Lopez
November 16, 2022

 1  We had a day off for the storm last week.

 2       I have spent the better part of the week and a

 3  half spending time with them and speaking with them, and

 4  they do support my decision.

 5       Q    You're not suggesting by the sentence at the

 6  beginning of the paragraph that the case wasn't

 7  evaluated on its own facts by Mr. Warren, are you?

 8       A    No, sir, that's -- that's just a general

 9  statement.  That's a general statement.  Every capital

10  murder case must be evaluated on its own facts, and that

11  is -- that is how every first degree murder -- I am not

12  implying, insinuating, anything.  It's just a statement

13  of fact.

14       Q    It's just a statement of fact that happens to

15  parrot the language of why the Governor suspended

16  Mr. Warren allegedly and what's in the order and all

17  this other stuff.

18            MR. LEVESQUE:  Object to the form.

19       A    But that is that's a statement of the law.

20       Q    And its's exactly what Mr. Warren did, right?

21            MR. LEVESQUE:  Object to the form.

22  BY MR. CABOU:

23       Q    He considered this case on its own facts, and

24  he reached a decision, which I understand is different

25  from your own.  But you're not suggesting he did

Susan Lopez
November 16, 2022

1  anything wrong, are you?

2      A    I'm not saying that he did anything wrong.  I'm

3  saying I disagreed with him, and I'm going to leave it

4  up to 12 jurors to make that decision because it is

5  ultimately not the State Attorney who is -- who is the

6  person who, for lack of a better term, who puts the

7  needle in a defendants' arm.  It is 12 citizens of

8  Hillsborough County.

9          In this case because there was a prior violent

10  felony, Mr. Terry was released from prison after having

11  done something strikingly similar in the state of

12  Michigan.  That victim, however, lived, and last night

13  when I spoke with her after the verdict, she does

14  support what -- what has happened.

15          She has a child with him, with Mr. Terry.  He

16  has a prior violent felony, and another aggravating

17  factor is heinous, atrocious and cruel.  And based on

18  all of the facts I reviewed in an 81-slide PowerPoint

19  presentation, everything that Mr. Terry, now has been

20  convicted, did to Ms. Baker that night constitutes

21  heinous, atrocious and cruel.

22          Therefore, because two aggravating factors,

23  aggravating circumstances existed, it shall be up to

24  12 members of our -- of our community to make that

25  determination.  They're in that right now.  The state

Susan Lopez
November 16, 2022

```
1    is -- is -- is putting on its penalty phase, and whether
2    or not the jury decides to -- to sentence Mr. Terry to
3    death is up to them.
4           But it was my decision on whether or not to
5    seek the death penalty, and I chose to do so based on
6    the law and the facts as applied.
7       Q    Okay.  You understand that --
8       A    I didn't.
9       Q    -- Mr. -- Mr. Warren sought the death penalty
10   against other defendants while he was State Attorney,
11   right?
12          MR. LEVESQUE:  Object to the form.
13      A    I do, and I have an example of one that I spoke
14   with next to kin, on the case of State of Florida versus
15   James Hanson.  Mr. Hanson was serving a life sentence.
16      Q    Wait, ma'am.
17      A    And that led --
18      Q    Hold on a second.  Hold on.  I want to use our
19   time wisely.
20          My question was:  Do you understand that
21   Mr. Warren sought death in other cases?
22      A    He did, but he came off of death in the same --
23   in the same administration against Mr. Hanson, and that
24   was against the wishes of the victim's family, so I
25   think that --
```

1          (Crosstalk.)

2     Q    I understand you've now said what you wanted to

3   say, but that wasn't an answer to my question.  Which

4   was yes or no, so let's stick to that, and we'll get

5   everybody out of here faster, okay?

6     A    I understand that, but I want to clarify that,

7   yes, he did seek but he also came off, and the case --

8   the case proceeded to trial.

9     Q    Okay.

10    A    There was a plea before the trial formally

11  began, though.

12    Q    Okay.  So that defendant was convicted and went

13  to prison and is still in prison?

14    A    That defendant entered a plea to life in prison

15  after the opening statement was given.

16    Q    Okay.

17    A    The family just did not want to come off of the

18  death penalty.

19    Q    Ma'am, I understand that you want to make that

20  point, and like there might be a campaign stop in your

21  future where you can make that point.  This isn't where

22  you make your point.  Just answer the questions, okay?

23         MR. LEVESQUE:  Objection.  She's -- she's

24     answering the question.

25         MR. CABOU:  She's answering a question I didn't

Susan Lopez
November 16, 2022

1    ask, and she doesn't get to do that, Counselor.

2    That's not --

3          MR. WYLER:  But, J., you're being way too

4    adversarial here, and you need to dial back.

5          MR. CABOU:  Doug, I take -- I take your

6    suggestion of that, and if I was frustrated just

7    now, I apologize for that.  But like I -- I want to

8    respect Ms. Lopez's time, and she's been -- and I'm

9    trying to do that, but when she gives long answers

10   to questions I didn't ask, it is frustrating.

11         So I apologize, and I will try to keep Doug's

12   suggestion.  Let's just move on.

13         MR. WYLER:  We appreciate it.

14         MR. CABOU:  Yes, sir.  Let's go.

15   BY MR. CABOU:

16   Q    Okay.  We talked about the bike stop policy.

17   You've now repealed that policy, right?

18         MR. LEVESQUE:  Object to the form.

19   A    Yes, sir.

20   Q    Okay.  And you also repealed the prosecutorial

21   discretion memo of August 14th, correct?

22   A    I don't believe I've specifically done that.

23   I -- again that was -- that was a memo that came out

24   during a time when -- right before I left the office,

25   but I don't believe that I've specifically repealed

Susan Lopez
November 16, 2022

```
 1   anything because I encourage prosecutorial discretion.
 2       Q    Okay.  Maybe I'll come at this from the other
 3   end.
 4            What are the policies of Mr. Warren's that you
 5   have repealed?
 6       A    There is the bike -- what's been referred to as
 7   the bike stop policy.
 8       Q    Okay.
 9       A    There was also a list of cases that were the
10   presumpt- --  and I -- again I think it's presumptive no
11   files, what it says across the top of the paper.  I
12   should have paid more attention to the title of it.
13       Q    I think we're talking about --
14       A    The one-page document.
15       Q    -- what -- okay?
16       A    It's the one-page document.
17       Q    The one-page document that I think we've marked
18   as Exhibit 5 to your deposition and that we've reviewed
19   to in this case as the low -- low level offense policy?
20            Let me put it up again just to make sure it's
21   clear.
22       A    I thought it was 4, I thought the first one was
23   4.
24       Q    You may be right.
25            So we're showing you -- this is exhibit --
```

Susan Lopez
November 16, 2022

1   exhibit -- is this Exhibit 5?

