# Exhibit D

Andrew Warren

vs.

Ron DeSantis, et al.

---

Deposition of:

Renee Muratti

October 24, 2022

*Vol 01*

---





IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CASE NO.:   4:22-CV-302-RH-MAF


ANDREW H. WARREN,

                Plaintiff,

vs.

RON DESANTIS, individually and
in his official capacity as
Governor of the State of
Florida,

                Defendant.
_____/


DEPOSITION OF

RENEE MURATTI


Monday, October 24, 2022
10:24 a.m. - 12:30 p.m.


Gray Robinson, P.A.
401 East Jackson Street
Suite 2700
Tampa, Florida  33602


Stenographically Reported By:
Cassie O. May, RMR

Job No.: 278410

Renee Muratti
October 24, 2022

Page 2

```
 1    APPEARANCES:

 2
      On behalf of Plaintiff:
 3
            SHUMAKER, LOOP & KENDRICK, LLP
 4          101 East Kennedy Boulevard
            Suite 2800
 5          Tampa, Florida  33602
            813-227-2349
 6          BY:  David Singer, Esq.
                 dsinger@shumaker.com
 7               Matthew Newton, Esq.
                 mnewton@shumaker.com
 8               Elizabeth Kellar, Esq.
                 ekellar@shumaker.com
 9

10
      On behalf of Defendant:
11
            GRAY ROBINSON, P.A.
12          301 South Bronough Street
            Suite 600
13          Tallahassee, Florida  32302
            850-577-9090
14          BY:  George Levesque, Esq.
                 george.levesque@gray-robinson.com
15               Jeffrey Aaron, Esq.
                 jeff.aaron@gray-robinson.com
16

17
      On behalf of Jeria Wilds:
18
            JACOBS SCHOLZ & WYLER, LLC
19          961687 Gateway Boulevard
            Suite 201-I
20          Fernandina Beach, Florida  32034
            904-261-3693
21          BY:  Douglas Wyler, Esq.
                 doug@jswflorida.com
22

23

24

25    ALSO PRESENT:  Andrew Warren, Plaintiff
```

Renee Muratti
October 24, 2022

Page 3

```
 1                    EXAMINATION INDEX

 2

 3   Testimony of Renee Muratti

 4       Direct Examination by Mr. Levesque          4
         Cross-Examination by Mr. Wyler            62
 5       Cross-Examination by Mr. Singer           63
         Redirect Examination by Mr. Levesque      75
 6       Certificate of Oath                       86
         Certificate of Reporter                   87
 7       Errata Sheet                              88
         Witness Review Letter                     89
 8

 9                    EXHIBIT INDEX

10

11   EXHIBIT NO.                            PAGE NO.

12   A    Policy Regarding Prosecution of Cases    22
          based on Pedestrian and Bicycle
13        Violations DEF 000047-000048

14   B    Presumption of Non-Prosecution DEF       40
          000049-000051
15
     E    Jury Instruction 23.5 Offering to Commit, 52
16        Committing, or Engaging in Prostitution,
          Lewdness, or Assignation
17
     C    12/14/21 Memorandum re: Prosecutorial    53
18        Discretion and the Mission of Criminal
          Justice DEF 000052-000060
19
     F    June 2021 Joint Statement from Elected   66
20        Prosecutors and Law Enforcement Leaders
          Condemning the Criminalization of
21        Transgender People and Gender-Affirming
          Healthcare
22
     D    06/24/22 Joint Statement from Elected    68
23        Prosecutors

24

25        Stenographer's Note:  Exhibits A through F
     marked and attached.
```

Renee Muratti
October 24, 2022

Page 4

1    Proceedings began at 10:24 a.m.:

2              THE STENOGRAPHER:  Will you raise your right

3         hand to be sworn.

4              Do you swear or affirm that the testimony

5         you're about to give will be the truth, the whole

6         truth, and nothing but the truth?

7              THE WITNESS:  I do.

8    Thereupon,

9                    RENEE MURATTI,

10             Being sworn in accordance with the law, was

11        examined and testified as follows:

12                   DIRECT EXAMINATION

13   BY MR. LEVESQUE:

14        Q    Good morning, Ms. Muratti.  Am I saying that

15   correctly?

16        A    Yes.

17        Q    My name is George Levesque.  I am here with my

18   partner Jeff Aaron and we represent Governor DeSantis.

19   Before we get started, you may know a lot of the folks

20   in the room.  I would just ask that they introduce them

21   and indicate who they represent.

22             MR. WYLER:  Doug Wyler on behalf of Renee

23        Muratti.

24             MR. SINGER:  Good morning.  I'm David Singer.

25        I am here on behalf of Andrew Warren, who is here

Renee Muratti
October 24, 2022

Page 5

1      as well, with my colleague Matthew Newton and my

2      colleague Liz Kellar.

3    BY MR. LEVESQUE:

4        Q    Have you ever been deposed before?

5        A    Yes.

6        Q    When was the last time you were deposed?

7        A    It was several years ago.

8        Q    How many times have you been deposed?

9        A    I think just the once.

10       Q    Have you taken depositions?

11       A    Yes.

12       Q    So you are generally familiar with the rules:

13   Audible answers; head shakes and things are a little

14   harder to take down?

15       A    Yes, and I will probably forget and you will

16   have to remind me.

17       Q    And I am awful about remembering it, but I am

18   sure counsel around the table is much better than I am.

19            Also I will try to let you finish your answer

20   before I ask a question, if you can let me finish my

21   question.  Sometimes, I will warn you, my questions can

22   kind of get long.  I will try to keep them short.  But

23   at different times I might ask a bad question and

24   counsel will object.  Let them get their objection on

25   the record and then we can kind of proceed.

Renee Muratti
October 24, 2022

1               It's not intended to be the Spanish

2    Inquisition.  If you need to take a break at any time,

3    please just signal, I need a break.  What I would ask

4    is, if we are breaking, we don't break while there is a

5    question pending.

6               What have you done to prepare for your

7    deposition today?

8        A    I have quickly glanced at a couple of

9    documents from the office that I thought might come up.

10       Q    Which documents did you look at?

11       A    The bike stop policy and the process for the

12   presumption of non-prosecution of low-level offenses.

13       Q    Did you look at any other documents?

14       A    I don't think so.

15       Q    Did you talk to anyone?

16       A    Yes.

17       Q    Other than your counsel?

18       A    Yes.

19       Q    Who did you speak with?

20       A    Gary Weisman and Jeria Wilds, but not really

21   about the substance of the deposition beyond it was

22   likely to cover those two topics, and then everything

23   else was scheduling.

24       Q    What was the conversation with Gary Weisman?

25   What else did you speak of?

Page 7

```
 1      A    Well, I speak a lot to Gary.  He is the office

 2  next door to me.  But that was -- regarding the

 3  depositions, I think that was everything.

 4      Q    What about Ms. Wilds?

 5      A    Hers was mostly about scheduling and our joint

 6  excitement at being deposed.

 7      Q    Have you spoken with anyone else related to

 8  your deposition?

 9      A    I don't believe so.

10      Q    Have you spoken to individuals related to the

11  suspension?

12      A    As little as possible.  Obviously, it's very

13  newsworthy so a lot of people ask questions, but it's

14  not something I have chosen to discuss any more than

15  necessary.

16      Q    Who are some people who have asked you

17  questions?

18      A    Everyone in the office, people I see out in

19  public.  I mean, it would be a huge list.  It's very

20  newsworthy, as well as the fact that part of my job is

21  working on transitions to make sure the office

22  functions, so we have had a lot of discussions related

23  to.

24      Q    What are some of the types of questions you

25  get?
```

Renee Muratti
October 24, 2022

Page 8

```
 1      A    How is it at your office, what do you think,
 2   what's your opinion.
 3      Q    And how do you answer those questions?
 4      A    I generally don't want to spend my time
 5   gossiping about the internal workings of the office, so
 6   generally I say things are moving forward, like, things
 7   are going on, we are still doing our jobs.  I don't give
 8   my -- any opinion publicly about decisions that are made
 9   that aren't my decisions.
10      Q    Privately, do you have an opinion about the
11   suspension?
12      A    Probably.
13      Q    What is your opinion about the suspension?
14           MR. WYLER:  Object to relevance.  Her opinion
15           has no bearing on this at all, her opinion of the
16           suspension.
17           MR. LEVESQUE:  I understand.  Actually, if she
18           is against the suspension, it would go to motive.
19           So I think it's a fair question, and relevance
20           isn't grounds for her to deny answering.
21           MR. WYLER:  Renee, go ahead and answer.
22      A    I was shocked about it.
23   BY MR. LEVESQUE:
24      Q    What shocked you about it?
25      A    I went on vacation and I got a text at an
```

Renee Muratti
October 24, 2022

Page 9

1   airport that my boss was being suspended.  That doesn't

2   generally happen.

3       Q    Have you read the executive order?

4       A    No.

5       Q    Do you understand -- or let me strike that.

6            What is your understanding of the basis for

7   the Governor's decision?

8       A    My understanding is that it relates to

9   statements that Andrew has made regarding prosecution of

10  abortion providers as well as the bike stop policy and

11  the presumption of non-prosecution.

12      Q    Based upon -- have you read the statements

13  on -- strike that.

14           Have you read Mr. Warren's statements

15  concerning his intentions to prosecute abortion crimes?

16      A    No.

17      Q    Do you have an opinion on the Governor's basis

18  for suspending Mr. Warren?

19      A    Well, I haven't read the full opinion -- his

20  full reasoning for why.  And I haven't read Andrew's

21  statement about comments about prosecuting abortion

22  cases, so I don't have a true opinion about that.

23      Q    Are you aware that Mr. Warren has made

24  statements about firing people or cleaning house when he

25  returns?

Renee Muratti
October 24, 2022

1   A    I am not aware of any such statements.

2   Q    **Is that a concern of people in your office?**

3   A    No one has expressed that concern to me.  I

4   have been at the office through several transitions of

5   different types, and that's always a concern people have

6   whether it's well-founded or not.

7   Q    **You would agree that if Mr. Warren returns, it**

8   **is going to be a different type of transition?**

9   A    Yes.

10   Q    **Have you spoken with Mr. Warren or his counsel**

11   **since the suspension?**

12   A    I have.

13   Q    **And was it Mr. Warren?**

14   A    I spoke with Mr. Warren.

15   Q    **Have you spoken with his counsel?**

16   A    I don't believe -- no.

17   Q    **And I don't just mean counsel in here, but he**

18   **has got other counsel, J Cabou, or any other members of**

19   **his legal team?**

20   A    No.

21   Q    **When did you speak to Mr. Warren?**

22   A    I have spoken to him a few times.  They were

23   immediately afterwards as well as -- I think the last

24   time that we had any conversation was the Wednesday of

25   the hurricane.  But it's been a handful of times at

Renee Muratti
October 24, 2022

1    most.

2        Q    **The first time you spoke, what did you speak**

3    **of?**

4        A    He asked if I was okay.

5        Q    **What did you tell him?**

6        A    I said I was shocked but I was fine.

7        Q    **Did you speak about anything else that first**

8    **time?**

9        A    I don't believe so.

10       Q    **What about subsequently, what did you discuss?**

11       A    Our discussion -- one time he asked me for a

12   copy of a document that is subject to a public record,

13   which I advised Gary Weisman because he was handling

14   public records stuff, sort of managing, because we had a

15   lot more requests right after this.  And I believe that

16   our public records section had provided it to him.  It

17   was the presumption of non-prosecution.  He asked for a

18   copy of it.

19            Other than that, our conversations were always

20   how are you, how is your family, did you make it through

21   the hurricane okay.

