## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

ANDREW H. WARREN,

       Plaintiff,

v.                                 CASE NO. 4:22cv302-RH-MAF

RON DESANTIS,

       Defendant.

_____/

## ORDER ON THE MERITS

Florida Governor Ron DeSantis suspended elected State Attorney Andrew

H. Warren, ostensibly on the ground that Mr. Warren had blanket policies not to

prosecute certain kinds of cases. The allegation was false. Mr. Warren's well-

established policy, followed in every case by every prosecutor in the office, was to

exercise prosecutorial discretion at every stage of every case. Any reasonable

investigation would have confirmed this.

Mr. Warren has sued the Governor. This order sets out the court's findings

of fact and conclusions of law following a bench trial. The order concludes the

suspension violated the Florida Constitution and was based in part on a violation of

the First Amendment to the United States Constitution. But the Eleventh Amendment prohibits a federal court from awarding relief of the kind at issue against a state official based only on a violation of state law. And the suspension would have occurred even had there been no First Amendment violation—the First Amendment violation was not essential to the outcome. This order thus directs entry of judgment for the Governor.

## I. Background

### *A. The Florida Constitutional Structure*

Florida has 20 judicial circuits. As required by the Florida Constitution, each circuit has an elected state attorney who serves as the circuit's chief prosecutor. Fla. Const. art. V, § 17. A state attorney is part of the executive branch, but under Florida's unique constitutional structure, a state attorney is not an employee of, or supervised by, the governor. Instead, a state attorney is a constitutional officer—an officer of independent stature within Florida government. A "state attorney has complete discretion in making the decision to charge and prosecute" any given case. *Cleveland v. State*, 417 So. 2d 653, 654 (Fla. 1982).

As one would expect, it sometimes happens that a governor and state attorney are members of different political parties with divergent views on political issues affecting the prosecutorial function. A Florida governor, unlike, for example, the President of the United States, is stuck with the state attorneys the

voters in the various circuits elect. Policy differences are an inevitable consequence of the system the Florida Constitution put in place.

To be sure, a governor may suspend certain officials, including state attorneys, for "malfeasance, misfeasance, neglect of duty, drunkenness, incompetence, permanent inability to perform official duties, or commission of a felony." Fla. Const. art. IV, § 7(a). Even so, "the power to remove is not analogous to the power to control." *Whiley v. Scott*, 79 So. 3d 702, 715 (Fla. 2011). Running a state attorney's office is the state attorney's job, not the governor's. A governor cannot properly suspend a state attorney based on policy differences.

### B. The Suspension of Mr. Warren

Governor DeSantis suspended Mr. Warren by executive order on August 4, 2022. The order asserted four writings—two of which were attached to the order—constituted "blanket" nonprosecution policies. The order asserted blanket nonprosecution policies show both "neglect of duty" and "incompetence."

"Neglect of duty has reference to the neglect or failure on the part of a public officer to do and perform some duty or duties laid on him as such by virtue of his office or which is required of him by law." *Israel v. DeSantis*, 269 So. 3d 491, 496 (Fla. 2019) (quoting *State ex rel. Hardie v. Coleman*, 155 So. 129, 133 (Fla. 1934)). Incompetence " 'has reference to any physical, moral, or intellectual quality, the lack of which incapacitates one to perform the duties of his office' and

'may arise from gross ignorance of official duties or gross carelessness in the discharge of them . . . [or] from lack of judgment and discretion.' " *Id*. at 496 (quoting *Hardie*, 155 So. at 133).

In asserting a blanket nonprosecution policy was a valid basis for suspension, the Governor relied on *Ayala v. Scott*, 224 So. 3d 755 (Fla. 2017). That case arose from State Attorney Aramis Ayala's statement that she would never pursue the death penalty, even in cases that "absolutely deserve the death penalty." *Id.* at 759. Governor Rick Scott reassigned Ms. Ayala's death-eligible cases to a different state attorney, and the Florida Supreme Court upheld the reassignment. Nobody suggested Ms. Ayala could be suspended from office on this basis.

Mr. Warren never made a statement similar to Ms. Ayala's. He never said he would not prosecute a case that absolutely deserved to be prosecuted. Quite the contrary. He said repeatedly that discretion would be exercised at every stage of every case.

### C. This Lawsuit

Mr. Warren filed this lawsuit challenging his suspension. He asserted two claims: first, a claim under 42 U.S.C. § 1983 and the First Amendment; and second, a state-law quo warranto claim based on the Florida Constitution. The complaint named the Governor as the sole defendant and sought declaratory and injunction relief, not damages.

Mr. Warren moved for a preliminary injunction. The Governor moved to dismiss. After full briefing and oral argument, the preliminary-injunction motion was denied without reaching the merits. The state-law claim was dismissed without prejudice as required by *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 121 (1984). That case held that the Eleventh Amendment bars any claim for injunctive relief based on state law against a state or against a state officer.

The First Amendment claim went forward. Each side conducted discovery. The Governor announced his decision not to call himself as a witness and not to call his chief of staff. The Governor moved to block his deposition and the chief of staff's and to prevent Mr. Warren from calling them as witnesses at trial. The motion was granted, so at the Governor's insistence, the record does not include his testimony or his chief of staff's.

Credibility determinations are made as are consistent with this order. The testimony of Mr. Warren and three chief assistant state attorneys—Jeria Bridget Wilds, Kimberly Hindman, and Renee Muratti—are credited in full. They answered questions directly, credibly, temperately, and based on personal knowledge. Had the Governor or his representatives checked, they could easily have learned the same information before the suspension.

### D. Preview of the Issues

The case turns on issues of both fact and law.

The overriding factual issue is why the Governor did it—why he suspended Mr. Warren. The record establishes beyond doubt that six factors played a part. The more difficult factual question is which of the factors were essential to the outcome.

One factor in the suspension was Mr. Warren's general approach to the prosecutorial function—how he did his job. To facilitate discussion of this issue, a word is in order about terminology. Criminal law has generated differences of opinion for about as long as there has been criminal law. Some participants in the criminal justice system favor such things as less aggressive prosecution of nonviolent offenses, alternatives to cash bail, and shorter sentences. Others favor more aggressive prosecution, more pretrial detention, and longer sentences. There are countless permutations, and categorizing an individual as a reform advocate or left-leaning, on the one hand, or as a law-and-order proponent or right-leaning, on the other hand, is likely to be misleading on any specific issue. This order uses those terms not because they are precise but because they are as good as any others and are sufficient for present purpose to describe contrasting viewpoints on prosecutorial issues. Using this terminology, a factor in Mr. Warren's suspension was that he was a reform prosecutor.

A second factor in his suspension was his *advocacy* of reform-prosecutor positions, including his association with a left-leaning organization, Fair and Just

Prosecution ("FJP"), and his joinder in four FJP statements. Two of the statements, which dealt with transgender and abortion issues, were attached to the executive order suspending him.

A third factor, listed separately because of its significance and different legal standing, was a sentence in the FJP abortion statement committing to refrain from prosecuting some kinds of abortion cases.

A fourth factor consisted of two office policies, one dealing with bicycle and pedestrian stops, the other with low-level offenses.

A fifth factor was Mr. Warren's political affiliation with and receipt of campaign funding from the Democratic Party and, indirectly, from George Soros.

A sixth factor was the anticipated political benefit to the Governor from the suspension.

The legal questions include which of these factors involved speech or activity protected by the First Amendment and, for those factors, whether relief is available in this court based on their improper consideration.

## II.  Facts

This order sets out the facts in three parts: first, the actual operation of the State Attorney's Office under Mr. Warren; second, the steps taken by the Governor and his staff leading to Mr. Warren's suspension; and third, facts related to the political benefit the suspension was expected to, and did, generate.

### A.  The State Attorney's Office under Mr. Warren

Mr. Warren is a graduate of Brandeis University and Columbia Law School. After a federal clerkship and a stint at a national law firm, he built a career in the United States Department of Justice, first in Washington, D.C., and then as an Assistant United States Attorney in Tampa.[1] His work ran the gamut from street crime in the District of Columbia Superior Court to complex, high-dollar national and international fraud prosecutions.[2] He received the 2013 Attorney General's award for trial litigation.[3] He served as an instructor at the Department of Justice's National Advocacy Center.[4] He was an extraordinarily well-qualified prosecutor.

Florida's Thirteenth Judicial Circuit consists entirely of Hillsborough County, where Tampa is located. In 2016, Mr. Warren resigned his position as an Assistant United States Attorney and ran for state attorney.

Mr. Warren ran on a reform platform as a Democrat.[5] His opponent was a Republican four-term incumbent. Mr. Warren won by roughly 4,500 votes.[6] He implemented reform policies as he said he would.[7] In 2020 he ran for reelection,

---

[1] *See* Trial Tr., ECF No. 138 at 47–52.

[2] *Id.* at 49–50.

[3] *Id.* at 50–51.

[4] *Id.* at 51.

[5] *Id.* at 52.

[6] *Id.* at 54.

[7] *See id.* at 53–54.

again on a reform platform, and this time he won by roughly 45,000 votes.[8] Voters apparently approved of his reform agenda.

