[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-10459

_____

ANDREW H. WARREN,

                                                    Plaintiff-Appellant,

*versus*

RON DESANTIS,
Individually and in his Official Capacity as
Governor of the State of Florida,

                                                    Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:22-cv-00302-RH-MAF

2                    Opinion of the Court                    23-10459

_____

Before JILL PRYOR and NEWSOM, Circuit Judges, and CONWAY,[*] District Judge.

JILL PRYOR, Circuit Judge:

We vacate our previous opinion and substitute the following.

*       *       *

Voters elected Andrew Warren to serve as the state attorney for Florida's Thirteenth Judicial Circuit. While serving, Warren implemented new policies and advocated reforms. Based on Warren's policies and advocacy, Florida Governor Ron DeSantis suspended him from office and appointed a political ally to replace him.

Warren sued under 42 U.S.C. § 1983, claiming that DeSantis suspended him in retaliation for his First Amendment activity and seeking reinstatement. After a bench trial, the district court found that six factors motivated DeSantis to suspend Warren. The court concluded that two of the factors relied on First Amendment-protected activity. After finding that Warren's protected activity motivated DeSantis, the district court nonetheless rejected Warren's claims on the merits. Setting aside the protected activity, the court

_____

[*] Honorable Anne C. Conway, United States District Judge for the Middle District of Florida, sitting by designation.

decided that DeSantis would have suspended Warren anyway, based on the unprotected activity.

The district court erred in concluding that the First Amendment did not protect the activities behind two of the other factors. We therefore vacate and remand. On remand, the district court should reconsider whether DeSantis would have made the same decision based solely on the unprotected activities.

## I.    BACKGROUND

Voters twice elected Andrew Warren to serve as the state attorney for Florida's Thirteenth Judicial Circuit, which encompasses Hillsborough County, whose seat is Tampa. Florida state attorneys are state officers, locally elected to four-year terms. *See* Fla. Const. art. V, § 17; Fla. Stat. § 27.01. State attorneys prosecute all criminal actions in the state courts within their circuit. Fla. Stat. § 27.02.

DeSantis suspended Warren in August 2022, during Warren's second term. Florida's constitution permits the governor to suspend unimpeachable state officers for enumerated reasons, such as neglect of duty or incompetence. Fla. Const. art. IV, § 7(a). The governor suspends only; the Florida Senate removes or reinstates the officer. *Id.* § 7(b).

In this Part, we begin with Warren's policies and his advocacy. Next, we move to DeSantis's inquiry and his resulting suspension of Warren. We then recount this case's procedural history.

## A.    Warren's Actions

Warren won election for state attorney in 2016, defeating a four-term incumbent by around 4,500 votes. Warren, a Democrat, ran on a reform platform which emphasized being tough on certain offenders, finding innovative solutions for others, and furthering criminal justice beyond simply prosecuting cases. Warren believed he fulfilled many campaign promises in his first term. Voters apparently agreed, reelecting him in 2020 by around 45,000 votes. During his second term, he continued to enact policies and advocate reforms.

### 1.    Warren's Policies

As state attorney, Warren adopted policies to provide consistency and guide over 100 attorneys in his office as they prosecuted between 50,000 and 60,000 cases annually. Many policies concerned specific crimes, like Warren's policy to aggressively prosecute domestic violence offenders. Other policies provided overarching guidance, like his policy to exercise individualized discretion in every case. Three policies are relevant to this appeal.

The first is Warren's Discretion Policy. Warren prioritized exercising individualized discretion in prosecutorial decisions from his first day in office. He formalized that priority as policy early in his second term. The Discretion Policy provided examples to guide prosecutorial decisions. But it stressed that "[c]ase-specific decisions must be made according to the unique facts and circumstances of the case. Therefore, it is impossible to provide examples that dictate the appropriate decision in every situation across a

category of cases." Doc. 112-7 at 8.[1] The examples thus were "not mandatory charging policies that must be followed in every situation." *Id.*

Warren used a process to adopt the Discretion Policy. In fact, he used a process whenever he adopted policies. The process involved consulting an executive committee, on which senior prosecutors served; drafting and revising the policy, which sometimes included outside input; finalizing the policy and informing managers about it; and, finally, training on the new policy. Warren collected his policies in a guidebook provided to prosecutors in his office and available on an internal site.

The Discretion Policy complemented Warren's other policies, including those that created presumptions about exercising discretion in certain cases. One such policy, for example, created a presumption that prosecutors would seek at least the mandatory minimum sentence in felon-in-possession-of-firearms cases. Prosecutors could document substantial mitigation to rebut the presumption, allowing them to offer plea deals below the mandatory minimum.

The second policy is Warren's Low-Level Offense Policy, which influenced DeSantis's suspension decision. The Low-Level Offense Policy listed charges that the office would presumptively not prosecute. These offenses were "low level" because most had only a 60-day maximum sentence. Many offenders served even less

---

[1] "Doc." refers to the district court's docket entries.

time. Warren designed the policy to mitigate COVID-19's effects: the virus delayed arrestees' initial court appearances and caused backlogs that resulted in extended detentions. These delays and backlogs raised potential constitutional concerns under the Sixth Amendment's Speedy Trial Clause and the Eighth Amendment. They also implicated fairness principles. By eliminating or reducing prosecutions for low-level offenses, the policy would alleviate those concerns. Although designed to address those concerns, the policy included no sunset provision for when the virus's effects dwindled, and thus it continued in force. Yet even when the policy's nonprosecution presumption was in force, it could be—and in fact was—overcome based on public safety concerns.

The third policy is Warren's Bike Policy, which also influenced DeSantis's suspension decision. The Bike Policy created a nonprosecution presumption in cases resulting from noncriminal bike and pedestrian violations. This policy stemmed from community input; it addressed the disproportionate racial impact of bike and pedestrian stops. Like the Low-Level Offense Policy, this policy's nonprosecution presumption could be overcome based on public safety concerns. And, in fact, it was. Days after Warren implemented the Bike Policy, his office filed drug trafficking and paraphernalia possession charges resulting from a civil bike stop.

Warren adopted the Low-Level Offense Policy and the Bike Policy through his policymaking process. Both policies received outside input, for example. Community law enforcement partners, including the Tampa Police Department and the Hillsborough

County Sheriff's Office, discussed the Low-Level Offense Policy with Warren's office. Law enforcement partners also considered the Bike Policy. Hillsborough County Sheriff Chad Chronister told Warren that the Sheriff's Office rarely conducted bike stops. Interim Tampa Police Chief Ruben Delgado described the Tampa police force's effort to reduce discriminatory stops. He supported the policy. Tampa Police Chief Mary O'Connor, who replaced Delgado, appreciated being informed of the policy but offered no suggestions.

Neither the Low-Level Offense Policy nor the Bike Policy precluded prosecutors from exercising individualized discretion. Although the policies created presumptions, they specified that a case's circumstances could overcome those presumptions.

2.    Warren's Advocacy

Besides instituting policies consistent with criminal justice reform, Warren advocated for it. His advocacy included signing four statements that the nonprofit organization Fair and Just Prosecution ("FJP") authored and published. These advocacy statements addressed capital punishment, election security, transgender care, and abortion. Because DeSantis cited the transgender care and abortion statements as justification for Warren's suspension, we describe those statements in detail.

In the summer of 2021, Warren signed an FJP statement expressing concern about "bills targeting the transgender community," especially transgender youth's access to gender-affirming care. Doc. 112-4 at 1. Citing research linking gender-affirming care

to reduced suicide risk in youth, the statement concluded that the bills harmed "the health of trans youth." *Id.* at 2. The signatories "pledge[d] to use [their] settled discretion and limited resources on enforcement of laws that will not erode the safety and well-being of [their] community." *Id.* at 3.

A year later, Warren joined nearly 70 elected prosecutors nationwide in signing an FJP statement addressing the criminalization of abortion after the Supreme Court decided *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022). Published the same day as *Dobbs*, the statement expressed "that prosecutors have a responsibility to refrain from using limited criminal legal system resources to criminalize personal medical decisions." Doc. 112-5 at 1. It stressed elected prosecutors' obligation to exercise discretion: "our communities have entrusted us to use our best judgment in deciding how and if to leverage the criminal legal system to further the safety and well-being of all, and we are ethically bound to pursue those interests in every case." *Id.* Signatories "commit[ted] to exercise [their] well-settled discretion and refrain from prosecuting those who seek, provide, or support abortions." *Id.*

Warren signed both statements with his title: "Andrew Warren[,] State Attorney, 13th Judicial Circuit (Tampa), Florida." Doc. 112-4 at 8; Doc. 112-5 at 8. Neither statement became policy, however. The executive committee never discussed them. Warren neither distributed the statements nor included them in materials provided to prosecutors. The office never trained prosecutors on them.

Case 4:22-cv-00302-RH-MAF    Document 169    Filed 01/11/24    Page 9 of 61
USCA11 Case: 23-10459    Document: 89-1    Date Filed: 01/11/2024    Page: 9 of 59

23-10459            Opinion of the Court                    9

And neither statement referred to a specific Florida law. To the contrary, the statements, which addressed national audiences, contained language inapplicable to Florida. When Warren signed the statement about bills targeting the transgender community, no Florida law criminalized gender-affirming care.

When he signed the abortion statement, a Florida law, HB 5, criminalized abortion after 15 weeks. A few days after FJP published the abortion statement, Warren clarified his position on HB 5 in a television interview. He announced that although he disagreed with HB 5, he would respect court rulings on its legality. He stressed that prosecution decisions in every case, including abortion-related cases, would depend on the case's facts.