2      A    Yes.

3      Q    Okay.  Exhibit 5 is a one-page document with a

4   yellow sticky note on the top says "process description

5   for caseload reduction 2021."

6           This is among the documents that you have

7   repealed, correct?

8      A    I don't believe there's been anything specific

9   referencing this document because again this was not a

10  document that I had previously seen.

11          But regarding the process to -- the -- the

12  caseload reduction of 2021 and the presumption of

13  non-prosecution, we are -- we are proceeding forward and

14  prosecuting those charges specifically within our

15  prosecutorial discretion if -- we will not have a

16  presumption of not filing them.

17     Q    Okay.  Let's look at -- let this will be

18  Exhibit 10.  It will be tab 15.  You might want to refer

19  back to that one, but let's look at Exhibit 10.

20          (Exhibit 10 was marked for identification.)

21  BY MR. CABOU:

22     Q    Okay.  So Exhibit 10 is an email from

23  Ms. Muratti to Mr. Weisman and Ms. Hindman with an

24  update on policies, and it was dated the same day as

25  your memo to the office, August 8th, correct?

Susan Lopez
November 16, 2022

```
1        A     Yes, sir.

2        Q     Okay.  It lists three documents that have been

3   removed from the internal training site as well as from

4   the references within our internal good books.  One is

5   the process description for caseload reduction.  That's

6   the thing we just looked at --

7        A     Yes, sir.

8        Q     -- in Exhibit 5.  Another one is the

9   prosecutorial discretion memo, and the other is the bike

10  stop policy.

11       A     Yes, sir.

12       Q     Okay.  Is this document and the steps it

13  describes specifically just removing these documents

14  from the training drive and the manuals -- is that

15  consistent with your direction as set forth in the

16  August 8th memo you wrote to the office?

17       A     Yes, sir, I just -- I have not previously seen

18  this email, so I apologize for that.  I have not --

19       Q     There is no need to apologize, Ms. Lopez.  I

20  just -- I just want to make sure we're on the same page

21  here.  You're in charge.  I just want to know what --

22  what's gone on in the office?

23       A     Absolutely, but I still encourage prosecutorial

24  discretion at all junctures.

25       Q     Okay.  It's just that the written memo was
```

Susan Lopez
November 16, 2022

1   rescinded and removed from the training site?

2       A    Yes, sir.

3       Q    Okay.

4            MR. LEVESQUE:  Mr. Cabou, is this -- is this a

5       document that's been produced in this litigation?

6            MR. CABOU:  Yes, and it's been marked in

7       Mr. Weisman's deposition.

8            MR. LEVESQUE:  Okay.  Thank you.

9   BY MR. CABOU:

10      Q    Is there anything else that you to the best of

11  your knowledge have -- any other policy that was

12  rescinded or made inactive as the result of your

13  August 8th memo?

14      A    I -- I -- I don't -- I do not believe so.

15      Q    Okay.

16      A    I don't believe so.

17      Q    Can you describe for me, please, who, if

18  anyone, you discussed rescinding these policies with

19  prior to making the decision to do it?

20      A    Mr. Weisman.

21      Q    Okay.  Why did you -- did you tell him why you

22  were rescinding the policies?

23      A    I believe our conversation in total was -- was

24  as I said in the memo, getting back to basics, getting

25  back to we will review what is referred for prosecution.

Susan Lopez
November 16, 2022

1  We will exercise our prosecutorial discretion, and we

2  will file cases accordingly.

3     Q    Okay.  Anyone other than Mr. Weisman that you

4  discussed it with?

5     A    I do not recall.  I do not believe so.

6     Q    Okay.  I'm going to ask that we mark as

7  Exhibit 11, tab 8.

8          (Exhibit 11 was marked for identification.)

9  BY MR. CABOU:

10    Q    While we're doing that, I'm going to ask you:

11 Do you know Bill Gladson?

12    A    I do not believe that I have ever met him,

13 I -- I don't remember -- to be honest, I don't remember

14 what circuit he is in, but I believe he is the State

15 Attorney in --

16    Q    Yeah, he's in the Fifth Circuit is what I

17 understand.

18    A    I was going to guess 5, but I -- I wasn't sure.

19 I had a meeting recently and had the -- had the

20 opportunity to meet many of my colleagues.  He was not

21 there, so I have not had an opportunity to meet him.

22    Q    Got it.  Okay.  I'm going to -- this has been

23 marked as Exhibit 11.  This document was produced in

24 response to a public records request, the request to us

25 to Mr. Gladson's office.

Susan Lopez
November 16, 2022

1        And I understand you have likely not seen this

2  before.

3     A     I have not.

4     Q     But this is an email that went to all the

5  attorneys in the Fifth Circuit that announces that they

6  have decided to make temporary changes to cases that

7  qualify for felony pretrial intervention.  These cases

8  will be -- changes will be in effect until further

9  notice.  It is intended to relieve some of the backlog

10  of cases and that the list is being provided to the

11  public defender's case so they can look for cases that

12  can be moved to pretrial intervention.

13        Again I'm not asking you to -- to tell me that

14  this is true or false or anything like that, but if as

15  this email says Mr. Gladson's office has expanded the

16  scope of felony pretrial intervention, do you think that

17  that is not back to basics?

18     A     Well, I would note that this email is dated

19  August 4th of 2020.

20     Q     Uh-huh.

21     A     At that point, I know in Hillsborough County

22  and I'm going to presume in -- in the Ocala area they

23  were not having in person court because I know that we

24  were not.  We dealt with a huge backlog of cases.  We

25  were not -- we did no go back to trying cases until the

Susan Lopez
November 16, 2022

1   third week of October of 2020.