22       Q    **Have you ever discussed the suspension with**

23   **him?**

24       A    I have not beyond what I have already

25   described.

Renee Muratti
October 24, 2022

1        Q       Did you discuss any other matters related to

2     the office?

3        A       No.

4        Q       What did Mr. Warren share with you?

5        A       He just shared with me that he was going to be

6     fighting it, but really he just reached out and asked

7     how I was.  He may have asked how people were doing in

8     the office, like more of a general how are people in the

9     office doing.

10       Q       Did he make any statements about the governor?

11       A       No.

12       Q       Did he make any statements about the sheriff?

13       A       No.

14       Q       Did he make any statements about Larry Keefe?

15       A       No.

16       Q       Do you recognize that name?

17       A       I know the name, but I have never met

18    Mr. Keefe.

19       Q       What is your understanding of who Mr. Keefe

20    is?

21       A       He was part of the governor's team who came to

22    the office the day of the suspension, and he gave a talk

23    to the supervisors that I listened to from the airport

24    in Maine, with his permission, just letting them know

25    the state attorney had been suspended, the new state

Page 13

1    attorney was being sworn in and on her way.

2        Q    Have you had any other dealings with

3    individuals from the governor's office?

4        A    I don't believe so.  We had a communications

5    person there briefly, but I didn't -- I don't know if he

6    is actually with the governor's office or not, and I

7    didn't talk to him about anything other than to say

8    hello in the hallway.

9        Q    That is Fred Piccolo?

10       A    Yes.

11       Q    And you said he was there briefly.  Is he

12   still in the office?

13       A    No.

14       Q    Anyone else?

15       A    I don't believe I did.  By the time I came

16   back, I arrived -- Thursday was the order, and I came

17   back in the office Friday afternoon, and so I don't

18   think there were a lot of people still there at that

19   point.

20       Q    And just for the record, who is your current

21   employer?

22       A    The state attorney's office, 13th Judicial

23   Circuit.

24       Q    How long have you been employed there?

25       A    Since 2000, March or April, I believe.

Renee Muratti
October 24, 2022

Page 14

```
 1        Q    And where were you employed before that?

 2        A    The public defender's office in Quincy,

 3   Florida.

 4        Q    And how long were you in the public defender's

 5   office there in Quincy, Florida?

 6        A    About two, two and a half years.

 7        Q    Where were you employed before that?

 8        A    The public defender's office in Pensacola,

 9   Florida.

10        Q    How long were you employed there?

11        A    Two years.

12        Q    What year did you graduate law school?

13        A    1995.

14        Q    And was the public defender's office in

15   Pensacola your first job out of law school?

16        A    Yes.

17        Q    Where did you graduate from law school?

18        A    University of Florida.

19        Q    And where did you do undergrad?

20        A    University of Florida.

21        Q    And what was your undergrad degree in?

22        A    Political science.

23        Q    What is your current title with the state

24   attorney's office?

25        A    Chief assistant state attorney.
```

Renee Muratti
October 24, 2022

1    Q    And how long have you been in that position?

2    A    I am bad with years, especially since COVID,

3    but it would have been, I believe, 2020 or 2021.

4    Q    What were you before that?

5    A    I was the bureau chief.

6    Q    Bureau chief.  Was there a particular bureau

7    or division you were over?

8    A    Juvenile and county court.

9    Q    How long were you in that position?

10   A    A year and a half.

11   Q    And I'm assuming that your bureau chief was a

12   promotion.  What were you before?

13   A    Chief of county court.

14   Q    How long were you in that position?

15   A    I was in that position starting in 2016 under

16   that title.  It was a position I had been in under

17   various titles since 2008.

18   Q    So same position, they just changed the

19   titles?

20   A    Yes.

21   Q    Did they change the pay with it?

22   A    Yes.

23   Q    Are you familiar with the Racial Justice Work

24   Group?

25   A    Yes.

Renee Muratti
October 24, 2022

1      Q      Did you ever attend any of their meetings?

2      A      No.

3      Q      What is your understanding of what the Racial

4    Justice Work Group is?

5      A      My understanding was that it was members of

6    the community who were meeting to identify -- I don't

7    know the best way to put this.  It was after George

8    Floyd.  There was a lot of requests to have more

9    feedback and input from the community in the office.

10   And so it was -- the way it was described to me or the

11   way I saw it, it was community members having an

12   opportunity to identify issues related to prosecution

13   that they wanted us to look further into.

14            It is a little bit different than the law

15   enforcement community council sort of thing because we

16   are still bound by our legal ethics and sort of have our

17   responsibilities to do, but it was a voice for members

18   of the community to talk about issues relating to race,

19   and for us to actually look at their comments.

20     Q      And what came out of that work group?

21     A      I believe there were some issues they

22   identified of things they wanted us to look further into

23   or changes they wanted us to make.

24     Q      What were some of those issues and what were

25   some of those changes?

Renee Muratti
October 24, 2022

1      A    I don't recall all of them, but one of them

2    was they wanted us to look at the cases that we had to

3    either not file or that were dropped or dismissed

4    because of a bad search or seizure by law enforcement,

5    to look at whether or not we could identify areas for

6    training or improvement in how those situations were

7    handled.

8      Q    **Now, when you are talking about training, is**

9    **that training of state attorneys or training of law**

10   **enforcement?**

11     A    When I say training, training of state

12   attorneys and then communications with law enforcement.

13   If you see an ongoing issue, which is something we would

14   do anyway, if we saw an issue with a particular officer

15   or an issue that kept arising, we would reach out to

16   those agencies and let them know this seems to be coming

17   up, and then they would handle it how they deemed

18   appropriate.

19     Q    **And that's something that you would do as a**

20   **matter of course regardless of whether Mr. Warren was**

21   **there or his predecessor, that if you see those**

22   **problems, you would have those conversations with law**

23   **enforcement?**

24     A    Yes, someone in our office would, not

25   necessarily me personally, but someone would, yes.

Renee Muratti
October 24, 2022

Page 18

1      Q      That wasn't something unique that Mr. Warren

2      brought in; that was something that you were doing

3      before Mr. Warren?

4      A      Yes.  The difference was the Racial Justice

5      Work Group, and I think the overall trend in criminal

6      justice and prosecution has been to look at a lot more

7      data.  I think even state laws we have had go into place

8      with more data transparency, there's a lot more looking

9      at whether it's -- whether the numbers fit what our

10     sense or our anecdotal experience is.  So the idea was

11     to look at those, but it would still have the review

12     process and individual assessment about cases.

13     Q      Were you involved with the drafting or editing

14     of the bicycle stop policy?

15     A      Yes.

16     Q      What was your role?

17     A      One of the other things the Racial Justice

18     Work Group mentioned was they wanted us to look at

19     resisting without violence and battery on a law

20     enforcement officer and resisting with violence to see

21     if there was a disproportionate minority impact.

22     Q      And related to those two latter categories,

23     battery on a law enforcement officer and resisting

24     arrest with violence, were there disparate impacts in

25     those areas?

Renee Muratti
October 24, 2022

Page 19

1      A    I don't know the other half of it.  But what I

2    did was, I looked at the resisting without violence

3    because we have to -- we are always balancing the harm

4    and danger in a situation as to what the right thing to

5    do going forward, what outcome is appropriate.  So what

6    we started with is looking at resisting without violence

7    where there are not violent acts being taken against a

8    law enforcement officer, and we pulled cases for a year

9    prior to COVID to look and see -- actually, I reviewed

10   all -- I reviewed those cases if that's the only charge

11   a person had to look and see what was the basis for the

12   stop and then what the race was, gender, that sort of

13   thing, to see what the -- and then looked at what the

14   data was from that.

15      Q    Okay.  But I guess my question was about the

16   data related to --

17      A    I did not pull any data regarding the other

18   two charges.

19      Q    So you don't know one way or another whether

20   it showed disparity or not?

21      A    Correct.

22      Q    And I will tell you right now, as Mr. Singer

23   has already sort of pointed out for me in Ms. Wilds'

24   deposition, I am a novice when it comes to the criminal

25   side of things.  I do civil law, but let me see if I can

Renee Muratti
October 24, 2022

Page 20

1   sort of understand some of the basic criminal law

2   concepts.

3              You would agree that crimes have elements that

4   are all set forth in statutes?

5   A    Yes.

6   Q    And if you are going to prosecute somebody for

7   those crimes, before you bring those charges, you are

8   going to want to make sure you have got evidence that

9   can demonstrate each of those elements, correct?

10   A    Yes.

11   Q    Sometimes those crimes might have a public

12   safety element, correct?

13   A    Yes.

14   Q    Other times there is no public safety element?

15   A    Hopefully there is some public safety element.

16   It's more of a lower end public safety issue.  But yes,

17   there are a few crimes that there is not a public safety

18   issue.

19   Q    Well, let's take prostitution.  Are you

20   familiar with the elements for prostitution?

21   A    Yes.

22   Q    Prostitution doesn't have a public safety

23   element, does it?

24   A    Public safety is not an element of the crime.

25   Public safety is generally not an element in the statute

Renee Muratti
October 24, 2022

1    for most crimes.  Usually it has a public safety aspect

2    to the charge.  That's why the law was enacted to begin

3    with, though it can be a stretch for some of the

4    charges.

5         Q     Fair enough.  But I think you were going where

6    I was hoping you would go, and that's when the

7    legislature enacts one of those criminal laws, they are

8    doing it to address a public safety concern?  So for

9    example, in prostitution, they see a public safety

10   issue; that's why they put a prostitution law on the

11   books.  Would you agree with that?

12        A     I don't know why the legislature puts certain

13   laws on the books or doesn't.

14        Q     Would you agree that one of the traditional

15   reasons they pass criminal laws is to protect the public

16   safety?

17        A     I hope that's the reason why they are passing

18   them traditionally, yes.

19        Q     You would also agree that reasonable people

20   sometimes can disagree about what actions should be

21   criminalized and what actions should not?

22        A     Yes.

23        Q     I am going to show you an exhibit that was

24   marked Exhibit A in Ms. Wilds' deposition, and we will

25   mark it as Exhibit A for this one as well.

Renee Muratti
October 24, 2022

Page 22

1           (Exhibit A marked for identification.)

2      BY MR. LEVESQUE:

3           Q      If you could take a moment to look at that and

4      let me know when you have had the opportunity to review

5      it.

6           A      I haven't read it in its entirety, but I'm

7      familiar with this document.

8           Q      What is that document?

9           A      It is our policy regarding prosecution of

10     cases based on pedestrian and bicycle violations.

11          Q      On page 2, in the next to last paragraph, the

12     second to the last sentence -- I'm sorry -- the very

13     last sentence, it says, "This exception should be

14     reserved for cases that pose a direct threat to public

15     safety, such as where an individual has suffered

16     physical harm or where a firearm is involved."

17                 Is public safety defined anywhere in this

18     policy?

19          A      No.

20          Q      Is it defined in other policies of the state

21     attorney's office for the 13th Judicial Circuit?

22          A      I don't believe there is a specific

23     definition, no.

24          Q      So if one were trying to figure out what would

25     constitute public safety, where would one go?

Renee Muratti
October 24, 2022

Page 23

1    A    Well, who is the one?

**2    Q    A state attorney.**

3    A    Okay.  An assistant state attorney, if they

4  were not familiar with what concerns for public safety

5  were, they would talk with their supervisor.  Anytime

6  they would have a question about a case or how to

7  interpret something, the appropriate thing to do would

8  be to talk to a supervisor.