Mr. Warren believed, as a bedrock of his approach to the prosecutorial function, that discretion should be exercised in every case—that each case should be evaluated on its individual merit, not based on hard-and-fast rules.[9] That was the approach in the office before Mr. Warren arrived and throughout his tenure. He personally wrote a memorandum emphasizing the need to exercise discretion at every stage of every case.[10] The office had roughly 130 prosecutors—assistant state attorneys—and Mr. Warren circulated the memorandum to all of them.[11] Mr. Warren personally conducted a training session on the memorandum.[12] As work went forward, Mr. Warren emphasized time and again the requirement to exercise discretion in every case.[13]

Mr. Warren also sought to treat like cases alike and to provide guidance to the 130 prosecutors, many of whom had limited experience. Mr. Warren established an executive committee made up of top assistants, and he instituted a formal process for adopting office policies.[14] The policies were circulated to all the

---

[8] *Id.* at 54.
[9] *Id.* at 66–68.
[10] *Id.* at 68; *see also* Joint Ex. 7, ECF No. 112-7.
[11] Trial Tr., ECF No. 138 at 54 & 67.
[12] *Id.* at 69.
[13] *Id.*
[14] *Id.* at 54–56 & 59–61.

prosecutors and collected in a guidebook.[15] The discretion-in-every-case memorandum was included in the guidebook.[16]

Two of the policies that provided guidance are relevant here. Each provided guidance by adopting a rebuttable "presumption"—a default position that prosecutors were to follow absent circumstances in a particular case that called for different treatment.[17] In the executive order suspending Mr. Warren, the Governor asserted, incorrectly, that the presumptions were blanket policies not allowing the proper exercise of prosecutorial discretion. The executive order cited, but did not attach, the two policies.

One addressed bicycle and pedestrian stops and has been referred to as the "bike policy." After George Floyd's death, there was unrest in Tampa, particularly in the Black community, just as in many cities. Mr. Warren established a Racial Justice Workgroup to identify problems and workable solutions within the criminal-justice system.[18] The Workgroup identified an issue relating to bicycle and pedestrian stops.[19] The Tampa Police Department had worked for years to

---

[15] *See id.* at 72–73.
[16] *Id.*; *see also* Pl.'s Ex. 48, ECF No. 111-32.
[17] Trial Tr., ECF No. 138 at 63.
[18] *Id.* at 79.
[19] *Id.* at 80–81.

remedy

remedy the perception that bicycle stops were being made on a racially disparate

basis—that individuals were being stopped for "biking while Black."[20]

Mr. Warren enlisted researchers at Florida International University to study

the actual data to determine whether the stops and resulting prosecutions were

occurring on a racially disparate basis—whether the perception that this was

occurring was correct.[21] The researchers studied the data as they saw fit, without

input or oversight from Mr. Warren.[22] They concluded there was indeed significant

racial disparity.[23]

Mr. Warren and his executive committee formulated a policy designed to

address the issue. Mr. Warren discussed the proposal with Hillsborough County

Sheriff Chad Chronister, who offered no input; with interim Tampa Police Chief

Ruben Delgado, who offered input that was incorporated into the policy; and,

when she came on board, with Tampa Police Chief Mary O'Connor, who was new

and provided no input.[24]

In Florida, as in most or all jurisdictions, law enforcement officers make

stops and arrests, but *prosecutors* decide whether to file charges. The bike policy

explicitly recognized that bike and pedestrian stops can be a legitimate law

---

[20] *Id.* at 85–86.
[21] *Id.* at 81 & 83–85.
[22] *Id.*
[23] *Id.* at 81.
[24] *Id.* at 85–87.

enforcement tool.[25] The policy did not limit the ability of officers to make stops or arrests. The policy noted, however, that these stops disproportionately burdened Black citizens and could undermine public trust.[26] The policy adopted a presumption that charges would not be filed following an initial encounter with law enforcement solely for a bicycle or pedestrian violation. But the policy explicitly provided that charges could be filed, with a supervisor's approval, if, "based on the facts and circumstances of the case," the "public safety needs of the community" outweighed the presumption.[27] The "public safety needs of the community" was a concept used here and elsewhere to capture the whole of the prosecutorial mission.[28] Serving the public safety needs of the community, after all, was why the office existed—indeed, why there were and are criminal laws.

By its plain terms, this was not a blanket nonprosecution policy, and in any event, the policy worked in tandem with the always-applicable policy requiring the exercise of prosecutorial discretion at every stage of every case.[29] Within two weeks after the bike policy was implemented, charges were filed in a case resulting from a bicycle stop—a case in which the presumption was not applied because the

---

[25] Joint Ex. 23, ECF No. 112-22 at 1.
[26] *Id.*
[27] *Id.* at 2; *see also* Trial Tr., ECF No. 138 at 89–90.
[28] Trial Tr., ECF No. 138 at 89–90.
[29] *Id.* at 71–72.

facts and circumstances of the individual case warranted filing charges.[30] The Governor has offered no explanation for how, if this was a blanket nonprosecution policy, that case was prosecuted.

The other office policy cited in the executive order dealt with low-level offenses. The policy was adopted to deal with the disruption in the court system caused by covid-19.[31] With trials shut down, the backlog was building. Mr. Warren and the executive committee adopted a presumption against charging 15 listed low-level offenses.[32] Examples included having an expired driver's license, not having a valid motorcycle endorsement, panhandling, trespass at a business location, and prostitution.[33] The policy said there was a presumption not to file charges for the listed offenses, but the policy explicitly provided that the presumption could be overcome by "significant public safety concerns"—the same broad concept referenced in the bike policy—"such as" pending felony charges, a violation of probation, or that the charge was part of a course of conduct that included other offenses.[34] The use of "such as" made clear the list was not exhaustive.[35]

---

[30] *Id.* at 93.

[31] *Id.* at 73.

[32] *Id.* at 73–77.

[33] Joint Ex. 24, ECF No. 112-23 at 1.

[34] *Id.*

[35] Trial Tr., ECF No. 138 at 89.

Limiting prosecutions of these low-level offenses was a method for reducing the backlog in the trial courts resulting from the covid lockdown. But there was more to it than that. These offenses often resulted in probation or time-served sentences.[36] Before covid, an arrested person had a prompt first appearance and might make bail. In any event, a plea could be arranged fairly quickly, so the case could be resolved before the defendant was detained longer than the statutory maximum sentence for the offense. But with the covid lockdown, there was a risk that, for example, a defendant facing a 60-day maximum sentence would be detained much longer than that awaiting a plea hearing or trial.[37] The low-level offense policy sought to reduce the number of cases producing such plainly unjust results.

Moreover, for offenses of this kind, an arrest often solved the immediate problem, without a need for filing charges and obtaining a conviction.[38] Thus, for example, a homeless person trespassing in a business parking lot could be arrested and removed. A law enforcement officer making an arrest might prefer that every case be prosecuted, but a reasonable prosecutor might choose, especially in light of the covid backlog, not to file charges. The low-level-offense policy guided the 130 prosecutors in their exercise of discretion: no charges unless warranted by public-

---

[36] *Id.* at 74.
[37] *Id.* at 74–75.
[38] *Id.* at 77.

safety concerns. After adoption of the policy, the office filed charges for listed low-level offenses—the presumption was not applied—when the facts and circumstances warranted filing charges.[39] This was not a blanket nonprosecution policy.

The record includes not a hint of misconduct by Mr. Warren. So far as this record reflects, he was diligently and competently performing the job he was elected to perform, very much in the way he told voters he would perform it. He had no blanket nonprosecution policies. Any minimally competent inquiry would have confirmed this. The assertion that Mr. Warren neglected his duty or was incompetent is incorrect. This factual issue is not close.

This conclusion does not end the analysis because, under *Pennhurst*, Mr. Warren cannot obtain relief in this court on the ground that his suspension violated the Florida Constitution.

### B. The Road to the Suspension

By late 2021, reform prosecutors around the country had drawn the attention of right-leaning public officials and the media.[40] Some apparently were supported by oft-vilified Democratic Party contributor George Soros.[41] In December 2021, Governor DeSantis asked a senior adviser, Larry Keefe, whether Florida had any

---

[39] *Id.* at 78.
[40] *See* Def.'s Ex. 25, ECF No. 142-14 at 3; *see also* Trial Tr., ECF No. 138 at 201.
[41] *See* Def.'s Ex. 25, ECF No. 142-14 at 3.

such prosecutors—prosecutors who, in the Governor's right-leaning view, were not enforcing the law.[42] Mr. Keefe said he would look into it.[43]

Mr. Keefe made some calls to acquaintances and quickly identified Mr. Warren as the Florida prosecutor who had taken the mantle of a reform prosecutor.[44] A major source was the executive director of the Florida Sheriff's Association—an individual who had no knowledge of Mr. Warren but passed along what he heard from others.[45] As Mr. Keefe put it, all roads led to Mr. Warren.[46]

Mr. Keefe said this was a project, not an investigation. He emphasized in his testimony time and again that he did not conduct an investigation.[47] The only two people he talked to, who had any knowledge of the actual operation of the State Attorney's Office under Mr. Warren, were Sheriff Chronister and *former* Tampa Police Chief Brian Dugan. Mr. Keefe did not talk to then-current Police Chief O'Connor or to her immediate predecessor, Mr. Delgado.[48] Mr. Keefe did not speak to Mr. Warren or to anyone who worked in the office—to anyone in position

---

[42] Trial Tr., ECF No. 138 at 201.