## B.    DeSantis's Actions

We turn now to DeSantis's decision to suspend Warren. Eight months before the suspension, DeSantis asked Larry Keefe, a senior advisor, whether any Florida prosecutors "were not enforcing the law." Doc. 138 at 201. Keefe assured DeSantis that he would ask around. We detail Keefe's inquiry and what it revealed about Warren before discussing DeSantis's decision to suspend Warren.

### 1.    Keefe's Inquiry

Keefe spoke to his own acquaintances, gathering their impressions of state attorneys. He disclaimed that he investigated. *Id.* at 203 ("Once again, I did not conduct an investigation."). He characterized his role, instead, as determining "whether there was the impression or belief in the law enforcement community that there were one or more [s]tate [a]ttorneys who were not enforcing the

law." *Id.* When Keefe communicated with his contacts, he focused on state attorneys' reputations, not their policies or prosecution decisions. Keefe avoided getting "into particularity in regard to specific examples or specific instances" of nonenforcement. Doc. 141 at 43. His inquiry "was more general"—"reputational." *Id.* He took no notes.

Keefe talked with Steve Casey, who directed the Florida Sheriffs Association. Casey told Keefe that, according to the law enforcement community, Warren was a reform prosecutor.[2] Casey said the community regarded Warren "as a [s]tate [a]ttorney whose approach to his job was harmful, was negative." Doc. 138 at 207. Warren had a "reputation as being a [s]tate [a]ttorney who was hostile and antagonistic to law enforcement." *Id.* at 208. Casey admitted that he based his observations on what he heard from others, not on firsthand knowledge of Warren or Warren's performance. He cited no laws that Warren's office underenforced and identified no office policies. Yet he thought Warren's approach "imped[ed]" law enforcement's mission. *Id.*

After speaking with Casey, Keefe reached out to other law enforcement community members, who expressed similar concerns. Keefe sensed that the community perceived Warren's "approach, his mindset, [and] the culture of his office with regard to

---

[2] "Reform prosecutor" is imperfect shorthand for a prosecutor whose approach emphasizes criminal justice reform. The term may be understood to contrast with "law-and-order prosecutor." As the district court observed, either shorthand "is likely to be misleading on any specific issue." Doc. 150 at 6.

law enforcement [to be] creating an environment of chaos, lawlessness, and disruption." *Id.* at 217. Despite holding strong views, these officials identified no actions that Warren had taken or failed to take as state attorney. Nor did they cite any laws that Warren underenforced.

When Keefe asked Orange County Sheriff John Mina, for example, whether he knew any state attorneys who "don't enforce the law," Mina mentioned Warren and Monique Worrell, the state attorney for the Ninth Judicial Circuit, which encompasses Orange County, whose seat is Orlando. Doc. 141 at 20. Mina called both "progressive prosecutors." *Id.* at 21. He told Keefe that being "a law enforcement sheriff is very difficult" in Worrell's environment. *Id.* Mina reported that, "reputationally," Warren shared Worrell's "mindset" and "approach." *Id.*

At this point, Keefe concluded that "all roads [led] to Tampa, Hillsborough County, the Thirteenth Circuit, and Mr. Warren." Doc. 138 at 218. So he focused on Warren and, for the first time, reached out to law enforcement officials in Hillsborough County. Keefe contacted Chronister, the Hillsborough County sheriff, who told him that his department struggled to get certain cases prosecuted. Chronister compiled cases he thought Warren should have prosecuted more aggressively and forwarded them to Keefe, along with additional materials, such as Warren's policies and articles about his office. The policies included the Discretion Policy, the Low-Level Offense Policy, and the Bike Policy. Keefe reviewed the materials. But he never followed up with Warren on the cases

Chronister identified or learned how Warren's office implemented the policies.

Keefe then spoke with Brian Dugan, a former Tampa police chief. Dugan expressed frustration with Warren's approach. He criticized the Bike Policy, which Warren implemented after Dugan retired. Keefe never spoke to the current Tampa police chief, Mary O'Connor, or her immediate predecessor, Ruben Delgado—the two law enforcement leaders whom Warren consulted before finalizing the Bike Policy.

During his inquiry, Keefe found online the four advocacy statements that FJP had published and Warren had signed—regarding transgender care and abortion, as well as election security and capital punishment. Keefe never looked to see whether Warren's office had adopted these statements as policy. It had not. He never determined whether Warren's office had encountered a case about transgender care or abortion. It had not.

Keefe's search also revealed an article about Democratic billionaire George Soros's financial support of "progressive prosecutors." Doc. 141 at 15. The article noted that Soros had donated to the Florida Democratic Party, which in turn contributed to Warren's campaign. Based on this fact and his other research, Keefe concluded that Warren "had ceded his power and authority as the [s]tate [a]ttorney in Tampa to be an expresser or a conduit for Mr. Soros's world views on criminal prosecution." *Id*. at 16.

During his inquiry, Keefe never communicated with Warren or anyone in his office. He spoke to only two people who knew

anything about how Warren's office operated: Chronister and Dugan. They told him about Warren's prosecutorial decisions, but Keefe never focused on those decisions. He concerned himself instead with the advocacy statements Warren had signed.

## 2.    Warren's Suspension

After conducting this inquiry, Keefe looped in DeSantis's lawyers about suspending Warren. About two weeks before the suspension, Keefe presented the information he had collected about Warren to Ryan Newman, DeSantis's general counsel, and Raymond Treadwell, a deputy general counsel. Keefe left it to the general counsel's office to "zero in on the particular statutory sections" not being enforced and to investigate how Warren's policies played "out in the field." Doc. 138 at 234.

Keefe forwarded a news article about the FJP abortion statement to Newman's office. Joshua Pratt, a deputy general counsel, asked whether the language in the statement referred to pre-*Dobbs* restrictions, such as on third trimester abortions. Newman responded, "Perhaps we should send a letter inquiring." Doc. 112-33 at 1. No one ever did.

Eager to move the suspension along, Keefe drafted an executive order suspending Warren under Florida's constitutional provision that permits the governor to suspend a state attorney for neglect of duty or incompetence. *See* Fla. Const. art. IV, § 7(a). His first draft cited only the abortion statement, calling it a "blanket policy" to "exercise no discretion at all" in abortion cases. Doc. 112-28 at 4.

His second draft included three advocacy statements: on abortion, transgender care, and capital punishment. His third added the advocacy statement on elections issues. It cited the advocacy statements as evidence that Warren refused "to exercise prosecutorial discretion on a case-by-case basis," constituting "neglect of duty in violation of his oath of office." Doc. 112-12 at 4. It also asserted that Warren had "publicly declared functional vetoes of other existing and potential future Florida laws and publicly announced his blanket refusal to enforce those laws." *Id.*

Keefe's third draft also introduced five paragraphs describing Warren's affiliation with Soros and the Democratic Party. Those paragraphs exclaimed that Warren "ceded the authority of the Office of State Attorney" and "subordinated the people of the 13th Judicial Circuit" to "entities associated with activist George Soros." *Id.* at 9.

Keefe shared these drafts with Newman and Treadwell. With DeSantis's go-ahead, the lawyers revised Keefe's draft, attempting to ensure that it would pass legal scrutiny.

Based on case law from the Florida Supreme Court, *see Ayala v. Scott*, 224 So. 3d 755 (Fla. 2017),[3] the lawyers emphasized

---

[3] In *Ayala*, the Florida Supreme Court concluded that Florida Governor Rick Scott did not exceed his authority when he reassigned State Attorney Aramis Donnell Ayala's death-penalty eligible cases away from her. 224 So. 3d at 759–60. The Court emphasized that Ayala intended to implement a blanket policy not to seek the death penalty, "in effect refusing to exercise discretion." *Id.* at 758 (internal quotation marks omitted).

Warren's "blanket" nonprosecution policies, asserting that those policies constituted "incompetence" and "neglect of duty" under Florida's constitution. Doc. 112-26 at 1–3, 5–7. They wanted to scrub from the draft the references to Soros and the Democratic Party but suggested that the references stay in the "political narrative." *Id.* at 6. They also added the Low-Level Offense Policy and the Bike Policy, as well as an argument that the abortion statement alone sufficiently justified the suspension.

During the drafting, the lawyers added a paragraph noting Warren's statements on television that he would make an individualized decision about every abortion case. But they never explained how those statements fit into Warren's "blanket" policy against prosecuting abortion cases. They ultimately removed from the final order the reference to Warren's interview statements that he would exercise individualized discretion in every case.

DeSantis edited the executive order. He then issued the final version suspending Warren on August 4, 2022. The order stated that Warren instituted blanket nonprosecution policies, constituting grounds for suspension under the Florida Constitution and Florida Supreme Court case law. It cited the transgender care and abortion statements. And it identified the Low-Level Offense Policy and the Bike Policy—the only Thirteenth Judicial Circuit policies the executive order mentioned.

Later that day, DeSantis announced his decision at a press conference in Tampa. He told the press that his office "spoke with line prosecutors throughout the state" and that the suspension

resulted from a "statewide review." Doc. 142-13 at 4, 32. That
night, DeSantis appeared on national television, talking with tele-
vision host Tucker Carlson about the suspension. He reiterated his
declaration that his staff "review[ed] all state attorneys" in Florida
and spoke with prosecutors throughout the state, including in War-
ren's office. Doc. 142-14 at 3. Yet no one in DeSantis's office or
working on its behalf reviewed all state attorneys. No one spoke to
prosecutors in Warren's office.