2           So I believe that this is a different situation

3   in that this is as a result of the pandemic and backlogs

4   that would -- that would have been created during the

5   pandemic, and of course he does state that in the second

6   line.  And so he was -- I guess he wanted to expand PTI.

7       Q    So you don't have any problem with -- and you

8   don't think it's contrary to your view of what a State

9   Attorney's Office should do, Mr. Gladson implementing a

10  policy of presumptive non-prosecution for felony cases

11  because of a pandemic?

12      A    Well, PTI -- well, a program that is offered

13  and run by the State Attorney's Office is ultimately

14  governed by the Department of Corrections, and in order

15  to be eligible for PTI, for example, one must not have a

16  charge under 316, which is the traffic statute.

17          So a fleeing to elude in any scenario, pandemic

18  or not, cannot go into PTI.  This is a case -- and one

19  cannot do PTI more than once, so I would actually be

20  interested to see how this actually went into play.

21          And again I'm just now seeing this for the

22  first time, but a fleeing to elude will never go in, and

23  a second degree felony would never go in.  It would have

24  to be reduced to a third degree felony.

25          There also has to be -- if there is a victim

Susan Lopez
November 16, 2022

1  involved, there has to be victim agreement.  The victim

2  has to agree.  So I -- I would be interested to see what

3  kind of cases wouldn't have been offered PTI, would have

4  been offered a withhold and supervision, that would

5  still be eligible.

6           And fleeing to elude, of course you can't get a

7  withhold on that anyway because it's a statutory

8  adjudication, so I'm sorry that answer was very long, BT

9  I don't understand -- understand how exactly this would

10 come into play.

11          If you have an example, that would be great.

12     Q    Yeah.  I'm not an expert in -- in this policy

13 either, but I guess my question for you is:  He's

14 announcing a policy that some cases are not going to be

15 prosecuted, and they're instead going to be referred to

16 PTI and why isn't that inconsistent with the presumption

17 that you just announced --

18          MR. LEVESQUE:  Object to form.

19     A    Do you have the -- the -- the attachments?

20     Q    I believe I do, yeah.  Let's go down.

21     A    Because -- but PTI does not mean that a case is

22 prosecuted.  A case is prosecuted.  If someone

23 successfully completes PTI, then pursuant to the

24 provisions of the contract that they -- that they enter

25 into with the state of Florida and the department of

Susan Lopez
November 16, 2022

1  corrections --

2      Q    Uh-huh.

3      A    -- the case will be dismissed.  It is not a

4  non-prosecution.

5      Q    It's an agreement by which a case doesn't go to

6  trial, there's not a sentence, and the defendant's

7  charges are dropped, correct?

8           MR. LEVESQUE:  Object to the form.

9      A    So here he has third degree fleeing to an

10  elude.  That -- I don't -- I don't know how that would

11  be done.  Driving -- 316 -- these are -- the first two

12  are 316 cases.

13          Grand theft is a -- is a PTI eligible case.

14  Third degree burglary is a PTI eligible case.  Resisting

15  with violence, battery on a law enforcement officer, all

16  of these would -- would -- are ordinarily eligible for

17  PTI because they are third degree felonies.

18      Q    Okay.  So these are all felonies --

19      A    I'm not sure -- I'm not sure how this would be

20  an exception with the exception of the third degree

21  fleeing to elude and DW- -- well, that's because of the

22  statute 316 that they fall under, but all of these other

23  charges are eligible for PTI pre-pandemic, during the

24  pandemic and post-pandemic.

25      Q    Okay.  Do you know Sheriff Lemma in Seminole

Susan Lopez
November 16, 2022

1   County?

2        A     No, sir.

3        Q     Okay.  Have you ever heard of him?

4        A     No, sir.

5        Q     Okay.  Do you know Sheriff Cronister?

6        A     Yes, sir.

7        Q     Sheriff Cronister told us under oath all about

8   a program he has in Hillsborough County where someone

9   can come to a sheriff substation with a kilo of fentanyl

10  and turn it in, no questions asked, no arrest made, no

11  case prosecuted as long as they say they're addicted and

12  seeking treatment.

13             Are you aware of that program?

14             MR. LEVESQUE:  Object to the form.

15       A     No, sir.  I'm only aware of programs or charges

16  if -- programs or -- or cases if they're referred to

17  this office for prosecution.

18       Q     Okay.  I mean, that -- that case was the

19  subject of like numerous -- that program was the subject

20  of numerous reports and TV stories.  I'm just wondering

21  if you -- if you happen to see them.

22       A     Mr. Cabou, I don't want the news very much

23  anymore.

24       Q     You and I have that in common, Ms. Lopez.  I

25  understand, but some people do, so I was just taking a

1  shot in the dark there.

2      A     Yeah.  No, sir, I'm not aware of that, and

3  unless and until a defendant has a CRA or arrive in this

4  office, we would not be aware of -- of anything like

5  that.

6      Q     Okay.  If Mr. -- if Mr. Cronister told the

7  truth and that program exists, do you think that program

8  is a -- is a violation of his Constitutional obligations

9  and subjects him to suspension under the same principles

10  that applied to Mr. Warren?

11          MR. LEVESQUE:  Object to the form.

12      A     That is up to -- up to Sheriff Cronister's

13  discretion who he chooses to arrest or not arrest, but

14  again that -- that doesn't have anything to do with me

15  or my office.

16          If someone shows up at the sheriff's office

17  with a kilo of cocaine and does not meet the criteria

18  you have enumerated that Sheriff Cronister gave you

19  under oath, then I believe that the sheriff will arrest

20  him, and he will be brought to this office and face a

21  25-year mandatory minimum for trafficking in fentanyl.

22      Q     Or cocaine or whatever the substance might be.

23      A     Oh, I thought said fentanyl.  I'm sorry.

24      Q     To be fair, I did, but then you said cocaine so

25  I was just trying to --

Susan Lopez
November 16, 2022

 1      A    Oh, okay.  Sorry.  Sorry.

 2      Q    -- to be clear I thought?

 3      A    Sorry, sorry.  Fentanyl or cocaine.  It would

 4  be a 15-year mandatory for cocaine.  I'm sorry, 25 for

 5  fentanyl.

 6      Q    Okay.  Okay.  Ms. Lopez, I want to ask you

 7  about a document that we have been provided and that I'm

 8  sure you've -- you've seen before.  This is tab 1 which

 9  will be Exhibit 12.