**9    Q    What about a law enforcement officer, if they**

**10  wanted to know, you know, so they could evaluate is this**

**11  somebody that I want to arrest or not, is there somebody**

**12  that they would want to go to, to find out -- or**

**13  somebody that they could go to, to figure out what a**

**14  direct threat to public safety would mean under the**

**15  policy?**

16    A    Well, although I don't work for a law

17  enforcement agency, over the years my understanding is

18  they have supervisors as well they go to, but our office

19  also answers questions for law enforcement.  So if they

20  have a question about a policy or a specific -- on a

21  specific case, while we will not tell them to -- what

22  the ultimate decision is, whether to arrest or not, that

23  is their call, if they have a question about a

24  situation, we will have someone either available during

25  the day or on call after hours for immediate questions.

Renee Muratti
October 24, 2022

Page 24

1           Honestly, since law enforcement works under a

2    different standard than -- a lower standard than we do,

3    they are generally going to make their best judgment

4    call at the time and then make the decision what they

5    want to do as far as an arrest, and that would be more

6    of a follow-up question where they would call us once

7    the case was in the system if they had questions.

8          Q    Did this policy change the practices for the

9    state attorney's office when it went into effect?

10         A    It changed -- yes.

11         Q    So there were instances where someone was

12   arrested for resisting arrest without violence that was

13   incidental to a bicycle stop that would have been

14   prosecuted previously but no longer were being

15   prosecuted because there was no direct threat to public

16   safety, correct?

17         A    Yes, as well as the evaluation of -- we look

18   at a case in its totality, and if there was nothing else

19   that was of concern to us, yes, it would not be filed.

20         Q    What are other things of concern that would

21   not be a direct threat to public safety?

22         A    Well, public safety, as you have hinted on, is

23   very amorphous, so I think it all connects back to that

24   on some level.  But for example, if you had someone who

25   was arrested who had pending felony charges but this

Renee Muratti
October 24, 2022

1   current arrest was only a -- you know, was a resisting

2   without based on a bike stop, we would evaluate that

3   case as part of their totality of the circumstances, if

4   it were my case I was doing the intake on, and then I

5   may decide in that circumstance to file the case.

6          I believe there may have been situations with

7   pedestrians where, you know, you could have the example

8   of someone walking into oncoming traffic on the side of

9   the road or walking on the wrong side of the road not on

10  a sidewalk who runs from the police.  That's very

11  different than a person in the middle of the

12  intersection on Fletcher dodging in between cars.  So we

13  would -- it still goes back to public safety as well,

14  but we would look at the facts and also the

15  circumstances surrounding that defendant and that case.

16         The bulk of them did not have, I don't

17  believe -- this is anecdotal -- did not have extenuating

18  circumstances.

19     Q   As you were walking through some of that, it

20  just occurred to me, can you walk me through sort of

21  soup to nuts how a case would come in and how you would

22  do the evaluation, and you know, what are the different

23  decision points or things that you would look at at each

24  phase?

25     A   I can.  How long do you have?

Renee Muratti
October 24, 2022

1        Q     I have only got seven hours under the federal

2    rules.

3        A     Is there a specific type of case you would

4    like me to walk you through?  That might be a better

5    example.

6        Q     Let's start with some of the cases that might

7    be covered under the presumption of non-prosecution?

8        A     Our typical resisting arrest without violence

9    case, because we have multiple ways we receive cases, we

10   may receive a case after an arrest, after a warrant.  We

11   have what are called direct file cases.  And we also, in

12   county court, we have notices to appear and citations

13   for criminal traffic offenses.

14              So one of those five things, and there are

15   also a couple of affidavits that we also initiate cases

16   off of, so one of those many things happen.  That's our

17   trigger to open the case within our system.  Once a file

18   is open, depending on the type of charge and the nature

19   of how it was initiated will decide who reviews it and

20   does intake on it.

21              For county court -- for resisting arrest

22   without violence, and honestly this varies depending on

23   when you look -- what point in time you look at because,

24   as with many people during COVID, we had staffing

25   issues.  So ideally, we would have intake attorneys in

Renee Muratti
October 24, 2022

```
 1   county court who review it and make a filing decision,

 2   but we have also had our regular line attorneys in

 3   county court have to fill in for that.  And if they were

 4   in custody and didn't make bond, then they would be set

 5   on what's called a video arraignment docket, and it is

 6   likely that a supervisor, possibly me, actually did the

 7   intake because there is a quick turnaround on those

 8   cases and we need our regular line attorneys to focus on

 9   their regular courtrooms.

10           So that would be -- our first decision point

11   would be at the intake stage.  If it's a notice to

12   appear, no intake is done.  The CRA or criminal report

13   affidavit is considered the charging document and it

14   goes straight on to an arraignment docket, but those

15   people are not in custody.  So that's one decision point

16   is our intake point.

17           You are always re-evaluating and making new

18   assessments of cases as new information comes in.  I

19   mentioned video arraignments have a quick turnaround, so

20   you are talking about less than a week.  There may be

21   additional reports, body-worn cameras, things like that

22   that come in, so you may have another decision point

23   when you are reviewing a case to make an offer or when

24   you are completing discovery and looking at what

25   evidence you have.
```

Renee Muratti
October 24, 2022

Page 28

1                    If a motion is filed, you may have another

2      decision point, whether or not the motion is

3      well-founded or not.  And also when it comes time to go

4      to -- when something actually gets set for trial,

5      another decision point.  You are evaluating limited

6      resources and what are the best cases that we should be

7      setting for trial and using our resources and community

8      resources on.

9                    Throughout all those decision points, the

10     other thing you are you looking at is, you know, your

11     eyes should be on what that ultimate outcome is.  Our

12     job is not about getting convictions or checking off a

13     box that we have got this number or this percentage.  I

14     think if you look at even like the ABA model rules, they

15     talk about sometimes your seeking justice involves what

16     charges not to go forward on as well.

17                   And so if you have had someone who sat in jail

18     for a certain period of time, you may feel like that's

19     an appropriate outcome on the case, that there is no

20     real value in getting another misdemeanor conviction

21     that's going to be .2 points if they ever have a felony

22     score sheet.  So there are decision points throughout.

23          Q    Okay.  At the intake stage, what information

24     is usually available and what are you considering?

25          A    Generally you have whatever has been done on a

Renee Muratti
October 24, 2022

Page 29

1    police report or you have -- you have a criminal report

2    affidavit that has their probable cause spelled out, and

3    you may have a police report that may or may not be

4    complete, depending on how quickly they are set for

5    court.

6         Q    And based upon that limited snapshot of what's

7    there in the reports, you are making the decision to

8    move the case forward or flush it, correct?

9         A    Correct.

10        Q    Flush it being my term, probably not yours.

11             And then so the next decision point would be

12   at arraignment; do I understand that?

13        A    At arraignment, you would generally make an

14   offer to see if they want to resolve the case or not.

15   So you are making another assessment at that that point

16   in time.

17             Now, generally your offer is going to be based

18   on the same assessments you used for intake, but you

19   could have a case where defense counsel brings you more

20   information or you get a supplemental police report or

21   something else comes up in court that you didn't know

22   about.  So you know, there is a lot of different things

23   that can happen on the case.

24        Q    But all throughout it, the elements of the

25   crime are going to be constant, correct?

Renee Muratti
October 24, 2022

Page 30

1      A     The elements of the crime are constant, yes.

2      Q     **Are you familiar with Fair and Just**

3   **Prosecution?**

4      A     A little bit.

5      Q     **What do you understand that organization to**

6   **be?**

7      A     My understanding is it's sort of a research

8   type organization.

9      Q     **Have you ever attended any of their**

10  **conferences?**

11     A     No.

12     Q     **Have you ever attended --**

13     A     I don't think so.  I may have -- if they had a

14  webinar, I may have gone to one for CLE, but I don't

15  think even that I have done.

16     Q     **Have you ever attended any conferences**

17  **oriented to prosecutors?**

18     A     Yes.

19     Q     **Which conferences have you attended?**

20     A     I am not going to be able to tell you all of

21  them, but --

22     Q     **And that's fair.  Let's go with like the last**

23  **five years.**

24     A     There haven't been as many in the last five

25  years, but the Florida Prosecuting Attorneys

Renee Muratti
October 24, 2022

Page 31

1   Association, the FPAA, that conference is the only

2   conference I have been to.  Otherwise, it's webinars or

3   CLEs.

4        Q    How did you become familiar with Fair and Just

5   Prosecution?

6        A    I believe they came to the -- I know they came

7   to the office for a meeting years ago that I was at.

8        Q    And do you recall who from that organization

9   came to your office?

10       A    No.

11       Q    Do you know who invited them?

12       A    No.

13       Q    Is there a procedure for an organization like

14   that to be invited, or can anybody just show up and say,

15   Hey, I would like to talk to the state attorneys?

16            MR. SINGER:  Objection to form.

17       A    There is no set procedure on meeting with the

18   organizations or members of the community, and I

19   wouldn't have -- I generally wouldn't be the person to

20   set something like that up.

21   BY MR. LEVESQUE:

22       Q    Do you know who would?

23       A    For scheduling, it would probably be someone's

24   legal assistant.

25       Q    Do you know what they spoke about?

Renee Muratti
October 24, 2022

Page 32

```
1      A    At the one I was at?

2      Q    Yes, ma'am.

3      A    The meeting I was at?  They talked a little

4   bit about how they wanted to do support for -- how they

5   could do research and provide data if you needed it, if

6   there are any initiatives you were interested in, things

7   like that.  And they talked to me about juvenile court.

8      Q    And did you take them up on their offer?

9      A    I never received any data from them.

10      Q    Did you receive other types of research?

11      A    I don't believe so, unless it was something

12   like a mail list or a listserv.  I didn't have any

13   follow-up with them.

14      Q    Are you on a listserv where they mail you or

15   you receive like materials or information?

16      A    I don't think I am, but I get a lot of spam.

17      Q    Are you familiar with an informal group, the

18   Safety & Justice Task Force?

19      A    I know of it.

20      Q    What is your understanding of the Safety &

21   Justice Task Force?

22      A    I don't really have an understanding of it

23   from the sense I didn't participate in it.  I believe

24   Andrew discussed it once at an executive committee, and

25   the discussion he had with me was it didn't have
```

Renee Muratti
October 24, 2022

Page 33

1   anything to do with my job, so --

2        Q     You mentioned an executive committee.  What is

3   the executive committee?

4        A     It's something I think we have always had at

5   the office until recently.  It's just a group of senior

6   people within the office that meet on a regular basis to

7   discuss keeping the office running basically.  So the

8   agenda could vary from updates on personnel to

9   conferences that were coming up or -- there's lot of

10  personnel discussions, or just sort of an update of here

11  are things that have been going on, here are community

12  meetings that we have been to and some feedback we have

13  gotten and things like that.

14             So it's very freeform, but it was -- you know,

15  just like what the calendar is, what's coming up in the

16  next week or two that we need to be prepared for.

17       Q     Who are the members of that committee?

18       A     At what point in time?

19       Q     Under Mr. Warren.

20       A     It would have been Andrew, his legal

21  assistant, Gary Weisman, Kim Hindman, myself, Jeria

22  Wilds, Carla Snavely, and I think that -- oh, it varied

23  also depending on who was at the office and what our

24  structure was, so I believe our communications director

25  would be there also.

Renee Muratti
October 24, 2022

1    Q    Who was your communications director?

2    A    The last one was Melanie Snow-Waxler.

3    Q    And who preceded her?

4    A    Grayson Kamm.

5    Q    And who is Carla Snavely?

6    A    She is essentially Gary's assistant, but don't

7    tell her I described her that way.