[43] *Id.* at 202.

[44] *Id.* at 202–208.

[45] *Id.* at 207.

[46] *Id.*

[47] *See, e.g., id.* at 202, 203, 205, 209, 210, 211, 212, 217, & 257; *see also* Trial Tr., ECF No. 141 at 17.

[48] Trial Tr., ECF No. 138 at 221–22 & 237; Trial Tr., ECF No. 141 at 9.

to know whether Mr. Warren in fact had any blanket nonprosecution policies.[49]

Indeed, Mr. Keefe's inquiries from the outset were not about blanket

nonprosecution policies but only about any reform-prosecutor approach in general.

Sheriff Chronister plainly disagreed with Mr. Warren's approach. Sheriff

Chronister told Mr. Keefe about a very small number of cases that Sheriff

Chronister thought should have been prosecuted more aggressively.[50] The cases

did not involve transgender or abortion issues or any alleged blanket

nonprosecution policy. Mr. Keefe paid no attention to the details and took not a

single note.[51]

Sheriff Chronister selected materials already in his possession and provided

them to Mr. Keefe.[52] Included were the State Attorney's Office bike policy, a

summary of the low-level-offense policy, and the discretion-in-every-case

memorandum.[53]

Mr. Keefe performed a google search and learned Mr. Warren was one of

scores of prosecutors from around the country who had signed on to four FJP

---

[49] Trial Tr., ECF No. 138 at 209 & 215.
[50] *See* Chronister Dep., ECF No. 144-1 at 63; Trial Tr., ECF No. 138 at 222–223; *see also* Joint Ex. 47, ECF No. 136-10.
[51] Trial Tr., ECF No. 138 at 217.
[52] *See* Chronister Dep., ECF No. 144-1 at 63; Trial Tr., ECF No. 138 at 222–223; *see also* Joint Ex. 47, ECF No. 136-10.
[53] Joint Ex. 47, ECF No. 136-10 at 45 & 62.

political statements.[54] The subjects were election issues, the death penalty,

transgender issues, and abortion. Mr. Keefe obtained information online about the

organization, "basically its hierarchy and how it worked."[55] Mr. Keefe made no

effort to determine whether the FJP statements had been adopted as policy in the

Thirteenth Judicial Circuit State Attorney's Office or communicated to the office's

prosecutors. He made no effort to determine whether the statements or the views

expressed in them had ever affected the handling of even a single case. They had

not.[56]

     None of the four statements included any commitment not to prosecute cases

of any given kind, with the possible exception of one sentence in the abortion

statement. The sentence said those who joined in the statement—this included Mr.

Warren—"commit to exercise our well-settled discretion and refrain from

prosecuting those who seek, provide, or support abortions."[57] One could

reasonably understand "refrain from prosecuting" to mean "not prosecute." And

one could reasonably understand "exercise our well-settled discretion" to mean not

---

[54] Trial Tr., ECF No. 138 at 214.

[55] *Id.* at 230 & 243.

[56] *See* Trial Tr., ECF No. 138 at 101–102, 105–108, 180–82, & 193–95.

[57] Joint Ex. 5, ECF No. 112-5 at 1. On an inhospitable, nonliteral reading, snippets of other sentences in the abortion statement could be treated the same as the one sentence. Doing so would make no relevant difference. For convenience, this order consistently refers to the one sentence without noting each time that other snippets could garner the same treatment.

that discretion would be exercised in a specific case if one arose, but that the

discretion had already been exercised and a case to which the sentence applied

would not be prosecuted.

This was not, however, the meaning Mr. Warren attributed to the statement.

FJP issued the statement in response to, and on the same day as, the Supreme

Court's decision in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct.

2228 (2022), which overruled *Roe v. Wade*, 410 U.S. 113 (1973). The FJP

statement expressed disagreement with *Dobbs*. Mr. Warren joined in the statement

because he agreed with its overall tenor—with the view that *Dobbs* was wrongly

decided.[58] Just four days later, Mr. Warren made clear in an interview on local

television station FOX-13 that he would exercise discretion whether to prosecute

any abortion case that came to the office—none ever had—just as the office

exercised discretion in every other case of every other kind.[59] Mr. Warren said he

would follow court rulings on the newly enacted Florida abortion statute, "HB5,"

which banned abortions after 15 weeks of pregnancy.[60] The Governor's Office

knew about Mr. Warren's statements.[61] Mr. Warren included HB5 in an office

training session, complete with its effective date, and formally agreed, as a

---

[58] Trial Tr., ECF No. 138 at 102–104.

[59] Pl.'s Ex. 19, ECF No. 111-13 (native slip-sheet).

[60] *Id.*

[61] Joint Ex. 26, ECF No. 112-25 at 6; *see also* Trial Tr., ECF No. 146 at 130.

condition of his dismissal from a lawsuit challenging the statute's validity under the Florida Constitution, that he would abide the ruling in the case, which is now on appeal.[62]

Mr. Keefe's search also turned up an old newspaper story that said Mr. Soros had provided funds to the Democratic Party, which in turn had provided funds to Mr. Warren's campaign, and that Mr. Warren said the funds helped.[63] Mr. Keefe concluded Mr. Warren was "an expresser or a conduit for Mr. Soros's world views on criminal prosecution."[64]

Mr. Keefe was determined to bring about Mr. Warren's suspension. As he put it, "I wanted this to happen."[65] He wanted it to happen primarily because Mr. Warren was a reform prosecutor of the kind targeted by the Governor and Mr. Keefe from the outset.

Mr. Keefe prepared successive drafts of an executive order making the suspension. The first draft cited and proposed to attach only the FJP abortion statement.[66] The second draft cited and proposed to attach three FJP statements—

---

[62] Trial Tr., ECF No. 138 at 112, 195.
[63] Trial Tr., ECF No. 141 at 15.
[64] ECF No. 141 at 16.
[65] Trial Tr., ECF No. 138 at 250.
[66] Joint Ex. 30, ECF No. 112-28 at 1–11.

those on the death penalty, transgender issues, and abortion.[67] The third draft added

the FJP statement on election issues.[68]

Remarkably, the third draft also included the following:

> WHEREAS, in each of the foregoing instances [the four FJP
> statements], as reflected in Exhibits "A," "B," "C," and "D"
> Warren has ceded the authority of the Office of State Attorney for
> the 13th Judicial Circuit and has subordinated the people of the 13th
> Judicial Circuit to the "Fair and Just Prosecution" ("FJP")
> organization, which is affiliated with entities associated with
> activist George Soros, as described below.

> WHEREAS, Warren has publicly acknowledged that activist
> George Soros ("Soros")-affiliated entities have funded Warren's
> political activities.

> WHEREAS, Soros has supported Warren and other "progressive
> prosecutors" through a series of shell organizations, affiliates
> and pass-through entities, including the Democratic Party.

> WHEREAS, FJP is affiliated with Soros through an organization
> named "The Tides Center," which represents itself publicly as
> an "incubator" that helps stand up progressive groups.

> WHEREAS, The Tides Center receives funding from Soros'
> "Open Society" network of entities.[69]

---

[67] *Id.* at 12-22.
[68] Joint Ex. 12, ECF No. 112-12.
[69] Joint Ex. 12, ECF No. 112-12 at 9–10; *see also* Joint Ex. 30, ECF No. 112-28 at
12–33 (second draft including the same language but omitting reference to Exhibit
D, the election statement).

There it was, stripped of pretext: a motivating factor in Mr. Warren's suspension was that he was a "progressive prosecutor." He was being supported by a contributor to, of all things, the Democratic Party.

The subject line of an email transmitting one of the drafts read, "Updated RP Draft."[70] The draft itself was named "RPsAW2.docx."[71] Mr. Keefe has not explained it, but a reasonable inference is that "RP" is a reference to reform prosecutor; "AW" is a reference to Andrew Warren; and "2" indicates the Word document began as the second draft. The "s" in "RPsAW" suggests that at some point, there were "RPs" plural—more than one—in the crosshairs.

That was where things stood when, perhaps just 10 days before the suspension, Mr. Keefe brought the issue to the Governor's general counsel, Ryan D. Newman, and an assistant general counsel, Raymond F. Treadwell. Mr. Keefe was, as Mr. Newman described it, "beating down my door about this."[72] Mr. Newman and Mr. Treadwell went to work sanitizing Mr. Keefe's draft.

The attorneys did not immediately delete the reference to Mr. Soros and the Democratic Party, but eventually they did.[73] Mr. Newman moved that reference to a separate talking-points document so that it could be retained as part of the

---

[70] Joint Ex. 12, ECF No. 112-12.
[71] Joint Ex. 13, ECF No. 112-13.
[72] Trial Tr., ECF No. 146 at 78.
[73] *See* Trial Tr., ECF No. 141 at 211.