DeSantis appointed Susan Lopez to replace Warren. Lopez
had served as an assistant state attorney for the Thirteenth Judicial
Circuit from 2005 until 2021, when DeSantis appointed her to a
judgeship. She resigned from the bench to become acting state at-
torney at DeSantis's behest. Upon taking office, Lopez immedi-
ately rescinded the Low-Level Offense Policy and the Bike Policy.

## C.    The Proceedings Below

After his suspension, Warren filed this lawsuit. He sued un-
der 42 U.S.C. § 1983, alleging that DeSantis suspended him in retal-
iation for exercising his right to free speech under the First Amend-
ment. He asked the court to declare the suspension unconstitu-
tional and require that DeSantis reinstate him.

Along with his complaint, Warren filed a motion for a pre-
liminary injunction directing DeSantis to reinstate him. DeSantis
opposed the preliminary injunction and moved to dismiss War-
ren's claims. The district court denied the preliminary injunction

motion, dismissed Warren's state law claim, and denied the motion to dismiss Warren's federal claim.[4]

The district court then held a bench trial. At trial, Warren sought to prove that his views on issues such as abortion, transgender care, and criminal justice reform motivated DeSantis's decision. He presented evidence that DeSantis was motivated not by any alleged "blanket" nonprosecution policies but by political disagreement with Warren's political affiliations and advocacy. He proceeded on the theory that DeSantis targeted Warren because of his political views and actions, seeking out a "woke" or "leftist" prosecutor. Doc. 138 at 13, 16.

DeSantis maintained that he suspended Warren for Warren's failure to exercise individualized discretion and refusal to prosecute certain cases. DeSantis contended that the abortion statement, along with the transgender care statement, the Low-Level Offense Policy, and the Bike Policy, showed that Warren had refused to prosecute certain cases.

Following the trial, the district court evaluated whether DeSantis engaged in unlawful retaliation under the First Amendment, using the framework from *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977). This framework placed the initial burden on Warren to show that activity protected by the

---

[4] The district court dismissed Warren's state law claim under the Eleventh Amendment. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984). Warren does not appeal that dismissal.

First Amendment's Free Speech Clause motivated DeSantis's decision to suspend him.

Warren met his burden, the district court determined. Warren's burden was to show (1) activity protected by the First Amendment, (2) an adverse action, and (3) a causal connection between the protected activity and the adverse action. The court explained that the First Amendment protected Warren's political affiliations and his advocacy. It concluded that Warren's suspension qualified as an adverse action. And it found that Warren's affiliations and advocacy motivated DeSantis's decision to suspend him. Because Warren carried his burden under *Mount Healthy*, the burden shifted to DeSantis.

Under *Mount Healthy*, the district court explained, DeSantis could not be liable for retaliation if he proved that he would have made the same decision regardless of protected activity. The district court began this inquiry by teasing out the six factors that motivated DeSantis to suspend Warren: (1) Warren's political affiliations with the Democratic Party and George Soros; (2) Warren's criminal justice reform advocacy, including the advocacy statements he signed; (3) a single sentence in the abortion statement committing to refrain from prosecuting abortion cases; (4) Warren's adoption of the Low-Level Offense Policy and the Bike Policy; (5) Warren's approach and performance as a reform prosecutor; and (6) DeSantis's anticipated political benefit from suspending a progressive prosecutor.

The district court then separated the factors based on protected activity from those based on unprotected activity. The court concluded that the First Amendment protected only Warren's political affiliation and his advocacy. It ruled the First Amendment left the activities underlying the other four factors unprotected.

After separating the factors, the district court addressed whether DeSantis would have terminated Warren based solely on the unprotected activity. The issue turned on DeSantis's actual motivation. Although the district court found that Warren's advocacy and political associations contributed to his suspension, "bringing down a reform prosecutor" and the resulting political benefit were the "controlling motivations for the suspension." Doc. 150 at 57.

To arrive at this finding, the district court considered Keefe's inquiry. It found that Keefe never tried to understand how Warren's office implemented the presumptive nonprosecution policies. Keefe likewise never tried to comprehend what impact, if any, the advocacy statements had on the office's practices. According to the district court, "Mr. Keefe did not look into these things because he already knew all he needed to know: Mr. Warren was the leading Florida reform prosecutor." *Id.* at 55. "Mr. Keefe was determined to bring about Mr. Warren's suspension," the court explained. *Id.* at 20. "He wanted it to happen primarily because Mr. Warren was a reform prosecutor of the kind" that DeSantis and Keefe "targeted . . . from the outset." *Id.*

The district court found that the other factors were "pretext to justify the suspension under the Florida Constitution." *Id.* at 58.

The court found that DeSantis's lawyers needed something they could credibly label a blanket nonprosecution policy to be comfortable signing off on the suspension. So they said that the Low-Level Offense Policy and the Bike Policy motivated Warren's suspension. These policies, along with the one sentence in the abortion statement, provided credible cover to move the suspension forward, the district court found. But "[t]he actual facts—whether Mr. Warren actually had any blanket nonprosecution policies—did not matter." *Id.* at 57–58.

Despite the pretext, the district court concluded that DeSantis would have suspended Warren based on his performance and DeSantis's anticipated political benefit—two activities it thought the First Amendment left unprotected. It thus ruled against Warren, denying injunctive relief.[5] Warren appealed.

## II.    STANDARD OF REVIEW

We review a district court's denial of a permanent injunction for an abuse of discretion. *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1349 (11th Cir. 2009). We review the court's legal conclusions *de novo* and its factual findings for clear error. *Id.*

The First Amendment context complicates our application of this standard, however. "Where the First Amendment Free

---

[5] Warren argues that the district court erred in ruling that the Eleventh Amendment precluded it from remedying a First Amendment violation. We disagree with Warren's characterization. The district court rejected his First Amendment claim on the merits after concluding that Warren would have been suspended even absent his protected activity.

Speech Clause is involved," we review "constitutional facts" *de novo. ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1203 (11th Cir. 2009) (internal quotation marks omitted). We review "historical facts" for clear error. *Id.* And because we are in the First Amendment retaliation context, we note two considerations related to employer motivations and protected activity.

First, in the First Amendment retaliation context, we have not yet decided, in a published opinion, whether our review of a factual finding about what motivated an employer to take an adverse employment action is *de novo* or for clear error. *Id.* at 1203–04 (acknowledging uncertainty about the standard of review). Here, though, because our conclusion would be the same under either standard, we assume without deciding that clear error applies to the district court's factual findings about DeSantis's motives.

Second, whether the First Amendment protects a particular activity is neither a constitutional nor a historical fact. It remains a question of law, reviewed *de novo. Beckwith v. Daytona Beach Shores*, 58 F.3d 1554, 1560 (11th Cir. 1995); *see also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 567 (1995) ("[W]e must thus decide for ourselves whether a given course of conduct falls on the near or far side of the line of constitutional protection."). With these considerations in mind, we move to our analysis.

## III.    DISCUSSION

The "First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in

protected speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (internal quotation marks omitted). For evaluating First Amendment retaliation claims, the Supreme Court has adopted a burden-shifting framework. *See Mount Healthy*, 429 U.S. at 281–86.[6] Under this framework, a plaintiff must show three elements: (1) he engaged in protected activity, (2) he suffered an adverse action, and (3) a causal connection exists between the protected activity and the adverse action. *See Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005). If the plaintiff shows all three, then the government official has a chance to present a "same-decision defense": to prove that he would have made the same decision even if the plaintiff never engaged in protected activity. *Mount Healthy*, 429 U.S. at 287.

Warren argues that DeSantis suspended him for activities the First Amendment protects. Applying the *Mount Healthy* framework, we begin in Part A with whether Warren carried his initial burden and conclude that he engaged in protected activity, suffered an adverse action, and showed a causal connection between the two.

We then turn in Part B to DeSantis's same-decision defense. The district court found that six factors motivated DeSantis to suspend Warren but concluded that the First Amendment protected only two of the activities behind those factors—Warren's political

---

[6] DeSantis argues that in addition to succeeding under *Mount Healthy*, Warren must make a "threshold showing" that DeSantis lacked probable cause to suspend him. Appellee's Br. at 26 (internal quotation marks omitted). We address this argument below in Part III-C.

affiliations and his advocacy. The court concluded that the First Amendment left unprotected the other four—Warren's performance in office, the sentence in the abortion statement he signed, two of his office policies, and DeSantis's anticipated political benefit. The district court then determined that DeSantis would have made the same decision without the two protected activities.

We conclude that the district court erred in two ways: first, in concluding that the First Amendment did not protect Warren's support of a sentence in the advocacy statement about prosecuting abortion cases, and second, in concluding that the First Amendment did not preclude DeSantis from suspending Warren to gain political benefit from bringing down a reform prosecutor. We therefore remand for the district court to reconsider whether DeSantis would have made the same decision based solely on Warren's performance and the two office policies.

After addressing the same-decision defense, we discuss in Part C DeSantis's argument that Warren had to make a threshold showing that DeSantis lacked probable cause. We need not decide whether that showing is necessary, though, because DeSantis never had probable cause for Warren's suspension.