10          (Exhibit 12 was marked for identification.)

11  BY MR. CABOU:

12      Q    This is a memo I'm sure you've seen who was

13  then written by Jill Hamel, who was then the chief of

14  felony Division D, and it's about -- it's about you.

15      A    Yes, sir.

16      Q    And it's been wildly reported?

17      A    Yes, sir.

18      Q    All right.  What's the story from your

19  perspective about this memo?

20      A    I did not become aware that the memo existed

21  until a little over a month ago.  I'm happy to address

22  any paragraph that you would choose to ask about.

23      Q    Well, yeah.  Understood, and I understand

24  that -- you know, that you have your own perspective on

25  the allegations in here.  You may have answered it --

Susan Lopez
November 16, 2022

1   really sort of the threshold question which was did you

2   see this memo while you were in the State Attorney's

3   Office prior to -- to taking over?

4       A    No, sir, I did not see it until -- I believe it

5   was sometime in October.  I could be wrong, it may have

6   been late September.  I don't -- I don't recall.

7       Q    Do you recall Ms. Hamel ever sharing with you

8   any reservations about your job performance?

9       A    She -- she had concerns about things, and I had

10  answers, but I was not afforded the opportunity to -- to

11  circle back with her about them, but I've -- I have

12  addressed them.  With --

13      Q    Okay.  Is it fair to say that you disagreed

14  with her assessment of your job performance?

15      A    Yes, sir.

16      Q    Do you know why she had the view she had about

17  her job -- your job performance?

18      A    I don't know because as I said, I disagree with

19  them.

20      Q    Okay.  And -- and -- I'm -- I'm not sure I

21  heard you correctly, but did you ever discuss her views

22  about your job performance with her?

23      A    With her directly, no, sir.

24      Q    Did you discuss them with anyone?

25      A    Yes, sir.

Susan Lopez
November 16, 2022

1    Q    With whom?

2    A    I discussed them with Kim Hindman after the

3  June 29th, 2018 meeting, and I'm looking at this

4  document to get the exact date.  I was -- was in the

5  middle of trying a RICO case and preparing it for trial

6  after my co-counsel had been removed from the

7  prosecution of that case.

8         And so there were a number of different issues

9  that I had, but I was not given an opportunity to

10  respond to her, so instead I responded to Ms. Hindman.

11    Q    And what did you tell Ms. Hindman?

12    A    That I disagreed with every -- I mean, again

13  I -- I know -- I know that you don't want me to answer

14  questions too -- too -- be too lengthy.

15         But I -- for example, I was not trying cases

16  with ASAs because I was in the -- preparing for a

17  racketeering trial that lasted for three weeks right

18  after the removal of my co-counsel who was the first

19  chair on the case.  A judge removed him.

20         And so I was balancing my work in Division D as

21  well as in the drug division where I had been previously

22  assigned.

23    Q    Okay.  Good enough.  We can take that down.

24         Ma'am, are you aware that since the -- this

25  litigation that we're here today about began, the

Susan Lopez
November 16, 2022

1  Governor's office has made several official requests to

2  your office?

3      A    For?

4      Q    For documents and information and things like

5  that.

6      A    I -- I -- I presume that they have.  I don't

7  know the specifics of them, but I -- I -- I believe I

8  have heard that -- that things have been requested.

9      Q    Okay.  So that was sort of my next question.

10  What was your involvement, if any, in the request from

11  the Governor's office?

12      A    I really don't have much involvement in any of

13  that.  I'm running the office every day.

14      Q    Okay.  Among other things, the Governor's

15  office asked for the physical custody of the phone and

16  laptop used by Mr. Warren while he was State Attorney,

17  correct?

18      A    Yes, sir, I understand that -- that that

19  happened.

20      Q    Okay.  Are you -- were you -- were you involved

21  in that process and decision to give them those

22  documents -- those devices?

23      A    No, sir.

24      Q    Okay.  How did you learn that they had made

25  that request?

Susan Lopez
November 16, 2022

```
 1      A    I learned from Mr. Weisman, and I was also made

 2  aware by the chief investigator.

 3      Q    Who is the chief investigator?

 4      A    Greg Holder.

 5      Q    Okay.  Let's take a look at tab 14, which will

 6  be Exhibit 13.

 7           (Exhibit 13 was marked for identification.)

 8           MR. CABOU:  Can we scroll to the bottom?

 9  BY MR. CABOU:

10      Q    Okay.  The documents we received -- this was

11  received from your office.  There's nothing at the

12  bottom.  There's no date or Bates stamp or anything, but

13  let's go back to the top.

14      A    What -- if I may just ask:  What is that at the

15  bottom that says Lopez with some numbers?

16      Q    So we attached, sorry -- I can't see that on my

17  screen for some reason.

18      A    It says LOPEZ000377.

19      Q    Those are your -- oh, those are your

20  Bates stamps, sorry.

21      A    Oh, okay.  Okay.

22      Q    I think those are your Bates stamps.  I would

23  have to check my notes.  Some documents were produced to

24  us without Bates stamps, and some had Bates stamps.

25           But in any event, this document came from you.
```

Susan Lopez
November 16, 2022

```
 1  Whether it was stamped or not, I cannot recall right

 2  now.

 3      A    Okay.

 4      Q    My question is:  What is this?

 5      A    It appears to me that there was -- that there

 6  was some sort of a search between the Governor's office

 7  and my email address for those key words, and nothing

 8  was found, and I'm just basing -- I'm not familiar with

 9  this document.  I'm just basing that --

10      Q    Okay.  I'm not familiar with it anymore than

11  you are.

12      A    Yeah.

13      Q    I just thought you might know.

14      A    I -- I don't, and I don't believe that there's

15  been any communication via email between the governor's

16  office and me anyway, so this doesn't come as a

17  surprise.

18      Q    Okay.  When did you first learn that Mr. Warren

19  was bringing legal action against the Governor?

20      A    To be honest, I don't -- I don't know.  I -- I

21  believe it was in August, but I really don't know.

22      Q    Okay.

23      A    My focus has just been on the office, and like

24  I said, I don't watch the news either.

25      Q    Okay.  Were you contacted any -- at any point
```

Susan Lopez
November 16, 2022

1   about the litigation by members of the Governor's

2   office?