8    Q    I promise I won't send her the transcript.

9         And how often did the executive committee

10   meet?

11   A    We tried to meet about once a week.

12   Q    Is there an executive committee now?

13   A    I don't believe so.

14   Q    Now, the executive committee, is that a

15   formally recognized committee under the state attorney's

16   office like rules or policies or anything, or was it

17   more of a kitchen cabinet executive committee?

18   A    I think it's something we have always

19   traditionally had from the time I started.  When I

20   started with the office, they had it, and it is

21   something that has just carried on through each state

22   attorney.

23   Q    But there is no, like, policy that the state

24   attorney's office has to have an executive committee?

25   A    No.

Renee Muratti
October 24, 2022

Page 35

1      Q     And so Mr. Warren, if he wants to make a

2    decision, isn't obligated to take it to the executive

3    committee, is he?

4      A     No.

5      Q     Certainly prudent state attorneys consult with

6    their senior staff when making decisions.  I am not

7    suggesting that in any sense.  But Mr. Warren, as the

8    elected public officer, has the full authority to make

9    the decisions for his office without consulting anybody

10   or consulting everyone he wants to, correct?

11     A     Correct.

12     Q     When you were working on the bicycle stop

13   policy, did you consult with anyone outside the office

14   on what would or would not be included in the policy to

15   get their feedback?

16     A     Did I personally, no.

17     Q     Do you know if anyone else in the office

18   consulted with people outside of the state attorney's

19   office?

20     A     Not that I know of.  And I might not

21   understand your question.  You mean like law enforcement

22   agencies or other agencies?

23     Q     Anyone outside the state attorney's office,

24   law enforcement agencies included.

25     A     As I think you can tell from the policy, we

Renee Muratti
October 24, 2022

Page 36

1   did look at the information Tampa Police Department had

2   previously compiled, and they have stuff publicly

3   available, so I'm not sure if anyone else consulted with

4   anyone on the policy.

5        Q    Well, I know the policy was based upon TPD's

6   data.  After you kind of were getting the policy in form

7   or after you had a draft, do you know if that was shared

8   with the Tampa Police Department?

9        A    I don't know if a draft was.  My understanding

10  was generally that when we had a policy like this -- if

11  we had a policy or something going out, I believe that

12  Andrew or Gary would reach out to law enforcement

13  agencies to give them a heads up.  I don't know if that

14  happened on this case or how much information was

15  shared, but that to me is more sort of the -- that's not

16  going out to other agencies to get research or data.

17  That's more how we rolled something out.

18       Q    Earlier when we were talking about the process

19  that you would go through, you had me kind of going up

20  through intake and arraignment, and you said at that

21  point you might have some motions that might be filed

22  that would cause you to re-evaluate whether you want to

23  proceed.  Is my memory on that correct?

24       A    Yes.  Defense counsel might file motions.

25       Q    And the motions might be motions for

Page 37

```
 1   dismissal, motions to suppress evidence --
 2        A    Yes.
 3        Q    Am I on the right track with those types of
 4   motions?
 5        A    Yes.
 6        Q    And then let's say you have made the decision
 7   you are going to proceed to trial, you are in trial, are
 8   there still discretionary decision points that you are
 9   making at that point in time?
10        A    Well, yeah.  I mean, you are deciding which --
11   you know, hopefully you have admissible evidence to
12   prove your elements, but you are making judgment calls
13   of how to present that evidence, which evidence is
14   appropriate.  If I have 14 hours of body-worn camera for
15   a 30-minute interaction because that many officers
16   responded, I am going to make a judgment call not to
17   show a jury 14 hours of body-worn camera.
18             And even after a finding of guilt, unless
19   there is a minimum mandatory, and even with minimum
20   mandatory, you can seek more, what you ask for from the
21   judge if you get a guilty verdict.
22        Q    And so let's go with that last part.  Let's
23   say you have got the conviction and you are looking at
24   sentencing.  What are the factors that go into your
25   consideration for sentencing at that point?
```

Renee Muratti
October 24, 2022

Page 38

1        A    It depends on the type of charge.  Felony is

2    going to be very different than county court and

3    juvenile is going to be very different from both of

4    those because felony you are always going to start with

5    the score sheet.  We don't have that in juvenile or

6    county court.

7             Juvenile, the stated purpose within the -- you

8    know, the whole purpose of juvenile court is

9    rehabilitation, it is within the statute, things like

10   that.  And so you are getting recommendations from

11   Department of Juvenile Justice and assessments.

12            County court, you do have some crimes that

13   have minimum mandatory like DUIs, and domestic violence

14   has certain things you have to do, but they are not

15   minimum mandatories the way you think of them for

16   felony.  It is not they much do this much time in jail.

17   It is usually things like DUI school, minimum terms of

18   probation, types of counseling.

19            So you still have a lot of leeway in what you

20   are doing, so you are looking at the charge, the

21   victim's wishes, what the defendant has already done,

22   because you could someone who sat in custody the entire

23   time waiting for trial, which you know, some of our

24   charge have a maximum of 60 days in jail.  So you are

25   looking at all those things.  Defense counsel might have

Renee Muratti
October 24, 2022

Page 39

1   stuff they want to bring up about employment, education,

2   their family, their standing in the community, like it's

3   very -- a lot of things can come into play at that point

4   in time.

5       **Q    Are there still considerations after the**

6   **person is sentenced that -- is there a decision making**

7   **process after sentencing that would still, you know,**

8   **impact your office in the exercise of discretion?**

9       A    You know, you start looking at violations if

10  they are on supervision, but at that point in time it's

11  very -- it is usually very judge-controlled at that

12  point in time.  We may have recommendations, but it's

13  the judge's probation.

14      **Q    What about in terms of like whether to defend**

15  **an appeal where someone is convicted of something and**

16  **they appeal?**

17      A    Yeah, you would exercise discretion then, but

18  a few years ago -- we don't do our own appeals.  The

19  attorney general's office handles those for us.  They

20  have an appellate decision.  We did handle our own

21  county court appeals until a few years ago when the

22  state law changed.

23      **Q    I am going to ask you to look at Exhibit B.**

24  **We will mark this as Exhibit B for this deposition as**

25  **well.**

Renee Muratti
October 24, 2022

Page 40

```
 1              (Exhibit B marked for identification.)

 2    BY MR. LEVESQUE:

 3         Q    Do you recognize that document?

 4         A    I do.

 5         Q    What is this document?

 6         A    It is part of the guidelines for the process

 7    that we laid out for the presumption of non-prosecution

 8    for some low-level offenses.

 9         Q    Did this --

10         A    Oh, I'm sorry, as well as our analysis on

11    handling driving with suspended license cases.

12         Q    Did this come out of the Racial Justice Work

13    Group?

14         A    I don't believe so, no.

15         Q    How did this idea come to fruition?  I guess

16    what was the genesis of it?

17         A    I don't know the exact genesis of it.  I can

18    tell you different things that went into it, different

19    factors that it went into because there is also --

20    depending on the charge, it's a different way it got

21    here.

22         Q    Okay.  I guess I might have jumped the gun on

23    some of that.  Were you involved with creating this

24    document?

25         A    Yes.
```

Renee Muratti
October 24, 2022

Page 41

1      Q      What was your role in creating this document?

2      A      I participated in discussions about it and

3   made recommendations and laid out processes, which once

4   again, are recommendations.  But I spoke to other

5   attorneys in the office, the ones that handled these

6   types of cases, got feedback from them.

7      Q      Was there a single person that was pushing for

8   this to be created or that was sort of the person that

9   was going to make sure that people followed through on

10   creating this policy?

11      A      I don't think there was any mission or

12   directive like that.  I think I am the person who

13   corrals getting some projects done, but that's not --

14   again, that's not I was given a mandate to do this or

15   had a mandate to do this.  And as the supervisor of the

16   area that prosecutes this, I would be the one who made

17   sure it was distributed throughout that area and

18   available to people.

19      Q      I guess I am just trying to figure out, to the

20   extent that you mentioned projects, is there a -- how

21   this ended up on the project list?

22      A      Oh, a lot of it was a response to COVID.  Our

23   courts were closed for a while.  We have limited staff.

24   And at a certain point in time, you have to be able to

25   focus your resources on cases such as our domestic

Renee Muratti
October 24, 2022

Page 42

 1   violence cases or DUI cases, the cases that really --

 2   and our felonies where you see the direct, direct public

 3   safety issues, I guess, so it's more obvious.

 4        Q    Was there a significant backlog of cases

 5   coming from COVID that would have met these guidelines?

 6        A    We had a significant backlog of cases, yes.  I

 7   couldn't tell you which ones they were.  But like I

 8   said, there are other charges that this sort of analysis

 9   would not be appropriate for.

10        Q    Like what?

11        A    Like cases where you have a victim suffering

12   harm, where you have like a theft where there is an

13   actual loss to the -- you know, monetary loss to

14   someone, like a battery or domestic violence battery.

15   Those are just a few examples, sticking to the

16   misdemeanor realm.  You know, DUIs, all of those -- I

17   mean, I don't think those were ever discussed as part of

18   this because it just -- those did not seem appropriate.

19   We would not -- even though they are misdemeanors, they

20   are not our lower level misdemeanors.

21        Q    Is it unusual for a prosecutor to have a

22   presumption that certain criminal laws will not be

23   enforced?

24        A    I don't know.

25        Q    Prior to Mr. Warren, are you aware of any

Renee Muratti
October 24, 2022

Page 43

1   policies in the state attorney's office that there were

2   certain crimes that you would presumptively not enforce?

3        A    We didn't have any real written policies, but

4   I can tell you there are -- like a crime -- there are a

5   couple crimes on here that, historically if you look

6   back, we weren't prosecuting them.  Like attaching a tag

7   not assigned, while it is on this list, our reason for

8   not prosecuting it also goes to some elements of some --

9   our ability to actually prove those cases, what the

10  standard is, things like that.  We just can't prove them

11  so we have never gone forward on them.

12             Unregistered motor vehicles requires pulling

13  witnesses from another agency, that it can become unduly

14  burdensome.  So even though these cases are all

15  technically filed because they are by citation, we

16  wouldn't generally go to trial on them because we

17  wouldn't be able to bring the witnesses in that we

18  needed to for those cases.

19       Q    What about disorderly conduct?

20       A    What about it?

21       Q    Would you put that in that same category of

22  cases that are difficult to prove?

23       A    It varies.  One of the key things, we need a

24  lay witness on those.  So a lot of times, while you have

25  activity or behavior that, I think, us reading it we

Renee Muratti
October 24, 2022

Page 44

1   would say that certainly appears to be disorderly

2   conduct, we wouldn't necessarily have the right

3   witnesses to prove it at trial through admissible

4   evidence.

5            And even then, it would still always be an

6   assessment based on the facts, the strength of the case,

7   whether or not we had a likelihood of successful

8   prosecution.  Obviously, as I mentioned before, we have

9   a different standard for convicting someone than law

10  enforcement does for arresting someone.

11       Q    Now, under this policy, the presumption can be

12  overcome by a significant public safety concern such as

13  pending felony charges, a violation of probation, or if

14  the current charge is part of a charged course of

15  conduct that includes a charge not on this list.

16            Are there other types of public safety

17  concerns that would also justify overcoming the

18  presumption?

19       A    Yes.

20       Q    Are the public safety concerns, that language,

21  is that essentially the same thing as the direct threat

22  to public safety that is addressed in the bicycle stop

23  policy?