"narrative" but would not be acknowledged as a basis for the suspension.[74] The attorneys added references to the bike and low-level-offense policies—the only things cited in the final draft that had anything to do with how the State Attorney's Office actually operated. The attorneys added an assertion that the FJP abortion statement, standing alone, would be a sufficient basis for the suspension.

Mr. Newman added to the draft a sentence acknowledging Mr. Warren's statement in the FOX-13 interview that he would exercise discretion whether to prosecute abortion crimes based on the "facts and circumstances of every case."[75] The draft attempted to explain this away by citing a graphic attached by the station on what "attorneys" would do—a graphic not attributable to Mr. Warren or consistent with what he said in the interview.[76] The attempted explanation did not work, and the discussion of the FOX-13 interview was removed from the draft. The untrue statement that Mr. Warren had a blanket policy not to prosecute abortion cases was left in.

The Governor edited the executive order to add graphic references to how late-term abortions are performed.[77] He issued the final version on August 4. He

---

[74] Joint Ex. 27, ECF No. 112-26 at 6; Joint Ex. 44, ECF No. 112-36; *see also* Trial Tr., ECF No. 141 at 213.
[75] Trial Tr., ECF No. 146 at 133; Joint Ex. 26, ECF No. 112-25 at 6.
[76] Joint Ex. 26, ECF No. 112-25 at 6.
[77] Joint Ex. 16, ECF No. 112-16 at 4.

staged a media event in Tampa to announce the decision,[78] and he appeared on

Tucker Carlson's nationally televised show that night.[79]

### C. Political Benefit

An elected official can properly seek to maximize the political benefit from

a decision even if the official makes the decision on the merits for wholly

nonpolitical reasons. But when analyzing an official's actual motivation for a

decision, anticipated political benefit may be relevant.

The Governor's press secretary Christina Pushaw tweeted, on the night

before the Governor suspended Mr. Warren, that there would be a major

announcement the next morning. The tweet said everyone should "get some rest

tonight" and "[p]repare for the liberal media meltdown of the year."[80] In this

litigation, the Governor has identified Ms. Pushaw as a person who knew the

reason for the suspension.[81]

The Governor's communications director Taryn Fenske testified at trial that

Ms. Pushaw was severely admonished for her tweet, but I do not credit the

testimony. Ms. Pushaw tweeted an equally partisan, unprofessional message about

---

[78] Def.'s Ex. 24, ECF No. 142-13 (transcript of media event).
[79] Def.'s Ex. 25, ECF No. 142-14 (transcript of Carlson appearance).
[80] Pl.'s Ex. 16, ECF No. 111-11 at 1.
[81] Pl.'s Ex. 5, ECF No. 111-5 at 3–5.

this the next night, after purportedly being admonished.[82] And in any event, any admonishment was about tone, not substance.

Mr. Keefe had Mr. Warren escorted out of his office on August 4 by an armed law enforcement officer. Mr. Keefe provided Mr. Warren a partial copy of the executive order suspending him but did not give Mr. Warren time to read it.[83] When a reporter asked whether Mr. Warren was indeed escorted out by an armed officer, the Governor's staff was happy this added to the buzz but confirmed it only off the record—more buzz, less responsibility.[84]

When the dust cleared—after the suspension, the media event, the Carlson show, and much additional reporting—the Governor's office calculated the free media coverage generated by the suspension at $2.4 million in 14 days.[85]

### III.  Justiciability

In a case of this kind, the issue of justiciability jumps off the page. When the United States House of Representatives impeaches a president or federal judge, the Senate tries the charge, and the federal courts have no role. The issue is nonjusticiable. The same is not true, however, for state impeachments. The

---

[82] Pl.'s Ex. 87, ECF No. 135-44.
[83] Trial Tr., ECF No. 138 at 116.
[84] Pl.'s Ex. 67, ECF No. 111-39 at 1.
[85] Pl.'s Ex. 31, ECF No. 111-22 at 1.

difference is that the United States Constitution textually commits federal impeachments to the House and Senate.

The Constitution includes no such textual commitment for state impeachments. So even if Florida's system, in which a governor suspends and the Senate removes, were deemed equivalent to impeachment, Mr. Warren's First Amendment challenge to this suspension would be justiciable. *See Larsen v. Senate of the Commonwealth of Pa.*, 152 F.3d 240, 245-48 (3d Cir. 1998) (holding justiciable a First Amendment challenge to the impeachment of a state supreme court justice); *see also Bond v. Floyd*, 385 U.S. 116, 131-32 (1966) (holding justiciable—and granting relief based on—a First Amendment challenge to the Georgia Legislature's exclusion of a member).

The Governor has acknowledged that Mr. Warren's First Amendment claim is justiciable.[86]

## IV.  The Probable-Cause Defense: *Nieves v. Bartlett*

In *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019), the plaintiff asserted a claim under 42 U.S.C. § 1983 on the ground that he was arrested in retaliation for speech protected by the First Amendment. There was probable cause for the arrest. The Supreme Court held that probable cause always defeats a First Amendment retaliatory-arrest claim.

---

[86] Trial Tr., ECF No. 146 at 238.

The Governor asserts the same is true for a First Amendment retaliatory-suspension claim of the kind Mr. Warren asserts here. The Governor says if there was probable cause to believe Mr. Warren had a blanket nonprosecution policy—the equivalent, in the Governor's view, of probable cause to believe Mr. Warren neglected his duty or was incompetent—his First Amendment claim must be rejected, even if the Governor's actual motive was to retaliate against Mr. Warren for the exercise of First Amendment rights.

The assertion fails on both the facts and the law.

The defense fails on the facts because any minimally competent investigation would have shown that Mr. Warren did not have any blanket nonprosecution policy. "[P]robable cause exists when the facts, considering the totality of the circumstances and viewed from the perspective of a reasonable officer, establish 'a probability or substantial chance of criminal activity.' " *Washington v. Howard*, 25 F.4th 891, 898-99 (11th Cir. 2022) (quoting *D.C. v. Wesby*, 138 S. Ct. 577, 586 (2018)). The issue thus is what a *reasonable* officer could conclude. *Id*. at 902. A deficient inquiry and willful ignorance do not establish probable cause. *See, e.g.*, *Cozzi v. City of Birmingham*, 892 F.3d 1288, 1294 (11th Cir. 2018) (holding that in evaluating probable cause, an officer may not unreasonably disregard evidence by choosing to ignore information or electing not to obtain easily discoverable facts that might tend to exculpate a suspect);

*Carter v. Butts Cnty.*, 821 F.3d 1310, 1321 (11th Cir. 2016) (holding no probable cause where an officer ignored readily available information).

On the law, a good starting point is this: probable cause is a criminal-law concept having nothing to do with a governor's suspension authority or employment law in general. Under the Florida Constitution, as under the Fourth Amendment to the United States Constitution, probable cause is a necessary and sufficient basis for an arrest. *See* Fla. Const. art. I, § 12; U.S. Const. amend. IV. In contrast, the Florida Constitution's provision giving a governor suspension authority does not mention probable cause at all. *See* Fla. Const. art. V, § 17. A governor may suspend an official based on, among other things, "neglect of duty" or "incompetence," but not based merely on probable cause to believe the official has neglected a duty or been incompetent.

In any event, *Nieves* emphasized the difference between First Amendment retaliatory-prosecution and retaliatory-arrest claims, on the one hand, and other First Amendment retaliation claims, including those arising in the employment context, on the other hand. Cases are legion analyzing First Amendment retaliation claims in the employment context without a hint that probable cause is a defense. *See, e.g.*, *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977) (setting out the framework governing a public employee's First Amendment claim and making the actual facts—not probable cause—controlling); *see also Kennedy*

*v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022) (analyzing a public employee's First Amendment claim based on the actual facts without mentioning probable cause); *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1289 (11th Cir. 2019) (noting that *Mt. Healthy* applies in First Amendment employment cases while probable cause is a defense in First Amendment retaliatory-arrest and retaliatory-prosecution cases). *Nieves* did not recede from *Mt. Healthy*—*Nieves* said *Mt. Healthy* was different, not that it was no longer good law.

In explaining the difference, *Nieves* cited a host of factors present when a law enforcement officer makes an arrest but not when an employer terminates or suspends an employee. Arresting officers must make "split-second judgments" in which the "content and manner of a suspect's speech may convey vital information." *Nieves*, 139 S. Ct. at 1723-24. Because probable cause is the essential prerequisite for an arrest, "evidence of the presence or absence of probable cause for the arrest will be available in virtually every retaliatory arrest case." *Id.* at 1724 (quoting *Reichle v. Howards*, 566 U.S. 658, 668 (2012)). The presence or absence of probable cause will "generally provide weighty" evidence of an officer's animus. *Id.* Arrests are generally evaluated under the Fourth Amendment, where the Court has "almost uniformly rejected invitations to probe subjective intent," *Ashcroft v. al-Kidd*, 563 U.S. 731, 737 (2019), an approach *Nieves* said would be undermined if the plaintiff in a retaliatory-arrest case could

probe subjective intent. *Nieves*, 139 S. Ct. at 1724-25. Law enforcement officers make roughly 29,000 arrests per day—arrests that, if they could be challenged based solely on subjective intent, would expose officers to "overwhelming litigation risks." *Id*. at 1725.