## A.    Warren's Initial Burden

Although Warren must satisfy three prongs under the *Mount Healthy* framework, this appeal turns only on the first prong, protected activity. He satisfied the second prong; his suspension constituted a materially adverse action. *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022) ("Some adverse actions may be easy to

identify—an arrest, a prosecution, or a dismissal from governmental employment."). And if Warren proved that the First Amendment protected the activities DeSantis cited in the executive order suspending him, he satisfied the third prong. The third prong asks whether constitutionally protected activity "was a 'motivating factor'" in DeSantis's decision. *Mount Healthy*, 429 U.S. at 287. DeSantis maintains that the reasons cited in the executive order motivated him to suspend Warren. The executive order cited the transgender care and abortion advocacy statements Warren signed. So, although DeSantis has a chance to show that he would have made the same decision even without those statements, to have carried his burden Warren needed to show only that the statements played a role in DeSantis's decision. *Id.* Because DeSantis concedes that the statements motivated him, the third prong is satisfied as well. We therefore focus on the first prong: whether the First Amendment protects those statements.

The First Amendment protects Warren's signing the transgender care and abortion statements. It prevents the government from "abridging the freedom of speech." U.S. Const. amend. I. Warren engaged in speech when he signed the statements. Indeed, the statements go beyond regular speech; they are "chock full of core political speech." Doc. 150 at 36. FJP specifically designed them, and Warren signed them, "to bring[] about . . . political and social changes." *Roth v. United States*, 354 U.S. 476, 484 (1957). DeSantis never contends that the two statements are not speech. Thus, the statements presumptively have the First Amendment's "full protection" unless they fall within a specific

unprotected category. *Id.*; *see also United States v. Stevens*, 559 U.S. 460, 468–69 (2010).

DeSantis argues that Warren's signing the statements falls within two unprotected categories. First, he contends that Warren engaged in unprotected government speech when he signed the statements. And second, he argues that Warren's actions were unprotected because signing the statements impeded Warren's performance as state attorney. We address each argument in turn.

1.  Signing the Statements Was Not Government Speech.

The First Amendment protects Warren's signing the statements notwithstanding the government-speech doctrine the Supreme Court articulated in *Garcetti v. Ceballos*, 547 U.S. 410 (2006). This doctrine established that "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Id.* at 418. So although the First Amendment protects citizen speech, *id.* at 419, it does not "shield[] from discipline the expressions employees make pursuant to their professional duties," *id.* at 426. In other words, "the Constitution does not insulate" government speech from employer discipline. *Id.* at 421.

We reject DeSantis's government-speech argument. On the one hand, *Garcetti*'s application to elected officials seems suspect. On the other—controlling—hand, even if we apply *Garcetti* to Warren, the First Amendment still protects Warren's signing the statements.

A refresher on *Garcetti* frames our analysis. In *Garcetti*, the Supreme Court considered Deputy District Attorney Richard Ceballos's claim under 42 U.S.C. § 1983 that District Attorney Garcetti and his staff retaliated against Ceballos for his speech, violating his First Amendment rights. *Garcetti*, 547 U.S. at 413–15.

Ceballos had disagreed with his supervisors about the validity of an affidavit supporting a search warrant. *Id.* at 413–14. Ceballos wrote two memos questioning the affidavit's quality. *Id.* at 414. He wanted the criminal case based on the search dismissed. *Id.* When the defendant challenged the search warrant, Ceballos testified for the defense. *Id.* at 414–15. But the trial court rejected the challenge. *Id.* at 415.

After the warrant fiasco, Ceballos sued under 42 U.S.C. § 1983, claiming that the district attorney's office violated his free speech rights. *Garcetti*, 547 U.S. at 415. In support of his claim, he alleged that, based on his activities surrounding the warrant, the office reassigned him to a trial deputy position. *Id.* He also alleged that it transferred him to another courthouse and denied him a promotion. *Id.*

The Supreme Court ruled against Ceballos. *Id.* at 426. The Court first explained that "public employees do not surrender all their First Amendment rights by reason of their employment." *Id.* at 417. They can still speak "as a citizen on a matter of public concern." *Id.* If they do, the government may only impose "speech restrictions that are necessary" to "operate efficiently and effectively." *Id.* at 419.

Applying those principles to Ceballos's case, the Supreme Court concluded that he had not spoken as a citizen for First Amendment purposes. *Id.* at 421. Rather, he had written the memos "pursuant to [his] official duties," and his employers therefore could discipline him for them without implicating the First Amendment. *Id.*

Unlike Warren, Ceballos was not an elected official. The Supreme Court has never applied *Garcetti* to elected officials. Nor have we. As a matter of first impression, *Garcetti*'s application to elected officials seems suspect for two reasons.

First, *Garcetti*'s rationale makes little sense for elected officials. The Supreme Court was concerned in *Garcetti* with ensuring that government employers could supervise employees without the employees constitutionalizing every grievance. *Id.* at 422–23. Government employers, "like private employers, need a significant degree of control over their employees' words and actions." *Id.* at 418.

But often, elected officials do not exercise a significant degree of control over other elected officials. Rather, the electorate controls elected officials and disciplines them by withholding votes if it disapproves of their performance. Consider federal legislators. Some federal legislators are senior to others. Federal legislators have the power to censure and expel fellow legislators. U.S. Const. art. I, § 5, cl. 2. But one legislator cannot control or manage another. Each legislator's constituency does that.

Florida's constitution and case law recognize that governors do not exercise a significant degree of control over state attorneys. True, DeSantis, as the state's chief executive, exercises some oversight over state attorneys. But DeSantis cannot remove a state attorney. Fla. Const. art. IV, § 7(b). He can suspend a state attorney only on specified grounds. *Id.* § 7(a). And some authorized oversight actions, like reassigning state attorneys, are subject to time limitations "to prevent [the governor] from frustrating the will of the voters . . . by replacing any elected state attorney with one" he chooses. *Finch v. Fitzpatrick*, 254 So. 2d 203, 205 (Fla. 1971). This limited managerial role weakens *Garcetti*'s application to Warren's speech.

Second, more apt Supreme Court cases exist. The Court has crafted a First Amendment doctrine specifically for elected officials' speech. This doctrine has never relied on, nor even cited, *Garcetti*. *Wood v. Georgia* provides an example. 370 U.S. 375 (1962). There, James Wood, Bibb County's elected sheriff, criticized an ongoing grand jury investigation. *Id.* at 379. As a result of Wood's criticism, a state court convicted him of criminal contempt. *Id.* at 382–83.

The Supreme Court reversed his conviction, rejecting Georgia's argument that Wood's "right to freedom of expression must be more severely curtailed than that of an average citizen" because Wood was the elected sheriff. *Id.* at 393. The Court emphasized that Wood "was an elected official and had the right to enter the field of political controversy." *Id.* "The role that elected officials play in our society," the Court continued, "makes it all the more

imperative that they be allowed freely to express themselves." *Id.* at 395. In a footnote, the Court clarified that it was treating Wood differently from past petitioners because he "was not a civil servant, but an elected official." *Id.* at 395 n.21.

Four years later, the Supreme Court extended *Wood*'s holding to legislators. In *Bond v. Floyd*, the Supreme Court stressed that the "First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy." 385 U.S. 116, 136 (1966); *see also Republican Party of Minn. v. White*, 536 U.S. 765, 788 (2002) (extending this latitude to judicial candidates).

We remain skeptical about applying *Garcetti* to elected officials. But we decline to decide that question because the First Amendment protects Warren's signing the statements even if we assume *Garcetti* applies. Under *Garcetti*, Warren must have "spoke[n] as a citizen on a matter of public concern" to qualify for First Amendment protection. 547 U.S. at 418. By signing the statements, Warren spoke on a matter of public concern. Transgender rights and abortion are "subject[s] of general interest and of value and concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 (2014) (internal quotation marks omitted). We therefore focus our analysis on whether Warren spoke as a citizen or as a government employee.

To answer this question, we inquire into "whether the speech at issue 'owes its existence' to the employee's professional responsibilities." *Moss v. City of Pembroke Pines*, 782 F.3d 613, 618

(11th Cir. 2015) (quoting *Garcetti*, 547 U.S. at 421). The Supreme Court "declined to provide a 'comprehensive framework' for deciding this question." *Id.* (quoting *Garcetti*, 547 U.S. at 424). Like the Supreme Court, we have declined to outline specific criteria for this analysis. Instead, our past cases have suggested factors to consider.

Some cases have looked at three factors: "the employee's job description, whether the speech occurred at the workplace, and whether the speech concerned the subject matter of the employee's job." *Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1161 (11th Cir. 2015); *see also Moss*, 782 F.3d at 618. Other cases recharacterized those three factors as five considerations: whether a public employee was "(1) speaking with the objective of advancing official duties; (2) harnessing workplace resources; (3) projecting official authority; (4) heeding official directives; and (5) observing formal workplace hierarchies." *Fernandez v. Sch. Bd. of Miami-Dade Cnty.*, 898 F.3d 1324, 1332 (11th Cir. 2018).

The various formulations of these nondispositive factors underscores that *Garcetti* demands a practical inquiry. 547 U.S. at 424. The "controlling factor" remains whether the statements were made under Warren's "official duties." *Id.* at 421. When we analyze the facts here, three factors lead us to conclude that Warren did not sign the statements under his official duties.

The first factor is the nature of Warren's job and whether he spoke to advance official duties. Warren's job description comes from the Florida Constitution and Florida general law. The Florida Constitution assigns state attorneys the duty to prosecute cases in

all trial courts in their circuit. Fla. Const. art. V, § 17. It also requires state attorneys to "perform other duties prescribed by general law." *Id.* General law requires state attorneys to appear in court "and prosecute or defend on behalf of the state all suits." Fla. Stat. § 27.02. It charges them with attending grand juries, whenever required. *Id.* § 27.03. It mandates that they "represent the state in all cases of habeas corpus." *Id.* § 27.06. It imposes various other duties on them as well. *See generally id.* § 27.