3      A    No, sir.  I -- like I said, I haven't spoken

4   with anyone from the Governor's office -- with the

5   exception of running into Mr. Newman last month, I

6   haven't spoken with anybody in the Governor's office in

7   quite some time.

8      Q    Mr. Weisman has been in touch with the

9   Governor's counsel in this case and had drinks with him

10  the weekend before the preliminary injunction in this

11  matter.  Did you know that?

12     A    I know that he went to Tallahassee, yes, sir.

13     Q    Why did he go?

14     A    You would have to ask him that.

15     Q    I did ask him that, but I -- I'm curious as to

16  whether he said, Hey, I'm going, do you mind since he

17  was going to miss a day of work?

18          MR. LEVESQUE:  Object to the form.

19     A    He did, and I said, That's fine.

20     Q    Okay.  Did he report back to you on what

21  happened in Tallahassee?

22     A    He -- he called me and gave me a brief

23  overview, and that was pretty much it.

24     Q    Okay.  During the -- sorry to skip around a

25  little bit.

Susan Lopez
November 16, 2022

```
 1              During the press conference on August 4th that
 2    you made remarks at and the Governor spoke at, the
 3    Governor made reference to George Soros.  Do you know
 4    who George Soros is?
 5        A    Yes, sir.
 6        Q    Who is it?
 7        A    My understanding is that George Soros is a
 8    gentleman who is in his I believe 90s by now, and he has
 9    supported for some time, but not in Florida until about
10    2016, races for State Attorney or district attorneys
11    throughout the country.
12        Q    Okay.  And how -- if you're familiar with it,
13    how would you describe his philosophy and the philosophy
14    of the candidates he perhaps supports when it comes to
15    the role of a prosecutor?
16        A    My understanding from what I know of him and
17    the -- and the candidates he supports is that they do
18    tend to be progressive candidates.  They are more
19    liberal candidates, and he essentially pumps a great
20    deal of money into their campaigns.
21        Q    Okay.  Do you know if Mr. Warren has ever
22    received a campaign contribution from Mr. Soros?
23              MR. LEVESQUE:  Object to form.
24        A    I don't know anything about the 2020 election.
25    I had heard in the 2016 election that there was money
```

Susan Lopez
November 16, 2022

 1  from Mr. Soros that went to Mr. Warren's campaign as

 2  well as a couple of other campaigns in the state.

 3      Q    Okay.  So if I told you that Mr. Warren has

 4  never received a campaign contribution from Mr. Soros,

 5  that would be a surprise to you?

 6      A    It -- whatever -- whatever you tell me, I'm

 7  sure is true, so, yeah.

 8      Q    Would that surprise you?

 9      A    It would just -- just because I had heard it

10  from -- from so many different people who I believe that

11  they were -- I just know that his campaign had -- had a

12  lot of money, so I don't --

13      Q    Okay.

14      A    I don't know where it came from.

15      Q    You supported Mr. Warren's opponent in that

16  campaign, right?

17      A    Yes, I did.  He had hired me in 2005, and I had

18  worked for him at the time of that campaign for

19  11 years.

20      Q    Okay.  Have you ever heard the term "woke"?

21      A    Yes.

22      Q    What does it mean?

23      A    To be honest with you, I'm not entirely sure.

24  I think that -- I don't know if it's a term that's been

25  made up by the media, so I -- I know generally what it

Susan Lopez
November 16, 2022

```
 1  is, but if you could -- and again I'm sorry to ask you
 2  to do this again, but if you could provide your
 3  definition, please.
 4       Q    I'm not going to, but not because I don't want
 5  to.  I just want to use our time a little bit
 6  differently.
 7       A    Okay.
 8       Q    So -- so can you tell me what you -- I
 9  understand you're not like an expert in wokeness, but
10  can you tell me to the best of your ability what you
11  understand it to mean?
12       A    I understand it to be -- the opposite of
13  conservative is -- is how -- is kind of what's popping
14  into my head right now.  I don't want to say it's like
15  porn, you know when you see it, but my understanding
16  that -- that it is a -- it is a very -- it's part of
17  the -- of a very maybe federal and progressive movement.
18          And wokeness deals with -- I mean, an example
19  would be -- well, I don't even know what an example
20  would be, to be honest.
21       Q    Would you -- do you think of yourself as woke?
22       A    I think based on my very articulate
23  description, no.
24       Q    Okay.  Do you think of yourself as -- as a
25  progressive prosecutor?
```

Susan Lopez
November 16, 2022

1     A    I'm not a progressive prosecutor.  I'm a -- I'm

2  a fair prosecutor.

3     Q    Okay.  Do you think Mr. Warren was an unfair

4  prosecutor?

5     A    No.  I didn't say that to say that in any way.

6     Q    Do you know what the Governor's views on

7  abortion are?

8     A    No, sir.  You would have to ask him.

9     Q    Okay.  Do you think the -- to the best of your

10 knowledge, I mean, the Governor's got a pretty high

11 profile.  He's -- he's now been twice elected as

12 Mr. Aaron was quick to tell us in a deposition last

13 week.

14      Do you know what the Governor's stance on

15 abortion is?

16     A    I -- I -- I understand that the Governor is

17 pro-life, and that is only based on what -- I have not

18 had a conversation with him about it.  That is what I

19 see on TV.

20     Q    Okay.  Do you know what Mr. Warren's stance on

21 abortion is?