24       A    That's just sort of our catchall phrase.  So I

25  mean, as you have hit on before, we don't have a

Renee Muratti
October 24, 2022

Page 45

```
 1   specific definition for it, but there are times where
 2   you have additional concerns.
 3              So for example, one of the charges on here is
 4   trespass at a business location.  There is a difference
 5   between someone cutting across the parking lot at a Wawa
 6   and someone going into the Wawa and screaming at the
 7   clerk.  And we do have both those sort of -- not
 8   necessarily with Wawa, but we do have both those sort of
 9   cases for the exact same charge, but obviously something
10   where someone is being aggressive towards members of the
11   public or people that work at the establishment, that
12   could rise to a public safety concern as opposed to you
13   have been told not to be there and you're cutting across
14   the parking lot.  Technically, you may be in violation,
15   but the concerns to the community aren't the same.
16              MR. LEVESQUE:  Why don't we go ahead and take
17        a quick break.
18              (Break from 11:20 a.m. to 11:29 a.m.)
19   BY MR. LEVESQUE:
20        Q    Going back to the presumption of
21   non-prosecution policy, who else was involved with the
22   creation of this policy?
23        A    I'm not sure.
24        Q    Was Mr. Warren involved?
25        A    Yes.
```

Renee Muratti
October 24, 2022

Page 46

1    Q    Was Gary involved?

2    A    Probably, at some point in time.

3    Q    You can't identify anybody else that was

4    involved with the creation of the policy other than

5    Mr. Warren, Mr. Weisman, and yourself?

6    A    In what way?

7    Q    Reviewed it, helped identify information that

8    should be included, helped identify particular crimes

9    that were to be included and covered?

10   A    I am sure we reviewed it -- people looked at

11   it at executive community or it was provided to them;

12   they may or may not have looked at it.  But obviously,

13   Andrew has ultimate decision making authority within our

14   office.  But I couldn't remember a specific name or

15   person.

16   Q    Were you the primary drafter for this

17   document?

18   A    Yes.

19   Q    And how did you identify the crimes that would

20   be included in the presumption of non-prosecution?

21   A    I don't remember the complete process I used,

22   but part of it was working in that area since 2007,

23   handling cases, going to court, reviewing cases with

24   people I supervised, getting feedback from people, not

25   necessarily about a policy in particular but things they

1   were concerned about or, you know, things they were

2   frustrated with or where they wanted to spend their time

3   on cases.

4       Q    And when --

5       A    I am sure at some point in time I probably

6   looked at some numbers, but I don't specifically recall.

7       Q    I apologize.  I thought you were finished.  I

8   didn't mean to speak over you there.

9            When this policy went into effect, was it

10  carried out by the staff who had been obligated to

11  observe those decision making entries?

12      A    I'm sorry.  Could you rephrase -- repeat that.

13      Q    That was an awful question.  I will concede

14  that one.

15           When the policy was put into effect, was it

16  carried out by staff?

17      A    The ASAs generally follow the policy.

18      Q    So after the policy was in effect, these

19  crimes would not be prosecuted unless there was a

20  significant public safety concern that was identified,

21  correct?

22      A    We did not have a specific process for you

23  have to, you know -- it's not like departing from an

24  enhanced sentence.  That's really sort of our catchall

25  provision so that if we felt it was necessary to go

Renee Muratti
October 24, 2022

Page 48

1   forward on a case we were able to.

2            So it wasn't a situation, if I had an ASA who

3   has a case and they wanted -- they want to file a

4   charge, one of these charges, they didn't have to come

5   have me sign off on it or Andrew Warren or stuff like

6   that.  They could use their own discretion.

7            And you know, we would talk about decision

8   points, sometimes the decision -- where you actually

9   discuss -- you can't discuss every case with a

10  supervisor.  There is 40,000 cases a year.  So sometimes

11  you might end up reviewing it with a supervisor when you

12  are preparing for trial or if defense counsel reached

13  out or when you are making a plea offer.  So not every

14  case even got reviewed by a supervisor.

15           But I believe generally, the ASAs follow the

16  policy, but they did have that catchall provision that

17  allowed them to use their discretion.

18       **Q    Now, under the bicycle stop policy, if you**

19  **were going to pursue one of those charges you had to**

20  **have a supervisor sign off, correct?**

21       A    By sign off is -- you should be checking --

22  you should be talking to your supervisor about it, I

23  believe -- let me -- if I can take a moment and look

24  back just to make sure.

25           Yeah, you had to review it with your

Renee Muratti
October 24, 2022

1    supervisor and document your file.

2        Q     Was there a particular form that was created

3    for that review?

4        A     No.

5        Q     If a state attorney was going to pursue

6    charges under the presumption of non-prosecution policy,

7    would they have to document that in the file as well?

8        A     Well, it would be documented by the fact they

9    filed a charge or if they were going to trial, but they

10   didn't have to get specific supervisor approval to go

11   forward.

12       Q     Well, I guess my question is, would they need

13   to document the significant public safety concern that

14   they had to sort of make sure they were complying with

15   the policy?

16       A     There was no requirement to do that.

17       Q     It would have been left up to the individual

18   state attorney to figure out whether they had a

19   significant -- whether they saw a significant public

20   safety concern, correct?

21       A     As with other intake, it would be up to the

22   individual assistant state attorney to evaluate the

23   strengths and weaknesses of their case and what policies

24   applied.  And if they had a question, they had

25   supervisors to go to, to get feedback from and to ask

Renee Muratti
October 24, 2022

1    what to do for guidance.

2         Q    But it's fair to assume that if there was no

3    significant public safety concern, all of these crimes

4    would not be prosecuted if the state attorney didn't see

5    that?

6         A    Wait.

7         Q    If the state attorney didn't see a public

8    safety concern and the underlying crime was one of these

9    crimes, they would not bring the charges?

10        A    The assistant state attorney?

11        Q    The assistant state attorney.

12        A    Because the state attorney wasn't reviewing --

13   I mean, he may have been.  I don't know that he was

14   reviewing any of these cases, though.  Can you repeat it

15   again a third time.

16        Q    Yes.  Maybe I will get it right.

17        A    The assistant state attorney.

18        Q    The assistant state attorney.

19             If the assistant state attorney did not

20   identify a significant public safety concern, he or she

21   would not bring charges if it involved one of these

22   crimes?

23        A    If it involved one of these crimes, they

24   didn't see a significant public safety concern, I would

25   like to say generally yes.  I would also like to put the

Renee Muratti
October 24, 2022

1    caveat in there that all of the ASAs in county court

2    have been attorneys for a very short period of time and

3    have a lot of work to do.  So one of the things we

4    always struggle with is making sure that things are done

5    consistently.  So it is possible that they still may

6    have filed something and not made the connection or

7    realized or -- you know, they are going forward -- you

8    know, a bulk of these cases -- these traffic cases are

9    all automatically filed by the filing of a citation.

10    Law enforcement files them, not us.  So could an ASA go

11    to arraignment court and have someone plead out on one

12    of these, yes, without having really evaluated the case.

13    But that's a function of inexperience and volume.

14         **Q    What are the cases -- what are the charges**

15    **where the ASA would file their own charges?  Would that**

16    **include disorderly conduct?**

17         A    It might.  For -- if you start with the

18    trespass at business location, disorderly conduct,

19    intox, soliciting and prostitution, on those cases, if

20    they did not come in as a notice to appear, the

21    assistant state attorney would need to do intake on the

22    case and file an information, which is the charging

23    document.

24              If the officer completed a notice to appear,

25    the criminal report affidavit would serve as the

Renee Muratti
October 24, 2022

Page 52

1   charging document.

2        Q    And for those cases that come in

3   automatically, like through the charging -- the law

4   enforcement --

5        A    All of these traffic ones, yes.

6        Q    For those cases where the state attorney sees

7   the case come in, looks at it, says, I'm not seeing a

8   significant public safety concern, what would his or her

9   next actions be in terms of handling the matter?

10       A    If they weren't going to go forward, then they

11  would announce a nolle prosequi.

12       Q    And what is that, for us civil law folks?

13       A    It's a voluntary dismissal.

14       Q    Is that a dismissal with prejudice or --

15       A    No.

16       Q    So if new evidence came to light, you could

17  bring the charges again?

18       A    If we weren't barred by speedy trial, yes.

19       Q    Ms. Muratti, I am going to show you a document

20  and ask do you recognize that document?

21       A    Yes.

22            MR. LEVESQUE:  We will mark this Exhibit E.

23            (Exhibit E marked for identification.)

24  BY MR. LEVESQUE:

25       Q    What is that document?

Renee Muratti
October 24, 2022

```
 1      A    It appears to be the standard jury instruction

 2   for offering to commit, committing, or engaging in

 3   prostitution, lewdness, or assignation.

 4      Q    And we have spoken about this a little bit

 5   already, but an element of this is not a significant

 6   public safety concern, correct?

 7      A    Correct.

 8      Q    And I just want to make sure I understand.  So

 9   for all of the prostitution that occurs in Hillsborough

10   County, under the presumption of non-prosecution policy,

11   if there is no public safety concern that the ASA

12   identifies, these types of crimes will not be

13   prosecuted; is that correct?

14      A    Unless there was some exception or something

15   unusual, that is correct.

16      Q    And the exception and the something unusual

17   would be a public safety concern?

18      A    Right, but as I have said before, the public

19   safety concern is sort of our catchall.  We could

20   have -- you know, ask me to suppose what potentially

21   could happen or other factors you have, strange things

22   happen in criminal law, so there is no telling.  But

23   generally, generally, they would not be prosecuted.

24           (Exhibit C marked for identification.)

25   BY MR. LEVESQUE:
```

Renee Muratti
October 24, 2022

Page 54

```
 1       Q     I am going to provide Exhibit C to you and ask
 2   you if you recognize that document once you have had the
 3   opportunity to look at it.
 4       A     I do recognize it.
 5       Q     What is that document?
 6       A     It is a memo that Mr. Warren prepared sort of
 7   encapsulating prosecutorial discretion and our mission
 8   regarding criminal justice.
 9       Q     Did Mr. Warren share this memorandum with you
10   before he distributed it to the state attorney's office?
11       A     I believe so, yes.
12       Q     Did you provide any editing or feedback on the
13   memo?
14       A     Probably, but I couldn't tell you what it
15   would have been, so --
16       Q     Do you know if Mr. Warren drafted this memo
17   himself?
18       A     I don't know.
19       Q     Do you know of anyone else that was involved
20   with the drafting or creation of this memo?
21       A     I don't have specific knowledge about it, but
22   I believe he shared it with the executive committee, and
23   frequently Gary was involved in reviewing memos and such
24   before they went out as well.
25       Q     Was this memo intended to be a policy that
```

Renee Muratti
October 24, 2022

Page 55

1   governed the actions of the state attorneys in

2   Mr. Warren's office?

3        A    I don't know Mr. Warren's actual intention

4   with it, but our discussions, it was more encapsulating

5   some of the ideas and concepts that as prosecutors we

6   discuss anyway, the concept of prosecutorial discretion.

7   And it was sort of an educational-type document for

8   people to realize that they do work at an office that

9   respects their prosecutorial discretion.  But a lot of

10  the ideas within it are things that you see in the ABA

11  model rules, that you see discussed in articles, things

12  like that.

13       Q    Well, I guess -- so was this intended to be a

14  policy or was it only intended to be a memorandum?  Did

15  it have a binding effect?

16       A    I don't know if I understand your -- the

17  difference.

18       Q    A policy is intended to guide actions,

19  correct?  Would that be a fair characterization of the

20  bicycle stop policies and --

21       A    Yes.

22       Q    Is this memo intended to be guidance for the

23  assistant state attorneys' decision making?