The interest in allowing officers to make 29,000 often-split-second arrests per day without incurring unnecessary litigation risks is simply not applicable to a decision to remove or exclude a duly elected official based on protected speech— something that might have happened just twice before in the nation's history. On those two occasions, the reviewing court did not treat probable cause as a defense. *See Bond v. Floyd*, 385 U.S. 116 (1966); *Velez v. Levy*, 401 F.3d 75 (2d Cir. 2005).

In sum, probable cause to believe Mr. Warren neglected his duty or was incompetent was absent and, in any event, would not be sufficient to defeat Mr. Warren's claim that the real reason for his suspension was protected First Amendment speech or activity.

## V.  The Merits: First Amendment Retaliation

Mr. Warren's principal claim is that the FJP transgender and abortion statements were motivating factors for his suspension, that the statements were protected by the First Amendment, and that the suspension thus violated the First Amendment. Mr. Warren relies, too, on First Amendment protection of his

political views more broadly and of his association with the Democratic Party and alleged association with Mr. Soros.

Removal of an elected official for expressing political views—or in circumstances that plausibly support a claim that that happened—is exceedingly rare. Predictably, then, there is limited judicial authority on the subject. This order addresses two cases—if there are others, the parties have not cited them—and then turns to First Amendment retaliation claims more generally.

### A.   First Amendment Protection of an Elected Official's Job

The leading case involving First Amendment protection of an elected official's job is *Bond v. Floyd*, 385 U.S. 116 (1966). There the Student Nonviolent Coordinating Committee issued a statement condemning the Vietnam War. Julian Bond, who had been elected to the Georgia House of Representatives, endorsed the statement. The Georgia House refused to seat him, concluding the statement made it impossible for him to take the required oath to support the state and federal constitutions. In the United States Supreme Court, the state did not contest Mr. Bond's right to speak against the war, but the state contended the SNCC statement advocated criminal conduct—noncompliance with the draft—and thus was not protected by the First Amendment.

The Supreme Court said the SNCC statement did not in fact advocate noncompliance with the draft. The Court noted that, in any event, any

"opaqueness" in the SNCC statement was corrected when, soon after issuance of the SNCC statement, Mr. Bond said he did not advocate noncompliance with the draft. The Court disagreed with the Georgia House's conclusion that Mr. Bond would be unable to comply with his oath of office. The Court held the refusal to seat Mr. Bond violated the First Amendment. The Court deferred to the Georgia House's factual analysis not at all.

Mr. Warren's case is remarkably similar to Mr. Bond's. The FJP abortion statement, like the SNCC statement, set out the organization's position on an issue of public importance. Mr. Warren, like Mr. Bond, did not author the statement but did endorse it. In the resulting litigation, Governor DeSantis, like the Georgia House, construed the statement as going beyond protected speech: for Mr. Warren, as adopting a blanket nonprosecution policy; for Mr. Bond, as advocating noncompliance with the draft. Governor DeSantis asserted the FJP statement showed Mr. Warren would not comply with his oath of office; the Georgia House said the SNCC statement showed the same thing for Mr. Bond. The Governor could make this assertion only by refusing to credit Mr. Warren's own individual statement on FOX-13 that was contrary to the Governor's inhospitable reading of the FJP statement, just as the Georgia House could support its assertion only by refusing to credit Mr. Bond's own individual statement rejecting the Georgia House's inhospitable construction of the SNCC statement.

The same comparison could be made between *Bond* and the FJP transgender statement, except that, with no nonprosecution provision in the FJP statement and no relevant criminal laws in Florida, Mr. Warren had no occasion to speak separately on the lack of any blanket policy not to prosecute transgender cases.

The other case involving removal of an elected official is *Velez v. Levy*, 401 F.3d 75 (2d Cir. 2005). An elected community school board member, Amy Velez, was accused of sprinkling a powdery substance—some called it voodoo powder—outside the door of a school official. The school district's elected chancellor, Harold O. Levy, removed Ms. Velez based on his authority to remove school board members for specified categories of misconduct. An administrative appellate panel reversed the decision, holding, in effect, that Ms. Velez was innocent of the voodoo-powder charge.

Ms. Velez filed a federal lawsuit, asserting, among other things, that the voodoo-powder charge was pretextual from the outset and that the real reason for her removal was the political positions she had taken in opposition to Mr. Levy and others. The Second Circuit held that the complaint stated a First Amendment claim against Mr. Levy on which relief could be granted.

This was a holding that when an executive-branch elected official with authority to remove a lower-ranking executive-branch elected official on limited grounds takes action purportedly on those grounds, the lower-ranking official may

prevail on a First Amendment claim by showing that the cited reason was
pretextual and that the real reason for the action was the lower-ranking official's
First Amendment-protected statements.

*Velez*, like *Bond*, confirms that an elected official cannot be removed or
excluded from office for making statements on issues of public interest protected
by the First Amendment.

*Bond* and *Velez* provide substantial support for Mr. Warren, especially in
light of the complete absence of contrary authority. But there is one difference
between *Bond* and *Velez*, on the one hand, and this case, on the other.

The SNCC statement on the Vietnam War at issue in *Bond* addressed a
subject that was beyond the authority of, and thus would not come before, the
Georgia Legislature. No part of the statement could be characterized as
unprotected conduct rather than protected speech. Similarly, no part of Ms. Velez's
speech could be characterized as unprotected conduct, because she was a member
of an advisory board whose only mission was speech.

Mr. Bond did not run the Vietnam War, and Ms. Velez did not run the
schools. Mr. Warren did, however, run the State Attorney's Office. The FJP
statements addressed issues related to the prosecutorial function, at least some of
which might come before the State Attorney's Office. One sentence in the abortion

statement, read in isolation, could fairly be characterized as a commitment to future conduct, not within the protection of the First Amendment.

To determine whether this difference makes a difference, it is useful to go back to basics—to the principles applicable not just to elected officials but to all public employees who allegedly suffer retaliation for exercising First Amendment rights.

### B.  First Amendment Retaliation Claims in General: Mt. Healthy

In *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977), a school board decided not to renew a teacher's contract. A substantial factor in the board's decision was a call the teacher made to a radio station commenting on a matter of public concern. The teacher asserted the nonrenewal violated the First Amendment.

On review of a judgment for the teacher, the Supreme Court established the framework that applies to a First Amendment claim of this kind. First, the plaintiff has the burden to show that protected speech or activity was a substantial or motivating factor in the challenged decision. Second, if the plaintiff meets this burden, the defendant has the burden to show that it would have made the same decision anyway, even in the absence of the protected speech or activity.

In *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005), the Eleventh Circuit said that to carry the plaintiff's burden on a First Amendment retaliation

claim, the plaintiff must show (1) speech or activity protected by the First Amendment, (2) an adverse action, and (3) a causal connection between the protected speech or activity and the adverse action. As *Mt. Healthy* makes clear, the third element—a causal connection—is met when the protected speech or activity is a substantial or motivating factor in the decision to take the challenged adverse action. The defendant still may assert the same-decision defense.

### C. Applying Mt. Healthy: Mr. Warren's Burden

Mr. Warren has easily carried his burden under *Mt. Healthy* and *Hendrix*.

### 1. Protected Speech

First, the FJP transgender and abortion statements were chock full of core political speech. The transgender statement said transgender people are "some of the most vulnerable Americans" and that attacks on them "will deeply harm public safety."[87] The statement said, "[W]e urge other policymakers to join us in standing up and standing together on this important issue."[88] The abortion statement said enforcing abortion bans will erode trust in the legal system and retraumatize victims of sexual violence.[89] Many other examples could be given.

Transgender and abortion issues have been the subject of proposed legislation in Florida and elsewhere and likely will be again. The FJP statements

---

[87] Joint Ex. 4, ECF No. 112-4 at 1.
[88] *Id*. at 3.
[89] Joint Ex. 5, ECF No. 112-5 at 1.

were plainly intended to influence public opinion on these issues and, in turn, any

proposed legislation. If a member of the public at large or a typical rank-and-file

state employee wrote a letter to a newspaper—or in today's world, issued a

tweet—with comments like these, nobody would seriously contend the comments

were not protected by the First Amendment. Nobody would seriously contend the

employee could be suspended or fired for making the comments.