Neither Florida's constitution nor other Florida law requires Warren to sign advocacy statements. We acknowledge that, as the Supreme Court observed in *Garcetti*, "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform." 547 U.S. at 424–25. No evidence, however, suggests that Warren is expected to sign, or not sign, advocacy statements.

And DeSantis cites no authority dictating that the advocacy statements "owe [their] existence to [Warren's] professional responsibilities." *Id.* at 421. He instead provides examples in which Warren and other state attorneys announced their prosecutorial priorities. But for *Garcetti* to apply, Warren must have "only spoke[n] about this issue because his job required him to speak about it." *King v. Bd. of Cnty. Comm'rs*, 916 F.3d 1339, 1346 (11th Cir. 2019); *see also Lane*, 573 U.S. at 240 ("The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties."). His job entails no such requirement.

The second factor is the nature of Warren's speech and its relationship to the workplace. Warren's speech occurred outside the workplace, and he never distributed the advocacy statements inside the workplace or included them in internal materials or training sessions. He employed no workplace resources and never marshaled the statements through his process for creating policies. Neither statement referenced any Florida law that would go unenforced.

DeSantis argues that because Warren used his official signature and title, the scales favor concluding that the messages were "official." *See Garcetti*, 547 U.S. at 422 (contrasting message's forms to aid in analysis). While our past cases have considered whether the speech "project[ed] official authority, *see Fernandez*, 898 F.3d at 1332, we have rejected treating that factor as dispositive, *see Leonard v. City of Columbus*, 705 F.2d 1299, 1301–03 (11th Cir. 1983) (holding that the First Amendment protected off-duty police officers' speech even when they were in uniform). So has the Supreme Court. *See Wood*, 370 U.S. at 394 (rejecting treating a signature and title as dispositive). Balancing Warren's use of his title against the fact that Warren never used workplace resources, heeded official directives, nor observed workplace hierarchies, we conclude this factor indicates that Warren spoke as a private citizen.

The third factor is Warren's status as an elected official. Often, elected officials speak as representatives of their constituents, not as "employees of the government." *Boquist v. Courtney*, 32 F.4th 764, 779 (9th Cir. 2022). The advocacy statements that Warren

signed expressed his views on policy—an action elected officials have the "widest latitude" to take. *Bond*, 385 U.S. at 136. Elected prosecutors, moreover, "are uniquely qualified to comment" on how prosecutors should exercise their discretion, a matter "concerning government policies that [is] of interest to the public at large." *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004).

Assuming that *Garcetti*'s government-speech doctrine applies to elected officials, we conclude that Warren's speech remains protected. Any other result would broaden *Garcetti*'s government-speech exception. Because that exception "must be read narrowly," *Alves*, 804 F.3d at 1162, we refuse to exempt the statements Warren signed from First Amendment protection.[7]

### 2.    Signing the Statements Did Not Impede Warren's Performance as State Attorney.

DeSantis's second argument is that Warren's speech impeded his performance as state attorney. This argument relies on

---

[7] We reject DeSantis's alternative method for identifying government speech. He argues that Warren engaged in government speech under the test applied in *Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022). But that case did not address circumstances in which a government actor speaks as a private citizen. *Shurtleff* concerned whether the city of Boston reserved a flagpole to communicate governmental messages or, instead, "opened the flagpole for citizens to express their own views." *Id*. at 248. It established, then, a "boundary between government speech and private expression [when] a government invites the people to participate in a program." *Id*. at 252. This case presents a very different scenario, and therefore *Shurtleff* is inapplicable.

the Supreme Court's opinion in *Pickering v. Board of Education*, which held that the First Amendment does not protect a government employee's speech that impedes his job duties. 391 U.S. 563, 572 (1968). We find this argument unconvincing because we doubt that *Pickering* applies to elected government officials, but even if it does apply, its balancing test favors Warren here.

In *Pickering*, the Supreme Court considered Marvin Pickering's claim that the Board of Education dismissed him from his teaching post because of his speech, violating his First Amendment rights. *Id.* at 564–65. The Board had submitted a tax increase proposal to voters. *Id.* at 566. Teachers wrote articles supporting the tax increase. *Id.* The superintendent wrote a letter to the local newspaper supporting the tax increase. *Id.* Pickering also wrote a letter to the local newspaper, but he disagreed with the other writers. *Id.* He attacked how the Board handled an earlier proposal and how it allocated financial resources. *Id.* His letter accused the superintendent of suppressing teachers' criticism. *Id.*

After the newspaper ran Pickering's letter, the Board dismissed him. *Id.* State law required that the board then hold a hearing on the dismissal. *Id.* During the hearing, the Board said that Pickering's false statements besmirched the Board and the school administration, damaged their professional reputations, would disrupt faculty discipline, and would foster controversy and conflict. *Id.* at 566–67. The Board found the statements false and upheld Pickering's dismissal. *Id.* at 567. The Illinois courts reviewed the proceedings and upheld the Board's decision. *Id.*

The Supreme Court reversed, holding that the First Amendment protected Pickering's speech because no evidence showed that he made the false statements knowingly or recklessly. *Id.* at 574. The Court first explained that the dilemma "in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568.

Applying that principle to Pickering's case, the Supreme Court considered Pickering's interest in sharing "informed and definite opinions" about school funding, "a matter of legitimate public concern." *Id.* at 571–72. It balanced that interest against the Board's interest. The Board never showed that the letter impeded Pickering's performance or interfered with school operations. *Id.* at 572–73. Its only remaining interest was "limiting [his] opportunities to contribute to public debate." *Id.* at 573. The Supreme Court found that unconvincing, and Pickering's interest prevailed. *Id.*

For years after *Pickering*, courts applied it to determine government employees' free speech rights. Now, we resort to *Pickering*'s balancing test only after deciding that *Garcetti*'s government-speech doctrine is inapplicable. *See Fernandez*, 898 F.3d at 1329. Our skepticism about applying *Garcetti* to elected officials extends to applying *Pickering* to elected officials.

The rationale undergirding *Pickering* does not support its application to elected officials. As we explained above, DeSantis does not manage Warren as a traditional employer would. When "the

State is not acting in a traditional employer role," "the *Pickering* test is inapplicable." *Harris v. Quinn*, 573 U.S. 616, 652 (2014). Every other circuit to have considered this issue has applied the Supreme Court's guidance in *Harris* and excluded elected officials from *Pickering* balancing. *See Boquist*, 32 F.4th at 780 (concluding that "the *Pickering* balancing test [does not] apply to an elected official's claim of First Amendment retaliation"); *Phelan v. Laramie Cnty. Cmty. Coll. Bd. of Trs.*, 235 F.3d 1243, 1247 (10th Cir. 2000) (concluding that "the *Pickering* approach does not apply" in part because the plaintiff was an "elected public official[]"); *Jenevein v. Willing*, 493 F.3d 551, 558 (5th Cir. 2007) (concluding that *Pickering* is inapplicable "for sorting the free speech rights of employees elected to state office").

Today, we decline to go that far because if we apply *Pickering*, the First Amendment still protects Warren's activity. No evidence suggests that the statements "impede[d] the government's ability to perform its duties efficiently." *See Morales v. Stierheim*, 848 F.2d 1145, 1149–50 (11th Cir. 1988) (determining that the government's interest outweighed the employee's interest when speech destroyed working relationships and "thwarted" the office's mission). Nor does any evidence suggest that the statements' time, place, manner, or context disrupted Warren's office. *See id.* at 1149.

DeSantis reasserts that Warren "shirked his obligations [and] barred line prosecutors from fulfilling their own." Appellee's Br. at 44. The record contradicts this, however. It shows the statements had no effect on the office's functions. As the district court explained, Warren neither distributed the statements to prosecutors

nor included them in training materials. His office also never encountered a transgender care or abortion-related case. Thus, Warren's interest outweighs the government's under *Pickering*'s analysis.

\*      \*      \*

Let us take stock. Warren carried his burden. He had to prove that he engaged in protected activity, he suffered an adverse action, and his protected activity motivated the adverse action. The First Amendment protects his signing the transgender care and abortion statements. Neither *Garcetti*'s government-speech doctrine nor *Pickering*'s balancing approach strips Warren's actions of First Amendment protection. Warren therefore engaged in protected activity. DeSantis suspended him, constituting an adverse action. And the transgender care and abortion statements—protected activity—motivated DeSantis to suspend Warren.

## B.   DeSantis's Same-Decision Defense

Once Warren carried his burden, *Mount Healthy* shifted the burden to DeSantis. 429 U.S. at 287. DeSantis had the opportunity to prove that he would have made the same decision without considering the protected activity. *See id.* This affirmative defense required DeSantis to prove that legitimate reasons motived his decision. *See Stanley v. City of Dalton*, 219 F.3d 1280, 1296 & n.27 (11th Cir. 2000).

To review, the district court found that six factors motivated DeSantis to suspend Warren: (1) Warren's political affiliation; (2) Warren's advocacy; (3) Warren's agreement with a sentence in

the abortion statement "commit[ting] to exercise [his] well-settled discretion and refrain from prosecuting those who seek, provide, or support abortions," Doc. 112-5 at 1; (4) Warren's adoption of the Low-Level Offense Policy and the Bike Policy; (5) Warren's performance as a reform prosecutor; and (6) the political benefit DeSantis would derive from suspending a reform prosecutor.[8] The district court then concluded that the First Amendment protected Warren's political affiliations and his advocacy, which provided the basis for factors one and two. It decided the First Amendment did not protect the rest of the activities, which provided the basis for factors three through six.