22     A    I've never had a conversation with him about

23 it, and I --

24     Q    I understand, but do you -- from other

25 sources -- understanding you never discussed it with

Susan Lopez
November 16, 2022

```
 1   Mr. Warren -- do you understand that Mr. Warren is
 2   pro-choice?
 3        A    As I was going to say, based on what I
 4   understand and based on the June 24th, 2022, memo, I
 5   will take from that that Mr. Warren is pro-choice.
 6        Q    Okay.  Are you pro-life or pro-choice?
 7        A    I am not really sure what that has to do
 8   with -- with my position to follow the law.  I will
 9   follow the law regardless of my personal beliefs.
10        Q    Okay.  But that wasn't my question.
11        A    And I understand that.  But will I follow the
12   law whether I agree with it or not?  Yes, sir, I will,
13   but those are my -- those are my own personally held
14   beliefs.
15           My personally held beliefs don't necessarily
16   come in the door with me every day at the State
17   Attorney's Office.  The law does.
18        Q    I understand.  But in a case about the
19   Governor's motivation for suspending Mr. Warren, who he
20   sees as woke and who he sees as Soros-backed and who he
21   alleges didn't follow the law and who he alleges was a
22   law on to himself and which is also by your own
23   admission about Mr. Warren's policy on abortion, it's
24   quite relevant what the view on abortion is of his
25   successor.
```

Susan Lopez
November 16, 2022

```
1            MR. LEVESQUE:  Object to the form.

2       A    I mean, I -- I am going to continue to disagree

3  with that.  The laws of the state of Florida are what

4  they are, and I will follow the laws of the state of

5  Florida as -- that they are what they are.  I understand

6  at this point we are at a 15-week limit.  I don't --

7  again I haven't been following very many things, but

8  that is -- that is my understanding, and I will follow

9  the law.

10      Q    To be clear, that's exactly what Mr. Warren

11 said he would do, right?

12           MR. LEVESQUE:  Object to the form.

13      A    I don't know.

14      Q    You don't know what he said he would do about

15 abortion?

16      A    Well, he said that he wouldn't -- my

17 understanding is that one of the things he said is he

18 would not prosecute any provider who performed an

19 abortion.

20      Q    Yeah.  Do you know where he said that?

21      A    I don't recall if that was in the June 24th,

22 but there were -- there were -- again there were blanket

23 policies about things that he would not prosecute and

24 that is my concern.

25      Q    Okay.  But you haven't pointed us to any
```

Susan Lopez
November 16, 2022

1  blanket policy, have you?

2          MR. LEVESQUE:  Object to the form.

3      A    Mr. Cabou, with all -- with all due respect,

4  this is not about whether or not I agree with or support

5  any suspension decision.  This is about me accepting

6  this appointment and being sworn in as the State

7  Attorney on August the 4th.

8      Q    Okay.  Ma'am?

9      A    It's not up to me to decide whether the

10  suspension was right or wrong.  That is what the Court

11  is for.  That is what -- that's is what y'all are being

12  paid for.  That is -- that is up to the Governor and the

13  Governor's legal team.

14          My position is Mr. Warren was suspended, and I

15  accepted the appointment from the Governor to be the

16  State Attorney.

17      Q    Okay.  And you previously during this

18  deposition expressed your disagreement with various

19  things that Mr. Warren did while he was in office.

20  Fair?

21      A    I agreed with some things he did.  I disagreed

22  with some things he did.

23      Q    I understand you didn't disagree with

24  everything.  I'm just saying like, for example, you

25  disagreed with the bike stop policy, and as a result you

Susan Lopez
November 16, 2022

1  rescinded it, correct?

2      A    Correct.

3      Q    Ok so Mr. Warren is pro-choice.  The Governor

4  is pro-life.  Are you pro-choice or pro-life?

5          MR. LEVESQUE:  Object to the form.

6      A    I don't think the question is relevant.

7  However, within the bound of the law as it states --

8  stands right now, if a woman chooses to have -- to have

9  an abortion, I believe that that -- up until that

10  15 week -- which I believe that that is where the law

11  stands.  If I am incorrect on that, please tell me that

12  I am incorrect.  You're shaking your head?

13      Q    I -- I -- I believe you are -- you are correct.

14  I do not believe you are incorrect.

15      A    Okay.

16      Q    And I'm not asking you about the state of the

17  law.  I'm asking if you're pro-life or pro-choice?

18      A    I -- I mean, I believe that Dobbs, when it was

19  handed down, returned the decision back to the states,

20  which I believe is correct.  I do not agree with the

21  assertion that there is a Constitutional right to

22  abortion because I don't believe that there is one.

23          I don't believe that that is what -- that that

24  is what the Supreme Court said, but in the state of

25  Florida, the law is right now up to 15 weeks, a woman

Susan Lopez
November 16, 2022

1  can have an abortion, and if she so chooses, that is

2  what the law states that is allowed, and therefore,

3  based on the fact that that is the law, I would support

4  that.

5      Q    Ms. Lopez, I'm only going to ask you this one

6  more time because I don't want to waste any more time,

7  but you haven't answered my question.  I'm going to ask

8  it very specifically and deliberately, and then if you

9  don't answer, Im' going to assume you are refusing to

10 answer, and we'll evaluate what to do after that.  Okay?

11     A    Okay.

12     Q    Are you pro-life or pro-choice?

13          MR. LEVESQUE:  Object to the form.

14     A    I am pro-choice within the bound of the law.

15 If it were up to me personally, if I were in that

16 situation, I am pro-life.  However, I've given you my

17 answer.

18     Q    Okay.  I'm not sure that you have, but I

19 appreciate that you've tried, and we will move on.

20          I'm sorry, my phone is ringing here.

21          I know that earlier in the deposition we marked

22 some text messages.  I would like to go back to that

23 briefly because I -- I got distracted.

24          MR. CABOU:  Do we know what exhibit the text

25     messages were?

Susan Lopez
November 16, 2022

```
 1           MS. CASSELMAN:  I think it's Exhibit 6.

 2           MR. CABOU:  Okay.  Can we look at Exhibit 6,

 3      please.  Thanks, Margo.

 4  BY MR. CABOU:

 5      Q    All right.  So I want to specifically direct

 6  our attention to like August 5th which will be the day

 7  after the -- the press conference.

 8      A    I don't see an August 5th text message.

 9      Q    Yeah, I don't either.  My -- my notes are a

10  little bit confused on this.  Oh, I get it.  Okay.

11           There's another batch of text messages that we

12  have not yet marked, which are going to be Exhibit 14.

13  Can we mark that?

14           (Exhibit 14 was marked for identification.)

15           MR. CABOU:  Okay.  If we can scroll down to

16      about August 5th.  These are sort of out of order.

17  BY MR. CABOU:

18      Q    Well, first let me ask you this.  Let's just go

19  through these.  They're not very long.

20           These are texts between you on the right in the

21  green bubbles and others on the left.

22      A    Yes.

23      Q    Who's Lindsey Garcia?

24      A    Lindsey and Brian both work in the Governor's

25  communication team, and they were here, and I went to an
```

Susan Lopez
November 16, 2022

1  event at the TPepin Hospitality Center, and the Governor

2  was there along with General Moody and others, and I

3  didn't know if they were going to be there, and they had

4  been very kind to me, and so I wanted to say hi.