24       A    It is, but most of it is a summary of what

25  your duty as a prosecutor is.  It's not Andrew Warren's

1    book of prosecution.  I think based on -- well, I don't

2    know what Andrew's actual intent was.  From

3    conversations we have had, I know that one of the things

4    he struggled with within the office is trying to get our

5    ASAs to focus on the outcome and think of each case

6    individually.

7              And so he would put policies into place to

8    sort of give some guidance of how he thought the

9    analysis should go on cases, but he was -- he would --

10   he had expressed frustration to me on multiple occasions

11   as to why someone would look at a case and if they felt

12   a particular way, a different way about a case, why

13   didn't they speak up, you know, why not stand up.  And

14   if you are not happy with what your chief has to say, we

15   have levels of supervision.  Be focused on what you want

16   the outcome to be on a case, what you think the right

17   outcome is.

18        Q    Are there specific examples that come to mind

19   related to those discussions?

20        A    I can't right now think of them specifically,

21   but it was just a theme in many of our conversations

22   about making those individual assessments on cases and

23   thinking about what you want to do on a case.  I think

24   sometimes we also had issues where when I would try to

25   explain I have very new people who don't necessarily

1    know enough to know what they want to do on it and how

2    they needed a little bit more guidance and wouldn't

3    necessarily know the full analysis to make.

4           So I think some of those conversations played

5    into -- you know, and I could be wrong, but I think some

6    of those conversations also played into drafting this

7    memo, sort of articulating for some of the newer people

8    especially that you should be -- you know, you are there

9    because we want you to apply the law and apply your

10   reasoning, and there is more to assessing a case as a

11   prosecutor than just checking off elements from a

12   statute.

13          Q    You mentioned that they are there to apply the

14   law, but it seems with the presumption of

15   non-prosecution policy that can only be overcome if

16   there is a public safety concern, that you are only

17   applying the law when that state attorney feels there is

18   a significant public safety concern.  Would you agree

19   with that?

20          A    I would agree that we have couched it as

21   public safety concern, but that it's -- what can be a

22   public safety concern is very broad.

23          Q    And I understand it can be very broad, but if

24   the legislature didn't include that as an element, you

25   are essentially adding to the law, are you not?

Renee Muratti
October 24, 2022

Page 58

1      A     But the legislature only lays out the elements

2   of a particular offense.  Even when you have elements of

3   an offense -- I mean, for example, identification is an

4   element of every offense we prosecute.  That's not an

5   element written in any statute, but legally we have to

6   prove ID in order to go forward on a case.  The fact

7   that we have to prove cases through admissible evidence,

8   that's not written in any statute, but that is the

9   nature of the work we do.

10             And so there are just a lot of -- I think

11  there are a lot of factors like that.  I think it

12  oversimplifies to think of it as a checklist.  The bare

13  minimum is to have the checklist, and then your analysis

14  should go a little deeper than that.

15      Q     Are you aware of anything in statute that sort

16  of says that state attorneys should only enforce laws

17  when there is a public safety concern?

18      A     No.

19      Q     Are you aware of anything in the ABA code of

20  conduct that says state attorneys should only enforce

21  laws that pose a public safety concern?

22      A     Actually, the ABA -- yeah, the ABA model rules

23  are more broader.  They -- their focus is on seeking

24  justice, whether that means going forward or not going

25  forward or anywhere in between, anything in between.

Renee Muratti
October 24, 2022

1      Q      But seeking justice is -- can be --

2      A      Yes.

3      Q      -- different than a public safety concern, can

4   it not?

5      A      It can be.

6      Q      Have you read the executive order?

7      A      No.

8      Q      Have you read any of the statements related to

9   either the transgender statement or the abortion

10   statement that Mr. Warren signed on to?

11      A      No.

12      Q      Going back to Exhibit C, how would you

13   characterize Exhibit C interacting with Exhibits A and

14   B?  Are they completely separate documents or is Exhibit

15   C something that would overlay the exercise of

16   discretion that is exercised under Exhibits A and B?

17      A      For the first part, they are separate

18   documents, but Exhibit C, I would say, overlays all of

19   our actions on our cases, whether there is another

20   policy in place or not.

21      Q      Did Mr. Warren discuss either of the two

22   statements with the executive committee before he signed

23   on to them?

24      A      I don't believe so.  I don't recall him

25   discussing it with them.

Renee Muratti
October 24, 2022

Page 60

1      Q    Were you aware that Mr. Warren signed on to a

2   couple of amicus briefs when the Dobbs decision was

3   pending before the US Supreme Court related to abortion?

4      A    I'm not sure.  I may have heard discussion of

5   it, but I wasn't part of any conversations regarding it.

6   I didn't review any briefs.  I wasn't part of any of

7   that.

8      Q    So that wasn't a decision that he brought back

9   to the executive committee for discussion?

10     A    Not to me.  If he did, it was a day I wasn't

11  there, though I was there most days.  And he also may

12  have -- like he may have a discussion with me about

13  DUIs.  He wouldn't wait for an executive committee to

14  necessarily talk to people, but I'm not aware of any

15  discussion about it.

16           MR. LEVESQUE:  If we could take five minutes,

17       I think I might be done.

18           (Break from 11:52 a.m. to 11:57 a.m.)

19  BY MR. LEVESQUE:

20     Q    You mentioned that Fair and Just Prosecution

21  came in and did a presentation in your office?

22     A    They came in like a meeting, like a

23  meet-and-greet type meeting.

24     Q    Do you recall when that was?

25     A    I don't remember specifically, but I feel like

Renee Muratti
October 24, 2022

Page 61

```
 1    it was probably like 2016 -- it was near the beginning
 2    of when Andrew took office, though I could be entirely
 3    wrong.
 4         Q    Are there other groups that you do that for?
 5         A    Yes, not just -- I mean, I am not necessarily
 6    at all of them, but I know like Hope is a local group
 7    that's a coalition of churches, church leaders, that
 8    they like to set up meetings with different agencies.  I
 9    participated in meetings with them.
10              So yes, I mean, there are different --
11    different groups come in to tell their side or to ask
12    their questions, and it's part of what our office does.
13         Q    What are some other organizations other than
14    FJP and Hope?
15         A    I am trying to think of ones -- luckily, I
16    don't go to a lot of those, so those aren't usually my
17    duties, but Hope is the one I have been to because I
18    have an interest in juveniles.  So I am sure there are
19    more, but you know, we have had -- I know they have
20    Leadership Tampa comes and does something, just because
21    I hear things coming and going, but I don't participate
22    in those.
23         Q    And are you aware if Mr. Warren's attorneys
24    have asked if you would meet with them after this
25    deposition?
```

Renee Muratti
October 24, 2022

Page 62

1       A     No one has asked me to do that.

2       Q     **No further questions.**

3             MR. WYLER:  I have just a couple, just not

4       really related to the substance of this but more

5       related to Ms. Muratti's availability going

6       forward.

7                         CROSS-EXAMINATION

8    BY MR. WYLER:

9       Q     **Ms. Muratti, what's your understanding of the**

10   **trial date in this matter?**

11      A     My understanding is it's November 29th.

12      Q     **And is it true that you have a preplanned,**

13   **prepaid vacation that was scheduled long before this**

14   **trial date was ever set or this lawsuit was ever**

15   **brought?**

16      A     It was scheduled before I heard when the trial

17   date -- before the trial date was set, I believe, or

18   before it was made public.

19      Q     **Okay.  And when are you going out of town and**

20   **where are you going?**

21      A     November 30th we leave for Europe.

22      Q     **Okay.  And how long will you be gone?**

23      A     Eight or nine days.

24      Q     **So is it your assertion then that you are**

25   **unavailable for this trial?**

Renee Muratti
October 24, 2022

Page 63

1        A     Starting November 30th, I am unavailable.

2        Q     I want to make that clear for the record.  I

3    have no further questions.

4             MR. SINGER:  I would like to go off the record

5             for about two minutes and then we can come back

6             right back on.

7                  (Break from 12:00 p.m. to 12:02 p.m.)

8                      CROSS-EXAMINATION

9    BY MR. SINGER:

10       Q     Ms. Muratti, just to remind you, my name is

11   David Singer, and I am one of the counsels for

12   Mr. Warren in this matter, and I have just a few

13   questions for you.

14             We may go over some of the same documents that

15   we went over during Mr. Levesque's questioning, and I

16   may ask you some similar questions but maybe in a

17   different way.  So bear with me.  I believe our time

18   together will be brief moving forward.

19             I would like to refer you back to Exhibit C.

20       A     The prosecutorial discretion memo?

21       Q     Yes, prosecutorial discretion memo.  And just

22   to refresh me, was this the subject of any discussion at

23   any executive committee meeting?

24       A     Yeah.  I mean, I feel like we did discuss it.

25   If you wanted specific dates or which parts, no, but it

Renee Muratti
October 24, 2022

Page 64

 1   was discussed and shared.

 2        Q    Was it discussed at a chief's meeting?

 3        A    I believe it was.  I believe that was part of

 4   the rollout.

 5        Q    After it was finalized, how was it distributed

 6   to the office?

 7        A    I believe it was discussed at the chief's

 8   meeting and then distributed by e-mail.

 9        Q    Do you remember if there was a meeting?

10        A    There was.

11        Q    Could you tell me about that?

12        A    Yes, we did have an office-wide meeting where

13   Andrew discussed it or -- it may not have been

14   office-wide.  It may have been attorneys only, but --

15        Q    I am going to hand you a copy of this policy,

16   of this memo, where I have made some highlights.  And I

17   will show it to counsel again.

18             On page 1 at the top, I have highlighted the

19   subject.  Can you read what is highlighted on page 1?

20        A    Prosecutorial Discretion and the Mission of

21   Criminal Justice.

22        Q    Turn to page 2.  I have highlighted the title

23   of the first section of this policy which is in italics.

24   Can you read the highlighted title in italics.

25        A    Exercise Discretion at Every Stage.

Renee Muratti
October 24, 2022

Page 65

1       Q      Just below that on page 2, I have highlighted

2    the text of that paragraph of the section titled

3    Exercise Discretion at Every Stage.  Would you bear with

4    us and just read that aloud.

5       A      "There is no simple formula that yields the

6    right prosecutorial outcome.  Case-specific review is a

7    hallmark of our criminal justice system.  In every case,

8    ASAs must exercise discretion based on the facts of that

9    case, the nature and circumstances of the offense, the

10   defendant's criminal history or lack thereof, victim

11   input, and other factors.  ASAs must exercise that

12   discretion at every stage from charging through plea

13   negotiation, trial, and sentencing.  Additionally, ASAs

14   must continually exercise discretion throughout the

15   pendency of a case beyond those key decision points.

16   The facts and circumstances may change and consequently

17   warrant re-evaluating a decision that has already been

18   made."

19      Q      What did this mean to you?

20      A      I think this is a more articulate version of

21   what I was trying to explain before, is the idea that

22   you don't just check off boxes for the elements, that

23   you are constantly reassessing and re-evaluating a case,

24   and that you should be looking at more than just the

25   checked boxes but the actual outcome, the impact, things

1    like the victims' needs, things like that.

2        Q    And was this the approach that was generally

3    taken by assistant state attorneys under Mr. Warren?

4        A    I think that is the approach that we attempted

5    to get them to take, yes.

6              MR. SINGER:  My colleagues and the court

7         reporter are going to have to remind if we used

8         either the FJP --

9              MR. LEVESQUE:  D.

10             MR. SINGER:  If you could turn to Exhibit D.

11             MR. LEVESQUE:  I'm sorry.  That's the first

12        letter.