By the time of trial, even Mr. Keefe apparently acknowledged that

substantial parts of these statements were protected.[90]

That Mr. Warren was an elected official, not a rank-and-file employee, does

not change the result. If anything, the distinction cuts the other way. In *Bond*, the

state argued that an elected official had lesser First Amendment rights than the

public at large. The Supreme Court unanimously rejected the assertion. *Bond*, 385

U.S. at 135–37. And just last term, the Supreme Court said, again unanimously,

"The First Amendment surely promises an elected representative . . . the right to

speak freely on questions of government policy." *Houston Cmty. Coll. Sys. v.*

*Wilson*, 142 S. Ct. 1253, 1261 (2022). The Court added that the role of elected

officials "makes it all the more imperative that they be allowed to freely express

themselves." *Id*. (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 781

(2002)).

---

[90] *See* Trial Tr. ECF No. 138 at 245–46.

The Governor suggests *Bond* has lost its force, but the unanimous decision in *Wilson* cited and discussed *Bond* at length, with nary a hint that its precedential value has ebbed. *See Wilson*, 142 S. Ct. at 1263. The Governor also says *Bond* deals only with a legislator, not an official in the executive branch. But *Wilson* involved an elected official in the executive branch, a member of a college board of trustees, and *Wood v. Georgia*, 370 U.S. 375 (1962), involved a sheriff, also a member of the executive branch. *Velez*, too, involved a member of the executive branch. *White* involved campaigns for judgeships, part of the judicial branch. The suggestion that an elected state attorney has no First Amendment right to comment on matters of public concern, including transgender and abortion issues, is wrong.

The Governor asserts *Garcetti v. Ceballos*, 547 U.S. 410 (2006), renders Mr. Warren's speech unprotected, but that is not so, as explained at greater length in the September 29, 2022 order in this case.[91] A summary is this. In *Garcetti*, the Supreme Court held that "when public employees make statements pursuant to their *official duties*, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from *employer discipline*." *Garcetti*, 547 U.S. at 421 (emphasis added). Instead, "government *employers*" must be afforded "sufficient discretion to *manage their operations*." *Id*. at 422 (emphasis added). The result: "the First Amendment does

---

[91] ECF No. 68.

not prohibit *managerial discipline* based on an employee's expressions made

pursuant to *official responsibilities*." *Id*. at 424 (emphasis added).

*Garcetti* does not help the Governor for three reasons.

First, the Governor had no authority to manage the Thirteenth Judicial

Circuit State Attorney's Office or to impose discipline on Mr. Warren, so on the

facts, *Garcetti*'s reasoning does not apply.

Second, the better view is that *Bond*, not *Garcetti*, applies to the speech of

elected officials. The weight of circuit authority supports this view. *See, e.g.*,

*Boquist v. Courtney*, 32 F.4th 764, 780 (9th Cir. 2022); *Phelan v. Laramie Cnty.

Cmty. Coll. Bd. of Trs.*, 235 F.3d 1243, 1247 (10th Cir. 2000); *Rangra v. Brown*,

566 F.3d 515, 522–27, *reh'g en banc granted*, 576 F.3d 531, *vacated as moot*, 584

F.3d 206 (5th Cir. 2009); *Werkheiser v. Pocono Twp.*, 780 F.3d 172, 177–79 (3d

Cir. 2015). *But see Parks v. City of Horseshoe Bend*, 480 F.3d 837, 840 n.4 (8th

Cir. 2007) (stating in dictum, in a footnote, without recognizing the issue, that

*Garcetti* would apply to an elected official's speech if made pursuant to official

duties).

Third, joining in FJP statements or other advocacy materials was not part of

Mr. Warren's "official duties" or "official responsibilities." *Garcetti*, 547 U.S. at

421, 424. None of the statements mentioned Florida law or addressed any issue

unique to Florida. They did not set out policy of the Thirteenth Judicial Circuit

State Attorney's Office. They were not presented to or approved by the executive committee, and they were not adopted through the process in place for establishing policies—the process that had led to approval of the bike and low-level-offense policies. The FJP statements were not circulated within the office or included in the guidebook, as the discretion-in-every-case memorandum was. They were not posted on the office website. They were simply political statements that Mr. Warren subscribed to individually and with which he generally agreed.

Joining in the statements was not within the course and scope of Mr. Warren's duties as State Attorney. *See Goss v. Human Serv. Associates, Inc.*, 79 So. 3d 127, 132 (Fla. 5th DCA 2012) ("The conduct of an employee is considered within the course and scope of employment when it (1) is of the kind the employee is hired to perform, (2) occurs substantially within the time and space limits authorized or required by the work to be performed, and (3) is activated at least in part by a purpose to serve the master."); *Peterson v. Cisco Sys., Inc.*, 320 So. 3d 972, 974 (Fla. 2d DCA 2021) (same); *Hennagan v. Dep't of Highway Safety & Motor Vehicles*, 467 So. 2d 748, 751 (Fla. 1st DCA 1985) (same); *cf. Israel v. DeSantis*, 269 So. 3d 491, 496 (Fla. 2019) (quoting dictionaries to define "duty," as used in the Florida constitutional provision establishing the governor's suspension authority, to mean "the action *required* by one's position or occupation" or an "act or a course of action that is *required* of one by position,

social custom, law, or religion") (emphasis added). Mr. Warren joined these statements on his own, as an advocate, not within the course and scope of his duties. Any assertion that Mr. Warren was *required* to join statements of this kind would be frivolous.

In sum, the transgender and abortion statements—with the exception of the one sentence in the abortion statement—were protected by the First Amendment.

## 2. *Adverse Action*

Suspending an officeholder, or indeed any employee, especially when accompanied by an interruption of pay, is an adverse action. *See Wilson*, 142 S. Ct. at 1260–61 (stating that removal from employment is an "easy to identify" adverse action). The issue is not close.

To be sure, Mr. Treadwell testified that he believed the executive order suspending Mr. Warren was just a pleading, analogous to the indictment in a criminal case.[92] The Governor may assert the same thing. But in fact, the executive order suspended Mr. Warren from office for at least a substantial period, and he was suspended without pay. Any suggestion that this was not an adverse action within the meaning of *Hendrix* and the many other Eleventh Circuit decisions addressing this concept would be frivolous. *See, e.g., Monaghan v. Worldpay US,*

---

[92] Trial Tr., ECF No. 141 at 142.

*Inc.*, 955 F.3d 855, 860 (11th Cir. 2020); *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238-39 (11th Cir. 2001).

Mr. Warren suffered an adverse action.

### 3. Causation: Substantial or Motivating Factor

The FJP transgender and abortion statements were substantial and motivating factors in the decision to suspend Mr. Warren. The Governor could hardly contend otherwise. The statements were cited in and indeed attached to the executive order making the suspension. The Governor cited the statements in his media event announcing the suspension and in his appearance on the Carlson show touting the decision. Mr. Keefe, Mr. Treadwell, and Mr. Newman—three representatives the Governor put forward as having knowledge of why the decision was made—all pointed to the transgender and abortion statements as at least part of the explanation.

Mr. Warren has carried his burden under *Mt. Healthy*.

### D. Applying Mt. Healthy: The Same-Decision Defense

Invoking the *Mt. Healthy* same-decision defense, the Governor asserts he would have suspended Mr. Warren anyway, based on his unprotected conduct, without considering Mr. Warren's protected speech. Analyzing the contention requires identifying the factors that actually motivated the decision, determining which were protected by the First Amendment and which were not, and

determining whether the Governor would have suspended Mr. Warren based on unprotected factors alone, without considering protected factors.

### 1. The Motivating Factors

There were six motivating factors: first, Mr. Warren's *performance* as a reform prosecutor; second, his *advocacy* of positions consistent with the reform-prosecutor viewpoint, including his affiliation with FJP and joinder in four of its statements; third, the sentence in the FJP abortion statement committing not to prosecute some types of abortion cases; fourth, the bike and low-level-offense policies; fifth, Mr. Warren's political affiliation with and receipt of campaign funding from the Democratic Party and, indirectly, from Mr. Soros; and sixth, the anticipated political benefit from the suspension.

The Governor asserts that the sole basis for the suspension was Mr. Warren's adoption of blanket nonprosecution policies. But in fact there were no blanket nonprosecution policies, and the alleged but nonexistent blanket policies were not the sole basis of the suspension. All six listed factors had a substantial, motivating role in the decision.

### 2. Sorting Protected from Unprotected Factors

The distinction between protected speech or activity and unprotected conduct is not always clear. *See Wollschlaeger v. Governor*, 848 F.3d 1293, 1307 (11th Cir. 2017); *see also Otto v. City of Boca Raton*, 981 F.3d 854, 861 (11th Cir.

2020). But as relevant here, the second and fifth factors—Mr. Warren's advocacy

and his political affiliations—were protected by the First Amendment. These were

factors that, as a matter of federal law, could not properly be the basis of a

suspension. The other factors were *not* protected by the First Amendment. These

other factors could not properly be the basis for a suspension under the Florida

Constitution—there were no blanket nonprosecution policies, no neglect of duty,

and no incompetence—but, under *Pennhurst*, relief cannot be awarded in this

federal action based solely on a violation of state law. And of critical importance: a

violation of state law is not, without more, a violation of the United States

Constitution. *See, e.g.*, *Snowden v. Hughes*, 321 U.S. 1 (1944) (holding that a state-

law violation was not a violation of the Equal Protection Clause)

### *a. Actual Performance as a Reform Prosecutor*

In this context, a state attorney's prosecutorial decisions are unprotected

conduct. This includes the decision whether to prosecute—or not to prosecute—

any given case or category of cases. This also includes such things as whether to

advocate higher or lower bail or pretrial release in any given case and how to

approach such decisions in general. Running an office—making decisions—on the

reform-prosecutor side of issues, rather than on the law-and-order side of issues, is

conduct, not speech. And the Governor is correct that when conduct is not

protected, talking about it does not change that status—the talk may be protected, and ordinarily is, but the conduct is still conduct.