We discuss only three factors here. In explaining above how the First Amendment protects Warren's political advocacy, including the advocacy statements, we have already addressed the second factor. And Warren does not contest the district court's conclusion that the First Amendment does not cover the fourth factor, his adoption of the Low-Level Offense Policy and the Bike Policy, or the fifth factor, his performance as a reform prosecutor. We

---

[8] Warren argues that the district court erred by *sua sponte* attributing motives to DeSantis, thereby depriving Warren of notice and the opportunity to refute those motivations at trial. We cannot agree. DeSantis's Answer and his staff's assertions provided Warren with sufficient notice that the motivations relating to his Low-Level Offense Policy, Bike Policy, and performance were at issue. *See Chambless v. La.-Pac. Corp.*, 481 F.3d 1345, 1349 (11th Cir. 2007). Warren also argued and presented evidence supporting the district court's findings that Warren's political affiliations, Warren's advocacy, and DeSantis's anticipated political benefit motivated DeSantis.

proceed now to factors one, three, and six and explain how the First Amendment protects the activity behind each factor.

1.  The First Amendment Protects Warren's Political Affiliations.

The district court concluded that the First Amendment protects Warren's political affiliations. We agree. The First Amendment protects government employees from adverse employment actions based on partisan considerations. *See Elrod v. Burns*, 427 U.S. 347, 360 (1976) (plurality opinion); *Branti v. Finkel*, 445 U.S. 507, 517 (1980). The Supreme Court has carved out an exception for "policymaking" employees whose "private political beliefs would interfere with the discharge of [their] public duties." *Branti*, 445 U.S. at 517. But whether the "policymaker" label "fits a particular position" is not "the ultimate inquiry"; "rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* at 518.

The policymaker exception does not apply here. The exception exists because a hiring authority "may appropriately believe that the official duties of various assistants who help him write speeches, explain his views to the press, or communicate with the legislature cannot be performed effectively unless those persons share his political beliefs and party commitments." *Id.* No such concern exists with an independently elected state attorney, whom the Hillsborough County voters selected to serve their interests—not DeSantis's.

DeSantis, though, maintains that the policymaker exception applies. But every case on which he relies applies the exception in a lawsuit between a hiring officer or authority, on the one hand, and a hired person, on the other. Here, we have two elected officials.

Our sister circuit explained it well: "Elections mean something. Majorities bestow mandates. Elected prosecutors translate those mandates into policies." *Borzilleri v. Mosby*, 874 F.3d 187, 192 (4th Cir. 2017). Voters elected Warren; DeSantis did not appoint him. If alignment with DeSantis's political preferences were an appropriate requirement to perform the state attorney's duties, there would be little point in local elections open to candidates across the political spectrum. The rationale for the policymaker exception simply does not apply here. The First Amendment thus protects Warren's political affiliations.

2.    The First Amendment Protects the Sentence in the Abortion Statement.

The district court singled out a sentence in the abortion statement, classifying it as unprotected conduct. In this sentence, the statement's signatories "commit[ted] to exercise [their] well-settled discretion and refrain from prosecuting those who seek, provide, or support abortions." Doc. 112-5 at 1. We conclude that Warren's agreement with this sentence qualified as protected speech for two reasons.

First, the First Amendment protects statements of future conduct. The district court ruled that the sentence could

reasonably be construed as a "statement of future conduct, not protected speech." Doc. 150 at 47. But the premise underlying the district court's ruling, that a statement about future conduct could never be protected speech, is incorrect. The Supreme Court has never stripped a statement of future conduct of First Amendment protection simply because it expresses future conduct. Rather, it has crafted doctrines distinguishing statements of future conduct from other, unprotected categories.

Consider *Brandenburg v. Ohio*, 395 U.S. 444 (1969). There, a Ku Klux Klan leader threatened to take "revengeance" against the government and expressed his intent to march on Washington. *Id.* at 446. He made statements of future conduct, promising that "[w]e are marching on Congress July the Fourth, four hundred thousand strong." *Id.* After Ohio convicted the speaker of criminal syndicalism, the Supreme Court reversed. The Court held that the First Amendment prevented Ohio from punishing "mere advocacy." *Id.* at 449. Put another way, the First Amendment protected the statements so long as they did not rise to the level of incitement or fall into another unprotected category. *See also Virginia v. Black*, 538 U.S. 343 (2003) (distinguishing a protected statement of future conduct from an unprotected true threat).

Neither *Brandenburg* nor *Black*, nor the unprotected categories they defined, would be necessary if statements of future conduct categorically lacked First Amendment protection. But they are necessary because the First Amendment does protect statements of future conduct unless they fall into an unprotected category.

DeSantis has failed to identify an unprotected category for the sentence, so the First Amendment presumptively protects it.

Second, the First Amendment protects the sentence when analyzed in context. The district court plucked one sentence out of a three-page statement, analyzing it "standing alone." Doc. 150 at 48. But "[t]he First Amendment does not permit such a shortcut." *Black*, 538 U.S. at 367. Rather, courts must assess "all of the contextual factors that are necessary to decide" whether statements fall outside the First Amendment's bounds. *Id.*; *see also Connick v. Myers*, 461 U.S. 138, 147–48 (1983) (Whether speech is protected speech or unprotected government speech "must be determined by the content, form, and context of a given statement, as revealed by the whole record."). The whole abortion statement provides the context within which courts should assess the sentence.

We explained above why the First Amendment protects the abortion statement. That protection extends to the sentence the district court singled out. The sentence does not lose First Amendment protection because of the government-speech doctrine. And it does not lose protection because of *Pickering* balancing.

When analyzed within its context, Warren's act of signing onto an advocacy statement that had a sentence expressing signatories' "commit[ment] to exercise [their] well-settled discretion and refrain from prosecuting those who seek, provide, or support abortions" enjoys First Amendment protection. Doc. 112-5 at 1. Rather than making a policy decision, Warren made a protected statement of future conduct.

3.      The First Amendment Protects Warren from Decisions Based Solely on Political Benefit.

The district court concluded that DeSantis did not violate the First Amendment when anticipated political benefit motivated his suspension decision. We disagree. We do agree, though, with the district court's intermediate conclusions: that the First Amendment does not protect a state attorney's policies and prosecutorial decisions and that, without more, considering an action's anticipated political benefit does not transform an otherwise lawful adverse action into First Amendment retaliation.

Here is where we part ways with the district court: the anticipated political benefit cannot be based on protected activity. Put another way, if a government actor's controlling motivation behind an adverse action is gaining political benefit from punishing protected activity, the government actor flouts the First Amendment. *Cf. Elrod*, 427 U.S. at 349; *Branti*, 445 U.S. at 508; *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 64 (1990).

The proper analysis therefore focuses on whether DeSantis sought to reap political benefit from punishing Warren's unprotected activities or sought to reap political benefit from punishing Warren's protected activities. The First Amendment protects only the second scenario, not the first.

The district court found that DeSantis sought political benefit from "bringing down a reform prosecutor." Doc. 150 at 57. It made clear throughout its opinion that DeSantis's anticipated political benefit derived from Warren's advocacy and reputation as a

reform prosecutor. The district court referred to Warren's performance as a reform prosecutor, but its findings tell a different story.

The district court's findings show that DeSantis never suspended Warren because DeSantis disagreed with his actual office policies or case decisions. Keefe never looked for deficient performance or neglect of duty; instead, he looked for indications "associated with reform prosecutors." *Id.* at 54. Keefe never sought information about Warren's policies or details of his case decisions because "he already knew all he needed to know: Mr. Warren was the leading Florida reform prosecutor." *Id.* at 55. Keefe urged the suspension along because Warren "was a reform prosecutor." *Id.* On these facts, DeSantis based Warren's suspension on his reputation as a "reform prosecutor." DeSantis's political benefit was solely derived from Warren's political ideology.

The First Amendment prevents DeSantis from identifying a reform prosecutor and then suspending him to garner political benefit. On remand, the district court should reconsider whether DeSantis would have made the same decision based solely on unprotected activities.[9]

---

[9] Because we conclude that the First Amendment protects Warren, we decline to address Warren's argument that DeSantis's anticipated political benefit cannot supply the legitimate reason *Mount Healthy* requires because considering political benefit violates state law.

### C.    DeSantis's Probable Cause Argument

Before closing, we must address one more argument DeSantis raises. He argues that to maintain a First Amendment retaliation claim, Warren must make a threshold showing that DeSantis lacked probable cause for the suspension. The district court rejected this argument, concluding that DeSantis lacked probable cause and that probable cause would be insufficient to defeat Warren's claim. We decline to decide whether probable cause would defeat Warren's claim because, even if it would, DeSantis lacked probable cause.

"[C]ourts have identified two general approaches to retaliation claims against government actors . . . ." *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1289 (11th Cir. 2019). When a government employee alleges retaliation by her employer, we use the first approach, which the Supreme Court outlined in *Mount Healthy*. This approach, applied above, generally "looks to whether the defendant governmental employer's retaliatory motivation was the but-for cause of the adverse employment decision." *DeMartini*, 942 F.3d at 1289. When the defendant "arrest[s] or prosecute[s] the plaintiff," we apply the second approach, which generally requires a showing that the defendant lacked probable cause. *Id.* Under the second approach, the plaintiff must show the defendant lacks probable cause and succeed under *Mount Healthy*'s burden-shifting framework to obtain relief. *See Nieves*, 139 S. Ct. at 1725.