5      Q    Got it.  Okay.  Let's keep going down.

6      A    I'm sorry, these are out of order.

7      Q    No, it could be mine are as well, and maybe it

8  is I owe you an apology.

9      A    Oh, I sent it again.  I -- I don't.

10     Q    All right.  Sorry, go ahead, ma'am.

11     A    I remember looking them up, and I -- did I have

12 any other text messages besides this one with them?  I

13 don't think I did.

14     Q    Okay.

15     A    But I could be wrong.

16     Q    Just to be clear, I mean, I think this is all

17 we got with them, but --

18     A    Yeah.  So I think -- I think I typed in their

19 names, and that's how I went looking for text messages,

20 and I didn't have anything individual to him or

21 individual to her.  I just had this one to the two of

22 them.

23          And so I don't think that there were -- that

24 there were any others.

25     Q    Okay.  Mr. Griffin says they're hearing great

Susan Lopez
November 16, 2022

1  things.  Do you know who he's hearing them from?

2      A    No, sir.

3      Q    Do you know what he's referring to?

4      A    I -- I -- I don't know who he would have heard

5  things from.

6      Q    Okay.  Okay.  I recall reviewing a text that

7  talks about you being on your way to a breakfast meaning

8  with Candace.  Who's Candace?

9      A    Candace is a friend of mine who used to work

10 here and now works at the U.S. Attorney's Office, and I

11 know what text you're referring to, and the reason that

12 I mentioned her is because Larry Keefe used to work with

13 her dad.

14     Q    Yeah, that -- I -- that -- you did text with

15 Mr. Keefe about Candace.  I was just wondering who she

16 was.

17     A    He -- it -- I had a feeling that's where you

18 were going.  He used to work with her dad, and so

19 when -- as I mentioned a couple hours ago when I said we

20 played the name game, that was a name, and so he does

21 know who she is.

22     Q    Got it.

23         MR. CABOU:  So I think where I went wrong was

24     that it was on -- it's in tab -- it's in our earlier

25     set of tabs Margo.  Can we look at that?  It was on

Susan Lopez
November 16, 2022

 1     August 11th, not August 5th.

 2   BY MR. CABOU:

 3     Q     All right.  So we're looking at the next

 4   messages with Mr. Keefe right here.  This is what I was

 5   looking for.

 6     A     Yes, sir.

 7     Q     Who is Ms. Rich's father?

 8     A     His name is Martin Garcia.

 9     Q     Who is?

10     A     He is an attorney, and he at one time in the

11   early '90s worked at Jacowitz Ferrier (phonetic), which

12   is where Mr. Keefe worked.

13     Q     Got it.  Has he ever been a candidate for

14   public office?

15     A     To the best of my knowledge, no.

16     Q     And do you know if Candace has ever sought

17   public office or ever been elected to office?

18     A     No, sir.

19     Q     Okay.

20     A     And no, sir, she has not.  I'm sorry, I should

21   have completed that.

22     Q     Yeah, I appreciate -- I appreciate that.  Let's

23   take a five-minute break.  I want to get organized, and

24   I'd like to cut this a little bit shorter than I had

25   earlier anticipated, so let's take five minutes, and

Susan Lopez
November 16, 2022

1  we'll be back at 11:00 -- or, sorry 1:22.

2      A    Thank you.

3      Q    Thank you.

4           THE VIDEOGRAPHER:   The time is 1:17 p.m.  We're

5      off video record.

6           (Break taken.)

7           THE VIDEOGRAPHER:   The time is 1:23 p.m.  We're

8      back on video record.

9  BY MR. CABOU:

10     Q    Okay.  A couple -- couple of -- couple of

11 questions.  Number 1, do you know if Ms. Rich was ever

12 considered as a candidate to replace Mr. Warren after

13 the suspension?

14     A    Oh, I don't know that.

15     Q    Okay.  There's been some -- some -- we've seen

16 some documents in this case suggesting that, quote,

17 Martin's daughter would be great.

18          And I was just wondering if you know if those

19 two are the same people, Ms. Rich and Martin's daughter?

20     A    She is Martin's daughter.  I can say that with

21 certainty.  I don't know -- I have no idea if she was

22 ever considered for this.  I don't.

23     Q    Did -- did you and Ms. Rich ever discuss the

24 suspension or your replacement of Mr. Warren?

25     A     In terms of the suspension, no.  The suspension

Susan Lopez
November 16, 2022

1    is -- like I've said, the suspension is not something

2    that's really been a part of my life.  It's my taking

3    over that's been -- I don't mean to sound self centered,

4    but that's -- that's been my focus.

5         Q    Okay.  Fair enough.  I want to ask you about

6    another policy of the office.  This would be tab --

7    well, it's going to be the very next exhibit is 15 or

8    16.

9              THE COURT REPORTER:  I think it's 15.

10             MR. CABOU:  The next exhibit will be 16 -- 15,

11         sorry, and this is a policy on gun violence unit and

12         prosecution strategies.

13             (Exhibit 15 was marked for identification.)

14   BY MR. CABOU:

15        Q    We discussed it with Mr. Treadwell as

16   Exhibit 10, and it's Exhibit 15 here.  It's dated July

17   7, 2022.  Have you ever seen this document before?

18        A    I do not believe that I have.

19        Q    Okay.  Among other things on the bottom of

20   page 3, top of page 4 -- I'm having trouble seeing.

21        A    I'd lend you my readers if -- if we were in the

22   same room.

23        Q    Yeah.  I'm sure you would, and I appreciate

24   that.

25             All right.  So let's -- let 's start at the

Susan Lopez
November 16, 2022

1    bottom of page 4, sorry.

2         A     Okay.

3         Q     Here we go.

4         A     Okay.

5         Q     Okay.  It says that "where a mandatory minimum

6    sentence is applicable, there is a presumption that the

7    ASA will seek enforcement of that mandatory minimum."

8              Do you agree with that presumption?

9         A     I just -- I'm just double-checking the -- the

10   footnote because there is a footnote referenced.