13             MR. SINGER:  Let's do the gender letter first.

14        Should we stick with the exhibit letter for

15        Mr. Wilds' deposition or should we --

16             MR. LEVESQUE:  Tell you what, we have got D

17        for that one.  We will make -- if you are going to

18        do the transgender, we will make that F.

19             (Exhibit F marked for identification.)

20    BY MR. SINGER:

21        Q    I will give you a few minutes to take a look

22    at this.  There is no rush.  And just general

23    familiarity with it -- I am not going to ask you much

24    about the substance of it.

25        A    Exhibit F, Joint Statement from Elected

Renee Muratti
October 24, 2022

Page 67

1    Prosecutors and Law Enforcement Leaders Condemning the

2    Criminalization of Transgender People?

3         Q    That is the one.  When did you first learn of

4    the existence of this letter written by FJP?

5         A    I think when you just handed it to me.  I have

6    never read this letter.

7         Q    Are you aware that Mr. Warren signed this

8    letter?

9         A    I am not aware that he signed this specific

10   letter.

11        Q    Got you.

12        A    I do have social media accounts, so obviously

13   I'm aware he has taken positions on things, but I have

14   not read the letter.  I did not.

15        Q    Were you involved in any aspect of the

16   drafting, signing, consideration of this letter?

17        A    No.

18        Q    To the best of your knowledge, did the

19   executive committee at the state attorney's office

20   discuss and consider this letter?

21        A    No.

22        Q    To the best of your knowledge, was this gender

23   statement distributed throughout the office like an

24   official office policy?

25        A    No.

Renee Muratti
October 24, 2022

Page 68

1    Q    Was there any training on this gender

2    statement?

3    A    No.

4    Q    Do you know if Mr. Warren was ever updated by

5    the executive committee on this gender statement?

6    A    Not that I'm aware of.

7    Q    Under any circumstances, would you consider

8    this gender statement a policy of the state attorney's

9    office?

10    A    I haven't read it in detail, but no.

11    Q    And then let's go back to Exhibit D.

12    A    I do not have Exhibit D.

13         (Exhibit D marked for identification.)

14    BY MR. SINGER:

15    Q    We are going to go through some of the same

16    questions here.

17    A    Okay.

18    Q    When did you first learn of this letter

19    written by FJP on the subject of criminalization of

20    abortions?

21    A    This specific letter I have not seen until it

22    was just handed to me.  I know there were statements

23    made by Mr. Warren about the criminalization of

24    abortions.

25    Q    Were you involved in Mr. Warren's decisions

Renee Muratti
October 24, 2022

Page 69

1    regarding this letter?

2        A    No.

3        Q    To the best of your knowledge, did the

4    executive committee discuss or consider this letter

5    before Andrew lent his name to it?

6        A    No.

7        Q    To the best of your knowledge, was this

8    distributed through the office like an official office

9    policy?

10       A    It was not.

11       Q    Was there any training on this statement?

12       A    No.

13       Q    Was Mr. Warren ever updated by the executive

14   committee on the abortion statement?

15       A    No.

16       Q    Would you consider this statement a policy of

17   the state attorney's office?

18       A    No.

19       Q    Go back to Exhibit C, which is the

20   prosecutorial discretion.

21       A    All right.

22       Q    You had said that this was the aspiration of

23   Mr. Warren and the executive committee that all

24   assistant state attorneys would approach their work with

25   these directives; is that correct?

Renee Muratti
October 24, 2022

Page 70

```
 1     A    Yes.
 2     Q    In your opinion and experience and as a member
 3   of the executive committee, did the statements in this
 4   memorandum basically just codify what was already the
 5   understanding for office procedures?
 6     A    It codified what Andrew wanted to be the
 7   understanding.  I think the reason for writing it out is
 8   because there was confusion amongst ASAs and to give the
 9   ASAs something that, if they had a concern and wanted to
10   go talk to a chief, they would have something to point
11   to, This is what I am coming to talk to you about, I
12   feel this way, here is my assessment, here is why, and I
13   have been encouraged to express my assessment of the
14   case.
15     Q    Do you think it achieved that purpose?
16     A    I don't know.
17     Q    Fair enough.  Fair enough.  Let's go back to
18   Exhibit A, which is the bike stop policy.
19     A    Yes.
20     Q    Are you aware -- strike that.
21          Has Ms. Lopez as acting state attorney
22   rescinded the bike stop policy?
23     A    It is my understanding that she has.
24     Q    Is it your understanding that she has
25   rescinded the low-level offense policy?
```

Renee Muratti
October 24, 2022

Page 71

 1     A    Yes.

 2     Q    Is it your understanding that she has

 3   rescinded the prosecutorial discretion policy as we just

 4   discussed in Exhibit C?

 5     A    Yes.  But to some extent, like I said, a large

 6   portion of what is in there is articulation of basic

 7   ethics and approaches to prosecution.  So she has not

 8   rescinded peoples' ethical obligations.  She has

 9   rescinded this document.  I think there is some portions

10   of this document that gave some insight into Andrew's

11   thought process like the fact that he is a big supporter

12   of diversion programs and that he wanted to explore the

13   use of those diversion programs.  I don't think

14   Ms. Lopez has revoked us using diversion programs, so --

15     Q    Were you consulted before any of these three

16   policies were rescinded?

17     A    No.

18     Q    Have you had any discussions with Ms. Lopez

19   about this deposition?

20     A    No.

21     Q    You said you did discuss this deposition with

22   Mr. Weisman?

23     A    Yes.

24     Q    Did you ask Mr. Weisman to attend this

25   deposition with you?

Renee Muratti
October 24, 2022

Page 72

1    A    I did not.

2        Q    Did you ever ask Mr. Weisman to appear as your

3    counsel at this deposition?

4    A    No.

5        Q    Did you ever tell Mr. Weisman that appearing

6    at this deposition made you very scared?

7    A    Yes.

8        Q    Have we exceeded your expectations?

9    A    It has been fine.

10       Q    Did you tell Mr. Weisman that you needed his

11   moral support for this deposition?

12   A    That doesn't sound like something I would say,

13   but yeah -- but I mean, he and I have talked more

14   generally about the deposition process, and like I said,

15   our excitement going through this.

16       Q    Ever express to Mr. Weisman that you feared

17   for your job because of this deposition?

18   A    I don't know.  I don't recall.

19       Q    Did you ask Mr. Weisman actually not to attend

20   this deposition?

21   A    I did not specifically ask him not to.  He had

22   said if he heard from me that I wanted him to be here,

23   he would be here, is the way he put it.

24       Q    Have you spoken with anyone on the governor's

25   legal team about this deposition?

Renee Muratti
October 24, 2022

Page 73

```
 1      A    No.

 2      Q    Have you spoken with anyone from the

 3   governor's office not on his legal team about this

 4   deposition?

 5      A    No.

 6      Q    Did you speak with anyone in the attorney

 7   general's office about this deposition?

 8      A    No.

 9      Q    Did you speak with anyone in the sheriff's

10   office about this deposition?

11      A    No.

12      Q    Did you speak with anyone in Hillsborough

13   County government about this deposition?

14      A    Only that I was having a deposition, but from

15   a personal side, not for -- not work related.  No one in

16   Hillsborough County government was actually interested.

17   It's a friend who is there.

18      Q    Did you speak with anyone in the state

19   legislature or their staff about this deposition?

20      A    No.

21      Q    I want to take you back to the morning of

22   August 4th, 2022.

23      A    Okay.

24      Q    Can you recall where you were that morning?

25      A    That's the day of the press conference by the
```

Renee Muratti
October 24, 2022

Page 74

1  governor?

2      Q    Yes.

3      A    Yes.  I was in Maine.

4      Q    When did you first learn that the governor had

5  suspended Mr. Warren?

6      A    I want to say late morning, I got a text

7  message from Kim Hindman that let me know the

8  governor -- because she knew I was traveling -- to let

9  me know the governor was about to do a press conference

10  and she thought that Andrew was going to be suspended,

11  to which I replied, Call me, please.

12      Q    Did you watch the press conference?

13      A    I did not watch the press conference.  I was

14  in security at TSA.

15      Q    And you learned after the press conference

16  that Mr. Warren -- that the governor had, in fact,

17  suspended Mr. Warren?

18      A    Yes.

19      Q    What was your reaction?

20      A    I was shocked.

21      Q    How did you first learn that Ms. Lopez would

22  take over as acting state attorney?

23      A    After I got through security, I don't remember

24  if I spoke to Kim or Gary, but I feel like one of them

25  probably told me because they also arranged for me to be

Renee Muratti
October 24, 2022

Page 75

1    able to listen in when Larry met, gave his little talk

2    and said that the new state attorney was on the way.

3                    MR. SINGER:  I think that's all I have.

4                    MR. LEVESQUE:  I have got just a couple of

5        follow-ups.

6                          REDIRECT EXAMINATION

7    BY MR. LEVESQUE:

8        Q    I want to confirm you haven't seen any of the

9    Fair and Just Prosecution statements before today,

10   correct?

11       A    Correct.

12       Q    But I think you indicated that you were aware

13   of Mr. Warren's statements through social media?

14       A    Just -- yes, that there were statements on

15   social media.

16       Q    And so one of those statements -- I guess, can

17   you describe the statements that you are aware of that

18   he has put out there.

19       A    Oh, I am sure it was -- it wasn't even

20   necessarily from him.  I am sure it was something on

21   Twitter where it was like a headline-type thing.  So it

22   could have been Andrew; it could have been from someone

23   else on my feed.

24       Q    Were you aware that Mr. Warren had made public

25   statements that he would not prosecute abortion-related

Renee Muratti
October 24, 2022

Page 76

1   crimes?

2       A    I am -- yes, I became aware of that, but I

3   didn't really -- I know this sounds bad, but I didn't

4   really look at them because I don't have any cases like

5   that.

6       Q    **Even though you don't have cases like that, if**

7   **you were to read a statement like that, would it be fair**

8   **to assume that you would know that our office isn't**

9   **going to prosecute abortion-related crimes?**

10      A    If I read a statement like that and I knew it

11  was on a particular topic and we actually got a case on

12  that, I would go speak to Mr. Warren about it because

13  what is said out in the world is different than

14  analyzing a specific case.

15           I would have a -- it would give me a flag to

16  me that it would be a case he would be interested in and

17  I would go talk to him before making a decision or going

18  further on it.

19      Q    **And that would deviate from your other**

20  **policies where you would just use the discretion that he**

21  **has described in this memorandum, correct?**

22      A    That would be exercising my discretion as

23  well.  Because with Andrew, as with any state attorney,

24  their name is ultimately on everything we do, although

25  obviously we do such a huge volume, no state attorney

Renee Muratti
October 24, 2022

Page 77

1    can know everything that's going on.  So part of

2    exercising discretion would be to make him aware if

3    there was something that I thought was of specific

4    interest to him, if I thought it was specifically

5    newsworthy, if it was part of a larger trend or concern,

6    I would exercise my discretion to go talk to him about

7    it.  And I would get guidance from him, but also I can

8    be a little opinionated, and I would make my own

9    assessment and share that with him, but he would be

10   the -- his name is on the door and the files and the

11   pleadings, so he would make the ultimate decision.

12            But I think that would be consistent with

13   other things.  When we had riots going on, obviously

14   that was an important thing going on that I knew

15   Mr. Warren would want to know about and that he would

16   specifically ask about.  So if we saw cases -- he didn't

17   direct every single case or the decision on each case,

18   but he was made aware of it, so if he felt we were doing

19   something inappropriate or that didn't follow his

20   course, he could tell us so.  But for the most part, it

21   would be a discussion about the case and our

22   recommendations about what we wanted to do.