To be sure, under the Florida Constitution, a governor cannot properly suspend a state attorney just for implementing a reform-prosecutor agenda or based on general dissatisfaction with the state attorney's performance—for being a reform prosecutor rather than a law-and-order prosecutor. It is not surprising that in this litigation, the Governor has not acknowledged that this was a factor in the suspension. But it plainly was. The Governor was looking for a reform prosecutor from the outset. A reform prosecutor is what Mr. Keefe found. If the charge against Mr. Warren was that he actually carried out the reform-prosecutor agenda he campaigned on, he would probably confess.

### b. Reform-Prosecutor Advocacy and FJP Statements

Mr. Warren associated with FJP, which advocated reform-prosecutor positions, and Mr. Warren signed on to four FJP political statements. The FJP transgender and abortion statements—with the exception of the one sentence in the abortion statement—were protected by the First Amendment. The statements were motivating factors in the suspension. The FJP election and death-penalty statements were also protected and also motivated the decision, but not as significantly.

The Governor nonetheless asserts, in effect, that he could properly use the otherwise-protected speech as a basis to infer the prosecutorial decisions Mr. Warren would make—the conduct he would engage in—if an abortion case came into the office, or if Florida adopted a criminal statute dealing with transgender issues and a transgender case came into the office.

The assertion that the protected statements showed the conduct Mr. Warren would engage in is untrue and, in any event, would not change the protected speech into unprotected conduct. A speaker who says openly carrying an assault rifle should be legal has engaged in protected speech but has not engaged in conduct—has not committed the offense of openly carrying an assault rifle. A state attorney who says being transgender or providing abortions should not be a crime has engaged in protected speech but has not engaged in conduct—has not refused to prosecute transgender or abortion offenses. The Governor was no more entitled to infer what Mr. Warren would do, based on his political statements, than the Georgia House of Representatives was entitled to infer what Mr. Bond would do, based on his political statements.

A leading economist once said people have an enormous capacity to believe what is in their economic interest to believe. The same is true of political actors: some have an enormous capacity to believe what is in their political interest to believe. The Governor and his staff may somehow have convinced themselves that

the four FJP statements were grounds for a suspension, even though they were

chock full of core political speech protected by the First Amendment and had no

effect on office policy. They were wrong.

### c. The Sentence on Prosecuting Abortion Cases

The one sentence in the FJP abortion statement was on a different footing.

The sentence said those who joined in the statement—this included Mr. Warren—

"commit to exercise our well-settled discretion and refrain from prosecuting those

who seek, provide, or support abortions."[93] On its face, this could be understood to

mean a case to which the sentence applied would not be prosecuted.

When so viewed, this was a statement of future conduct, not protected

speech. If a school board can discipline a bus driver for driving drunk today, the

school board can discipline the driver for promising to show up drunk tomorrow;

the board need not wait for the driver to take the wheel. The First Amendment does

not preclude a governor from taking whatever action is otherwise warranted in

response to a state attorney's statement that cases of a specific kind will not be

prosecuted.

As an aside, it was not clear which categories of abortion the sentence

applied to. There was an explicit, footnoted exception for forced or negligently

performed abortions or those intended to harm the woman. Beyond that, it was not

---

[93] Joint Ex. 5, ECF No. 112-5 at 1.

clear whether the sentence was limited to abortions that would have been legal

under *Roe v. Wade*. Mr. Newman and at least one of his assistants recognized the

ambiguity.[94] The issue of whether the Florida Constitution provided the same

protection as *Roe v. Wade*—and thus might have barred the only cases the critical

FJP sentence applied to—was and still is pending in Florida state court. But this

makes little if any difference for present purposes; what matters is that the

sentence, standing alone, could reasonably be understood as a commitment not to

prosecute some categories of abortion cases.

This was not, however, Mr. Warren's intended course. He made this clear in

the FOX-13 interview.[95] His remarks in that interview were consistent with the

discretion-in-every-case memorandum, which, unlike the FJP statement, had been

trained on and circulated to every assistant state attorney.[96] But the single sentence

---

[94] Joint Ex. 39, ECF No. 112-33 at 1; Trial Tr., ECF No. 146 at 126–29.

[95] Pl.'s Ex. 19, ECF No. 111-13 (native slip-sheet).

[96] Mr. Keefe said the FJP abortion statement was controlling over the discretion-in-every-case memorandum because the FJP statement was made in "mass media" while the memorandum was "boilerplate" that was "tucked away in [Mr. Warren's] office." Trial Tr., ECF No. 138 at 228-29. The assertion is untrue, and it shows just how eager Mr. Keefe was to find a basis to suspend Mr. Warren. In fact, Mr. Warren's only comment on mass media was the FOX-13 interview. The discretion-in-every-case memorandum was in the guidebook, circulated to every prosecutor in the office, and the subject of a training session for every prosecutor conducted by Mr. Warren himself. The FJP statement, in contrast, was not provided to office prosecutors; it was one of trillions of obscure documents available only by a targeted search of the internet. Had Mr. Keefe tried, he could easily have learned the truth.

in the FJP abortion statement, on its face, was a statement about future conduct and thus, standing alone and in this context, was not protected by the First Amendment.

### d. The Bike and Low-Level-Offense Policies

The bike and low-level-offense policies were conduct, not protected speech. Mr. Warren seems to acknowledge this; he has based his First Amendment speech claim on the transgender and abortion statements, not on the bike and low-level-offense policies.

The bike and low-level-offense policies were not blanket nonprosecution policies, and under the Florida Constitution, they were not a legitimate basis for suspending Mr. Warren. Even so, they were not protected by the First Amendment.

### e. Association with the Democratic Party and Mr. Soros

Mr. Keefe's second and later drafts of the executive order explicitly referred to Mr. Soros's indirect financial support of the Democratic Party and, in turn, Mr. Warren. The Governor cited this in his media event and in his appearance on the Carlson show. Indeed, when asked on the Carlson show why he suspended Mr. Warren, the first thing the Governor mentioned was "the destruction we've seen with these Soros prosecutors around the country."[97] Mr. Warren's association with the Democratic Party and perceived association with Mr. Soros were factors in the suspension.

---

[97] Def.'s Ex. 25, ECF No. 142-14 at 3.

In this litigation, the Governor has not asserted he could properly consider these associations when deciding whether to suspend Mr. Warren. This is understandable: being a Democrat or accepting legal political contributions is plainly not a legitimate basis for a suspension under the Florida Constitution.

Considering these associations also violated the First Amendment. The Eleventh Circuit has said the "Constitution guarantees freedom of association . . . as an indispensable means of preserving other individual liberties. We have specifically held that this right to freedom of association extends to public employees being able to engage in associative activity without retaliation." *O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1053-54 (11th Cir. 2022) (citing *Hatcher v. Bd. of Pub. Educ. & Orphanage for Bibb Cnty.*, 809 F.2d 1546, 1558 (11th Cir. 1987)).

In addition, the Supreme Court has made clear that a government employer ordinarily cannot terminate an employee based on political patronage—that is, for supporting an opposing political party or based on other partisan considerations. *See Branti v. Finkel*, 445 U.S. 507 (1980); *Elrod v. Burns*, 427 U.S. 347 (1976).

There is an exception for employees whose party affiliation or political loyalty is an appropriate requirement for effective performance of the job. Thus, for example, an elected official is entitled to a chief of staff whose political views line up with the official's. The Eleventh Circuit applies the exception broadly. *See,*

*e.g.*, *Cutcliffe v. Cochran*, 117 F.3d 1353 (11th Cir. 1997) (holding that a Florida sheriff could remove deputy sheriffs at all levels based on partisanship).

In the federal system, an incoming administration sometimes removes the prior administration's United States Attorneys. This order assumes that in a system with appointed chief prosecutors serving at a president's or governor's pleasure, a chief prosecutor can be removed based on partisanship. But that is not Florida's system. In Florida, state attorneys are independently elected, constitutional officers. Party affiliation or political loyalty to the governor is not required and cannot properly be demanded. The *Branti-Elrod* general rule, rather than the exception, applies. In this litigation, the Governor has not asserted the contrary.

### *f. Anticipated Political Reaction*

The Florida Constitution does not allow a governor to suspend a state attorney to achieve a political benefit for the governor. But the First Amendment does not speak to the matter. Considering any anticipated political benefit was not a First Amendment violation.

### *3. Would Unprotected Factors Have Produced the Same Result?*

What remains is the controlling question: would the Governor have made the same decision—would he have suspended Mr. Warren—based only on the unprotected factors, without considering the protected factors? The burden of proof

on this issue is on the Governor. The issue is close and could reasonably be decided either way.