DeSantis urges that we apply the second approach. We need not decide whether we should because Warren showed that

46                          Opinion of the Court                          23-10459

DeSantis lacked probable cause for the suspension. *See DeMartini*, 942 F.3d at 1300. To have probable cause for the suspension, DeSantis must have reasonably believed that Warren established blanket nonprosecution policies sufficient to constitute neglect of duty or incompetence.

DeSantis could not have reasonably believed that. The district court found that Warren's office had no blanket policies prohibiting discretion. The court found that "any minimally competent inquiry would have confirmed this." Doc. 150 at 15. The Low-Level Offense Policy and the Bike Policy required prosecutors to consider case-specific facts when making charging decisions. The Discretion Policy, which Chronister provided to Keefe, emphasized the need to exercise prosecutorial discretion at every stage of every case. DeSantis, moreover, "has been unable to identify even a single case in which" Warren's office failed to exercise individualized discretion. *Id.* at 53.

DeSantis cites decisions evaluating probable cause in the wrongful arrest context to argue that the district court erred in its probable cause analysis. But his reliance on these cases is misplaced. In the wrongful arrest context, unlike the suspension context, officers make "quick decisions in circumstances that are tense, uncertain, and rapidly evolving." *Nieves*, 139 S. Ct. at 1725 (internal quotation marks omitted). And even in the arrest context, "an officer may not 'unreasonably disregard certain pieces of evidence' by 'choosing to ignore information that has been offered to him or her' or 'electing not to obtain easily discoverable facts' that might

tend to exculpate a suspect." *Cozzi v. City of Birmingham*, 892 F.3d 1293, 1294 (11th Cir. 2018) (alterations adopted) (quoting *Kingsland v. City of Miami*, 382 F.3d 1220, 1230 (11th Cir. 2004)), *abrogated on other grounds by Washington v. Howard*, 25 F.4th 891 (11th Cir. 2022); *see also Kingsland*, 382 F.3d at 1230 (concluding officers lacked arguable probable cause where "officers consciously and deliberately did not make an effort to uncover reasonably discoverable, material information"), *abrogated on other grounds by Williams v. Aguirre*, 965 F.3d 1147 (11th Cir. 2020).

DeSantis was under no pressure to suspend Warren. Eight months elapsed between when Keefe first learned about Warren and when DeSantis suspended him. It took about three weeks for DeSantis's staff to finalize the executive order alone. What is more, his staff ignored readily available information contradicting the purported basis for the suspension. As the district court found, Keefe "made no effort" to determine how Warren's office implemented the Low-Level Offense Policy or the Bike Policy because he "did not wish to know." Doc. 150 at 55. He made no effort to determine whether the advocacy statements affected the office's functions. And although DeSantis's attorneys knew of Warren's subsequent statements that prosecution decisions in every case, including abortion cases, depended on the case's circumstances, DeSantis's attorneys ignored them. Even in the arrest context, although officers need not "explore and eliminate every theoretically plausible claim of innocence," they cannot ignore readily available information as DeSantis did here. *Kingsland*, 382 F.3d at 1229 (internal quotation marks omitted). Because DeSantis lacked probable

cause to believe Warren neglected his duty or was incompetent, we do not address whether probable cause would have defeated Warren's claim.[10]

## IV.    CONCLUSION

We vacate and remand to the district court for further pro-ceedings consistent with this opinion. On remand, the district court should reexamine whether DeSantis would have suspended War-ren based solely on the unprotected activities that motivated the suspension: Warren's performance, his Low-Level Offense Policy, and his Bike Policy.

**VACATED and REMANDED.**

---

[10] DeSantis argues that even if Warren prevails on the merits of his claim, the district court lacks the authority to reinstate Warren. We reject this argument. The Eleventh Amendment permits federal courts to remedy First Amendment violations. *See Ex parte Young,* 209 U.S. 123, 159–60 (1908); *see also Brown v. Ga. Dep't of Revenue,* 881 F.2d 1018, 1023 (11th Cir. 1989) ("The determinative ques-tion is . . . whether the relief was ordered pursuant to state or federal law."); *Lane v. Cent. Ala. Cmty. Coll.,* 772 F.3d 1349, 1351 (11th Cir. 2014) (holding that *Ex parte Young* permits reinstatement).

23-10459            Newsom, J., Concurring            1

NEWSOM, Circuit Judge, concurring:

During a recent presidential debate, Florida Governor Ron DeSantis lamented that, in his view, other contenders for the Republican nomination weren't "willing to stand up and fight back against what the Left is doing to this country." As evidence that he would do so, DeSantis boasted that he had "beat[en] the teachers' unions when [he] did school choice," that he had "beat[en] Fauci on COVID," and, as relevant here, that he had "beat[en] George Soros when [he] removed two of his radical district attorneys." Andrew Warren was one of the DAs whom DeSantis removed. The question before us today is whether, in doing so, DeSantis violated the First Amendment.

As the majority explains, the district court concluded (1) that six different factors motivated DeSantis's decision to suspend Warren—two of which the court found impermissibly focused on protected First Amendment activity and four of which didn't, and (2) that DeSantis would have suspended Warren based on the unprotected factors alone. *See* Maj. Op. at 2–3. As the majority also explains, among the considerations that the district court identified was Warren's joinder in the Fair and Just Prosecution organization's statement advocating abortion rights and condemning the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022). *See id.* at 7–9. The district court found that the bulk of that statement—and thus Warren's endorsement of it—constituted pure political speech and, therefore, that it couldn't validly serve as a basis for DeSantis's action. But, the court

held, "one sentence in the FJP abortion statement" was "on a different footing."  Doc. 150 at 47.  In that sentence, signatories "decline[d] to use [their] offices' resources to criminalize reproductive health decisions and commit[ted] to exercise [their] well-settled discretion and refrain from prosecuting those who seek, provide, or support abortions."  Doc. 112-5 at 1.  "[S]tanding alone," the district court held, that sentence—which I'll call the abortion-related "commitment"—constituted "a statement of future conduct, not protected speech," and thus served as a valid ground for Warren's suspension.  Doc. 150 at 47–48.

At first glance, the district court's conclusion seems sensible enough—namely, that Warren's so-called "commitment" was precisely the sort of "blanket" non-prosecution policy that DeSantis had targeted, and precisely the sort of "performance" in office that the First Amendment doesn't reach.  *See id.* at 1, 3, 43, 52 (referring to DeSantis's focus on "blanket" non-prosecution policies); *id.* at 44 (noting that Warren's "[a]ctual [p]erformance" in office isn't protected First Amendment activity).  But a closer look, particularly one that properly accounts for context, reveals that the sentence the district court isolated was neither a "blanket" statement of any kind nor a "policy" of any sort.  Nor was it an instance of Warren "perform[ing]" his job duties.  For better or worse, it was an expression of pure political speech made by an elected government official, and thus entitled to full First Amendment protection.

Because in balancing the six factors it identified the district court put Warren's abortion-related "commitment"—and,

relatedly, the "political benefit" that DeSantis might reap from his suspension of Warren—on the wrong side of the ledger, its analysis suffers from (my term) an "input" error. Accordingly, the majority today correctly reverses and remands the case for a re-weighing.

## I

As an initial matter, the district court's focus was too granular. It's clear from the court's analysis that it examined the "single sentence" in the FJP's abortion statement "standing alone." Doc. 150 at 48; *see also id.* at 41, 45, 47, 53, 58 ("the one sentence"). But as in all interpretive enterprises, "context is king." *Wachovia Bank, N.A. v. United States*, 455 F.3d 1261, 1267 (11th Cir. 2006). And indeed, that is perhaps especially true when First Amendment freedoms are at stake. *See, e.g.*, *Virginia v. Black*, 538 U.S. 343, 367 (2003) (directing courts to assess "all of the contextual factors that are necessary to decide" whether statements fall within the First Amendment's bounds); *Connick v. Myers*, 461 U.S. 138, 147–48 (1983) (explaining that whether speech is protected "must be determined by the content, form, and context of a given statement, as revealed by the whole record").

Evaluated in the proper context—provided both by the document itself and by the surrounding circumstances of which DeSantis and his deputies were aware—it's clear that the "commitment" wasn't a "policy" at all, let alone a "blanket" one. Nor was it constitutionally unprotected job "performance." It was pure speech, which—whether one agrees with its import or not—enjoys First Amendment protection.

## A

First and foremost, although the question isn't free from ambiguity, I don't think that the "commitment" sentence in the FJP abortion statement is properly understood as a statement of official "policy."

There are admittedly a few aspects of the FJP statement that give off official-policy vibes. For instance, (1) Warren signed the letter using his official title; (2) the statement purports to represent his views as an "elected prosecutor[]"; (3) by definition, only a prosecutor acting in his or her official capacity can decide whether to charge a crime; and (4) the letter makes representations about the use of "our offices' [*i.e.*, public] resources." Doc. 112-5 at 1.

On balance, though, it seems clear to me that no part of the FJP's abortion-related statement—including the "commitment"—constituted official policy. That is true for both procedural and substantive reasons.

First, procedure. As the majority opinion explains, the record shows that Warren used a specific process whenever he adopted a formal office policy: "Th[at] process involved consulting an executive committee, on which senior prosecutors served; drafting and revising the policy . . . and informing managers about it; and, finally, training on the new policy." Maj. Op. at 5. Warren then "collected his policies in a guidebook provided to prosecutors in his office and available on an internal [web]site." *Id.*; *accord* Doc. 150 at 9–10 (noting that "office policies" were "circulated to all the prosecutors and collected in a guidebook").