11        Q     Of course.

12        A     Okay.

13        Q     Have you had a -- a chance to read the sentence

14   and the footnote?

15        A     Yes, sir, finishing up.  Okay.  Yes, sir.

16        Q     Do you agree with -- with the presumption as

17   stated here?

18        A     This -- this is -- this is one presumption

19   that -- that I might agree with you on, Mr. Cabou, that

20   there -- if someone is in actual possession of a firearm

21   under 775, that does carry a three-year mandatory

22   minimum.  Where we most frequently see it is a gun in a

23   waistband.

24        Q     Uh-huh.  Okay.  And this policy was dated July

25   7th, is this policy rescinded or does this policy

Susan Lopez
November 16, 2022

1   continue as of today, as we sit here right now?

2      A    Well, as I said, I don't believe that I've even

3   seen this, but this has to do with our gun violence

4   unit.  As it states earlier in this -- in this memo,

5   those cases are not prosecuted generally in the gun

6   violence unit.

7           But, yes if there is a three-year -- if there

8   is actual possession of a firearm, the legislature

9   dictates there should be a three-year mandatory minimum

10  associated with that, and so that should be followed.

11     Q    Okay.  So to the best of your recollection,

12  this has not been removed from the training drive or

13  from the manuals or guide books; this is sill something

14  that ASAs refer to today?

15     A    Yes.  However, I don't know how widely this has

16  been disseminated because this deals specifically

17  with -- with one particular unit that has two

18  prosecutors assigned full time and two who are assigned

19  part time, so I don't know how widely this has been

20  disseminated because this came out while I was gone.

21     Q    Understood.  Ms. Lopez, I don't believe I have

22  any more questions for you.

23          MR. CABOU:  So at this point I'm going to stop

24      and see if any of my colleagues have questions.

25          MR. WYLER:  I don't have any questions

Susan Lopez
November 16, 2022

1      for Ms. Lopez.  Mr. Levesque, do you?

2          MR. LEVESQUE:  Give me one moment.  Let me go

3      back through my notes.

4          No, I do not.  Thank you for your time,

5      Ms. Lopez.

6          THE WITNESS:  Thank you very much.

7          MR. CABOU:  Mr. Wyler?

8          MR. WYLER:  As I -- I said already I don't have

9      any questions for her.

10         MR. CABOU:  I'm sorry.  Thank you.  That

11     concludes the deposition.

12         THE VIDEOGRAPHER:  The time is 1:29 p.m.  We're

13     off video record.

14         (Break taken.)

15         (The remote video-recorded deposition was

16     concluded at 1:29 p.m.)

17

18

19

20

21

22

23

24

25

Susan Lopez
November 16, 2022

1                    CERTIFICATE OF OATH

2    STATE OF FLORIDA

3    COUNTY OF DUVAL

4

5         I, Deanne M. Moore, RMR, CRR, FPR, FPR-C, Notary

6    Public of the State of Florida, certify that SUSAN LOPEZ

7    personally appeared before me on the 16th of November,

8    2022, and was duly sworn.

9         Signed this 20th day of November, 2022.

10

11

12
                    Deanne M. Moore, RMR, CRR, FPR, FPR-C
13                  Notary Public, State of Florida
                    Commission No:  HH11232
14                  Commission Expires:  9/11/2024

15

16

17

18

19

20

21

22

23

24

25

Susan Lopez
November 16, 2022

1                    CERTIFICATE OF REPORTER

2    STATE OF FLORIDA

3    COUNTY DUVAL

4           I, Deanne M. Moore, RMR, CRR, FPR, FPR-C certify

5    that I was authorized to and did stenographically report

6    the deposition of SUSAN LOPEZ, pages 1 through 165; that

7    a review of the transcript was requested; and that the

8    transcript is a true record of my stenographic notes.

9           I further certify that I am not a relative,

10   employee, attorney, or counsel of any of the parties,

11   nor am I a relative or employee of any of the parties'

12   attorneys or counsel connected with the action, nor am I

13   financially interested in the action.

14          Dated this 20th day of November, 2022.

15

16

17                    Deanne M. Moore, RMR, CRR, FPR, FPR-C

18

19

20

21

22

23

24

25

Susan Lopez
November 16, 2022

1                    WITNESS NOTIFICATION LETTER

2    November 20, 2022

3    SUSAN LOPEZ
        c/o George T. Levesque, Esquire
4           GRAY ROBINSON, P.A.
            301 South Bronough Street
5           Suite 600
            Tallahassee, Florida 32301-1724
6
     In Re:  Andrew Warren v. Ron DeSantis
7            Deposition taken on November 16, 2022
             U.S. Legal Support Job. No. 6264749-001
8
     The transcript of the above-referenced proceeding has
9    been prepared and is being provided to your office for
     review by the witness.
10
     We respectfully request that the witness complete their
11   review within 30 days and return the errata sheet to our
     office at the below address or via email to:
12   southeastproduction@uslegalsupport.com.

13   Sincerely,
     Deanne M. Moore, RMR, CRR
14   U.S. Legal Support, Inc.
     700 East Dania Beach Boulevard
15   First Floor
     Dania Beach, FL  33004
16   (904) 359-0583

17   CC via transcript:
     JEAN-JACQUES CABOU, Esquire
18   GEORGE T. LEVESQUE, Esquire

19

20

21

22

23

24

25

Susan Lopez
November 16, 2022

 1                          ERRATA SHEET

 2      DO NOT WRITE ON TRANSCRIPT-ENTER CHANGES OF THIS PAGE

 3                   Andrew Warren v. Ron DeSantis
                 Deposition taken on November 16, 2022
 4             U.S. Legal Support Job. No. 6264749-001

 5     _____

       Page No.  Line No.           Change              Reason
 6     _____

 7     _____
       _____
 8     _____
       _____
 9     _____
       _____
10     _____
       _____
11     _____
       _____
12     _____
       _____
13     _____
       _____
14     _____
       _____
15     _____
       _____
16     _____
       _____
17     _____
       _____
18     _____

19     Under penalties of perjury, I declare that I have read
       the foregoing document and that the facts stated in it
20     are true.

21

22     _____                _____
       Date                    SUSAN LOPEZ
23

24

25