23       Q    Are there criminal laws on the books that you

24   disagree with?

25       A    Yes.

Renee Muratti
October 24, 2022

Page 78

1     Q    But you as a prosecutor are still obligated to

2     enforce them, correct?

3          A    Yes.

4          Q    Do you think it would be an appropriate

5     exercise of prosecutorial discretion to say, I'm not

6     going to enforce a law that I disagree with?

7          A    I guess it would depend on the law and the

8     circumstances, if you are asking me a hypothetical.

9          Q    Well, I guess what would be an example of a

10    law that would be okay for you not to enforce because

11    you disagree with the law?

12         A    Well, I think if you -- I am thinking more

13    about historically, if we were to see laws like that

14    again, where the laws were blatantly discriminatory.  We

15    are not talking about disparate minority impact, but

16    where it was directed to a particular race or gender, I

17    can see where there were times where it was not the

18    appropriate thing to prosecute because it was the wrong

19    thing to do.

20              I think we have seen historically in other

21    countries in the past that it's not the right thing to

22    do, but just because I don't happen to like a particular

23    law doesn't mean I am not going to enforce it.  I think

24    that's a different level we are talking at that point in

25    time.  I think that's very serious and a different

Renee Muratti
October 24, 2022

1    level.

2              The fact that I disagreed with a Hillsborough

3    County ordinance personally, that's not grounds for me

4    to not go forward on that prosecuting or enforcing that

5    law, and I should still assess it.  I think impact on

6    the community, I think the impact on public safety, I

7    think my ability to prove those cases, all of those are

8    appropriate assessments for a law, but --

9        Q    I guess you used the example of a racial

10   discriminatory law that specifically targets a race, as

11   an example?

12       A    Uh-huh.

13       Q    Are there other examples that you would use?

14       A    Not that I can think of right now.

15       Q    Certainly if you were to prosecute that law,

16   the defendant would have the ability to raise

17   constitutionality as a defense?

18       A    They would have the ability, but as a

19   prosecutor our role is much different.  I am not

20   representing a specific client.  Because I am

21   representing the State, I also have to be aware of

22   constitutional issues.

23              Yeah, there are things that are fairly up for

24   debate or things that should certainly be litigated.

25   The fact someone says Fourth Amendment doesn't mean we

Renee Muratti
October 24, 2022

```
 1   should run away scared and drop a case, but there are

 2   times where you see a constitutional violation that, in

 3   good faith as prosecutors, we shouldn't be going forward

 4   on those.  I think, once again, it is another assessment

 5   we make during the prosecution of a case because we are

 6   working for a different client.

 7             A lot of times we have -- in county court, you

 8   have a lot of pro se defendants who aren't educated

 9   about the system and don't know what's going on, and so

10   sometimes your job, even if you believe you should be

11   convicting that person, a big part of your job is making

12   sure you are doing it fairly, and that just because they

13   don't have the knowledge to raise an issue or let the

14   Court know about something, if I know about it as a

15   prosecutor, I do have a duty to do that.

16        Q   It sounds like part of your analysis there is

17   where, in the example of a racial discriminatory law,

18   you are relying on long-settled case law that is not

19   really up for debate to make that determination that

20   that law that they have passed is unconstitutional under

21   all the current precedence --

22        A   Well, I mean, that's -- I am thinking the

23   second part, I was thinking more of things we actually

24   have in front of us, like you may have something that

25   clearly was a bad stop or a bad search.  Even the
```

Renee Muratti
October 24, 2022

1   officer was making their best judgment -- exercising

2   their best judgment at the time, they are human also,

3   but if it's -- if there is no legal basis for me to

4   argue it's a good search, I should not be arguing that.

5   And if I have a defendant who isn't knowledgeable enough

6   to raise that issue, it is something I should evaluate

7   as part of my case evaluation.

8        Q    I appreciate that.  I am not -- I am less

9   concerned with the facts that might influence the

10  decision and more concerned with maybe the abstract

11  concept of the prosecutor's duty to enforce a law on the

12  books that the legislature has passed and the

13  circumstances where that prosecutorial discretion can,

14  for all intents and purposes, act like a veto of the

15  criminal laws in that jurisdiction.

16            So in that construct, I can appreciate the

17  racial example that you gave because there are clear

18  Supreme Court precedents that address that.

19       A    But there weren't at the time those laws went

20  into effect.

21       Q    Fair enough.

22       A    And that's how you got to the Supreme Court

23  and that's -- you know --

24       Q    And where we are in today's society, though,

25  with those long histories of precedence going back to

1    the '50s and '60s after the Civil Rights Act and the

2    subsequent legislation, we are in a different place now.

3              So if the legislature were to pass such a law,

4    that would be something that you could point to the

5    court's precedence and say, this is not something that

6    we should enforce because it is blatantly

7    unconstitutional.  You could make that statement,

8    correct?

9         A    Yes.  Our office still relies on prior

10   precedence, uh-huh.

11        Q    In the context of abortion that is

12   specifically addressed in the statement, you wouldn't be

13   able to make that same argument, though, would you,

14   because the Supreme Court has said that abortion is no

15   longer a fundamental constitutional right; it can be

16   regulated by the states.  And therefore, for a

17   prosecutor exercising their discretion, they would

18   essentially be saying, I'm going to ignore what the

19   Florida legislature did on the topic of abortion, and I

20   am just not going to prosecute it because I think the

21   Supreme Court of the United States got it wrong.

22        A    The most recent Supreme Court decision --

23        Q    Correct.

24        A    -- we are referring to, okay, not the prior

25   precedent.

Renee Muratti
October 24, 2022

Page 83

 1              Well, here is the thing:  As a prosecutor, I
 2   don't make assessments on a case that I don't have.  I
 3   have opinions.  Like I said, I am an opinionated person.
 4   I have opinions on a lot of things, but that doesn't
 5   mean -- but the way I do my job as a prosecutor, once I
 6   receive a case is when I make the assessment of what I
 7   am going to do.
 8              I don't -- you know, like I said, I have a lot
 9   of opinions, personal opinions, that's not what my job
10   is as a prosecutor.  As a prosecutor, I wait until I
11   receive a case and then I make an assessment of that
12   case.
13        Q    Well, then if that's the case, what possible
14   reason could Mr. Warren have for going out and publicly
15   stating, I am not going to prosecute a whole class of
16   crimes in Florida that involve abortions?
17              MR. SINGER:  Object to form.
18        A    I don't know.  That would be a question for
19   Mr. Warren, not for me.  I wasn't part of the
20   discussion.
21   BY MR. LEVESQUE:
22        Q    Well, is that type of statement -- does it
23   deviate from the prosecutor code of conduct?
24        A    I haven't read the statement in detail.  I
25   have never been told as a prosecutor in the office

Renee Muratti
October 24, 2022

Page 84

1   that -- first of all, I don't have any of these -- we

2   haven't had any of these cases, so it's not really

3   something that's come up.  I have not been told by

4   Andrew that I should handle them in a particular way,

5   that if one came in I should do this or that.  I have

6   not even been instructed by Andrew that I should tell

7   him about the case.  When I told you I would bring it to

8   him, it's because that would be me exercising my

9   discretion and going to my supervisor for guidance.  But

10  Andrew has never told me to handle an abortion or

11  transgender or gender-affirming health care case in a

12  particular way.  He has never given me a directive.  We

13  have never had a conversation about it.

14       Q    Are you aware of any other statements that

15  Mr. Warren has made publicly or privately where he has

16  said, We are not going to prosecute this class of

17  crimes?

18       A    I can't think of off the top of my head, no.

19       Q    So at least as it relates to abortion and

20  transgender, those are really unique statements that

21  Mr. Warren put out, correct?

22       A    I don't know.  I don't read all of his

23  statements.

24       Q    But as you sit here today --

25       A    Sorry.

Renee Muratti
October 24, 2022

Page 85

1       Q     You are not aware -- as you sit here today,

2   you are not aware of him making those types of

3   statements related to any other crimes, correct?

4       A     I am not, yeah.

5       Q     That's all the questions I have.  Thank you.

6             THE STENOGRAPHER:  Same orders?

7             MR. LEVESQUE:  Yes.

8             MR. SINGER:  Yes.

9             MR. WYLER:  Do you want to read or waive?

10             THE WITNESS:  I want to read.

11             (Deposition concluded at 12:30 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Renee Muratti
October 24, 2022

Page 86

1                              CERTIFICATE OF OATH

2

3     STATE OF FLORIDA

4     COUNTY OF HILLSBOROUGH

5          I, Cassie O. May, RMR, Notary Public, State of

6          Florida, certify that RENEE MURATTI personally

7          appeared before me on October 24, 2022 and was

8          duly sworn.

9

10         Signed this 6th day of November, 2022.

11

12

13     _____
       Cassie O. May, RMR
14     Notary Public, State of Florida
       My Commission No. HH 106641
15     Expires: 04/23/2025

16

17

18

19

20

21

22

23

24

25

Renee Muratti
October 24, 2022

Page 87

1                    CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA

4    COUNTY OF HILLSBOROUGH

5

6          I, Cassie O. May, RMR, do hereby certify that I

7          was authorized to and did stenographically

8          report the foregoing deposition of RENEE

9          MURATTI, pages 1 through 85; that a review of

10         the transcript was requested; and that the

11         transcript is a true record of my stenographic

12         notes.

13         I FURTHER CERTIFY that I am not a relative,

14         employee, attorney, or counsel of any of the

15         parties, nor am I a relative or employee of any

16         of the parties' attorney or counsel connected

17         with the action, nor am I financially

18         interested in the action.

19         Dated this 6th day of November, 2022.

20

21

22

23    _____
      Cassie O. May, RMR
24

25

Renee Muratti
October 24, 2022

Page 88

# ERRATA SHEET

DO NOT WRITE ON THE TRANSCRIPT
ENTER CHANGES ON THIS SHEET

ANDREW WARREN V. RON DESANTIS
Deponent:  Renee Muratti
Date of Deposition:  October 24, 2022
Case No.:  4:22-cv-302-RH-MAF

PAGE    LINE          REMARKS

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Under penalties of perjury, I declare that I have read
the foregoing document and that the facts stated in it
are true.

Signature of Witness _____

Dated this _____ day of _____, _____.

Job No.:  278410

Renee Muratti
October 24, 2022

Page 89

November 6, 2022

Jacobs, Scholz & Wyler, LLC
Douglas Wyler
doug@jswflorida.com


Re:  Andrew Warren v. Ron DeSantis
Case No.:  4:22-CV-302-RH-MAF

Please take notice that on October 24, 2022, your
client's deposition was taken in the above cause.  At
that time, signature was not waived.  The transcript is
now available for your client to read and sign.

Please call (888)811-3408 or e-mail
production@phippsreporting.com between the hours of 9:00
a.m. and 4:00 p.m., Monday through Friday, for access to
a read-only PDF transcript via computer.  Please execute
the PDF-fillable Errata Sheet which will be forwarded to
you by Phipps Reporting.  The Errata Sheet can also be
downloaded from www.phippsreporting.com.  Once
completed, please print, sign, and return to us for
distribution to all parties.

If your client does not read and sign the deposition
within 30 days, the original, which has already been
forwarded to the ordering attorney, may be filed with
the Clerk of the Court.

If your client wishes to now waive signature, please
have deponent sign his/her name in the blank at the
bottom of this letter and return to the address listed
below.

Very truly yours,


_____
Cassie O. May, RMR
Phipps Reporting, Inc.
www.PhippsReporting.com

I do hereby waive my signature.


_____
RENEE MURATTI

Job No.:  278410