The issue turns on actual motivation—not what could have motivated the Governor, but what did motivate him. *See Holley v. Seminole Cnty. Sch. Dist.*, 755 F.2d 1492, 1505 (11th Cir. 1985). I find that what motivated the Governor included everything that motivated Mr. Keefe. This is so for four reasons. First, there is no evidence Mr. Keefe departed from the assignment the Governor gave him. Second, the Governor chose in this litigation to rely on Mr. Keefe's testimony, and that of other staff members; indeed, the Governor blocked Mr. Warren from deposing or calling as a witness either the Governor or his chief of staff, asserting that other staff members, including Mr. Keefe, would accurately present the relevant facts. Third, the Governor chose to accept Mr. Keefe's recommendation without conducting an independent investigation, rendering the Governor responsible for Mr. Keefe's motivation under the "cat's paw" theory. *See, e.g.*, *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999). And fourth, even aside from these first three factors, I find as a fact, based on the entire record, that the Governor's motivation was the motivation attributed to him in this order.

If this finding is incorrect—if the Governor was actually motivated, as he has claimed, only by his belief that Mr. Warren had blanket nonprosecution policies—the Governor can easily set it right. After a full and fair trial, the

evidence establishes without genuine dispute that Mr. Warren had no blanket

nonprosecution policies. The record establishes that, contrary to what the Governor

said on the Carlson show,[98] his staff did not conduct a thorough review and did not

talk to line prosecutors throughout the state or in Mr. Warren's office. With

unlimited time and the full array of discovery available in federal litigation, the

defense has been unable to identify even a single case in which discretion was not

exercised. If the facts matter, the Governor can simply rescind the suspension. If he

does not do so, it will be doubly clear that the alleged nonprosecution policies were

not the real motivation for the suspension.

The unprotected factors that motivated the suspension were Mr. Warren's

actual *performance*—not advocacy—as a reform prosecutor, the one sentence in

the abortion statement, the bike and low-level-offense policies, and the anticipated

political benefit. My finding is that the Governor would have suspended Mr.

Warren based on these factors alone, even without considering Mr. Warren's

*advocacy* of reform-prosecutor positions, his affiliation with FJP and joinder in the

remainder of the FJP statements, his association with the Democratic Party, and his

alleged association with, or indirect receipt of funds from, Mr. Soros.

The finding is based on all the record evidence and my corresponding

credibility assessments. A summary of the reasoning follows.

---

[98] Def.'s Ex. 25, ECF No. 142-14 at 4.

The whole episode started when reform prosecutors in other states made national news that came to the Governor's attention. The Governor assigned Mr. Keefe to look into whether Florida had any such prosecutors—prosecutors who, as the Governor may have described it, were not enforcing the law. Transgender and abortion issues had nothing to do with it. Mr. Keefe was not assigned to look for prosecutors who had made *statements* about reform-prosecutor issues; it was a search based primarily on what prosecutors had done, not what they had said. Mr. Keefe quickly identified Mr. Warren as the state's leading reform prosecutor. Mr. Keefe had his target.

Mr. Keefe contacted acquaintances in the law enforcement community. He did not ask about the FJP statements—he did not even know they existed—or about transgender or abortion issues. He asked, instead, about Mr. Warren's performance in office—about whether Mr. Warren was making prosecutorial decisions of the kind the Governor and Mr. Keefe associated with reform prosecutors. Mr. Keefe did not conduct an investigation or take a single note, because he was not looking for details or misconduct. There had been no hint of misconduct, and Mr. Keefe must have known, early in the process, that any search for misconduct was likely to come up empty.

Sheriff Chronister told Mr. Keefe about cases having nothing to do with transgender or abortion issues or anything else in the FJP statements. The Sheriff

sent Mr. Keefe materials having nothing to do with those issues. Among the materials were the bike policy, a summary of the low-level-offense policy, and the discretion-in-every-case memorandum. Mr. Keefe received these materials but made no effort to determine how they were implemented within the State Attorney's Office; he did not wish to know.

Mr. Keefe did a google search. He found the four FJP statements. He made no effort to determine whether the statements had been adopted as State Attorney's Office policy or even whether they had been communicated to or seen by others in the office. He made no effort to determine what effect, if any, the statements had within the office. He made no effort to determine how the office handled cases involving the subjects addressed in the FJP statements.

Mr. Keefe did not look into these things because he already knew all he needed to know: Mr. Warren was the leading Florida reform prosecutor. The FJP statements were a way to justify a decision already in the works on other grounds.

By his own account, Mr. Keefe wanted the suspension to happen. He wanted it to happen because Mr. Warren was a reform prosecutor, not merely because of the FJP statements or anything Mr. Warren had said. Mr. Keefe was eager; he was beating down Mr. Newman's door.

Mr. Newman and Mr. Treadwell, acting in their capacities as attorneys but not decisionmakers, analyzed whether a suspension could be justified on the

information Mr. Keefe had obtained. They cleaned up Mr. Keefe's draft of the executive order to make it more defensible. But like Mr. Keefe, they made no effort to determine whether the FJP statements were adopted as policy or circulated within the State Attorney's Office or what effect, if any, the statements had on the actual conduct of the office. They added references to the bike and low-level-offense policies but, as with the FJP statements, made no effort to determine how they were actually implemented in the State Attorney's Office—whether, on any colorable view, these were blanket nonprosecution policies. They knew about the FOX-13 interview but chose to ignore it—it did not fit the narrative. They did not contact Mr. Warren for fear it would tip him off and allow him to set the record straight.[99]

Mr. Newman would not have signed off on the suspension without something that could be labeled a blanket nonprosecution policy. I find, though, that the single sentence in the FJP abortion statement, together with the bike and low-level-offense policies, would have been enough. What mattered was not whether these were actually nonprosecution policies—they were not—but only whether the assertion could eventually be defended in the heavily partisan Florida Senate. With Mr. Newman's sign off, the Governor did what he had been looking

---

[99] Trial Tr., ECF No. 141 at 240–241.

to do from the day he assigned the project to Mr. Keefe: he took down a reform prosecutor.

The Governor's remarks at the media event announcing the suspension and on the Carlson show were consistent with this finding. The Governor followed the script in part, citing the alleged nonprosecution policies, but he also denounced reform prosecutors more generally. He said Florida is a law-and-order state.[100] He presented speaker after speaker who criticized Mr. Warren's policies and cited prosecutorial decisions having nothing to do with transgender or abortion issues or anything else in the FJP statements. Later, when asked on the Carlson show why he suspended Mr. Warren, the Governor started with the "destruction we've seen" from the performance of reform prosecutors around the country—not what they said but what they did. To be sure, the Governor tied this to Mr. Soros—part of the political narrative—but while this factual issue could reasonably be resolved either way, I find that the Soros connection was not essential to the decision.

In short, the controlling motivations for the suspension were the interest in bringing down a reform prosecutor—a prosecutor whose performance did not match the Governor's law-and-order agenda—and the political benefit that would result. The actual facts—whether Mr. Warren actually had any blanket

---

[100] Def.'s Ex. 24, ECF No. 142-13 at 30.

nonprosecution policies—did not matter. All that was needed was a pretext to justify the suspension under the Florida Constitution.

Mr. Warren was indeed a reform prosecutor, exactly as he told voters he would be. Disagreements about the proper prosecutorial approach are the stuff on which state-attorney elections properly turn. Disagreements like this are *not* the stuff on which *suspensions* properly turn.

Even so, in this context Mr. Warren's actual performance as a reform prosecutor was conduct, not speech protected by the First Amendment. The Governor would have suspended Mr. Warren based on that conduct, together with the pretext provided by the bike and low-level-offense policies and the one sentence in the FJP abortion statement. The Governor would have done so even without considering the protected factors.

## VI.  Conclusion

The Governor violated the First Amendment by considering Mr. Warren's speech on matters of public concern—the four FJP policies save one sentence—as motivating factors in the decision to suspend him. The Governor violated the First Amendment by considering Mr. Warren's association with the Democratic Party and alleged association with Mr. Soros as motivating factors in the decision. But the Governor would have made the same decision anyway, even without

considering these things. The First Amendment violations were not essential to the

outcome and so do not entitle Mr. Warren to relief in this action.

The suspension also violated the Florida Constitution, and that violation *did*

affect the outcome. But the Eleventh Amendment prohibits a federal court from

awarding declaratory or injunctive relief of the kind at issue against a state official

based only on a violation of state law.

For these reasons,

IT IS ORDERED:

The clerk must enter judgment under Federal Rule of Civil Procedure 58

stating, "The plaintiff Andrew H. Warren's claims against the defendant Ron

DeSantis arising under state law are dismissed without prejudice based on the

Eleventh Amendment. Mr. Warren's claims against Mr. DeSantis arising under

federal law are dismissed on the merits with prejudice." The clerk must close the

file.

SO ORDERED on January 20, 2023.

s/Robert L. Hinkle
United States District Judge