23-10459            Newsom, J., Concurring            5

Tellingly, that's precisely the process Warren used to adopt and implement other office policies at issue in this case, including the Bike and Low-Level-Offense Policies.  When formulating the Bike Policy, for example, Warren and his executive committee met with local sheriffs and police chiefs to discuss the pertinent issues and to solicit input that he then incorporated.  That policy was then formalized, memorialized in writing, and posted on the office's internal website.  So too, the Low-Level-Offense Policy was researched and drafted with the input of local law enforcement and, as with Warren's other policies, was then formally "approved" and posted to the office's internal website.

Notably, *none* of that formality attended Warren's joinder in the FJP's abortion-related statement or its "commitment" sentence.  As the district court correctly explained, the statement was "not presented to or approved by the executive committee," was "not adopted through the process in place for establishing policies—the process that had led to approval of the [B]ike and [L]ow-[L]evel-[O]ffense [P]olicies," was "not circulated within the office or included in the guidebook," and was "not posted on the office website"—and, therefore, "did not set out policy of the Thirteenth Judicial Circuit State Attorney's Office."  Doc. 150 at 39–40.  Moreover, as the district court also correctly explained, joining the FJP statement wasn't part of Warren's "official duties" or "official responsibilities" but, rather, was "simply [a] political statement[] that Mr. Warren subscribed to individually and with which he generally agreed."  *Id*.  Warren, the district court said, joined the FJP's abortion-related statement "on his own, as an advocate, not within the

course and scope of this duties." *Id*. at 41. It's hard for me to understand how the district court could have found *all* that to be true—as I think it is—and yet come to the conclusion that Warren's joinder in the FJP statement's "commitment" sentence constituted an act of unprotected policymaking.

Second, and separately, there's the substance of the FJP's abortion-related statement itself, which was released the day that the Supreme Court issued its opinion in *Dobbs* and lamented the Court's "decision to end the federally protected constitutional right to abortion." Doc. 112-5 at 1. When read in context—that is, when properly situated within the entire document—it's clear that the single-sentence "commitment" is, like the balance of the statement, pure political advocacy protected by the First Amendment. Here, for example, are the sorts of contentions that surrounded the lone sentence on which the district court focused:

- "[W]e have watched with increasing concern as the constitutional right to abortion has been threatened and eroded."

- "[A]t the heart of the pursuit of justice is the furtherance of policies and practices that protect the well-being and safety of *all* members of our community."

- "Criminalizing abortion will not end abortion; it will simply end *safe* abortion, forcing the most vulnerable among us—as well as medical providers—to make impossible decisions."

- "Abortion bans will isolate people from the law enforcement, medical, and social resources they need."

- "Abortion bans will also disproportionately harm victims of sexual abuse, rape, incest, human trafficking, and domestic violence."

- "We are horrified that some states have failed to carve out exceptions for victims of sexual violence and incest in their abortion restrictions; this is unconscionable."

- "Keeping communities safe inherently requires promoting trust and faith in the integrity of the rule of law."

- "Criminalizing and prosecuting individuals who seek or provide abortion care makes a mockery of justice; prosecutors should not be part of that."

*Id.* at 1–3.

In short, the FJP's statement was, as the district court observed, "chock full of core political speech"—in particular, pro-choice, pro-*Roe*, anti-*Dobbs* speech. Doc. 150 at 36. If context really *is* king—if words and phrases really *are* known by the company they keep—then it seems clear to me that the single-sentence abortion "commitment" is likewise best understood as a statement of political advocacy, not a declaration of office policy.

**B**

Even if the abortion-commitment sentence could be understood as having promulgated a formal policy, it certainly wasn't a

"blanket" policy of the sort that DeSantis said justified Warren's suspension.  *See, e.g.*, *id.* at 1, 3, 43, 52.  The district court found as fact that "[j]ust four days" after signing onto the FJP statement, Warren "made clear in an interview on local television station FOX-13 that he would exercise discretion whether to prosecute any abortion case that came to the office—none ever had—just as the office exercised discretion in every other case of every other kind." *Id.* at 19.  Specifically, Warren explained that he would decide whether to prosecute abortion crimes based on the "facts and cir-cumstances of every case." *Id.* at 23.  The district court further found that in the same interview Warren "said he would follow court rulings on the newly enacted Florida abortion statute, 'HB5,' which banned abortions after 15 weeks of pregnancy." *Id.* at 19.

The district court *also* found as fact that "[t]he Governor's office knew about Mr. Warren's statements" clarifying his position on abortion-related matters.  *Id.*  In particular, the court found that DeSantis's general counsel originally included in the draft order suspending Warren a "sentence acknowledging [his] statement in the FOX-13 interview that he would exercise discretion whether to prosecute abortion crimes based on the 'facts and circumstances of every case,'" but that the acknowledgment was eventually "re-moved from the draft" when it couldn't be convincingly explained. *Id.* at 23.

So the best evidence indicates—and the district court's own findings demonstrate—that Warren's joinder in FJP's abortion-re-lated "commitment" was never made a formal office policy, let

alone a "blanket" policy of the sort that DeSantis emphasized as the basis for Warren's suspension.

## II

This conclusion—that the abortion-related "commitment" sentence was neither official policy nor on-the-job performance, but rather pure speech entitled to First Amendment protection—rings especially true given that Warren was an elected official addressing a matter of intense political interest.

The Supreme Court has repeatedly emphasized, as a general matter, that "First Amendment protection is 'at its zenith'" when applied to "core political speech." *Meyer v. Grant*, 486 U.S. 414, 420, 425 (1988); *see also, e.g.*, *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (emphasizing the country's "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open"). It would be an understatement to say that during the last 50 years no issue has captured the political imagination—and been the topic of more vigorous political debate—than abortion.

The Court has also stressed, more specifically, that "[t]he role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance." *Wood v. Georgia*, 370 U.S. 375, 394–95 (1962) (so holding in a case involving an elected sheriff); *see also, e.g.*, *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 478 (2022) ("The First Amendment surely promises an elected representative . . . the right to speak freely on questions of government

policy."). And *why* must elected officials like Warren "be given the widest latitude to express views on issues of social policy"? To serve "[t]he manifest function of the First Amendment in a representative government." *Bond v. Floyd*, 385 U.S. 116, 135–36 (1966). Warren wasn't just an elected official, he was also a once and likely future candidate for office. And "[w]hatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs[,] . . . of course includ[ing] discussions of candidates." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). And, to close the loop, that makes sense, because "[i]n a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation." *Buckley v. Valeo*, 424 U.S. 1, 14–15 (1976).

Bottom line: The Supreme Court has made clear—for reasons that cut to the core of our representative democracy—that the First Amendment safeguards elected officials' right to express their views on salient political issues. Whatever one thinks of Warren's particular views about abortion, he is no less entitled to that protection.

### III

The First Amendment is an inconvenient thing. It protects expression that some find wrongheaded, or offensive, or even ridiculous. But for the same reason that the government can't muzzle

so-called "conservative" speech under the guise of preventing on-campus "harassment," *see Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022), the state can't exercise its coercive power to censor so-called "woke" speech with which it disagrees. What's good for mine is (whether I like it or not) good for thine.[1]

---

[1] There is one loose end: The district court correctly acknowledged in its opinion that "[t]he Eleventh Amendment prohibits a federal court from awarding declaratory or injunctive relief of the kind at issue against a state official based only on a violation of state law." Doc. 150 at 59; *see also, e.g., Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984); *Williams v. Reeves*, 954 F.3d 729, 734, 739–41 (5th Cir. 2020) (holding that *Pennhurst*'s bar applies to requests for declaratory, as well as injunctive, relief). And yet, it *repeatedly* "declar[ed]" its view of Florida law. *See, e.g.*, Doc. 150 at 44 ("These other factors could not properly be the basis for a suspension under the Florida Constitution …."), 45 ("[U]nder the Florida Constitution, a governor cannot properly suspend a state attorney just for implementing a reform-prosecutor agenda …."), 49 ("The bike and low-level-offense policies were not blanket nonprosecution policies, and under the Florida Constitution, they were not a legitimate basis for suspending Mr. Warren."), 50 ("[B]eing a Democrat or accepting legal political contributions is plainly not a legitimate basis for a suspension under the Florida Constitution."), 51 ("The Florida Constitution does not allow a governor to suspend a state attorney to achieve a political benefit for the governor."), and 59 ("The suspension . . . violated the Florida Constitution."). On remand, the district court should avoid such unnecessary (and impermissible) asides regarding the consistency of Governor DeSantis's conduct vis-à-vis Florida law.

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

### ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

January 11, 2024

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  23-10459-AA
Case Style:  Andrew Warren v. Ron DeSantis
District Court Docket No:  4:22-cv-00302-RH-MAF

Electronic Filing
All counsel must file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause. Although not required, non-incarcerated pro se parties are permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing are available on the Court's website.

Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, <u>costs taxed against the appellee</u>.

Please use the most recent version of the Bill of Costs form available on the court's website at <u>www.ca11.uscourts.gov.</u>

<u>Clerk's Office Phone Numbers</u>

| | | | |
|---|---|---|---|
| General Information: | 404-335-6100 | Attorney Admissions: | 404-335-6122 |
| Case Administration: | 404-335-6135 | Capital Cases: | 404-335-6200 |
| CM/ECF Help Desk: | 404-335-6125 | Cases Set for Oral Argument: | 404-335-6141 |

OPIN-1A Issuance of Opinion With Costs